**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **PAUL J. MANAFORT, Jr., and RICHARD W. GATES III,** | **Crim. No. 17-201-1 (ABJ)** |
| **Defendants** | |

**GOVERNMENT'S MEMORANDUM IN RESPONSE TO**
**DEFENDANT MANAFORT'S MOTION TO MODIFY RELEASE CONDITIONS**

The United States of America, by and through Special Counsel Robert S. Mueller III, submits this memorandum in response to defendant Manafort's motion to modify his conditions of release (ECF#32). While the government continues to work with Manafort's counsel on an acceptable bail package, as of this writing Manafort has not yet substantiated his net worth or provided sufficient documentation to establish the value of the property and assets he proposes to secure a modified bond.

The government has argued at each stage of these proceedings that the defendant constitutes a risk of flight in light of the serious charges against him, the weight of the evidence, and his financial status and ties abroad, and that he should be released only on conditions or a combination of conditions sufficient to reasonably assure his appearances as required by law. Manafort correctly notes in his filing that the parties have had discussions about his proposed package, but those discussions are best described as ongoing, and the government is not prepared to consent to a change in the current conditions of release at least until Manafort provides a full accounting of his net worth and the value of the assets that he proposes to pledge as part of his bail package.

To expedite this process, the government sets forth the conditions under which it would consent to pretrial release, which would supplement any and all standard requirements imposed by the Court and Pretrial Services:

- a $10 million bond secured by two financially responsible sureties and real property or additional assets.[1]

- Mr. Manafort will not apply for any passport or travel card and has surrendered all of the same.

- Mr. Manafort will only travel to Virginia, NY, and Florida, and may not travel overseas.

- Mr. Manafort will report to Pretial Services once a week as directed; and

- Mr. Manafort has not and will not seek to encumber his assets proposed as bail since the date of his arrest, or to transfer assets overseas.

Only the financial conditions in the first bullet are now at issue. As described below, Manafort has not yet provided sufficient information to substantiate the value of the properties he proposes to use as security, nor has he sufficiently substantiated his claimed net worth in a manner that gives the government confidence about the appropriate amount of assets necessary to secure the bond.

## I.        MANAFORT POSES A RISK OF FLIGHT

The government briefly responds below to Manafort's risk-of-flight arguments, but relies principally on our October 31, 2017 Memorandum in Support of Conditions of Release (ECF#14, hereinafter "Gov't Mem.").

   *A. Nature and circumstances of the offense.* In addressing the nature and circumstances of the charged offense, Manafort suggests that the allegations supporting the money laundering conspiracy are somehow unusual because they involve the movement of funds into the United

---

[1] The government does not oppose either Kathleen Manafort or Andrea Manafort as sureties here. Further, the government reserves the right to adjust the bond amount it believes to be appropriate based on the defendant's accounting of his net worth.

States, rather than movement from the United States to offshore accounts; argues that the indictment implies that he committed tax crimes but fails to charge specific offenses under Title 26; and asserts that criminal violations of the Foreign Agents Registration Act (FARA), 22 U.S.C § 618(a), are rarely charged. ECF#32 at 4, 6-7. None of these arguments calls into question the validity of the charges, or their seriousness.

As an initial matter, there is nothing "novel" (ECF#32 at 6) about international money laundering charges based on the transmission of funds into the United States. *See* 18 U.S.C. § 1956(a)(2)(A). Section 1956(a)(2)(A) plainly proscribes knowingly transmitting or transferring monetary instruments or funds "to a place in the United States from or through a place outside the United States" when the defendant acts with the intent to promote the carrying on of a specified unlawful activity—that is, when the defendant conducted or attempted to conduct the financial transaction for the purpose of making it easier or helping to bring about the specified unlawful activity. Second, both the Count 1 conspiracy against the United States and the Count 2 money laundering conspiracy do involve Title 26 tax offenses, the latter explicitly so. Indictment ¶ 41 (referencing 26 U.S.C. §§ 7201 and 7206). And third, while criminal charges under FARA are not often brought, the facts set forth in the indictment indicate the gravity of the violation at issue based on the dollar volume of earning from the violation, its longevity, its maintenance through creation of a sham entity designed to evade FARA's requirements, and its continuation through lies to the FARA unit.

Finally, it is noteworthy that Manafort does not contest either the statutory maximum penalties for the charged offenses or the government's estimate of the applicable (and advisory) sentencing guidelines ranges for these offenses, which for Manafort would be 151 to 188 months' imprisonment. *See* Gov't Mem. 5-6. As the government has previously explained, both of these

objective measures of the seriousness of charged offenses contribute significantly to the risk-of-flight analysis.  *Id.* at 6-7 (citing cases from this district).[2]

**2.  *Weight of the evidence*.**  Manafort also fails to meaningfully challenge the "weight of the evidence" set forth in the indictment and the government's prior submission.  *See* 18 U.S.C. § 3142(g)(2).  He does not dispute his work in the Ukraine and his use of offshore accounts, and he does not address (or dispute) any of the documentary evidence cited in the indictment, or his failure to timely report his conduct or submit reports to the Department of Justice or to the Treasury Department.  In short, he refutes in no way the government's showing that the weight of evidence against him is strong.

**3.  *History and characteristics of the defendant*.**  The parties appear to be in agreement on the aspects of Manafort's history and characteristics relevant to his risk of flight.  Manafort agrees, as the government has previously showed (Gov't Mem. 11), that he has "considerable wealth," ECF#32 at 7.  He admits that he has extensive ties abroad and travels frequently.[3]  And Manafort does not dispute that he used multiple Cyprus-based accounts (although he does not address, much

---

[2]  Like codefendant Richard Gates, Manafort attempts to distinguish the government's reliance on *United States v. Anderson*, 384 F. Supp. 2d 32 (D.D.C. 2005), by emphasizing certain facts that led the court in that case to order the defendant detained pending trial.  But Manafort does not, and cannot, dispute that *Anderson* and other decisions in this district stand for the proposition that offenses carrying significant penalties and demonstrating a defendant's familiarity with sophisticated international financial transactions evince a flight risk.  *See Anderson*, 384 F. Supp. 2d at 35-36 (finding flight risk based in part on defendant's familiarity with commercial law of other countries and his "sophistication in arranging international financial transactions and in moving money across borders"); *United States v. Saani*, 557 F. Supp. 2d 97,  98-99 (D.D.C. 2008) (explaining relevance to flight risk of the defendant's being charged with "a crime of deception" that showed his "ability to support himself overseas" and his "alleged access to funds in foreign bank accounts").

[3]  The parties do dispute one minor factual point: Manafort claims that his work in the Ukraine ended in 2014, ECF#32 at 3, while the indictment alleges his continued work through 2015 on behalf of the Opposition Bloc, after the flight to Russia of President Victor Yanukovych.  Indictment ¶ 1.

less explain, his use of more than a dozen shell companies in a variety of names to effectuate the various transfers to the United States). As the government has argued (Gov't Mem. 10-13), these factors all point toward a risk of flight.

## II.   MANAFORT'S PROPOSED BAIL PACKAGE REMAINS INSUFFICIENTLY SUBSTANTIATED TO WARRANT MODIFICATION OF HIS CONDITIONS OF RELEASE

Manafort seeks to secure his bond by (1) pledging real property and a life insurance policy and (2) having family members serve as sureties. ECF#32 at 7-8. That proposal implicates two provisions of the Bail Reform Act, 18 U.S.C. § 3142(c)(1)(B)(xi) and (xii).

First, the Act authorizes courts to condition a defendant's pretrial release on the execution of "an agreement to forfeit upon failing to appear as required, property of a sufficient unencumbered value, including money, as is reasonably necessary to assure the [defendant's] appearance . . . as required." 18 U.S.C. § 3142(c)(1)(B)(xi) (further stating that the defendant "shall provide the court with proof of ownership and the value of the property along with information regarding existing encumbrances as the judicial office may require"). Second, courts may condition release on "execut[ion of] a bail bond with solvent sureties[,] who will execute an agreement to forfeit in such amount as is reasonably necessary to assure appearance of the person as required." *Id.* § 3142(c)(1)(B)(xii). The statute requires that the sureties have "a net worth [of] sufficient unencumbered value to pay the amount of the bail bond," and that the proposed sureties "provide the court with information regarding the value of the assets and liabilities . . . and the nature and extent of encumbrances against the surety's property." *Id.*; *see also* Fed. R. Crim. P. 46(e) (setting forth requirements for sureties).

Here, Manafort has pledged two properties in Manhattan, New York (5th Avenue and Baxter Street), and a third property in Palm Beach Gardens, Florida, as well as various life insurance policies.[4]  We address each property and the proposed assets below:

### A. 5th Avenue, New York, NY (claimed net asset value $3 million):

The government does not presently have sufficient information to assess the claimed net asset value of this property, or even to be confident that the property has equity in it at all.  Based on communications with Manafort's counsel, the government understands that the $3 million net asset value is based on a fair market value of $6 million, reduced by a $3 million mortgage on the property obtained from UBS.  This fair market value is not, however, backed by an appraisal or even any open source estimates (which in many cases may not be particularly accurate).  Rather, Manafort provided the government with an open source estimate for a different unit in the building, listed as approximately $4.5 million, which Manafort believes is below the fair market value of his own unit, which is on a higher floor.  Meanwhile, the government has searched open source real estate value estimators and found one that lists the value of Manafort's own unit as $2.5 million, and another that lists the value as $2.7 million.

Until an independent appraisal of the property is obtained, the government cannot agree that this property is appropriate as a security.

---

[4] The government has been in discussions with Manafort's counsel, both before and after Manafort's submission to the Court on Saturday, about other properties that might be pledged, including real estate in Alexandria, Virginia and the Hamptons.  The government does not presently believe that either property would be appropriate as security for the bond.  The Hamptons property is subject to a $9.5 million mortgage, and the government has seen widely varying valuations of the property, ranging from open source estimates between approximately $5.3 and $8.6 million to a 2016 appraisals of the property for $13.5 million.  The Alexandria property, apparently valued at between approximately $2.7 and $3 million – is also encumbered by the same $9.5 million mortgage, making it inappropriate, in the government's view, as security here.

**B.   *Baxter Street, New York, NY (claimed net asset value $3.5 million)*:**

Based on the information available to the government, which shows an approximate fair market value of $4.5 million and a $1 million mortgage to Woodlawn LLC, we are comfortable with the use of this property as security.  It is worth noting, however, that the property is titled to a legal entity rather than to Manafort.  The government understands that the legal entity is owned by Manafort, his wife, and his daughter Andrea.  Manafort would need to confirm the beneficial owners of the property and ensure that each agrees to pledge the property and that each agrees not to encumber the property in any way.

**C.   *St. James Drive, Palm Beach Gardens, FL (claimed net asset value $1.5 million):*

Based on the information available to the government, we are comfortable with the use of this property as security, although the open source estimate provided to the government by Manafort shows a fair market value of $1.25 million rather than $1.5 million.  As a condition of using this property as security, Manafort and his wife should be required to waive any homestead exemption that may be available under Florida law and to agree not to encumber the property in any way.

**D.   *Life Insurance Assets:***

Lastly, Manafort proposes to pledge "[a] combination of life insurance policies held in trust and/or in his or his wife's name" (claimed approximate net asset value $4.5 million).  The government lacks sufficient information to be able to evaluate the use of these life insurance assets as security.  Over the weekend, counsel for Manafort provided the government with a document listing various life insurance policies held in the names of Manafort and various relatives at Northwestern Mutual Life Insurance Company, together with their respective cash surrender values.  That list on its face was accurate as of only April 2017.  Given the complexity of this asset, the government believes further information is necessary to evaluate its net value and has requested

that Manafort permit the government to speak with a representative at Northwestern Mutual Life Insurance to confirm the nature and value of the assets.  We are prepared to talk to the insurance company Monday to determine the cash value and to confirm that the policies can in fact legally be pledged.[5]

Additionally, the use of the life insurance assets as security is complicated by the fact that Manafort is on notice that the government intends to seek forfeiture of one Northwestern Mutual life insurance policy, which is specifically identified in the indictment.  Indictment ¶ 53e.  On November 2, 2017, the government moved for a restraining order to prevent Manafort from encumbering the asset.  That life insurance policy, with a cash surrender value of approximately $2.6 million, is nonetheless included on the summary sheet provided by Manafort to the government in support of the claimed $4.5 million valuation for the aggregate life insurance assets proposed as security.

The fact that a substantial portion of the life insurance assets may be forfeited upon conviction bears on the analysis here, and in particular on how much weight to place on the use of the assets as security.  By their terms, the provisions of the Bail Reform Act discussed above direct courts to consider the "unencumbered value" of the property pledged in determining whether the prospect of losing such property will sufficiently mitigate the risk of flight and assure the defendant's presence at trial.  *See* S. Rep. No. 225, 98th Cong., 1st Sess., at 23 (Aug. 4, 1983) ("The rationale for the use of financial conditions of release is that the prospect of forfeiture of the amount of a bond or of property used as collateral to secure release is sufficient to deter flight.").

---

[5] Additionally, based on information provided by Manafort, the government understands that a substantial portion of the value of the life insurance policies is held in trust.  The government has requested trust documentation from Manafort, in order to verify that the proposed pledging of the policies is consistent with the terms of the trust.

It is therefore relevant to the bail calculus that a piece or property or a pledged asset has either already been restrained or is subject to forfeiture upon the defendant's conviction. *See id.* at 23-24 (explaining that the deterrence rationale of financial conditions "no longer holds true" "[w]hen the proceeds of crime are used to post bond," and that "[t]he source of property used to fulfill a condition of release is thus an important consideration in a judicial officer's determination of whether such a condition will assure the appearance of the defendant"); *United States v. Sabhnani*, 493 F.3d 63, 67-68 (2d Cir. 2007) (noting the lower courts' rejection of proposed personal recognizance bonds as inadequately secured because a home used as collateral "was subject to forfeiture as an item used in furtherance of the charged crime and" had already been "restrained as such"). Accordingly, in determining the overall value of assets to be pledged, consideration should be given to the fact that a substantial portion of the life insurance asset is subject to forfeiture upon defendant's conviction.

### III. MANAFORT'S NET WORTH HAS YET TO BE SUBSTANTIATED

Although Manafort has provided the government with a spreadsheet listing his total assets at approximately $28 million, the government has yet to substantiate Manafort's net worth. Indeed, we continue to have questions about that sum. For example, with respect to a property held by Manafort in Brooklyn, he asserted the value at $9 million, when a recent appraisal comes in at substantially lower (in the $5 to $6 million range). The spreadsheet provided by Manafort also lists values of other assets, such as securities, that do not match information available to the government or that cannot be substantiated at this time. Additionally, in prior years, through at least 2014, Manafort reported a $6 million asset in Ukraine on his tax returns; Manafort has claimed that it lost all value. In short, the government seeks to further understand the full extent of Manafort's wealth. Without that information, the government cannot be assured that whatever

assets that Manafort pledges are sufficiently meaningful in relation to his overall net assets to reasonably assure his presence at trial.  To ensure that any bail package is based on an accurate picture of his finances, we submit that Manafort should be required to represent the full extent of his assets, in the United States and abroad, to the Court.

* * * * * *

In short, at present Manafort has not yet substantiated his bail package in a manner sufficient to warrant a modification of the conditions of his release.  The government will continue to engage with counsel to work through these issues.

Respectfully submitted,

ROBERT S. MUELLER III
Special Counsel

Dated: November 5, 2017                    By:     __/s/_____
                                                 Andrew Weissmann
                                                 Greg D. Andres
                                                 Kyle R. Freeny
                                                 (202) 616-0800