```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3   United States of America,      ) Criminal
                                   ) No. 17-201
4                   Plaintiff,     )
                                   ) Bond Review Hearing
5   vs.                            )
                                   ) Washington, DC
6   PAUL JOHN MANAFORT, JR.        ) November 6, 2017
    RICHARD W. GATES, III,         ) Time:  9:30 a.m.
7                                  )
                    Defendants.    )
8   _____

9          TRANSCRIPT OF BOND REVIEW HEARING
                      HELD BEFORE
10     THE HONORABLE JUDGE AMY BERMAN JACKSON
              UNITED STATES DISTRICT JUDGE
11  _____

12                 A P P E A R A N C E S

13  For the Plaintiff:      GREG D. ANDRES,
                            Senior Assistant Special Counsel
14                          ANDREW WEISSMANN
                            KYLE R. FREENY
15                          U.S. Department of Justice
                            Special Counsel's office
16                          950 Pennsylvania Avenue NW
                            Washington, D.C.  20530
17                          202-514-1746

18
    FOR DEFENDANT MANAFORT: KEVIN M. DOWNING
19                          815 Connecticut Avenue, N.W.
                            Suite 730
20                          Washington, D.C. 20006
                            (202) 754-1992
21
                            THOMAS EDWARD ZEHNLE
22                          Miller & Chevalier, Chartered
                            900 Sixteenth Street, NW
23                          Washington, DC 20006
                            (202) 626-5800
24                          Email: Tzehnle@milchev.com

25
```

```
1    FOR DEFENDANT GATES:       SHANLON WU
                                Wu, Grohovsky & Whipple
2                               1300 Pennsylvania Avenue, NW
                                Suite 700
3                               Washington, DC 20004
                                (202) 204-3053
4                               Email: Swu@dcwhitecollar.com

5    ALSO PRESENT:             Andre Sidbury, Pretrial Officer

6                              Omer Meisel, Special Agent

7    _____

8    Court Reporter:           Janice E. Dickman, RMR, CRR
                               Official Court Reporter
9                              United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
10                             Washington, DC  20001
                               202-354-3267

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Your Honor, this morning we

2     have criminal case number 17-201, the United States of

3     America versus Paul Manafort, Jr., and Richard Gates, III.

4     Both Mr. Manafort and Mr. Gates are present in the courtroom.

5          Will counsel for the parties please approach the

6     lectern and identify yourself for the record and the party

7     that you represent.

8          MR. ANDRES:  Good morning, Your Honor.  Greg

9     Andres.  Andrew Weissmann, Kyle Freeny for the special

10    counsel is with us.  And with us at our counsel table is

11    Supervisory Special Agent Omer Meisel.

12          THE COURT:  Good morning.

13          MR. WU:  Good morning, Your Honor.  Shanlon Wu on

14    behalf of Mr. Gates, who's present.

15          MR. DOWNING:  Good morning.  Kevin Downing for Mr.

16    Manafort.

17          THE COURT:  Good morning.

18          MR. ZEHNLE:  Good morning.  Thomas Zehnle on

19    behalf of Mr. Manafort.

20          THE COURT:  Good morning, everyone.

21          I appreciate all the pleadings that were filed

22    over the weekend.  I've reviewed all of them.  I also got a

23    fair number of motions for extension of time over the

24    weekend, all of which were perfectly understandable.  I

25    realize we're trying to do many things on a fast track here,

1    but the reason for that is the parties asked me to do it on

2    a fast track.

3            Last Thursday counsel for Mr. Manafort told me he

4    was prepared to file a bond motion that day, so I set a date

5    for a response and scheduled a hearing for this morning.

6    And counsel actually asked me to accelerate the process,

7    have the hearing on Friday but then I didn't even get the

8    bond motion until Saturday.  And as I will explain in a few

9    minutes, it didn't contain the necessary filings.

10           Counsel also asked me to set an April trial date.

11   But I realize I didn't have any information about how long

12   is this trial going to be, what kind of motions practice am

13   I going to need to bake into the schedule.  So, I issued a

14   minute order telling the parties, you know, can you give me

15   your predictions about those things.

16           Defendant Gates quite reasonably responded:  I

17   don't know, I haven't even seen the discovery yet.  I need

18   more time before I can answer those questions.  And I

19   certainly recognize and respect that the defendants are not

20   in a position to make predictions about what they need to do

21   because they haven't even seen the discovery yet.

22           So, I went ahead and crafted a schedule based on

23   the assumption that motions would be filed, which was

24   confirmed by defendant Manafort's submission.  But one

25   question I want to talk about before we talk about a trial

1     date is whether we should set a trial date now in accordance

2     with that schedule or hold a status conference after the

3     discovery has been provided.

4              Does either one of defense counsel have a position

5     about that?  Then I'm going ask the government some questions.

6              MR. ANDRES:  Yes, Your Honor.

7              THE COURT:  You can start.

8              MR. ANDRES:  Judge, if I can take a crack at that,

9     just because we've had the opportunity to discuss.  And

10    actually, we're going to propose exactly that, which was to

11    ask for a status conference in approximately five weeks, at

12    which point we could address the issue about a trial date

13    and all the scheduling, and the expectation by that time the

14    discovery will be substantially finished.

15             So having discussed with counsel for Mr. Manafort

16    and Mr. Gates, we would request a status conference in,

17    again, five weeks, and at that time be in a position to set

18    dates, if appropriate.

19             THE COURT:  All right.  Well, I think that is

20    really the sensible way to proceed.  And I can assure you

21    that while I do have several criminal trials in the early

22    part of 2018, which is somewhat unusual for this Court, I

23    have enough time in my schedule that when we're ready to set

24    a trial, we're going to be able to set one with dispatch.

25             One question I have for the government is the

1    indictment is certainly very detailed about bank accounts

2    and transfers and expenditures.  Is there any reason why the

3    Rule 16 materials can't be produced right away?

4               MR. ANDRES:  Judge, we're in the process of doing

5    that.  So that you understand our process, a lot of those

6    documents are electronic, so we are having them Bates

7    stamped.  Our plan is to produce the material, which

8    obviously is substantial, as Your Honor knows from our

9    complex case designation.  We're planning on making rolling

10   productions and doing those on a disk drive, effectively, so

11   we can just hand it over to the defense.  And we can

12   certainly prioritize some of the bank records.

13              Some of the bank records the defendants have

14   because they produced them themselves.  But we'll certainly

15   prioritize that material and move as quickly as we can to

16   produce that discovery.

17              THE COURT:  All right.

18              MR. ANDRES:  Just on that -- sorry, Judge.  The

19   one other issue with respect to that is we've been in

20   discussions with defense counsel about submitting a

21   protective order for discovery.  And we have the consent of

22   both parties, of both Mr. Gates and Mr. Manafort to file

23   that unopposed, which we'll do today.  And that will help us

24   expedite the discovery process.

25              THE COURT:  Any consent motions I get for

1    protective orders I usually sign very quickly, so that

2    shouldn't be a problem.

3          Do I have anything scheduled for December 11, Mr.

4    Haley?

5          THE COURTROOM DEPUTY:  One second, Your Honor.

6          (Off-the-record discussion between Court and

7    Courtroom Deputy.)

8          THE COURT:  How about December 11 at 9:30 in the

9    morning for a subsequent status conference in this case?

10   Does that work for everyone?

11         MR. ANDRES:  That's fine for the government.

12         MR. WU:  That's fine for Mr. Gates.

13         MR. DOWNING:  That's fine.

14         THE COURT:  One thing I want to note is whether it

15   makes sense for the parties to meet and confer and possibly

16   come up with a discovery schedule that includes not only the

17   documents we were talking about before, but things like the

18   FBI 302s, expert reports, if there are going to be experts,

19   grand jury transcripts, rather than my attempting to

20   generate a schedule in a vacuum.  So perhaps you can be

21   prepared, or at least see if you can come up with a joint

22   schedule.  And if not, then we should be prepared to talk

23   about a discovery schedule at the next status conference.

24         MR. ANDRES:  That's acceptable to the government,

25   Judge.

1          THE COURT:  All right.  Well, let's talk about,

2     then, the motions for review of conditions of release.

3          There's two pending motions.  While there's no

4     D.C. Circuit precedent on the standard of review, as the

5     District Court noted in the case cited by both parties, *U.S.*

6     *versus Saani*, 557 F.Supp.2d 97, the recognized practice is

7     that the Court reviews the bond determination made by the

8     magistrate judge de novo.

9          So I don't think we really need to spend any more

10    time focusing on what the magistrate judge was thinking or

11    what the understanding supposedly was when she issued her

12    order.  I'm writing on a clean slate.  And in any event,

13    you've both presented information and proposals to me that

14    weren't before her.

15         Has everyone knows, under 18 U.S. Code § 3142(b),

16    the judge is required to release the defendant on personal

17    recognizance or upon the execution of an unsecured

18    appearance bond unless the judge determines that such

19    release will not reasonably assure the appearance of the

20    person as required or will endanger the safety of any other

21    person of the community.

22         We are not talking about dangerousness here,

23    that's not an issue.  We're only talking about flight.  If

24    the Court doesn't find personal recognizance in the

25    unsecured bond to be sufficient, then under subsection (c)

1    the Court shall release the defendant subject to the least

2    restrictive further condition or combination of conditions

3    that the Court reasonably determines will assure the

4    appearance of the person as required.

5              Before we address the reasonableness of conditions

6    that people are proposing, the first question to be answered

7    then is whether I should find, under § 3142(c)(1), that the

8    release described in subsection (b), that is, personal

9    recognizance and an unsecured appearance bond, will not

10   reasonably assure the appearance of either defendant as

11   required.

12             To be clear, that's just personal recognizance and

13   an unsecured appearance bond, which is essentially a promise

14   that if I break my promise to appear, well, then I'll pay

15   millions of dollars.  But at that point, the promisee --

16   promissor is already gone.  So there's not really much

17   assurance in that.

18             Defendant Manafort argued in his response to the

19   government's memorandum that the unsecured bond was

20   sufficient, but his bond review motion offers to pledge

21   assets and to provide a security.  So, do you want to be

22   heard on that preliminary question, or do you concede that

23   more conditions are necessary?  And you don't have to

24   concede it, it's up to you.

25             MR. DOWNING:  Thank you, Your Honor.  I believe in

1    order to expedite the situation, we're in discussions with

2    the government to come up with a surety package.  And I

3    think by this afternoon we will have provided them with the

4    information they need.

5           So we are happy to proceed at this time under such

6    agreement of a surety being posted, with co-surety signing,

7    along with properties being pledged.

8           THE COURT:  All right.  With respect to Mr. Gates,

9    is it still your position that release under subsection (b)

10   would be sufficient?

11          MR. WU:  Your Honor, it is.  But also in footnote

12   4 of our original notion, I let the Court know we are

13   engaged in active discussions with the government.  We have

14   continued those.  We are also very close to preparing a

15   surety package.  It would include the pledging of real

16   estate assets, co-signers, including his parents, as well as

17   his brother.

18          And so I think we're very close on that point.  If

19   the Court were to rule in our favor, that personal

20   recognizance is fine, I'm certainly not going to object to

21   that.  But just for your knowledge, we are in discussions

22   with the government and we hope to move very quickly to a

23   satisfactory surety package.

24          THE COURT:  All right.  I think that it's going to

25   be necessary for me to make all the predicate findings for

1    the record.  We have a motion, first filed by defendant

2    Gates.  The current release conditions are home confinement

3    with GPS monitoring and the unsecured appearance bond of

4    $5 million.  In other words, he hasn't posted bond, he just

5    signed an agreement to pay it.  Docket 21 is his motion to

6    modify those conditions.  He asked me to revoke the order.

7    Meaning, I presume, the order that he be subject to home

8    confinement.

9            MR. WU:  That's correct.

10           THE COURT:  And he asked for permission to travel

11   nationally and internationally and makes no financial

12   proposal; does assert that the unsecured bond is adequate,

13   but there are other discussions going on.

14           I have a few questions.  The only employment

15   information offered to me is a vague statement that he is a

16   consultant.  That could mean many things.  So I wondered if

17   you could tell me a little bit about the nature of his

18   business.  Does he work from an office?  Does he work from

19   his house?  Is his business incorporated?  Where?  Does it

20   have bank accounts?  Where?

21           MR. WU:  Court's indulgence.

22           (Off-the-record discussion between Mr. Wu and

23   Defendant Gates.)

24           MR. WU:  Your Honor, the consulting business is a

25   self-employed business at the moment.  He's no longer

1    employed by a company.  And he primarily works from his

2    home, but there are business locations in other cities that

3    he travels to.

4         And I want to clarify that with regard to any

5    travel that he would do, first, there's actually not any

6    likelihood there would be a need for international travel in

7    the near future.  And domestically, we absolutely would be

8    happy to make arrangements and notification to the pretrial

9    services on an as-needed basis.

10        For example, there are some business meetings

11   coming up this week, which ultimately we hope the Court

12   might allow him to work an arrangement, as the Court did for

13   this weekend when he had family members to attend to, to

14   notify pretrial services of where and when he needs to go,

15   so that time could be allotted, if the monitoring is not

16   lifted.

17        THE COURT:  I'm certainly very disinclined to

18   permit international travel.  And if we end up with the

19   financial security that we're talking about, I feel

20   differently about travel within the United States, as long

21   as it's approved in advance.

22        But just in terms of all the findings I have to

23   make, do you disagree with the preliminary guideline

24   calculation that was in the government's memorandum that

25   would put him at a level 32 for guideline purposes?

1          MR. WU:  No, we're not quarreling with any of the

2    potential penalties or guidelines calculations.

3          THE COURT:  And at this point, you did mention

4    your possible negotiations with the government.  Have you

5    specifically proposed any assets or surety for their

6    consideration?

7          MR. WU:  Yes, we have, Your Honor.  And those

8    specific assets are the real estate, the house that Mr.

9    Gates owns.  In addition to that, also pledging the value of

10   life insurance policies.  And for both of those, we're in

11   the steps of having appraisals done for the house, for

12   documents to reflect that, as well as documents to reflect

13   any equity, as well as relevant documents to identify the

14   life insurance policies and what value they may have.

15         And the third prong of that is there are personal

16   guarantors going to sign on to guarantee whatever financial

17   aspect need to be guaranteed, and those would include his

18   parents and his wife.

19         THE COURT:  All right.  One thing people should be

20   aware of is there are instructions and forms, I believe,

21   available through the clerk's office of what is needed.  If

22   assets are pledged, there has to be an application to

23   pledge.  Real estate, there have to be deeds of trust

24   executed.  It's a fairly complex procedure that I expect

25   counsel to comply with.

1           With respect to life insurance policies, the

2     policies may or may not permit that.  So you need to

3     ascertain that it is appropriate under the terms of the

4     policies.  Mr. Manafort talked about policies that may be

5     held in trust.  And those have a lot of restrictions.  The

6     trustees have to permit it and, plus, I think some of these

7     policies are subject to forfeiture anyway under the

8     indictment.  And so I'm not sure those are appropriately

9     used as security.  So, a lot of these details need to be

10    nailed down.

11          Is the house in Richmond encumbered with a mortgage?

12          MR. WU:  Yes, it is, Your Honor.  And that's part

13    of the documentation, to determine how much equity is in the

14    house.

15          THE COURT:  All right.  Thank you.  With respect

16    to Mr. Manafort, his release conditions right now are home

17    confinement with GPS monitoring and the unsecured appearance

18    bond of $10 million.  And he's filed a motion, docket 32, to

19    modify those release conditions.  He asks to be released

20    from the home confinement and the GPS based on a pledge of

21    several pieces of property and possibly family members as

22    sureties.

23          He asked to travel to New York City where he,

24    quote, makes his living, close quote.  And I wondered also,

25    what does he do and where does he do it?

1             MR. DOWNING:  Your Honor, Mr. Manafort is an

2     international consultant with respect to campaigns,

3     international investing.  And he does a lot of his work out

4     of New York City.  And also, he does quite a bit of work

5     down in Florida.  He's got a business down in Fort Lauderdale.

6             THE COURT:  What's the business?

7             MR. DOWNING:  It's a telecommunications business.

8     It's developing secure cell phones, and it also does make

9     them relatively or virtually indestructible.  So between

10    those two, his international consulting and that business,

11    that takes him to Florida and New York on a regular basis.

12            THE COURT:  All right.  Your pleading only

13    mentioned New York, but the government mentioned Florida in

14    their pleading.  But in New York, does he have an office

15    there or his clients are there?  What are his necessity --

16            MR. DOWNING:  His clients are in New York City and

17    he has a residency in New York City.  And I apologize for

18    not explaining the telecommunications business in more detail.

19            THE COURT:  I just don't remember that you asked

20    to travel to Florida in the pleading.  I know you asked to

21    be able to travel to New York.

22            MR. DOWNING:  I believe we did ask for that.

23            THE COURT:  I'm not sure.  I noted New York.  But

24    the government said it didn't have a problem with Florida.

25            All right.  So those are the questions I have for

1     you.

2             I have some questions for the government.  I was

3     not initially inclined to permit a family member to serve as

4     a surety or to permit travel out of the D.C. area without

5     permission.  And while I was prepared to release the

6     defendants from home detention as long as they posted

7     sufficient financial security, I was planning to order that

8     they stay away from transportation facilities and to

9     continue the GPS monitoring to monitor the geographic

10    conditions and the stay-away, as well as the possible curfew.

11            So, can you explain to me why in your view none of

12    that is necessary?

13            MR. ANDRES:  Sure, Judge.  Just so I have all of

14    that:  So the first is the issue with respect to family

15    members as sureties.  The second was with respect to GPS

16    versus no GPS.  And the third, I believe, was travel.

17            THE COURT:  Right.  I mean, the idea of the GPS

18    would be they would be released from home confinement, but

19    there would be still the geographical within the D.C. area,

20    or D.C. and Richmond as to Mr. Gates.  So the GPS would

21    monitor that and the GPS would also monitor if somebody

22    suddenly showed up at an airport.

23            Now, clearly, if they're allowed to travel to

24    New York, that might be a train.  But Florida would probably

25    involve an airport.  So there would have to be a lot of

1    restrictions and explanations included.  But you said pretty

2    strongly in your pleading, as long as they give us the

3    financial level of comfort that we're looking for, we're

4    willing to forgo GPS monitoring.  And that I have juxtaposed

5    with multiple pleadings telling me what a significant flight

6    risk they are because of their international contacts and

7    their resources.  So, I want to know why I shouldn't impose

8    those things.

9          MR. ANDRES:  Judge, it's the government's view

10   that haven taken the defendant's passports, which we think

11   we now have, that which didn't think that the GPS monitoring

12   was necessary.  There are obviously the travel restrictions.

13   We're working through a lot of these issues in terms of

14   their financial issues.  Principally and probably most

15   importantly to understand what their net worth is.  So we're

16   more advanced with Mr. Manafort than Mr. Gates.

17          But our understanding is that Mr. Manafort's net

18   worth is somewhere in the neighborhood of $28 million.  We

19   need to do more work on that to be clear, but that's the

20   representation that counsel has made and the package that

21   he's agreed to, which would be signed by both his wife and

22   at least one of his daughters, would be somewhere in the

23   neighborhood of $10 million with assets up to that amount.

24   And it was the government's position that that was

25   sufficient in terms of conditions that would require him to

1     come back.

2          So that addresses both the travel issue, which we

3     think we've addressed by the taking the passports, and the

4     family issues.

5          One thing with respect to Mr. Manafort, a lot of

6     his property or a lot of the property involves other

7     entities, it involves family members.  So those family

8     members would necessarily have to sign in order to pledge

9     those assets in the first place, which, again, sort of

10    necessitates family members being sureties.

11         But given our discussions to date and the amount

12    of the assets and the size of the bond, which is significant,

13    it's the government's position that that was sufficient to

14    ensure the defendant's return to court without requiring

15    GPS.  As Your Honor has said, we're required to have the

16    least restrictive conditions, and as a result that's where

17    we landed.

18         THE COURT:  Well, I don't have any problem --

19    obviously, it's necessary having family members cosign any

20    assets that are pledged, it's fundamental that that happen.

21    But that's different from saying, okay, instead of pledging

22    an asset to make up X dollars, I have a surety and my family

23    member is going to be my surety, that I think is a different

24    situation and that I was a little uncomfortable with because

25    an independent surety demands proof that the person has

1      something to back up what they're going to put forward to

2      the court.

3               MR. ANDRES:  Right.  It's really both, though,

4      Judge.  It's both that they're securing the assets that are

5      being pledged, and they'll also be sureties.  So both Mrs.

6      Manafort and Mr. Manafort's daughter will also be required

7      to the full extent of the bond, to the extent there's a

8      violation of the bond.  So they're serving in both capacities.

9               THE COURT:  All right.  Well, under the terms of

10     the Bail Reform Act, the paragraph that deals with sureties

11     says that if it's not an approved surety, then the surety

12     has to provide sufficient financial information concerning

13     their assets and liabilities and whether those are

14     encumbered, so that you know if they have the assets to meet

15     the obligations.  So you're being provided with that

16     information as well?

17               MS. ANDRES:  That's part of the process that we're

18     going through, particularly as we understand Mr. Manafort's

19     net worth, also to understand the net worth of the sureties

20     as well, that's something that we'll continue to do.

21               THE COURT:  All right.  So do you have an idea how

22     much longer this process is going to take?

23               MR. ANDRES:  I think for Mr. Manafort, we're

24     getting close.  We have the issues, and frankly, Your Honor

25     has identified all of them.  With the life insurance we need

1      to understand what the value is and whether it can be

2      forfeited.  We identified an issue with the Homestead Act.

3      I'm not admitted in Florida, but I know it's an issue about

4      pledging property in Florida, and then getting all the

5      paperwork done.  So we're going to continue to have those

6      discussions today and we're going to try to expedite things.

7      But I think, fairly, we need at least two days, would be my

8      guess, and maybe more.  But we're happy to keep the Court

9      updated as to that.

10            With Mr. Gates we're slightly further behind,

11     although I think we now understand the process well with

12     him, what he's pledging.  We've been given the name of

13     family members, so we can begin to do checking on that.  And

14     also we have some knowledge about his property.  But those

15     discussions are not as advanced as they are with Mr.

16     Manafort.  But again, we'll continue to speak to counsel to

17     get that done as quickly as we can.

18            THE COURT:  Well, I very much appreciate the fact

19     that counsel are working cooperatively on everything; on

20     bond, on scheduling, on discovery.  And I think that's

21     really the way to go.  The more complex the case is the more

22     it's necessary.

23            I think I need to make a couple of findings today.

24     You can be seated.

25            MR. ANDRES:  Thank you.

1          THE COURT:  I'm going not going to set a due date

2     or schedule for this.  I think it's in everyone's interest

3     to get this done as soon as possible, particularly on the

4     defense side of the courtroom.  So as soon as this is done,

5     if you file something with me on paper that says it's done

6     and this is what we propose, I'll be able to rule on it very

7     quickly.  I don't see the point of setting another status

8     conference to come in and tell me the status of it.  I

9     expect that you'll let me know as soon as possible.

10          And if you can't come to an agreement, then the

11     defendants are welcome to put the proposal to me and see if

12     I will accept it.

13          But I do need to make a couple of findings today,

14     which I'm going to go ahead and make.

15          As I said before, under the Bail Reform Act, 18

16     U.S. Code § 3142(c), if I determine that the release

17     described in subsection (b), that is, release on personal

18     recognizance or with an unsecured appearance bond will not

19     reasonably assure the appearance of the person as required,

20     I shall order the pretrial release of the person, A, subject

21     to the condition that he not commit a federal, state, or

22     local crime, and subject to the least restrictive further

23     conditions or combination of conditions that I determine

24     will reasonably ensure the appearance of the person as

25     required.  And those can include any of the 13 possible

1    conditions listed in the statute, or other conditions that

2    are reasonably necessary.

3         The factor to be considered under § 3142(g), in

4    determining whether there are conditions that will

5    reasonably ensure their appearance are the nature and

6    circumstances of the charged offenses, the weight of the

7    evidence against the defendants, the history and

8    characteristics of the defendants, and the nature and

9    seriousness of the danger to any person or to the community

10   that would be posed by the defendant' release.

11        The fourth factor is not a factor here.

12        With respect to the nature and circumstances of

13   the offense, they're detailed in the indictment.  The

14   probable cause finding has been made by the grand jury and

15   there have been additional unsealed findings made by the

16   chief judge.  These are serious alleged offenses that would

17   expose these defendants to significant penalties.

18        Money laundering has a statutory maximum penalty

19   of 20 years.  Foreign agent registry charges can go up to

20   ten years, and other charges up to five.

21        The guideline calculation as to Mr. Gates puts him

22   at a level 32 of an advisory sentencing guideline range of

23   121 to 151 months, or 10 to 12 1/2 years.

24        The defendants argue the mere fact of

25   international business dealings is not illegal.  The mere

1    fact of international bank accounts, overseas corporations,

2    and international transfers are not illegal.  And they point

3    out that the work that's involved in this case was completed

4    several years ago.  And the government doesn't argue

5    otherwise.  But they aren't indicted for having international

6    clients or for having international bank accounts.  The

7    charges are that they used those mechanisms to evade

8    reporting of financial obligations imposed on people who

9    perform this kind of work.  They are just charges at this

10   time.  It remains to be seen if they can be proved beyond a

11   reasonable doubt.

12          But it is important to note for bond purposes that

13   the charges involve not only alleged failures to comply with

14   technical registration requirements and the creation of

15   intricate networks for the movement of funds, but also, much

16   more recent, false statements to the Department of Justice

17   investigators and even to their own lawyers handling the

18   registration issue.

19          With respect to the history and characteristics of

20   defendant Gates, he turned himself in.  He has no prior

21   criminal convictions.  The significant family ties to the

22   region with his wife and children in Richmond.  He remained

23   in the United States while this investigation was underway.

24   But significant financial resources and international

25   connections are alleged.  And there have been some highly

1    inconsistent previous filings itemizing the extent of his

2    financial holdings, and there were some questions about

3    whether he was entirely straightforward about a matter as

4    fundamental as how many passports he had at the initial

5    hearing, even though I think now we've got it down.

6           With respect to defendant Manafort, he, too,

7    turned himself in.  He has no prior criminal history.  He

8    returned to the United States from international travel at a

9    time he knew this investigation was underway.  He also has a

10   wife who lives with him here in northern Virginia.  But with

11   him even more significant international connections are

12   alleged.  And when his business was described, I was told

13   he's an expert in international investing.  The indictment

14   reflects considerable sophistication in finding international

15   havens for assets and transferring them around.

16           I realize that both of these cases are

17   distinguishable from the *Anderson* case and the other cases

18   mentioned by the government.  But in those cases the

19   defendants were held without any bond at all.  So the

20   distinctions don't militate against the less onerous

21   conditions that I would impose.  And the cases recognize the

22   principle of the financial wherewithal and sophistication

23   are factors be that can be fairly considered when you assess

24   the risk of flight.

25           Considering all these factors, I find, pursuant to

1       sections (b) and (c)(1), that merely some personal

2       recognizance upon execution of an unsecured appearance bond

3       will not reasonably assure the appearance of either

4       defendant and that I must impose additional conditions under

5       subsection (c)(1)(B).  But the current requirement of house

6       arrest is not the least restrictive condition that will

7       accomplish that goal and, therefore, I'm prepared to modify

8       it.  The problem is that I have not yet received the

9       information that I need to do it.

10              Among the non-exhaustive list of conditions that a

11      Court can consider, the critical ones are here under

12      § (c)(1)(B)(xi), which is to execute an agreement to

13      forfeit, upon failing to appear as required, property of a

14      sufficient unencumbered value as is reasonably necessary to

15      assure the appearance of the person.  And under that

16      provision the defendant has to provide the Court with proof

17      of ownership and the value of the property, along with

18      information regarding existing encumbrances.

19              Another option under the Bail Reform Act is

20      subsection (xii), which permits a defendant to execute a

21      bond with solvent sureties, who will execute an agreement to

22      forfeit in such amount as is reasonably necessary to assure

23      the appearance of the person, and shall provide the Court

24      with information regarding the value of the assets and

25      liabilities of the surety if they are other than an approved

1    surety.

2            And then I'm entitled, under § (xiv), to impose

3    any other conditions that are reasonably necessary.  And I

4    have a fair amount of discretion in doing that.

5            Defendant Gates has not identified, as least to

6    me, although he has begun with the government, the assets

7    that he's going to offer as a security, nor has he indicated

8    specific arrangements made with the surety, although I'm

9    glad to hear that's underway.  Clearly, the government's

10   willingness to be flexible on home confinement was

11   contingent on these sorts of financial arrangements.

12           I don't have anything to go on yet with Mr. Gates.

13   Mr. Manafort, in the pleadings to me, under the time

14   constraints he was facing this weekend, identified three

15   pieces of property that he would pledge and he estimated

16   their value at a total of $7.5 million.  That's a good

17   start, but that doesn't begin to comply with subsection (xi).

18   The government opposition revealed to me that these

19   properties are encumbered by mortgages, and it offered

20   multiple reasons to question the defendant's valuation of

21   the equity.

22           I've already mentioned that I think there may be

23   some concerns with the insurance policies if they're not in

24   his name or they're held in trust.  It's yet to be shown

25   that they could legally be pledged under the terms of the

1      policy or the trust.  And I'm also concerned about the fact

2      that they're the same policies, some of them, that are

3      subject to the forfeiture allegations.

4              Mr. Manafort assured the Court that certain family

5      members will sign as sureties when necessary.  And as I said

6      earlier, I think there's a difference between co-signing

7      your property and serving as the surety.  If a family member

8      is going to serve as a surety, I think they have to comply

9      with the plain language of subsection (xii), which would

10     require that the Court be given information concerning their

11     assets and liabilities.

12             So I'm not in a position to grant either motion

13     today.  We're going to have to await the provision of the

14     additional information.  I can tell you that these will be

15     the conditions or combination of conditions that I'm

16     inclined to impose to secure their appearance.

17             First of all, in order to be relieved of the

18     condition of home confinement, the defendants must supply

19     either security under subsection (xi) or a surety under

20     subsection (xii), or both, for the $10 million and $5 million

21     appearance bonds that are now unsecured, as well as all the

22     necessary financial information.

23             To me, a family member serving as a surety is very

24     problematical.  In any view, it should be at least an

25     approved surety or an independent individual or entity that

1    complies with the statutory financial disclosure

2    requirements.  The government doesn't seem to object to

3    certain family members, so I'll consider it if it comes to

4    me as a joint proposal.  But it will only be acceptable if

5    the information that is described in subsection (xii) is

6    provided.

7            No international travel is going to be a condition

8    of this release.  And it was my inclination that the

9    condition of remaining within the D.C. area, or D.C. plus

10   Richmond for Mr. Gates, should be a part of any order.

11   Again, with the government's consent, I may view this

12   differently.  But the defendants will not be permitted to

13   travel otherwise within the United States without the prior

14   permission of the Court and without prior submission to

15   pretrial where they're going and their itinerary.

16           Although I may permit New York and Florida for Mr.

17   Manafort without prior permission of the Court, as long as

18   pretrial has been advised.  So, again, some of that will

19   come to me when I see what I've been provided with.

20           I was planning to order that the defendants be

21   ordered to stay away from transportation facilities,

22   including airports and private airports.  If the government

23   is willing to forgo that once the financial constraints have

24   been established, I'm willing to consider giving that up.

25           And I had been planning that while I would

1   alleviate home confinement, that there would be some sort of

2   curfew in the evening and that all of that, the curfew, the

3   geographic restrictions, and the stay-away order was going

4   to be monitored by GPS.  So that's where I was headed, but I

5   will keep an open mind if the government and the defense can

6   work something out that's mutually agreeable.

7          I recognize that the conditions are inconvenient

8   and it's the defense position that they're unnecessary.  But

9   I was prepared to find that they are the least restrictive

10  combination of conditions that will reasonably assure that

11  the defendants appear.  However, as I say, if financial

12  arrangements are made that satisfy the government, I may be

13  willing to impose a less restrictive regime.

14         So given all these findings, as I said, that's the

15  basis from which we're going to proceed.  I'm not going to

16  set another date for another bond review hearing, but as

17  soon as I get something, I will review it.

18         And so, with that, I only have a couple of issues

19  regarding the form of pleadings.  And I think we could

20  probably deal with that at the bench very briefly.  So if I

21  could have counsel --

22         (Bench discussion:)

23         THE COURT:  First, I just want to say that from

24  this point on, a motion to extend the date a pleading is

25  supposed to be filed has to be filed before the pleading is

1    supposed to be filed, otherwise what is the point?  You've

2    already granted yourself the extension.

3           Second, I want to talk about the conversation we

4    had at the status conference last Thursday.  Mr. Downing,

5    when I went through the fact that the government had filed a

6    memo and you filed a response, and then I said -- I issued

7    an order saying a bond review pleading has to be in writing,

8    but you only filed a response, you didn't ask for anything.

9    You stood up and said, No, in the last -- second to last

10   paragraph of my pleadings I did request relief from the bond

11   conditions.

12          But I went back and read the last sentence of your

13   pleadings.  I was surprised when you said that because I

14   didn't remember it.  And basically, it just says the

15   continuation of the $10 million unsecured appearance bond,

16   subject to the condition that he not commit another crime

17   will more than suffice.  So, you did intimate the bond alone

18   was sufficient, but he didn't ask to be relieved of

19   anything.

20          And the problem wasn't the form of your filing,

21   the problem was that you tried to tell me that you'd filed a

22   bond review motion when actually you hadn't.  It's a subtle

23   discrepancy, it's a minor point, but just do yourself a

24   favor from this point on, this case is going to be get more

25   complicated.  Don't tell me, if something says something it

1     doesn't say.  In all likelihood you can count on the fact

2     that I will have read it and it doesn't -- it undercuts the

3     power of your argument and your credibility if you say, you

4     know, that you did something that you didn't do.

5              Also, on the subject of pleadings filed with the

6     Court, the prosecution filed a pleading on Thursday that

7     they called ex parte motion for post-indictment restraining

8     order.  You specifically asked me to enter an order

9     concerning Mr. Manafort's assets ex parte, and offered legal

10    authority for proceeding in this manner.

11             In other words, you weren't saying we wanted to

12    consult with the defendant and then we want you to do this;

13    you asked me to do it.  Sometimes judges would have just

14    signed it.  I thought it was highly extraordinary for a

15    judge to be communicating ex-party with the prosecution

16    after an indictment has been filed.  So I spent a fair

17    amount of time looking at the authority provided to see if

18    there was legal support to do it.

19             And since I wasn't comfortable that there was, I

20    called for the government to explain the legal basis and the

21    justification for proceeding ex parte.  I took care, though,

22    to make sure that my response was properly sealed and it

23    only went to you because that's how we were communicating.

24    And then it turns out that while the pleading asks for

25    ex parte action, it actually had been filed on the public

1    docket.  And so when I had my deputy clerk call you to find

2    out if a mistake had been made, you said, Oh, we meant to do

3    it, but, actually, we were planning to communicate with

4    counsel about this.

5             So, I don't understand that.  What were you trying

6    to do?  And why did you tell me it was ex parte if you were

7    planning to tell to them about it?

8             MR. WEISSMANN:  I can discuss that.  One, it was

9    not a mistake to file it.  Our understanding, we had the

10   documents, but none of them were under seal.  And so --

11   which I understand is unusual.

12            THE COURT:  Well, if it's on the docket, it's not

13   ex parte.  They get an ECF notification anytime anything is

14   filed.  Right?

15            MR. WEISSMANN:  But there's things that they were

16   not -- they were not entitled to.  We also had no

17   objection -- we can put the purpose in.  If the Court would

18   like to hear from the defendants, we have absolutely no

19   objection to that.  So when we heard from the Court's deputy

20   there was an issue --

21            THE COURT:  He wasn't telling you anything.  All

22   he wanted to know was whether it was a mistake or not

23   mistake.  I don't communicate through him other than

24   scheduling matters.  But I didn't understand why you would

25   call something ex parte, ask me to do something ex parte

1    when you were perfectly willing to have it public.  I don't

2    think you use the docket to send messages to each other.  It

3    should be because you're asking me for relief, and if you're

4    asking me for ex parte relief, I think you have to have a

5    basis to do it.

6           And it didn't make any sense -- I've never seen an

7    ex parte pleading that wasn't sealed, because -- I mean, did

8    you get it?  Did you get it from the ECF?  Or did everybody

9    get it but them?

10          MR. WU:  Yes.

11          THE COURT:  That doesn't make any sense.

12          MR. DOWNING:  I don't know the answer to that.

13          MR. WU:  I believe we received it from ECF.

14          MR. ZEHNLE:  We got it from ECF.

15          THE COURT:  I just want everybody to take care in

16   the future.  I don't know what the status of it is anymore.

17   I guess the motion is still pending, even though it's not

18   ex parte and it's not sealed anymore.  But it also relates

19   to the same -- this is one of the insurance policies you're

20   talking about pledging.

21          So maybe as part of whatever you're providing to

22   me, you can let me know whether you want me to do with that,

23   whether you want me to restrain it or whether you want it to

24   be pledged to the Court.

25          So I'll hold off on ruling on the motion.  But I

1    found the whole thing a little extraordinary.  And certainly

2    I want to caution you, moving forward, that I would take a

3    very dim view of doing anything ex parte, unless it's

4    legally required and justified.  And I thought that the

5    statute seemed to permit ex parte pre-indictment, but not

6    post-indictment.  And so that was why I issued the order.

7    But you don't have to respond.

8              I think you did respond to the order anyway at

9    this point.  But I don't know if there's anything further to

10   do with that, we'll just wrap it up on the bond thing.

11             Okay.  So I think that's everything I want to talk

12   about.

13             MR. WU:  I can do this in open court, too, but I

14   was going to ask Your Honor, with regard to the documents

15   for valuation encumbrance on the assets, as well as any

16   identifier information for the sureties, I have a slight

17   concerned if it has to be filed with the Court, there's some

18   privacy concerns.

19             THE COURT:  You can file a motion for leave to

20   file it under seal.  I don't have any problem with that.

21             MR. WU:  All right.  That's fine.

22             THE COURT:  Certainly, any account numbers have to

23   be blacked out under our court rules in the public docket.

24   Don't put the surety's personal identification, the

25   addresses, the Social Security numbers, the birth dates;

1     they all have to be blacked out.  So be careful of that.

2     I'm not seeking to invade their privacy, and that's fine.

3              MR. WU:  Very well.  And so Your Honor would want

4     that independently of what we're providing to the government?

5              THE COURT:  If you provide it to the government

6     and the government agrees that it's sufficient, then I don't

7     think it all needs to be docketed.  However, if the

8     government and you don't agree, but think this is sufficient

9     and you're filing a motion with me to do it on that basis,

10    then I need the information.

11             MR. WU:  I understand.  Thanks.

12             THE COURT:  All right.  Thank you.

13             MR. ANDRES:  Thank you, Judge.

14             (Open court:)

15             THE COURT:  All right.  Is there anything further

16    I need to take up today on behalf of the government?

17             MR. ANDRES:  Not from the government, Judge.

18    Thank you.

19             THE COURT:  Anything for Mr. Manafort?

20             MR. DOWNING:  No, Your Honor.

21             THE COURT:  Anything for Mr. Gates?

22             MR. WU:  Yes, Your Honor.  A few things.  One is

23    in anticipation of your future ruling, the rest of the legal

24    team for Mr. Gates is in New York.  So we would ask you to

25    consider allowing him to go to New York for those legal

1    meetings.  I belive the original conditions allowed him to

2    travel for meetings with counsel as well.  So I just flag

3    that now.

4            THE COURT:  That was to leave his house, it wasn't

5    to leave the area.

6            MR. WU:  I understand.

7            THE COURT:  But you can put what you want to put

8    into what you propose to me.  If he needs to travel to

9    New York to meet with his attorneys, that may be permissible,

10   if everything else is agreed to.  But that may also be

11   something that he has to notify pretrial about before he goes.

12           MR. WU:  Yes, Your Honor.  And on that point, in

13   the meantime, until we can get the joint proposal

14   straightened out with the government, would the Court allow

15   him, for things like family activities or a business meeting

16   domestically, to ask pretrial services and give them the

17   same type of specificity he gave over the weekend, with a

18   schedule and location?

19           THE COURT:  At this point I think the fact of the

20   current conditions is what is getting us to work with

21   alacrity on putting together the financial information.  And

22   you're asking me and pretrial to micromanage his life on an

23   ongoing basis.  I think we can get this all done very

24   quickly and we should probably do that.

25           If there's somewhere he has to go that isn't one

1    of the places that is specifically listed, and he has to do

2    it in the next two days, he can request the Court's

3    permission to do it.

4              MR. WU:  Very well, Your Honor.

5              Court's indulgence for one moment.

6              (Off-the-record discussion between Mr. Wu and

7    Defendant Gates.)

8              MR. WU:  Very well, Your Honor.  Thank you.

9              THE COURT:  All right.  I'll see everybody on

10   December 11.  And I will read anything I get in the

11   meantime.

12             Thank you.

13                             *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, JANICE DICKMAN, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of

my stenograph notes and is a full, true and complete

transcript of the proceedings to the best of my ability.

                    Dated this 7th day of November, 2017.




                    /s/_____

                    Janice E. Dickman, CRR, RMR
                    Official Court Reporter
                    Room 6523
                    333 Constitution Avenue NW
                    Washington, D.C. 20001