UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**APPLICATION TO PLEDGE REAL PROPERTY TO SECURE RELEASE ON BOND**

UNITED STATES OF AMERICA      )
                             )
        v.               )    Criminal Number 17-201-01 (ABJ)
                             )
                             )
_____)

1.   Name(s) of person(s) offering real property for appearance or surety bonds:

     Summerbreeze, LLC

2.   Address(es): 174 Jobs Lane, Bridgehampton, NY

3.   Location of property offered (address and brief description of property):

     174 Jobs Lane, Bridgehampton, NY (single family home)

4.   Person(s) and address(es) in whose name property is assessed:

     Summerbreeze, LLC 174 Jobs Lane, Bridgehampton, NY

5.   Mortgage, liens, encumbrances of any kind on such property and the interest held in such property by anyone other than the person(s) in whose name the property is assessed:

     Federal Savings Bank (mortgage)

6.   Assessed value of property: $ 13,500,000

7.   Mortgage, liens, encumbrances or other interests (total)
     $ 9,500,000

(over)

8.  Net assessed value of property (line 6 less line 7):
    $ 4,000,000

9.  Amount required for appearance or surety bonds:
    $ See attached rider

    There must be attached to this form a certificate from the
Assessor's Office of the District of Columbia, indicating the
square and lot numbers, street address, current assessed value,
and in whose name the property is assessed.

    If the amount shown on line 8 (listed above) exceeds that
shown on line 9, then the property, if qualified in all other
respects, is adequate to secure the bond in question.

               *   *   *   *   *   *   *   *

**AFFIDAVIT IN SUPPORT TO APPLICATION TO PLEDGE REAL PROPERTY TO
SECURE RELEASE OF DEFENDANT ON BOND**

    I declare under penalty of perjury that the information
on this application is true and correct.

    I also warrant under oath that, subsequent to the execution
of deed of trust on the property described in this application
to secure the release of:

    Paul J. Manafort, Jr.

and prior to recordation of said deed, no other deed of any kind
will be executed by me or will this property be further encumbered
in any way.

Witness my hand and seal _____

Subscribed and sworn to before me this _____day of _____,

19_____.

                    _____
                    CLERK, U.S. DISTRICT COURT

AO 100  (Rev. 06/09) Agreement to Forfeit Real Property to Obtain a Defendant's Release

# UNITED STATES DISTRICT COURT
### for the District of Columbia

| | | |
|---|---|---|
| United States of America | ) | 17 - 201 - 01 (ABJ) |
| v. | ) | Case No. |
| Paul J. Manafort | ) | |
| *Defendant* | ) | |

## AGREEMENT TO FORFEIT REAL PROPERTY TO OBTAIN A DEFENDANT'S RELEASE

To obtain the defendant's release, we jointly and severally agree to forfeit the following property to the United States of America if this defendant fails to appear as required for any court proceeding or for the service of any sentence imposed as may be noticed or ordered by any court considering this matter, or fails to comply with any conditions of release set by the court  *(describe property and any claim, lien, mortgage, or other encumbrance on it)*:

174 Jobs Lane, Bridgehampton, New York as more fully described in attached Deed Mortgage to Federal Savings Bank dated November 16, 2016.  Amount: $9,500,000.00

*Ownership.* We declare under penalty of perjury that we are this property's sole owners and that it is not subject to any claim, lien, mortgage, or other encumbrance except as disclosed above.  We promise not to sell, mortgage, or otherwise encumber the property, or do anything to reduce its value while this agreement is in effect. We deposit with the court the following ownership documents, including any encumbrance documents *(list all documents and submit as attachments)*:

1. Deed dated Nov. 9, 2016
2. Mortgage dated Nov. 16, 2016
3. Appraisal

*Surety Information.* We understand that the court and the United States of America will rely on the surety information in approving this agreement.

*Conditions of Release.* We state that we have either read all court-ordered conditions of release imposed on the defendant or had them explained to us.

*Continuing Agreement.* Unless the court orders otherwise, this agreement remains in effect during any appeal or other review until the defendant has satisfied all court notices, orders, and conditions.

*Exoneration of Sureties.* This agreement is satisfied and ends if the defendant is exonerated on all charges or, if convicted, the defendant reports to serve any sentence imposed.

*Forfeiture.* If the defendant fails to obey all conditions of release, court notices, and orders to appear, the court will immediately order the property forfeited and on motion of the United States of America may order a judgment of forfeiture against the signing parties and their representatives, jointly and severally, including interest and costs.

AO 100  (Rev. 06/09) Agreement to Forfeit Real Property to Obtain a Defendant's Release

I swear under penalty of perjury that the above information is true and agree to the conditions of this agreement.

Date: _____

_____
*Defendant (if a property owner)*

City and state: _____

Summerbreeze, LLC by Kathleen B. Manafort
_____
*Property owner's printed name*

_____
*Property owner's signature*

_____
*Property owner's printed name*

_____
*Property owner's signature*

_____
*Property owner's printed name*

_____
*Property owner's signature*

Sworn and signed before me.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Agreement accepted.

*UNITED STATES OF AMERICA*

Date: _____

_____
*Assistant United States Attorney's signature*

Agreement approved.

Date: _____

_____
*Judge's signature*

# 174 Jobs Lane, Bridgehampton, NY

# DEED

Bargain and Sale Deed, with Covenant against Grantor's Acts

THIS INDENTURE, made the 9th day of November, two thousand and sixteen

BETWEEN Kathleen B. Manafort, 10 St. James Drive, Palm Beach Gardens, Florida 33418

party of the first part, and

Summerbreeze, LLC. 10 St. James Drive, Palm Beach Gardens, Florida 33418

party of the second part,

WITNESSETH, that the party of the first part, in consideration of Ten D o l l a r s , and other valuable consideration p a i d by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the part of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Southampton, Sullfok County, State of New York, previously recorded at Section 134.00, Block 01.00, Lot 048.006 as set forth more specifically in Schedule *A* annexed hereto and make part herein.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof;

TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written. In presence of:

KATHLEEN B. MANAFORT

**First American
Title Insurance Company
of New York**

*STATE OF NEW YORK    }
                    } ss.:
COUNTY OF _____ }

On the _____ day of _____ in the year _____ before me, the undersigned, personally appeared _____,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of
Individual taking acknowledgement

*STATE OF NEW YORK    }
                    } ss.:
COUNTY OF _____ }

On the _____ day of _____ in the year _____ before me, the undersigned, personally appeared _____,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of
Individual taking acknowledgement

* For acknowledgements taken in New York State.

** State, District of Columbia, Territory, Possession, or Foreign Country

_Florida – Palm Breach County_ ) s.s.:

On the _10_ day of _November_ in the year _2016_ before me, the undersigned, personally appeared _Kathleen B. Manafort_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the _Palm Breach County, Florida_ (Insert the city or other political subdivision and the state or country or other place the acknowledgement was taken.)

_____
Signature and Office of
Individual taking acknowledgement

LOUIS MONTALBANO
Notary Public - State of Florida
My Comm. Expires Aug 22, 2017
Commission # FF 038473

* For acknowledgements taken outside New York State.



_First American_
_Title Insurance Company_
_of New York_

# Fidelity National Title Insurance Company

### TITLE NO.: 16-7406-39626-SUFF

October 4, 2016

---

## SCHEDULE A *(Description)*

ALL that certain plot, piece or parcel of land, situate, lying and being at Mecox, in the Town of Southampton, County of Suffolk and State of New York, known and designated as Lot No. 2 on a certain subdivision map entitled, "Minor Subdivision Map for Cidney Farms", being more particularly bounded and described as follows:

BEGINNING at a point on the westerly side of Jobs Lane which point is situate South 49 degrees 15 minutes 00 seconds West 1730.17 feet more or less from the intersection of the southerly line of Mecox Road and the westerly line of Jobs Lane and which point is also situate 49.17 feet from the southerly line of land now or formerly of Niuta S. Titus;

RUNNING THENCE North 64 degrees 30 minutes 00 seconds West 569.18 feet;

RUNNING THENCE South 25 degrees 31 minutes 17 seconds West 348.78 feet to land now or formerly of S.H. Talmage;

RUNNING THENCE along the last mentioned land North 64 degrees 28 minutes 43 seconds West 260.00 feet;

RUNNING THENCE North 25 degrees 31 minutes 17 seconds East 338.70 feet;

RUNNING THENCE along the arc of a regular curve to the right, having a radius of 25.00 feet, a distance of 39.26 feet;

THENCE South 64 degrees 30 minutes 00 seconds East 810.78 feet to the westerly side of Jobs Lane;

RUNNING THENCE along the westerly side of Jobs Lane South 49 degrees 15 minutes 00 seconds West, 16.39 feet to the point or place of BEGINNING.

*THE POLICY TO BE ISSUED under this Commitment will insure the title to such buildings and improvements on the premises which by law constitute real property.*

*FOR CONVEYANCING ONLY: Together with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.*

*SCHEDULE A (Description)*

# 174 Jobs Lane, Bridgehampton, NY

# MORTGAGE

Loan Number 1010001429

**When recorded, return to:**
The Federal Savings Bank
Attn: Final Document Department
300 North Elizabeth Street, Suite 3E
Chicago, IL 60607

Title Order No.: 16-7406-39626-SUFF

Escrow No.: 16-7406-39626-SUFF

LOAN #: 1010001429

_____[Space Above This Line For Recording Data]_____

## MORTGAGE

A.    Borrower, a New York limited liability company, has executed a Promissory Note in connection herewith and made payable to the order of Lender in an amount of Nine Million Five Hundred Thousand Dollars ($9,500,000.00), plus interest at the rate provided therein (the "Note").

C.    Borrower desires to secure the prompt payment of the indebtedness and interest evidenced by the Note, the repayment of any advances made pursuant to this Mortgage, with interest thereon, and the due, prompt and complete observance, performance and discharge of each and every obligation, covenant and agreement set forth in the Note, in this Mortgage, and in any other Loan Documents (as hereinafter defined). For purposes of this Mortgage, the Note and any documents executed or delivered in connection with the Note are referred to collectively herein as the "Loan Documents;" provided, however, any environmental indemnity or environmental indemnity agreement, executed by Borrower or any other persons in connection with the Loan, shall in no event constitute a Loan Document for purposes of this Mortgage.

## MORTGAGE

**WORDS USED OFTEN IN THIS DOCUMENT**
(A) "Security Instrument." This document, which is dated   November 16, 2016,          together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower."   SUMMERBREEZE, LLC,

whose address is   C/O BRUCE E. BALDINGER, ESQ., 43 WEST 43RD ST, SUITE 141, NEW YORK, NY 10036, sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "Lender" is THE FEDERAL SAVINGS BANK and Lender's successors and assigns. Lender is a FEDERAL SAVINGS BANK organized and existing under the laws of the UNITED STATES OF AMERICA. Lender's address is 300 N. ELIZABETH ST. SUITE 3E, CHICAGO, IL 60607. Lender is the mortgagee under this Security Instrument.

(D) "Note." The note signed by Borrower and dated   November 16, 2016,          will be called the "Note." The Note

LOAN #: 1010001429

shows that I owe Lender **NINE MILLION FIVE HUNDRED THOUSAND AND 00/100 Dollars** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*(U.S. **$9,500,000.00)**
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay
the debt in full by **December 1, 2046.**

(E)    **"Property."** The property that is described below in the section titled "Description of the Property," will be called the
"Property."
(F)    **"Loan."** The "Loan" means the debt evidenced by the Note, plus interest, late charges due under the Note, and all
sums due under this Security Instrument, plus interest.
(G)    **"Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the
Property" sometimes will be called the "Sums Secured."
( I )  **"Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The
following Riders are to be signed by Borrower [check box as applicable]:
         ☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
         ☐ Other
(J)    **"Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions
will be called "Applicable Law."
(K)    **"Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are
imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will
be called "Community Association Dues, Fees, and Assessments."
(L)    **"Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft,
or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic
tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of
an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a mer-
chant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated
clearinghouse transfers.
(M)    **"Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."
(N)    **"Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages,
or proceeds paid by any third party (other than Insurance Proceeds as defined in, and paid under the coverage described
in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omis-
sions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent
domain is known as "Condemnation."
(O)    **"Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(P)    **"Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any
amounts under Section 3 will be called "Periodic Payment."
(Q)    **"RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or succes-
sor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to
all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does
not qualify as a "federally related mortgage loan" under RESPA.
(R)    **"Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his
designee.
(S)    **"Deposit Account Agreement"** shall mean that certain Deposit Account and Security Agreement [Borrower's Funds
Account] of even date herewith, providing Lender with a first lien security interest in the Borrower's Funds Account and the
"Pledged Funds" (as defined in the Deposit Account Agreement [Borrower's Funds Account]) deposited therein.
(T)    **"Additional Collateral"** shall mean $630,000.00 to be deposited by Borrower into the Borrower's Funds Account to be
held by Lender as additional security for the Note.

**DESCRIPTION OF THE PROPERTY**
I give Lender and Lender's successors and assigns rights in the Property described in
(A) through (G) below:
         (A) The Property which is located at  **174 JOBS LANE, BRIDGEHAMPTON,**
                                                                   [Street] [City, Town or Village]

         New York          **11976**
                              [Zip Code]

         This Property is in  **SUFFOLK**                                           County. It has the following legal description:
         **SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS "EXHIBIT A".**
         **APN #: Sec: 134.00 Block: 01.00 Lot: 48.006**

*Exhibit A*

# FIDELITY NATIONAL TITLE INSURANCE COMPANY

TITLE No.: 16-7406-39626SUFF

## SCHEDULE A - Part I

### DESCRIPTION

ALL that certain plot, piece or parcel of land, situate, lying and being at Mecox, in the Town of Southampton, County of Suffolk and State of New York, known and designated as Lot No. 2 on a certain subdivision map entitled, "Minor Subdivision Map for Cidney Farms", being more particularly bounded and described as follows:

BEGINNING at a point on the westerly side of Jobs Lane which point is situate South 49 degrees 15 minutes 00 seconds West 1730.17 feet more or less from the intersection of the southerly line of Mecox Road and the westerly line of Jobs Lane and which point is also situate 49.17 feet from the southerly line of land now or formerly of Niuta S. Titus;

RUNNING THENCE North 64 degrees 30 minutes 00 seconds West 569.18 feet;

RUNNING THENCE South 25 degrees 31 minutes 17 seconds West 348.78 feet to land now or formerly of S.H. Talmage;

RUNNING THENCE along the last mentioned land North 64 degrees 28 minutes 43 seconds West 260.00 feet;

RUNNING THENCE North 25 degrees 31 minutes 17 seconds East 338.70 feet;

RUNNING THENCE along the arc of a regular curve to the right, having a radius of 25.00 feet, a distance of 39.26 feet;

THENCE South 64 degrees 30 minutes 00 seconds East 810.78 feet to the westerly side of Jobs Lane;

RUNNING THENCE along the westerly side of Jobs Lane South 49 degrees 15 minutes 00 seconds West, 16.39 feet to the point or place of BEGINNING.

LOAN #: 1010001429

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;
(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"
(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;
(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;
(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and
(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) though (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS.

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 14 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, food and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.** I will pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

**LOAN #: 1010001429**

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.** Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.** Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**(d)  Deficiencies.**  In no event shall Lender be required to disburse any amount which, in Lender's reasonable opinion, will either (a) reduce the total undisbursed amount of the Loan below the amount necessary to pay for the balance of the work, labor and materials necessary to fully complete construction of the Improvements and the payment of all costs in connection therewith, or (b) reduce the undisbursed amount of Loan proceeds allocated to the costs described in any cost category set forth in the Project Budget or in any schedule of values approved by Lender below the amount which Lender, in Lender's reasonable opinion, deems sufficient to pay in full the costs to which such amount is allocated (the deficiencies described in clauses (a) and (b) of this sentence being hereinafter collectively referred to as a "Loan Deficiency").

Borrower hereby agrees that if Lender reasonably determines that a Loan Deficiency exists, Borrower shall, upon five (5) Business Days' written notice from Lender, either:

   a)  deposit with Lender in the Borrower's Funds Account the amount that Lender, in its reasonable opinion, deems necessary to pay for the balance of the costs of completing the construction of the Improvements or the costs in the cost category described in the Project Budget or in any such schedule of values, as the case may be, less the undisbursed amount of the Loan or undisbursed portion thereof under the cost category in question, or

   b)  furnish Lender with paid invoices, bills and receipts indicating that Borrower has paid, from Borrower's own funds, the costs of completing the construction of the Improvements or the costs in the cost category in question, as the case may be, in a sufficient amount to make the undisbursed amount of the Loan or the undisbursed portion thereof under the cost category in question sufficient to pay for the entire balance of the costs of completing the construction of the Improvements or the entire balance of the costs in such cost category, as the case may be.

All amounts deposited by Borrower pursuant to this Section 3(d) shall be disbursed in accordance with the terms of this Agreement for the payment of the cost of construction of the Improvements prior to any further disbursement of the Loan. Notwithstanding anything to the contrary set forth in this section, in determining the Loan Deficiency, Lender, at its option, may determine what sums are available by reallocating between specific line items of the Project Budget, and Lender may also review the amount of any holdback before requesting that any sum be paid by Borrower under this section.

**4.   Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument.

**LOAN #: 1010001429**

In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 24 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid

LOAN #: 1010001429

because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

**(b)  Lender's Inspection of Property.** Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8.   Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9.   Lender's Right to Protect its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 10), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10.   Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of

LOAN #: 1010001429

the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 18 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 24). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**11. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.** Lender may allow me, or a person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 24 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**12. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 17 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 19.

**13. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**14. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**17. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial

LOAN #: 1010001429

interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 17, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 14 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**18. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** If I meet certain conditions, I shall have the right to reinstatement of a mortgage. These conditions are that:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the beginning of foreclosure proceedings within two years immediately prior to the beginning of current foreclosure proceedings; (ii) reinstatement will prevent foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 18, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 17 of this Security Instrument.

**19. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join, or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 14 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 24 and the notice of the demand for payment in full given to me under Section 24 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19. All rights under this paragraph are subject to Applicable Law.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if I do not repay the Loan as agreed. I acknowledge and agree that I am not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor am I entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable  Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

**LOAN #: 1010001429**

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**22. Grounds for Acceleration of Debt.**

**(a) Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

    (i)  I default by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

    (ii) I default by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

**(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn–St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

    (i)  All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

**(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

**(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

**(e) Mortgage Not Insured.** I agree that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**23. Assignment of Rents.** I unconditionally assign and transfer to Lender all the rents and revenues of the Property. I authorize Lender or Lender's agents to collect the rents and revenues and hereby direct each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to me of my breach of any covenant or agreement in the Security Instrument, I shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and me. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to me: (a) all rents received by me shall be held by me as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

I have not executed any prior assignment of the rents and have not and will not perform any act that would prevent Lender from exercising its rights under this Section 23.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to me. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**24. Lender's Rights if Borrower Fails to Keep Promises and Agreements.** Lender shall give notice to me prior to acceleration following my breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to me, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform me of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense I have to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender will have the right to collect all costs allowed by law, including, but not limited to reasonable attorneys' fees and costs of title evidence.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 24 or applicable law.

**25. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that

**LOAN #: 1010001429**

I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**26. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 26.

**27. Borrower's Statement Regarding the Property [check box as applicable].**

☒ This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

☐ This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

☒ This Security Instrument does not cover real property improved as described above.

**28. Event of Default.** Any event of default under any of the Loan Documents shall constitute an event of default for purposes of this Security Instrument.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 10 of this Security Instrument and in any Rider signed by me and recorded with it.

SUMMERBREEZE LLC, a New York limited liability company

By: _____
Bruce Baldinger, Special Secretary, —Borrower

State of _N⅄_ )
) SS:
County of _N⅄_ )

On the 16th day of NOVEMBER in the year 2016, before me, the undersigned, a Notary Public in and for said State, personally appeared Bruce Baldinger, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

KRYSTIANA GEMBRESSI
Notary Public, State of New York
No. 01GE6217319
Qualified in Nassau County
Commission Expires February 08, 2018

My commission expires: _2/18_

LOAN #: 1010001429

SECOND HOME RIDER

THIS SECOND HOME RIDER is made this 16th day of November, 2016, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower," whether there are one or more persons undersigned) to secure Borrower's Note to THE FEDERAL SAVINGS BANK (the "Lender") of the same date and covering the Property described in the Security Instrument (the "Property"), which is located at : 174 JOBS LANE, BRIDGEHAMPTON, NY 11976

In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are deleted and are replaced by the following:

6. Occupancy. Borrower shall occupy, and shall only use, the Property as Borrower's second home. Borrower shall keep the Property available for Borrower's exclusive use and enjoyment at all times, and shall not subject the Property to any timesharing or other shared ownership arrangement or to any rental pool or agreement that requires Borrower either to rent the Property or give a management firm or any other person any control over the occupancy or use of the Property.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's second home.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.

SUMMERBREEZE LLC, a New York limited liability    company

By:_____
Bruce Baldinger, Special Secretary,   - Borrower

# 174 Jobs Lane, Bridgehampton, NY

## PROPERTY APPRAISAL
## and
## BROKER'S VALUATION

## APPRAISAL OF REAL PROPERTY

### LOCATED AT:

174 Jobs Ln
District 900 Section 134 Block 1 Lot 48.006
Bridgehampton, NY 11932

### FOR:

The Federal Savings Bank
300 N Elizabeth St Suite 3E
Chicago, IL  60607

### AS OF:

10/04/2016

### BY:

Douglas C Feinberg
DCF Appraisals
135 Lewis Street
Southampton NY 11968

516-381-3812 Cell Phone   631-537-6169 Office Phone and Fax

The Federal Savings Bank
300 N Elizabeth St Suite 3E
Chicago, IL 60607

Re: Property:     174 Jobs Ln
                  Bridgehampton, NY 11932
    Borrower:     Paul Manafort
    File No.:      R16-08638

In accordance with your request, we have appraised the above referenced property.  The report of that appraisal is
attached.

The purpose of this appraisal is to estimate the market value of the property described in this appraisal report, as
improved, in unencumbered fee simple title of ownership.

This report is based on a physical analysis of the site and improvements, a locational analysis of the neighborhood and
city, and an economic analysis of the market for properties such as the subject.  The appraisal was developed and the
report was prepared in accordance with the Uniform Standards of Professional Appraisal Practice.

The value conclusions reported are as of the effective date stated in the body of the report and contingent upon the
certification and limiting conditions attached.

It has been a pleasure to assist you.  Please do not hesitate to contact me or any of my staff if we can be of additional
service to you.

Sincerely,

Douglas C. Feinberg
Douglas C Feinberg

Douglas Feinberg (516)361-3812

# Uniform Residential Appraisal Report

9016235816
File # R16-08638

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| Property Address 174 Jobs Ln | City Bridgehampton | State NY | Zip Code 11932 |
|---|---|---|---|

Borrower Paul Manafort     Owner of Public Record Kathleen B Manafort     County Suffolk

Legal Description  District 900 Section 134 Block 1 Lot 48.006

Assessor's Parcel #  0900-134.00-01-00-048.006     Tax Year 2016     R.E. Taxes $ 19,773

Neighborhood Name Bridgehampton South     Map Reference 31-Q-43     Census Tract 1907.04

Occupant ☒ Owner ☐ Tenant ☐ Vacant     Special Assessments $ 0     ☐ PUD  HOA $ 0   ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☒ Refinance Transaction ☐ Other (describe)

Lender/Client  The Federal Savings Bank     Address  300 N Elizabeth St Suite 3E, Chicago, IL 60607

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☐ Yes ☒ No

Report data source(s) used, offering price(s), and date(s).  Broker Record Research.

**CONTRACT**

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $     Date of Contract     Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE $ (000) | AGE (yrs) | One-Unit | 65 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | | | 2-4 Unit | 0 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | 1,450 Low | 1 | Multi-Family | 0 % |
| Neighborhood Boundaries   The neighborhood is bound to the north by Montauk Hwy, to the east by Sagg | | | | | | 22,000 High | 200 | Commercial | 10 % |
| Pond, to the south by Atlantic Ocean and the west by Mecox Bay. | | | | | | 5,500 Pred. | 40 | Other | 25 % |

Neighborhood Description   The subject dwelling is located in a quiet neighborhood. Transportation includes trains, busses, and aircraft. Easy access to major roadways and highways. Close proximity to shopping, commercial,  business districts, restaurants, recreational waterways, ocean and bay beaches. Employment is strong and stable with a higher demand during the summer months.

Market Conditions (including support for the above conclusions)   The real estate market appears to be stabilizing for single-family properties. Mortgage financing is mixed VA, FHA and Conventional, all at competitive rates and terms. There are no standard loans discounts or interest rate buy downs in this marketing area.  Seller sales concession activity is not normally found except on new construction and on Relocation Company assis

**SITE**

Dimensions Subject to Survey     Area 2.37 ac     Shape Irregular/Typical     View N;Res;

Specific Zoning Classification R80     Zoning Description  Min lot size 80,000 square feet.

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ 800 Amps | Water | ☐ | ☐ | Street Asphalt | ☒ | ☐ |
| Gas | ☐ | ☒ Propane | Sanitary Sewer | ☐ | ☒ Septic System | Alley  None | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X500     FEMA Map # 36103C0537H     FEMA Map Date 09/25/2009

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  ☐ Yes ☒ No  If Yes, describe

Underground septic systems, private wells and propane are common to the area and are in satisfactory operation with no problems noted. No apparent or visible adverse or unfavorable factors which would effect the subject's value or marketability at time of inspection. There are no public or private sewer systems in the streets of the subject market area. All comps have the same septic waste disposal system.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls | Stone Face,Concrete | Floors | Wood,Good |
| # of Stories 2 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls | Cedar Shingle,Good | Walls | Drywall,Good |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area 3,255 sq.ft. | | Roof Surface | Composit,Shg,Good | Trim/Finish | Wood Paint,Good |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish 90 % | | Gutters & Downspouts | Yes,Alum,Good | Bath Floor | Ceramic,Good |
| Design (Style) Colonial | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | Double Hung,Good | Bath Wainscot | Marble,Cerm,Good |
| Year Built 1994 | | Evidence of ☐ Infestation | | Storm Sash/Insulated | Yes,Good | Car Storage | None |
| Effective Age (Yrs) 2 | | ☐ Dampness ☐ Settlement | | Screens | Yes,Good | ☒ Driveway   # of Cars 6 |
| Attic ☐ None | Heating ☒ FWA ☐ HWBB ☐ Radiant | | | Amenities | ☐ Woodstove(s) # 0 | Driveway Surface | Stone |
| ☒ Drop Stair ☐ Stairs | ☐ Other  Fuel Oil | | | ☒ Fireplace(s) # 2 | ☒ Fence Fbgls,Wire | ☒ Garage   # of Cars 2 |
| ☐ Floor ☐ Scuttle | Cooling ☒ Central Air Conditioning | | | ☒ Patio/Deck Both | ☒ Porch Side | ☐ Carport   # of Cars 0 |
| ☐ Finished ☐ Heated | ☐ Individual ☒ Other  None | | | ☒ Pool In Ground | ☒ Other  Extras | ☒ Att. ☐ Det. ☐ Built-In |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☒ Disposal ☒ Microwave ☒ Washer/Dryer ☒ Other (describe)  Extras

Finished area above grade contains:     15 Rooms     8 Bedrooms     8.1 Bath(s)     6,123 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).     See Addendum on Page 3.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).     C2;Kitchen-remodeled-one to five years ago;Bathrooms-remodeled-one to five years ago;Total life expectancy estimated at 60 years. Physical depreciation estimated on a straight line basis.  Physical depreciation of subject is 3.33%.  No functional or external obsolescence. The subject is adequately maintained with no repairs required at the present time.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe

Your appraiser is not a home inspector and this appraisal report is not a home inspection, your appraiser only performed a visual observation of accessible areas and the appraisal report cannot be relied upon to disclose conditions and/or defects in the subject property. A professional home inspection is recommended.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

## Uniform Residential Appraisal Report

9016235816
File # R16-08638

There are **8** comparable properties currently offered for sale in the subject neighborhood ranging in price from $ **11,495,000** to $ **22,000,000** .
There are **4** comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ **11,500,000** to $ **14,600,000** .

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 174 Jobs Ln, Bridgehampton, NY 11932 | 379 Ocean Rd, Bridgehampton, NY 11932 | | 461 Ocean Rd, Bridgehampton, NY 11932 | | 672 Halsey Ln, Bridgehampton, NY 11932 | |
| Proximity to Subject | | 1.55 miles NE | | 1.40 miles NE | | 0.66 miles N | |
| Sale Price | $ | $ | 14,600,000 | $ | 13,500,000 | $ | 12,000,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 1591.45 sq.ft. | | $ 2563.13 sq.ft. | | $ 1200.72 sq.ft. | |
| Data Source(s) | | See Below No MLS#;DOM 143 | | See Below No MLS#;DOM 418 | | See Below No MLS#;DOM 437 | |
| Verification Source(s) | | Assessor,RTS 2000***See Below | | Assessor,RTS 2000***See Below | | Assessor,RTS 2000***See Below | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | ArmLth | | ArmLth | |
| Concessions | | Unk;0 | | Cash;0 | | Cash;0 | |
| Date of Sale/Time | | s08/16;Unk | | s10/15;Unk | | s11/15;Unk | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 2.37 ac | 2.47 ac | 0 | 1.96 ac | +41,000 | 1.96 ac | +41,000 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;Colonial | DT2;Colonial | | DT2;Colonial | | DT2;Colonial | |
| Quality of Construction | Q2 | Q2 | | Q2 | | Q2 | |
| Actual Age | 22 | 12 | 0 | 5 | 0 | 8 | 0 |
| Condition | C2 | C2 | | C2 | | C2 | |
| Room Count | Total 15 / Bdrms. 8 / Baths 8.1 | Total 16 / Bdrms. 8 / Baths 7.3 | | Total 13 / Bdrms. 6 / Baths 6.2 | +30,000 | Total 16 / Bdrms. 7 / Baths 7.2 | +10,000 |
| Gross Living Area | 6,123 sq.ft. | 9,174 sq.ft. | -610,200 | 5,267 sq.ft. | +171,200 | 9,994 sq.ft. | -774,200 |
| Basement & Finished | 3255sf2930sfin | 4333sf3000sfin | 0 | 2400sf2000sfin | 0 | 4800sf3500sfwu | 0 |
| Rooms Below Grade | 1rr0br0.1ba4o | 1rr0br1.0ba2o | 0 | 1rr1br1.0ba2o | 0 | 1rr0br1.0ba2o | 0 |
| Functional Utility | Conforms Yes | Conforms Yes | | Conforms Yes | | Conforms Yes | |
| Heating/Cooling | H(Y)C(Y) | H(Y)C(Y) | | H(Y)C(Y) | | H(Y)C(Y) | |
| Energy Efficient Items | Energy Star | Energy Star | | Energy Star | | Energy Star | |
| Garage/Carport | 2ga6dw | 3ga6dw | -10,000 | 2ga6dw | | 3ga6dw | -10,000 |
| Porch/Patio/Deck | 1Porh,4Pato,4D | 1Porh,3Pato1D | +60,000 | 1Porch,4Patio | +80,000 | 2Porch,2Patio | +100,000 |
| Fireplace | 2 Fireplace | 5 Fireplace | -75,000 | 5 Fireplace | -75,000 | 4 Fireplace | -50,000 |
| Pool/Fence | Pool/Hot Tub | Pool/Hot Tub | | Pool/Hot Tub | | Pool/Hot Tub | |
| EXTRAS | P/H,Ten,GG,OK | Equal | 0 | Equal | 0 | Inferior | +1,000,000 |
| Net Adjustment (Total) | | □ + ☒ - $ | -635,200 | ☒ + □ - $ | 247,200 | ☒ + □ - $ | 316,800 |
| Adjusted Sale Price of Comparables | | Net Adj. 4.4 % Gross Adj. 5.2 % $ | 13,964,800 | Net Adj. 1.8 % Gross Adj. 2.9 % $ | 13,747,200 | Net Adj. 2.6 % Gross Adj. 16.5 % $ | 12,316,800 |

I ☒ did □ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research □ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s) Geodata
My research □ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s) Geodata
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Geodata | Geodata | Geodata | Geodata |
| Effective Date of Data Source(s) | 10/04/2016 | 10/04/2016 | 10/04/2016 | 10/04/2016 |

Analysis of prior sale or transfer history of the subject property and comparable sales   Any transfers of the subject and comparable sales are noted above.

***NOTE: DATA SOURCE(S): Data Sources utilized on the market data grid above may be all or a combination of the following data sources for data transfer price, date and address verification. Assessor Records, Broker Records, Geodata, RTS 2000, Comps Inc. The Suffolk County Clerk Office & on Occasion Zillow. Note Suffolk County Clerk only provides recorded date not sale date. See Addendum.

Summary of Sales Comparison Approach   Due to the lack of more recent & closer comparable sales, your appraiser was required to include comps 2,3&4 even though they exceed the 6 month guideline and comps 1&2 even though they exceed the 1 mile guideline ( same market area ). With adjustments made deemed proper, all comps are valid and support the subject's Fair Market Value.
The final opinion of value is based on the comparables available utilized and adjusted accordingly.

Indicated Value by Sales Comparison Approach $ 13,500,000

Indicated Value by: Sales Comparison Approach $ 13,500,000   Cost Approach (if developed) $ 13,711,497   Income Approach (if developed) $
All three approaches to value were considered. The sales comparison analysis method was deemed to be the most reliable indicator of value and was supported by the cost approach. The income approach does not apply due to insufficient rental data for single family homes in this area.

This appraisal is made ☒ "as is", □ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, □ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or □ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: This appraisal was prepared for mortgage purposes only in conformity with the Code of Ethics of the NAIFA and under the Uniform Standards of Professional Practice.
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 13,500,000 , as of 10/04/2016 , which is the date of inspection and the effective date of this appraisal.

## Uniform Residential Appraisal Report

9016235816
File # R16-08638

Estimate of Exposure Time: See USPAP Identification & Exposure Time Addendum.

The appraiser certifies and agrees that this appraisal was prepared in accordance with the requirements of Title XI of the Financial Institutions, Reform, Recovery, and Enforcement Act (FIRREA) of 1989, as amended (12 U.S.C. 3331 et seq.), and any applicable implementing regulations in effect at the time the appraiser signs the appraisal certification.

Mandatory USPAP Disclosures: See USPAP Addendum.

The one-unit neighborhood analysis was preformed to arrive at the high, low and predominate values reported in the subject neighborhood for the prior 12 months from the effective date of this appraisal report. A second market analysis was preformed going back for the same period from 2014 to 2015. The difference in the median price from 2014/2015 to 2015/2016 is from which the market percent decline, increase or stabilizing trend was derived.

One Unit Housing Trends and Date of Sale:
Your appraiser is an expert and appraises very frequently in the subject neighborhood market area. With repeated overall closed sale market analysis utilizing Geodata over the past year the subject market area has shown a steadily stabilizing market. No time adjustments warranted.
A extensive search for closed sales within 90 days of the effective date of this appraisal report in the subject market area was performed, due to the slow real estate market no other more reasonable closed sales similar to the subject were found within 90 days of the effective date of this appraisal report other than already utilized.

Additional Features: See Addendum.

The Intended User of this appraisal report is the Lender/Client. The Intended Use is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value. No additional Intended Users are identified by the appraiser.

This appraisal report is prepared for the sole and exclusive use of the appraiser's lender/client to assist with the mortgage lending decision. No third parties are authorized to rely upon this report for any purpose whatsoever. This report should not be relied upon to disclose any conditions present in the subject property. This appraisal report does not guarantee that the subject property is free of defects. A professional home inspection is recommended.

The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute
The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives
As of the date of this report, I Douglas Feinberg has completed the Standards and Ethics Education Requirements for (Candidates and Practicing Affiliates) of the Appraisal Institute

See Additional Addendum.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    The site value was determined by the extraction method.
See Addendum for cost approach comments.

ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW

| | | |
|---|---|---|
| OPINION OF SITE VALUE | =$ | 6,500,000 |
| DWELLING 6,123 Sq.Ft. @ $ 900.00 | =$ | 5,510,700 |
| 3,255 Sq.Ft. @ $ 200.00 | =$ | 651,000 |
| Amenities | =$ | 1,000,000 |
| Garage/Carport 528 Sq.Ft. @ $ 75.00 | =$ | 39,600 |
| Total Estimate of Cost-New | =$ | 7,201,300 |
| Less Physical Functional External | | |
| Depreciation 239,803 | =$( | 239,803) |
| Depreciated Cost of Improvements | =$ | 6,961,497 |
| "As-is" Value of Site Improvements | =$ | 250,000 |

Source of cost data  Local builders
Quality rating from cost service  Average  Effective date of cost data  Current
Comments on Cost Approach (gross living area calculations, depreciation, etc.)
No external or functional obsolescence noted. Site value exceeding 30% (based on closed land transactions in the area.) of the estimated replacement cost new of the improvement is common and typical for the area and does not adversely affect the subject's value or marketability. Replacement cost estimated using local building costs.

Estimated Remaining Economic Life (HUD and VA only)    58 Years    INDICATED VALUE BY COST APPROACH    =$ 13,711,497

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____    Indicated Value by Income Approach
Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No    Unit type(s) ☐ Detached ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal Name of Project
Total number of phases _____ Total number of units _____ Total number of units sold _____
Total number of units rented _____ Total number of units for sale _____ Data source(s) _____
Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No If Yes, date of conversion.
Does the project contain any multi-dwelling units? ☐ Yes ☐ No Data Source
Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No If Yes, describe the rental terms and options.
Describe common elements and recreational facilities.

## Uniform Residential Appraisal Report

9016235816
File # R16-08638

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

SCOPE OF WORK: The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

INTENDED USE: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

INTENDED USER: The intended user of this appraisal report is the lender/client.

DEFINITION OF MARKET VALUE: The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS: The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

## Uniform Residential Appraisal Report

9016235816
File # R16-08638

**APPRAISER'S CERTIFICATION:**   The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004UAD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Uniform Residential Appraisal Report

9016235816
File # R16-08638

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**   The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

---

**APPRAISER**   Douglas C. Feinberg

Signature   *Douglas C. Feinberg*
Name   Douglas C Feinberg
Company Name   DCF Appraisals
Company Address   135 Lewis Street
　　　　　　　　　Southampton NY 11968
Telephone Number   516-381-3812 Or 631-537-6169
Email Address   Dougfein@aol.com
Date of Signature and Report   10/05/2016
Effective Date of Appraisal   10/04/2016
State Certification #   45000043752
or State License #
or Other (describe) _____ State # _____
State   NY
Expiration Date of Certification or License   03/21/2018

ADDRESS OF PROPERTY APPRAISED
174 Jobs Ln
Bridgehampton, NY 11932
APPRAISED VALUE OF SUBJECT PROPERTY $   13,500,000
LENDER/CLIENT
Name   Nadlan Valuation
Company Name   The Federal Savings Bank
Company Address   300 N Elizabeth St Suite 3E, Chicago, IL 60607

Email Address _____

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature _____
Name _____
Company Name _____
Company Address _____
　　　　　　　　　_____
Telephone Number _____
Email Address _____
Date of Signature _____
State Certification # _____
or State License # _____
State _____
Expiration Date of Certification or License _____

SUBJECT PROPERTY

☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
　　Date of Inspection _____
☐ Did inspect interior and exterior of subject property
　　Date of Inspection _____

COMPARABLE SALES

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
　　Date of Inspection _____

---

Freddie Mac Form 70 March 2005　　　　　　UAD Version 9/2011　　　Page 6 of 6　　　　　　Fannie Mae Form 1004 March 2005

## Uniform Residential Appraisal Report

9016235816
File # R16-08638

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 174 Jobs Ln | 408 Pauls Ln | | 280 Highland Terr | | 770 Ocean Rd | |
| | Bridgehampton, NY 11932 | Bridgehampton, NY 11932 | | Bridgehampton, NY 11932 | | Bridgehampton, NY 11932 | |
| Proximity to Subject | | 1.00 miles N | | 1.76 miles NE | | 0.77 miles NE | |
| Sale Price | $ | | $     11,550,000 | | $     18,495,000 | | $     14,900,000 |
| Sale Price/Gross Liv. Area | $          sq.ft. | $ 1470.59 sq.ft. | | $ 2077.16 sq.ft. | | $ 4727.16 sq.ft. | |
| Data Source(s) | | See Below Grid No MLS#;DOM 338 | | Broker Record#0;DOM 192 | | Broker Record#0;DOM 288 | |
| Verification Source(s) | | Assessor,RTS 2000***See Below | | Broker Record | | Broker Record | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | ArmLth | | Listing | | Listing | |
| Concessions | | Conv;0 | | Sal/List11%;0 | -2,034,450 | Sal/Lst11%;0 | -1,639,000 |
| Date of Sale/Time | | s10/15;Unk | | Active | | Active | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 2.37 ac | 1.76 ac | +61,000 | 2.07 ac | +30,000 | 3.20 ac | -83,000 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT2;Colonial | DT2;Colonial | | DT2;Colonial | | DT2;Colonial | |
| Quality of Construction | Q2 | Q2 | | Q2 | | Q2 | |
| Actual Age | 22 | 3 | 0 | 1 | 0 | 21 | 0 |
| Condition | C2 | C2 | | C1 | 0 | C2 | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 15   8   8.1 | 18   8   9.3 | -40,000 | 16   10  10.2 | -50,000 | 9   4   4.1 | +80,000 |
| Gross Living Area | 6,123 sq.ft. | 7,854 sq.ft. | -346,200 | 8,904 sq.ft. | -556,200 | 3,152 sq.ft. | +594,200 |
| Basement & Finished | 3255sf2930sfin | 3000sf2500sfwu | 0 | 4200sf3800sfwu | 0 | 1869sf0sfwu | 0 |
| Rooms Below Grade | 1rr0br0.1ba4o | 1rr0br0.1ba2o | 0 | 1rr1br1,0ba1o | 0 | | +200,000 |
| Functional Utility | Conforms Yes | Conforms Yes | | Conforms Yes | | Conforms Yes | |
| Heating/Cooling | H(Y)C(Y) | H(Y)C(Y) | | H(Y)C(Y) | | H(Y)C(Y) | |
| Energy Efficient Items | Energy Star | Energy Star | | Energy Star | | Energy Star | |
| Garage/Carport | 2ga6dw | 3ga6dw | -10,000 | 3ga6dw | -10,000 | 2ga4dw | 0 |
| Porch/Patio/Deck | 1Porh,4Pato,4D | 1Porh,2Pato,1D | +100,000 | 3Porh,3Pato,3D | 0 | 3Porch,1Patio | +60,000 |
| Fireplace | 2 Fireplace | 3 Fireplace | -25,000 | 5 Fireplace | -75,000 | 2 Fireplace | |
| Pool/Fence | Pool/Hot Tub | Pool/Hot Tub | +10,000 | Pool/Hot Tub | | Pool/Fence | +10,000 |
| EXTRAS | P/H,Ten,GG,OK | Inferior | +1,000,000 | Inferior | +1,000,000 | Inferior | +1,000,000 |
| Net Adjustment (Total) | | ☒ +   ☐ - | $   749,800 | ☐ +   ☒ - | $  -1,695,650 | ☒ +   ☐ - | $      222,200 |
| Adjusted Sale Price | | Net Adj.      6.5% | | Net Adj.      9.2% | | Net Adj.      1.5% | |
| of Comparables | | Gross Adj.   13.8% | $   12,299,800 | Gross Adj.  20.3% | $  16,799,350 | Gross Adj.  24.6% | $   15,122,200 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | Geodata | Geodata | Geodata | Geodata |
| Effective Date of Data Source(s) | 10/04/2016 | 10/04/2016 | 10/04/2016 | 10/04/2016 |

Analysis of prior sale or transfer history of the subject property and comparable sales       Any transfers of the subject and comparable sales are noted Above.

Analysis/Comments     Broker records do not list days on market for active listings. DOM reported are approximated from listing date to effective date.

The comparables utilized are the most similar to the subject which the opinion of market value was derived. The active listings were added at the requirement/request of the lender.
Listings have no weight whatsoever as to the conclusion and or opinion of value for the subject. Any guidelines exceeded for active listings was necessary.

Sale to list ratio derived by: Sale Price divided by List Price. Add all percentages then divide by number of sales comps utilized = % of sale to list ratio.

Form 1004UAD.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Supplemental Addendum

File No. R16-08638

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County Suffolk | | State NY | Zip Code | 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |

This appraisal should not be relied upon to detect hidden and non apparent conditions as your appraiser has no formal training or expertise in detecting hidden and non apparent conditions.

Additional Certification:The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Appraisal Institute's Code of Professional Ethics and Standards of Professional Appraisal Practice, which include the Uniform Standards of Professional Appraisal Practice.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives

As of the date of this report, I Douglas C Feinberg have completed the continuing education program of the Appraisal Institute.

Neighborhood Section, Present Land Use % The number of % of land use in the other box refers to vacant land.

**Predominant Value:** In the subject market area, neighborhoods are mixed with varied size homes, utility and amenities. Such as from older small 800 -1,400 square foot ranch style 2-3 bedroom 1-2 bathroom homes to much larger 3,000 - 6,000+ & larger square foot new built traditional, contemp or post modern style 4/6+ bedroom 3/5+ bathroom. Due to the varied mixed neighborhoods the price range reported in the neighborhood section under the One-Unit Housing Price may span a wide high, low range. Although the predominant value of the subject's final opinion of value may differ by 20% +/- the subject is not considered a under improvement or a over improvement for the neighborhood and falls well within the high low range. This has no negative impact on the subjects marketability or opinion of value.

**Data Sources, Verification Sources:** A combination of Assessor record and broker record are utilized when available, additional verification sources, Geodata, RTS 2000, Comps Inc and Zillow. Your appraiser collects the data, cross references the data, verifies the data, analyses the data and after these steps are taken reports the data.

**Comparable Search Data:** The neighborhood data is from Geodata which provides the closed sales data from which the market trend study is researched and reported.. The closed sales data from Geodata is considered and cross referenced with local broker records from which the comparables are chosen. Your appraiser collects, cross references, verifies and analyses the available data through assessor records, geodata, comps inc. and broker records. The search parameters go back 12 months from the effective date of this appraisal report and may have been expanded beyond the 1 mile guideline but still within what is considered to be the subject market area, to obtain closed transfers from what would be considered outside the subject market area would be deemed misleading and inappropriate appraisal practice. Closed transfers within the subject neighborhood may not be considered truly comparable to the subject. Transfers outside the immediate neighborhood but still within the subject market area may be judged to be more comparable to sales then those in closer proximity to the subject.

The Comparable Search Data statement above applies to the first 20 closest sale transfers. Although Fennie Mae calls the first 20 closest transfers "comparables" none may be comparable at all as stated above. Your appraiser does due diligence in researching the subject market area for the very best available comparables to compare to the subject which are utilized and adjusted accordingly.

The comparables utilized were chosen because they are the most recent, reasonable comparables available similar to the subject. Any differences between the subject and comparables utilized were adjusted accordingly. No other more reasonable comparables available then those already utilized as of the effective date of this appraisal report.

Comparable Sales - Database Photographs: Photographs vary from season to season i.e., ("winter to summer"). Attempts are made to physical photograph comparable sale as close to the selling date as possible. The reasoning behind this method is to attempt to capture a true visual image of the sale as it appears prior to the new owner making any improvements, renovations or alterations, which may miss lead, the reviewer's visual perception of the dwelling. Database photos are becoming the standard for the industry and a good indictor of the comparable physical appearance at the time of listing or sale. All comp photos were taken by your appraiser at time of exterior inspection for the use of this or previous appraisals throughout the year.

Financing Type:   A diligent attempt during the course of business in the subject market area for financing was preformed. At times no conclusive type of financing was found or available to your appraiser.

## Supplemental Addendum

File No. R16-08638

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County Suffolk | | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | |

Financing type reported when available.

Basement: Square Footage : A diligent attempt was made by the appraiser to extract the actual square feet of the comparable basement area, by the extraction method from the available data. The exact square footage is estimated by the appraiser from the data sources available through Public Records, and represents the appraisers best effort in estimating the basement square footage and finished area of the comparable's utilized in this report.

MLS #: In the subject market area MLS is not available as a reliable data source due to the lack of local brokerages association and participation. The different local real estate agencies have their own listing systems and while comp addresses are the same listing numbers differ from agency to agency. MLS # unavailable.

Amenities: Due to the UAD lack of allowed characters Amenities line on the cost approach as it applies to the subject's amenities such as fireplace(s), porch(s), patio(s), deck(s), pool, pool house, tennis court, etc:

Your appraiser has acted independently and without undue influence from any party that may benefit from the real estate property transaction related to this appraisal assignment.

March 2005 version of the Fannie Mae/Freddie Mac forms, the cost approach is optional. The cost approach is required by the lender/client

The cost approach has only been developed by the appraiser as an analysis to support your appraiser's opinion of the subject property's market value. Use of this data, in whole or part, for other purposes is not intended by the appraiser. Nothing set forth in this appraisal report should be relied upon for the purpose of determining the amount or type of insurance coverage to be placed on the subject property. Your appraiser assumes no liability for and does not guarantee that any insurable value estimate inferred from this report will result in the subject property being fully insured for any loss that may be sustained. Your appraiser recommends that an insurance professional be consulted. Further, the cost approach may not be a reliable indication replacement or reproduction cost for any other date other then the effective date of this appraisal report due to changing costs of labor and materials and due to changing building codes and or governmental regulations and or requirements.

Market Trends 1004MC: Total number of sales and Median sale price reported are without Foreclosures.

USPS Addresses: In the market areas of your appraisers expertise there are some zip code areas that have USPS PO Box delivery only. Therefore house number and street address may not be found or verified using a USPS address tracker. All addresses for the subject, comps and or any active listings were verified utilizing any of or a combination of the following. Assessor Records, Geodata, RTS 2000, Comps Inc, ala mode USPS tracking conversion tool & Zillow.

Age Adjustments: Your appraiser does not adjust for the difference in age from the subject and comparables utilized. The subject as well as the comparables utilized are of all similar effective age. Adjustments are made for any difference in quality of construction and or difference in condition if necessary.

Your appraiser does not adjust for difference in basement square foot. The unfinished area is negligible as storage area. The adjustments are made for finished and unfinished basements.

Data Difference: With Fannie Mae monitoring crucial data there may be a slight difference in comps utilized due to the level of data verification from a previously utilized active listing and that same active listing utilized later as a closed transfer. The difference will be found in the GLA data as closed transfers receive a higher level of data verification then utilizing active listing broker records only. This applies to some market areas of your appraisers market areas of expertise due to the lack on online data availability and online data verification.

Data Source: When broker records show a very recent closed date that can not be verified by Assessor Records, Geodata, RTS 2000 & Comps Inc. Then your appraiser utilizes the Suffolk County Clerk's Office Automated system to verify that the comp did in fact close was recorded and to verify the closed price. When utilizing Suffolk records your appraiser relies on broker records for the closed month and year as Suffolk records only provides the recording date and price.

## Supplemental Addendum

File No. R16-08638

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County  Suffolk | State  NY | Zip Code  11932 | |
| Lender/Client | The Federal Savings Bank | | | | |

Your appraiser is also an Associate Real Estate Broker. When referring to local broker records the local broker records utilized by your appraiser is the Hampton Listing Service which is also known as RealNet.

Subject Location Only Map: When placing the subject only map on occasion your appraiser will move the address balloon out of the way of other residences and over the water or an open space or reserve. This is done so the viewer can get a better picture of the subject neighborhood. Your appraiser does not move the balloon to cover any external obsolesce.

The 1004 MC form is filled out to the fullest readily available data during the normal course of business. No other relevant data available during the normal course of business.

In the subject market area, neighborhoods are mixed with varied size homes, utility and amenities. Such as from older small 1,000-1,400 square foot ranch style 2-3 bedroom 1-2 bathroom homes to much larger 3,000 -6,000 & larger square foot new built traditional, contemp or post modern style 4/6+ bedroom 3/5+ bathroom. This is reported in the overall neighborhood section one-unit housing trends of this appraisal report and are not considered all to be comparable to the subject. This also applies to the MC form and above the sales comparison grid at the top of page 2.

The MC form is filled out to which data is available there is no data available to report the different time periods for the sections marked unavailable.

1004MC comparable sales and comparable sales reported above market data grid: As mentioned throughout the comments addendum and on the 1004MA form, the data base utilized Geodata Plus does not and can not decipher the difference in closed transfers to what is comparable to the subject.. As mentioned throughout the report including on the 1004MC Form. " In the subject market area, neighborhoods are mixed with varied size homes, utility and amenities. Such as from older small 1,000-1,400 square foot ranch style 2-3 bedroom 1-2 bathroom homes to much larger 3,000 -6,000 & larger square foot new built traditional, contemp or post modern style 4/6+ bedroom 3/5+ bathroom. This is reported in the overall neighborhood section one-unit housing trends of this appraisal report and are not considered all to be comparable to the subject." This goes for what is reported on the 1004MC form. The comparable sales reported above the market data grid are the comparable sales found and utilized.

On the 1004MC form where a Zero is place there is no data available to complete.

No employee, director, officer or agent of the lender, or any other third party acting as a joint venture partner, independent contractor, appraisal management company, or partner in behalf of the lender has influenced or attempted to influence the development, reporting, result or review of this assignment through coercion, extortion, collusion, compensation, instruction, inducement, intimidation, bribery or in any other manner. I have not been contacted by anyone other than the intended user (lender/ client as identified on the first page of the report), borrower or designated contact to make an appointment to enter the property. I agree to immediately report any unauthorized contacts either personally by phone or electronically to partnermanagement.

**Age of Subject and Comps: In certain subject market areas where on line data is available the data sources report the effective age from assessor records vs the actual age. Your appraiser researches, verify's and reports the actual age of the subject and comps.**

Page 1 of the report one unit housing price, low $1,450,000. High, $220,000,000. Pred. $5,500,000.

Market Data Grid Extras Abbreviations, as follows: P/H= = Pool House. Ten = Tennis Court. GG = Golf Green. OK = Outdoor Kitchen. The adjustments are based on equal or inferior extras based on the beast data researched available.

Comp 1 was a recent transfer verified with the Suffolk County Clerks Office: Receded on 10/04/2016 Liber D00012882 Page 438 Sale price $14,600,000 Utilizing broker record sale date of 08/29/2016.

## Supplemental Addendum

File No. R16-08638

| Borrower | Paul Manafort | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | | |
| City | Bridgehampton | County | Suffolk | | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | | |

Closed Sale Dates: Your appraiser expanded the search to 2+ miles within the subject market area for similar comparable transfers. No more recent reasonable closed similar transfers were found within 90 days or 6 months. The subject market is strong and stable going back for at least 24 months. No time adjustments warranted.

Your appraiser is aware that this may be a second appraisal. Market competency is noted above. As mentioned your appraiser utilizes and cross references many verification data sources. Such as but not limited to the following:. Geodata, assessor records, broker records, Suffolk County records Any difference in comp data reporting from another appraiser is unavoidable. Your appraiser will not change or alter any of the already deeply researched data reported.

Your appraiser personally and physically measured primarily utilizing a high tech Lazar measuring tool and measuring wheel where the lazar tool could not be utilized. Any difference in GLA or the sketch from another report of the subject is unavoidable. Your appraiser will not re measure the subject. The only way a different conclusion result can be reported is if a full set of builders plans to scale 1/4" = 1". be provided to your appraiser.

Additional Features: The subject has hardwood floors, recessed lighting, ceiling fans and custom audio/visual system throughout. Kitchen with granite counter tops, ceramic back splash and high end stainless steel appliances. Extra appliances include two refrigerators in pantry, under counter wine fridge and out door appliances. Fireplace in living room and master bedroom. Basement finished with family entertainment area, rec area, gym, massage room, half bathroom, laundry room. Pool house with wet bar, family rooms, full bathroom and three bedrooms. Porch off side, state patio with in ground pool and hot tub off side. By pool house out door snack/sandwich bar and fire pit. Off kitchen is a out door kitchen with built in double grills. Deck's, patio's and upper decks off rear. Half basket ball court off garage. Putting green in rear yard. off to the front side is the tennis court, in front yard is a nice pond. The grounds are extensively landscaped.

Reconciliation: The most weight was placed on comps 1-3 and supported by additional comps utilized and active listings included.

**10/05/2016 Revision/Comments: Subject address: Assessor records and data bases utilized have the subject in Bridgehampton, Bridgehampton's zip code is 11932 not 11976. However looking at the hagstrom map, Bridgehampton 11932 to to the east side of Jobs lane and Water Mill 11976 is to the west side of Jobs lane. The subject is on the west side of Jobs Lane. The address is reported and consistent with a assessor records and data bases utilized.**

**Borrowers name and owner name of public record. The appraiser is required to report the owner of public record, which was done as required. The borrower may differ and is known as the owner of public record to be the husband.**

**The oil tanks are located in the ground. They are known to be relatively new. Your appraiser is not a professional oil tank inspector, under ground seepage in unknown. No odors noted above ground at time of inspection.**

**The high, low and pred. range was noted in the addendum because $220,000,000 can not be reported in the one unit housing section due to the lack of numerical space, I thought that would be evident, that is why I place a note in the addendum.**

**C1 vs C2: C1 is new construction in new condition, C2 is recent renovation in like new condition. No adjustment in the C1 to C2 condition rating.**

**Subject Aerial was added to the subject location map. The label of the map has nothing to do with value of the subject and was not misleading to the reader.**

9016235816
File No.   R16-08638

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Condition Ratings and Definitions

### C1

The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

### C2

The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

### C3

The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

### C4

The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

### C5

The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

### C6

The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

Quality Ratings and Definitions

### Q1

Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

### Q2

Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residence constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

### Q3

Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

### Q4

Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Form UADDEFINE - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Quality Ratings and Definitions (continued)

Q5

Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6

Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure

Definitions of Not Updated, Updated, and Remodeled

Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical/functional deterioration.

Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/or expansion.
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of) square footage). This would include a complete gutting and rebuild.

Explanation of Bathroom Count

Three-quarter baths are counted as a full bath in all cases.  Quarter baths (baths that feature only a toilet) are not included in the bathroom count.  The number of full and half baths is reported by separating the two values using a period, where the full bath count is represented to the left of the period and the half bath count is represented to the right of the period.

Example:
3.2 indicates three full baths and two half baths.

Form UADDEFINE - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## UNIFORM APPRAISAL DATASET (UAD) DEFINITIONS ADDENDUM
(Source: Fannie Mae UAD Appendix D: UAD Field-Specific Standardization Requirements)

Abbreviations Used in Data Standardization Text

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| ac | Acres | Area, Site |
| AdjPrk | Adjacent to Park | Location |
| AdjPwr | Adjacent to Power Lines | Location |
| A | Adverse | Location & View |
| ArmLth | Arms Length Sale | Sale or Financing Concessions |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade |
| br | Bedroom | Basement & Finished Rooms Below Grade |
| B | Beneficial | Location & View |
| Cash | Cash | Sale or Financing Concessions |
| CtySky | City View Skyline View | View |
| CtyStr | City Street View | View |
| Comm | Commercial Influence | Location |
| c | Contracted Date | Date of Sale/Time |
| Conv | Conventional | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions |
| DOM | Days On Market | Data Sources |
| e | Expiration Date | Date of Sale/Time |
| Estate | Estate Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions |
| GlfCse | Golf Course | Location |
| Glfvw | Golf Course View | View |
| Ind | Industrial | Location & View |
| in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| Lndfl | Landfill | Location |
| LtdSght | Limited Sight | View |
| Listing | Listing | Sale or Financing Concessions |
| Mtn | Mountain View | View |
| N | Neutral | Location & View |
| NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| BsyRd | Busy Road | Location |
| o | Other | Basement & Finished Rooms Below Grade |
| Prk | Park View | View |
| Pstrl | Pastoral View | View |
| PwrLn | Power Lines | View |
| PubTrn | Public Transportation | Location |
| rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Relo | Relocation Sale | Sale or Financing Concessions |
| REO | REO Sale | Sale or Financing Concessions |
| Res | Residential | Location & View |
| RH | USDA - Rural Housing | Sale or Financing Concessions |
| s | Settlement Date | Date of Sale/Time |
| Short | Short Sale | Sale or Financing Concessions |
| sf | Square Feet | Area, Site, Basement |
| sqm | Square Meters | Area, Site |
| Unk | Unknown | Date of Sale/Time |
| VA | Veterans Administration | Sale or Financing Concessions |
| w | Withdrawn Date | Date of Sale/Time |
| wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| WtrFr | Water Frontage | Location |
| Wtr | Water View | View |
| Woods | Woods View | View |

Other Appraiser-Defined Abbreviations

| Abbreviation | Full Name | Fields Where This Abbreviation May Appear |
|---|---|---|
| | | |

**Subject Photo Page**

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County Suffolk | | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | |



**Subject Front**

| | |
|---|---|
| 174 Jobs Ln | |
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



**Subject Rear**



**Subject Street**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



### Subject Kitchen

| | |
|---|---|
| 174 Jobs Ln | |
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



**Kitchen**



**Dining Room**

### Subject Interior Photo Page

| Borrower | Paul Manafort | | | |
|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | |
| City | Bridgehampton | County Suffolk | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | |



**Living Room**

| | |
|---|---|
| 174 Jobs Ln | |
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



**1/2 Bathroom**



**Sun Room**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County Suffolk | | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | |



**Den**

174 Jobs Ln
Sales Price
Gross Living Area        6,123
Total Rooms              15
Total Bedrooms           8
Total Bathrooms          8.1
Location                 N;Res;
View                     N;Res;
Site                     2.37 ac
Quality                  Q2
Age                      22



**Den**



**Wet Bar**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



**Pantry**

174 Jobs Ln
Sales Price
Gross Living Area     6,123
Total Rooms           15
Total Bedrooms        8
Total Bathrooms       8.1
Location              N;Res;
View                  N;Res;
Site                  2.37 ac
Quality               Q2
Age                   22



**Bedroom**



**Bathroom**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



### Family Room

| | |
|---|---|
| 174 Jobs Ln | |
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



**Bedroom over Garage**



**Bathroom over Garage**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code | 11932 |
| Lender/Client | The Federal Savings Bank | | | | | | |



**Master Bedroom**

| 174 Jobs Ln | |
|---|---|
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



**Master Bathroom**



**Bedroom**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County | Suffolk | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | |



**Bathroom**

| | |
|---|---|
| 174 Jobs Ln | |
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



**Bedroom**



**Bathroom**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code | 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



**Bedroom**

174 Jobs Ln
Sales Price
Gross Living Area     6,123
Total Rooms          15
Total Bedrooms        8
Total Bathrooms       8.1
Location             N;Res;
View                 N;Res;
Site                 2.37 ac
Quality              Q2
Age                  22



**Bathroom**



**Bedroom**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



### Bathroom

174 Jobs Ln
Sales Price
Gross Living Area    6,123
Total Rooms          15
Total Bedrooms       8
Total Bathrooms      8.1
Location             N;Res;
View                 N;Res;
Site                 2.37 ac
Quality              Q2
Age                  22



### Bedroom



### Bathroom

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | |
|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | |
| City | Bridgehampton | County Suffolk | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | |



### Finished Basement

| | |
|---|---|
| 174 Jobs Ln | |
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



### Basement 1/2 Bathroom



### Basement Gym

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County | Suffolk | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | |



### Putting Green

174 Jobs Ln
Sales Price
Gross Living Area   6,123
Total Rooms         15
Total Bedrooms      8
Total Bathrooms     8.1
Location            N;Res;
View                N;Res;
Site                2.37 ac
Quality             Q2
Age                 22



### Side Porch



### Sandwich/Snack Bar
Firepit

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code  11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



**Pool, Pool House, Hot Tub**

| | |
|---|---|
| 174 Jobs Ln | |
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



**Pool House Wet Bar**



**Pool House Bathroom**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code | 11932 |
| Lender/Client | The Federal Savings Bank | | | | |



**P/H Family Room**

174 Jobs Ln
Sales Price
Gross Living Area       6,123
Total Rooms            15
Total Bedrooms          8
Total Bathrooms         8.1
Location               N;Res;
View                   N;Res;
Site                   2.37 ac
Quality                Q2
Age                    22



**P/H Bedroom**



**P/H Bedroom**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County  Suffolk | | State  NY | Zip Code  11932 |
| Lender/Client | The Federal Savings Bank | | | | |



**P/H Bedroom**

174 Jobs Ln
Sales Price
Gross Living Area      6,123
Total Rooms            15
Total Bedrooms         8
Total Bathrooms        8.1
Location               N;Res;
View                   N;Res;
Site                   2.37 ac
Quality                Q2
Age                    22



**P/H Game Table**



**Outdoor Kitchen/Grills**

## Subject Interior Photo Page

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County Suffolk | | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | |



### Tennis Court

| 174 Jobs Ln | |
|---|---|
| Sales Price | |
| Gross Living Area | 6,123 |
| Total Rooms | 15 |
| Total Bedrooms | 8 |
| Total Bathrooms | 8.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.37 ac |
| Quality | Q2 |
| Age | 22 |



### Pond



### 1/2 Baeket Ball Court

## Comparable Photo Page

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower | Paul Manafort | | | | | |
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



### Comparable 1

379 Ocean Rd

| | |
|---|---|
| Prox. to Subject | 1.55 miles NE |
| Sale Price | 14,600,000 |
| Gross Living Area | 9,174 |
| Total Rooms | 16 |
| Total Bedrooms | 8 |
| Total Bathrooms | 7.3 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.47 ac |
| Quality | Q2 |
| Age | 12 |



### Comparable 2

461 Ocean Rd

| | |
|---|---|
| Prox. to Subject | 1.40 miles NE |
| Sale Price | 13,500,000 |
| Gross Living Area | 5,267 |
| Total Rooms | 13 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | N;Res; |
| View | N;Res; |
| Site | 1.96 ac |
| Quality | Q2 |
| Age | 5 |



### Comparable 3

672 Halsey Ln

| | |
|---|---|
| Prox. to Subject | 0.66 miles N |
| Sale Price | 12,000,000 |
| Gross Living Area | 9,994 |
| Total Rooms | 16 |
| Total Bedrooms | 7 |
| Total Bathrooms | 7.2 |
| Location | N;Res; |
| View | N;Res; |
| Site | 1.96 ac |
| Quality | Q2 |
| Age | 8 |

## Comparable Photo Page

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower | Paul Manafort | | | | | |
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



### Comparable 4

408 Pauls Ln
| | |
|---|---|
| Prox. to Subject | 1.00 miles N |
| Sale Price | 11,550,000 |
| Gross Living Area | 7,854 |
| Total Rooms | 18 |
| Total Bedrooms | 8 |
| Total Bathrooms | 9.3 |
| Location | N;Res; |
| View | N;Res; |
| Site | 1.76 ac |
| Quality | Q2 |
| Age | 3 |



### Comparable 5

280 Highland Terr
| | |
|---|---|
| Prox. to Subject | 1.76 miles NE |
| Sale Price | 18,495,000 |
| Gross Living Area | 8,904 |
| Total Rooms | 16 |
| Total Bedrooms | 10 |
| Total Bathrooms | 10.2 |
| Location | N;Res; |
| View | N;Res; |
| Site | 2.07 ac |
| Quality | Q2 |
| Age | 1 |



### Comparable 6

770 Ocean Rd
| | |
|---|---|
| Prox. to Subject | 0.77 miles NE |
| Sale Price | 14,900,000 |
| Gross Living Area | 3,152 |
| Total Rooms | 9 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 3.20 ac |
| Quality | Q2 |
| Age | 21 |
| | Photo From Perviouos Apprais |

**Photograph Addendum**

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



Comp 1 Broker Photo



Comp 2 Assessor Photo



Comp 3 Broker Photo

**Building Sketch (Page – 1)**

| | |
|---|---|
| Borrower | Paul Manafort |
| Property Address | 174 Jobs Ln |
| City | Bridgehampton |
| Lender/Client | The Federal Savings Bank |

| County | State | Zip Code |
|---|---|---|
| Suffolk | NY | 11932 |



**Area Calculations Summary**

| Living Area | | Calculation Details | |
|---|---|---|---|
| First Floor | 3255 Sq ft | 0.5 × 2 × 2 = | 2 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 8 × 2 = | 16 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 8 × 2 = | 16 |
| | | 14 × 22 = | 308 |
| | | 43 × 20 = | 860 |
| | | 27 × 9 = | 243 |
| | | 48 × 32 = | 1536 |
| | | 14 × 2 = | 28 |
| | | 10 × 2 = | 20 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 11 × 18 = | 198 |
| | | 2 × 9 = | 18 |
| **Total Living Area (Rounded):** | **3255 Sq ft** | | |
| **Non-living Area** | | | |
| 2 Car Attached | 528 Sq ft | 22 × 24 = | 528 |

TOTAL Sketch by a la mode, inc.

## Building Sketch (Page - 2)

| Borrower | Paul Manafort | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | | |
| City | Bridgehampton | | County | Suffolk | State | NY | Zip Code  11932 |
| Lender/Client | The Federal Savings Bank | | | | | | |



| Area Calculations Summary | | |
|---|---|---|
| **Living Area** | | **Calculation Details** |
| Second Floor | 2868 Sq ft | 38 × 14 =   532 |
| | | 24 × 22 =   528 |
| | | 16 × 14 =   224 |
| | | 18 × 88 = 1584 |
| **Total Living Area (Rounded):** | **2868 Sq ft** | |

TOTAL Sketch by a la mode, inc.

## Building Sketch (Page - 3)

| Borrower | Paul Manafort | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code | 11932 |
| Lender/Client | The Federal Savings Bank | | | | | | |



TOTAL Sketch by a la mode, inc.

### Area Calculations Summary

**Non-living Area**

| | | | |
|---|---|---|---|
| Basement | 3255 Sq ft | 0.5 × 2 × 2 = | 2 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 8 × 2 = | 16 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 8 × 2 = | 16 |
| | | 14 × 22 = | 308 |
| | | 43 × 20 = | 860 |
| | | 27 × 9 = | 243 |
| | | 48 × 32 = | 1536 |
| | | 14 × 2 = | 28 |
| | | 10 × 2 = | 20 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 0.5 × 2 × 2 = | 2 |
| | | 11 × 18 = | 198 |
| | | 2 × 9 = | 18 |

**Building Sketch (Page – 4)**

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County Suffolk | State NY | Zip Code 11932 | |
| Lender/Client | The Federal Savings Bank | | | | |



30'  Pool House 1st Fl

Wet Bar

Bath

20'        20'

Family Rm

Den

Enter                    Enter

30'

30'  Pool House 2nd Fl

Bedroom          Game Table

20'        20'

Family Rm

Bedroom              Bedroom

30'

TOTAL Sketch by a la mode, inc.                    **Area Calculations Summary**

**Non-living Area**

| Undefined Area | 600 Sq ft | 20 × 30 = 600 |
|---|---|---|
| Third Floor | 600 Sq ft | 20 × 30 = 600 |

Form SKT.BLDSKI – "TOTAL" appraisal software by a la mode, inc. – 1-800-ALAMODE

### Subject Aerial Location Map

| Borrower | Paul Manafort | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | | |
| City | Bridgehampton | County | Suffolk | State | NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | | |



## Location Map

| Borrower | Paul Manafort | | | | |
|---|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | | |
| City | Bridgehampton | County Suffolk | | State NY | Zip Code 11932 |
| Lender/Client | The Federal Savings Bank | | | | |



## Market Conditions Addendum to the Appraisal Report

9016235816

File No. R16-08638

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 174 Jobs Ln | City Bridgehampton | State NY | ZIP Code 11932 |
|---|---|---|---|---|

Borrower   Paul Manafort

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 24 | 10 | 4 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Absorption Rate (Total Sales/Months) | 4.00 | 3.33 | 1.33 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Total # of Comparable Active Listings | 0 | 0 | 0 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 0 | 0 | 0 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | 5,375,000 | 4,787,500 | 8,250,000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 0 | 0 | 0 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Comparable List Price | 0 | 0 | 0 | ☐ Increasing | ☐ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | 0 | 0 | 0 | ☐ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 0 | 0 | 0 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☐ Yes | ☒ No | | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).     There are no standard loans discounts, interest rate buy downs or seller concession normally found in the subject market area.

Are foreclosure sales (REO sales) a factor in the market?   ☐ Yes   ☒ No      If yes, explain (including the trends in listings and sales of foreclosed properties).

Cite data sources for above information.     Geodata,RTS 2000 and some limited available Broker Records

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
In the subject market area, neighborhoods are mixed with varied size homes, utility and amenities. Such as from older small 1,000–1,400 square foot ranch style 2-3 bedroom 1-2 bathroom homes to much larger 3,000 -6,000 & larger square foot new built traditional, contemp or post modern style 4/6+ bedroom 3/5+ bathroom. This is reported in the overall neighborhood section one-unit housing trends of this appraisal report and are not considered all to be comparable to the subject.
Inventory Analysis, Absorption Rate and Median Camparable Sale Price is reported from utilizing GeoData Plus as a general overall neighborhood trend. GeoData Plus is an appraisal data base for closed real estate transfers.  Median Sales Days On Market are not available. 1004MC analysis of increasing/declining trends may differ from a more in depth market analysis as described on the page 3 addendum page.
Please note there is no MLS in the subject market area therefore no statistical data available for median list price, days on market or active list

If the subject is a unit in a condominium or cooperative project , complete the following:    Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?   ☐ Yes   ☐ No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

| Signature | *Douglas C. Feinberg* | Signature | |
|---|---|---|---|
| Appraiser Name | Douglas C Feinberg | Supervisory Appraiser Name | |
| Company Name | DCF Appraisals | Company Name | |
| Company Address | | Company Address | |
| State License/Certification # | 45000043752   State   NY | State License/Certification # | State |
| Email Address | Dougfein@aol.com | Email Address | |

Freddie Mac Form 71   March 2009          Page 1 of 1          Fannie Mae Form 1004MC   March 2009

Form 1004MC2 – "TOTAL" appraisal software by a la mode, inc. – 1-800-ALAMODE

# USPAP ADDENDUM

9016235816
File No. R16-08638

| Borrower | Paul Manafort | | | |
|---|---|---|---|---|
| Property Address | 174 Jobs Ln | | | |
| City | Bridgehampton | County  Suffolk | State  NY | Zip Code  11932 |
| Lender | The Federal Savings Bank | | | |

**This report was prepared under the following USPAP reporting option:**

☒ Appraisal Report          This report was prepared in accordance with USPAP Standards Rule 2-2(a).

☐ Restricted Appraisal Report          This report was prepared in accordance with USPAP Standards Rule 2-2(b).

**Reasonable Exposure Time**
My opinion of a reasonable exposure time for the subject property at the market value stated in this report is: _____
Estimate of Exposure Time: Based on statistical analysis and the examination of relevant sales history of comparable properties, the reasonable exposure time for the subject type and value range is ( 5-15 ) months.

**Additional Certifications**
I certify that, to the best of my knowledge and belief:

☒ I have NOT performed services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

☐ I HAVE performed services, as an appraiser or in another capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Those services are described in the comments below.

- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- Unless otherwise indicated, I have no present or prospective interest in the property that is the subject of this report and no  personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice that were in effect at the time this report was prepared.
- Unless otherwise indicated, I have made a personal inspection of the property that is the subject of this report.
- Unless otherwise indicated, no one provided significant real property appraisal assistance to the person(s) signing this certification (if there are exceptions, the name of each individual providing significant real property appraisal assistance is stated elsewhere in this report).

**Additional Comments**




| APPRAISER: | SUPERVISORY APPRAISER: (only if required) |
|---|---|
| Signature:  *Douglas C. Feinberg* | Signature: _____ |
| Name:  Douglas C Feinberg | Name: _____ |
| Date Signed:  10/05/2016 | Date Signed: _____ |
| State Certification #:  45000043752 | State Certification #: _____ |
| or State License #: _____ | or State License #: _____ |
| State:  NY | State: _____ |
| Expiration Date of Certification or License:  03/21/2018 | Expiration Date of Certification or License: _____ |
| Effective Date of Appraisal:  10/04/2016 | Supervisory Appraiser Inspection of Subject Property: |
| | ☐ Did Not   ☐ Exterior-only from Street   ☐ Interior and Exterior |

**License**

| | | |
|---|---|---|
| UNIQUE ID NUMBER | *State of New York* | FOR OFFICE USE ONLY |
| 45000043752 | *Department of State* | Control No. **90297** |
| | DIVISION OF LICENSING SERVICES | |

PURSUANT TO THE PROVISIONS OF ARTICLE 6E OF THE
EXECUTIVE LAW AS IT RELATES TO R.E. APPRAISERS,

EFFECTIVE DATE
MO. DAY YR.
03 22 16

FEINBERG DOUGLAS C
C/O DCF APPRAISALS
135 LEWIS ST
SOUTHAMPTON NY 11968

EXPIRATION DATE
MO. DAY YR.
03 21 18

HAS BEEN DULY CERTIFIED TO TRANSACT BUSINESS AS A
R.E. RESIDENTIAL APPRAISER

CESAR A. PERALES
SECRETARY OF STATE

DOS-1096 (Rev. 3/01)

**E & O Insurance**



Real Estate Professionals
Errors and Omissions Policy

### Declarations

| Agency | Branch | Prefix | Policy Number |
|--------|--------|--------|---------------|
| 078990 | 969 | RFB | 27611351116 |

Insurance is provided by
Continental Casualty Company,
333 South Wabash Ave., Chicago, IL 60604.
A Stock Insurance Company.

1. **NAMED INSURED AND MAILING ADDRESS:**

   Douglas C. Feinberg
   135 Lewis Street
   Southampton, NY 11968

   **NOTICE TO POLICYHOLDERS:**
   The Errors and Omissions Liability coverage
   afforded by this policy is on a Claims Made
   basis. Please review the policy carefully
   and discuss this coverage with your
   insurance agent or broker.

2. **POLICY PERIOD:**    Inception: 04/26/2016    Expiration: 04/26/2017
   at 12:01 A.M. Standard Time at your address shown above.

3. **ERRORS AND OMISSIONS LIABILITY:**

   A. Limits of Liability:    Each Claim:    $1,000,000    Aggregate:    $1,000,000

   B. Discrimination Limits of Liability    $250,000

   C. Deductible:    Each Claim:    $2,500

   D. First Coverage Date:    04/26/2005

   E. Prior Acts Date:    03/25/2002

4. **POLICY PREMIUM:**    $600.00

   DISCRIMINATION (Optional $250,000 Sublimit):    $0.00
   TOTAL PREMIUM:    $600.00

5. **EXTENDED REPORTING PERIOD PREMIUM:**    One Year:    50% of the Policy Premium
   Three Years:    130% of the Policy Premium

_Kathleen W. Avery_

Countersigned by Authorized Representative

CNA65760NY ED. 09-2013

- 1 -

I136122-B21183

Form SCNLGL - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

# BROWN HARRIS STEVENS

### Established 1873

Dear Mr. Manafort

I have previewed your home at 174 Jobs Ln in Bridgehampton. Based on two recent sales, 461 Ocean Rd, Bridgehampton($14,995,000) and 34 Bay Lane, Water Mill ($12,995,000) we could list the home at an asking price of $13,500,000. Please know I am not a licensed appraiser this is based on your appraisal and the properties listed above.
The market has softened in this price range so it may take some time to sell but you have many amenities that add value to the property.
Please let me now if you would like to move forward and I will send you a marketing proposal.


Sincerely,

Jane Babcook
Licensed Associate Broker
2408 Main St.
Bridgehampton, NY 11932

(USD) Change Currency

REGISTER / LOGIN
MY PROPERTY BOOK

HOME    SEARCH    AREAS    AGENTS    ABOUT    CONTACT US

Enter WEB#, Title, Agent or Blog



## Jane Babcook

**Licensed Associate Real Estate Broker**

jbabcook@bhshamptons.com
631-537-4346  direct
631-680-1001  cell
Bridgehampton Brokerage

My Sale Listings    My Land Listings    My Rental Listings    My Career Sales    Download V-Card

**Specialties:**  Equestrian Properties, Waterfront

Highly respected in the Hamptons real estate industry, Jane joined the Bridgehampton brokerage office of Brown Harris Stevens in 2015 after a real estate career spanning almost two decades.

Throughout her career, Jane has consistently been a top producing agent and a leader in her community with an elite roster of national and international clients. Specializing in luxury properties, Jane has been nationally recognized as a top agent with an enviable history of successfully closing both high-end sales and rentals throughout the Hamptons.

Fluent in the complexities of land acquisitions, waterfront properties, new construction, both historic and modern homes, equestrian properties, and more, including the resolution of building, zoning, environmental, financing and title issues that arise within each of these property types, Jane has a proven command of the local market that allows her to render unparalleled service to her clients.

An avid equestrian, sailor and skier, and a full time resident of Sag Harbor for over 26 years, Jane is currently on the board of the Breakwater Yacht Club where she has served as Vice Commodore, is a long standing member of the Sag Harbor Yacht Club, and is a member of the Architectural Review Board for the neighboring Village of North Haven.

Jane Babcook
Brown Harris Stevens
2408 Main Street
Bridgehampton, NY 11932

**Jane Babcook's Sales Listings**

**SAG HARBOR, NEW YORK**
$18,750,000

WEB# 10049                                          Favorites
Beds: 7 | Baths: 8 | Halfbaths: 1                    Print
Acres: 1.1
Sq. Ft.: 10000 | Pool
**Quick View»**

**SAG HARBOR, NEW YORK**
$10,900,000

WEB# 51666                                          Favorites
Beds: 5 | Baths: 5 | Halfbaths: 1                    Print
Acres: 0.4
Sq. Ft.: 7000 | Pool
**Quick View»**

**EAST HAMPTON, NEW YORK**
$9,250,000

WEB# 39422                                          Favorites
Beds: 4 | Baths: 5                                   Print
Acres: 5.18
Sq. Ft.: 3500 | Pool
**Quick View»**

**WAINSCOTT, NEW YORK**
$5,250,000   Just Reduced

WEB# 24420
Beds: 7 | Baths: 7 | Halfbaths: 2          Favorites
Acres: 1.1 | So. of Hwy                       Print
Sq. Ft.: 7000 | Pool
**Quick View»**

**WATER MILL, NEW YORK**
$4,995,000

WEB# 54144
Beds: 8 | Baths: 8 | Halfbaths: 1          Favorites
Acres: 1                                          Print
Sq. Ft.: 7000 | Pool
**Quick View»**

**SAGAPONACK, NEW YORK**
$4,950,000

WEB# 51951                                Also for Rent
Beds: 6 | Baths: 5 | Halfbaths: 1          Favorites
Acres: 9                                          Print
Sq. Ft.: 5000 | Pool & Tennis
**Quick View»**

**SAG HARBOR, NEW YORK**
$4,495,000   Just Reduced

WEB# 49381
Beds: 4 | Baths: 4 | Halfbaths: 2          Favorites
Acres: 1                                          Print
Sq. Ft.: 5500 | Pool
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
$4,295,000

WEB# 51687
Beds: 7 | Baths: 7                            Favorites
Acres: 0.65 | Water View                     Print
Sq. Ft.: 5200 | Pool
**Quick View»**

**SHELTER ISLAND, NEW YORK**
$3,995,000

WEB# 55264                                Also for Rent
Beds: 4 | Baths: 3                            Favorites
Acres: 0.56 | Waterfront                      Print
Sq. Ft.: 2400
**Quick View»**

**SAG HARBOR, NEW YORK**
$3,795,000

WEB# 50567                                Also for Rent
Beds: 4 | Baths: 4                            Favorites
Acres: 8.3                                        Print
Sq. Ft.: 2400 | Pool
**Quick View»**

**EAST HAMPTON, NEW YORK**
$3,250,000

WEB# 53728
Beds: 6 | Baths: 4                            Favorites
Acres: 0.2                                        Print
Sq. Ft.: 1800
**Quick View»**

**SAG HARBOR, NEW YORK**
$2,495,000

WEB# 53945                                Also for Rent
Beds: 4 | Baths: 4 | Halfbaths: 1          Favorites
Acres: 0.17                                       Print
Sq. Ft.: 2700 | Pool
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
$1,695,000  Just Reduced

WEB# 36764                          Also for Rent
Beds: 4 | Baths: 3                  Favorites
Acres: 0.58                         Print
Sq. Ft.: 2400 | Pool
**Quick View»**

**SOUTHAMPTON, NEW YORK**
$1,695,000  Just Reduced

WEB# 32697
Beds: 3 | Baths: 3 | Halfbaths: 1   Favorites
Acres: 1.4                          Print
Sq. Ft.: 2240 | Pool
**Quick View»**

**WATER MILL, NEW YORK**
$1,295,000

WEB# 17012                          Also for Rent
Beds: 3 | Baths: 2                  Favorites
Acres: 1 | So. of Hwy               Print
Sq. Ft.: 1400 | Pool
**Quick View»**

### Jane Babcook's Land Listings

**WATER MILL, NEW YORK**
$5,650,000

WEB# 5238
Acres: 49.3                         Favorites
                                    Print
**Quick View»**

**SOUTHAMPTON, NEW YORK**
$375,000  In Contract

WEB# 2492
Acres: 3.17                         Favorites
                                    Print
**Quick View»**

### Jane Babcook's Rental Listings

**SAGAPONACK, NEW YORK**
July/Aug: $325,000, August: $165,000,
July: $160,000, Short-Term: $85,000

WEB# 97613
Beds: 6 | Baths: 6 | Halfbaths: 1   Favorites
Acres: 2 | Waterfront | So. of Hwy  Print
Sq. Ft.: 6100 | Pool
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
Year-Round: $295,000, MD-LD: $240,000,
July/Aug: $205,000, August: $135,000

WEB# 94763
Beds: 5 | Baths: 6 | Halfbaths: 1   Favorites
Acres: 2.26 | So. of Hwy            Print
Sq. Ft.: 5300 | Pool & Tennis
**Quick View»**

**SAGAPONACK, NEW YORK**
Year-Round: $225,000, MD-LD: $185,000,
July/Aug: $170,000, June/July: $100,000,

WEB# 70986
Beds: 5 | Baths: 5                  Favorites
Acres: 2.75                         Print
Sq. Ft.: 4000 | Pool & Tennis
**Quick View»**

Jane Babcook | Brown Harris Stevens

**WATER MILL, NEW YORK**
MD-LD: $185,000, July/Aug: $135,000,
August: $85,000, July: $70,000

WEB# 91415
Beds: 7 | Baths: 6 | Halfbaths: 1    Favorites
Acres: 1 | So. of Hwy    Print
Sq. Ft.: 4500 | Pool
**Quick View»**

**SAG HARBOR, NEW YORK**
Year-Round: $125,000, MD-LD: $85,000,
July/Aug: $70,000, August: $40,000,

WEB# 97867      Also for Sale
Beds: 4 | Baths: 4 | Halfbaths: 1    Favorites
Acres: 0.17    Print
Sq. Ft.: 2700 | Pool
**Quick View»**

**SAG HARBOR, NEW YORK**
MD-LD: $115,000, July/Aug: $95,000,
August: $50,000, July: $45,000

WEB# 85254      Also for Sale
Beds: 4 | Baths: 4    Favorites
Acres: 8.3    Print
Sq. Ft.: 2400 | Pool
**Quick View»**

**SAG HARBOR, NEW YORK**
MD-LD: $95,000, August: $48,000, July: $40,000

WEB# 61384
Beds: 4 | Baths: 3    Favorites
Acres: 0.85    Print
Sq. Ft.: 3000 | Pool
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
July/Aug: $85,000, August: $45,000, July: $40,000

WEB# 61223
Beds: 4 | Baths: 4    Favorites
Acres: 0.57    Print
Sq. Ft.: 2800 | Pool
**Quick View»**

**SAG HARBOR, NEW YORK**
MD-LD: $85,000, July: $35,000, June: $20,000

WEB# 89638
Beds: 4 | Baths: 4 | Halfbaths: 1    Favorites
Acres: 0.51    Print
Sq. Ft.: 3000 | Pool
**Quick View»**

**SHELTER ISLAND, NEW YORK**
June/July: $75,000, August: $57,000, July: $40,000,
Short-Term: $15,000

WEB# 90606      Also for Sale
Beds: 4 | Baths: 3    Favorites
Acres: 0.56 | Waterfront    Print
Sq. Ft.: 2400
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
August: $75,000, Short-Term: $40,000

WEB# 82148
Beds: 4 | Baths: 3    Favorites
Acres: 5    Print
Sq. Ft.: 4500 | Pool
**Quick View»**

**EAST HAMPTON, NEW YORK**
MD-LD: $72,000, July/Aug: $65,000,
June/July: $45,000, August: $35,000, July: $30,000

WEB# 97659
Beds: 6 | Baths: 5    Favorites
Acres: 0.28 | So. of Hwy    Print
Sq. Ft.: 3000 | Pool
**Quick View»**

Jane Babcook | Brown Harris Stevens

**NORTH HAVEN, NEW YORK**
July/Aug: $68,000, August: $34,000, July: $34,000

WEB# 87422
Beds: 4 | Baths: 2 | Halfbaths: 1          Favorites
Acres: 2                                                    Print
Pool & Tennis
**Quick View»**

**SAG HARBOR, NEW YORK**
Year-Round: $65,000, August: $19,500

WEB# 72161
Beds: 3 | Baths: 2 | Halfbaths: 1          Favorites
Acres: 0.11                                              Print
Sq. Ft.: 2000
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
MD-LD: $60,000, July: $20,000

WEB# 58862
Beds: 2 | Baths: 2                              Favorites
Acres: 0.59                                           Print
Sq. Ft.: 1426 | Pool
**Quick View»**

**SAGAPONACK, NEW YORK**
August: $55,000

WEB# 81820
Beds: 6 | Baths: 5                              Favorites
Acres: 2                                                 Print
Sq. Ft.: 5000 | Pool
**Quick View»**

**SAGAPONACK, NEW YORK**
July/Aug: $50,000, July: $24,000

WEB# 68461
Beds: 3 | Baths: 3                              Favorites
Acres: 1                                                 Print
Sq. Ft.: 2200 | Pool
**Quick View»**

**SAGAPONACK, NEW YORK**
Short-Term: $50,000

WEB# 76378
Beds: 5 | Baths: 4                              Favorites
Acres: 2.02 | Waterfront | So. of Hwy     Print
Sq. Ft.: 4500 | Pool & Tennis
**Quick View»**

**SAG HARBOR, NEW YORK**
MD-LD: $40,000, July/Aug: $30,000,
June/July: $27,000, August: $18,000, July: $15,000

WEB# 81329
Beds: 2 | Baths: 1                              Favorites
Acres: 0.1                                              Print
Sq. Ft.: 1000
**Quick View»**

**SAG HARBOR, NEW YORK**
August: $35,000, Short-Term: $25,000

WEB# 82102
Beds: 3 | Baths: 2 | Halfbaths: 1          Favorites
Acres: 4 | Waterfront                           Print
Sq. Ft.: 1740 | Pool & Tennis
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
August: $28,000, Short-Term: $28,000

WEB# 87516
Beds: 4 | Baths: 3                              Favorites
Acres: 0.91                                           Print
Sq. Ft.: 2000 | Pool
**Quick View»**

**SOUTHAMPTON VILLAGE, NEW YORK**
MD-LD: $25,000, August: $12,500, July: $12,500

WEB# 61741
Beds: 2 | Baths: 1                              Favorites
Acres: 1                                        Print
Sq. Ft.: 1700
**Quick View»**

**WATER MILL, NEW YORK**
Rented

WEB# 70546                          Also for Sale
Beds: 3 | Baths: 2                  Favorites
Acres: 1 | So. of Hwy               Print
Sq. Ft.: 1400 | Pool
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
Rented

WEB# 60070
Beds: 5 | Baths: 3                              Favorites
Acres: 1 | So. of Hwy                           Print
Sq. Ft.: 2500 | Pool
**Quick View»**

**BRIDGEHAMPTON, NEW YORK**
Rented

WEB# 74629
Beds: 3 | Baths: 3 | Halfbaths: 1    Favorites
Acres: 0.5                           Print
Sq. Ft.: 2500 | Pool
**Quick View»**

**Jane Babcook's Career Sales**

Jane Babcook represented the seller, the buyer or both on the sold property transactions listed below.

131 Lockwood Avenue, Bridgehampton Last Asking Price: $5,295,000

18 Howard Street, Sag Harbor Last Asking Price: $3,995,000

18 Oakland Avenue, Sag Harbor Last Asking Price: $3,995,000

185 Hildreth Lane, Bridgehampton Last Asking Price: $3,750,000

19 Howard Street, Sag Harbor Last Asking Price: $3,395,000

51 Brandywine Drive, Sag Harbor Last Asking Price: $2,995,000

78 Round Pond Lane, Sag Harbor Last Asking Price: $2,895,000

12 Ludlow Green, Bridgehampton Last Asking Price: $2,675,000

8 South Harbor Drive, Sag Harbor Last Asking Price: $2,395,000

69 Redwood Road, Sag Harbor Last Asking Price: $2,275,000

6 Winding Way, Water Mill Last Asking Price: $1,695,000

30 Bayview Avenue, Sag Harbor Last Asking Price: $1,399,000

258 Ferry Road, North Haven Last Asking Price: $1,295,000

66 Franklin Avenue, Sag Harbor Last Asking Price: $1,125,000

475 Toppings Path, Sagaponack Last Asking Price: $1,050,000

16 Arthur Avenue, Bridgehampton Last Asking Price: $895,000

1580 Sagg Road, Sag Harbor Last Asking Price: $775,000

64 Long Beach Lane, Sag Harbor Last Asking Price: $565,000

59 Wickatuck Drive, Sag Harbor Last Asking Price: $475,000

| Bridgehampton | East Hampton | Sag Harbor | Southampton | Westhampton | Greenport |
|---|---|---|---|---|---|
| 631.537.2727 | 631.324.6400 | 631.725.2250 | 631.287.4900 | 631.288.5500 | 631.477.0551 |

**The best place to start your Hamptons or North Fork real estate search.**
bhshamptons.com is an all-in-one real estate site that gives you the local scoop about Hamptons homes for sale, Hamptons vacation rentals, vacant land, investment and commercial real estate, and all types of North Fork properties to help you figure out exactly what, where, and when to buy, sell, or rent. You can also find a real estate agent, and get information about the neighborhood. Get in touch with our real estate agents for advice and opinions.

We specialize in:

| | | | | | |
|---|---|---|---|---|---|
| Bridgehampton Real Estate | East Hampton Real Estate | Montauk Real Estate | North Fork Real Estate | Quogue Real Estate | Sag Harbor Real Estate |
| Sagaponack Real Estate | Southampton Real Estate | Wainscott Real Estate | Water Mill Real Estate | Westhampton Real Estate | |

The Hamptons - one of the most celebrated resort areas in the world - is renowned for the strength of its luxury real estate market. Brown Harris Stevens is the leading real estate firm offering Hamptons homes for sale, waterfront estates, Hamptons summer rentals, vacant land, investment and commercial properties. We also offer every type of property on the North Fork, known for its dramatic waterfront properties, vineyards, open farmland and quaint villages. Our experienced agents are expertly qualified to assist with navigating through the many choices associated with buying, selling or renting Hamptons real estate and North Fork real estate. Brown Harris Stevens is the exclusive affiliate of Christie's International Real Estate in the Hamptons, the North Fork, New York City and Palm Beach.

All information is from sources deemed reliable but is subject to errors, omissions, changes in price, prior sale or withdrawal without notice. No representation is made as to the accuracy of any description. All measurements, square footages, acreage and property taxes are approximate and all information should be confirmed by customer. All rights to content, photographs and graphics reserved to Broker. Customer should consult with its counsel regarding all closing costs, including without limitation the New York State 1% tax paid by buyers on residential properties over $1 million and the Peconic transfer tax of approximately 2% paid by buyers. Broker represents the seller/owner on Broker's own exclusives, except if another agent of Broker represents the buyer/tenant, in which case Broker will be a dual agent with designated agents representing seller/owner and buyer/tenant. Broker may represent either the buyer/tenant or the seller/landlord when showing the exclusives of other real estate firms. Broker actively supports equal housing opportunities. **Brown Harris Stevens of the Hamptons, LLC and Brown Harris Stevens Westhampton & North Fork, LLC.**

© 2013 Terra Holdings.      Terms of Use