# Attachment B

**CQ Congressional Transcripts**

©2018, Provided under license from Bloomberg Government.

Bloomberg Government
Support: 1-877-498-3587
www.bgov.com

All materials herein are protected by United States copyright law and/or license from Bloomberg Government, and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of Bloomberg Government. You may not alter or remove any trademark, copyright or other notice from copies of the content.

Dec. 13, 2017 - Revised Final

# House Judiciary Committee Holds Hearing on the Justice Department's Investigation of Russia's Interference in the 2016 Presidential Election

**LIST OF PANEL MEMBERS AND WITNESSES**

**Partial Text - complete transcript not yet available**

GOODLATTE:

Good morning. The Judiciary Committee will come to order, and Without objection, the chair is authorized to declare recesses of the committee at any time.

We welcome everyone to this morning's hearing on -- oversight hearing with Deputy Attorney General Rod Rosenstein. And I'll begin by recognizing myself for an opening statement.

Thank you, Deputy General -- Attorney General Rosenstein, for appearing for the first time in front of this committee. There is much to discuss today, and we look forward to your testimony and answers to your questions.

As chairman of the committee with primary oversight of the Department of Justice and the FBI, I've always supported the department and the FBI in performing their valuable missions to keep our nation safe and to hold individuals accountable for criminal conduct. Yet I and many on this committee now find ourselves in the very difficult position of questioning the actions of both prior and current department and FBI leadership.

You have a unique role at the Department of Justice in that you appointed Special Counsel Mueller and have a supervisory role over his investigation. It is therefore very appropriate for you to appear before this committee to answer questions related to the scope of the special counsel's investigation, as well as its current efficacy in light of various events calling into question its impartiality.

Reports on the political predisposition and potential bias of certain career agents and department lawyers on Special Counsel Mueller's team are deeply troubling to all citizens who expect a system of blind and equal justice. The Department of Justice investigations must not be tainted by individuals imposing their own political prejudices.

We are now beginning to better understand the magnitude of this insider bias on Mr. Mueller's team. First, we have FBI agent Peter Strzok and FBI lawyer Lisa Page, exchanging communications showing extreme bias against President Trump, a fact that would be bad enough if it weren't for the fact that these two individuals were employed as part of the Mueller dream team, investigating the very person for whom they were showing disdain.

And calling it mere disdain is generous. According to the documents produced last night to this committee, Mr. Strzok and Ms. Page referred to

the president as an utter idiot, a loathsome human, and awful, while continually praising Hillary Clinton and the Obamas.

These text messages prove what we all suspected: high-ranking FBI officials involved in the Clinton investigation were personally invested in the outcome of the election and clearly let their strong political opinions cloud their professional judgment. And this was only an initial disclosure containing heavy redactions.

Second, former embattled FBI General Counsel and current Mueller prosecutor Andrew Weissmann expressed his awe of a former DOJ official for shunning the president and failing to faithfully execute the law. However, we are the ones now in awe that someone like Mr. Weissmann remains on an investigative team that looks more and more partisan.

Third, we have learned that a top Mueller prosecutor, Jeannie Rhee, in addition to the other actions that would normally justify recusal, served as an attorney for the Clinton Foundation. Aren't Department of Justice attorneys advised to avoid even the appearance of impropriety? A former Clinton employee is now investigating President Trump. This seems to be the very definition of "appearance of impropriety."

Fourth, we have just recently learned that another top Department of Justice official, Bruce Ohr, has been reassigned because of his wife and his connections with the infamous dossier and the company from whom the opposition research document originated.

We hope to hear your assessment of the foregoing conflicts, whether individuals are being held accountable and whether you still have confidence in the judgment of the special counsel you named and supervise.

Regarding the Clinton e-mail scandal, you, along with Attorney General Sessions, have to date declined to appoint a second special counsel to investigate the improprieties that continue to surface related to the handling of the Clinton e-mail investigation and other events surrounding the 2016 election.

These are some of the important issues on which we will focus our energy and questions today. We want to understand your participation and the department's involvement in addressing both investigations.

Mr. Deputy Attorney General, the Department of Justice's reputation as an impartial arbiter of justice has been called into question. This taint of politicization should concern all Americans who have pride in the fairness of our nation's justice system.

While we continue to call on you to appoint a second special counsel, as you are aware, we have also opened our own joint investigation with the House Oversight and Government Reform Committee to review FBI and the Department of Justice's handling of the Clinton e-mail investigation.

I want to thank you and Attorney General Sessions for recently committing to provide us relevant documents to enable robust congressional oversight of this matter. I implore you to continue to work with us on these and other important matters facing our nation.

One of these matters involves a critical program for our national security, FISA Section 702. This committee passed, on an overwhelming, bipartisan basis, the USA Liberty Act, which maintains the integrity of the program while protecting cherished civil liberties.

This overwhelming vote occurred despite the department's lobbying efforts against our bill. The USA Liberty Act was characterized as bad for the program, highly problematic, unworkable and a proposal that would effectively dismantle Section 702. However, the reality is that this committee's legislation struck a balance that promotes national security and civil liberties.

I hope to hear from you why the Department of Justice felt it necessary to oppose a bill that would reauthorize 702 and instill confidence in the American people that their privacy and civil liberties are respected by a government whose duty it is to protect them.

The Department of Justice must reacquire the trust of the American people. I know there are thousands of Department of Justice employees and line agents in the department -- in the bureau of -- in Federal Bureau of Investigation that are dedicated individuals that are dedicated to upholding the rule of law and protecting the American people, and I hope that we can come to a conclusion about those people who have not met that standard in this hearing today.

Thank you, Mr. Deputy Attorney General, for appearing today. I now yield to the gentleman from New York, the ranking member of the committee, Mr. Nadler, for his comments.

NADLER:
Thank you, Mr. Chairman.

Before I begin my statement, first, let me wholly endorse the comments of the chairman, with reference to Section 702 and to the legislation that we reported out of this committee.

And, second, I want to acknowledge a letter the chairman and I received last night from the Democratic women of this committee. Our colleagues have written to ask that we convene a hearing regarding the serious and credible allegations of sectional harassment and misconduct leveled against President Trump by at least 19 women. Without objection, I ask that this letter be made part of the record.

GOODLATTE:
Without objection, it will be made a part of the record.

NADLER:
And let me be clear, I unequivocally endorse this letter. We should convene this hearing as soon as possible. This is an opportunity for us to lead and to show the country that this kind of behavior is unacceptable at any level of government.

Mr. Chairman, let me start by saying welcome to the House Judiciary Committee, Mr. Rosenstein. For the better part of a year, my colleagues and I have employed this committee to conduct real oversight of the Department of Justice.

On January 24th, 2017, we wrote to Chairman Goodlatte, insisting that the committee hold hearings on President Trump's conflicts of interest at home and abroad. Citing to experts across the political spectrum, we showed that, quote, "The administration's attempts to address its ongoing topics of interest are so far wholly inadequate," close quote.

Six weeks later, Attorney General Sessions was forced to recuse himself from the Russia investigation, but we have not held a single hearing on the question of conflicts of interest.

On March 8th, we wrote again to the chairman, encouraging him to call -- encouraging him to call hearings on, quote, "Russia's alleged interference in the U.S. election." Again, no such hearings were ever held.

In fact, this committee, which, during the Obama administration, held half a dozen hearings around Operation Fast and Furious, received testimony from FBI Director Comey three times in 13 months and detailed staff and resources to a Benghazi investigation across the public almost $8 million -- this committee, from Inauguration Day until four weeks ago, was largely silent in terms of oversight.

We haven't lifted a finger on election security. Attorney General Sessions told us on November 14th that he has done nothing to secure the next election from threats from at home and abroad.

We have not once discussed the president's abuse of the pardon power. While the hurricane bore down on Houston, President Trump sidelined the Office of the Pardon Attorney to pardon a serial human rights abuser who bragged about running a concentration camp in Arizona.

And we have not held a single hearing on allegations of obstruction of justice at the White House, not for lack of evidence, but because of the chairman's words: Quote, "There is a special counsel in place examining the issue," unquote, and, quote, "Several other Congressional committees are looking into the matter," and the committee, quote, "does not have the time to conduct this critical oversight." I ask my colleagues to keep those excuses in mind.

Now, with the year coming to a close, with the leadership of the Department of Justice finally before us, what do my Republican colleagues want to discuss? Hillary Clinton's e-mails. Let me repeat that. With all of these unresolved issues left on our docket a week before we adjourn for the calendar year, the majority's highest oversight priority is Hillary's e-mail -- Hillary Clinton's e-mails and a few related text messages.

As we saw in our recent hearings with the Department of Justice and the FBI, my Republican colleagues seem singularly focused on the call for second special counsel, and failing that, on the need to investigate the investigators themselves -- ourselves.

The White House has now joined the call by House Republicans for a new special counsel to investigate the FBI. The president's private lawyers have done the same. I understand -- I understand the instinct to want to change the subject after the Flynn and Manafort indictments, but this request is grossly misguided for a number of reasons.

First, it shows a fundamental misunderstanding of how the special counsel regulations work. Some criminal investigations pose a conflict of interest of the Department of Justice; the Russia investigation is such a case, because of the Attorney General's ongoing recusal and because department leadership assisted in the removal of Director Comey, among other reasons. In cases like these, the attorney general may use a special counsel to manage the investigation outside of the ordinary chain of command.

But the key here is the criminal investigation. That's what special counsel does. The department cannot simply assign a special counsel to look at things that bother the White House; there has to be enough evidence to have

predicated a criminal investigation in the first place. Then, and only then, if the facts warrant, can a special counsel be assigned to the case.

So far, there's been no credible, factual legal claim that anybody at the Department of Justice violated any law by deciding not to bring charges against Hillary Clinton or by attempting to meet with Fusion GPS. In other words, there is no investigation to which the department could even assign a new special counsel.

Second, the list of grievances raised by the majority for review by a new special counsel also seems wildly off the mark. For example, there is nothing unlawful about Director Comey's sitting down to draft an early statement about the Clinton investigation, nor would it have been unethical to outline his conclusions before the investigation was over, if the clear weight of the evidence pointed in one direction.

Nor is there anything wrong with FBI agents expressing their private political views via private text message, as Peter Strzok and Lisa Page appear to have done in the 375 text messages we received last night. In fact, department regulations expressly permit that sort of private communication.

I have reviewed those text messages, and I am left with two thoughts. First Peter Strzok did not say anything about Donald Trump that the majority of Americans weren't also thinking at the same time. And second, in a testament to his integrity and situational awareness, when the Office of the Inspector General made Mr. Mueller aware of these exchanges, he immediately removed Mr. Strzok from his team.

To the extent that we are now engaged in oversight of political bias at the FBI, this committee should examine evidence of a coordinated effort by some agents involved in the Clinton investigation to change the course of

the campaign in favor of President Trump by leaking sensitive information to the public and by threatening to leak additional information about new e-mails after the investigation was closed.

On Monday, Ranking Member Cummings and I sent a letter to the department asking for additional materials related to these leaks, as well as to the claims that these efforts may have been coordinated with former Mayor Rudy Giuliani, former National Security Adviser Michael Flynn and other senior figures in the Trump campaign.

Third, the president's call for an investigation of the investigation is at best wildly dangerous to our democratic institutions. On the one hand, the president -- the president's old "Lock her up" cheer seems quaint after a couple of guilty pleas by Trump Associates. On the other, as former Attorney General Michael Mukasey, no fan of Hillary Clinton, has said, the president's continued threats to prosecute his political opponents is, quote, "something we don't do here." If the present were to carry out his threat, quote, again from Attorney General Mukasey, "It would be like a banana republic."

Finally, and most important, this investigation into the investigation cannot credibly be a priority for this committee at this time. I understand the instinct want to give cover to the president. I am fearful that the majority's effort to turn the tables on the special counsel will get louder and more frantic as the walls continue to close in around the president. But this committee has a job to do.

President Trump has engaged in a persistent and dangerous effort to discredit both the free press and the Department of Justice. These are the agencies and institutions under our jurisdiction. Every minute that our

majority wastes on covering for President Trump is a minute lost on finding a solution for the Dreamers, or curving a vicious spike in hate crimes, or preventing dangerous individuals from purchasing firearms, or stopping the president from further damaging the constitutional order.

I hope my colleagues will use today's hearing as an opportunity to find their way back to the true work of the House Judiciary Committee. I thank the chairman and I yield back the balance of my time.


GOODLATTE:
We welcome our distinguished witness. If you would please rise, I'll begin by swearing you in.

Do you solemnly swear that the testimony that you are about to give shall be the truth, the whole truth and nothing but the truth, so help you God?

Thank you. Let the record show that the witness answered in the affirmative.

Mr. Rod Rosenstein was sworn in as the 37th deputy attorney general of the United States on April 26th, 2017, by Attorney General Jeff Sessions. Mr. Rosenstein has had a distinguished career in public service.

He began his legal career in the public integrity section of the Department of Justice's criminal division, and later served as counsel to the deputy attorney general and principal deputy assistant attorney general for the tax division.

Until his appointment by President Trump, Mr. Rosenstein served for 12 years as the United States attorney for the district of Maryland. He holds a Bachelor's degree in economics from the Wharton School and a J.D. from the -- from Harvard Law School.

General Rosenstein, your written statement will be entered into the record in its entirety, and we ask that you summarize your testimony in five minutes. Welcome. We're pleased to have you here.

ROSENSTEIN:

Chairman Goodlatte, Ranking Member Nadler, members of the committee, I want to thank you for this opportunity to testify as part of your oversight of the United States Department of justice. I appreciate your support and concern for the Department of Justice.

I know several of you are alumni of the department; two, in fact, served alongside me as United States attorneys, and I'm very grateful for the opportunity to be with you today.

As deputy attorney general, my job is to help the attorney general, to manage our department's components, including seven main justice litigating divisions, 94 U.S. attorneys' offices, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the United States Marshals Service, the Office of Justice programs, the Federal Bureau of Prisons, the Office of the Inspector General and many others.

Our department includes over 115,000 employees and tens of thousands of contractors stationed in every state and territory and in many foreign nations. We prevent terrorism and violent crime, illegal drug distribution, fraud, corruption, child abuse, civil rights violations and countless other threats to the American people. We enforce tax laws, antitrust laws and environmental laws.

We represent the United States in the Supreme Court, the courts of appeal and the district courts, and in state and territorial courts. We protect federal judges, manage federal prisons, review parole applications, oversee the bankruptcy system. We manage -- we assist tribal governments and we adjudicate immigration cases. We provide legal advice to the president and to every federal agency.

We implement grant programs and support state and local law enforcement. We combat waste, fraud and other misconduct involving employees and contractors. We resolve foreign claims and represent our government in international law enforcement forums. We collect, analyze and disseminate law enforcement data, and we perform countless other important functions for the American people.

Department of Justice employees are united by a shared understanding that our mission is to pursue justice, protect public safety, preserve government property, defend civil rights and promote the rule of law.

The mission attracted me to law enforcement, but the people who carry out that mission are what I treasure most about my job. With very few exceptions, they are honorable, principled and trustworthy.


ROSENSTEIN:
America's federal, state and local law enforcement agencies are more professional today than ever. Rigorous scrutiny by internal affairs offices and external oversight agencies has resulted in increased accountability and higher standards. When wrongdoing occurs, we are more likely to discover it, and we remedy it. That is critical to building and maintaining public confidence.

Over the past eight months, I've spoken with thousands of department employees around the country. I remind them that justice is not only our name; justice is our mission. Justice requires a fair and impartial process. And that's why we have a special responsibility to follow ethical and professional standards.

In 1941, Attorney General Robert Jackson said that the citizen's safety lies in the prosecutor who tempers zeal with human kindness, seeks truth and not victims, serves the law and not factional purposes, and approaches the task with humility.

Under the leadership of Attorney General Jeff Sessions and an experienced team appointed by President Trump, the Department of Justice is working tirelessly to protect American citizens and to uphold the rule of law.

Today, I look forward to discussing some of our department's important work of following the U.S. Attorneys' Manual and the examples set by past Department of Justice officials. We always seek to accommodate congressional oversight requests while protecting the integrity of our investigations, preserving the department's independence and safeguarding sensitive information.

Thank you, Mr. Chairman; I look forward to your questions.


GOODLATTE:
Thank you, Mr. Rosenstein. I'll start by recognizing myself for questions.

Last week, Director Wray indicated that the normal procedures were not followed in the investigation of former Secretary Clinton's e-mail server. He said it was not normal protocol to have witnesses sit in the room during an interview of the target of an investigation.

If the inspector general determines that normal protocol was not followed, or that the investigation was closed or otherwise tainted for political purposes, would that be a justification, in your mind, to reopen the investigation?

ROSENSTEIN:

Mr. Chairman, we are certainly anticipating the outcome of that inspector general investigation. As you know, that's been ongoing for some time. I'm hopeful that of the concluded with the next couple of months. And, when we get those results, we'll take appropriate action.

I don't know exactly what the findings are going to be, but it's always appropriate for us to review any findings of impropriety or misconduct and take appropriate action.

GOODLATTE:

When you announced your decision to terminate the employment of FBI Director Comey, in that decision, you announced some practices that I took it to mean you thought were inappropriate actions on the part of the former FBI director. Do you think that those actions on his part would merit further investigation into how that whole matter was conducted?

ROSENSTEIN:

Mr. Chairman, as you're aware, the inspector general is conducting an investigation into the handling of that Hillary Clinton e-mail investigation, and I believe that the matters that you've referred to are part of his investigation.

The memo that you're familiar with that I provided reflects my personal opinion. It's not an official finding of misconduct. That's the inspector general's job. He'll reach his own independent determination. But, as you pointed out, my views about it are already known.

GOODLATTE:

Are you aware of any prior efforts by the Judiciary Committee -- this committee to unduly restrict the ability of the intelligence community to do its job of protecting our national security?

ROSENSTEIN:

I'm not personally aware of any. No, sir.

GOODLATTE:

Are you aware that this committee has primary oversight of the Foreign Intelligence Surveillance Act, due in part to the significant constitutional and legal questions that government surveillance raises?

ROSENSTEIN:

Mr. Chairman, I respect the Congress's decision about which committee has oversight. I know that both this committee and the Intelligence Committee have an interest in that issue.

GOODLATTE:

Well, given the understand this committee's jurisdiction and its history of providing the intelligence community with the tools it needs, why would we,

in the words of the department, attempt to, quote, "dismantle" Section 702 of our nation's most important surveillance program?


ROSENSTEIN:

I certainly would hope that wouldn't be the case. I don't know who made the statement you're referring to. I know the department obviously has expressed its opinion about the reauthorization, which we think is critically important, of Section 702.

I respect their differences of opinion, but I think the department has been very clear that we believe it's essential to national security that Section 702 be reauthorized.


GOODLATTE:

We agree with you that it's essential that Section 702 be reauthorized. We also believe that it's essential that the civil liberties of American citizens be protected and that a standard be imposed on the examination of information about U.S. citizens incidentally gathered as a part of the Section 702 program with the surveillance of non-U.S. citizens outside the United States, but -- incidentally gathering information about U.S. citizens and then being looked into by agents of the Federal Bureau of Investigation without a warrant.

I'm not aware of that being appropriate in any other type of investigation that they might -- conducting. We're not talking about terrorist attacks. We're not talking about national security, because we have clearly distinguished that.

We're simply talking about crimes that have already occurred, that are being investigated, as they should be investigated by the department, but under the procedures that the American people would expect that they would follow to protect their civil liberties in other circumstances.

ROSENSTEIN:

Mr. Chairman, I -- as you know, I've had the advantage, over the last eight months, of having a role in overseeing our national security operations. I discussed this with Director Wray yesterday, and if -- if you'd like, I could give you a detailed explanation. It might take a couple of minutes, but I'd be happy to give you some details. But the bottom line is that it really is critical to national security that the FBI have the ability to query the data. That's the issue here.

GOODLATTE:

And our legislation allows them to do that. But if the query provides a hit that -- they want to read an e-mail, they want to see other documentation, they want to see -- in its full form, they're required to get a warrant under those circumstances.

ROSENSTEIN:

And I discussed this with Director Wray. And what happens when the FBI conducts these queries, Mr. Chairman, is that, typically, they're leads that are not necessarily based on probable cause, but based on a lead, a suspicion. And the ability to query that data and then follow up on it gives the FBI the opportunity to put two and two together, to connect the dots...

(CROSSTALK)

GOODLATTE:

There are lots of leads that any law enforcement person would like to pursue. But we have protections against them pursuing it without appropriate standard for doing it in a whole host of other ways, to protect people from unreasonable searches. And this is a search of information about a United States citizen.

ROSENSTEIN:

Well it's a -- it's a query, as a constitutional matter, what we're talking about...

GOODLATTE:

(OFF-MIKE) allow the initial query, once that results in something the agent wants to look at, I don't see how you distinguish the further reading of e-mails or other things from a search.

ROSENSTEIN:

If I could take a couple of minutes, I could explain to you -- I talked with Director Wray about an appropriate way to explain this publicly.

Hypothetically, let's say for example that a local police department receives a call that somebody has purchased a large quantity of hydrogen peroxide, and something made the clerk at the store suspicious about that. So he contacts the local police. There's no probable cause. There's nothing illegal about what the person did, but something that caused concern. The local police may...

(CROSSTALK)

GOODLATTE:

General Rosenstein, let me interrupt you, because the very specific instance that you are citing was cited to us in our discussions with the FBI, and that very specific protection for the FBI was added to our legislation.

ROSENSTEIN:

Well, the example I'm providing is a situation where there would not be probable cause, but we think it would be appropriate for the FBI to follow up. And what we're trying to avoid is a situation where we re-erect a wall that would prevent the FBI from gaining access to information that might allow them to connect a lead to information that implicates national security.

GOODLATTE:

Thank you. My time has expired.

The chair recognizes the gentleman from New York, Mr. Nadler, for five minutes.

NADLER:

Thank you.

On Monday, Ranking Member Cummings and I wrote you a letter, sir, about the majority's ongoing investigation into the investigation of Former Secretary Clinton. Without objection, I ask unanimous consent that our letter it be placed into the record.

GOODLATTE:

Without objection, it will be made a part of the record.

NADLER:

Thank you. For -- the first part of our letter discusses the department's failure to provide the minority with access to the documents you've already provided to the majority. Yes or no, will you commit to ensuring that the minority -- that we receive equal access to any materials you may provide this committee in the future?

ROSENSTEIN:

Yes, and I believe we -- my understanding is that that information may have been provided to the...

(CROSSTALK)

NADLER:

I'm (ph) not interested in the past at this point. Thank you. That's all I wanted (ph). I have to be -- I have a lot of questions.

The majority of this committee, the White House and President Trump's private attorneys have all called for the Department of Justice to appoint a new special counsel to investigate a number of Hillary Clinton-related matters. I think we could benefit from your experience in how the special counsel regulation's work.

The regulations say the attorney general, or, in your case, the acting attorney general, will appoint the special counsel when you determine that, one, criminal investigation of a person or matter is warranted, and two, the investigation either presents a conflict of interest to the department or some other strong public interest requires you to appoint this special counsel.

That first part, when he or she determines a criminal investigation of a personal matter is warranted -- is that part of the regulations optional?

ROSENSTEIN:

No, that is a part of the regulations.

NADLER:

OK, thank you. So a criminal investigation must first be determined to be warranted before you can assign a special counsel to the matter?

ROSENSTEIN:

Yes.

NADLER:

Thank you. And, at the Department of Justice, a criminal investigation requires an initial assessment and a preliminary review of the evidence?

ROSENSTEIN:

Correct.

NADLER:

Has that assessment been made with respect to former Director Comey's handling of the Hillary Clinton investigation?

ROSENSTEIN:

I'm not going to comment on any investigations in the normal course. Before we made a determination, we would conduct an appropriate review.

NADLER:

And I assume your answer be the same if I asked you about the FBI's interaction with Fusion GPS?


ROSENSTEIN:

It would be the same for anything, yes.


NADLER:

OK. Then, presuming for a moment -- presuming for a moment that the department has conducted an initial assessment and found no predicate for criminal investigation -- so, in plain English, there is no ongoing criminal investigation -- under this presumption, could you or the -- Attorney General Sessions simply appoint this special counsel to look into these matters?


ROSENSTEIN:

No.


NADLER:

As I said earlier, to my knowledge, there's been no credible factual or legal claim that anybody at the department violated any law by deciding not to bring charges or by attempting to meet with Fusion GPS.

If that is true, if there is no underlying criminal investigation because there is insufficient evidence of a crime, in this or any other case, do the regulations permit you to appoint a special counsel?

ROSENSTEIN:

No.

NADLER:

Thank you.

According to the department, the Office of the Inspector General informed Special Counsel Mueller of the existence of these text messages between Peter Strzok and Lisa Page on July 27th, 2017 -- the texts you sent us last night.

Mr. Mueller immediately concluded the Mr. Strzok could no longer participate in the investigation, and he was removed from the team the same day. Did Mr. Mueller take appropriate action in this case?

ROSENSTEIN:

Yes, he did.

NADLER:

Thank you. In testimony before the Senate Judiciary Committee, you said that you would only fire Special Counsel Mueller for good cause, and that you had not seen any yet. Several months have passed since then. Have you seen good cause to fire Special Counsel Mueller?

ROSENSTEIN:

No.

NADLER:

Thank you. If you were ordered today to fire Mr. Mueller, what would you do?

ROSENSTEIN:

As I've explained previously, I would follow the regulation. If there were good cause, I would act. If there were no good cause, I would not.

NADLER:

And you see no good cause so far?

ROSENSTEIN:

Correct.

NADLER:

Thank you.

On May 1st, the Office of Legal Counsel issued an opinion, arguing that "ranking minority members do not have the authority to conduct oversight," unquote. Shortly thereafter, Politico reported that the White House counsel instructed federal agencies not to cooperate with oversight requests from Democrats.

Since then, Democrats on this committee have written more than 40 letters to the administration, without any meaningful response thus far. Can you clarify your current position on responding to letters from the minority? And are you concerned that the department's May 1st opinion, serves to justify a policy of stonewalling by the administration?

ROSENSTEIN:

My position, Congressman, is that that we make every effort to respond to any legitimate inquiry from a member of Congress. Obviously, we prioritize inquiries propounded by the chair on behalf of the committee, but we'll make an effort to respond to any inquiry. We get a lot of letters.

NADLER:

I'm sure.

ROSENSTEIN:

And so I apologize if there's a delay, but we...

NADLER:

But would you prioritize, after letters from the chair, letters from the minority?

ROSENSTEIN:

... our goal is to respond to all those letters in a -- in a reasonable manner. In fact, when our new assistant attorney general, Stephen Boyd, took office, there was quite a backlog. And we've been...

NADLER:

And would you encourage the Office of Legal Counsel to withdraw its May 1st opinion?

ROSENSTEIN:

I'll take a look at it, Congressman. But, as I said, the -- without regard to what the law may require, our policy is to try to...

(CROSSTALK)

NADLER:
I understand that, but you would take a look at whether you would encourage the Office of Legal Counsel to withdraw that May 1st opinion?

ROSENSTEIN:
Well, I'm not -- I'm not committing to do anything. I will agree to look at it.

NADLER:
OK, thank you.

And, finally, I just want to say -- and follow up with what the chairman was saying about Section 702. The bill that this committee reported specifically said you -- basically said, where you're doing a counterintelligence or a foreign or terrorism investigation, you don't need a warrant to query Section 702 data.

But, where you're conducting an investigation of domestic crimes, then, like any other investigation of domestic crimes, you would need a warrant. So that -- the danger that I think you were referring to is taken care of by the bill. And I endorse the comment of the chairman to that effect, and I think you should take a look at that. I urge you to take a look at that.

Thank you. I yield back.

GOODLATTE:

The chair thanks the gentleman, recognizes the gentleman from Texas, Mr. Smith, for five minutes.

SMITH:

And thank you, Mr. Chairman.

Mr. Rosenstein, I am concerned that the special counsel may be casting too wide of a net -- that he is trying to catch all the fish in the ocean, not just the Soviet sharks. And, if the special counsel were to obtain information not directly related to Russian interference with the election, and he wanted to investigate that further, would he need to obtain your authority to expand the investigation?

ROSENSTEIN:

Yes, he would.

SMITH:

OK. Has he ever asked to expand the scope of the investigation?

ROSENSTEIN:

I appreciate that question, Congressman. If I can explain briefly, there are a lot of media stories speculating about what the special counsel may or may not be doing. I know what he's doing. I'm properly exercising my oversight responsibilities, and so I can assure you that the special counsel is conducting himself consistently with our understanding about the scope of his investigation.

SMITH:

Right. That really wasn't my question. My question was, has he asked you or consulted with you about a desire to expand the investigation beyond the original scope?

ROSENSTEIN:

Well, the consultation, actually, is much more detailed than that. He consults with me, his office consults with me about their investigation, both within and without the scope. So I know what they're authorized to do.

SMITH:

I know you know what they're doing, but has he requested to expand the scope of the original -- of the original jurisdiction?

ROSENSTEIN:

The scope of the original jurisdiction, as you know, is publicly set forth...

SMITH:

Right.

ROSENSTEIN:

... in that order. But the specific matters are not identified in the order. So I discussed that with Director Mueller when he started, and we've had ongoing discussion about exactly what is within the scope of his investigation. And, to the extent there was any ambiguity about it, he's received my permission to include those matters within his investigation.

SMITH:

So he has asked to expand the scope and you've given him permission?

ROSENSTEIN:

Well, yeah -- you're characterizing it as an expansion. As I said, it's a clarification, in most cases. But he understands that this is a special counsel. It's not an independent counsel.

SMITH:

Right. Right.

ROSENSTEIN:

And I'm accountable for what they're doing, and I need to know what they're doing.

SMITH:

Yeah. A clarification may be an expansion, and we may be caught up on the meaning of those words. But I do think -- regardless, I think the American people have a right to know if the original jurisdiction has been expanded. Do you agree with that?

ROSENSTEIN:

The difficulty, Congressman, is that I have a responsibility not to talk about what's being investigated, and that's why the original order doesn't identify any persons or charges.

SMITH:

Right.

ROSENSTEIN:

But we know what's under investigation.

SMITH:

I'm not asking you to go into any specifics, or to name names or to even talk about the subject; just whether or not the request had been made to expand it. You said you clarified his jurisdiction. I assume that that would involve an expansion, as you suggested.

ROSENSTEIN:

I want to make sure I'm 100 percent accurate, and I'll need to check and get back to you as to whether or not we considered particular issues to be a clarification or an expansion.

SMITH:

OK.

ROSENSTEIN:

But, whatever it may be, I'm responsible for and I know what he's investigating.

SMITH:

OK. Please do get back to me on the difference between those two.

Do you feel that the special counsel is authorized to investigate the personal finances of the Trump family members?

ROSENSTEIN:

Congressman, that would implicate the concern that I've expressed, that we just don't talk about what's under investigation. So I hope you don't draw any inference, pro or con, but we're simply not going to discuss it.

SMITH:

Well, do you think the personal finances come under the original jurisdiction of direct involvement, of Russian interference with the election?

ROSENSTEIN:

I certainly appreciate your concern, Congressman. But I hope you appreciated my position that, if I start answering what is and isn't, I've gone down that road that I just don't go down of discussing what's under investigation.

There have been four persons who have been charged. Those are known. And, ordinarily, the Department of Justice -- that's what we publicize. If we charge somebody with crime, we publicize it. If we don't charge anybody with a crime, we don't talk about it.

SMITH:

Right. But some of the people charged have been charged with crimes not directly connected to Russian interference with the election.

ROSENSTEIN:

The crimes with which they're charged are publicly known.

SMITH:

OK. So, in other words, you do feel that the special counsel can go into the personal finances not connected to Russian interference?

ROSENSTEIN:

Hope I've been clear, Congressman, I am not commenting on the scope of the investigation.

SMITH:

All right. What about -- can the special counsel investigate the personal actions of staff unconnected to the Russian interference of the -- with the election?

ROSENSTEIN:

Only if I determine that it's appropriate for him to do so.

SMITH:

OK. So that's your determination, not the special counsel's?

ROSENSTEIN:

As I said, Congressman, I know what he's doing. If I felt he was doing something inappropriate, I would take action.

SMITH:

Right. Let me just maybe summarize by saying that I think the American people deserve to know who is being investigated, and why. I have one final question in my last couple of seconds here.

As you know, and as many of us know, in the lawyers' code of ethics, attorneys are supposed to avoid not just the actual impropriety itself, but the appearance of impropriety. The special counsel has hired at least eight attorneys who had direct connections to both the -- to either the Obama or Clinton campaigns.

Don't you think that creates an appearance of impropriety? And I'm not saying whether you think they can do their jobs. Don't you think it creates an appearance of impropriety?

ROSENSTEIN:
I suppose...

(CROSSTALK)

GOODLATTE:
The time of the gentleman has expired. The witness is permitted to answer the question.

ROSENSTEIN:
I do not believe -- I'm not aware of any impropriety. We do have regulations; the special counsel is subject to all the department's rules and subject to oversight by the department, including the inspector general. I'm not aware of any violation of those rules by the special counsel employees.

SMITH:

So you don't think it creates the appearance of impropriety?


ROSENSTEIN:

Well, appearance is to some extent in the eye of the beholder. We apply the department's rules and regulations in making determinations, and we do have career ethics advisers who provide us counsel about that.


SMITH:

All right (ph). Thank you, Mr. Rosenstein.

Thank you, Mr. Chairman.


ROSENSTEIN:

Thank you.


GOODLATTE:

The chair recognizes the gentlewoman from California, Ms. Lofgren, for five minutes.


LOFGREN:

Thank you, Mr. Chairman, and thank you, Mr. Rosenstein, for being here with us today. You are a career attorney in the department, isn't that right?


ROSENSTEIN:

I would say I was a career attorney.

LOFGREN:

Was a career attorney. You spent your whole life working for the people of the United States as a career attorney, until you were asked to fulfill the current function that you're performing.

ROSENSTEIN:

Well, as a U.S. attorney, I was a political appointee. So for the past 12 years, I've been a political appointee; 15 years prior to that, I was a career attorney.

LOFGREN:

So let me ask you, I -- in taking a look at the individuals who are working on the matters that we are discussing, are they career attorneys in the department that were working on this?

ROSENSTEIN:

Some of them are, Congresswoman. Under the regulation, the special counsel is permitted to request the detail of attorneys in the department who he believes will be helpful. He also has authority to hire attorneys from outside the department, and he's used both approaches.

LOFGREN:

So wouldn't they be subject to the principles -- the merit system principles in the Civil Service Reform Act?

ROSENSTEIN:

Yes. I believe they are.

Case 1:17-cr-00201-ABJ    Document 244-2    Filed 04/02/18    Page 38 of 223

LOFGREN:

So you know, I was -- we've been on the committee here for a long time. And I remember, back in 2008, there were allegations that the Department of Justice had used politics as a basis for hiring and firing in the department.

And the Office of Inspector General and the Office of Professional Responsibility issued a report outlining the impropriety of using politics in personnel decisions. One of the things they said was that the department's policy on nondiscrimination includes the Department of Justice needs to seek to eliminate discrimination on the basis of race, color, religion, sex, sexual orientation, national origin, marital status, political affiliation, age and the like.

So wouldn't that policy be governing the actions of the individuals working on this? You couldn't discriminate based on this whole list, including their political affiliation?

ROSENSTEIN:

Congresswoman, one of the advantages that I bring to the job is, having been in and around the department for a while, I've seen mistakes that have been made in the past.

And that is precisely one of the issues that I've discussed with our political appointees -- that we're not going to do that, that we are not going to improperly consider political affiliation with regard to career employees of the department.

LOFGREN:

Thank you very much.

You know, I wanted to ask about a couple of concerns. And you may or may not have responsibility for this. If so, just let me know. I am concerned that the department has had a change in position on certain important voting rights issues.

One has to do with the purging of rolls in Ohio. The department had previously argued against purging those rolls because the National Voter Registration Act prohibits the purging of voters simply because they haven't voted in a given period of time. And it's my understanding that the department is now arguing that Ohio can purge individuals from rolls, even without evidence that they have moved.

Additionally, the department had argued that the state of Texas I.D. law had discriminated against individuals, and that the department has changed its position on that. And it's -- the law, as currently drafted, probably excludes up to 600,000 Americans from being able to vote because of the I.D. -- the draconian I.D. laws.

Can you give us any insight into why the department changed its position on these key voting rights issues?


ROSENSTEIN:
Congresswoman, I'm generally familiar. I don't know all the details of both of those matters. But, as a general matter, it's important to understand that the determination about -- ultimate determination about what the law means is made by a judge. Department officials obviously need to make a decision, based upon a good-faith analysis of facts and the law, of what position to take.

It may be that new leadership of the department takes a different position. But I can assure you that's based on a good-faith analysis, and there may be legitimate ambiguity in some of these provisions. And we're responsible for making our determination, just like the prior administration made theirs. But ultimately, it will be up to a judge to decide what that law means.

LOFGREN:

Right.

Let me just ask a final question. It's my understanding that, under the order appointing him, Mr. Mueller has the authority to investigate matters that arose or may arise directly from the investigation, which would include crimes uncovered while he is investigating the main mission.

So, for example, if he is looking at the Russia investigation and he finds out that the person he's looking at committed a bank robbery, he isn't required to ignore a bank robbery. Would that be a fair assessment of his responsibilities?

ROSENSTEIN:

It's a fair assessment...

(CROSSTALK)

GOODLATTE:

The time of the gentlewoman has expired. Mr. Rosenstein may answer the question.

ROSENSTEIN:

Congresswoman, it's also -- it's important to recognize, because it's a special counsel, not an independent counsel, those issues are worked out with the department. So, in the event that he came across evidence that was not appropriate for him to prosecute, he could refer it to other components of the department. So we wouldn't allow something like that to slip through the cracks, but we would make sure to route it to the appropriate prosecutor.

LOFGREN:
Thank you, Mr. Chairman.

GOODLATTE:
Chair recognizes the gentleman from Ohio, Mr. Chabot, for five minutes.

CHABOT:
Thank you, Mr. Chairman.

Mr. Rosenstein, you already indicated that Mr. Strzok was removed for impropriety. It's beyond me how the other people that were mentioned by the chairman and Mr. Smith were not removed for impropriety, as well.

Let me ask you, first of all, I assume that the team you put together, you felt was going to be -- that Mueller put together was going to be fair and unbiased, correct?

ROSENSTEIN:
Correct. I selected Mr. Mueller, and he made the...

CHABOT:

And he selected the team?

ROSENSTEIN:
... staffing decisions.

CHABOT:
Right. Now, let me just review a few facts about the supposedly unbiased group of people that Mr. Mueller pulled together. Nine of the 16 have made political contributions. To be fair, let's just go through them in alphabetical order.

First, Greg Andres gave $1,000 to the Democrat running to hold the seat -- the Senate seat previously held by Barack Obama. He gave $2,600 to Democrat Senator Gillibrand, who just this week led the charge of Democratic senators demanding that President Trump resign. And, yeah, Mr. Andres gave zero to the Trump campaign, or to any Republican, for that matter.

Next, again, in alphabetical order, Rush Atkinson. He donated to the Clinton campaign last year. Again, zero to the Trump campaign. Third, Kelly (sic) Freeny contributed to both Obama campaigns and to Hillary Clinton's campaign; zero to the Trump campaign.

Next, Andrew Goldstein -- he donated $3,300 to both Obama campaigns; again, zero to the Trump campaign. Fifth, Elizabeth Prelogar, who clerked for liberal Supreme Court Justices Ginsberg and Kagan, contributed to both the Obama and Clinton campaigns, and zero to Trump.

Next, James Quarles -- he's contributed to the Democratic presidential campaigns of Dukakis, Kerry, Obama and Hillary Clinton, and Gore as well.

He did contribute to former Congressman Chaffetz and Senator Allen, but he contributed over $20,000 to Democratic House and Senate candidates, and again, gave zero to Trump.

Seventh, Jeannie Rhee -- she actually represented, as was previously mentioned, Hillary Clinton and the Clinton Foundation in several lawsuits. She's donated $16,000 to Democrats, contributed $5,400 to the Clinton campaign and zero to the Trump campaign.

Eighth, Brandon Van Grack contributed to ActBlue, the fundraising outfit organized to elect Democratic congressional candidates, contributed to the Obama presidential campaign, and of course, gave nothing to Trump.

And, finally, Andrew Weissmann -- he contributed $2,000 to the Democratic National Committee, $2,300 to the Obama campaign, $2,300 to the Clinton Campaign, and zero to Donald Trump. He's also the guy who praised the holdover acting attorney general, Susan (sic) Yates, for defying President Trump on the travel ban.

Now, my question to you is, how, with a straight face, can you say that this group of Democrat partisans are unbiased and will give President Trump a fair shake?

ROSENSTEIN:
Well, Congressman, I think it's important to recognize that, when we talk about political affiliation, that all demonstrates political affiliation. The issue of bias is something different.

I've discussed this with Director Mueller, and he and I collectively have a lot of experience managing offices in the Department of Justice. We recognize

we have employees with political opinions. And it's our responsibility to make sure those opinions do not influence their actions.

ROSENSTEIN:
Pardon me. And so I believe that Director Mueller understands that and that he is running that office appropriately, recognizing that people have political views, but ensuring that those views are not in any way a factor in how they conduct themselves in office.

CHABOT:
Well, when you say he's running it appropriately, I think putting the committee, the people, these investigators together to begin this investigation in the first place is part of the investigation. And how these people -- the group he put together is considered unbiased -- I don't know how anyone can possibly reach that conclusion.

You know, when this whole "Russia was involved in our elections" flap (ph) surfaced and you picked Robert Mueller to lead the investigation, I was, at first, encouraged. It seemed like a serious matter and it deserved a serious investigation. And I assumed, as many of us did, that Mr. Mueller would pull together an unbiased team.

But, rather than wearing stripes, as umpires and referees might wear, I would submit that the Mueller team overwhelmingly ought to be attired with Democratic donkeys on their jerseys or "I'm with Hillary" T-shirts -- certainly not with "Let's Make America Great Again."

And I think that's a shame, because I think the American people deserve a lot better than the very biased team that they're getting under Robert Mueller, and I think it's really sad.

I yield back.

GOODLATTE:
The chair recognizes the gentlewoman from Texas, Ms. Jackson Lee, for five minutes.

JACKSON LEE:
Deputy Attorney General, thank you. Welcome and thank you for your service to the nation.

Allow me, just for a moment, as I move on (ph) my questions, to indicate that I am shocked and baffled, the way some in the right-wing media and some of our friends on the other side show such contempt for the Department of Justice and the FBI and so much (sic) skepticism or mistrust of the Russian government.

Let me briefly review for the record, the FBI and DOJ brought to justice and put away Timothy McVeigh, domestic terrorist who killed 168 Americans; Klansmen who murdered civil rights workers Goodman, Chaney and Schwerner; the Unabomber; terrorists who bomb U.S. embassies in Kenya and Tanzania; organized crime family kingpins; the murderer who assassinated Medgar Evers; Pan Am 103 bombing; Soviet diplomat that had a spy ring during World War II; Aldrich (ph) Ames, Richard Hansen, Alger Hiss and others, for espionage; World Trade Center bombing in 1993; TWA

847 hijacking; Lindbergh kidnapping; Beltway snipers; Klansmen who killed four little girls in a 16th Street church in Birmingham.

And, of course, on the other hand, Russians are known for shooting down a civilian airline, KAL 007, killing 269 passengers and crew; annexing Crimea and invading Ukraine; killing journalists; propping up Assad, the Butcher of Damascus; building the Berlin Wall; imposing an Iron Curtain against freedom; and committing cyber theft and conspiring and doing a sabotage of the American presidential election in 2016.

Perhaps our friends on the other side of the aisle can show more respect for the FBI and the DOJ, as so many of us do, including myself. So let me ask these questions, and, with my limited time, I really need just a yes or no.

Are you in the business of helping to secure the elections in 2018 and making sure that there is an infrastructure in the DOJ to help states have secure elections? Yes or no?


ROSENSTEIN:
Yes.


JACKSON LEE:
Special Counsel Mueller -- I'm reminded -- some of us would say we read it in the history books -- of the Saturday Night Massacre. I know you must be aware of it.

During the meeting of May 8th, 2017, with you, Sessions and President -- and the president, the day before Comey was fired, what did you discuss regarding the FBI investigation?

ROSENSTEIN:

Congresswoman, as I explained previously, I'm not going to be discussing anything related to that until after the investigation.

JACKSON LEE:

Thank you very much, Mr. Deputy Attorney General.

Let me, then, go forward with the question of the protection of the special prosecutor. Do you have in place a protection scheme or system that would void a potential Saturday Night Massacre?

Do you in fact have the authority to stand up against the president, who is putting out the right-wing media to taint the Mueller investigation? Will you protect Mr. Mueller, if he deserves the protection and has done nothing to violate his duties and responsibilities?

ROSENSTEIN:

As I've explained, if he hasn't violated...

(CROSSTALK)

JACKSON LEE:

Is that yes or no, Mr. Deputy Attorney General?

ROSENSTEIN:

I won't take any action unless he's violated his duties.

JACKSON LEE:

Let me show you these individuals here. It says that the Trump accusers want a day in court, or at least want to be heard. The president is the chief executive and law enforcement officer of the United States. Therefore, he is an officer of the United States.

What does the Department of Justice -- what intentions do you have to allow these women, who are accusing the president of sexual misconduct and have never been heard in terms of a public setting, as many of us on this committee -- women on this committee -- Democratic women on this committee have asked for this committee to hold a hearing with these women -- what does the Department of Justice intend to do, in light of the fact that the president is the chief law enforcement officer of the United States of America?

ROSENSTEIN:
I don't think I have any position on that, Congresswoman. If there -- if they file a lawsuit, and they're free to do so, it wouldn't be a department matter.

JACKSON LEE:
Would you not believe that it's important to give these women a forum to be heard? The Department of Justice, the FBI investigates -- I just gave a long litany of the great successes of the Department of Justice.

ROSENSTEIN:
If there's anything that warrants federal investigation, Congresswoman, we'd certainly look at it.

JACKSON LEE:

So can I refer these women -- can we refer these women to the Department of Justice? If they walked up to the Department of Justice, would there be an intake officer, an FBI officer that would take their complaints?

ROSENSTEIN:

If somebody wants to file a complaint of a potential federal crime, yes, they can report that to the FBI, or they can write. Anybody can do that at any time, and...

(CROSSTALK)

JACKSON LEE:

Then let me publicly say to these women, you have one option at this time. It is to go to the Department of Justice, as the Deputy Attorney General has just said to us, to be able to file a complaint. And I would encourage them to do that. I would also encourage this hearing, as well, to do -- this committee to have hearings.

Let me ask this last question regarding the whole question of commutation program and President Obama, and of course the memo by Attorney General Sessions that rescinds memos regarding the charging and sentencing policy, and also the use of private prisons -- that was by Eric Holder.

What is the position of the U.S. Department of Justice as relates to a fair and just commutation program? And also the issues dealing with over prosecution and the sentencing policy that was offered by Eric Holder, which was considered fair and just, and the use of private prisons -- have

been known to be abusive to prisoners and do not allow FOIA requests to go forward.

What is your position on that?

GOODLATTE:
The time of the gentlewoman has expired. The attorney -- deputy attorney general may answer the question.

JACKSON LEE:
I thank you.

ROSENSTEIN:
Thank you, Mr. Chairman.

You've raised a number of issues, Congresswoman. I don't know that I have time to respond to them all. But I do just want to clarify, anybody is free to report to the Department of Justice when they believe a crime is committed.

It's not a complaint in the way that you might file a complaint in some local police departments. You're free to report any allegations, and the department will conduct appropriate review, as we do with any allegations of alleged criminal conduct. We initiate investigations, though, only if we determine there's proper predication under our policies.

Thank you.

JACKSON LEE:
Well, I'm yielding -- I'm yielding back, Mr. Chairman. But he did not answer my questions. Thank you.

GOODLATTE:

The time of the gentlewoman has already expired.

The chair recognizes the gentleman from California, Mr. Issa, for five minutes.

ISSA:

Thank you, Mr. Deputy Attorney General.

If someone comes in to make that complaint or to file that information, they're going to have their identification checked for who they are, right, to get into the building?

ROSENSTEIN:

I'm not certain -- if they were to -- admitted to the building, you actually can walk into most FBI offices, I think, without having to go through security.

ISSA:

But you wouldn't consider it draconian if, while they're filing this complaint or allegation, their driver's license was looked at, would you?

ROSENSTEIN:

Well, if we're going to conduct an investigation, we need to know who the witnesses are.

ISSA:

Thank you. I just wanted to know that that wasn't draconian.

In the case of Mr. Strzok, the -- you know, there was an appearance of impropriety that people are observing. But you -- you'd said, "Well, there may not have been the reason."

But if it wasn't the appearance of impropriety, based on his numerous rather strident tweets -- or not tweets, but texts commenting adversely on the president, what was it?

ROSENSTEIN:
If I said that, Congressman, it was inadvertent. The decision to remove Mr. Strzok off that case was made by Director Mueller, based upon the circumstances known to him.

It's important to understand, though, that -- those text messages were uncovered in the course of an inspector general investigation that is not complete. So we won't be able to make any determination about what, if any, discipline is required...

(CROSSTALK)

ISSA:
Let me go to the inspector general, now. This is Michael Horowitz, right?

ROSENSTEIN:
Correct.

ISSA:
Michael Horowitz has repeatedly complained that he cannot, in fact -- he does not have the authority to look for impropriety by lawyers, as to their

conduct as lawyers, because the office of the -- OPF -- the OPR has that authority. That's still true, isn't it?

ROSENSTEIN :
It's true, but he does have authority for certain types of misconduct by lawyers.

ISSA:
OK. So we have a situation in which he can look at some of the misconduct, not others. So one of the pieces of misconduct he cannot look at would be the question of bias or the appearance of bias in their investigations, in how they're conducting it or -- and/or decisions. That is uniquely excluded to the inspector general in your Cabinet position, versus all other Cabinet positions, if I...

(CROSSTALK)

ROSENSTEIN:
I'm not certain about that. And if I may, I'll -- I'll check and get back to you on that, but it would either...

ISSA:
But he is excluded?

ROSENSTEIN:
... it would either be OPR or the Inspector General. And, with regard to conflicts of interest, I believe certain of those are within the jurisdiction of the inspector general, but I'd have to verify.

ISSA:

OK. Well, you can get back to me on that.

The -- you know, these political views that Mr. Chabot mentioned -- and they're pretty clear -- that these are people who had a strong preference -- but notwithstanding that, let's be very candid. Nobody up here is going to claim to be without their political bias.

So one of the reasons that, when there is a conflict of interest, people recuse themselves, and when there is a -- an appearance of impropriety, they're excused, and one of the reasons that we look to a special prosecutor and that you appointed a special prosecutor was to not only get past the politics on this dais, but to get past the appearance of any conflict by the Department of Justice. Is that fair to say?

ROSENSTEIN:

To minimize any appearance, on either side, of bias. Correct.

ISSA:

OK. But the -- a special prosecutor, under the remaining statute, how it's done, is still a group looking for wrongdoing. That is their charge is -- they're not looking for right-doing. They're looking for wrongdoing. That's fair to say -- like any prosecutor, you're not looking for innocence?

ROSENSTEIN :

The way I would characterize it, Congressman, is that they're looking for the truth, and then they'll make a determination about whether or not it's appropriate to prosecute.

ISSA:

OK. So my question to you is, if that's the case, if we accept that -- my assumption that they're looking to -- if they can, to hang the president or people around him -- hear me out for a moment -- then there really isn't a problem with having people that are dead- set on trying to find anything that will incriminate the administration in a Russian connection, which is somewhat their charge.

So I'll posture to you that maybe it's not that bad to have people who really dislike the president and would like to hang him. Having said that, when there's impropriety, such as Mr. Strzok; when there is, in fact, a history at the FBI of withholding information from Congress; when there is the appearance of impropriety by the Department of Justice; and when the inspector general is limited under the statute, both because he doesn't have full access and because certain portions are out of it, wouldn't you say that this is a classic example where, in order to investigate the FBI and the Department of Justice, a special prosecutor who is equally looking for the truth, if it exists adversely to the conduct of the FBI and the Department of Justice -- is within your charge and responsibility to see that happens?

(CROSSTALK)

GOODLATTE:

The time of the gentleman has expired...

ROSENSTEIN:

You've built a number of assumptions...

(CROSSTALK)

ROSENSTEIN:

... you've built a number of assumptions...

GOODLATTE:

... Mr. Rosenstein may answer the question.

ROSENSTEIN:

... into your question, Congressman. And my simple answer to it would be that, if we believed there was a basis for an investigation or a special counsel, I can assure you that we would act.

ISSA:

Well, Mr. Chairman, I would say that, since we've already had dismissals for wrongdoing, since there's ongoing internal investigations, the elements necessary to ask for a special prosecutor to in fact see what was done wrong already exist.

GOODLATTE:

The time of the gentleman has expired.

The chair recognizes the gentleman from Tennessee, Mr. Cohen, for five minutes.

COHEN:

Thank you -- thank you, Mr. Chair. First, I want to thank you for your service to the country and for accepting the difficult position under the difficult circumstances that you have.

Has President Trump ever communicated with you about removing Robert Mueller from his role of special counsel?

ROSENSTEIN:

Congressman, I am not going to be discussing my communications with the president. But I can tell you that nobody has communicated to me a desire to remove Robert Mueller.

COHEN:

You said you're not going to relate your conversations with President Trump. How many conversations have you had, since your appointment, with President Trump?

ROSENSTEIN:

I'm the deputy attorney general, Congressman, and it's appropriate for me to talk with the president about law enforcement issues. And I don't believe that's an appropriate issue for discussion.

COHEN:

When you chose Robert Mueller to be the special counsel, what were his characteristics, his history and the reasons for you to have chosen him for this important position?

ROSENSTEIN:

I think it would be very difficult, Congressman, for anybody to find somebody better qualified for this job. Director Mueller has, throughout his lifetime, been a dedicated and respected and heroic public servant.

He, after college, volunteered to serve as a Marine in Vietnam, where he was wounded in combat. He attended law school and then devoted most of his career to serving as a federal prosecutor. With the exception of brief stints in private practice, he served as United States Attorney in two districts in Massachusetts and in Northern California.

He served in many other positions in the department after he lost his position as the head of the criminal division. When President Clinton was elected in 1992, Mr. Mueller briefly went into private practice, and then he went back at an entry-level position, as a homicide prosecutor trying to help with the violent crime problem in the District of Columbia, in the early 1990s.

He then rose once again through the ranks, and ultimately was confirmed, I believe unanimously, as FBI director, and protected this nation after 9/11. And then, when his tenure term expired, he was so well-respected that he -- his term was extended, I believe, also almost unanimously, for another two years.

So I believe that, based upon his reputation, his service, his patriotism, and his experience with the department and with the FBI -- I believe he was an ideal choice for this task.


COHEN:

Thank you, sir. I agree with you. FBI Director Wray agrees with you. He said that -- similar thoughts. He said he was a smart lawyer, a dedicated public servant, well-respected within the FBI.

I think everybody on the other side of the aisle agreed with you, when you appointed him; and everybody in this Judiciary Committee and probably everybody in this Congress agreed with his appointment as FBI director, which was -- which was unanimous; his reappointment, which was unanimous, by Republican Bush and Democrat Obama.

Everybody respects that man in this country. He may be the most (ph)...

(UNKNOWN)
I didn't. I don't.

COHEN:
... respected man in this -- obviously, that -- we knew that would be an exception.

(LAUGHTER)

But the fact is they didn't start to dislike him until he started to get -- think issues that affected the president that currently serves this country. And, because of that, they said the FBI was in tatters, that the FBI, the chief law enforcement -- top law- enforcement folks in this country, are questionable.

Some of their allies on television said they're like the KGB. They've questioned you. They've questioned the Justice Department. They've questioned some of the most loyal, dedicated, fearless people in our country who serve the rule of law, and I find it repugnant and awful.

Now, I wonder what you think about it, when you hear about the FBI, which works under you -- being suggested it's in tatters, and that there's something wrong with the FBI and that they are somehow like the KGB.

ROSENSTEIN:

Congressman, as I know you're aware, I've expressed concern with certain aspects of certain things done by the FBI. But in general, throughout my experience working with FBI agents over the decades, I've found them to be an exceptional group of public servants; very loyal, faithful and dedicated, and I believe some of the finest people that I know are agents of the Federal Bureau of Investigation.

COHEN:

I thought about them, sir, When I watched the Army-Navy game, and I thought about them because I have the honor, as everybody up here has, of recommending some folks to be at West Point and at Annapolis. Those are the cream of the crop, and the people at the FBI are -- in law enforcement, there the cream of the crop. And Justice Department attorneys are, too.

It's not easy to get a job in Justice, no matter where you went to law school and what you did. You hire the best; you always have. I compliment you on that. I hope and know you will continue to hold the Department of Justice up as a pantheon of outstanding lawyers and jurists and take justice where it should go, as truth demands and justice dictates.

I yield back the balance of my time.

GOODLATTE:

The chair recognizes the gentleman from Iowa, Mr. King, for five minutes.

KING:

Thank you, Mr. Chairman, and thank you, Mr. Rosenstein, for your testimony here and your service.

A number of things I'm curious about here -- first of all, in the -- in the interview of Hillary Clinton that took place, reportedly, July 2nd of 2016, how many people were in the room for that? How many people had the opportunity to question her?

ROSENSTEIN:

Congressman, I do not know the answer to that. I believe, when the inspector general completes his review, we may have additional information. But I personally do not know.

KING:

And would you know who selected that team?

ROSENSTEIN:

No, I do not.

KING:

Really? OK.

I recall a testimony here by James Comey, and also by then- Attorney General Loretta Lynch, that testified -- one of the two of them -- that there were three representatives of the FBI and three representatives of DOJ in that room, doing that interview. Would that be consistent with practice that you would anticipate? Am I -- am I going to hear I.G. again?

ROSENSTEIN:

Yeah, not -- typically we would have at least two agents conduct an interview. And there may be any number of attorneys, based upon who's on the case. I just don't know the details of that particular decision.

KING:

OK. And the practice in a -- in an interview like that -- would there be records kept of that interview?

ROSENSTEIN:

Yes, if there are FBI agents present, typically, they would take notes and produce a report summarizing the interview.

KING:

Would there be a video tape, audio tape or a transcript?

ROSENSTEIN:

Generally, no.

KING:

And why not?

ROSENSTEIN:

Well, it's just not -- it's not is not the practice to do it.

KING:

It needs to become the practice. And the practice out across the countryside, many of our local law enforcement, is that, if you're a county deputy and you interview somebody for drunk driving, you tape that interview. And we have sheriffs out there that will say, if they don't do that, that's cause for discipline.

Now, we're sitting here with a mystery on what went on in that interview of July 2nd, and there's many questions that have been asked about that, before and after, and they will -- they will trickle through history until we get to the bottom of it.

We don't know yet it who was in the room -- at least you can't tell me who was in the room. Do you have any knowledge that Peter Strzok might have been one of those people?

ROSENSTEIN:
I do not, no.

KING:
It has been reported in the news that he was one of those people. Are you aware of that?

ROSENSTEIN:
I've read a lot of news reports. I may have seen that in the news, but I personally do not know.

KING:

I see. And, when I look through a -- just a timeline here, just quickly, to drop this into the record, May -- April, May of 2016, Peter Strzok interviews Huma Abedin and Cheryl Mills, who -- Cheryl Mills, who happened to be in the room with Hillary Clinton and her general counsel and her chief of staff, and a subject of the investigation.

Then, on May 2nd, Comey e-mails FBI officials a draft statement, a couple of months before his recommendation not to prosecute Hillary Clinton. And, in that chain, Peter Strzok's name shows up.

It's been reported that he's the one that swapped out the references from "gross negligence" to extremely -- carelessness. I don't know if that's true. Do you have any knowledge about that?

ROSENSTEIN:

No, but I would point out, Congressman, that it's the Inspector General review that has turned up this information.

KING:

I thought that was going to be the answer. And then, also, skipping forward to July 24th, FBI interviews Michael Flynn on Russia. It's reported in the news that Peter Strzok is in that interview. No knowledge to disagree with the reports that are in the news, however (ph)?

ROSENSTEIN:

Correct.

KING:

And then we get the news, later on, that sometime in mid- summer, Peter Strzok had been removed from Mueller's investigative team, but we find out December 4th that that took place, publicly. I kind of understand that. If that had drifted into the -- into the jet stream, perhaps we wouldn't be in the middle of this controversy.

But what about -- if his hands are in so many things -- and I've not touched them all, by any means. But if he has his hands in this many things, what about the fruit of the poisonous tree? It's -- this is the reverse of this. These are the -- this is the voids of the fruit of the poisonous tree.

And I'm looking at what was reported this morning. I just took a picture the television set on my iPhone, just so that we all know what I'm talking about here -- a quote from August 6, 2016, text, Lisa Page to Peter Strzok, and they're talking about President Trump. "And maybe you're meant" -- she's speaking to Peter Strzok, her lover, I hear -- "and maybe you're meant to stay where you are because you are meant to protect the country from that menace."

And Peter Strzok's response is, "Thanks. It's absolutely true that we're both very fortunate. And, of course, I'll try and approach it that way. I just don't know; it will be -- it will be tough at times. I can protect our country at many levels. Not sure if that helps." Does that sound like a declaration that he would use his job to leverage his work against the president of the United States?

ROSENSTEIN:

Congressman, the Inspector General's investigation includes interviews of numerous witnesses, and I anticipate, hopefully in the near future, we'll have a report with the Inspector General's conclusions.

KING:

Would you have any opinion on the lack of the fruit from the poisonous tree that might've been erased by Peter Strzok?

ROSENSTEIN:

Well, as a legal matter, Congressman, I can tell you that, if evidence is tainted, then that would raise a concern for me. But, typically, our cases would be prosecuted based upon witnesses and documents, not upon the agent, unless the agent personally were a witness in the case. But that would certainly concern us, if there were any tainted evidence in the case.

KING:

Thank you, Mr. Rosenstein, I appreciate it and I yield back.

GOODLATTE:

The chair recognizes the gentleman from Georgia, Mr. Johnson for five minutes.

H. JOHNSON:

Thank you, Mr. Chairman, and thank you for your service to the country Mr. Rosenstein. Based on the language in your special counsel order, or your order appointing special counsel, does the special counsel have the authority to investigate any individual who may have obstructed the investigation that

FBI Director Comey confirmed on March 20 of this year, which was the Russian interference with the 2016 elections?

ROSENSTEIN:

Special counsel does have authority to investigate any obstruction related to his jurisdiction.

H. JOHNSON:

Does this authority to investigate possible obstruction include investigating President Trump?

ROSENSTEIN:

I hope you won't take an inference one or the other, congressman, but as I've explained, that's simply something we do not do. We do not discuss who may or may not be under investigation.

H. JOHNSON:

Well, I'm not asking you whether or not the president is under investigation, I'm just simply asking whether or not your order appointing the special counsel authorizes the special counsel to investigate the president?

ROSENSTEIN:

It authorizes him to investigate that anybody who there is predication to believe obstructed justice.

H. JOHNSON:

And that includes the president, correct?

ROSENSTEIN:

It'll include anybody who is suspected of obstructing justice.

H. JOHNSON:

All right. Does -- do you think that it's appropriate for the president to comment publicly on any pending investigation?

ROSENSTEIN:

Congressman, the decision about whether people in political positions comment on investigations, is not mine. My responsibilities to ensure that our investigations are not impacted improperly by any opinion whether, be a member Congress or else.

H. JOHNSON:

Well, it would not be appropriate for you to comment about the any pending investigation, isn't that correct?

ROSENSTEIN:

Correct.

H. JOHNSON:

And the president is the chief law enforcement officer. He considers himself in the country. It would be inappropriate for him then to comment on a pending investigation would it not?

ROSENSTEIN:

Congressman, I believe over the years there have been presidents who have made comments about investigations and it's simply not my responsibility to make that decision.

H. JOHNSON:

Well, do you think it's appropriate for the president to publicly call for the investigation of specific individuals.

ROSENSTEIN:

I'm simply on that, congressman, other than to tell you, it's my responsibility, along with the attorney general to make sure that those decisions are made independently by the department based upon the facts and law.

H. JOHNSON:

Has the president ever contacted you to urge action in any pending investigation?

ROSENSTEIN:

Congressman, I have not received any improper orders and I'm not to be talking about particular communications I may have with -- which appropriate communications with the White House.

H. JOHNSON:

What would be your legal basis for refusing to answer the question whether or not the president has contacted you to urge any action in any pending

investigation? What would be your legal basis for refusing to answer that question?

ROSENSTEIN:

Congressman, this is not a partisan issue. I had worked on an investigation where the previous president encouraged the department to do an expeditious investigation and so the question for me is, are we are or are we not appropriately making an independent determination, regardless of who comments on it.

H. JOHNSON:

My question -- I respect your question -- but my question is has the president ever contacted you to urge action in any pending investigation?

Yes or no?

ROSENSTEIN:

I have nothing further to say about it, congressman.

H. JOHNSON:

So you're going to refused to answer a question from a member of Congress seeking to do oversight?

ROSENSTEIN:

No, I've told you, congressman that I have not received any improper orders and I'm simply not going to talk about communications -- I think in every administration, the senior law enforcement officers have to be able to communicate with the president and his officials about appropriate matters

within their responsibility and not comment on it. So you shouldn't draw any inference, it's simply -- it's simply not appropriate for me to talk about communications I may have with the administration.

H. JOHNSON:
So it would...

ROSENSTEIN:
I would tell you if something happened that was -- that was wrong -- if somebody heard me do something that was improper, but that has not happened.

H. JOHNSON:
Well, it would be improper for the -- for the president to ever contact you about initiating an investigation of someone, would it not?

ROSENSTEIN:
We've discussed this previously, congressman. The presidents have commented publicly and...

H. JOHNSON:
No, no, no, my question is, it would be improper for president to contact you about initiating an investigation of someone. It would be improper, wouldn't it?

ROSENSTEIN:

It would be improper for the president order me to conduct an investigation that wasn't justified.

H. JOHNSON:
It would be improper for the president to ask you to initiate an investigation, would it not

ROSENSTEIN:
If it were for improper reasons, yes.

H. JOHNSON:
And so is it your testimony today that the president has not asked you to investigate someone specifically?

ROSENSTEIN:
Congressman, I understand what you're getting at, but as I said, I was in the last administration in the president of the last administration commented on matters...

H. JOHNSON:
You're being very -- you're being very artful in...

ROSENSTEIN:
No I'm not.

H. JOHNSON:

...jumping around and evading answering my question, and -- and so you're not going to answer it...

ROSENSTEIN:

I'm not evading.

H. JOHNSON:

That's unfortunate. Are you afraid of President Trump firing you?

ROSENSTEIN:

No I am not, congressman.

H. JOHNSON:

With that, I will yield back.

GOODLATTE:

The chair recognizes the gentleman from Texas, Mr. Gohmert for five minutes.

GOHMERT:

Thank you, Mr. Chairman. Thanks for being here, Mr. Rosenstein.

ROSENSTEIN:

Thank you.

GOHMERT:

Did you ever tell Special Counsel Robert Mueller that in essence, everything you do must not only be just and fair, but must also appear beyond reproach? Anything like that?

ROSENSTEIN:
In essence, yes.

GOHMERT:
Yes. Well, since Attorney General Sessions recused himself, you are effectively the boss of the special counsel and staff, correct?

ROSENSTEIN:
It is correct that I am effectively the boss.

GOHMERT:
Well, we all know that FBI Director James Comey was fired. We know of your letter. We know your public statements. Here's a question; to your knowledge, who first proposed the idea of firing James Comey as FBI director?

ROSENSTEIN:
Congressman, I'm not going to comment on that. The president has explained that he made the decision and I'm not going to comment beyond that.

GOHMERT:

At the time you wrote the letter suggesting a firing, did you believe what you put in that = letter?

ROSENSTEIN:
Yes I did.

GOHMERT:
All right. if an FBI employee goes into a meeting and as part of his job, in furtherance of his job, someone else in the government and he comes out and he makes a memo memorializing the meeting, perhaps in the future -- past memory refreshed, is that memo DOJ property?

ROSENSTEIN:
Generally congressman, I would think that it would be. It might depend on what's in the memo, what the subject matter is. But generally the answer would yes.

GOHMERT:
Well an FBI employment agreement -- yes, employment agreement, there's a statement that says that -- and this is the person agreeing to work for the FBI -- all information acquired by me in connection my official duties with the FBI and all the official material which I've accessed remain the property United States of America.

I will not reveal by any means, any information material from or related to the FBI files or any other information acquired by virtue of my official employment. If you make a memo of things that were discussed as part of

your job, then it would be a violation of that agreement to send that to someone to leak to the press, isn't that right?

ROSENSTEIN:
It well may be.

GOHMERT:
All right, the question I'm about to ask, I'm not asking what you may have told Attorney General Jeff Sessions. I don't want to know any words used or ideas conveyed, nor sources referenced. In fact, I'm asking a question that could not possibly have any other answer other than one of two words, that would be yes or no. You are completely free to wholly answer this question with one of those two words and neither word is privileged, confidential, or classified. Here is the question.

As Attorney General Jeff Sessions' deputy, did you give Jeff Sessions any advice regarding whether or not he should recuse himself in the matter of the Russian investigation, yes or no?

ROSENSTEIN:
No. And can I give a little bit of an explanation, Congressman. I appreciate you asking that question. I wasn't there. I was confirmed, I believe, on April 25th and took office on April 26th. I was not there at the time of the recusal.

GOHMERT:
All right. did you ever talk to Bruce Ohr?

ROSENSTEIN:

Yes.

GOHMERT:

Wasn't he four doors down from yours?

ROSENSTEIN:

I haven't counted but he was down the hall.

GOHMERT:

All right and of course, he's been demoted over the relationship with Fusion GPS and then of course we found out that his wife, Nellie was a Russian expert and was made by Fusion GPS through summer and fall of 2016 helping the Clinton campaign get a dossier from the Russians. How well do you know the people that work on your hall?

ROSENSTEIN:

Well, it varies, Congressman. I think that is precisely -- it varies. Some of them I know well. Some of them I don't know as well.

GOHMERT:

All right, of course everybody has some opinions, political opinions or otherwise. The key is not having those affect or bias you in the Department of Justice.

ROSENSTEIN:

Correct.

GOHMERT:

Well, here is here is Mr. Strzok, some of his texts talking about Trump. He's an idiot like Trump. And Martin O'Malley said, well, a D-word, I'm not watching, I can't tell you how little I care right now, he is talking about the Republican convention, so much more substantive than the representative debates, and he goes on at some point, the Republican party needs to pull their head out of their blank. Shows no sign of occurring any time soon. Of course, he's -- the (inaudible) were told by Christopher Ray stands for fidelity, but these were all made in the course of infidelity.

Then he makes slurs against Kasich. He is just unbelievable; I hate these people, talking about the Republicans. No support for the women who has to spend the rest of her life rearing this child but we care about "life." A-holes. How the F can he be a Republican? On and on it goes. America will get what the voting public deserves and that's what I'm afraid of. Hillary should win 100 million to zero. Did you hear him make a comment -- anyway. This is not just political opinions. This is disgusting, unaccountable bias and there's no way that could not affect a person's work. Were you aware of just how biased Mr. Strzok was?

ROSENSTEIN:

No, I was not.

GOHMERT:

Thank you. One final thing. I'm asking a question, the answer's not classified or privileged. Based on information to the best of your knowledge, has the FBI ever used work product or report any part of which was paid for

by a political campaign, political party, political candidate or prepared on a candidate's behalf?

ROSENSTEIN:

Congressman, the issue that you're --

GOODLATTE:

The time of the Gentleman has expired. The witness may answer the question.

ROSENSTEIN:

I know that we're working with at least one committee, House Intelligence that has access to that information. I believe they'll get whatever information --

GOHMERT:

I'm asking a general question.

GOODLATTE:

The time of the Gentleman has expired.

Please answer the question in the form that it was already presented.

ROSENSTEIN:

Not to my personal knowledge, but I'm not representing, I don't know everything about the FBI.

GOHMERT:

And Mr. Chairman, point of personal privilege, since my character was slandered by Mr. Cohen who said that I never -- we never challenged Mueller until he came after the administration when he knows how tough I went after FBI Director Mueller. He's been here when I went after Mueller while Bush was President. He knows I have been after him because of the damage he did and what he stated about me is a lie. And I need the record to properly reflect that.

GOODLATTE:

The Gentleman's comment is duly noted. The Chair recognizes the gentlewoman from California, Ms. Bass for five minutes.

BASS:

Thank you, Mr. Chairman. According to an august 17th FBI intelligence assessment titled black identity extremists, likely motivated to target law enforcement officers, quote, it is very likely that black identity extremists perceptions of police brutality against African Americans spurred an increase in retaliatory violence. So I've tried to get to the bottom of where this report came from, who did it, what its status is.

I've asked Attorney General Sessions, I've asked Director Wray. And so now I want to ask you. Did you order the FBI to conduct this assessment?

ROSENSTEIN:

Sorry, what was the date?

Case 1:17-cr-00201-ABJ    Document 244-2    Filed 04/02/18    Page 81 of 223

BASS:

August 2017, August of this year.


ROSENSTEIN:

No, I did not.


BASS:

Do you know who authored the report, are you familiar with the report?


ROSENSTEIN:

I'm not familiar with the report. I'm familiar with the general issue.


BASS:

And so maybe you could talk a little bit about the general issue, in particular when the FBI began tracking black identity extremism.


ROSENSTEIN:

I think it's important for me to explain, Congresswoman, that the FBI does not make a determination with regard to domestic groups to investigate them based on their first amendment views or their affiliation. It bases its decisions on evidence of a propensity to violence. So with regard to members of any ideology domestically, the FBI would only be investigating if there were some indication.


BASS:

Do you believe there's a political movement in the country called black identity extremism?

ROSENSTEIN:

I don't believe the FBI intends that to encompass a particular political movement, what they do is they try to categorize different threats that they identify.

BASS:

So you said investigate. But before you do an investigation, there's surveillance, correct?

ROSENSTEIN:

Generally, no. There might need to be a determination first that there was a basis for an investigation typically before any surveillance.

BASS:

So how does that determination take place and where has it taken place?

ROSENSTEIN:

If you want details, I need to get back to you. But the FBI has strict guidelines. As you know, several decades ago there was quite a bit of controversy about this issue. the FBI has very detailed guidelines for when they initiate investigations. And I'm not aware of any departure from those guidelines.

BASS:

So one thing that -- and I am aware of the FBI's history from many years ago. COINTELPRO and many people are looking at this document, black identity extremism is COINTELPRO 2, one of the concerns that has been raised and that I raised with Attorney General Sessions and Director Ray is that this document, for whatever reason, was mass distributed to law enforcement offices around the country. Are you aware of that?

ROSENSTEIN:
No, I'm not.

BASS:
So when we talked to Director Wray, it wasn't clear how this term was even developed. In other words, what evidence was it based on to even come up with a term like that and then to write a document about it and then to distribute it to law enforcement around the country?

ROSENSTEIN:
I don't know the answer to that, Congresswoman, but if it's of any reassurance, I have been any indication that the FBI is approaching this in a biased way. They're conducting investigations where they believe the person who is the subject represents a potential threat, not simply because they believe in an ideology or associate with an ideology, but because they represent a particular threat. And I believe the FBI guidelines are designed specifically to ensure that there are no abuses.

BASS:

Case 1:17-cr-00201-ABJ    Document 244-2    Filed 04/02/18    Page 84 of 223

So what I am hearing from activists around the country, in particular, activists who were protesting law enforcement and police brutality or deaths at the hands of law enforcement is they're being visited by the FBI, that the FBI is leaving business cards. And then what the concern about that is that if they do engage in a conversation with an FBI agent and perhaps make a mistake, or maybe say something that isn't true, then they're vulnerable to be prosecuted for lying to a law enforcement officer. So the activists that have received visits by the FBI have never been involved in violence at all. Are you aware of that happening in any of your offices around the country?

ROSENSTEIN:

No.

BASS:

Let me just express another concern about this. When a document that doesn't seem to have any scientific basis that develops a category called black identity extremism, that nobody can say whether or not it really exists, when you send a document like that to law enforcement around the country, you know, in some places, I will worry they will take that to say that any time there is an officer involved shooting, and then there is a protest, that the people that protest might be black identity extremists.

ROSENSTEIN:

Congressman, to the best of my knowledge, the FBI is not investigating people who are peacefully protesting. I haven't read that document. I'll review it and see what it says.

(CROSSTALK)

ROSENSTEIN:

I would appreciate it if you would. And if there is no basis for this term, that then the FBI take a step to retract the document and send a message to law enforcement around the country that no such category exists. I yield back my time.

GOODLATTE:

The Chair recognizes the Gentleman from Ohio, Mr. Jordan for five minutes.

JORDAN:

Did the FBI pay Christopher Steele and was the dossier the basis for securing warrants at the FISA court to spy on Americans associated with the Trump campaign? Really, when you sum it all up. It boils down to those fundamental questions. Did you pay the guy who wrote it? And did you use what he wrote, disprove and discredit the dossier paid for by the Clinton campaign, did you use it to go get warrants to spy on Americans? That's what it comes down to. And you're the guy who could answer those questions. And I was -- yesterday, I was convinced that the answer to those questions was probably yes, but today I'm even more convinced the answer is yes based on the text messages we got to read early this morning.

Mr. Rosenstein, you know Peter Strzok? Are you familiar with that name?

ROSENSTEIN:

Yes. I'm familiar with the name and...

(CROSSTALK)

JORDAN:

Former deputy head of counter intelligence at the FBI, Peter Strzok, that one.

ROSENSTEIN:

I don't know his precise title. But yes, he had a significant rule in...

JORDAN:

Peter Strzok ran the Clinton campaign, interviewed Mills, Abedin, Clinton, changed from the exoneration letter from gross negligence to extreme carelessness. Peter Strzok who ran the Russian investigation interviewed Mike Flynn, Peter Strzok selected by Mr. Mueller to be on his team. That Peter Strzok, we learned had all these text messages. We got to read some of them early this morning. Now, as my colleagues have pointed out, some of them are you know,, show he didn't like Trump. He and Ms. Page are exchanging text messages back and forth, show they don't like the President.

But that's nothing new. Everyone on Mueller's team -- no one on Mueller's team likes Trump. We already knew that. But I want to focus on one in particular, one in particular. And this is a text message from Mr. Strzok to Ms. page recalling a conversation and a meeting that took place in Andrew McCabe's office, deputy director of the FBI recalling a meeting earlier and Mr. Strzok says this. I want to believe the path you threw out for conversation at Andy's office, then there's a break, it says that there's no way he gets elected, no way Trump gets elected. He says I want to believe that. You said that in a meeting in Andrew McCabe's office, I want to believe that, but then he goes, but I'm afraid we can't take that risk. This goes to

intent. He says we can't take the risk. You know, the people of this great country might elect Donald Trump President. We can't take this risk.

This is Peter Strzok, head of counter intelligence of the FBI. This is Peter Strzok who I think had a hand in that dossier that was all dressed up and taken to the FISA court. he's saying we can't take the risk, we have to do something about it. Don't forget the timeline here either, Mr. Rosenstein. Peter Strzok, January 10th. he's the guy who changes the exoneration letter from gross negligence, criminal standard, to extreme carelessness. July 2nd, he's the guy who sits in on the Clinton interview. July 5th 2016, that is when Comey has the press conference that says we are not going to prosecute, Clinton is okay, we are not going to prosecute.

And then august 2016 we have this text message, the same month that the Russian investigation is opened at the FBI, August 2016. And my guess is that's the same month that the application was taken to the FISA court to get the warrants to spy on Americans. Using this dossier that the Clinton campaign paid for, Democrats paid for, fake news all dressed up, taken to the court. So I got really just a couple basic questions. Because it seems to me, if the answer to any of these -- of those two questions if the answer is yes, if you guys paid Christopher Steele at the same time the Democrats and the Clinton campaign were paying him, or if you took the dossier and dressed it all up, took it to the FISA court and used that as the basis to get warrants.

And now we have intent in this text message saying -- there's another text message. My colleague referenced it earlier where Mr. Strzok says I can protect our country at many levels. He says it with all the Janoli (ph) he could muster. I can protect our country at many levels. This guy thought he was super agent James Bond at the FBI. This is obvious. I'm afraid we can't take

that risk. We can't -- there's no way we can let the American people make Donald Trump the next President. I've got to protect our country. This is unbelievable. I'm here to tell you, Mr. Rosenstein, I think the public trust in this whole thing is gone.

So it seems to me you've got two things you can do. You're the guy in charge. You're the guy who picked Mueller. You're the guy who wrote the memo saying why he needed to fire Comey. You are the guy in charge. You can disband the Mueller special prosecutor and you can do what we have all called for -- appoint a second Special Counsel, to look into this, to look into Peter Strzok, and everything else we have learned in the last several weeks.

ROSENSTEIN:

Yes, Congressman. I can assure you that I can consider it very important to make sure that a thorough review is done and our inspector general is doing a thorough review. That's how we found those text messages as part of that review.

JORDAN:

You've given that answer like 15 times. Let me ask you this. Are you concerned, this is what a lot of Americans are believing right now and I certainly do, that the Comey FBI and the Obama justice department worked with one campaign to go after the other campaign. That's what everything points to. Think about what we've learned in the last several weeks. We first learned they paid for the dossier. Then we learn about Peter Strzok. And then last week, we learned about Bruce Ohr and his wife Nellie. This is unbelievable.

So what's it going to take to get a second Special Counsel to answer these questions and find out if Peter Strzok was up to what I think he was.

ROSENSTEIN:

I think it's important to understand, Congressman, we have -- the inspector general has 500 employees and $100 million budget. And this is what he does. He investigates allegations of misconduct involving department employees. That review that he is conducting is what turned up those text messages. It will also involve interviews of those persons and of other witnesses.

JORDAN:

We're looking forward to his report and we've met with Mr. Horowitz. And we are anxiously awaiting that report. But that doesn't dismiss the fact that the country thinks we need a second Special Counsel. 20 members of this committee, the judiciary committee with primary jurisdiction over the Justice Department thinks we need a second Special Counsel.

All kinds of senators think we need a Special Counsel, what fact pattern do you have to have? What kind of text messages do you have to see before you say it's time for a second Special Counsel?

ROSENSTEIN:

I want to assure you, Congressman, and I think the Attorney General explained we take very seriously the concerns of 20 members of this committee or one member of this committee, but we have a responsibility to make an independent determination and we will.

JORDAN:

Thank you, Chair.


GOODLATTE:

The Chair recognizes the Gentleman from New York, Mr. Jeffries for five minutes.


JEFFRIES:

Thank you, Mr. Chairman.

Mr. Rosenstein, there are approximately 14,000 special agents within the FBI, is that correct?


ROSENSTEIN:

37,000 total employees.


JEFFRIES:

is it fair to say a majority of those FBI special agents are registered Republicans?


ROSENSTEIN:

I haven't asked them and I wouldn't want to speculate.


JEFFRIES:

Is it fair to say that the majority of the 14,000 FBI special agents have conservative leaning political views like much of the law enforcement community throughout the entire nation?

ROSENSTEIN:

I'm certain that many of them do. I haven't counted.

JEFFRIES:

Now, the Department of Justice, apparently, last evening, invited a group of reporters to its offices to view the private text messages that were sent during the election by Peter Strzok and Lisa Page, is that correct?

ROSENSTEIN:

I believe that's correct.

JEFFRIES:

No who exactly authorized the Department of Justice in advance of a Congressional hearing to invite reporters to come view private text message communications between two Department of Justice employees who were the subject of a pending investigation? Did you give that order, sir?

ROSENSTEIN:

I think it's a very important question you asked, Congressman, because that was one of my concerns about this issue is what is the status of these messages and is it appropriate to release them and the determination was made that it is. so we gave notice to their attorneys, we notified the committee. And our goal Congressman is to make sure that it's clear to you and the American people we are not concealing anything that's embarrassing to the FBI.

JEFFRIES:

So is it extraordinary that you would invite reporters for a private viewing in advance of a Congressional hearing?

ROSENSTEIN:

Only if the information is appropriate for public release. If it's not appropriate for public release, it is never appropriate to disclose it to reporters.

JEFFRIES:

Okay, now Shannon Bream is a Fox News Supreme Court reporter, she tweeted last evening at 9:29 that Fox News producer Jake Gibson has approximately 10,000 text messages between Peter Strzok and Lisa Page. Now, it's my understanding that only about 350 or so were released to this committee, is that correct?

ROSENSTEIN:

There are others that are being reviewed. And we assured the committee chairs that we're going to produce them as soon as we have them available, there are some redactions that need to be made.

JEFFRIES:

How is it that possible that Fox News apparently has 10,000 text messages?

ROSENSTEIN:

I wouldn't assume that's true just because it was in the news, Congressman, I'm not aware of that.

JEFFRIES:

Okay, but this is a Fox News reporter who is indicating that, I'm sure we are going to get to the bottom of it, hopefully The Chairman in a bipartisan way would be interested in what is clearly -- would be a violation of law and Department of Justice proceedings.

ROSENSTEIN:

If there were any evidence we disclosed information to a reporter that wasn't appropriate for public release or wasn't disclosed to the Congress, I would agree with you. But I'm not aware of that.

JEFFRIES:

Okay, now the Department of Justice investigation should be free of political interference, true?

ROSENSTEIN:

Absolutely.

JEFFRIES:

Let me put up a tweet from Donald Trump on November 3rd at 3:57 a.m. in the morning, god knows what he was doing at that time other than tweeting. It says everybody -- can we put that tweet up?

GAETZ (?):

Can I ask the clock stop while we're trying to --

GOODLATTE:

What was the Gentleman's request?


JEFFRIES:

Yeah, the committee had been given notice of a tweet that I wanted displayed on the screen last evening, and I have been asking for that to be put up.


GOODLATTE:

And there's some technical difficulty in doing that? Yeah, we'll suspend.


GAETZ (?):

I believe the Gentleman had a minute and 45 seconds.


GOODLATTE:

We'll make sure he has plenty of time.


JEFFRIES:

Thank you, Mr. Gaetz (ph).

In the interest of time, Mr. Chairman, I'll just read what was written by the President. He said everybody is asking why the Justice Department and FBI isn't looking into all of the dishonestly going on with crooked Hillary and the dems. Let me ask you a question. Is it ever appropriate for a President, any President of the United States, to encourage the Department of Justice to launch criminal investigations against his or her perceived political enemies?

ROSENSTEIN:

I'm not going to comment on that, Congressman. As I have explained previously, the President has put a team of experienced folks in charge of the Department of Justice. And we're not going to be influenced by anything other than the facts of law.

JEFFRIES:

Was that an appropriate tweet for the President of the United States to send?

ROSENSTEIN:

It's not my role to opine on that.

JEFFRIES:

Does the President's repeated attempts to encourage criminal prosecutions against perceived political enemies concern you, sir?

ROSENSTEIN:

Congressman, as I have said, we understand our responsibility. and we're going to continue to conduct our responsibility in accordance with the facts and the law, and I'm grateful that the President has put an experienced team in charge of the justice department who understand what to do.

JEFFRIES:

Thanks. On June 20th, the New York Times published a wide ranging interview with Donald Trump in it, the President criticized you for being from Baltimore. Saying there are very few Republicans in Baltimore if any. So he is from Baltimore?

ROSENSTEIN:

It's true.


JEFFRIES:

Mr. Rosenstein, are you unable to be fair and impartial because you're from Baltimore?


ROSENSTEIN:

Well, I did work in Baltimore for twelve years. It's true, there aren't a lot of Republicans in Baltimore.


JEFFRIES:

Okay, Donald Trump's statement had no basis in reality, correct?


ROSENSTEIN:

As I said, that part of it was true.


JEFFRIES:

Okay Preet Bharara was a former US attorney for the southern district of New York, true?


ROSENSTEIN:

Yes.


JEFFRIES:

He was fired by Donald Trump in March? Is that correct?

ROSENSTEIN:

Along with almost all sitting US Attorneys.

JEFFRIES:

This office for the southern district of New York has prosecutorial jurisdiction over Trump Tower in Manhattan, correct?

ROSENSTEIN:

Has jurisdiction over everything in its jurisdiction.

JEFFRIES:

Okay, and Presidential interviews of US attorney candidates, that has been reported to be the case for Preet Bharara's replacement, that would be a departure from traditional Presidential protocol. Correct?

ROSENSTEIN:

For the President to personally conduct the interview?

JEFFRIES:

That's correct.

ROSENSTEIN:

I'm not aware of all the prior practices. I don't think it was done in the last two administrations that I'm familiar with.

JEFFRIES:

Okay, and you were appointed by President Bush, and then continued in that position

You were appointed by President Bush and then continued in that position as US attorney for Maryland by Barack Obama. That's correct?

ROSENSTEIN:

That's correct. As a matter of law, I was appointed and never removed.

JEFFRIES:

Okay, were you ever asked by President Bush for a loyalty pledge?

ROSENSTEIN:

No.

JEFFRIES:

Were you ever asked by President Barack Obama to take a loyalty pledge?

ROSENSTEIN:

No.

JEFFRIES:

Is it ever appropriate for the President of the United States to demand the Department of Justice official of FBI director have a loyalty pledge?

ROSENSTEIN:

I don't have an opinion on that, Congressman. Nobody has asked me to take a loyalty pledge, other than the oath of office.

JEFFRIES:
Thanks, I yield back.

GOODLATTE:
The Chair recognizes the Gentleman from Texas, Mr. Poe, for five minutes.

POE:
Thank you, Chairman. Thank you for being here. Just so it's clear, I'm one of the numerous members of the judiciary committee that have asked for a second special prosecutor based on what Mr. Jordan earlier said.

The Justice Department is responsible for investigating criminal conduct. Would that include criminal conduct by the NSA?

ROSENSTEIN:
Yes.

POE:
Okay. We all learned under the prism that was happening years ago by the NSA that the NSA was doing, in my opinion, unconstitutional surveillance on Americans in their e-mails by tracking it and hacking into see those e-mails came to light under Snowden, after Snowden, who I care nothing for, brought that to America's attention. NSA said we're not going to do that anymore, which I think is appropriate because I thought it was unconstitutional. And we have heard reports through the media that there

has been unmasking of information, what I mean by that is classified information is seized on somebody, and someone else, an American, that their name is caught up in the communication, and if someone leaks who that was, unmasked that individual, my understanding is if it's classified information, whoever does that unmasking has committed a felony. Is that correct?

ROSENSTEIN:

The only distinction I would make, Congressman, is the unmasking is done in the course of intelligence analysis. Leaking would be a violation.

POE:

That's what I'm talking about, the leaking of that information. And as of today, has anybody been indicted under prism? Has anybody been indicted under leaking information on unmasking up until today? Has the justice department indicted anybody under those two scenarios and events?

ROSENSTEIN:

We have indicted, prosecuted people for leaking. I'm not certain -- I don't believe any of them are related to unmasking.

POE:

So no one has been indicted, to your knowledge. Which I want to bring up now the Foreign Intelligence Surveillance Act that has been discussed by this committee numerous times. It's the law that allows secret courts to issue secret warrants to try to go get terrorists that are operating overseas and get

their information. Does the justice department present those FISA warrants to a FISA judge?

ROSENSTEIN:

In situations where a warrant is required, yes. It needs to be obtained by a federal judge.

POE:

That is right, the justice department is responsible for that, is that correct?

ROSENSTEIN:

That's correct.

POE:

Also under FISA, once again, Americans are brought into the scenario because you target a foreign terrorist, and then you go after their e-mails, and then you find e-mails of Americans. And those are inadvertently caught in the surveillance of the target. According to The Washington Post recently, 90% of those inadvertent e-mails are on Americans. And my question to you is, why hasn't the justice department, the FBI, the intelligence community, presented to Congress and our request that took place years ago, how many of those inadvertent e-mails, communications, text messages, conversations had been on Americans?

We have been asked for the number. Do you know why that has not been brought to our attention? And let me just follow up with this reason. Here's the reason we need it, we're getting ready to maybe reauthorize 702, which I have a lot of problems with. I think it's unconstitutional in many other ways.

But beside the point, here we are at the deadline getting ready to reauthorize it, and still, the intelligence community refuses to tell us how many Americans' information has been seized. Can you tell us why we haven't gotten that information that we have asked for for years.

ROSENSTEIN:

No, I testified at a hearing with Director Coates who I think would be a more appropriate person to answer that because he has access to the data, and he has explained it. But I would simply point out that you use the term inadvertent. It's a term that we use incidental.

POE:

Incidental, I don't mind the name change.

ROSENSTEIN:

My point is simply if you're investigating a foreign terrorist, knowing with whom that person is communicating maybe relevant to your investigation.

(CROSSTALK)

POE:

That's not my question. My question was, we're getting ready to maybe reauthorize 702. I don't think we ought to reauthorize it until we find out from the intelligence community where there are no indictments that have been issued against the intelligence community based upon the statements that you have made to see whether or not they're violating the law, and they refuse to give this committee the information about how many people have

been caught up in that. And we have been stonewalled from the intelligence community saying we just can't do it.

Why can't the intelligence community get some geek over at Best Buy and have them come in and answer that question with a few little taps into the big computer system? We just want the number.

GOODLATTE:
The time of the Gentleman has expired. The witness may answer the question.

ROSENSTEIN:
As I explained, Congressman, I have heard Director Coates explain this. And he's better positioned than I.

POE:
So we don't know. Still don't know. Thank you, Mr. Chairman.

GOODLATTE:
The Chair thanks the Gentleman. The Gentleman from Illinois, Mr. Gutierrez is recognized five minutes.

GUTIERREZ:
Thank you, Mr. Chairman. I would like to ask you about sexual assault by the President of the United States of America. Over the past few days, echoing previous allegations made against the President in the past several years, at least 16 women have come forward to say that the President of the United States felt them up, kissed them without permission, put his hands under

their clothing without permission, groped them, touched their genitalia, walked into dressing rooms unannounced to see them naked, and made other unwanted sexual advances that to everyone are clear violations of the law.

Now, I believe the women. And I generally give the women and their word a lot of weight. And when the him in question is Donald Trump, there really should be no further discussion because as everybody, regardless of their political affiliations or partisanship can clearly see, we have a man in the presidency who has a very difficult relationship with the truth.

In this case, we have women who were made to feel powerless and insignificant, who at great personal cost and risk to come forward. And I believe them. I do. Al Franken is resigning from the Senate. And it goes no further than this committee where two senior members resigned because women came forward and made credible claims. That just happened last week. And others on this dais right now are among the additional members of the body who are accused, credibly accused of misconduct. Right now, with the number two person in the justice department before our committee and sworn to tell the truth, I think it's important to get your opinion on whether there are grounds for criminal investigation or an ethics investigation against the President of the United States of America.

For example, Rachel Crooks is one of the 16 women that we know of who have come forward. She said that President Trump before he was President, quote, kissed me directly on the mouth. It was so inappropriate, he thought I was so insignificant that he could do that, end quote. Jill Harth, another one of the 16 women said, quote, he groped me. He absolutely groped me, and he just slipped his hand there, touching my private parts, end quote. Now, these are just two examples of unwelcome sexual advances. I think were he

on the subway or in a restaurant, would not either or both of these incidents be enough to get him arrested? In your experience as the number two most important law enforcement officer in the United States?

But before you answer that, how about these cases? Kristen Anderson in an interview said, quote, the person on my right who unbeknownst to me at the time was Donald Trump, put their hand up my skirt. He did touch my vagina through my underwear, end quote. And Cassandra Searless said he continually groped my ass and invited me to his hotel room, end quote.

These are very serious allegations of crimes committed by the President, are they not? but before you answer the question, I think it's important to point out that these stories are corroborated by one of the most important witnesses of all, the President himself corroborates this. He told TV host Billy Bush when he was mic'ed up for an interview with Entertainment Tonight, quote, I just start kissing them. It's like a magnet, I just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. He continued and said grab him by -- you know what he said. You can do anything, end quote.

Samantha Holvey said on national television when she was a contestant in a beauty contest, Trump would come back unannounced to the dressing room. she tells her story, and once again, we have audio tape of the President corroborating this account, when he told Howard Stern, well, quote, I'll tell you, the funniest is before a show, I'll go backstage and everyone is getting dressed. And everything else, and you know, no men are anywhere, but I'm allowed to go in because I'm the owner. And he went on to say the chicks will be almost naked, end quote.

Mr. Rosenstein, I see you as a law enforcement officer. And I value your opinion on these matters. Would it be appropriate for you to investigate these and other allegations of assault and unwanted sexual advances by the President of the United States?

ROSENSTEIN:

Congressman, I am happy to take any questions regarding oversight of the Department of Justice. With regard to that matter or any other allegation that you think warrants investigation, I will invite you to submit the evidence and the department will review it if you believe there's a federal crime. That applies to any alleged violation by any person. And that's all I have to say about that.

GUTIERREZ:

But Mr. Rosenstein, you're the number two top law enforcement officer in the nation. Let me ask you, if a person on a train went and kissed a woman, is that a crime?

ROSENSTEIN:

If it's a federal train, it might be a federal crime, Congressman.

GUTIERREZ:

It's Amtrak.

ROSENSTEIN:

Just not going to answer.

(CROSSTALK)

GUTIERREZ:

It's Amtrak.


ROSENSTEIN:

It wouldn't be appropriate for me to answer any...

(CROSSTALK)


GUTIERREZ:

Wouldn't be appropriate? You think -- as the number two law enforcement officer, you don't think it's a crime for a woman to be on a train, be in a restaurant sitting and a stranger unwanted, a stranger would come up to her and grope her and kiss her, that's not a crime?


ROSENSTEIN:

Sir, if you ask me --


GOODLATTE:

The time of the Gentleman has expired. The witness may answer the question.


ROSENSTEIN:

I would have to know the facts and evaluate the law. I have never prosecuted a case like that in federal court, Congressman. But if you have an allegation by any person at any time, you should feel free to submit it.


GUTIERREZ:

The women have made the allegations.

(CROSSTALK)

GOODLATTE:
The time of the Gentleman has expired. The Chair recognizes the
Gentleman from Pennsylvania, Mr. Marino for five minutes.

MARINO:
Thank you, Chairman. deputy Attorney General, it's good to see you again.

ROSENSTEIN:
Thank you.

MARINO:
We do a lot of good work together over the years.

ROSENSTEIN:
Yes, sir.

MARINO:
And I'm proud of it, and I'm still proud to tell people I was part of the justice
department. Actually, I have a strong bias for the justice department. I know
your character. I know what kind of man you are. And I have the most
confidence in you that you will direct that agency to follow the rule of law
and to see that everything is above board. 99.99% of the people that I
worked with there are good, honest, law enforcement people and I have

ultimate respect for them. They helped me on many cases even when I was a D.A.

I do would like to ask you to clarify a procedure. And first of all, would you tell me if I'm right here? Special Counsel is appointed by the Attorney General, or under the circumstances, by you, and that Special Counsel reports to you.

ROSENSTEIN:
Correct.

MARINO:
Am I correct in saying that an independent counsel is again appointed by the Attorney General or you, but that counsel is independent and not report to anyone in the essence of can I do A, B, or C, is that correct?

ROSENSTEIN:
Under the independent counsel statute that lapsed in 1999, the appointment would be made by a federal judge. So there would be no role for the department in the selection or oversight.

MARINO:
DOJ wouldn't be involved in it at all?

ROSENSTEIN:
Correct.

MARINO:

Let's talk a moment about, I have been in many interviews with FBI agents, DEA agents, concerning potential cases. And what I have seen handled was above board, but would you explain to the committee what a 302 is.

ROSENSTEIN:
Yes, a 302 is simply the form number for an FBI interview report. So after conducting a witness interview, FBI agent would write a summary of the interview. we refer to that as a form 302.

MARINO:
And during an interview, whether it's done by attorneys or investigators at the Department of Justice or it's done back in my district in the middle of Pennsylvania, at some point, is there usually an assistant US Attorney present in those interviews?

ROSENSTEIN:
There's no rule against it, Congressman, but typically not. I would say the majority of interviews would be conducted by two agents without a prosecutor.

MARINO:
Who makes the final determination on whether immunity is granted? Is that by the US attorney or the attorney at the justice department who could perhaps be handling that case?

ROSENSTEIN:

That's correct. It would be a prosecutor who would need to make that determination, and depending upon what type of immunity it might require a higher level of review.

MARINO:

And before any immunity is given to anyone, whether it's absolute or not, we in law enforcement look for a proffer, is that correct, from that individual or their attorney? What are you going to tell us, why should we give you immunity?

ROSENSTEIN:

We have a strong preference for obtaining a proffer prior to any grant of immunity. We don't always do it, but we have a strong preference for it.

MARINO:

I have never been in a situation, and perhaps it's not unique, where immunity has been given where there has not been a proffer. Is that -- would that be an extreme unusual situation where someone would say immunity, but we have no idea what they're going to say?

ROSENSTEIN:

I wouldn't want to characterize it, Congressman, as a US attorney, I had to approve formal immunity, and the majority of the cases, there had been a proffer. If there wasn't a proffer, I typically would ask why. So I can't characterize what percentage of cases might fall into that category.

MARINO:

And also, any evidence that would be collected such as laptops, computers, things of that nature pursuant to the investigation, there would be a thorough investigation of that equipment before immunity would be given to someone.

ROSENSTEIN:

It would depend upon the circumstances, Congressman. We have to make a determination of whether we believe whether the data might be relevant to the decision.

MARINO:

Right, but there is -- we just don't give blanket immunity because someone asked for it or just to get them in to talk.

ROSENSTEIN:

We could not give immunity just because somebody asks for it, correct.

MARINO:

That's all I have. Thank you very much for being here, and I know you'll keep an eye on things and keep everything above board. It's a pleasure to see you again. I yield back.

ROSENSTEIN:

Likewise, thank you.

GOODLATTE:

I thank the Gentleman. The Chair recognizes the Gentleman from Florida, Mr. Deutch.

DEUTCH:

Thank you, Mr. Chairman, thank you for being here.

There has been a lot of talk about dates and timeline but I would like to actually just walk through for the benefit of my colleagues a short timeline from this year. In January, the FBI, CIA, and NSA concluded the following and I quote, we assess Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US Presidential election. Russia's goals were to undermine faith in the US process, denigrate Secretary Clinton and harm her electability and potential presidency. We further assessed Putin and the Russian government developed a clear preference for P resident Trump. Close quote. Mr. Rosenstein, could you give any reason to dispute that?

ROSENSTEIN:

No.

DEUTCH:

In January, also in January, January 24th, Michael Flynn denied to the FBI agents that he discussed US sanctions with Russia before he took office. on January 26th, acting Attorney General Sally Yates told the White House counsel that Flynn lied about the nature of his calls with Kislyak and is vulnerable to blackmail. On February 13th of this year, Flynn resigned of his conversations with the vice President. On February 15th, public reports of telephone records shows members of the Trump campaign and other Trump

associates had repeated contacts with senior Russian intelligence officials in the year before the election. On March 16th, documents released by Representative Cummings showed the Flynn received $33,700 from Russia's state-owned TV for a speech that he made in Moscow. On March 20th, the FBI director acknowledged an investigation in a possible collusion between the Trump Campaign and Russia.

On May 9th, the President fired the FBI director. On May 10th, Trump met with Russian diplomats in the White House and revealed classified information and told them he fired the head of the FBI, called him a nut job, and said and I quote, I face great pressure because of Russia. That's taken off. Close quote. On May 11th, the President told NBC News that the Russia thing with Trump and Russia is a made up story.

On June 7th, we learned President Trump urged Comey to drop the Flynn investigation. on July 8th, we learned of an undisclosed Trump Tower meeting between Donald Trump Jr., Jared Kushner, Paul Manafort, and a Russian lawyer. the next day, five sources stated that Donald Trump Jr. agreed to the meeting on the premise that damaging information on Hillary Clinton would be provided, and five days after that, a veteran of the Russian military, we learned, also attended the Trump Tower meeting with Donald Trump Jr., Paul Manafort, and Jared Kushner.

On October the 5th, George Papadopoulos, one of the five people the President identified as a policy advisor pleaded guilty to one count of making a false statement to the FBI on January 27th about the timing, extent, and nature of relationships and interactions with certain foreign nationals. In the statement of offense, we learned that he reached out regarding his connections that he could help arrange a meeting between Trump and Putin. On October 27th, former Trump campaign chairman Paul Manafort and

campaign adviser, Rick Gates were indicted on multiple counts including conspiracy against the United States.

In November, the President of the United States met with Vladimir Putin and said, and I quote, he said he didn't meddle. He said he didn't meddle. I asked him again. You can only ask so many times. Every time he sees me, he says I didn't do that. And I really believe that. When he tells me that, he means it. The President went on to say, I mean, give me a break talking about the national security folks who put together that report that I quoted earlier. Give me a break. They are political hacks.

On December 1st, former national security adviser Michael Flynn pleaded guilty to one count of making a false statement to the FBI about conversations he had with the Russian ambassador regarding sanctions. This is a little walkthrough what happened over the past year. I would like to ask you, Mr. Rosenstein, I would like to quote some of my colleagues from this committee. one said that the Special Counsel's investigation into whether the Trump campaign assisted in its efforts to interfere in the election is an attempt to overthrow the government of the United States.

Do you believe that, Mr. Rosenstein?


ROSENSTEIN:
No.


DEUTCH:
He said we're at risk of a coup d'etat in this country if we allow an unaccountable person, Special Counsel unaccountable here?

ROSENSTEIN:

No, he's not unaccountable.


DEUTCH:

He went on to say with no oversight. Is there no oversight at all with the Special Counsel?


ROSENSTEIN:

There is oversight.


DEUTCH:

Then he went on to say that if we allow an unaccountable person with no oversight to undermine the duly elected President of the United States, is pursuing a rule of law undermining the dually elected President of the United States? Mr. Rosenstein?


ROSENSTEIN:

No it is not.


DEUTCH:

One of my other colleagues said we have to clean this town up. He talked about firing Mueller. One of our former colleagues on this committee accused Mueller of having a vendetta against Trump because he fired James Comey. Mr. Rosenstein, do you believe he has a vendetta against the President?

ROSENSTEIN:

No, I do not.


DEUTCH:

I would just conclude that this little walkthrough, this one year in American history, makes it impossible to understand how it is that my colleagues on the other side continue to launch attacks, not only against reporters, against the FBI, against the Special Counsel, but they do so to throw dirt on the story, to make it try to go away. They may want to bury their heads in the sand, but Mr. Chairman, I want to make clear that they will not bury the rule of law in the United States of America and I yield back.


GOODLATTE:

The Gentleman's time has expired. The Chair recognizes the Gentleman from South Carolina, Mr. Gowdy, for five minutes.


GOWDY:

Thank you, Judge Poe, there are a lot of issues I would like to ask you about, Mr. Deputy Attorney General. We had a terrorist incident in New York this week. We have 702 reauthorization that is pending in Congress, gun violence, the opioid epidemic, criminal justice reform. But when I go home to South Carolina this weekend, trust me when I tell you, no one is going to ask me about any of those issues. They're going to ask me, what in the hell is going on with the Department of Justice and the FBI?

The reason we have Special Counsel, and this is a very important point, and you know it, the reason we have Special Counsel is because of a conflict of

interest. The regulation itself specifically makes reference to a conflict of interest, and we don't like conflicts of interest because it undercuts people's confidence in both the process and the result. So let's be really clear why we have Special Counsel.

It was either a real or perceived conflict of interest that we were fearful would either impact the result or people's confidence in the process. That's why we have something called Special Counsel. And that's why we have Special Counsel in this fact pattern, and then lo and behold, those who are supposed to make sure there are no conflicts of interest seem to have a few of their own. There's a senior prosecutor who sent obsequious e-mails to a fact witness. She could be described as nothing other than a fact witness. She's a really important fact witness if you pursue the line of inquiry that my Democrat friends want to pursue, they got off collusion and now they're on obstruction of justice. She may be the most important fact witness in an obstruction of justice case and the senior prosecutor for this conflict of interest free Special Counsel sent a fawning obsequious e-mail to a fact witness.

And then we have prosecutors assigned to conduct this investigation who donated almost exclusively to one candidate over another. And then we have a prosecutor assigned to this conflict of interest free team that attended what was supposed to be, what he had hoped to be a victory party for Secretary Clinton. And we have a senior DOJ official, Mr. Deputy Attorney General, with an office that used to be two doors down from yours. Meeting with Fusion GPS, and Fusion GPS, of course, was paying for Russian dirt on the very person that they're supposed to be objectively investigating.

And then that same senior DOJ official's wife, the one that met with Fusion GPS, his wife was on the payroll of Fusion GPS. And then we have a senior

agent assigned to investigate Secretary Clinton's e- mail, help draft the exoneration letter, what would change the language from grossly negligent to extremely careless. Interviewed Secretary Clinton in an interview I have never seen and I doubt you have either in your career as a prosecutor, interviewed Michael Flynn, was actively involved in the investigation into the Trump campaign before the inspector general found his texts.

So this agent in the middle of almost everything related to Secretary Clinton and President Trump sent pro-Clinton texts, anti- Trump texts to his paramour, in response to being told maybe he is where he is to protect the country from that menace, Donald Trump, he said, I can protect our country at many levels. and then he said, Hillary Clinton should win 100 million to nothing. Think about that, Mr. deputy Attorney General. That's a pretty overwhelming victory. 100 million to zero. And when I read that last night, what I thought was, this conflict of interest free senior agent of the FBI can't think of a single solitary American who would vote for Donald Trump. that's where the zero comes in. Not a single solitary American he can imagine would vote for Donald Trump. this is the conflict of interest free special agent assigned.

And then he went on, if that weren't enough, to belittle Trump supporters by saying he could smell them at a Wal-Mart in Virginia. This is the person we needed to avoid a conflict of interest. And then he said this they fully deserve to go and demonstrate the absolute bigoted nonsense of Trump. But he wasn't content to just disparage Donald Trump. He had to disparage Donald Trump's family. This is what he said, Mr. Deputy Attorney General. He said the douche bags are about to come out. He's talking about our first lady and children. This conflict of interest free special agent of the FBI.

This is who we were told we needed to have an objective, impartial, fair, conflict of interest free investigation. So he's openly pulling for the candidate he had a role in clearing, and he's openly investigating a candidate that he has bias against, and then if that's not enough, he says Trump is an f'ing idiot. What the f just happened to our country. This is the same man who said he would save our country.

What happens when people who are supposed to clear the conflict of interest have even greater conflicts of interests than those they replace? That's not a rhetorical question. You nor I nor anyone else would ever sit Peter Strzok on a jury, we wouldn't have him objectively dispassionately investigate anything knowing what we know now. Why didn't we know it ahead of time, and the last question, my final question to you, and I appreciate The Chairman's patience, how would you help me answer that question when I go back to South Carolina this weekend?

ROSENSTEIN:

Congressman, first of all, with regard to the Special Counsel, Mr. Strzok was already working on the investigation when the Special Counsel was appointed. The appointment I made was of Robert Mueller. What I recommend that you tell your constituents is that Robert Mueller and Rod Rosenstein and Chris Wray are accountable and that we will ensure that no bias is reflected in any of the actions taken by the Special Counsel or in any matter, within the jurisdiction of the Department of Justice. When we have evidence of any inappropriate conduct, we're going to take action on it. And that's what Mr. Mueller did here as soon as he learned about this issue. He took action and that's what I anticipate that the rest of our prosecutors, our new group of US attorneys, our justice department appointees, they

understand the rules, and they understand the responsibility to defend the integrity of the department.

If they find evidence of improper conduct, they're going to take action.

So Congressman, that's the best assurance I can give you. But actually, there's one other point, which is you should tell your constituents that we exposed this issue because we're ensuring that the inspector general conducts a thorough and effective investigation and if there is any evidence of inpropriety, he's going to surface it and report about it publicly.

ROSENSTEIN:
I'll try.

GOODLATTE:
The time of the Gentleman's time has expired. The Chair recognize the Gentleman from Rhode Island, Mr. Cicilline for five minutes.

CICILLINE:
Thank you, Mr. Chairman, thank you, Mr. Rosenstein. In February, the Department of Justice changed its litigation position in Veasey versus Abbott, a Texas photo ID case. Did you have any involvement in the decision to reverse the justice department's long standing position in this case of the Texas Voter ID law was intentionally discriminatory?

ROSENSTEIN:
No, I do not.

CICILLINE:

In august, the department of Justice changed its litigation position in the case of Husted versus A Philip Randolph Institute. The justice department is now defending Ohio's voter purging law. Were you involved in the decision to change this litigation position, and now side with the voter purging law?

ROSENSTEIN:

I was at the department at the time, but I don't believe I had any involvement in the decision.

CICILLINE:

Were you involved in the Justice Department decision to file an Amicus brief on Masterpiece Cakeshop versus Colorado Civil Rights Commission on behalf of the baker who seeks to deny baking wedding cakes to same-sex couples.

ROSENSTEIN:

That decision was made by our inspector general -- pardon me, our solicitor general.

CICILLINE:

You describe the Special Counsel as a heroic figure who served his country a career prosecutor, someone who was confirmed unanimously as FBI director, someone of extraordinary reputation, service, and patriotism.

I take it your judgment on Mr. Mueller has not changed today.

ROSENSTEIN:

Correct.


CICILLINE:

And you would not have appointed a Special Counsel or appointed Mr.
Mueller if you thought he was going to engage in a witch hunt, correct?


ROSENSTEIN:

Correct.


CICILLINE:

So you then would disagree with the President's labeling of the Special
Counsel's investigation as a witch hunt, I assume.


ROSENSTEIN:

I don't know exactly what the President meant by that, Congressman. The
Special Counsel's investigation is not a witch hunt.


CICILLINE:

It's not a witch hunt. The President said it is. You disagree. You're supposed
to be independent. You can answer a question contrasting with the
President. You disagree it's a witch hunt. The President is wrong, correct?


ROSENSTEIN:

I don't know what the President meant by that comment and I can only
answer for myself.

CICILLINE:

Do you believe the repeated attacked on the credibility of Special Counsel Mueller whether by conservative pundits on TV or by my colleagues threatens to undermine the credibility of the independent investigation?

ROSENSTEIN:

The independence and integrity of the investigation is not going to be affected by anything anybody says.

CICILLINE:

You delivered remarks on October 25th before the US chamber of commerce, and I quote, you said if we permit the rule of law to erode when it does not directly harm our personal interest, the erosion may eventually consume us as well. The rule of law is not self executing, if it collapses, if the people lose faith in the rule of law, then everyone will suffer, end quote.

In the context of the President's attacks, the American people are really witnessing an unprecedented attack on our democratic institutions by this President. First, diminishing the seriousness of the investigation, which is under way about Vladimir Putin's interference in our elections. Attacks on the judiciary, attacks on the free press. The one institution, which continues to enjoy broad public support and remains key to protecting the rule of law is the Federal Bureau of Investigations and the Department of Justice.

America is counting on your integrity and your commitment to protecting the independence of the Special Counsel to reaffirm our commitment to the rule of law. So when you said just a moment ago that you don't have an opinion about a loyalty oath from the President being asked of people, it

might be useful to remind you, sir, that members of the Department of Justice take an oath to the constitution. And so a loyalty oath to the President of the United States is inappropriate for any President to ask for and for anyone to swear. Do you agree?

ROSENSTEIN:
Congressman, nobody has asked me for a loyalty oath.

CICILLINE:
That's not my question, sir. My question is, you are here to demonstrate the independence of your office. And you are unwilling to say that an oath to the President of the United States rather than to the constitution is not inappropriate? That does not inspire a lot of confidence.

ROSENSTEIN:
No, I did not say that, an oath to the President of the United States, rather than the constitution, would be inappropriate.

CICILLINE:
An oath to the President of the United States, period, is not appropriate?

ROSENSTEIN:
Congressman, you're talking about a hypothetical. It's not clear what was asked or what was said.

CICILLINE:
You also --

ROSENSTEIN:

As long as you are following your oath of office, you can also be faithful to the administration.

CICILLINE:

Faithful is not the question. I'll move to a new question. You also said you would not respond to the question to say whether or not the President of the United States had asked you to initiate criminal prosecutions against political adversaries. You would not disclose whether or not those conversations took place.

ROSENSTEIN:

I said I would disclose if I was told to do something improper.

CICILLINE:

What if you were encouraged to do something improper? What if you were encouraged to initiate a criminal investigation? That's not appropriate to do, is it?

ROSENSTEIN:

Several of your colleagues on both sides have encouraged me today, Congressman, and as I have explained, I'm going to base my decisions on the facts and the law.

CICILLINE:

I understand that, Mr. Rosenstein, but the action of a President to encourage you to initiate a criminal prosecution, separate of what you will do with that, that very action is not appropriate.

ROSENSTEIN:

You're free to make that judgment.

CICILLINE:

I'm asking you in your judgment. Isn't that inappropriate?

ROSENSTEIN:

My judgment is it would be inappropriate for somebody to order me to do something.

CICILLINE:

But it wouldn't be inappropriate for your supervisor, the person you serve, the President of the United States, to tell you or suggest to you or encourage you to initiate a criminal prosecution against a political adversary?

ROSENSTEIN:

Congressman, I think I have been very clear about this that nobody is giving me --

(CROSSTALK)

CICILLINE:

I'll just end with this, Mr. Deputy Attorney General. You know, we have heard you very proudly here talk about the integrity of the Department of

Justice and the work of the FBI. We heard Director Wray say the same thing. These two agencies, the FBI and the Department of Justice, are in the midst of an unprecedented attack by individuals who are trying to undermine the credibility of this independent counsel's investigation. These are the same group of individuals who praised Robert Mueller when he was appointed, spectacular, was praised uniformly, and now the only thing that's changed is two indictments, two pleas. Michael Flynn, part of the President's inner circle, now cooperating with the government. That's the only thing that's changed.

We need to hear your voice, defending the integrity of this department, rule of law, the independence of this investigation because the very future of our democracy is at stake if you fail to do that and so I urge you to do so. And with that, I yield back.


GOODLATTE:
The Chair recognizes the Gentleman from Idaho, Mr. Labrador, for five minutes.


LABRADOR:
Thank you, Mr. Chairman. Thank you, Mr. Rosenstein, for being here today. I shudder at some of the questions from the other side. And I just want to ask you a quick question.

Have you ever said that you are the President's wingman?


ROSENSTEIN:
No, sir.

LABRADOR:

Has the current Attorney General of the United States ever said that he is the President's wingman?

ROSENSTEIN:

Not to my knowledge.

LABRADOR:

But yet, the Attorney General under President Obama said that he was the President's wingman, and I never heard a single democrat object to that. So it's kind of ridiculous to sit here and try to question your integrity or try to question whether somebody is going to be loyal to their President or not, as you clearly indicated, you can be both loyal to the constitution and to the President of the United States, as long as there's not a conflict of interest, as long as you're not doing anything that is inappropriate, it's okay to be the President's wingman. It's also okay to say that you're going to be loyal to the President, as long as they're not asking you to do anything that is illegal. Isn't that correct?

ROSENSTEIN:

Yes.

LABRADOR:

So what was the goal of the Russians when they tried to interfere with the elections in the United States?

ROSENSTEIN:

The assessment of the intelligence community as reflected in their public report is that the goal of the Russians was to undermine American confidence in democracy.

LABRADOR:

So to undermine the American --

ROSENSTEIN:

That is sort of paraphrasing, Congressman. I don't have it in front of me.

LABRADOR:

So they tried to undermine the public faith in the US democratic process, is that correct?

ROSENSTEIN:

I believe that's correct.

LABRADOR:

I believe no one in the United States has done more to undermine the belief in the United States democratic process than the Democrats, and the press in some cases, when they continue to report on false allegation after allegation, after allegation. in fact, what you see from the democrats is they move from one allegation, that allegation is proven to be false, and they move to the next one, and they move to the next one, and they move to the next one because they're unhappy with the result of the election. Can you tell me why the independent counsel was actually appointed?

ROSENSTEIN:

The Special Counsel, Congressman, I have explained publicly, that I appointed the Special Counsel based upon unique circumstances in order to promote public confidence, and I have nothing to add to that.

LABRADOR:

So why, when Mr. Mueller was charged with investigating, he was charged with investigating, quote, any links and/or coordination between the Russian government and individuals associated with the campaign of Donald Trump. And any matters that arose or may arise directly from the investigation, end quote. That charge is overly broad. But there's been two prosecutions or at least two charges so far brought by the independent counsel, is that correct?

ROSENSTEIN:

Four individuals charged, two pleaded guilty and two will stand trial.

LABRADOR:

Have any of them been charged with any links and or coordination between the Russian government and individuals associated with the campaign for President Trump?

ROSENSTEIN:

Congressman, the charges speak for themselves. I'm not going to comment beyond what's in the charging documents.

LABRADOR:

But is there anything in those charging documents that there was a coordination between the Trump administration and the Russians?

ROSENSTEIN:

Congressman, I'm not going to comment beyond what's in the charging documents. I think you can draw your own conclusion.

LABRADOR:

So something I do agree with my friends on the other side is we should get do the bottom of this. We should know the truth. We should know whether there was collusion between Russia and the President of the United States. We should also know whether there was collusion between any department who tried to interfere with our elections.

So can you tell me, was there collusion between the DOJ and Fusion GPS to use a democratic funded document for political and legal purposes?

ROSENSTEIN:

I don't know the answer to that, Congressman. I would simply point out the language used in the appointing order was coordination. And I believe that was the language used by Director Comey when he publicly testified about an ongoing investigation. I did not use the word collusion.

LABRADOR:

Okay. So that coordination, was there any coordination between the DOJ and Fusion GPS to try to undermine an election of the United States?

ROSENSTEIN:

If there were, Congressman, I would be very concerned about it. As you know, there are ongoing reviews, and I'm not in a position to comment about that.

LABRADOR:

So there are ongoing reviews, so there could potentially be an investigation whether the DOJ and members of the DOJ actually colluded with an enemy of a political party and a political candidate to undermine the elections of the United States.

ROSENSTEIN:

If there's any evidence that warrants it, Congressman, we'll do what is appropriate.

LABRADOR:

All right, so I think if you want to restore the trust of the American people, I think the Department of Justice has a duty to give us all the information that we have been asking for. We need to find out who started this investigation, we need to find out what the purpose was. If you have an individual who actually had a desire to have an outcome in a political race, and they decided to use the Department of Justice to investigate their political opponent, I think that is one of the worst crimes that has occurred in the history of the United States when it comes to politics, do you agree with that?

ROSENSTEIN:

If that were what happened, it would certainly be a great concern.

LABRADOR:

All right, well I hope that you're truly investigating this and that we get to the bottom of this. Thank you very much. I yield back.

GOODLATTE:

The Chair recognizes the Gentleman from California, Mr. Swalwell, for five minutes.

SWALWELL:

Thank you, Mr. Chairman. welcome, Mr. Rosenstein. please express my thanks to your employees who serve at our national interest every day and do very important work at the department. Mr. Rosenstein, have you spoken with the President since you were appointed?

ROSENSTEIN:

Of course.

SWALWELL:

And is that in a one-on-one setting?

ROSENSTEIN:

I have never spoken with the President in a one-on- one setting.

SWALWELL:

Has he called you since you have been appointed? By telephone.

ROSENSTEIN:

Yes.


SWALWELL:

And what was discussed?


ROSENSTEIN:

As I said, Congressman, I have told you that if I were told to do anything inappropriate, I would talk about it, but if the President is consulting me about matters within my official responsibility, that's part of the way you run the government.


SWALWELL:

Did he discuss at all Mr. Mueller's investigation.


ROSENSTEIN:

I'm not going to comment, Congressman, about my communications with the President.


SWALWELL:

How many times has he called you?


ROSENSTEIN:

Congressman, I do not -- I'm not going to comment about my communications with the President. There's nothing wrong with the

President consulting with his Deputy Attorney General about matters within the jurisdiction of the Justice Department, as long as it's not inappropriate.

SWALWELL:

Mr. Rosenstein, I agree, except that this President has demonstrated and it's been expressed through testimony from James Comey that has not been contradicted under oath multiple times that he is willing to talk to individuals at the department about ongoing investigations. That's where the concern arises.

With respect to Attorney General Sessions' recusal, was he involved at all in the decision by the department to allow reporters to review the text messages that you discussed earlier?

ROSENSTEIN:

Not to my knowledge.

SWALWELL:

Will you tell us if he was?

ROSENSTEIN:

If I learn about it, if it matters, Congressman, as I said, not any inpropriety in what the department has done in making these text messages available.

SWALWELL:

But Attorney General Sessions is recused from Bob Mueller's investigation, right?

ROSENSTEIN:

Attorney General Sessions is recused from Director Mueller's investigation, correct.

SWALWELL:

And these text messages are related to an individual on Bob Mueller's investigation?

ROSENSTEIN:

I don't want to argue with you, Congressman.

(CROSSTALK)

ROSENSTEIN:

I'm aware of the recusal and I'm not aware of any evidence that the Attorney General has violated his recusal.

SWALWELL:

Mr. Rosenstein, if you're overseeing an investigation and lead a team of investigators and you learn that one of the investigators has demonstrated a perceived bias against an individual in the investigation, should you, A, keep the person on the team, or B, remove the person from the investigation?

ROSENSTEIN:

B.

SWALWELL:

And knowing that fact pattern, what did Bob Mueller do with a similar fact pattern?

ROSENSTEIN:
He chose the correct option.

SWALWELL:
Mr. Rosenstein, the President has said a number of things about you, the Attorney General, the FBI being in tatters. He even compared our intelligence community, which your employees are a part of, to Nazi Germany. And I want to ask, considering his continued disparagement of the department and your employees, are your employees proud to work for a person who holds their high integrity in such low regard?

ROSENSTEIN:
Congressman, my employees are, I believe, proud to work for the Department of Justice. Some of them support a particular President, some of them don't, but as long as they do their job appropriately, that's my concern.

SWALWELL:
I agree, and I hope so, and I hope that's the case. Mr. Rosenstein, your testimony today is that you believe Bob Mueller is a person of high integrity, is that right?

ROSENSTEIN:
Yes.

Case 1:17-cr-00201-ABJ    Document 244-2    Filed 04/02/18    Page 139 of 223

SWALWELL:

You believe his investigation is being conducted fairly, is that correct?

ROSENSTEIN:

Yes.

SWALWELL:

You also believe that, and you understand that he's publicly indicted two individuals with respect to his investigation.

ROSENSTEIN:

Correct.

SWALWELL:

He's also obtained two guilty pleas with respect to his investigation.

ROSENSTEIN:

Correct.

SWALWELL:

Is there good cause to fire Bob Mueller as we sit here today?

ROSENSTEIN:

Not to my knowledge.

SWALWELL:

Now, I am concerned that my House Judiciary Committee colleagues, particularly in the majority, have signaled quite indiscreetly today, that they would probably give the President a pass if he were to fire or order you to fire Bob Mueller. There have been a number of statements attempting to undermine the good character of Bob Mueller. That concerns me because that would certainly fly in the face of the rule of law in this country. It would not be okay, I believe, with the American people or the spirit that our country was founded upon.

Mr. Deputy Attorney General, your investigation is a very narrow bridge. The important part, I believe, for our country is for you to not be afraid during these trying times. we need you to be fearless. We have a President who has demonstrated a willingness to involve himself in ongoing investigations that involve he and his family. And for the sake of our country, for the sake of rule of law, I hope that you continue to demonstrate the character that got you into this position and that has given us as a committee, I think, faith in your ability to carry out that mission. I yield back.


GOODLATTE:

The Chair recognizes the Gentleman from Texas, Mr. Farenthold for five minutes.


FARENTHOLD:

Thank you, Mr. Chairman. I know we talked a lot about this today, but I feel obliged on account of the folks that I represent are always asking me about this, to say there is a real concern out there in Texas, certainly, and I think around the nation. We have got a Special Counsel who is working 24/7

investigating the Trump administration yet the Department of Justice and various witnesses we have had up here, has basically not been able to confirm or deny what investigations if any are going on with respect to the potential misdeeds of the Clinton campaign and their dealings with Russia be it through uranium one, various speaking engagements for the former President Clinton, and the like.

And again, I'm not asking you to break that confidentiality, but I am suggesting that there are a lot of people out there who would be sadly disappointed if there isn't an investigation. And who may actually -- who do actually think that there might ought to be a special prosecutor or Special Counsel appointed to look at the other side. So instead of beating that dead horse, I'm going to beat another one that I have been talking a lot about and that's specifically the DOJ's opposition to the USA Liberty Act.

Why is it so hard, why is the work requirement so difficult to deal with on your part? We understand the need to have [excellent] circumstances where things get looked at quickly, but like the FISA court and this whole process of obtaining things for foreign intelligence purposes to stop terrorists are being rolled into more normal mainstream criminal investigations where traditionally there's been a need for a warrant. Why is it so difficult to get a warrant? In many cases, you can create the necessary probable cause and paperwork in a matter of hours if not minutes. They judges are on call 24/7 to look at these things. Why is it such a problem? And why are you all opposed to it?

ROSENSTEIN:
I believe -- I want to duplicate Director Wray's comments about this, Congressman.

I wish actually, that you could join us in the department and see how we go about our work, and I think that would actually enhance public confidence. The public sees when things go wrong. They don't see the 99.9% of the time, as Congressman Marino pointed out, when things go right. And it would be burdensome. I certainly respect, and I understand the concerns, Congressman.

And I think those are serious concerns. And we're going to do everything that we can to try to reassure people about it. But I can simply tell you, and it would take me a lot longer than the time you have to explain the full process, but I believe Director Wray is correct about this. And the national security community, I know many folks who were involved pre-9/11 and post-9/11 have spoken up about how important it is for us to have this tool because we do not want to be in a position again as we were in 9/11 and people said why didn't the FBI put these facts all together and figure out about this threat before the terrorists attacked?

So that's the basis, Congressman, and I can assure you that if it were easy to do with a warrant, I would be in favor of it. But it's not, and I believe we have appropriate safeguards in place, and that we have people who are responsible, who are conducting these investigations, and are going to avoid infringing Americans' rights. That's our primary concern. Attorney General Sessions has made it one of his priorities to make sure there are no violations of Americans' rights, and I do not believe the program as it exists represents a violation of anyone's rights.

FARENTHOLD:

You and I may disagree on whether it violates folks rights or not. I agree we have got to fight terrorism, but there's a reason the fourth amendment was

included in the constitution. Finally, I just want to touch for a second on cybersecurity. I used to run a computer consulting company, and you have heard about breaches all throughout the public and private sector. can you just give me an overview quickly about what y'all are doing with respect to that? And what, if anything, Congress needs to do to help you?

ROSENSTEIN:

It would be hard for me to do it quickly, Congressman, because we do have a lot of resources, both the FBI and other agencies, that are protecting against the cyber threat. It's a significant threat. We face an intelligence threat from hostile foreign governments, and also a criminal threat from people who try to break into our systems to commit crimes and defraud Americans. And so it's a very challenging issue, as you know from your experience. Technology continues to evolve and we need to stay a step ahead of the capabilities of our adversaries and of criminals.

So the FBI does have a lot of resources devoted to that. I testified about our budget a couple months ago. And I think that's going to be an area where we will need increasing support from the Congress to make sure that we keep up with our adversaries.

FARENTHOLD:

I see my time has expired. thank you, Mr. Chairman.

GOODLATTE:

Thank you. The Chair grants the Gentleman from California, Mr. Lieu, for five minutes.

LIEU:

Thank you, Mr. Chairman. thank you, Deputy Attorney General Rosenstein for being here today. I know for the American people that not only were you appointed by Republican President Donald Trump. you were also previously appointed by Republican President George Bush to serve as US Attorney for Maryland. And if a profile of you in The Washington Post" when you were a US Attorney, a former prosecutor says Rob Rosenstein is the poster child for the professional, confident, ethical and fair minded prosecutor. Thank you for your service to the American people and for your exemplary service.

ROSENSTEIN:

Thank you.

LIEU:

Last week, FBI Director Chris Wray told us no one is above the law. You would agree with that statement, correct, that no one is above the law?

ROSENSTEIN:

Yes, I would.

LIEU:

Now, important to our democracy, not only that concept but also that people have to have trust in our law enforcement investigations. There are some of my colleagues and some in the media who have suggested that if you make political contributions, somehow, you cannot be fair and impartial. So as you know, these political contributions are a matter of public record. You previously said when it comes to Special Counsel investigations, you, Special

Counsel Mueller, and FBI Director Wray will be the ones held accountable.
So we looked up the political contributions of FBI Director Wray. he has
made over $39,000 in contributions exclusively to Republicans. Including
$2500 twice to Romney for President. $2600 twice to Perdue for President.
Thousands of dollars to national republican senatorial committee. $1,000 to
Komsak (ph) for Congress, and on and on.

Do you believe FBI director Chris Wray can remain fair and impartial?


ROSENSTEIN:
Yes, I do.


LIEU:
Your colleague, Associate Attorney General Rachel Brand, has made over
$37,000 in political contributions exclusively to Republicans. Do you
believe she can remain fair and impartial despite her political contributions?


ROSENSTEIN:
Yes.


LIEU:
I think it's important to shut down this silly argument from my colleagues
across the aisle that somehow the Department of Justice employee exercises
their first amendment right to make political contributions and somehow
they cannot do their job. And it shows the desperation that some people have
about the Mueller investigation, which I now want to turn to.

You supervised that investigation, so you're aware, of course, of the guilty pleas and indictments. And in reviewing the guilty plea of George Papadopoulos, you would agree there's a solid legal and factual basis for that guilty plea, correct?

ROSENSTEIN:

I believe he was represented by competent defense counsel who assisted him in making his decision.

LIEU:

And he pled guilty to lying to FBI agents about interactions with Russia, Russian officials, correct?

ROSENSTEIN:

I believe that's correct. I don't want to comment, Congressman, beyond what's on the charging documents. They speak for themselves.

LIEU:

Thank you. The guilty plea of Michael Flynn. You must have looked at those as you supervised this investigation. You would agree there's a legal and factual basis for that guilty plea as well, correct?

ROSENSTEIN:

Yes.

LIEU:

And he lied to FBI agents about his interactions with Russian Ambassador
Sergey Kisiyak? Correct?

ROSENSTEIN:

Again, Congressman, the documents speak for themselves.

LIEU:

You read the indictments against Paul Manafort and Mr. Gates, you would
agree there's a solid factual basis for those indictments?

ROSENSTEIN:

Congressman, when we return an indictment, we're careful to say the
defendants are presumed innocent. But I'm comfortable with the process
that was followed with regard to that indictment.

LIEU:

You're aware of the various people that have been interviewed by Special
Counsel Mueller's team. You would agree there's a factual and legal basis to
interview those witnesses?

ROSENSTEIN:

I'm not aware of any impropriety.

LIEU:

You previously testified about Robert Mueller's exemplary record and
dedication service. You did mention he was a Vietnam veteran. I just want to

know for the record, and I'm sure you know as well, he also did receive a bronze star for his service in Vietnam, correct?

ROSENSTEIN:
I believe two, correct.

LIEU:
He also received a purple heart for his service in Vietnam, correct?

ROSENSTEIN:
Yes.

LIEU:
So what do we have here? we have a Special Counsel investigation that is being supervised by Mr. Rosenstein who has been described as a fair-minded prosecutor appointed twice by Republican Presidents being run by Special Counsel Mueller, a man of extraordinary dedication that is a Vietnam veteran, bronze star winner, purple heart. And in coordination with FBI Director Christopher Wray who has been appointed by Republican President who made over $39,000 of contributions exclusively to Republicans. That is the leadership of this Special Counsel investigation and I am okay with that.

I yield back.

GOODLATTE:
The Gentleman yields back. The Chair recognizes the Gentleman from Florida, Mr. Desantis, for five minutes.

DESANTIS:

Mr. Deputy Attorney General, when Sally Yates defied President Trumps' travel restriction order at the end of January 2017, was that appropriate what she did?

ROSENSTEIN:

I disagreed with her decision.

DESANTIS:

So if you're in a position where you get an order, your job is to follow the order, if you think it's unconstitutional, your response would be to resign your office, correct?

ROSENSTEIN:

My response would be first to talk with the person who gave the order, but ultimately if I concluded it were unconstitutional, I would not implement it.

DESANTIS:

And obviously, you can't have a department operating where each one is a law into themselves where if they happen to think is something is bad, that they don't follow the orders? Correct?

ROSENSTEIN:

That's exactly right.

DESANTIS:

So it bothered me one of the recent revelations. You know, you have Andrew Weisman, he a big democrat donor, which I agree, doesn't disqualify you from being fair. He went to Hillary's supposed victory party. It doesn't mean that disqualifies you. But when she took that action, he sends her an e-mail with his DOJ account saying how he's in awe and so proud of her basically standing up to Trump. I mean it was seen as a very direct rebuke to the President.

So your test was are the political opinions affecting how one conducts himself in office. I think that's a fair test. But isn't that example, of that e-mail, an example of his strong strongly held anti-Trump opinions affecting how he's conducting himself on his official e-mail?

ROSENSTEIN:

As I mentioned, Congressman, I've discussed this general issue with Director Mueller on several occasion. He understands the importance of ensuring that there's no bias reflected in the conduct of the investigation.

DESANTIS:

It looks bad to the public. I'm just telling you that right now, part of it is there an actual bias but as you know, someone very experiences, is there an appearance of that and this appears to be because clearly, what she did was not something that experienced prosecutors would think is good and obviously the supreme court has (inaudible) the Russia investigation, who started it? Who was the agent? Was it Strzok who started it? Who opened the case.

ROSENSTEIN:

Congressman, that matter is under review by the intelligence committee. And there's nothing that I can talk about publicly regarding the initiation of the investigation. But I can assure you we're going to provide appropriate access to the intelligence committee to what they need.

(CROSSTALK)

DESANTIS:

Did the FBI pay for the dossier?

ROSENSTEIN:

I'm not in position to answer that question, Congressman.

DESANTIS:

You know the answer to the question?

ROSENSTEIN:

I believe I know the answer, but the intelligence committee is the appropriate committee to make that….

(CROSSTALK)

DESANTIS:

That's not true. we have oversight over your department and the FBI. And whether public funds were spent on a dossier, that's not something that's classified. we have every right of that information. You should provide it, if you're not, then there will probably be things. Was that info used to get surveillance over anybody associated with Trump?

Case 1:17-cr-00201-ABJ   Document 244-2   Filed 04/02/18   Page 152 of 223

ROSENSTEIN:

I appreciate that question, Congressman and I know there's been a concern for several members of the committee. I have set aside about a half hour every day to review FISA applications. And it's not legal for me to talk about those applications. So I'm not able to answer one way or the other.

DESANTIS:

I'd like that authority. I think that you can -- you may not be able to talk about the sources and message or the substance, but if this was used, we need to know that. do you agree that given -- who was the role of Bruce Ohr? He met with Christopher Steele before the election. Was that an authorized meeting?

ROSENSTEIN:

Congressman, I do not know all the details. This information is still developing. So I don't know the full story. But we have agreed to make Mr. Ohr available for Congressional interviews and they will be free to -- I mean asking those questions.

DESANTIS:

You need to pursue it. It's your department. You demoted him. He's working with Christopher Steele. You have an anti- Trump dossier funded by the Democratic party, his wife works for Fusion GPS, this doesn't look good. So we need answers to those questions.

ROSENSTEIN:

I'm not suggesting that I am disinterested, Congressman, just that we have been in...

(CROSSTALK)

DESANTIS:

I get it, I get it.

(CROSSTALK)

DESANTIS:

Let me ask you this, the role of Mr. Strzok. How much of this Russia investigation was due to him because, yes, Mueller saw the texts. Obviously, I think there was nothing he could do to get rid of him.

But how much of this whole investigation has been infected with his bias? have you made a determination on that?

ROSENSTEIN:

I have not, but I do want you to know, again, without talking specifically about this investigation. The FBI does have procedures for all investigations to ensure that they are appropriately vetted. So there's no case for one individual would be able to make decisions.

DESANTIS:

I hope that, but if you look at that damning text on 15 August 2016, this is bad. He says, I want to believe the path you threw out for consideration in Andy's office. I'm going to go out on a limb and say that is Andrew McCabe's office, that there's no way, he meaning Donald Trump, gets elected. But I'm

afraid we can't take that risk. We in the FBI can't take that risk. It's like an insurance policy in the unlikely event you die before you're 40. So let me ask you this. If you have those Wal-Mart shopping Trump voters that Peter Strzok so derided in his text messages, how do they react to that? Do they have confidence in their FBI and their Department of Justice when you see that that you can't let the American people vote somebody in who they want to?

ROSENSTEIN:

Congressman, I think -- what I hope you can tell your constituents and to provide reassurance to the American people is we have appropriate internal affairs officers who will get to the bottom of that.

Our inspector general is the one who exposed that. And he's going to deliver a report and we're going to --

DESANTIS:

When is that report due?

GOODLATTE:

The Gentleman is out of time.

ROSENSTEIN:

I believe it's going to be relatively soon. I believe he's actually testifying coincidentally next door. He knows I want it completed as quickly as possible but consistent with his responsibilities to make sure he gets it right.

DESANTIS:

I thank the Gentleman. I yield back.

GOODLATTE:

Thank you, the Chair recognizes Mr. Raskin for five minutes.

RASKIN:

Mr. Chairman, thank you very much, Mr. Rosenstein, welcome, it's good to see you again. I'm aware from having been a state senator in Maryland for a decade of your excellent service as US Attorney there. And thank you for your service to your country now.

My first question is about the emolument clause, which you know, forbids the collection of foreign government payments by the President of the United States and other public officials. More than 180 members of the US Congress brought a lawsuit in the District of Columbia against the President's continuing collection of foreign government money for the Trump Hotel, the Trump Tower, Trump golf courses and so on. The Department of Justice took the position that we don't have standing to raise that.

If members of Congress, whose permission is required under the emoluments clause, do not have standing to raise the president's violation of the clause. How do we deal with the problem?

ROSENSTEIN:

Congressman, that as you mentioned, that's pending litigation. The department has taken its position in court. It will be the judge's determination whether or not that position prevails. And I don't have anything to say beyond that when they make that decision.

DESANTIS:

Thank you. You said that Robert Mueller is a dedicated, respected, and heroic public servant whose distinguished military career and career as a prosecutor make him eminently qualified, perhaps singularly qualified to be running the Special Counsel investigation right now. He's also a registered Republican, nominated as FBI director by President Bush and unanimously confirmed by every Republican and Democrat in Congress. Is his judgment impaired or are his decisions suspect because he's a registered Republican?

ROSENSTEIN:

No.

DESANTIS:

Do criminal prosecutors and investigators have a right to contribute money to candidates for public office?

ROSENSTEIN:

Yes.

DESANTIS:

And there are members of this committee who as prosecutors at the federal or state level, gave thousands of dollars of contributions while they were prosecutors to candidates for office. Do you think that would be the grounds for overturning verdicts that they received against criminal defendants?

ROSENSTEIN:

No.

DESANTIS:

So I want to ask you this, on the eve of this hearing, we got a dump of hundreds of text messages that we have been spending most of the day talking about between Mr. Strzok and Ms. Page and they no doubt make for fascinating reading. It's a little bit like Ana Karenina to go through them.

And they are of course equal opportunity critics of public officials. They trashed Bernie Sanders. They trashed Senator O'Connell (sic).

They trashed Martin O'Malley, the governor of our state. And, of course, they trashed Donald Trump, who is repeatedly called an idiot.

And at one point I think, Mr. Strzok says, watching the Republican debates, "OMG, he's an idiot," which hardly qualifies him for any awards for originality or exceptional insight. You probably could have found that in millions of tweets across the country.

But I was amazed to learn from Business Insider that the Department of Justice had invited a select group of reporters yesterday evening to DOJ to screen these emails, to look at these private emails.

And I'm wondering whether you know of any precedent of the Department of Justice calling reporters, asking them to come in to look at part of an ongoing investigation outside of a press conference, or even if that's taking place during a press conference? I was amazed. Can you just explain that?

ROSENSTEIN:

I -- I am -- I'm accountable, Congressman, but as you know, I'm not the public affairs officer, so I wouldn't know what the precedent was. But generally speaking, our goal is to be as forthcoming with the media as we can

when it's lawful and appropriate to do so. So I would not approve anybody disclosing things that weren't appropriate to disclose.

RASKIN:

Do you know of any other cases where material in an ongoing investigation were released by the press officer to reporters? ROSENSTEIN: I don't know the details, Congressman, but...

RASKIN:

And are -- are you -- are you aware of the I.G. rule, which says that material in an ongoing investigation...

ROSENSTEIN:

Yes, thank you...

RASKIN:

... cannot be released?

ROSENSTEIN:

Yes, I appreciate that. No. When this inquiry came in from the Congress, we did consult with the inspector general, and he determined that he had no objection to the release of the material. If he had, I can assure you I would not have authorized the release.

RASKIN:

OK. But there's been much propagandistic talk today about fruit of the poisonous tree and so, you know, they're -- they're -- they're in a mad, wild

goose chase for a villain, and they found their villain in Mr. Strzok, who was promptly removed from the investigation by Mr. Mueller.

But they're saying, well, there might be fruit from the poisonous tree here. And, of course, fruit of the poisonous tree is a Fourth Amendment doctrine that relates to evidence that derives from an illegal search or seizure. Have you heard any allegation of Mr. Strzok or any other agent in this case having conducted an illegal search or seizure?

ROSENSTEIN:
No.

RASKIN:
Thank you very much for your testimony.

I yield back.

M. JOHNSON:
Thank you.

The chair recognizes Mr. Ratcliffe for five minutes.

RATCLIFFE:
Thank you, Chairman Johnson.

Mr. Deputy Attorney General, good to see you.

ROSENSTEIN:
Likewise.

Case 1:17-cr-00201-ABJ    Document 244-2    Filed 04/02/18    Page 160 of 223

RATCLIFFE:

I had a line of questions that I wanted to go into, but like many of the folks on this committee, last night, I had a chance to see a number of these text messages between Agent Peter Strzok and -- and Ms. Page. You've been asked about those. Have you had a chance to read them?

ROSENSTEIN:

Not all of them, Congressman.

RATCLIFFE:

How many have you read?

ROSENSTEIN:

A -- a few dozen, I believe.

RATCLIFFE:

OK. Well, I will tell you, I can't read some of these publicly. They're that obscene. They're that offensive. And as someone who served with you at the Department of Justice and reveres the independence of the Department of Justice, I will tell you that I changed my questioning to ask you about them, because as I read them I found them so sickening and heartbreaking, that I felt compelled to do so.

Now, in addition to being sickening and heartbreaking, these texts are also evidence. They're not evidence of an appearance of impropriety. They're evidence of an actual vitriolic bias, of actual prejudice, of actual hatred for

the subject of the special counsel's investigation by folks serving as the independent investigators and lawyers on the special counsel itself.

Mr. Deputy Attorney General, I guess, please tell me that when you read these texts, your heart fell, that you were appalled by what you read there.

ROSENSTEIN:
I don't mean to quibble you, with you, Congressman, the -- the special counsel investigation does not have any identified subjects, that is, individuals other than the persons that have already been charged.

But I -- I can tell you with regard to those text messages, we concluded, when we learned about 'em, that it was appropriate to complete the inspector general's investigation. And if the inspector general reaches the conclusion that it's misconduct, and, obviously, I have an opinion, as anybody may, about what it looks like, but it's important for me, since I supervise that investigation, to await in the formal conclusion and then any recommendation before I reach a -- a official decision and take any action.

RATCLIFFE:
Well, I guess when you line up Agent Strzok and Ms. Page, along with Bruce Ohr and Aaron Zebley and Andrew Weissmann, and all the other conflicts of interest, I would tell you that, first of all, these aren't run of the mill conflicts of interest.

You mentioned Mr. Ohr being a few doors down. He's your assistant deputy attorney general. And, you know, the employees at the department sometimes have spouses that -- that are involved with corporations.

But we're not talking about companies like Walmart or Microsoft here. We're talking about Fusion GPS, a company that had 10 employees, and his wife was one of 'em. And he was engaged in meetings with that.

ROSENSTEIN:

I just want to clarify, if I may, Congressman, that although Mr. Ohr was part of my office when I arrived, I never involved Mr. Ohr in the Russian investigation. So he had no role assigned by me.

RATCLIFFE:

Well, I understand that, but I guess what I'm getting at is, you know, the -- the -- the conflict of interest here and the appearance of impropriety are, as everyone has said, colossally bad, but let's talk beyond that about judgment.

You said in response to Mr. Gowdy's questioning that we should have great confidence in Mr. Mueller and in Director Wray and in -- in yourself. And you pointed out that as soon as Director -- former Director Mueller found out about Mr. Strzok, for instance, that -- that he took action.

But I -- I want to give him credit for removing or reassigning folks, but isn't he the one that chose them in the first place?

ROSENSTEIN:

Congressman, the -- Mr. Mueller was assigned by me to come in as special counsel, and there were a number of folks already working on the investigation. So I don't know to what extent Mr. Mueller -- his -- my goal was to get him in and working as quickly as possible. So I don't know what, if any, screening he did that...

RATCLIFFE:

Well, do you know what anyone did with respect to vetting this -- this team, because, you know, if you set out to create an appearance of bias or prejudice or impropriety or conflict of interest, the only way you would -- could do a better job of doing it would be to pick this team and then have them wear their "I'm With Her" t-shirts to work every day.

ROSENSTEIN:

I regret that you feel that way, Congressman, but as I said, I've talked with Director Mueller, and he understands the importance of avoiding any bias in that investigation.

RATCLIFFE:

Well, Deputy Attorney General, I have talked often about the fact that I think people can lose faith and trust in elected officials. But if they lose faith and trust in organizations like the FBI and the Department of Justice, to fairly investigate and adjudicate violations of the law, that we may lose the republic.

I know that you take that charge seriously in the role where you are, but as has been said, events like these and the daily transgressions that become public, one after another, are not serving either the Department of Justice or the FBI well. And I just encourage you to do everything you can to restore integrity to those organizations that I know that we have both revered.

ROSENSTEIN:

If I may, Mr. Chairman, I -- I agree with you entirely -- Congressman -- and I want to assure you that when Attorney General Sessions talked with me about taking on this job, he conveyed to me his desire to make certain we do everything we can to enhance public confidence in the rule of law and ensure that the Department of Justice runs appropriately.

He, like you and me, served as a U.S. attorney. He had the privilege of serving for 12 years, and he was so proud to return because of the deep respect that Attorney General Sessions has for the department.

I think that's reflected in the appointments that have been made to the department. Setting myself aside, we have a superb team of experienced professionals, including Chris Wray, who are in position to run that department.

So I cannot assure you that will be no wrongdoing. We have 115,000 employees. Things go wrong, but I can assure you that we will respond appropriately when they do.


RATCLIFFE:
Thank you.

I yield back.


M. JOHNSON:
Thank you.

The -- the chair recognizes the gentlelady from Washington, Ms. Jayapal, for 5 minutes.

JAYAPAL:

Thank you, Mr. Chairman.

And Deputy Attorney Rosenstein, thank you for your service to the country at this consequential time.

We have spent three hours, and many of my colleagues on the other side have continued to harp on the theme of expressing concern with FBI Agent Peter Strzok and the text messages that were just released yesterday.

But I'd like to remind everyone of where we were just a little over a year ago. The FBI was conducting investigations of Hillary Clinton's emails and leaks occurred routinely. Reports cited anti- Hillary Clinton bias within the FBI as the cause of leaks surrounding the investigation of Secretary Clinton's emails.

One current agent even described the FBI as, quote, "Trump land." Another agent said that some within the FBI viewed Secretary Clinton as quote, "The anti-Christ," and said, quote, "The reason why agents are leaking is that they're pro-Trump."

Now, these leaks had serious consequences, and they arguably swung the election results in Trump's favor. And I didn't hear any of my colleagues on the other side expressing concern about the FBI's bias last year when this was happening, despite the very real problems we were seeing.

I agree with you in your earlier statement that "political affiliation is different from bias." I believe I'm quoting you correctly when you say that. And I want to remind my colleagues that people are allowed to have their personal opinions and their political affiliations.

For instance, Special Counsel Mueller and former FBI Director James Comey and you are lifelong Republicans. But that is not what is at issue.

As much as my colleagues on the other side would like to deflect attention away from the urgency of the special counsel's investigation into obstruction of justice and collusion at the highest levels of our government, it is clear to me, after listening to three hours of questioning, that none of this is about text messages.

It is rather a full-fledged, irresponsible and very dangerous attempt on the other side to attack and undermine Robert Mueller's investigation and the credibility, his credibility, and to lay the groundwork for a desire to fire Robert Mueller or invalidate the results of his investigation, acts that I believe would cripple our democracy and acts the likes of which we have not seen since Watergate.

Let me just warn my Republican colleagues and the American people that history will not judge those acts kindly. And being dragged into a president's personal vendettas or apparent attempts to undermine the very fundamentals of our democracy is something we must resist.

And so Deputy Attorney General Rosenstein, let me just ask you again, in your role overseeing the FBI, is it your sense that the FBI's impartiality is at any risk?


ROSENSTEIN:
It's important to distinguish the reputation of the FBI from the character of the FBI. Reputation, obviously, is damaged by every incident that comes to public attention. But the character of the FBI is a function of approximately

37,000 employees. And as I said earlier, I -- I've been very impressed with the character of the agents and employees who I know personally.


JAYAPAL:

And do you believe that the FBI as an agency is politically motivated?


ROSENSTEIN:

I don't believe you can characterize any agency, Congresswoman. We all recognize there can be individuals who do things they shouldn't do, but that's something that we address when it comes to our attention.


JAYAPAL:

Deputy Attorney General, what can you do to protect the integrity of Special Counsel Mueller's investigation and the results that it comes out with?


ROSENSTEIN:

Congresswoman, I don't think there's anything special that I need to do. Director Mueller has his mandate. He's conducting his investigation, and I believe he'll continue to conduct it until it's concluded.


JAYAPAL:

And let me ask you one more time. You've said this a couple of times, but do you have full faith and confidence in Director Mueller's ability to conduct this investigation?


ROSENSTEIN:

Yes, I do.

JAYAPAL:

Thank you.

Let me move to election security. On November 15, when the attorney general appeared before this Committee, I and several of my colleagues asked questions about the Justice Department's actions to ensure the security of our elections.

And at the time, the attorney general said that he had not yet ordered a review of what laws might need to be updated to protect our elections from foreign influence. Has such a review yet been ordered?


ROSENSTEIN:

I can tell you, Congresswoman, we have a lot of ongoing work relating to protection of elections. And -- and I don't have enough time to go through it all now, but that is a very high priority for us.

We have met with, that is the attorney general and I, have met with Director Wray and some of his experts, and we're gonna continue to do everything that we can to ensure that our elections...


JAYAPAL:

Thank you, and we'd love to have an update on that.

Let me use my last few minutes, last few seconds, to ask you about civil rights. We -- I have been very concerned that the DOJ is not actively defending civil rights and is instead dismantling critical structures and abandoning tools that for decades have been used by the Department of Justice to protect people from police brutality and discrimination.

What is the status of the 18 open reform agreements, five open investigations, and one case in active litigation brought under Section 14141 that is managed by the Department's Civil Rights Division?

ROSENSTEIN:
I regret I don't have personal knowledge of all of those, Congresswoman, but if I may, yesterday I attended the annual awards ceremony at the Civil Rights Division. And the Civil Rights Division has a lot of very talented and proud attorneys. The attorney general spoke about his deep respect for the work of the Civil Rights Division, and so I'm confident that work will go on.

JAYAPAL:
I would appreciate just a response to that later when you have a chance. Thank you.

I yield back.

M. JOHNSON:
Thank you.

The chair recognizes the gentleman from Georgia, Mr. Collins, for 5 minutes.

COLLINS:
Thank you, Mr. Chairman. Thank you for being here.

Just a few things that I'm not -- I mean, there's been a lot of questions, a lot of understanding of -- of -- of texts and bias and a lot of things, and I think something that's really interesting. There are two things that I want to sort of

base some of the questions I'm gonna have on 'em, because, someone asked a little bit, one of my colleagues asked, is the special counsel not accountable, is -- is unaccountable? And you said, no, they're accountable to you.

ROSENSTEIN:
Correct.

COLLINS:
I think, which presents -- presents my line of questioning in a little bit of way, because I think there has to be at least in your mind a little bit of embarrassment of what's going on right now.

Because I think you, in good conscience, chose Director Mueller, believing as many of us did, you know, just a very respectable record, one that we could all trust. And now we're starting to find out that this team has been put together with (inaudible).

One of the questions that was also asked about Mr. Strzok was is it -- did you know of his bias? And you responded no. Now given the indication there, the flip side is is you would agree that there is a bias that looks at -- at least to be presented in these text messages. Would you agree with that?

ROSENSTEIN:
I -- I agree that the text messages raise concern. As I said, I'm gonna withhold my judgment until the investigation is completed.

COLLINS:

Well, that one brings up an interesting question, because I spent time last week with the FBI Director Wray, and was -- it was really interesting that he, especially some of his comments, that he felt like he didn't have to provide to this committee. I think after -- hopefully after that he realized that we do have direct jurisdiction, and he will be getting us stuff.

But he brought up this issue of Mr. Strzok and where he is now. So I want us just focus these last few minutes on where this -- this issue is at.

At the time, you -- you give direct accountability to Director Mueller. When you discussed -- was there a discussion between you and Director Mueller about moving Mr. Strzok off the committee, off the investigation?

ROSENSTEIN:
I -- I believe Director Mueller and I were together when we learned from the inspector general about what he had found.

COLLINS:
And by the way, when did you have that discussion and -- and he was removed again?

ROSENSTEIN:
It was approximately July 27.

COLLINS:
And it is just coming out that he was removed, correct? Publicly.

ROSENSTEIN:

I think -- I think the fact that he was no longer on the case was known. The reasons were not known.

COLLINS:

The reason was not known. And -- and I think that's an interesting thing because it does -- and again, perception is reality in most parts, and whether that's true or false, it's perception's reality.

And perception is -- is that uh-oh, we found a problem. This investigation could be tainted. We don't really want this to come out. And now it's starting to come out.

But I do have a question just in a process, because Mr. Wray last week said he was not demoted. He was just moved to H.R. I made the comment at that point that said that it's funny to me that the second in command of -- in the investigation division being put on a very high-profile investigation, one of the highest in this town in a long time, and is simply being moved over to H.R. was not a demotion.

In fact, why would you put somebody with challenges that you've now seen in texts, which we didn't have last week, why would you put him in H.R.? There seems to be a little bit of a problem there.

So I do have a question. When he was removed from the investigation did he possess a security clearance?

ROSENSTEIN:

I -- I -- I believe he did. I don't have personal knowledge, but I'm fairly confident he did.

COLLINS:

You don't know if he has a security clearance for working on what he was working on?

ROSENSTEIN:

I'm certain he would have had a security clearance.

COLLINS:

OK. Was it revoked or -- is it revoked or suspended at this point?

ROSENSTEIN:

Not to my knowledge.

COLLINS:

Why would it not be?

ROSENSTEIN:

Why would it not be revoked?

COLLINS:

Well, why -- I -- I'm -- because I think what we're having here is there's a double standard. The -- the new agent coming in working, or the new U.S. Attorney in -- in office coming in and having what is now perceived as -- as bias, having -- working on a case in which that bias would at least be perceived by most average individuals as having an influence on the outcome of an investigation, especially being him being involved in all of

these other parts of this, changing letters, changing this, I -- I think the interesting issue is here is is he being treated differently than a younger agent or a line agent out in -- in, you know, another field office?

ROSENSTEIN:

I appreciate that question, Congressman, and if I may explain, I can understand why to the average American it might seem unusual, but within the Department of Justice we're subject to the government employment regulations. And there are very strict rules about what we may and may not do.

So when we have an allegation of -- of misconduct, it's investigated. And we don't take any disciplinary action unless and until a conclusion is made that it's warranted. So the decision to transfer the agent was made based upon what was known at the time. That's not a punishment.

If there is an adverse finding, and again, I'm supervising the inspector general, I need to withhold my judgment, but if there is an adverse finding and -- and our employees have due process rights. So they have a right to provide any explanation in defense. I don't know what it's going to be, but they have a right to do that. And at the conclusion, and Mr....

COLLINS:

And I agree with that. Let me just jump into here, because I only have -- and I appreciate where you're headed there. I understand being investigated. But also let me say, this is a gentleman who, through these texts that we have seen, is -- and I understand that he wanted to protect America, that he didn't like the new president, he is still involved in the -- in the FBI.

He is still -- at this point undoubtedly still has a security clearance. He is -- it -- what -- is it -- does it not strike you that at least this person, who had -- had access to very high-risk, sensitive security issues, dealing in this Russia investigation, why would they have not been separated out in -- under all rules and regulations, but at least take -- I mean, has he been polygraphed, simply, since he's -- in regards to this?

ROSENSTEIN:
The inspector general's response for -- for handling that review and -- and when he concludes it, as I said, will be a public report. And with regard to the timing, I should clarify, I -- I actually had anticipated and hoped the report would have been done and completed in November, but it's not completed yet. But I anticipate it will be ready soon.

COLLINS:
Is there a reason why it's not been completed?

ROSENSTEIN:
Yes, because the inspector general made a determination that he wasn't finished.

(CROSSTALK)

GOODLATTE:
The gentleman's time has expired.

COLLINS:

I -- I think that -- that the impression here is though, again, is that somebody's being treated special, and that if you're looking at it, and I think from you having the responsibility and accountability for the special counsel, it is on you, at this point...

ROSENSTEIN:
Correct.

COLLINS:
... to make sure that that is corrected. And right now there is a lot of mistrust out there.

Thank you, and I yield back.

GOODLATTE:
The gentleman from Illinois, Mr. Schneider, is recognized for 5 minutes.

SCHNEIDER:
Thank you.

Deputy Attorney General, I believe you touched earlier on this, but I -- I want to confirm your answer. Do you agree with the unanimous finding of the director of National Intelligence and the 17 agencies of the intelligence community, that Russia, on orders of Vladimir Putin, actively worked to interfere in the 2016 presidential election?

ROSENSTEIN:
I agree with the assessment of the intelligence community, yes.

SCHNEIDER:

Well, Mr. Rosenstein, in an October interview with the Target USA podcast, you stated the following, quote, "If we have foreign countries that are seeking to interfere in our elections, I think we need to take appropriate actions in response," end quote.

I wholeheartedly agree with you. Unfortunately, on several occasions, including recently before this very committee, Attorney General Sessions stated that we're not where we need to be on this issue, and there's no review underway by the department on what steps it should be taking.

You've said that protecting the integrity of our elections is a high priority. You seemed to indicate earlier that you have had conversations with the attorney general and the FBI director.

I have a simple yes or no question. Has there been a formal review of the attacks made on the 2016 election, and what DOG -- DOJ must do to protect the integrity of our 2018 elections?

ROSENSTEIN:

Congressman, that's the second time this issue's been raised, and I -- I did not watch all the attorney general's testimony, and I'll have to check that, but I -- I believe you may have been referring to a review of legislation as opposed to a review of the issue.

SCHNEIDER:

No, if I can reclaim my time? I asked him very specifically what steps had been taken following the appearance on the Senate side, in a question asked

by Senator Sasse, if any steps had been taken to review the elections and to take steps to protect our future elections.

I'm asking the same question of you, simple yes or no. Has there been a review of what Russia tried to do, or any other agencies tried to do, to interfere in our elections last year and what must we do to protect our elections next year?

ROSENSTEIN:
I -- I -- I believe the answer is yes, but I can get further information for you, if you like.

SCHNEIDER:
If that answer is yes, it has not been shared with us. As -- as of today, we've had no information shared. I think this is an important issue. Elections are a short time away, and we need to make sure they are secured.

Have there been any specific actions taken by the attorney general following his appearance before this committee? You talked about meetings. Is there anything specifically you can share with us as actions to protect our elections?

ROSENSTEIN:
Yes. The FBI has. The attorney general and I met with a team of FBI experts and -- and discussed a variety of things that they're doing, some of which are classified. In addition to that, Homeland Security has a role to play in this too in coordination with state and local elections officials. So there is a lot going on in that area.

SCHNEIDER:

I -- I -- I appreciate that, but I -- I think we have to expect that 2016 wasn't the first time the Russians have tried to interfere in our elections. They've been interfered in elections around the world.

They're gonna try to interfere on our future elections. Their attacks are gonna become more aggressive, more intensive, more complicated. We need to be staying a -- a step ahead of them.

Twice now, the Attorney General Sessions, first in -- in front of the Senate, and -- and then recently in front of this committee, said not enough has been done. The meeting you were talking about, did that happen before November, or is that subsequent to Mr. Sessions' appearance here?

ROSENSTEIN:

I -- I -- I don't recall the date, Congressman. I'll be happy when we take a break to review it, but I -- I don't think there's any inconsistency in my answer.

SCHNEIDER:

Well, Mr. Sessions committed -- committed to me that the department would brief this committee on any actions taken. Last month after his appearance, I sent the follow-up letter asking for that briefing before the end of the year, ideally before this week and -- and the intended adjournment of Congress.

Unfortunately, I've not even received a response, let alone a -- a scheduling of a briefing. Are you willing to commit that we can have a briefing that you

will update this committee on what actions are being taken to make sure our elections are secure next year?

ROSENSTEIN:
If the attorney general committed that, Congressman, I'll make sure it happens, and I will make sure we respond to your letter. As I mentioned earlier, we make every effort to, and I'm sure it's in the queue.

SCHNEIDER:
Thank you. I would hope that this moves to the top of the queue, that this is not a priority of a long list of items that may get to eventually.

I think if the confidence of the American people in our electoral process, if the confidence of the American people in our democracy is damaged, as the Russians clearly have tried to do, then the future of the republic is challenged.

We need to -- this is not a partisan issue. It's not Republican; it's not Democrat. We need to make sure that people respect our elections, know that their votes will be counted, know that their voices will be heard.

I am imploring the Department of Justice to work with this committee, to work with Congress to make sure that the American people can be confident in the future of our elections. I hope I can count on you to work with us.

ROSENSTEIN:
Absolutely. And I -- I want to be absolutely clear, that is near the top of the list for us, and I know it is for the attorney general as well.

SCHNEIDER:

Thank you. I look forward to hearing back on our letter from last month.

I yield back.

GOODLATTE:

The chair thanks gentleman. The committee is advised, Mr. Schneider and I are advised, that we have votes on the floor.

General Rosenstein, we will be back in about 35 to 40 minutes, so if you want to get a bite to eat, whatever, we'll have time. The committee will reconvene immediately after this vote series. I think we have about four to six more members...

ROSENSTEIN:

Thank you.

GOODLATTE:

... to ask questions.

(RECESS)

GOODLATTE:

The committee will reconvene and continue the questions for the deputy attorney general.

And the chair recognizes the gentleman from Florida, Mr. Gaetz, for five minutes.

GAETZ:

Was Peter Strzok the author, recipient, carbon copy, blind carbon copy on any documents relating to the meeting between Loretta Lynch and Bill Clinton on the Arizona tarmac?

ROSENSTEIN:

I do not know the answer to that.

GAETZ:

Will all of the documents relating to that tarmac meeting be produced in an unredacted format?

ROSENSTEIN:

Congressman, the inspector general is handling that investigation. And as I said, we're going to try to accommodate any congressional requests that we can, but I'll have to consult with them before I do.

GAETZ:

So if the president declassified the documents, how quickly could they be produced?

ROSENSTEIN:

If documents are declassified they could be produced fairly quickly.

GAETZ:

Is that like in -- within a week?

ROSENSTEIN:

Well, it would depend upon the sensitivity of the -- the document. I can't answer that (inaudible).

GAETZ:

Well, if they were declassified, I guess they wouldn't be sensitive anymore. So I mean, could we get them within a week?

ROSENSTEIN:

Which documents are we talking about, Congressman?

GAETZ:

The documents relating to the tarmac.

ROSENSTEIN:

Oh, well, I don't know if -- I -- I don't know if they're classified. I -- I just -- I don't know...

GAETZ:

No, assuming they're declassified...

ROSENSTEIN:

... if (inaudible), Congressman.

GAETZ:

... how quickly would it take to get them from you to us if the president declassified them?

ROSENSTEIN:
If there are documents that's appropriate to disclose, then we disclose them as quickly as we could.

GAETZ:
When did Justice first learn that Nellie Ohr was employed by Fusion GPS?

ROSENSTEIN:
I do not know the precise date, Congressman.

GAETZ:
Can you find that out and get it to us?

ROSENSTEIN:
Well, if -- if we know it, yes.

GAETZ:
Well, and we've got to find that out, right? I mean, you -- you've got...

ROSENSTEIN:
Yes.

GAETZ:

... the wife of someone who was one of the top counterintelligence officials in the Department of Justice working for the company that was a passthrough for money from the Democratic Committee to Russians to get dirt on the president to discredit him both before and after the election.

I feel like it should be a pretty high priority to figure out when that occurred, right?

ROSENSTEIN:
I don't want to quibble with you, except to say -- and Mr. Ohr's not a counterintelligence official -- but yes, I agree with you. In fact, I believe Mr. Ohr is scheduled to testify before one of the committees or at least to be interviewed next week.

GAETZ:
Right, but that -- that doesn't absolve us of the obligation of actually go and find out when his wife started working for these people that wrote this salacious and unverified dossier.

So when did the Department of Justice learn of Bruce Ohr's contact with Christopher Steele during the 2016 campaign?

ROSENSTEIN:
Congressman, I'm -- I'm reluctant to answer that only because I don't know all the information, and I -- I -- I want to make sure we know all the information before we give any answers.

GAETZ:

We too want to know all the information. That's why we keep asking these
questions.

I mean, again, you've got this person who works at the Department of Justice
whose wife is working for Fusion GPS, and during the campaign he's
meeting with the author of a dossier that Mr. Comey called salacious and
unverified.

And so I would hope that it would be a top priority to figure out when we first
came to know of those meetings. Is that something you can get to the
committee?


ROSENSTEIN:
If -- if we -- if we get all the information and we have a firm answer. I don't
want to answer any questions until I know all the details.


GAETZ:
When did the Department of Justice first learn of Bruce Ohr's contact with
Fusion -- with Glen Simpson after the election?


ROSENSTEIN:
Congressman, we have agreed to provide all the relevant documentation to
the Intelligence Committee. I haven't seen it all, so I'm not in a position to
answer it.


GAETZ:
So during Mr. Chaffetz's questioning, he -- he pretty thoroughly laid out the
number of people on Mr. Mueller's team who have financial donations to --

to Democrats, the Clinton-Obama campaigns. I mean, I think over half of the Mueller team donated to either Clinton or Obama. None of them donated to Trump.

And so that's either one of two things. Either Mr. Mueller was curating a universe of people who hate the president or it's just one hell of a coincidence that a whole lot of people had demonstrable bias that we learn more and more about each day.

And so you've answered that question by saying, look, people have personal opinions, but that doesn't always influence action. And it's the action that is your responsibility to make sure it's not infected by this bias.

ROSENSTEIN:
Correct. GAETZ: And -- and I would -- I would proffer that, like, when Mr. Strzok goes and changes wording from gross negligence, a crime, to extremely careless, that's not a belief. That's an action.

Well, I guess the -- we -- we can't find out. You won't tell us whether or not taxpayer money was used to go and buy this dossier. If it was, if the FBI was working with the Democratic Party to buy a dossier to discredit the president of the United States, that's not a belief. That's an action.

If that dossier was dressed up as an intelligence document and brought to a FISA court, that wasn't a belief. That was an action.

If Bruce Ohr is meeting with the author of the dossier during the campaign and the head of Fusion GPS after the campaign, and as you sit here today you can't tell us when that occurred, those meetings aren't beliefs. They're actions that undermine the credibility of this investigation.

And I would certainly suggest that when Mr. Weissmann, Mueller's number two in this probe, sends an email on his official Department of Justice email to Sally Yates praising for defying the president of the United States, that's not a belief. That's an action.

So my question to you is, like, what are we ultimately have -- what do you have to see in terms of the actions of people with demonstrated bias against the president of the United States before you will appoint a special counsel to investigate the clear bias that has infected this investigation?

ROSENSTEIN:

Well, Congressman, there are a number of different issues that you've raised. With regard to the allegations of bias, as I've explained, our inspector general is conducting a very thorough review of that.

He's the one that identified the text messages. And so I'm confident that's going to be done appropriately. We're going to...

GAETZ:

Mueller didn't, right? It took the inspector general doing it. Mr. Mueller didn't find this information?

ROSENSTEIN:

Well, I don't -- Mr. Mueller found it when somebody told him about it, but it was in the text messages which the I.G. got access to.

GAETZ:

It -- it really makes you wonder how all these people that we're finding all this information about, with all these connections, ended up on his team.

I yield back, Mr. Chairman.


ROSENSTEIN:
Mr. Chairman, thank you. Just to clarify, though, I do want to make clear with (inaudible)...


GOODLATTE:
The gentleman may answer.


ROSENSTEIN:
Thank you, sir. With regard to oversight, we are working with the Intelligence Committee to try to provide them all the information they need to answer some of those questions. And I don't personally know the answers, but I'm confident that we'll be able to get that information to them.


GOODLATTE:
Well, thank you, but I just want to note here -- and I'll take the time right now -- I was going to say something at the end -- but, two things.

First of all, the House Judiciary Committee, not the Intelligence Committee, has direct oversight responsibility over the Department of Justice and the Federal Bureau of Investigation.

We have, well, a majority of the majority called for the appointment of a second special counsel to investigate all of this. And I think if that were taking place, that might satisfy a number of us.

However, it's not. And even based on prior conversations that I've had with you, you're aware of this and -- and you've noted that we certainly have the right and the responsibility to do that oversight.

So when you talk about providing documents to the Intelligence Committee, I have no problem with you doing that, but all of that information should be made available to this committee as well.

Secondly, the inspector general, his investigation is very important. We support that. It is very encouraging to us that he is doing what I think is good, unbiased work, and we want that to continue.

But our investigation does not need to -- you may drop -- you may wait for them to draw conclusions, but our investigation does not need to wait on the inspector general.

So again, I thank you for the documents that were provided to us yesterday. There as you -- or as you know, many, many, many more. There are, I think, 1.2 million documents that the inspector general has, and we have a commitment from the -- the assistant attorney general, Mr. Boyd, to provide those by January 15.

We have asked -- we've sent a letter asking for certain information and commitments in regard to that January 15 production date, but we've -- we've -- that is very important for us.

And we -- we do not intend to wait on the inspector general's report, whenever that may be. It may be before then, it may be after then, to pursue the investigation that this committee is pursuing.

So as -- as long as we have that understanding and that you live by the commitment that has already been made to be fulsome in your production of

documents, I have no problem what you provide to the Intelligence Committee, but don't look at this as something that's just provided to them.

It should provide to this committee. If it needs to be handled in camera, if it needs to be handled in a -- in a classified manner, we have the facilities, and we are certainly prepared to make the necessary commitments to do that.

ROSENSTEIN:
Mr. Chairman, I appreciate that. If I may further explain. I have instructed our staff to make sure that they do make this information available to you as well. And my understanding is that they're seeking to make arrangements with your staff to do so this month.

GOODLATTE:
Thank you very much.

The chair recognizes the gentleman from Louisiana, Mr. Johnson, for five minutes.

M. JOHNSON:
Thank you, Mr. Chairman, and thank you for being here today here, sir. Last night I was discussing the importance of this hearing with my teenage daughter. She's in civics right now.

And I reminded her that it was 240 years ago when John Adams was trying to explain the difference between an empire and our fledgling republic and he famously summarized, "We're a nation of laws, not of men."

And I -- I reminded her that the founders understood that all men are fallen. we're flawed, and -- and that we have a natural instinct. People have a

Case 1:17-cr-00201-ABJ   Document 244-2   Filed 04/02/18   Page 192 of 223

natural instinct to benefit their friends and seek retribution against their political enemies.

And that's a dangerous instinct when it's exercised by someone in a high position of authority at the Department of Justice, obviously.

So the founders gave constitutional authority to Congress to monitor all of this and -- and -- and to monitor those who are in responsibility so we can maintain the rule of law. And as been mentioned here today on the hearing, the survival of our republic depends on that.

So there's been a lot of discussion this morning about biases of some members of the Mueller team, and we've expressed our serious concerns about former FBI Director Comey's investigation of Hillary Clinton's illegal use of a private server.

Of course, it's been mentioned federal regulations strictly prohibit, for obvious reasons, any DOG -- DOJ employee from participating in a criminal investigation or prosecution if the employee has a personal or political relationship or affiliation with any person under investigation.

Reports have shown, and it's been mentioned this morning, that the lawyers on Mueller's team have contributed more than $62,000 to Democratic candidates and only $2,750 to Republican candidates. The question is, isn't it reasonable for us to assume that there's an inherent bias there?

ROSENSTEIN:
Congressman, I appreciate that question. I have teenage daughters, and I've had the same sorts of conversations with them.

And I can assure you, Congressman, that although I understand the basis for the concern, as I explained earlier, Director Mueller and I have a lot of experience as managers in the department, and -- and we understand our responsibility to make sure that nobody's personal opinions are improperly allowed to impact the investigation.

So I can assure you that I've discussed that with Director Mueller, and he's taking appropriate steps to make sure that his investigation is not affected by any bias.

M. JOHNSON:

What -- what -- what are those appropriate steps? I mean, what -- let us know what that looks like. I know you've explained it a little bit, but just...

ROSENSTEIN:

Yes, sir.

JOHNSON:

... for my daughter back home, what does that look like?

ROSENSTEIN:

I appreciate it. I think there's several aspects to it. Pardon me. Number one is the tone that you set around the office and making clear to everybody that although they may have personal political views, it's not to factor into their work and they're not to discuss it in the context of their work.

Number two, it's the process that we have within the Department of Justice. Nobody does anything on their own. Everything is subject to review. And the

more significant the matter, the higher level the review and the more people are involved in reviewing it.

And, of course, we have external checks as well. We have our inspector general, our Office of Professional Responsibility. And -- and for any matters that we bring, of course, in the Department of Justice we need to be prepared to prove our case in court beyond any reasonable doubt so you need admissible evidence. So there are -- there are several levels of checks within the department.


M. JOHNSON:

In 2014, speaking of the processes, Attorney General Eric Holder announced a significant policy shift concerning electronic recording of statements.

And there was established at that time a presumption that the FBI and other federal law enforcement agencies will record all interviews of witnesses and suspects. The question is is that policy still in place today?


ROSENSTEIN:

I -- I believe that the policy had to do only with custodial subjects. That is somebody who's in custody of the FBI, not with mere witnesses.


M. JOHNSON:

With regard to the interview of former Secretary of State Hillary Clinton about her email server in 2016, was that recorded? Do you know?


ROSENSTEIN:

I -- I -- I have no personal knowledge of that. My understanding from what I've read in the media is no.

M. JOHNSON:

Could you find that out for us, specifically?

ROSENSTEIN:

Certainly.

M. JOHNSON:

If it was not recorded, would you have any idea why that would not have not been recorded under that policy?

ROSENSTEIN:

I -- I think the norm would be for a -- a non- custodial interview not to be recorded. That's my understanding.

JOHNSON:

If it was her email server, wouldn't she be -- wouldn't it be implied that she was a custodian of...

ROSENSTEIN:

No.

M. JOHNSON:

Not at that time?

ROSENSTEIN:

The policy only applies to folks who are actually -- have been arrested and they're in custody at the time of the interview.

M. JOHNSON:

That's not the way I understood that policy, but I'll -- I'll defer to you on that. But if you can get us some follow- up information on that, that'd be -- be helpful.

Earlier this year certain names of individuals who were apparently illegally leaked who were caught in a FISA surveillance investigation and -- and, obviously, when something like this occurs, it's -- it's absolutely irresponsible and egregious that a leak on that level is -- whatever happened.

Can you inform this committee on what is currently being done within the DOJ to investigate potential FISA leaks? Just emphasize that for us.

ROSENSTEIN:

Yes, sir. I appreciate the question. The attorney general has made it a very, very high priority for us to pursue any leaks that are in violation of the law.

So when we receive a referral from an intelligence agency that they believe there's been a leak of information within their jurisdiction and that they believe a criminal investigation should be conducted, we give that a very high priority.

We've set up a new unit within the FBI to conduct those investigations. And we have attorneys within our National Security Division who are specializing

in that, and we are monitoring those cases to make sure that they move expeditiously.

Obviously, as you know, there are challenges in proving a leak case, but we are giving those extraordinary attention.

M. JOHNSON:
I'm out of time.

I yield back. Thank you.

GOODLATTE:
The chair recognizes the gentleman from Arizona, Mr. Biggs, for five minutes. BIGGS: Thank you, Mr. Chairman. I thought I understood in testimony to Mr. Ratcliffe that you said that you were supervising the inspector general and his -- and his team's review?

ROSENSTEIN:
The -- the -- pardon me. The inspector general reports to the deputy attorney general. In the conduct of the investigation, the inspector general traditionally has a -- a high degree of autonomy.

So I'm not micromanaging it, but I'm aware of the investigation and aware that we anticipate a conclusion in the near future.

BIGGS:
Is he -- is he providing you substantive reports or is he providing you timeline reports?

ROSENSTEIN:

Generally timeline reports. When there are significant issues that arise in his investigations, as for example, with the text messages that came up in the review of the Hillary Clinton email investigation, he brings that to my attention.

BIGGS:

And I am curious about the scope of the inspector general's review. My understanding is it's to review allegations that department policies or procedures were not followed in connection with or in actions leading up to or related to director -- former Director Comey's July 2016 announcement that Democratic presidential nominee Hillary Clinton would not be charged in her use of a private email server while secretary of State.

Is that the -- is that the limitation of the scope or is it broader than that? And what -- what are the boundaries?

ROSENSTEIN:

I believe it's broader than that. The inspector general, I believe, was scheduled to testify today, and it'd be -- be better to direct it to him.

But he actually has publicly talked about the scope of the investigation and identified a number of matters within the scope of that investigation. And so it's relatively broad, I believe.

BIGGS:

Well, in -- in -- in light of that, Director Wray was here last week, and in questioning, he said that he would try to "unring the bell" if -- if the inspector

general's conclusions indicated that's -- that there was something that had gone amiss with the Hillary Clinton investigation.

I asked him what that meant, and he alluded to some personnel issues and -- and remedial personnel action, but he also said that he thought they might reopen that original investigation, if necessary. Is that your understanding as well?

ROSENSTEIN:
I don't know exactly what he said. It's hard to unring bells, but we do make every effort, Congressman, to take appropriate action if something comes to our attention. So I certainly support Director Wray if he feels there's justification for reviewing that.

BIGGS:
And I'm not just talking about reviewing, I'm talking about reopening the investigation. Is that -- it -- if that's the direction you -- you -- you'd concur with that, if that's the direction he went?

ROSENSTEIN:
I mean, it's -- it's certainly conceivable. It would depend upon the facts and circumstances, but if he thought it was appropriate to do that, I would certainly give that great weight.

BIGGS:
Additionally, I -- I -- I just thought it was interesting that you previously -- and I'm quoting from -- this came from the media side. I don't know if it's accurate or not.

ROSENSTEIN:
OK.

BIGGS:
But that's just my skepticism. But it says, "If there were conflicts," and this is you speaking, "if there were conflicts that arose because of Director Mueller or anybody employed by Director Mueller, we have a process within the department to take care of that." And just now you've indicated that -- that -- I think that those processes include the tone around the office, everything subject to review by a supervisor, and the Inspector general could be called in if there's something amiss.

But the bottom line is you have to -- ultimately have to prove the case in court. So there's some checks and balances built into the system.

But previously Director Wray and Attorney General Sessions testified in this committee that there are no formal processes to discover individual conflicts of interest or of that (inaudible). And I'm going to call unfair bias because everybody has some bias. It's just whether it's unfair or not.

And they both said it's left up to each individual. Would you concur with their -- with their bottom line assessment there?

ROSENSTEIN:
To a large extent, Congressman, I would say it's left to the individual, but also to the supervisor. The supervisor has a responsibility to know if there's some reason for concern and should take appropriate action and do an inquiry if -- if there is a basis for it.

BIGGS:

And another issue that we've touched on today and -- and this has been brought up repeatedly, is this idea of integrity, independence, adherence to the rule of law, and this idea that we don't want to lose faith in the rule of law.

And one of the things that I cannot convey to you in strong enough terms is that when I go home to my constituents, there is a real sense that there is disparity going on in how the current administration is being treated and with former Secretary of State's Hillary Clinton.

I understand a lot of that is the divisiveness of this in the nation, a lot of that is partisanship. I understand that. But some of the things that we've talked about today, whether it's the Strzok issue, Bruce Ohr and -- and Jeannie Ray (ph.), Aaron Zebley, Andrew Weissmann, et cetera, et cetera, it isn't the money that people donate to campaigns.

We've -- I think we've established that. It is what do they do beyond that? What did Aaron Zebley do? Set up the private email server -- representing Cooper who set up the private email server and destroyed Clinton computer's hard drives and drives.

I mean, these -- these are actions. These are actions that someone took. And it's not necessarily a -- a mere bias that we might have or an -- an unfair bias. It's just something that goes beyond that and it taints this investigation.

And that is the reason that so many us -- it's not because we don't think Director Mueller is a -- is a -- is a war hero and is -- has done great service to this country. It is simply that it has tainted everything around this

investigation so that I can't go home without people decrying it with -- in loud terms.

And so I think that that's the -- what needs to happen. And I think we need more information. Some of this information came out through FOIA requests, some through the inspector general, but some of it not very timely.

And I do agree with the chairman here with -- this committee as jurisdiction. We need to be getting this information timely. And -- and with that, my time has expired.

Thank you, Mr. Chairman.


GOODLATTE:
The chair recognizes the gentlewoman from Georgia, Ms. Handel, for five minutes.


HANDEL:
Thank you, Mr. Chairman.

Good afternoon. Thank you for your time today. I am having a little trouble reconciling some comments from your opening statement with the realities.

You said justice requires a fair and impartial process. And I think we could both agree that to have a fair and impartial process no appearance even of conflict of interest or bias needs to be present.

I want to ask specifically, it's my understanding that the text messages and emails that Strzok sent were specifically labeled, quote "Midyear Exam or MYE or ME," which was the code name for the Clinton email investigation.

Were those emails and text messages, were they put into the Sentinel case management at the FBI?

ROSENSTEIN:

To the best of my knowledge, no, but I can check and get back to you.

HANDEL:

I would appreciate an answer to that, thank you. With the revelations regarding Strzok, Page and others from the Mueller team, has Special Investigator Mueller taken any specific action on the remaining member of the teams, to ferret out whether they, too, have these types of biases and perhaps have sent such text messages or emails?

ROSENSTEIN:

As -- as I mentioned, I've talked with Director Mueller about the importance of ensuring the integrity and neutrality of everybody working on the investigation. I don't know precisely what steps he's taken.

HANDEL:

If you're supervising this, don't you think that would be something you should know?

ROSENSTEIN:

Yes, and I -- I can assure you, Congresswoman, based on his reputation, I'm confident that he knows what to do to ensure that his team is not biased.

HANDEL:

OK. Well, apparently not since we've just seen all of these text messages. I would like to -- you said in your opening statement that there has to be a special responsibility for professional standards that rise to a truly higher standard. Do you think that the actions that we've seen rise to that standard?

ROSENSTEIN:

Congresswoman, they're -- that's our aspiration. We recognize there are going to be deviations. I think the commitment that I have, and the ATTORNEY GENERAL, is that when there are deviations we're going to deal with them appropriately.

So we can't guarantee there will be no mistakes, errors or wrongdoing. But we know what we can ensure is that we're going to set the right tone, and when anything comes to our attention we're going to take appropriate action.

HANDEL:

OK. Were those text messages or e-mails sent on bureau, or DOJ-issued cells or other electronic devices?

ROSENSTEIN:

I -- I believe the answer is yes.

HANDEL:

You said that special -- Mueller acted appropriately and immediately to deal with the issue with Strzok. He was, my understanding is, reassigned to H.R.? Is that correct?

ROSENSTEIN:

Well, Director Mueller would make the decision to no longer have him participate in the special counsel investigation.

HANDEL:

Right.

ROSENSTEIN:

The FBI would make the decision of where within the FBI to place him.

HANDEL:

All right, let me be a little more succinct. Where is Strzok working now, in which department?

ROSENSTEIN:

It's -- it's -- that's my understanding, Congresswoman. I don't know -- I don't personally.

HANDEL:

That's it's H.R.?

ROSENSTEIN:

That -- that's what I've heard. I don't know it specifically.

HANDEL:

OK, well, it was reported that way. That would be very interesting. I would like to have the answer to that. It's peculiar to me that an individual, under investigation by the inspector general would be redeployed to the very division and department that is tasked was setting workplace policies. Do you think that's a little strange?

ROSENSTEIN:
I -- I don't -- I assume that he's not setting workplace policies, but I -- I can check on that.

HANDEL:
Well, what else would you be doing in H.R. but dealing with personnel matters?

ROSENSTEIN:
Well, I think processing personnel matters. I think that's largely what they do.

HANDEL:
Interesting, a person under I.G. investigation processing H.R. That's all I have.

Thank you, Mr. Chairman, I yield back.

GOODLATTE:
Thank you.

The chair recognizes the gentlemen from Florida, Mr. Rutherford, for five minutes.

RUTHERFORD:

Thank you, Mr. Chairman. Deputy Attorney General, thank you for your long testimony today. Listen, I want to talk a little bit about policy, because everybody understands that in a large organization you're going to have bias.

And as was mentioned earlier, everybody accepts that you can have bias until it crosses into the workplace and it affects actions and how you conduct investigations. And -- and that's -- that's when leadership and policy comes into play.

Can -- can you tell me, has Special Agent Strzok -- I don't want to know if he's been found guilty of a charge, but is there a policy charge against Special Agent Strzok at this time?

ROSENSTEIN:

There is an inquiry being conducted by our watchdog, the inspector general, and he'll reach a conclusion. And if he reaches an adverse conclusion then there would be proposed discipline.

RUTHERFORD:

OK. And -- and I don't -- I'm not asking for the conclusion because clearly we've got to wait to due process. But -- but the question is is there a policy violation that Mr. Strzok is being charged with at this time?

ROSENSTEIN:

Well, the -- the charge would occur at the conclusion of the investigation.

RUTHERFORD:

OK. All right, and -- and let me ask you this. You -- you mentioned earlier that offering immunity in a -- in a non- custodial interview is not unusual, as happened with Cheryl Mills and several other top State Department aids.

My question is, on a -- on a policy, during an investigation, you -- you give immunity and you don't record the meeting -- the -- the interview?

That -- that, to me, is unprecedented. That -- that -- we discussed this with Director Wray last week. Is -- is that normal policy for...

ROSENSTEIN:

Well, Congressman, as you know, that -- that investigation occurred before I arrived, and so I don't know the details of what decisions were made or why.

In --- in my experience, we typically would not record a -- a witness interview, but on the decision on whether or not to grant immunity, that we based upon the facts and circumstances of the case. And I just don't know what they were...

RUTHERFORD:

Yeah.

ROSENSTEIN:

... and so I wasn't involved. But the inspector general, if there's anything suspected inappropriate about that, he'd have the authority to review it.

RUTHERFORD:

See, here's the situation that I think the American people are looking at. We have a situation where a special agent does something very unprecedented in an investigation by offering immunity and failing to record.

You know, there was a question earlier was -- was there a proffered statement during that interview? And -- and I don't recall if you said no, but I suspect the real answer is nobody knows because it wasn't recorded.

ROSENSTEIN:

Well, the -- if there had been a proffer, typically that would've been written down. I just don't know -- I have no knowledge about what was done in that particular case.

RUTHERFORD:

OK. So -- so let me ask -- so here we have the situation with Special Agent Strzok, which is really bringing the agency's integrity into question, and -- and what's going to be important is how you and -- and Director Wray address this at the end of the investigation.

I -- I get that, and I appreciate that, and we are really waiting to see how folks are held accountable where we think bias has affected their investigative activities.

Now, what really concerns me now with Mr. Strzok is after that situation and the others that have been mentioned earlier, do -- do you see any reason that



after President Trump's election that the Office of the Attorney General
should have any reason to fear his election?

ROSENSTEIN:
No.

RUTHERFORD:
And do you think the FBI should have any reason to fear the election of
Donald Trump?

ROSENSTEIN:
No.

RUTHERFORD:
Let -- let me read to you -- this is number 70 -- I -- I'm sorry, 89 -- on page 89
of -- of Mr. Strzok's conversations. And whoop -- it -- it says that he is
worried about -- hold on a second here.

"The New York Times' probability numbers are dropping every day." He's
talking about the election, and then it says, "I'm scared for our
organization." Do you have any idea what he's referring to there?

ROSENSTEIN:
No, sir, I do not.

RUTHERFORD:
Our organization -- and then on -- on email number 89, or page 89, he says,
"And I keep thinking about that D -- what D said, what is it, sick to one's

stomach. I want to talk to you about it more, and -- and would like to talk to Jim and Andy, too. Jim may be too much a true believe though."

Those are -- those are scary comments from a special agent, talking about other folks within the agency that he's having these kind of political conversations about, and he's worried because of -- of a presidential -- the potential of a presidential election?

He's worried about what that's going to do to his organization? Can -- can you comment on that?

ROSENSTEIN:
Yes, Congressman. Attorney General Sessions has been clear with me that our -- our mission in this administration is to make sure we run the department and the FBI properly.

And if information comes to our attention that suggests there's been any wrongdoing, to make sure we conduct an appropriate investigation that includes due process for the folks who are accused of wrongdoing and -- and take appropriate action if there's an adverse finding.

And I think, Congressman, that I've been asked several times this issue about what reassurance we have, and the reassurance is that that's the commitment the attorney general and I have made that's reflected by all of this administration's appointees in the Department of Justice.

A really superb, experienced team, and in particular Christopher Wray, who the president appointed to direct the FBI, who I believe, is well-positioned to do a superb job and to promote public confidence in the future.

Now, that's all we can do, Congressman, is to -- to commit to you that we will do everything we can in the future to earn and deserve public trust.


RUTHERFORD:

And -- and in closing just let me say, if I could take just a moment, Mr. Chairman, I -- I really do appreciate that. And -- and -- and I believe we have the right people in the right seats right now to -- to root this out.

But I'm going to tell you, I -- I fear that it runs deep. And -- and I do believe that we have the right people in -- in place, because we have to protect the integrity of all those men and women, all -- all those agents, all those staff folks, who are -- who are good, you know, law-abiding, hard-working heroes out there. And -- and they deserve an agency with strong integrity like theirs.

So -- so thank you for everything you're going to do to make that happen.


ROSENSTEIN:

Thank you very much.


RUTHERFORD:

And I yield back.


GOODLATTE:

The chair thanks gentlemen.

The chair understands the gentleman from Texas has some unanimous consent requests?


JACKSON LEE:

Yes, Mr. Chairman, thank you for your kindness.

And then I thank the deputy attorney general for his testimony.

I'd like to submit in the record a December 12, 2017 letter, Mr. Chairman, to the committee by four members of the committee -- four women of the committee, myself, Miss Bass, Jayapal and Miss Lofgren, on asking this committee to hold hearings for the women accusers of Mr. Trump to be heard. I ask unanimous consent for that to be put into the record.

GOODLATTE:
Without objection that will be made a part of the record.

JACKSON LEE:
I -- then I have a line a questions that I hope to put in a letter to the deputy attorney general that were not complete. I ask unanimous consent to put that in the record.

GOODLATTE:
Without objection.

JACKSON LEE:
And then H.R. 3654, which is a complement to the Senate bill, follows my line of questioning regarding the protection of the integrity of the work of Special Counsel Mueller.

GOODLATTE:
Without objection.

JACKSON LEE:

And Mr. Chairman, the scheduling -- if I could stop and ask for a scheduling question? Are we having another judiciary, do you think, in the next week?

GOODLATTE:

Not that I know of. I -- I do not think at this point we have any plans next week.

JACKSON LEE:

And let me ask, I -- I've been sitting here listening but as well noting a lot of meetings are going on. I -- I would just ask the Judiciary Committee to be an active participant in the DACA fix.

I mean, this is our jurisdiction and, Mr. Chairman, as I go home, despite our likes or dislikes, there are so many young people that are living in such devastating fear.

And I know that our engagement with the speaker and the leadership, could really provide some comfort to young people who are, right now, statused, but they are so fearful that they will be unstatused, that I've had adults come to me whose children are not DACA, but whose children's friends are, about the suicidal nature of many of these young people because they are so frightened.

GOODLATTE:

Well...

JACKSON LEE:

So I don't know whether we could fix in the committee, there are bills, or whether or not you'd provide a dialogue with the now present ranking member, and subcommittee's ranker and chair, that we look to see how we can fix this, or at least provide a clarifying message for these DACA young people as they go home -- excuse me, I'm sorry -- as we go home for the Christmas holiday.

We are leaving young people coming home from school into homes that they are fearful that will be raided and that they will be immediately deported and not be able to even go back to school. medical school, Ph.D. candidates, various other academic individuals, and then of course people who are working.

I'm very concerned, Mr. Chairman, very concerned.


GOODLATTE:
I -- I understand your concern. As you know, the speaker has appointed a task force on the majority side, of which three members of this committee, including myself, are involved. I'd be happy to have discussions with you about it.

I also don't believe that DACA recipients, where the program has been extended through March, need fear what's going to happen here.

And I do hope for an outcome that allows us to have the laws of the land changed to prevent this type of illegal immigration in the future, but also address the concern of these people who were brought here illegally, in many instances by their parents. And I -- I hope for a resolution just like you do.

JACKSON LEE:

Well, I'll take you up on it...

GOODLATTE:

It might not be the same resolution you want, but I -- but I do want...

JACKSON LEE:

Well, I'll take you up on this order and I -- I do beg to differ that they were statused even as they came into this country through no fault of their own. So I don't want that to hang over their head that they're illegal. They've got a status here now.

But let me just say that the March deadline has been -- unfortunately, it seems to be encroaching on their thinking process because the raids are -- are still continuing with their family members, the raids are continuing in their schools, ICE -- places where they are.

So if nothing else, let me just put on the record, we need -- first of all we need the DACA fix. I -- I disagree that -- that March is an appropriate timeframe, but I understand what you're saying.

But we certainly need the president, speaker of the House, the leadership of this nation, to be able to indicate that the deputy attorney general, Homeland Security, ICE officers, FBI officers, are not going to, unless there is some other element to their status, any action by them is not going to randomly deport DACA statused young people.

I think that is a -- a crucial statement to have made, and I thank the gentlemen for yielding.

GOODLATTE:

I thank the gentlewoman for her comments, and the majority will definitely take them under advisement. I do want to thank the attorney -- deputy attorney general for his participation today.

I do have a couple more questions. Did former Director Comey, in sharing his memos with another individual who then shared them with a New York Times reporter, share classified information?

ROSENSTEIN:

Congressman, I do not know the answer to that, but the inspector general of our department has jurisdiction to review that issue.

GOODLATTE:

And -- and are you aware of the report indicating that Jim Baker, the general counsel of the FBI, was under investigation by the FBI for sharing classified information?

ROSENSTEIN:

I believe that I read the media account that you're referring to.

GOODLATTE:

Do you still have confidence in the FBI general counsel?

ROSENSTEIN:

I have confidence in the FBI, and I have confidence, Mr. Chairman, that Director Wray will make appropriate decisions with regard to his staff.

GOODLATTE:

And finally, in an interview with NBC's Scott MacFarlane on December 6, you indicated that you were satisfied with how the special counsel's investigation is proceeding. Why -- after you've heard all the concerns expressed here today, why are you satisfied with the course of the investigation so far?

ROSENSTEIN:

I'm satisfied, Congressman, because based upon what I know, which is different from what accounts may appear in the media, based upon what I know, I believe Director Mueller's appropriately remaining within his scope and conducting himself appropriately. And in the event that there is any credible allegation of misconduct by anybody in his staff, that he is taking appropriate action.

GOODLATTE:

Well, thank you. Thank you very much. We will have, I have no doubt, from both sides of the aisle, additional questions in writing, and -- and we hope that you're able to answer those and answer them expeditiously.

Again, I thank you. You're a little bit ahead, not much, but a little bit ahead of Director Wray's time, and I -- and I know the sacrifice it is to prepare for this and then to give us the better of a day to answer these questions.

But they're very important. The FBI is an incredibly important law enforcement organization. In my opinion it's still the premier law enforcement organization in the world.

And again, as I said earlier, there are tens of thousands of employees there who are very dedicated to doing the right thing, upholding the rule of law and providing justice in the fashion that the blindfolded woman with balanced scales stands for. I think the department stands for that.

But I do think at the higher levels of the department there are some serious problems. The gentleman from Florida asked some questions very much related to this.

And I think that while we all have confidence in Director Wray, we also believe that there need to be some changes made, both in terms of the personnel, in terms of the protocols that are followed, and certainly in terms of getting the necessary information to this committee and whatever other appropriate committees, so that all of this can be aired and the public's understanding that these problems are being solved, and that they know what the nature of them are.

So again, thank you very much for your participation. Thank you very much for your work in a very difficult situation as deputy attorney general of the United States under these circumstances.


ROSENSTEIN:
Thank you.


GOODLATTE:
And -- and with that, without objection, all members will have five legislative days to submit additional written questions for the witness and additional materials for the record. And the hearing is adjourned.

List of Panel Members and Witnesses

PANEL MEMBERS:

REP. ROBERT W. GOODLATTE, R-VA. CHAIRMAN

REP. LAMAR SMITH, R-TEXAS

REP. JIM SENSENBRENNER, R-WIS.

REP. DARRELL ISSA, R-CALIF.

REP. STEVE KING, R-IOWA

REP. TRENT FRANKS, R-ARIZ.

REP. LOUIE GOHMERT, R-TEXAS

REP. JIM JORDAN, R-OHIO

REP. TED POE, R-TEXAS

REP. JASON CHAFFETZ, R-UTAH

REP. STEVE CHABOT, R-OHIO

REP. TOM MARINO, R-PA.

REP. TREY GOWDY, R-S.C.

REP. RAUL R. LABRADOR, R-IDAHO

REP. BLAKE FARENTHOLD, R-TEXAS

REP. DOUG COLLINS, R-GA.

REP. RON DESANTIS, R-FLA.

REP. MIKE BISHOP, R-MICH.

REP. KEN BUCK, R-COLO.

REP. JOHN RATCLIFFE, R-TEXAS

REP. MIKE JOHNSON, R-LA.

REP. MARTHA ROBY, R-ALA.

REP. ANDY BIGGS, R-ARIZ.

REP. MATT GAETZ, R-FLA.

REP. KAREN HANDEL, R-GA.

REP. JOHN RUTHERFORD, R-FLA.

REP. JERROLD NADLER, D-N.Y. RANKING MEMBER

REP. ZOE LOFGREN, D-CALIF.

REP. SHEILA JACKSON LEE, D-TEXAS

REP. STEVE COHEN, D-TENN.

REP. HANK JOHNSON, D-GA.

REP. TED DEUTCH, D-FLA.

REP. LUIS V. GUTIERREZ, D-ILL.

REP. KAREN BASS, D-CALIF.

REP. CEDRIC L. RICHMOND, D-LA.

REP. HAKEEM JEFFRIES, D-N.Y.

REP. DAVID CICILLINE, D-R.I.

REP. PRAMILA JAYAPAL, D-WASH.

REP. TED LIEU, D-CALIF.

REP. JAMIE RASKIN, D-MD.

REP. ERIC SWALWELL, D-CALIF.

REP. BRAD SCHNEIDER, D-ILL.

WITNESSES:

ROD J. ROSENSTEIN, DEPUTY ATTORNEY GENERAL

**Testimony & Transcripts**

**Complete written testimony for this event** Dec. 13, 2017

**About House Committee on Homeland Security**

**Staff**

**Hearing**

**Transcripts**

**Testimony**

**Committee Reports**

**Associated Bills**

**Schedules**

**Markup**

<u>Amendments</u>

© 2018 · CQ - Roll Call, Inc · All Rights Reserved.

1625 Eye Street, Suite 200 · Washington, D.C. 20006-4681 · 202-650-6500

About CQ    Help    Privacy Policy    Masthead    Terms & Conditions