**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**PAUL J. MANAFORT, JR.,**<br><br>**Defendant** | **Crim. No. 17-201-1 (ABJ)** |

### GOVERNMENT'S RESPONSE TO DEFENDANT PAUL J. MANAFORT, JR.'S MOTION TO DISMISS ONE OF TWO COUNTS AS MULTIPLICITOUS

The United States of America, by and through Special Counsel Robert S. Mueller, III, hereby files this response to defendant Paul J. Manafort, Jr.'s motion (Doc. 236) to dismiss either Count Four or Count Five of the Superseding Indictment (Doc. 202) on the ground that the two counts are multiplicitous. Manafort's motion lacks merit. The two counts do not charge the same offense within the meaning of the Double Jeopardy Clause because proving a violation of the Foreign Agent Registration Act's (FARA) false-statements provision, 22 U.S.C. § 618(a)(2), does not necessarily establish a violation of 18 U.S.C § 1001(a), and proving a Section 1001(a) violation does not necessarily establish a false-statements violation under FARA. But even if Manafort's argument had merit, pre-trial dismissal would be unwarranted because any multiplicity here presents only a problem of multiple punishments that can and should be addressed post-trial if the jury convicts Manafort on both counts. Accordingly, Manafort's motion should be denied.

### BACKGROUND

Counts Four and Five of the Superseding Indictment ("Indictment") are based on representations that Manafort and co-conspirator Richard Gates caused to be made in letters submitted to the Department of Justice's FARA Unit in November 2016 and February 2017. The

Indictment alleges that, in 2012, Manafort and Gates arranged for two D.C.-based lobbying firms, Company A and Company B, to lobby in the United States on behalf of the Government of Ukraine, its President at the time (Yanukovych), and Yanukovych's political party (the Party of Regions).  Indictment ¶ 21.  The Indictment further alleges that, "[t]o minimize public disclosure of their lobbying campaign and distance their work from the Government of Ukraine," Manafort and others arranged for a third party—the European Centre for a Modern Ukraine (Centre)—"to be the nominal client of Company A and Company B," *id.* ¶ 24, and Gates provided false and misleading documentation to give the lobbying firms a pretext for failing to register with the Department of Justice as agents of Ukraine, *id.* ¶ 25.

In 2016, press reports focused on Manafort's connections with Ukraine.  Indictment ¶ 26.  The Indictment alleges that, in response and "[t]o conceal the scheme," "Manafort and Gates developed a false and misleading cover story that would distance themselves and the Government of Ukraine, Yanukovych, and the Party of Regions from the Centre, Company A, and Company B."  *Id.*  The Indictment further alleges that, when the Department of Justice sought to determine whether Manafort, Gates, and their firm (DMP International, or DMI) had acted as unregistered agents of a foreign principal, Manafort and Gates "caused false and misleading letters to be submitted to the Department of Justice, which mirrored the false cover story" that they had previously developed and shared with a principal of Company B.  *Id.* ¶ 27.  Specifically, the letters contained representations that:

- DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

- MANAFORT and Gates did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall

being party to, arranging, or facilitating any such communications. Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

- MANAFORT and Gates had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

- DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents." The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

*Id.* (emphasis omitted).

These and other representations in the letters are alleged to be "false and misleading," and Manafort knew them to be so. *See* Indictment ¶ 4 ("[W]hen the Department of Justice sent inquiries to MANAFORT and Gates in 2016 about their activities, MANAFORT and Gates responded with a series of false and misleading statements."). In particular, the Indictment alleges that, contrary to the representations in the letters, Manafort and Gates had:

> selected Company A and Company B; engaged in weekly scheduled calls and frequent e-mails with Company A and Company B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Company A and Company B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the lobbying firms over $2 million from offshore accounts they controlled, among other things.

Indictment ¶ 28. In addition, court-authorized searches of Manafort's e-mail accounts and a search of Manafort's Virginia residence had "revealed numerous documents, including documents related

3

to lobbying, which were more than thirty-days old at the time of the November 2016 letter to the Department of Justice," *id.*, thus suggesting that the letter's representations about e-mail retention were likewise false and misleading.

Count Four charges that Manafort "knowingly and willfully caused to be made a false statement of a material fact, and omitted a material fact necessary to make the statements therein not misleading, in a document filed with and furnished to the Attorney General under the provisions of FARA," in violation of 22 U.S.C. § 618(a)(2) and 18 U.S.C. § 2.[1]  Indictment ¶ 45. The charge identifies six excerpts from the letters, including the representations quoted above, as the basis for violation.  Indictment ¶ 45.

Count Five, in turn, charges that Manafort violated 18 U.S.C. §§ 1001(a) and 2 based on the same representations in the two letters.[2]  Indictment ¶ 47.  Tracking the statutory language, Count Five alleges that Manafort "knowingly and willfully did cause another: to falsify, conceal,

---

[1] Section 618(a)(2) provides in relevant part that "[a]ny person who . . . in any registration statement or supplement thereto or in any other document filed with or furnished to the Attorney General under the provisions of this subchapter willfully makes a false statement of a material fact or willfully omits any material fact required to be stated therein or willfully omits a material fact or a copy of a material document necessary to make the statements therein and the copies of documents furnished therewith not misleading, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both."

Section 2 of Title 18, which is referenced in Count Four, punishes as a principal whoever aids and abets the commission of an offense or "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States."

[2] Section 1001(a) provides in relevant part that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
    (2) makes any materially false, fictitious, or fraudulent statement or representation; or
    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
    shall be fined under this title, imprisoned not more than 5 years or, . . . both."

and cover up by a scheme and device a material fact; to make a materially false, fictitious, and fraudulent statement and representation; and to make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement." *Id.*

## ARGUMENT

Manafort argues (Doc. 236 at 4–9) that Counts Four and Five are multiplicitous and moves the Court to require that the government choose to try him on one of the counts while dismissing the other. As explained below, the Court should reject those requests: Counts Four and Five permissibly charge separate statutory violations, and even if a multiplicity defect existed, dismissing one of the counts at sentencing would sufficiently remedy it.

**A. Counts Four and Five Charge Separate Offenses Under The *Blockburger* Test**

1. "It is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause" of the Fifth Amendment. *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (1980). Convictions for separate statutory charges based on the same conduct violate that Clause's protection "against multiple punishments," and qualify as multiplicitous, only when those convictions are "for the same offense." *United States v. Mahdi*, 598 F.3d 883, 887 (D.C. Cir. 2010) (internal quotation marks omitted), *cert. denied*, 562 U.S. 971 (2010); *see United States v. Cooper*, No. 17-3015, 2018 WL 1542496, at *5 (D.C. Cir. March 30, 2018). To determine whether two crimes under separate statutory provisions qualify as "the same offense" for double jeopardy purposes, courts have long applied the test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932), which asks "whether each provision requires proof of a fact

which the other does not, i.e., whether either is a lesser included offense of the other." *Mahdi*, 598 F.3d at 888 (internal quotation marks and citation omitted).[3]

The *Blockburger* test "calls for comparison of the statutorily-prescribed elements of the offenses, not the constituent facts either as alleged or proven." *United States v. Coachman*, 727 F.2d 1293, 1301 (D.C. Cir. 1984); *see, e.g.*, *Illinois v. Vitale*, 447 U.S. 410, 416 (1980) ("[T]he *Blockburger* test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial."); *United States v. Weathers*, 186 F.3d 948, 954 (D.C. Cir. 1999) (inquiry "focuses exclusively on the statutory elements of the offenses"), *cert. denied*, 529 U.S. 1005 (2000). The inquiry, at bottom, is whether proof of one of the two offenses "*necessarily* includes proof of" the other. *Ball v. United States*, 470 U.S. 856, 862 (1985); *accord United States v. Woodward*, 469 U.S. 105, 108 (1985) (per curiam) (summarily reversing lower court's multiplicity determination because "proof of a currency reporting violation does *not* necessarily include proof of a false statement offense" under 18 U.S.C. § 1001).

2. Under these principles, Counts Four and Five charge separate "offenses" within the meaning of the Double Jeopardy Clause. As an initial matter, and contrary to Manafort's principal contention (Doc. 236 at 6), proof of a violation of FARA's false-statements provision will not "necessarily" prove a Section 1001(a) violation as well. While FARA covers statements rendered

---

[3] Manafort quotes (Doc. 236 at 5, 6) from the Supreme Court's decision in *United States v. Dixon*, 509 U.S 688, 696 (1993), which summarized the *Blockburger* test as "inquir[ing] whether each offense contains an element not contained in the other." But the *Blockburger* opinion, (*see* 284 U.S. at 304), Supreme Court decisions post-dating *Dixon* (*see Rutledge v. United States*, 517 U.S. 292, 297 (1996)), and Manafort's cited D.C. Circuit precedent all state the governing test as being "whether each provision requires proof of a fact that the other does not," *Mahdi*, 598 F.3d at 888 (quoting *United States v. Weathers*, 186 F.3d 948, 951 (D.C. Cir. 1999), *cert. denied*, 529 U.S. 1005 (2000)); *see also Cooper*, 2018 WL 1542496, at *5. Those formulations are used interchangeably because they are functionally equivalent: each looks to what proof satisfies the statutory definitions, rather than looking to the facts alleged to establish the violation in a particular case. The proper analysis therefore does not change under either linguistic formulation.

"misleading" by omissions of material facts, 22 U.S.C. § 618(a)(2), the D.C. Circuit has held that Section 1001(a) does not reach statements that are misleading but "literally true." *See United States v. Milton*, 8 F.3d 39, 45 (D.C. Cir. 1993), *cert. denied*, 513 U.S. 919 (1994); *United States v. Dale*, 991 F.2d 819, 832–833 (D.C. Cir.), *cert. denied*, 510 U.S. 906 (1993). Similarly, FARA covers willful omissions of material fact no matter how they are accomplished, *see* 22 U.S.C. § 618(a)(2) ("willfully omits any material fact required to be stated"), while Section 1001(a) applies to "nondisclosure of material facts" only when the conduct amounts to concealment and is "accomplished in a particular way: by a 'trick, scheme, or device.'" *United States v. Safavian*, 528 F.3d 957, 965 n.8 (D.C. Cir. 2008) (quoting 18 U.S.C. § 1001(a) and citing *Woodward*, 469 U.S. at 108). Accordingly, proof of a FARA false-statements violation will "*not* necessarily include proof of a false statement offense" under Section 1001(a). *Woodward*, 469 U.S. at 108.

Similarly, proving a violation of Section 1001(a) will not necessarily establish a FARA false-statements violation. That is because Section 1001(a) reaches not just false statements in materials furnished to the Attorney General under FARA, *see* 22 U.S.C. § 618(a)(2), but such statements made in any matter within the executive branch's jurisdiction. 18 U.S.C. § 1001(a). Section 1001(a) would therefore cover false statements about an individual's lobbying work whether made to the State Department or the FBI, *see United States v. Rodgers*, 466 U.S. 475 (1984); indeed, it reaches statements made to entities that are outside of the federal government when the executive branch "ha[s] the power to exercise authority" over the relevant matter. *See United States v. Starnes*, 583 F.3d 196, 208 (3d Cir. 2009) (reports submitted to local housing authority); *see also, e.g.*, *United States v. Hooper*, 596 F.2d 219, 223 (7th Cir. 1979) (stipend reports made to university subject to federal audit).

In sum, each of the false-statements statutes at issue can be satisfied with proof of facts that would not suffice under the other: Section 1001(a) requires proof of actual falsity or concealment through a trick, scheme, or device, whereas FARA sweeps more broadly by reaching literally true yet misleading statements and willful omissions even absent affirmative acts of concealment; and while FARA requires proof that the false or misleading statements were made in submissions to the Attorney General, Section 1001(a) reaches more broadly to cover false statements to other executive branch agencies (or non-federal agencies subject to federal oversight). Those differences demonstrate that proving one offense does not necessarily prove the other. Accordingly, the two crimes do not amount to "the same offense" under the *Blockburger* test, *see Mahdi*, 598 F.3d at 888, and neither Count Four nor Count Five should be dismissed as multiplicitous.[4]

3. Manafort's remaining contentions lack merit. Focusing on the offenses "[a]s alleged in the Superseding Indictment," Doc. 236 at 6, he offers a comparative chart that implies that the charges against him rest solely on the ground that he affirmatively "made a false statement." *See id.* But Manafort's focus on the specifics of the Indictment is, as a legal matter, misplaced. As explained above, p. 6, *supra*, the *Blockburger* test compares the statutes on their face, not the allegations in the particular charging instrument. *See Coachman*, 727 F.2d at 1301.

---

[4] The result would be the same under Manafort's preferred terminology of "necessarily included" offenses, which he draws from precedent interpreting not the Double Jeopardy Clause, but Federal Rule of Criminal Procedure 31(c). *See* Doc. 236 at 4 & n.1. Under that precedent, one offense is "necessarily included in the other" if "it is impossible to commit the" first offense "without . . . having committed the" second. *Schmuck* v. *United States*, 489 U.S. 705, 719 (1989) (internal quotation marks omitted). As explained above, pp. 6-7, *supra*, it is possible to violate Section 618(a)(2) without violating Section 1001(a) and vice versa; accordingly, neither is a "necessarily included" offense of the other.

In any event, Manafort misreads the Indictment. Count Four alleges in plain terms that Manafort both caused "a false statement of material fact" to be made, "*and* omitted a material fact necessary to make the statements therein not misleading, in a document filed with and furnished to the Attorney General under the provisions of FARA." Indictment ¶ 45 (emphasis added); *see* 22 U.S.C. § 618(a)(2) (covering false statements and omissions of material fact). Count Five, in turn, alleges that Manafort committed each of "[t]he several different types of fraudulent conduct proscribed by" Section 1001(a), *United States v. Stewart*, 433 F.3d 273, 319 (2d Cir. 2006) (cited at Doc. 236 at 7 n.3). In particular, and contrary to Manafort's assertion (Doc. 236 at 3), the Indictment alleges that he "knowingly and willfully cause[d] another . . . to make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement." Indictment ¶ 47; *see id.* (also alleging that Manafort caused another "to falsify, conceal, and cover up by a scheme and device a material fact[ and] to make a materially false, fictitious, and fraudulent statement and representation"). The Indictment, in short, alleges not only that Manafort made false statements but also that he committed the several other types of conduct that he acknowledges Sections 618(a)(2) and 1001(a) to reach.

Manafort asserts (Doc. 236 at 7) that these differences in the types of conduct covered by the two provisions do not prevent Counts Four and Five from qualifying as "the same offense" under Supreme Court precedent. But his cited decisions do not support that conclusion. To the contrary, the Court's decision in *Illinois v. Vitale*, *supra*, makes clear that a court determining whether one offense "necessarily involve[s] proof" sufficient to establish another must account for the full range of conduct that satisfies the two statutes. 447 U.S. at 417. In that case, the Court held that manslaughter by automobile would not qualify as the greater offense of "failure to reduce speed" if manslaughter could be committed through factual means other than "a failure to slow."

*Id.* at 419 ("[I]f manslaughter by automobile does not always entail proof of a failure to slow, then the two offenses are not the 'same' under the *Blockburger* test."). By the same logic, if a FARA false-statements violation can be proved through facts that would "not always entail proof" of a Section 1001(a) violation, and vice versa, then the two offenses are not "the 'same.'" *See id.*

Manafort's other cited cases are inapposite. Both involve application of the *Blockburger* test to offenses—such as felony murder and criminal contempt—that necessarily incorporate all elements of a subsidiary crime. *See United States v. Dixon*, 509 U.S 688, 698 (1993) (contempt based on violation of a "court order [that] incorporated the entire governing criminal code"); *Harris v. Oklahoma*, 433 U. S. 682, 682–683 (1977) (per curiam) (felony murder). In that setting, courts have based their *Blockburger* analysis on the particular version of the incorporated offense at issue in the case, *i.e.*, "the drug offense" that formed the basis for the contempt charge in *Dixon*, 509 U.S. at 698, and the robbery offense underlying the felony-murder charge in *Harris*, 433 U.S. at 682–683 & n.*. *See also United States v. McLaughlin*, 164 F.3d 1, 13 (D.C. Cir. 1998) (explaining *Blockburger*'s application to "compound offenses" such as felony murder), *cert. denied*, 526 U.S. 1079 (1999). Manafort does not claim that either of the two statutes here incorporates another crime's elements in similar fashion.

Finally, although Manafort notes (Doc. 236 at 5 n.2) that the *Blockburger* test is not dispositive where contrary congressional intent is evident, he does not argue that Congress intended to preclude multiple convictions in the specific circumstances of this case. That is with good reason. Courts have regularly upheld "convictions and sentences under both § 1001 and a more specific" false-statements provision. *See United States v. Ramos*, 725 F.2d 1322, 1324 (11th Cir. 1984) (Section 1001 and 18 U.S.C. § 1542, which covers false statements in passport

applications).[5]  And when, as is true of FARA,[6] the more specific statute postdates Section 1001(a)'s enactment, courts have likewise rejected any suggestion that Congress meant to displace Section 1001(a) and require prosecution exclusively under the other statute.  *See United States v. Hansen*, 772 F.2d 940, 945–946 (D.C. Cir. 1985) (collecting cases), *cert. denied*, 475 U.S. 1045 (1986).  This case, in short, does not present the "clear indication of contrary legislative intent," *Albernaz*, 450 U.S. at 340, that would be necessary to counter the presence of separate offenses under *Blockburger*.

### B. Pre-Trial Dismissal Would Be Unwarranted Even If The Counts Were Multiplicitous

Even if Counts Four and Five were multiplicitous, Manafort's requested remedy of pre-trial dismissal would be unwarranted.  That remedy is not, as Manafort implies (Doc. 236 at 8–9), standard practice in this District or elsewhere.  *See United States v. Pires*, 642 F.3d 1, 16 (1st Cir. 2011) ("There is no inflexible rule that the exclusive remedy for multiplicitous counts is election between them."); *United States v. Phillips*, 962 F. Supp. 200, 201 (D.D.C. 1997) (stating that "the decision whether to compel the prosecution to elect among multiplicitous counts before trial is within the discretion of the trial court") (cited at Doc. 236 at 8–9).  To the contrary, Manafort's own cited cases recognize that "[t]he principal danger in a multiplicitous indictment is . . . that the defendant may receive multiple sentences for a single offense."  *United States v. Langford*, 946

---

[5] *See also, e.g.*, *United States v. Bryant*, 117 F.3d 1464, 1468–1469 (D.C. Cir. 1997) (Section 1001 and impersonation of a federal official, in violation of 18 U.S.C. § 912), *cert. denied*, 523 U.S. 1071 (1998); *United States v. Laimeche*, 56 F. App'x 835, 836 (9th Cir. 2003) (unpublished) (Section 1001 and Medicare-specific statute); *United States v. York*, 888 F.2d 1050, 1058–1059 (5th Cir. 1989) (Section 1001 and false statement in a loan application under 18 U.S.C. § 1014).

[6] *Compare* Act of June 8, 1938, ch. 327, § 5, 56 Stat. 633 (version of FARA's false-statements provision in the original 1938 statute), *with United States v. Gilliland*, 312 U.S. 86, 92–93 (1941) (explaining that the relevant language in current Section 1001(a) was added in 1934).

F.2d 798, 804 (11th Cir. 1991), *cert. denied*, 503 U.S. 960 (1992).  And because "the primary evil of multiplicity is double punishment for the same offense," "[m]ultiplicitous counts may be" (and often are) remedied at the sentencing phase.  *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 121 (D.D.C. 2012); *see Ball*, 470 U.S. at 865.

The D.C. Circuit has approved of remedying multiplicity claims at the post-trial stage in several settings.  In *United States v. Hubbell*, 177 F.3d 11, 14 (D.C. Cir. 1999), a false-statements prosecution, the court observed generally "that multiplicity claims are better sorted out post-trial."  The court in *United States v. Clark*, 184 F.3d 858 (D.C. Cir. 1999), "detect[ed] no prejudice" from the submission of multiplicitous counts based on the same evidence, holding that the only necessary remedy was to vacate one of the two resulting convictions.  *Id.* at 872.  And in *United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993), the court held that the trial judge had "correctly submitted" charges under two tax statutes to the jury "[g]iven the absence of controlling D.C. Circuit precedent" deeming such charges multiplicitous and that the appropriate remedy was simply "to vacate the sentences" for one set of the charges.  *Id.* at 859; *see United States v. Wheeler*, No. 11-cr-151 (ESH), 2012 WL 1865506, at *1–*2 (D.D.C. 2012) (where multiplicity question was "of first impression in this jurisdiction," finding it "appropriate to allow all of the counts to go to the jury" so that the court of appeals would have a chance to address the question).

Analogous considerations show that Manafort's multiplicity claim here is also "better sorted out post-trial."  *Hubbell*, 177 F.3d at 14.  First, Manafort faces little risk of prejudice from being tried on Counts Four and Five where, by his own account (Doc. 236 at 3, 8), "the charges encompass the same underlying facts and conduct," *Sanford, Ltd.*, 859 F. Supp. 2d at 124, and the jury will have to weigh the same evidence in evaluating Manafort's guilt on the Count One conspiracy charge in any event.  *See* Indictment ¶ 38 (alleging that Manafort conspired to commit

the false-statements offenses charged in Counts Four and Five and "to defraud the United States by impeding, obstructing, and defeating the lawful functions of" the Department of Justice. Moreover, as Judge Huvelle concluded in *Wheeler*, 2012 WL 1865506, at *2, any "potential prejudice"—such as Manafort's suggestion that jurors will be tempted to reach a compromise verdict (Doc. 236 at 8–9)—"can be addressed through" instructions emphasizing the need for the jury to consider each charge separately. *See, e.g.*, 1A Kevin F. O'Malley, et al., *Fed. Jury Prac. & Instr.* § 12:12 (6th ed.). Jurors, of course, are presumed to follow such instructions. *See Zafiro v. United States*, 506 U.S. 534, 540–541 (1993).

Finally, if there were a serious question of multiplicity (here, the government submits there is not), post-trial consideration would promote judicial efficiency. It would avoid premature resolution of a question of first impression that may disappear if the jury acquits on one or both of the charges, *see Pires*, 642 F.3d at 16; *Sanford, Ltd.*, 859 F. Supp. 2d at 121, 124, and would preserve the possibility that the court of appeals will be able to resolve the legal question on appeal from a final judgment (or an appealable post-trial order), *see Dale*, 991 F.2d at 859; *Wheeler*, 2012 WL 1865506, at *1.

## CONCLUSION

For the foregoing reasons, Manafort's motion to dismiss one of two counts as multiplicitous (Doc. 236) should be denied.[7]

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: April 4, 2018

/s/ Andrew Weissmann
Andrew Weissmann
Greg D. Andres (D.D.C. Bar No. 459221)
Scott A.C. Meisler
U.S. Department of Justice
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-0800

*Attorneys for the United States of America*

---

[7] If the Court defers consideration of the multiplicity question to the post-trial stage, it may wish to deny Manafort's motion "without prejudice to being renewed after trial." *Wheeler*, 2012 WL 1865506, at *2.