**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 17-201-1 (ABJ)** |
| **PAUL J. MANAFORT, JR.,** | |
| **Defendant** | |

## GOVERNMENT'S RESPONSE TO PAUL J. MANAFORT, JR.'S MOTION TO DISMISS COUNT TWO AND TO STRIKE THE FORFEITURE ALLEGATION

The United States of America, by and through Special Counsel Robert S. Mueller, III, hereby files this response to defendant Paul J. Manafort, Jr.'s Motion to Dismiss Count Two and to Strike the Forfeiture Allegations (Doc. 237).  Manafort's challenges to Count Two of the Superseding Indictment ("Indictment") (Doc. 202), which alleges a multi-object money laundering conspiracy, are without merit, as is his request that the Court strike the forfeiture allegation that is based on the charged conduct.

Manafort's challenge to the first object of the conspiracy—international promotion money laundering, Indictment ¶ 41(a)—flows from a basic misunderstanding of the charge against him. That conspiracy object rests not on Manafort's "personal expenditures" (Doc. 237 at 2, 9), but on allegations that Manafort and his co-conspirators funneled money through accounts in Cyprus and Saint Vincent & the Grenadines (the Grenadines) to pay U.S. lobbying and law firms, among others, to act as unregistered agents of the Government of Ukraine and its then-President, in violation of the Foreign Agents Registration Act ("FARA").  Indictment ¶¶ 24–29.  The offense of conspiracy to commit international promotion money laundering, in violation of 18 U.S.C. § 1956(h) and (a)(2)(A), can validly rest on allegations of an agreement to fund, through

international money transfers, the commission of a crime that meets the definition of specified unlawful activity, as FARA does.

Manafort's challenge to the second object of the conspiracy (Indictment ¶ 41(b)) is legally flawed. This money laundering object requires a transaction with proceeds of specified unlawful activity. Manafort argues that this object is invalid because FARA is a registration crime that, as a matter of law, is categorically incapable of generating proceeds. But that argument is irreconcilable with the basic point, acknowledged by Manafort (Doc. 237 at 6, 11), that FARA requires registration only by those who take or agree to take certain actions as an "agent" of a foreign principal. It is also contrary to the D.C. Circuit's holding that FARA's statute of limitations runs from the last act that an unregistered agent takes on behalf of its foreign principal and Congress' understanding when it added FARA as a money laundering predicate in 2001. And it is undermined by Manafort's concession (Doc. 237 at 12 n.4) that a similar statute formerly codified alongside FARA, 18 U.S.C. § 951, can generate proceeds.

For these and other reasons explained further below, Manafort's motion to dismiss Count Two should be denied. Because Count Two states a valid money laundering offense, and because FARA is a crime capable of generating proceeds, Manafort's request to strike the forfeiture allegations associated with those offenses should likewise be denied.

## BACKGROUND

### A.  Statutory Background

Count Two charges Manafort with participating in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Indictment ¶ 41. The money laundering statute that is the object of the conspiracy criminalizes several types of conduct. As relevant here, it criminalizes transferring funds into or out of the United States "with the intent to promote the carrying on of

specified unlawful activity." 18 U.S.C. § 1956(a)(2)(A). Under this international-promotion prong of the statute, the funds transferred need not be illicit in origin. *See Cuellar v. United States*, 553 U.S. 550, 561 n.3 (2008); *United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994); Doc. 237 at 10 (agreeing that this offense "does not require that the funds transferred internationally be criminally derived"). The transfer of those funds, however, must be intended to facilitate the carrying on of criminal conduct that qualifies as "specified unlawful activity," a category that Congress expanded in 2001 to include, among other crimes, additional "foreign corruption offenses" and "any felony violation of the Foreign Agents Registration Act." *See* USA PATRIOT Act of 2001, Pub. L. No. 107-56, tit. III, § 315, 115 Stat. 272, 308–309 (2001); *see* 18 U.S.C. § 1956(c)(7)(D). FARA, in turn, makes it unlawful for any person to "act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto." 22 U.S.C. § 612(a). Willful violation of that provision is punishable as a felony, as is making materially false statements—or omissions that render other statements misleading—in any registration statement or other document furnished to the Attorney General under FARA. *Id.* § 618(a)(1) and (2).

Other provisions of the money laundering statute cover transactions conducted with the fruits—or "proceeds"—of crimes that constitute specified unlawful activity. *See* 18 U.S.C. § 1956(a)(1).[1] Two such provisions are at issue here. First, a provision addressing concealment money laundering prohibits conducting financial transactions in the proceeds of specified unlawful activity "knowing that the transaction is designed in whole or part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." *Id.*

---

[1] The term "proceeds" is defined in the statute as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9).

§ 1956(a)(1)(B)(i).  Second, another provision prohibits conducting such transactions "with intent

to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code

of 1986," that is, tax evasion or submission of false tax returns.  *Id.* § 1956(a)(1)(A)(ii); *see United

States v. Zanghi*, 189 F.3d 71, 76–78 (1st Cir. 1999), *cert. denied*, 528 U.S. 1097 (2000).

Forfeiture of property can be based on either money laundering offenses or offenses

constituting specified unlawful activity.  Specifically, federal law subjects to forfeiture "[a]ny

property . . . involved in a transaction or attempted transaction in violation of section 1956" and

"any property traceable to such property."  18 U.S.C. § 981(a)(1)(A).  "Any property . . . which

constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting

'specified unlawful activity,'" including FARA, is also subject to forfeiture.  *Id.* § 981(a)(1)(C).

**B.  The Charges Against Manafort**

Count Two charges Manafort with conspiring to commit both (a) international promotion

money laundering and (b) money laundering by conducting transactions in proceeds of specified

unlawful activities to commit tax offenses and to conceal the proceeds of such activities.

Indictment ¶ 41.

Paragraph 41(a) of the Indictment—the international promotion money laundering

object—is based on multi-faceted lobbying activity that Manafort and conspirator Richard Gates

conducted on behalf of the Government of Ukraine, its then-President (Yanukovych), and

Yanukovych's political party.   Indictment ¶¶ 19–31.  As one part of the scheme, Manafort and

Gates solicited two D.C. lobbying firms to represent Ukraine but arranged for a third entity (the

European Centre for a Modern Ukraine, or Centre) to serve as the companies' nominal client.  The

Indictment alleges that, between 2012 and 2014, the companies were paid more than $2 million

for their services and that the payments came not from "the Centre, but solely through offshore

accounts associated" with Manafort-affiliated entities in Cyprus and the Grenadines.  *Id.* ¶¶ 22–24.  The Indictment further alleges that the companies did not register with the Department of Justice as agents of Ukraine and that, "to avoid such registration, Gates provided the companies a false and misleading statement" stating that the Centre was not supervised, controlled, or financed by a foreign government.  *Id.* ¶ 25.

While acting on behalf of Yanukovych and a Ukraine government agency, Manafort and Gates are also alleged to have retained a U.S. law firm to write a report on the trial of Yanukovych's political rival, among other things.  Indictment ¶ 29.  They also retained a public relations firm to create and implement a roll-out plan for the report.  *Id.*  As alleged in the Indictment, Manafort and Gates again used offshore accounts to funnel payments to both firms:  $4 million to pay for the law firm's report ("a fact that was not disclosed in the report or to the public"), and another $1 million to pay the public relations firm.  *Id.*

Paragraph 41(b) of the Indictment charges that Manafort conspired to conduct transactions with the proceeds of FARA violations.  Indictment ¶ 41(b).  Those transactions are distinct from the promotional ones underlying Paragraph 41(a).  Specifically, Paragraph 41(b) rests on the allegations in the Indictment that Manafort and others agreed to conduct transactions intended to violate the tax laws and to conceal the proceeds, including through millions of dollars in wire transfers that were used to pay for personal items, services, and real estate.  *Id.* ¶¶ 15–17, 41(b); *see id.* ¶¶ 1, 2 (alleging that Manafort "acted as an unregistered agent of a foreign government and foreign political parties," "generated tens of millions of dollars in income as a result of his Ukraine work," and "engaged in a scheme to hide the Ukraine income from United States authorities").

The Indictment also contains a forfeiture allegation that, as relevant here, is based on the money laundering conspiracy charged in Count Two and on Counts Three and Four, which charge Manafort with FARA violations based, among other things, on the conduct described above.

## LEGAL STANDARD

Manafort moves to dismiss Count Two on the ground that it fails to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). Such a motion "is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (internal quotation marks omitted); *see United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005). Rather, "the scope" of the Court's review "is limited." *Huet*, 665 F.3d at 595. It asks "whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012). In answering that question, "the court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *Id.* (internal quotation marks and emphasis omitted). The Court "'assumes the truth of [the government's] factual allegations,'" *United States v. Knowles*, 197 F. Supp. 3d 143, 149 (D.D.C. 2016) (quoting *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015)), and it "may not dismiss an indictment on a determination of facts that should have been developed at trial." *United States v. Han*, 280 F. Supp. 3d 144, 148 (D.D.C. 2017) (ellipses and internal quotation marks omitted).

## ARGUMENT

I.    **Count One Validly States An Offense Of Conspiracy To Commit International Promotion Money Laundering**

Manafort first contends (Doc. 237 at 6–11) that Paragraph 41(a) of the Indictment fails to state an offense of conspiracy to engage in international promotion money laundering. But Manafort's principal contention—that the charge fails because it is based on "personal

6

expenditures" that cannot promote FARA violations, *id.* at 9, 10—rests on a fundamental misapprehension of the basis for the charge.[2]  And Manafort's other arguments exceed the scope of this Court's review of a motion to dismiss an indictment and otherwise lack merit.

**A.**  Contrary to Manafort's understanding, the Indictment does not allege that his personal expenditures—for example, the numerous international transfers of funds into the United States to purchase luxury goods, services, and real estate, *see* Indictment ¶¶ 15–16—promoted a FARA violation.  Rather, the international-promotion object of the money laundering conspiracy rests on the allegation that Manafort knowingly and intentionally conspired with others to transfer funds from offshore accounts into the United States to pay various entities for participating in conduct that violates FARA.  *Id.* ¶ 41(a).  Among other things, Manafort and Gates are alleged to have transferred more than $2 million "from offshore accounts they controlled" to two Washington, D.C. lobbying firms as payment for their unregistered lobbying work.  *Id.* ¶ 28.  Manafort and Gates are also alleged to have used "one of their offshore accounts to funnel $4 million to pay for" a report written by a U.S. law firm on behalf of the Government of Ukraine and another $1 million to pay a public relations firm to create and implement a roll-out plan for the report.  *Id.* ¶ 29.  In short, the international promotion object of the conspiracy is based on money transfers that promoted the FARA violations that Manafort committed himself and that he caused Gates, the

---

[2] The government understands Manafort to be arguing that a particular set of financial transactions he identifies from the Indictment ("the charged financial transactions") could not, as a matter of law, have promoted the FARA violations alleged in the Indictment.  *See* Doc. 237 at 2, 7, 10–11.  To the extent Manafort means to argue more broadly that money transfers can never promote a FARA offense because that offense consists solely of a failure to register, that argument fails for reasons explained in Part II below—namely, because FARA punishes acting without registering and not merely failing to register and because Manafort's contrary argument, when combined with his position that FARA offenses never generate proceeds, would largely nullify Congress's decision to make the offense a money laundering predicate in 2001.  *See* Part II.C.

Case 1:17-cr-00201-ABJ   Document 250   Filed 04/04/18   Page 8 of 19

lobbying, public-relations, and law firms to commit. *See id.* ¶ 43. It is not based on the separate set of transfers that supported Manafort's lifestyle.

The allegations at issue fall squarely within the prohibitions of the money laundering statute. Paragraph 41(a) tracks the language of 18 U.S.C. § 1956(a)(2)(A), which establishes two elements relevant here: (1) transferring or transmitting funds from outside the U.S. to or through a place in the U.S., and (2) doing so with the intent to promote the carrying on of FARA violations. *See United States v. Trejo*, 610 F.3d 308, 315 (5th Cir. 2010) (cited at Doc. 237 at 6). The allegations satisfy those statutory elements. The transfers of funds from offshore accounts to pay lobbying and law firms in the United States are transactions that, if proved, satisfy the first element. Indictment ¶¶ 24, 29. And while intent is an issue properly reserved for trial, *see* p. 9, *infra*, case law confirms that the kind of payments at issue here—which encourage others to undertake or participate in conduct that qualifies as a specified unlawful activity—can give rise to an inference that they were made with intent to promote. *See, e.g.*, *United States v. Valdez*, 726 F.3d 684, 691 (5th Cir. 2013) (noting cases "support[ing] the proposition that payments to employees may constitute sufficient evidence of an intent to promote an unlawful activity," and holding that the jury could infer that payments made to employees of a pain-management clinic were meant "to encourage their continued participation in the fraudulent scheme, and thus that the payments promoted the ongoing healthcare fraud") (internal quotation marks omitted); *see also Cuellar*, 553 U.S. at 567 n.8 (explaining in a money laundering case that a "defendant's knowledge or purpose" often "is not established by direct evidence but instead is shown circumstantially based on inferences drawn from evidence of effect").

**B.** Manafort's other challenge to Paragraph 41(a) improperly focuses on the proof necessary to sustain a charge of international promotion money laundering, an issue that exceeds

the scope of this Court's limited review on a motion to dismiss. For example, relying on *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004), Manafort argues that an intent to promote the carrying on of specified unlawful activity cannot be inferred from expenditures made for the "customary costs of running a legal business." *See* Doc. 237 at 10 (quoting *Miles*, 360 F.3d at 479). But the *Miles* decision, as well as others cited by Manafort, addressed the sufficiency of the evidence that the government had presented to the jury at trial. As explained above, a motion to dismiss under Rule 12(b)(3)(B)(v) is not a vehicle for testing the sufficiency of the government's evidence. *See Yakou*, 428 F.3d at 246; *Huet*, 665 F.3d at 595.

Whether alleged payments to U.S. entities engaged in lobbying on behalf of the Government of Ukraine were made with the intent to promote the carrying on of a FARA violation, as alleged in the Indictment, or were instead made with a lawful intent, is a question for the jury. *See United States v. Ravoy*, 994 F.2d 1332, 1338 (8th Cir. 1993) ("The question of intent is a quintessential jury question"); *see also, e.g.*, *United States v. Pettaway*, -- F. Supp. 3d -- , 2018 WL 1393424, at *8 (D.D.C. March 1, 2018) (denying defendant's motion to dismiss bomb-threat charge based on contention that the allegations in the indictment were insufficient to prove "that he acted with the requisite mental state"). Moreover, Manafort's arguments overlook the fact that he is charged not with substantive money laundering but with participating in a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). *See* Indictment ¶ 41. Conspiracy is an offense whose elements—agreement and intent—are often inferred from the facts and circumstances of the case, *see Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975); *United States v. Gates*, 807 F.2d 1075, 1080 (D.C. Cir. 1986), *cert. denied*, 481 U.S. 1006 (1987), making it especially ill-suited to attack on a motion to dismiss. *See also Whitfield v. United States*, 543 U.S. 209, 214

(2005) (holding that a money laundering conspiracy charge under Section 1956(h) does not require proof of "an overt act").

In any event, even if Manafort's objection were properly considered at this stage, the payments at issue were directed at financing unregistered lobbying and related conduct, not the legitimate aspects of a business.  Further, the Indictment alleges that international payments to U.S. lobbying and law firms (among others) reflected significant indicia of deception, which is inconsistent with the payment of ordinary business expenses.  *Cf. United States v. Parker*, 364 F.3d 934, 950 (8th Cir. 2004) (holding that intent to promote specified unlawful activity can be inferred "from the nature of the transactions themselves").   For example, the Indictment alleges that the $4 million used to pay for the U.S. law firm's work on behalf of the Government of Ukraine came not from the client but from offshore accounts controlled by Manafort and Gates and that these payments were "not disclosed in the report or to the public."  Indictment ¶ 29.  Additionally, the Indictment alleges that, after using offshore accounts to compensate the two Washington, D.C. firms for their unregistered lobbying work, Gates prepared talking points that obfuscated the source of funds and that he and Manafort then caused false and misleading letters mirroring those talking points to be submitted to the Department of Justice.  *See id.* ¶¶ 26–27.  A jury could readily "infer[]" from these and other circumstances surrounding the transactions, *see Parker*, 364 F.3d at 950, that Manafort participated in a conspiracy with the intent to "facilitate, make easier[,] or help to bring about" (Doc. 237 at 8) the FARA violations described in the Indictment.  *See also, e.g.*, *Cuellar*, 553 U.S. at 567 n.8 (explaining that the defendant's mental state is often inferred from other evidence); *Trejo*, 610 F.3d at 315 (recognizing that "[d]etermining whether specific intent to commit promotion money laundering" exists "is necessarily a fact-bound inquiry frequently turning upon circumstantial evidence").

## II.     Count Two Validly States An Offense For Conspiring To Launder The Proceeds Of A FARA Violation

Manafort argues (Doc. 237 at 2–6, 11–12) that Paragraph 41(b) of the Indictment also fails to state a valid money laundering conspiracy object.  This object of the conspiracy, as Manafort points out, differs from the first in that it requires that the specified unlawful activity generate "proceeds" that are used in subsequent transactions.  *See* 18 U.S.C. § 1956(a)(1)(A)(ii) and (a)(1)(B)(i).  Specifically, Paragraph 41(b) rests on allegations that Manafort's violation of FARA by acting as an unregistered agent of Ukraine yielded proceeds that formed the basis of the wire transfers that Manafort used to pay personal expenses and fund real estate improvements without reporting the money as income.  *See* Indictment ¶¶ 15–17, 41(b).  Manafort contends that this theory of money laundering fails as a matter of law because a FARA violation is crime of omission that consists solely of a failure to register and that is therefore incapable of generating proceeds.  That contention lacks merit.

**A.**  As an initial matter, Manafort's position is contrary to the statutory text.  The statute's relevant prohibition states that "[n]o person shall *act* as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto . . . or unless he is exempt from registration under the provisions of this subchapter."  22 U.S.C. § 612(a) (emphasis added).  The term "agent of a foreign principal," in turn, is defined in the statute as "any person who *acts* as an agent, representative, employee, or servant . . . of a foreign principal," or "who agrees . . . to *act*" as such.  22 U.S.C. § 611(c)(1) and (2) (emphases added).  The provision establishing the registration duty then ties the time when that duty arises to the moment when the agent first acts (or agrees to act) on behalf of the foreign principal.  *Id.* § 612(a); *see United States v. McGoff*, 831 F.2d 1071, 1075 (D.C. Cir. 1987) (agent must file the registration statement "within 10 days of commencing his or her *activities*") (emphasis added).

11

And FARA's penalty provision, Section 618(a)(1) makes punishable as a felony willful violations of the requirements of Section 612(a), as well as obligations other than registration that FARA separately imposes on agents. *See, e.g.*, 22 U.S.C. § 614(b) (declaring it "unlawful" for agents of foreign principals to transmit "informational materials for or in the interests of such foreign principal" without including a required disclaimer).

These aspects of the statute make unmistakably clear that a FARA violation does not consist solely of "the failure to file [a] registration statement," as Manafort asserts (Doc. 237 at 4). Rather, the statute prohibits a course of conduct in which a person must both "act" as an agent of a foreign principal and fail to register as such.   Indeed, Manafort himself describes the FARA violation at issue as consisting of "the failure to file a registration statement when acting as an agent of a foreign principal."   Doc. 237 at 11; *see id.* at 6 (FARA "punishes the failure to file a registration statement with the Attorney General while acting as an agent of a foreign principal") (emphasis omitted).   That description underscores that "acting" is an essential component of the FARA offense.

In that regard, FARA is directly analogous to 18 U.S.C. § 951, a registration-related offense that Manafort concedes *is* capable of generating proceeds.   Doc. 237 at 12 n.4.   Section 951(a) provides that "[w]hoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Attorney General if required in subsection (b)," commits a felony punishable by fine, imprisonment, or both.   The structure of that provision mirrors Section 612(a) of FARA:  both prohibit "act[ing]" "as an agent of a foreign" entity absent disclosure to the Attorney General, unless the individual is exempted from notification by other provisions of the respective statutes.   Manafort points out (Doc. 237 at 4–5) that Section 951 "requires that the activities of the agent be under the control of a foreign

government," whereas FARA reaches the broader category of "foreign principals," 22 U.S.C. § 611(b). But any difference in the two statutes' substantive coverage does not alter the conclusion that both Section 612(a) and Section 951 are violated only when an agent acts and fails to provide the requisite information to the Attorney General.[3]

Nor do any of the other minor distinctions between the statutes alter that conclusion. While the criminal penalty for violating Section 612(a) is set forth in a provision separate from the substantive proscription, that is easily explained by the fact (noted above) that FARA's penalty provision covers a broader range of misconduct than just failures to register. *See* 22 U.S.C. § 618(a); *cf. Whitfield*, 543 U.S. at 217 (finding "nothing remarkable in Congress' decision to place" a conspiracy provision in one subsection rather than another). It also makes no difference that Section 951 appears in Title 18, which contains the criminal code, while FARA is placed in Title 22, which governs foreign relations. Indeed, at the time that Section 612(a) was amended to state its current prohibition on "act[ing] as an agent of a foreign principal" without registering, *see* Act of Apr. 28, 1942, ch. 263, 56 Stat. 251, Section 951's predecessor was codified alongside it in the same subchapter of Title 22. *See United States v. Duran*, 596 F.3d 1283, 1295 n.7 (11th Cir.), *cert. denied*, 562 U.S. 840 (2010). None of the distinctions between FARA and Section 951, in

---

[3] The facts of *United States v. Melekh*, 193 F. Supp. 586 (N.D. Ill. 1961), cited by Manafort (Doc. 237 at 4), illustrate why violations of Section 951 and FARA alike can generate proceeds. The indictment there alleged that the defendants conspired to violate Section 951 by inducing a U.S. citizen, in exchange for "valuable consideration," to procure information for the Soviet Union. *Id.* at 589; *see also, e.g., United States v. Dumeisi*, 424 F.3d 566, 582 (7th Cir. 2005) (agent in U.S. received "money and property," including "cash payments," from Iraqi government representatives), *cert. denied*, 547 U.S. 1023 (2006). Just as agents can earn money for acting on behalf of "a foreign government," 18 U.S.C. § 951(a), so too can they earn money for working on behalf of FARA's broader category of "foreign principals," *see* 22 U.S.C. § 611(b). In either case, because such earnings are "derived . . . directly or indirectly" from the agent's unregistered work on behalf of another, those earnings constitute "proceeds" of the offense. *See* 18 U.S.C. § 1956(c)(9) (defining "proceeds").

short, suggests that Section 951 is an offense capable of generating proceeds (as Manafort concedes) but that FARA is not.[4]

**B.**   Manafort is not aided by his reliance (Doc. 237 at 3–4) on FARA's language at the time of its 1938 enactment, when it provided that "[e]very person who is now an agent of a foreign principal" or who later becomes one "shall forthwith file with the Secretary [of State] a registration statement."   Act of June 8, 1938, ch. 327, § 2, 52 Stat. 632.   The current text of FARA controls the analysis, and it makes acting as an agent of a foreign principal without registering the basis for the offense.   But even under the former language, Section 1 of the Act defined an "agent of a foreign principal" as someone who "acts or engages or agrees to act" in certain matters "for a foreign principal."   *Id.* § 1, 52 Stat. 632.   Section 2 of the Act then stated that such agents—meaning persons engaging in the covered acts—had to register.   *Id.* § 2, 52 Stat. 632.   The Supreme Court, in turn, described the 1938 Act as "provid[ing] that every person *acting as* 'agent of a foreign principal' . . . must file with the Secretary of State a registration statement."   *Vireck v. United States*, 318 U.S. 236, 237 (1943) (emphasis added).   That description aligns with the purpose of the 1938 Act:  as Manafort acknowledges (Doc. 237 at 3), FARA was intended to ensure that, if foreign agents engaged in information campaigns in the United States, they had to do so in a transparent way that would allow the government and the public to know on whose behalf the agents were acting.   *See, e.g.*, *United States v. Auhagen*, 39 F. Supp. 590, 591 (D.D.C 1941)

---

[4] Manafort's reliance (Doc. 237 at 6) on the government's choice of charging language in one previous prosecution is misplaced.   As he acknowledges (*id.* at 5 n.1), the government has alleged in multiple other cases that the offender's FARA violation consisted of "willfully act[ing] as an agent of a foreign principal . . . without first having registered with the Attorney General."   Information ¶ 11, *United States v. Siljander*, No. 07-cr-87 (W.D. Mo. July 9, 2010) (Doc. 537); *see also, e.g.*, Indictment ¶ 44, *United States v. Park*, No. 05-cr-59 (S.D.N.Y. May 15, 2006) (Doc. 127) (alleging that defendants "would and did act in the United States as agents of a foreign principal . . . without registering with the Attorney General, as required by law").

(FARA was meant "to bring the activities of persons engaged in disseminating foreign political propaganda in this country out into the open").

Changes to FARA since 1938 only confirm the centrality of acting to the statutory scheme. When Congress amended Section 612(a) to its current phrasing in 1942, for example, the House Report explained that "the amendment makes it unlawful for an agent of a foreign principal to act without filing a required registration statement."  H.R. Rep. No. 1547, 77th Cong., 1st Sess. 3 (1941).  The Report further explained that the amendment enhanced FARA's effectiveness by ensuring that venue for criminal prosecutions would lie not only in the district where registration is required, but "in any district wherein an agent of a foreign principal acts without having" registered.  *Id.*  By tying venue to the place where an unregistered agent acts, Congress signaled its view that such action is among the "essential conduct elements" of the crime, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999), which are what determine venue as a constitutional matter.  *See id.*; *United States v. Anderson*, 328 U.S. 699, 703 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.").

The D.C. Circuit's decision in *McGoff*, cited by Manafort (Doc. 237 at 5), further underscores the essential role of an agent's acts in the FARA offense.  While Manafort quotes the court's observation that FARA "criminalizes the willful failure to comply with the information production requirements," 831 F.2d at 1075, he does not mention the D.C. Circuit's holding in the case—namely, that the statute of limitations for a FARA registration offense runs from "the last day that an unregistered foreign agent *acts* on behalf of the foreign principal."  *Id.* at 1071 (emphasis added).  *McGoff* thus confirms that action by the agent not only triggers the duty to register in the first place and fixes venue for prosecuting a FARA registration offense; it also starts the running of the limitations period.

15

**C.**     In addition to misconstruing FARA, Manafort's argument fails to account for Congress's decision to make FARA a money laundering predicate.  As noted above, p. 3, *supra*, Congress added FARA as a specified unlawful activity in a portion of the USA PATRIOT Act of 2001 entitled "inclusion of foreign corruption offenses as money laundering crimes."  Pub. L. No. 107-56, tit. III, § 315, 115 Stat. 272, 308–309 (2001).  The relevant committee report explained that the legislation "enlarge[d] the list of foreign crimes that can lead to money laundering prosecutions in this country *when the proceeds* . . . are laundered in the United States," and that it was "intend[ed] . . . to send a strong signal that the United States will not tolerate the use of its financial institutions for the purpose of *laundering the proceeds* of such activities."  H.R. Rep. No. 250(I), 107th Cong., 1st Sess. 55 (Oct. 17, 2001) (emphases added); *cf. United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 10 (D.D.C. 2008) (quoting same language in House Report).  This language reflects that Congress added FARA alongside other foreign-focused offenses that it understood to generate proceeds capable of being laundered through U.S. financial institutions—that is, that Congress understood FARA not only as an offense capable of being promoted through the flow of money into the United States, but one that would itself generate proceeds subject to downstream laundering.

Manafort's position runs against the grain of that congressional expectation.  Indeed, if his further suggestion that FARA is a crime of omission categorically incapable of being promoted through financial transactions were accepted (Doc. 237 at 8), then Congress would have accomplished nothing when it added FARA as a specified unlawful activity in 2001.  This Court should avoid a construction of the money laundering statute that would risk rendering Congress's considered decision a nullity.  *See, e.g.*, *Taylor v. United States*, 495 U.S. 575, 594 (1990) (rejecting interpretation that "would come close to nullifying [a] term's effect in the statute").

16

**D.**   In any event, even if Manafort's understanding of a FARA offense were correct, it would still not demonstrate that FARA violations are categorically incapable of generating proceeds.   In particular, Manafort overlooks the possibility that a party "acting as an agent of a foreign principal" may well be paid not simply to serve as such an agent but specifically to do so without registering—that is, to "willfully fail[] to provide information to the government" that is required under FARA.   *See* Doc. 237 at 11.   Likewise, an agent could be hired (and paid) to do a foreign principal's bidding on the understanding that the agent will register with the Attorney General but will misrepresent the nature or extent of its activities on behalf of the foreign principal. *Cf.* 18 U.S.C. § 618(a)(2) (criminalizing false statements in or material omissions from documents furnished to the Attorney General under FARA).   Payments that the agent received in either scenario—for bypassing FARA registration entirely or misrepresenting the nature of the activities conducted—would fall comfortably within the definition of "proceeds."   *See* 18 U.S.C. § 1956(c)(9) ("'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity").   For this reason as well, Manafort's motion to dismiss the second object of the conspiracy should be denied even if his description of the FARA offense were accurate.

**E.**   Finally, Manafort points out (Doc. 237 at 9) that the substantive theory of money laundering set forth in Paragraph ¶ 41(b) of the Indictment—that is, conducting transactions involving proceeds of specified unlawful activity to achieve certain prohibited ends—requires a specific temporal sequence, in that the FARA offense must have generated proceeds that then became the subject of subsequent transactions.   *Cf. United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir.) ("[P]redicate offenses must produce proceeds before anyone can launder those

proceeds."), *cert. denied*, 525 U.S. 1056 (1998).  The Indictment, however, satisfies that require-

ment.  It alleges that Manafort began engaging in his "multi-million dollar lobbying campaign" as

an unregistered agent of Ukraine in 2006, *see* Indictment ¶¶ 1, 20, and Count Three specifically

charges that Manafort violated FARA as early as 2008, *id.* ¶ 43.   The financial transactions

involving the proceeds of that offense, in turn, are alleged to have taken place between "2008 and

2014."  *See id.* ¶¶ 15–16. The allegations relevant to Paragraph 41(b) thus follow the time sequence

that Manafort notes—*i.e.*, the FARA offense generated proceeds that could then be "subsequently

laundered," Doc. 237 at 12.   Whether Manafort conspired to engage in such transactions with the

requisite "improper intent" (*id.* at 11) is a question for the jury to resolve at trial.

### III.  The Forfeiture Allegation Is Valid

In addition to seeking dismissal of Count Two, Manafort urges (Doc. 237 at 12–13) the

Court to strike the forfeiture allegation from the Indictment (¶¶ 48–50).  The Court should reject

that request.  Manafort's argument rests exclusively on the premises that (1) Count Two fails to

state the offense of money laundering conspiracy and (2) the FARA offenses charged in Counts

Three and Four are incapable, as a matter of law, of generating proceeds.  As explained above,

however, both of those premises are flawed:  Count Two validly charges Manafort with money

laundering conspiracy under 18 U.S.C. § 1956(h), and the FARA offense in Count Three can

generate proceeds, as Congress contemplated when it added FARA as a specified unlawful activity

in 2001.[5]  Manafort's motion to strike the forfeiture allegation associated with those counts, and

to release property already restrained based on that allegation, should therefore be denied.

---

[5] Because these counts (Two and Three) are sufficient to sustain the forfeiture allegation, and because the Count Two conspiracy does not depend on the FARA false-statements offense charged in Count Four, the Court need not address here whether that offense is independently capable of generating proceeds.

**CONCLUSION**

For the foregoing reasons, Manafort's motion to dismiss Count Two and strike the forfeiture allegation (Doc. 237) should be denied.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: April 4, 2018               By: */s/ Andrew Weissmann*
                                   Andrew Weissmann
                                   Greg D. Andres (D.D.C. Bar No. 459221)
                                   Kyle R. Freeny
                                   Scott A.C. Meisler
                                   U.S. Department of Justice
                                   Special Counsel's Office
                                   950 Pennsylvania Avenue NW
                                   Washington, D.C. 20530
                                   Telephone: (202) 616-0800

                                   *Attorneys for the United States of America*