UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 17-201-01 (ABJ) |
| PAUL J. MANAFORT, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT PAUL J. MANAFORT, JR.'S MOTION TO SUPRESS EVIDENCE AND ALL FRUITS THEREOF RELATING TO THE GOVERNMENT'S SEARCH OF THE STORAGE UNIT LOCATED IN ALEXANDRIA, VIRGINIA**

Defendant Paul J. Manafort, Jr., by and through counsel, hereby moves the Court pursuant to Rules 12(b)(3)(C) and 41(h) of the Federal Rules of Criminal Procedure to suppress evidence obtained by the government pursuant to a search warrant issued by a magistrate judge in the Eastern District of Virginia on May 27, 2017, for the storage unit located in Alexandria, Virginia (the "Search Warrant," attached hereto as Exhibit A) because: (1) the warrantless initial search of the storage unit for information that the FBI then used to obtain the Search Warrant violated the Fourth Amendment; (2) the Search Warrant was an overbroad general warrant that improperly gave federal agents *carte blanche* to indiscriminately seize property contained within the storage unit in violation of Mr. Manafort's Fourth Amendment rights; and (3) the agents who executed the search exceeded the warrant's search parameters in violation of the Fourth Amendment.[1]

---

[1] The warrant is also invalid because the FBI agents who sought and executed the warrant acted pursuant to Acting Attorney General Rosenstein's invalid grant of authority to the Special Counsel, as set forth in his Motion to Dismiss (Dkt. No. 235). As the Supreme Court has recognized,

> where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief.

Accordingly, the evidence obtained from the government's search of the storage unit should be suppressed. Moreover, because other search warrants later obtained by the government incorporated the fruits of the illegal search of the storage unit, all evidence obtained from those warrants must also be suppressed.[2]

## I. FACTS

On May 27, 2017, the FBI executed the Search Warrant for the storage unit and seized nine categories of documents and binders from it. It was not, however, the first time that the FBI had searched the storage unit. The day before, May 26, 2017, an FBI Special Agent (the "FBI Agent") conducted a warrantless search of the storage unit after obtaining "consent" to do so from a former low-level employee of Davis Manafort Partners, Inc. ("DMP"). During the time that he was employed by DMP, the former employee's responsibilities involved carrying out low-level administrative functions. He had no actual authority to allow the FBI Agent into the premises, as an experienced law enforcement officer must have known. The FBI Agent clearly recognized this, because he did not open any of the containers stored within the premises at that time. Instead, the FBI Agent entered and observed a number of boxes and a filing cabinet inside the premises, as well as some writing on the sides of some boxes. He then left the storage facility. The next day, the FBI Agent prepared and signed an Affidavit in Support of an Application for a Search Warrant (the "FBI Affidavit," attached hereto as Exhibit B). In his affidavit, the FBI Agent used the information he had obtained during his warrantless search to argue in support of probable cause for a warrant to search the storage unit and seize documents from it. When a magistrate judge

---

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949).

[2] For example, the search warrant affidavit submitted with the government's application for a warrant to search Mr. Manafort's residence incorporated evidence obtained from the FBI Agent's warrantless initial search of the storage unit.

sitting in the Eastern District of Virginia issued the Search Warrant the following day, the FBI

Agent's end-run around the Fourth Amendment was complete.  The Search Warrant was executed

less than an hour after it was issued, and the FBI seized virtually every document contained within

the storage unit.

## II.    DISCUSSION

### A.  The FBI's warrantless search of the storage unit violated the Fourth Amendment

#### 1.  Neither Mr. Manafort nor any other authorized person consented to the warrantless initial search of the storage unit

As the FBI Affidavit makes plain, the storage unit contained business records belonging to

Mr. Manafort or businesses associated with him.  (*See* FBI Aff.  ¶¶ 28, 30 (describing "office files

of Manafort's business" and "more recent office files of Manafort's business").)  Mr. Manafort

maintained a reasonable expectation of privacy in the storage unit, which had been locked (*see id.*

¶ 30), and the FBI Agent's intrusion into the premises prior to obtaining a valid search warrant

constituted a search within the meaning of the Fourth Amendment.  *See, e.g.*, *Garcia v. Dykstra*,

260 Fed. App'x 887, 897 (6th Cir. 2008).  In *Garcia*, the court determined that law enforcement

intrusion into a locked storage unit constituted a search, reasoning:

> [a]lthough an individual may not maintain a legitimate expectation
> of privacy in the lock on a door on the theory that a lock exposed to
> a public hallway is available to testing by anyone, he may
> reasonably expect that the contents of a closed, locked storage unit
> within a gated storage complex will remain free from public
> inspection.

*Id.*

Of course, a warrantless search is "the quintessential intrusion and is presumptively

unreasonable."  *United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014).  "Even if supported

by probable cause, warrantless searches are 'per se unreasonable under the Fourth Amendment –

subject only to a few specifically established and well-delineated exceptions.'"  *United States v.*

*McEachin*, 670 F.2d 1139, 1144 (D.C. Cir. 1981) (quoting *United States v. McClinnhan*, 660 F.2d 500, 503 (D.C. Cir. 1981)).  Accordingly, unless an exception to the presumptive rule applies, the initial search conducted by the FBI Agent – prior to seeking judicial authorization to search the storage unit – was unlawful.

In this case, the sole applicable exception to the rule stated above would be third-party consent.  *See generally United States v. Matlock*, 415 U.S. 164 (1974).  In an effort to use the evidence ultimately seized from the storage unit – *after* the FBI Agent used information gleaned from his warrantless search to obtain the Search Warrant – against Mr. Manafort at trial, the Special Counsel must rebut the presumption of unreasonableness by arguing that the former employee had legal authority to permit the FBI Agent to enter the storage unit and that he consented to the search. But the former employee had no such authority, and the FBI Agent knew it.

The Search Warrant was fundamentally flawed from the outset because the FBI Agent knew when he conducted the warrantless search of the storage unit that he had not obtained valid consent to do so.  The *former* DMP employee had no authority to consent to a search of DMP's property.  Because the initial warrantless search violated the Fourth Amendment and formed the basis for the government's subsequent application for a warrant to search that storage unit and seize its contents, the Search Warrant should have never been issued, and all evidence that the government obtained from the FBI's second search of the premises, and the fruits thereof, should be suppressed.  *See generally Wong Son v. United States*, 371 U.S. 471 (1963); *United States v. Holmes*, 505 F.3d 1288 (D.C. Cir. 2007).

## 2.  The former employee had no actual or apparent authority to consent to the initial search

An agent acts with actual authority only when he reasonably believes, *in accordance with the principal's manifestations to the agent,* that the principal wishes the agent so to act." *A-J*

*Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 175–76 (D.D.C. 2011) (quoting Restatement (Third) of Agency: Actual Authority § 2.01 (2006) (emphasis in original)). "Actual authority can be created expressly or by implication through 'written or spoken words or other conduct of the principal, which reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" *Id.* (quoting *Evans v. Skinner*, 742 F. Supp. 30, 32 (D.D.C. 1990)).

In this case, when considering the question of actual authority, the relevant analysis rests on the former employee's state of mind – *i.e.*, what he *reasonably understood* the authority Mr. Manafort vested in him to be (or not to be) – *not* on what the FBI Agent may have *believed* from the face of the lease agreement. Here, the former employee was named as an occupant on the lease agreement simply for administrative convenience and only because he happened to be the DMP employee tasked with setting up the storage lease on DMP's behalf and moving DMP's business records into the unit. This is bolstered by the fact that the former employee's DMP email address was listed on the lease agreement and the fact that Mr. Manafort appears on the agreement as the *only person* with authorized access to the storage unit. As the FBI Agent knew, the former employee's primary responsibilities at DMP were performing ministerial "functions for Manafort and his companies *as directed by Manafort*." (*See* FBI Aff. ¶ 28) (emphasis supplied). It was clear to the former employee and others at DMP that he had no authority to enter the storage unit for any reason *absent prior express permission from Mr. Manafort*. On no occasion did Mr. Manafort do or say anything that manifested an express or implied desire to allow the former employee to consent to a law enforcement search of the premises for DMP's records. Put simply, he did not have actual authority in connection with the storage unit and did not have the actual authority to consent to the FBI Agent's search.

Alternatively, a person with apparent authority may authorize a search, provided that law enforcement reasonably believes that the person is authorized to do so.  *See United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014) ("Even a person who does not *actually* use the property can authorize a search if it is reasonable for the police to believe she uses it," and "[s]uch 'apparent authority' is sufficient to sustain a search" provided "that officers' factual determinations in such situations are reasonable.")   (citation omitted; emphasis in original).  However, "[a]pparent authority ends when it is no longer reasonable for the third party with whom an agent deals to believe that the agent continues to act with actual authority."   Restatement (Third) of Agency: Termination of Apparent Authority § 3.11(2) (2006).   As the District of Columbia Court of Appeals has explained (in answering a certified question from the Circuit Court of Appeals for the District of Columbia), "apparent authority depends upon the *principal's manifestations to the third party*[.]"  *Makins v. D.C.*, 861 A.2d 590, 594 (D.C. 2004) (emphasis added).

Here, Mr. Manafort never expressed anything to the FBI Agent with regard to what the former employee was authorized to do (or not to do).  Mr. Manafort and the FBI Agent have never communicated with each other.  Second, the FBI Agent stated in his affidavit that he accompanied the former employee to the storage facility and that, after they arrived, he reviewed a copy of the lease agreement that identified the former employee as the storage unit's occupant.  (*See* FBI Aff. ¶ 29.)  But the FBI Agent also acknowledges that he knew that that the former employee was no longer employed by DMP.  (*See id.* ¶ 28 ("your Affiant met with [him], a *former employee* of [DMP.]") (emphasis added).)  It was entirely unreasonable for the FBI Agent to have believed at the time he visited the storage facility with the former employee that the *former* DMP employee had the authority to consent to a search of the storage unit for DMP records.  Lastly, the FBI Agent knew that the premises contained Mr. Manafort's – *not* the former employee's – business records,

6

(*see id.*), rendering any belief by the FBI Agent that the former employee had authority to consent to a search of the storage unit unreasonable.

That is, once the FBI Agent knew that the former employee could not legally enter the storage unit without Mr. Manafort's direction and consent, the FBI Agent knew that the former employee had no actual or apparent authority to do so.   In *United States v. Corral*, 339 F. Supp. 2d 781 (W.D. Tex. 2004), the court suppressed evidence seized from a home where the purported consent to a warrantless search came from a part-time domestic housekeeper. *Id.* at 799.   Prior to the search, the housekeeper told federal agents that she was in charge of the homeowner's child when the homeowner was absent and that the homeowner allowed her to clean (and thereby access) the entire premises on a regular basis. *Id.* at 785-86.   The court reasoned that these "minimal facts" had been insufficient to provide a basis for the agents to reasonably believe that the housekeeper had apparent authority to consent to a search of the home.   *Id.* at 796.   In *Boyer v. Peterson*, 221 F. Supp. 3d 943 (W.D. Mich. 2016), the court concluded that a spouse did not have apparent authority to consent to a search of a home despite being a co-owner of the property where the spouse was no longer a co-occupant of the home, a fact known to the police at the time of the search. *Id.* at 957.   The court noted that the searching officer's reliance on the spouse "as the 'owner' and 'deed-holder' was not sufficient to conclude that the spouse had 'actual' or 'apparent' authority over the residence" because "[a] third-party's 'common authority' is not synonymous with a technical property interest.") *Id.* (quoting *Georgia v. Randolph*, 547 U.S. 103, 110 (2006)). In *United States v. Toan Phuong Nghe*, 925 F. Supp. 2d 1142 (W.D. Wash. 2013), the court held that it was unreasonable for police officers to conduct a warrantless search of a hotel room despite the fact that the hotel manager had consented to the search, because the manager did not have

apparent authority to consent to the search even though he had given the officers a key to the hotel room.  *Id.* at 1147.

In this case, the FBI Agent overstepped the confines of the Fourth Amendment, and any reliance by the government on the concept of apparent authority is misplaced.  Although the former employee retained a key to a storage unit that contained DMP's property and papers, he was no longer a DMP employee, and the FBI Agent knew this.  The mere fact that the former employee still appeared on the lease agreement did not confer on him the apparent authority to consent to a search of the unit under the facts then and there known by the FBI Agent.  Just as in *Boyer*, *supra*, a technical property interest is not the same as having actual or apparent authority over the premises to be searched.  For these reasons, the Court should conclude that the former employee had neither actual nor apparent authority to allow the FBI Agent to conduct the warrantless initial search of the storage unit.

### 3.  The former employee had no "common authority" to consent to the FBI Agent's initial search

Absent actual or apparent authority, only persons with "'common authority over … the premises'" may consent to a search of that premises.  *United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014) (quoting *Matlock*, 415 U.S. at 171).  Common authority (a concept often intertwined with the concept of apparent authority, *supra*,) is narrowly defined as:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 552 (quoting *Matlock*, 415 U.S. at 171 n.7).  The burden of establishing common authority with regard to third-party consent to search property rests with the government.  *See Illinois v. Rodriguez*, 497 U.S. 177, 181–82 (1990).

*Peyton* is instructive.  There, the defendant shared a small apartment with his great-great-grandmother (the "co-occupant"); she lived in the bedroom area while the defendant slept and kept his personal property in the apartment's living room.  745 F.3d at 549.  The police had been to the apartment previously when they conducted a search pursuant to a warrant.  On the occasion at issue, however, the officers decided to proceed to the apartment without a warrant when they knew that the defendant would not be there with the express hope that the co-occupant would consent to a search.  *Id.*  When the police arrived at the apartment they explained to the co-occupant that they believed that there might be drugs inside the apartment and obtained her written consent to search the entire apartment.  *Id.*  As the officers approached the bed in the living room, however, the co-occupant stated that the defendant kept his personal belongings in that area.  *Id.*  Nevertheless, an officer observed a closed shoebox near the bed, opened it, and discovered illegal narcotics.  *Id.*  The defendant was subsequently indicted for possession with intent to distribute crack cocaine.  *Id.* at 550.

The Court of Appeals held that the co-occupant lacked common authority in connection with the shoebox, despite the fact that it was located in the apartment that she shared with the defendant and that the defendant had made no attempt to hide the shoebox.  *Id.* at 553-54.  The court further noted that it should have been clear to the police that the shoebox contained personal property and that the defendant's co-occupant did not have permission to use the shoebox herself.  *Id.*  More specifically, the court held that common authority to consent to a search is applicable only where "it is reasonable for the police to believe" that a person using the property has actual authority to consent to a search of that property.  *Id.* (citing *Rodriguez*, 497 U.S. at 186).  The court explained that the scope of the common authority principal is limited because "[t]he fact that a person has common authority over a house, an apartment, or a particular room, does not mean that

she can authorize a search of anything and everything within that area." *Id.* Thus, while common authority may be sufficient to allow officers to search a "common area" and "extends to most objects in plain view, it does not automatically extend to the interiors of every enclosed space within the area." *Id.* (quoting *Donovan v. A.A. Beiro Construction Co.*, 746 F.2d 894, 901-02 (D.C. Cir. 1984)). Critically, the court further explained that "[a]pparent authority does not exist *where it is uncertain* that the property is in fact subject to mutual use." *Id.* at 554 (footnote omitted; emphasis added).

Based on his sworn affidavit, the FBI Agent could not have proceeded with any degree of certitude that the former employee and Mr. Manafort mutually used the storage unit after he learned that he was no longer an employee of DMP. Nothing that the former employee purportedly stated to the FBI Agent can be construed as an indication that he ever shared use of the storage unit with Mr. Manafort. Rather, the FBI Affidavit makes it abundantly clear that the storage unit was used exclusively for the storage of Mr. Manafort's business records and that it did not contain any property that belonged to the former employee. Indeed, the FBI Affidavit states that the former employee described the contents of the premises as the "office files of Manafort's business" (FBI Aff. ¶ 28) as well as "additional, more recent office files of Manafort's business[.]" (*Id.* ¶ 30.) In fact, the former employee was unable to provide the FBI Agent with a description of the contents of the filing cabinet stored in the premises but stated that he would put "brown, legal-sized files" into the cabinet at Mr. Manafort's direction. (*Id.*) He also explained to the FBI Agent that the filing cabinet stored inside the premises had come from Mr. Manafort's former residence. (*Id.*) Not once in his affidavit does the FBI Agent identify a single item of property that belonged to the former employee and that was contained, or might have been contained, within the storage unit. In short, *nothing* that he stated to the FBI Agent when he described the contents of the storage unit

could have caused the FBI Agent to reasonably believe that the unit was a space that Mr. Manafort and the former employee mutually shared.  Thus, the FBI Agent had no legitimate basis to reasonably believe that the former employee had common authority to consent to the warrantless initial search of the storage unit.

Indeed, the fact that the FBI Agent knew that the former employee had no true authority to consent to a search of the storage unit is revealed by the steps the FBI Agent took once he gained initial access to the unit.  Rather than conducting a search and seizure based on a belief that the former employee had authority to consent to such a search – which the law would have clearly permitted in the case of a valid and voluntary consent – the FBI Agent took care not to open any of the boxes or the filing cabinet that he observed inside the unit.  (*See id.* ¶ 31.)  Instead, the FBI Agent completed his initial search, left the storage facility, returned to his office, and drafted the search warrant affidavit to establish probable cause to conduct the second search of the premises.  Had the FBI Agent truly believed that the former employee had the authority to consent to the initial search, there would have been no reason for the FBI Agent to apply for a search warrant to allow him to search the storage unit a second time.

### 4.  Suppression is the appropriate remedy for the warrantless initial search

The appropriate remedy here is suppression of all evidence seized by the government from the premises and the fruits thereof.  *See United States v. Holmes*, 505 F.3d 1288 (D.C. Cir. 2007).  In *Holmes*, police officers chased down and apprehended a defendant who had fled immediately upon seeing the officers approach him.  *Id.* at 1290.  During the course of conducting a routine pat down, one of the officers felt a set of car keys in the defendant's pants and removed them.  *Id.*  The officer subsequently used the suspect's car key to enter the suspect's vehicle, where the officer discovered a handgun.  *Id.* at 1291.  After the defendant's motion to suppress was denied, the

handgun was admitted as evidence at the defendant's trial, which resulted in his conviction for unlawful possession of a firearm. *Id.* at 1291-92.

The Court of Appeals reversed. *Id.* at 1295-96. The court reasoned that the search and seizure of the defendant's keys from inside his pocket exceeded the scope of a protective frisk and, thus, a warrant should have been obtained prior to searching the pocket and seizing its contents. *Id.* at 1292. The court explained that illegally obtained evidence must be suppressed where a defendant "make[s] a *prima facie* showing of a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress[]" *id.* (citing *United States v. Crews*, 445 U.S. 463, 471 (1980)), unless the government can establish that the evidence would have been inevitably discovered, that it would have been discovered through independent means, or attenuation of the taint. *Id.* at 1293.

Here, the nexus between the government's violation of the Fourth Amendment and the evidence it obtained from the initial search is clear. But for the impermissible warrantless initial search of the storage unit, the FBI Agent would have had very little specific knowledge of its contents. Therefore, the FBI Agent would not have been in a position to swear out an affidavit to establish probable cause for a warrant to search the storage unit, the Search Warrant would have never been issued, and the materials would have never been seized. There is no basis here for the government to argue the concepts of inevitable discovery, or discovery by independent means, nor is there a factual basis to argue that any subsequent action purged the taint of the warrantless initial search. Accordingly, all evidence that the government seized from the storage unit must be suppressed.

### 5.  The Court should hold a hearing as to whether the former employee's purported consent to the initial search of the storage unit was voluntary

"The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and 'voluntariness is a question of fact to be determined from all the circumstances.'"  *United States v. Glover*, 583 F. Supp. 2d 5, 18 (D.D.C. 2008) (quoting *Ohio v. Robinette*, 519 U.S. 33, 40 (1996)).  The burden lies with the government to establish that consent was freely and voluntarily given.  *Id.*  The Supreme Court has cautioned that the question of whether consent was free and voluntary requires the "most careful scrutiny" to deter "the possibility of official coercion", therefore, "account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973).

As discussed above, the FBI Agent's Affidavit avers that the former employee consented to the FBI's warrantless initial search of Unit 3013 on May 26, 2017.  This consent must be considered invalid, however, unless the government carries its burden of proving at a hearing that it was voluntarily given.  *Schneckloth*, 412 U.S. at 222.  The test for voluntariness is based on all the facts and circumstances, including a claim by agents that they have authority to make the search even without consent; a show of force or other coercive surroundings; a threat to seek or obtain a search warrant; prior illegal action by agents; and agents having given a warning of one's right not to consent.  Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 8.2 (5th ed.).  Other factors include the person's age, education, and emotional state.  *Schneckloth*, 412 U.S. at 226.  The FBI Affidavit provides no indication of the facts and circumstances of the former employee's purported consent.  The government, therefore, must prove the validity of his consent at a hearing.

**B.  The Search Warrant was unconstitutionally overbroad**

**1.   The Search Warrant was an impermissible "all documents" warrant**

Even if the Search Warrant was not invalid in light of the FBI's warrantless search, it was fatally overbroad in scope because it allowed the searching agents to indiscriminately seize everything from the storage unit.  The Fourth Amendment simply does not permit the warrant that was issued in this case, which was essentially a general warrant for "any and all" documents without any temporal limitation.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  The purpose of the Fourth Amendment's warrant clause is to ensure that "those searches deemed necessary should be as limited as possible."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

"[T]he specific evil" in this case "is the 'general warrant' abhorred by the colonists, and the problem is not the intrusion per se, but of a general, exploratory rummaging in a person's belongings."  *Coolidge*, 403 U.S. at 467; *see also Arizona v. Grant*, 556 U.S. 332, 345 (2009) ("[T]he central concern underlying the Fourth Amendment [is] the concern about giving police officers unbridled discretion to rummage at will among a person's private effects.").  The Constitution limits law enforcement's rights to search only "the specific areas and things for which there is probable cause to search," and requires that "that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  For these reasons,

the Fourth Amendment requires that search warrants "'particularly describ[e] the place to be searched, and the persons or things to be seized," which operates to "prevent[ ] the seizure of one thing under a warrant describing another.'"  *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016) (quoting *Marron v. United States*, 275 U.S. 192, 195–96 (1927)).

The Search Warrant here fell short of the constitutional requirements set out above.  The Search Warrant directed the seizure of, *inter alia*, "*[a]ny and all* financial records" related to Mr. Manafort or any companies associated with him, (*see* Search Warrant, Attachment B, ¶ 1a. (emphasis added)), "*[a]ny and all* federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules" (*id.* ¶ 1b. (emphasis added)), all communications related to "*any* foreign financial institution," (*id.* ¶ 1b[3]. (emphasis added)), "*[a]ny and all* correspondence, communication, memorandum or record of *any kind* relating to" Mr. Manafort's work, (*id.* ¶ 1c. (emphases added)), "*any and all* daily planners, logs, calendars, schedule books", (*id.* ¶ 1g. (emphasis added)), and "[c]omputers or storage media" that the executing agents were apparently able to recognize during their search had been used in connection with the offenses under investigation, (*id.* ¶ 2.)

The Search Warrant functioned as a general warrant that improperly authorized an unfettered search and the wholesale seizure of virtually every document contained within the storage unit.  The Search Warrant violated the core purpose of the particularity requirement "to protect against the centuries-old fear of general searches and seizures."  *United States v. Heldt*, 668 F.2d 1238, 1257 (D.C. Cir. 1981).  As the Court of Appeals recently observed, this is especially true where law enforcement agents are not seeking illegal contraband, but are instead searching for and seizing purely innocuous items such as documents or electronic devices.  *See United States*

---

[3] Attachment B to the Search Warrant contains two sections labeled "1b.".

*v. Griffith*, 867 F.3d 1265, 1276 (D.C. Cir. 2017) (finding warrant that permitted seizure of "all electronic devices" unconstitutionally overbroad).

    **2.  The Search Warrant for the storage unit bore no temporal limitation in violation of the Fourth Amendment.**

For a search warrant to be valid, it must provide the executing agents with guidance as to the time frame for which the agents are to seize evidence.  In other words, if the government is investigating potential offenses for the years 2006 through 2017, then the search warrant must limit agents to searching for and seizing evidence that relates to offenses for those years only.  The Search Warrant lacked any temporal limitation at all, making it impermissibly broad and leaving the decision of what to seize to the discretion of the agents in violation of the Fourth Amendment.

The Fourth Amendment requires that "those searches deemed necessary should be as limited as possible."  *Coolidge*, 403 U.S. at 467.  "Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad." *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999).  The dates were manifestly available to the agents in this case.  Indeed, the other warrants that the government executed in this case explicitly prohibited the agents from seizing evidence relating to anything other than offenses "occurring on or after January 1, 2006."  The warrant's descriptive terms, unbound by any temporal limitation, were impermissibly broad by their own right, authorizing the seizure of "[a]ny and all financial records for Paul Manafort, Richard Gates or companies associated with Paul Manafort or Richard Gates."  (Search Warrant, Attachment B ¶ 1a.)  As noted, a warrant that authorizes the seizure of any and all financial records of the targets of the investigation for any and all years is a general warrant that is repugnant to the Fourth Amendment.

Federal courts have repeatedly pointed to the absence of a temporal limitation as an indicator of a warrant's unconstitutional overbreadth.  *See, e.g.*, *United States v. Blake*, 868 F.3d

960, 974 (11th Cir. 2017) ("[T]he warrants should have requested data only from the period of time during which Moore was suspected of taking part in the prostitution conspiracy."); *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 84 (2d Cir. 2016) ("Nor does the warrant place any temporal limit on the property to be seized."); *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) (finding a search warrant valid in part because it was restricted to a fixed time period); *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006) (invalidating a warrant that was limited to a six-year period on the ground that probable cause only supported the seizure of evidence pertaining to a three-month period); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) (finding one factor in the overbreadth analysis to be the government's failure to "limit the scope of the seizure to a time frame within which the suspected criminal activity took place, even though [the] affidavit indicates that the alleged criminal activity began relatively late in [the business's] existence."); *United States v. Leary*, 846 F.2d 592, 604 (10th Cir. 1988) (warrant impermissibly failed to limit itself to the "specific period of time coincident to the suspect transaction"); *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980) (finding warrant overbroad in part because it contained "no limitation as to time").

According to his affidavit, during the warrantless initial search the FBI Agent observed file boxes bearing dates going back 30 years, (*see* FBI Aff. ¶ 36), demonstrating that the government knew that the storage unit contained materials predating the years under investigation by *more than two decades*.  Despite this, nothing in the Search Warrant limited the agents' seizure of materials based on their temporal relevance to the Special Counsel's investigation.  With this temporally-unbounded warrant in hand, the agents did not need to spend any time determining which materials were relevant to the years under investigation.  Indeed, the magistrate judge signed

the Search Warrant at 4:47 p.m., (*see* Search Warrant), and the agents had completed their search

and seizure by 5:20 p.m. (*see* Search Warrant Return).

The FBI Affidavit cannot save this defective warrant.  The Supreme Court has made clear

that the Fourth Amendment's particularity requirements must be satisfied "in the warrant, *not in

the supporting documents*."  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (emphasis added).  A

court may only "construe a warrant with reference to a supporting application or affidavit if the

warrant uses appropriate words of incorporation, and if the supporting document accompanies the

warrant." *Id*. at 557–58.  The Court of Appeals has recently explained that it will "read warrants

by reference to an affidavit, [but], only if the issuing judge uses explicit words on the warrant

indicating an intention to incorporate the affidavit's contents and thereby limit [the warrant's]

scope." *Griffith*, 867 F.3d 1265 at 1277.  Here, the Search Warrant in no way incorporated the

FBI Affidavit, rendering it a general warrant for all financial documents covering any time period.

**C. The executing agents improperly seized materials beyond the warrant's scope and
    returned a search inventory so general as to violate the requirement of an inventory**

Even where the particularity requirement is satisfied – and here it was not – "the search

itself must be conducted in a reasonable manner, appropriately limited to the scope and intensity

called for by the warrant." *Heldt*, 668 F.2d at 1256 (citation and footnotes omitted).  As the court

in *Heldt* further explained:

> When investigators fail to limit themselves to the particulars in the
> warrant, both the particularity requirement and the probable cause
> requirement are drained of all significance as restraining
> mechanisms, and the warrant limitation becomes a practical nullity.
> Obedience to the particularity requirement both in drafting and
> executing a search warrant is therefore essential to protect against
> the centuries-old fear of general searches and seizures.

*Id.* at 1257.  In light of these principals, "the Fourth Amendment confines an officer executing a

search warrant strictly within the bounds set by the warrant[.]" *Id.* at 1260 (quoting *Bivens v. Six*

*Unknown Named Agents*, 403 U.S. 388, 394 n.7 (1971)).   Therefore, "in general, only items particularly mentioned in the warrant may be seized."   *Id.* at 1268 (collecting cases).

The agents that executed the Search Warrant in this case ran afoul of the above principles and seized virtually everything from the premises.   This is clear from the Search Warrant Return inventory, which simply lists nine groups of unidentified "documents" seized by the agent (with the exception of line item #1, which lists a group of unidentified "documents and binders").   (*See* Search Warrant Return.)   Accordingly, the searching agents improperly seized everything contained within the storage unit, without regard for which "documents" and "binders" they were authorized, or not authorized, to take.

In addition, Rule 41 of Federal Rules of Criminal Procedure sets forth procedures that the government must follow when seeking and executing search and seizure warrants.   After executing a search warrant, "[a]n officer present during the execution of the warrant must prepare and verify an inventory of any property seized."   Fed. R. Crim. P. 41(f).   As noted above, after searching the premises, the agents prepared a document that purported to be an inventory but which was instead a perfunctory statement that the FBI seized "documents" and "documents and binders."   This description fails entirely to inform either "the person from whom, or from whose premises, the property was taken," or the Court what the agents seized.   *Id.*

Courts analyze alleged violations of Rule 41 by first considering if the Rule was in fact violated and, if it was, determining whether the violation rose to a violation of the Fourth Amendment.   *See United States v. Krueger*, 809 F.3d 1109, 1113 (10th Cir. 2015).   Here, the purported inventory was so devoid of description as to be a violation of Rule 41.

A search and seizure that leaves the subject without a reasonable description of what was seized is an unreasonable search and seizure in violation of the Fourth Amendment and requires suppression of the fruits of the seizure.  In the alternative, if a court

> determine[s] that the Rule 41 violation is not of constitutional import, [it] then consider[s] whether the defendant can establish that, as a result of the Rule violation, (1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*Krueger*, 809 F.3d at 1114.  Here, the inventory is so bare as to rise to the level of an intentional and deliberate disregard of Rule 41, and thus suppression is warranted.

### D.  All evidence seized from the storage unit should be suppressed

Evidence seized in violation of the Fourth Amendment, as well as the fruits thereof, is subject to suppression.  *See Herring v. United States*, 555 U.S. 135, 139 (2009) (holding that the exclusionary rule forbids use of improperly obtained evidence at trial).  The primary purpose of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."  *United States v. Calandra*, 414 U.S. 338, 347 (1974).  *See also United States v. Johnson*, 332 F. Supp. 2d 35, 38 (D.D.C. 2004) ("The exclusionary rule bars the prosecution from using in its case-in-chief evidence obtained during a search that violated the Fourth Amendment.") (citing *United States v. Dawkins,* 17 F.3d 399, 407–08 (D.C. Cir. 1994)).

In this case, without the FBI Agent's illegal initial search, the Search Warrant in this case would have never been issued, and the evidence from the storage unit would have never been discovered.  When the Search Warrant was (improperly) issued, it was impermissibly overbroad; and even if it was sufficiently particularized, the agents ignored its scope and improperly seized virtually everything from the premises.  Accordingly, the exclusionary rule should be applied, and

the evidence from the storage unit suppressed, because the Search Warrant was fundamentally flawed from the outset, it was insufficiently particularized and, even it did not suffer these infirmities, it was executed in an impermissibly overbroad fashion.

## III.     CONCLUSION

Wherefore, Mr. Manafort respectfully moves the Court to suppress the evidence seized and all fruits of the government's search of the storage unit on the grounds stated herein.

Dated: April 6, 2018                                Respectfully submitted,

s/ Kevin M. Downing
Kevin M. Downing
(D.C. Bar No. 1013984)
Law Office of Kevin M. Downing
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 754-1992
kevindowning@kdowninglaw.com


s/ Thomas E. Zehnle
Thomas E. Zehnle
(D.C. Bar No. 415556)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 368-4668
tezehnle@gmail.com

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

MAY 2 7 2017

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

THE PREMISES LOCATED AT 370 HOLLAND LANE,
UNIT 3013, ALEXANDRIA, VA, 22314, MORE
PARTICULARLY DESCRIBED IN ATTACHMENT A

)
)
)
)
)
)

Case No.1:17-SW-    (UNDER SEAL)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 31 USC 5314, 5322 | Failure to file Foreign Bank Account Reports |
| 22 USC 618 | Violation of Foreign Agent Registration Act |
| 26 USC 7206(a) | Filing a False Tax Return |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

_____
*Applicant's signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

Date: _____ 5/27/2017 _____

*Judge's signature*

City and state: Alexandria, VA

Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA      **MAY 2 7 2017**

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH ) | Case No. 1:17-SW- 294 |
| OF THE STORAGE UNIT LOCATED AT ) | |
| 370 HOLLAND LANE, UNIT 3013, ) | |
| ALEXANDRIA, VA, 22314, ) | **(Under Seal)** |
| MORE PARTICULARLY DESCRIBED ) | |
| IN ATTACHMENT A ) | |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, ▮▮▮▮▮▮▮ being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant under

Federal Rule of Criminal Procedure 41 to search the storage unit located at 370 Holland Lane,

Unit 3013, Alexandria, Virginia 22314, which is described more particularly in Attachment A, in

order to locate and seize the items described in Attachment B.  Both Attachment A and

Attachment B are incorporated by reference as though fully set forth in this affidavit.

2.  I have been a Special Agent with the FBI since 2002.  I have received basic law

enforcement training at the FBI Academy in Quantico, Virginia.  I am currently assigned to the

FBI's International Corruption Squad in Washington, DC, where I am responsible for conducting

and assisting in investigations relating to international corruption, money laundering, violations

of the Foreign Corrupt Practices Act, and other related financial crimes.

3.  The facts in this affidavit come from my personal observations, my training and

experience, a review of documentary evidence, information provided by witnesses, and

information obtained from other law enforcement agents. This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, I submit that there is probable cause to believe that violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to File a Report of Foreign Bank and Financial Accounts), 22 U.S.C. § 618 (Foreign Agent Registration Act), and 26 U.S.C. § 7206(a) (Filing a False Tax Return), have been committed, and that there is probable cause to search the premises described in Attachment A for evidence, instrumentalities, contraband, or fruits of the crimes further described in Attachment B.



















28.    On May 26, 2017, your Affiant met with ▇▇▇▇▇▇▇▇, a former employee of

Davis Manafort Partners, and a current employee of Steam Mountain, LLC, which is a business currently operated by Paul Manafort. ▮▮▮▮ advised that he is a salaried employee of Manafort's company, and that he performs a variety of functions for Manafort and his companies as directed by Manafort. ▮▮▮▮ advised that, in approximately 2015, at the direction of Manafort, ▮▮▮▮ moved a series of office files of Manafort's business contained in boxes from one smaller storage unit at 370 Holland Lane, Alexandria, Virginia, to a larger storage unit, at the same storage facility, also at 370 Holland Lane, Alexandria, Virginia. ▮▮▮▮ advised that he personally moved the office files into Unit 3013 at that location, and that the files were still in that unit.

29.     Later on May 26, 2017, ▮▮▮▮ led your Affiant to the storage facility at 370 Holland Lane, Alexandria, Virginia, where your Affiant obtained a copy of the lease for Unit 3013 from the manager of the storage facility. The lease identifies ▮▮▮▮ as the occupant of Unit 3013, and also identifies Paul Manafort as a person with authorized access to Unit 3013. Richard Gates is listed as an alternate point of contact for the lease.

30.     ▮▮▮▮ further provided law enforcement with a key to the lock on Unit 3013 and described the contents of Unit 3013. ▮▮▮▮ advised that Unit 3013 contained several boxes of office files from Manafort's business, as well as a metal filing cabinet containing additional, more recent office files of Manafort's business. ▮▮▮▮ said he moved the filing cabinet from Manafort's former residence in Mount Vernon, Virginia, in the spring of 2015. ▮▮▮▮ indicated that Manafort was using his former residence as an office at the time. ▮▮▮▮ explained that the cabinet was extremely heavy when he moved it, indicating that it contained a large amount of records. Although ▮▮▮▮ could not describe the contents of the filing cabinet in detail, he advised that Manafort occasionally sent emails to ▮▮▮▮ directing ▮▮▮▮ to put certain records

11

into the filing cabinet on Manafort's behalf. ▬ described the records as "brown, legal-sized files." ▬ recollection is that he last added to the filing cabinet in the spring of 2016.

31.     Your Affiant obtained written consent from ▬ to search Unit 3013. ▬ then opened Unit 3013 using the key in his possession in the presence of your Affiant. Without opening any boxes or filing cabinet drawers, I observed inside the unit that there were approximately 21 bankers' boxes that could contain documents, as well as a five-drawer metal filing cabinet. None of the file drawers are marked as to their contents. Some of the boxes are unmarked, while others bear markings. For example, one of the bankers' boxes is marked on the exterior with the following:

> Box 2
> MPI
> - Legal Docs
> - Promissory Notes
> - Admin
>   o Tax Returns
>   o BOD Resolution
>   o Written Consent of Sole Manager
>   o Seiden COI Waiver
>   o Resignation Letters
>   o Certificate of Liability Insurance
>   o Director's Insurance
>   o Trade Mark
>   o Worker's Comp
>   o MPI Holdings LLC
> - Binder contains documents executed in connection with formation and
>   financing of MPI Holdings LLC

32.     Another box is marked on the exterior as follows:

> Box 5
> MPI
> - Expenses
> - Paid Bills
> - Invoices
> - Legal Complaints
> - Jules Nasso

33.     Your Affiant has determined from a search of a public records database that MPI

stand for Manhattan Productions International, a film production company, for which Manafort

is believed to be an investor.  The name suggests that the company has an international scope.

Accordingly, it is reasonable that these records may contain evidence of solicitations for and

financial transactions involving foreign persons or sources of funds.

34.     Another box is marked on the exterior as follows:

Box 12
Ukraine Binders
-       Georgia
-       Ballot Security
-       Surrogates
-       Admin
-       Research
-       RA
-       Political
-       Polling
-       PJM Political Presentation
-       Ukraine Campaign
-       Media Earned
-       Media
-       Advance and Training
-       Leader

35.     For a number of reasons set forth herein it is reasonable to believe that this

storage unit is a collection point for Manafort's and Gates's business records from their work in

Ukraine. These include that there is a box marked "Ukraine," that ▮▮▮▮▮ has advised the affiant

that he moved business records for Manafort into the storage unit, and because Manafort and

Gates—who is listed on the lease as a contact for the lessor—worked together in Ukraine.  It is

also reasonable to believe that these records and those in the filing cabinet will include financial

records for several reasons. These include, but are not limited to, IRS guidelines recommending

that persons and corporations generally retain business records for three years from filing of

13

returns for and seven years if the tax payer had certain losses or bad debts.

36.     Your affiant also saw a box marked "movie production stuff," four boxes marked "'96 convention," and three boxes marked "1979 convention," "1988 convention" and "1992 convention, respectively. Because the records go back over 30 years, I believe records relating to Manafort's and Gates's work in Ukraine, including financial records, were retained and may be contained within the storage unit.

37.     From my training and experience, I am also aware that individuals and businesses often retain copies of contracts and other business and financial records in anticipation of litigation. Public sources reveal that Manafort was sued by his former client, Oleg Deripaska, sometime in or about 2008. Therefore, it is reasonable to believe historical records have been retained by Manafort and Gates.

38.     After I accompanied [redacted] to the storage unit described in Attachment A and conducted a review of the contents without opening any box or file drawer on May 26, 2017, the unit was locked with a key. Access to the facility by leaseholders and members of the public was foreclosed by the company from 9:00 pm on May 26, 2017 until approximately 7:00 am on May 27, 2017. Law enforcement agents have surveilled the only entrance and exit to the unit since the time the unit was locked on May 26, 2017 until 9:00 pm, and beginning again at 6:30 am on May 27, 2017, before the business was open to the public or leaseholders. No one has been observed entering or leaving the unit.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.     In my training and experience, I have learned that U.S. businesses routinely generate and maintain records of correspondence and financial records on computers. For a variety of reasons, copies of historical records and current records are frequently stored on

14

external hard drives, thumb drives and magnetic disks. There is reasonable cause to believe such media may be contained in and among records of the Mananfort's and Gates's business in the storage unit.

40.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES described in Attachment A, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.[3] Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

41.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

        a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

---

[3] A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

42. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

16

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the

17

search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under

18

investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

43. *Necessity of seizing or copying entire computers or storage media.* In most cases,

a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

44.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## REQUEST FOR SEALING

45.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation, and many of the details of the investigation are not yet public. Accordingly, there is good cause to seal these documents because their premature disclosure may give subjects and witnesses an opportunity to move outside of U.S. jurisdiction or to destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation. Similarly, witnesses located abroad may take steps to compromise the investigation.

21

## CONCLUSION

46.    Based on the foregoing, I submit that this affidavit supports probable cause for a

warrant to search the PREMISES described in Attachment A and seize the items described in

Attachment B.

Respectfully submitted,

Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____ 5|27 _____, 2017

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
United States Magistrate Judge

22

## ATTACHMENT A

*Property to Be Searched*

The property to be searched is the storage unit located at 370 Holland Lane, Unit 3013, Alexandria, Virginia 22314, as well as any locked drawers, locked containers, safes, computers, electronic devices, and storage media (such as hard disks or other media that can store data), found therein. The storage unit is further described as a metal corrugated steel room with a red and white sign on the exterior with the number 3013.

1

**ATTACHMENT B**

*Property to be seized*

1.        Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to File a Report of Foreign Bank and Financial Accounts), 22 U.S.C. § 618 (Foreign Agent Registration Act), and 26 U.S.C. § 7206(a) (Filing a False Tax Return), including:

   a.  Any and all financial records for Paul Manafort, Richard Gates or companies associated with Paul Manafort or Richard Gates, including but not limited to records relating to any foreign financial accounts;

   b.  Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Richard Gates, or companies associated with Paul Manafort or Richard Gates;

   b.  Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

   c.  Any and all correspondence, communication, memorandum, or record of any kind relating to the Party of Regions, Viktor Yanukovych, the European Centre for a Modern Ukraine, or any other foreign principal of Paul Manafort or Richard Gates, or any company associated with Paul Manafort or Richard Gates;

   d.  Any and all correspondence, memorandum, press release, or documentation of any kind regarding any lobbying or advocacy performed by Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates, on behalf of the Party of Regions, Viktor Yanukovych, the European Centre for a Modern

Ukraine, or any other foreign principal of Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates.

e. Records related to, discussing, or documenting Neocom Systems, Antes Management, Yiakora Ventures, Global Highway Ltd., Global Endeavor, Leviathan Advisors, Peranova Holdings, Bletilla Ventures, Lucicle Consultants, and/or Telmar Investments, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records.

f. Records related to, discussing, or documenting the Podesta Group.

g. Any and all daily planners, logs, calendars, schedule books relating to Paul Manafort or Richard Gates.

2. Computers or storage media used as a means to commit the Target Offenses.

3. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

THE PREMISES LOCATED AT 370 HOLLAND LANE, UNIT
3013, ALEXANDRIA, VA, 22314, MORE PARTICULARLY
DESCRIBED IN ATTACHMENT A

)
)
)
)
)
)

Case No. 1:17-SW-      (UNDER SEAL)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Eastern_____ District of _____Virginia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the*
*property to be seized)*:

See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 10, 2017_____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been
established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Theresa Carroll Buchanan
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ .
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  5/27/2017   4:47 pm      _____
*Judge's signature*

City and state:    Alexandria, VA      Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>1:17-SW-    (UNDER SEAL) | Date and time warrant executed:<br>5/27/2017   1720 | Copy of warrant and inventory left with:<br>████████ (NOT PRESENT) |
| Inventory made in the presence of :<br>████████████████ | | |
| Inventory of the property taken and name of any person(s) seized: | | |

(1) DOCUMENTS AND BINDERS

(2) DOCUMENTS

(3) DOCUMENTS

(4) DOCUMENTS

(5) DOCUMENTS

(6) DOCUMENTS

(7) DOCUMENTS

(8) DOCUMENTS

(9) DOCUMENTS

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 6/5/2017

_____
*Executing officer's signature*

████████████████████████
*Printed name and title*

**ATTACHMENT A**

*Property to Be Searched*

The property to be searched is the storage unit located at 370 Holland Lane, Unit 3013, Alexandria, Virginia 22314, as well as any locked drawers, locked containers, safes, computers, electronic devices, and storage media (such as hard disks or other media that can store data), found therein.  The storage unit is further described as a metal corrugated steel room with a red and white sign on the exterior with the number 3013.

**ATTACHMENT B**

*Property to be seized*

1.      Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to File a Report of Foreign Bank and Financial Accounts), 22 U.S.C. § 618 (Foreign Agent Registration Act), and 26 U.S.C. § 7206(a) (Filing a False Tax Return), including:

   a.   Any and all financial records for Paul Manafort, Richard Gates or companies associated with Paul Manafort or Richard Gates, including but not limited to records relating to any foreign financial accounts;

   b.   Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Richard Gates, or companies associated with Paul Manafort or Richard Gates;

   b.   Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

   c.   Any and all correspondence, communication, memorandum, or record of any kind relating to the Party of Regions, Viktor Yanukovych, the European Centre for a Modern Ukraine, or any other foreign principal of Paul Manafort or Richard Gates, or any company associated with Paul Manafort or Richard Gates;

   d.   Any and all correspondence, memorandum, press release, or documentation of any kind regarding any lobbying or advocacy performed by Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates, on behalf of the Party of Regions, Viktor Yanukovych, the European Centre for a Modern

2

Ukraine, or any other foreign principal of Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates.

e.  Records related to, discussing, or documenting Neocom Systems, Antes Management, Yiakora Ventures, Global Highway Ltd., Global Endeavor, Leviathan Advisors, Peranova Holdings, Bletilla Ventures, Lucicle Consultants, and/or Telmar Investments, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records.

f.  Records related to, discussing, or documenting the Podesta Group.

g.  Any and all daily planners, logs, calendars, schedule books relating to Paul Manafort or Richard Gates.

2.  Computers or storage media used as a means to commit the Target Offenses.

3.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web

4

pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5

## LEASE/RENTAL AGREEMENT

THIS LEASE/RENTAL AGREEMENT is executed this ___3/26/2015___ , by and between Public Storage (as owner or agent for owner "Owner") of the self storage facility, Tax ID# ██████ , at 370 Holland Lane, Alexandria, VA 22314-3418 _____ and Alexander Trusko _____ (as "Occupant"), whose address and alternate contact address are as follows:

|  |  |
|---|---|
| | Richard Gates |
| | Alternate Contact Name |
| ████████ | ████████ |
| Occupant Address | Alternate Address |
| Alexandria, VA, 22309-3218 | Richmond, VA, 23226-1733 |
| Occupant City/State/Zip Code | Alternate City/State/Zip Code |
| ████ | ████ |
| Occupant Telephone    ID/Driver's License | Alternate Telephone |
| ████@dmpint.com | Paul Manafort |
| Occupant Email Address for Electronic Communication | Occupant's Authorized Access Persons |

Premises: Enclosed/Parking Space No. 3013   (**approximately** 10x25   )   Account# 20342949   **Facility**# 08385   **Lease**# 12744989

FEES AND CHARGES:

| | | | | |
|---|---|---|---|---|
| $332.00 | Monthly Rent (Due on or before 1st of Month) | $66.40 | Late Charge after 6 th of the Month | |
| $22.00 | New Account Administration Fee (Non-Refundable) | $62.50 | Lien Fee after ( 31 ) Days (Whether or not Sale Occurs) | |
| $25.00 | Dishonored Check Charge | $130.00 | Lien Sale Fee | |

By INITIALING HERE ████   Occupant acknowledges that the above information is correct, that unless Occupant is identified above as a business Occupant is a consumer, that all payments are due before the close of business on the day indicated to be applied to the oldest delinquency first, including late charges and other fees which have become due, that Occupant understands and agrees to pay the charges, fees and Rent as noted above and that Owner reserves the right to require that Rent, fees and charges be paid in cash, certified check or money order.

It is agreed by and between Owner and Occupant:

1. PURPOSE AND DESCRIPTION OF PREMISES. For the consideration stated above, the Owner agrees to let the Occupant use and occupy a space in the self-service storage facility known as Public Storage, located in the City identified above, State of Virginia, and more particularly described as the Enclosed/ Parking Space Number indicated, along with its approximated size, above and as further described below (hereinafter the "Premises" or "Space") which, as used in this Lease/Rental Agreement, means that part of the self-service storage facility described above containing similar rented spaces and common areas for the use of Occupant and other occupants (the entire self service storage facility is hereinafter referred to as the "Property") and with the express understanding and agreement that no bailment or deposit of goods for safekeeping is intended or created hereunder. **Occupant shall examine the Premises and the Property and, by INITIALING HERE ████ acknowledges that space size is estimated per Building Office Management Association standards and does not refer to usable space, that the size of the Premises and any referenced sizes are approximate, given for illustration only and may vary materially, that Occupant has had the opportunity to measure the Premises prior to moving in, and that the Premises and the common areas of the Property are satisfactory for all purposes for which Occupant shall use the Premises and the Property including the size and capacity of the Premises.** Occupant shall have access to the Premises and the common areas of the Property only during the Property's posted hours and days of operation. This access is conditioned on the Owner's ability to maintain the business, rentability, safety, or security of the Premises and the Property, and if such ability is compromised, the Owner may take reasonable preventative or corrective measures such as, but not limited to, restricting access hours and requiring verification of Occupant's identity. The person(s) listed above as "Authorized Access Persons" is/are solely agents of the Occupant and is/are not parties to this Lease/Rental Agreement, has/have no rights of tenancy or standing to bring any claim, or to file suit from occurrences arising from the use of the storage space.

2. RENT; TERM. The term of this Lease/Rental Agreement shall commence as of the date written above and shall continue from the first day of the month immediately following on a month-to-month basis until terminated. Occupant shall pay Owner as a monthly Rent, without deduction, prior notice, demand or billing statement, the sum noted above (plus any applicable tax imposed by any taxing authority) in advance on the first day of each month. If the term of this Lease/Rental Agreement shall commence other than on the first day of the month, Occupant shall pay a full month's Rent for the first month and shall owe a pro rata portion of the second month's Rent. Occupant understands and agrees that under no circumstances will Occupant be entitled to a refund of the first month's Rent paid upon execution of the Lease/Rental Agreement. Also, Occupant shall not be entitled to a refund of a pro rata portion of the Rent for the month in which the termination occurs. If any monthly installment is not paid by the fifteenth (15th) of the month due, or if any check given in payment is dishonored, Occupant shall be deemed to be in default. The monthly Rent, amounts and type of other Fees and/or Charges, as well as any other term of this Lease/Rental Agreement, may be adjusted by Owner effective the month following written notice by Owner to Occupant specifying the adjustment, which such notice shall be given not less than thirty (30) days prior to the first day on which the adjustment shall be effective. Any such adjustment shall not otherwise affect other terms of this Lease/Rental Agreement and all other terms of this Lease/Rental Agreement shall remain in full force and effect.

3(a). OWNER'S LIEN; DEFAULT. **Pursuant to Va. Code Ann. §§ 55-416 *et seq.* and any contractual liens, Owner has a lien on all personal property stored within the Premises for rent, labor, and other charges, and for expenses reasonably incurred in the sale or other disposition of the personal property. If Occupant defaults in the payment or Rent or any other obligation in this Lease/Rental Agreement, Owner may deny Occupant the right to enter the Premises and the right to have access to the personal property stored therein. The Owner may then enforce the lien and the personal property stored in the Premises may be sold or otherwise disposed of to satisfy the lien. Prior to the lien sale, Owner will mail Occupant lien notices and advertise the lien sale in a local newspaper and/or on www.publicstorageauctions.com. By INITIALING HERE** ▮▮▮▮. Occupant acknowledges that he has read and understands Owner's lien.

3(b). ABANDONMENT. Any personal property of Occupant which shall remain in or on the Premises or at the Property after the expiration or termination of this Lease/Rental Agreement (other than the termination of this Lease/Rental Agreement while a default by Occupant exists) shall be considered abandoned at the option of Owner and, if abandoned, Owner may sell, destroy or otherwise dispose of Occupant's property.

4. APPLICABLE LAW; JURISDICTION; VENUE; TIME TO BRING CLAIMS. This Lease/Rental Agreement shall be governed and construed in accordance with the laws of the state in which the Premises are located. If any provision of this Lease/Rental Agreement shall be invalid or prohibited under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Lease/Rental Agreement. **The parties agree that in view of the limitations of value of the stored goods as provided in paragraph 5 below and the limitations as to Owner's liability as provided in paragraph 7 below, the value of any claim hereunder is limited to $5,000 and, accordingly, any action for adjudication of a claim shall be heard in a court of limited jurisdiction such as a small claims court.** Any claim, demand, or right of Occupant, and any defense to a suit against Occupant, that arises out of this Lease/Rental Agreement, or the storage of property hereunder (including, without limitation, claims for loss or damage to stored property) shall be barred unless Occupant commences an action (or, in the case of a defense, interposes such defense in a legal proceeding) within twelve (12) months after the date of the act, omission, inaction or other event that gave rise to such claim, demand, right or defense. **By INITIALING HERE** ▮▮▮▮ , Occupant acknowledges that he understands the provisions of this paragraph and agrees to these provisions

5. USE OF PREMISES AND PROPERTY AND COMPLIANCE WITH LAW. The space named in the agreement is to be used by the Occupant solely for the purpose of storing any personal property belonging to the Occupant. Because the value of the personal property may be difficult or impossible to ascertain, **Occupant agrees that under no circumstances will the total value of all personal property stored in the Premises exceed, or be deemed to exceed, $5,000. Occupant acknowledges and agrees that the Premises and the Property are not suitable for the storage of heirlooms or precious, invaluable or irreplaceable property such as, but not limited to, books, records, writings, contracts, documents, personalized or other DVDs or videos, works of art, objects for which no immediate resale market exists, objects which are claimed to have special or emotional value and records or receipts relating to the stored goods. Occupant agrees that the value of any such items shall not exceed for any purpose the salvage value of the raw materials of which the item is constituted.** Occupant agrees not to store any explosives or any highly inflammable goods or any other Hazardous Materials (as defined below) which would cause danger to the space, Premises, or Property or to store any improperly packaged food or perishable goods and other inherently dangerous material in the Premises or the Property and shall not store any personal property on the Premises which would result in the violation of any law or regulation of any governmental authority, including without limitation, all laws and regulations relating to Hazardous Materials, waste disposal and other environmental matters, and Occupant shall comply with all laws, rules, regulations and ordinances of any and all governmental authorities concerning the Premises and its use. For purposes of this Lease/Rental Agreement, "Hazardous Materials" shall include, but not be limited to, any hazardous or toxic chemical, gas, liquid, substance, material or waste (including, in some jurisdictions, vehicle tires) that is or becomes regulated under any applicable local, state or federal law or regulation. Occupant shall not use the Premises in any manner that will constitute a hazard, waste, nuisance or unreasonable annoyance to Owner, Owner's Agents or employees, or other occupants in the Property. Occupant acknowledges that the Premises may be used for storage only, and that use of the Premises for the conduct of a business or for human or animal habitation is specifically prohibited. The occupant agrees that the property will not be used for any unlawful purposes and the occupant agrees not to commit waste, nor alter, nor affix signs on the space and will keep the space in good condition during the term of this agreement. Upon termination of this Lease/Rental Agreement, Occupant shall promptly remove all Occupant's personal property from the Premises unless there are unpaid charges secured by Owner's lien rights as referenced in paragraph 3 (including any subparts) and shall immediately deliver possession of the Premises to Owner in the same condition as delivered to Occupant on the commencement date of this Lease/Rental Agreement, reasonable wear and tear excepted. **By INITIALING HERE** ▮▮▮▮, Occupant acknowledges that he has read and understands the provisions of this paragraph and agrees to comply with its requirements.

6. INSURANCE; RELEASE OF LIABILITY. **ALL PERSONAL PROPERTY IS STORED BY OCCUPANT AT OCCUPANT'S SOLE RISK. OCCUPANT IS OBLIGATED UNDER THE TERMS OF THIS LEASE/RENTAL AGREEMENT TO INSURE HIS OWN GOODS AND UNDERSTANDS THAT OWNER DOES NOT PROVIDE ANY TYPE OF INSURANCE WHICH WOULD PROTECT THE OCCUPANT'S PERSONAL PROPERTY FROM LOSS BY FIRE, THEFT, OR ANY OTHER TYPE CASUALTY LOSS. IT IS THE OCCUPANT'S RESPONSIBILITY TO PROVIDE SUCH INSURANCE.** To the extent Occupant's insurance lapses or Occupant does not obtain insurance coverage for the full value of Occupant's personal property stored in the Premises, Occupant agrees Occupant will personally assume all risk of loss. **Owner and Owner's agents, affiliates, authorized representatives and employees ("Owner's Agents") will not be responsible for, and Occupant hereby releases Owner and Owner's Agents from any responsibility for, any loss, liability, claim, expense or damage to property that could have been insured (including without limitation any Loss arising from the active or passive acts, omission or negligence of Owner or Owner's Agents) (the "Released Claims").** Occupant waives any rights of recovery against Owner or Owner's Agents for the Released Claims, and Occupant expressly agrees that the carrier of any insurance obtained by Occupant shall not be subrogated to any claim of Occupant against Owner or Owner's Agents. The provisions of this paragraph will not limit the rights of Owner and Owner's Agents under paragraph 7. Occupant understands that if Occupant elects to obtain the insurance available at the Property, the additional amount for such insurance coverage must be included with the monthly payments as noted above. Further, all payments received will be applied as noted above. **By INITIALING HERE** ▮▮▮▮, Occupant acknowledges that he understands the provisions of this paragraph and agrees to these provisions and that insurance is Occupant's sole responsibility.

*VA11202013*

7. LIMITATION OF OWNER'S LIABILITY; INDEMNITY. **Owner and Owner's Agents will have no responsibility to Occupant or to any other person for any loss, liability, claim, expense, damage to property or injury to persons ("Loss") from any cause, including without limitation, Owner's and Owner's Agents active or passive acts, omissions, negligence or conversion, unless the Loss is directly caused by Owner's fraud, willful injury or willful violation of law. Occupant shall indemnify and hold Owner and Owner's Agents harmless from any loss incurred by Owner and Owner's Agents in any way arising out of Occupant's use of the Premises or the Property including, but not limited to, claims of injury or loss by Occupant's visitors or invitees. Occupant agrees that Owner's and Owner's Agents' total responsibility for any Loss from any cause whatsoever will not exceed a total of $5,000. By INITIALING HERE** ███████ , Occupant acknowledges that he understands and agrees to the provisions of this paragraph.

8. REPRESENTATION AS TO MILITARY SERVICE: (a) Occupant (check one) is ___ or is not ☒ **in the military.** (b) If in the military, Occupant is, at the time of signing this Lease/Rental Agreement (check one or both if applicable) ___ **in the reserves or National Guard** and/or ___ **on active duty.** In addition to the provisions of paragraph 13 (including any subparts) below, Occupant **agrees to immediately notify Owner of changes in Occupant's military status or assignment resulting in changes to any information provided above.**

9. RIGHT TO ENTER, INSPECT AND REPAIR PREMISES. Occupant shall grant Owner or Owner's Agents access to the Premises upon three (3) days written notice to Occupant. If Occupant does not grant access as required, or in the event of suspected criminal activity, an emergency, or upon default of any of Occupant's obligations under this Lease/Rental Agreement, Owner, Owner's Agents, or a governmental authority shall have the right, but not the obligation, to remove Occupant's locks and enter the Premises for the purpose of examining the Premises or the contents or to make repairs or alterations and taking such other action as may be necessary or appropriate to preserve the Premises or to comply with applicable law including any applicable local, state or federal law or regulation governing hazardous or toxic substance, material or waste, or to enforce any of Owner's rights. If in an emergency, Owner must relocate Occupant's personal property to another space at the Property, the relocated space shall be deemed the "Space" for purposes of this Lease/Rental Agreement. In the event of any damage or injury to the Premises or the Property arising from the negligent or deliberate act or omissions of the Occupant, or for which Occupant is otherwise responsible, or if Occupant fails to remove all personal property from the Premises or the Property upon termination of this Lease/Rental Agreement, all expenses reasonably incurred by Owner to repair or restore the Premises or the Property including any expense incurred in connection with any investigation of site conditions, or any clean-up, removal or restoration work required by any applicable local, state or federal law or regulation or agency regulating any hazardous or toxic substance, material or waste, shall be paid by the Occupant and shall be due upon demand by the Owner.

10. RELEASE OF INFORMATION; NEGATIVE CREDIT INFORMATION. By executing this Lease/Rental Agreement, Occupant grants Owner, or Owner's service provider acting on Owner's behalf, full authorization for obtaining information regarding Occupant's employment, savings, and checking accounts and/or any previous or present credit, including real estate loans, whether on a closed or open status. Owner or its service provider is also authorized to request from a company or companies of Owner's choice a full credit report on the previous and present credit history of Occupant including updated credit information. This Authorization is valid for the purpose of extending credit, reviewing credit or in the collection of amounts owed to Owner in connection with this Lease/Rental Agreement. Owner, or its service provider acting on Owner's behalf, may report information about Occupant's account to credit bureaus. Late payments, missed payments, or other defaults on Occupant's account may be reflected in Occupant's credit report.

11. PRIVACY POLICY. Occupant acknowledges that Occupant has received a copy of Owner's Privacy Policy and has reviewed and agrees with its terms and provisions. Owner's Privacy Policy is incorporated in full herein by this reference.

12. TERMINATION AND DEFAULT. Owner may terminate this Lease/Rental Agreement (i) if Occupant is not in default of this Lease/Rental Agreement, by giving written notice to Occupant by first class mail or electronic mail at the last known physical address or email address provided to Owner in writing by Occupant not less than seven (7) days before expiration of the term or, (ii) if Occupant is in default of this Lease/Rental Agreement, by notice two (2) days in advance at any time during the term. Occupant may terminate this Lease/Rental Agreement at any time by giving two (2) days oral or written notice to Owner. If Occupant defaults under any of the obligations under this Lease/Rental Agreement, Owner may pursue any remedies available to Owner under applicable law or this Lease/Rental Agreement. Owner's decision to pursue one remedy shall not prevent Owner from pursuing other available remedies. Also, if Owner or Owner's Agents reasonably determine that Occupant has vacated the Premises, Owner may terminate this Lease/Rental Agreement.

13(a). CHANGE OF PHYSICAL ADDRESS OR EMAIL ADDRESS. In the event Occupant shall change Occupant's physical address or email address or alternate name and address as set forth on this Lease/Rental Agreement, Occupant shall give Owner written notice of such change signed by Occupant and specifying Occupant's current physical address or email address and alternate name, address and telephone number, within ten (10) days of the change: such notice to be mailed to Owner by first class mail with proof of mailing. Changes of addresses or telephone numbers cannot be effected telephonically or through the listing of such information on return envelopes or checks.

13(b). NOTICES; CONSENT TO ELECTRONIC COMMUNICATIONS. Except as otherwise expressly provided in this Lease/Rental Agreement or by law, any written notices or demands required or permitted under the terms of this Lease/Rental Agreement may be personally served or served by first class mail deposited in the United States mail with postage thereon fully prepaid and addressed to the party at the address provided for in this Lease/Rental Agreement or may be delivered electronically to the most current email address on record for Occupant. Service of any such notice or demand shall be deemed complete on the date of deposit with postage thereon in the United States mail or upon delivery, if personally delivered, or upon the date and time sent by Owner, in the case of an electronic notice. Further, Occupant consents to and expressly agrees that to the extent permitted by law, any notices, writings, or other communications required by or made in connection with this Lease/Rental Agreement by Owner may be made electronically to the most current email address provided by Occupant to Owner (consistent with the provisions of paragraph 13a), and that all such notices, writings and communications shall be deemed made by Owner as of the date and time the email is sent by Owner to Occupant. Occupant further agrees that all such notices, writings and communications made in electronic form by Owner shall have the same legal force, effect and enforceability as if they were made in non-electronic form. Occupant agrees that any reference in this Lease/Rental Agreement to a writing or written form may be fulfilled through an electronic record, including an electronic signature, which shall have the same legal force, effect and enforceability as if it was made in a non-electronic form.

14. RULES AND REGULATIONS. The rules and regulations posted in a conspicuous place at the Property are made a part of this Lease/Rental Agreement and Occupant shall comply at all times with such rules and regulations. Owner shall have the right from time to time to change the rules and regulations and upon the posting of any such changes at the Property, they shall become a part of this Lease/Rental Agreement.

15. MISCELLANEOUS.

(a) Occupant shall provide, at Occupant's own expense, a lock for the Premises which Occupant deems sufficient to secure the Premises. Occupant shall not provide a key and/or combination to Occupant's lock to Owner or Owner's Agents.

(b) Electricity which may be supplied to the Premises is to light the Premises for Occupant's convenience in accessing stored goods only.

(c) Occupant shall not make or allow any alterations without the prior written consent of Owner.

(d) Occupant hereby authorizes Owner to release any information regarding Occupant as may be required by law or requested by governmental authorities or agencies, law enforcement agencies, or courts, or to others for marketing and similar purposes in accordance with the Owner's Privacy Policy.

(e) Occupant shall not assign or sublease the Premises. Owner may assign or transfer this Lease/Rental Agreement without the consent of Occupant and, after such assignment or transfer, Owner shall be released from all obligations under this Lease/Rental Agreement occurring after such assignment or transfer. All of the provisions of this Lease/Rental Agreement shall apply to, and be obligatory upon, the heirs, executors, administrators, representatives, successors and assigns of all the parties hereto.

(f) Time is of the essence.

16. NO WARRANTIES; ENTIRE AGREEMENT. **Owner hereby disclaims any implied or express warranties, guarantees or representations of the nature, condition, safety or security of the Premises and the Property and Occupant hereby acknowledges that Occupant has inspected the Premises and the Property and hereby acknowledges and agrees that Owner does not represent or guarantee the safety or security of the Premises or the Property or of any personal property stored therein, and this Lease/Rental Agreement does not create any contractual obligation for Owner to increase or maintain such safety or security. This Lease/Rental Agreement and any written amendments or addenda executed at the same time as this Lease/Rental Agreement, and any notices provided under this Agreement by Owner, set forth the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings with respect thereto. With the exception of posted rules and regulations as noted in paragraph 14, there are no representations, warranties, or agreements by or between the parties which are not fully set forth herein and no representative of Owner or Owner's Agents is authorized to make any representations, warranties, or agreements other than as expressly set forth herein and, further, with the exception of any subsequent notice from Owner to Occupant of adjustments as provided in paragraph 2 above, this Lease/Rental Agreement may only be amended by a writing signed by the parties.**

IN WITNESS WHEREOF, the parties hereto have executed this Lease/Rental Agreement the day and year first above written.

PUBLIC STORAGE                                      OCCUPANT

Property Manager

Make checks payable to: PUBLIC STORAGE

# INSURANCE ADDENDUM TO LEASE/RENTAL AGREEMENT
## THIS ADDENDUM TO BE ATTACHED TO AND MADE PART OF THE LEASE/RENTAL AGREEMENT

| # Lease/Rental Agreement | # Storage Unit | # Facility |
|---|---|---|
| 171449999 | 3013 | 08385 |

As more fully set forth in the Lease/Rental Agreement, all personal property is stored by Occupant at occupant's sole risk. Occupant is solely responsible for insuring his own goods and understands that Owner will not insure Occupant's personal property and that Occupant is obligated under the terms of this lease/rental agreement to insure his own goods.

## INSURANCE CERTIFICATION AND DISCLOSURES

I acknowledge that I understand and agree to the provisions of the above paragraph and that I understand I am solely responsible to insure my stored property. I acknowledge that the Lease/Rental Agreement requires me to maintain insurance that covers loss or damage for the personal property that I intend to store at this facility. Purchase of the self-storage insurance below, or having other applicable insurance, may satisfy this requirement. I understand that if I do not have insurance, or if my insurance lapses, I am personally responsible for any loss or damage to my goods. I personally assume all risk of loss and Owner is not responsible no matter how the loss or damage occurred.

This facility and its employees are not qualified or authorized to evaluate the adequacy of any insurance you may have. The insurance policy offered by this self-storage agent may provide a duplication of coverage already provided by your homeowners' insurance policy or by another source of coverage. Questions regarding the Storage Insurance Program should be directed to PSCC, Inc. dba in CA as PSCC Insurance Services Processing (PSCC, Inc.). I understand this insurance is not required in order to store my goods at this facility.

**I ACKNOWLEDGE I HAVE REVIEWED THE ABOVE INSURANCE CERTIFICATION AND DISCLOSURES**

Date Signed 03/24/15    Tenant Signature ███████    Print Name ███████



## APPLICATION FOR INSURANCE
### New Hampshire Insurance Company
175 Water Street, New York, NY 10038

I elect to obtain the insurance coverage available through PSCC, Inc., in the amount indicated below.

| $5,000 Coverage $15.00 per Month  Initial _____ | $4,000 Coverage $13.00 per Month  Initial _____ | $3,000 Coverage $11.00 per Month  Initial _____ |
|---|---|---|

Date Signed 03/24/15    Tenant Signature ███████    Print Name ___

**ACKNOWLEDGEMENT:** I understand the amount noted is the Premium I must pay monthly for the Amount of Insurance I have selected. I authorize Owner to conduct the administrative function of receiving the premium to send to the insurance company on my behalf. I have elected to satisfy my obligation to have insurance for the stored goods by purchasing the insurance protection available through PSCC, Inc.. I have read and completed this Insurance Election Addendum to apply for the coverage. I have read the insurance literature provided and understand that the insurance I am applying for underwritten by New Hampshire Insurance Company has EXCLUSIONS and CONDITIONS.

**COVERAGE EFFECTIVE:** The insurance coverage will be effective immediately upon completion of your application and payment of Premium. You will become insured effective as of that time, for the Amount of Insurance you selected and initialed above.

**ELIGIBILITY:** I understand that insurance on personal property in the enclosed storage space described in the Rental Agreement is available to all Tenants who have entered into a Rental Agreement with the Owner on such enclosed storage space.

**PREMIUM:** I have elected the Premium above. I understand that I will receive one month's notice of changes in the Premium, or such notice as otherwise may be required by applicable law, if any, and the new Premium shall be effective on the first (1st) day of the month following the month in which advance notice of such change is mailed to me. I understand my insurance will continue on a month-to-month basis in accordance with the terms of this insurance. I understand that I may cancel the insurance at any time and cancellations after the first of each month may be subject to a minimum premium. I may receive a refund of unearned premium.

**INSURANCE INFORMATION: I have received a copy of the literature provided and the Certificate of Storage Insurance. I understand that I may have a copy of the complete specimen policy for review by simply calling PSCC, Inc. at 1-877-878-6730 or writing to the address below.**

**NOTICE TO VIRGINIA APPLICANTS: IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.**

**PSCC, Inc.**
dba in CA as PSCC Insurance Services Processing    (CA License # 0E14626)
PO Box 25097
Glendale, CA 91221-5097
www.perfectsolutionsstorageinsurance.com    Or by calling (877) 878-6730



Producer Signature

Date Signed 03/24/15    Tenant Signature ███████    Print Name ___

WHITE – *Property Copy*    YELLOW – *Customer Copy*

VA – 01/15
(A1531)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 17-201-01 (ABJ) |
| PAUL J. MANAFORT, JR., | ) | |
| | ) | Judge Amy Berman Jackson |
| Defendant. | ) | |

**[Proposed] <u>ORDER</u>**

Upon consideration of Defendant Paul J. Manafort, Jr.'s motion pursuant to Rule

12(b)(3)(C) and Rule 41(h) of the Federal Rules of Criminal Procedure to suppress evidence and

all fruits thereof relating to the government's search of the storage unit located in Alexandria,

Virginia, (the "Premises") and any opposition and reply thereto, it is hereby **ORDERED** that the

motion is **GRANTED** and it is hereby **FURTHER ORDERED** that all evidence seized from the

Premises is hereby **SUPPRESSED**.

      **SO ORDERED.**

Dated: _____          _____
                                      AMY BERMAN JACKSON
                                      United States District Judge