```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,      ) Criminal
                                      ) No. 17-201-1
 4                    Plaintiff,      )
                                      ) Motions Hearing
 5     vs.                            )
                                      ) Washington, DC
 6     Paul John Manafort, Jr.,       ) April 19, 2018
                                      ) Time:  9:30 a.m.
 7                    Defendant.      )
                                      )
 8     _____

 9                  TRANSCRIPT OF MOTIONS HEARING
                            HELD BEFORE
10         THE HONORABLE JUDGE AMY BERMAN JACKSON
                   UNITED STATES DISTRICT JUDGE
11     _____

12                     A P P E A R A N C E S

13     For the Plaintiff:      GREG D. ANDRES,
                               Senior Assistant Special Counsel
14                             ANDREW WEISSMANN
                               MICHAEL RICHARD DREEBEN
15                             ELIZABETH BARCHAS PRELOGAR
                               ADAM C. JED
16                             U.S. Department of Justice
                               Special Counsel's office
17                             950 Pennsylvania Avenue NW
                               Washington, D.C.  20530
18                             202-514-1746

19
       For the Defendant:      KEVIN M. DOWNING
20                             815 Connecticut Avenue, N.W.
                               Suite 730
21                             Washington, D.C. 20006
                               (202) 754-1992
22
                               THOMAS EDWARD ZEHNLE
23                             Miller & Chevalier, Chartered
                               900 Sixteenth Street, NW
24                             Washington, DC 20006
                               (202) 626-5800
25                             Email: Tzehnle@milchev.com
```

```
 1                                RICHARD WILLIAM WESTLING
                                  Epstein Becker & Green, P.C.
 2                                1227 25th Street, NW
                                  Suite 700
 3                                Washington, DC 20037
                                  (202) 861-1868
 4                                Email: Rwestling@ebglaw.com

 5      ALSO PRESENT:             Omer Meisel, Special Agent
                       _____
 6
        Court Reporter:           Janice E. Dickman, RMR, CRR
 7                                Official Court Reporter
                                  United States Courthouse, Room 6523
 8                                333 Constitution Avenue, NW
                                  Washington, DC  20001
 9                                202-354-3267

10                                   *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        THE COURTROOM DEPUTY:  Your Honor, this morning we

2    have criminal case number 17-201-1, the United States of

3    America v. Paul J. Manafort, Jr.  Mr. Manafort is present in

4    the courtroom.

5        Will counsel for the parties please approach the

6    lectern, identify yourself for the record.

7        MR. WEISSMANN:  Good morning, Your Honor.  Andrew

8    Weissmann for the government.  With me at counsel table is Greg

9    Andres and Brian Richardson.  And also arguing today for the

10   government are Michael Dreeben, Elizabeth Prelogar, and Adam

11   Jed.

12       THE COURT:  All right.  Good morning.

13       MR. DOWNING:  Good morning, Your Honor.  Kevin

14   downing for Mr. Manafort, along with Thomas Zehnle and Richard

15   Westling.

16       THE COURT:  Good morning.

17       MR. DOWNING:  We don't have anybody else.  Sorry,

18   Your Honor.

19       THE COURT:  That's a pretty deep bench you got going

20   there.

21       There's a hearing this morning on several motions

22   that have been filed by the defendant to dismiss the charges in

23   the superseding indictment that are pending against him in this

24   court.  Similar motions concerning the charges in the

25   indictment in the Eastern District of Virginia have been filed,

```
1    but they are not a matter for this Court to decide.

2          First, I have docket 235 the motion to dismiss the

3    superseding indictment.  It argues, first, that the appointment

4    of the special counsel was an ultra vires act by the deputy

5    attorney general that was contrary to the terms of the

6    Department of Justice special counsel regulations.  And,

7    second, that even if the appointment was lawful, the indictment

8    exceeds the scope of the authority granted to the special

9    counsel in the appointment order.

10          I also have before me today docket 236, the motion to

11   dismiss either Count 4 or Count 5 on the grounds that they

12   charge a single offense and are, therefore, multiplicitous.

13   And I also have docket 237, the motion to dismiss Count 2, the

14   money laundering count, and to strike the related forfeiture

15   allegations.

16          I'm going to take them up one at a time and hear from

17   both parties on each motion before I move on to the next

18   motion.

19          I want to note that there's also a number of other

20   motions pending:  Docket 255, the motion for a bill of

21   particulars; 257, the motion to suppress the fruits of the

22   search of the storage unit, and; 264, the motion to suppress

23   the fruits of the search of his residence.  These are all going

24   to be the subject of a future hearing, which I believe is now

25   set for May 23rd.
```

1          Can I just see counsel or some subset of counsel

2    briefly at the bench to talk about a procedural matter?

3          (Bench discussion:)

4          THE COURT:  All right.  I can tell that the

5    government has gotten the world that I've said it's fine for

6    different lawyers to argue different motions.  I want to make

7    sure your side understands that you have the same right.

8          MR. DOWNING:  We do.

9          THE COURT:  There's only one judge here, but

10   everybody else has a pretty deep bench.

11          I also wanted to put on the record, because I haven't

12   had you all here and had the opportunity to do this before,

13   that when Mr. Westling started out as an associate in the

14   practice of law at Venable, probably more than 20 years ago

15   now, he worked for their young partner, who was me.  I don't

16   recall at this point even which one of us was the first to

17   leave the law firm.  But, that was the extent of our

18   relationship with him.  We've not worked together since, we're

19   not social friends, we don't know each other's families.

20          But, I wanted to put on the record that I have worked

21   with Mr. Westling in the past and I don't see any basis to

22   recuse myself, but I want everybody to know.

23          MR. WEISSMANN:  Thank you, Judge.

24          (Open Court:)

25          THE COURT:  All right.  Let me start with counsel for

1    Mr. Manafort on the motion to dismiss the superseding

2    indictment.

3             MR. DOWNING:  Good morning, Your Honor.

4             THE COURT:  Good morning.  And I think you know

5    that -- what's going to happen next.

6             MR. DOWNING:  I'm ready, I hope.

7             THE COURT:  All right.  There's two issues you've

8    raised in this motion, which is the legitimacy of the

9    appointment order itself, and then, second, the legitimacy of

10   the investigation under the appointment order.  So I want to

11   start with issue number one first.

12            You argue that the order issued by the deputy

13   attorney general exceeds the authority in the special counsel

14   regulations, in particular, 28 C.F.R. § 600.4, and that,

15   therefore, the indictment obtained under its auspices must be

16   dismissed.

17            The appointment order says, as we've discussed

18   before, that the special counsel's authorized to conduct the

19   investigation, confirmed by then FBI Director James M. Comey in

20   testimony before the house Permanent Select Committee on

21   Intelligence on March 20th, 2017.  In other words, it referred

22   an ongoing, preexisting investigation.  And then the order

23   says:  Including, in paragraph (b)(i), any links and/or

24   coordination between the Russian government and individuals

25   associated with the campaign of President Donald Trump.  And

1    paragraph (b)(ii), any matters that arose or may arise directly

2    from the investigation.  And paragraph (b)(iii), any other

3    matters within the scope of 28 C.F.R. § 600.4(a), which means

4    federal crimes committed in the course of or with the intent to

5    interfere with the special counsel investigation, such as

6    perjury or obstruction of justice.

7            Before I delve into the merits of all this, I just

8    want to confirm what is at issue.  Am I correct that the only

9    portion of this order that you say is invalid is paragraph

10   (b)(ii), the language in the order that provided from the

11   outset that the special counsel could investigate any matters

12   that arose or may arise directly from the investigation?

13           MR. DOWNING:  That is our main point, though in our

14   motions we have also called into question whether or not this

15   was an appropriate -- the specific mandate was an appropriate

16   mandate for a grand jury investigation, as opposed to if it was

17   truly a counterintelligence investigation.  So that's one of

18   the issues that we have in our motion, to question whether or

19   not that would be appropriate.

20           And I raise the issue because when Mr. Rosenstein

21   testified on the Hill, he had testified that the first thing he

22   had to do before determining whether or not to appoint a

23   special counsel was determine if there was evidence that crimes

24   had been committed.  And we think, with respect to the broad

25   mandate, the campaign coordinating with the Russian government,

1     to date no one has articulated what exact federal crime would

2     be violated, if there even existed such coordination between a

3     campaign associate and a Russian government official.  So, that

4     is in our papers.  But the main thrust of the argument for us

5     has to with (b)(2)(i).

6          THE COURT:  Where in your papers do you allege that

7     this was an inappropriate investigation because it was a

8     national security investigation and not a criminal

9     investigation?

10          MR. DOWNING:  If I could have a moment, Your Honor.

11     Excuse me for a minute.

12          (Pause.)

13          MR. DOWNING:  Your Honor, if we could go back to that

14     issue, I'll have someone identify the footnote for you.

15          THE COURT:  All right.  As I understand it, what you

16     were challenging is a paragraph in the appointment order that

17     says not only can you investigate this, but you can investigate

18     any matters that arose or arise out of it, is that correct?

19          MR. DOWNING:  That's correct, Your Honor.

20          THE COURT:  So, if -- and we'll get to whether he was

21     later -- but if I find that he was investigated pursuant to

22     paragraph (b)(i), the specific grant of authority, is that the

23     end of your motion to dismiss, of this motion to dismiss?

24          MR. DOWNING:  If you find that the investigation into

25     what Mr. Rosenstein said on April 2nd was two other matters --

1    you're asking me if --

2              THE COURT:  If I find that the investigation that

3    resulted in the indictment that is pending before this Court

4    falls under paragraph (b)(i), any link between any person

5    associated with the campaign and the Russian government -- says

6    links and/or coordination -- so, if I find -- and you can argue

7    later that it's not -- but if I find that it's an investigation

8    of a link and if it falls under (b)(i), you're not challenging

9    (b)(i)?

10             MR. DOWNING:  That's correct.

11             THE COURT:  All right.  So let's talk about the legal

12   basis of your challenge to the second prong of the appointment

13   order.

14             The memo relies heavily on cases involving the

15   Independent Counsel Act, and those cases largely raise a

16   constitutional question, arguments that having a judge appoint

17   a prosecutor and to determine the scope of a prosecutor's

18   authority usurped an executive function and violated the

19   separation of powers.  Are you alleging any constitutional

20   violation in this case?

21             MR. DOWNING:  No, I don't believe so, Your Honor.

22             THE COURT:  Okay.

23             MR. DOWNING:  But if I may, the *Espy* case in

24   particular, it may have involved the independent counsel and

25   the interaction between the Department of Justice, the

1    independent counsel and the Court, the *Espy* case is the one

2    that we think factually is closest to the analysis that we're

3    asking this Court to make.  Because in *Espy* what the Court said

4    is you look at the initial mandate and then you find -- and

5    then you look to see if these other matters that the

6    independent counsel wanted to investigate were demonstrably

7    related.  And they look at temporally and they look at it as in

8    terms of related to that mandate.

9         And we think in *Espy* it was quite clear, as we think

10   it should be here, that the matters for which Mr. Manafort

11   ended up being indicted in that investigation cannot be said to

12   be demonstrably related to that specific mandate.  So we think

13   the framework in the *Espy* case, although dealing with the

14   Independent Counsel Act, is really, literally, the framework

15   that we're asking this Court to review in this case.

16        THE COURT:  I understand that.  But wasn't the whole

17   reason the Court went into that framework *Espy* is the concern

18   that it shouldn't be the judiciary that expands the scope of a

19   prosecutor's investigatory authority, because that's an

20   executive function?  They didn't say *Espy* can't be investigated

21   for those things, they said it shouldn't be up to us to decide,

22   it should be up to the attorney general to decide.  In this

23   case, it's all happening within the executive branch.  So, how

24   is *Espy* apposite here?

25        MR. DOWNING:  I don't quite agree with your analysis

1    because the statute -- the reg. that existed at the time, that

2    gave the Court certain authority, the question was --

3              THE COURT:  The Court wasn't exercising its authority

4    under a reg.  The Court was exercising its authority under the

5    independent counsel statute --

6              MR. DOWNING:  Statute.

7              THE COURT:  -- and there was a challenge to its

8    exercise of that authority to expand the investigation the way

9    an ordinary prosecutor would expand an investigation.

10             MR. DOWNING:  Right.

11             THE COURT:  And the Court said our authority to

12   expand is limited to only things that -- a more narrow test

13   than what would apply if it was just an ordinary prosecutor

14   and, therefore, the Court's jurisdiction to expand is more

15   narrow than the Department of Justice's.  Here --

16             MR. DOWNING:  Right.  And the interesting part in

17   that case was the Department of Justice said, No, we're not

18   expanding.  That's the interesting part about *Espy* because they

19   said it is demonstrably related.  This is -- you're going

20   afield of your specific mandate.  So what I'm saying to you,

21   the context in which the analysis was done would be the same

22   here, even though I would agree with you that it was a

23   different statute that was involved.

24             THE COURT:  Well, I also think that the whole

25   analysis was predicated on the separation of powers concerns.

1    But I'll look at it again.

2              MR. DOWNING:  I'm not disagreeing about the

3    separation of powers.  What I'm saying, though, is that to

4    grant the expansion, whether it was under the independent

5    counsel or it was here, the analysis had to do with what was

6    the specific mandate and whether or not what the independent

7    counsel wanted to get into, what the special counsel got into

8    here, was demonstrably related to that specific mandate.

9              And I think if you look at that analysis and you look

10   at it here, you would not, under those factors, be able to find

11   that this investigation and the resulting indictment is

12   demonstrably related to that specific mandate that was given to

13   the special counsel.

14             THE COURT:  All right.  And as I said, I do want to

15   talk about that, but I still want to make sure I understand the

16   legal grounds for your challenge.  We've put aside the

17   Constitution.  The special counsel was appointed pursuant to a

18   statute, 28 U.S. Code § 515, which says that the attorney

19   general or any other office of the Department of Justice or any

20   attorney specially appointed by the attorney general under law

21   may, when specifically directed by the attorney general,

22   conduct any kind of legal proceeding, civil or criminal.  Do

23   you claim that the statute was violated in this case?

24             MR. DOWNING:  Yes.

25             THE COURT:  Okay.  Where is that in your memo?

1          MR. DOWNING:  Well, was the statute violated?  We say

2     yes, but the question for us in front of this Court is whether

3     or not the special counsel had jurisdiction, whether he had

4     authority.  That's our only question.

5          THE COURT:  Right.  And you --

6          MR. DOWNING:  But the --

7          THE COURT:  -- point to --

8          MR. DOWNING:  Your Honor, just to be clear about

9     this, our challenge here today has to do with whether or not

10    the special counsel had the jurisdiction granted to him through

11    the special counsel regs.  By the way, the special counsel

12    regs. say "jurisdiction," whether or not he had the

13    jurisdiction and authority to conduct the investigation that he

14    did.  That's --

15         THE COURT:  I understand that.

16         MR. DOWNING:  That's our claim.

17         THE COURT:  And what you're saying is that -- what I

18    understand you to be saying is that he didn't because the

19    deputy attorney general didn't have the authority under the

20    regulations to grant as broad a jurisdiction as was granted.

21         MR. DOWNING:  That's correct.

22         THE COURT:  Because it exceeded the scope of what's

23    in the regulations.  Are you arguing that it exceeded the scope

24    of what could be granted under the statute?

25         MR. DOWNING:  Well, I'm going to say it again, like I

1    did the other day, the regs. implement the statute that's

2    specifically determined is being carried out through the regs.

3    The additional jurisdiction is exactly that.  The regs. say

4    that in addition to the specific mandate, if there was going to

5    be any other jurisdiction granted to the special counsel, it

6    would be done specifically.  There would be additional

7    jurisdiction to be done specifically.  And that's why we say

8    that's the violation, that the (b)(ii) gives a broad grant of

9    authority that is not permissible under the regs.  And we

10   believe the regs. are just implementing the statute.

11            THE COURT:  Let's talk about the regs.  Before we get

12   to their substance, I want to talk about whether they're

13   actionable at all.

14            What's your legal support for the proposition that if

15   I conclude that the regs. were not followed to the letter, that

16   the indictment should be dismissed?

17            MR. DOWNING:  So, I think there would be two issues

18   there.  One is we're challenging whether or not the special

19   counsel has the authority and jurisdiction of a U.S. attorney

20   with respect to this investigation.  And if he doesn't, then he

21   doesn't have the authority to do anything, he's just a U.S.

22   citizen.  If he doesn't have that jurisdiction, he cannot go in

23   to grand jury, he cannot return an indictment.  Quite frankly,

24   he can't appear in this courtroom.

25            So our challenge is a jurisdictional one.  If he

1    doesn't have the appropriate authority --

2              THE COURT:  Right.  My question is:  If he's duly

3    pointed by statute, what is the legal support for the

4    proposition that a violation of the regulations undermines his

5    jurisdiction or the indictment, that the regulations are

6    actionable in a court of law?

7              MR. DOWNING:  Our action comes about as to whether or

8    not the special counsel has jurisdiction and authority.  That's

9    our challenge.  You look to the regs. --

10             THE COURT:  Your only challenge is predicated on the

11   fact that the regulations -- the internal Department of Justice

12   regulations as the defense describes them and as they are

13   described expressly in the regulations that you're invoking.

14   So why does it matter in a court of law if the regulations were

15   not complied with?  The regulations state --

16             MR. DOWNING:  So, Your Honor, we disagree with this

17   internal regulation.  It's not an internal regulation, it's a

18   regulation.

19             THE COURT:  All right.  Well, that's -- I'm asking

20   you why.

21             MR. DOWNING:  But what I'm saying to you is it wasn't

22   put in the U.S. attorney's manual, it wasn't issued as a

23   policy.  There was a determination made by the attorney

24   general, in light of the prior bad experiences, awful

25   experience with the independent counsel that these were going

1    to be regulations.

2            THE COURT:  Well, you said it wasn't issued as a

3    policy.  The Federal Register notice that promulgated and

4    announced the rules said we're not having notice and comment,

5    we're not delaying the effective date, we're not doing anything

6    we do for those kinds of regulations because, quote, this rule

7    relates to matters of agency management or personnel.

8            It is a rule of agency organization, procedure, or

9    practice; it is not a substantive rule.  And then right in the

10   regulations it says they are not intended to and may not be

11   relayed upon to create any rights enforceable at law or in

12   equity in any matter, civil, criminal or administrative.

13   That's § 600.10 of the regs. that you're saying govern this

14   situation.  So, how is that distinguishable from the case law

15   involving the U.S. attorney manual or other regs. like that?

16           MR. DOWNING:  I think the average, everyday citizen

17   certainly cannot come in and bring an action against Mr.

18   Rosenstein for exceeding his authority under the regs.

19   Certainly, I would agree with that.

20           THE COURT:  That's a standing question.

21           MR. DOWNING:  Under 12(b) we get to challenge

22   jurisdiction, we get to challenge grand jury proceedings, we

23   get to challenge the process by which we're dragged here into

24   court.  Under 12(b) we get to do that, the Federal Rules say

25   you get to challenge it.  That's our basis for our challenge.

1              THE COURT:  You have the right to file a motion under

2     Rule 12(b) challenging --

3              MR. DOWNING:  Yes.

4              THE COURT:  I agree with that.  And that, of course,

5     was the issue in the civil case, that 12(b) existed; so, why

6     were you bringing a civil case.  So we're here --

7              MR. DOWNING:  Yes.

8              THE COURT:  -- you have the authority to challenge

9     this indictment, no question about that.

10             MR. DOWNING:  Yes.

11             THE COURT:  My question is:  If the sole legal

12    predicate for your challenge is that the department didn't

13    follow its own regulations, what makes that actionable in this

14    court?  Why do they --

15             MR. DOWNING:  It means the government official

16    exceeded his authority.  And to the extent he exceeded his

17    authority, Mr. Mueller does not have authority.  That's why

18    we're here, that's our argument.

19             THE COURT:  I understand that.

20             MR. DOWNING:  And that's not internal to the

21    Department of Justice.  I mean, they said -- they promulgated

22    this reg. and they said we will do the following:  This is how

23    a special counsel will get appointed, this is the jurisdiction,

24    this is the additional jurisdiction.  It's specifically spelled

25    out there.

1           Now, I don't know if -- how they can violate those

2      regs. and we can still be here and say it doesn't matter, the

3      special counsel has his authority anyway.  What are the regs.

4      there for?  That doesn't make any sense.

5           THE COURT:  Well, it seems to me that when you start

6      looking at the regs. and you read them all, and you also read

7      the Federal Register notice that went along with it, they make

8      it very clear that there's no one-size-fits-all situation.

9      They have examples; this could happen, that could happen --

10          MR. DOWNING:  Sure.

11          THE COURT:  -- so here's the structure of how we're

12     going to handle it.  And, you've kind of pulled out one or two

13     sentences in it and said these were violated.  But when you

14     look at the structure as a whole, seems to me the goal of it is

15     to say we're not going to have what they complained about in

16     *Morrison versus Olson*; a guy, a rogue guy out there on his own.

17     He's going to be under our umbrella.  He's going to have to

18     consult with us.  He's going to have to report to us, we're

19     going to decide; he doesn't get to decide if the investigation

20     gets expanded.

21          Why, in this case, if there is a written piece of

22     paper where the deputy attorney general said, Yes, you can

23     investigate the thing that Mr. Manafort was investigated for,

24     have those regulations been violated?

25          MR. DOWNING:  Two things.  Any reading of (B)(ii) is

1    a violation of the regs. -- any reading of it, it's a violation

2    of the regs.  And you can read every single one of those regs.

3    and you can read them all together, there is no doubt that

4    (B)(ii) is as clear as day.  It says to get additional

5    jurisdiction the special counsel has to come back, he has to

6    consult with the attorney general or the acting attorney

7    general.  The acting attorney general then has to decide

8    whether or not to grant such additional jurisdiction.

9          I think, Your Honor, it is incredibly important for

10   this Court to focus on the fact that it says "jurisdiction."

11   And I agree totally with what you just said.  The politically-

12   accountable official is the acting attorney general.  He is the

13   one who grants the specific mandate, he is the one that decides

14   if there is a conflict such that a special counsel should be

15   appointed, and he must grant additional jurisdiction.

16         So what we have here is a memo that's written two and

17   a half months after the appointment.  And part of what we've

18   said in our motion is where is the rest of the record?  Where

19   is the record as to the appointment of the special counsel on

20   May 17th?  Where is the record as to what was delegated?  We

21   should have that record in front of this Court.

22         It would be very easy for this Court then to make a

23   determination as to whether or not Mr. Rosenstein in fact

24   complied with or violated that requirement that he grant

25   additional jurisdiction.  And we don't have any of that.  We

1    have one document, two and a half months later -- which, by the

2    way, Your Honor, the document itself certainly can be a

3    statement of Mr. Rosenstein's state of mind on August 2nd.  But

4    it doesn't say in there:  As we agreed, As we discussed.

5            So, it seems to me to be a very much after-the-fact

6    memo, trying to make a justification, maybe, for something

7    that, on August 2nd, Mr. Rosenstein realized he got wrong on

8    May 17th.

9            But I do think, before this Court resolves this

10   motion, it is incumbent to ask the government to produce the

11   rest of the record so this Court can inspect it and make it

12   available as appropriate and as we can show need to the

13   defense, so we can actually argue what happened on May 17th or

14   therein before that date.

15           THE COURT:  All right.  Well --

16           MR. DOWNING:  And, Your Honor, not -- and I know this

17   is -- look, this is an incredibly serious issue and I don't

18   want to make this, like, some dramatic statement, but if you

19   look at this as if Mr. Mueller, really without an appropriate

20   delegation of authority, he is not otherwise a U.S. attorney,

21   he got -- they brought him in out of a law firm, a private law

22   firm and said we want you to be special counsel.

23           These regs. were put together, like you mentioned,

24   about the abuses of the independent counsel.  We can't have,

25   then, the first act of Mr. Rosenstein says here's your specific

1    mandate, and anything "that arose or may arise."  That seems to

2    me -- and if the position of the Court is there's not judicial

3    review, we're in a worse place than we were under the

4    independent counsel because at least there was some judicial

5    review under the independent counsel.  And I can't imagine,

6    after that law was allowed to lapse, after these regs. were

7    adopted, that it was really meant to say that the attorney

8    general gets to do whatever he wants and there's no judicial

9    review of it.

10              THE COURT:  All right.  Well, let's go back to the

11   provision in the regs. that you point to.  And there's two

12   aspects of it that you point to.  First of all, in the original

13   jurisdiction section, after the first sentence that says he

14   gets -- the attorney general gets to decide what it is, it

15   could be as broad as possible, and --

16              MR. DOWNING:  No --

17              THE COURT:  -- and then the second says he has to

18   provide a specific factual statement.

19              MR. DOWNING:  I disagree.  It cannot be as broad as

20   possible.  I disagree with that.

21              THE COURT:  Whatever he decides to assign, he can

22   assign.

23              MR. DOWNING:  No, but -- Your Honor, the assignment

24   of the matter dovetails with whether or not there's a conflict.

25   It isn't just, Hey, we're kind of busy at the Department of

1    Justice, let's give the special counsel a whole bunch of things

2    to investigate.  It has to be specific.  The mandate was

3    specific, we agree with that.  But he couldn't give a broad

4    one, we disagree with that.

5             THE COURT:  There are two aspects of the regs. that

6    lead you to your conclusion.  The first is the second sentence

7    of the original jurisdiction reg. where it says he shall be

8    provided with a specific factual statement, and then you drop

9    down to the additional jurisdiction provision and you couple

10   the two of those together and you say that's what makes the

11   second portion of the appointment order invalid.

12            So, about the provision in the regs. that says that a

13   specific factual statement must be provided, the office of

14   special counsel says, Given law enforcement concerns and

15   privacy concerns, that militated against doing it publicly.  Do

16   you agree with that?

17            MR. DOWNING:  I do.

18            THE COURT:  Okay.  So you're not saying that the

19   factual statement itself has to be spelled out in the order?

20            MR. DOWNING:  No, it does not.  But it has to be

21   spelled out in an order.

22            THE COURT:  Okay.

23            MR. DOWNING:  Not a public order.  I understand why

24   that was made public, but contemporaneously with that public

25   order or before that should be the confidential order giving

1    the full description of what it was that was being handed over

2    to the special counsel.

3              THE COURT:  All right.  And one of the problems

4    you've identified with § (B)(ii) of the appointment order is

5    that it's impossible to give a new prosecutor a specific

6    factual statement of any matters that arose or may arise in

7    this investigation.  That's a fair point with respect to the

8    future.

9              But do you object to both prongs of that?  Matters

10   that arose, as well as may arise?  Because here, he was

11   transmitting, I think we can all agree, an investigation that

12   was already underway.  Right?

13             MR. DOWNING:  Well, again, Your Honor, why I think

14   this Court should ask for discovery is there's a few moving

15   parts here.  There is a counterintelligence investigation that

16   was being conducted that Mr. Comey talked about up on the Hill.

17   There is also one or two other investigations that were at the

18   Department of Justice.  Those other two investigations, without

19   having much detail about it, were also moved along to the

20   special counsel.

21             So, there are a lot of moving parts here, and I

22   really think without the government producing a record to this

23   Court, there's a lot of, like, speculation about what they

24   could have been thinking about, what could have been going on.

25             THE COURT:  I understand your point about whether

1    there's documentation.  And I can tell you that I already have

2    a question about that issue to ask Mr. Dreeben.  But my

3    question to you is:  Is it your position that the deputy

4    attorney general didn't have the authority to assign the

5    special counsel what had already arisen out of the

6    investigation and was already under investigation?

7            In other words, would it have been okay if they

8    said -- if there was -- when they gave their specific factual

9    statement, we started looking at links, and in connection with

10   the links, were interested in the Ukraine and Manafort's

11   business dealings with that, and so that's part of what we're

12   giving you.  Would that have been okay?

13           MR. DOWNING:  Well, see, this is the problem I have:

14   One, that didn't happen, that I know.

15           THE COURT:  Why do you say it didn't happen?

16           MR. DOWNING:  There's a public record that that

17   didn't happen.  Mr. Manafort was investigated with respect to

18   the Ukraine back in 2014, long before there was any issue about

19   the Trump campaign, long before there was a Trump campaign.  So

20   this is the problem we have with this proceeding.  We're all

21   sitting here guessing about what happened, where there has to

22   be a record, Your Honor.

23           The Department of Justice operates on a written

24   record.  Mr. Rosenstein had been at the department for over --

25   I think almost 30 years.  He's served in positions of deputy

1   assistant attorney general, deputy attorney general, U.S.

2   attorney.  He goes out and he exercises one of the biggest

3   delegations of authority, the appointment of special counsel.

4   There's a record of this.  And I think we're entitled to see

5   that record.

6           THE COURT:  That's my point.  You're saying to me no

7   specific factual statement was given and that's why this is

8   invalid.  But you just made the point here we have the deputy

9   attorney of the United States -- deputy attorney general of the

10  United States turning over the agency's probably most

11  high-profile, most complex criminal investigation to the former

12  director of the FBI, who had also been a former U.S. attorney,

13  and you're telling me that he didn't tell him what it was

14  about?

15          MR. DOWNING:  Your Honor, we have no document.

16  Nothing's been produced by the government.  The government

17  could have produced this document a year ago; we wouldn't even

18  have this motion, we wouldn't have this hearing.  Not one

19  document --

20          THE COURT:  Why do they have an obligation to share

21  that with you?  We do have sworn testimony from the deputy

22  attorney general who said, Yes, I gave him a specific factual

23  statement.

24          MR. DOWNING:  No, he did not testify to that, Your

25  Honor.  In fact, when he was confronted by a representative as

1    to how did he and when did he expand the jurisdiction of the

2    special counsel, he couldn't answer the question.

3             THE COURT:  That's when it was expanded.  That's a

4    different question.

5             MR. DOWNING:  He finished by saying, I need to go

6    back and check my records -- which, hopefully that indicates

7    there are records.

8             THE COURT:  I understand that.  But you pointed me to

9    page 29 of his testimony where he acknowledged that specific

10   matters are not identified in the order.  And you argue in your

11   pleading, See, that's the beginning and end of it.  He said the

12   specific matters are not identified in the order.  But if you

13   want me to rely on that, in the next sentence of his testimony

14   he said, So, I discussed that with Director Mueller when he

15   started, there's a written statement that we have, it's dated

16   August 2nd.  Why does it matter if it -- if he was told when

17   the written statement was written?

18            MR. DOWNING:  Well, Your Honor, once again, I think

19   we're entitled to see the record.  There has to be a record.  I

20   can't imagine a delegation of authority like this, as you just

21   pointed out, in such a case of national importance, that's

22   being looked at from all over the world, there's no writing?

23   There's no memo?  He conjured up in his head a conflict and

24   said, Hey, here's a bunch of things you can investigate, on a

25   phone call?  I cannot believe that the Department of Justice

1    operates like that.  And, quite frankly, I'd been there 15

2    years and never seen it operate like that.  So, I think --

3              THE COURT:  I don't think it's fair to say, after the

4    attorney general of the United States recused himself from the

5    matter, that someone conjured up --

6              MR. DOWNING:  No, no, that's what I'm saying, I'm

7    saying there's got to be a record.  I'm in total agreement with

8    you.  I'm just -- I'm trying to figure out why we need to sit

9    here and speculate about what Mr. Rosenstein did when there has

10   to be a record that can be reviewed by the Court and made

11   available to the defense after review.  I mean, it could be

12   deliberative process, but we have a need to see this, the Court

13   has a need to see it, and it would answer your question.

14             But an August 2nd memo doesn't answer the question as

15   to what Mr. Rosenstein did on May 17th or therein; I just don't

16   think it does.  And when you read it, a careful reading of it

17   doesn't say, As we discussed.  Doesn't say, As we agreed.  So,

18   I think there is definitely a real issue here.  And a record

19   produced to this Court could probably clear it up, if it can be

20   cleared up.

21             THE COURT:  Well, I hear you on that.  And I'm not

22   saying that's not a valid point, but I've got it.  My question

23   to you is:  If, on August 2nd, whether he said, As we

24   discussed, or whether it was brand new, if the whole point of

25   the regs. is to oversee and supervise the assignment of matters

1    between the special counsel and the department -- not whether

2    people get investigated, but who investigates them -- once it

3    was determined, written down on August 2nd, I want you to carry

4    the ball, special counsel, on these particular matters, how

5    could he possibly not have jurisdiction to bring the

6    indictment?

7              MR. DOWNING:  As of August 2nd, you're asking the

8    question?

9              THE COURT:  Yes.

10             MR. DOWNING:  We're not talking about from May 17th

11   to August 2nd?

12             THE COURT:  Let's assume nothing happened between May

13   17th and August 2nd -- which I'm not sure is what the record

14   established.  But even if you were right about that and he

15   said, Mr. Mueller, there's your office, and he never told him

16   what was in the files, he just handed them over, and nobody

17   talked to him between then and August 2nd, if he said, on

18   August 2nd, I want you to do A, B, and C and now there's an

19   indictment arising out of A or B or C, why do we have a

20   violation of the regulation that could somehow invalidate the

21   indictment?

22             MR. DOWNING:  So, I think certainly at that point we

23   would still challenge the authority of Mr. Rosenstein to assign

24   an unrelated matter to -- a matter unrelated to whether or not

25   the campaign -- how or anyone with the campaign had coordinated

1    with the Russian government --

2              THE COURT:  Is that what it says?

3              MR. DOWNING:  -- we would still challenge that.

4              Well, in the August 2nd memo the thing I found

5    interesting is that there's three separate bullet points.  One

6    is redacted, but there's three separate bullet points.  And the

7    idea that this broad Ukrainian thing could fit into one I think

8    is definitely disproven by the fact that Mr. Rosenstein, in

9    that memo, puts these as separate investigations, separate

10   matters to be investigated.  So that's the first thing.

11             But I still think we have the ability to challenge

12   whether or not Mr. Rosenstein abused his authority under the

13   regs. to assign something that isn't related or didn't --

14             THE COURT:  Okay.  I don't see that in your memo

15   either.

16             MR. DOWNING:  Well, we're concentrated on (B)(ii).

17   This is what we've talked about, (B)(ii).

18             THE COURT:  Right.

19             MR. DOWNING:  But you're positing these new scenarios

20   for me, but I didn't --

21             THE COURT:  The point of (B)(ii) --

22             MR. DOWNING:  Your Honor, if I could finish.  I

23   didn't posit a hypothetical.  Our motion on based on what it is

24   we knew.  And we didn't know about the August 2nd memo at that

25   point in time either and we don't know what other memos exist

1     to have a more direct challenge on this very issue.

2              So I hate to kind of rehash this, but you're giving

3     me hypotheticals and I'm not sure how the hypothetical applies

4     to what actually happened here.

5              THE COURT:  My point is, I'm trying to figure out

6     what your challenge is, and I thought your challenge was that

7     the attorney general didn't have authority to assign him up-

8     front to anything that arose --

9              MR. DOWNING:  Yes.

10             THE COURT:  -- because the regs. say the attorney

11    general is supposed to keep control of that on an ongoing

12    basis.

13             MR. DOWNING:  Yes.

14             THE COURT:  And at least as of August 2nd, the

15    Department of Justice said, Special Counsel, this one is yours.

16    And I don't think that's a hypothetical.  You've been provided

17    with that document.

18             MR. DOWNING:  Now.  But you asked why that wasn't in

19    our motion.

20             THE COURT:  I didn't ask why that wasn't in your

21    motion.

22             MR. DOWNING:  You did before.

23             THE COURT:  My point is why -- what you're saying is

24    that that's not related, but does it -- he -- the reg. that you

25    cite, the reg that you want applied gives him broad authority.

1   It could be a completely unrelated investigation but involving

2   somebody who could be a potential witness.  They give three

3   alternatives.

4            MR. DOWNING:  And we say that that is completely in

5   violation of the regs.  It's unauthorized.  It's not --

6            THE COURT:  That's in the regs. as an option.

7            MR. DOWNING:  No.  The idea is it can't be thrown out

8   to the special counsel on day one.  The special counsel, as

9   he's conducting his investigation -- as the government points

10  out, you're conducting an investigation.  You don't know what's

11  going to happen on day two, day five; it happens.  The special

12  counsel has to go back through the regs. and consult with the

13  acting attorney general, who has to decide whether or not to

14  give him the additional jurisdiction.

15           THE COURT:  I understand that.

16           MR. DOWNING:  So I think we're in agreement.  I think

17  we are.

18           THE COURT:  If the special counsel was told from the

19  get-go that the pending investigation that was being turned

20  over included this matter, would that take care of the problem?

21  I realize you're saying I need the documents, I don't believe

22  that --

23           MR. DOWNING:  Your Honor, I have to tell you, sitting

24  here answering hypotheticals is like me digging a hole for

25  myself.  I mean, we really need the record.  And I would be

1    more than happy to come in and take the record head-on as to

2    what happened on May 17th or therein and what happened on

3    August 2nd.  But we're sitting here -- and I appreciate why the

4    Court is doing this, but I'm just sitting here arguing against

5    myself on hypotheticals when the government has the ability to

6    give this Court and have Mr. Manafort in possession of what the

7    record is.

8           THE COURT:  Well, does it matter that in the August

9    2nd memo it doesn't just say this is what I say today you can

10   do, but it actually does say that this is what you got back

11   then?

12          MR. DOWNING:  I can't even really understand what the

13   letter is communicating.  Because Mr. Rosenstein could have

14   clearly said, you know, I forgot to write it down, I was kind

15   of busy, but here's what we agreed to.  He doesn't say that in

16   that memo.  It's very carefully worded.  Very carefully worded.

17          THE COURT:  Well, if we disregard the memo and you

18   want to look at more contemporaneous records, what should we

19   make of the fact that the affidavit in support of the search

20   warrant for the storage unit was dated only ten days after the

21   appointment order and it refers to steps taken before that?

22   Are you saying that the whole investigation was expanded to

23   include this, and all within ten days?

24          MR. DOWNING:  Well, if you want me to just, like,

25   take a guess, my guess is Mr. Rosenstein said to the special

1    counsel, Take this Russian thing and take Manafort and take

2    everything, just go do it.  That's what I think (B)(ii) is

3    meant to convey to Mr. Mueller.  And it violates the regs. and

4    it's an inappropriate, unauthorized grant of authority.  That's

5    all I can think right now.  Without having more of a record in

6    front of me to show otherwise, that's what (B)(ii) looks like.

7    (B)(ii) looks like Mr. Rosenstein washed his hands and said,

8    Mr. Mueller, you do it all.  And then on August 2nd he

9    realized, maybe I made a mistake.

10                THE COURT:  Could you --

11                MR. DOWNING:  By the way -- and I mean this with the

12   utmost respect to Mr. Rosenstein.  I don't know what happened.

13   We've been very careful.  I want to make sure this Court

14   understands, if we can have a record, we'll all know what

15   happened, it would be very easy to resolve this.

16                THE COURT:  I don't think you're being disrespectful

17   to anyone.  You're making legal points on behalf of your

18   client, and I don't have a problem with that.

19                Now, what was I going to say?

20                You claim -- let's move on to the second part of your

21   argument, which is that even if the appointment order was

22   correct and the deputy attorney general was permitted to grant

23   the special counsel the authority that he granted, whatever it

24   means, that the special counsel exceeded the scope of that

25   authority.

```
 1              I know what I was going to ask you before, is can you
 2     read the appointment order as simply tracking the statute?  In
 3     other words, setting out the broadest scope of what Mr. Mueller
 4     would have the power to investigate.  First of all, specific
 5     matter X, obstruction of the investigation of specific matter
 6     X, in matters that arise out, with contemplating and
 7     understanding that the consultation would still be required in
 8     each --
 9              MR. DOWNING:  No, I think (b)(ii) is a blatant
10     violation of the regs.
11              THE COURT:  All right.  So, even if it wasn't, you
12     say that it was exceeded, in any event.  And you say that
13     because the allegations didn't arise out of the investigation
14     into the election and Russian interference and that Mr. Mueller
15     has now inappropriately expanded the matter to reach Mr.
16     Manafort's dealings, now paragraph (b)(i) of the appointment
17     order authorizes the investigation into any links between the
18     Russian government and individuals associated with the campaign
19     of President Donald Trump.  So, why wouldn't that cover an
20     investigation of Mr. Manafort's offenses set out in the
21     indictment?
22              MR. DOWNING:  The -- Mr. Manafort's activities in
23     U.K. have nothing to do, at all, with the campaign and whether
24     or not there was any coordination with the Russian government.
25     It has nothing to do with it.  Absolutely noting.
```

1          THE COURT:  I agree with that.  That's not all it

2     says, though.

3          MR. DOWNING:  I know.  And what I wanted to say, much

4     like *Espy*, also looking temporally at what it is the specific

5     mandate was.  The specific mandate covered the campaign.  The

6     timeframe of the campaign is readily definable.  And going back

7     ten years to look at anything and everything Mr. Manafort did

8     in his business in no way -- and in totally keeping with *Espy*,

9     is completely unrelated.

10          THE COURT:  Well, don't we have a conspiracy count

11     that goes into 2016 in this case?

12          MR. DOWNING:  We do.

13          THE COURT:  Okay.  But, let's --

14          MR. DOWNING:  But, we don't have anything in our

15     indictment that has to do with the Trump campaign.  There is

16     zero.

17          THE COURT:  I understand that.

18          MR. DOWNING:  It's important.  That's the main point.

19          THE COURT:  That's your point, but that's not what

20     the appointment order says.  The appointment order doesn't say

21     any collusion, any coordination, any campaign violations.  It

22     says any links and/or coordination between the Russian

23     government and individuals associated with the campaign.

24          MR. DOWNING:  Your Honor --

25          THE COURT:  Now, if someone is going to be looking to

1   determine whether there are links between the Russian

2   government and the campaign, are you saying that it was

3   inappropriate and it doesn't fall between (b)(i)?  The

4   opposition filed by the office of special counsel, on page 18,

5   goes chapter and verse --

6              MR. DOWNING:  Categorically, it does not fall in the

7   specific description.  And, quite frankly, a reading of a

8   specific description to be that broad would completely violate

9   the spirit of those regs.  It's called specific for a reason.

10  It can't be anything and everything that you claim might just

11  be related to something that might have happened during the

12  campaign.  I mean, if it was written like that, right on its

13  face everybody would have gone nuts.  That's just way too

14  broad.

15             THE COURT:  To ask for -- let's leave out the

16  coordination phrase.  Any links between the Russian government

17  and individuals.  Why wouldn't that be something that would be

18  absolutely essential to any criminal -- you can't start with

19  the conclusion, Well, we're only going to -- you don't know if

20  there's coordination until you know if there's anybody who

21  would be in a position to coordinate, do you?

22             MR. DOWNING:  You raise an interesting issue because

23  having been around the department for a long time, grand jury

24  investigations don't get started on some lark or some, like,

25  hey, I wonder if somebody did this or that.  You have some

1    credible evidence that something happened.  So there's a

2    starting point here.

3            We, again, if you had it -- if the government had

4    produced it, you would have the starting point and you would be

5    able to say, Look, Mr. Downing, it's right here and this is why

6    it makes sense.  Or you would look at the record and say there

7    is no record and then we would all have to go back to just

8    guessing at what was assigned.

9            THE COURT:  I understand your desire to explore more

10   explicitly what led to the assignment of these matters to the

11   special counsel.  But now you're talking about the genesis of

12   the entire investigation, which I think is outside of the scope

13   of this.

14           MR. DOWNING:  Oh, it absolutely is not.  It

15   absolutely is not.  The designation of the special counsel, the

16   specific mandate, the conflict, all of this gives rise to the

17   special counsel.  The question is, as Mr. Rosen --

18           THE COURT:  As you said, somebody can't come in here

19   off the street and argue about the appointment order to Mr.

20   Manafort.  I don't think Mr. Manafort gets to argue about

21   aspects of it that don't relate to him.

22           MR. DOWNING:  You just asked a question about how

23   broad it can be and you asked a question about coordination --

24           THE COURT:  I didn't ask how broad it could be.

25           MR. DOWNING:  But wait a minute.

1          THE COURT:  I asked you why what it says, "Any links

2     between the Russian government and any individuals associated

3     with the campaign of Donald Trump," why is the government wrong

4     in its opposition when it says this investigation of this

5     gentleman for the specific work that's described in the

6     indictment isn't a link between the Russian government and a

7     person significantly involved in the campaign?

8          MR. DOWNING:  I think Mr. Rosenstein would have

9     needed a memo on August 2nd, if your rationale applied, or the

10    government's rationale applied.  He would not have had to have

11    written a three-point bullet.  And bullet No. 2 is not in

12    bullet No. 1.  Bullet No. 2 is separate and apart.

13         What we're here for on Mr. Manafort's activities in

14    Ukraine is bullet No. 2.  Mr. Rosenstein did not say, Oh, and

15    by the way, I always envisioned the specific mandate

16    encompassed Mr. Manafort's work in the Ukraine.  He doesn't say

17    that.  He says -- it's a separate bullet.  And I think that's

18    very telling of the fact that it wasn't included.  And there

19    would be no need to have an August 2nd memo if, in fact, that

20    was the fair reading of the attorney general.

21         THE COURT:  Well, if there's an August 2nd memo, then

22    why is this an ultra vires action on the part of Mr. Mueller?

23    At that point wasn't it his?

24         MR. DOWNING:  At that point we would still argue that

25    point No. 2 is not a matter related and should not have been

1    given jurisdiction to the special counsel.  Because, again,

2    Your Honor, the idea here is -- and again --

3              THE COURT:  I think it says, "Arising out of" --

4              MR. DOWNING:  Yes.  "May arise or arose from."

5              THE COURT:  What's the reg. say?  "If, in the course

6    of his or her investigation, the special counsel concludes that

7    additional jurisdiction beyond that specified in the original

8    jurisdiction is necessary in order to fully investigate and

9    resolve the matters assigned, or to investigate new matters

10   that come to light in the course of his investigation."

11   Doesn't even say "related."  It just says he shall consult who

12   will determine whether to include the additional matters within

13   their jurisdiction or assign them elsewhere.

14             And then when you read the regs. -- not the regs.,

15   the Federal Register notice that announced these regs., they

16   give a whole list of things, and they certainly don't limit it

17   to arising out of, directly related to.  The language that was

18   of importance in *Espy* is absent, even from the regs.

19             MR. DOWNING:  So, no disagreement that in the course

20   of an investigation that a special counsel may want to pick up

21   matters for different reasons, related to somebody that is

22   within the scope of his investigation.  I'm not disagreeing

23   with that.  But, I will tell you this:  If the starting point

24   for these regs. is there's a conflict at the Department of

25   Justice, for which there has been one established, that had to

1   do with the Russian investigation.

2         There's an ongoing investigation being conducted by

3   U.S. attorney's office at that point in time.  There certainly

4   would have to be some type of justification as to why that

5   would then be sent to Mr. Mueller.  We have a big mismatch

6   here.  We have an August 2nd memo, but we have activity that

7   occurred starting -- it may have started even before May 17th.

8   But, at least between May 17th and August 1st there was a ton

9   of activity, far afield from anything about Russia or any

10  coordination with the campaign.  It started on day one.  That's

11  why we think there's --

12        THE COURT:  Isn't the fact that it started on day

13  one, or at least we know by day nine or ten they're in the

14  storage unit, doesn't that suggest that it was part of what was

15  handed over from the beginning?  Doesn't that undercut the

16  point you're making?

17        MR. DOWNING:  No.  Actually, my point is that Mr.

18  Rosenstein did that.  (B)(ii) is overly broad.  And he said to

19  Mr. Mueller, Go do it, go do whatever you want.  That's why

20  (b)(ii) is a violation of the rule.

21        THE COURT:  What I'm saying is how could, Whatever

22  you want include this?

23        MR. DOWNING:  We don't know the answer because the

24  government hasn't given us the record.

25        THE COURT:  All right.  All right.  Is there anything

1    else -- we're going to argue the other two motions after I've

2    heard from the government on this motion.

3              Is there anything else you want to tell me about this

4    issue?  I have, as you can tell, I've read your pleadings, I've

5    read your reply.  But if there's something else you want to

6    highlight for me, I want to hear it.

7              MR. DOWNING:  Okay.  Could I have one moment to

8    confer?

9              THE COURT:  Yes.

10             MR. DOWNING:  Thank you.

11             (Pause.)

12             MR. DOWNING:  My colleagues say I should sit down.

13             THE COURT:  All right.

14             MR. DOWNING:  Thank you, Your Honor.

15             THE COURT:  Mr. Dreeben.

16             MR. DREEBEN:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             If the whole point of the regulation is to establish

19   a system where the special counsel knows from the get-go what's

20   been referred and that he has to come back and ask for

21   permission for each expansion, why isn't an appointment order

22   that incorporates the additional jurisdiction from the start

23   completely inconsistent with that?

24             MR. DREEBEN:  Your Honor, the starting point, I

25   think, to answer that question, is that the regulations nowhere

1    provide that a public appointment order need contain a full and

2    complete statement of the jurisdiction that the attorney

3    general is assigning to a special counsel.  And there is good

4    reason for that.

5          THE COURT:  Well, I think Mr. Manafort -- Mr.

6    Manafort's counsel basically conceded that it doesn't have to

7    be public, and it doesn't have to be in the appointment order.

8    But, the order doesn't just say matters that arose, it also

9    says matters that may arise.  And so, clearly, they couldn't

10   have been detailed from the get-go because I don't think, as

11   good as he is, that the deputy attorney general can see into

12   the future.  So, why is it appropriate to go that far at the

13   start?

14         MR. DREEBEN:  I think the answer to that question is

15   that within the structure of the regulations, the "arising

16   directly out of" language reflects the fact that an

17   investigation naturally moves forward.  By definition, it's

18   going to expose and explore facts that are not completely known

19   at the time.  But not everything that will fall into that

20   category is going to constitute a new matter or an additional

21   matter that requires an expansion of the special counsel's

22   jurisdiction.  And to have a restriction on the special counsel

23   that would be so narrow that anything at all that wasn't

24   specified at the outset would constitute additional

25   jurisdiction would intrude on one of the two core purposes of

1    the special counsel regulations.

2           Purpose one is to establish an independent counsel

3    who can establish an independent investigation, somebody within

4    the justice department who is free from day-to-day supervision

5    and can, therefore, proceed in an independent way that will

6    give public credibility to the investigation.  And the second

7    feature and purpose of the regulations is to assure

8    accountability to the attorney general.

9           So a variety of reporting mechanisms are established.

10   The acting attorney general knows what the special counsel is

11   doing.  The regulations provide for a very -- variety of

12   reporting mechanisms.

13          So the "arising directly out of" language is simply a

14   reflection of the fact that the whole purpose of an

15   investigation is to move forward.

16          If the special --

17          THE COURT:  But aren't the whole purpose of the regs.

18   to say we understand that?  And regular U.S. attorneys get to

19   do it on a daily basis, but we want to balance your

20   independence with accountability.  We don't want you to be the

21   one, at the end of the day, who decides that the new thing that

22   grew out of your investigation is yours, or whether it's ours,

23   so you have to come back and ask us.

24          So, given if that is the thrust of the regulation, to

25   give him some flexibility, but also to give oversight, why

1      doesn't it exceed what's contemplated in the regulations to,

2      from the start, say, And your jurisdiction will include what

3      may arise?

4              MR. DREEBEN:  Because that language doesn't have

5      unlimited sweep.  It has to be interpreted in the context of an

6      attorney general who's decided to operate under the framework

7      of regulations, who's giving jurisdiction to a special counsel.

8      The special counsel knows from the regulations and from the

9      promulgation statement that accompanied them, that discussed

10     them, that when he hits a matter that's new, you have to go

11     back to the attorney general and get an expansion, if you want

12     to do it.  The attorney general could assign it elsewhere,

13     could assign it to the special counsel.

14             So this language, which is not statutory language,

15     it's language that the acting attorney general chose to put in

16     an order.  He certainly would get deference about the

17     interpretation of language that he chose to put in an order, in

18     the context of a regulatory framework.  It doesn't occupy, as

19     Mr. Manafort's counsel says, all the space that -- in the

20     world, of anything that the special counsel runs across.

21             It's not a blank check, it's not carte blanche.  It's

22     simply a reflection of limited investigatory freedom within the

23     assigned area of jurisdiction.  And if a new matter does arise

24     that's comprehended by 600.4(b), special counsel comes back to

25     the acting attorney general and they discuss it and they work

1    it out.  And the testimony of the deputy attorney general that

2    was public, under oath, on the record, explains that's exactly

3    how things unfolded.

4         At the outset he issued a public order so that the

5    public would have notice of the general parameters of the

6    investigation.  The details of it could not be conveyed in a

7    public record.  I think that Mr. Manafort's counsel has

8    properly acknowledged that.  Those details were conveyed as the

9    deputy attorney general has explained.

10        THE COURT:  Well, he has one sentence, in the 200

11   pages of testimony that you provided to me, that said, "I

12   discussed it with Mueller."  The memorandum asserts that a

13   factual statement was provided at the time of the appointment

14   order.  And if that's true, what was the point of the August

15   2nd memo?

16        MR. DREEBEN:  Precisely because we saw that this day

17   would come, and that the public appointment order does not

18   mention Mr. Manafort or other specific subjects, and that a

19   defendant might point to that order and say, Hey, I'm not in

20   there, therefore, there was no jurisdiction to investigate me.

21   And, therefore, that order reflects confirmation of what was

22   within our scope at the time of the appointment and what was

23   confirmed on August 2nd.

24        We provided it to the Court so that the Court has a

25   regular assurance.  There's nothing that overcomes the

1   presumption of regularity here that governmental officials are

2   properly and honestly reporting to the Court the facts that

3   surrounded the jurisdiction that was established.  And we,

4   therefore, have a document that reflects, long before the

5   indictment was issued in this case, that the acting attorney

6   general wanted the special counsel to investigate both the

7   links and coordination issues and, also, to make it more

8   precise and specific, crimes that would arise or might arise

9   out of the receipt of payments from the Ukraine government that

10  Mr. Manafort received.  And that's what the special counsel has

11  investigated, that's what's resulted in the criminal charges

12  here today.

13          And we, therefore, think we have both a fit with the

14  public appointment order -- I think Your Honor has explained

15  why the (b)(i) provision dealing with links and coordination

16  would naturally lead investigators and prosecutors to ask the

17  question.

18          Here you have somebody who was a campaign official in

19  the Trump campaign, that he had longstanding ties to

20  Russia-backed politicians in the Ukraine.  What were the nature

21  of those connections?  Did they provide means for surreptitious

22  communications?  Did they provide back channels to Russia?

23  Investigators will naturally look at those things.

24          THE COURT:  Why shouldn't I be concerned, if we're

25  talking about regularity and presumptions of regularity, about

1    a gap in time between the appointment order and the August 2nd

2    memo?

3         MR. DREEBEN:  I don't know why the Court would be

4    concerned about it.  That was a reflection of communications

5    between the acting attorney general and the special counsel to

6    document processes and decisions that had already been made.

7    It's not an after-the-fact justification or an expansion.  The

8    very language of it says these were matters that were within

9    your scope at the time of the appointment and are still within

10   your scope.

11        THE COURT:  Well, Mr. Manafort points to the fact

12   that the memo came after the execution of key search warrants.

13   And one of the things you point out to me is that the

14   regulations require consultation with Department of Justice

15   officials, and particularly kind of the career experts in these

16   areas, before significant events such as not just indictments,

17   but search warrants take place.

18        So, shouldn't you be demonstrating to me that that

19   was memorialized or documented somewhere?

20        MR. DREEBEN:  Well, I don't think that the government

21   has any obligation to demonstrate any of that in a public

22   record in this proceeding.  We have argued that compliance with

23   these regulations is not a matter for judicial cognizance.

24   Compliance with the appointment order is a personnel decision

25   that the acting attorney general made.  It was not intended to

1    provide rights for defendants, or to benefit them.

2            So pulling back the curtain on the consultation

3    process between very senior officials in the Department of

4    Justice over a criminal investigation would be extraordinary,

5    and I think it would require an extraordinary showing of either

6    illegality or misconduct or some other basis to do that.

7            So with that said, I can represent to the Court that

8    the government has complied with the regulatory structure in

9    consultations with the acting attorney general, as the acting

10   attorney general informed Congress.  We're well aware of what

11   our obligations are under the regulations.  The prosecutors who

12   are handling the matter and the special counsel's office and

13   the attorney general's office are in contact and complying with

14   consultation requirements.

15           But, again, I don't think that that is a matter that

16   Mr. Manafort is entitled to probe in a motion to dismiss the

17   indictment.  He's basically making an argument that the Court

18   is without jurisdiction, that the special counsel is without

19   authority and, therefore, he can attack the indictment.  Now

20   we're talking about search warrants, whether they were

21   appropriately executed at a time when the August 2 memorandum

22   and the legal authorities backing it were in place.  I don't

23   really think that that's an attack on the indictment.  He can

24   file a separate motion if he wants to.

25           THE COURT:  No, it's not his attack.  What I'm saying

1     is that if the point is that he had this authority all along

2     and it was blessed by the Department of Justice from the

3     beginning for him to -- either because it's a link or it's an

4     expansion, it was understood and it was there from the get-go,

5     and you're saying that I can take comfort in the fact that the

6     regulations were followed because they require consultation

7     along the way, they don't just hand off a case and say

8     good-bye.

9              You're telling me to take comfort in something, but

10    not even saying to me, okay, ex parte, without any of the

11    reasons, here's a date from office of special counsel to

12    somebody in DOJ, Re:  Search warrant, with the rest of it

13    blocked out, just to add some color to it.  What you're saying

14    is just read what he told Congress, which got a little -- at

15    some point, halfway through, when they were pressing him, well,

16    was that an expansion?  Was it a confirmation?  He's, I got to

17    get back to you --

18             MR. DREEBEN:  Well, there wasn't any specific

19    reference in that colloquy to Mr. Manafort.

20             I just want to back up a point that I think Your

21    Honor made in colloquy with Mr. Manafort's counsel.  This is an

22    intra-executive branch process in which the acting attorney

23    general is working out which prosecutors will handle which

24    legitimate investigatory matters.  That is normally something

25    that is an entirely intra-executive branch issue.  And the

1    issue for the Court is does the Court have jurisdiction?  Has

2    there been a violation of some constitutional right or

3    statutory right that's individually enforceable?

4              I think Mr. Manafort today has said that you don't

5    have a constitutional claim in front of you.  He said that

6    there's a statutory claim, but his statutory claim is entirely

7    derivative of his claim that he can enforce the special counsel

8    regulations.  Special counsel regulations were designed as a

9    matter for governance of the Department of Justice, so that we

10   could have both an investigation that had integrity and public

11   respect, and also adequate supervision, so that we didn't have

12   runaway independent counsels.

13             And in setting up that structure and providing the

14   benefit of public notice of how it was going to work, the

15   regulations were quite explicit:  It's not intended to confer

16   rights on anyone.  It also doesn't limit the acting attorney

17   general's authority.

18             So, much of what we're talking about today of the

19   sort of intra-executive branch process of the acting attorney

20   general talking to prosecutors that he's appointed is not

21   something that gives rise to legal claims that impugn in any

22   way this Court's authority to hear the charges that the grand

23   jury returned in the indictment.

24             The normal background rule is an indictment returned

25   by an unbiased grand jury is sufficient to call for trial on

1    the merits.  He's seeking to attack that by saying that the

2    prosecutor who appeared before the grand jury, signed the grand

3    jury indictment, doesn't have proper status under Department of

4    Justice regulations, regulations that were adopted to organize

5    how DOJ does its business.

6           I'm not sure why any of that gives rise to something

7    that should concern the Court legally about the status of the

8    prosecutor who's in front of you.  The appointment order --

9           THE COURT:  Do I have to rely on Deputy Attorney

10   General Rosenstein's testimony to rule on this motion?

11          MR. DREEBEN:  You do not have to rely on that

12   testimony.  I think that you could look at the order itself, on

13   its face, before you even get to the August 2nd memorandum and

14   conclude that the matters that gave rise to the indictment are

15   subsumed in (b)(i).  (B)(i) deals with, as I think Your Honor

16   has discussed, links and/or coordination between the Russian

17   government in its efforts to interfere with the election and

18   individuals associated with the campaign of the president.

19          And Mr. Manafort falls on both sides of that divide.

20   He was associated with the campaign as its chairman and in

21   other official capacities and he has a long series of links to

22   Russian-backed politicians in the Ukraine and other Russian-

23   affiliated persons.  And an investigation doesn't start out

24   with a crime, it starts out with facts that warrant

25   clarification.  The whole --

1          THE COURT:  Let's say I disagree with that and I

2     agree with his contention that it falls outside the scope of

3     any links.

4          MR. DREEBEN:  Okay.  We still have --

5          THE COURT:  One of the things you've pointed me to is

6     the deputy attorney general's testimony and the August 2nd

7     document.  And you, in one of your footnotes, gave me authority

8     that said it would be permissible to rely on things like

9     documents like the August 2nd memo.

10          MR. DREEBEN:  Yes.

11          THE COURT:  Is there any similar authority about the

12     deputy attorney general's testimony?  I mean, one thing that

13     came to mind to me is when he says to Congress -- which is a

14     totally different kind of body than this Court, in terms of the

15     decision making it's making and what it's doing -- the special

16     counsel is in compliance with my order.  Is that a legal

17     opinion?  Is that a factual question?  What's he doing?  And

18     what am I supposed to make of it?

19          MR. DREEBEN:  I think you can do two things with it,

20     Your Honor.  We're certainly not asking you to take it as a

21     surrogate for this Court's responsibility to decide issues of

22     law.  It does represent a factual statement by the very officer

23     who Mr. Manafort says is not adequately supervising or

24     authorizing the conduct of the special counsel, that in fact he

25     is doing that.  And he's doing it under oath, he's doing it in

1    a manner in which, as a factual matter, what he said, the Court

2    can take judicial cognizance of, and it buttresses the

3    assumption that officers do conduct their affairs in a regular

4    manner that appropriately fulfills their legal obligations.

5         Unless there's some strong evidence that overcomes

6    that, usually courts just accept that because it fits within

7    the presumption of regularity that the Supreme Court has time

8    and again reaffirmed.  Cases like *United States versus*

9    *Armstrong*, for example.  Claims of selective prosecution don't

10   get to the discovery stage unless there's a substantial

11   threshold basis for showing that selective prosecution may have

12   gone on.  There's no basis here for impugning what the acting

13   attorney general told Congress.  So, I would say that to you.

14        And, on a lower level, it does provide some comfort

15   that we have an alive and awake acting attorney general who's

16   looking at this investigation, knows what's going on, has

17   testified to it in the public domain.  And I think it makes it

18   all the more implausible for Mr. Manafort to say somehow the

19   special counsel is out on a frolic and detour that far exceeds

20   any mandate that he was given.  It just -- kind of defies

21   belief that the acting attorney general would say that to

22   Congress, if we, in fact, were exceeding our mandate.

23        THE COURT:  All right.  Is there anything else that I

24   didn't ask you that we haven't discussed that you want to

25   emphasize in response to --

1          MR. DREEBEN:  Just two matters, Your Honor.  And I

2     think you touched pretty clearly on one of them, but I wanted

3     to underscore it.  To the extent that he's making an argument

4     based on 28 U.S.C. 515, which Your Honor quoted to him, for the

5     first time in, I think, his reply brief he really surfaced that

6     he is trying to make a statutory argument by saying the

7     regulations are really an interpretation of § 515.  So if

8     there's a regulatory violation, there's a violation of the

9     statute.  That's a new argument that he's making.  I think that

10    argument is wrong, based on the fact that the regulations don't

11    purport to be an interpretation of the statute.

12         THE COURT:  And they're not issued pursuant to a

13    congressional directive in the statute to the agency.

14         MR. DREEBEN:  Correct.

15         THE COURT:  You should implement this with regs.

16         MR. DREEBEN:  Correct.  And right in the promulgation

17    statement, just a little bit down from where Your Honor read

18    the APA-type disclaimer, the authorities for it are cited.  And

19    the authorities, 5 U.S.C. 301, which is basically a statute

20    about organizing the affairs of a department.  Any head of

21    department can promulgate those types of regulations.  And then

22    it cites a couple of other statutes, 509 and 510, I believe,

23    which are statutes about the authority of the attorney general.

24    Doesn't cite 515 at all.  And it just didn't represent an

25    interpretation or a limitation on the attorney general's

1    authority.  I'm not even sure, by regulation, that the attorney

2    general could limit his own authority.

3          And Congress has provided very broad authority for

4    the attorney general to appoint special attorneys and to allow

5    them to conduct their affairs to the -- the cases that have

6    interpreted the language on which he's relying, that the

7    special counsel can conduct matters when specifically directed

8    by the attorney general.  The cases that have interpreted that

9    have said it is pretty much as broad as the attorney general

10   wants it to be.  It's not language of extreme limitation.

11   People have been sent into districts in order to investigate

12   and prosecute crime in those districts, Courts have said that

13   that is fine.

14         Here, there is a much more specific direction to the

15   special counsel, but nothing infringes the statute in what --

16   even what Mr. Manafort says is the jurisdiction that we have.

17         And then the second thing that I would want to point

18   out, also in response to a new argument that Mr. Manafort made.

19   Mr. Manafort suggested in his brief and again today at the

20   podium, that because the special counsel regulations are

21   published in the Code of Federal Regulations, they somehow

22   assume a legal status that distinguishes them from the United

23   States attorney's manual.  And I think he's doing that to

24   distinguish the line of cases that are represented in the D.C.

25   Circuit's *Blackley* decision, in a case that we did not cite

1    because he did not make this argument.

2         In the D.C. Circuit, the D.C. Circuit has applied the

3    same principle, that internal DOJ guidance and policies are not

4    enforceable by Courts when they have the language that says,

5    "This shall not create any rights."

6         The D.C. Circuit has applied that to a provision in

7    the Code of Federal Regulations.  The case is *In re:  Grand*

8    *Jury Subpoena, Judith Miller*, citation is 438 F.3d 1114.  And

9    at pages 1152 to -53 the Court applies the exact same rule to

10    the media subpoena regulation, 28 C.F.R. 5010, which is, again,

11    a guidance provision that the department imposes on itself to

12    afford additional protection above and beyond what the First

13    Amendment would provide to members of the media who are being

14    compelled to produce evidence.  And the litigant in that case

15    claimed, ah, there's a violation of 5010.  And the Court said

16    that's not a reviewable issue, it doesn't create legal rights

17    for individuals and, therefore, it doesn't provide a basis for

18    judicial cognizance.

19         It's in the C.F.R., just like the special counsel

20    regulations are in the C.F.R.  And we would submit that that

21    authority establishes a ground for this Court to conclude that

22    the regulations do not provide enforceable rights for Mr.

23    Manafort.

24         THE COURT:  Okay.  Thank you.

25         Yes?

1          MR. DOWNING:  Just one follow-up, Your Honor.  When I

2   started out talking about counterintelligence investigation

3   appropriately being in front of a grand jury, it's at footnote

4   6.

5          THE COURT:  Okay.

6          MR. DOWNING:  Thank you, Your Honor.

7          THE COURT:  But didn't -- when Mr. Comey testified --

8   and it's his testimony that's referenced in the appointment

9   order -- didn't he say there are criminal matters being

10  investigated?  He goes on to say it was -- he didn't just say

11  it was counterintelligence.  He confirmed that it was counter-

12  intelligence, but then didn't he also say it was criminal?

13         MR. DOWNING:  I will go back and check, but I think

14  what he said was they had a counterintelligence investigation

15  and the next thing they would have to determine was whether or

16  not there was evidence of crimes that would be subject to

17  further criminal investigation.  But I'll check that.

18         THE COURT:  I know I read it to you last time, so I

19  have it.

20         All right.  We're going to take a break before we go

21  on to the next two motions to dismiss.  And, so, we'll resume

22  in about ten minutes.  Thank you.

23         (Recess.)

24         THE COURT:  All right.  Let's go on to the motion to

25  dismiss Count 4 or 5 on multiplicity grounds.  In this motion

1   the defendant looks at Count 4, which alleges misleading

2   statements and letters to the Department of Justice dated

3   November 23rd, 2016 and February 10th, 2017, and alleges that

4   they violate the Foreign Agents Registration Act.  And then in

5   Count 5, the indictment alleges that false statements were made

6   to the United States in violation of 18 U.S. Code § 1001 on

7   11-23-16 and 2-10-17, based on the same two letters to the

8   Department of Justice.

9          So, the defendant says, well, these counts are

10   essentially seeking to punish me for the same false statements,

11   which is essentially the same offense twice and that's

12   improper.

13          So let me start with counsel for Mr. Manafort who's

14   assigned to this one.

15          MR. ZEHNLE:  Thank you, Your Honor.

16          THE COURT:  All right.  I think I understand your

17   argument concerning the similarity of the elements of the two

18   offenses.  And whether I agree at the end of the day whether

19   dismissal is required, I think it has a lot of force and I

20   don't have too many questions about it.

21          But what is your response to the argument by the

22   office of special counsel that when you get to the omissions

23   prong of these statutes, that 1001 and FARA have different

24   elements?

25          MR. ZEHNLE:  So, Your Honor, I think the response to

1    that would be as follows:  In the government's briefing, they

2    essentially -- we talk about the false statements issue.  As

3    the Court has just inquired, that's really not at issue right

4    now.  It's really the issue of under 618(a)(2), whether that

5    omission of a material fact is also included by 1001(a).  My

6    response and our response would be that those two things -- I

7    think the government has actually maybe overstated the breadth

8    of what FARA says.

9         If I might, in responding the government says while

10   FARA covers statements rendered misleading by omissions of

11   facts, § 1001(a) does not reach statements that are misleading

12   but literally true.  Actually, 1001, under the prong that deals

13   with -- and I'll read the Court's the language, I'm sure you're

14   familiar with it, "Falsifies, conceals or covers up by any

15   trick, scheme or device a material fact" would, in the defense

16   view, cover that conduct.

17        If the Court looks at 618(a)(2), which is what the

18   charge is brought under, it begins, "Any person who, in any

19   registration statement, any supplement, or any other document

20   filed with or furnished to the attorney general under the

21   provisions of the subsection."  When you look at 1001(a)(1), it

22   says, "Falsifies, conceals or covers up by any trick, scheme or

23   device a material fact."

24        So, what's left out when you look at (a)(2) in the

25   government's briefing, what's left out is that it actually has

1    to be a physical submission of the registration statement, the

2    supplement, or any document with respect to that.

3          1801(a)(1) talks about a trick, scheme, or device to

4    essentially conceal a material fact.  Courts have held that a

5    trick, scheme, or device essentially implies an affirmative

6    act.  This is not just a material omission in the sense of I

7    left something out during a conversation.  What they've done

8    is, arguably, under the government's theory, submitted a false

9    document that may have left out key material facts.  And our

10   argument is that 1001(a)(1), that would qualify as a trick,

11   scheme or device --

12         THE COURT:  Well, do we even have to get into that?

13   In this case it seems what they're alleging is the letters were

14   out-and-out false; not that they left things out, but that they

15   lied.  So where would the daylight be between -- I guess that's

16   my question for them.

17         MR. ZEHNLE:  Arguably, I see no daylight between

18   that, Your Honor.  And, in fact, the Court's question follows

19   the way that the defense viewed those two counts, Counts 4 and

20   Count 5.  When you read through them, they are the same

21   statements and the same letters made to the same people at the

22   same date.  There is no daylight between those two.  If the

23   government is in fact saying I've made -- you know, the

24   argument is he's made a materially false statement under

25   618(a)(2) and he's made a material false statement under

1       1001(a)(3), I believe.

2                  THE COURT:  Well, I think it's true that when you

3       look at *Blockburger* and the other legal cases involved, that

4       the issue isn't are the facts they allege the same facts, the

5       issue is what are the elements under each of the two statutes

6       involved?  And I take it that there is no binding authority on

7       me that has lined these two statutes up and answered that

8       question yet, is that right?

9                  MR. ZEHNLE:  That's correct, Your Honor.  We've found

10      none.

11                 THE COURT:  And even if the government fails the

12      *Blockburger* test, even if the elements do line up, the Courts

13      have said you get to look at Congressional intent about whether

14      there should be a second prosecution for this thing.  Is there

15      any indicia of Congressional intent here that I should be

16      looking at?

17                 MR. ZEHNLE:  Well, the only intent -- and, actually,

18      the government, I think, was trying to preclude the argument in

19      its response, was -- the last paragraph it talks about the fact

20      that 6 -- 618(a)(2) was subsequently adopted after the more

21      general language that was proposed in 1001.  But, in fact, you

22      know, the Supreme Court has held, at least in certain cases,

23      that a more specific statute that follows after a more general

24      statute is -- can be indicative of Congressional intent because

25      they start out with a broad, overarching course of conduct that

1    they're interested in, and then subsequently they have

2    specified it within this particular parameters, this is what we

3    want you to do, 618(a)(2).

4            THE COURT:  Well, what's your response to the cases

5    that they cite that they say, Well, the D.C. Circuit has

6    already approved prosecutions for 1001 and other offenses that

7    charges false statements in specific contexts?

8            MR. ZEHNLE:  So, the primary cases that the

9    government cited, and I think in particular *Woodward* was cited

10   a couple of times, dealt with a situation where you're talking

11   about a false statement under 1001.  And in *Woodward* in

12   particular, it dealt with the failure to file a CMIR -- CMIR,

13   excuse me.  Yes, Cash and Monetary Instrument Report.  That is

14   an act of omission.  And the Court in *Woodward* was right in

15   distinguishing those two because the false statements,

16   obviously, the affirmative act of doing something, making a

17   false statement, submitting a false document, etcetera, or

18   trying to conceal something through a trick, device or scheme.

19   Whereas, an act of omission could be accomplished without any

20   of those happening, even though the requisite intent is

21   willfulness.

22           THE COURT:  What about the *Ramos* case, I guess it was

23   out of the 11th Circuit, that involved a false statement of

24   passport application?

25           MR. ZEHNLE:  Well, Your Honor, in terms of that, I

1    think the statements -- in certain cases the Courts have looked

2    at this issue and, I think, taken a strict *Blockburger*

3    approach, has said, Well, that might require an additional

4    element of -- or, proof of a fact that this one does not.

5            But, what I would say in this case, with the two

6    charges that we have before us in this court, that proof of the

7    facts in Count 4 would necessarily prove up Count 5, the 1001

8    violation.  That is, you either, essentially, submit a document

9    which has a materially false statement and you do so

10   willfully -- which is important, you know, intentional

11   violation of a known legal duty -- and, obviously, under 1001,

12   you have the same kind of mens rea requirement that you're

13   having to do that.

14           So, I think those things match up fairly well in

15   terms of the submission of a false statement.  (a)(2) then

16   talks about the material omission, that if you materially omit

17   something from your submission, that makes it misleading.

18   Actually, the language says "not misleading," but I'm going to

19   make it positive and say it's misleading.

20           If you omit something from either your submission or

21   documents that you present in support of it, that makes it

22   misleading, that's a crime.  And our view, under 1001, is that

23   is exactly what 1001(a)(1) would cover; that is, a trick,

24   scheme, or device to conceal a material fact.

25           THE COURT:  Well, the fact that you're talking about

1    after this evidence comes in, when you look at this evidence,

2    as the jury is going to be instructed with the elements of

3    these statutes, it's going to show that one necessarily

4    requires a conviction of the other.  Does that suggest that I

5    should follow the case law that says I have the discretion to

6    wait until we have a record of what they actually put in, what

7    they actually argued was wrong, what they actually asked me to

8    instruct the jury the elements were, what we decided the

9    elements should be, so that there is a fuller record about

10   whether he is in fact being prosecuted for two things?

11          MR. ZEHNLE:  Well, the short answer to that question

12   is, Your Honor, no.  We don't think you should wait until after

13   that because courts in this jurisdiction -- and first things

14   first, of course the Court has the discretion to decide this,

15   whether or not to require an election of one count or the

16   other, dismissal, etcetera.  But, that's a given.

17          But, what Courts in this jurisdiction have also

18   found, and most recently, the most recent Court that we've

19   cited, was that the mere fact of putting those charges

20   together, essentially layering charges that are essentially the

21   same crime, has an unfair prejudicial effect on the defendant

22   before trial.  And the Courts in this jurisdiction have found

23   that.  And in our papers we've cited at least a half a dozen

24   cases where the Courts have said that is an issue for us.  The

25   District of Columbia has said this is a problem.  We hear, and

1     there is certainly case law, and the government has cited it,

2     well, maybe we can remedy this after the fact by simply

3     dismissing this and we'll let the jury hear everything,

4     etcetera.

5                THE COURT:  Well, don't you also have the circuit --

6     and I have to listen to a little bit more than I have to listen

7     to my colleagues -- saying that the better practice is to wait?

8     What do I do about that?

9                MR. ZEHNLE:  Well, I'm not sure exactly which case

10    you're referring to, Your Honor, so it's hard for me to --

11               THE COURT:  I think in the *Hubbell* case, and maybe

12    some others, didn't the D.C. Circuit say, particularly in a

13    situation where it's a case of first impression about whether

14    the two statutes are or are not multiplicitous, that the better

15    practice is to wait until after verdict and to decide it then?

16               MR. ZEHNLE:  Well, those cases do stand for certain

17    propositions based upon where the Court was -- where the appeal

18    was at that particular time.  The point that we're making on

19    behalf of the defense is that many Courts, many in D.C. and

20    elsewhere, have said that there is an unfair prejudice that's

21    created right from the outset, and it's not a good practice to

22    necessarily wait until the end, if in fact it comes up at the

23    end, you know, at that particular point in the appeal process.

24    That's what *Hubbell* was dealing with.

25               THE COURT:  All right.  When does congressional

1    intent come into play?  When am I supposed to look for whether

2    that is?  Am I supposed to look at that only if I can't tell

3    whether there's a *Blockburger* problem, or do you look at

4    congressional intent if you think there's one, but then

5    congressional intent could override it?

6              MR. ZEHNLE:  I think the case law would support the

7    former, Your Honor, that you would actually look to see if you

8    could discern what the congressional intent was in the statutes

9    at first.  Because if Congress makes it very specific and says,

10   yes, we intend for this to be a separate crime and this to be a

11   separate crime, and it's spelled out, then I think that's what

12   necessarily is the first step in the analysis.

13             I think that the *Blockburger* test essentially is a

14   way -- it's a way of -- and I'll see if I can find the exact

15   wording that they use.  But it's a method of, essentially,

16   trying to determine, are these two the same crimes?  And if

17   they're the same crimes, then the argument would then be, you

18   know, did Congress really intend to have separate punishments

19   for both of these individual statutes?

20             THE COURT:  Well, if the argument is -- I mean,

21   clearly, a double jeopardy problem can be cured after verdict,

22   if necessary.  But if the argument is there's -- the jury will

23   just hold it against him that there's more than one charge and

24   they'll think he's got to be guilty of something because, gee,

25   there's so many charges, there's still going to be a lot of

1    charges, even if we get rid of one of these.  But why isn't

2    that problem cured by jury instructions?  Don't we have to

3    assume that the jury will listen to my instruction telling them

4    they're not supposed to draw any conclusions from that fact and

5    that they have to consider each count on its on merits?

6          MR. ZEHNLE:  In the ordinary case, Your Honor, you're

7    absolutely right.  I mean, the law is very clear that the jury

8    is supposed to listen to the jury instructions, that there's a

9    presumption that they will listen to the instructions that the

10   Court provides.  But, in this particular case, you raise a very

11   good point in terms of what I would say is the confusion that

12   would be created between Counts 4 and Count 5 in this

13   particular indictment.

14          Frankly, it was confusing to defense counsel when we

15   read through these because it does allege the same

16   transaction -- essentially the same acts, the same date, the

17   same parties, etcetera.  So the Court would have the problem in

18   this particular case of, essentially, charging the jury in

19   terms of what is the distinction between this 618(a)(2) charge

20   and this 1001(a) charge, and that could read -- obviously, that

21   could have significant impacts in terms of how the jury is

22   charged and what the jury ultimately -- you know, whether or

23   not they can understand the distinction that's being drawn.

24          I mean, in the papers, like I said, for the first

25   time we understand, oh, there's this argument that material

1     facts were omitted from the presentation, as opposed to a plain

2     reading of Count 4 and Count 5, which are exactly the same, you

3     know, by referencing the same specific false statements.  I

4     think there's a significant issue of jury confusion in this

5     case.

6                THE COURT:  All right.  Is there anything else that

7     you wanted to tell me about this motion that you didn't get to

8     say?

9                MR. ZEHNLE:  No, Your Honor.

10               THE COURT:  All right.  Thank you.

11               MR. ZEHNLE:  Thank you.

12               MS. PRELOGAR:  Good morning, Your Honor.

13               THE COURT:  Good morning.  You say that proof of a

14    FARA false statement will not necessarily prove a violation of

15    § 1001.  And I'm not sure I understand why not.  Do you agree

16    that if a jury finds him guilty of Count 4, as you've alleged

17    it, it has to find him guilty of Count 5?

18               MS. PRELOGAR:  I think on the facts as we've alleged

19    them on the indictment, a jury would have to rationally convict

20    on both accounts.  But I don't think that affects the

21    multiplicity analysis because the question isn't whether on

22    these facts it gives rise to liability under both offenses,

23    it's whether it would necessarily do so on any set of facts and

24    whether each of these statutes requires proof of facts that

25    would necessarily violate the other.  And that's where we

1    think --

2          THE COURT:  I want to focus in on the word "requires"

3    because that's where I think the test is.  But you say, on page

4    8, that this passes the *Blockburger* test because each of the

5    statutes can be satisfied with proof of facts that wouldn't

6    suffice under the other.  And isn't that different from saying

7    that they must be?

8          MS. PRELOGAR:  Well, I think what we were trying to

9    articulate there is that you can conceive of different factual

10   patterns where a violation of FARA wouldn't necessarily violate

11   § 1001.  And that's exactly the *Blockburger* test.  The question

12   is whether in every case § 1001 requires proof of facts that

13   necessarily violate FARA, and vice versa.  And what we were

14   trying to articulate is that that wouldn't be satisfied here

15   because you can imagine a situation where a defendant makes

16   statements that would be false or misleading.  And misleading,

17   I think, is the critical component under § 618(a)(2), and that

18   wouldn't necessarily violate § 1001 because the D.C. Circuit

19   has recognized the literal truth defense in that context.

20         THE COURT:  What would be the element of fact or a

21   fact that you have to prove in a 1001 case that isn't necessary

22   to a false FARA statement case?

23         MS. PRELOGAR:  You would have to prove actual falsity

24   under the 1001 case.  Literal truth would be a defense.  You

25   don't necessarily need to prove that under § 618(a)(2).  There,

1  even if the statements are literally true, they could be

2  misleading within the meaning of the statute.  And so there

3  would be liability under the FARA false statements provision,

4  but not under § 1001 in that circumstance.

5          THE COURT:  Well, I understand that *Blockburger* and

6  *Illinois versus Vitale* talk about what could happen under the

7  statute.  But, in this case is your theory that there were

8  omissions?  It seemed to me that your theory was that these

9  were out and out lies.

10         MS. PRELOGAR:  In this case, in Count 4, the FARA

11 false statement provisions, we've alleged that these statements

12 were both false and misleading.  So, I think that we have

13 alleged the conduct that's covered in full by the FARA false

14 statement provision.  But I think even if we hadn't, Your

15 Honor, and even if we were focused only on actual falsity, that

16 wouldn't affect the *Blockburger* analysis.

17         THE COURT:  I understand the *Blockburger* analysis.

18 But you just said in the FARA case we are alleging that the

19 statements are both false and misleading.  My question was:  Is

20 there any omissions theory to Count 4?

21         MS. PRELOGAR:  I think that we think that all of

22 those statements were actually false, but I think that our

23 charge gives the jury an adequate basis, if they were to

24 disagree with that and they think that there was something to a

25 literal truth defense in this circumstance, they could still

1    convict on the basis that they found those statements

2    misleading.  And so although it's the case that on the facts of

3    this case we think we can prove a violation of both FARA and

4    § 1001 based on actual falsity, it wouldn't be necessary for us

5    to do so in every case.  And in Count 4 we're alleging both

6    that they're false and misleading.

7         And I think, actually, the Supreme Court's decision

8    in *Woodward*, which opposing counsel references, is really

9    instructive on this point.  Because there, it was a similar

10   circumstance there.  The defendant was alleged to have made an

11   affirmative false statement when he entered the country in

12   failing to declare his currency.  He said no, he didn't have a

13   particular amount of currency or an excess of that amount on

14   his person.  And that violated both the currency reporting

15   requirement and § 1001.

16        But what the Supreme Court said in that case is

17   because the statutes could be violated through different means,

18   not the actual means of the false statement used in that case,

19   they contained different elements for purposes of a *Blockburger*

20   analysis.  So they weren't the same offense, even though the

21   conduct in that case represented an affirmative false

22   statement.

23        THE COURT:  You point to the *Ramos* case to say, see,

24   the Court did approve a prosecution for both the general and

25   the specific.  But didn't *Ramos* undertake the *Blockburger*

1    analysis and find that there were different elements in each?

2          MS. PRELOGAR:  Yes, absolutely it did.  And we think

3    that that same analysis would show that there are different

4    elements in each here.  Because as I had explained, FARA can be

5    violated through misleading statements, whereas § 1001 requires

6    proof that the statements were actually false.  And because

7    § 1001 can be violated through any false statements submitted

8    to any agency department official, and FARA requires different

9    proof, that it was specifically made or furnished to the

10   attorney general under FARA.  So each of those requires proof

11   that the other does not.

12         THE COURT:  I was a little confused by your cite to

13   the *Hansen* case.  In the pages of the opinion you identified,

14   you said the Court lists a number of cases where it said that

15   prosecution for both was permitted.  But, it seemed to me that

16   the Court found that it was -- it used the words it was okay to

17   either prosecute under 1001 or the more specific statute.  So

18   why does that approve of a prosecution for both?

19         MS. PRELOGAR:  Well, I think the specific issue that

20   Hansen was considering was whether the government was bound to

21   only prosecute under the specific statute, whether it had,

22   essentially, displaced § 1001.  And so I agree in that

23   circumstance where the Court was considering whether that was

24   the exclusive remedy for the government, the Court used -- the

25   D.C. Circuit used language suggesting that it was appropriate

1     to proceed under either statute.  But I think that what we

2     focus on *Hansen* for is the proposition that there's no signal

3     in § 618(a)(2) that Congress meant to displace liability under

4     § 1001 as well.  And then we're back to the same *Blockburger*

5     analysis to assess congressional intent, and, specifically,

6     whether Congress meant to offer cumulative punishment.

7            THE COURT:  Well, isn't congressional intent a

8     different analysis from the *Blockburger* analysis?  Don't you

9     line up the elements?  When do you get into congressional

10    intent and what indication do we have of any congressional

11    intent here?

12           MS. PRELOGAR:  I think what the Supreme Court and the

13    D.C. Circuit has recognized is the *Blockburger* test has meant

14    to implement congressional intent because if Congress enacts

15    statutes that each require proof or an element that the other

16    does not, then there's a strong presumption that Congress meant

17    to authorize separate punishment and cumulative punishment.

18           And that's particularly true when the statutes appear

19    in separate sections, when they contain different language,

20    when they have different elements.  And then congressional

21    intent can only be brought in to override that, if there's

22    something express on the face of the statute to suggest that

23    although they are different elements, Congress didn't intend

24    cumulative punishment.  Or the opposite, like in the case with

25    RICO, where Congress, although the statutes might overlap

1    completely, in fact did intend to authorize cumulative

2    punishment.

3         THE COURT:  What's your response to the defendant's

4    argument that given the incredible overlap, at least as you've

5    alleged these two, and even as the statutes themselves, that

6    there's a prejudice that arises out of that to a criminal

7    defendant from the mere accumulation of counts?

8         MS. PRELOGAR:  I think that, actually, the D.C.

9    Circuit and other district courts in this district have

10   recognized the opposite, and that when the government is

11   relying on the same evidence to prove both of the charges,

12   there's not substantial prejudice because the jury is going to

13   be exposed to that evidence no matter what.  And so, what the

14   D.C. Circuit has recognized in that situation, and as Your

15   Honor noted before, jury instructions can adequately focus the

16   jury on the fact that it has to consider each count on its own

17   terms and that there is a reduced risk of prejudice because the

18   same evidence is going to be relevant to both counts.

19        THE COURT:  Well, it's the same evidence and that

20   helps you on the prejudice prong, then aren't you saying we're

21   prosecuting him for the same thing twice?  How does that help

22   you on the double jeopardy piece?

23        MS. PRELOGAR:  I think that the reason it doesn't

24   matter that we're relying on the same evidence is because the

25   focus is not on what particular facts prove the offenses in

1   this case, it's what Congress intended and whether it intended

2   these crimes to be the same offense or not.  And that turns on

3   the statutes on their face, on their elements.  It doesn't turn

4   at all on the particular facts of the case or whether the

5   defendant in this case, through a single course of conduct,

6   happened to violate two separate statutes.  That's always --

7   or, frequently the case when a multiplicity objection is

8   raised.  And the *Blockburger* test resolves that by saying don't

9   look at the particular facts, don't look at the government's

10  theory of the case, don't even look at how it's been charged in

11  the indictment; look at the statutes.  And that's the best

12  indication of whether Congress intended to authorize cumulative

13  punishment.

14          THE COURT:  What if I do what you've asked me to do

15  and say I'm going to wait until the conclusion of the trial,

16  and let's say we conclude the trial and then there are two

17  guilty verdicts and they renew their motion and they say we had

18  a multiplicity problem here.  At that point do the actual jury

19  instructions that were given on the counts govern, or are you

20  still looking at the statute?

21          MS. PRELOGAR:  I think the inquiry still turns on the

22  statute.  But, of course, I would expect the Court's jury

23  instructions to conform to the statute by articulating the

24  elements of those offenses.  And so to the extent that --

25          THE COURT:  But when you give a jury instruction, if

1    there's some way of being convicted under the statute that

2    isn't supported by the facts at trial, you don't tell the jury

3    about that.  You didn't say you can convict for something else

4    that there's no evidence to support.

5          So, assuming -- let's just assume there's no

6    omissions theory, they're not going to hear about how omissions

7    could give rise to a violation because that wouldn't be

8    supported by the facts.

9          MS. PRELOGAR:  That's absolutely right, Your Honor.

10   And I'm sorry, I understood us to be, on this hypothetical,

11   operating in a world like here, where we have charged all the

12   forms of conduct and all the means by which these offenses can

13   be committed and the jury would be instructed on that basis.

14         But to take Your Honor's hypothetical, if one version

15   of the offense, one means of committing these offenses wasn't

16   presented to the jury and they weren't instructed on that, it

17   would still be appropriate in that instance to look at the

18   statute, not at the particular way in which the offense was

19   committed in the case.  And, again, I point Your Honor to the

20   *Woodward* cases --

21         THE COURT:  Even in your indictment, where you track

22   the language of the statute of all the means, do you allege any

23   facts that would be any means other than false or misleading?

24         MS. PRELOGAR:  Well, I think that we have preserved

25   an argument here and would have the right to present to the

1    jury evidence to show that there were material omissions that

2    made the statements misleading, if not actually false.  I point

3    Your Honor to paragraphs 27 and 28 of the indictment.  This is

4    where we outline particular statements that were made in the

5    letters that were furnished to the Department of Justice under

6    FARA.  And in paragraph 28, says what the actual facts were.

7    And so I think, although we think that these statements were

8    actually false, certainly I think we would be entitled to

9    proceed on an omissions theory as well.

10          But thinking about what would happen at the end of

11   the trial, after the jury instructions, I think the critical

12   point is that no matter when the Court resolves the

13   multiplicity objection, it's still the elements of the statute

14   that control.  And even if the government is not pursuing a

15   particular theory, like in *Woodward*, where it was focusing only

16   on false statements and not on concealment or other prongs of

17   § 1001, that doesn't change the analysis about whether two

18   separate statutes are the same offense, looking at their face,

19   as Congress intended.

20          THE COURT:  Do we know of any of the cases where the

21   Court said should be decided later and not at the beginning,

22   how they turned out at the end of the day?  What the Court

23   looked at at the end of the day?  Because it seems like every

24   case I've been looking at has been at this stage, a motion to

25   dismiss stage.  And, so, I don't think I've read cases that

1    came up after the trial and whether the jury instructions

2    became relevant at that point or the evidence became relevant

3    at that point.

4            MS. PRELOGAR:  The case that immediately springs to

5    my mind -- I'm hoping I'm getting it right -- is the *Clark*

6    case, which is the D.C. Circuit decision we cite in our portion

7    of our opposition discussing the appropriate remedy here.  In

8    that case, as I recall, the District Court had gone ahead and

9    submitted both counts to the jury and then had later

10   concluded -- or, the D.C. Circuit concluded, based on the

11   statutory elements that the charges were multiplicitous, that

12   the D.C. Circuit there held that there had been no prejudice to

13   the defendant by having those charges submitted to the jury in

14   the first place.

15           And I think what emerges from that opinion is that

16   the Court, in conducting that multiplicity analysis post-trial,

17   did focus, like *Blockburger* directs, on the statutory elements

18   and didn't get into the particular jury instructions that had

19   been given in that case.

20           THE COURT:  All right.  Is there anything else that

21   you want to tell me that I didn't ask you about?

22           MS. PRELOGAR:  I think I got through everything on my

23   list.  Thank you, Your Honor.

24           THE COURT:  Thank you.

25           All right.  It's your motion, is there anything you

1    want to add before we go on to the money laundering count?

2              MR. ZEHNLE:  No, Your Honor.  Thank you.

3              THE COURT:  All right.

4              All right.  Count 2 charges a money laundering

5    conspiracy with two objects:  Conspiracy to violate two

6    different sections of the money laundering statute, and the

7    second object has two prongs.  So, it alleges a conspiracy to,

8    in paragraph A, transfer funds from outside the United States

9    to within the United States with the intent to promote the

10   carrying on of a specific unlawful activity.  And specific

11   unlawful activity is in quotes as a firm of art lifted from the

12   money laundering statute.  And the unlawful activity that's

13   identified is a felony violation of the Foreign Agents

14   Registration Act, and that's in violation of § 1956(a)(2)(A) of

15   the money laundering statute.  And that section of the statute

16   doesn't have anything to do with proceeds.

17             In paragraph (b) of this count the government alleges

18   that there was a conspiracy to conduct financial transactions

19   with property known to represent the proceeds of some form of

20   unlawful activity.  First, with the intent to engage in conduct

21   in violation of the Internal Revenue Code.  And, second,

22   knowing that the transactions were designed to conceal and

23   disguise the nature, source or ownership of proceeds of, again,

24   specified unlawful activity.  And both of those prongs are in

25   violation of § 1956(a)(1) of the money laundering statute;

1    (a)(1)(A)(ii) and (a)(1)(B)(i).

2           So, this just gets more complicated as the day moves

3    forward.  Probably should have done it in the opposite order,

4    given the fatigue that is setting in.

5           But, the defendant moved to dismiss the entire count

6    and the forfeiture allegations predicated on that count.  It

7    says, Well, how could monetary transactions promote a violation

8    of the Foreign Agent Registration Act?  How could the money I

9    spent be the proceeds of a violation of the Foreign Agent

10   Registration Act when what that act prohibits is failing to

11   register, not acting as an agent.

12          So, looks like Mr. Westling wants to talk to me about

13   that.  Now that -- any ambiguity concerning which transactions

14   are the subject of the promotion theory in paragraph (a) versus

15   the engaging in transactions with proceeds theory in paragraph

16   (b), is it fair to say that your argument with respect to both

17   theories is the same, that the crime is failing to register and

18   not acting as an agent?

19          MR. WESTLING:  Yes, it is, Your Honor.

20          THE COURT:  Okay.  So, your motion is not based on

21   any other problem with paragraph (a), the international

22   promotion prong of the conspiracy?

23          MR. WESTLING:  I think that there is a corollary

24   argument about the ability to promote, and regardless of how

25   you define the statute.  So, even if the Court were to accept

1    the government's view that acting is in fact what the statute

2    FARA punishes, the Foreign Agents Registration Act, there would

3    still be an argument whether the facts as alleged could promote

4    that.

5           But, the core issues, sort of, for the Court to

6    determine, it seems to me at the outset, is the scope of what

7    FARA prohibits, because it's that definition that determines

8    how it relates to these two prongs the Court has outlined that

9    are alleged.

10          THE COURT:  All right.  I just want to -- I wasn't

11   sure that there was anything beyond that issue with respect to

12   either count.  Certainly with (b) the whole argument is that

13   these are not proceeds, right?

14          MR. WESTLING:  That's correct.

15          THE COURT:  Okay.  And, obviously, the argument has

16   some force if the crime is, as you refer to it, as a failure to

17   register.  But, where do you see that in the text of the

18   statute?

19          MR. WESTLING:  Well, I think we look at the statute

20   sort of as a whole, and then we look at it as interpreted.  So,

21   to be fair, on the face of the statute we've referred to the

22   language in 612, which to the Court's read -- to all of our

23   reading refers to the importance of acting as an agent and the

24   requirement of registration.  But that section, by its

25   definition, is a section about registering, not about acting.

1       And from our perspective, it's only when you marry that to the

2       criminal enforcement provision, 618, that it becomes clear that

3       what that punishes is is the filing of a false or misleading

4       statement or the failure to file such a statement.

5              And we sort of know that because when 618 defines

6       that offense, it goes on to talk about the nature of the

7       failing to file offense, particularly within -- with reference

8       to a statute of limitations issue.

9              THE COURT:  All right.  Well, both sides made me read

10      *McGoff*, which was --

11             MR. WESTLING:  We're sorry.

12             THE COURT:  -- which was an unduly long and wordy

13      opinion.  But putting that aside --

14             MR. WESTLING:  Sure.

15             THE COURT:  -- doesn't it start with the proposition

16      that you start with the text?  The text is the most important

17      part of a textual analysis.

18             MR. WESTLING:  I think it does, Your Honor.

19             THE COURT:  All right.  So, the text says, No person

20      shall act as an agent of a foreign principal unless he has

21      filed with the attorney general a true and complete

22      registration statement.

23             Now, I understand that there's a Rule of Lenity in

24      criminal cases and I understand that Justice Scalia himself

25      applied it to the word "proceeds" in the *Santos* case.  But is

1    it your position that this statute is ambiguous?

2         MR. WESTLING:  I think our position is that that

3    statute is a regulatory statute.  And if we stick only to the

4    language of 612, it's not clear it prohibits anything.  It sets

5    up a requirement of what one has to do in order to be compliant

6    with the law.

7         THE COURT:  Well, doesn't it prohibit -- "No person

8    shall act unless he's registered."  Isn't that a prohibition?

9         MR. WESTLING:  Well, I think, with all due respect,

10   Your Honor, I think what it is, is we're reading it in the

11   order it's written, admittedly, but what it's saying is you

12   must register before you act.  And I think there's a difference

13   between that and the idea of acting alone.

14        And you're more than familiar with the pleadings and

15   the briefs here about the myriad reasons why we believe that's

16   the only way that statute can be read, both to sustain

17   constitutional challenge, but also based on, really, all of the

18   case law out there that has interpreted to date.

19        THE COURT:  Well, there's not much.

20        MR. WESTLING:  That's true.

21        THE COURT:  So, let me start with your argument based

22   on comparing 18 U.S. Code 951 and 22 U.S. Code § 612.  951

23   says, "Whoever acts as an agent without prior notification of

24   the attorney general shall be fined or imprisoned."  And 612

25   says, "No person shall act."  And then it's another provision

1   that says if you willfully violate 612, that's a crime.   How

2   does that help you?   Don't both of them zero in on the verb

3   "act"?

4           MR. WESTLING:   Well, with all due respect, Your

5   Honor, we don't think so.   We think that 951 is a statement

6   about action.   And the reason for that is that in that case the

7   action that was being proscribed was acting under the control

8   and direction of a foreign government.   In essence, almost an

9   espionage type activity.   It would make sense that Congress

10   would want to prohibit that sort of action.   When you compare

11   that to --

12           THE COURT:   That statute isn't about that anymore,

13   really.   I mean, I think you concede that it's much broader

14   now.

15           MR. WESTLING:   Well, 612 is.   I don't know about 951.

16   I think 612 is much broader, but it still aims at the same

17   issue, which from the very beginning has not been -- not about

18   stopping the activity but, rather, ensuring that it happens in

19   the daylight that public disclosure provides.   That was

20   Congress's purpose when it enacted the statute, when it revised

21   it.   And it hasn't changed since its beginning.   Its direction

22   has changed, it now looks at law firms and lobbyists and the

23   like, rather than propagandists, where it started way back in

24   the '30s.

25           But there's nothing in the sort of congressional

1    history that suggests at any point their goal was to outlaw the

2    activity of what would otherwise be, in many cases, conduct

3    which would be First Amendment protected.

4              THE COURT:  All right.  Well, if you want me to bring

5    a lot of other aspects of the statute and the whole structure

6    of the statute to bear on this decision, why isn't it

7    significant that Congress provided the venue for a FARA

8    prosecution would not only lie in the jurisdiction where

9    registration has to be filed, but also in the state where the

10   agent acts while he's unregistered?  That's where he's

11   committing the crime, according to them, so why isn't that the

12   crime?

13             MR. WESTLING:  I think there are lots of situations

14   that I can think of where venue extends to locations in which

15   the crime, the act, the focal crime doesn't occur.  I mean, if

16   you -- you're well aware, you've prosecuted and you've defended

17   these cases where situations are a phone call was made from one

18   jurisdiction to another and that's sufficient for there to be

19   venue in both places because the crime continued into whatever

20   the location may have been.

21             I think what Congress was trying to do in enacting a

22   venue statute was to ensure that there was not going to be a

23   situation where statutory violations would not be prosecuted

24   because of what is often seen as a fairly preliminary issue

25   regarding the appropriate venue for the prosecution to be

1    brought.

2            Similarly, the argument around the changes at the

3    same time with response to the statute of limitations, the

4    government argues in its response that because of the

5    limitations period in *McGoff*, as interpreted in *McGoff*, focuses

6    on the idea of someone continuing to be an agent as sort of the

7    way in which the statute is either tolled or not makes that

8    central.

9            But what we know from reading *McGoff* and the history

10   of the statute before that is that Congress recognized, before

11   changing the law, that if it did nothing, it was possible for

12   someone to become an agent, fail to register as an agent, and

13   then continue to be in a fail-to-register status while acting

14   as an agent for up to three years.  And if that three-year

15   period ran, they could continue to act as an agent with

16   abandon, and there would be no way to prosecute them.  And that

17   was -- the attorney general made that representation to

18   Congress in seeking the statute of limitations change that was

19   brought about and then later interpreted in *McGoff*.

20           So, the Justice Department's view, at least in the

21   1940s, was that this statute doesn't relate to the underlying

22   activity, but, rather, the failure to file the form or filing a

23   false form.

24           THE COURT:  I read that in your reply and I'm still

25   not sure I completely understand how that legislative history

1    ends up the conclusionary sentence that you just said.

2         MR. WESTLING:  Okay.  Well, I guess our argument

3    would be, Your Honor, that if it was a situation that when that

4    statute of limitations change was made, FARA permitted someone

5    to act without registering, but if they did that they would be

6    prosecuted for failing to file a registration statement, not

7    for failing -- not for acting, then it seems to us there's

8    nothing about what Congress has done that has changed the

9    meaning of that law.

10        And what the attorney general represented to Congress

11   in seeking the change was that, in essence, someone could be

12   acting and fail to file, violating the law, and if they wait

13   long enough, even though they continue to act, the time will

14   run because the time from which they were supposed to file the

15   form will have run, the statute of limitations ends, and the

16   person continues to do what they've been doing, which from what

17   is represented in the *McGoff* description of this, would

18   continue to not be a violation of the law because acting has

19   never been outlawed.  And --

20        THE COURT:  Let's talk about *McGoff* a little bit.

21   You quote one sentence from page 1075 where the Court says,

22   "FARA, thus, creates a comprehensive regulatory scheme for

23   foreign agent registration."

24        MR. WESTLING:  Right.

25        THE COURT:  But, that "thus" came after the Court

1    went through all the provisions of that complex regulatory

2    scheme; when the registration has to be filed, who's in it,

3    what it has to say.  Does *McGoff* at any point ever purport to

4    answer the question that we have here?  I read it carefully and

5    I looked for it.  And its textual analysis, as far as I can

6    tell, started two sentences in, never included the first

7    sentence.

8         So is there any part of the opinion that I missed

9    that deals with the first sentence?

10        MR. WESTLING:  To be very blunt, Your Honor, they did

11   not decide this issue.  I think they were looking at the

12   statute purely within the context of the statute of limitations

13   question.  They did, in that statute of limitations analysis,

14   attempt to determine what they believe the statute outlawed

15   because they viewed that as central to that determination.  And

16   every indication I have from the way the D.C. Circuit

17   interpreted that opinion was that the provision of illegality

18   is all about registering or failing to register.

19        THE COURT:  Well, he spent a lot of time trying to

20   figure out if this is a continuing offense, what's the offense

21   and when does it start and when does it end?  So what do you

22   make of his discussion when he says -- this is on page 1082 --

23   "It appears that the statutory obligation expires when the

24   agent ceases activity on behalf of the foreign principal.

25   After all, once an individual has ceased his activity, he's no

1    longer an agent within the meaning of FARA."  Doesn't that

2    suggest that the registration offense is inextricably tied to

3    action?

4              MR. WESTLING:  I think, to be fair, Your Honor, it

5    is, but that's because -- this is similar to what, I guess,

6    I've always termed a status crime.  You have to have the status

7    before you have the requirement to register.  And then once you

8    have the status and fail to register, it's the failure to

9    register that's criminal; it's not having the status in and of

10   itself.

11             To use a pretty bad analogy, but one that comes to

12   mind is if I'm going to be a felon in possession, I'm a felon.

13   Being a felon, although I did something illegal to become one,

14   is a status that is not illegal in and of itself, it's only

15   when I go out and buy the gun that I'm now in violation of the

16   law.

17             I think this is the same thing.  It's not the action

18   itself that is illegal, it's the fact that I'm going to

19   continue to act when I have not done the regulatory requirement

20   that is required by § 612.  And it's, therefore, the failure to

21   file that is the problem.

22             THE COURT:  All right.  Well, dealing with promotion

23   and proceeds separately, getting to the -- kind of your little

24   carve-out at the beginning, even if you're right and the only

25   offense under 612 is failing register, why isn't it a question

1      for the jury whether the facts alleged about how the various

2      entities that were engaged to allegedly help Mr. Manafort with

3      his undisclosed and unregistered agency relationships were paid

4      and by whom, using offshore accounts and keeping Manafort's

5      name out of it, whether that promoted or facilitated the crime

6      of failing to register and disclose who you're acting on behalf

7      of?  Isn't that a jury question and not a dismiss-the-

8      indictment question?

9              MR. WESTLING:  So, working first with promotion, you

10     know, I think, Your Honor, that the Court is called on to view

11     the indictment as charged.  And from our perspective, the

12     government has conceded, really, through its pleadings, that it

13     has charged the case that depends on FARA being an action crime

14     and not a failure to file crime.

15             THE COURT:  Well, in all the paragraphs, once you get

16     through the long list of the personal transactions, when you

17     get to the transactions they're talking about, hiring Company A

18     and Company B and the law firm and how they were -- each time

19     it says, And they were paid out of this account, you know,

20     using this name, doesn't that give rise to an inference that

21     it's up to the jury to decide, as opposed to me, whether those

22     facts support promotion or not?

23             MR. WESTLING:  Well, I think two points on that.  I

24     think the first is that none of the allegations in the

25     indictment indicate that those payments were made to those

1    entities with the knowledge that those entities would have to

2    file and that somehow caused them to fail to file.  I mean,

3    we're not then talking about --

4            THE COURT:  No, it only has to promote, I think, his

5    failure to file.

6            MR. WESTLING:  But I don't see how it can.

7            THE COURT:  Because that's the crime that they say is

8    the specific unlawful action.  Well, but it doesn't matter how

9    you see it and how I see it, doesn't it matter how the jury

10   sees it?

11           MR. WESTLING:  Well, I think it starts with can we

12   come up with a hypothetical in which Mr. Manafort's alleged

13   failure to file on his own and, therefore, to be in this

14   unregistered status, doing whatever he's doing, is furthered by

15   paying a third party that really has nothing to do with --

16           THE COURT:  But not paying them as Paul Manafort,

17   paying them as, you know, X, Y, Z Corporation in some foreign

18   country, that that promotes the notion that he's trying to be

19   under the radar about it.  He's not a -- and I'm not trying

20   to --

21           MR. WESTLING:  I understand.  And I think there's a

22   fair argument to be made that that suggests that there's an

23   argument of concealment.  But concealment as part of the

24   broader case is different from the FARA violation, which is did

25   I file a form I'm required to file or not?  There's not -- you

1    know, there's not a conspiracy here to violate FARA as a

2    practical matter --

3              THE COURT:  You say the filing of the form.  Even if

4    I think the case is all the filing of the form, the filing of

5    the form is all about having everybody be able to see what

6    you're doing, if you're doing it on behalf of a foreign entity.

7              MR. WESTLING:  Right.  And so to the extent that we

8    failed to file the form as alleged, then the allegations would

9    support that possible violation.  That's not the same as saying

10   all the activity I took while acting with money somehow

11   furthers that past failure to file.  I mean, it can't promote

12   something that's already --

13             THE COURT:  An ongoing failure to file, didn't we

14   decide that already --

15             MR. WESTLING:  I'm sorry?

16             THE COURT:  It's an ongoing failure to file, not a

17   past failure to file, according to Mr. *McGoff* and the statute.

18             MR. WESTLING:  That's right, it's a continuing

19   offense.

20             But, I think, Your Honor, the reality is that the

21   failure to file status is there, it continues, and I don't see

22   anything that a jury could be instructed that evidence could

23   come in that would support the idea that these events that are

24   related to third parties and payments that are made separately

25   and outside of whatever Mr. Manafort is doing, would promote

1    his violation, his alleged violation of failing to file that

2    form.  I mean, that doesn't seem to me to be a factual

3    possibility.

4              Now, admittedly, that doesn't necessarily mean that,

5    you know, I win the point, but I think it's important for us to

6    look at what the indictment charges -- and I know that's what

7    the Court's doing -- and determine, really, are we saying

8    something that could happen or that's actually happening?  And

9    I think when we look at the allegations on their face, they

10   simply don't make out that hypothetical crime.

11             THE COURT:  All right.  Well, let's get back to your

12   larger point.  How can your interpretation be correct if

13   Congress specifically added "Any felony violation of the

14   Foreign Agents Registration Act of 1938" to the list of

15   specific offenses that can constitute the specific unlawful

16   activity that is a money laundering predicate?  There's no

17   other felony in there that doesn't relate to registration, is

18   there?

19             MR. WESTLING:  Well, I guess there's fail -- no,

20   filing falsely and failing to register would be my argument of

21   what it punishes.

22             THE COURT:  Doesn't that signify that Congress

23   thought this offense, since they said any felony violation of

24   FARA, is a specific offense for money laundering purposes, they

25   decided to put it in there, doesn't that signify that they

1    thought that the offense could generate proceeds or could

2    promote -- be promoted by international monetary transactions?

3                MR. WESTLING:  I think that when you look at the

4    legislatively history around that issue, obviously it came in

5    with the Patriot Act of 2001, it was a time when, really,

6    Congress was looking to any law it could to make sure it added

7    to the money laundering statute included foreign corruption

8    offenses and it included the Foreign Agents Registration Act.

9    To be fair, whether anyone took the time to parse this

10   question, I somehow doubt.

11               But that being said, I think it's also important,

12   Your Honor, that there are other statutes that are -- specified

13   unlawful activity, murder being one, that don't lend themselves

14   to an easy adaptation to a proceeds theory.  I mean that, yes,

15   you could have murder for hire, but that's a different offense.

16   The elements of murder in and of itself don't typically mean I

17   have money that generate from that that I'm now going to use in

18   financial transactions.  Yet, nonetheless, murder is a

19   specified unlawful activity because it's a predicate act for

20   RICO.

21               And so there are many situations where Congress has

22   added to the list of SUAs over the years where it simply

23   grabbed sections of the code that seemed to fit.  And I think

24   to suggest that --

25               THE COURT:  Well, I think -- you know, I don't think

1    it's up to me to say Congress wasn't thinking about what it was

2    doing.  I think that's a rough road to go down.  I think it's

3    certainly true that the legislative history doesn't always

4    illuminate what Congresses had in mind, or it can be used to

5    point to multiple contradictory conclusions about what Congress

6    had in mind, but I have to deal with the fact that it said what

7    it said, and what it said seems to undercut what you're saying.

8         MR. WESTLING:  Well, Your Honor, I guess the

9    disagreement I would have with that is it gets sort of the cart

10   and horse backwards.  There's nothing about what Congress does

11   in the Patriot Act, making this a specified unlawful activity,

12   that can change the nature of the crime that was originally

13   enacted by Congress in 1938 and then subsequently amended.

14        So if all they ever said there was that it would

15   punish act -- not acting, but failing to file, then there's

16   nothing about it being included as a SUA that changes any of

17   that.  And so I'm not sure that's the right intent to look at.

18   I think we have to look at the intent at the time it was

19   enacted and to see clearly that Congress made no attempt, based

20   on the cases we've cited, because of First Amendment concerns,

21   to punish the action itself.  And, therefore, anything that

22   subsequently makes this part of an SUA has to be limited by the

23   nature of that statute.

24        Nor, frankly, is there a single prosecution to date

25   where someone has actually been prosecuted in a reported case

1    that involved anything more than an allegation that they failed

2    to file the form.  So I think the body of law that's out there

3    supports our position.

4            I think there's one other point I would like to make,

5    Your Honor, with the Court's permission, and that is this is a

6    little bit different from the typical motion to dismiss because

7    there are collateral consequences to the way the Court decides

8    it that are important both now, pretrial, and during trial.

9            THE COURT:  The forfeiture.

10            MR. WESTLING:  And that's because there's millions of

11    dollars that have been restrained on what I believe is a very

12    thin theory of forfeiture, and those are not available to this

13    defendant to do the things he must to properly defend this

14    case.  And so it's important for the Court to scrutinize these

15    issues with that in mind.  Going back to where we started,

16    which is if the government had taken the offense, the 951

17    claim, 18 U.S.C. 951, where clearly acting is illegal, and

18    there would be an argument, I suppose, if it fits the facts,

19    I'm not sure it would, it couldn't seek forfeiture there

20    because Congress didn't, when it changed the law in 2001,

21    include that statute as a specified unlawful activity, for some

22    inexplicable reason.  It simply included FARA.

23            And it's the use of FARA that has allowed the

24    government to sort of leverage the money laundering statute to

25    tie up millions of dollars in assets that are, therefore,

1    unavailable to Mr. Manafort.

2              THE COURT:  Is 951 narrower in terms of the

3    circumstances where you need attorney general approval, as

4    opposed to the circumstances where you have to register?

5              MR. WESTLING:  The conduct is different, but I don't

6    think it's narrower.  Interestingly, 951 also doesn't have a

7    grace period.  So it says whoever acts without notifying is

8    guilty.  FARA, obviously, gives you ten days, which would

9    suggest the underlying action is not the problem, it's being

10   registered.

11             THE COURT:  All right.  Thank you.

12             MR. WESTLING:  Thank you, Your Honor.

13             All right.  Who am I getting?

14             MR. JED:  Good morning, Your Honor.

15             THE COURT:  It's your turn.  You have to come up.

16             MR. JED:  Adam Jed for the United States.

17             THE COURT:  All right.  Do you think the statute is

18   ambiguous?

19             MR. JED:  I do not.

20             THE COURT:  All right.  Why not?

21             MR. JED:  Well, I guess -- let me step back and say

22   that --

23             THE COURT:  I think you need to step closer to the

24   microphone.

25             MR. JED:  Apologies.

1          THE COURT:  Thank you.

2          MR. JED:  Let me step back and say I'm not sure that

3   I entirely understand Mr. Manafort's argument, because I think

4   no matter how you understand the FARA violation, the crime is

5   the conjunction of acting and not registering.  There's not

6   just some freestanding obligation to register for anyone out

7   there, nor is the government alleging that there's a

8   prohibition on acting.  It's the conjunction of the two that is

9   the crime.

10          And I think, as Your Honor's questions to Mr.

11   Manafort's counsel indicated, we think that is pretty clearly

12   laid out in 612 where it specifically says that you cannot act

13   without registering.  But even if that phrasing didn't exist,

14   even if it was just the reverse, which said anyone who is

15   acting must register, having then not registered, the

16   conjunction still exists.  You still -- if you were promoting

17   someone's action, you would be promoting the crime.  And I

18   actually think it's interesting that Mr. Manafort's counsel --

19          THE COURT:  Aren't you going -- you're going further

20   than you need me to go here.  But are you suggesting that if it

21   just said, really, what's in 18, any failure to file a

22   registration statement is a felony, that we'd be having this

23   conversation?

24          MR. JED:  We think the 1938 text, which was phrased

25   in that terms, would still be sufficient.

1      But as Your Honor's questions indicated, obviously

2 Congress did change the text of the statute.  It does expressly

3 say that it is illegal to act without registering.

4      THE COURT:  You shouldn't necessarily assume anything

5 from what my questions indicate.  I try to ask each side what I

6 think are the most difficult questions for them, to help me

7 understand.

8      But, given the fact that there is another criminal

9 statute and that representing a foreign entity or an individual

10 in and of itself is not criminal, and you have the statute

11 that's called the Registration Act and all the issues they've

12 talked about about the legislative history, is there any

13 ambiguity in there that gives rise to the need for me to apply

14 the Rule of Lenity in this situation?

15      MR. JED:  I don't think that there is, Your Honor.  I

16 mean, obviously the bar at which the Rule of Lenity applies is

17 very high; it's grievous ambiguity.  Here we have the textual

18 argument, the language in 612 which says it is illegal to act

19 without registering.

20      THE COURT:  Where do you get the words "grievous

21 ambiguity"?

22      MR. JED:  I apologize, I don't have that case cite

23 off the top of my head.  I believe that's the language that at

24 least some of the Supreme Court cases have used for where the

25 Rule of Lenity applies.  But it doesn't particularly matter

1    because I don't think we're anywhere in the category of

2    ambiguity.  We have our plain textual argument based on 612.

3    We have Mr. Manafort's concession about 951, a statute which is

4    worded in virtually identical terms.  He has some policy

5    explanation for why it is that he thinks Congress might care

6    differently about a violation of 951 versus a violation of

7    FARA.  But that certainly confirms that the text in 612 shows

8    that the conjunction of acting without registering is still a

9    crime.

10         We have the general purpose of FARA, which is that if

11   someone is going to act as an agent of a foreign principal,

12   they need to do so in a transparent way, by registering with

13   the attorney general, by appending certain disclosure

14   statements to some of their communications.  And then we

15   obviously have Congress's decision in 2001 to make this a

16   specified unlawful activity.

17         THE COURT:  What is your response to the defendant's

18   argument that if the offense was based on acting as an agent

19   and not the failure to register, there would have been no need

20   in the provision of 618(e) clarifying that a failure to file

21   shall be considered a continuing offense as long as such

22   failure exists?

23         MR. JED:  There are three or four main responses to

24   that, Your Honor.  First, the continuing offense provision in

25   618(e) as it was construed in *McGoff* is still one that pegs the

1    crime to the act.  That's the only question in *McGoff*, was

2    whether it's first act or last act.  But either way, an act was

3    still a necessary element of the crime.

4            And I should actually point out, by the way, Your

5    Honor, the facts in *McGoff* are almost a perfect illustration of

6    how FARA both could be promoted and generate proceeds.  You

7    have the South African government moving millions of dollars

8    into the United States and paying an individual to conduct an

9    influence campaign.  It's very difficult to see, just looking

10   at the facts of that, how it is that FARA, as a matter of law,

11   would be incapable of generating proceeds.

12           Second, I should say that Congress's decision in 1950

13   to add a later procedural statute couldn't shed light on the

14   underlying substantive offense, particularly where we have both

15   the plain text of the substantive offense, which references

16   "act" and various legislative history explaining why those

17   changes were made.

18           To the extent that you're kind of interested in why

19   is it that Congress made that change in 618, there's obviously

20   some ambiguity about Congress's intention there.  I think

21   *McGoff* notes that there's no legislative history specifically

22   surrounding 618.  *McGoff* identifies the legislative history

23   surrounding the accompanying change that was made in 612.  And

24   there they basically say that the point was to remove any doubt

25   about when the clock started running.  But the doubt that was

1    being removed was just a procedural doubt.  It was a question

2    of whether the clock started running with the first act or the

3    last act.  And either way, an act was still an essential

4    element of the crime.

5           And finally, Your Honor, I should just point out that

6    to the extent that Mr. Manafort now says that we should ignore,

7    somehow discount the plain text description of the obligation

8    in 612 and, instead, look to other provisions in 618 to shed

9    light on what 618 means, I would then point Your Honor to

10   618(f) and 618(g).  618(f) says the attorney general can seek

11   an injunction to stop someone from acting in violation of FARA.

12   618(g) says that if the attorney general notifies a registrant

13   that their registration statement is deficient, that it is

14   illegal to continue acting more than ten days past that.

15          So, I think that 612 on its face is quite clear.  But

16   if you did think that 618 sheds light on it, that's actually

17   more helpful to the government's position than to Mr.

18   Manafort's.

19          THE COURT:  All right.  What impact should the ruling

20   in *McGoff* have on the issue?  While I think your interpretation

21   may be consistent with the ruling, is there anything specific

22   the Court said in that case that governs this one?

23          MR. JED:  I don't think there is.  Obviously, the

24   holding in *McGoff* was just -- the issue present in *McGoff* was

25   last day versus forever.  It seems like 618 being discussed in

1    *McGoff* was added to address the question of first act versus

2    last act.  The holding in *McGoff* does not address the question

3    that is at issue here.  And certainly *McGoff's* analysis, which

4    focuses on the text and its holding, which focuses on when the

5    act occurs, and the facts of *McGoff* where you literally see

6    money being used to promote a FARA violation and money that was

7    proceeds of the FARA violation are certainly supportive of the

8    government's position, but by no means dispositive.

9            THE COURT:  Well, in that case the Court said to

10   figure out, for a continuing course of conduct, what statute of

11   limitation is, you have to look at what offense is created in

12   the first place.  And didn't it say in this case it was the

13   failure to register as is required by 612?  How does that

14   support your interpretation?

15           MR. JED:  *McGoff* has this quote that Mr. Manafort

16   identifies where I think it says the willful failure to comply

17   with information production.  I mean, I understand that line

18   essentially as shorthand.  I mean, certainly, if you were just

19   normally to describe the kind of universe of what someone could

20   do to violate 612, you would say we've got a person who's been

21   acting for a period of time, did they register?  Did they not

22   register?  Was that failure to register willful or wasn't it?

23           It's still the conjunction of acting and not

24   registering that's the crime.  It just seems like an

25   appropriate shorthand.  And actually, in *McGoff* it was a

1   especially appropriate shorthand.

2           As Your Honor is aware, in *McGoff* the prosecution was

3   brought so many years after the action had ceased that the

4   question there was, essentially, just is the statute of

5   limitations running forever?  Did he still have to register

6   years and years after he had stopped acting?

7           So, all the more, it's obvious that that's the

8   shorthand the Court would have used there, but it was certainly

9   not part of the Court's holding.

10          THE COURT:  If I agree with Mr. Manafort's

11  interpretation of the statute, do objects of your conspiracy

12  fail?

13          MR. JED:  No, Your Honor.  I actually think if you

14  agreed with his interpretation of the statute, neither object

15  would fail.  Because we've made the back-up argument in our

16  brief that even if the question is whether someone was paid to

17  or -- paid to not register or whether the failure to register

18  itself generated proceeds, that, nonetheless, we've

19  sufficiently alleged that in our brief -- or, excuse me, in our

20  indictment.  I would be happy to unpack that for you.

21          With respect to the promotion prong, the question is

22  actually just the intention at the time that that international

23  transfer occurred, when Mr. Manafort conspired with others to

24  bring money from outside the United States into the United

25  States.  Did he intend to promote a FARA violation?  And if a

1      FARA violation were simply failure to register and you kind of

2      ignore all else, nonetheless, the indictment has alleged a

3      number of facts to suggest that when they made the transfer,

4      and likely when they conspired to make those transfers, that

5      the whole plan was that there would be no registration.  I

6      mean, essentially this was an influence campaign that was

7      designed to be done surreptitiously, without registering.

8              THE COURT:  I understand that with respect to the

9      promotion.  Explain to me how you get proceeds, if I disagree

10     with your interpretation that's attached.

11             MR. JED:  Absolutely.  Because the failure to

12     register itself was something that could have generated money.

13     I mean, I think that we have alleged that Mr. Manafort was

14     being paid by the Ukraine to engage in a surreptitious

15     influence campaign.  So the proceeds are what it is that the

16     Ukraine paid him to do.

17             Now, I don't think it's necessary that at the time

18     that the money was paid, that they agreed there would be no

19     registration.  I think to the extent that Mr. Manafort did not

20     register, nonetheless, they were proceeds that were generated

21     by his FARA violation, how ever you understand that, even if

22     that is just failure to register.

23             But I actually think from the facts that we've

24     alleged in the indictment, you could also infer that while Mr.

25     Manafort was being paid, while those proceeds were being given

1      to him, that the understanding was that he would not register.

2                THE COURT:  But aren't you still really -- when you

3      say those were the proceeds of engaging in an undisclosed

4      campaign, aren't you really relying on acting, as opposed to

5      disclosing?

6                MR. JED:  I mean, obviously the difficulty in -- I

7      think that kind of underscores the difficulty in talking

8      about --

9                THE COURT:  Injunction.

10               MR. JED:  Right.  A freestanding registration

11     obligation.  But I think if you go to someone and you say, you

12     know, I'm going to give you a bunch of money, let's pretend you

13     don't say, "and do some actions," and just say, "and whatever

14     you do, don't register," the amount of money that has been

15     given to that person, I think, could be understood, even in Mr.

16     Manafort's terms, as the proceeds of not registering.

17               THE COURT:  All right.  I don't think --

18               MR. JED:  Ah, I have been given a citation for the

19     grievous ambiguity line.  *Muscarello versus United States*, Your

20     Honor.

21               THE COURT:  All right.  Is there anything further

22     that you or anyone else at your table wants to add?

23               MR. JED:  Nothing further, Your Honor.

24               THE COURT:  Okay.  Thank you.

25               MR. JED:  Thank you.

1          THE COURT:  I very much appreciate the quality of

2    everyone's arguments this morning on all the points.  And now I

3    have all three motions under advisement and we'll adjourn.

4          See you in May.

5                              *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6    and foregoing constitutes a true and accurate transcript of my

7    stenograph notes and is a full, true and complete transcript of

8    the proceedings to the best of my ability.

9                    Dated this 21st day of April, 2018.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25