**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**PAUL J. MANAFORT, JR.,**<br><br>**Defendant** | **Crim. No. 17-201-1 (ABJ)** |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT PAUL J. MANAFORT, JR.'S MOTION TO SUPPRESS EVIDENCE**
**AND ALL FRUITS THEREOF RELATING TO THE SEARCH OF THE**
**STORAGE UNIT LOCATED IN ALEXANDRIA, VIRGINIA**

The United States of America, by and through Special Counsel Robert S. Mueller, III, files this memorandum in opposition to defendant Paul J. Manafort, Jr.'s motion (Doc. 257) to suppress evidence that the government obtained pursuant to a warrant authorizing the search of a storage unit located in Alexandria, Virginia. Manafort argues principally that a previous consent search of the storage unit violated the Fourth Amendment and tainted the subsequently issued warrant, that the warrant was an overbroad general warrant, and that execution of the warrant was unreasonable and violated Federal Rule of Criminal Procedure 41(f). These arguments lack merit.

As was fully disclosed to the magistrate judge who signed the warrant for the storage unit, the initial entry into the storage unit was done with the permission of the unit's lease holder, who had a key to the unit. Specifically, Special Agents of the Federal Bureau of Investigation (FBI)—who were working with the United States Attorney's Office for the Eastern District of Virginia and the Money Laundering and Asset Recovery Section of the Department of Justice's Criminal Division—entered the storage unit after obtaining written consent from an employee of a Manafort-affiliated business who had a key to the unit, was listed as its occupant on the lease, and

had personally moved the contents of the unit into the unit.[1]   The employee thus had common authority to consent or, at a minimum, apparent authority to do so.   Regardless, any infirmity in this initial entry would not undermine the lawfulness of the subsequently obtained search warrant. Even excising the description of what the agent saw in the storage unit during the initial entry, the warrant application established probable cause to believe that evidence of the listed offenses would be found at that location.   And, given that the pertinent facts were disclosed to the magistrate who signed the warrant, and that the entry was at the very least closely aligned with pertinent legal authority, suppression is not warranted under the good-faith exception to the exclusionary rule.

Manafort's challenges to the breadth and execution of the warrant are equally unavailing. The warrant satisfies the Fourth Amendment's particularity requirement because the categories of documents to be seized, especially when read alongside the subject crimes, sufficiently guided officer discretion and do not amount to a prohibited general warrant.   Nor does the absence of a specific temporal limitation render the warrant overbroad in light of the extensive scope of the financial criminal activities described in the warrant affidavit.   And even assuming otherwise, the warrant was not so obviously overbroad that it precluded a reasonable officer from relying on a neutral magistrate's decision to issue it.   In any event, the remedy for any overbreadth would be exclusion of evidence predating the period relevant to this case, not the blanket suppression that Manafort seeks.   Finally, Manafort's complaints about execution of the warrant lack merit and do

---

[1] Manafort's opening assertion that the agents who executed the warrant "acted pursuant to Acting Attorney General Rosenstein's invalid grant of authority to the Special Counsel," Doc. 257 at 1 n.1, overlooks the information in the warrant application making clear that the agent who sought the warrant was assigned at the time to the FBI's International Corruption Squad, Aff. ¶ 2, and that the warrant application was reviewed by an Assistant U.S. Attorney (AUSA) in the Eastern District of Virginia, Doc. 257-1 at 1; *see also* Doc. 258-1 (sealed version of application identifying AUSA by name).

not support suppression.  For these and other reasons explained further below, Manafort's motion to suppress should be denied.

## BACKGROUND

The relevant facts, as established by the warrant, the supporting affidavit, and related materials, are as follows.[2]  On May 26, 2017, a Special Agent then assigned to the FBI's International Corruption Squad in Washington, D.C. ("the Agent") met with a salaried employee ("the Employee") of a business affiliated with Manafort, Steam Mountain, LLC.  Aff. ¶ 28.  The Employee, who had previously worked at another Manafort business (Davis Manafort Partners, or DMP), informed the Agent that "he perform[ed] a variety of functions for Manafort and his companies[,] as directed by Manafort."  *Id.*  As relevant here, the Employee stated that, in approximately 2015, he had moved a series of office files from Manafort's business contained in boxes in a smaller storage unit to the larger unit at the same storage facility ("Unit 3013") that became the subject of the search.  *Id.*  The Employee advised that he had personally moved the office files to the larger unit and that they were still in the unit.  *Id.*

Later that day, the Employee led the Agent to the storage facility.  Aff. ¶ 29.  Once there, the Agent obtained a copy of the lease for Unit 3013 from the facility manager.  *Id.*  The lease identified the Employee as the "occupant" of the unit, *id.*, and also named Manafort as one of the "occupant's authorized access persons."  Doc. 257-3.  Richard Gates, another Manafort employee, was listed as an alternate point of contact.  *Id.*; Aff. ¶ 29.

---

[2] Manafort has appended a redacted version of the warrant affidavit ("Aff.") to his motion and filed an unredacted version under seal (Doc. 258-1).  With one exception, citations in the memorandum are to the redacted version, which (among other things) preserves the anonymity of the Manafort employee mentioned in the text.  The one exception—a citation to a paragraph in the affidavit describing Manafort's work in Ukraine—reveals no confidential information and instead recites information already made public in the Superseding Indictment, Doc. 202 ¶¶ 1, 8-9.

The Employee confirmed to the Agent that he had a key to the unit's lock and further orally described the contents of the unit.  Aff. ¶ 30.  Specifically, the Employee stated that Unit 3013 contained several boxes of office files from Manafort's business, as well as a metal filing cabinet that contained additional, more recent business files.  *Id.*  The Employee said that he had moved the filing cabinet from Manafort's former residence—which Manafort was using as an office at the time—in the spring of 2015.  The Employee stated that the cabinet was extremely heavy when he moved it, indicating that it contained a large amount of records.  *Id.*  In addition, although the Employee could not describe the contents of the filing cabinet in more detail, he told the Agent that Manafort occasionally sent emails directing the Employee to put certain records into the filing cabinet.  *Id.*  The Employee described those records as "brown, legal-sized files," and recalled having last added such records to the filing cabinet in the spring of 2016.  *Id.*

The Employee signed a written consent-to-search form stating that he had "been advised of [his] right to refuse consent," that he voluntarily gave permission to search Unit 3013, and that he authorized the investigating agents "to take any items which they determine may be related to their investigation."  Exh. B, *infra*; Aff. ¶ 31.  The Employee then used the key in his possession to open Unit 3013.  The Agent entered the unit and observed approximately 21 bankers' boxes that could contain documents, as well as a five-drawer metal filing cabinet.  Aff. ¶ 31.  None of the file drawers was marked as to their contexts, but some of the boxes did have markings.  *Id.*  Two were labeled "MPI," initials that the Agent determined to stand for an international film-production company in which Manafort was believed to be an investor.  *Id.*  Another was marked "Ukraine binders," making it reasonable to believe that the storage unit was "a collection point for Manafort's and Gates's business records from their work in Ukraine."  *Id.* ¶ 35.

The Agent did not open any of the boxes or file-cabinet drawers during his entry into Unit 3013.  Aff. ¶ 31.  Rather, the Agent prepared an application for a warrant to search the unit and submitted it to a magistrate judge in the Eastern District of Virginia the next day.  The affidavit in support of the warrant explained at the outset that, since 2014, law enforcement agents had been conducting an investigation into, among other things, Manafort's financial dealings.  Aff. ¶ 5.  The affidavit then set forth at length facts establishing probable cause to believe that violations of three federal laws had been committed—*viz.*, failure to report bank accounts, in violation of 31 U.S.C. §§ 5314 and 5322(a); acting as an unregistered agent of a foreign principal, in violation of 22 U.S.C. §§ 612 and 618; and filing a false tax return, in violation of 26 U.S.C. § 7206(a)—and that evidence and fruits of those crimes would be found in the storage unit.  Aff. ¶ 4.  In reciting those facts, the affidavit described what the Employee had told the Agent about the contents of the storage unit, how the Agent had obtained the Employee's consent to enter the unit a day earlier, and what the Agent had observed when he entered the unit.  *Id.* ¶¶ 28-37.  The affidavit also explained that the unit had been locked with a key when the Agent exited and had been under surveillance since that time to ensure that no one entered or took items from the unit.  *Id.* ¶ 38.

On May 27, 2017, the magistrate judge issued a warrant authorizing the search of Unit 3013, "as well as any locked drawers, locked containers, safes, computers, electronic devices, and storage media . . . found therein."  Doc. 257-2, Attach. A.  Attachment B to the warrant identified as the "[p]roperty to be seized" "[r]ecords relating to" the three federal offenses listed in the Agent's affidavit:  failure to file a report of a foreign bank account, in violation of 31 U.S.C. §§ 5314 and 5322; acting as an unregistered act of a foreign principal, in violation of 22 U.S.C. § 618; and filing a false tax return, in violation of 26 U.S.C. § 7206(a).  Doc. 257-2, Attach. B ¶ 1.  The warrant listed the following eight categories of records as subject to seizure:

a. Any and all financial records for Paul Manafort, Richard Gates or companies associated with Paul Manafort or Richard Gates, including but not limited to records relating to any foreign financial accounts;

b. Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Richard Gates, or companies associated with Paul Manafort or Richard Gates;

b. Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

c. Any and all correspondence, communication, memorandum, or record of any kind relating to the Party of Regions, Viktor Yanukovych, the European Centre for a Modem Ukraine, or any other foreign principal of Paul Manafort or Richard Gates, or any company associated with Paul Manafort or Richard Gates;

d. Any and all correspondence, memorandum, press release, or documentation of any kind regarding any lobbying or advocacy performed by Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates, on behalf of the Party of Regions, Viktor Yanukovych, the European Centre for a Modern Ukraine, or any other foreign principal of Paul Manafort, Richard Gates, or any company associated with Paul Manafort or Richard Gates[;]

e. Records related to, discussing, or documenting Neocom Systems, Antes Management, Yiakora Ventures, Global Highway Ltd., Global Endeavor, Leviathan Advisors, Peranova Holdings, Bletilla Ventures, Lucicle Consultants, and/or Telmar Investments, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records[;]

f. Records related to, discussing, or documenting the Podesta Group[;]

g. Any and all daily planners, logs, calendars, schedule books relating to Paul Manafort or Richard Gates.

*Id.*, Attach. B ¶ 1.

FBI agents entered the storage unit to execute the warrant at approximately 5:20 p.m. that afternoon.  Doc. 257-2 at 2 (reporting time as 17:20).  Over the course of the next two hours, they seized nine sets of documents that were within the scope of the warrant, a subset of what was in

the unit.  *See* Exh. A, *infra* (FBI Collected Item Log lists time of seizure as 7:09 p.m.).  Five of the groups of documents (and some binders) were taken from a file cabinet, while the remaining four sets were gathered from boxes located on the left-hand side and rear wall of the storage unit.  *Id.* On June 5, 2017, nine days after the search, the Agent submitted to the magistrate an inventory that described one set of the seized items as "documents and binders" and the other eight sets as "documents."  Doc. 257-2 at 2.

## LEGAL STANDARD

A defendant generally must show a violation of his personal Fourth Amendment rights in order to prevail on a motion to suppress evidence.  *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). When challenging a warrant-authorized search, the defendant therefore bears the burden to establish that the warrant was invalid or overbroad.  *See United States v. de la Fuente*, 548 F.2d 528, 533-34 (5th Cir. 1977).  In a challenge to a warrantless search or seizure, however, "the burden shifts to the government" to justify the intrusion.  *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 108 (D.D.C. 2014); *see United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014) (government can establish reasonableness of a search "by showing that the police, despite lacking a warrant, were permitted to undertake the search by someone with authority").

## ARGUMENT

## I.  The Preliminary Consent Search Was Valid And, Even If Not, Would Not Require Suppression Of Evidence Later Obtained Pursuant To The Warrant

Manafort argues (Doc. 257 at 3-13) that the Agent's consent search of Unit 3013 was unconstitutional because the Employee lacked authority to consent to a search.  He claims that all evidence obtained from the subsequent search pursuant to a warrant should be suppressed and that an evidentiary hearing is necessary to determine whether the Employee's consent was voluntary. As explained below, those contentions lack merit.

### A. The Employee Had Authority To Consent To The Search of Unit 3013

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. A search within the meaning of this Amendment occurs when the government violates a person's reasonable expectation of privacy or obtains information by physically intruding into a constitutionally protected area. *Florida v. Jardines*, 569 U.S. 1, 5 (2013). Such a "search" occurred in this case when the Agent entered Unit 3013 and observed its contents, and the government accepts for purposes of this motion that Manafort is entitled to challenge that search under the Fourth Amendment. *See United States v. Karo*, 468 U.S. 705, 720 n.6 (1984) (noting individuals' "reasonable expectation of privacy in their own storage locker"); *see also, e.g., United States v. Johnson*, 584 F.3d 995, 1001 (10th Cir. 2009) (similar, even when the individual "is not the lessee of the unit").

The Agent's entry into Unit 3013 was a "[c]onsent search[]," one of the "categories of permissible warrantless searches" that are constitutionally "reasonable" and thus lawful under the Fourth Amendment. *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014). Although the government must establish that a search was conducted pursuant to valid consent, "[s]uch consent need not come from the target of the search." *Peyton*, 745 F.3d at 552. It may instead be provided by "a third party who possessed common authority over or [had] other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). This authority to consent rests not on "the law of property" but on indicia of "joint access or control" that make it "reasonable to recognize that any of the co-inhabitants has the right to

permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

Even when the third party ultimately lacks the authority to consent, a search based on that party's consent is reasonable (and constitutional) "if it [was] reasonable for the police to believe" that the party had the requisite authority. *Peyton*, 745 F.3d at 552. "Such 'apparent authority' is sufficient to sustain a search because the Fourth Amendment requires only that officers' factual determinations in such situations 'always be reasonable,' 'not that they always be correct." *Id.* (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990)). As explained below, the warrantless entry into Unit 3013 was reasonable because the Employee had common authority or, at a minimum, apparent authority to consent to the search.

### 1. The Employee had common authority to consent

As an initial matter, the Employee had common authority to consent to a search of Unit 3013. The Employee was listed as the occupant on the unit's lease. Aff. ¶ 29; Doc. 257-3. He had a key to the unit. Aff. ¶ 30. And he had accessed the unit multiple times as part of his job responsibilities, both when first moving the files and boxes into the unit in 2015 and on the more recent occasions when, at Manafort's direction, he placed files in the filing cabinet stored in the unit. *Id.* ¶¶ 28, 30. Under those circumstances, Manafort "assumed the risk that [the Employee] would" use the key he possessed to "permit outsiders (including the police) into the" unit. *Peyton*, 745 F.3d at 555; *see Matlock*, 415 U.S. at 171 & n.7.

Two courts of appeals have held that materially indistinguishable facts establish a storage unit lessee's authority to consent to a search of the unit. In *United States v. Kim*, 105 F.3d 1579 (9th Cir.), *cert. denied*, 522 U.S. 940 (1997), an associate of Kim's (Wee) had rented storage units that officers believed to contain stolen goods. *Id.* at 1580. The officers reviewed lease agreements

9

showing that Wee had rented the units and that others, including Kim, also had access to them. Wee did not have the keys to the units but told the officers that Kim had hired him to rent the storage units and inventory merchandise in them.  Officers "also learned that Wee had been the only individual present during the unloading of some of the allegedly stolen goods and that Wee had temporarily kept the keys to the storage units afterwards." *Id.*  Based on those facts, the Ninth Circuit held "that Wee possessed common authority to consent to the search." *Id.* at 1582.  The court explained that Kim had "allowed Wee to keep possession of the leases, supervise unloading of the goods and retain the keys on occasion." *Id.*  By "ced[ing] partial control" of the units "to Wee at all times, and allow[ing] him total control on occasion," the court reasoned," Kim "assumed the risk that Wee would allow a search of the units." *Id.*

The Tenth Circuit followed *Kim* in *United States v. Trotter*, 483 F.3d 694 (10th Cir. 2007), *vacated on other grounds*, 552 U.S. 1090 (2008).  The defendants there, two brothers, participated in a drug-distribution conspiracy with King, who rented a storage unit in his own name at the direction of one of the brothers.  *Id.* at 697.  The brothers kept the three keys to the unit, "but on numerous occasions Mr. King was temporarily given a key so that he could retrieve drugs and drug paraphernalia from unit." *Id.*  After surreptitiously copying or stealing one of the keys, King cooperated with the police and consented to searches of the unit using the key.  *Id.*  The brothers moved to suppress the resulting evidence on the ground that King lacked actual authority to consent to the search, but the Tenth Circuit rejected that argument.  The court pointed out both that King's status as lessee of the unit gave him the right to have the facility open the unit at any time without the brothers' knowledge and that the brothers had allowed "King to access the storage unit when they sent [him] to the unit to retrieve or drop off items." *Id.* at 699.  The court concluded that "King's position as lessee of the unit and his active participation in renting and using the

facility gave him a 'sufficient relationship to the premises' to justify the searches based upon his consent." *Id.* (quoting *Matlock*, 415 U.S. at 171); *see also United States v. Atiyeh*, No. 00-cr-682, 2001 WL 66409, at *9 (E.D. Pa. 2001) (party who rented storage locker in his own name at the behest of, and had been partially reimbursed by, the defendant had authority to consent to search).

The same result is warranted in this case.  As in *Kim* and *Trotter*, the Employee was the lessee of the storage unit and thus had the right and capability to gain access to the unit at any time "without [Manafort's] knowledge or permission."  *Kim*, 105 F.3d at 1582.  As in those cases, the other person listed on the lease (Manafort) "allowed" the Employee access to the storage unit by sending the Employee to the unit to "drop off items."  *Trotter*, 483 F.3d at 699; *see* Aff. ¶¶ 28, 30 (in addition to having the Employee move materials into the larger storage unit at the outset, Manafort occasionally sent the Employee emails "directing [him] to put certain records into the filing cabinet" in the unit).  And as in those cases, the Employee had a key to the storage unit. Indeed, the Employee's access to a key is more probative of his authority here than in *Kim* and *Trotter*.  Unlike in *Kim*, 105 F.3d at 1580, the Employee possessed the key at the time that he consented to the search.  Aff. ¶¶ 30-31.  And he did not have to steal or "surreptitiously" make a copy of the key to obtain access to it, as in *Trotter*, 483 F.3d at 697.  The undisputed facts, in short, overwhelmingly support the conclusion that the Employee "possessed common authority to consent to the search."  *Kim*, 105 F.3d at 1582.

### 2. *The Agent reasonably believed that the Employee had authority to consent*

At a minimum, the search is valid based on the Employee's apparent authority to consent. The relevant question in deciding apparent authority is whether "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises."  *Rodriguez*, 497 U.S. at 188 (internal quotation marks and

ellipses omitted); *see United States v. Law*, 528 F.3d 888, 904 (D.C. Cir. 2008) (per curiam).  Here the answer to that question is "yes."

As noted above, the Agent had verified that the Employee was listed as the occupant of the unit on the lease, Aff. ¶ 29, a factor that courts have considered significant in determining the existence of common authority.  *Compare Rodriguez*, 497 U.S. at 181 (rejecting common-authority argument in part because the consenting party's "name was not on the lease").  The Employee also had a key to the unit, another fact that signals authority to consent.  *See United States v. Murphy*, 506 F.2d 529, 530 (9th Cir. 1974) (even where employee "was given the key to the warehouse" only on occasions when he performed work there, his "custody of the key gave him sufficient dominion over the premises to enable him to grant the necessary consent").  In addition, the Agent understood that the Employee "current[ly]" worked for Manafort, received a salary from one of his affiliated companies, and that the "functions" the Employee performed "for Manafort and his companies" included moving files into the storage unit.  Aff. ¶ 28.  Even if those circumstances did not definitively establish the Employee's common authority to consent, they made it reasonable for the Agent to believe that the Employee had sufficient authority "over the premises" to give consent.  *See Rodriguez*, 497 U.S. at 188; *Law*, 528 F.3d at 904.[3]

---

[3] None of Manafort's cited cases—all of which involve residential searches—supports a contrary result.  Doc. 257 at 7.  The consenting party in *United States v. Corral*, 339 F. Supp. 2d 781 (W.D. Tex. 2004), was a part-time housekeeper who did not even have a key to the house.  *Id.* at 792.  In *Boyer v. Peterson*, 221 F. Supp. 3d 943 (W.D. Mich. 2016), the police knew that the woman who gave consent had not resided at the house for months and had to make an "appointment" with her estranged husband to enter.  *Id.* at 957-58.  And *United States v. Toan Phuong Nghe*, 925 F. Supp. 2d 1142, 1145-47 (W.D. Wash. 2013), involved consent from a motel manager, which the Supreme Court has generally deemed insufficient to justify entry into a guest's room since *Stoner v. California*, 376 U.S. 483 (1964).

### 3. *Manafort's contrary arguments lack merit*

Manafort makes a series of factual and legal arguments against the Employee's authority to consent, but none undermines the lawfulness of the Agent's entry.

a. Factually, Manafort bases much of his argument on the assertion that the Agent knew the Employee who gave consent to be merely a "former employee" of one of Manafort's companies, DMP.  That assertion is inaccurate.  What the Agent actually knew is that the consenting party was "a former employee of [DMP], *and a current employee of Steam Mountain, LLC, which is a business currently operated by Paul Manafort*."  Aff. ¶ 28 (emphasis added).  The Agent further understood the Employee to be "a salaried employee" of one Manafort company who "perform[ed] a variety of functions for Manafort *and his companies* as directed by Manafort." *Id.* (emphasis added).  Accordingly, this is not like a situation in which an employee quits his job, keeps a copy of the key to the job site, and then invites the police to enter.  *Cf.* 4 Wayne R. LaFave, *Search And Seizure: A Treatise On The Fourth Amendment* § 8.6(c) at n.49 (5th ed. 2012).  Rather, it involves at most a formal change in the identity of the business entity (from DMP to Steam Mountain) used to pay a worker's salary, where the principal remains the same.  Nothing about that change would have signaled to a reasonable officer (or even the Employee himself) that the Employee's access to and authority over the storage unit had suddenly ceased; indeed, it did not change anything about the Employee's services to Manafort or access to the unit.

Manafort also makes a series of factual assertions about how the Employee and others would have understood the bounds of the Employee's authority.  Doc. 257 at 5 (calling it "clear to the [Employee] and others at DMP that he had no authority to enter the storage unit for any reason *absent prior express permission from Mr. Manafort*").  But those assertions are not backed up by affidavits from Manafort, the Employee, or any of the "others at DMP' (*id.*) who supposedly

understood these limitations on the Employee's access to the unit.  *Cf. United States v. Wilson*, 493 F. Supp. 2d 364, 380 (E.D.N.Y. 2006) (defendant must develop a factual dispute through "an affidavit of someone with personal knowledge of the underlying facts").  More to the point, Manafort does not allege that the Agent was aware of these internal DMP understandings, such that those purported understandings could render unreasonable the Agent's reliance on the objective indicia of common authority described above.

b.  Legally, Manafort argues (Doc. 257 at 4-6) based on civil cases and the Restatement of Agency that the Employee's authority to consent depended on the specifics of his interactions with Manafort or on what Manafort would have told the Agent (had they spoken).  *Id.* at 5-6.  The principles he cites, however, do not govern how third-party consent works under the Fourth Amendment.  To the contrary, the point of the common-authority concept is that consent given by an individual with the requisite connection to the premises is effective against an absent co-occupant, without the police's having to reach out to the co-occupant for his agreement.  *See Matlock*, 415 U.S. at 170 ("the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared"). For the same reason, the validity of the Employee's consent does not depend on Manafort's having "manifested an express or implied desire to allow [the Employee] to consent to a law enforcement search" of the storage locker, Doc. 257 at 5.  *See United States v. Jenkins*, 46 F.3d 447, 456 (5th Cir. 1995) (fact that company never gave employee "permission to allow the FBI to copy or view the videotapes" did not affect the employee's "actual or apparent authority to consent"); *cf.* 4 LaFave, *supra*, § 8.6(c) ("an employer runs some necessary risks that his employees will permit a search—even if such permission is not strictly within their authority as an agent of the employer").

Manafort's reliance on the decision in *Peyton*, 745 F.3d 546, is also misplaced. *Peyton* "concern[ed] the scope of a contenant's common authority." *Id.* at 556. The D.C. Circuit agreed that the cotenant there (a great-grandmother) had authority to consent to a search of most areas in the one-bedroom apartment that she shared with her grandson. *Id.* at 555. The court held, however, that police could not reasonably believe that this authority extended to a closed shoebox stored in an area where the grandmother had told officers "that Peyton kept his 'personal property.'" *Id.* at 554. This case, by contrast, does not involve any analogous scope-of-authority issues. Manafort challenges not the extent of any search that police conducted in the storage unit based on the Employee's consent but whether the Employee had authority to consent to a search of the storage unit at all. And on that point, *Peyton* supports the existence of common authority here by underscoring the significance of the Employee's status as the lessee of the unit and the risks that Manafort assumed as the Employee's cotenant. *See id.* at 549 (Peyton and his grandmother were "[b]oth named as residents on the lease"); *id.* at 555 ("Peyton assumed the risk that [his grandmother] would permit outsiders (including the police) into the room where he slept" and thus that "those outsiders would see any of his possessions left in plain view").[4]

c. Finally, Manafort speculates (Doc. 257 at 11) that the Agent himself must not have believed the Employee's consent to be valid because he obtained a warrant before seizing and opening the containers that he had observed in the storage unit. But the Agent can hardly be faulted

---

[4] Manafort appears to draw from *Peyton* (Doc. 257 at 10-11) a requirement that the Employee have stored items of his own in Unit 3013 in order to have common authority over the area. But *Peyton* involved cotenants in an apartment. In an area that an employee jointly accesses because of his job, "mutual use" is established when the employee "is authorized to enter" a location "to perform his [job] duties" and in fact performs those duties there. *See United States v. Buettner-Janusch*, 646 F.2d 759, 765 (2d Cir. 1981) (research assistant with keys to university laboratory and permission to enter had common authority). And it is undisputed here that the Employee performed his job duties by moving items into the storage unit outside the presence of, and without supervision from, Manafort or other DMP principals. Aff. ¶¶ 28, 30.

for honoring "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  In any event, Manafort's speculation is unfounded.  As Manafort elsewhere emphasizes (Doc. 257 at 12), the Agent described in the warrant affidavit the circumstances of his consent entry into the storage unit and what he observed in the unit.  That disclosure confirms not that the Agent believed that the consent was insufficient to justify a full search, but that the added assurance of a warrant could help eliminate later disputes over the authorization for and bounds of the search.  Officers should not be penalized for taking such precautions.

## B. Suppression Would Not Be Warranted Even If The Entry Was Not Supported By Valid Consent

Even assuming the Agent's entry into Unit 3013 were unlawful, Manafort errs in arguing (Doc. 257 at 11-12) that "[t]he appropriate remedy" would be "suppression of all evidence seized . . . from the premises and the fruits thereof."  That is so for two reasons.

First, even without the information obtained from the initial warrantless entry, the warrant affidavit establishes probable cause that evidence of the three listed offenses would be found in the storage unit.  *See United States v. Karo*, 468 U.S. 705, 719 (1984) (where information from an earlier unconstitutional search was included in a warrant affidavit, "the warrant was nevertheless valid" because "sufficient untainted evidence was presented in the warrant affidavit").  Based on the Agent's interview with the Employee, the affidavit established that the storage unit housed "office files of Manafort's business contained in boxes," as well as a metal filing cabinet that was heavy enough to "contain[] a large amount of records" and into which the Employee had more recently placed other records at Manafort's request.  Aff. ¶¶ 28, 30.  The affidavit also explained that Manafort was authorized to access the unit and that Richard Gates—the Manafort associate alleged to be involved in the offenses set forth in the warrant—was an alternate point of contact

16

on the lease.  *Id.* ¶ 29.  And the affidavit gave specific reasons, apart from box labeled "Ukraine" in the unit, to believe that the storage unit was a repository for business records relevant to the tax, FBAR, and FARA offenses at issue.  *Id.* ¶ 35 (reasonable to believe that financial records would be found in light of IRS guidelines recommending that business records be retained for three to seven years); *id.* ¶ 37 (noting that people often retain records "in anticipation of litigation" and that Manafort had been "sued by his former client, Oleg Deripaska, sometime in or about 2008").  Taken together, this information met the legal standard for probable cause—*i.e.*, it "demonstrate[d] cause to believe that 'evidence'" relevant to proving the listed offenses "'[wa]s likely to be found at the place to be searched.'"  *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Groh v. Ramirez*, 540 U.S. 551, 568 (2004)).

Second, suppression is unwarranted under the good-faith exception to the exclusionary rule.  *See generally United States v. Leon*, 468 U.S. 897 (1984).  In particular, and as several courts of appeals have held, the good-faith exception applies when a warrant affidavit cites information obtained in violation of the Fourth Amendment but the police conduct that violated the Fourth Amendment was "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable."  *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir.) (internal quotation marks omitted), *cert. denied*, 569 U.S. 987 (2013); *see also, e.g.*, *United States v. Massi*, 761 F.3d 512, 527-28 (5th Cir. 2014) (adopting that rule but noting that a minority of circuits have rejected it), *cert. denied*, 135 S. Ct. 2377 (2015).  That standard is readily satisfied here.  Given that two courts of appeals have validated a third party's authority to consent on almost identical facts, *see* Part I.A.1, *supra*, the Agent's entry into Unit 3013 based on the Employee's consent was at least "close . . . to the line of validity."  *See Cannon*, 703 F.3d at 413; *see also United States v. Thornton*, 746 F.2d 39, 49 (D.C. Cir. 1984) ("eminently reasonable" for officers

to rely on warrant where "the overwhelming weight of authority" had upheld the type of warrantless search that preceded the warrant).  As a result, it was objectively reasonable for the Agent to believe in the lawfulness of the warrant, and suppressing the fruits of the subsequent search would not further the deterrent purpose "of the exclusionary rule in any appreciable way." *Leon*, 468 U.S. at 920 (internal quotation marks omitted).  For that reason too, the storage-locker evidence should not be suppressed even if the initial warrantless entry was unlawful.

### C.  Manafort Is Not Entitled To An Evidentiary Hearing On The Voluntariness Of The Employee's Consent

Contrary to Manafort's contention, the Court need not hold an evidentiary hearing to determine whether the Employee's "consent to the initial search of the storage unit was voluntary." Doc. 257 at 13.   While Manafort correctly points out that the government bears the burden of establishing that a party's consent was voluntary, the government has carried that burden here by (1) describing in the warrant affidavit  the circumstances surrounding the Employee's consent and (2) producing the consent-to-search form that the Employee signed.  *See* Exh. B, *infra*.  Manafort cannot secure a hearing to challenge that showing merely by citing the legal factors that courts consider in deciding voluntariness.  *See* Doc. 257 at 13.  He must instead "allege facts, sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented."  *United States v. Calderon*, 77 F.3d 6, 9 (1st Cir. 1996) (internal quotation marks omitted); *see Law*, 528 F.3d at 903-904 (D.C. Cir.) ("A defendant is entitled to an evidentiary hearing on his motion to suppress only upon factual allegations which, if established, would warrant relief.") (internal quotation marks omitted).

The decision in *Calderon* illustrates the deficiencies in Manafort's hearing request.  The defendant there claimed that his Spanish-speaking girlfriend's written consent to search an apartment they shared was invalid because she did not understand the English-speaking officers

when they came to the door late at night.  77 F.3d at 9.  In affirming the district court's decision to

reject that claim without an evidentiary hearing, the First Circuit explained that the defendant had

"filed no affidavits in support of the motion, not even from [his girlfriend], on whose state of mind

he now so heavily relies," and had not made an offer of proof in response to police reports produced

by the government that tended to contradict his version of events.  *Id.*  Likewise here, Manafort

has filed no affidavits—from the Employee or otherwise—that would contradict the signed form

evincing the Employee's free and voluntary consent to the Unit 3013 search.  Nor has he

"describe[d any] circumstances supporting his" bare suggestion that the Employee was somehow

coerced into meeting with the Agent, accompanying him to the storage facility, signing the consent

form, and using his key to give the Agent access to the unit.  *See id.*  Manafort is therefore not

entitled to an evidentiary hearing on the voluntariness of the Employee's consent.[5]

## II.  Manafort's Challenges To The Breadth Of The Search Warrant Are Unavailing And Do Not Support Blanket Suppression

Manafort argues (Doc. 257 at 14-21) that the warrant issued by the magistrate judge was

"unconstitutionally overbroad" and that the government executed it unreasonably by seizing

materials beyond the warrant's scope and providing a search inventory that allegedly violated

Federal Rule of Criminal Procedure 41(f).  These arguments lack merit and would not, in any

event, support the remedy of blanket suppression that Manafort seeks.

---

[5] Manafort has not requested an evidentiary hearing to resolve his other challenges.  In the government's view, those challenges raise legal questions that do not turn on disputed facts and that can therefore be resolved based on the warrant and supporting materials and without an evidentiary presentation.  *See, e.g.*, *United States v. Mejia*, 953 F.2d 461, 467 (9th Cir. 1991) (no hearing on consent required where "the contest is over the legal significance of undisputed facts rather than over the facts themselves").  But if the Court determines that witness testimony is necessary, the government respectfully requests notice well in advance of the May 23, 2018 hearing date because the affiant for the warrant is currently stationed overseas and arrangements would have to be made for him to return to the United States.

### A.  The Warrant Satisfies The Particularity Requirement

As stated above, p. 8, *supra*, the Fourth Amendment's warrants clause "requires that warrants 'particularly describ[e]' the 'things to be seized.''  *Griffith*, 867 F.3d at 1275 (quoting U.S. Const. amend. IV).  Manafort contends that the warrant here runs afoul of that requirement "because it allowed the searching agents to indiscriminately seize everything from the storage unit."  Doc. 257 at 14.  In so doing, he claims, the warrant authorized the kind of "general, exploratory rummaging in a person's belongings" that the Fourth Amendment was designed to avoid.  *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

Manafort's contention blurs two related but distinct types of specificity relevant under the Fourth Amendment: "particularity and breadth."  *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006) (internal quotation marks omitted), *cert. denied*, 549 U.S. 1299 (2007); *see United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017) ("[B]readth and particularity are related but distinct concepts."), *pet. for cert. filed*, No. 17-950 (Jan. 4, 2018).  As one court of appeals has explained, "[p]articularity is the requirement that the warrant must clearly state what is sought," while "[b]readth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."  *Hill*, 459 F.3d at 973 (internal quotation marks omitted); *see Griffith*, 867 F.3d at 1275-1276 (explaining that the particularity requirement "prevents the issuance of warrants on loose, vague or doubtful bases of fact" and, "[i]n that way, . . . is closely tied to the requirement of probable cause") (internal quotation marks, citations, and brackets omitted).

The warrant here poses no particularity problem.  Attachment B, which is expressly incorporated on the face of the warrant, identifies by name and citation three federal offenses for which the accompanying affidavit establishes probable cause—failure to report foreign bank accounts (FBAR), acting as an unregistered agent of a foreign principal (FARA), and filing a false

tax return.  Doc. 257-2 at 4.  It then lists eight categories of records "to be seized."  *Id.*; p. 6, *supra* (quoting categories in full).  Two of the listed categories (¶¶ 1c and 1d) seek specific types of records reflecting the work of Manafort and Richard Gates on behalf of named individuals and entities.  *Id.* ("the Party of Regions, Viktor Yanukovych, the European Centre for a Modern Ukraine").  One category (¶ 1f) covers a single lobbying firm involved in the FARA scheme.  Another category (¶ 1e) authorizes seizure of records relating to ten specific Manafort-affiliated companies.  Still another (¶ 1g) refers to "daily planners, logs, calendars, [and] schedule books" of two named individuals (Manafort and Gates).  And two other categories (both listed as ¶ 1b) seek, respectively, "federal and state tax documentation" and correspondence "with any foreign financial institution" or individual signatory on a foreign bank account.

All of those descriptions fully satisfied the particularity requirement.  *See United States v. Young*, 260 F. Supp. 3d 530, 549 (E.D. Va. 2017) (rejecting particularity challenge to warrant that sought "all records and documents" falling within eight enumerated categories).  Each "suppl[ied] enough information to guide and control the executing agent's judgment in selecting where to search and what to seize."  *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013); *see United States v. Dale*, 991 F.2d 819, 846 (D.C. Cir. 1993) (explaining that courts "assessing particularity . . . are concerned with realities of administration of criminal justice," and that "[i]t is sufficient if the warrant signed by the judicial officer is particular enough if read with reasonable effort by the officer executing the warrant" (internal quotation marks omitted)).  And by so doing, they ensured that the agents who executed the warrant would not have "unbridled discretion to rummage at will" among the "effects" found in the storage locker.  *See* Doc. 257 at 14 (quoting *Arizona v. Gant*, 556 U.S. 332, 345 (2009)).

Manafort bases his contrary argument (Doc. 257 at 15, 16) largely on the first category in

Attachment B (¶ 1a), which authorized the seizure of "[a]ny and all financial records" for Manafort, Gates, and their associated companies, "including but not limited to records relating to any foreign financial accounts."   But for three reasons, this language does not transform the warrant into an "'all documents' warrant," Doc. 257 at 14, as Manafort suggests.   First, the clause is limited by its terms to "*financial*" records of two individuals and their companies.   It therefore would not authorize agents to seize and retain, for example, family letters or analogous personal documents.   Second, while the final portion of the clause does not strictly limit the first, it does focus the executing agents on one specific class of records—*viz.*, those "relating to any foreign financial account."   *Cf. Kuc*, 737 F.3d at 133 (construing broader clause in a warrant that was linked to more a particular one by the "transitional phrase" "including, without limitation").   Third, the clause must be read in light of the three criminal offenses that are listed in the warrant immediately before it.   *See Andresen v. Maryland*, 427 U.S. 463, 479-81 (1976) (the phrase "together with other fruits, instrumentalities, and evidence of crime at this (time unknown)," had to be read in context and together with the warrant's "lengthy list of specified and particular items to be seized").   And when it is so read, the warrant's reference to "all financial records" of Manafort and Gates serves to focus the executing agents on those financial records that relate to three specific criminal offenses.   *See United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990) (recognizing that "a warrant's reference to a particular statute may in certain circumstances limit the scope of the warrant sufficiently to satisfy the particularity requirement"); *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994) (similar); *see also* 2 LaFave, *supra*, § 4.6(d) ("A warrant for seizure of 'records' has also been upheld where the listing of other objects in the warrant made it apparent precisely what type of records were sought.").

But even if this category had the sweep that Manafort ascribes to it, the warrant would still not violate the particularity requirement.  Courts "take into consideration the circumstances of the crime in assessing the degree of particularity that should be required of descriptions of items to be seized in the warrant."  *Dale*, 991 F.2d at 848.  And in cases of financial malfeasance that require investigators to follow a paper trail, courts have long held that some broader or more generically described categories may satisfy the Fourth Amendment.  *See id.* (recognizing, in a case that included "tax evasion allegations," that "specificity is even more difficult because evidence of the crimes can be found in almost every type of business document conceivable"); *see also, e.g.*, *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) (cited in Doc. 257 at 17), *cert. denied*, 549 U.S. 1338 (2008); *United States v. Logan*, 250 F.3d 350, 365 (6th Cir.), *cert. denied*, 534 U.S. 895 (2001).  Here, given the warrant's focus on crimes that involved multi-million-dollar financial transactions, that arose from foreign connections, and that related to the tax code, the inclusion of a single more capacious category alongside the seven narrower ones did not violate the Fourth Amendment's particularity requirement.  *See Andresen*, 427 U.S. at 479-81; *Kuc*, 737 F.3d at 133.

## B.  Any Temporal Overbreadth Does Not Justify Blanket Suppression

Manafort also argues (Doc. 257 at 16-18) that the warrant is overbroad because it does not expressly limit the records subject to seizure to a specific time frame.  He points out that this warrant differs in that respect from the warrant authorizing a search of his residence, which permitted the seizure of records relating to violations of several statutes that occurred "on or after January 1, 2006."  *Id.* at 16.  And he argues that the absence of date limits invalidates the warrant, because "[f]or a search warrant to be valid, it must provide the executing agents with guidance as to the time frame for which the agents are to seize evidence."  *Id.*  But as explained below, Manafort's challenge fails whether understood as contesting particularity or breadth, and blanket

suppression would be inappropriate in any event under the good-faith exception to the exclusionary rule and the doctrine of severance.

1. Construed as the type of particularity challenge addressed in Part II.A, Manafort's contention fails. The omission of a specific time frame does not detract from the clarity with which Attachment B described the various categories of records to be seized. And while the absence of date limits authorized the seizure of a wider swath of records, "a search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100.

2. Manafort's objection is equally unavailing if it is understood as focusing on the issue of "breadth" discussed above (p. 20, *supra*). Although the absence of date limits can contribute to a mismatch between the scope of the seizures authorized by a warrant and the probable cause supporting that warrant, Manafort's own cases confirm that a specific time frame is not an indispensable requirement. *See United States v. Blake*, 868 F.3d 960, 973-74 n.7 (11th Cir. 2017) (concluding that "the lack of a time limitation did not render the warrant unconstitutional" where other aspects of the warrant ensured that it was "appropriately limited in scope") (cited in Doc. 257 at 16-17). Warrants need not be limited by "specific time periods," for example, when "[t]he dates of specific documents" relevant to the offenses at issue "could not have been known to the Government." *United States v. Shilling*, 826 F.2d 1365, 1369 (4th Cir. 1987), *cert. denied*, 484 U.S. 1043 (1988). And courts have further held that some temporal "flexibility" must be afforded the warrant drafter, "because evidence that date[s] from outside of the time period" described in a warrant affidavit "may be relevant to the activity within the time period." *United States v. Abboud*, 438 F.3d 554, 576 n.7 (6th Cir.) (cited in Doc. 257 at 17), *cert. denied*, 549 U.S. 976 (2006).

Several aspects of the warrant and accompanying affidavit here support the seizure of records that predate Manafort's Ukraine work, which the affidavit describes as starting in 2005.

Aff. ¶ 6.[6]  As an initial matter, the subject offenses in the warrant include tax violations, *id.* ¶ 4, a context in which courts have recognized that earlier conduct can inform the assessment of violations alleged to have occurred later.  *See Shilling*, 826 F.2d at 1359 ("as for income tax violations, documents from an earlier time may have bearing on the tax violations alleged in a later year").  Further, both of the other named offenses (FBAR and FARA) are specific-intent crimes that involve international connections—one the failure to report foreign bank accounts, and the other acting as an unregistered agent of a foreign principal.  *See* 31 U.S.C. § 5322(a) and (b) (penalties for willful FBAR violation); 22 U.S.C. § 618(a) (penalty for "willfully violat[ing]" FARA).  Evidence that predated the specific course of conduct described in the affidavit could shed light on Manafort's (or Gates's) past use of or access to foreign accounts, as well as prior representation of foreign clients, both of which may be relevant to establishing the mental state needed to prove the FBAR and FARA violations.  *See United States v. Cohan*, 628 F. Supp. 2d 355, 365 (E.D.N.Y. 2009) (explaining, where warrant lacked a date limit, how prior instances of conduct predating criminal scheme by as much as 14 years "would be potentially admissible under Federal Rule of Evidence 404(b) to demonstrate intent or absence of mistake"); *cf. Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) ("[P]robable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular . . . conviction.").  This is therefore not an instance in which the scope of the search authorized by the warrant outstrips the probable cause established by the affidavit.

3.  The Court, however, need not definitively resolve whether the absence of a specific

---

[6] Manafort suggests (Doc. 257 at 18) that the supporting affidavit cannot be consulted because the issuing magistrate did not expressly incorporate it into the warrant.  But when the alleged defect inheres in the breadth of a warrant (*i.e.*, probable cause) and not the specificity of the descriptions in it, a reviewing court may consult the affidavit "regardless of whether it is incorporated or attached." *United States v. Cohan*, 628 F. Supp. 2d 355, 364 n.4 (E.D.N.Y. 2009).

time frame renders the warrant overbroad.  That is because, even if the warrant is overbroad, suppression is inappropriate under the good-faith exception to the exclusionary rule.  *See Leon*, 468 U.S. at 925 (authorizing courts to "turn[] immediately to a consideration of the officers' good faith" without resolving validity of the warrant).

As the Supreme Court has explained, the exclusionary rule "does not apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later held invalid."  *Davis v. United States*, 564 U.S. 229, 238-39 (2011) (quoting *Leon*, 468 U.S. at 922).  "The error in such a case rests with the issuing magistrate, not the police officer, and 'punish[ing] the errors of judges' is not the office of the exclusionary rule."  *Id.* at 239 (quoting *Leon*, 468 U.S. at 916).  Of relevance here, the Court has applied that reasoning both where the warrant was allegedly unsupported by probable cause (as in *Leon*, 468 U.S. at 903), and where it was found to be overbroad (as in the companion case of *Massachusetts v. Sheppard*, 468 U.S. 981, 988-91 (1984)).

Lower courts, in turn, have applied *Leon* and *Sheppard* to the specific type of defect that Manafort emphasizes here—*viz.*, temporal overbreadth.[7]  *See United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002) ("Evidence seized pursuant to an overly broad warrant need not be suppressed if the good faith exception applies.").  In an opinion by then-Judge Alito, for example, the Third Circuit assumed that a warrant was overly broad because it authorized the seizure of a decade's

---

[7] The D.C. Circuit and other courts have also applied *Leon* to warrants found overbroad because they reached "virtually all of [a party's] business records," *Maxwell*, 920 F.2d at 1033-34, or were similarly expansive in scope, *see, e.g.*, *United States v. Gros*, 824 F.2d 1487, 1497 (6th Cir. 1987) (executing officers reasonably presumed validity of warrant permitting "seizure of 'books, documents and other papers tending to show motive and intent'").  Under those precedents, the good-faith exception would equally foreclose suppression if the Court found merit in the particularity challenge addressed in Part II.A above.

worth of records that predated the food-stamp-fraud scheme under investigation. *Id.* at 151. But the court held that "[t]he absence of limiting dates" did not preclude officers who had fully presented the facts gathered in their investigation "to a neutral and detached [m]agistrate [j]udge" from relying on that judge's conclusion that the officers were entitled to conduct the search that they had requested. *Id.* at 152. The same conclusion follows in this case, where the Agent prepared a detailed affidavit that undisputedly established probable cause, that affidavit was reviewed by an Assistant U.S. Attorney, and a magistrate judge issued a warrant that authorized the seizure of the enumerated categories of records that the Agent had listed in Attachment B.   *See id.*; *see also, e.g.*, *United States v. Diaz*, 841 F.2d 1, 4-6 (1st Cir. 1988) (applying good-faith exception where the warrant allowed officers to seize records that predated by months "the first instance of wrongdoing mentioned in the affidavit"); *Cohan*, 628 F. Supp. 2d at 367 (applying good-faith exception where warrant had no date limits).

"[A] few narrow exceptions to the *Leon* principle" do exist, *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir.), *cert. denied*, 555 U.S. 1017 (2008), but neither of the two exceptions potentially relevant to this case are applicable. This is not the rare case in which the affidavit was so lacking in probable cause that the executing agents could not rely on the warrant issued based on that affidavit. *See Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (Supreme Court "precedents make clear . . . that the threshold for establishing this exception is a high one, and it should be"). Nor does "the absence from the warrant of a provision limiting the search and seizure to documents pertaining to the time period" described in the affidavit "make the warrant so facially deficient as to render official belief in its legality entirely unreasonable." *$92,422.57*, 307 F.3d at 151 (internal quotation marks and brackets omitted). To the contrary, Manafort's own cases make clear that date limits are not indispensable, *see* p. 24, *supra*, and courts in the district where this

warrant was issued have repeatedly held that "a search warrant does not fail the particularity requirement by not explicitly articulating a time frame." *Young*, 260 F. Supp. 3d at 550 (quoting *United States v. Moore*, 775 F. Supp. 2d 882, 898 (E.D. Va. 2011), *aff'd*, 498 Fed. Appx. 195 (4th Cir. 2012)).   Against that legal backdrop, "a reasonably well trained officer would [not] have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23; *see also Cohan*, 628 F. Supp. 2d at 367 (good-faith exception applied where regional court of appeals had not addressed whether "time-frames are a constitutional requirement in business-record search warrants, and district courts in th[at] circuit have not converged upon a clear rule").

Finally, nothing in the D.C. Circuit's recent decision in *Griffith*, 867 F.3d 1265 (cited in Doc. 257 at 15-16, 18), supports a contrary result.  *Griffith* involved a warrant that the court found to be clearly defective in two ways:  it authorized the seizure of cellphones from a residence despite the affidavit's failure to establish probable cause to believe that the suspect even owned a cellphone, let alone that one would contain evidence of the crime under investigation; and the warrant was "material[ly] overbr[oad]" in authorizing the seizure of "every electronic device found in the home." *Id.* at 1278-79.  "[T]hose failings," when "[t]aken together," placed "the warrant beyond the good-faith exception's reach." *Id.* at 1279.  The warrant in this case, by contrast, features no analogous probable-cause deficiency, and any temporal overbreadth is far less clear or "material" than was the case in *Griffith* given the other limits in the warrant, including the requirement that seizable record relate to the three specific criminal offenses listed in Attachment B.

4.  Even if any overbreadth required suppression, it would not support exclusion of "[a]ll evidence seized from the storage unit," as Manafort claims (Doc. 257 at 20-21).  Rather, under the doctrine of severance, any suppression remedy would be limited to evidence seized under the

portion of the warrant that is overbroad, which would at most be records that predate 2005.

The courts of appeals have uniformly applied the doctrine of severance (also sometimes referred to as "partial suppression" or "redaction") when a warrant only partly satisfies either the particularity or probable cause requirements. *United States v. Sells*, 463 F.3d 1148, 1150 n.1 (10th Cir. 2006) (citing cases from every circuit), *cert. denied*, 549 U.S. 1229 (2007); *see also United States v. Nader*, 621 F. Supp. 1076, 1085 (D.D.C. 1985) (explaining that the D.C. Circuit, among other courts, had "recognized the severability of the seized evidence and upheld the seizure of the items described with particularity"). The doctrine reflects a judgment that "it would be harsh medicine indeed if a warrant issued on probable cause and particularly describing certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well." 2 LaFave, *supra*, § 4.6(f).

Notably, courts—including in Manafort's cited cases—have applied the severance doctrine in the particular circumstances at issue here, in which a warrant is allegedly overbroad because it authorizes the seizure of items without a sufficient (or any) limitation on timeframe. The warrant in *Abboud*, *supra*, for example, was overbroad because "law enforcement knew that the evidence in support of probable cause in the affidavit revolved only around a three-month period in 1999," yet the "warrant authorized search for records from January 1996 to May of 2002." 438 F.3d at 576. The Sixth Circuit concluded that the warrant's overbreadth did "not require suppression of all of the items seized pursuant to the warrant," and instead that the proper result was that "all evidence seized irrelevant to the three-month period in 1999 should have been suppressed, while evidence relevant to this period should be upheld." *Id.* The Third Circuit reached a similar conclusion in *$92,422.57*, explaining that even if a warrant is temporally overbroad insofar as it covers time periods for which probable cause may not have existed, "the proper remedy . . . [i]s

simply to excise the years for which there was no probable cause." 307 F.3d at 151; *accord United States v. Flores*, 802 F.3d 1028, 1045 (9th Cir. 2015) (applying severance to a warrant with "no temporal limit" under which investigators "[s]eiz[ed] five or six years' worth of data"), *cert. denied*, 137 S. Ct. 36 (2016).

Under these decisions, the severance doctrine applies to any overbreadth resulting from the absence of date limits in the warrant here. Manafort does not dispute that the affidavit established probable cause to seize the enumerated categories of materials for the period of conduct described in the affidavit—that is, 2005 to the date of the warrant. Aff. ¶ 6 (Manafort's Ukraine work extended from 2005 through "at least 2014"); *see* Doc. 257 at 16 (raising no objection to another's warrant probable cause showing as to offenses "occurring on or after January 1, 2006"). The proper remedy under the severance doctrine would therefore be to suppress evidence dating from the pre-2005 time period for which probable cause was ostensibly lacking.

### C. The Execution Of The Warrant Violated Neither The Constitution Nor Rule 41

Manafort's final contentions concern the execution of the search warrant. He asserts, without submitting any affidavit or making any proffer, that the executing agents exceeded the scope of the warrant by "seiz[ing] virtually everything from the premises" and that they violated both the Fourth Amendment and Federal Rule of Criminal Procedure 41(f) by preparing an inventory of seized items that was, Manafort asserts, "devoid of description." Doc. 257 at 19. These contentions lack merit.

As an initial matter, Manafort is simply incorrect about the scope of the materials seized from the storage unit. He infers from the listing of "nine groups of unidentified documents" in the inventory returned to the magistrate judge that the searching agents "seized everything contained within the storage unit." Doc. 257 at 19. But that inference is unfounded. Before the search, the

Agent observed in the unit "approximately 21 bankers' boxes that could contain documents, as well as a five-drawer metal filing cabinet."  Aff. ¶ 31.  The agents seized from those containers the nine sets of documents listed in the inventory returned to the magistrate—five sets of documents (including binders) from the filing cabinet, two sets from bankers' boxes on the left-hand side of the unit, and two sets from boxes on the rear wall.  Exh. A, *infra* (Collected Item Log).  The documents taken do not amount to anywhere near the entire contents of the storage unit, much less demonstrate a seizure beyond the scope authorized by the warrant.[8]

Manafort's criticisms of the inventory itself are equally misguided.  He cites no cases supporting his contention (Doc. 257 at 20) that an unclear "description of what was seized" in a post-search inventory can render the previously completed search "unreasonable" within the meaning of the Fourth Amendment.  Relevant authority is instead to the contrary.  In particular, courts have explained that "restrictions regarding the preparation of a search inventory . . . are creatures of statute or rules," and that "[a] failure to inventory the property seized during a search has no relation to the Fourth Amendment prohibition against unreasonable searches and seizures." *United States v. Fredericks*, 273 F. Supp. 2d 1032, 1038 (D. N.D. 2003) (citing, among others, *United States v. Dudek*, 530 F.2d 684, 688 (6th Cir. 1976)).  Nor would any such constitutional violation give rise to a suppression remedy.  As a leading treatise explains, "the 'overwhelming weight of authority' is to the effect that required warrant return procedures are ministerial and that failure to comply with them is not a ground for voiding an otherwise valid search."  2 LaFave, *supra*, § 4.12(c); *see United States v. Hubbard*, 493 F. Supp. 209, 221 (D.D.C. 1979) ("failure

---

[8] The inventory and Collected Items Log, when read together, refute Manafort's assertion (Doc. 257 at 17-18) that the agents finished executing the warrant within 33 minutes of obtaining it.  Those documents instead show that the agents entered the unit to execute the warrant at approximately 5:20 p.m. and completed their seizure of items from the cabinet and boxes just under two hours later, at 7:09 p.m.  *See* Doc. 257-2 at 2 (inventory); Exh. A, *infra* (log).

even to complete an inventory is merely a ministerial violation which does not affect the validity of the search"), *aff'd sub nom. United States v. Heldt*, 668 F.2d 1238 (D.C. Cir. 1981).

Manafort's argument under the Rules of Criminal Procedure fares no better.  Although Rule 41(f)(1)(B) requires that executing agents "prepare and verify an inventory of any property seized," the Rule "do[es] not dictate a requisite level of specificity for inventories."  *Matter of Searches of Semtex Indus. Corp.*, 876 F. Supp. 426, 430 (E.D.N.Y. 1995).  And of relevance here, "[i]n circumstances where filing cabinets of documents are seized, routine practice is to list the storage devices, i.e., the cabinets, on the inventory, as opposed to making a document by document list of the contents."  Fed. R. Crim. P. 41 adv. comm. note (2009 amendment).  The inventory in this case did not violate Rule 41(f) when, rather than providing such "a document by document list" of the materials seized from the filing cabinet and bankers boxes, it described the seized items more generically as consisting of nine sets of documents (and some binders).  *See, e.g.*, *United States v. Rollack*, 90 F. Supp. 2d 263, 271 (S.D.N.Y. 1999) (no violation of Rule 41 where inventory prepared following search of a jail cell "refer[red] only to 'miscellaneous papers' and the like without listing specific items seized").

In any event, any Rule 41(f) violation would not justify suppression.  Manafort makes no effort to establish prejudice from the asserted violation, which is the showing that the D.C. Circuit has required for a defendant to obtain suppression based on "ministerial errors" under Rule 41. *United States v. Gerald*, 5 F.3d 563, 567 (D.C. Cir. 1993).  Citing out-of-circuit authority, Manafort instead suggests that suppression is appropriate because the description in the inventory evinces "intentional and deliberate disregard" of Rule 41(f)'s requirements.  Doc. 257 at 20 (citing *United States v. Krueger*, 809 F.3d 1109, 1114 (10th Cir. 2015)).  But it is far from clear that the "intentional and deliberate" standard applies outside the context of "pre-search procedures."

*United States v. Burroughs*, 882 F. Supp. 2d 113, 127 (D.D.C. 2012).  And even if it did, Manafort

does not explain how an inventory description that mirrors the "routine practice" in cases where

entire cabinets are seized, *see* Fed. R. Crim. P. 41 adv. comm. note (2009 amendment), could

demonstrate intentional and deliberate disregard of Rule 41(f)'s requirements.

### CONCLUSION

For the foregoing reasons, Manafort's motion to suppress evidence derived from the search

of the storage unit (Doc. 257) should be denied.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: April 23, 2018

*/s/ Andrew Weissmann*
Andrew Weissmann
Greg D. Andres (D.D.C. Bar No. 459221)
Scott A.C. Meisler
U.S. Department of Justice
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-0800

*Attorneys for the United States of America*

# EXHIBIT A

FD-1087 (Rev. 5-8-10)

UNCLASSIFIED



**OFFICIAL RECORD**
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

# FEDERAL BUREAU OF INVESTIGATION

### Collected Item Log

**Event Title:** (U) Search of 370 Holland Lane,                **Date:** ▮▮▮▮▮▮▮
Unit 3013, Alexandria, Virginia

**Approved By:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Drafted By:** ▮▮▮▮▮▮▮▮▮▮▮▮

**Case ID #:** ▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮
                          ▮▮▮▮▮▮
                          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
                          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Full Investigation Initiated:** ▮▮▮▮▮▮

**Collected From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
370 Holland Lane
Unit 3013
Alexandria, Virginia

**Receipt Given?:** Yes

**Holding Office:** WASHINGTON FIELD

**Details:**

On 5/27/2017, a search was conducted at 370 Holland Lane, Unit 3013,
Alexandria, Virginia pursuant to a Federal Search and Seizure Warrant
obtained in the Eastern District of Virginia.

| Item Type | Description |
|-----------|-------------|
| 1B General | (U) Documents/ Binders |
| | Collected On:  05/27/2017 07:09 PM EDT |
| | Receipt Number:  1 |
| | Seizing Individual: ▮▮▮▮▮▮▮▮ |
| | Collected By: ▮▮▮▮▮▮▮ |
| | Location Area:  Storage Unit 3013 |
| | Specific Location:  File Cabinet |

**UNCLASSIFIED**

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its
contents are not to be distributed outside your agency.

UNCLASSIFIED

Title:  (U) Search of 370 Holland Lane, Unit 3013, Alexandria, Virginia
Re:  205B-WF-6832812, 05/31/2017

1B General        (U) Documents
                  Collected On:  05/27/2017 07:09 PM EDT
                  Receipt Number:  2
                  Seizing Individual:  █████████████████
                  Collected By:  ██████████
                  Location Area:  Storage Unit 3013
                  Specific Location:  File Cabinet

1B General        (U) Documents
                  Collected On:  05/27/2017 07:09 PM EDT
                  Receipt Number:  3
                  Seizing Individual:  █████████████████
                  Collected By:  ██████████
                  Location Area:  Storage Unit 3013
                  Specific Location:  File Cabinet

1B General        (U) Documents
                  Collected On:  05/27/2017 07:09 PM EDT
                  Receipt Number:  4
                  Seizing Individual:  █████████████████
                  Collected By:  ████████
                  Location Area:  Storage Unit 3013
                  Specific Location:  File Cabinet

1B General        (U) Documents
                  Collected On:  05/27/2017 07:09 PM EDT
                  Receipt Number:  5
                  Seizing Individual:  ████████████████
                  Collected By:  ██████████
                  Location Area:  Storage Unit 3013
                  Specific Location:  File Cabinet

1B General        (U) Documents
                  Collected On:  05/27/2017 07:09 PM EDT
                  Receipt Number:  6
                  Seizing Individual:  ████████████████
                  Collected By:  ██████████
                  Location Area:  Storage Unit 3013
                  Specific Location:  Bankers Boxes on Left Hand Side
                  of Unit

UNCLASSIFIED

Title:  (U) Search of 370 Holland Lane, Unit 3013, Alexandria, Virginia
Re:  205B-WF-6832812, 05/31/2017


1B General          (U) Documents
                    Collected On:  05/27/2017 07:09 PM EDT
                    Receipt Number:  7
                    Seizing Individual:  ██████████████
                    Collected By:  ████████
                    Location Area:  Storage Unit 3013
                    Specific Location:  Bankers Boxes on Left Hand Side
                    of Unit


1B General          (U) Documents
                    Collected On:  05/27/2017 07:09 PM EDT
                    Receipt Number:  8
                    Seizing Individual:  ██████████████
                    Collected By:  ████████████
                    Location Area:  Storage Unit 3013
                    Specific Location:  Boxes on Rear Wall


1B General          (U) Documents
                    Collected On:  05/27/2017 07:09 PM EDT
                    Receipt Number:  9
                    Seizing Individual:  ██████████████
                    Collected By:  ██████████
                    Location Area:  Storage Unit 3013
                    Specific Location:  Boxes on Rear Wall


◆ ◆

# EXHIBIT B

FD-26 (Rev. 7-20-94)

# DEPARTMENT OF JUSTICE

## FEDERAL BUREAU OF INVESTIGATION

### CONSENT TO SEARCH

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:

(Describe the person(s), place(s), or thing(s) to be searched.)

STORAGE UNIT LOCATED @ 370 HOLLAND LANE, ALEXANDRIA, VA
UNIT 3013

2. I have been advised of my right to refuse consent.

3. I give this permission voluntarily.

4. I authorize these agents to take any items which they determine may be related to their investigation.

5/26/2017
_____
Date

Witness

_____
Signature