IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America, Plaintiff,

vs.

Paul Manafort, Jr.,
Richard W. Gates, III,
Defendants.

Criminal Action No. 17-CR-201
STATUS CONFERENCE
PUBLIC TRANSCRIPT
**PORTIONS UNSEALED PER 4-23-18 ORDER**
Washington, DC
Date: February 14, 2018
Time: 9:30 a.m.

---

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

---

A P P E A R A N C E S

For the Plaintiff: ANDREW WEISSMANN
GREG D. ANDRES
KYLE R. FREENY
U.S. Department of Justice
Special Counsel's office
950 Pennsylvania Avenue NW
Washington, D.C. 20530
202-514-1746
Email: Aaw@usdoj.gov
Email: Gda@usdoj.gov
Email: Krf@usdoj.gov

For Defendant Manafort: KEVIN M. DOWNING
815 Connecticut Avenue, N.W.
Suite 730
Washington, D.C. 20006
(202) 754-1992
Email: Kevindowning@kdowninglaw.com

THOMAS EDWARD ZEHNLE
Miller & Chevalier, Chartered
900 Sixteenth Street, NW
Washington, DC 20006
(202) 626-5800
Email: Tzehnle@milchev.com

For Defendant Gates: SHANLON WU
Wu, Grohovsky & Whipple
1300 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 204-3053
Email: Swu@dcwhitecollar.com

Walter Mack
DOAR RIECK DeVITA KALEY & MACK
217 Broadway
Suite 707
New York, NY 10005
(212) 619-3730
Email: Wmack@doarlaw.com

ALSO PRESENT:

Pretrial Officers: Andre Sidbury
Shay Holman

FBI Special Agent: Omer Meisel

Court Reporter: Janice E. Dickman, RMR, CRR
Official Court Reporter
United States Courthouse, Room 6523
333 Constitution Avenue, NW
Washington, DC 20001
202-354-3267

* * *

THE COURTROOM DEPUTY: Good morning, Your Honor. We have this morning criminal case number 17-201-1 and -2, the United States of America v. Paul Manafort, Jr., and Richard W. Gates, III. Both Mr. Manafort and Mr. Gates are present in the courtroom.

Will counsel for the parties please approach the lectern and identify yourself for the record.

MR. ANDRES: Good morning, Your Honor. Greg Andres, Andrew Weissmann, Kyle Freeny from the Special Counsel's Office. And with us at counsel table is Supervisory Special Agent Omer Meisel.

THE COURT: All right. Good morning.

MR. WU: Good morning, Your Honor. Shanlon Wu, and Mr. Walter Mack are here for Mr. Gates.

THE COURT: All right. Good morning.

MR. DOWNING: Good morning, Your Honor. Kevin Downing and Tom Zehnle for Mr. Manafort.

THE COURT: All right. Good morning. I don't know how much we can actually do today. And I don't know how much we can actually do on the public record today, but we'll try to do some of it.

I do want to address sealing issues first. The fact that this case is of significant public interest is not a reason to seal things. It's a reason to unseal things. But it does support maintaining the privacy of the

defendant's private information; their addresses, their family members' addresses, their bank account numbers, the dollars in the bank accounts, their family members' personal information, and financial information that isn't part of the indictment. Attorney-client communications are privileged and not public. And Rule 60 requires that the government be scrupulous about not revealing information about ongoing investigations.

So, there's a lot of reasons why a lot of things that people are telling me have to remain sealed and have to remain private at the moment, but I think people are overdoing it just a little bit. The pleading I received Mr. Gates last night, docket 176, doesn't actually have anything private in it. It just asks for more time. So I'm going to order that it be unsealed.

Mr. Manafort's bond motion, I permitted it to be filed under seal, but I've ordered that a redacted version be posted, and I need that done by Friday. The government's response, docket 175, I'm going to grant you leave to file the opposition under seal, but whatever aspects of it can be filed on the public docket -- and I think there are aspects of it that can -- need to be. So that needs to be done by Friday.

That being said, while my goal is to include the public as much as possible in these proceedings, there are a

number of issues I have to address here today that are going to require either bench conferences or sealed proceedings because they relate to attorney-client confidences or the details of financial arrangements. And at some point these issues will be resolved and they will result in orders and the orders will be public.

So, with that, I guess I usually start each of these status conferences with talking about the status of discovery. And hopefully that's something that you can answer on the record. Mr. Andres?

MR. ANDRES: Yes. Good morning, Judge. And there is something that we would like to approach about. I'll tell you about discovery, but there are matters that we would like to address with the Court at the bench.

So with respect to discovery, we've, since the last status conference, made several productions. We're going to make another production this week. As we said last time, we're largely completed with discovery. What remains are the rolling productions; that is, materials that we continue to receive, whether pursuant to a subpoena or some other process. And obviously we try to get that out as quickly as possible. And then as we described last time, there are other parts of the Special Counsel's Office, other investigations, and we're going through the files of those other investigations that don't relate principally to the

defense in this case or the charges in this case. And we're looking through those files to make sure there's nothing in those that are discoverable, and we'll continue to produce those.

So, as with last time, we're substantially completed, but obviously it's an ongoing process.

THE COURT: All right. So, do you need to come to the bench now to --

MR. ANDRES: I think it would just be appropriate, Judge, because it would alert you to certain issues that may come up along the proceedings.

THE COURT: Okay.

THE COURT REPORTER: Is this sealed?

THE COURT: Yes, this portion is sealed.

(Bench conference.)

THE COURT: All right. Do I have at least one lawyer for each defendant who can hear?

MR. DOWNING: Yes.

THE COURT: Okay.

MR. ANDRES: So, Judge, I didn't want to -- I at least wanted defense counsel to know what we wanted to talk to the Court about, which is to update the Court about certain grand jury matters, both in the Eastern District of Virginia and here in the District of Columbia. I think those matters are more appropriately discussed ex parte, at

least in the first instance, and then if there are matters that should be disclosed to the defense, we'll certainly do that. But I think for purposes of updating the Court on grand jury matters, we should do that ex parte.

THE COURT: All right. Well, you all, not ex parte, came up here last time and told me that indictments were anticipated and that they knew about them and that you had discussed with them whether they would be filed, and that they would be brought before today. I was sort of hoping that if they weren't, somebody would move to continue this hearing so we wouldn't be doing this with everybody watching us, not talking to them. But here we are.

So, I guess I don't really understand why you could talk about it last time with everybody but you can't talk about it this time.

MR. ANDRES: Sure. So, Judge, we are aware that -- something that has happened. We want to update you about that, but some of those matters are sealed. And in light of that, we wanted to proceed ex parte in the first place.

As for continuing this conference, we talked to defense counsel about that, but because there are other issues relating to Mr. Gates's representation, bail, etcetera, it seemed prudent -- or, defense wanted to proceed with that. So, we just need to now take it to the next step. Obviously, we've had conversations with the defense

counsel about the superseding -- I mean, about the Eastern District charges and other matters. But I think what remains should be done ex parte.

THE COURT: All right. In terms of just enlightening me about the schedule, that has to be done ex parte?

MR. ANDRES: I think this information would help you, alert you as to what should happen next on the scheduling.

MR. DOWNING: We would object to ex parte communications.

THE COURT: I understand that.

MR. DOWNING: I understand that Mr. --

THE COURT: Wait. Wait. Wait. You need to come up here, near the microphone, so she can get you.

MR. DOWNING: I'm sorry.

THE COURT: And don't talk over me, so we can have it.

I understand your objection. Your objection is noted. But until I hear what it is, I don't know that I can solve your problem. So, it does seem that they've been in communication with you about what's coming down the road. So, I need to hear what he has to say before I can order him to tell it to you. But your objection is noted.

MR. DOWNING: Thank you.

MR. WU: Just for the record, we'll join in the objection.

THE COURT: All right. While you're up here, I want to tell you a few other things. I plan to go from this matter into discussing Manafort's bond issues and then at 10:30 I plan to discuss Mr. Gates's representation issues. And I have summoned Mr. Green for that purpose as well, so he will be here. Not the Mr. Green that bills.

MR. WU: No comment, Your Honor.

THE COURT: I'm sure you would like to see him faster.

All right. Well, how do you want to handle this? Just have you guys step down. And you can tell me what's going on. Let's do that right now.

So this will continue to be sealed and the record will reflect that the government is now going to speak to me ex parte.

So you can go back to counsel table.

MR. ZEHNLE: Your Honor, yes, if I might raise one issue. With respect to the filing of the supplemental memorandum that you just addressed a moment ago for Mr. Manafort's bond, we can certainly file that by Friday. There's one thing in the minute order --

THE COURT: It isn't a supplemental, it's just a redacted version of your supplemental -- of what you filed.

MR. ZEHNLE: The supplemental memorandum that we filed that related to the motion for reconsideration.

THE COURT: Okay.

MR. ZEHNLE: Okay. The Court said to -- it's fine, redacted addresses, the financial information. On page 2 of that memorandum there was a brief summary of what we had discussed in the sealed hearing on January 22nd. So, I wanted the Court's guidance before I filed that because technically that's not an address, that's not financial information, but it's certainly under seal. So I didn't know if the Court wanted me to redact that brief summary of the January 22, or not.

THE COURT: Well, I think what I said then was exactly what I had said at the original hearing, which is that you had to have one or the other or both to satisfy. So, you know, if you just want to change it to the Court has emphasized that or something, without specifically referencing -- I mean, I don't think it's -- I don't have a problem with that.

MR. ZEHNLE: We don't either, Your Honor. I just want to make sure that I'm not talking about it.

THE COURT: We sealed the hearing because you were telling me about his expenses and legal fees and things like that. I don't have a problem with that.

MR. ZEHNLE: Okay.

MR. DOWNING: And, Your Honor, just as a matter of administration, we would like to address the Court regarding

discovery issues after we finish at the bench.

THE COURT: Yes. I would like to set a trial date. I was planning to set a trial date today. I can't set a trial date without knowing who co-counsel is going to be, so that's a little bit of a problem. So we might be able to do it later this morning, we might have to get together early next week and do it. I don't know the answer to that yet. I was hoping to have an answer by yesterday at 5 o'clock, but I didn't get one, so --

(Whereupon defense counsel step back to counsel table. Remaining at the bench is government counsel only.)

THE COURT: All right.

MR. ANDRES: Thank you, Judge. So, we did return a super -- we did return -- the grand jury returned an indictment in the Eastern District of Virginia yesterday against Mr. Manafort; that's still sealed, which was the purpose of doing this ex parte.

Second, the government is planning on superseding in this case this Friday, and we'll ask the grand jury to return a superseding indictment against Mr. Manafort. Both of those instruments only charge Mr. Manafort because of the ongoing nature of the negotiations with Mr. Gates. We don't know how that's going to resolve itself yet. We have some hope that it will happen in the next week to ten days. And our hope is that if, in fact, that happens, after that

happens, we can unseal both of those indictments, have Mr. Manafort arraigned here on the District of Columbia cases and proceed that way.

So we were uncomfortable with disclosing to the defense the fact that there's a sealed indictment in the Eastern District of Virginia. But that's what's happening. I think both of those -- or, all three of those events substantially affect what the schedule is going forward. But, once we resolve with Mr. Gates, or not, we can then unseal those indictments and the Court can proceed to have an arraignment and have the schedule go forward that way.

THE COURT: Well, if there's not an agreement with Mr. Gates, is he a codefendant in any of these?

MR. ANDRES: Yeah, if we don't resolve things with Mr. Gates -- and I think we'll know that within the next ten days -- then we would probably supersede on both of those instruments, to include him in both of those. But in light of the negotiations, it would seem prudent to do that.

THE COURT: All right. Well, is there any reason why we can't call them back up here and have you say that what you've told me is that you still intend to supersede and you still intend to proceed in the Eastern District of Virginia? I mean, they already know the substance of the pending indictment.

MR. ANDRES: Absolutely.

THE COURT: So there's nothing about that that's changed.

MR. ANDRES: Correct.

THE COURT: Well, just so they don't think that there's something else.

MR. ANDRES: Yeah.

THE COURT: I mean --

MR. ANDRES: Yeah. I mean, I think what we don't want to disclose, anything that's sealed. We don't want to disclose that Mr. Manafort is the only defendant in those. But we can certainly say --

THE COURT: But I think you can say that you're still intending to proceed to supersede and to proceed there and the schedule is uncertain and is --

MR. WEISMANN: I think the thing that we're trying to avoid is having -- we are hopeful that Mr. Gates's situation will resolve itself quickly and that we will be in front of the Court with the papers and the Court can schedule the plea hearing. We also are cognizant that if it doesn't work out, we don't want to have Mr. Gates in a position where the public knows he's intending to plead guilty and the public -- the issues that are raised but didn't --

THE COURT: But that's different than having you -- Yes, I understand that. Okay.

Counsel, can you return to the bench?

(Defense counsel returns to the bench.)

THE COURT: All right. Based on what's been told to me, I just want to let you know that what was told to me is fundamentally that everything that you -- is not a change to what you already know; that are there are charges contemplated in the Eastern District of Virginia and that there are superseding charges contemplated here and that the timing is still uncertain. But, it is not something else that they're planning to do that they told me about that they haven't told you about.

So, that much I can tell you. I think, given that -- well, I, too, believe we need to set a trial date. I don't think we can set a trial date until you see what the new charges are because, you know, you won't know how long it's going to take you to get ready. So I'm also hamstrung by the counsel issues, in terms of setting a trial date. But I will let you put your position on the record about setting a trial date and discovery.

MR. DOWNING: I understand that. It doesn't make any sense to me to take a futile position. But I do think that we should set a status conference for next week, so we can come back here, because there are a lot of issues going on. But we, for Mr. Manafort, we ought to set a firm date because that's what we're getting ready for. I don't know

how much more time the government is asking for, but we do have a pending deadline on the 23rd for some motions that, obviously -- I don't know what the new one looks like, but I have a good idea. So I don't think we need more than a week on that, if they're going to return something next week. But I don't know, so I think a status conference would be appropriate.

THE COURT: I don't know either. And I can set a status conference for the end of next week. My problem with that is, you know, then we have a million people sitting here. And maybe the better thing to do is just set it on shorter notice, like --

MR. DOWNING: Okay.

THE COURT: -- kind of take it a day at a time and see if something breaks one way or the other that makes it clear what we need to do and when we need to do it.

MR. DOWNING: Okay.

THE COURT: But, I'm not exactly -- we're all sort of in unchartered waters at this point.

Did you want to say something?

MR. MACK: Just to make a comment to Mr. Wu briefly, because he doesn't always trust me to say what I should be saying.

We do not know with any detail precisely what is happening with respect to Mr. Gates because he will not tell

us.

MR. WU: This may go to the 10:30 issues, Your Honor. But I would put on the record, under seal, we do not feel we have any clarity from the government vis-a-vis what will happen to our client on these new charges, and that's the result of their feeling that their position is they cannot speak to us about that.

THE COURT: All right. But you were alerted at some point as to what the potential charges could be. Because you had told me last time that you knew what they were and you wanted to face them there.

MR. WU: Yes, I understand. To be specific, last time we were only aware of the potential second indictment in Virginia. As of yesterday we learned that there also was likely to be, in addition to that, a superseding indictment in D.C.

THE COURT: All right.

MR. WU: The particulars of those charges --

THE COURT: I understand, you're hamstrung. Is there any change in Mr. Manafort's point of view about the Eastern District versus the District? I think the only thing I can imagine that's more unusual than the government offering you the choice is the choice you're making. But, is there any further discussion about that?

MR. DOWNING: No.

THE COURT: All right.

MR. ZEHNLE: Thanks, Judge.

(Open Court:)

THE COURT: All right.

MR. WU: Your Honor, may I just clarify one thing from the earlier discussion that you made on the record?

THE COURT: Yes.

MR. WU: Which is the pleading that Mr. Gates apparently filed last night, I think you referenced that. Counsel of record has not seen that pleading. I just want to make that clear. We double-checked.

THE COURT: Well, it's on the docket and it's going to be unsealed. It has now been docketed, so you should now be able to see it, even if it was sealed, because it's on the docket. So now it will also be unsealed, so anybody can see it.

MR. WU: I think the delay was because it was not filed via ECF.

THE COURT: Right. He filed it pro se. I can simply tell you that he asked me to put off the consideration of the motion to withdraw for approximately a week, and that is the sum total of what was in the document. And now it's going to be public.

MR. WU: Thank you, Your Honor.

THE COURT: All right. All right. We have a

motions schedule in place. The government took issue with the scheduling of briefs related to the 404(b) issue, and Mr. Manafort has weighed in on that and thought that -- preferred the schedule I set to the one that the government recommended.

I think I need to have a trial date and a pretrial conference before I answer that question, although I do want to advise the Office of Special Counsel that I'm not sure that the government's proposal of waiting until eight weeks before whatever the trial date is is going to work in connection with all the other work that you're going to have to do it get ready for the pretrial conference.

The schedule was established with an understanding that in advance of the pretrial conference, you're going to file a pretrial statement with me that's going to identify the exhibits and witnesses in advance of trial. And the defense can't do that if they don't know what the allegations are that are going to be tried.

So, I think there's going to come a point where I'm going to order the government to inform the Court and the defense of any 404(b) evidence it intends to introduce so that they can explain to me why I should exclude it, you can explain to me why I can include it, I can rule on it and then we know what the universe is that's going to trial. Which brings me to another point, which is that I believe

that this case needs a trial date. I realize there are some circumstances that may make that impossible today, but I think it has to happen soon.

These defendants are presumed to be innocent, but they're facing serious charges that expose them to significant penalties and we have spent a lot of time being focused on everything but that. We've been dealing with the minutia of bond and soccer practice and public relations and people changing their minds about where they want to live and unsettled questions concerning representation since October, and it's unacceptable.

The nature of charges they have to face, the evidence that they're going to have to respond to can't be a mystery for long. I don't think we can do it at this minute, until we resolve certain fundamental issues that have to be outside the public eye, but I expect to set another status conference soon, at which a status -- a trial date will be set.

Mr. Downing, is there anything you want to say in response to the discovery issues that were on the record?

MR. DOWNING: Thank you, Your Honor. One, Mr. Manafort joins you in wanting to set a firm trial date. We understand there's some issues that the Court has to deal with today. But, we would request that as soon as practical, that that date get set.

We do think we are rather late in the game to still be getting discovery from the government. We got a dump yesterday. We do have some issues that we think additional materials need to be produced that we have not reached agreement with the government on. So we anticipate, in the middle of all this, starting to file discovery motions with the Court regarding those issues. But to the extent we need to be back in this courtroom on short notice to set a trial date, we're prepared to do it. Thank you.

THE COURT: All right. Thank you. I mean, I think making rolling productions as more documents come to you is different than producing what is already in your possession or was in your possession when you decide to bring these charges, and that should already be out the door and in their hands. I'm happy -- I'm not going to set a schedule for the filing of discovery motions. You file them and that will prompt a schedule for a reply and an opposition, and we'll take them up as we get them.

Is there anything else -- there are two things that I want to talk about that I do believe I need to talk about in a sealed courtroom, notwithstanding the desire of everyone in the courtroom to be here, and that is Mr. Manafort's pending bond motion and the motion to withdraw filed by counsel.

Are there any other issues I can take up before I

need to do that? Are there any other issues anybody wanted me to take up today? Mr. Wu?

MR. WU: Your Honor, just to put our position on the record with regard to discovery matters. We have been receiving further discovery, but based on what we have brought to your attention in the motion to withdraw, we have been unable to make any significant progress in terms of preparation or review or adhering to the Court's schedule with regard to substantive motion practice.

THE COURT: All right. I think when we resolve the issues that we need to resolve, if the motions for continuances or extensions of time need to be filed, then they'll be filed and we'll take them up at that time. I don't know what else to say at the moment.

MR. WU: Thank you, Your Honor.

THE COURT: All right. Is there anything further from the government right now?

MR. ANDRES: Judge, just to exclude time. The case has already been designated as complex. There's a motion schedule. But we, in an excess of caution, move to exclude time between now and the time of the -- there is a hearing for motions scheduled in April, so between now and the April hearing date, we would move to exclude time under the Speedy Trial Act.

THE COURT: All right. I'm not sure that's

necessary either. I think, certainly in Mr. Gates's case, some of the delay is attributable to Mr. Gates.

Mr. Manafort, what's your position about speedy trial and excluding the time between now and the next hearing?

MR. DOWNING: We would like to take it under consideration, Your Honor.

THE COURT: All right. Well, you can let me know at the end of the week. I mean, I think as soon as you file motions, the clock is going to stop ticking anyway and this is a complex case and I don't think --

MR. DOWNING: I understand, but I think there also are situations which could be non-excludable time and I would like to take a little time to take a look at that.

I would also ask you to, I guess, hold the February 23rd motions deadline open until we can resolve the issues that --

THE COURT: I don't know what you mean by hold it open. Right now --

MR. DOWNING: Well, right now they're due on the 23rd.

THE COURT: This is a motion that I don't think is dependent on discovery. You stood up and said, I think at the very first status conference, that you wanted to file a motion about the legitimacy of the indictment, just based on the face of the indictment. And then you filed a civil suit

alleging the same thing. And so, I don't -- I deliberately set an earlier schedule for the motion that would either obviate the case or just needs to be resolved up front. So why can't that one be filed on time?

MR. DOWNING: Your Honor, you just had a side bar about issues that obviously come into play with respect to that motion.

THE COURT: All right. Well, I'm not sure that's entirely true. What it --

MR. DOWNING: I'm not either, so I --

THE COURT: All right. All right. Can you just all approach the bench again?

THE COURT REPORTER: And sealed again?

THE COURT: Yes.

(Bench discussion:)

THE COURT: I understand that in terms of things like bills of particulars or challenging new charges, that you can't challenge those until you see what they are. But, your fundamental problem with the case that is pending now and the fact that you told me that on its face it doesn't state a crime and that it was improper, can you go ahead and brief that yet?

MR. DOWNING: I don't know what the indictment is going to be by next week or the week after, until we get the additional indictment that's going to supersede it. That

doesn't make any sense.

THE COURT: All right. Let's just -- you know, my problem is that we're all just going to end up being so backed up.

MR. DOWNING: Right. What we'll commit to, to the extent there aren't major changes, we can get those motions filed right away. I don't have a problem with that. But I really don't understand --

MR. WEISMANN: Judge, could I just say that as the Court knows and as counsel knows, our view with respect to the civil action that's now before the Court is that that was -- should properly be a motion in a criminal case. There is nothing about the superseding indictment that they would seek -- that would in any way change the legal issues that were raised in that civil case --

THE COURT: Well, I think they had to -- they had substantive issues related to the charges, in addition to the overall concern about the legitimacy of the investigation, and rather than having two motions and two oppositions and two replies, it probably does make sense to see what the indictment is before you move to dismiss it. So that makes sense to me. And I think we can have a phone conference if and when there's a superseding indictment and set a schedule.

MR. DOWNING: When it is appropriate.

THE COURT: All right. That makes sense to me. All right. Thank you.

(Open court:)

THE COURT: All right. At this point I'm going to close the courtroom to everyone but the government and Mr. Manafort and Mr. Manafort's counsel, after which I will take up a proceeding involving Mr. Gates and Mr. Gates's counsel, for which I don't know that I will need the United States, although I may want to hear from you at the beginning and then excuse you.

So let's start with the Manafort matter. And Mr. -- if the Gates people can hover, so that we can just roll into that next.

(Sealed transcript. Present in the courtroom are defense counsel and Defendant Manafort.)

THE COURT: All right. The courtroom has been sealed and, for the record, the only people present are Mr. Manafort and his counsel and government counsel and my team.

I recognize that I invited the defendant to propose an alternative that would free up some cash for his defense and/or enable him to further encumber some of his properties, to use the equity to fund his defense, and to perhaps relieve the burden on family members that didn't quite realize what they were signing up for when they offered to be sureties in the first place.

But, the requirement was still that we end up with a comfortable security or surety for the $10 million. And the court case is not a business deal where you can put up things that are leveraged some other way. This has to be real money, real property. And, so, while last time I permitted the [REDACTED] Street property to be part of the proposal, we had the belts-and-suspenders going on last time and there was some substantial cash also being essentially frozen, in case that property wasn't available.

But that property has already been pledged as security to someone else, so it's a little hard to say, Judge, you can have it free and clear, because I can't. And I do also have concerns, I noticed even before I got the government's pleading, that [REDACTED] from the minute it's given to the Court forward, there's some problems if they're not already.

So, I had some concerns about whether we were all the way there or not when I read it. I know the government has some additional concerns they want to put on the record. I'm not sure. There's the issue about putting up property that's already subject to forfeiture. At least we have the -- everybody agrees on the Baxter Street property, so that gives us about [REDACTED] million. So that's a good start.

So, I don't know who wants to go first. Maybe since you've objected, but didn't put all your objections in the pleading, maybe you should finish telling me what you want to tell me and then I can hear from the defense.

MS. FREENY: Good morning, Your Honor. Just as an initial matter, I would say that the government understands that the -- we need to unseal our pleading on Friday. In fact, we believe that we can unseal -- file it in its entirety. We don't think there's anything in there that requires redaction. So I think we're prepared to file it as is, unless the Court feels otherwise. We filed it under seal because it addressed the defendant's filing under seal.

THE COURT: Well, I think you have to be careful about addresses. I mean, just look at it in terms of the kinds of material that's supposed to be kept private.

MS. FREENY: Will do. Understood. So I do think that the government's filing yesterday evening addresses the two primary defects that we see in the proposal. Those being, as the Court noted, the fact that it does not meet the $10 million bond; that is, the properties don't amount to 10 million in equity, and that's even without factoring in the discount that the government has advanced that should be applied for properties subject to forfeiture. And then the government also takes issue with the absence of any sureties, in light of the proposal.

So, rather than go through each of the properties, I think our --

THE COURT: What do you think the appropriate discount factor is?

MS. FREENY: I think that's difficult, Your Honor. I don't think it is an exact science. Of course, bail is not an exact science across the board. The -- it's -- the general principal is that posting property that is subject to forfeiture is just not as much assurance as posting property that is not subject to forfeiture.

So when the government had previously agreed to a bail package, it was because Mr. Manafort had in fact proposed additional sureties to address the government's concern. So where there were those additional sureties, that provided the additional assurance necessary. By removing those, we believe that presents then a concern because we don't really have 10 million in unencumbered assets, even assuming there was, you know, up to the 10 million.

THE COURT: All right. Well, what about all the other issues you raised about them?

MS. FREENY: So, as the Court noted, we -- the government is aware or understands that [redacted]

[redacted]

The [redacted] property, as the Court noted, is put up as collateral for a loan of more than [redacted] million. Previously, when Mr. Manafort had proposed a package that included both the [redacted] property and the [redacted] property, that accommodated the fact that both of those two properties are put up for that mortgage because then the equity could be subtracted by the amount of that loan.

Now that Mr. Manafort proposes to take [redacted] out of the package, from the government's perspective, the [redacted] property doesn't have any equity because the bank could choose to foreclose on that property to recover.

THE COURT: All right.

MS. FREENY: The [redacted] property, as we know in our papers, is subject to forfeiture. And as the Court notes, we do not have a problem with the use of the [redacted] Street property.

THE COURT: Well, you talked about other charges and bank fraud in your pleadings, what about that?

MS. FREENY: Yes. So, Your Honor, the government

has additional facts related to fraudulent conduct by Mr. Manafort respecting mortgages, including a mortgage on the [redacted] property. And that bears on two things: It bears both on his risk of flight, and then it bears on the risk the properties are going to go into foreclosure. So as the government noted in its filing --

THE COURT: Which properties again? I'm sorry.

MS. FREENY: Including the [redacted] property.

THE COURT: [redacted] Street?

MS. FREENY: Yes.

THE COURT: Okay.

MS. FREENY: And the [redacted] property. But, obviously, Mr. Manafort is no longer proposing to put that up as security.

So the government has evidence that Mr. Manafort submitted --

THE COURT: Well, but in your pleading at one point you seem to suggest that it would be better if he put that one up because it had more equity. So now you're saying that one is questionable, too. Which way do you want it?

MS. FREENY: So, I think -- I think both of those properties have, sort of, different issues with respect to them. We were, I think, at one point in time comfortable with inclusion of the [redacted] property. Again,

together with the [REDACTED] property, so that the same properties that were put up as collateral, they're together. I know that Mr. Manafort has expressed concern about his ability to [REDACTED] property, so that raises new concerns for the government.

And then, again, the government -- since the time of the government's, sort of, original filing with respect to bail, the government has developed additional facts related to Mr. Manafort's conduct with respect to the mortgage that is secured by the [REDACTED] property and the [REDACTED] property, including facts that Mr. Manafort submitted false profit and loss statements in connection with securing that mortgage.

And so that, again, then bears on both his risk of flight, and that is associated with fraudulent conduct that is more recent in vintage than the conduct in the indictment. So this -- we're talking about the, roughly, 2016 through, I believe, the beginning of 2017 time period. And then as mentioned, it bears on the risk that the bank will foreclose on that property, just based on the circumstances in which the mortgage was obtained.

I can also proffer to the Court additional facts related to [REDACTED]

[redacted]

THE COURT: Okay. Anything else you wanted to say?

MS. FREENY: Not at this time, Your Honor.

THE COURT: All right.

MS. FREENY: Thank you.

MR. ZEHNLE: Good morning, Your Honor.

THE COURT: Good morning.

MR. ZEHNLE: So, in terms of addressing the bail package and the bond issues, listening to the Court's initial remarks and then the government's response, I think probably a few things need to be made clear.

First of all, I think that counsel misspoke when she said that they had asked for sureties before, because, in fact, I think if we look back on the record -- and we could go back and do this -- the government was not requiring any sureties when this package was initially being proposed.

THE COURT: I think the original agreement that everybody agreed to, that you proposed, had -- I mean, who asked for them, I don't know, but it included that.

MR. ZEHNLE: It did, Your Honor.

THE COURT: And then the issue came up with the

e-mail and they withdrew their consent, and I ordered what you asked for. But putting aside who asked for it, who didn't ask for it, it gave everybody comfort in the areas where there were uncertainties or deficiencies. And I did say to you that the statute says security or surety, but if the security is -- doesn't make -- doesn't quite cut it in terms of the level of comfort that the money is going to be there, then that was where the surety was helpful.

Is there some amount of the cash that was available that he's willing to put up in connection with this? Either through the use of a surety or some -- you know, you objected to -- I think, last time it was $5 million and $2 million; 5 for Kathleen and 2 for Andrea. Is there some other -- is there a way to substitute for the [REDACTED] property or to make up for the uncertainty associated with the [REDACTED] property and now the -- I'm also concerned about the [REDACTED] property.

So why don't you address why those are appropriate to include and what we do about it.

MR. ZEHNLE: Okay. I think, maybe, first steps first, right? At the sealed hearing on January 22nd, obviously we were paying very close attention to what the Court was saying and we talked about either sub -- or, excuse me, sub 12 -- sub 11 or sub 12.

THE COURT: I know exactly what I said, you don't

 have to --

MR. ZEHNLE: Okay. But I want to --

THE COURT: -- quote back to me what I said. I want you to tell me why this is adequate. I am not saying there has to be a surety. I'm saying that what I get has to be adequate. So why is this adequate?

MR. ZEHNLE: Okay. Okay. So, at the hearing we discussed what would be -- I specifically remember, I was at this podium, I was asking the Court what the Court would find is appropriate proof or the evidence with respect to the properties or the assets being pledged. And the Court specifically advised that a professional appraisal or an independent appraisal --

THE COURT: But we're not quibbling about the value.

MR. ZEHNLE: But we are, Your Honor. I mean, if you let -- can I -- may I -- if I can finish, I'll answer your question.

THE COURT: All right.

MR. ZEHNLE: I just want to sit there and say, so that's what we took first. It's a $10 million appearance bond. And so, therefore, we want to have security sufficient to cover the $10 million. And we told the Court at the previous hearing that there was some substantial concern because of forfeitures that the government has

initiated against Manafort, Mr. Manafort, that the [REDACTED] property might put him at risk. He didn't want to be at risk. He's not going to come up and pledge something to the Court and not be able to follow through.

THE COURT: Well, that wasn't what you said the problem was with [REDACTED] You said the problem with [REDACTED] was that it was costing you [REDACTED] a month to maintain it --

MR. ZEHNLE: Maintain the mortgage.

THE COURT: Right. And so it was the requirement of maintaining the mortgage that was a problem, and there was also the possibility that you might want to borrow against that equity.

MR. ZEHNLE: What we said, and it's in the papers, what we said was that the mortgage on the [REDACTED] property, which is by far the largest --

THE COURT: Right.

MR. ZEHNLE: -- was being paid. There was a special account set aside.

THE COURT: And he needed to free up the cash to do that.

MR. ZEHNLE: Exactly. And then the government seized -- you know, a seizure warrant was issued and that money was taken away from Mr. Manafort, which created a problem because that money was specifically set aside to pay

the mortgage on the [redacted] property. That was the situation that caused us concern.

And so, after discussing this in our papers, at the January 22nd hearing, we went back and we looked at properties that we could prove to the Court, with independent appraisals, as the Court recommended, that had a substantial unencumbered value equal to the appearance bond amount. And that's what we did.

So, we can put aside [redacted] Street because apparently there's no disagreement on [redacted] Street. With respect to the [redacted] Street property, [redacted], that was, as the Court noted, that was already proposed in a previous submission.

THE COURT: Right. What I'm saying is I knew at the time and I was troubled at the time that you were offering up to me something you'd already offered to another bank, something that was already encumbered 100 percent. But, given the overlapping security that I was being provided, it was satisfactory as part of the whole. I don't understand why I can count on it for such a big chunk of the whole now.

MR. ZEHNLE: So, here's -- Your Honor, the one property that did have an appraisal, which the Court specifically said, Look, this is the kind of information or evidence I would --

THE COURT: I'm not worried about the appraisal. Can we just put the appraisals aside? I was --

MR. ZEHNLE: How are we talking about values, Your Honor? I mean, I'm trying to sit there and give you an idea how we came up with this so that you can understand our position.

THE COURT: I understand how you come up with it. I added up the values. I get that the values, the appraised values added up to $10 million. I'm not disputing that. I haven't asked you one question about that. I appreciate the appraisals. I didn't quite understand why there were different appraisers for every property, but they are all real, certified appraisers, they are certified appraisals. Okay.

MR. ZEHNLE: Okay.

THE COURT: Let's put aside the value of the property. I haven't asked you one question about the value of the property. I've asked you, Why can I count on receiving, at the end of the day, in the event of flight, a property of the value that we agree it has, because it's been apprised, when that property has already been essentially pledged to another?

MR. ZEHNLE: As the Court knows, it was cross-collateralized from our previous filing. That is, it comes into play -- they don't get to pick -- the bank doesn't get

to pick, oh, I'm going take this property, as opposed to that one.

The Court already has an appraisal. The [redacted] property is worth [redacted] million. The outstanding mortgage on that property is [redacted] million. In a previous filing, before the forfeiture and all this stuff came up, that was a [redacted] million unencumbered value, which did not seem to be challenged at that time, certainly not by the government. It is [redacted] million over what the mortgage is, the liability. The cross-collateralization, or the over collateralization, by saying, Oh, and by the way, just in case that [redacted] million isn't enough, there's the [redacted] condo that we could put in there, is highly, highly improbable that it will ever occur.

And no one objected when this property was initially put up. I mean, the government's objecting now. But no one objected to the [redacted] million, which the appraisal actually came in at in the previous papers. But now all of a sudden, oh, there's an issue with this, this [redacted] million. How do we know? An independent appraisal says it's [redacted] and we know there's [redacted] million in cushion on the other property.

THE COURT: That's the answer to the question --

MR. ZEHNLE: That is the answer to the question.

THE COURT: -- not the [redacted] Nobody is questioning

the ████ We don't have to talk about the appraisals any more. You keep coming back to it. I was very glad to get them. You're getting full credit for them. But every time you talk about them, you're not talking about the issue. When you answered the question about the value of the ██████████ property, you finally answered the question. Okay.

MR. ZEHNLE: I'm also answering the government's remarks, too, Your Honor. So, I'm trying to answer your questions, as well as the government's position that it's taken.

THE COURT: But they didn't challenge the value. They challenged whether I should be able to give it full credit under the circumstances.

MR. ZEHNLE: Unless I read -- what was filed last night, Your Honor, they're giving it zero.

THE COURT: Because it's pledged to the bank, not because it didn't come in with a nice appraisal that we all agree with.

MR. ZEHNLE: Okay.

THE COURT: All right. So, here's, I guess, my question: There's no question that the ██████████ property, if it were sold by Mr. Manafort, he hung out a sign and there was a willing buyer and willing seller in a typical arms-length business transaction, that he would be

able to get full value, hopefully. God knows what's going on with the market. But at any rate, I understood the value of that property. But if he doesn't comply with his mortgage obligations and the bank that's owed the [redacted] million decides to institute forfeiture proceedings -- I mean, you're saying, well, they would sell it first and then only if they didn't get the full [redacted] would they then turn around and ask for the other property. Is that how it works? Or would they just say, Okay, we'll take that, we'll take that, we'll sell both whenever we feel like it?

MR. ZEHNLE: I think, Your Honor, it works that they have to go to the primary property first with the mortgage and then if there was insufficient funds from the sale of that --

(Attorney Downing hands note to Attorney Zehnle.)

MR. ZEHNLE: May I -- Court's indulgence, please.

THE COURT: Sure. Yes.

(Off-the-record discussion between defense counsel.)

MR. ZEHNLE: Your Honor, my co-counsel wanted me to point out, too, as well, that there is another security on that [redacted] property. There is [redacted] million pledged against that property as well. So not only do you have the [redacted] property itself, more than sufficient to cover the amount of the mortgage, you have the account which we had talked about, which were set up simply to pay

the mortgage on that property, which has been frozen right now and which we are working to get out. You have 2.5 million in cash set aside against that liability.

THE COURT: That was the [redacted] that we didn't take into consideration before. There was the spreadsheet.

MR. DOWNING: Yes.

MR. ZEHNLE: Yes.

THE COURT: Okay. All right.

MR. ZEHNLE: Then you have the [redacted] property.

THE COURT: Are they ordered in any particular order? How does it work?

MR. ZEHNLE: Yeah, there is -- I can find out. Sorry, Your Honor.

THE COURT: All right. All right. That's fine.

(Off-the-record discussion between defense counsel.)

MR. ZEHNLE: I'm advised the [redacted] property is last in order.

THE COURT: All right. What is the situation with respect to the [redacted] property?

MR. ZEHNLE: It is current, Your Honor, despite the representations made earlier.

THE COURT: Well, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

THE COURT: What was the thinking behind the substitution? I understand why you took [redacted] out. Why did you take the [redacted] out?

MR. ZEHNLE: Well, Your Honor, I think what we were trying to do was come up with the 10 million security to cover the bond in the best way possible that would leave Mr. Manafort in the best position possible because we understand that these assets can't be sold or touched during the pendency of this case. So that's why -- I mean, we just -- in terms of the property -- I mean, I don't want to actually get into attorney-client discussions about why we did one thing versus the other. What I was focused on was what was the Court's concern in terms of securitizing that $10 million bond. So now we have three properties which are not subject to any forfeiture and one that is.

THE COURT: All right. What if I am concerned, notwithstanding what you've told me, which is very helpful, about standing in line behind another bank on the [redacted] property? Would you have an alternative that you can offer?

And you don't have to tell me off the top of your head what it would be.

But, I would like you to think about that, or some sort of overlapping something that could give me some comfort, more comfort there. I realize it is less of a risk than I might have thought coming into the hearing, but it's still a risk and we're still not first in line. And unlike other cases where there's a mortgage and we're not first in line, it's not the entirety. Here the entirety of the property is pledged to another bank that could decide that it's just easier to proceed that way, if people aren't in the mood to buy properties for [REDACTED] million in the [REDACTED].

So, I'm interested in the answer to that question. And I do require -- I need some -- since there's this dispute of fact about the [REDACTED]

MR. ZEHNLE: Are we talking about the --

THE COURT: On the [REDACTED] property.

MR. ZEHNLE: [REDACTED] property.

THE COURT: [REDACTED]

Is there anything -- what do you want to say about the issue? And you may have addressed this in prior pleadings, but if there's anything you want to add about

properties that are subject to forfeiture, what do you want to say about that?

MR. ZEHNLE: Well, as I said a moment ago, Your Honor, the only one that is currently subject to forfeiture in the package that's been proposed to the Court is the one in [redacted]. And the Court asked the question just a few minutes ago, Well, what is the correct percent discount that you're advocating? And the government said, Well, that's hard to say, it's just a general principle.

So it's very difficult for me to sit there and say, you know, how to address what percent discount, if any, there should be. The only information cited in the government's pleading filed last night was a Senate report from 1983. I've seen no case law or anything from the government. I've heard about this from -- for almost four months now, in terms of dealing with the bond. Oh, it should have a discounted value. But there's no case law cited or anything for the Court. And, so, my view is that that shouldn't have a discount.

This is a probable cause. I mean, it's subject to forfeiture under a probable cause standard. As the Court noted today, he's presumed innocent, right? as he sits here right now. So, I don't understand how there is an appropriate discount of some unknown percentage that's to be applied to this and we're supposed to just guess it. And I

don't have any case law, I don't have any authority to tell me this is what you do.

So, it's hard to fashion something that I can propose to the Court and say, Well, Judge, we should knock 10 percent off or 5 percent, or I'm sure the government probably would say 50 percent, or maybe more, I don't know.

THE COURT: All right. Thank you.

I think, Mr. Downing, you want to say something? I think generally --

MR. DOWNING: Could we --

THE COURT: You want to say something to him?

MR. DOWNING: Yes. If we can have a moment before we finish?

THE COURT: All right. Go ahead.

(Off-the-record discussion between counsel and defendant.)

MR. ZEHNLE: Thank you, Your Honor.

THE COURT: All right.

MR. ZEHNLE: Couple other points, which actually might be helpful for the Court's consideration. [redacted]

[redacted]

It's also worth noting, I think, in terms of the agreements that Mr. Manafort will have to sign and any owners or co-owners will have to sign, that specifically those things have to be maintained as current, he's well aware of that particular fact.

And finally, with respect to the [redacted] property, we did have a discussion and I feel like I'm okay in telling you, Your Honor, one of the reasons we also wanted to use the [redacted] and the [redacted] properties is to keep -- I mean, you have to go and record these things and undertake actions in the various local counties where the residences are located.

So we narrowed it down to [redacted], obviously, is much easier for us to do than [redacted] But, we took [redacted] out of the picture so that we don't have to go down to the county clerk and get that, you know, work done down there, too. Because, frankly, we thought it would be more efficient and faster to do it up here, Your Honor.

THE COURT: All right. The government also included some allegations in its pleading. I don't want

this bond proceeding to turn into a mini trial on uncharged conduct. I think we should be able to resolve this without my having to make findings about whether there was fraud involved in the purchase of these properties. I hope I can do it without having to get into that. But, what do you want to say, if anything, with respect to what they said about that?

MR. ZEHNLE: With respect to the new evidence of the bank fraud that might impact it?

THE COURT: Yes.

MR. ZEHNLE: Indictment, paragraph 4. They already have talked about the bank fraud and bank fraud conspiracies relating to Mr. Manafort's property, albeit they've done it in a general way. And now on the eve of that hearing, they sent something last night and said, Oh, by the way, all these bank fraud -- potential bank fraud and conspiracy charges is based on all this new evidence that we had.

So, I don't think that's a very credible argument, Your Honor. This has been known from the day the indictment was released. And you can look at it, it's paragraph 4.

THE COURT: All right. Thank you. Does the government have anything it wants to add?

MS. FREENY: If I might. Your Honor, there are three issues that I think we would like some clarification

 on, or some substantiation. And the Court has already noted some of them. But just for the record, the first is with respect to the issue of the cross-collateralization. It was the government's understanding that the bank had a right to proceed against either property. That is to say that it was not the case that it was -- the bank was forced to proceed against [REDACTED] So that's something that we would like to see verification of.

The -- Mr. Manafort's counsel mentioned a [REDACTED] account. It was the government's understanding that that was collateral for a different piece of property. Now, we may be wrong, but we understood that that was collateral for the [REDACTED] Street property, rather than the [REDACTED] property.

And then the third is with respect to the [REDACTED] property, we would simply ask to see confirmation of that. [REDACTED]

THE COURT: All right. There was, on the document that I got [REDACTED]

don't know. Somebody needs to find out.

So I will continue to take this under advisement. I agree that I would require supplementation on those three issues. How am I supposed to know? Something that explains what happens in the event of a default on the [REDACTED] mortgage. Something that makes it clear which property the [REDACTED] million is collateral for. And something that establishes the state of the [REDACTED] mortgage.

MS. FREENY: Thank you, Your Honor.

THE COURT: All right. And then, obviously, if there's anything anybody else wants me to consider in connection with this, you're welcome to file it.

Mr. Downing, I just want to let you know that you are an expressive human being and how you feel about what is being said in the courtroom is a big part of your demeanor and your physical demeanor. And that doesn't upset me particularly, but it will upset me enormously if there's a jury in the box. So, just keep that in mind.

MR. DOWNING: Understood, Your Honor.

THE COURT: All right. Okay. I think we can suspend this portion of the proceedings and invite the Gates people in and then we'll start with the government here and then we'll excuse the government and try to finish that up.

All right.

MR. WEISMANN: Your Honor, before Mr. Manafort and

his counsel leave, I would just say, one of the things we tried to do in our filing, and I think in connection with this part of the court appearance, is I'm not sure there was any -- certainly in our filing, we kept out anything that was of personal identifying information, cognizant of the Court's rules and the admonition of the Court. But I think in listening, also, to this court appearance and this piece of it, I'm not sure there was anything that would preclude this under the Court's rules from being public.

THE COURT: Well, I don't think so either, but if you want to look at it and let them know if you have -- if you think that in an abundance of caution some aspect of it needs to be redacted, that's fine. You have a few days before the redacted version has to be filed.

MR. ZEHNLE: Yes, Your Honor. I would mention, just for the Court's information, I mean, I think the discussion [REDACTED] are generally redacted.

THE COURT: I think that's fair. So take a look at it.

MR. WEISMANN: We have no objection.

THE COURT: I think your larger objections, the fact that the property is pledged in connection with another property, I think that's fine, you don't have to name which

property, you don't have to name which banks, all that. All right. Thank you.

(Whereupon Defendant Manafort and his counsel leave the courtroom.)





53



54









58









62





















CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 22nd day of February, 2018.

/s/________________________

Janice E. Dickman, CRR, RMR
Official Court Reporter
Room 6523
333 Constitution Avenue NW
Washington, D.C. 20001