IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,        ) Criminal Action
                                 ) No. 17-CR-201
                    Plaintiff,   )
                                 ) MOTIONS HEARING
vs.                              )
                                 ) Washington, DC
Paul Manafort, Jr.,              ) Date:  May 23, 2018
                                 ) Time:  9:30 a.m.
                    Defendant.   )
                                 )
_____

TRANSCRIPT OF MOTIONS HEARING
HELD BEFORE
THE HONORABLE JUDGE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiff:      ANDREW WEISSMANN
                        GREG D. ANDRES
                        SCOTT MEISLER
                        U.S. Department of Justice
                        Special Counsel's office
                        950 Pennsylvania Avenue NW
                        Washington, D.C.  20530
                        202-514-1746
                        Email: Aaw@usdoj.gov
                        Email: Gda@usdoj.gov
                        Email: Sacm@usdoj.gov


For the Defendant:      KEVIN M. DOWNING
                        815 Connecticut Avenue, N.W.
                        Suite 730
                        Washington, D.C. 20006
                        (202) 754-1992
                        Email: Kevindowning@kdowninglaw.com

                        THOMAS EDWARD ZEHNLE
                        Miller & Chevalier, Chartered
                        900 Sixteenth Street, NW
                        Washington, DC 20006
                        (202) 626-5800
                        Email: Tzehnle@milchev.com

```
 1                                    RICHARD WILLIAM WESTLING
                                      Epstein Becker & Green, P.C.
 2                                    1227 25th Street, NW
                                      Suite 700
 3                                    Washington, DC 20037
                                      (202) 861-1868
 4                                    Email: Rwestling@ebglaw.com

 5        ALSO PRESENT:               Omer Meisel, Special Agent

 6
          Court Reporter:            Janice E. Dickman, RMR, CRR
 7                                    Official Court Reporter
                                      United States Courthouse, Room 6523
 8                                    333 Constitution Avenue, NW
                                      Washington, DC  20001
 9                                    202-354-3267

10                                       *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Your Honor, this morning we

2     have criminal case number 17-201-1, the United States of

3     America v. Paul J. Manafort, Jr.  Mr. Manafort is present in

4     the courtroom, Your Honor.

5          Will counsel for the parties please approach the

6     lectern, identify yourself for the record.

7          MR. ANDRES:  Good morning, Your Honor.  Greg Andres,

8     Andrew Weissmann, and Scott Meisler for the Special Counsel's

9     Office.  And with us at the counsel table is Supervisory

10    Special Agent Omer Meisel.

11         THE COURT:  All right.  Good morning.

12         MR. ZEHNLE:  Good morning, Your Honor.  Tom Zehnle on

13    behalf of the defendant.  Mr. Manafort is present in the

14    courtroom.  With me is Mr. Downing and Mr. Westing.

15         THE COURT:  Good morning.

16         We're here on several motions filed by the defendant,

17    docket 255 is a motion for bill of particulars; 257, the motion

18    to suppress the fruits of the search of the storage unit; 264,

19    the motion to suppress the fruits of the search of his

20    residence.

21         There's also docket 243 still to be resolved, which

22    was the motion to compel the production of unredacted

23    affidavits.  I received the defendant's most recent submission

24    what's left to be resolved and received the affidavits

25    themselves in camera on Monday.  I've only had the opportunity

1   to closely review the ones related to the motion scheduled for

2   today.  But I've looked at them briefly and so I may be able to

3   ask a few questions about that.

4          I want to start with the storage unit.  There's some

5   issues that relate to that motion that will also relate to the

6   other motion.  But I think in terms of overbreadth, we'll

7   probably deal with that more in connection with the search of

8   the residence.

9          So, who's going to be arguing the storage unit

10  motion?

11         MR. ZEHNLE:  I am, Your Honor.

12         THE COURT:  Just to make sure, since the exhibits the

13  parties are relying upon are things that have already been

14  provided to me in writing, I want to state what the record for

15  this hearing consists of at this point, so that it's clear.

16         There was Exhibit 1 to defendant's motion, which is

17  the application for the search warrant in the Eastern District

18  of Virginia, docket 257-1.  An unredacted version was filed

19  under seal at 261.  And there are two attachments to that;

20  attachment A, the property to be searched, and attachment B,

21  the property to be seized.

22         Defendant had an Exhibit 2 which was the return for

23  that warrant, docket 257-2, that also had the attachment A and

24  B.  And defendant had Exhibit 3, the lease or rental agreement,

25  with the insurance a addendum, docket 257-3.

1          The government had some exhibits attached to its

2     opposition, the FBI collected item log docket 283-1, and the

3     consent to search form, docket 283-2.

4          All right.  Counsel, I have a couple of questions for

5     you about that much, and then I might let you talk a little.

6          With respect to your request for the unredacted

7     version of this particular warrant affidavit, as far as I can

8     tell, the only thing that's still redacted is the name of the

9     employee.  And I understand, also, that you have -- you know

10    the name because it's in the docket in the sealed version of

11    the lease.

12         So is there anything left to be resolved with respect

13    to your request for the unredacted version of that affidavit?

14         MR. ZEHNLE:  I believe not, Your Honor.

15         THE COURT:  Okay.  Now, I also want to ask you one

16    more preliminary question, and that is:  I understand, in

17    addition to talking about the overbreadth of the warrant, you

18    challenge the actual authority of the employee to grant access

19    to the storage unit.  And I believe you've challenged his

20    apparent authority as well.

21         You set forth a number of facts in page 5 of your

22    memorandum concerning the scope of his authority.  And you

23    argued, on page 13 of your memorandum, that I should have a

24    hearing and hear from the agent and give you the opportunity to

25    cross-examine him.  But last week when I inquired about the

1    parties' intentions, you agreed with the Office of Special

2    Counsel that this case could and should be decided without

3    witnesses, based on the face of the warrant affidavit and the

4    exhibits.

5          So, I just want to confirm that that is your position

6    and there's no questions you want to ask or facts you seek to

7    elicit, and you're prepared to argue before the Court based on

8    the record before the Court at this time?

9          MR. ZEHNLE:  Your Honor, with respect to the pages

10   that you've mentioned in our motion, I agree with you that we

11   do not need the agent because that was specifically with

12   respect to the former DMP employees, whether that was a

13   voluntary consent or not.  Since that time we've received the

14   exhibit that the Court referenced a moment ago from the

15   government, the actual signed, written consent.  So we're not

16   going to proceed on that basis right now.

17         THE COURT:  All right.  Well, when you say you agree

18   with me, I don't have a position --

19         MR. ZEHNLE:  Understood.

20         THE COURT:  -- on whether the agent should testify or

21   not.  I just want to make sure it's your position that the

22   record is complete and there's nothing you want to ask or add

23   and you're prepared to argue.

24         MR. ZEHNLE:  Yes, on the motion, Your Honor.  Of

25   course, but if there's a hearing and the government, who had

1    the burden in a warrantless search, presents evidence,

2    obviously then I would certainly want an opportunity to examine

3    the witness.

4              THE COURT:  All right.  I'm going to ask this one

5    more time.  The government said we're not planning to call

6    them, we think the record is complete.  And you said, I agree.

7              MR. ZEHNLE:  That's correct.

8              THE COURT:  All right.

9              MR. ZEHNLE:  That's correct.

10             THE COURT:  All right.  Then let's explore the basis

11   for your argument that the employee did not have actual

12   authority.  You do agree that Supreme Court precedent

13   specifically recognizes the concept of common authority.  So

14   why isn't that the beginning and the end of it here?

15             MR. ZEHNLE:  Well, Your Honor, there's actually two

16   issues involved.  We'll start with common authority, as the

17   Court points out.  But it's intertwined, obviously, with

18   apparent authority, which is another basis for permitting a

19   warrantless search to occur.

20             So, what the Court has held at *Matlock* is the key

21   case in this regard, is that common authority is, of course,

22   not to be implied from the mere property interest a third-party

23   has in the property.  The authority which justifies the

24   third-party consent does not rest upon the law of property with

25   its attendant historical and legal refinements, but rests,

1    rather, on mutual use of the property by persons generally

2    having joint access or control for most purposes.  That's what

3    *Matlock* holds.

4         THE COURT:  Right.  *Matlock* says the authority which

5    justifies third-party consent rests on, as you said, mutual use

6    of the property by persons generally having joint access or

7    control for most purposes, so that it would be reasonable to

8    recognize that any of the co-inhabitants had the right to

9    permit the inspection in his own right and that the others have

10   assume the risk that one of their members might permit the

11   common area to be searched.  So, whether we're talking about

12   Ninth Circuit, D.C. Circuit, in the end *Matlock* is the test, is

13   that correct?

14        MR. ZEHNLE:  That's correct.  And subsequently, just

15   last week, I think the Supreme Court reaffirmed the principles

16   of reasonable expectation of privacy in *Byrd v. United States*

17   in the context of a car lease.

18        THE COURT:  So why isn't it reasonable here?  It

19   seemed like many of the cases you talked about involved

20   personal privacy and highlighted the privacy that people have

21   in their own homes.  Do the expectations and what's reasonable

22   change here because we're not talking about someone with a key

23   to his house or a key to his hotel room, but we're talking

24   about a person with a key to a place where papers are stored in

25   containers?

 1          MR. ZEHNLE:  No, Your Honor, that is not our

 2    position.

 3          THE COURT:  Okay.

 4          MR. ZEHNLE:  The Fourth Amendment states that a

 5    person shall be free from unreasonable search and seizure, not

 6    only in a house, but in their papers and their effects as well.

 7    It's specifically spelled out in the Fourth Amendment.

 8          THE COURT:  All right.  Well, what facts in the

 9    record establish that he had any expectation that the person

10    listed as the occupant on the lease would not enter anytime he

11    chose, with whomever he chose?

12          MR. ZEHNLE:  So, Your Honor, in terms of analyzing

13    this particular issue, I think the crux of the matter is

14    contained in the FBI affidavit that was attached to the

15    warrant.  The paragraphs that are crucial to this particular

16    argument are paragraphs 28 through 38.  This issue will be

17    determined upon those paragraphs in particular in the

18    affidavit.

19          Now, if the Court goes to the affidavit, in the first

20    paragraph that deals with the former DMP employee and now Steam

21    Mountain employee -- I'll give you a moment.

22          THE COURT:  All right.  I got it.  Yes.

23          MR. ZEHNLE:  Okay.  Without reading through the

24    entire paragraph, Your Honor, I will note that in two separate

25    sentences the FBI agent, in identifying his discussions with

1    the purported third-party consent-giver, states that he

2    performs a variety of functions for Manafort, that is, Mr.

3    Manafort, and his companies -- and here's the keywords -- "as

4    directed by Manafort."  The next sentence -- redacted on my

5    copy but presumably the third-party -- advised that in

6    approximately 2015 -- and again, the keywords -- "at the

7    direction of Manafort," that person moved a series of office

8    files contained in boxes over to the storage unit.

9              If the Court goes down a little further, looks at

10   paragraph 30 of the FBI agent's affidavit, at the bottom of the

11   page 11 on my copy, he's talking about -- I believe this is the

12   filing cabinet and records being moved to the filing cabinet.

13   What's stated there is that if you look at the last two lines

14   of that paragraph, last two on page 11, he advised that

15   Manafort occasionally sent e-mails to him directing -- again,

16   the keyword "directing" -- him to put records into the filing

17   cabinet.

18             THE COURT:  All right.

19             MR. ZEHNLE:  It's not once, not twice, but three

20   times, Your Honor, in the affidavit itself, the agent clearly

21   acknowledging that these actions are undertook -- undertaken at

22   the direction of Mr. Manafort.

23             THE COURT:  All right.  Well, you wrote in your

24   memorandum it was clear to the former employee and others at

25   DMP that he had no actual authority to enter this storage unit

1   for any reason, absent prior express permission from Mr.

2   Manafort.  What evidence supports that statement?

3          MR. ZEHNLE:  Your Honor, that is a summation,

4   essentially, of what is reported here in the affidavit, that

5   these actions were taken under the direction of Mr. Manafort.

6          THE COURT:  Well, what do you make of the fact that

7   he had a key?  He had a key.  Manafort didn't say, as far as we

8   know, I want you to put these boxes there, come to my house,

9   pick up the key, when you come back, drop off the key with me.

10  He had his own key.  He's the only person -- he is named as the

11  occupant on the lease.  Whether -- whatever he delivered there,

12  he delivered at Manafort's direction or not, why does that mean

13  he could only open it at Manafort's direction?

14         MR. ZEHNLE:  Well, first of all, Your Honor, I'm not

15  sure from my reading of the affidavit that I can say he had his

16  own key.  It's just simply not clear in the affidavit whether

17  he had his own separate key or whether, as the Court

18  hypothesized a moment ago, whether he went to Mr. Manafort.  He

19  just -- it just says he had a key.

20         So, the key, no doubt -- and the defense doesn't take

21  any -- you know, doesn't object to the idea that a key can be a

22  factor to be considered in determining whether or not someone

23  has common authority.  But a key in and of itself doesn't meet

24  the standard that is put forth in *Matlock* regarding mutual use

25  of the property by persons generally having joint access and

1    control for those purposes.

2          We know from the affidavit that he's only acting at

3    the direction of Mr. Manafort, and so it's not unusual for, I

4    think, in a situation, for a person to say, You keep the key

5    and when I have things for you to deliver to that, and when I

6    tell you to do that, go and deliver them.

7          The case of, for example, the hotel manager that

8    we've discussed before, clearly, that person has access to a

9    guest room.  Clearly.  But that doesn't mean that that person

10   has the authority to let an FBI agent or a police officer into

11   that guest room and say go ahead and take a look around and if

12   they have papers laying out on the desk, that's fine, you can

13   look at them you can copy them, you can photograph them, you

14   can do whatever you want.  That's clear.  And the Supreme Court

15   has held that and subsequent cases have held that.

16          I just went to my daughter's graduation a week and a

17   half ago, I left a key with the pet sitter.  It's not as though

18   I authorized the pet sitter, you can roam around and let anyone

19   in my house and they can take pictures if I left bank

20   statements laying out or whatever, that you can do that.

21          THE COURT:  Well, what's the best case for your

22   proposition?  It's true that *Whitfield* had a problem with the

23   mother's consent to the officer's search of the son's bedroom

24   because there was a lack of evidence of mutual use of that

25   specific room or the closet in the room or the pockets of the

1    coat in the closet of the room.  But, why is this -- that case

2    analogous here?  Isn't this more analogous to the fact that she

3    opened the door to the apartment itself?

4         MR. ZEHNLE:  I would say no, Your Honor.  And it's

5    because we do contest here whether he had authority at all to

6    let the FBI agent into the storage unit to begin with.  We're

7    not analogizing the storage unit to, say, a shoe box laying

8    next to the bed, as it was, or a locked storage unit.

9         THE COURT:  Because with respect to that, the agents

10   did what you're supposed to do when you see a container within

11   a place that you have access and they got a warrant for the

12   container, right?

13        MR. ZEHNLE:  I'm sorry, I -- I'm not sure I follow

14   the Court's point there.

15        THE COURT:  Because you can't analogize the case to

16   the container-within-the-bedroom type situations, the *Peyton*

17   situation, even though you rely on it heavily, because in this

18   case the agents did exactly what the agents didn't do there,

19   they gained access to the premises but they didn't open the

20   containers, and they got a warrant for the containers, i.e.,

21   the boxes and the filing cabinet, right?

22        MR. ZEHNLE:  That is correct.

23        THE COURT:  So, we're only talking about the ability

24   to walk into the apartment, or to walk into the storage room,

25   or to walk into the hotel room and see something in plain view,

1      right?

2                  MR. ZEHNLE:  Correct.

3                  THE COURT:  All right.  So, why isn't this case more

4      similar to the *Trotter* case, the ones that involved storage

5      units?

6                  MR. ZEHNLE:  Your Honor, I do think that *Whitfield*, I

7      think the *Peyton*, and, obviously, the precursor in *Matlock* are

8      the key cases to focus on here wherever we're talking about

9      common authority or when we're talking about apparent

10     authority.  But in this particular situation, I think it's more

11     analogous to the cases where the hotel manager has access to

12     the guest's room.  The hotel manager can't simply just open up

13     and say, Go in and take a look at things and see whatever you

14     see in plain view and then leave, that's not the authority that

15     he's granted.  He didn't have actual authority to do that.

16     They have limited authority.  Just like my pet sitter example,

17     Your Honor.  They have limited authority, for example, to go

18     feed the pet.

19                 THE COURT:  Well, why am I supposed to read that

20     limitation, some sort of inherent limitation into a lease that

21     on its face says he's the occupant, he's named as the occupant,

22     and he has a key?

23                 MR. ZEHNLE:  So, here's the argument, Your Honor, and

24     I think the facts bear it out:  First of all, we know that the

25     lease agreement itself is not dispositive.  It's a factor to be

1    considered. Similar to a key. But the Court has just -- as I

2    said, just recently, last week, talked about the reasonable

3    expectation of privacy that that individual has. And the fact

4    that someone has a key or that their name is on a property

5    deed -- and that's a case that we've cited in our moving

6    papers, where the wife was -- the estranged wife was still on

7    the deed and they attempted to use that wife's consent for the

8    search, and that was ruled inadmissible, inappropriate,

9    unlawful.

10                THE COURT: Well, that was because she no longer

11   really was using the premises.

12                MR. ZEHNLE: Well, it's not as though this

13   third-party consent-giver was using the premises of his own --

14   there's no mutual use here, Your Honor. The affidavit that the

15   agent prepared -- yeah, this is obviously nothing we did, we're

16   just looking at the affidavit and what's sworn to by the agent.

17   He's saying that only at Mr. Manafort's direction and control.

18   And not just once or twice, but three times, with his own --

19                THE COURT: Not quite. He says what he says. And I

20   take your point that he says he took the filing cabinet and

21   took the boxes at Mr. Manafort's direction, so it says that.

22                MR. ZEHNLE: And he put the files in the filing

23   cabinet at Mr. Manafort's direction.

24                THE COURT: At Mr. Manafort's direction. But, where

25   is the evidence that makes it unreasonable? Where is the

1     notion that Manafort was exercising control over this space and

2     they didn't cede it completely to the gentleman with the key?

3          MR. ZEHNLE:  Out of the ten paragraphs that the agent

4     writes on this particular issue, as I've noted three times, he

5     is saying I talked to the purported consent-giver and that

6     person, on three separate occasions, told me that he did things

7     for Mr. Manafort and his companies at Mr. Manafort's direction.

8     That --

9          THE COURT:  Is it your position --

10          MR. ZEHNLE:  -- that, in and of itself, Your Honor,

11     should put a reasonable -- reasonably cautious FBI agent on

12     notice that there is something potentially ambiguous about

13     whether or not this person has actual or common authority over

14     this.

15          THE COURT:  Well, was it ambiguous?  I mean, to the

16     agent who's given a lease that doesn't say it's rented out to

17     Manafort and this gentleman has access, but it says it's rented

18     out to the gentleman and Manafort has access and the gentleman

19     has the key to let them in, why -- what was ambiguous to them

20     about that situation?

21          MR. ZEHNLE:  I go back again, Your Honor, to the

22     statements in the FBI agent's affidavit that talk about these

23     things being done at the direction of Mr. Manafort.  It seems

24     reasonable -- only reasonable that if you see that, that

25     certain questions would arise.  Why is your name on the lease?

1     Why not clear up this ambiguity?  Your name is on top and

2     you're signed as the occupant, what's going on?  I know that

3     you work for Steam Mountain now, but I see your e-mail address

4     is a DMP, a Davis Manafort Partners e-mail address.  I see that

5     Mr. Manafort himself is identified as the authorized person for

6     entry.

7          These are just, I think, reasonable, prudent

8     questions that any agent or police officer should ask when

9     you're doing what is -- let's be honest, something that is not

10    favored by the courts in this country.  Warrantless searches

11    are disfavored.  And so it doesn't seem a great stretch --

12          THE COURT:  Well, consent searches are not

13    disfavored.

14          MR. ZEHNLE:  They are an exception, but that doesn't

15    mean that warrantless searches are generally disfavored; the

16    Court said that.  But the Court also understands that there are

17    certain circumstances that come up where a warrantless search

18    is permissible.  That's clear.

19          THE COURT:  Do you have any other storage unit cases

20    besides the two the government came up with?  I was kind of

21    shocked by how few there are.  Is that the only authority that

22    we know of?

23          MR. ZEHNLE:  Storage unit, no.

24          THE COURT:  Or share of locker.  Let's take the

25    mother in the bedroom.  I don't think the hotel room is

1    necessarily analogous, but a storage-type facility, are there

2    any other cases besides *Trotter* and *Kim*?

3              MR. ZEHNLE:   *Kim*.  We were not able to find one,

4    except, Your Honor, that *Trotter* was subsequently addressed by

5    the Tenth Circuit, and I believe the case was *U.S. v. Cos*.

6              THE COURT:   *Cos* or *Cos*.

7              MR. ZEHNLE:   *Cos*.

8              THE COURT:   That was basically saying assumption of

9    the risk in and of itself isn't going to be enough of a basis.

10   But they still -- the test is still all one.  Is there

11   something about the joint access and the multiple use that

12   makes it reasonable and gives rise to the assumption of the

13   risk?  I don't think they've changed that, and they can't

14   change what *Matlock* said anyway.

15             MR. ZEHNLE:   Agree.

16             THE COURT:   Is it your point of view those cases are

17   wrongly decided?  I know I don't have to follow them, I'm not

18   in that circuit.  But are they wrongly decided?

19             MR. ZEHNLE:   I think, in accord with D.C. law at the

20   circuit court level, yes, I do think that they're wrong, Your

21   Honor.  I don't think that those case, which did -- you can't

22   divorce the fact that they were dealing with an assumption of

23   risk theory behind them.  It's hard for me to sit there and

24   speculate how the Court might have determined, if they had

25   actually used the standard set forth in *Matlock*, which is

1     evidence of mutual use and joint access or control on most

2     occasions.

3            There's no evidence here, Your Honor, when you read

4     through the affidavit, of mutual use.  There's evidence that at

5     the direction of Mr. Manafort, the third-party consent-giver

6     was allowed to go there and place items in there.  If you read

7     closely, they don't even -- he doesn't even know exactly what

8     these things are being placed in.  In the file cabinet.  It's

9     brown, legal-sized folders.  Right?  He doesn't -- in the

10    affidavit, it's not spelled out what are in the boxes?  Did the

11    third-party consent-giver tell you that?  There's nothing.

12    He's just there to bring things when directed by Mr. Manafort.

13           THE COURT:  All right.  Well, one thing you've

14    mentioned a couple times is D.C. Circuit authority.  And I want

15    to ask both sides about this.  The motion's being heard here.

16    The search warrant was executed in the Eastern District of

17    Virginia.  Do we have a choice of law issue here?  What -- and

18    I don't think the circuit's law are different because they all

19    derive from *Matlock*.  But to the extent there is some

20    difference, and we don't have -- I don't see a Fourth Circuit

21    storage locker case, which should control here?

22           MR. ZEHNLE:  Your Honor, I think, for purposes of

23    this motion and the argument, that the case law here in D.C.,

24    under the previous citations I've given you, and the case law

25    in the Eastern District of Virginia are the same.  The case in

1    Virginia that I think would be of primary interest to the Court

2    would be -- I believe it is *U.S. v. Buckner*, if memory serves.

3    I don't have that case cite.  I just had to deal with it in the

4    other matter, so --

5            THE COURT:  Okay.  All right.

6            MR. ZEHNLE:  -- I feel pretty confident of that.

7            THE COURT:  You pointed to the language in *Kim* about

8    a consent-giver with limited access to the searched property.

9    But wasn't the reason the Court found that it fell outside the

10   joint access concept or common authority doctrine was because

11   the third-party didn't have a key?

12           MR. ZEHNLE:  I'm not sure that that is exactly what

13   was controlling, Your Honor.  But I would defer to the Court on

14   that.

15           My position on *Kim* and *Trotter*, as I've said before,

16   and I'm not varying from this, is those cases are not

17   dispositive.  And when we read the clear instructions from

18   *Peyton*, from *Whitfield*, and obviously from *Matlock* --

19           THE COURT:  *Peyton* seems to be all about the

20   container within the container.  I don't see how that really

21   helps you one way or the other here.

22           MR. ZEHNLE:  Well, it's a reasonable expectation of

23   privacy, as the Court said in *Byrd v. United States*.

24   Regardless of whether we're talking about the container that's

25   sitting next to the bed or whether we're talking about the

1    storage unit --

2          THE COURT:  That was the problem.  They didn't say

3    there was a problem for being in the room and seeing the

4    container or smelling it or noticing it, what they said was

5    they shouldn't have opened it without getting a warrant.

6    You've said to me the fact that they went and got a warrant for

7    the filing cabinet and for the boxes shows that they knew that

8    they were there unlawfully in the first place.  I think it

9    shows that they knew about *Peyton*.

10          MR. ZEHNLE:  Well, Your Honor, I mean, if -- look, my

11   view is that if they true -- here's what they said, and let's

12   just cut down to the chase.  They've said, in their papers,

13   even if we took out all the information in the warrant that

14   dealt with this alleged third-party consent-giver, we still

15   would have probable cause to have gone in.  That's what they've

16   said in their papers.

17          So, query, if that's the case -- remember the dates,

18   it's very important, May 26th, they do the warrantless search.

19   May 27th, the day after, they're getting the search warrant

20   based on all the information that they just saw when they went

21   into the storage unit on the warrantless search.  If they had

22   probable cause, as they allege, why wouldn't they have just

23   simply done it on the 26th?  That's not -- that's not a

24   credible explanation, Your Honor.

25          THE COURT:  So, let's say --

1          MR. ZEHNLE:  They had it already, according to

2     themselves, according to the agents.

3          THE COURT:  If I agree with your theory that the

4     initial entry was unlawful, then the only remedy, according to

5     you, is to suppress, and the warrant is not -- the warrant

6     can't save it because the warrant is based on that?

7          MR. ZEHNLE:  Yes, Your Honor.  Because, remember, the

8     Fourth Amendment protects -- if there's probable cause, as this

9     Court well knows, if there's probable cause to suspect that a

10    crime may have been permitted, that's one part of it.  But the

11    other key part -- and that's fine for an arrest warrant, but

12    the other key part is that there's probable cause to believe

13    that there might be evidence of that crime in the place to be

14    searched.  They don't have any evidence of that.

15         THE COURT:  What about all the statements that you

16    quoted to me, that he said I took his business files and I put

17    them there, I put his file cabinet there, I did this at his

18    direction; he gave me his papers and he told me to put them

19    there.  Why do they need to go in at all?  Why doesn't that

20    give you a basis to say to a Court, we think that he's got

21    financial records in there?

22         MR. ZEHNLE:  Those are mere allegations, Your Honor,

23    and they have nothing to do with the whole crux of what they're

24    arguing in terms of potential Ukrainian payments that are being

25    made to Mr. Manafort.  There's nothing that this third-party

1    consent-giver said at any time, saying, Oh, yes, that deals

2    with the matters that Mr. Manafort was dealing with in Ukraine.

3    If you read through what the agent said, he basically said, I

4    move some office files.

5           Now, I don't know what that means, office files.

6    People keep personal files in their offices, too, I certainly

7    do.  And he just says that's what I moved over there.  And,

8    with respect to the filing cabinet, I moved a filing cabinet

9    over there, it was heavy.  Do you know what was in it?

10   According to the affidavit, no.  But, you know, about a year or

11   so ago I got an e-mail where Mr. Manafort directed me to take

12   some folders over, they're brown, legal-sized folders, and I

13   put them in there.

14          That is the sum and substance of what this agent got,

15   obtained from this consent-giver.

16          THE COURT:  Well, I feel like you're saying, though,

17   that I should read into the lease some inherent limitation,

18   since one could infer from the lease that the employee was

19   named the occupant in his capacity as an employee for Davis

20   Manafort and not in his personal capacity.  And I want to know

21   if you have any case that stands for that proposition and why I

22   should narrow the authority on the lease further, if Manafort

23   himself didn't?

24          If he could have made the company the occupant, he

25   could have made himself the occupant.  He could have declined

1    to permit the employee to have a key.  None of those things

2    happened.  Why don't all those relate to the reasonableness of

3    the expectation of privacy, the assumption of risk, the mutual

4    use and what was reasonable in the eyes of the agent?

5         MR. ZEHNLE:  Well, Your Honor, I think the response

6    to that question is up until this matter, we weren't even aware

7    the name of the occupant was an individual who purportedly gave

8    consent.

9         THE COURT:  I don't understand what that -- how that

10   answered my question.

11        MR. ZEHNLE:  But you were asking, well, how is it

12   that this person's name is on the lease and how am I supposed

13   to infer that Mr. Manafort, you know, wanted it to be that way?

14   We weren't even aware of this until these documents were turned

15   over.

16        THE COURT:  The point is --

17        MR. ZEHNLE:  So, I can't -- I don't know how you can

18   object to it before you know it, Your Honor, is the only point

19   I'm trying to make.

20        THE COURT:  Now, I guess my question is, why should I

21   look at the lease and read some limitation into it?  Why should

22   the officer have had to read the lease and read a limitation

23   into it that isn't apparent from the face of the lease?

24        MR. ZEHNLE:  Because there is no indication in those

25   paragraphs, in that affidavit that in any way, shape, or form

1   say that that person had mutual use of that.  No questions were

2   asked, Do you store your own materials there?  Do you pay

3   the -- I see your name is on the lease, do you pay the lease?

4           THE COURT:  I guess my question is, does the lease --

5   I think they're saying the lease and the key are the beginning

6   and the end of the story, and so they were not confronted with

7   an ambiguous situation.  And what you're saying is you have to

8   read the lease more narrowly than the lease says on its face.

9           MR. ZEHNLE:  No.  I'm saying you have to read the

10  lease and the fact that he had a key in conjunction with what

11  the third-party consent-giver is telling the agent at that

12  time.  And he's saying I'm only doing these things -- three

13  times in his own affidavit; we didn't write it -- that I only

14  do this when I'm directed by Mr. Manafort.  That's the

15  ambiguity that's created, Your Honor.  And I don't think that a

16  reasonable, prudent FBI agent should have just sat there and

17  said, Well, wait a second, you just told me that you only do

18  this when you are directed by Mr. Manafort.  Let me ask you a

19  couple follow-up questions, just to make sure that I feel you

20  have the authority to allow me into this unit.

21          THE COURT:  All right.  I understand your argument.

22  And I think I've already asked you, if I agree with your

23  argument, is there any way that the warrant that was obtained

24  survives?  And you've said no, they didn't have probable cause,

25  enough specificity to know that there were documents related to

1   his business just based on the fact of the affidavit.

2           MR. ZEHNLE:  Correct.

3           THE COURT:  All right.  So if I conclude the initial

4   entry was lawful, though, and that the resulting warrant was,

5   therefore, valid, what's your basis for the claim that the

6   warrant was impermissibly broad?

7           MR. ZEHNLE:  So, Your Honor, there's really two

8   things, and they are taken in conjunction.  Again, our primary

9   argument relates to, as we've been discussing, common authority

10  and/or apparent authority, which we didn't really specifically

11  discuss.

12          THE COURT:  Does apparent authority apply here?  The

13  cases I've seen to look at talk about that that only comes in

14  to question if the officer made an error of fact.  And I don't

15  think we're talking about an error of fact here, we're talking

16  about -- you're not saying there's some other facts, you're

17  saying that the facts he had weren't enough, which is a -- gets

18  to the question of law.

19          MR. ZEHNLE:  That's common authority.  But also, I

20  can understand, and the government in its papers has posited

21  that there was apparent authority, too.  So I didn't want to

22  just simply go past that without at least addressing --

23          THE COURT:  Okay.  Why didn't he have apparent

24  authority?

25          MR. ZEHNLE:  As I said at the beginning of my

1    argument, Your Honor, these two concepts are intertwined here

2    in terms of the common authority issue and the apparent

3    authority.

4         Our point, on behalf of Mr. Manafort, is once the

5    agent is alerted to potential ambiguity, and whether or not

6    this person has actual common or apparent authority over this,

7    further inquiry is required.  That inquiry, if you read through

8    paragraphs 28 through 38, which is the crux of this part

9    dealing with the third-party consent-giver, that wasn't done.

10   Reasonable follow-up wasn't done.  And if you don't do that --

11   I believe the case was *Whitfield* that said if you don't have

12   that, then that's the end of the inquiry.  That's it.  And I

13   know it's cited in my papers, I could find it, if you want me

14   to, Your Honor.

15        THE COURT:  No.  They were talking about the son's

16   bedroom and once they got into the bedroom, they didn't ask the

17   mother enough questions.

18        MR. ZEHNLE:  And, Your Honor -- listen, you asked

19   earlier about what about storage units and things like that?

20   As this Court is well aware, Fourth Amendment issues dealing

21   with suppression, etcetera, tend to be very fact-specific.  So

22   it's not really -- maybe it's a bit surprising that storage

23   units haven't been subject to as many warrantless searches, you

24   know, in the case law, but, the fact is, these facts -- I mean,

25   one Fourth Amendment case to another, you know, a variation in

1   a particular fact here or there can drive a Court to say, Yes,

2   I believe that they had probable cause and what they did was

3   appropriate, or that they didn't.  And so I just wanted to make

4   that point in terms of common authority and apparent authority.

5           THE COURT:  It's very important with everything.  I

6   mean, I think in the end, when we start talking about *Griffith*,

7   *Griffith* says, over and over again, based on the facts of this

8   case, based on the facts of this case.  And so we're going to

9   have to determine whether they're analogous, but we're not

10  there yet.

11          But, let's get to the overbreadth.  Again, you cited

12  lots of cases for general principles about general searches and

13  rummaging through people's possessions.  And while I agree with

14  you that, clearly, Fourth Amendment applies to a storage unit,

15  it applies to a car; it doesn't just apply to the homes.  I do

16  believe that all the case law, when they're striking something

17  down and it involves a home, talks about the specific and

18  particular sanctity and expectation of privacy in a home.  So,

19  we're -- the law applies, but I do think it is -- there's a

20  difference.  We don't have that extra finger on the scale.

21          But, your concern is that this search is too broad

22  and the warrant specifically called for records relating to the

23  statutes alleged to be violated.  And, so, the question is,

24  does that serve as a limitation?  It doesn't say all financial

25  records, period.  It says all financial records related to the

1      statutes alleged to be violated.

2              The Office of Special Counsel says the list of

3      offenses solves any particularity problem because we know what

4      they're supposed to be looking for.  So, does it also solve the

5      problem of limiting the scope to the offenses for which

6      probable case is identified?

7              MR. ZEHNLE:  We would argue that it does not, Your

8      Honor.  I think that it is more analogous to an any-and-all

9      documents request than it is to something that's been

10     specifically narrowed by the three statutes that they cite, one

11     of which is -- again, I mean, this happens, which is mis-cited.

12     The tax statute, there is no 726(a).  I'll just assume that was

13     typographical or whatever.  But there is no statute like that

14     it's 7206(1).

15             THE COURT:  It's quite clear that they're talking

16     about the violation.

17             MR. ZEHNLE:  It seems like that's what they're

18     talking about.  But you've asked me about the three things, I

19     figured I should at least point that out for you.

20             THE COURT:  But why doesn't their saying this is what

21     we're looking into narrow the case and differentiate the case

22     from any and all records?  What's your best case for the notion

23     that this warrant on its face is too broad?

24             MR. ZEHNLE:  Well, Your Honor, I think the primary

25     focus in our papers is on the fact that the search warrant

1    itself, not only did it say any and all financial records, but

2    that there was no temporal limitation whatsoever in the

3    warrant.  That is, if you look at the face of the warrant, you

4    can essentially go in and get any and all financial records

5    because there's no limiting in that particular paragraph.  And

6    it can be -- it could go back to whatever, 1950.

7         THE COURT:  Well, even if I agree with you, and even

8    if I find -- and we need to talk about this -- the good faith

9    exception doesn't apply with respect to the time limitation

10   issue, why isn't the partial suppression option in the

11   government's opposition the answer?  They would say, okay,

12   you're right, anything prior to X would be suppressed, but not

13   everything.

14        MR. ZEHNLE:  Well, it goes back to the issue of

15   specificity of the warrant.  Right?  And some cases, the

16   government has cited them, some cases not in this jurisdiction,

17   not controlling, but we'll talk about specificity and what

18   specificity means in those particular circuits.  You know is it

19   particularity -- are particularity and overbreadth two separate

20   concepts?  You know, cases that they cite seem to suggest, yes,

21   they could be distinct concepts, but they're clearly related.

22        So if it's an overbreadth situation, we would

23   acknowledge that in those circumstances it is possible,

24   although I'm not saying that it would happen in this particular

25   case, Your Honor, that you might be able to extract or delete

1     those items that were outside the restrictions, as it were.  If

2     it's particularity, basically saying I don't have any idea of

3     what timeframe I should be looking for these records, I think

4     it's a different issue.  Because then it doesn't really give

5     any particular guidance in terms of following through on the

6     probable cause.  Right?  Probable cause to believe that there

7     may have been violations of these three statutes.

8             But if you view it as particularity, it's like I

9     don't know exactly what I'm supposed to be looking at.  Tax

10    charges, FBAR charges, even the FARA registration, these are

11    done primarily on an annual basis, right? and there're statute

12    of limitations for those things, and the government is aware of

13    them and, obviously, we're aware of them, too.

14            But if you don't have any kind of limitation

15    whatsoever, you know, to say, okay, I'm going to go back and

16    search and seize records from 1975 because I found it -- a tax

17    return for that particular year, I think that that is a

18    problem.  And whether it's defined as a lack of particularity

19    under the case law or whether it's defined as overbreadth, I

20    think it's problematic in the way that this warrant was

21    actually drafted and executed.

22            THE COURT:  Right.  My question is the time limit

23    question.  Can that be resolved with partial suppression?

24            MR. ZEHNLE:  It can, Your Honor, under the right

25    circumstances, I agree.

1            THE COURT:  Now, when I asked you about your other

2     overbreadth argument and doesn't the specification of

3     particular offenses solve that problem, you went onto time

4     limits.  But putting aside the time limits with respect to the

5     any-and-all financial records, do you agree that that was

6     actually limited by the specification of the offenses?

7            MR. ZEHNLE:  May I have a moment to look at it?

8            THE COURT:  Yes.

9            MR. ZEHNLE:  Thank you, Your Honor.

10           (Pause.)

11           MR. ZEHNLE:  So while I see what Your Honor is saying

12    in paragraph 1, the prefatory language to paragraph A, which

13    talks about any and all financial --

14           THE COURT:  That's the language you challenge.

15           MR. ZEHNLE:  Yes, it is the language that we're

16    challenging.  I would argue that the mere recitation of those

17    violations in and of themselves doesn't give enough direction

18    regarding the kinds of documents that are supposed to be seized

19    here.

20           THE COURT:  All right.  And what is the best case

21    you're relying on for the notion that this warrant -- assuming

22    they were putting aside the consensual entry issue that led to

23    it -- is overbroad on its face?

24           MR. ZEHNLE:  Best case?

25           THE COURT:  Yes.

1           MR. ZEHNLE:  One moment.

2           THE COURT:  All right.

3           (Pause.)

4           MR. ZEHNLE:  On pages 16 and 17 I cited a number of

5     cases -- 15, 16, 17, I guess I should say.

6           THE COURT:  So those are your best pages.  Do you

7     know the best case?

8           MR. ZEHNLE:  I'm sorry?

9           THE COURT:  I mean, the government has provided me

10    with a lot of cases that specifically relate to financial

11    records that they say is analogous to this warrant, where this

12    kind of warrant has been upheld, where we're talking about

13    financial crimes, that it can extend over a long period of

14    time.  So I want to know, and I'll ask them the same question,

15    but I want to know, what do you think is the most analogous

16    fact pattern that I should drill down on?

17          MR. ZEHNLE:  Understood.  I think the best case I can

18    cite Your Honor to would be *United States v. Maxwell*, which is

19    what the government has cited.  But as you'll note on page 10

20    of the reply brief, that Court went on to say, in the full

21    context of the quotation that the government provided,

22    "Although it warrants reference to a particular statute, it

23    may, in certain circumstances, limit the scope of the warrant

24    sufficiently to satisfy the particularity requirement.  It will

25    not do so where, as here, the warrant authorizes the seizure of

1    all warrants and where, as here, the reference is to a broad

2    federal statute."  And then it goes on to identify potentially

3    the federal wire fraud statute.

4         THE COURT:  Okay.  Well, they would say, see, Judge,

5    is says, "where, as here, the reference is to a broad statute."

6    They didn't just say we're investigating conspiracy.  They said

7    we're talking about tax evasion, foreign agent registration,

8    specific crimes.  So does that change anything?

9         MR. ZEHNLE:  I think the defense argument is that

10   those are broad federal statutes, Your Honor.

11        THE COURT:  All right.  When we get to the second

12   warrant we're going to talk more about the good faith

13   exception.  But let me just ask you, with respect to this

14   warrant, again, just a choice of law question, is whether

15   the -- do we assess the officer's objectively reasonable belief

16   under D.C. law or Fourth Circuit law, since the warrant was

17   presented to an of the Eastern District of Virginia magistrate?

18        MR. ZEHNLE:  And, again, Your Honor, I think the case

19   law on both jurisdictions on this is similar, so I don't think

20   the choice-of-law question is particularly relevant.

21        THE COURT:  All right.  What would be the basis for

22   arguing, with respect to this motion, that the officer didn't

23   have an objectively reasonable basis to believe they were

24   proceeding lawfully after they got the magistrate's signature

25   on the warrant?

1          MR. ZEHNLE:  Because the agent knew at the time he

2     presented this material to the magistrate that the third-party

3     consent-giver --

4          THE COURT:  Separate from the third-party consent.

5     I'm just talking about overbreadth.

6          MR. ZEHNLE:  Overbreadth.  In terms of overbreadth,

7     Your Honor, I think, you know, the warrant obviously is very

8     broad.  So, it's difficult to sit there and say that the

9     agents, you know, went above and beyond a very broad warrant to

10    begin with, that had no temporal limitation and, as I mentioned

11    before, reference a broad federal statute.  So, that is a more

12    problematic question, and the defense admits it.

13         THE COURT:  But aren't we, at this point, supposed to

14    say even if they made a mistake, they presented it to someone

15    who presumably knows what -- I think it was a she, what she's

16    doing --

17         MR. ZEHNLE:  Yes.

18         THE COURT:  -- and she signed it, weren't they

19    entitled to rely on that?

20         MR. ZEHNLE:  Well, it also depends upon, Your

21    Honor -- I'm not sure, but I do believe the agent who prepared

22    the affidavit was also the agent that was also involved in the

23    execution of the affidavit -- or, of the warrant.  And so, that

24    agent's knowledge, based on what was told previously to the

25    magistrate judge, I think it was Buchanan, and then the

1    subsequent warrant that was gathered, that would still be in

2    his head.  He would still know what, you know, the limitations

3    were when he initially went to that judge and whether or not he

4    was going too far.

5            THE COURT:  All right.  You've also raised concerns

6    with the inventory.  Even if there's -- those problems are

7    accurately described, why would that warrant suppression?

8            MR. ZEHNLE:  It may in a particularly egregious case,

9    Your Honor.  Obviously, this is not.  This is being raised as a

10   matter for the record, defendant wishes to keep this objection

11   in this regard.  But our primary focus, as you've been able to

12   determine, is really the common authority and the apparent

13   authority issue.  And the second issue, obviously, being the

14   breadth of the actual warrant itself, with no time limitation.

15           THE COURT:  Okay.  We're going to spend more time

16   talking about the other warrant.  I want to hear from the

17   government on this warrant.  Is there anything else that you

18   wanted to say that you didn't get to say about this warrant?

19           MR. ZEHNLE:  A couple things, Your Honor.  Obviously,

20   whenever we're talking about timeframes and when the

21   information was provided to the agent and what the basis for

22   the -- in this case the consent-giver's knowledge is, we're not

23   talking about specifically a staleness issue.  But in terms of

24   the reasonableness of what the agent understood at the time he

25   sought the warrantless search, I think it's important for the

1   Court to consider that when he talked to that former employee

2   of DMP, that he was told that, oh, that was something I did

3   back in 2015 with respect to moving the boxes.  In 2016, I

4   believe that was when the filing cabinet was moved over, or at

5   least some files were transmitted to that file cabinet.

6           So I think it's important for the Court to

7   understand, when the agent is talking to this person in order

8   to assess whether or not they have the authority to let him in

9   in the first place, the person is explaining to the agent, this

10  is based on things that actually happened a year or two ago.

11  So I don't -- there's no reason, it seems to me, it's not

12  reasonable for the agents to simply say, Well, based on

13  something that you did two years ago, some office files were

14  moved, and we don't know exactly what they were, that that's a

15  reasonable basis to say I still think you have consent to let

16  me in here and go through this.

17          THE COURT:  All right.  Well, you emphasized in your

18  pleadings that they said former Davis Manafort employee.

19          MR. ZEHNLE:  They do.

20          THE COURT:  But the affidavit also indicates, and you

21  don't seem to dispute, that he continues to work for a Manafort

22  company, even though he doesn't work for that particular

23  corporate entity anymore.  So why does that matter?

24          MR. ZEHNLE:  Because, Your Honor, the agent didn't

25  even take -- undertake what we would say would have been a

1    reasonable and prudent course.  Well, wait a second, you're now

2    telling me you don't work for DMP.  The agent knows his

3    investigation is based upon the potential Ukrainian issues that

4    we've been discussing about for the last number of months.  And

5    he doesn't say, Well, has your job, now that you've worked for

6    Steam Mountain, has that changed?  You know, what has changed,

7    if anything?

8         These are just reasonable inquiries I think any agent

9    or police officer should have made confronted with these

10   circumstances.  You're saying he knows I'm a former employee of

11   DMP, presumably the records relate to DMP, whatever records

12   there are, because the consent-giver doesn't really know what

13   records are in there, other than generic office files.  And so

14   I think that's important.

15        I also think it's important, Your Honor, that --

16        THE COURT:  Well, while the offenses that led -- that

17   are of interest here relate to that, weren't the alleged bank

18   fraud allegations that relate to Virginia and more recent also

19   in the affidavit and the warrant?

20        MR. ZEHNLE:  I don't believe they're in this warrant,

21   Your Honor.  I could be mistaken, but --

22        THE COURT:  It's the other one?

23        MR. ZEHNLE:  I think that is the warn -- the

24   affidavit for the house.

25        THE COURT:  I can determine that when I look at it.

1    All right.  Is there anything else you want to say

2 about this warrant before I ask Special Counsel to respond?

3    MR. ZEHNLE:  Not at this time, Your Honor.

4    THE COURT:  Okay.  Thank you.

5    MR. MEISLER:  Good morning, Your Honor.

6    THE COURT:  All right.  Good morning.  All right.

7 Let's just jump right in to where we stopped.  Which is, what

8 evidence in the affidavit supports the notion of not only joint

9 authorized access, but mutual use, as described in *Matlock* and

10 described in more detail in *Whitfield*.

11    MR. MEISLER:  We think mutual use in these

12 circumstances means access to the facility to perform one's job

13 functions.  The case we've cited and that defense hasn't

14 addressed is from the Second Circuit and involved a research

15 assistant working for a professor.  So we think, for example,

16 if a research assistant has a key, is given a key to a lab by a

17 professor who says, Check on my Petri dish for my experiment

18 every night and write me up a report and come back and report

19 it to me, that person is acting at the direction of the

20 professor, but has access via the key and permission to enter

21 and is performing job functions there.  Performing job

22 functions in a facility you're authorized to enter is use of

23 the facility.

24    So, we think mutual use is required under the *Matlock*

25 test, that it's satisfied here.  And as Your Honor put it

1    better than I did before, we think, here, that the combination

2    of the access via the key, the carrying out of job functions in

3    the space and, of course, the employee's name as the

4    occupant -- being named as the occupant on the lease agreement

5    taken together do not create any kind of ambiguity that would

6    require further inquiry by the agents at that time.

7         THE COURT:  What impact does the fact that the

8    employee was a former employee of Davis Manafort have on his

9    authority or apparent authority?

10        MR. MEISLER:  In this instance we don't think it has

11   any affect.  I would point Your Honor to the very same language

12   in paragraph 28 of the warrant affidavit that I believe was

13   just being discussed, where -- I'll just try to read it

14   directly, so I don't get it wrong.  But, I believe the agent

15   there noted that the employee was a current employee of Steam

16   Mountain, which is a business currently operated by Paul

17   Manafort.  The employee advised he's a salaried employee of

18   Manafort's company and that he performs a variety of functions

19   for Manafort and his companies as directed by Manafort.

20        So, the agent understood Manafort to be associated

21   with a number of companies and this employee to performed work

22   for Mr. Manafort on behalf of multiple entities.  So in

23   those --

24        THE COURT:  Well, they're hanging their hat on at the

25   direction of Manafort.  In other words, if he went there, he

1    went there at the direction of Manafort.  If he opened the

2    door, he did it at the direction of Manafort.  Does that give

3    rise to an ambiguity that should have called for more inquiry?

4    Do you need his permission every time you enter?

5              MR. MEISLER:  I don't think so in these

6    circumstances.  Going back to the example I gave from the

7    Second Circuit case, in that case you would be directed by the

8    professor to enter the lab to check up on the experiments or

9    whatnot.  And here the employee only had reason to go to the

10   storage unit at the direction of Manafort, because he was going

11   there as part of his employment duties.  We don't dispute that,

12   that's clear in the affidavit.

13             But it doesn't change either the legal property-based

14   rights that the employee had as the occupant on the lease, on

15   the rental agreement, or the physical capability, the joint

16   access he had via possession of the key.  So, we don't think

17   that in these circumstances it matters.

18             THE COURT:  Does it matter that while the employee is

19   listed as the occupant on the lease, and the lease is between

20   the lessor and him, that the address of the occupant was

21   Manafort's address and not the individual's address?  Does that

22   matter?

23             MR. MEISLER:  I think it doesn't matter here for a

24   similar reason, which is that at that time I believe that the

25   address used was both Mr. Manafort's personal address and his

1    business address, because he was operating his business -- or,

2    had listed his residential address as his business address.

3    So, there, again, if the employee is acting as an employee,

4    he's taking this out -- and taking out the lease to make use of

5    it in his role as an employee, it doesn't matter there.  And I

6    believe his personal cell number was the one listed on there as

7    the cell phone contact number.

8          THE COURT:  Is there anything you're pointing to,

9    besides the lease and the key, to support the finding under

10   *Matlock* that it was reasonable to assume in this instance that

11   the employee had the authority to admit third parties to the

12   unit?

13         MR. MEISLER:  No.  I think the three pillars of our

14   argument are the ones that Your Honor just walked through

15   before, which is lease, key, and the representations in

16   paragraph 28 that the employee had previously accessed the

17   facility.  He was the one, in fact, who moved the contents of

18   the facility into that location.  So he had previously occupied

19   the physical space as part of his job functions in the

20   facility.

21         Those are really the three factors we think that

22   dispel any potential ambiguity in the situation and eliminated

23   any duty to inquiry.  It both, we think, established common

24   authority as a matter of law under the cases we cited, Your

25   Honor has mentioned a couple of them, *Kim*, *Trotter*.  You know,

1    the only other case we found was an Eastern District of

2    Pennsylvania case called *Atiyeh*, A-T-I-Y-E-H.  And those are

3    the only three storage locker cases, all three of them that

4    involve similar facts here; name on the lease, access via a

5    key, and either the permission to use or actual having used the

6    facility all find common authority.

7         And in light of that, we think, at the very least, it

8    was reasonable for the officers to understand that authority

9    and, therefore, they would have apparent authority.

10        THE COURT:  Well, are you relying on apparent

11   authority here and does the doctrine apply?  The case law

12   seems, to me, to get a little confused about whether there's a

13   question of fact or a question of law, and apparent authority

14   only arises if there's been a mistake of fact.  You're not

15   arguing that there was some mistake of fact?

16        MR. MEISLER:  We're not.  I agree with Your Honor,

17   that I think the cases in this area are somewhat confusing.

18   Your Honor may have taken the mistake of fact versus mistake of

19   law distinction from the *Whitfield* case; it has kind of a

20   preliminary discussion in that regard.  I don't think the Court

21   actually applied that distinction in that case.

22        I would refer the Court to the *U.S. versus Law*

23   decision, L-A-W, from the D.C. Circuit cited in our response.

24   And in *Law* the Court acknowledged *Whitfield*, cited it, but it

25   did not make any preliminary inquiry into whether something was

1    a mistake of fact or mistake of law.  That's a notoriously

2    slippery distinction in the law.

3            And I would note that in the *LaFave Search and*

4    *Seizure* treatise that's cited in our papers, that the author

5    has added a footnote recently to calm questions whether that

6    distinction actually holds in this area, precisely because the

7    Supreme Court case, a couple years ago, in a case called *Heien*

8    *versus North Carolina*, which is not cited in our papers, it's

9    H-E-I-E-N, rejected that distinction in the context of probable

10   cause where officers are making a traffic stop, probable cause

11   and reasonable suspicion, rejected that distinction as not

12   being helpful and not supported by the law.  So in light of

13   *Heien*, the LaFave treatise itself has questioned whether that

14   distinction holds.

15           So, if the Court is going to go down that route, we

16   think it would hopefully follow the analysis that the D.C.

17   Circuit employed in the *Law* decision by just asking, based on

18   the facts before the officers, was it reasonable to understand

19   the third-party to have the common authority to consent?  But

20   that, again, is not our primary argument.  We do think that the

21   three pillars I've mentioned before, as a matter of law,

22   establish common authority and the Court, therefore, wouldn't

23   have to reach any of these difficult questions about apparent

24   authority.

25           THE COURT:  What's the name of your Second Circuit

1    case?  Because when I read your opposition, I don't remember so

2    much emphasis being placed on the fact that he entered it in

3    accordance with his job functions.  It makes your argument

4    almost completely merge with theirs, because they're saying he

5    entered only in accordance with his job function and,

6    therefore, it wasn't reasonable to assume he could show up

7    there on another occasion.  And you're saying his dominion over

8    the property, his ability to go at any time, is somehow broader

9    because it is accorded to him by virtue of his job function,

10   which, literally, you're both arguing based on the exact same

11   facts at this point.  So what is the name of the Second Circuit

12   case?

13            MR. MEISLER:  Second Circuit, the case is cited on

14   page 15, footnote 4 of our brief, which is document 283, and

15   it's United States -- let me get the name -- pronounce it

16   wrong, but Buettner-Janusch, with a hyphen, and it's 646 F.2d

17   759.  And I believe, just to be clear about it, there were two

18   individuals there whose authority the Second Circuit was

19   assessing.  One was a fellow professor, the defendant there was

20   a professor.  One was a fellow professor, the second one was a

21   research assistant.  We think that the analogy here is really

22   to the research assistant.

23            But to take Your Honor's question, I don't think our

24   arguments merge.  I was trying to make the point that if you're

25   viewing this to the language of mutual use, and the response to

1    Mr. Manafort's suggestion that mutual use would require some

2    kind of shared use, it would require the employee to have

3    stored or to have discussed with Mr. Manafort his right to

4    store his own belongings there.  We think that mutual use would

5    be satisfied by performance of employment functions in the

6    premise that were searched.

7         I agree with Your Honor, I think that even if we

8    didn't --

9         THE COURT:  I think mutual use on all these cases

10   would be if he had the right to come and go on his own, without

11   getting express permission.  He could determine that he wants

12   to go in there and rearrange things, or just felt like being in

13   a storage unit one Saturday afternoon, that that's really the

14   question; if he was free to come and go, and free to admit

15   third parties.  I mean, for instance, if the filing cabinet was

16   too heavy and he brought somebody else in to help him bring in

17   the filing cabinet -- we don't know if that happened or not --

18   but did he need to have permission to do that?  That would seem

19   to go to the question of whether it was reasonable to assume

20   that Manafort assumed the risk, that he would admit third

21   parties.  I mean, I don't know.

22        If -- is there anything, though, in your argument

23   about apparent authority that is different from your argument

24   about actual authority?

25        MR. MEISLER:  There is the one point which I think is

1    a helpful clarification to make.  I do think that when it come

2    to apparent authority, we would be limited to the facts that

3    the officers knew at the exact moment they first made entry.

4    And in that regard I do want to point the Court to the passage

5    in our brief where we discuss apparent authority, to make sure

6    that if the Court did rely on apparent authority, it strictly

7    limited itself to those facts, which I think are the ones set

8    forth in paragraphs 28 and 29 of the affidavit.

9             In paragraph 30, I think -- comes before 31 in the

10   affidavit, obviously; 31 describes the entry, the actual

11   physical opening of the locker and what the agent then saw

12   inside.  But paragraph 30, which comes before that, we think

13   likely includes facts that the agent clarified with the

14   employee in a subsequent phone conversation or two.  So

15   although those actually come before the discussion of the entry

16   in the affidavit, we're not confident that those were in the

17   agent's possession at the time he entered.

18            So, I do think that's the one issue, I would say, is

19   that factually the Court would be limited -- strictly limited

20   to the facts that the agent clearly knew at the time of entry

21   for apparent authority, where I do think if the Court is just

22   considering the legal question of common authority based on all

23   the circumstances, it could include information -- it could

24   rely on information that was gleaned after the fact.

25            THE COURT:  All right.  If I were to conclude that

1    there was no actual authority or it was unreasonable for the

2    agents to rely on his apparent authority without asking more

3    questions, does the warrant necessarily fail?  Is this the

4    fruit of a poisonous tree situation?  Does *Leon* apply?  Does

5    the good faith exception apply here?  Or are you relying on the

6    notion that if you just skip what they saw when they went

7    inside, you still had probable cause for the search?  What

8    happens if I agree with that?

9         MR. MEISLER:  I think both of those paths -- by both

10   I mean the good faith exception and what I would called

11   friends-type of analysis, where you excise the information.

12   We've cited Supreme Court decision in *United States versus*

13   *Karo*, K-A-R-O, for that proposition, so I'll start there.  And

14   I do think that excising the information, the officer gave his

15   observations during his entry into the unit, we would still

16   have probable cause here.

17        I think Your Honor mentioned some of those factors in

18   the colloquy with defense counsel, which is to walk through

19   them again.  We had representations from an employee of Mr.

20   Manafort's that he had moved in office files, yes, it was true,

21   in 2015 and in 2016, but, of course, the course of conduct

22   described in the affidavit itself took place between 2005 and

23   2014 or '15.  So that would overlap with the period of time

24   described in there.

25        Agents were looking for records of Mr. Manafort's

1    work, so the fact that these are office files or business files

2    is indicative, they saw a lease on which not only Mr. Manafort

3    was listed as the occupant's authorized access person, but

4    where Gates, Mr. Richard Gates, who was involved in the

5    criminal -- alleged criminal conduct described in the

6    affidavit, was listed as an alternate point of contact.  And

7    the agent gave independent reasons, based on his experience,

8    including IRS guidelines for retention of documents, and the

9    fact that parties in litigation often preserve files and that

10   Manafort had been in litigation with Oleg Deripaska.  If you

11   add all that together, we think it equals the relatively

12   forgiving standard here, which is a fair probability.  Does it

13   establish a fair probability that records responsive to the

14   warrant would be found in the storage unit.

15            So if the Court does not want to get into the thorny

16   issues surrounding actual authority, common authority, apparent

17   authority, that is one way the Court could resolve this motion

18   without -- without addressing those issues.

19            And then the other point is the good faith exception.

20            THE COURT:  How does that come into play?  Are you

21   saying that the magistrate's determination that there was

22   probable cause and determination about the breadth of the

23   warrant, which is inherent in signing the warrant, goes so far

24   as to bless the entry?  Or that it just doesn't matter anymore?

25            MR. MEISLER:  It doesn't -- I don't think we're going

1    so far to say as it blesses the entry.  What the cases have --

2    most recent cases that we've cited, coming from the Eighth

3    Circuit, *Massi* from the Fifth Circuit addresses a situation in

4    which, A, the obtaining of a warrant is preceded by a

5    constitutional violation -- here it would be an unlawful

6    consent entry -- and information from, obtained from that entry

7    is used in the warrant affidavit, as it would be here if Your

8    Honor resolved the case on this basis.

9          But what the Courts do in that situation is they look

10   at it and say, Well, wait a second, was the constitutional

11   violation that preceded the attaining of the warrant close

12   enough to the line of validity?  Was the officer's conduct

13   close enough to the Fourth Amendment line of validity such that

14   when the officers presented all these circumstances to the

15   magistrate, the magistrate, nonetheless, issued the warrant and

16   the search was conducted, the officers could reasonably rely on

17   the document the magistrate issued.

18          So that's the analysis the Courts have undertaken.

19   Again, we've cited a couple cases in that regard.  The D.C.

20   Circuit has not addressed that scenario, and I think we would

21   acknowledge, as the *Massi* case in the Fifth Circuit chronicles,

22   that some disagreement does exist in the Court of Appeals on

23   that question.  But we think that the D.C. Circuit's decision

24   many years ago in the *Thornton* case which is cited in our

25   response is instructive.  That was the situation where the

1    Court applied the good faith exception, and we said we don't

2    have to decide whether there was this antecedent constitutional

3    violation.  That case involved a trash pull, where the police

4    went into a trash bin.  They said we don't have to decide that

5    because the virtually uniform body of precedent at the time

6    that existed had held no reasonable expectation of privacy in

7    your trash.  And, therefore, the officer reasonably believed

8    that this conduct was lawful and that be explaining it to the

9    magistrate they could rely on the warrant afterwards.

10          So we think that would be directly analogous here

11   where, as we've been discussing, the only cases on storage unit

12   searches in analogous circumstances all upheld common

13   authority.  So we think it would be reasonable for the officers

14   to disclose the circumstances of the consent entry to the

15   magistrate and then had a warrant issue could rely on that

16   warrant.

17          THE COURT:  All right.  Now, so far no one has

18   pointed out any Fourth Circuit, D.C. Circuit glaring,

19   disparities.  But does the fact the magistrate was in the

20   Eastern District of Virginia, the unit was in the Eastern

21   District of Virginia, the warrant was presented there, does

22   that give rise to any choice of law issues that I should keep

23   in mind?

24          MR. MEISLER:  I don't think it gives rise to a choice

25   of law issue except in the following sense:  I do think if the

1    Court is reaching good faith issues, that the state of the law

2    in the circuit, if there were differences, right, the state of

3    the law in the circuit where a warrant was obtained and

4    executed -- and I assume we're going to talk about the

5    overbreadth issue.

6            With respect to the overbreadth issue, for example,

7    we have pointed to the Eastern District of Virginia decision in

8    *Young*, in *United States versus Young*, that cites a line of

9    Fourth Circuit authority for the proposition that time limits

10   are not required in a warrant.  So if the Court -- maybe,

11   perhaps, jumping ahead of the Court's questions here, but if

12   the Court did have concerns of the absence of date restrictions

13   in the warrant, that would be a circumstance where I think it

14   would be instructive for the Court to look at the state of the

15   law in the district, each circuit, where the warrant was

16   obtained and executed.

17           THE COURT:  All right.  What's your response to

18   Manafort's argument that once we get past the consent issues,

19   if we get past the consent issues, that the search was

20   overbroad, given the absence of a time limit?

21           MR. MEISLER:  Right.  So I think in that regard, Your

22   Honor, it's useful to recognize that the cases have not -- not

23   just in the Fourth Circuit, but elsewhere, have not strictly

24   required a time limit.  An officer preparing a warrant like

25   this and looking at it could conclude that other aspects of the

1    warrant imposed meaningful limitations.  Your Honor had

2    mentioned the three subject offenses, FARA, FBAR, and filing

3    the false tax return, those are not the kind of broad amorphous

4    provisions, such as conspiracy, or perhaps just wire fraud,

5    that courts -- the D.C. Circuit in *Maxwell* viewed as not

6    providing limitation.

7          And the second one I'll mention is the financial

8    records aspect of it itself, the one set of documents that Mr.

9    Manafort has pointed to as being quite dated, it concerned

10   political convictions.  And if upon inspection of those

11   documents, those turned out to be, in fact, political platform

12   descriptions or whatnot, they would not necessarily fit within

13   the category of the warrant authorizing seizure of Mr.

14   Manafort, Mr. Gate's financial records.

15         So there are other restriction in the warrant, apart

16   from the dates themselves, which were, of course, in the home

17   warrant, that, I think, impose reasonable, meaningful

18   restrictions.  And certainly if the Court was looking at this

19   through a lens of good faith, an officer could view them as

20   providing meaningful restriction.

21         THE COURT:  All right.  I think I understand the rest

22   of your argument from your pleading.  Is there anything that

23   you want to say in response to the defense argument about the

24   warrant that you haven't gotten to say already?

25         MR. MEISLER:  The -- let's see here.  The one thing I

1   was just going to mention because it was mentioned during

2   defense counsel's presentation, was the Supreme Court's recent

3   decision in *Byrd versus United States*, which is a case about

4   rental car, unauthorized drivers on rental cars.  To the extent

5   that *Byrd* has any relevance here, I actually think it favors

6   the government's position with respect to consent because *Byrd*

7   underscores the property law concepts, I think is the term the

8   Court used there.

9          Property law concepts influence the reasonable

10   expectation of privacy and while everyone agrees here under the

11   *Matlock* footnote and subsequent decisions such as *Georgia*

12   *versus Randolph* that property law is not dispositive in the

13   common authority context, it's certainly influential.  And so

14   starting -- going back to that issue, the occupants being named

15   on the lease we think would be a significant factor, even under

16   the analysis the Court recently underscored in *Byrd*.

17          THE COURT:  All right.  Okay.  Thank you.

18          The next thing I want to talk about is docket 264,

19   the motion to suppress the search of the apartment.

20          I guess one question is would this be a good time for

21   a break for the court reporter?  Yes.  So we'll do that.

22          We'll resume about 11 or 5 after.  Thank you.

23          (Recess.)

24          THE COURTROOM DEPUTY:  Your Honor, recalling criminal

25   case number 17-201-1, the United States of America v. Paul J.

1    Manafort, Jr.

2            THE COURT:  All right.  Let's go on to docket 264 the

3    motion to suppress the search of the Alexandria apartment.

4    Before you start, or try to start, Mr. Westing, I just want to

5    establish, since this one is also going to be argued on the

6    basis of the record, what the record consists of.  Defendant's

7    Exhibit 1 is the search and seizure warrant, docket 264-1, the

8    sealed version of it in its entirety is at docket 266.  Okay,

9    the first exhibit, that one was actually the return that

10   attached attachment A, the property to be searched, and

11   attachment B, the items to be seized.

12           Exhibit 2 is the application of the search warrant,

13   docket 264-2, including the affidavit in support, attachment A

14   and attachment B.  Government Exhibit 1, at 286-1, is the

15   sealed, wholly unredacted version of Defendant's Exhibits 1 and

16   2.  So, since the unredacted affidavit was filed with the

17   government's opposition, the motion to compel production of

18   that affidavit in its entirety to you is also moot, right?

19           MR. WESTLING:  I think that's right, Your Honor.  The

20   only thing was the name that you mentioned that's still

21   redacted, and we I think had resolved that previously.

22           THE COURT:  But the name, there's nothing even -- is

23   his name in this one?  I don't think there's anything redacted.

24           MR. WESTLING:  I believe it is, Your Honor.

25           THE COURT:  To the extent it is, you know who it is.

1    All right.

2              Now, I just want to confirm, before we get into the

3    overbreadth issue, that the motion makes no claims whatsoever

4    concerning the manner in which the agents entered the

5    apartment.  It's based solely on the overbreadth of the warrant

6    and what was seized and retained, is that right?

7              MR. WESTLING:  That's correct, Your Honor.

8              THE COURT:  Now, with respect to the words "any

9    financial records," I take it the argument is the same as with

10   respect to the storage unit, that that's not particular enough,

11   correct?

12             MR. WESTLING:  That's correct, Your Honor.

13             THE COURT:  All right.  So, why -- I'll give you a

14   chance to answer the same question -- why doesn't the fact that

15   the warrant establishes or sets out -- which I don't think

16   you're challenging that it sets out probable cause to believe

17   that certain offenses had been committed, you're not

18   challenging that, are you?

19             MR. WESTLING:  I suppose, to be careful, Your Honor,

20   it clearly sets up probable cause to believe offenses have been

21   committed.  Whether it does so for every offense listed in this

22   very long list in this, I suppose is a question we don't need

23   to resolve that today for these purposes.

24             THE COURT:  Okay.  But your complaint is that the

25   warrant doesn't supply a basis to believe that evidence related

1    to those offenses could be found on the premises, is that

2    right?

3              MR. WESTLING:  That's correct.

4              THE COURT:  Now, does the identification of the

5    offenses limit the words "any financial records" to the point

6    where there's no complaint that those words are overbroad?

7              MR. WESTLING:  Ive think in this case, Your Honor,

8    given the breadth of the list of offenses attached to this

9    warrant, included in this warrant, the answer to that is no.

10   The challenge here is that because the government -- the

11   Special Counsel's office has relied on literally a long series

12   of offenses, including tax crimes, which generally provide a

13   much broader look at issues and documents, there typically

14   should be additional specificity about connecting all financial

15   records to those specific offenses.

16              Here, what we have is a list of offenses that are

17   broad, some of them I still couldn't articulate for you how

18   there's a mail fraud on these facts.  I'm sure the government

19   has a theory about that, but it's not set out here.  And then

20   leads on to and any and all financial records related to that,

21   virtually allows the seizure of every financial record.  There

22   is no limitation, that I can see, other than a temporal one,

23   which is in this warrant but not in the prior, that in any way

24   limits the agent's discretion about whether to take a document,

25   to the extent it is deemed to be a financial record.

1          THE COURT:  Well, but given what you've just said,

2    that they were looking at tax offenses, why does this warrant

3    fail under case law talking about people looking at tax

4    offenses?

5          MR. WESTLING:  Well, I think that generally, the

6    burden here on the government, as I understand it, I think the

7    case law supports this, is evidence first that the item will be

8    located in the place and, second, that it will be evidence of

9    the crime.  And evidence is not, as the Court is well aware,

10   the same as discovery standards relating to might lead to

11   admissible evidence.  It is in fact evidence.  And I think the

12   burden on the government is to make a statement as to how these

13   documents connect to these offenses.

14         It's not enough to say there's an offense and that

15   means I get all the documents you have.  I mean, that clearly,

16   in my definition, is the classic overbroad warrant and it would

17   require the government to do more in showing that there is a

18   file in a drawer that relates to this offense, not just that

19   there's some records in the house and we want all the records,

20   which I think is what this warrant is aimed at.

21         THE COURT:  Well, the case you rely on most heavily

22   is the *Griffith* case.

23         MR. WESTLING:  Correct.

24         THE COURT:  And that certainly says what you just

25   said, the affidavit has to do more than set out a basis for

1      suspecting a crime.  And there the problem was that the

2      affidavit failed to establish probable cause that any cell

3      phone or electronic device containing incriminating evidence

4      about the conduct would even be on the premises at all.

5              It's a very unique and very specific case.  I realize

6      it came out of the D.C. Circuit and it's binding on me, but the

7      concern there was the absence of any showing of cause to

8      believe that evidence was likely to be in the place that was

9      searched.  The warrant was based on the mere possibility there

10     might be a phone and it might be there and a year after

11     committing a murder there might still be texts on it.

12             Is the concern expressed there, about the lack of a

13     particularized basis to believe the guy even had a phone after

14     he'd been locked up for a year, or there was even a phone in

15     the apartment applicable here?

16             The affiant had specific information that Manafort

17     had an office and a computer in the apartment, that he did

18     business out of the apartment after he moved there from the

19     prior address in Mount Vernon.  And obviously we're talking

20     about financial records and business records, which are

21     somewhat different than year-old texts.

22             MR. WESTLING:  I'll try to break that down in

23     answering what I think are a couple of issues raised by the

24     Court's question.  I think the first is to the extent the

25     argument is *Griffith* is limited to the presence of the thing

1  that is the target of the search, a cell phone in the

2  residence, and there wasn't sufficient evidence of that, I

3  don't think we have that argument here.  I think the question

4  here is *Griffith* goes further, to say it's not just that there

5  would be a cell phone, but the cell phone would in fact contain

6  incriminating information.

7  THE COURT:  Okay.  So with respect to that, the

8  concern was that the assertion that evidence would still be on

9  the phone was so weak, given the attenuated connection between

10  a phone and the particular offense they were looking at and the

11  time that had gone by since the events under investigation.  So

12  why did either of those concerns pertain here, where the

13  offenses are much more directly related to paperwork,

14  computers, electronic media, etcetera?

15  MR. WESTLING:  Well, I think, Your Honor, that some

16  of the concerns that *Griffith* raises about cell phones are very

17  pertinent to this situation.  You know, the dilemma that you

18  had in any white-collar type case involving a search warrant,

19  as the Court is well aware, is the idea that we all keep

20  papers.  In fact, we know that we've done that for years

21  because the constitution specifically references our papers in

22  our homes in terms of the Fourth Amendment.

23  And I think the difficulty here is that for you to

24  say I use a computer in my home and you've seen a business

25  record to be the sole basis on -- upon which you enter my home,

1    determined by *Griffith* to be the first among equals under the

2    Fourth Amendment, is allowing the government tremendous reach

3    in looking at what we have in our homes that amounts to

4    anything that is paperwork.  Right?

5           The challenge here, it seems to me, is that it's not

6    enough to say I have business records.  They have to be records

7    of the offense and there needs to be a showing that that's

8    what's going to be found.  It's not enough to say we know

9    you're doing business there.  I mean, that's not a basis for a

10   search warrant.  A search warrant, even in the context of a

11   business, would require some evidence that records related to

12   the offense are contained in the place.  And I don't see

13   anything on the face of this warrant in the affidavit that

14   makes that showing.  It says there's somebody who's had access

15   to the residence, who knows there are documents there, very

16   broadly writ.  So if you don't write "all documents," you're

17   not going to get in the door.  And then we go further to say

18   that's going to allow a wholesale search of the premises.

19           THE COURT:  Well, didn't he also say that he's now

20   doing business out of that apartment?  He's operating out of

21   there in the conduct of his business.  That's different than

22   *Griffith*, where there was just no connection whatsoever between

23   the telephone and the offense under investigation.  The

24   language was quite strong.  And you're hanging your hat on it

25   and I think what's very different.  We're talking about alleged

1    offenses for which records are ordinarily generated and

2    retained on electronic media, which is different from a gang

3    murder.  And you agree, the agents didn't have to allege that

4    the computers on the premises were used in the commission of a

5    crime, just that evidence related to the crime might be stored

6    on them, right?

7            MR. WESTLING:  Well, I think the argument the

8    government makes in response is that that's the way the warrant

9    is framed.  I would be careful in my response in saying, first,

10   there's two ways --

11           THE COURT:  Just the fact that they imaged them

12   reflects that, that they're looking for what's stored on it.

13           MR. WESTLING:  Right.  Well, the warrant looks at

14   computers in two ways.  It specifically mentions computers that

15   are used in the offense, that's the only specific mention of

16   You may search a computer.  And then there is all documents,

17   and it defines documents to include anything found on a

18   computer.  I mean, there's a question there, I think, into

19   whether getting into the residence, assuming you can, means you

20   get into the computer as well, if there's not a specific

21   showing of its use.

22           And so this is a really broad warrant.  I mean, it

23   allows me to go in the door, to look at every piece of paper in

24   the place, and it allows me to look at every piece of digital

25   media, which, by its nature, we have no idea whether there's

1   any evidence that any of that stuff is in fact kept in those

2   places.  There's no allegation here of the computer being used

3   in furtherance of the business, it's simply in the office.

4          Further, in this case, the government sort of seeks

5   out every piece of storage media and does so just because that

6   might be where people keep records based on the agent's

7   experience.  And, clearly, that is not what the framers had in

8   mind when they adopted a Fourth Amendment standard requiring a

9   warrant which particularly showed probable cause to get into a

10  place, to look at what was there, to find evidence of a crime.

11  I mean, the challenge here, Your Honor, is I think that you

12  couldn't construct a warrant any broader than this for

13  documents.

14          THE COURT:  But you're talking -- they're talking

15  about a person who operates, essentially, a consulting business

16  out of his home.  They're not talking about going into just

17  anybody's home.  They already have the predicate that he works

18  from home.

19          MR. WESTLING:  Well, actually, I don't think they do

20  based on the affidavit.  I think they have a clear predicate of

21  that at the prior residence.  And then in paragraph 66 they say

22  they were informed that one of the rooms in the premises is

23  used as an office.  That's not specific to business in any way.

24  PI have a home office that I use to pay my bills.  I don't

25  think that it's clear that that's something different than what

1    they're talking about here, and that he's seen business records

2    in that office, including one or two drawers.  Among the

3    records maintained in the drawers were related to various

4    business entities, fairly nonspecific, including John Hannah,

5    and, he believes, DMP.

6              So, I mean, this is a pretty sketchy description of

7    the business that's being conducted.  And there's no statement

8    that I'm aware of here that suggests that something more is

9    going on, that I have seen him transacting business on the

10   computer, that I know that that's the computer he uses when he

11   pays bills for this business, or anything of the like.  I mean,

12   this is --

13             THE COURT:  What's your best case for the notion that

14   that level of specificity is required, given the relatively low

15   standard that's needed here?

16             MR. WESTLING:  Well, I think the question -- the best

17   case that I have here today is going to be back to *Griffith*.

18             THE COURT:  Well, *Griffith*, seems to me -- you also

19   have the problem in *Griffith*, one of the specific reasons they

20   said it was overbroad is it called for the seizure of all

21   electronic devices in the home, not just Griffith's.  That

22   seemed to be particularly offensive to the Court since he

23   wasn't the only one living in the apartment.

24             MR. WESTLING:  Well, the same thing is true with Mrs.

25   Manafort's financial records, which are included here, in that

1    paragraph, "All records relating to Kathleen Manafort."

2         THE COURT:  They do specifically allege, when they go

3    through the facts, that money that came in through these

4    various means, that they claim are the basis for these

5    offenses, went to joint accounts, or so they -- they talk about

6    a co-mingling here, and they don't ask -- so, I think that's a

7    different situation, *Griffin* has zero reason.

8         MR. WESTLING:  I understand they're not identical, I

9    have to acknowledge that, as the Court has pointed out.  But I

10   think we have to keep in mind that the government has created

11   an incredibly broad construct that really allows a wholesale

12   ability to sift through the papers in my client's home, and

13   does so on the barest of showing that there's business being

14   conducted contemporaneously in that space.

15        THE COURT:  Putting aside the *Griffith* case, what's

16   your best case when agents are investigating financial crimes

17   and they're seeking financial records, stored on electronic

18   media?

19        MR. WESTLING:  I think the other cases cited in our

20   brief -- and I would have to pull them, there is the *Debbi* case

21   from Judge Rakoff, I think it was, and *Metter* out of New York,

22   that both sort of deal with this problem of the breadth of

23   searching in the context of a financial crime, without, sort

24   of, limits.  And in this case, I think, Your Honor, to again --

25   I know you're tired of hearing me talk about *Griffith*, but just

1  to touch on it one more time, I think there it's the same

2  challenge --

3        THE COURT:  But there -- that relates to the limits.

4  Doesn't that relate to the issue that we already discussed,

5  about the fact that they identified specific offenses that they

6  were looking at?  You're saying because they said too many, and

7  now it's not specific anymore?

8        MR. WESTLING:  Well, I think to some degree that's

9  true.  I mean, clearly if I put in the whole criminal code, we

10  would all agreed that's an overbroad warrant.  Right?  So where

11  is the limit?  I don't know that I have that line.  What I do

12  know, it's very hard for me to see how an agent executing this

13  warrant is going to be limited from taking that document in

14  that folder because of something that's here.  And if it

15  doesn't have that limitation, it clearly does not meet the

16  constitutional limits.  There is no viable warrant that can

17  allow for the seizure of every record without its connection to

18  a crime.

19        I think, additionally, Your Honor, you know, there's

20  the dilemma of -- the same is true -- I mean, when you look at

21  our reply, I mean, we cite, you know, all of these cameras and

22  things that are taken that, you know, clearly don't have any

23  business records on them --

24        THE COURT:  That was the thrust of your rely, and I

25  want to ask the government about that.  But one of the things

1    that *Griffith* did, is it cited Department of Justice

2    regulations for the proposition that the warrant should have

3    been tailored to the justification for entering the house; that

4    is, devices owned by the defendant or with links to the alleged

5    offense.  Is there any claim that the DOJ regulations that

6    relate to this kind of search, computer records, financial

7    records, weren't followed here?

8              MR. WESTLING:  I think that in this situation, this

9    is still broader than those regulations typically dictate.  I

10   think if you look at those regulations -- and I will say I'm

11   speaking from memory here, so I'll be careful, as far as how

12   far out on a limb I go, but the nature of the information and

13   instruction that's given by those regulations is aimed at

14   narrowness.  The goal is to sort of say, if we want to continue

15   to search and seize this information, then we have to find

16   limits on the way we do it.

17             I mean, that's sort of what the *Comprehensive Testing*

18   *Lab* case out of the Ninth Circuit sort of aims at.  Right?  The

19   idea that there are limits being put on the way in which this

20   is done so that we don't end up with a broad general search in

21   an age of increasing electronic information, and the fact that

22   these have become harder, admittedly, for law enforcement.

23             But I think opening the door, sort of the sifting

24   through all of the information and then only keeping what

25   matters is clearly something that, you know, has tension with

1    the Fourth Amendment and the existing case law that's out

2    there.

3           I think the other thing, Your Honor, and I don't want

4    to move ahead, but I think this is a related concept, we point

5    in our briefs to the authorization for the agents to seize

6    evidence of the state of mind of Mr. Manafort as they conduct

7    their search.  And I have singled that out in particular

8    because I think it goes to this problem of how broad and how

9    little discretion -- or, how unlimited the discretion is of the

10   agent in sifting through everything that's there to find

11   anything that might matter.

12          You know, when you try to say I'm going to find state

13   of mind of that list of offenses, again, I think you are

14   authorizing the search of every piece of paper in the place.

15   And to me, given the constitutional requirement that the search

16   be aimed at evidence which amounts to information that is tied

17   to the probable cause of the offenses and not beyond that, I

18   mean, it's not a, you know, an open door, now I'm in, now I can

19   look at everything.  But this warrant really does allow that.

20          THE COURT:  Not -- I don't know that every one of

21   those offenses has a state-of-mind requirement.  I mean, I have

22   to go through each one.  But, failure to register I think is a

23   yes or no issue.  I don't know that there's a specific intent

24   requirement.  I'm not -- I don't know.  But, I guess the point

25   is, the case law that says the warrant has to establish

1   probable cause that records are on the premises, it's not

2   necessary to predict that they will or won't be recovered in

3   computerized form.  They image the computers and then they say

4   to you this is the search protocol we're using to cull out

5   what's covered, and not spend our time looking at things that

6   aren't covered and are personal.  And according to them, you

7   didn't come in and say, I want to sit down and go over that

8   search protocol with you, I don't like it, or I want to at

9   least see what it is, or add my two cents into other search

10  terms that should be included or excluded.

11          So, given the fact that they have this warrant, and

12  computers, even if the warrant isn't too broad, computers

13  clearly contain things that aren't covered, and they made an

14  effort to only look at what was covered, where are his

15  constitutional rights violated by that?

16          MR. WESTLING:  I would say, first, we do not agree

17  with the government that they are right to retain anything that

18  was not within the warrant persist.  And so while they've

19  identified things that they say are outside the scope and have

20  put those aside, they're not relevant, they have not returned

21  those documents to Mr. Manafort.  They still retained them.

22          THE COURT:  How do you return -- if they're paper, I

23  understand that.  How do you return something that might be on

24  an image of a computer when you have the computer and they say,

25  okay, we're only searching the hard drive for X?  How do you

1     return Y?

2          MR. WESTLING:  Well, I mean, I can say in the case

3     that the Court has some experience with, case in Eastern

4     District of Virginia that we were both involved in, the

5     government actually returned a hard drive from congressman

6     Jefferson's office and asked Mr. Swetland, my client, to retain

7     it.  And not to go into it, but the government couldn't keep it

8     in its possession during that period of time.  The thought is,

9     you don't want that information that they had no right to seize

10    in the first place to continue to be available to them to look

11    at at their will.

12          And so, I mean, I think there are clearly

13    technological abilities to say we're going to take what we

14    can't use, pull it out of that image, set it aside and we're

15    not going to look at it and we're going to return it to you.

16    But the idea you're just going to sit with it and keep it in

17    your storage locker when you had no right to it in the first

18    place, and you made a representation to the Court here that you

19    wouldn't do that.

20          THE COURT:  I'm saying if they had the right to seize

21    the computer and they're searching the computer they can't part

22    the hard drive in a freezer and not look at it because the hard

23    drive has some things that they're allowed to look at.  And

24    you've got the original and they've got an image anyway.

25          MR. WESTLING:  Right, but the question is at this

1    point they continue to retain an image which contains a lot of

2    information that they had no right to take.  And so it seems to

3    me that is a continuing violation of Mr. Manafort's Fourth

4    Amendment rights.

5           THE COURT:  Do you have case law that says when you

6    seize a computer and you image it and then you go search it,

7    that there's something unlawful about having it?

8           MR. WESTLING:  I think that's what the cases I just

9    cited a moment ago stand for.

10          THE COURT:  All right.  All right.  Well, if I agree

11   with you, that either warrant was problematical for one reason

12   or another, why wouldn't *United States versus Leon*, the good

13   faith exception control, since the FBI walked into the

14   apartment, it's undisputed, with a warrant signed by a

15   magistrate judge from the Eastern District of Virginia.  There

16   is -- *Leon* says that evidence seized in good faith relies on a

17   valid warrant, even if it's subsequently found to be invalid,

18   should not be suppressed unless the reliance was objectively

19   unreasonable; that is, the judge was misled by information in

20   the affidavit that the affiant knew was false.  You're not

21   alleges that, are you?

22          MR. WESTLING:  No.

23          THE COURT:  That the magistrate abandoned his or her

24   judicial rule of neutrality.  You're not alleging that?

25          MR. WESTLING:  No.

1          THE COURT:  The magistrate was so lacking in the

2     in indicia of probable cause to make reliance on it

3     unreasonable.  Is that the one you're relying on?  Or are you

4     relying on the fourth one, that it's so facially deficient,

5     doesn't identify places to be searched or things to be seized,

6     that the officers couldn't reasonably assume it was valid?

7          MR. WESTLING:  I think it's the last one because I

8     think what that stands for is the proposition that a warrant

9     that says you can take everything is the same as no warrant at

10    all.

11         THE COURT:  All right.

12         MR. WESTLING:  And so fundamentally it's overbreadth,

13    which was obvious to everyone who was involved in producing it

14    and presenting it to the magistrate creates the problem.

15         THE COURT:  Well, it's obvious -- we don't know if

16    it's obvious to the agents or not.  But, the case law,

17    including out of the D.C. Circuit in *United States versus*

18    *Spencer* really just quotes *Leon*, and says the basic rule is

19    that once the police turn the probable cause determination over

20    to another person, they're generally entitled to presume that

21    the magistrate knows what the magistrate is doing.

22         You don't suggest that just because *Griffith* decided

23    to find an exception, that it has purported to change the

24    standard applicable in these cases?

25         MR. WESTLING:  I don't think that we say that it has

1   changed the standard.  I do think the exception of *Griffith*

2   fits this case.

3            THE COURT:  All right.  Well, here, too, I believe

4   your colleague talked about how these cases are very fact

5   specific.  And in *Leon* didn't the Court say it applies due to

6   the particular circumstances of the case, and it listed all

7   three; the failure to establish probable cause to believe that

8   any cell phone or any device containing incriminating evidence

9   would be on the premises, the affidavit was so lacking in

10  indicia of probable cause as to render official belief in its

11  existence entirely unreasonable.  How do we get there from

12  here?

13           MR. WESTLING:  Well, I think the way we get there,

14  Your Honor, is that we're looking at a situation where we have

15  a person's home, where there is only the minute -- most minimal

16  amount of evidence that it's being used in any way to further

17  the business concerns.  There's one statement about having seen

18  records.  It's not clear when that occurred.  And as a

19  practical matter, it is just -- in fact, there's other evidence

20  to the contrary, right?  We know that when he moved out of the

21  prior residence, he stored records in the storage locker.  We

22  know that, you know, there's, sort of, evidence that things

23  that were in the old home, the government seems to rely on, are

24  not there anymore, that they've gone somewhere else and that

25  they found them, frankly, before they came and did this search.

1          The temporal reality of the serial searches here is

2    significant because they know by the time they get this warrant

3    they've already got the tax records, they were found in the

4    other space.  But they don't make any statement about that to

5    the magistrate, they don't limit themselves in any way.

6    Instead, they seek every record.

7          The situation here, I think, is one that if this

8    warrant -- you know, the dilemma that it should not be easy for

9    the government to obtain a document warrant to search someone's

10   home.  It's one thing to do it in their office and it's another

11   no do it in their home.  And the showing here shows only a

12   fairly minimal contact between the home and the broad category

13   of information they're seeking.  It's like we have enough to

14   look into, so let's look at everything.

15         And I think that is a line that has been exceeded

16   here and this warrant stands, somewhat clearly, in my mind, as

17   fairly far down the road of just go and look at whatever you

18   want and, you know, if you find something, you get to keep it,

19   you return the other things.  And that can't be the standard

20   that we're going to accept to allow a search of our homes under

21   the Constitution.

22         THE COURT:  All right.  Does it matter to the

23   analysis that the warrant was signed in the Eastern District of

24   Virginia and not D.C., and to the applicability of *Griffith* to

25   either the good faith exception or to the reasonableness of the

1  warrant in the first place?  Actually, and even if the

2  lawsuit -- even if the search was here, the *Griffith* decision

3  came out, I believe, after the search of the apartment anyway.

4          MR. WESTLING:  I think that's correct, Your Honor.

5          THE COURT:  So, assuming *Griffith* changed the law,

6  which I don't think it did --

7          MR. WESTLING:  We would agree on that.

8          THE COURT:  Just applied it to its own facts.  The

9  state of the law was what the state of the law was before

10 *Griffith* at the time that they walked into the apartment.  So

11 the combination of that, what they put in the warrant and the

12 fact that the magistrate signed what they gave her -- and we're

13 going to assume that she read it and did her job -- it's still

14 your argument that it was objectively unreasonable for the

15 officers to believe that they had a valid warrant when they

16 walked into his house?

17         MR. WESTLING:  Absolutely.

18         THE COURT:  All right.  Now, let's say that the

19 seizure of cameras and iPods exceeded the scope of the warrant.

20 What's the remedy?  And the remedy is to give them back?  Why

21 is it to suppress what didn't exceed the scope of the warrant?

22         MR. WESTLING:  Well, I think it goes back to the

23 discerning the purposes of the exclusionary rule by its nature,

24 which has traditionally been a rule designed to ensure that the

25 problem doesn't recur and that the agents involved learned

1    something from when they violated the Constitution in this

2    case, so it doesn't get repeated the next time.  And I think

3    there's a debate, obviously, with our court up on the Hill,

4    depending on which votes count, probably, about how those cases

5    might be decided today.

6            But clearly, the nature of the exclusionary rule here

7    is designed to prevent, you know, the government from being

8    unencumbered by violating Fourth Amendment rights.

9            And so, in this case, where there is such an

10   overbroad warrant that leads to the seizure of items which, in

11   our view, are within that -- I mean, I think the difficult

12   thing --

13           THE COURT:  Will, I think your argument about the

14   cameras and the iPads, that it exceeded the scope.

15           MR. WESTLING:  Actually, Your Honor, here's the

16   problem.  I don't think -- we make that argument to some

17   degree, but it's a difficult argument to make, to be very fair

18   to the Court, because but the breadth of the warrant is such --

19   I mean, there's a reference to photographic information.

20   Again, it's not tied to anything in the warrant, otherwise it's

21   just as a device.  And so I think the dilemma that I'm having

22   with that is there is a way to read this warrant to say it was

23   broad enough to take all of that.  I think the question is how

24   could you possibly have a warrant that broad?  But in this case

25   what we know is that, you know, these items that were clearly

1    not likely to retain any of the information that was being

2    searched for were in fact seized.

3           THE COURT:  All right.  So assuming they've checked,

4    as I believe they think they said they had and disavowed the

5    idea that there is anything on them that's important, at that

6    point why would their retention of that be a basis of

7    suppression, as opposed to a motion for return of property?

8           MR. WESTLING:  Well, I think in terms of the property

9    issue alone, that the Court is correct that it's really about

10   returning property they don't have a right to retain, because

11   they've apparently found nothing on these devices, from what I

12   can tell from the pleadings.

13          I think the dilemma, though, is in understanding that

14   their seizure in the first place and the way that fits into the

15   warrant context generally is just further evidence, in our

16   mind, of why this warrant is so broad that it does not meet the

17   good faith standard of *Leon*.

18          THE COURT:  All right.  Is there anything else you

19   want to say about this warrant and this search before I hear

20   from the government?

21          MR. WESTLING:  No, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          MR. MEISLER:  Good morning.

24          THE COURT:  Good morning.  So, I really think just

25   the question is, what is your response to this argument?

1    They -- the warrant was broad, the evidence that he was doing

2    business out of his apartment was general.  Do they have enough

3    information to ask for the scope of what they asked for here?

4            MR. MEISLER:  I think, Your Honor, I want to push

5    back, if I can, on the notion that the information was general

6    and just point to a couple paragraphs in the warrant, if I can.

7            THE COURT:  All right.

8            MR. MEISLER:  In particular, paragraph 65 starts out

9    by saying that this employee who had recently been in the

10   Manafort home says, Indicated that Manafort used his home to do

11   business and maintained records of his businesses at his home.

12   That's the first line of it.  He also advised the FBI that

13   complete documentation was being kept at the subject premises,

14   and he goes on to give some details about what that was.

15           And Mr. Westling references paragraph 66, which I

16   think is quite specific.  It references a particular company,

17   John Hannah, and then cross-references the paragraph from the

18   probable cause section of the warrant describing criminal

19   offenses that also relates to that same enterprise.

20           Paragraph 68 goes on to mention specific reasons why

21   records of the FARA offense may be found at the home; 69 is to

22   the same degree, and 70, that's the same with evidence of the

23   bank fraud scheme that's described earlier in the warrant.

24           So I don't think it's general at all.  Then we get,

25   of course, to paragraph describing the electronic devices.  And

1   I think here, where quite clearly within the acknowledgment in

2   *Griffith* itself, that there are going to be certain situations

3   in which officers are given information about the existence and

4   presence of electronic devices at a location, even a home, and

5   they can't describe them fully or more particularly because

6   they've gotten that from an informant.  Griffith felt --

7   acknowledged that exact same scenario.  That's what we have

8   here.

9           Desktop computer in a space that, again, I think the

10  warrant strongly supports the inference of a home office, that

11  itself contained relevant business records, and the widespread

12  use of electronic media in business, which not all businessmen,

13  I think, do, combined with other descriptions in the warrant

14  about Mr. Manafort's past use of and access to electronic

15  devices and of officers' ability to extract forensic evidence

16  date from past crimes, even on devices that may have been

17  deleted or wiped or whatnot.

18          Those thing taken together I think strongly support

19  probable cause to believe that evidence of the subject offenses

20  would be found on electronic devices at the residence.

21          THE COURT:  And electronic devices that retain

22  information certainly is broad enough to include cameras and

23  music players.  Since you've now determined that there was no

24  basis for that, or it's not there, have those materials been

25  returned?  And, if not, what is the basis for retaining them?

1          MR. MEISLER:  So, in some cases what -- a few cases

2     where physical devices were taken from the premises, my

3     understanding -- and I'll stand corrected, of course, but my

4     understanding is those few devices have been returned.  I'll

5     discuss that we defense counsel.

6          As far as the images go, I guess there's two

7     categories, right?  One would be the reference we have in the

8     footnote to the Second Circuit *Ganias* decision, the *en banc*

9     decision of the Second Circuit, G-A-N-I-A-S.  We think that

10    when there is a drive or device that may have relevant records

11    in those that are outside the scope of the warrant, the

12    government has very good reasons for retaining the complete

13    image for authenticity purposes, to maintain the integrity of a

14    device to comply with *Brady* obligations and whatnot, at least

15    during the pendency of the litigation.  This is a case that is

16    headed for trial, potentially, in two districts.

17          With respect to the other things, like the camera,

18    memory cards or the iPods, those, to my knowledge, were imaged.

19    So Mr. Manafort retained the original.  And I hadn't heard or

20    understood the defense position until today, that the

21    government has a duty to destroy those.  I'm unaware of a legal

22    authority that requires us to do so.  And that's something the

23    parties can perhaps discuss outside of the rubric of a Fourth

24    Amendment suppression challenge.

25          THE COURT:  All right.  Is there anything further

1     that you wanted to say in response to the arguments that he's

2     made?

3              MR. MEISLER:  I won't belabor, but I want to mention

4     a couple of things in response.  I did mention specific

5     paragraphs in the warrant.  The state of mind objection, I

6     would refer the Court to the Supreme Court's decision in

7     *Anderson versus Maryland*, in particular footnote 10 of that

8     decision which recites some of the clauses in that warrant, one

9     of which was evidence relating to tending to show, I think were

10    the words, tending to show knowledge or intent with respect to

11    the crime of false pretenses in that case.

12             So I think Courts have upheld state of mind

13    restriction so long as they're, of course, tied to subject

14    offenses.  The a number of subject offenses here do have

15    heightened mens rea requirements, like wilfulness, intent to

16    defraud.  So we think that the category here was right in line

17    with the controlling authority and persuasive authority,

18    including *Anderson*.

19             THE COURT:  What about the argument that the sheer

20    accumulation of clauses takes away the force of your argument

21    that -- of the sheer humiliation of offenses takes away from

22    your argument that the list of offenses adds specificity?

23             MR. MEISLER:  I think that may be true, if the

24    warrant just provided for evidence of the forgoing crimes, but

25    there is an elaborate list, I think 11 specified categories.

1    And so I think the controlling authority dictates that warrants

2    have to be read in light of those.  So if that was just a list

3    itself that said all records, that may be problematic.  But

4    here we are needing all financial records, and even all

5    financial records category, has including-but-not-limited to

6    clause and says, you know, focuses officers' discretion, says

7    we're really interested in these.

8           It would have reached other financial documents but,

9    again, those are limited by the temporal restriction, which is

10   present in this warrant, unlike in the storage unit warrant and

11   the list of offenses.

12          Your Honor also referred to --

13          THE COURT:  What does that tell me about the lack of

14   the temporal requirement in the other warrant?

15          MR. MEISLER:  Well, again, I think the temporal

16   restrictions can add to the specificity.  And had there not

17   been other restrictions in the storage unit warrant, that might

18   be more problematic.  We're also, again, dealing with a

19   different basic commercial space versus the home, which is

20   truly somewhat different, as Your Honor mentioned, and a

21   narrower universe of documents.  What can you fit in a storage

22   unit versus at home, including the electronic devices found in

23   a home.  It's a narrow universe of documents that would be

24   searched.

25          I was also just going to mention the DOJ regulations

1    that Your Honor had --

2         THE COURT:  I was going to ask if there was any

3    daylight between those and this warrant?

4         MR. MEISLER:  I myself would have to go back and read

5    those.  I thought that being in the computer search manual,

6    those referred to criteria for searching devices once you have

7    them.  But even if I'm mistaken about that, I just wanted to

8    mention to the Court that we don't think that would give rise

9    to a suppression remedy.  Usually violations of Department of

10   Justice restrictions imposed on its own employees and agents

11   don't give rise to suppression.

12        A case that we've cited in the Fourth Circuit

13   briefing was *Sanchez-Llamas versus Oregon*, 548 U.S. 331.  And

14   that -- I think that line of cases goes back to Supreme Court

15   decisions from the 1970s including United States versus

16   Caceres, C-A-C-E-R-E-S.  So even if there were a violation of

17   the regulation, which I doubt, that would not give rise to a

18   suppression remedy.

19        THE COURT:  Has anybody thought through what would

20   happen if one Court said one thing about the warrant and

21   another Court said something else?  The -- a difference of

22   opinion about the indictments could relate to the indictments,

23   but we're talking about the same searches.

24        MR. MEISLER:  That's true, Your Honor.  It has come

25   up.  I can't say that we've reached a definitive conclusion I'm

1    prepared to present to the Court today.  It would present an

2    interesting issue of preclusion law, I think, that we haven't

3    fully grappled with yet.  But we're obviously hopeful that both

4    courts will uphold the searches and the indictments as well,

5    and so the issues won't arise.

6           THE COURT:  All right.  I think that's really all I

7    have on this issue.

8           I think we can go on, briefly, to talk about the

9    motion for bill of particulars.  I believe that's largely

10   something that I have to do based on the face of the indictment

11   and your pleadings, and there's not that much to be added to

12   the pleadings.  But I do have a few questions for each of you

13   on that and then, really, one question for each of you with

14   respect to the motion to compel production of the affidavit.

15   So I would like to just keep going.

16          All right.  With respect to docket 265 and the motion

17   for bill of particulars, as things go, I would say it's a

18   pretty particular indictment.  And the reply seemed to be more

19   argumentative than the initial motion was.  Keeping in mind

20   that the test is you need a bill of particulars where the

21   indictment is just too general to tell this defendant about the

22   specific acts he's accused of committing so that he can prepare

23   his defense.

24          Given the combination now of the indictment and the

25   discovery, what are the specific questions that still have to

1   be answered at this time?  You talked in your pleading about

2   company A and B, but I think you know who company A and B are;

3   is that correct?  You're nodding.

4          MR. DOWNING:  That's correct, Your Honor.

5          THE COURT:  You know what law firm was involved in

6   connection with the report?

7          MR. DOWNING:  We do, Your Honor.

8          THE COURT:  You know who the accomplice was, who

9   opened the bank accounts, allegedly.  I mean, I think that

10  person has been named who was responsible for opening the bank

11  accounts.

12         MR. DOWNING:  Off the top of my head, Your Honor, I

13  can't confirm that.  I would have to go back and check.

14         THE COURT:  All right.  The alleged false statements,

15  they are listed in the indictment.  And, yes, the indictment

16  uses broad language; he caused these false statements to be

17  made.  But, these are letters written by a lawyer and the

18  communications with the lawyer have been -- you're aware of

19  them even though they haven't been made publicly available,

20  isn't that correct?  When we're talking about causing, we're

21  talking about communications with counsel.  Is that a mystery?

22         MR. DOWNING:  Well, Your Honor, I mean, that we have

23  not received.  We have not received the statements of the

24  attorney.  That is one of the issues I would like to address

25  with you.

1          THE COURT:  All right.  But that's a discovery

2    question.

3          MR. DOWNING:  It is.

4          THE COURT:  I guess in the notion of causing, did you

5    understand that to be anything other than his attorney did it

6    at his direction?

7          MR. DOWNING:  That is our understanding, Your Honor.

8    I think the point of the bill of particulars is simply to

9    confirm that.  Similar to the statements that you were just

10   mentioning in terms of the specified statements, I believe it's

11   in paragraph 45 of the superseding indictment.  They listed

12   those statements, and about a month or so ago -- the Court will

13   certainly remember that we were here arguing -- I was here

14   before the Court arguing the multiplicity issue.

15         The idea that came up during that discussion was I

16   get it, if those are the statements that you're saying are the

17   alleged false statements in this case, that's fine.  But there

18   is the general language and, you know, generally speaking, and

19   other and earlier parts of the indictment they talk about, you

20   know, representations or statements being made or caused to be

21   made to others.  That's the concern.  And Rule 7(f) is

22   essentially the procedural mechanism which we bring these

23   things to the Court.

24         Obviously we've had dealings with the Office of

25   Special Counsel, and these are things I would certainly like to

1    work out instead of, necessarily, a motion for a bill of

2    particulars.  But I do not and I cannot abide a situation where

3    I'm not sure what my client said was a false statement or how

4    did my client cause this particular action to occur, when it's

5    written that broadly.

6              THE COURT:  All right.  So --

7              MR. DOWNING:  That's our focus.

8              THE COURT:  I've got -- you want to ascertain whether

9    there are any other statements or omissions that are the basis

10   for the allegations of false statements in the false statements

11   to the United States count and the count that you believe is

12   multiplicitious --

13             MR. DOWNING:  Multiplicitious.

14             THE COURT:  -- the FARA account.  Is there any other

15   basis for the use of the verb "cause" besides the attorney

16   acting at his direction?  Is there anything else that you're

17   saying to me at this point is so broad you can't defend

18   yourself against it without more?

19             MR. DOWNING:  Well, the only other thing I would rake

20   to the Court's attention is there are some discussions of

21   alleged accomplices or others, in quotes.  And to the extent

22   that some of these individuals are, at least when you read

23   through the indictment, individuals who appear to be foreign

24   nationals, it's very difficult for us to try to ascertain who

25   these people are.  We might have to come to the court, you

1    know, in terms of trying to secure their presence, if

2    necessary.  And so that we're asking for as well, in terms of

3    broad categories of others who might have been involved or that

4    Mr. Manafort allegedly, you know, caused to file or fail to

5    file certain registrations.

6            THE COURT:  Do you have authority that when we're

7    talking about a bill of particulars and we're talking about a

8    conspiracy, that they have to identify for you all others or

9    accomplices through the vehicle of bill of particulars.

10           MR. DOWNING:  Well, obviously the authority we cited

11   in our papers, certainly Judge Friedman has dealt with this and

12   think -- the name escapes me now, *Chan* [sic] I think, and the

13   *Maria Shia* case.

14           THE COURT:  I'm sorry.  Shia, S-H-I-A?

15           MR. DOWNING:  S-H-I-A, Maria Shia.  It was Charlie

16   Trie, T-R-I-E, pardon me.  Those cases definitely did talk

17   about identifying individuals, particularly when you're saying

18   that someone is conspiring with an entity.  You know, because

19   it doesn't really tell you who exactly were you supposedly

20   causing to do something at the entity, it's just, you know, a

21   broad entity.  And I believe *Trie* in particular discussed that

22   particular problem.

23           THE COURT:  All right.  Well, we talked about cause,

24   with making the false statements.  What paragraphs in

25   particular are you saying that the word "cause" leaves you

1   scratching your head?

2            MR. DOWNING:  It is paragraph 43 of the superseding

3   indictment, Your Honor.  And we've asked how Mr. -- identified

4   how Mr. Manafort -- and then this is quoting from the

5   indictment, "From 2008 to 2014, both dates being approximately

6   inclusive, caused and aided and abetted Companies A, B, C, and

7   others, to act as agents of a foreign principal without

8   registering with the attorney general," etcetera, etcetera.

9            THE COURT:  All right.  So you're not concerned about

10   the letters, it's the "others" now that's the problem?

11            MR. DOWNING:  If the government -- I mean, if the

12   Office of Special Counsel wants to confirm that, yes, those are

13   the statements in the letters and that is what we're focused

14   on, I think we're not going to have an issue.  We just need to

15   know, in order to prepare our defense, what are the statements

16   that you're alleging that are false?

17            THE COURT:  That's a different issue.  I already

18   asked about that one.  I'm asking you, are you saying that

19   the -- the sentence you just read to me --

20            MR. DOWNING:  Yes.

21            THE COURT:  -- that it caused certain people to act

22   as unregistered agents, that you know who A and B and C are,

23   but you don't know who the others are?

24            MR. DOWNING:  We do not know.  I don't know who the

25   "others" refers to.

1              THE COURT:  All right.  Okay.

2              MR. DOWNING:  Sorry for the misunderstanding.

3              THE COURT:  That's all right.  I just want to make

4     sure I know, I have the exact list of -- notwithstanding what

5     might have been a mystery at the time you wrote this motion to

6     preserve the issue, what is in fact a mystery.

7              MR. DOWNING:  Okay.

8              THE COURT:  All right.  Is there anything else?

9              MR. DOWNING:  No.  No, Your Honor.

10             THE COURT:  Okay.  All right.  Okay.

11             MR. ANDRES:  Good morning, Your Honor.  I might be

12    last.

13             THE COURT:  You're actually arguing?  Your opposition

14    was relatively general, you basically said, He knows.  And so

15    with respect to some of them, I think you're right, and he

16    agrees.  But I guess with respect to others -- and I don't

17    expect you to necessarily answer the question on the record at

18    the moment, but the question is:  Do you have any problem

19    answering the question to him, are there any other statements

20    or omissions that are the basis for the false statement

21    allegations, other than the ones that are listed in the

22    indictment?

23             MR. ANDRES:  With respect to Counts 4 and 5, which

24    are the FARA false statements, false and misleading statements,

25    and the 1001 counts, those are the statements, Judge.  And I

1    would note for the Court that in addition to having articulated

2    specifically those statements, these were issues that were

3    addressed in great specificity in Chief Judge Howell's opinion

4    on the crime fraud issue.

5           So, unlike other cases that are cited -- and again,

6    the case law is hard to interpret with respect to the bill of

7    particulars, which is so much of it depends on seeing the

8    indictment or the discovery or the reverse proffers and the

9    like.  Here we have Chief Judge Howell's opinion and we have

10   the underlying affidavits that the government submitted, which

11   we have not submitted to the Court.  Judge, we're happy to, or

12   the full unredacted copy of Chief Judge Howell's opinion.  It

13   goes through each one of those statements and says why it is

14   either false or misleading.

15          So, we've articulated those statements and we've

16   articulated in great detail why those statements are false and

17   misleading.  There really can be no doubt whatsoever with

18   respect to those issues.

19          THE COURT:  Okay.

20          MR. ANDRES:  With respect to the issue of the lawyer,

21   Miss Lorenza, defense counsel has asked repeatedly for her

22   statements.  Nothing about her statements -- nothing about the

23   fact that they don't have her statements prevent them from

24   understanding what the false statements are.  And as discussed

25   again at great length in the crime fraud litigation, in sum and

1    substance she's going to testify -- or, we expect her to

2    testify that those statements in her letters to the DOJ were

3    the statements that she received from her clients.

4         So she was passing on information to the Justice

5    Department based on her discussions with her clients about

6    what -- how they would answer those questions.  Those facts

7    come from the clients.

8         THE COURT:  Well, just for purposes of the bill of

9    particulars issue, that is the underlying circumstance for

10   which the verb "cause" is used to describe.  There's no other

11   cause to make false statements that you're talking about,

12   besides statements made to the attorney about what to say in

13   the letters?

14        MR. ANDRES:  Correct.

15        THE COURT:  All right.

16        MR. ANDRES:  And just to be -- sorry, Miss Lorenza is

17   now alleged to be a co-conspirator.  That is, and we made this

18   clear in the crime fraud litigation, no one is suggesting that

19   she was, quote, unquote, in on it, but, rather, that she was

20   simply conveying the facts that she got from her clients to the

21   justice department.

22        So even to the extent -- we don't agree with this --

23   but the sense of being entitled to any of that, but a co-

24   conspirator, she is most -- she is not a co-conspirator in this

25   case.

1    THE COURT:  But to the extent you intend to call her

2    as a witness, her testimony would be Jencks material at that

3    point?

4    MR. ANDRES:  Absolutely.  And in this case the

5    government has already offered to provide the Jencks material

6    well in advance of the time required by the law.  So even to

7    the extent that the defense thought they needed it, they'll

8    have that well in advance of the trial, and we believe it is

9    Jencks material.

10    THE COURT:  And to the extent any aspect of it is

11    favorable to the defendant, you would -- you have an ongoing

12    obligation to turn it over before the Jencks obligation

13    attaches.

14    MR. ANDRES:  Absolutely.

15    THE COURT:  All right.  What about his concern

16    that -- with respect to paragraph 43, about Company A, B, and

17    C, and others?  Have those been identified in discovery and is

18    there any obligation to tell them who you're talking about

19    there?

20    MR. ANDRES:  Courts here in D.C. and otherwise have

21    repeatedly said that you look first to the indictment and then

22    to the discovery.  Obviously, in this case, as I mentioned, we

23    also have the crime fraud litigation, which are tantamount to a

24    reverse proffer.  These are affidavits by the government as to

25    why the defendants were involved in the charged crimes.  The

1   discovery clearly outlines who the others are to the extent

2   there are any.  That is, we are relying principally on Company

3   A, B, and C, but to the extent that involves individuals at

4   that company -- and that was one of the issues in the *Hsia*

5   case, if I'm pronouncing that correctly, H-S-I-A, I think what

6   Judge Friedman said in that case is when you're relying on

7   statements by a company, the government was required to provide

8   who the individuals were at those companies.

9        Companies A, B involve principals that were assigned

10   to this matter, which are more than obvious to the defense

11   based on the discovery, based on some of the e-mails cited in

12   the indictment which have been produced to the defendant.

13        In some cases Courts have criticized the government

14   for relying on discovery in response to a bill of particulars.

15   In those cases there was the concept of open discovery, whether

16   there was, in effect, a large dump of documents.  We haven't

17   done that here.  We've identified hot documents for the

18   defense, we've identified the documents in the indictment,

19   we've produced discovery such that every time we do so, we

20   identify the source of that material.

21        So, the defense knows who Company A, B, and C are,

22   they know where the documents from A, B, and C are, both from

23   the hot documents and otherwise.  And they know clearly from

24   those documents who the individuals are at Company A, B, and C

25   who are relevant to this case.

1          THE COURT:  And I don't have any reason to doubt your

2     good faith in telling me that.  I obviously haven't read all

3     the discovery, don't intend to.  What would be the impediment

4     to your sending them a letter and saying, With respect to

5     paragraph 43, "others" refers to the principals of Company A,

6     B, and C.  We believe you know who they are, but if you don't,

7     this is who they are.  Why shouldn't they know that as the

8     trial date bears down?

9          MR. ANDRES:  First, Judge, I would say because the

10    law doesn't require it.  They've been given appropriate

11    particulars in the indictment and the discovery.  Courts have

12    said repeatedly that a bill of particulars is not a vehicle for

13    additional discovery and to provide this level of detail.

14         So I would say, first and foremost, they're not

15    entitled to it.  Secondly, that would, in effect, be giving the

16    defense, to some extent, a premature list of who the

17    government's witnesses are.  That's less of a concern for me.

18    But, again, I would stress the fact that they're not entitled

19    to it and it's -- the government has satisfied its obligations

20    under the law.

21         THE COURT:  All right.  Thank you.  I think that's

22    all I have for you, unless there's something more?

23         MR. ANDRES:  Thank you, Judge.  No.  Thank you.

24         THE COURT:  I wanted you to respond the specific

25    things he identified, and we went through them all.

1          All right.  With respect to the motion to compel the

2    production of affidavits that we haven't talked about this

3    morning, but that you still have not received in their fully

4    unredacted form, my question for whoever on the team is

5    answering that question is:  If my review in camera reveals

6    nothing that's still redacted from the remaining warrants that

7    we haven't talked about today that relates to the charges

8    against Manafort, or the sufficiency of lawfulness of the

9    warrant itself, is that satisfactory for purposes of the

10   motion?  Is there any reason why you would be entitled to

11   things that don't relate to the charges here?

12          MR. ZEHNLE:  May I have a moment to confer, Your

13   Honor?

14          THE COURT:  Yes.

15          (Pause.)

16          MR. WESTLING:  Your Honor, I think our view on this

17   is that we are not aware in any of the pleadings that suggest

18   the purpose for keeping that information from the defense.

19   These are the documents that have been used to collect evidence

20   against our client and we think it's essential for us to know

21   everything that's there.

22          Admittedly, there may be times when a name or

23   something else needs to be redacted for purposes along the

24   lines of not pre-identifying a witness, but we can only assume

25   that these are paragraphs that matter to the judge that

1    reviewed the warrant.  And I think we should be in a possession

2    to be able to see that.  And I'm not aware of any law or body

3    of precedence that would suggest -- I mean, knowing there's a

4    strong concern about keeping these sealed in general, that it

5    wouldn't be applied and provided to a defendant who was

6    defending themselves in the face of, you know, information that

7    had been gathered that way.  So we think it's important that we

8    see the documents in complete form.

9         THE COURT:  All right.  Well, I think they talked

10   about ongoing investigations into matters that may be unrelated

11   to the charges that have been brought and the confidentiality

12   of those investigations.  And so I think they gave some reasons

13   in their pleadings.  And so I guess I wanted to know, if I read

14   these and they fall within those categories, and there's no

15   wiggle room about that, what legal requirement there would be

16   to turn testimony over at this point?

17        MR. WESTLING:  Well, I guess, I would try to be

18   careful and clear.  I think to the extent they relate to Mr.

19   Manafort, we have a right to see them.  And I don't think there

20   is anything, that I'm aware of, that would suggest that it's

21   appropriate to not provide those at this point.  The government

22   has created the document, it did it in such a way that allowed

23   a judge to rely on it, and now it's saying I don't want to show

24   it to everyone, and they're the ones who have indicted our

25   client.

1          So, I mean, I think the burden clearly is on them to

2     make a very strong showing that it's not related to Mr.

3     Manafort for me to be comfortable with the idea that it can

4     continue to be kept secret.

5          THE COURT:  Let's just take it out of the Mr.

6     Manafort context.  Let's say -- and I think the warrants we're

7     talking about now would not the searches, but they are searchs

8     of telephones, and not -- you know, pen registers, things like

9     that.  And let's say there was a warrant that said,

10    Confidential Witness A says that the defendant is selling

11    firearms out of his residence and -- all about firearms.  And

12    confidential witness B is all about drugs, and he gets charged

13    with drugs and firearms is still under investigation.  And

14    confidential witness related to firearms has not -- not

15    implicated in the drugs whatsoever and so is unknown.

16         Why, in connection with discovery related to the

17    charges moving forward, would he be entitled -- just because

18    it's about him -- assuming what's redacted is about him, if he

19    doesn't relate to him, I don't know what your basis would be

20    for asking for it.  But, what if it -- even if it is about him,

21    if it's not about this case --

22         MR. WESTLING:  I think the reason that we're entitled

23    to those documents in the first place is because there may be

24    opportunities, as we read them and understand everything that's

25    there, to bring things to the court, to challenge them.  And in

1        each case these documents are not read in part by the person

2        authorizing the activity.  And so, to me, it is very difficult

3        to ask the defendant in a case like this to look at what's

4        there; oh, but, you know, that paragraph, which was apparently

5        enough to include and important enough for the magistrate or

6        anyone else to rely upon, is not something you can see right

7        now.  I mean, it doesn't --

8              THE COURT:  What if -- I think one of them is about

9        phone information.  What if the redacted phones are not his

10       phone?

11             MR. WESTLING:  I don't have problem a with that.  I

12       think we're talking about things that relate to this defendant

13       in this case.  And the idea that, you know, the government

14       wants to say we may be still looking at something, I don't

15       think they get to continue to rely on that when they are the

16       ones who have moved the ball forward into this Court by

17       indicting him.

18             THE COURT:  All right.  Is there anything you want to

19       add to that?

20             MR. MEISLER:  Good morning, Your Honor, again.  I'm

21       not sure we have much to add to that, except just to make a

22       point, which is made in our legal pleading, that while, of

23       course, information may be included in an affidavit because the

24       government deems it important to the magistrate's

25       consideration, the case law we've cited recognizes that it can

1     be withheld from the defendant in certain situations based, of

2     course, on ongoing investigations, as Your Honor mentioned, so

3     long as the government is prepared to defend any challenges to

4     those warrants without consideration of the redacted

5     information.

6              So that's the line of cases on which we've relied.

7     And so if the defendant wanted to challenge those and we were

8     willing to forgo reliance on the redacted material, we think

9     that will be proper under the case law we cited.

10             THE COURT:  All right.

11             MR. WESTLING:  Your Honor, if I could, one very quick

12    point on that.

13             THE COURT:  I think your point is going to be, but a

14    magistrate relied on it.

15             MR. WESTLING:  Well, that, but also, the reality is

16    that without seeing the statement, we don't know whether it

17    raises a Franks issue or anything else.  I mean, if there's

18    something there that could be demonstrably false, it actuality

19    sets in motion a number of other challenges.  We just have no

20    way to know.

21             THE COURT:  All right.  All right.  I will review

22    them closely with all these issues in mind.  I realize there's

23    a bond motion pending.  I think maybe we're getting closer than

24    we've ever been to -- except at the beginning, to resolving the

25    bond issue.  But there's a submission that I've yet to receive,

1    so I'm not planning to hear argument or discuss the bond motion

2    further today.

3              I think we've talked about everything at this moment

4    that needs to be resolved right now.  Is there anything else

5    the defendant wanted to say about anything else?

6              MR. ZEHNLE:  No, Your Honor.

7              THE COURT:  Is there anything further I need to take

8    up on behalf of the Office of Special Counsel?

9              MR. ANDRES:  Judge, I just wanted to clarify one

10   issue with respect to the bill of particulars as to the

11   paragraph that relates to A, B, and C.  There are other PR

12   firms and those have all been satisfied.  That is, the defense

13   is on notice of those as a result of the discovery produced by

14   the government.

15             THE COURT:  All right.  Thank you.

16             Do you dispute that?

17             MR. ZEHNLE:  We'll have to go back and check, Your

18   Honor.

19             THE COURT:  All right.  Okay.  All right.  Thank you

20   very much.  I appreciate it, the quality of all the arguments

21   this morning.

22                          *   *   *

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


         I, JANICE DICKMAN, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of my

stenograph notes and is a full, true and complete transcript of

the proceedings to the best of my ability.

                         Dated this 24th day of May, 2018.



                         /s/_____

                         Janice E. Dickman, CRR, RMR
                         Official Court Reporter
                         Room 6523
                         333 Constitution Avenue NW
                         Washington, D.C. 20001