**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**PAUL J. MANAFORT, JR.,**<br><br><br>**Defendant.** | **Crim. No. 17-201-1 (ABJ)** |

**GOVERNMENT'S MOTION TO REVOKE OR REVISE DEFENDANT**
**PAUL J. MANAFORT, JR.'S CURRENT ORDER OF PRETRIAL RELEASE**

Pursuant to 18 U.S.C. § 3148, the United States of America, by and through Special Counsel Robert S. Mueller, III, hereby moves the Court to revoke or revise the current Order authorizing the release of defendant Paul J. Manafort, Jr. (Manafort) to the Pretrial Services Agency's high-intensity supervision program. The evidence set forth below and in the attached declaration of Federal Bureau of Investigation (FBI) Special Agent Brock W. Domin establishes probable cause to believe that Manafort has violated 18 U.S.C. § 1512(b)(1) by attempting to tamper with potential witnesses while on pretrial release and, accordingly, has violated the conditions of his release. That violation triggers a statutory presumption that no conditions or combination of release conditions will assure the safety of the community and of others. *See* 18 U.S.C. § 3148(a)-(c). The government therefore requests that the Court promptly schedule the hearing called for by the statute to determine Manafort's release status. *See id.* § 3148(b).[1]

---

[1] By minute order entered on May 31, 2018, the Court granted the government leave to file a supplemental response to Manafort's motion to reconsider the conditions of his release (Doc. 291). The government submits this motion as its supplemental response to avoid any question about the Court's authority to revoke the release Order under Section 3148. *Cf. United States v. Koumbairia*, No. 07-cr-61, 2007 WL 1307909, at *2 (D.D.C. May 3, 2007) (noting that the "question of whether a revocation proceeding could be initiated without . . . a written government motion remained unresolved").

### A. Factual Background

### 1. *Manafort Was Released To Home Confinement Subject To The Standard Condition That He Not Commit Any Federal, State, Or Local Crime*

On October 27, 2017, Manafort was first indicted by a grand jury in this District on nine counts, including conspiracy to defraud and commit offenses against the United States, conspiracy to launder money, failure to file reports of foreign bank accounts, making false and misleading statements, and acting as an unregistered agent of a foreign principal. The charges included allegations that Manafort lied to a wide array of people to carry out the charged crimes. Doc. 13. On October 30, 2017, Manafort was permitted to surrender to the government after providing his passport to the FBI. Following his arraignment, Manafort was, upon the parties' consent, ordered released to the Pretrial Service Agency's high-intensity supervision program and subject to the condition of home confinement and a $10 million bond. *See* Doc. 9; 10/30/2017 Tr. 19. The order releasing Manafort to home confinement, which Manafort signed, informed him that he was "not to commit any criminal offense nor violate any condition of this release order – a rearrest for any offense based upon probable cause may be grounds for revoking your release." Doc. 9 at 2.

Since Manafort was released into the high-intensity supervision program, his conditions of release have been the subject of repeated motions concerning the security necessary to release him from home detention. *See, e.g.*, Doc. 32, 66, 153, 182, and 229. None of those motions has altered the basic requirement that Manafort not commit a federal, state, or local crime during the period of his release. *Cf.* 18 U.S.C. § 3142(b) (providing that, even when a defendant is released "on personal recognizance," release is "subject to the condition that the person not commit a Federal, State, or local crime").

For instance, on November 4, 2017, Manafort moved this Court to modify his conditions of release to permit, among other things, travel within the District of Columbia and the states of

Florida, New York, and Virginia.  Doc. 32.  On November 6, the Court held a hearing on the motion and found that release on Manafort's personal recognizance with an unsecured appearance bond would not reasonably assure his appearance.  11/6/2017 Tr. 24:25-25:5.  On December 15, 2017, the Court further ordered that Manafort would, upon the satisfactory posting of a sufficient bond and the fulfillment of various other conditions, be released from home confinement and permitted to travel within a limited geographic area around his residence.  *See* Doc. 95; *see also* 12/11/17 Tr. 15:14-16:9 (noting that the Court was prepared to modify the condition of home confinement but "required financial information that would satisfy . . . the two applicable conditions under the Bail Reform Act").  Manafort's inability to satisfy the financial conditions necessary to ensure his release have, to date, prevented him from securing the modification he seeks.   Like the October 30 Order, the Court's December 15 Order provided that Manafort's pretrial release must, in accordance with the Bail Reform Act, be "subject to the condition that [he] not commit a Federal, State, or local crime."  Doc. 95 at 1 (quoting 18 U.S.C. § 3142(c)); *see also* Doc. 95 at 2 (determining, as a necessary condition of release, that "Defendant must not commit any federal, state, or local crime").

2.  *Manafort's Attempts to Influence Potential Witnesses*

On February 23, 2018, the grand jury returned the operative Superseding Indictment of Manafort.  Doc. 202.  As relevant here, the Superseding Indictment included new allegations concerning a part of Manafort's lobbying scheme that is alleged to have violated the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 *et seq.*  Informally referred to by Manafort and his co-conspirators as the "Hapsburg" group, this part of the charged illegal United States lobbying scheme involved the secret retention of a group of former senior European politicians who would act as third-party paid lobbyists for Ukraine.  Manafort was alleged to have funneled to the

Hapsburg group more than 2 million euros from overseas accounts he controlled. *See* Superseding Indictment ¶¶ 30–31.

Two individuals who were principals of a public-relations company (Company D) acted as intermediaries between Manafort, Person A, co-defendant Richard Gates, and the Hapsburg group. Those two individuals are described herein as Persons D1 and D2. Manafort, with the assistance of Person A and Gates, managed the work of Persons D1 and D2 on behalf of Ukraine (along with the work of Companies A, B, and C, and others).[2]

Persons D1 and D2's work for Manafort, which included their work directing the Hapsburg group, was—from its inception—directed at both the United States and Europe. Manafort himself wrote a June 25, 2011 memorandum to Person D1 describing the goals and deliverables of Persons D1 and D2's work for Ukraine. Manafort stated that a "goal of the program . . . is to educate western media, expand the media awareness of what is really happening and establish mechanisms to maintain a constant flow of information into Europe and the US," including "Washington." Domin Decl. ¶ 6. Similarly, Manafort noted in a "conference call agenda" that one deliverable of Persons D1 and D2's work would be "Print/electronic media coverage in European [sic] and US," and that Ukraine's contract with Persons D1 and D2's company would "cover the EU and the US." *Id.*

Pursuant to Persons D1 and D2's scope of work—and in coordination with Manafort, Person A, Persons D1 and D2, and others—the Hapsburg group directly lobbied and conducted public-relations work in the United States. For example, in September 2012, Manafort and Gates,

---

[2] The references to anonymized companies and individuals in this motion mirror those used in the Superseding Indictment (*e.g.*, Doc. 202 ¶¶ 24, 29, 31) and in other pleadings in this and related cases. *See, e.g.*, Gov't Sent. Mem. at 2, *United States v. van der Zwaan*, No. 1:18-cr-31 (D.D.C. March 27, 2017) (Doc. 19).

with the assistance of Persons D1 and D2, arranged for members of the Hapsburg group to contact United States senators directly to lobby on behalf of Ukraine in connection with the Senate's potential condemnation of the imprisonment of Yulia Tymoshenko.  Domin Decl. ¶ 9.   In addition, in early 2013, Manafort and Gates arranged for members of the Hapsburg group to meet with members of Congress and their staffs.  Manafort and Gates further directed Persons D1 and D2 to draft an op-ed in the name of one of the members of the Hapsburg group, and arranged for its placement in *The Hill*—a newspaper published in Washington, D.C—at or around the time that the member of the Hapsburg group was in the United States.  *Id.* ¶ 10.  Persons D1 and D2 did the same with respect to another op-ed by a member of the Hapsburg group placed in *The New York Times* in January 2014.  *Id.* ¶ 12.

Following the public disclosure of the February 23 Superseding Indictment, Manafort and Person A—who is a longtime associate of Manafort's—repeatedly contacted Persons D1 and D2 in an effort to secure materially false testimony concerning the activities of the Hapsburg group.  Neither Person D1 nor D2 had had any recent contact with Manafort or Person A.  But after the Superseding Indictment was publicly disclosed, Manafort called Person D1 on Persons D1's cellular phone.  Person D1 sought to avoid Manafort, so Person D1 ended the call.  Domin Decl. ¶¶ 14, 20.

The day after the Superseding Indictment was made public, Manafort also sent Person D1 a text message on an encrypted application, stating "This is paul."  Domin Decl. ¶ 14.[3]  Two days later, on February 26, 2018, Manafort used the same encrypted application to send Person D1 a news article describing the Superseding Indictment's allegations concerning the Hapsburg group,

---

[3] Persons D1 and D2 both preserved the messages they received from Manafort and Person A, which were sent on encrypted applications, and have provided them to the government.  Domin Decl. ¶ 12 n.1

which included the statement that "two European politicians were secretly paid around €2 million by Manafort in order to 'take positions favorable to Ukraine, including by lobbying in the United States.'"[4]  One minute after sending the news article, Manafort wrote: "We should talk. I have made clear that they worked in Europe."  Domin Decl. ¶ 15.  Toll records for one of Manafort's phones indicate that Manafort had a short call with Person D1 on February 24, 2018, and that Manafort attempted to call Person D1 again on February 25 and 27, 2018.  *Id.* ¶ 14.

As noted in Special Agent Domin's declaration, Person D1 has told the government that he understood Manafort's outreach to be an effort to "suborn perjury," because Person D1 knew that the Hapsburg group worked in the United States—not just Europe.  Domin Decl. ¶ 19.

In an effort to connect Manafort with Person D1, Person A reached out to Person D2, a longtime partner of Person D1.  On February 28, five days after the Superseding Indictment, Person A attempted to contact Person D2 via an encrypted messaging application.  Person A wrote: "My friend P is trying to reach [Person D1] to brief him on what's going on."  Domin Decl. ¶ 17.  Two minutes later, Person A added: "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU."  *Id.*  Approximately five hours later, Person A switched to another encrypted application and sent a similar series of messages to Person D2, including a message relaying Manafort's "summary" that the Hapsburg group never lobbied in the United States.  *Id.*

The February 2018 messages were not Person A's only efforts to put Manafort in contact with Persons D1 and D2.  In April 2018, Person A reached out to Person D1, relaying the message:

---

[4] Michael Kranz, *Former European leaders struggle to explain themselves after Mueller claims Paul Manafort paid them to lobby for Ukraine*, Business Insider (Feb. 25, 2018), available at http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T

"My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." Domin Decl. ¶ 18.  Person A contacted Person D2 via two encrypted applications the same day, reiterating his need for help in connecting Person D1 with Manafort.  Person A added in his final text to Person D2: "I tried him [*i.e.*, Person D1] on all numbers."  *Id.*[5]

Like Person D1, Person D2 understood that Manafort and Person A were reaching out to him and Person D1 in an effort to influence the testimony of potential witnesses.  Domin Decl. ¶ 19, 20.  Person D2 explained that he and Person D1 had been responsible for interfacing with the Hapsburg group, and acted as "intermediaries" between Manafort and Ukraine government officials and the Hapsburg group.  *Id.* ¶ 20.  Person D2 further stated his opinion that Manafort and Person A's outreach to him and Person D1 was an effort to get them to relay a message to the Hapsburg group: if the members of the Hapsburg group were contacted by anyone, they should say that their lobbying and public relations work was exclusively in Europe—a representation that would be contrary to Person D's knowledge that the Hapsburg group worked in both Europe and the United States.  *Id.* ¶ 19, 20.

## B.  Legal Standard

"The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, permits the revocation of release and an order of detention for a person who has been released under 18 U.S.C. § 3142 and has violated a condition of that release."  *United States v. Addison*, 984 F. Supp. 1, 2 (D.D.C. 1997).  As relevant here, an "attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court."  18 U.S.C. § 3148(b).  Section 3148 further provides that the judicial officer hearing the motion:

shall enter an order of revocation and detention if, after a hearing, the judicial

---

[5] A chart summarizing the contacts and attempted contacts discussed in this motion is attached to Special Agent Domin's Declaration as Exhibit N.

officer—

(1) finds that there is—

(A) *probable cause to believe that the person has committed a Federal, State, or local crime while on release*; or

(B) clear and convincing evidence that the person has violated any other condition of release;  and

(2) finds that--

(A) based on the factors set forth in [18 U.S.C. § 3142(g)], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

(B) the person is unlikely to abide by any condition or combination of conditions of release.

*Id.* (emphasis added).

The government's motion here is based on Section 3148(b)(1)(A), which requires "probable cause to believe" that Manafort has committed (as pertinent here) a federal "crime while on release."  The probable-cause standard is not an onerous one.  As the Second Circuit explained in an analogous case, "[p]robable cause under § 3148(b)(1)(A) requires only a practical probability that the evidence supports a finding that the defendant has committed a crime while on bail." *United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000) (internal quotation marks, citation, and ellipses omitted); *accord, e.g.*, *United States v. Aron*, 904 F.2d 221, 224 (5th Cir. 1990) ("[T]o satisfy the probable cause requirement of § 3148(b)(1)(A), the facts available to the judicial officer must warrant a man of reasonable caution in the belief that the defendant has committed a crime while on bail.") (internal quotation marks omitted).

Notably, once a court finds probable cause to believe that the defendant committed a crime while on release, "a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the

8

community." 18 U.S.C. § 3148(b). If the defendant rebuts that presumption and a court finds

"that there are conditions of release that will assure that the person will not flee or pose a danger

to the safety of any other person or the community, and that the person will abide by such

conditions," then the court "shall treat the person in accordance with the provisions of [18 U.S.C.

§ 3142] and may amend the conditions of release accordingly." *Id.*; *see United States v. McKethan*,

602 F. Supp. 719, 722 (D.D.C. 1985) (explaining that, where the government seeks detention

"based upon a charge that a defendant has committed a felony while on release, § 3142 does not

come into play unless and until the judicial officer finds under § 3148(b)(2)(B) that the defendant

has overcome the statutory rebuttable presumption"). Nonetheless, the statutory "presumption

does not disappear once the defendant has produced some rebuttal evidence, but continues to be

weighed along with other factors." *LaFontaine*, 210 F.3d at 130 (quotation marks omitted).

## C. The Defendant Has Violated The Release Condition That He Not Commit Any Federal Crime

The facts set forth above and in Special Agent Domin's Declaration establish probable

cause to believe that Manafort has violated his conditions of release by attempting to tamper with

witnesses, in violation of 18 U.S.C. § 1512(b)(1). A violation based on commission of a federal

crime triggers the statutory presumption in favor of detention.

1. Section 1512(b)(1) proscribes "knowingly . . . corruptly persuad[ing]" or "attempt[ing]

to" corruptly persuade another person "with intent to . . . influence . . . the testimony of any person

in an official proceeding." 18 U.S.C. § 1512(b)(1).[6] As relevant here, the statute's plain language

---

[6] Section 1512(b)(1) provides in full:

(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

reaches "non-coercive attempts to tamper with witnesses," *United States v. Khatami*, 280 F.3d 907, 912 (9th Cir. 2002), including attempts "to persuade a witness to give false testimony," *United States v. Cruzado-Laureano*, 404 F.3d 470, 487 (1st Cir. 2005).  *See also United States v. Baldridge*, 559 F.3d 1126, 1142 (10th Cir.) ("All circuits that have considered the issue have" held "that a non-coercive attempt to persuade a witness to lie to investigators constitutes a violation of § 1512(b)."), *cert. denied*, 556 U.S. 1226 (2009).

That straightforward construction of the statute—that Section 1512(b)(1) reaches non-coercive witness tampering—is borne out by the D.C. Circuit's decisions applying the statute.  In *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), for example, the court affirmed the conviction of a defendant who had tried to corrupt a witness "by exhorting her to violate her legal duty to testify truthfully in court," an effort that the witness understood as a request that she "'perjure' herself."  *Id.* at 630.  More recently, the defendant in *United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006), was charged with conspiracy and other offenses arising from his role in financial malfeasance at a credit union.  After his arrest, the defendant and another credit-union employee attempted to persuade a witness to sign an affidavit falsely stating that the witness had authorized money to be transferred from her account.  *Id.* at 154.  The D.C. Circuit upheld Gurr's conviction under Section 1512(b)(1), rejecting his argument that the evidence was insufficient "because there was no evidence of cooperation between Gurr and the other credit union employee and no evidence that the witness was intimidated or threatened."  *Id.*  The court explained that Gurr

---

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

* * *

shall be fined under this title or imprisoned not more than 20 years, or both.

"was not charged with intimidating or threatening [the witness], and the jury could reasonably find that Gurr, with the assistance of [the other employee], attempted to 'corruptly persuade [ ]' [the witness] in order to influence her testimony by having her sign a false affidavit." *Id.*

In support of its conclusion, the court in *Gurr* cited with approval several out-of-circuit decisions involving non-coercive efforts to influence witness testimony that are similar to Manafort's conduct here. For example, *United States v. LaShay*, 417 F.3d 715 (7th Cir. 2005), involved a gas station employee's efforts to convince a co-worker to lie for him about a $2,000 check that the defendant had received from the gas station's owner. The court in *LaShay* followed decisions of the Second Circuit holding that "corrupt" persuasion occurs (1) "where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it," and (2) where a "defendant trie[s] to persuade a witness to give a false account that tracked the defendant's position." *Id.* at 718 (quoting, respectively, *United States v. Gabriel*, 125 F.3d 89, 102 (2d Cir. 1997), and *LaFontaine*, *supra*, 210 F.3d at 132). Applying those principles to the facts before it, the Seventh Circuit affirmed the employee's Section 1512 conviction, concluding that "[a] jury could properly view LaShay's remarks [to his co-worker] as an unstated invitation to lie." *Id.* at 719.

In *LaFontaine*, one of the Second Circuit decisions discussed in *LaShay*, the district court revoked the bail of a defendant who had tampered with a witness after her indictment. *See* 210 F.3d at 128-33. The defendant there participated in a fraudulent-billing scheme in which her health clinic performed cosmetic surgeries for patients but billed them out as necessary procedures to obtain insurance payments. After her arrest in the scheme, the defendant was recorded on a jail call "reminding" a relative and former employee (Reyes) that Reyes' mother had undergone the procedures listed on the clinics' false bills. When she was released from custody, the defendant

then met with Reyes several times, including one occasion on which the defendant played for Reyes a recording of the jail call "reminder" about her mother's surgeries.  The Second Circuit upheld the decision revoking the defendant's bail, concluding that her "attempt to review the 'facts' that would likely become part of Reyes['s] trial testimony . . . satisf[ies] the requirements of the witness tampering statute and, consequently, of the bail revocation statute." *Id.* at 133.  In so concluding, the court rejected the defendant's argument that the jail call did "not show any threats or intimidation of Reyes," explaining that Section 1512(b)(1) "plainly does not require 'physical force' or 'threats' to support a tampering charge; corrupt influence is sufficient." *Id.*

Finally, the First Circuit's decision in *Cruzado*, *supra*, involved a corrupt mayor who extorted money and kickbacks from local businesses and, after learning of the investigation, pressured various individuals to conform their stories to his.  The First Circuit characterized Cruzado's challenge to the sufficiency of the evidence as "simple: all he did was urge witnesses to tell the truth, which is not a crime." 404 F.3d at 487.  But the court rejected that challenge. While "Cruzado did ask that [witnesses] tell the truth," the court explained, "his version of 'the truth' that he urged upon them was anything but the truth." *Id.*  The jury could therefore find that Cruzado was trying to persuade witnesses to testify to something other than their true beliefs, which was sufficient to support his Section 1512(b)(1) convictions. *Id.*

2.   Under these decisions, the evidence recited above and in Special Agent Domin's Declaration establishes probable cause to believe that Manafort violated Section 1512(b)(1) by attempting to persuade Persons D1 and D2—both directly and through an intermediary—to support a materially false narrative in connection with the charges in the Superseding Indictment.

The string of communications with Persons D1 and D2 establishes a violation of Section 1512(b)(1) under the probable-cause standard.  Manafort sent Person D1 a news article

that reported on allegations in the recent Superseding Indictment that members of the Hapsburg group performed lobbying and public-relations work in the United States, not just in Europe, which is a key difference for purposes of liability under FARA.  *See* 22 U.S.C. § 611(c)(1) (defining "agent of a foreign principal" as a person who, as relevant here, engages in various acts "within the United States").   Manafort then messaged Person D1 that he had "made clear that" the Hapsburg group "worked in Europe," a message that Person D1 reasonably understood to embody one form of corrupt persuasion criminalized by Section 1512(b)(1)—*viz.*, an attempt "to persuade a witness to give a false account that track[s] the defendant's position." *LaShay*, 417 F.3d at 718. Indeed, Person D1's understanding of the message as an effort to "suborn perjury" is itself a strong indication that Manafort acted both "corruptly" and with the intent to "influence" a third party's testimony, as required by Section 1512(b)(1).  *See, e.g.*, *Morrison*, 98 F.3d at 629–30 (affirming Section 1512 conviction where witness understood defendant's request to provide false testimony as asking her "to 'perjure' herself").

Person A's outreach to Person D2 on behalf of Manafort is equally probative of a Section 1512(b)(1) violation.  As described in Special Agent Domin's Declaration, Person D2 perceived Person A's series of messages as an effort by Manafort to influence the accounts of potential witnesses in his case about the nature of the work performed behalf of Ukraine.  At the very least, Person A's statements and Person D2's description of them establish "a practical probability that the evidence supports a finding that the defendant has committed a crime while on bail." *LaFontaine*, 210 F.3d at 133.

As an initial matter, the content and context of Person A's messages indicate that Person A was reaching out to Person D2 at Manafort's request.  That much is evident from Person A's initial message to Person D2 that Manafort was "trying to reach [Person D1] to brief him on what's going

on." It would strain credulity to suggest that Person A—a close confidant of Manafort for years—undertook that outreach without Manafort's knowledge and approval, especially given the timing of the messages (they followed closely on the heels of Manafort's own outreach to Person D1, after a lengthy hiatus with no communications with Persons D1 or D2), their content (they sought to arrange a communication with Manafort), and the person with an overriding legal interest in the communication (Manafort). The inference that Person A acted on Manafort's behalf is all the more reasonable in light of evidence already before this Court demonstrating that Manafort and Person A coordinated in connection with an op-ed that appeared in the *Kyiv Post* during Manafort's home confinement. *See* Decl. of Special Agent Brock W. Domin, Doc. 123, Exs. A & B (Dec. 8, 2017).

Furthermore, the story that Person A conveyed to Person D2 was, like the message Manafort conveyed to Person D1, false. Person A wrote: "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU." Domin Decl. ¶ 17. As explained above, that description of the geographic reach of the Hapsburg group's activities is both false and central to the applicability of FARA to Manafort's "Hapsburg group" scheme. Person A's message is thus a "false story" conveyed "as if the story were true," *LaShay*, 417 F.3d at 718, and an attempt "to persuade a witness to give a false account that tracked the defendant's position," *id*. *See also Cruzado*, 404 F.3d at 487 (affirming Section 1512(b) conviction where, although the defendant asked witnesses to "tell the truth," the "version of 'the truth' that he urged upon them was anything but the truth"). Person A's message consequently amounts to an attempt to corruptly persuade a witness proscribed by Section 1512(b)(1).

It is no defense that Manafort conveyed messages to Person D2 through an intermediary. Section 1512(b)(1)'s language is sufficiently expansive to reach acts designed "to influence testimony at a proceeding by corruptly persuading [one] person *through another*."  *United States v. Norris*, 753 F. Supp. 2d 492, 505 (E.D. Pa. 2010) (emphasis added); *see also United States v. Amato*, 86 F. App'x 447, 450 (2d Cir. 2004) (unpublished) (upholding Section 1512 conviction where the defendant believed a third party was cooperating against him, the defendant was concerned the third party would testify against him at trial, and the "defendant directed intermediaries" to reach out to the third party and deliver a message).  And even if Section 1512 alone did not reach corrupt persuasion accomplished through intermediaries, 18 U.S.C. § 2 makes it a crime both to cause an unwitting third party to corruptly persuade a potential witness and to aid and abet a complicit party in committing corrupt persuasion.

In sum, the government's evidence establishes probable cause that Manafort violated the witness-tampering statute both through his direct outreach to Person D1 and his intermediary's outreaches to Persons D1 and D2.  As a result, Manafort violated the condition of release requiring that he not commit any federal, state, or local crime.  *See LaFontaine*, 210 F.3d at 133.

3.  A finding of probable cause to believe that Manafort violated his conditions of release by committing the federal crime of witness tampering triggers the statutory presumption that no condition or combination of conditions can assure that Manafort "will not pose a danger to the safety of any other person or the community."  18 U.S.C. § 3148(b); *see United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989) (explaining that "[o]nce the presumption arises, the ball is in the defendant's court, and it is incumbent on the defendant to come forward with some evidence to rebut the presumption.") (internal citation omitted).  And with respect to "danger to . . . the community," courts have recognized that a defendant's "attempts to influence the testimony of"

15

potential witnesses "constitute the type of danger to the community that [can] support detention." *LaFontaine*, 210 F.3d at 135; *see, e.g.*, *United States v. Gilley*, 771 F. Supp. 2d 1301, 1308 (M.D. Ala. 2011) (explaining that a probable-cause finding that a defendant engaged in witness tampering goes to "the very integrity of [the court's] own processes and the fair administration of justice," and implicates "not only the singular concern of keeping a defendant from engaging in illegal conduct, but also the public concern of encouraging all witnesses and all potential witnesses to come forward and provide information helpful to the implementation of justice") (internal brackets and quotation marks omitted).

The Second Circuit's decision in *LaFontaine*, *supra*, is instructive. The fraud defendant there argued that she posed no danger to the community because, unlike in other witness-tampering cases, she was "a white-collar criminal with no connection to the mob . . . or to narcotics," and the evidence showed at most that she "persistently 'fed' [a witness] false testimony with the expectation that [the witness] would adopt it." 210 F.3d at 134. The Second Circuit rejected that argument. It explained that "obstruction of justice ha[d] been a traditional ground for pretrial detention by the courts, even" before the Bail Reform Act of 1984 made "dangerousness" a basis for detention. *Id.*; *see id.* (stating that "pretrial trial detention [i]s even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness"). And although the court acknowledged that "witness tampering that is accomplished by means of violence may seem more egregious," it concluded that "the harm to the integrity of the trial is the same no matter which form the tampering takes." *Id.* at 135. The court therefore affirmed the district court's conclusion that the defendant "posed a danger to the community," *id.* at 134, and that revocation was warranted under Section 3148(b), *id.* at 135.

Revocation of the terms of the current Order is appropriate here for many of the same reasons.  Manafort's efforts to influence the testimony of potential witnesses, both directly and through an intermediary, threaten "the integrity of the trial" even though those efforts have not been violent in nature and the underlying prosecution involves "white-collar" offenses rather than "narcotics" or violent crimes.  *See LaFontaine*, 210 F.3d at 134.  At the same time, Manafort's obstructive conduct—carried out at a time when he was seeking relief from his current conditions of release—instills little confidence that restrictions short of detention will assure Manafort's compliance with the Court's orders and prevent him from committing further crimes.  To the contrary, that conduct is strong evidence that Manafort is conscious of his guilt of the FARA allegations added in the Superseding Indictment and that he has a greater incentive to flee than this Court (and another) already found him to possess in connection with the earlier indictments.  *See* 11/6/2017 Tr. 24-25 (citing Manafort's "risk of flight" as one factor weighing against release on personal recognizance); Doc. 25 at 2, *United States v. Manafort*, No. 1:18-cr-63 (E.D. Va. March 9, 2018) (finding that Manafort "poses a substantial risk of flight").

## CONCLUSION

For the foregoing reasons, the government moves the Court to conduct a hearing pursuant to 18 U.S.C. § 3148(b) and to revoke or revise its current Order authorizing Manafort's release to the Pretrial Services Agency's high-intensity supervision program.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: June 4, 2018        By:        */s/ Andrew Weissmann*
                                       Andrew Weissmann
                                       Greg D. Andres (D.D.C. Bar No. 459221)
                                       Scott A.C. Meisler
                                       Brian M. Richardson
                                       Special Counsel's Office
                                       950 Pennsylvania Avenue NW
                                       Washington, DC 20530
                                       Telephone: (202) 616-0800

                                       *Attorneys for the United States of America*