**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**PAUL J. MANAFORT, JR.,**<br><br>**Defendant.** | **Crim. No. 17-201-1 (ABJ)** |

**DECLARATION IN SUPPORT OF THE GOVERNMENT'S**
**MOTION TO REVOKE OR REVISE DEFENDANT PAUL J. MANAFORT, JR.'S**
**CURRENT ORDER OF PRETRIAL RELEASE**

I, Brock W. Domin, hereby state as follows:

**A. Affiant**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") working directly with the Special Counsel's Office. I have been a Special Agent with the FBI since 2015. I have training and experience related to national security investigations, as well as federal financial crimes. Prior to my employment with the FBI, I spent seven years in the software industry and have extensive experience working with computer technology.

2. I make this declaration in support of the government's motion to revoke or revise the release order of defendant Paul J. Manafort, Jr., pursuant to 18 U.S.C. § 3148. This declaration is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement personnel, and my training and experience. Where the contents of documents or the statements and conversations of others are reported herein, they are reported in substance and in pertinent part, except where otherwise indicated.

### B. The "Hapsburg" Group

3. As part of its ongoing investigation, the government identified a public-relations firm—called, along with its successor, "Company D" in what follows—and two principals at that firm (Persons "D1" and "D2") who communicated with Manafort, Gates, and Person A regarding the lobbying scheme described in the Superseding Indictment. Persons D1 and D2's work with Manafort, Gates, and Person A encompassed lobbying work on behalf of the Ukrainian government, which included the lobbying work by the Hapsburg group members. Persons D1 and D2 also communicated with individual(s) at Law Firm A, Company A, and Company B, and Ukrainian government personnel, among others, regarding Manafort's scheme to lobby on behalf of Ukraine in the United States.

4. As referenced in the Superseding Indictment, in late 2011, Manafort, with Person D1, developed what became the "Hapsburg group." Manafort proposed the project to the Ukrainian government in the "Eyes Only" memorandum excerpted in the Superseding Indictment. *See, e.g.*, Superseding Indictment of February 23, 2018 (Doc. 202), ¶ 31.

5. Person D1 told the government that Manafort wanted the Hapsburg group to remain "under the radar," and that the Hapsburg group would speak as ostensible third-party endorsers on behalf of Ukraine, but the fact that they were paid millions of euros would be kept secret. Manafort and Person D1 selected individuals who could be discreet.

6. In or about June 2011, Manafort arranged a conference call with Person D1 to discuss the goals and deliverables of Company D's work. Manafort then sent Person D1 a memorandum describing a "framework" for Company D's work: the "goal of the program . . . is to educate the western media, expand the media awareness of what is really happening and establish mechanisms to maintain a constant flow of information into Europe and the US,"

including "Washington." Manafort's agenda for the conference call proposed a contract that would "cover the EU and the US." And, indeed, a contract sent by Person A to Person D1 regarding Company D's work described a "campaign . . . aimed at media, decision-makers, think[] tanks and business and political leaders in Europe and the United States." The contract included, as "agreed deliverables," work on "Print/electronic media coverage in Europe and US." A copy of Manafort's e-mail regarding the June 2011 conference call is attached hereto as Exhibit A, and a copy of the contract is attached hereto as Exhibit B.

7. In or about June 2012, Person D1 wrote a memorandum to Manafort describing a group of "Third-Party Champions on Ukraine," which Person D1 described as a "small chorus of high-level European third-party endorsers and politically credible friends who can act informally and without a formal government relationship . . . ." In this memorandum, Person D1 described a phone call with a former senior politician who would eventually become the head of the Hapsburg group, during which the former politician embraced the "idea of what he called 'underground commenting.'" Person D1's memorandum to Manafort is attached hereto as Exhibit C.

8. As alleged, the government has developed substantial evidence showing that the Hapsburg group performed a variety of lobbying tasks in the United States. That work included, among other things, the dissemination of ghostwritten articles in the American press and the arrangement of meetings with politicians in the legislative branch and members of the Executive Branch (in coordination with Companies A and B).

9. As one example of the Hapsburg group's lobbying directed towards the United States, in September 2012, members of the Senate Foreign Relations Committee were considering a resolution condemning as "politically motivated" the prosecution of Yulia Tymoshenko. Manafort and Gates, with the assistance of Persons D1 and D2, arranged for members of the

Hapsburg group to lobby United States senators on behalf of Ukraine. Manafort emphasized that one of the senators should be made aware that one member of the Hapsburg group was a "representative of the President of the [European Parliament]," but did not disclose that that member was a paid lobbyist for Ukraine. A copy of the correspondence memorializing the Ministry of Foreign Affairs's instructions, Manafort's guidance, and outreach to senators is attached hereto as Exhibit D.

10.  As another example, in early 2013, Manafort, Gates, and Persons D1 and D2 arranged for members of the Hapsburg group to meet with politicians and others in Washington, D.C. In connection with one member's visit to Washington, D.C., Gates and others arranged for the member of the Hapsburg group to submit an op-ed to *The Hill*. *See* Ex. E. Persons D1 and D2 drafted the op-ed, and redrafted it after receiving Manafort's direction that it not appear "too partisan" for the Hapsburg group member. Once satisfied with the piece, Manafort noted that it was "[a]lmost a waste not to use this on the FT, NYT, WSJ, WP, caliber newspapers." *See* Ex. F. The article was placed in *The Hill*, a newspaper and website published in Washington, D.C., on March 4, 2013.

11.  In connection with another member of the Hapsburg group's trip to Washington in early 2013, Gates and Manafort communicated with Persons D1 and D2 regarding the trip. Gates sent Manafort an agenda memorializing the member's scheduled meetings with senators, congressmen, and members of their staffs. That agenda is attached hereto as Exhibit G. As explained by an employee of Company B to an embassy employee making border entry arrangements, the Hapsburg group member would "be traveling to Washington, DC next week" and would "be meeting with US Government officials and Members of Congress." *See* Ex. H. Person D2 told the government that he attended the meetings in Washington, D.C. with the member

of the Hapsburg group and members of Congress, among others.  Person D2 further stated that after the meetings with United States government officials, the member of the Hapsburg group, Person D2, and Manafort met at the Willard Hotel for drinks.  After the member of the Hapsburg group left, Person D2 and Manafort remained at the hotel and discussed how the meetings had gone.  Manafort reported that he had received positive feedback regarding the meetings from a "backchannel" source, and, in Person D2's view, Manafort was happy with the results.

12. As a final example, when an editorial regarding Ukraine appeared in *The New York Times* in January 2014, Gates forwarded the article to Persons D1 and D2 with instructions that a member of the Hapsburg group should write a "response."  *See* Ex. I.  Persons D1 and D2 drafted an op-ed on behalf of one of the members of the Hapsburg group, *see* Ex. J, Gates offered comments, *see* Ex. K, and the op-ed ran in *The New York Times* in or around February 2014, *see* Ex. L.

   C. **Efforts to Contact Persons D1 and D2**

13. Documents produced by Persons D1 and D2, statements made by Persons D1 and D2 to the government, telephone records obtained by the government, and documents recovered pursuant to a court-authorized search of Manafort's iCloud account evidence that Manafort, while on bail from this Court, and with the assistance of Person A, contacted and attempted to contact Persons D1 and D2 in an effort to influence their testimony and to otherwise conceal evidence. The investigation into this matter is ongoing.[1]

14. On February 24, 2018—the day after Gates pleaded guilty—Manafort sent Person D1 the message "This is paul."  Manafort's toll records for his cell phone indicate that he called a number associated with Person D1 the same day, and that the two had a call lasting 1 minute and

---

[1] Persons D1 and D2 provided the content of the text messages described below in May 2018.

24 seconds.  On February 25 and 27, 2018, Manafort attempted to call another phone number associated with Person D1, but did not connect.  Person D1 told the government that in or around this period, Manafort called Person D1, and that the two had not spoken since July of the previous year.  Person D1 stated that after answering the call and after the caller identified himself as Manafort, Manafort stated that he wanted to give Person D1 a heads-up about Hapsburg.  Person D1 immediately ended the call because he was concerned about the outreach.

      15.     On February 26, 2018, Manafort sent Person D1 a series of messages using an encrypted application on his phone.  The messages read as follows:

- **23:56:** http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T
- **23:57:** We should talk. I have made clear that they worked in Europe.

The government confirmed that these messages were sent by Manafort, upon review of Manafort's iCloud account pursuant to a court-authorized search.  Information contained in Manafort's iCloud account further indicates that Manafort attempted to call Person D1 from the same encrypted application on February 27, 2018.

      16.     The web address included in Manafort's "23:56" message contains an article describing the Superseding Indictment and its inclusion of allegations concerning the Hapsburg group and its work in the United States.  *See* Michael Kranz, *Former European leaders struggle to explain themselves after Mueller claims Paul Manafort paid them to lobby for Ukraine*, Business Insider (Feb. 25, 2018), *available at* http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T (attached hereto as Exhibit M) ("According to Mueller's indictment, two European politicians were secretly paid around €2 million by Manafort in order to 'take positions favorable to Ukraine, including by lobbying in the United States.'").

      17.     On February 28, 2018, Person A separately contacted Person D2 via an encrypted messaging application.  Person D2 worked for years with Person D1, and was known to Manafort

and Person A as a key associate of Person D1.  Person D2 told the government that he worked on press strategy for the Hapsburg group, and did work on behalf of Ukraine in the United States and Europe.  Person A's texts to Person D2 read as follows:

- 01:49: [Person D2], hi! How are you? Hope you are doing fine. ;))
- 01:51: My friend P is trying to reach [Person D1] to brief him on what's going on.
- 01:51: If you have a chance to mention this to [Person D1] - would be great.
- 01:53: Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU

Approximately four hours later, Person A switched to another encrypted application and sent a similar series of messages to Person D2.

18.     Approximately one month later, Person A reached out to Person D1 directly as well. On April 4, 2018, Person A sent a message to Person D1: "Hi. This is [Person A's first initial]. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." Person A reached out to Person D2 the same day, and reiterated his need for help in connecting Person D1 with Manafort.  Person A added in his text to Person D2: "I tried him [*i.e.*, Person D1] on all numbers."  A timeline summarizing the above-described communications is attached hereto as Exhibit N.

19.     Person D1 told the government that Person D1 understood Manafort's messages to be an effort to "suborn perjury" by influencing Person D1's potential statements.  Person D1 well knew and believed from frequent interactions with its members that the Hapsburg group in fact lobbied in the United States, and that Manafort and Person A knew that fact.

20.     Person D2 told the government that Person D1 had also told him that Manafort had called Person D1 to discuss the new indictment, but that Person D1 abruptly ended the call.  Person D2 further stated that he received the messages from Person A "out of the blue," but did not open them at the time for fear of alerting Person A that he had read them.  (Person D2 could, however,

7

read the first few lines of each message in the preview screen of the electronic application.) Person D2 stated that, in his opinion, Manafort and Person A were reaching out to him and Person D1 because Company D "owned" the Hapsburg group and served as intermediaries between Manafort, Gates, and Person A, on the one hand, and the Hapsburg group on the other. Person D2 further stated that he understood Manafort and Person A's outreach to him and Person D1 to be an effort to get at least Person D1 to relay a message to the members of the Hapsburg group: if the members of the Hapsburg group were contacted by anyone, they should say their lobbying and public-relations work was exclusively in Europe. Person D2 stated to the government that the Hapsburg group worked in Europe and in the United States, and that he understood that one of the goals of the Hapsburg group was to lobby in the United States.

Respectfully submitted,

6/4/2018
Date

Brock W. Domin
Special Agent
Federal Bureau of Investigation