IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO.  17-201 (ABJ)(S-4) |
| v. | * | |
| | * | (18 U.S.C. §§ 2, 371, 981(a)(1)(C), 982, |
| PAUL J. MANAFORT, JR., and | * | 1001(a), 1512(b)(1), 1512(k), 1956(h), |
| KONSTANTIN KILIMNIK, | * | and 3551 et seq.; 22 U.S.C. §§ 612, |
| | * | 618(a)(1), and 618(a)(2); 28 U.S.C. |
| Defendants. | * | § 2461(c)) |
| | * | |

*******

## SUPERSEDING INDICTMENT

The Grand Jury for the District of Columbia charges:

## Introduction

At all times relevant to this Superseding Indictment:

1.     Defendant PAUL J. MANAFORT, JR. (MANAFORT) served for years as a political consultant and lobbyist.  Between at least 2006 and 2015, MANAFORT, through companies he ran, acted as an unregistered agent of a foreign government and foreign political parties. Specifically, he represented the Government of Ukraine, the President of Ukraine (Victor Yanukovych, who was President from 2010 to 2014), the Party of Regions (a Ukrainian political party led by Yanukovych), and the Opposition Bloc (a successor to the Party of Regions after Yanukovych fled to Russia in 2014).

2.     MANAFORT generated tens of millions of dollars in income as a result of his Ukraine work.  From approximately 2006 through 2017, MANAFORT, along with others including Richard W. Gates III (Gates), engaged in a scheme to hide the Ukraine income from United States authorities, while enjoying the use of the money.  From approximately 2006 to 2015, when

1

MANAFORT was generating tens of millions of dollars in income from his Ukraine activities, MANAFORT, with the assistance of Gates, avoided paying taxes by disguising tens of millions of dollars in income as alleged "loans" from nominee offshore corporate entities and by making millions of dollars in unreported payments from foreign accounts to bank accounts they controlled and United States vendors. MANAFORT also used the offshore accounts to purchase real estate in the United States, and MANAFORT used the undisclosed income to make improvements to and refinance his United States properties.

3.      In furtherance of the scheme, MANAFORT, with the assistance of Gates, funneled millions of dollars in payments into numerous foreign nominee companies and bank accounts, opened by them and their accomplices in nominee names and in various foreign countries, including Cyprus, Saint Vincent & the Grenadines (Grenadines), and the Seychelles. MANAFORT concealed the existence and ownership of the foreign companies and bank accounts, falsely and repeatedly reporting to his tax preparers and to the United States that he had no foreign bank accounts.

4.      In furtherance of the scheme, MANAFORT, with the assistance of Gates, concealed from the United States his work as an agent of, and millions of dollars in payments from, Ukraine and its political parties and leaders. Because MANAFORT, among other things, participated in a campaign to lobby United States officials on behalf of the Government of Ukraine, the President of Ukraine, and the Party of Regions, he was required by law to report to the United States his work and fees. MANAFORT did not do so. Instead, when the Department of Justice sent inquiries to MANAFORT and Gates in 2016 about their activities, MANAFORT and Gates responded with a series of false and misleading statements.

5.      In furtherance of the scheme, MANAFORT used his hidden overseas wealth to enjoy a lavish lifestyle in the United States, without paying taxes on that income. MANAFORT, without

reporting the income to his tax preparer or the United States, spent millions of dollars on luxury goods and services for himself and his extended family through payments wired from offshore nominee accounts to United States vendors.  MANAFORT also used these offshore accounts to purchase multi-million dollar properties in the United States and to improve substantially another property owned by his family.

6.      In total, more than $75,000,000 flowed through these offshore accounts.  MANAFORT, with the assistance of Gates, laundered more than $30,000,000, income that he concealed from the United States Department of the Treasury (Treasury), the Department of Justice, and others.

## Relevant Individuals And Entities

7.      MANAFORT was a United States citizen.  He resided in homes in Virginia, Florida, and Long Island, New York.

8.      In 2005, MANAFORT and another partner created Davis Manafort Partners, Inc. (DMP) to engage principally in political consulting.  DMP had staff in the United States, Ukraine, and Russia.  In 2011, MANAFORT created DMP International, LLC (DMI) to engage in work for foreign clients, in particular political consulting, lobbying, and public relations for the Government of Ukraine, the Party of Regions, and members of the Party of Regions.  DMI was a partnership solely owned by MANAFORT and his spouse.  Gates worked for both DMP and DMI and served as MANAFORT's right-hand man.  Defendant KONSTANTIN KILIMNIK (KILIMNIK) worked for DMI and oversaw its Kiev office.

9.      The Party of Regions was a pro-Russia political party in Ukraine.  Beginning in approximately 2006, it retained MANAFORT, through DMP and then DMI, to advance its interests in Ukraine, the United States, and elsewhere, including the election of its Ukrainian slate of candidates.  In 2010, its candidate for President, Yanukovych, was elected President of Ukraine.

In 2014, Yanukovych fled Ukraine for Russia in the wake of popular protests of widespread governmental corruption.  Yanukovych, the Party of Regions, and the Government of Ukraine were MANAFORT, DMP, and DMI clients.

10.     The European Centre for a Modern Ukraine (the Centre) was created in or about 2012 in Belgium as a mouthpiece for Yanukovych and the Party of Regions.  It reported to the Ukraine First Vice Prime Minister.  The Centre was used by MANAFORT, Gates, and others in order to lobby and conduct a public relations campaign in the United States and Europe on behalf of the existing Ukraine regime.  The Centre effectively ceased to operate upon the downfall of Yanukovych in 2014.

11.     MANAFORT, with the assistance of Gates, owned or controlled the following entities, which were used in the scheme (the MANAFORT entities):

<u>Domestic Entities</u>

| Entity Name | Date Created | Incorporation Location |
| --- | --- | --- |
| Daisy Manafort, LLC (PM) | August 2008 | Virginia |
| | March 2011 | Florida |
| Davis Manafort International LLC (PM) | March 2007 | Delaware |
| DMP (PM) | March 2005 | Virginia |
| | March 2011 | Florida |
| Davis Manafort, Inc. (PM) | October 1999 | Delaware |
| | November 1999 | Virginia |
| DMI  (PM) | June 2011 | Delaware |
| | March 2012 | Florida |
| Global Sites LLC (PM, RG) | July 2008 | Delaware |

4

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Jesand Investment Corporation (PM) | April 2002 | Virginia |
| Jesand Investments Corporation (PM) | March 2011 | Florida |
| John Hannah, LLC (PM) | April 2006 | Virginia |
| | March 2011 | Florida |
| Lilred, LLC (PM) | December 2011 | Florida |
| LOAV Ltd. (PM) | April 1992 | Delaware |
| MC Brooklyn Holdings, LLC (PM) | November 2012 | New York |
| MC Soho Holdings, LLC (PM) | January 2012 | Florida |
| | April 2012 | New York |
| Smythson LLC (also known as Symthson LLC) (PM, RG) | July 2008 | Delaware |

Cypriot Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Actinet Trading Limited (PM, RG) | May 2009 | Cyprus |
| Black Sea View Limited (PM, RG) | August 2007 | Cyprus |
| Bletilla Ventures Limited (PM, RG) | October 2010 | Cyprus |
| Global Highway Limited (PM, RG) | August 2007 | Cyprus |
| Leviathan Advisors Limited (PM, RG) | August 2007 | Cyprus |
| LOAV Advisors Limited (PM, RG) | August 2007 | Cyprus |
| Lucicle Consultants Limited (PM, RG) | December 2008 | Cyprus |
| Marziola Holdings Limited (PM) | March 2012 | Cyprus |
| Olivenia Trading Limited (PM, RG) | March 2012 | Cyprus |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Peranova Holdings Limited (Peranova) (PM, RG) | June 2007 | Cyprus |
| Serangon Holdings Limited (PM, RG) | January 2008 | Cyprus |
| Yiakora Ventures Limited (PM) | February 2008 | Cyprus |

Other Foreign Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Global Endeavour Inc. (also known as Global Endeavor Inc.) (PM) | *Unknown* | Grenadines |
| Jeunet Ltd. (PM) | August 2011 | Grenadines |
| Pompolo Limited (PM, RG) | April 2013 | United Kingdom |

12.    The Internal Revenue Service (IRS) was a bureau in the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the Treasury.

**The Scheme**

13.    Between in or around 2006 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, MANAFORT and others devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises from the United States and others.  As part of the scheme, MANAFORT repeatedly provided and caused to be provided false information to financial bookkeepers, tax accountants, and legal counsel, among others.

<u>MANAFORT's Wiring Money From Offshore Accounts Into The United States</u>

14.     In order to use the money in the offshore nominee accounts of the MANAFORT entities

without paying taxes on it, MANAFORT caused millions of dollars in wire transfers from these

accounts to be made for goods, services, and real estate.  He did not report these transfers as

income.

15.     From 2008 to 2014, MANAFORT caused the following wires, totaling over $12,000,000,

to be sent to the vendors listed below for personal items.  MANAFORT did not pay taxes on this

income, which was used to make the purchases.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **Vendor A** (Home Improvement Company in the Hamptons, New York) | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | Global Endeavour Inc. | Grenadines | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | **Vendor A Total** | **$5,434,793** |
| **Vendor B** (Home Automation, Lighting, and Home Entertainment Company in Florida) | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 11/5/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | | | **Vendor B Total** | **$1,319,281** |
| **Vendor C** (Antique Rug Store in Alexandria, Virginia) | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | **Vendor C Total** | **$934,350** |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **Vendor D** (Related to Vendor C) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | **Vendor D Total** | **$100,000** |
| **Vendor E** (Men's Clothing Store in New York) | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |
| | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |
| | 10/15/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/24/2014 | Global Endeavour Inc. | Grenadines | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | | | **Vendor E Total** | **$849,215** |
| **Vendor F** (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | **Vendor F Total** | **$655,500** |
| **Vendor G** (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | **Vendor G Total** | **$623,910** |
| **Vendor H** (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | **Vendor H Total** | **$520,440** |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **Vendor I** (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | **Vendor I Total** | **$500,000** |
| **Vendor J** (Contractor in Florida) | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | **Vendor J Total** | **$432,487** |
| **Vendor K** (Landscaper in the Hamptons, New York) | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | | | **Vendor K Total** | **$164,740** |
| **Vendor L** (Payments Relating to Three Range Rovers) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | **Vendor L Total** | **$163,705** |
| **Vendor M** (Contractor in Virginia) | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | | | **Vendor M Total** | **$125,650** |
| **Vendor N** (Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, New York) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | **Vendor N Total** | **$112,825** |
| **Vendor O** (Purchase of Mercedes Benz) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |
| | | | **Vendor O Total** | **$62,750** |
| **Vendor P** (Purchase of Range Rover) | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Vendor P Total** | **$47,000** |
| **Vendor Q** (Property Management Company in South Carolina) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| **Vendor R** (Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| **Vendor S** (Housekeeping in New York) | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

16.    In 2012, MANAFORT caused the following wires to be sent to the entities listed below to purchase the real estate also listed below.  MANAFORT did not report the money used to make these purchases on his 2012 tax return.

| Property Purchased | Payee | Date | Originating Account | Country of Origination | Amount |
|---|---|---|---|---|---|
| Howard Street Condominium (New York) | DMP International LLC | 2/1/2012 | Peranova | Cyprus | $1,500,000 |
| Union Street Brownstone, (New York) | Attorney Account Of [Real Estate Attorney] | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,800,000 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,200,000 |
| Arlington House (Virginia) | Real Estate Trust | 8/31/2012 | Lucicle Consultants Limited | Cyprus | $1,900,000 |
| **Total** | | | | | **$6,400,000** |

17.    MANAFORT also disguised, as purported "loans," more than $10 million from Cypriot entities, including the overseas MANAFORT entities, to domestic entities owned by MANAFORT.  For example, a $1.5 million wire from Peranova to DMI that MANAFORT used to purchase real estate on Howard Street in Manhattan, New York, was recorded as a "loan" from Peranova to DMI, rather than as income.  The following loans were shams designed to reduce fraudulently MANAFORT's reported taxable income.

| Year | Payor / Ostensible "Lender" | Payee / Ostensible "Borrower" | Country of Origination | Total Amount of "Loans" |
|---|---|---|---|---|
| 2008 | Yiakora Ventures Limited | Jesand Investment Corporation | Cyprus | $8,120,000 |
| 2008 | Yiakora Ventures Limited | DMP | Cyprus | $500,000 |
| 2009 | Yiakora Ventures Limited | DMP | Cyprus | $694,000 |
| 2009 | Yiakora Ventures Limited | Daisy Manafort, LLC | Cyprus | $500,000 |
| 2012 | Peranova | DMI | Cyprus | $1,500,000 |

| Year | Payor / Ostensible "Lender" | Payee / Ostensible "Borrower" | Country of Origination | Total Amount of "Loans" |
|------|------|------|------|------|
| 2014 | Telmar Investments Ltd. | DMI | Cyprus | $900,000 |
| 2015 | Telmar Investments Ltd. | DMI | Cyprus | $1,000,000 |
| **Total** | | | | **$13,214,000** |

18.     From 2010 to 2014, Gates caused the following wires, totaling more than $3,000,000, to be sent to entities and bank accounts of which he was a beneficial owner or he otherwise controlled.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|------|------|------|------|------|
| Richard Gates United Kingdom Bank Account A | 3/26/2010 | Serangon Holdings Limited | Cyprus | $85,000 |
| | 4/20/2010 | Serangon Holdings Limited | Cyprus | $50,000 |
| | 5/6/2010 | Serangon Holdings Limited | Cyprus | $150,000 |
| Richard Gates United Kingdom Bank Account B | 9/7/2010 | Serangon Holdings Limited | Cyprus | $160,000 |
| | 10/13/2010 | Serangon Holdings Limited | Cyprus | $15,000 |
| Richard Gates United States Bank Account C | 9/27/2010 | Global Highway Limited | Cyprus | $50,000 |
| | | **2010 Tax Year Total** | | **$510,000** |
| Jemina LLC United States Bank Account D | 9/9/2011 | Peranova | Cyprus | $48,500 |
| Richard Gates United Kingdom Bank Account B | 12/16/2011 | Peranova | Cyprus | $100,435 |
| | | **2011 Tax Year Total** | | **$148,935** |
| Richard Gates United Kingdom Bank Account B | 1/9/2012 | Global Highway Limited | Cyprus | $100,000 |
| | 1/13/2012 | Peranova | Cyprus | $100,435 |
| | 2/29/2012 | Global Highway Limited | Cyprus | $28,500 |
| | 3/27/2012 | Bletilla Ventures Limited | Cyprus | $18,745 |
| | 4/26/2012 | Bletilla Ventures Limited | Cyprus | $26,455 |
| | 5/30/2012 | Bletilla Ventures Limited | Cyprus | $15,000 |
| | 5/30/2012 | Lucicle Consultants Limited | Cyprus | $14,650 |
| | 6/27/2012 | Bletilla Ventures Limited | Cyprus | $18,745 |
| | 8/2/2012 | Bletilla Ventures Limited | Cyprus | $28,745 |
| | 8/30/2012 | Bletilla Ventures Limited | Cyprus | $38,745 |
| | 9/27/2012 | Bletilla Ventures Limited | Cyprus | $32,345 |
| | 10/31/2012 | Bletilla Ventures Limited | Cyprus | $46,332 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|-------|------------------|----------------------------|------------------------|-----------------------|
| | 11/20/2012 | Bletilla Ventures Limited | Cyprus | $48,547 |
| | 11/30/2012 | Bletilla Ventures Limited | Cyprus | $38,532 |
| | 12/21/2012 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | 12/28/2012 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | | | **2012 Tax Year Total** | **$651,448** |
| Richard Gates United Kingdom Bank Account B | 1/11/2013 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | 1/22/2013 | Bletilla Ventures Limited | Cyprus | $34,783 |
| | 1/30/2013 | Bletilla Ventures Limited | Cyprus | $46,583 |
| | 2/22/2013 | Bletilla Ventures Limited | Cyprus | $46,233 |
| | 2/28/2013 | Bletilla Ventures Limited | Cyprus | $46,583 |
| | 3/1/2013 | Bletilla Ventures Limited | Cyprus | $42,433 |
| | 3/15/2013 | Bletilla Ventures Limited | Cyprus | $37,834 |
| | 4/15/2013 | Bletilla Ventures Limited | Cyprus | $59,735 |
| | 4/26/2013 | Bletilla Ventures Limited | Cyprus | $48,802 |
| | 5/17/2013 | Olivenia Trading Limited | Cyprus | $57,798 |
| | 5/30/2013 | Actinet Trading Limited | Cyprus | $45,622 |
| | 6/13/2013 | Lucicle Consultants Limited | Cyprus | $76,343 |
| | 8/7/2013 | Pompolo Limited | United Kingdom | $250,784 |
| | 9/6/2013 | Lucicle Consultants Limited | Cyprus | $68,500 |
| | 9/13/2013 | Cypriot Agent | Cyprus | $179,216 |
| Jemina LLC United States Bank Account D | 7/8/2013 | Marziola Holdings Limited | Cyprus | $72,500 |
| | 9/4/2013 | Marziola Holdings Limited | Cyprus | $89,807 |
| | 10/22/2013 | Cypriot Agent | Cyprus | $119,844 |
| | 11/12/2013 | Cypriot Agent | Cyprus | $80,000 |
| | 12/20/2013 | Cypriot Agent | Cyprus | $90,000 |
| | | | **2013 Tax Year Total** | **$1,541,237** |
| Jemina LLC United States Bank Account D | 2/10/2014 | Cypriot Agent | Cyprus | $60,044 |
| | 4/29/2014 | Cypriot Agent | Cyprus | $44,068 |
| | 10/6/2014 | Global Endeavour Inc. | Grenadines | $65,000 |
| Bade LLC United States Bank Account E | 11/25/2014 | Global Endeavour Inc. | Grenadines | $120,000 |
| | | | **2014 Tax Year Total** | **$289,112** |

<u>MANAFORT And Gates' Hiding Ukraine Lobbying And Public Relations Work</u>

19.     It is illegal to act as an agent of a foreign principal engaged in certain United States influence

activities without registering the affiliation.  Specifically, a person who engages in lobbying or public relations work in the United States (hereafter collectively referred to as lobbying) for a foreign principal, such as the Government of Ukraine or the Party of Regions, is required to provide a detailed written registration statement to the United States Department of Justice.  The filing, made under oath, must disclose the name of the foreign principal, the financial payments to the lobbyist, and the measures undertaken for the foreign principal, among other information.  A person required to make such a filing must further include in all lobbying material a "conspicuous statement" that the materials are distributed on behalf of the foreign principal, among other things. The filing thus permits public awareness and evaluation of the activities of a lobbyist who acts as an agent of a foreign power or foreign political party in the United States.

20.    In furtherance of the scheme, from 2006 until 2014, both dates being approximate and inclusive, MANAFORT, with the assistance of Gates, KILIMNIK, and others, engaged in a multi-million dollar lobbying campaign in the United States at the direction of Yanukovych, the Party of Regions, and the Government of Ukraine.  MANAFORT did so without registering and providing the disclosures required by law.

21.    As one part of the scheme, in February 2012, MANAFORT, with the assistance of Gates, solicited two Washington, D.C., firms (Company A and Company B) to lobby in the United States on behalf of Yanukovych, the Party of Regions, and the Government of Ukraine.  For instance, Gates wrote to Company A that it would be "representing the Government of Ukraine in [Washington,] DC."

22.    MANAFORT repeatedly communicated in person and in writing with Yanukovych, and Gates passed on directions to Company A and Company B.  For instance, MANAFORT wrote Yanukovych a memorandum dated April 8, 2012, in which he provided Yanukovych an update on

the lobbying firms' activities "since the inception of the project a few weeks ago. It is my intention to provide you with a weekly update moving forward." Toward the end of that first year, in November 2012, Gates wrote to Company A and Company B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013."

23.     At the direction of MANAFORT and Gates, Company A and Company B engaged in extensive lobbying. Among other things, they lobbied multiple Members of Congress and their staffs about Ukraine sanctions, the validity of Ukraine elections, and the propriety of Yanukovych's imprisoning his presidential rival, Yulia Tymoshenko. In addition, with the assistance of Company A, MANAFORT directly lobbied a Member of Congress who had Ukraine within his subcommittee's purview, and reported in writing that lobbying effort to senior Government of Ukraine leadership.

24.     To minimize public disclosure of their lobbying campaign and distance their work from the Government of Ukraine, MANAFORT, Gates, and others arranged for the Centre to be the nominal client of Company A and Company B, even though in fact the Centre was under the ultimate direction of the Government of Ukraine, Yanukovych, and the Party of Regions. For instance, MANAFORT and Gates selected Company A and Company B, and only thereafter did the Centre sign contracts with the lobbying firms without ever meeting either company. Company A and Company B were paid for their services not by their nominal client, the Centre, but solely through offshore accounts associated with the MANAFORT entities, namely Bletilla Ventures Limited (in Cyprus) and Jeunet Ltd. and Global Endeavour Inc. (in Grenadines). In total, Company A and Company B were paid more than $2 million from these accounts between 2012 and 2014. Indeed, various employees of Company A and Company B viewed the Centre as a fig leaf. As a Company

A employee noted to another employee: Gates was lobbying for the Centre "in name only. [Y]ou've gotta see through the nonsense of that[.]"

25.     Neither Company A nor Company B registered as required with the United States Department of Justice.  In order to avoid such registration, Gates provided the companies a false and misleading signed statement from the Centre, stating that it was not "directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in part by a government of a foreign country or a foreign political party."  In fact, the Centre took direction from Yanukovych and the Party of Regions, as MANAFORT and Gates knew.

26.     To conceal the scheme, MANAFORT and Gates developed a false and misleading cover story that would distance themselves and the Government of Ukraine, Yanukovych, and the Party of Regions from the Centre, Company A, and Company B.  For instance, in the wake of extensive press reports on MANAFORT and his connections with Ukraine, on August 16, 2016, Gates communicated false and misleading talking points to Company B in writing, including:

- Q: "Can you describe your initial contact with [Company B] and the lobbying goals he discussed with them?"  A: "We provided an introduction between the [Centre] and [Company B/Company A] in 2012.  The [Centre] was seeking to retain representation in Washington, DC to support the mission of the NGO."

- A: "Our [MANAFORT and Gates'] task was to assist the [Centre to] find representation in Washington, but at no time did our firm or members provide any direct lobbying support."

- A: "The structure of the arrangement between the [Centre] and [Company A / Company B] was worked out by the two parties."

- Q: "Can you say where the funding from for [sic] the [Centre] came from? (this

19

amounted to well over a million dollars between 2012 and 2014)."  A: "This is a question better asked of the [Centre] who contracted with the two firms."

- Q: "Can you describe the lobbying work specifically undertaken by [Company B] on behalf of the Party of Regions/the [Centre]?"  A: "This is a question better asked to [Company B] and/or the [Centre] as the agreement was between the parties.  Our firm did not play a role in the structure, nor were we registered lobbyists."

Company B through a principal replied to Gates the same day that "there's a lot of email traffic that has you much more involved than this suggests[.]  We will not disclose that but heaven knows what former employees of [Company B] or [Company A] might say."

27.     In September 2016, after numerous recent press reports concerning MANAFORT, the Department of Justice informed MANAFORT, Gates, and DMI that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act (FARA), without registering.  In November 2016 and February 2017, MANAFORT, Gates, and DMI caused false and misleading letters to be submitted to the Department of Justice, which mirrored the false cover story set out above.  The letters, both of which were approved by MANAFORT and Gates before they were submitted, represented, among other things, that:

- DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

- MANAFORT and Gates did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications.  Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and

conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

- MANAFORT and Gates had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

- DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents."  The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

28.    In fact, MANAFORT and Gates had: selected Company A and Company B; engaged in weekly scheduled calls and frequent e-mails with Company A and Company B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Company A and Company B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the lobbying firms over $2 million from offshore accounts they controlled, among other things.  In addition, court-authorized searches of MANAFORT and Gates' DMI email accounts in 2017 and a search of MANAFORT's Virginia residence in July 2017 revealed numerous documents, including documents related to lobbying, which were more than thirty-days old at the time of the November 2016 letter to the Department of Justice.

29.    As a second part of the lobbying scheme, in 2012, MANAFORT, with the assistance of Gates, on behalf of Yanukovych and the Government of Ukraine's Ministry of Justice, retained a United States law firm to write a report on the trial of Tymoshenko, among other things.  The

treatment of Tymoshenko was condemned by the United States and was viewed as a major hurdle to normalization of relations with Ukraine.  MANAFORT and Gates used one of their offshore accounts to funnel $4 million to pay for the report, a fact that was not disclosed in the report or to the public.  They also retained a public relations firm (Company C) to create and implement a roll-out plan for the report.  MANAFORT and Gates again secretly used one of their offshore accounts to pay Company C, funneling the equivalent of more than $1 million to pay for the work. MANAFORT, Gates, and their conspirators developed detailed written lobbying plans in connection with the dissemination of the law firm's report, including outreach to United States politicians and press.  MANAFORT reported on the law firm's work and the lobbying plan to representatives of the Government of Ukraine, including President Yanukovych.  For instance, a July 27, 2012, memorandum from MANAFORT noted: "[t]his document will address the global rollout strategy for the [law firm's] legal report, and provide a detailed plan of action[]."  The plans included lobbying in the United States.

30.     As a third part of the lobbying scheme, in or about 2012, MANAFORT, with the assistance of Gates and KILIMNIK, on behalf of Yanukovych and the Party of Regions, secretly retained a group of former senior European politicians to take positions favorable to Ukraine, including by lobbying in the United States.  The plan was for the former politicians, informally called the "Hapsburg group," to appear to be providing their independent assessments of Government of Ukraine actions, when in fact they were paid lobbyists for Ukraine.  In 2012 and 2013, MANAFORT used at least four offshore accounts to wire more than 2 million euros to pay the group of former politicians.

31.     MANAFORT explained in an "EYES ONLY" memorandum created in or about June 2012 that the purpose of the "SUPER VIP" effort would be to "assemble a small group of high-level

European highly influencial [sic] champions and politically credible friends who can act informally and without any visible relationship with the Government of Ukraine." Yanukovych and the Party of Regions through MANAFORT retained an additional group of lobbyists (Company D and Persons D1 and D2, among others) to serve as intermediaries with the Hapsburg group and to engage in other lobbying for Ukraine.  The Hapsburg group was led by a former European Chancellor, Foreign Politician A, who coordinated with MANAFORT, KILIMNIK, and Person D1.  As explained by MANAFORT, a nongovernmental agency would be created to retain this group, but it would act "at our quiet direction."  In or about 2013, Foreign Politician A and other former politicians from the group lobbied United States Members of Congress, officials in the Executive Branch, and their staffs in coordination with MANAFORT, Gates, KILIMNIK, Persons D1 and D2, Company A, and Company B, among others.

<u>MANAFORT's Hiding Foreign Bank Accounts And False Filings</u>

32.    United States citizens who have authority over certain foreign bank accounts—whether or not the accounts are set up in the names of nominees who act for their principals—have reporting obligations to the United States.

33.    First, the Bank Secrecy Act and its implementing regulations require United States citizens to report to the Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeds $10,000 at any point during the year.  This is commonly known as a foreign bank account report or "FBAR."  The Bank Secrecy Act requires these reports because they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.  The Treasury's Financial Crimes Enforcement Network (FinCEN) is the custodian for FBAR filings, and FinCEN provides access to its FBAR database to law

enforcement entities, including the Federal Bureau of Investigation. The reports filed by individuals and businesses are used by law enforcement to identify, detect, and deter money laundering that furthers criminal enterprise activity, tax evasion, and other unlawful activities.

34.     Second, United States citizens are also obligated to report information to the IRS regarding foreign bank accounts. For instance, in 2010, Schedule B of IRS Form 1040 had a "Yes" or "No" box to record an answer to the question: "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" If the answer was "Yes," then the form required the taxpayer to enter the name of the foreign country in which the financial account was located.

35.     For each year in or about and between 2008 through at least 2014, MANAFORT had authority over foreign accounts that required an FBAR filing. Specifically, MANAFORT was required to report to the Treasury each foreign bank account held by the foreign MANAFORT entities noted above in paragraph 11 that bears the initials PM. No FBAR reports were made by MANAFORT for these accounts.

36.     In each of MANAFORT's tax filings for 2008 through 2014, MANAFORT, with the assistance of Gates, represented falsely that he did not have authority over any foreign bank accounts. MANAFORT and Gates had repeatedly and falsely represented in writing to MANAFORT's tax preparer that MANAFORT had no authority over foreign bank accounts, knowing that such false representations would result in false tax filings in MANAFORT's name. For instance, on October 4, 2011, MANAFORT's tax preparer asked MANAFORT in writing: "At any time during 2010, did you [or your wife or children] have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account

or other financial account?"   On the same day, MANAFORT falsely responded "NO."

MANAFORT responded the same way as recently as October 3, 2016, when MANAFORT's tax

preparer again emailed the question in connection with the preparation of MANAFORT's tax

returns: "Foreign bank accounts etc.?"   MANAFORT responded on or about the same day:

"NONE."

## Statutory Allegations

## COUNT ONE
### (Conspiracy Against The United States)

37.    Paragraphs 1 through 36 are incorporated here.

38.    From in or about and between 2006 and 2017, both dates being approximate and inclusive,

in the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., together

with others, knowingly and intentionally conspired to defraud the United States by impeding,

impairing, obstructing, and defeating the lawful governmental functions of a government agency,

namely the Department of Justice and the Treasury, and to commit offenses against the United

States, to wit: the violations of law charged in Counts Three, Four, and Five, and to unlawfully,

willfully, and knowingly fail to file with the Treasury an FBAR disclosing a financial interest in,

and signature and other authority over, a bank, securities, and other financial account in a foreign

country, which had an aggregate value of more than $10,000 in a 12-month period, in violation of

31 U.S.C. §§ 5314 and 5322(a).

39.    In furtherance of the conspiracy and to effect its illegal object, MANAFORT and his

conspirators committed the overt acts noted in Count Four and the overt acts, among others, in the

District of Columbia and elsewhere, set forth in paragraphs 8–11,14–18, 20–31, and 35–36, which

are incorporated herein.

(18 U.S.C. §§ 371 and 3551 et seq.)

**COUNT TWO**
**(Conspiracy To Launder Money)**

40.     Paragraphs 1 through 36 are incorporated here.

41.     In or around and between 2006 and 2016, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., together with others,  did knowingly and intentionally conspire to:

(a) transport, transmit, and transfer monetary instruments and funds from places outside the United States to and through places in the United States and from places in the United States to and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: a felony violation of FARA, in violation of Title 22, United States Code, Sections 612 and 618 (the "Specified Unlawful Activity"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

(b) conduct financial transactions, affecting interstate and foreign commerce, knowing that the property involved in the financial transactions would represent the proceeds of some form of unlawful activity, and the transactions in fact would involve the proceeds of the Specified Unlawful Activity, knowing that such financial transactions were designed in whole and in part (i) to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986, and (ii) to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(ii) and 1956(a)(1)(B)(i).

(18 U.S.C. §§ 1956(h) and 3551 et seq.)

## COUNT THREE
### (Unregistered Agent Of A Foreign Principal)

42.     Paragraphs 1 through 36 are incorporated here.

43.     From in or about and between 2008 and 2014, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., knowingly and willfully acted as an agent of a foreign principal, and caused and aided and abetted Companies A, B, and C, and others, including former senior foreign politicians, to act as agents of a foreign principal, to wit, the Government of Ukraine, the Party of Regions, and Yanukovych, without registering with the Attorney General as required by law.

(22 U.S.C. §§ 612 and 618(a)(1); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNT FOUR
### (False and Misleading FARA Statements)

44.     Paragraphs 1 through 36 are incorporated here.

45.     On or about November 23, 2016, and February 10, 2017, within the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., knowingly and willfully caused to be made a false statement of a material fact, and omitted a material fact necessary to make the statements therein not misleading, in a document filed with and furnished to the Attorney General under the provisions of FARA, to wit, the underlined statements:

- "[DMI]'s efforts on behalf of the Party of Regions and Opposition Bloc did not include meetings or outreach within the U.S."

- "[N]either [DMI] nor Messrs. Manafort or Gates had any agreement with the [Centre] to provide services."

- "[DMI] did provide the [Centre], at the request of members of the Party of Regions, with a list of potential U.S.-based consultants—including [Company A and

Company B]—for the [Centre]'s reference and further consideration.  [The Centre]
then contracted directly with [Company A and Company B] to provide services
within the United States for which these entities registered under the Lobbying
Disclosure Act."

- "Although Gates recalls interacting with [the Centre]'s consultants regarding
  efforts in the Ukraine and Europe,  neither Gates nor Mr. Manafort recall meeting
  with or conducting outreach to U.S. government officials or U.S. media outlets on
  behalf of the [the Centre], nor do they recall being party to, arranging, or facilitating
  any such communications. Rather, it is the recollection and understanding of
  Messrs. Gates and Manafort that such communications would have been facilitated
  and conducted by the [Centre]'s U.S. consultants, as directed by the [Centre],
  pursuant to the agreement reached between those parties (to which [DMI] was not
  a party)."

- "[A] search has been conducted for correspondence containing additional
  information related to the matters described in [the government's] Letters.
  However, as a result of [DMI's] Email Retention Policy, which does not retain
  communications beyond thirty days, the search has returned no responsive
  communications."

  (22 U.S.C. §§ 612 and 618(a)(2); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNT FIVE
**(False Statements)**

46.   Paragraphs 1 through 36 and paragraph 45 are incorporated here.

47.   On or about November 23, 2016, and February 10, 2017, within the District of Columbia

and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, the defendant PAUL J. MANAFORT, JR., knowingly and willfully did cause another: to falsify, conceal, and cover up by a scheme and device a material fact; to make a materially false, fictitious, and fraudulent statement and representation; and to make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement, to wit, the statements in the November 23, 2016, and February 10, 2017, submissions to the Department of Justice quoted in paragraph 45.

(18 U.S.C. §§ 2, 1001(a), and 3551 <u>et seq</u>.)

**COUNT SIX**
**(Obstruction Of Justice)**

48.     Paragraphs 1 through 36 are incorporated here.

49.     From in or about and between February 23, 2018, and April 2018, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendants PAUL J. MANAFORT, JR., and KONSTANTIN KILIMNIK knowingly and intentionally attempted to corruptly persuade another person, to wit: Persons D1 and D2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

(18 U.S.C. §§ 2, 1512(b)(1), and 3551 <u>et seq</u>.)

**COUNT SEVEN**
**(Conspiracy to Obstruct Justice)**

50.     Paragraphs 1 through 36 are incorporated here.

51.     From in or about and between February 23, 2018, and April 2018, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendants PAUL J. MANAFORT, JR., and KONSTANTIN KILIMNIK knowingly and intentionally conspired to corruptly persuade another person, to wit: Persons D1 and D2, with intent to influence, delay, and

prevent the testimony of any person in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1).

(18 U.S.C. §§ 1512(k) and 3551 <u>et seq</u>.)

<b><u>FORFEITURE ALLEGATION</u></b>

52.     Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section 2461(c), in the event of the defendants' conviction.  Upon conviction of the offense charged in Count Two, the defendant PAUL J. MANAFORT, JR., shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property.  Upon conviction of the offenses charged in Counts One, Three, Four, Six, and Seven, the defendants PAUL J. MANAFORT, JR., and KONSTANTIN KILIMNIK (as to Counts Six and Seven) shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s) of conviction.  Notice is further given that, upon conviction, the United States intends to seek a judgment against the defendants for a sum of money representing the property described in this paragraph (to be offset by the forfeiture of any specific property).

53.     The grand jury finds probable cause to believe that the property subject to forfeiture by PAUL J. MANAFORT, JR., includes, but is not limited to, the following listed assets:

   a.     The real property and premises commonly known as 377 Union Street, Brooklyn, New York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

   b.     The real property and premises commonly known as 29 Howard Street, #4D, New York, New York 10013 (Block 209, Lot 1104), including all appurtenances, improvements,

30

and attachments thereon, and any property traceable thereto;

c.      The real property and premises commonly known as 1046 N. Edgewood Street, Arlington, Virginia 22201, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

d.      The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

e.      Northwestern Mutual Universal Life Insurance Policy 18268327, and any property traceable thereto;

f.      All funds held in account number XXXX7988 at Charles A. Schwab & Co. Inc., and any property traceable thereto; and

g.      All funds held in account number XXXXXX0969 at The Federal Savings Bank, and any property traceable thereto.

**Substitute Assets**

54.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section

982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853, to seek forfeiture of any other property of said defendants.

Robert S. Mueller, III
Special Counsel
Department of Justice

A TRUE BILL:

Foreperson

Date:  June 8, 2018

32