UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Crim. No. 17-201-01 (ABJ) |
| PAUL J. MANAFORT, JR., and ) | |
| KONSTANTIN KILIMNIK, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANT PAUL J. MANAFORT, JR.'S OPPOSITION TO THE SPECIAL COUNSEL'S MOTION TO REVOKE OR REVISE THE CURRENT ORDER OF PRETRIAL RELEASE

Defendant Paul J. Manafort, Jr., by and through counsel, hereby submits his opposition to the Office of Special Counsel's (the "Special Counsel") motion to revoke or revise the current order of pretrial release (Doc. 315). In his motion, the Special Counsel contrives dubious allegations of witness tampering. From a scant record, the Special Counsel conjures a sinister plot to "corruptly persuade" two of Mr. Manafort's former business associates to perjure themselves at the upcoming trial in September. However, exhibits attached to the Special Counsel's filing support the defendant's position that the mission and work of the so-called Hapsburg Group was European-focused and that the text messages cited by the Special Counsel do not establish any witness tampering. Mr. Manafort's Sixth Amendment right to trial by an impartial jury in this district may have been irreparably damaged by the Special Counsel's latest, very public and very specious, filing of this motion.[1]

---

[1] The Special Counsel's unsupported allegations, made through a *bail submission*, were clearly aimed at generating widespread—and intensely negative—media coverage of Mr. Manafort. *See, e.g.*, *Former Trump Campaign Chair Paul Manafort To Be Jailed For Stupidest Case Of Witness Tampering: Ex-DOJ Official*, Newsweek, June 6, 2018, available at http://www.newsweek.com/trump-campaign-paul-manafort-jail-mueller-investigation-doj-official-961500 (last accessed June 7, 2018); *Former US attorney says Manafort will likely go to prison Friday*, thehill.com, June 6, 2018, available at

BACKGROUND

The order of pretrial release in this case (Doc. 9 (the "Release Order")) sets forth the standard conditions of home confinement with additional conditions that allow Mr. Manafort to visit with his attorneys, make court appearances, and leave his home in the case of a medical emergency. *Id.* The Release Order requires that Mr. Manafort report to Pretrial Services each day by telephone, and it precludes him from applying for a new passport. *Id.* Importantly, the Court's Release Order does *not* order Mr. Manafort to "stay away" from any individuals, nor is a "do not contact" list attached to the Release Order, because there is no basis for imposing such conditions. *Id.*

The Special Counsel creates an argument based on the thinnest of evidence; *to wit*, Mr. Manafort violated the Release Order's standard admonition that a defendant not commit an offense while on release by allegedly attempting to tamper with trial witnesses. However, the scant proof of this claim is an 84-second telephone call and a few text messages between Mr. Manafort (or an associate referred to as "Person A") and two former business associates (Doc. 315-2, Ex. N). These brief text messages followed the filing of the Superseding Indictment on February 23, which was the first time the Special Counsel raised any allegations about the mission and work of the Hapsburg Group. (Doc. 202, ¶¶30, 31.) Closer scrutiny of this "evidence" reveals that the Special

---

http://thehill.com/blogs/blog-briefing-room/news/391058-former-us-attorney-says-manafort-likely-to-go-to-prison-friday (last accessed June 7, 2018); *Mueller accuses Paul Manafort of witness tampering*, Washington Post, June 4, 2018, available at https://www.washingtonpost.com/local/public-safety/mueller-accuses-paul-manafort-of-witness-tampering/2018/06/04/df8fd2c4-685b-11e8-bf8c-f9ed2e672adf_story.html?utm_term=.c2dc56f1fe08 (last accessed June 7, 2018); *Judge orders Manafort to respond to witness tampering claims*, Politico, June 5, 2018, available at https://www.politico.com/story/2018/06/05/manafort-witness-tampering-response-625164 (last accessed June 7, 2018).

Counsel's allegations are without merit because Mr. Manafort's limited communications cannot be fairly read, *either factually or legally*, to reflect an intent to corruptly influence a trial witness.

Indeed, the majority of the communications—which are identified in only *one* exhibit to the motion—are irrelevant, innocuous and unsupportive of the conjured witness tampering claim. For example, the first text message identified by the Special Counsel stated simply: "This is paul." (Doc. 315-2, ¶ 14.) Another communication—a telephone call between Mr. Manafort and the recipient of the aforementioned text message—lasted only 84 seconds, and the Special Counsel does not even identify (with a sworn affidavit or otherwise) the substance of what was discussed.[2] *See id.* The Special Counsel further points to four attempted phone calls in which Mr. Manafort did not connect with anyone. (Doc. 315-2, Ex. N.) And, regarding Person A, the Special Counsel relies on 13 text messages, only a handful of which contain something more than a greeting or a request that the recipient help arrange further contact. *Id.*

Indeed, the crux of the Special Counsel's motion is just two text communications from the defendant and unfounded speculation. Although the agent cites "a series of messages" (Doc. 315-2 at ¶ 17) sent by Mr. Manafort to an unidentified individual ("D1"), the two messages sent on February 26 are the only messages that merit a response. The first only contained a link to a publicly-available news report about certain alleged members of the Hapsburg Group; the second text message, occurring one minute later, simply stated, "We should talk. I have made clear that

---

[2] This is no small matter. It is clear from the Special Agent's declaration that the agent spoke with the person on the other end of the call (*i.e.*, D1). (*See* Doc. 315-2, ¶¶ 19, 20). Instead of identifying what was said exactly for purposes of this motion, however, the Special Counsel instead states what D1 "understood" from Mr. Manafort's brief text messages—*not* the telephone call that occurred. *Id.* at ¶19. The Special Agent also states what D1 opines, *i.e.*, what D1 believes *Mr. Manafort* knew. *Id.* Person D2, with whom Mr. Manafort had *no* telephone conversations or text messages, states that D1 told him (D2) that he "abruptly ended the call." *Id.* at ¶ 20.

3

they worked in Europe." *Id.* ¶ 15.[3] But these communications—which the Special Counsel contends were made to improperly influence the recipients' future trial testimony *should they even be called to testify*—are entirely consistent with Mr. Manafort's stated position and repeated assertion of his innocence.[4]

In fact, Mr. Manafort was presented with the idea for the European-focused "Project Habsburg" by the very same individual (D1) that the Special Counsel's Office now contends the defendant sought to corruptly influence. (*See* Exhibit A, "Eyes Only Memo for Paul" from D1, dated July 12, 2012.) Reading this document (subject line: "Kick-Off Meeting of Project Habsburg") in conjunction with the Special Counsel's June 2012 exhibit (Doc. 315-2, Ex. C) outlining the group's mission statement, clearly demonstrates the European focus of the group, identifies Europeans as the group's members, and shows that the conferences that were planned were to occur in Europe. *Id.* The Special Counsel's disagreement with Mr. Manafort's view of this case regarding the Hapsburg Group does not make it a crime for Mr. Manafort to communicate his view to others, especially when he is *not aware of who the Special Counsel may call as witnesses*.[5]

---

[3] The Special Counsel also references text messages sent by Person A, who advised another unidentified individual (D2) that Mr. Manafort sought to provide D1 with a quick summary of his position, that "basically" the Hapsburg Group did not engage in lobbying work in the United States and that it focused on the European Union. (Doc. 315-2, ¶¶ 17).

[4] *See* Doc. 315-5, reflecting the Hapsburg Group's "Mission Statement: To take the direction from us informally and via [redacted] to speak out in the European media and to write and publish occasional op-eds and to appear at select conferences we stage in Rome, Berlin or Brussels before and after the election of October, and if desired, to serve as a prestige international observer during the election. To essentially promote the idea of a Ukraine that is closer to Europe than to Russia and to recognize its path toward electoral and economic reforms. Perhaps to write and announce a report examining the Electoral Law in terms of transparency, to emerge before or after the election this autumn."

[5] To the extent that the Special Counsel believes that Mr. Manafort's (and/or Person A's) use of "encrypted messaging application[s]", (*see, e.g.*, Doc. 315 at 6), suggests illegal intent, Exhibit N to Doc. 315-2 reveals that the text messages in question were sent using the WhatsApp or Telegram Messenger applications, both of which are free, widely-used, social networking applications available at Apple's App Store. This not-

ARGUMENT

Title 18, Section 1512(b)(1), makes it a crime to (1) knowingly (2) use intimidation, threats, or corrupt persuasion or engage in misleading conduct toward another (3) with the intent to influence, delay, or prevent the (4) testimony of that person in an official proceeding.  18 U.S.C. § 1512(b)(1).  As the Special Counsel obviously recognizes, the only way to establish a violation of the statute in this case would be to convince the Court that there is probable cause to believe that Mr. Manafort knowingly and intentionally engaged in corrupt persuasion to influence potential trial witnesses.  (Doc. 315 at 9-10.)  While the Special Counsel's motion generated enormous negative media coverage against Mr. Manafort, the Special Counsel's actual "proof" in the motion is virtually nonexistent.

The type of evidence required to establish a violation of the witness tampering statute is much more substantial than the Special Counsel's speculation in his motion.  In *United States v. Edlind*, 887 F.3d 166 (4th Cir. 2018), the defendant's witness tampering conviction was affirmed because of the defendant's repeated attempts to influence a witness's testimony and avoid government surveillance.  *Id.* at 176.  The charges in *Edlind* arose from a separate human trafficking case involving a different defendant, who was a close friend of Edlind and incarcerated.

---

too-subtle attempt to poison the potential jury pool against Mr. Manafort through alleged and uncharged "bad conduct" raised during the bail process has now become an undeniable pattern of heavy-handed tactics employed by the Special Counsel.  In the past, the Special Counsel has sought to portray the use of a different telephone while traveling abroad to regions where communications are routinely hacked as worthy of deep suspicion, even as major corporations (and the U.S. Government itself) preach caution in this regard.  (*See* Doc. 32 at 5-6).  And Mr. Manafort's passports (all in his own name) became clear evidence of questionable conduct and demonstrated a severe risk of flight in the Special Counsel's eyes, even though minimal due diligence would have shown that Mr. Manafort's permanent passport had been lost, replaced, and subsequently recovered.  *Id.*  More recently, the Special Counsel's unilateral contacts with a third party that is not the subject of any allegations in the Superseding Indictment has clearly interfered with Mr. Manafort's private right of contract and has complicated and delayed the bond process for him.

*Id.* at 168. Edlind instructed other members of his friend's support group that if any of them were contacted by federal agents, they should state that they did not know anything. *Id.* at 169.

Several weeks prior to the trial, Edlind's friend—who had been ordered to have no contact with witnesses or potential witnesses—wrote him a letter from jail asking that Edlind meet with two likely trial witnesses (who had been members of the support group) and impress upon one of them that he should "clarify" statements he had made to federal agents. *Id.* at 168-70. Edlind told the potential witnesses that they could not communicate over the phone and that, when they met, they should leave their cell phones in their cars. *Id.* Edlind also tried to confuse one of the witnesses as to whether, when the friend had made statements on prior occasions, he had been making truthful statements or expressing an odd sense of humor. *Id.* at 170-71. Mr. Manafort engaged in no such conduct based on the communications identified by the Special Counsel in his motion.

The case law relied on by the Special Counsel confirms that a defendant must do much more than communicate his views of a case and evidence to others to sustain an attempted witness tampering charge. For example, in *United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006), the defendant attempted to have a witness sign a false affidavit. *Id.* at 154. In another case cited by the Special Counsel, the defendant actually urged a witness to lie under oath at trial and falsely state that the witness and the defendant had lived together for one year and that the witness babysat the defendant's children. *See United States v. Morrison*, 98 F.3d 619, 629 (D.C. Cir. 1996). In *United States v. LaShay*, 417 F.3d 715 (7th Cir. 2005), the defendant attempted to influence a witness's testimony and "raised the subject daily for three days, stating that he wanted to make sure [the witness] remembered" the defendant's version of events. *Id.* at 717. The defendant in *United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000), *violated a release order that barred her*

*from communicating with potential trial witnesses* and "reminded" one witness to state false information concerning medical procedures. *Id.* at 128.  In addition, during meetings with the potential witness, the defendant "often treated [the witness's] children to meals and gifts, which was not [the defendant's] previous custom." *Id.*  Lastly, in *United States v. Cruzado-Laureano*, 404 F.3d 470 (1st Cir. 2005), also cited by the Special Counsel, the defendant instructed witnesses to mischaracterize payments made to the defendant as a loan or political contributions, and the defendant made numerous calls to another witness to the extent that the witness hired counsel to send the defendant a cease-and-desist letter. *Id.* at 487-88.

Finally, any determination would require evidence satisfying § 1512(b)'s *mens rea* standard, as articulated by the Supreme Court in *Arthur Andersen, LLP v. United States*: "Only persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuade.' And limiting criminality to persuaders conscious of their wrongdoing sensibly allows § 1512(b) to reach only those with the level of 'culpability . . . we usually require in order to impose criminal liability.'" 544 U.S. 696, 705-706 (2005) (citations omitted).

The communications and conduct alleged by the Special Counsel in this case come nowhere near the conduct discussed in the cases supporting witness tampering charges.  In fact, *nothing* in the Release Order bars Mr. Manafort from communicating with others, whether those individuals are possible witnesses at his trial or otherwise.[6]  Mr. Manafort does not know the individuals that the Special Counsel intends to call at his trial.  The Special Counsel has not provided Mr. Manafort with its witness list.  Indeed, previously, Mr. Manafort had to move the

---

[6] The Bail Reform Act, of course, contemplates this very issue and provides for such a "do not contact" provision, an option that the Special Counsel has *never sought*. Specifically, the Court may in its discretion order pretrial release subject to a condition that a defendant "avoid all contact … with a potential witness who may testify concerning an offense[.]" 18 U.S.C. § 3142(c)(1)(B)(v).  As noted, the Court did not impose any such condition of release in this case.

Court for a Bill of Particulars requesting that the Special Counsel identify the "others" mentioned in the Superseding Indictment precisely because the Special Counsel has refused to identify relevant parties to the alleged charges. (Doc. 255 at 3.) That motion is pending, and Mr. Manafort needs the information to identify potential witnesses and adequately prepare his defense.

Mr. Manafort asked no one to provide a false affidavit or false testimony at trial, or perjure themselves, and he has not given—nor offered to give—any potential witness anything in exchange for false testimony. At bottom, the Special Counsel contends that two brief text messages to D1 concerning the Hapsburg Group's activities (one which simply forwarded a press article after the new allegations were made public in the February 2018 Superseding Indictment) amounted to an effort to suborn perjury because the Special Counsel disagrees with the theory of the defense.[7] In short, Mr. Manafort's disagreement with the Special Counsel's theory—and the freedom that he, and any defendant in this country, has to express those views—does not provide a basis to revoke or revise the current Release Order.

WHEREFORE, the Special Counsel's motion to revoke or revise the current order of pretrial release (Doc. 315) should be denied. The defendant requests the Court to accept the recently submitted bail package as assuring his attendance as required pursuant to 18 U.S.C. § 3142. In this regard, it must be reiterated that Mr. Manafort has been in full compliance with his reporting obligations to Pretrial Services for almost eight months now, and he has secured sufficient assets to support the current $10 million appearance bond. The new charge of witness tampering made by the Special Counsel should be seen for what it is: an attempt to derail the

---

[7] The Special Counsel's argument improperly invites the Court to engage in unfounded speculation as to how—based on the handful of communications set out in the Special Counsel's motion—the potential witness *felt* about the communications. The issue is not how the potential witness(es) *perceived* or *felt* about Mr. Manafort's alleged communications; rather, the focus is on whether Mr. Manafort had any corrupt intent, and he plainly did not.

modified conditions of release at the eleventh hour. The Court should not condone such heavy-handed gamesmanship by the Special Counsel when there is no reason to believe that the latest charge has somehow increased the risk of flight in this case.

Dated: June 8, 2018                    Respectfully submitted,

                                                      /s/_____
Kevin M. Downing
(D.C. Bar No. 1013984)
Law Office of Kevin M. Downing
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 754-1992
kevindowning@kdowninglaw.com

                                                      /s/_____
Thomas E. Zehnle
(D.C. Bar No. 415556)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 368-4668
tezehnle@gmail.com

                                                      /s/_____
Richard W. Westling
(D.C. Bar No. 990496)
Epstein Becker & Green, P.C.
1227 25th Street, N.W.
Washington, DC 20037
Tel: (202) 861-1868
Fax: (202) 296-2882
rwestling@ebglaw.com

# Exhibit A

*Redaction Key*
HGM = Hapsburg Group Member
UO = Ukrainian Official

EYES ONLY MEMO FOR PAUL

Subject: Kick-Off Meeting of Project Habsburg

Date: July 12, 2012

1. [D2] and [D1] had a 5-hour meeting last night with [Hapsburg Group Member] and his chief of staff. Yesterday morning, on July 11, 2012, he met in Brussels together with [Hapsburg Group Member] and [Hapsburg Group Member]. Both have accepted the offer, underground from now until December, and then as public members from January 2013 of the new ▮▮▮▮▮. But even better…

2. [Hapsburg Group Member], [HGM] and [Hapsburg Group Member] then also met yesterday in private with [European Official] in Brussels to discuss EU policy related to an issue on Khazakstan and WTO. Since [Hapsburg Group Member] brought them on board for our project before that meeting, they split the [European Official] meeting in half, and shifted from Khazakstan to Ukraine.

3. Here is how [HGM] reported to us, in a summary of this heavyweight meeting of himself and [HGM] and [Hapsburg Group Member] with [European Official]: "We compared Ukraine to Khazakstan, saying that it was not in EU's interest to lose either country to the new Russian empire Putin is trying to build, but that Khazakstan has already joined the Eurasian Union and Ukraine will not, provided Europe is there for Ukraine. We told him Yanukovich is really committed to Europe, and [European Official] said he knows that, and he agrees that Ukraine should not be "lost" to EU and that he has talked a lot to Yanukovich (in fact, [European Official] said Yanukovich is of the heads of state outside the EU he speaks to the most) and he likes and respects Yanukovich and he wishes they could finalise and sign the AA, but if he tried now while the Tymoshenko case is still big he would be rejected by the European Parliament. [European Official] told us he is really frustrated by the European Parliament. We mentioned that Ukraine are following EU guidelines on judicial and election reform and the laws have been approved by parliament but they really need help from EU to implement these things. They need know how. [European Official] told us that "anything you can do to help to assist them with reforms and these laws would be welcome because we really want Ukraine with us and not with the Russians." And he told [HGM] and [Hapsburg Group Member] and [HGM] that if they can do something for Ukraine and can help, "you will can have my support, to make things happen," basically urging them on. [Hapsburg Group Member] said: "Don't push back Ukraine." [European Official] replied: "The opposite. We need to embrace them."

4. I asked [HGM] if he thought [European Official] would be open to exploring whether some form of technical assistance from the European Commission could be announced in connection with reforms and he said yes, and that he was surprised how far they got [European Official] to go in their meeting yesterday. He said if Paul wants he can and will go back to [European Official] for another meeting.

5. We discussed an idea, which [HGM] said he could discuss with [Hapsburg Group Member], which was that ▮▮▮▮▮▮▮▮▮▮ he

1

could ask officially **European Official** to provide some "technical assistance from the Commission" to help with judicial and electoral reforms, or at least the former, which we could then repackage as a EU cooperation step with Ukraine pre-election and **Hapsburg Group Member** could spin our way in public statements with media.

6. We agreed on Vienna, Berlin, Rome and Paris conferences, starring **HGM**, **Hapsburg Group Member** and **HGM**, with **UO** as featured Ukraine speaker. And media around these.
7. We agreed that **HGM** would start lunching the OSCE right away and begin that "bridge."
8. We agreed that **HGM** and **Hapsburg Group Member** and he would sign op-eds, be available to speak for major newspaper interviews that Paul's team and we would recommend or fix, they would be willing to issue statements or a report on free and fair elections in early October, plus plus… essentially ready to do all, as long as **Hapsburg Group Member**'s involvement is kept unofficial until ▮▮▮. And **HGM** and **HGM** stay under radar as well until ▮▮▮ emerges.
9. Next steps: **HGM** speaking to **Hapsburg Group Member** next few days, he asked me to speak to **HGM**, and fix meeting for them as well, and he thinks **European Official** would do it but he prefers a conservative (CDU) in Germany and tow ait on **European Official**. He is also exploring French.
10. Our judgement is that from now through December we have **HGM**, **HGM**, **Hapsburg Group Member** and **HGM**, and we add a German and French sometime in autumn or after election but use **European Official** meanwhile for Berlin event too.
11. Timetable and Work Plan now being developed by us, for your review and then to **HGM** for his review, but tentatively September 20/21 would suit **Hapsburg Group Member** for the Vienna conference.
12. Payments to each of the first three (**HGM**, **HGM** and **Hapsburg Group Member**) are requested to their companies in their own individual EU countries from foreign company in places like Malta or Singapore, in **HGM**'s case even farther offshore if desired like BVI. He and **HGM** and **Hapsburg Group Member** are happy if they get generic consulting contracts from private sector companies that do not mention U, but they all intend to declare their income and pay taxes in their countries so they want to issue invoices. They asked for first half to be paid by August, and contracts in next 2 weeks. **HGM** may be more flexible.