**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**v.**

**PAUL J. MANAFORT, JR.,**

**Defendant.**

**Crim. No. 17-201-1 (ABJ)**

**GOVERNMENT'S REPLY IN SUPPORT OF MOTION TO REVOKE OR REVISE DEFENDANT PAUL J. MANAFORT, JR.'S CURRENT ORDER OF PRETRIAL RELEASE**

The United States of America, by and through Special Counsel Robert S. Mueller, III, replies to defendant Paul J. Manafort, Jr.'s response (Doc. 319) to the government's motion to revoke or revise the Court's order of pretrial release. *See* Doc. 315.

**A.** On June 8, 2018, a grand jury sitting in the District of Columbia returned a Superseding Indictment charging Manafort and his longtime associate, Konstantin Kilimnik, with attempted witness tampering and conspiracy to commit witness tampering, in violation of 18 U.S.C. §§ 1512(b)(1) and (k). *See* Doc. 318 ¶¶ 48-51. Counts Six and Seven of that Superseding Indictment "'conclusively determine[] the existence of probable cause' to believe the defendant" committed a federal crime while on pretrial release. *Kaley v. United States*, 134 S. Ct. 1090, 1097 (2014) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("[T]he indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community."). Probable cause to believe that Manafort committed a crime, in turn, triggers a rebuttable presumption "that no condition or combination of conditions will assure that [Manafort] will not pose a danger to the safety of any other person or the community." 18 U.S.C. § 3148(b).

Manafort's challenge to the strength of the government's evidence of witness tampering is thus both misplaced and unavailing. *See Kaley*, 134 S. Ct. at 1098 & n.6 (explaining that "[t]he grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime," and recognizing that this "unreviewed finding . . . may play a significant role in determining a defendant's eligibility for release before trial under the Bail Reform Act").[1]

**B.** The rebuttable presumption triggered by the probable-cause finding "operate[s] *at a minimum* to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985) (construing analogous presumption in 18 U.S.C. § 3142(e)(3)); *accord United States v. Cook*, 880 F.2d 1158, 1162 (10th Cir. 1989) (same under Section 3148(b)). That "burden of production may not be heavy," but Manafort cannot carry it through "mere speculation." *United States v. Garcia*, No. 18-cr-132, 2018 WL 2170316, at *2 (D.D.C. May 10, 2018) (internal quotation marks and citations omitted). He must instead present "at least some evidence, or basis to conclude that the presumption has been rebutted in his" case, such as by identifying "special features of his case that take it outside the congressional paradigm giving rise to the presumption." *Id.* (internal quotation marks omitted). And even if Manafort meets his burden of production, "the presumption does not disappear, but rather remains as a factor for consideration in the ultimate release or detention determination." *Cook*, 880 F.2d at 1162.

[1] Although the government submits that the grand jury's probable-cause determination obviates the need for testimony by the agent who signed the declaration in support of the government's motion to revoke or revise, the agent will be available to testify if needed per the Court's Order. The government submits, however, that any remaining factual matters can be addressed by proffer, as is common practice at bail hearings. *See Smith*, 79 F.3d at 1210; *see also United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (calling it "well established . . . that proffers are permissible both in the bail determination and bail revocation contexts").

Manafort has not acknowledged the statutory presumption or carried his burden of rebutting it. Manafort does not set forth facts refuting the government's showing that the Hapsburg group lobbied in the United States, that Manafort was aware of this activity, and that his outreach after the February 2018 Superseding Indictment was an effort to have witnesses conform to a false version of events, *i.e.*, that the Hapsburg group did not lobby in the United States. Rather, asserting that he "has been in full compliance with his reporting obligations to Pretrial Services," Doc. 319 at 8, Manafort urges the Court to accept his most recent proposed bail package and release him from home detention. *See* Doc. 319 at 8. That bail package, however, was designed to address the Court's earlier risk-of-flight finding based on the charges at that time, not the "danger to the safety" of individuals and to "the community" that Manafort is now presumed to pose under Section 3148(b) in light of the existing charges. In short, the bail package that Manafort proposed before the witness-tampering charges does not suffice to rebut the statutory presumption. *Cf. United States v. Wilson*, 820 F. Supp. 1031, 1034 (N.D. Tex. 1993) (defendant's family ties, operation of a business, "and a good record of reporting to the government" did not rebut presumption triggered by a probable-cause finding that he tampered with witnesses).

**C.** 1. Manafort's primary factual contention is that the story communicated to Persons D1 and D2 was not false because the Hapsburg group was "European-focused." Doc. 319 at 4. But the single document he cites—a July 2012 memorandum—does not engage with the government's proof that the Hapsburg group conducted substantial lobbying activities in the United States beginning in or about September 2012 and continuing into 2014. These United States activities included:

- In September 2012, Manafort and Gates, with the assistance of Persons D1 and D2, arranged for members of the Hapsburg group to lobby on Ukraine's "urgent" behalf by calling United States Senators involved in the Senate Foreign Relations Committee's consideration of a resolution condemning the prosecution of former Ukraine Prime Minister Yulia Tymoshenko. *See* Domin Decl. (Doc. 315-2) ¶ 9 & Ex. D. The Hapsburg group's outreach responded to an "urgent request" from the Ministry of Foreign Affairs of Ukraine, which stressed that its request for a Hapsburg member to "make an early morning call" to a Senator was an issue "under Big Guy's personal control"—a reference to President Yanukovych. *See* Domin Decl. (Doc. 315-2), Ex. D, pp. 4-5. In light of this urgency, Person D1 reported that he was "ON IT," Gates arranged to provide a "direct line to [the Senator's] office," and Manafort (who was copied on this initial correspondence) weighed in to "recommend" that the contacted Senator be made aware of the "[Hapsburg member's] role as a designated representative of the President of the EP" and "of the fact that the US would be getting out front in a political way even further than EP has gotten by passing [the Senate] resolution." *Id.* at 3-4.[2] Gates confirmed that the message was "delivered" to the Senator's Chief of Staff, and kept Manafort apprised of the Hapsburg member's lobbying of the Senators throughout the day. *Id.* at 3.

- In early 2013, Manafort, Gates, and Persons D1 and D2 arranged for a member of the Hapsburg group to meet with U.S. politicians and others in Washington, D.C. Gates and others further arranged for that Hapsburg group member, in conjunction with his Washington D.C. visit, to submit an op-ed to *The Hill*—a newspaper and website published in Washington—after Manafort reviewed and made comments on a draft of the op-ed. *See* Domin Decl. (Doc. 315-2) ¶ 10 & Exs. E, F.

- Also in early 2013, Manafort and Gates worked with Persons D1 and D2 (among others) to arrange for another member of the Hapsburg group to lobby members of Congress in Washington, D.C. *See id.* ¶ 11. Manafort was fully aware of that effort because Gates sent him an agenda reflecting the member's meetings with United States officials. Manafort had drinks at a Washington hotel with the member and Person D2 at the conclusion of those meetings to discuss how they had gone. *Id.* ¶ 11 & Exs. G, H. Person D2's report to Person D1 on the day's events described them as including "meetings at the Senate Foreign Relations Committee" with Republicans and Democrats, and stated that "PJM"—a reference to Manafort—"later said he had received two calls right after the meetings, praising [Hapsburg group member]." Exhibit 1, *infra*.

[2] Manafort's references to the Hapsburg member's "role" and the "EP" refer to that Hapsburg member's position as a representative of the European Parliament and the parallel actions of the European Parliament and the United States Senate regarding Tymoshenko's imprisonment in 2012. That characterization is consistent with Person D2's description, during a meeting with the government, of that Hapsburg member's role as Manafort's "spy and mouthpiece."

- In 2014, after an editorial regarding Ukraine appeared in *The New York Times*, Gates forwarded the article to Persons D1 and D2 with instructions that a member of the Hapsburg group should write a "response," Persons D1 and D2 drafted an op-ed on behalf of one of the members of the Hapsburg group, Gates offered comments on the draft, and the op-ed ran in *The New York Times* in or around February 2014. *See id.* ¶ 12 & Exs. I, J, K, L. Gates reported the op-ed's placement in *The New York Times* to Manafort soon thereafter. *Id.*, Ex. L.

This evidence, unrebutted by Manafort, establishes that the story he urged Persons D1 and D2 to adopt was knowingly false: contrary to the narrative Manafort and Kilimnik conveyed to Persons D1 and D2, the Hapsburg group lobbied in the United States.

    2.  Manafort's own words establish the falsity of his representation that the Hapsburg group was "European-focused."  In April 2013, Manafort drafted a report to Ukrainian President Yanukovych—for whom he worked—on the success of the United States political and media lobbying effort, including the work of the Hapsburg group.  A redacted copy of Manafort's memorandum, which was recovered in the court-authorized search of his Virginia residence, is attached as Exhibit 2.  (It had been previously produced to Manafort in discovery.)

    Manafort's memorandum to Yanukovych explained that "[t]he strategy for the first quarter of 2013 was to heavily engage with the [U.S. government] and US Congress, using a strategy I built."  Ex. 2, at 1.  Manafort noted that "[w]e have aggressively made the case to Congress and the Executive Branch that if sanctions are imposed against Ukraine it will undercut the European initiative to bring Ukraine into the European sphere," *id.* at 2, and explained that the lobbying effort included "dozens of Congressional offices including the leadership and every member of the Senate Foreign Relations Committee and House Foreign Affairs Committee," *id.*  He further relayed that "[w]e have organized and leveraged the visits of the [Hapsburg member] and [another Hapsburg member] to make critical in-roads in how policymakers view Ukraine.  Toward that end, the Chairman of [a Congressional Committee] told [Hapsburg member] that 'we must continue to

encourage pro-western forces in Ukraine.'" *Id.* And, as to public relations, Manafort reported that "[s]ince the beginning of 2013, we have been working across traditional and social media platforms to build a positive narrative for Ukraine in the US." *Id.* at 3. That outreach included placement of Hapsburg group op-eds in American media, including the op-ed in *The Hill* described above. Manafort described that placement as amounting to "a significant publication in Washington, DC that is delivered to every congressional office, the White House, and all U.S. federal agencies." *Id.* Manafort also reported that his outreach and strategy included "pitching our narrative and messaging to key reporters and editors at the Washington Post, the Wall Street Journal, and New York Times"—all United States newspapers of record. Manafort described the United States efforts as "help[ing] the broader Washington community understand the importance of the US for Ukraine to further its relationships with the West." *Id.*[3]

3. With respect to the tampering efforts after the February Superseding Indictment, Manafort does not deny that he had not communicated with Persons D1 or D2 for a lengthy period prior to February 2018, that shortly after the February 2018 charges he reached out to Person D1 by phone and messaging application, that Kilimnik contacted Persons D1 and D2 via messaging applications after Manafort's efforts were rebuffed, or that Kilimnik acted on Manafort's behalf when he did so. Manafort argues instead that his conduct is not as egregious as the facts in the Section 1512(b)(1) cases cited by the government. But Manafort cannot and does not dispute the central legal rule recognized in those decisions—namely, that Section 1512(b)(1) reaches "non-coercive attempt[s] to persuade a witness to lie to investigators," *United States v. Baldridge*, 559 F.3d 1126, 1142 (10th Cir.), *cert. denied*, 556 U.S. 1226 (2009), including attempts "to persuade

[3] Of note, in order to avoid paying VAT tax, one proposed contract with a Hapsburg group member's company stated that the group would not perform work in Europe.

a witness to give a false account that track[s] the defendant's position," *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005); *accord United States v. Edlind*, 887 F.3d 166, 174 (4th Cir. 2018) (cited in Doc. 319 at 5-6) (explaining that "corrupt persuasion includes situations where a defendant coaches or reminds witnesses by planting misleading facts"). The facts set forth in Special Agent Domin's declaration and the accompanying exhibits establish that Manafort engaged in just such brazen efforts at corrupt persuasion, while under house arrest in a closely-watched federal case.[4]

**D.** Finally, Manafort says that the Court's release order did not contain a condition barring him from contacting certain individuals. *See* Doc. 319 at 7-8.[5] That has no bearing on the Court's inquiry under Section 3148(b)(1)(A). Pursuant to that provision, the government has based its revocation motion on probable cause to believe that Manafort committed the federal crime of witness tampering while on release, not on the violation of a no-contact bail condition, *see id.* § 3148(b)(1)(B). *See also United States v. LaFontaine*, 210 F.3d 125, 132-133 (2d Cir. 2000) (separately analyzing Section 1512(b)(1) violation where the defendant's interactions with a witness also violated a no-contact order). For the same reason, Manafort's claim that he could not have attempted to tamper with witnesses because he did not know precisely who the government

[4] Manafort points out (Doc. 319 at 7) that a Section 1512(b) violation based on corrupt persuasion requires that the defendant be "conscious of wrongdoing," *Arthur Andersen, LLP v. United States*, 544 U.S. 696, 705-706 (2005). The grand jury found that *mens rea*, and it is readily inferable from the timing, content, and coordination of Manafort's and Kilimnik's outreach to Persons D1 and D2, including Manafort's use of an intermediary (*i.e.*, Kilimnik) to reach them when his own efforts were rebuffed.

[5] Manafort's release order in the Eastern District of Virginia required him to "avoid all contact, directly or indirectly, with any person who is a victim or witness in the investigation or prosecution of the defendant" in connection with his release to home confinement in the Eastern District of Virginia. *See* Order, *United States v. Manafort*, No. 18-cr-83 (TSE) (March 9, 2018) (Doc. 25).

planned to call as trial witnesses defies common sense. Manafort would have had no other reason to reach out to Persons D1 and D2 about the Hapsburg group's geographic reach—after a long period of no communication, and immediately after the Superseding Indictment issued, *see* Domin Decl. (Doc. 315-2) ¶¶ 14-16—if he did not expect the government to seek testimony from them. And he would have no reason to feed them a false narrative if he did not believe it would help protect him at trial.

## CONCLUSION

For the foregoing reasons and those set forth in the government's motion (Doc. 315), the Court should revoke or revise its current Order authorizing Manafort's release to the Pretrial Services Agency's high-intensity supervision program.

Respectfully submitted,

ROBERT S. MUELLER, III
Special Counsel

Dated: June 12, 2018         By:         */s/ Andrew Weissmann*
Andrew Weissmann
Greg D. Andres (D.D.C. Bar No. 459221)
Scott A.C. Meisler
Brian M. Richardson
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 616-0800

*Attorneys for the United States of America*

# EXHIBIT 1

From: Person D2
Sent: Wednesday, March 13, 2013, 10:03 PM
To: Person D1
Subject: Great First Day
Attachments: ATT00001.rtf

---

All went superb.
Had an interesting meeting with 10 people from Company B and Company A More on that when I see you.

Then meeting at [redacted] embassy. Then picked up Haps. mem. and briefed him extensively on the drive in. I prepared a lovely folder for him with the sked, talking points, latest news on Vlasenko, Lutsenko, VY integration pledge, Klitchko call for sanctions etc. He was very pleased and also complimented us on the Carnegie speech.
Then meetings at the Senate Foreign Relations Committee… first with Republicans, then Democrats. Haps. mem. did well, reading off our talking points. The Republicans especially were quite Tymo heavy, with one Senator staffer dwelling a bit on it. But Haps. mem. was solid… urging inclusion, a "vigilant" Russia, trade opportunities etc. PJM later said he had received two calls right after the meetings, praising Haps. mem.

This was followed by a short meeting with PJM, who said he had already received two calls from the Hill praising Haps. mem. Haps. mem. had to leave for dinner with the ambassador and PJM and me then had drinks. He was in good form and is thrilled with our work and Habsburg.
Tomorrow we have about 10 meetings back to back… and then I fly Cattle Class back to LHR, rush to GTW to make the flight to Innsbruck. I too need some rest one day.

Call you tomorrow.
Ciao, Person D2

# EXHIBIT 2

# MEMORANDUM

**To:** President VFY
**From:** PJM
**Subject:** US Consultants – Quarterly Report
**Date:** April 22, 2013

---

Over the last three months the Government of Ukraine has gained considerable ground in enhancing its relationship with the USG. This is largely a result of building a comprehensive strategy that adopted issues of importance to the USG, and focusing on key and positive messages to better inform key members of the USG about Ukraine's objectives which are in alignment with the West.

## Strategy

Substantial effort was spent in 2012 to defend against proponents of YT and views that she was selectively prosecuted. At that time it was the priority of the USG to attempt to influence the process of her release. We learned quickly that we needed to do a comprehensive outreach that relayed important progress that Ukraine was making on multiple fronts. The strategy for the first quarter of 2013 was to heavily engage with the UGS and US Congress, using a strategy I built called "Engage Ukraine" which focused the dialogue on positive key issues, and away from YT. These key messages include:

- Ukraine's integration with the EU
- Energy Security
- Russia attempting to have Ukraine align with the Customs Union
- Nuclear Proliferation

## Impact

At the outset of 2013, the prospects for Congress imposing sanctions against Ukraine for perceived selective prosecution and regression in carrying out democratic reforms was high. Members of Congress, Executive Branch officials and opinion leaders criticized Ukraine on many fronts. Most importantly, these stakeholders hammered away at Ukraine for the imprisonment of YT. The challenges for changing the nature of the discussion were significant. The mood toward Ukraine was negative.

Following the holidays in December and early January it was widely expected that several members would be taking proactive and aggressive positions against Ukraine. However, one of the most critical goals that we have achieved during this quarter is to prevent the application of any sanctions against the GoU or its officials. We have been able to accomplish this by implementing key messages from the "Engage Ukraine" strategy, many of which resonate with key US officials.

Ub Q1m we have made progress in softening the perception of Ukraine in the US. Based on a sustained and aggressive implementation of our strategy, it is far less likely that Congress will impose sanctions against Ukraine. We have drawn out the White house, Dept of State and key Members of Congress on this issue and gotten them to endorse an "engage Ukraine" policy.

## Messaging

Our "Engage Ukraine" messaging to policy makers focuses on two central themes.

1. We have and continue to emphasize the positive aspects of the US-Ukraine relationship. We highlight:
    * **Defense and Security**: Ukraine has a proven track record of actively contributing to several NATO and international peacekeeping missions
    * **Criminal Policy Reform**: This is one of the single best achievements that has been achieved by the GoU. This has shifted the debate significantly, and has resulted in reengaging expert European bodies to continue with more reforms.
    * **Energy Cooperation**: The selection of Chevron and ExxonMobil to explore and develop shale gas and gas fields reflects a commitment by Ukraine to deepen its energy relationship with the U.S.
    * **Combatting Maritime Piracy:** To combat piracy, Ukraine has taken a lead role and is an active partner in NATO's anti -piracy operations in the Indian Ocean

These are just some of the substantive issues that we use with policy makers that are changing perceptions of Ukraine.

> We have aggressively made the case to Congress and the Executive Branch that if sanctions are imposed against Ukraine it will undercut the European initiative to bring Ukraine into the European sphere. There is growing understanding that this would undermine both European and U.S. national security interests. This argument is resonating with policymakers in both political parties in Congress.
>
> Who "lost Ukraine" will be a burden that Congress will shoulder should it pass legislation that mandates sanctions. We have been persistent on that point with key policy makers, and it is one of the single most effective arguments that turns the discussion away from YT and her imprisonment.

## Outreach

We have carried our message to a wide audience. We have engaged dozens of Congressional offices including the leadership and every member of the Senate Foreign Relations Committee and House Foreign Affairs Committee. We have also worked with the Helsinki Commission and have educated members of the Senate and House Armed Services Committees on security questions.

Our engagement with senior officials of the Department of State is bearing fruit. While the U.S. policy continues to support Tymoshenko's release, senior officials now agree with us that imposing sanctions could push Ukraine toward Russia. Thus, the State Department is now making that case to Congress, and continues to believe that engagement with Ukraine is the best course of foreign policy.

We have organized and leveraged the visits of the Hapsburg group member and Hapsburg group member to make critical in-roads in how policymakers view Ukraine. Toward that end, the Chairman of the House Foreign Affairs Committee, Congressperson told Hapsburg member that "we must continue to encourage pro-western forces in Ukraine".


Speeches, roundtables and programming at major think-tanks such as the Carnegie Endowment for International Peace have also helped the broader Washington community understand the importance of the US for Ukraine to further its relationships with the West.

The pardon of Yuriy Lutsenko and five other prisoners is also a positive development that we have used effectively to argue against sanctions and to make the argument that the European Union should sign the Association Agreement with Ukraine. This step has also allowed us to leverage the progress in the US and have its support for the AA signing in the Fall.

## Media

Since the beginning of 2013, we have been working across traditional and social media platforms to build a positive narrative for Ukraine in the US. The underlying theme for this narrative is the following: ***Ukraine is an important global strategic partner to the United States and West that is committed to the necessary reforms for EU accession***.

We have delivered more specific messages that are representative of this theme, such as: ***Ukraine is a global leader in energy production, is a significant contributor to the global economy, recognizes the rule of law as shown by the recent release of six prisoners, and Ukraine has been an active participant in combating maritime piracy.***

Our media outreach and strategy has included:

- placement of an op-ed by Hapsburg group member in a significant publication in Washington, DC that is delivered to every congressional office, the White House, and all U.S. federal agencies;
- placement of an op-ed by Hapsburg group member in the Christian Science Monitor, a universal publication that has a high readership in many key foreign policy communities and among key policymakers in the US;
- pitching our narrative and messaging to key reporters and editors at the Washington Post, the Wall Street Journal, and New York Times; and extensive online outreach to relevant bloggers.

In the next few weeks we will be capitalizing on the upcoming visit of Foreign Minister Kozhara and Sergei Klyuiev by placing an op-ed (authored by Kozhara) for publication in an influential newspaper during or around the time of their visit.

After their visit, we will place an op-ed that highlights Ukraine's track record in working with Western fleets to combat maritime piracy. We have secured a retired US Navy Admiral – who is an expert in maritime piracy issues and who has experience working with Ukraine in this area – to author this op-ed.

Our ongoing efforts will include pitching bi-weekly press releases/news articles that highlight new, updated achievements and progress that Ukraine is making in its pursuit of the Association Agreement with the EU; identifying additional credible authors for op-eds that we will draft and have strategically placed; and developing and executing new digital strategies to increase the profile and narrative of Ukraine online and across multiple social media platforms.

Emerging Problem Areas

Given the changes in perceptions towards Ukraine, it is important to note the emergence of a broader issue agenda.

There are several issues that are growing in importance and will need to be addressed in the next 3 months.

1. IMF. There is a growing impression that Ukraine is unwilling to make the fiscal and monetary changes necessary to finalize a new loan facility. The new economic team led by DPM Arbuzov is viewed as competent and more organized than thee previous team. However, there is a consensus hardening that the Govt of Ukr is not addressing the problems. While the gas tariff issue is a deal stopper, if a new strategy can frame an credible program that addresses the issues raised by the IMF Mission teams, some pressure can be applied with the new supporters in Washington. More than any other bilateral issue, the IMF matter is viewed as the litmus test of the seriouseness of the Govt to fix its core problems.
2. WTO. RICK FILL IN THE ISSUE HERE AND SOME OF THE THINGS WE CAN AND WILL DO
3. IPR RICK FILL IN THE ISSUE HERE AND SOME OF THE THINGS WE CAN AND WILL DO
4. OTHER ISSUES/ RICK ID

## Way Forward

The US consultants team will seek to leverage the hard work and important actions taken by the GoU taken in the first quarter to continue with the strong progress that has been made and further advance the "Engage Ukraine" agenda for the second quarter.

The USG strategy looks to leverage the reforms being promoted in compliance with EU conditions for signing the AA and DCFTA. Because there is less direct awareness in Washington, we will bring European leaders to Washington to educate USG officials of the important changes occurring in Ukrainee and the progress being achieved in the reform and modernization programs.

Two of the critical reform areas are in the implementation of the CPC and the electoral changes made based on OSCE recommendations from the VR elections. Using visits by Ukr officials and European leaders, we will educate targeted officials in the USG.

The goal is to lay the foundation and protect the work that has been done to ensure that the AA is signed this Fall in Vilnius.

We will continue to identify, educate, recruit and mobilize third-party validators for Ukraine's west-ward focus, and goal of EU membership through our "Engage Ukraine" outreach campaign. Our primary goal is to ensure signing of the AA and to prevent the passage of sanctions against Ukraine. This will take a sustained effort in Congress and in the executive branch to ensure that the progress we have made is not reversed. We will also continue to establish representation in Congress on behalf of the GoU during any relevant Congressional briefings and hearings.

Our team will directly work to advance our existing relationships, or construct them where they are preliminary, with Members of Congress that will be in a direct position to influence policy regarding Ukraine. We have made much progress in the beginning of 2013 and the