```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal Action
                                     ) No. 17-CR-201
 4                    Plaintiff,     )
                                     ) ARRAIGNMENT AND
 5    vs.                            ) MOTIONS HEARING
                                     )
 6    Paul J. Manafort, Jr.,         ) Washington, DC
                                     ) Date:  June 15, 2018
 7                    Defendant.     ) Time:  10:00 a.m.
                                     )
 8    _____

 9          TRANSCRIPT OF ARRAIGNMENT AND MOTIONS HEARING
                            HELD BEFORE
10         THE HONORABLE JUDGE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
11    _____

12                    A P P E A R A N C E S

13    For the Plaintiff:      ANDREW WEISSMANN
                              GREG D. ANDRES
14                            SCOTT MEISLER
                              U.S. Department of Justice
15                            Special Counsel's office
                              950 Pennsylvania Avenue NW
16                            Washington, D.C.  20530
                              202-514-1746
17                            Email: Aaw@usdoj.gov
                              Email: Gda@usdoj.gov
18                            Email: Sacm@usdoj.gov

19    For Defendant:          KEVIN M. DOWNING
                              Law Office of Kevin M. Downing
20                            815 Connecticut Avenue, N.W.
                              Suite 730
21                            Washington, D.C. 20006
                              (202) 754-1992
22                            Email: Kevindowning@kdowninglaw.com
                              THOMAS EDWARD ZEHNLE
23                            Law Office of Thomas E. Zehnle
                              601 New Jersey Avenue, NW
24                            Suite 620
                              Washington, DC 20001
25                            (202) 368-4668
                              Email: Tzehnle@milchev.com
```

```
1                              RICHARD WILLIAM WESTLING
                               Epstein Becker & Green, P.C.
2                              1227 25th Street, NW
                               Suite 700
3                              Washington, DC 20037
                               (202) 861-1868
4                              Email: Rwestling@ebglaw.com

5      ALSO PRESENT:
                               Takeysha Robinson, Pretrial Officer
6
                               Omer Meisel, Special Agent
7

8      Court Reporter:         Janice E. Dickman, RMR, CRR
                               Official Court Reporter
9                              United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
10                             Washington, DC  20001
                               202-354-3267
11
                                    *   *   *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1              THE COURTROOM DEPUTY:  Your Honor, this morning we

2       have criminal case number 17-201-1, the United States of

3       America v. Paul J. Manafort, Jr.  Mr. Manafort is present in

4       the courtroom.

5              Will counsel for parties please approach the lectern,

6       identify yourself for the record.

7              MR. ANDRES:  Good morning, Your Honor.  Greg Andres,

8       Andrew Weissmann, Scott Meisler, Brian Richardson, and

9       special -- Supervisory Special Agent Omer Meisel.

10             THE COURT:  Good morning.

11             MR. WESTLING:  Good morning, Your Honor.  Richard

12      Westling, Kevin Downing, and Tom Zehnle on behalf of Mr.

13      Manafort.

14             THE COURT:  All right.  Good morning.

15             THE COURTROOM DEPUTY:  Your Honor, the pretrial

16      officer present for these proceedings is Ms. Robinson.

17             THE COURT:  All right.  We're here on two pending

18      motions this morning:  Docket 229, defendant's motion for

19      reconsideration of his conditions of release; docket 315, the

20      government's motion to revoke his current order of pretrial

21      release.

22             We also need to arraign him on the superseding

23      indictment.  And so I think we ought to take care of that

24      matter first.

25             Mr. Westling, or whoever is coming -- Mr. Downing and
```

1       Mr. Manafort can come to the lectern, please.

2                   MR. DOWNING:  Good morning, Your Honor.

3                   THE COURT:  Good morning.

4                   THE COURTROOM DEPUTY:  Are you Paul J. Manafort, Jr.?

5                   THE DEFENDANT:  I am.

6                   THE COURTROOM DEPUTY:  Are you the person named in

7       the superseding indictment?

8                   THE DEFENDANT:  I am.

9                   THE COURTROOM DEPUTY:  Your Honor, may the record

10      reflect that both counsel and the defendant have received a

11      copy of the superseding indictment which has been filed in this

12      case.

13                  Mr. Manafort, you are charged in criminal case No.

14      17-201-1 in a seven-count superseding indictment charging you

15      with the following:  Count No. 1, 18 United States Code §§ 371

16      and 3551, conspiracy against the United States.  Count 2,

17      18 United States Code § 1956(h) and 3551, et seq., conspiracy

18      to launder money.

19                  Count No 3, 22 United States Code §§ 612 and

20      618(a)(1), 18 United States Code §§ 2 and 3551, et seq.,

21      unregistered agent of a foreign principal.  Count No. 4, 22

22      United States Code §§ 612 and 618(a)(2), 18 United States Code

23      §§ 2 and 3551 et seq., false and misleading FARA statements.

24                  Count No. 5, 18 United States Code §§ 2, 1001(a) and

25      3551, et seq., false statements.  Count 6, 18 United States

1   Code §§ 2, 1512(b)(1), and 3551 et seq., obstruction of

2   justice.  And Count No. 7, 18 United States Codes §§ 1512(K)

3   and 3551, et seq., conspiracy to obstruct justice.

4            Do you waive formal reading of the superseding

5   indictment?

6            THE DEFENDANT:  I do.

7            MR. DOWNING:  We do.

8            THE COURT:  For purposes of the arraignment, how do

9   you plead to the superseding indictment?

10            THE DEFENDANT:  Not guilty.

11            THE COURT:  All right.  You can be seated.

12            MR. DOWNING:  Thank you.

13            THE COURT:  I want to go through a little bit the

14   procedural history that bought us to this point today.

15            On October 30th, 2017 Mr. Manafort was arrested.  He

16   appeared before a magistrate judge in this court and was placed

17   on a high intensity supervision program, home detention with

18   GPS monitoring and an unsecured $10 million appearance bond.

19   He was permitted to leave his home only to meet counsel, attend

20   religious services or doctors' appointments and was required to

21   report to the pretrial services agency.

22            A condition of his release, which was printed in

23   bold, all in caps on the document he signed, said you are not

24   to commit any criminal offense.  And defendant immediately

25   sought relief from those conditions and he appeared before me

1    on November 6, 2017.

2              I found that his mere release on personal

3    recognizance with an unsecured appearance bond and without GPS

4    monitoring would not reasonably assure the appearance of the

5    defendant and that additional conditions were needed.

6              But I also found at that time that house arrest was

7    not the least restrictive condition that would accomplish those

8    goals and I was prepared to modify the terms of his release.

9    So, I held, on November 6th, in order to be relieved of the

10   condition of home confinement he had to supply either a

11   security, property with sufficient unencumbered value to cover

12   the bond under § 3142(c)(1)(B)(xi) of the Bail Reform Act, or

13   he could identify a surety, a person with a net worth of

14   sufficient unencumbered value to pay the amount of the bail

15   bond under subsection (xii).  Or, I said there could be some

16   combination as a substitute for the $10 million unsecured

17   appearance bond.  But by that point I hadn't received the

18   necessary proposal or financial information.

19             Since then I've made repeated efforts to facilitate

20   the easing of the current restrictions and the defense has

21   spent the last six months in fits and starts trying to put a

22   package together.  Meanwhile, on November 8th, 2017, I issued

23   in this case -- with, I remind everyone, the consent of all the

24   parties -- a media communication order.

25             On November 30th, 2017, the defendant submitted a

1    more specific bond proposal that was largely acceptable to the

2    Office of Special Counsel.  But then the Office of Special

3    Counsel brought to my attention its concern about a violation

4    of the media communication order involving communications with

5    a Russian national in Kiev regarding publication of a favorable

6    op-ed piece that the defendant had edited himself in Kiev.

7         And so I held a hearing on December 11th and at that

8    time I found that maybe it wasn't entirely clear to the

9    defendant that that was covered by the media communication

10   order.  But I said I want all the defendants and all the

11   parties to understand that I'm likely to view similar conduct

12   in the future to be an effort to circumvent and evade the

13   requirements of my order as they've been clarified this

14   morning.  And I do believe it's fair to consider the facts that

15   I was provided with, like all facts, in connection with my

16   consideration of the bond issue.

17        And then, on December 15th, I granted the defendant's

18   first bond proposal, which had provided the combination of

19   security and a surety.  I included the logical condition that

20   he couldn't rely on the assets of his surety if those assets

21   were joint.  And I said, Well, they have to be put in the

22   surety's name.  And that was the end of that proposal; the

23   defendant was no longer interested.

24        There were subsequent efforts to propose appropriate

25   security.  I raised questions because the defendant proposed to

1    pledge to me property that was already pledged to a bank to

2    secure the mortgage on another property.  I was told in court,

3    oh, that's not a problem, the bank is only going to take that

4    property last, if the sale of the mortgaged property doesn't

5    cover the loan.  And he submitted a stack of documents to me

6    that were supposed to reflect that, but none of them did.

7            So I rejected that effort, but I made one more effort

8    to make it crystal clear, and on April 9th, 2018 I issued an

9    order setting out exactly which properties I would accept and

10   what the conditions needed to be for the sureties.  Which

11   brings us to the current motion filed on May 10th.  But it

12   identified different properties and different sureties than

13   what had been listed in my order.  However, the government was

14   largely satisfied; it proposed a few tweaks, the defendant was

15   willing to make them.

16           But then the Office of Special Counsel came in and

17   said, Wait, Judge, there's something we want to tell you, and

18   they submitted a sealed pleading letting me know what it would

19   be, but asked to have until June 4th to file a response to the

20   bond motion.  On June 4th they filed a motion to revoke the

21   defendant's bond and placed their concerns on the public

22   record, attaching affidavit and exhibits.

23           Thereafter, given my ongoing concern about making as

24   much of this case public as possible, I took pains to have the

25   prior pleading unsealed.  The Office of Special Counsel said

1    that's fine, but we need certain limited redactions, and I

2    agreed to that.

3              And, so, I need to digress a minute to discuss here

4    what happened on Wednesday.  The filing was ordered to be made

5    unsealed with redactions.  Due to an error in the internal

6    workings of the clerk's office, unredacted versions of exhibits

7    were posted on the docket instead.  This error was caught and

8    corrected in approximately 17 minutes.

9              I do not fault the members of the press who are

10   present for reporting the content of what appeared in their

11   in-boxes, even though it was probably apparent that the

12   documents were supposed to be redacted.  But, I do question the

13   publication of the completely unsupported speculation that this

14   revelation was an intentional leak by the Office of Special

15   Counsel.

16             No reporter had any facts to base that on, so I'm not

17   sure why anyone printed it.  It's not responsible.  And in case

18   anyone has failed to correct those assertions, I want to state

19   for the record that no one in this courtroom and no one working

20   for either party had any responsibility for the error.  It was

21   a court error for which the Court apologizes.

22             Returning to the motions at issue, I want to say that

23   I've read the pleadings and all of the exhibits.  The Office of

24   Special Counsel has indicated its desire to proceed on the

25   record it submitted.

1    The defense, do you have any witnesses that you

2    intend to call?

3    MR. WESTLING:  We don't, Your Honor.

4    THE COURT:  All right.  I do want to lay out then

5    what's already in the record before I hear argument.

6    I note that not only did the government bring certain

7    facts to my attention in connection with its opposition to the

8    bond motion and then its own motion, but on June 8th, 2018 a

9    superseding indictment was returned.  So that means there's

10   already been a determination made by the grand jury that there

11   is probable cause to believe that this defendant violated

12   18 U.S. Code § 1512(b)(1), tampering with a witness.  And it

13   alleges conspiracy with another individual to do so as well.

14   So what does the witness tampering statute say?

15   18 U.S. Code § 1512(b) says:  Whoever knowingly uses

16   intimidation, threats, or corruptly persuades another person,

17   or attempts to do so, or engages in misleading conduct towards

18   another person with the intent to influence the testimony of

19   any person in an official proceeding has committed a felony.

20   It also says that whoever conspires to commit any offense under

21   this section is subject to the same penalties.

22   So, what evidence has been presented on that issue?

23   Again, I think it's helpful to review the facts and the

24   circumstances chronologically.

25   On February 23rd, 2018 the last superseding

1    indictment was presented in this court.  It included, for the

2    first time, new charges arising out of the allegations that the

3    defendant served as an unregistered agent to lobby U.S.

4    officials on behalf of a foreign government and foreign

5    political parties.  In particular, the Russia-backed political

6    leadership of the Ukraine and its president, and later former

7    president, Victor Yanukovych.

8         In particular, the new allegations said that as a

9    part of that ongoing effort defendant engaged other firms to

10   lobby on their behalf and secretly retained a group of former

11   senior European politicians, the Hapsburg Group, to take

12   positions favorable to the Ukraine, ostensibly independently,

13   but in fact as paid lobbyists, and that some of this lobbying

14   took place not just in Europe, but in the United States.

15        I note that as of today these are still simply

16   allegations.  There will be a trial.  But those allegations

17   were first made public on February 23rd.  What happened next?

18   Well, on the very next day, it is alleged, that Mr. Manafort,

19   on February 24th, at 3:51 p.m., called a principal of the

20   public relations company that was the intermediary for the

21   Hapsburg Group, Company D.  And he called a person who we're

22   going to refer to as D1, who was the principal of that company,

23   on that person's cell phone.  The call lasted for a minute and

24   24 seconds.  We don't know what they said.

25        Later, it's alleged -- and these are all documents

1    attached to the FBI declaration -- that on February 24th, again

2    the day after the indictment, 3:53 p.m., Mr. Manafort texted D1

3    using his WhatsApp encrypted app, saying, This is Paul.

4          Again on February 24th he used his phone, not

5    encrypted, to contact D1, identified himself and stated that he

6    wanted to give D1 a heads-up about Hapsburg.  D1 immediately

7    ended the call.

8          There are documents that are provided that on the

9    next day, February 25th, Mr. Manafort attempted to call D1

10   using his phone, but the phone call did not go through.  The

11   next day, February 26th, Mr. Manafort sent a message to D1

12   which attached an article from businessinsider.com that

13   described issues going on with the former European leaders, and

14   it stated two European politicians were secretly paid around

15   €2 million by Manafort in order to take positions favorable to

16   the Ukraine, including by lobbying in the United States.

17         So that article was sent by Mr. Manafort to person D1

18   at 11:56 p.m.  At 11:57 p.m. on February 26th he sent an

19   encrypted text to D1 that said, We should talk.  I have made

20   clear that they worked in Europe.

21         The next day, February 27th, 2018, Mr. Manafort

22   attempted to call person D1 using the encrypted WhatsApp app.

23   February 27th, the same day, about a half an hour later, he

24   attempted to call D1 using the phone which was not encrypted,

25   but the phone call did not go through.

1           There's also an allegation in the affidavit provided

2     by the special agent who has averred that D1 has stated that he

3     interpreted this conduct -- contact as an effort to suborn

4     perjury.

5           On February 28th, 2018 Person A, who has now been

6     named in the superseding indictment as Konstantin Kilimnik,

7     attempted to contact Person D2, another principal of the media

8     firm involved as an intermediary with the Hapsburg Group,

9     through WhatsApp.  It's alleged in this superseding indictment

10    that Mr. Kilimnik worked for Davis Manafort International in

11    Kiev.

12          On February 28th, at 1:49 a.m., there's an encrypted

13    message from Person A to Person D2:  Hi, how are you?  I hope

14    you're doing fine.  Thereafter, 1:51 a.m., a second message,

15    encrypted:  My friend P is trying to reach D1 to brief him on

16    what's going on.

17          1:51 a.m., a third encrypted message:  If you have a

18    chance to mention this to Person D1, it would be great.

19          Fourth message, same time, another minute later:

20    Basically, P wants to give him a quick summary that he says to

21    everybody -- parens, which is true, close parens -- that our

22    friends never lobbied in the U.S., and the purpose of the

23    program was EU.

24          February 28th, Person A switches to Telegram, a

25    different encrypted messaging application to D2 and sends five

1    similar messages to D2, which, according to the government's

2    exhibits, stated the following, at 6:01 a.m. to D2:  Hey, how

3    are you?  This is Person A.

4         6:01 a.m.:  Hope you are doing fine.  Another one at

5    6:01 a.m.:  My friend P is trying to reach D1 to brief him on

6    what's going on.  6:02:  Basically, P wants to give him a quick

7    summary that he says to everybody, which is true, that our

8    friends never lobbied in the U.S. and the purpose of the

9    program was the EU.

10        6:03 a.m.:  If you have a chance to mention this to

11   Person D1, it would be great.  It would be good to get them

12   connected to discuss in person.  P is his friend.

13        Now, I note that the defense has emphasized in its

14   submissions to me that Mr. Manafort at this time was not under

15   a court order by me not to communicate with witnesses.  And

16   that is true.  But the next thing that happened chronologically

17   is that on March 9th, 2018, docket 25 on the docket of the

18   matter pending in the Eastern District of Virginia, an order

19   was entered that the defendant, quote, must avoid all contact,

20   directly or indirectly with the person, with any person who is

21   a victim or witness in the investigation or prosecution of the

22   defendant.  That was on March 9th, 2018.

23        April 4th, 2018, Person A, one month later, texted D2

24   using two different encrypted messaging applications, and he

25   texts him three times.  April 4th at 8:53 a.m., Person A to

1    Person D2 using WhatsApp:  Hey, this is Person A.  My friend P

2    asked me again to help connect him with person D1.  Can you

3    help?

4              8:45, Person A to Person D2:  Hey, my friend P has

5    asked me again if there's any way to help connect him to Person

6    D1.  April 4th, 2018, 8:54 a.m., Person A to Person D2, using

7    Telegram this time:  I tried him, Person D1, on all numbers.

8    And then at 1 p.m. on April 4th Person A texts, the last text

9    that I've been informed about:  Hi, this is Person A's first

10   initial, my friend P is looking for ways to connect to you to

11   pass you several messages.  Can we arrange that?

12             Now, I don't have any jurisdiction to sanction an

13   alleged violation of Judge Ellis's order, it's up to him.  But

14   the fact of the existence of the order is another factor that I

15   can consider when I'm thinking about the likelihood of

16   compliance with any orders that I issue.

17             Now, the defense disputes the government's

18   characterization of the contacts which I've just described.

19   First it of all, it says he didn't know when he contacted the

20   people he hadn't talked to in years, the day after the new

21   charges were handed down, that D1 and D2 were witnesses.

22             More fundamentally, he argues that he wasn't

23   advancing a false story; the Hapsburg Group work was about

24   Europe and not about the United States.  And he provides a

25   document which is docketed at docket 319-1, a memo for the

1    kickoff meeting on July 12th, 2012 that confirms the intention

2    of the members of the group to be remunerated, but only EU work

3    is described.

4         The government has supplied its own exhibits.

5    Attached to its motion were certain communications with the

6    communications firm where D1 and D2 were employed, that

7    referenced outreach in both Europe and the United States.  But

8    Exhibit B, docket 315-5, a memo from D1 about the Hapsburg

9    Group, is largely European focused, although other documents

10   related to planned meetings between one or more Hapsburg Group

11   members and the U.S. Congress were provided.

12        And in its reply, the government provided me with an

13   exhibit -- two exhibits; docket 322-1 is a memo from D2 to D1

14   describing just such a meeting in the United States with a

15   congressman, and docket 322-2 is a memorandum from the

16   defendant himself to President VFY, it's a quarterly report,

17   and it describes the strategy in the first quarter of 2013 to

18   heavily engage with the U.S. government -- it says USG and the

19   U.S. Congress.

20        It includes a self-congratulatory account of the work

21   done to organize and leverage the visits of the Hapsburg Group

22   member to make critical inroads in how U.S. policymakers view

23   the Ukraine.  And it mentions op-eds by Hapsburg Group members

24   that were placed in United States publications as part of,

25   quote, our immediate outreach and strategy, close quote.

1          So, both sides have pointed me to documents that they

2    can draw upon.  The defendant also underscores the fact that

3    the overwhelming majority of these contacts that make up the

4    Office of Special Counsel's motion didn't actually establish

5    contact.  A lot of them are unanswered calls and texts.  And of

6    the few that did get through, most said little.  P is trying to

7    contact D.  Have you contacted D?  There are only three of

8    substance that mention the issue of whether the Hapsburg

9    Group's work was in Europe versus the United States.

10         Also, the defendant points out that most of the

11   contacts were by Person A and not by Mr. Manafort.  Therefore,

12   the defendant questions the Office of Special Counsel's ability

13   to make out the elements of its offense.  And with a fair

14   amount of indignation it suggests that it was improper for the

15   prosecutors to bring this to my attention in the first place.

16         Now, the original motion put the question of whether

17   there was probable cause to believe the defendant had committed

18   a crime before me to decide.  But the superseding indictment

19   has altered that situation.  A probable cause finding has been

20   made.  And, therefore, I don't need to weigh the evidence

21   myself to state now, for purposes of § 3148 of the Bail Reform

22   Act, that there has been a finding of probable cause to believe

23   that this defendant committed a felony offense while he was on

24   pretrial release in this case.

25         Now, as I just noted, the defendant has raised a

1    number of issues concerning the quality of the government's

2    proof.  It says the Office of Special Counsel's case is thin.

3    And I was prepared, when this issue was in front of me, to

4    address some of those issues in connection with the pending

5    motion today.  But given the indictment, I'm not going to get

6    into any assessment of the strengths or the deficiencies of the

7    evidence that's been presented.  A jury is going to be called

8    upon to decide this matter very soon in this courtroom, and I'm

9    not going to be the fact-finder.  And so they should be able to

10   do that based on the entire record, without having read a

11   public account of my views on the matter based on what I've

12   read here.

13          So that means the only question for me to resolve is:

14   What action should be taken in connection with the defendant's

15   bond under these circumstances?  And I think, as I have on

16   every occasion when bond came up, that it's important to start

17   with what the statute says.

18          18 U.S. Code § 3148, sanctions for a violation of a

19   release condition, provide that a person who's been released

20   and who has violated a condition of his release is subject to a

21   revocation, an order of detention, and prosecution for contempt

22   of court.  Paragraph B says the attorney for the government may

23   initiate a proceeding for revocation of an order of release by

24   filing a motion with the district court.

25          To the extent practicable, a person charged with

1    violating a condition of release, that he not commit a federal,

2    state, or local crime, shall be brought before the judicial

3    officer who ordered the release and whose order is alleged to

4    have been violated.

5         The judicial officer shall enter an order of

6    revocation and detention if, after a hearing, the judicial

7    officer finds probable cause to believe that the person has

8    committed a federal, state, or local crime while on release,

9    which I have.  Or, clear and convincing evidence that the

10   person has violated any other condition of release.  That has

11   not been put before me; it's not my condition of release that's

12   in issue, other than the commission of a crime.

13        But I still have to also make other findings; that

14   there is no condition or combination of conditions that will

15   assure that the person will not flee or pose a danger to the

16   safety of any other person or the community.  Or, that the

17   person is unlikely to abide by any condition or combination of

18   conditions of release.  If, as here, there is probable cause to

19   believe that while on release the person committed a federal,

20   state, or local felony, the law says a rebuttable presumption

21   arises that no condition or combination of conditions will

22   assure that the person will not pose a danger to the safety of

23   any other person or the community.

24        And then the statute goes on, and it says if the

25   judicial officer finds that there are conditions of release

1    that will assure the person will not flee and pose a danger to

2    the safety of any other person or of the community, and that

3    the person will abide by those conditions, then the judicial

4    officer shall treat the person in accordance with the

5    provisions of § 3142 of this title.

6            Well, what does that mean?  That means that I have to

7    treat him the same way I would have had to treat him at the

8    beginning of these proceedings.  So, here, what do we have?

9    Probable cause to believe that he committed a felony offense

10   and the rebuttable presumption has arisen under § 3148(b.) And

11   this is true even if the felony is a non-violent felony.  The

12   statute does not differentiate.

13           There's not much authority about what I'm supposed to

14   think about that in this circuit, but in *United States versus*

15   *Bartok*, the Second Circuit, 472 Fed.Appx. 25, stated it upheld

16   the district court's order of a bond revocation based on the

17   defendant's commission of perjury, saying the law plainly

18   states that the rebuttable presumption may be triggered by a

19   probable case finding as to a defendant's commission of any

20   felony, regardless of whether the felony itself involves

21   violence, threats, or any indicia of dangerousness.  *United*

22   *States versus LaFontaine*, 210 F.3d 125, involved perjury and

23   witness tampering.

24           Within this district, in *United States versus*

25   *McDonald*, 238 F.Supp.2d 182, the court held that defendants

1    involved in a long-term drug dealing operation should be

2    detained pending trial, even though drug dealing does not

3    necessarily impose physical danger to the community.  I don't

4    think the case is entirely apposite here, but the court did

5    say, for the purposes of the Bail Reform Act, dangerous doesn't

6    mean violent.  The Committee on the Judiciary intends that the

7    concern about safety be given a broader construction than

8    merely danger of harm involving physical violence.

9          Similarly, in *United States versus McKethan*, 602

10   F.Supp. 719, the court in this district revoked defendant's

11   bond based on the rebuttable presumption when he was arrested

12   for possession of heroin, a nonviolent crime, while on pretrial

13   release.

14         Thus, I find under 18 U.S. Code § 3148 the

15   presumption has been triggered.

16         What does that mean?  The burden shifts to the

17   defendant to come forward with some evidence to rebut it.

18   There's no D.C. Circuit case specifically on how that plays

19   out.  But other circuits have found that the rebuttable

20   presentence position in § 3148 is similar to the one in

21   § 3142(e), which applies at the beginning of the bond

22   determination, and it's been held that it should be applied the

23   same way.  That was *United States versus Cook*, 880 F.2d 1158.

24         So how does it work at the time of the initial bond

25   determination under § 3142(e)?  Once a rebuttable presumption

1    has been triggered, the presumption operates, at a minimum, to

2    impose a burden of production on the defendant to offer some

3    credible evidence contrary to the statutory presumption.

4    That's *United States versus Alatishe*, 768 F.2d 364, out of the

5    D.C. Circuit.

6          Other circuits, the Second Circuit, in *United States*

7    *versus Rodriguez*, 950 F.2nd 85, underscored that a defendant

8    must introduce some evidence contrary to the presumed fact in

9    order to rebut the presumption.

10          But, courts have also said while the production --

11    burden of production may not be heavy, all the applicable cases

12    speak in terms of a defendant's obligation to introduce

13    evidence.  That's *United States versus Stricklin*, 932 F.2d 1353

14    from the Tenth Circuit.

15          As the court in this district explained in *United*

16    *States versus Ali*, even if the defendant offers evidence to

17    counter the presumption, the presumption just doesn't

18    disappear.  The presumption still remains a factor to be

19    considered after the defendant has produced credible evidence.

20          And the Sixth Circuit said, in *United States versus*

21    *Stone*, 608 F.3d 939, even when a defendant satisfies his burden

22    of production, the presumption favoring detention does not

23    disappear entirely, but remains a factor to be considered among

24    those weighed by the district court.

25          But in the end, while the presumption operates to

1    shift the burden of production, it does not alter the

2    government's burden of persuasion under the statute, which is

3    consistent with the presumption of innocence, which still

4    applies in this case.  As the *Stone* court said, regardless of

5    whether the presumption applies, the government's ultimate

6    burden is to prove that no conditions of release can assure

7    that the defendant will appear and will assure the safety of

8    the community.

9            So, while what the defendant presented to me was

10   largely argument, he did supply some exhibits.  So I find,

11   given the low threshold here, that he has come forward with

12   some evidence to rebut the presumption.

13           With that background, I want to give the parties an

14   opportunity to argue.  I think you know that I've read your

15   pleadings.  I don't need to hear argument on the question of

16   probable cause, I've made that finding.  I don't need to hear

17   argument on the question of whether the presumption has been

18   triggered or whether it's been rebutted, I've made those

19   findings.

20           But, I have simultaneous requests pending before me

21   to loosen the conditions of bond or to revoke it altogether.

22   And so I do want to hear from both the government and the

23   defendant on what is needed to protect the safety of the

24   community.  How has that changed in light of this information?

25           Also, I want to underscore that the Bail Reform Act

24

1    says that even if I find that there are conditions of release

2    that could assure that the person will not flee and pose a

3    danger, I have to find that he will abide by those conditions.

4         So I want to hear from both sides on whether and how

5    I can be assured of that.  And I'll start with the government.

6         MR. ANDRES:  Thank you, Judge.  Judge, I just wanted

7    to start by addressing one fact that you mentioned with respect

8    to one of the initial phone calls, I believe it was the second

9    phone call that lasted over a minute.  It's the second one in

10   the Government Exhibit N, which is the chart.  I think Your

11   Honor said we didn't know what was said on that call.  There is

12   a reference, in paragraph 14, on page 6 of Special Agent

13   Domin's declaration.  Very briefly, that says that Mr. Manafort

14   said he wanted to speak to D1.

15        Subsequent to the provision of that affidavit, we've

16   spoken to counsel for D1 and he's provided us with a proffer of

17   what was said more specifically with that call.  So I would

18   like to proffer that information, because we do have more

19   information about specifically what was said.

20        At the time of that call, Manafort's call to D1 on

21   February 24th, 2018, D1 was in a car on a rural road in Italy,

22   his wife was driving.  D1 was confident that Manafort had

23   called him on his Italian cell phone.  D1 usually saw the

24   caller's number when he received calls from the U.S., but

25   Manafort's number did not display on D1's phone.  D1 did not

1    use speaker phone for this telephone call.

2           Manafort said:  This is Paul, Paul Manafort.  I need

3    to give you a heads-up.  D1 responded, Hello, Paul.  Manafort

4    said, I need to give you a heads-up about Hapsburg.  At this

5    time D1 turned down the radio so he could hear the call more

6    clearly.  Manafort continued:  Have you seen any articles about

7    Hapsburg?  It's important that we talk.  I have an update about

8    Hapsburg.  D1 responded:  I can't talk right now.  Manafort

9    continued:  I need to give you a heads-up about Hapsburg.  At

10   this point D1 hung up the phone while Manafort was still

11   talking.  D1 wanted to get off the phone quickly.

12          So we do have information about what was said on that

13   phone call.

14          Judge, the government takes the position that there

15   are no conditions upon which -- will satisfy the community or

16   rebut the presumption that Mr. Manafort is a -- is a danger to

17   the community.  And I would note, at the outset, that Mr.

18   Manafort hasn't provided any conditions, much less any

19   combination of conditions that would mitigate his danger to the

20   community.

21          In his reply brief -- or, in his response, I should

22   say, Mr. Manafort both didn't address the presumption and

23   didn't add anything about any conditions, but, rather,

24   advocated for the imposition of the bail package, which is

25   intended to address the risk of flight.

1        These are not random outreaches to these witnesses D1

2   and D2.  And Mr. Manafort certainly knew that these were

3   potential or prospective witnesses.  Section 1512 doesn't say

4   that it's an effort to hinder a trial witness or a witness

5   that's been identified by the government.  It says any person

6   who may give testimony.  And the statute is broad in that

7   respect.

8        These were not just a mere number of texts.  This was

9   a sustained campaign over a five-week period to use multiple

10  phone numbers, applications and people to reach D1 and D2 to

11  influence their testimony.  Obstruction of justice while the

12  defendant was on bail.

13       Generally, obstruction of justice is one of the

14  crimes for which courts consider in the Bail -- prior to the

15  Bail Reform Act considered pretrial detention.  This case is a

16  case where Mr. Manafort was taking these actions over a

17  five-week period while he's on bail, aware of the conditions of

18  his bail release.  Mr. Manafort, from his apartment or

19  someplace in Virginia or Washington, is reaching out 4,000

20  miles away to influence a witness in Italy on one occasion with

21  respect to D1.

22       With respect to D2, he's reaching out to Mr.

23  Kilimnik, who's in Russia, who then reaches out to another

24  individual who's also in Europe.  The notion that there could

25  be any condition, any condition that would keep him from

1    continuing to do that or to restrict his ability or protect the

2    community and witnesses in this case and rebut the danger, I

3    don't think exists, Judge.

4         There is certainly the possibility that you could

5    consider taking away his phone or his internet.  But courts

6    have repeatedly said that constructing what is, in effect, a

7    private prison doesn't necessarily ensure that there are

8    conditions, because those conditions have to be complied with

9    and ensured.  And there's nothing on the record that suggests

10   that this Court can have any confidence that Mr. Manafort will

11   abide by those conditions, if not for the fact that he's

12   already violated them.

13        And the number of different ways in which Mr.

14   Manafort can continue at this activity -- you could take away

15   his phone and somebody else could come in his apartment, or he

16   could use his wife's phone, or he could get another phone.

17   It's simply not practical to impose conditions that will

18   contain this type of evidence [sic].

19        To the extent, Judge, that we're now relying on the

20   factors with respect to bail; that is, the circumstances -- the

21   nature and circumstances of the charge, the weight of the

22   evidence, a danger to the community, and the like, Mr. Manafort

23   is now facing a substantial sentence in this case.  There are

24   multiple counts of more than -- that have a statutory maximum

25   of 20 years imprisonment.  His guidelines, I believe, are

1    somewhere in the neighborhood of 168 months.  That alone is

2    significant and something the Court should take into

3    consideration.

4            THE COURT:  Well, I'm not sure in terms of flight,

5    given what he was facing before, that there's been that

6    significant a change.  And I hear everything that you're

7    saying, but the Bail Reform Act doesn't talk as much about what

8    he's alleged to have done or not have alleged to have done and

9    the strength of the evidence about what he did or didn't do, it

10   says does that point to the notion that he's a danger?

11           So, you've talked about the fact that there's no way

12   to ensure that he's not going to continue to try to affect the

13   outcome of his trial, and there's no conditions that could keep

14   him from reaching out, but can you address the issue of the

15   safety of any person or the community? which are the words that

16   I have to look at.

17           MR. ANDRES:  Sure.  Judge, the danger here is not a

18   physical danger or a danger of violence.  The danger is that

19   Mr. Manafort will continue to commit crimes.  The danger to the

20   community is that if Mr. Manafort is released, that there have

21   to be conditions that prevent him from continuing to commit

22   crimes, and it's on that point that we don't think there are

23   conditions.

24           I will say, Judge, in the first instance, we haven't

25   been presented with any conditions.  So, it's a little hard

1    to -- for us to address whatever those conditions have been

2    because Mr. Manafort hasn't said anything about any conditions.

3    In fact, he's asked again that his bail not be revoked but,

4    rather, that it be lightened and that he be released from home

5    detention.

6              So it's the government's position that the danger at

7    issue is his ability to continue to commit crimes like the

8    crime that he's recently committed and been indicted for.

9              THE COURT:   Thank you.

10             MR. ANDRES:   Thank you, Your Honor.

11             MR. WESTLING:   Your Honor, in addressing the Court's

12   question regarding conditions or combination of conditions that

13   will reasonably assure the safety of others, persons and the

14   community, looking at the requirements, as the Court clearly

15   has of the Bail Reform Act, we suggest, first, that the history

16   of this matter, other than the issue we're here for today,

17   related to this new indictment, suggests that generally -- and

18   the Court has pointed out the exception regarding this prior

19   order involving contact with the media that was the subject of

20   the hearing back in December.  But, Mr. Manafort has largely

21   been in compliance with all the conditions of his bond.  It

22   suggests he's worked very hard in a very difficult program,

23   with a lot of monitoring, a lot of requirements, to meet those

24   requirements as this Court has handed them down and when they

25   have been abundantly clear to him.

1      I think there is the issue that the Court has pointed

2  to here about there not being a no-contact order in this case.

3  There clearly are facts which the Court has weighed that I

4  don't know that we need to spend a lot of time regarding what's

5  in the new counts in the indictment.  But I do think there are

6  things about the nature of the crimes, even assuming probable

7  cause, that inform the decision of whether there are conditions

8  or combination of conditions.

9      First, we're not talking about a situation where the

10  witness tampering charges are based on any kind of threat,

11  offer of promise, of reward.  In fact, you know, obviously, our

12  position is that there's not really even evidence of an intent

13  to influence.  But again, there's been a probable cause finding

14  on that that we're not here to upset.

15      I think the nature of the question of does this

16  present a record on which a no-contact order would be

17  insufficient to stop this from happening? in my view the answer

18  to that is no.  I think the other thing the Court is well aware

19  of --

20      THE COURT:  Well, what do we do about the contacts

21  that happened after a no-contact order?  You've told me that

22  he's complied with orders when they're abundantly clear.  Was

23  there anything that was not abundantly clear about Judge

24  Ellis's order?

25      MR. WESTLING:  Well, I would argue, Your Honor, that

1    Judge Ellis's order would be limited to the matter before him

2    and the investigation before him and would not, you know, reach

3    into the case before this Court, where this witness was

4    clearly, if he is in fact a witness, engaged.  If he doesn't --

5           THE COURT:  Well, that's why I looked at the order.

6    And I was struck by the breadth of the language, which says

7    defendant must avoid all contract, directly or indirectly, with

8    any person who is a victim or witness in the investigation or

9    prosecution of the defendant.

10          Do you -- is it your position that he could call

11    witnesses in this case, but not witnesses in that case?

12          MR. WESTLING:  Well, I think it's unclear, Your

13    Honor, frankly.  I recognize the Court may disagree with that,

14    but the problem is that is a standard condition of bond that is

15    entered in every case and it is typically limited to the

16    contours of the case before the court giving the order.  And so

17    it's very clear there was an order that said you can't call the

18    bankers, you can't call the whatever in the Virginia case.

19    It's less clear about what it meant for this case.

20          Additionally, there is no contact by Mr. Manafort

21    directly after that date, from everything I understand about

22    the factual timeline here.  So I'm not sure there's even been a

23    violation of the contact order in the Eastern District of

24    Virginia, which, as you point out, Judge Ellis may well take up.

25          I will note that the violation notice that's been

1    entered by the pretrial services office in Virginia references

2    only the new indictment and not anything about the contact

3    issue.

4         So, I think, from our perspective, the trouble in

5    this case, from the beginning -- and the Court, you know, is

6    aware of this, has been -- we've been working very hard to try

7    to figure out who the people are.  And, of course, when you

8    know who the people are, it's really easy to say stay away from

9    them.  The Court just recently granted, this week, a motion for

10   a bill of particulars that identified a list of others.  That

11   generated a list of 55 potential people that, you know, we now

12   know, it's pretty clear they should not be, you know, on

13   anybody's radar for Mr. Manafort to reach out to.

14        I can also say that, Your Honor, the challenge, any

15   time you're trying to reach out, even when it's a legitimate

16   effort to contact a witness for the benefit of the defense,

17   that is something that often requires the client to be

18   involved, only because they know.  The best practice, clearly,

19   is to do that with your lawyer involved; that didn't happen

20   here.  But I --

21        THE COURT:  None of the contacts said my lawyer is

22   going to be contacting you to talk about this, please tell them

23   everything you know.

24        MR. WESTLING:  Right.  All we know is that what it

25   said is I need to give you a heads-up about this development.

1    And that could mean a lot of things if there had been a

2    follow-on conversation.

3        I think the answer here -- and I think the thing

4    we're not, you know, endeavoring to address really because, I

5    think, the law sort of says we shouldn't, is the nature of

6    what's provable in that case.  I mean, those cases, as the

7    Court knows, will go to trial here at some point in the future

8    and we'll hash out what all the evidence is about what those

9    calls really meant.

10        I think what we have to -- and I know the Court is

11   well aware of this, what we have to look at is what we've got,

12   sort of, on the face of it.  And I don't see any evidence that

13   suggests that there was any kind of threat, any kind of

14   promise, any kind of the traditional things that you see in

15   cases involving an effort to tamper with or undermine witness

16   testimony.

17        You know, it didn't start with, Have you been talked

18   to by the government?  That would be the one question I would

19   expect someone to have asked if this was the typical witness

20   tampering concern.  Right?  Have you heard from the government?

21   I mean, that's -- unfortunately, I've had these situations

22   before and that's kind of what happens.

23        I think here it suggests more there's a development

24   in the news and there's an effort to reach out.  The question

25   for this Court, however, is whether there's something that can

1    keep that from happening in the future.  And from my

2    perspective, Your Honor, I think clarity is the solution to

3    that.  And the Bail Reform Act -- I mean, even when you have

4    conditions like you can't contact any witness or any victim,

5    you know, typically the best practice is to say, Well, Judge,

6    the government should tell us who those people are so we don't

7    have a misunderstanding about this.

8          I mean, the dilemma becomes we have no way of knowing

9    when D1 and D2 became witnesses.  Was it after they were

10   contacted by Mr. Manafort?  Was it before that?  When and --

11   you know, the government is the one who gets to define all

12   these terms.  And I think the important thing here is what

13   everybody, I think, should want is to see the purpose of the

14   Bail Reform Act played out in a way that will protect the

15   community, protect other persons, and to do that by ensuring

16   that Mr. Manafort knows exactly what he is supposed to do and

17   does it.

18         And here I think there was some lack of clarity about

19   that.  I'm not -- you know, that's just where we find

20   ourselves.  In this particular situation, the remedy of

21   revocation, it seems to me, is very harsh, given that, you

22   know, there just isn't an indication, other that the

23   supposition of the people having gotten the calls, that this

24   must have had something to do with an attempt to influence my

25   testimony.

1              THE COURT:  Well, I feel like you're somewhat

2      understating what we have.  There are at least three contacts

3      where -- an affirmative statement about what the facts really

4      are were made, and that is different than just reaching out, as

5      you keep calling it.

6              MR. WESTLING:  But I think the difficulty, Your

7      Honor, is we don't understand the context.  And again, I'm not

8      here to try the case.  But, I mean, there are lots of reasons

9      why, under this same set of facts, the indictment comes down,

10     for the first time this entity is mentioned, there's an article

11     in the news about it that says something.  You know, if I

12     haven't talked to somebody in a long time and something I've

13     been involved in that's all over the news has gotten their work

14     in the paper, I may well call and say, hey, just so you know,

15     this is going on and this is my concern.  That's different from

16     it relating to what's going to happen with these, quote,

17     witnesses in this case.

18              And the problem we have is that the government still

19     hasn't ever made a supposition about did it hear from D1 or D2

20     before this?  I would submit, Your Honor, if they didn't, then

21     they're not witnesses.  I mean, they're not planning to be

22     present in a proceeding, you know, and that's the requirement.

23     There has to be an expectation at the time that contact is made

24     that those people would be called to give testimony.  And if

25     that's not clear on the record, then I think there's some

```
 1    problems with this case.

 2             But, again, I keep trying to say, and I hope the

 3    Court understands that -- I know it does -- but the nature of

 4    the law suggests I shouldn't be, you know, trying to fight that

 5    case now.  But we have to deal with it, as the Court has

 6    pointed out, in terms of trying to think through where do we

 7    find ourselves today?  And I would suggest to you, Your Honor,

 8    the record of compliance with the bond conditions overall,

 9    where they are clear and unambiguous, you know, along with all

10    the other factors in 3142(g), which continue to militate in

11    favor of Mr. Manafort remaining on bond during the pendency of

12    these trials.  The government has not argued to the Court,

13    other than this will keep happening.  I think the question then

14    becomes what do we do to make sure that it doesn't?

15             THE COURT:  What do we do?

16             MR. WESTLING:  I think the answer is that we enter a

17    condition that says you will have no contact -- and I would ask

18    for the provision, other than if your attorneys are involved --

19    with any witness that is involved in this case.  We now have a

20    list of many.  I would continue to ask that the Court consider

21    whether the government should give us categories of people to

22    stay away from.  But I will tell you that our instructions to

23    the client will be don't call anybody.  It's simple, right?

24             THE COURT:  I'm sure those were your instructions a

25    long time ago.  I have confidence that everyone said that a
```

1      long time ago.

2              MR. WESTLING:  But I think the difficulty here, Your

3      Honor, is that this is a broad-ranging matter that is largely

4      something the government continues to expand, and with that it

5      puts Mr. Manafort in a position of not knowing whether any call

6      he makes is a risk of violating the unknown list of witnesses

7      in a situation where that's not made clear.

8              And so from my perspective, a clear no-contact rule

9      will solve the problem.  There's no indication of attempting

10     to, as I've said before, you know, threaten, do anything other

11     than reach out, with whatever intent that the government may

12     prove at a later date.  And I think if we simply cut off that

13     line of contact, it will solve this problem.  And I don't think

14     there's any evidence to suggest that that is not -- we're

15     trying, and in an appropriate way, for the Court to weigh the

16     balance it's forced to weigh where there is a general sense

17     that where there are conditions, remaining out of jail pending

18     a trial is the proper result.

19             And, I know that, you know, these are the kinds of

20     things that judges wish they didn't have to deal with.

21             THE COURT:  I -- yes.

22             MR. WESTLING:  We all get that.

23             THE COURT:  This has been, it continues to be, to

24     this minute, an extraordinarily difficult decision.

25             MR. WESTLING:  I understand that.  I understand that.

```
1     But I believe that Mr. Manafort can be put in a position, Your

2     Honor, where conditions can be set, and I think that's largely

3     a no-contact rule that is clear and unambiguous from this

4     Court, that this will not happen again.  And the goal of what

5     the Court does here today is all about preventing it from

6     happening again.

7              And I think that anything else -- if we jump to the

8     thought that that means that he should be remanded today, that

9     may achieve the result, but it will do so in a manner that is

10    more harsh and creates more challenges for this defendant as he

11    faces two trials in separate courts and preparing for those

12    trials than the Bail Reform Act requires or compels under these

13    circumstances.

14             THE COURT:  All right.  Thank you.

15             You have the burden, Mr. Andres, so I'll let you --

16    since you're already standing.

17             MR. ANDRES:  My colleague has the law absolutely

18    wrong with respect to witness tampering.  Absolutely wrong.  It

19    doesn't -- a defendant can be involved in witness tampering

20    without a list of government witnesses.  Right?  It's any

21    person who may give testimony.  And with the Hapsburg Group,

22    which is the issue that Mr. Manafort is reaching out to D1 and

23    D2, they control the Hapsburg Group.  It's inconceivable that

24    he doesn't know that they're potential witnesses, and that's

25    what the law is, not that they've been told that there's a
```

1     witness.  It isn't about a contact -- no-contact list.  This is

2     about influencing the testimony of a potential witness, a crime

3     for which Mr. Manafort has now been indicted.  He has

4     absolutely violated the terms of his bail by committing a crime

5     while on bail.  That's one.

6              Two, he has the law absolutely wrong about threats of

7     violence and witness tampering.  The courts have been

8     absolutely clear that providing a false story to a witness,

9     reminding them about the facts, which are false -- in this case

10    Mr. Manafort is reminding these individuals.  And if that

11    wasn't clear from his text, it's abundantly clear from Mr.

12    Kilimnik's text, which put in parenthesis, by the way, that

13    something is true.  Generally, when something is true, you

14    don't have to remind another witness that it is true.

15             He provides them with facts that are false.  The

16    Hapsburg Group absolutely operated in the United States.  They

17    provide an account that said only Europe, or Europe, at least,

18    and that is false.  When a witness -- when a defendant tells a

19    witness a false story and reminds him of that story, the courts

20    have held repeatedly that that constitutes witness tampering.

21             So Mr. Westling is wrong about what it means to be a

22    witness.  He's wrong about having to have a no-contact list or

23    a list of government witnesses.  He's wrong about the type of

24    methods that can be used to tamper with the witness.

25             Your Honor, earlier you asked --

1          THE COURT:  Well, and I have already found, and I'm

2     not going to alter my finding, that there is probable cause to

3     believe that he committed the offense of witness tampering in

4     this record, he's been indicted for it, and that the rebuttable

5     presumption has arisen.  So, while all these things are

6     related, the extent of the witness tampering and whether it was

7     really witness tampering does go to the question of

8     dangerousness.

9          I believe the two questions that I have to wrestle

10    with, that are the most difficult, are whether he poses a

11    danger to the safety of any person or to the community, and

12    whether I have any confidence that he's going to abide by any

13    order that I impose.  And one is more difficult for one side of

14    the courtroom, and one is more difficult for the other side of

15    the courtroom.

16         And so that's where I feel like the focus of the

17    argument needs to be, is safety.  And I guess one question I

18    have for you is:  At the beginning of these proceedings the

19    government was satisfied that it would ensure his appearance

20    and the safety of the community if we had either the home

21    detention that we have now or a $10 million bond.  Had this

22    count been in the original indictment, would you have moved for

23    his pretrial detention, do you think?  Or would we have still

24    been talking about a substantial bond and significant

25    conditions?

1              MR. ANDRES:  Judge, it's hard to talk about a

2     hypothetical in that respect.  But what I would say is this:

3     That we're in a much, very -- we're in a very different

4     situation, not just because Mr. Manafort committed obstruction

5     of justice, witness tampering, which is the question, would we,

6     at the time, if he was indicted in October on those counts, we

7     have moved for detention?  Put that aside.  Today we're talking

8     about obstruction of justice during a time when he's on bail.

9              So that, Judge, I think alters the calculation

10    significantly, at least as to with respect to the question of

11    whether the Court can have any confidence that Mr. Manafort

12    will abide by those conditions.

13             This is a case in which Mr. Manafort has lied to his

14    accountants and the IRS, a case where he's lied to his lawyers

15    and the Department of Justice with respect to FARA.  There is a

16    history of deception on behalf of Mr. Manafort in this case.

17             You had asked earlier, Judge, about the types of

18    dangers that are at issue that you have to address.  I think

19    Your Honor mentioned the case regarding perjury and a court

20    that found that perjury itself was a potential danger and a

21    basis to detain a defendant or to revoke his bail.  There's

22    also the case in *LaFontaine*, which is the Second Circuit case

23    that Your Honor mentioned that said danger to the community,

24    courts have recognized that a defendant's attempts to influence

25    the testimony of potential witnesses constitutes the type of

1    danger to the community that can support detention.

2          So it is the actual effort to corrupt the integrity

3    of this process and tamper with witnesses that is the danger

4    that we're accounting for, and that is hardly resolved by

5    simply telling Mr. Manafort what he already knows, that there

6    are individuals that are witnesses, like D1 and D2.

7          Lastly, Judge -- or almost lastly, I should say, with

8    respect to Mr. Manafort, he has a history of using encrypted

9    applications, we know that from the evidence in this case.

10   There are at least a half dozen others that he uses.  We're

11   aware that he's involved in doing something called foldering,

12   where he has an e-mail where multiple people have access.  They

13   draft an e-mail, they put it in a draft folder, it doesn't

14   actually get sent, so you don't know who it's going to or who's

15   reading it, but other people that have access to those e-mail

16   accounts also are able to read that e-mail.  So they basically

17   hide the fact that they're sharing information or who's sharing

18   information between different people.

19         It's important to note as well, Judge, that this case

20   or this issue with the obstruction of justice, the government

21   did not learn about that by somehow subpoenaing or monitoring

22   or getting a search warrant for Mr. Manafort's communications.

23   We learned about it because a witness in this case, that was

24   part of the government's investigation, brought forth the

25   information about the tampering.  And that's when we started

1    our investigation.  That's when we asked the Court for

2    additional time to give our opinion about bail, and that's

3    where we started our investigation.

4            So, there's no way to monitor Mr. Manafort's

5    communications in some effective way, at least because he's

6    adept at using encrypted applications and, B, we have no real

7    ability to monitor that.  The notion that the only condition

8    that defense counsel suggests will address the issue of him --

9    Mr. Manafort tampering with witnesses is a no-contact list,

10   it's just not sufficient to protect the community or to give

11   the Court any confidence that Mr. Manafort won't try this

12   again.

13           Again, it's not a single episode, it's a campaign

14   that took place over five weeks.

15           As we sit here today, Judge, Mr. Manafort has

16   committed a crime while he's on bail.  There's a rebuttable

17   presumption.  I don't think the defense has done anything to

18   rebut that presumption.  The Court has before it crimes that

19   relate to danger, namely, the witness tampering.  And he's

20   released on a recognizance bond of $10 million today.  At a

21   minimum, the bond that he is released on today can't possibly

22   be sufficient to address the danger issue.  And he hasn't

23   advanced anything with respect to -- even the bond that he

24   proposed with respect to risk of flight, I don't know, we

25   certainly haven't seen it, that documents have been filed, that

1    people have signed it.

2              As we sit here today Mr. Manafort is out on a

3    $10 million recognizance bond and he's been indicted for a

4    crime while on bail.

5              THE COURT:  Thank you.  I want to take some time to

6    be absorb it.

7              MR. WESTLING:  Your Honor, may I have just a minute

8    or two?

9              THE COURT:  All right.  I'll give you a chance.

10             MR. WESTLING:  I want to address a couple of points

11   made by special counsel.  You know, I think the first is that

12   one of the things in the discussion about foldering we clearly

13   know is that the government's spending a lot of time monitoring

14   what Mr. Manafort is doing.  And to the extent that that's

15   what's going on, I think it's important to note that while this

16   has been described as a campaign, we're not talking about there

17   being, you know, other circumstances that fit this bill.  And

18   so I think, you know, the ability to sort of deal with this in

19   a way that sort of discontinues any contact with anyone.

20             I think the other thing here that's significant is

21   there's a lot of emphasis on the use of encrypted programs and

22   things.  And I guess I just want to say, and it may just be to

23   hear myself talk, I will admit that, but, you know, WhatsApp is

24   being used by 1.2 billion people in the world right now.  I

25   mean, the idea that something is special about using that app,

1    which all of my children use, is somehow nefarious, I think is

2    a little bit of gilding the lily here.

3             I think that the important thing for the Court to

4    recognize, and I know it does, is this is a difficult balancing

5    matter, but the general standards here should go towards trying

6    to find a way to keep Mr. Manafort out on release with

7    conditions that will prevent this conduct in the future.  I

8    think we've talked to the Court about what those may be and we

9    ask that you consider that.

10            THE COURT:  All right.  Thank you.  I'm going to take

11   a break and return in approximately 15 minutes.

12            I would like to note to the people that are from the

13   media that are going to have an interest in reporting whatever

14   takes place after the break, that I do not want people standing

15   up and running out of this courtroom.  So if you want to go to

16   the overflow courtroom for the second portion of this, you're

17   welcome to do that.  But otherwise when you come back and

18   you're seated, you're seated until court is adjourned.

19            All right.  Thank you.  You can remain seated now.

20            (Recess.)

21            THE COURTROOM DEPUTY:  Your Honor, recalling criminal

22   case number 17-201-1, the United States of America v. Paul J.

23   Manafort, Jr.

24            THE COURT:  What is that?  Is that the hall?  Or are

25   we having some other room broadcast in here?

1          (Pause.)

2          THE COURT:  All right.  As I was planning to start

3     this ruling, no matter which way I ruled, there's no question

4     that I have the legal authority on this record to revoke the

5     defendant's bond today.  In *United States versus LaFontaine*,

6     210 F.3d 125, that was the most similar case I could find.  A

7     defendant in a white collar case who had no history of violence

8     coached a witness by reminding her what to say, but did not

9     threaten or intimidate her.  The trial court's decision to

10    revoke the defendant's bond was upheld by the circuit.

11    Although witness tampering that is accompanied by means of

12    violence may seem more egregious, the court said the harm to

13    the integrity of the trial is the same, no matter which form

14    the tampering takes.

15          Therefore, the court found that the nonthreatening

16    witness tampering by a defendant without a violent criminal

17    history was sufficiently dangerous to the community to support

18    the revocation of his bond.

19          In *United States versus Aron*, a Fifth Circuit case,

20    904 F.2d 221, although the defendant -- the witness in the case

21    testified that he felt intimidated by the defendant's visit to

22    his home while the defendant was on release, the defendant

23    didn't actually threaten the witness when they spoke or use

24    violence.  However, the circuit upheld the district court's

25    revocation and detention decision.

1          In *United States versus Gilley*, out of the middle

2     District of Alabama, 771 F.Supp.2nd 1301, the district court

3     upheld a magistrate judge's revocation of bond due to the

4     probable cause finding that the defendant committed witness

5     tampering by bribing a witness to testify falsely.  The Court

6     found that continued pretrial detention was appropriate because

7     any kind of witness tampering affects the integrity of the

8     court and invokes the public concern of encouraging individuals

9     to serve as witnesses.

10          In *United States versus Mustachio*, 254 Fed.Appx. 853,

11     the court said where the post-release criminal conduct involved

12     obstruction of justice through intended destruction of evidence

13     and deceit of the court, defendants can hardly claim that

14     conclusory denials of any intent to jeopardize the safety of

15     others sufficed to rebut the presumption in favor of detention.

16          *United States versus Mackie*, out of the Fifth

17     Circuit, the court held upholding bond revocation where there

18     was probable cause to believe that the defendant induced travel

19     as part of a fraud scheme, a nonviolent offense, was still

20     sufficient to support the revocation of bond.

21          It is also worth observing that a fair proportion of

22     the cases in which bond is revoked or bond is denied involve

23     actual threats to witnesses.  For instance, *United States*

24     *versus Gotti*, 794 F.2d 773, out of the Second Circuit.  But

25     with or without threats, pursuant to § 3148, the indictments on

1    the witness tampering charges give rise to a rebuttable

2    presumption that the defendant is likely to flee or pose a

3    danger.  And there has been very, very little presented here

4    today to rebut the presumption.

5            However, the law is clear, if I find that there are

6    conditions that will assure that the person will not flee or

7    pose a danger to the safety of any other person or the

8    community, and that he will abide by those conditions, I

9    shall -- the statute says must -- treat the defendant in

10   accordance with the provisions of § 3142, and that says that I

11   shall, I must, release him under the least restrictive

12   conditions to accomplish those goals.

13           Thus, the touchstone of the Bail Reform Act is still

14   and always has been flight and safety.  The law is clear that I

15   cannot impose pretrial detention to punish this defendant for

16   the alleged conduct in the new allegations.  And, so, I have

17   struggled with this decision.

18           At the end of the day, as I have emphasized, it's the

19   government that bears the burden to prove that there are no

20   conditions that can ensure the defendant's appearance and the

21   safety of any person or the community.  Here, I don't believe

22   there's been any change in the defendant's risk of flight.  The

23   additional charges don't really change the calculus that much,

24   given what he's already facing.

25           Is he a danger?  The statute first talks about the

 1    need for bond to assure no harm to any person or the community.

 2    There's been no harm to any person alleged.  While the grand

 3    jury has found probable cause to believe that the defendant has

 4    attempted to corruptly persuade people to lie, there's been no

 5    evidence of even a threat of harm to any person.  What we have

 6    here is an alleged threat of harm to the community.  We don't

 7    have what one would consider the typical sort of harm to the

 8    community at large; dangerous substances being pedalled on the

 9    corner, unlawful possession of firearms.  The harm in this case

10    is the harm to the administration of justice.  It is the harm

11    to the integrity of the court system.

12              And I've wrestled with this because now that the

13    Office of Special Counsel has decided to supersede, we have a

14    situation where this defendant will be tried for trying to

15    inflict that very harm in just three-months time.  And so if a

16    sanction is warranted, I will have the opportunity to vindicate

17    the community's interest at that time, if and when he's found

18    guilty.

19              But then I still have to determine what conditions

20    could there be?  This is not middle school, I can't take his

21    cell phone.  And if I say, well, don't call the 56 witnesses

22    that Mr. Westling tells me I need clearly list in the order,

23    will he call the 57th?  All the defendant has said to me is,

24    well, there wasn't a clear enough order saying not to do it.

25    And my problem is, I don't think I can draft a clear enough

1    order to cover every possible future violation of the

2    United States code, and I shouldn't have to.

3              I thought about this long and hard, Mr. Manafort.  I

4    have no appetite for this.  But in the end, I cannot turn a

5    blind eye to these allegations.  Given the number of contacts,

6    the persistence of the contacts and their obvious intent and

7    import, it is how they were perceived and received by the

8    person to whom they were made.  And this witness tampering

9    occurred while the defendant was already on bond and already

10   under an order by another judge not to do this.

11             The indictment alleges a corrupt attempt to undermine

12   the integrity and truth of the fact-finding process upon which

13   our system of justice depends.  The defense suggested that it

14   was inappropriate for the government to bring these matters to

15   my attention.  So I want to state quite clearly that it

16   absolutely was not.  You struck that note repeatedly in your

17   papers, but this hearing is not about politics.  It is not

18   about the conduct of the Office of Special Counsel.  It is

19   about the defendant's alleged conduct.  And this is not the

20   first time we've had to talk about the rules and we've had to

21   talk about skating close to the line.

22             I am very troubled that the contacts with these

23   witnesses are alleged to have taken place even after you were

24   under an explicit order not to contact witnesses, directly or

25   indirectly.  I am concerned that you seem inclined to treat

1    these proceedings as just another marketing exercise and not a

2    criminal case brought by a duly appointed federal prosecutor in

3    a federal court.  You seem inclined to take matters in your own

4    hands instead of relying on the defense mounted by your counsel

5    who are fighting vigorously and fiercely and zealously on your

6    behalf, but always within the rules.

7          And so all of this, at bottom, affects my judgment

8    about whether you can be trusted to comply with the Court's

9    directives.  And that is the finding that the statute also

10   requires me to make if I release you, and I can't make it.  You

11   have abused the trust placed in you six months ago.  And,

12   therefore, the government's motion will be granted.  And the

13   defendant will be detained pending trial as of today.

14         MR. WESTLING:  Your Honor, we would ask that the

15   Court stay imposition of any remand to allow us to appeal.

16         THE COURT:  What's the government's position on that?

17         MR. ANDRES:  Judge, there are no conditions to

18   address any of the concerns the Court -- there's nothing that

19   will prevent them from appealing immediately, and if they

20   prevail on appeal, Mr. Manafort can be released.  But presently

21   there are no conditions, as the Court has found, to guard

22   against the danger to the community, so we oppose that

23   application.

24         THE COURT:  And I'm also concerned that now that I've

25   issued this order, that the risk of flight has just multiplied

1    substantially.

2              So I appreciate the request, and it's a serious

3    request and I understand that, but I'm going to deny it.

4                              *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5            I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                        Dated this 15th day of June, 2018.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25