**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                  )
UNITED STATES OF AMERICA,          )
                                                  )
          v.                                      )          Crim. Action No. 17-0201-01 (ABJ)
                                                  )
PAUL J. MANAFORT, JR.,                 )
                                                  )
          Defendant.                          )
_____)

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendant Paul J. Manafort, Jr. has moved to suppress the evidence obtained when the FBI

executed a search warrant issued by the United States District Court for the Eastern District of

Virginia, and it seized business records contained in boxes and a filing cabinet in a self-storage

unit in Alexandria, Virginia.  Manafort argues that the search was unlawful because the agents

entered the storage unit and looked around without a warrant the day before they presented their

request for a warrant to the court.  While they did not open the boxes or review the papers filed in

the drawers on that day, they described the exterior of the containers they observed, including the

labels on the boxes, in the warrant application.  Therefore, Manafort claims, the warrantless initial

entry tainted the later search of the files that was authorized by the warrant.  He also argues that

the warrant itself was too broad to comport with the Constitution for a number of reasons,

including that it was not limited to a particular time period and it called for broad categories of

financial records.

The defendant's motion will be denied.  Law enforcement agents do not need a warrant to

enter a location if they have voluntary consent, and they do not need to have the consent of the

person under investigation if they receive permission from a third party who has, or who

reasonably appears to have, common authority over the place to be searched.  Here, the agents

obtained a copy of the lease for the storage unit.  The person identified as the lessee or "occupant" of the storage unit was an employee of a company owned by Manafort who had a key to the premises, and he unlocked the door for the agents and gave them written permission to enter. Therefore, the preliminary inspection of the unit falls within the consent exception to the warrant requirement.

Furthermore, the agents did obtain a search warrant in compliance with the Fourth Amendment for the containers within the storage unit before they opened any of the boxes or drawers or examined the records inside.  A review of the warrant affidavit reveals that even if the initial survey of the unit was unlawful, that finding would not invalidate the seizure of the records that was carried out in accordance with the warrant.  The affidavit in support of the warrant application set out the agent's reasons to believe that Manafort had been engaged in criminal activity in the conduct of his business, and that his business records had been moved to, and remained in, the locker rented for that purpose.  So, if one were to excise the challenged information from the application, and presume that the Magistrate Judge was presented with a warrant application that did not include the few paragraphs describing the contents of the storage unit and the labels on the boxes, the affidavit would still support a finding of probable cause to believe that a crime or crimes had been committed and that records related to those crimes were likely to be found in the unit.

Finally, the warrant was not overbroad since it called for records related to specific offenses detailed in the application and in the warrant itself.  And even if this Court were to conclude that the warrant could or should be have been more tightly drawn, the agents relied in good faith on a warrant that had been reviewed and signed by a United States Magistrate Judge, and therefore, the evidence seized during the execution of the warrant should not, and will not, be excluded.

# BACKGROUND

## I.     Procedural History

On April 6, 2018, defendant filed his motion to suppress evidence seized pursuant to the warrant authorizing the search of the premises located at 370 Holland Lane, Unit 3013, in Alexandria, Virginia on the grounds that the search violated his Fourth Amendment rights.  Def.'s Mot. to Suppress Evid. and All Fruits Thereof Relating to the Gov't Search of the Storage Unit Located in Alexandria, Virginia [Dkt. # 257] ("Def.'s Mot.") at 1, 19–20.  The government opposed the motion, Gov't Mem. in Opp. to Def.'s Mot. [Dkt. # 283] ("Gov't Opp."), defendant replied, Def.'s Reply to Gov't Opp. [Dkt. #287] ("Def.'s Reply"), and the Court heard argument on May 23, 2018.

## II.    Applicable Facts

On May 26, 2017, an FBI agent met with a former employee of Davis Manafort Partners, who is currently a salaried employee of Steam Mountain, LLC, another business operated by the defendant.  Aff. in Supp. of an Appl. for a Search Warrant [Dkt. # 257-1] ("FBI Aff.") ¶ 28.  The employee stated "that he performs a variety of functions for Manafort and his companies as directed by Manafort."  *Id.*  He reported that "in approximately 2015, at the direction of Manafort, [he] moved a series of office files of Manafort's business contained in boxes from one smaller storage unit at 370 Holland Lane, Alexandria, Virginia to a larger storage unit, at the same storage facility, also at 370 Holland Lane, Alexandria, Virginia.  [The employee] advised that he personally moved the office files into Unit 3013 at that location, and that the files were still in that unit." *Id.*

Later the same day, the employee led the agent to the storage facility, where the agent obtained a copy of the lease for Unit 3013 from the manager of the facility.  FBI Aff. ¶ 29.  The lease identifies the employee as the "Occupant" of the unit, and also identifies defendant as

"Occupant's Authorized Access Person[]"and Richard Gates, with whom defendant worked in Ukraine, as "Alternate Contact."[1]  *Id.* ¶¶ 29, 35; Lease Agreement [Dkt. # 257-3] ("Lease") at 1. The lease states:  "By INITIALING HERE [the employee] Occupant acknowledges that the above information is correct, that unless Occupant is identified above as a business[,] Occupant is a consumer," Lease at 1, and that "the Owner agrees to let the Occupant use and occupy a space in the self-service storage facility."  Lease ¶ 1.  It further provides that "[t]he space named in the agreement is to be used by the Occupant solely for the purpose of storing any personal property belonging to the Occupant," Lease ¶ 5, and that "Occupant shall not assign or sublease the Premises." Lease ¶ 15(e).

The employee provided law enforcement with a key to unlock the unit, and he described the contents of the unit:  boxes of office files from defendant's business and a metal filing cabinet containing additional, more recent office files from defendant's business.  FBI Aff. ¶ 30.  He explained that he moved the filing cabinet from defendant's former residence in Virginia in the spring of 2015, and he "indicated that Manafort was using his former residence as an office at the time."  *Id.*  The agent noted in his affidavit that the employee stated that the cabinet was extremely heavy, "indicating that it contained a large amount of records."  *Id.*  The employee was unable to describe the contents of the filing cabinet in detail, but he stated that Manafort occasionally sent him emails directing him to put certain records, which the employee described as "brown, legal-sized files," into the filing cabinet on Manafort's behalf.  *Id.*   His recollection was that he last added to the filing cabinet in the spring of 2016.  *Id.*

---

1       On February 23, 2018, Gates pled guilty to conspiring with Manafort to defraud the United States and to making false statements.  *See* Superseding Information [Dkt. # 195]; Plea Agreement [Dkt. # 205] at 1.

The agent provided the employee with a written consent form which stated:

1.   I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of [the unit].

2.   I have been advised of my right to refuse consent.

3.   I give this permission voluntarily.

4.   I authorize the agents to take any items which they determine may be related to their investigation.

Consent Form [Dkt. # 283-2].  The form identified the storage unit, and the employee signed the consent form.  *See* Consent Form; FBI Aff. ¶ 31.  The employee then used the key in his possession to open the unit in the presence of the agent.  FBI Aff. ¶ 31.  The agent reports that "[w]ithout opening any boxes or filing cabinet drawers," he observed "approximately 21 bankers' boxes that could contain documents, as well as a five-drawer metal filing cabinet" inside the unit.  *Id.*  None of the file drawers were marked as to their contents, but some of the boxes bore labels such as "Admin," with subcategories including "Tax Returns," and "Box 12 Ukraine Binders," including subcategories such as "Surrogates," "Political," and "Media," which led the agent to conclude that they contained information related to, among other things, taxes, finances, and international activities connected to Ukraine and a company called Manhattan Productions International, in which defendant has a stake.  *Id.*  ¶¶ 31–35.

Afterwards, the unit was locked and surveilled while the agent sought a warrant authorizing the search of the unit and its contents.  *Id.* ¶¶ 38, 46; Application for a Search Warrant [Dkt. # 257-1].  United States Magistrate Judge Theresa Carroll Buchanan signed the warrant on May 27, 2017.  Search and Seizure Warrant [Dkt. # 257-2] ("Warrant").

The warrant authorized agents to search the storage unit, including "any locked drawers, locked containers, safes, computers, electronic devices, and storage media," Warrant, Attach. A, and to seize certain records.  Specifically, the warrant authorized seizure of eight categories of

"[r]ecords relating to violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to File a Report of Foreign Bank and Financial Accounts), 22 U.S.C. § 618 (Foreign Agent Registration Act), and 26 U.S.C. § 7206(a) (Filing a False Tax Return)."  Warrant, Attach. B ¶ 1.  It further authorized seizure of "[c]omputers or storage media used as a means to commit the Target Offenses," *id.* ¶ 2, as well as thirteen categories of evidence relating to the use and control of those items.  *Id.* ¶ 3.  The warrant limited the seizure of evidence concerning who used, owned, or controlled a computer or storage medium to evidence relating to that use, ownership, or control "at the time the things described in this warrant were created, edited, or deleted," *id.* ¶ 3(a), but otherwise, the warrant did not include date-range limitations on what could be seized.

Law enforcement agents executed the warrant on May 27, 2017, and created an inventory listing nine categories of records seized:  eight labeled "documents" and one labeled "documents and binders."  Warrant at 2.  There is no indication that any computers or electronic storage media were seized.  *See id.*

## LEGAL STANDARD

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  This protection extends beyond the walls of a private dwelling: "[t]he privacy that is invaded may be sheltered by the walls of a warehouse or other commercial establishment."  *Michigan v. Tyler*, 436 U.S. 499, 504–05 (1978).  The government bears the burden in a challenge to a warrantless search, *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 108 (D.D.C. 2014); *see United States v. Peyton*, 745 F.3d 546, 552 (D.C. Cir. 2014), and the defendant bears the burden when a search is authorized by a warrant.  *See Rakas v. Illinois,* 439 U.S. 128, 130 n.1 (1978); *United States v. de la Fuente*, 548 F.2d 528, 533–34 (5th Cir. 1977).

## ANALYSIS

Defendant asserts that the search of the storage unit violated his Fourth Amendment rights because the initial entry and inspection of the unit was conducted without a warrant, the warrant obtained based on the initial search was overbroad, and the agents who executed the search exceeded the warrant's search parameters.  Def.'s Mot. at 1.

**I.      The agents had the consent of a person with the authority, or apparent authority, to consent to their initial warrantless entry into the storage unit.**

A search without a warrant is presumed to be unreasonable, but law enforcement agents may rebut that presumption with a showing that a person with authority to do so permitted them to enter the premises.  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).  The Supreme Court has made it clear that

> when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

*United States v. Matlock*, 415 U.S. 164, 171 (1974); *see also United States v. Law*, 528 F.3d 888, 904 (D.C. Cir. 2008), quoting *Matlock*, 415 U.S. at 170 ("[C]onsent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.").

As the D.C. Circuit emphasized in *Peyton*, "'[c]ommon authority' does not refer to some kind of 'technical property interest.'"  745 F.3d at 552, quoting *Georgia v. Randolph*, 547 U.S. 103, 110 (2006); *see also Matlock*, 415 U.S. at 171 n.7 ("Common authority is . . . not to be implied from the mere property interest a third party has in the property.  The authority which justifies the third-party consent does not rest on the law of property . . . .").  Rather, the Court of Appeals said, common authority

arises simply from "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Peyton,* 745 F.3d at 552, quoting *Matlock*, 415 U.S. at 171 n.7.  The parties are agreed that this case must be decided in accordance with *Matlock. See* Def.'s Reply at 1.

 It is the government's burden to establish that the third party had the authority to consent to a search.  *Rodriguez*, 497 U.S. at 181; *United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991).  But "[e]ven a person who does not *actually* use the property can authorize a search if it is reasonable for the police to believe she uses it.  Such 'apparent authority' is sufficient to sustain a search because the Fourth Amendment requires only that officers' factual determinations in such situations 'always be reasonable,' 'not that they always be correct.'" *Peyton*, 745 F.3d at 552 (emphasis in original) (citation omitted), quoting *Rodriguez*, 497 U.S. at 185–87; *see also Randolph*, 547 U.S. at 110, citing *Rodriguez*, 497 U.S. at 181–82 ("The common authority that counts under the Fourth Amendment may thus be broader than the rights accorded by property law.").

Applying these principles, the Court finds that the initial warrantless entry into the storage unit was lawful.

### A.     The person who leased the unit possessed actual authority over the premises.

The starting point of the analysis in this case is the fact that the "occupant" who signed the lease for the premises located at 370 Holland Lane, Unit 3013, was a person other than Paul Manafort.  *See* Lease at 1.  It was that person who gave the agents written permission to enter, *see* Consent Form, and it was that person who opened the door with his key and let them in.  FBI Aff. ¶¶ 30–31.  The person is "a salaried employee of Manafort's company," FBI Aff. ¶ 28, and Manafort's name appears on the lease only as the "Occupant's Authorized Access Person[]."

Lease at 1. Thus, the record supports a finding that permission to search was obtained from a person who possessed – at the very least – common authority over the premises to be inspected, and a warrant was not required.[2]

Manafort points to the statements in the agent's affidavit concerning the actions taken by the employee "at the direction of Manafort." FBI Aff. ¶ 28; *see also id.* ("[H]e performs a variety of functions for Manafort and his companies as directed by Manafort."). He argues that the affidavit thereby reveals that the employee was *only* permitted to enter the unit when he was given an express direction to do so. *See* Tr. of Mots. Hr'g (May 23, 2018) [Dkt. # 305] ("Tr.") at 12 ("We know from the affidavit that he's only acting at the direction of Mr. Manafort . . . ."); Tr. at 15 ("[W]e're just looking at the affidavit and what's sworn to by the agent. He's saying that only at Mr. Manafort's direction and control. And not just once or twice, but three times, . . . ."). But the affidavit does not say that.

In paragraph 28 of his affidavit, the agent reports that the employee "advised that in approximately 2015, at the direction of Manafort, [he] moved a series of office files of Manafort's business" from a small unit at Holland Lane to the larger one at issue in this case. FBI Aff. ¶ 28. Paragraph 30 reports that the employee moved a filing cabinet from Manafort's former residence to the unit in the spring of 2015, and that he "advised that Manafort occasionally sent emails to [him] directing [him] to put certain records into the filing cabinet on Manafort's behalf." FBI Aff. ¶ 30. So the affidavit connects the defendant to the storage unit by establishing that he

---

2       The prosecution did not argue here that the defendant does not have standing to object to the search and seizure of his business records.

instructed the employee to place materials in it, but it does not explicitly or implicitly delineate

any limits on the employee's right of access at any other time.[3]

This conclusion that the employee had the authority to consent is consistent with the legal

precedent amassed by both parties.  The briefs in this case were thorough, and it appears that there

have been few reported cases from any circuit that present similar facts.  The only two cases

---

3    In his motion, Manafort asserts that the employee lacked actual authority:

> Here, the former employee was named as an occupant on the lease
> agreement simply for administrative convenience and only because he
> happened to be the DMP employee tasked with setting up the storage lease
> on DMP's behalf and moving DMP's business records into the unit.  This
> is bolstered by the fact that the former employee's DMP email address was
> listed on the lease agreement and the fact that Mr. Manafort appears on the
> agreement as the *only person* with authorized access to the storage unit.
>                                          * * *
> It was clear to the former employee and others at DMP that he had no
> authority to enter the storage unit for any reason *absent prior express
> permission from Mr. Manafort*.  On no occasion did Mr. Manafort do or say
> anything that manifested an express or implied desire to allow the former
> employee to consent to a law enforcement search of the premises for DMP's
> records.  Put simply, he did not have actual authority in connection with the
> storage unit and did not have the actual authority to consent to the FBI
> Agent's search.

Def. Mot. at 5 (emphasis in original); *see also* Tr. 11 (Defense Counsel:  "[T]hat is a summation, essentially, of what is reported here in the affidavit . . . .").

Obviously the statement that Manafort was the "*only*" person on the lease with authorized access to the storage unit is belied by the lease itself, which was in the employee's name.  The lease provides that "Occupant shall provide, at Occupant's own expense, a lock for the premises . . . .  Occupant shall not provide a key and/or combination to Occupant's lock to Owner or Owner's agents."  Lease ¶ 15(a).  The employee provided the agents with access to the unit with a key in his possession; there is no evidence in the record about whether Manafort or anyone else possessed a duplicate key.

The rest of the factual recitation in defendant's pleading is devoid of any citations to the record, and the defense presented no testimony or evidence of its own at the hearing, agreeing with the government that the motion could be decided based on the face of the affidavit alone.  Tr. at 6.  Thus, the Court need not consider these wholly unsubstantiated assertions concerning the scope of the employee's agency in its assessment of the evidence.

presented to the Court involving storage units both concluded that an individual with joint control had actual authority to consent to the search of the unit, and in each of those cases, the facts supporting common authority were not even as strong as they are here.

In *United States v. Kim*, 105 F.3d 1579 (9th Cir. 1997), the Ninth Circuit upheld the district court's refusal to suppress evidence seized from a storage locker that had been leased by an associate of the defendant, named Wee, at the defendant's direction. *Id.* at 1580 ("Wee also told [an agent] that Kim had hired him to rent the storage units . . . ."). The associate rented several units from a storage unit facility, and the lease agreements indicated that other people, including the defendant, were named as additional persons with access to the units. *Id.* Wee advised law enforcement agents that he believed the defendant had placed stolen goods inside of the units. *Id.* He did not have a key to the units, but he authorized the agents to cut off the locks, and he consented to a search of the contents. *Id.* "Agent[s] also learned that Wee had been the only individual present during the unloading of some of the allegedly stolen goods and that Wee had temporarily kept the keys to the storage units afterwards." *Id.*

The Court in *Kim* began its analysis with the Supreme Court's opinion in *Matlock*: "[t]he Court defined common authority as 'joint access or control for most purposes.'" 105 F.3d at 1582, quoting *Matlock*, 415 U.S. at 171 n.7. The government pointed to the fact that Wee's name was on the lease and that he had a key at one time. *Id.* But the court was troubled by the fact that Kim "had the only key to the lock and had general control over the unit," and it concluded that "[t]hese factors put the case outside the 'joint access or control for most purposes' test." *Id.* Nonetheless, after taking note of the "assumption of risk" language in *Matlock*, *see* 415 U.S. at 171 n.7, the Court found that Wee had actual authority to consent to a search of the units. *Kim*, 105 F.3d at 1582–83.

11

> Here, Kim dispatched Wee to rent the storage units.  By instructing Wee to
> lease the units in Wee's name, Kim assumed the risk that Wee could
> exercise his rights as lessee to have the storage company open the unit.  In
> addition, Kim allowed Wee to keep possession of the leases, supervise
> unloading of the goods and retain keys on occasion.  At any time, Wee could
> have accessed the storage locker without Kim's knowledge or permission.
> Because Kim ceded partial control of the [] lockers to Wee at all times, and
> allowed him total control on occasion, he assumed the risk that Wee would
> allow a search of the units.

*Id.* at 1582.

The Tenth Circuit reached a similar conclusion ten years later in *United States v. Trotter*,

483 F.3d 694 (10th Cir. 2007).  In that case, an alleged co-conspirator of the defendants named

King rented a storage unit in his own name at the direction of one of the defendants, and the

defendants held on to the keys.  *Id.* at 697.  "[O]n numerous occasions, Mr. King was temporarily

given a key so that he could retrieve drugs and drug paraphernalia from the unit.  At some point,

Mr. King surreptitiously copied or stole one of the keys." *Id.*  He later began cooperating with the

police and gave them the key along with permission to enter the unit at any time.  *Id.*  As in *Kim*,

the appellate court upheld the district court's decision to deny a motion to suppress evidence

recovered from the storage unit on the grounds that King had actual authority.

> Because the storage unit at issue was leased in Mr. King's name, he could
> at any time have exercised his rights as lessee to have the storage company
> open the unit, without Appellants' knowledge or permission.  Additionally,
> Appellants allowed Mr. King access to the storage unit . . . to retrieve or
> drop off items.  We conclude the Mr. King's position as lessee of the unit
> and his active participation in renting and using the facility gave him a
> 'sufficient relationship to the premises' to justify the searches based upon
> his consent.

483 F.3d at 699.

This case presents the factors that pointed towards common authority in *Kim* and *Trotter*

without any of the complications.  As in *Kim*, the third party here rented the storage unit in his

own name; the defendant was simply listed on the lease as an additional authorized person; and

the employee loaded items into the unit on his own.  FBI Aff. ¶¶ 28–29.  Neither the Ninth Circuit

nor the Tenth expressed reservations based on the fact that the associates in those cases rented the

units at the defendants' direction; what was persuasive in each situation was the fact that each

lessee could have exercised his right to enter the premises at any time, and that each had actually

made use of his right of access by depositing material in the unit.  Those facts are present here as

well.

Most important, unlike the associates in *Kim* and *Trotter*, the employee in this case retained

possession of a key.  FBI Aff. ¶ 31.  It was defendant Kim's retention of the only key to the unit

that led the *Kim* court to characterize Wee's control over the premises as something other than

"joint control for most purposes" under *Matlock*.  105 F.3d at 1582.  But one can easily find joint

control, and therefore, actual authority, on the facts present here.[4]  Moreover, the lessee of the unit

here was not simply an "associate" hired solely for the purpose of facilitating illegal activity; he

was and continues to be an employee of the business, which strengthens the finding that Manafort

entrusted him with control over the unit.

---

4        This is true whether or not this Circuit joins the Ninth Circuit and others to recognize "assumption of the risk" as an independent predicate for the finding.

In *United States v. Cos*, 498 F.3d 1115, 1125 (10th Cir. 2007), the Court reviewed the varying language utilized by circuits around the country when applying the *Matlock* test for actual authority, noting that both the Ninth Circuit in *Kim* and the Seventh Circuit in *United States v. Cook*, 530 F.2d 145, 149 (7th Cir. 1976), have recognized an assumption of risk approach.  *But see United States v. Davis*, 332 F.3d 1163, 1169 n.4 (9th Cir. 2003) (stating that "the few cases" in which the Ninth Circuit applied assumption of risk analysis "involved situations where the person whose property was searched clearly ceded authority over the property, either partially or totally, to the consenting third party").  The Tenth Circuit then advanced its own take on the issue: "we have read *Matlock* to establish the following standards for assessing actual authority to consent to a search of a residence:  '(1) mutual use of the property by virtue of joint access, *or* (2) control for most purposes over it.'"  *Cos*, 498 F.3d at 1125, quoting *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999) (emphasis in *Cos*).  The Court concluded that neither the assumption of risk language in *Kim*, nor the "sufficient relationship" language in *Trotter* appropriately framed the necessary inquiry, particularly when the inquiry was to be applied to the search of a home.  *Id.* at 1126–27.

The defendant urges this Court, then, to forego any reliance on *Kim* and *Trotter*, *see* Def.'s Reply at 2–3, but the Court finds the analysis in those cases to be useful even if one does not adopt the same approach to the *Matlock* test, and it notes that in *Cos*, the Tenth Circuit concluded that the facts in *Trotter* warranted a finding of actual authority under the correct standard as well.  *Cos*, 498 F.3d at 1126–27.

The D.C. Circuit has not weighed in on this issue directly, but the Court notes that *Matlock* is not the only Supreme Court case where assumption of risk language appears.  In *Frazier v. Cupp*, 394 U.S. 731(1969), the Court made quick work of the petitioner's claim that the police did not have valid consent to search a duffel bag that was being used by both the petitioner and his cousin Rawls.  *Id.* at 740.  The bag had been left at the cousin's house, and the cousin authorized the police to look inside.  Petitioner claimed that Rawls only had permission to use one compartment in the bag, and therefore his right to consent was similarly limited.  *Id.*  The Supreme Court ruled:  "[w]e will not . . . engage in such metaphysical subtleties in judging the efficacy of Rawls' consent.  Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside."  *Id.* at 740; *see also Randolph*, 547 U.S. at 110, quoting *Frazier*, 394 U.S. at 740.

Manafort likens the situation to a search of a hotel room authorized by a hotel employee, and he points to authority that holds that the mere fact that the employee has a key to a guest's room does not establish that the employee had the right to admit others and intrude upon the guest's reasonable expectation of privacy in his room during his stay.  Def.'s Mot. at 7–8; Tr. at 12, citing *United States v. Toan Phuong Nghe*, 925 F. Supp. 2d 1142 (W.D. Wash. 2013).  This precedent would have some force if the agents had gained entry through an employee of Public Storage, the owner and lessor of the storage facility on Holland Lane, which reserved its right to enter the unit under certain circumstances.  *See* Lease ¶ 9 ("Right to Inspect and Repair").  But here, the third party who granted the FBI access to the premises was the less*ee*, the individual with the right "to use and occupy a space in the self-service storage facility."  Lease ¶ 1.  Thus, he is more similar to the hotel guest himself than he is to the bellman or the person manning the front desk.[5]

---

[5]     The facts of this case are also not analogous to the other situation invoked by counsel: when a person gives a key to his home to a pet sitter or cleaning service.  *See* Tr. at 12.  Courts take particular care when scrutinizing claims of third party consent to enter a defendant's home, the personal sanctuary where he has the greatest expectation of privacy.  *See Peyton*, 745 F.3d at 552, quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *Cos*, 498 F.3d at 1127 (emphasizing "the heightened protection afforded to the home under the Fourth Amendment").  But even if one were to accord a businessman's expectation of privacy in a rented storage unit the same weight, the situation in counsel's hypothetical involves granting a third party access to premises over which the homeowner retains and exercises primary access and control, and granting that access at specific times and for a limited purpose.  Here, the employee, and not Manafort, was the designated occupant of the premises; he was free to come and go at any time.  Manafort could have easily maintained sole dominion over the unit by signing the lease himself, purchasing the lock, and holding on to the key, but he did not do so.  And, he chose to put no evidence in the record concerning any instructions or limitations he imposed on the employee, who, as far as the record is concerned, was entirely free to permit others to enter, for example, to assist him in delivering the heavy filing cabinet.  *See* FBI Aff. ¶ 30.  It is true that the government has the burden to establish the third party's authority to consent, but the government carried its burden here, and the defendant cannot ask the Court to reject the obvious inferences from the record in favor of contrary, unsupported suppositions, particularly after he elected to forego an opportunity to examine either the agent or the employee.

B.      **It was reasonable for the agent to believe that the occupant of the unit had the right to permit the inspection of the premises.**

The facts that underlie the Court's view that the search was approved by a third party with authority over the premises also made it reasonable for the agent to conclude that the occupant of the unit had the authority to consent to the search, even if that conclusion was incorrect. In other words, whether he had the actual authority or not, the occupant had the apparent authority to consent, and that made the entry into the premises lawful. The touchstone for resolving a challenge to government action under the Fourth Amendment is reasonableness, and the Court finds that the agent's actions were reasonable in this case.

Manafort argues, though, that the information provided to the agent – in particular, the statement that the employee moved items into the storage unit "at the direction of Manafort," FBI Aff. ¶ 28 – made the terms of the employee's control of the premises sufficiently ambiguous that it was unreasonable for the agent to conclude that the employee could grant permission to enter without additional investigation. But a common sense analysis of the situation points in the opposite direction, and the cases Manafort relies upon are not analogous.

It is worth noting that the agent's understanding was not simply derived from the unambiguous lease and the key; the other significant fact in the calculus is that the agent presented the employee with a formal consent to entry form and the employee signed it. *See* Consent Form. If the person who signed the lease did not equivocate, and he did not act as if *he* perceived the situation to be ambiguous, why would it have been unreasonable for the agent to fail to treat it as if it was?

Defendant points to *Whitfield*, 939 F.2d at 1074, Def.'s Reply at 2, but there were specific facts in the record in that case that led the D.C. Circuit to conclude as a matter of fact that the agents could not have reasonably believed that the third party had authority to consent to the

search.[6]  First of all, the case does not involve joint control over a single undifferentiated space,

like a storage unit; in *Whitfield*, the question was whether the defendant's mother, who leased the

_____

6    Manafort relies upon *Whitfield* for the proposition that agents confronted with an ambiguous situation must make further inquiries.  It is true that the *Whitfield* opinion states: "[i]f the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful *without further inquiry*.'"   939 F.2d at 1075, quoting *Rodriguez*, 497 U.S. at 188–89 (emphasis in *Whitfield*).  But if one looks at the context from which those phrases from *Rodriguez* were lifted, it becomes clear that the principle does not apply here, and the agents acted reasonably in this case.

In *Rodriguez*, the defendant's daughter summoned the police to report that he had assaulted her earlier that day at an apartment where he could still be found.  497 U.S. at 179.  The daughter led the officers to that location, referred to it as "our" apartment, and unlocked the door with her own key.  *Id.* at 179–80.  Based on facts that were introduced at the hearing indicating that the daughter had actually moved out and taken the key without permission, the lower court invalidated the search, ruling as a matter of law that an officer's reasonable belief could not support a warrantless entry if the belief had been shown to be incorrect.  *Id.* at 180.  The Supreme Court reversed and remanded, holding that a search could be valid if the officer had reasonable grounds to believe at the time that the third party had the necessary authority, even if a fuller examination of the facts later revealed it was lacking.  *Id.* at 188–89.  In announcing its ruling, the Court cautioned that "what we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises.  Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Id*. at 188.

But that hypothetical, "conceivable" situation does not pertain here.  In this case, there were no "surrounding circumstances" that would have given the agent reason to doubt the employee's apparent ability to enter.

> As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard:  would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises? . . . If not, then warrantless entry without further inquiry is unlawful unless authority actually exists.  But if so, the search is valid.

497 U.S. at 188–89, quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).  The only ambiguity the defense can point to here is based on suppositions that have no support in the record.  The situation might have been less clear if the lease had been in Manafort's name, the lease was in the name of the company, the employee had no key in his possession, or the employee demurred when he was asked for written consent.  But no such facts were presented to the agent at the moment.

apartment where her 29-year-old son also resided, had the authority to consent to a search of his

bedroom within the apartment, and more particularly, to the search of the pockets of the son's

clothing, found inside a closet, in the son's bedroom.  939 U.S. at 1074.  The Court found:

> The bedroom itself was not a "common area" and the agents had no grounds
> for believing otherwise. . . .  The agents never asked Mrs. Whitfield whether
> she cleaned her son's room, visited with him there, stored any of her
> possessions in the room, watched television there, or made use of the room
> at any time for any purpose.

*Id.*  Furthermore, the Court observed that since the son was no longer a minor, one could not

presume that the mother came and went from his room regularly; the officers needed to ask

questions to discover whether this particular mother and her adult son had an understanding that

he enjoyed exclusive use of the bedroom or whether there was some other arrangement.  *Id.* at

1075.  Here, the storage unit as a whole was a "common area."

Second, the Court of Appeals in *Whitfield* was struck by the lack of clarity in the record.

The Court reported:

> One of the agents . . . asked Mrs. Whitfield whether the defendant's room
> was open or locked. She said it was open. The agent testified that his
> purpose in asking this question was to determine whether Mrs. Whitfield
> had "free access" to her son's room.  He construed her answer to mean that
> she did, although she did not use those exact words.  Whether the agents
> asked Mrs. Whitfield anything else is unclear.

*Id.* at 1072–73.  The agents then asked for permission to search the room and gave the mother a

consent form to sign; while she said she would consent and took them up to the room, she also

refused to sign the form.  *Id.* at 1073.  So the factual situation confronting the *Whitfield* agents was

murkier than the straightforward arrangement described to the agent in this case, and the *Whitfield*

agents never received a signed consent form.

Manafort places great emphasis on the statement in *Whitfield* that while Mrs. Whitfield

plainly had "access" to her son's room, it was not clear to the agents at the time that she had

"mutual use" of it, and therefore, the agents could not have reasonably concluded that she had authority to consent to the search under *Matlock*.  *See* Def.'s Reply at 2, citing *Whitfield*, 939 F.2d at 1074) ("*Whitfield* held that even if the third party's ability (or legal right) to access the property established the joint access or control element of common authority, it did not establish the mutual use element.").[7]  The Court is not certain that the D.C. Circuit purported to refine *Matlock* to establish a new, two-part test for "common authority" in *Whitfield*,[8] but the record in this case does not give rise to the level of confusion present in *Whitfield* in any event.  The Court of Appeals did not hold that the prosecution would have to show that the mother occupied the room for strictly

---

7       The reply also states, "[t]his Circuit has held that the government must prove the existence of *both* mutual use of the property *and* joint access to or control of the property by the third party and the target of the search."  Def.'s Reply at 2 (emphasis in original).  The Court does not believe that the D.C. Circuit articulated the principle quite that crisply on the page cited, although the absence of information concerning "mutual use" was certainly critical to its ultimate decision.  In *Whitfield*, and again in *Peyton*, the D.C. Circuit recited the *Matlock* test in its entirety, *see* 939 F.2d at 1074; 745 F.3d at 552, and in this Court's view, the defendant's effort to read *Matlock* as a recipe comprised of specific necessary ingredients is inconsistent with the broad language of the Supreme Court opinion itself.

        The Court stated in the body of the *Matlock* opinion that the prosecution may show that permission to search was obtained from a third party who possessed common authority over the premises, "or other sufficient relationship to the premises."  415 U.S. at 171.  The Court did not provide further information about what "other" relationships could be "sufficient."  It did elaborate on what it meant by "common authority" in a footnote, explaining that a finding of common authority could be predicated on "mutual use of the property by persons generally having joint access or control for most purposes," so that it would be "reasonable" to conclude that one of the co-inhabitants has the right to consent to a search and that the others have assumed the risk that another "might" do so.  *Id.* at 171 n.7.  This formulation, like Fourth Amendment jurisprudence in general, is founded on the concept of reasonableness, which must be assessed based upon a consideration of all of the facts and circumstances presented to the agents at the time, and it does not appear to turn on any one particular factor.  *See Rodriguez*, 497 U.S. at 186 (stating that whether the basis for authority to consent to a search exists "is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably").

8       Counsel for the defendant agreed at the hearing that "whether we're talking about Ninth Circuit, D.C. Circuit, in the end *Matlock* is the test."  Tr. at 8.

personal purposes to make "mutual use" of it; it bemoaned the lack of any evidence that she cleaned the room, visited her son in it, or "made use of [it] at any time *for any purpose*." *Whitfield*, 939 F.2d at 1074 (emphasis added).  By contrast, here, as in *Trotter*, the Manafort employee's "position as lessee of the unit and his active participation in renting *and using* the facility," 483 F.3d at 699 (emphasis added) – that is, delivering items to it and placing them inside – gave rise to a reasonable basis to conclude that the *Matlock* test had been satisfied.  The Court also notes that the *Matlock* formulation calls for a showing of joint control "for most purposes," 415 U.S. at 171 n.7; while a bedroom, as the *Whitfield* discussion suggests, could have multiple purposes, a storage unit has only one, and the employee here had access to the unit for that specific purpose.

Finally, Manafort argues that the fact that the agent sought a warrant the day after he gained entry into the unit without a warrant demonstrates that the agent knew that he had entered unlawfully the day before.  This is a mischaracterization of the circumstances.  The application for a warrant to search the storage unit sought the court's express permission not only to enter the unit, but to open the boxes and filing cabinet inside.  The agent's application for the warrant before he did so is a manifestation of the government's adherence to the cases cited by Manafort, in which courts have recognized that an individual may have a heightened and separate expectation of privacy in a container or enclosed space that is located within otherwise shared premises.  *See Peyton*, 745 F.3d at 552, citing *Donovan v. A.A. Beiro Constr. Co.*, 746 F.2d 894, 901–02 (D.C. Cir. 1984); *see also* Def.'s Mot. at 9 (summarizing *Peyton*: "The Court of Appeals held that the co-occupant lacked common authority in connection with the shoebox, despite the fact that it was located in the apartment that she shared with the defendant . . . .").  It is the agent's application for a warrant to search the containers within the storage unit that differentiates this case from those

precedents, and the seizure and examination of the records pursuant to a warrant satisfied the requirements of the Fourth Amendment.

## II.    The affidavit would have supplied probable cause to justify the search even without the additional information obtained inside the unit.

Even if the agents did not initially gain entry to the unit with the permission of a person with the authority or apparent authority to consent, and the survey of the inside was therefore unlawful, there would still be no need to suppress the evidence obtained when the warrant was executed.  Manafort argues that the agent's warrantless observations tainted his application to the Magistrate Judge and the resulting warrant.  But the Supreme Court has held that "if sufficient untainted evidence [is] presented in the warrant affidavit to establish probable cause, the warrant [is] nevertheless valid."  *United States v. Karo*, 468 U.S. 705, 719 (1984), citing *Franks v. Delaware*, 438 U.S. 154, 172 (1978).  So the question becomes, was there sufficient information in the affidavit to establish probable cause to search the unit even without the agent's first-hand account of what he saw inside?

An affidavit in support of a warrant application "must provide the magistrate with a substantial basis for determining the existence of probable cause," and it cannot consist of "wholly conclusory statement[s]."  *Illinois v. Gates*, 462 U.S. 213, 239 (1983).  "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  *Id.* at 232.  The Supreme Court has recognized that the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that . . . evidence of a crime will be found in a particular place."  *Id.* at 238 (abandoning the rigid two-prong test for determining informant veracity in favor of a totality of circumstances approach).

Thus, a magistrate is supposed to consider the "totality-of-the-circumstances" in making probable cause determinations.  *Id.*

An examination of the warrant application reveals that the affidavit contained sufficient grounds to believe that there may be evidence of a crime in the storage unit, even without the information the agent gathered after stepping inside the unit.

The affidavit starts by setting out the reasons behind the agent's conclusion that there was probable cause to believe that Manafort – at times in connection with his associate Richard W. Gates – had been engaged in a series of criminal offenses related to his business as a consultant and lobbyist.  Those offenses included:  violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to File a Report of Foreign Bank and Financial Accounts); 26 U.S.C. § 7206(a) (Filing a False Tax Return); and 22 U.S.C. § 618 (Foreign Agent Registration Act), all of which were ultimately charged in the indictment.

The affidavit then goes on to set forth the agent's reasons to believe that evidence related to those offenses, that is, Manafort's business records, could be found on the premises.

In paragraph 28 of the affidavit, the agent reports that on May 26, 2017, he met the former employee of Davis Manafort Partners, and current employee of Steam Mountain, LLC.  FBI Aff. ¶ 28.  The employee "advised that, in approximately 2015, at the direction of Manafort, [he] moved a series of office files of Manafort's business contained in boxes" from a "smaller storage unit" at the Holland Lane facility to a "larger storage unit, at the same storage facility."  *Id.*  Of importance to this aspect of defendant's motion, the employee "advised that he personally moved the office files into Unit 3013 at that location, and that the files were still in the unit."  *Id.*

Paragraph 30 of the affidavit also reports that the employee moved a filing cabinet from Manafort's former residence to the storage unit in the spring of 2015, and that "Manafort was using

his former residence as an office at the time." FBI Aff. ¶ 30. Further, the employee reported that

he last added to the filing cabinet on Manafort's behalf in the spring of 2016. *Id.*

Next, the affidavit outlines the reasons for the agent's belief that the boxes and filing

cabinet contain evidence of the alleged crimes listed in the warrant application. The agent avers

that it was "reasonable to believe that this storage unit is a collection point for Manafort's and

Gates's business records from their work in Ukraine," FBI Aff. ¶ 35, because "[the employee]

advised the affiant that he moved business records for Manafort into the storage unit, and . . .

Manafort and Gates – who is listed on the lease as a contact for the lessor – worked together in

Ukraine." *Id.* The agent went on:

> It is also reasonable to believe that these records and those in the filing
> cabinet will include financial records for several reasons. These include,
> but are not limited to, IRS guidelines recommending that persons and
> corporations generally retain business records for three years from filing of
> returns for and seven years if the tax payer had certain losses or bad debts.

FBI Aff. ¶ 35. Further, the agent was "aware" from training and experience "that individuals and

businesses often retain copies of contracts and other business and financial records in anticipation

of litigation," and that "[p]ublic sources reveal that Manafort was sued by his former client, Oleg

Deripaska, sometime in or about 2008." *Id.* ¶ 37. Therefore, the agent concluded that "it is

reasonable to believe historical records have been retained by Manafort and Gates." *Id.* All of

this supported the Magistrate Judge's "common-sense" determination, *see Gates*, 462 U.S. at 238,

that there was probable cause to believe that records related to the alleged crimes would be found

in the unit, and the Magistrate Judge had a "'substantial basis for . . . concluding' that a search

would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236, quoting *Jones v. United States*,

362 U.S. 257, 271 (1960) (ellipses in *Gates*) (internal edit omitted).

At the hearing on the motion to suppress, counsel for the defendant questioned whether the

affidavit supplied probable cause to believe that relevant documents would still be in the storage

unit at the time the agent applied for the warrant. He made the point that the last date it was known that the employee placed documents was a year before the search, and that the events at issue in the investigation occurred years before that, and he pointed the Court to the D.C. Circuit's recent opinion in *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017). Tr. at 22–23, 27–28. In that case, the Court found a search to be unconstitutional even though it was conducted pursuant to a warrant because the Court found the showing of probable cause to be woefully deficient.

The warrant for Griffith's apartment called for the seizure of cell phones. *Griffith*, 867 F.3d at 1268. The Court was concerned there was no basis set out to believe that the defendant possessed *any* cell phone, and certainly no evidence that he was in possession of the same cell phone he might have used at the time of the particular murder under investigation – a year had gone by since then, and Griffith had been incarcerated on other charges in the interim. *Id.* at 1272–75. The Court was also concerned that even if Griffith owned a phone at the time the warrant was obtained, there were no facts in the affidavit to give rise to a reason to believe that there would be evidence on it related to the murder committed a year before. *Id.* at 1275.

But the comparison to the *Griffith* case is not apt. First of all, the property to be searched here was not a friend's apartment, but a *storage unit* – where, by definition, people place things to secure them for some period of time. The affidavit explains that the boxes Manafort initially had placed in the unit contained business records that had already been preserved for some period of time and were simply being moved to a larger storage unit. FBI Aff. ¶ 28. The affidavit reflects that Manafort continued to give the employee files to add to the unit after it was first leased in 2015, the lease was still in force in May of 2017, and the employee still had the key. *Id.* ¶¶ 28–30. Moreover, there was no evidence that the employee who leased the unit and delivered items

to it had ever been directed to remove any of the files.  Most important, he specifically informed the agent that the items he loaded into the storage unit were still there.  *Id.* ¶ 28.

Manafort argues that without the FBI agent's description of the labels he observed on the boxes in the unit, the Magistrate Judge "would have been left with bare assertions from an informant whose reliability and current basis for knowledge (as a former DMP employee) had not been established."  Def.'s Reply at 12.  But the affidavit indicates that the employee acquired his information concerning the contents of the storage unit "from personal knowledge, an inherently reliable method of obtaining such information."  *United States v. Davis*, 617 F.2d 677, 693 (D.C. Cir. 1979).

Defendant raises the question of whether, without the agent's observations, there was adequate reason to credit the employee's description of the use and contents of the unit.  *See* Def.'s Reply at 12.  But in evaluating the validity of the information the employee provided, the Magistrate Judge was able to consider the fact that the Davis Manafort representative was designated as the occupant on the lease of the storage unit to which Manafort and Gates also had access.  What is more, the employee held the key to that unit, and that lends credibility to his claimed knowledge and statements that he moved the records and filing cabinet into it.

Even without any understanding of the employee's motivation, his "explicit and detailed description . . . , along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."  *Gates*, 462 U.S. at 234; *id.* at 234–38 (discouraging "an excessively technical dissection of informants' tips" and favoring a "totality-of-the-circumstances" approach to probable cause determinations); *see also United States v. Laws*, 808 F.2d 92, 102 (D.C. Cir. 1986) ("It is clear from *Gates* that, in measuring overall reliability of a tip, a fair indication of the informant's basis of knowledge may compensate for a less than

conclusive demonstration of his credibility.").[9]   Here, a consideration of all of the facts and

circumstances would have given rise to "a fair probability that . . . evidence of a crime w[ould] be

found" in the storage unit, *Gates*, 462 U.S. at 238, and thus, even if the initial warrantless entry

into the storage unit was unconstitutional and none of the information obtained by the agent from

that search could legally be considered, the affidavit contained sufficient untainted information to

furnish probable cause for the issuance of the search warrant, and the items seized need not be

suppressed.

**III.   The search warrant was particularized and not overbroad.**

The Constitution limits searches by law enforcement to "the specific areas and things for

which there is probable cause to search," and it requires that a search "be carefully tailored to its

justifications" and "not take on the character of the wide-ranging exploratory searches the Framers

intended to prohibit."  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  Accordingly, "[s]earch

warrants must be specific."  *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006). "Specificity

has two aspects:  particularity and breadth.  Particularity is the requirement that the warrant must

clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be

limited by the probable cause on which the warrant is based."  *Id.*, quoting *United States v.

Towne,* 997 F.2d 537, 544 (9th Cir.1993).   Defendant challenges the search warrant on both

grounds.  Def.'s Mot. at 14–20.

**A.   The search warrant was particularized.**

Search warrants must "'particularly describ[e] the place to be searched, and the persons or

things to be seized,' which operates to 'prevent[ ] the seizure of one thing under a warrant

describing another.'"  *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016), quoting *Marron v.*

---

9       The Court also notes that the defendant points to no facts that would raise questions about
the employee's credibility.

*United States*, 275 U.S. 192, 195–96 (1927) (edits in original).  Defendant contends that the search

warrant does not satisfy this requirement.  Def.'s Mot. at 14–16.

Manafort's initial motion complained that the use of the words "any and all" or "any" in

several paragraphs of the attachment listing the items to be seized violated the Fourth Amendment.

Def.'s Mot. at 15 (emphasizing this language in quoting paragraphs 1.a., 1.b.(1), 1.b.(2), 1.c., and

1.g.).  But in his reply brief and at oral argument, he focused his arguments solely on paragraph

1.a.  *See* Def.'s Reply at 8 (emphasis in Reply); *see also* Tr. at 32.  That paragraph authorized

seizure of:

> 1.  Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (Failure to
> File a Report of Foreign Bank and Financial Accounts), 22 U.S.C. § 618
> (Foreign Agent Registration Act), and 26 U.S.C. § 7206(a) (Filing a
> False Tax Return), including:
>
> > a.  Any and all financial records for Paul Manafort, Richard Gates or
> > companies associated with Paul Manafort or Richard Gates,
> > including but not limited to records relating to any foreign financial
> > accounts[.]

Warrant, Attach. B ¶ 1.

"[A] warrant generally satisfies the particularity requirement when it allows officers 'to

seize only evidence of a particular crime.'"  *United States v. Young*, 260 F. Supp. 3d 530, 546

(E.D. Va. 2017), quoting *United States v. Fawole*, 785 F.2d 1141, 1144 (4th Cir. 1986).  The

Supreme Court has made clear that a phrase in a warrant must be read in the context of the rest of

the warrant.  *Andresen v. Maryland*, 427 U.S. 463, 479–82 (1976) (holding that the phrase

"together with other fruits, instrumentalities and evidence of crime at this (time) unknown" read

in the context of the warrant's "lengthy list of specified and particular items to be seized" showed

that the warrant "did not authorize the executing officers to conduct a search for evidence of other

crimes but only to search for and seize evidence relevant to the crime [alleged] and [the property

at issue]").

Defendant's argument ignores the introductory clause in paragraph 1, which provides that the seven categories of records subject to seizure must relate to three specified offenses: failing to file a foreign bank account report or "FBAR" under the 31 U.S.C. §§ 5314 and 5322(a), failing to register as an agent of a foreign principal under the Foreign Agent Registration Act, 22 U.S.C. § 618 ("FARA"), and filing false tax return in violation of 26 U.S.C. § 7206(a).   Warrant, Attach. B ¶ 1.  Thus, the warrant did not authorize the seizure of "any and all financial records" in the storage unit, but "any and all financial records" related to filing FBAR and FARA statements and false tax returns.  This excluded other financial records in the storage unit not pertaining to those offenses, such as, for example, the "Worker's Comp" files.  *See* FBI Aff. at 12.

Defendant argues the introductory clause in paragraph 1 cannot save the warrant because the three federal offenses listed in it are themselves broad.  Tr. at 33–34; Def.'s Reply at 10, citing *United States v. Maxwell*, 920 F.2d 1028, 1033 (D.C. Cir. 1990).  In *Maxwell*, the D.C. Circuit held that a search warrant's reference to 18 U.S.C. § 1343, the federal wire fraud statute, did not sufficiently limit the scope of the warrant because "reference . . . to a broad federal statute, such as the federal wire fraud statute . . . realistically constitute[s] no limitation at all on the scope of an otherwise overbroad warrant."  920 F.2d at 1033.  But *Maxwell* recognizes that reference to a particular statute may "limit the scope of the warrant sufficiently to satisfy the particularity requirement," *id.*, and the Bank Secrecy Act,[10] FARA,[11] and 26 U.S.C. § 7206(a) are considerably more focused than the "broad" wire fraud statute in *Maxwell*.

---

10   Section 5322 of Title 31, referenced in paragraph 1, sets forth criminal penalties for willfully violating 31 U.S.C. § 5314.

11   Section 618 of Title 22, referenced in paragraph 1, sets forth criminal penalties for willfully violating its provisions, and 22 U.S.C. 612 sets forth the reporting requirement.

Both the Bank Secrecy Act and FARA regulate a small set of people and entities.   The Bank Secrecy Act requires those with an interest in or control over a foreign account containing more the $10,000 to report to the government specific information about their transactions.   *See* 31 U.S.C. §§ 5314(a)(1)–(4).[12]   FARA requires agents representing foreign principals to report specific information about their work on behalf of those principals.   *See* 22 U.S.C. § 612.   Because these statutes apply to narrow groups of people and impose specific reporting requirements, they are not "broad federal statutes" under *Maxwell*.

And while the federal tax code covers a wide territory, and 26 U.S.C. § 7206(a) applies to all tax filers, the D.C. Circuit has made it clear that an allegation of making a false statement in a tax return would make a search for "any and all financial records" related to that offense valid under the Fourth Amendment.   *See United States v. Dale*, 991 F.2d 819, 848 (D.C. Cir. 1993) (per curium) (stating that courts may "consider[ ] the circumstances of the crime in assessing the degree of particularity that should be required of descriptions of items to be seized in the warrant").   The *Dale* case involved allegations that the defendant, a corporation that supplied hard drives to the Army, had evaded taxes and defrauded the United States by substituting other products for the hard drives that were ordered under the contract.   *Id.*   The defendant challenged the particularity of the search warrant, which authorized the seizure of "business records including, but not limited to" various categories of documents "and other records which relate to the criminal scheme outlined" in the agent's affidavit.   *Id.* at 846.   The Court ruled that the warrant was sufficiently particularized, in part, because it is not easy to be specific about the records to be seized when

---

12   Anyone "having a financial interest in, or signature or other authority over, a bank, securities or other financial account [over $10,000] in a foreign country shall report such relationship . . . for each year in which such relationship exists." *United States v. Kelley-Hunter*, 281 F. Supp. 3d 121, 123 (D.D.C. 2017) (edit in original), citing 31 C.F.R. §§ 1010.350(a), 1010.306(c).

investigating financial crimes.  *See id.* at 848.  And "[i]n the case of . . . tax evasion allegations, specificity is even more difficult because evidence of the crime[] can be found in almost every type of business document conceivable."  *Id.*; *see also United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982) ("One of the crucial factors to be considered is the information available to the government.  Generic classifications in a warrant are acceptable only when a more precise description is not possible.") (internal quotation marks and edits omitted); *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) (noting that "the government is [ ] given more flexibility regarding the items to be searched when the criminal activity deals with complex financial transactions").  Given the narrow scope of the Bank Secrecy Act and FARA, and the fact that the government was also looking into tax evasion, the Court holds that paragraph 1.a. was sufficiently particularized under the Fourth Amendment.

Finally, the nature and volume of defendant's international dealings supported the broad request for records in paragraph 1.a.  Law enforcement agents were investigating whether defendant maintained or controlled foreign bank accounts and whether he performed work on behalf of foreign principals without registering.  Given what was set forth in the sealed and unsealed portions of the affidavit, *see* FBI Aff. ¶ 21, it was necessary to examine a significant number of records to obtain evidence of these alleged offenses.  *See United States v. Logan*, 250 F.3d 350, 365 (6th Cir. 2001), *cert. denied*, 534 U.S. 895 (2001) (given the investigators' understanding of the substance and scope of the defendant's business, they were "necessarily

involved in an examination of an extensive paper trail in order to discover which transactions may have been illegal in nature").[13]

In sum, the Court holds the paragraph 1.a. was sufficiently particularized because the categories of records to be seized were related to three specific criminal allegations that require an examination of an extensive paper trail to determine the scope of any violations.[14]

### B.     The search warrant was not overbroad.

Defendant also challenges the search warrant as overbroad. "Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Hill*, 459 F.3d at 973, quoting *Towne,* 997 F.2d at 544; *see, e.g.*, *United States v. Abboud*,

---

[13]     Defendant also asserts that the limitation in the introductory clause cannot save the warrant here because "there is no similar limiting language in the next clause" as the First Circuit relied on in *United States v. Kuc*, 737 F.3d 129 (1st Cir. 2013). Def.'s Reply at 9. But the *Kuc* case does not hold that limiting language must appear in two clauses to make a warrant constitutionally valid. Rather, it applies the principal in *Andresen* that courts must read a warrant in context and cited the additional clause in the warrant there as a basis for reading the phrase at issue narrowly. 737 F.3d at 133, citing *Andresen*, 427 U.S. at 480–81 ("We recognized long ago that a warrant's language must be read in context, such that the 'general' tail of the search warrant will be construed so as not to defeat the 'particularity' of the main body of the warrant.") (some quotation marks omitted). And while the final clause of paragraph 1.a. calling for "records relating to any foreign financial accounts" does not strictly limit the scope of the search to only financial records relating to foreign accounts, it does focus the search on that category of records. *Cf. Kuc*, 737 F.3d at 133 (holding that a warrant using the phrase "including, without limitation" to link a broader clause to more a particular one was not "constitutionally infirm").

[14]     Given defendant's failure to address the other subparagraphs of paragraph 1 in his reply brief or at oral argument, it appears he abandoned his challenges to them. *See* Def.'s Reply at 8 (referring only to paragraph 1.a.); Tr. at 32 ("MR. ZEHNLE: So while I see what Your Honor is saying in paragraph 1, the prefatory language to paragraph A, which talks about any and all financial – THE COURT: That's the language you challenge. MR. ZEHNLE: Yes, it is the language that we're challenging."). He also complained in his motion that paragraph 2 was overbroad, Def.'s Mot. at 15, but presented no argument in response to the government's opposition on the issue and did not address it at the hearing. *See* Def.'s Reply at 8–11; Tr. 4–39 (not addressing the issue of electronic devices as they relate to the search of the storage unit); *cf.* Tr. 55–100 (addressing electronic devices in the context of the search of defendant's residence). Accordingly, the Court will not address these portions of the warrant. *See United States v. Moore*, 75 F. Supp. 3d 568, 574 n.1 (D.D.C. 2014) (rejecting argument, in part, because defendant abandoned it in his replies).

438 F.3d 554, 576 (6th Cir. 2006) (holding that a warrant covering a six-year period was invalid because probable cause only supported the seizure of evidence pertaining to a three-month period).

Defendant asserts that the warrant's failure to impose a time frame renders it unconstitutional because it left "the decision of what to seize to the discretion of the agents." Def.'s Mot. at 16.  He argues that the storage unit had file boxes bearing dates going back thirty years, and the agents knew the relevant dates for the alleged crimes but failed to include a time limit in the warrant.  Def.'s Mot. at 16–17 (noting that warrant for the search of his residence included a time limit), citing *United States v. Ford*, 184 F.3d 566, 576 (6th Cir. 1999); *United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017); *In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 84 (2d Cir. 2016); *Yusuf*, 461 F.3d at 395; *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *United States v. Leary*, 846 F.2d 592, 604 (10th Cir. 1988); *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir. 1980).

Warrants need not contain specific time limits, when "dates of specific documents" relevant to the offenses at issue "could not have been known to the Government," *United States v. Shilling*, 826 F.2d 1365, 1369 (4th Cir. 1987) (per curium) (overruled on other grounds), or when "evidence that date[s] from outside of the time period" described in a warrant affidavit "may be relevant to the activity within the time period." *Abboud*, 438 F.3d at 576 n.7 (cited in Def.'s Mot. at 17), *cert. denied*, 549 U.S. 976 (2006).  Indeed, earlier conduct can inform the assessment of later alleged violations.  *See Shilling*, 826 F.2d at 1369 ("[A]s for income tax violations, documents from an earlier time may have bearing on the tax violations alleged in a later year.").  And both FBAR and FARA violations require evidence of willful conduct, *see* 31 U.S.C. § 5322(a) and (b); 22 U.S.C. § 618(a), so evidence predating conduct can shed light on a defendant's intent.  *See United States v. Cohan*, 628 F. Supp. 2d 355, 365 (E.D.N.Y. 2009) (explaining, where warrant

lacked a date limit, how prior instances of conduct predating criminal scheme by as much as fourteen years "would be potentially admissible under Federal Rule of Evidence 404(b) to demonstrate intent or absence of mistake").  So while as a general matter, the better practice would be to establish boundaries for the time period of the records to be seized, given the nature of the offenses under investigation, the warrant was not so unreasonably broad as to violate the Fourth Amendment.[15]

But even if the warrant is overbroad given the absence of a specific time frame, the warrant falls within the good faith exception established by *United States v. Leon*, 468 U.S. 897 (1984).

## IV.     The agents relied in good faith on a warrant signed by a federal Magistrate Judge and therefore, the exclusionary rule does not apply.

Even if the warrant was drafted too broadly, the evidence will not be suppressed.  The agents were acting within the scope of a valid warrant when they conducted the search, and their reliance on the warrant issued by the federal Magistrate Judge was objectively reasonable. According to the Supreme Court, in those circumstances, the exclusionary rule does not apply. *Leon*, 468 U.S. at 920–22.  This good faith exception to the exclusionary rule applies not only when a reviewing court concludes that the affidavit in support of the warrant lacked probable cause, but also to warrants later found to be overbroad.  *Massachusetts v. Sheppard*, 468 U.S. 981, 988–91 (1984); *Maxwell*, 920 F.2d at 1034.

In *Leon*, the Court made it clear that suppression is not available as a remedy in every situation in which a reviewing court concludes that there has been a constitutional violation, and

---

[15]    Defendant argues that the agent's affidavit cannot be considered in analyzing the warrant because the warrant does not incorporate the affidavit, Def.'s Mot. at 18, citing *Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004), but the Court's ruling here relies primarily on the nature of the continuing offenses being investigated and that defendant's activities in prior years could provide evidence of defendant's intent.

the D.C. Circuit has reiterated that a mere disagreement with the issuing court is not sufficient to justify the exclusion of evidence.  "That is because the 'exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.'"  *United States v. Spencer*, 530 F.3d 1003, 1006 (D.C. Cir. 2008), quoting *Sheppard*, 468 U.S. at 990.  The Supreme Court recognized that "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921. "Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable . . . ." *Id.* at 922.

Manafort maintains that it was not reasonable for the agent to rely on the warrant here because it did not limit the records to be seized to any particular time period, and it authorized the seizure of any and all financial records of defendant and his companies. *See* Def.'s Mot. at 16–18. But as explained above, the warrant is sufficiently particularized, and the criminal offenses under investigation justify a search for records that predated the alleged offense, so it was not objectively unreasonable for the same reasons.

Defendant points the Court to the opinion of the D.C. Circuit in *United States v. Griffith*, in which the Court found a search warrant to be both so lacking in probable cause to believe that evidence would be found on the premises, and so overbroad in its description of the items to be seized, that it ordered the evidence to be excluded notwithstanding *Leon.* Def.'s Mot. at 15–16, citing 867 F.3d at 1276. But the defense relies too heavily on that decision, which did not purport to – and could not – refine or limit the *Leon* principle, but simply found it to be "inapplicable in the particular circumstances" of that case. *Id.* at 1278.

*Griffith* is inapposite primarily because the decision to suppress was based on the unique combination of the Court's finding that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," 867 F.3d at 1278, quoting *Leon*, 468 U.S. at 923, and its concerns about overbreadth.   While Griffith, the individual under investigation, lived in an apartment leased by his girlfriend, "the warrant did not stop with any devices owned by Griffith, which already would have gone too far.   It broadly authorized seizure of *all* cell phones and electronic devices, without regard to ownership."   *Id.* at 1276 (emphasis in original).   This compounded the problem the Court of Appeals had already identified that "the affidavit failed to establish probable cause to believe that *any* cell phone (or other electronic device) containing incriminating information about [the defendant's] suspected offense would be found in the apartment."   *Id.* at 1279 (emphasis in original); *see also id.* at 1278 ("[T]he affidavit sought, and the warrant granted, authorization to search for and seize every electronic device found in the home. The warrant's material overbreadth in that regard underscored the police's unawareness of the existence of any such devices in the first place (much less the existence of any belonging to Griffith) . . . .").

Thus, there is little in the opinion that bears on the case at hand.   The claimed overbreadth is not comparable since the application did not ask for devices or files with no connection to Manafort.   And the application did not seek the seizure of every device or container found in the storage unit that *might* contain paper records or electronic information, but rather records stored *within* the boxes and cabinet related to particular topics.   And unlike the affidavit that failed to aver that Griffith even had a cell phone, much less, a cell phone that might still contain messages that had been exchanged about a murder a year before, the affidavit here supplied reason to believe

that the business and banking records that were the object of the search were placed and remained in the location to be searched.

## CONCLUSION

For the reasons stated above, defendant's motion to suppress the evidence obtained from the search of the storage unit [Dkt. # 257] is DENIED.


AMY BERMAN JACKSON
United States District Judge

DATE:  June 21, 2018