AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   1:17SW449 |
| THE PREMISES LOCATED ▮▮▮▮▮▮ | ) | |
| ▮▮▮▮ ALEXANDRIA, VIRGINIA 22314 | ) | **UNDER SEAL** |
| | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Virginia_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____August 8, 2017_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Theresa C. Buchanan_____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ▮▮▮▮ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____/s/_____

Date and time issued:   7/25/17   11:25 am
                                        /s/
                                        Theresa Carroll Buchanan
                                        United States Magistrate Judge
                                        *Judge's signature*

City and state:      Alexandria, Virginia                    Honorable Theresa C. Buchanan
                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>1:17SW449 | Date and time warrant executed:<br>7/26/2017  4:56PM | Copy of warrant and inventory left with:<br>Paul Manafort |
| Inventory made in the presence of :  Paul Manafort | | |

Inventory of the property taken and name of any person(s) seized:

See attached:

• List of items seized (Attachment A)

• List of items digitally imaged, not physically taken
~~seized~~ BY (Attachment B)

• List of items seized, flagged for possible
attorney-client privilege (Attachment C)

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  8/8/17

█████████████████
*Executing officer's signature*

█████████████████  Special Agent
*Printed name and title*

FD-697 (Rev 8-11-94)                                                                          Page 1 of 4

| Attachment A |

# UNITED STATE DEPARTMENT OF JUSTICE
# FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property   Received/Returned/Released/Seized

**File #:** ███████
███████

On (date)   7/26/2017 _____

item(s) listed below were:
- ☐ **Received From**
- ☐ **Received To**
- ☐ **Released To**
- ☒ **Seized**

| | |
|---|---|
| (Name) | Paul Manafort |
| (Street Address) | ████████████████ |
| (City) | Alexandria, VA 22314 |

## Description of Item(s):

Financial documents, calenders, list of passwords

Business agreement

Papers with e-mail addresses, handwritten notes, letter from ███████ correspondence, envelopes from financial institutions

Capital One statement + deposit acct ███████  Capital One statement + deposit acct# ███████  Capital One deposit acct#

M+T Bank Acct # ███████  M+T Bank Acct# ███████

Various banking deposit slips from Citibank, Wells Fargo, acct statements Citigold acct# ███████ transfer + acct statements Citigold acct# ███████

Handwritten list of contacts

Hudson City Savings Bank Acct# ███████  Hudson City Savings Bank Acct# ███████

Transaction Register: "Capital One", Transaction Register: "Opened Mar 20, 2013", Transaction Register: "███████

Capital One brokerage statement acct ███████  Capital One acct. profile + agreement acct: ███████

First Repub. Bank acct statement: ███████  First Repub. Bank acct statement: ███████

Nine (9) green hanging file folders containing financial and other documents

Thirteen (13)  green hanging file folders containing documents

Safety deposit key number 55 with envelope labeled "CCFSB"

1 Citibank banking document, handwritten notes on yellow lined paper, with envelope "Davis, Manafort Inc ███████████████ Alexandria Virginia 22314"

4 Capitol One banking documents with envelope "Hudson M&T savings"

FD-597 (Rev 8-11-94)                                                                                    Page 2 of 4

# UNITED STATE DEPARTMENT OF JUSTICE
# FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property    Received/Returned/Released/Seized

File #: ██████
██████

---

Eight (8) documents from hanging file drawer #4, plus one (1) green hanging file

---

Seven (7) green and five (5) brown hanging file folders containing documents.

---

Check for USB acct: ██████

---

One (1) deposit slip, Two (2) documents from Charles Schwab re: closure of accounts; one addressed to Paul Manafort, one addressed to ██████

---

Pack of 4 DVD discs, "Hyatt Regency Kyiv" notepaper used to make handwritten notes mentioning "laptop", "flashdrin", "and "disc"

---

1 black external hard drive "simpletech" logo. SN: unknown; BOM No: ██████

---

1 Blue external hard drive - "WD" logo SN: ██████

---

American Express Business Platinum, ██████ ending in ███ Ramshead Farm

---

UBS Visa, ██████ ending in ███ UBS Visa, Ramshead Farms LLC Paul Manafort, ending in ██
UBS Visa, LOAV LTD Paul J. Manafort, ending in ███ UBS Visa, John Hannah LLC Paul J. Manafort, ending in

---

S10, drawer two; including financial documents. Box 2 of 2.

---

S10, drawer three, including real estate, inheritance, investment, tax, retirement and art purchase documents

---

S10, drawer one, including financial and real estate document

---

S10, drawer two; including real estate and financial documents. Box 1 of 2.

---

Twenty (20) documents containing financial + other information, located in Charles Schwab folder on built-in library shelf

---

Financial document

---

1 black watch, labeled "The Royal Way, Bijan, N03"

---

512 MB Sandisk SD Card from Nikon Cool Pics FN-1 located in black case in black/red camera/video bag

---

32GB Transcend SD card located in Go Pro Hero 2 from black bower camera bag

---

1 8G Transcend SD card; 1 32GB SD card Nikon D-7000 located in black/red Tamrac camera bag

---

1GB Sandisk card from Casio EXILIM camera from gray mesh bag

---

Black Sony stick 32GB located in a Sony camera from black  Lo Pro bag

---

16GB San Disk SD Card from Nikon D-90 located in black Nikon camera bag

---

Micro SD 64G - found in Nikon I camera from bright green Tumi camera bag

---

16 GB Sandisk SD card from Nikon Cool Pics S-9700 located in bright green Tumi camera bav

---

1 16GB Sony memory stick pro located in Sony handicam from Sony leather handicam case in clear ziploc

FD-597 (Rev 8-11-94)                                                                                    Page 3 of 4

# UNITED STATE DEPARTMENT OF JUSTICE
# FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property   Received/Returned/Released/Seized

File #: ████

████

iPod, 64 GB, SN: ████

32GB Transcend 32GB SD card located in Panasonic HCV700M video camera + black/red video bag

2 16MB Lexar compact flash cards; 1 Viking 128MB compact flash card; 1 San Disk 4GB SD card; 1 San Disk 256MB memory stick; 1 8MB Sony mega memory stick; 1G4 MB Sony memory stick; 1 16GB Sony memory stick

2GB Polaroid SD card located in Casio camera

8GB Sony memory stick located in Sony cyber shot in black pouch + black mesh bag

Lexar 1GB SD card located in Casio EX-Z1200, in black mesh bag

4 GB memory stick, Sony, located in Sony cyber shot in black Sony pouch

4GB San Disk SD card located in Canon power shot XS210 in black camera bag

G Drive Slim, 500GB; SN ████

RMK_MacBook_Air_Western Digital WD7500BPKX-00HPJT0 750GB hard drive, S/N ████ containing memory dump and image of a 500GB solid state drive from an Apple MacBook Air model A1466, S/N ████

Western Digital external hard drive, SN: ████

4 Citibank financial documents

2 M&T banking statements (accts: ████ and ████ Capital One brokerage statement (accts - ████, 2 property tax assessments (Land Rover Financial Group)

iPad - 64GB SN: ████

iomega hard drive; model 31905000; SN: ████

Mobile Mate SD+ memory card reader - San disk; Memorex 8GB MegaTravel Drive, w/case - in Ziploc bag

iomega hard drive; model# 31847300 SN: ████ in black case

(6) Six blue thumbdrives; (2) Two pink thumbdrives

HP Mobile USB Drive; Kit#D0549A, Drive Spare #348648-001 Cable Spare #348649-001

Seagate Go Flex hard drive S/N: ████

iPad - 64GB serial#: ████

iPhone in black and orange case IMEI: ████

Sony micro vault pro - 5GB SN: ████ located in blue case

DEWF_COMBO1: A 1TB HGST HDD, S/N: ████ containing forensic images and device extractions from rooms: C, F, K, and Q

5 UBS checks from 5 different accounts

FD-597 (Rev 8-11-94)                                                                              Page 4 of 4

# UNITED STATE DEPARTMENT OF JUSTICE
# FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property    Received/Returned/Released/Seized

**File #:** ▮▮▮▮▮▮
▮▮▮▮▮

6 blank deposit slips from various banks, 7 check reorder forms from various banks, 1 top page of Merrill Lynch checkbook

Financial records

Documents of personal letters, vehicle information, e-mail information, contact information, Politico article "Mystery Man: Ukraine's U.S. Political Fixer."

iomega portable hard drive 1TB SN ▮▮▮▮▮▮

Documents and seal for JESAND, LLC

Life insurance policy information from Northwestern Mutual

Estimates and/or quotes of high dollar items from Mallett, Inc.

Art records and financial records and home appraisals

**Received By** ▮▮▮▮▮▮▮▮▮                    **Received From**   Paul Manafort

(signature) _____        (signature) _____

## ATTACHMENT B

List of items digitally imaged on-premises, not physically taken:

- RMC_IPOD_TOUCH - Apple iPod Touch 8 Gigabyte (GB) 4th Generation, Model: A1367, MC540LL/A, Serial Number (S/N): ▮▮▮▮▮▮ A file system and logical extraction was made.
- RMF_IMAC - Apple iMac (27-inch, Mid 2011), Model: A1312, S/N: ▮▮▮▮▮▮ EMC No: 2429 containing a 250 GB Apple Solid State Drive (SSD), Model: TS256C, S/N: ▮▮▮▮▮▮ and a 1 TB Western Digital Hard Disk Drive (HDD), Model: WD1001FALS-403AA0, S/N: ▮▮▮▮▮▮ The date and time of the device was accurate. The owner supplied the password: ▮▮▮▮ was used to gain access to the computer and the WiFi networking was turned off at approximately 7:29 AM. A memory capture was made of the running computer. No encryption was detected on the internal HDDs.
- RMF_IPHONE7 - Black Apple iPhone 7 32 GB, Model: A1660 / MNAC2LL/A, S/N: ▮▮▮▮▮▮ IMEI: ▮▮▮▮▮▮ ICCID: ▮▮▮▮▮▮ MEID: ▮▮▮▮▮▮ containing Verizon SIM: ▮▮▮▮▮▮ running IOS 10.2.1 (14D27). There was no Apple ID associated with the phone. The phone name is: iPhone. A file system and logical extraction was made of the phone and a logical extraction was made of the SIM card.
- RMF_IPOD_TOUCH1 - Apple iPod Touch 8 GB 4th Generation, Model: A1367, MC540LL/A, S/N: ▮▮▮▮▮▮ A file system and logical extraction was made.
- RMF_IPOD_TOUCH2 - Apple iPod Touch 8 GB 4th Generation, Model: A1367, MC540LL/A, S/N: ▮▮▮▮▮▮ A file system and logical extraction was made.
- RMF_IPOD - Apple iPod 160 GB, model: A1238, S/N: ▮▮▮▮▮▮ A forensic image was made. Note: The forensic image was inadvertently named the same as RMF_FLASH10.
- RMF_SDCARD - 512 MB Lexar Platinum SD card, Model: 3401-512SA 4505C, Universal Serial Bus (USB) S/N: ▮▮▮▮ A forensic image was made.
- RMF_FLASH2 - 32 GB Monster Digital Flash Drive, USB S/N: ▮▮▮▮▮▮ A forensic image was made.
- RMF_FLASH3 - 4 GB Silver and Clear Flash Drive, USB S/N: ▮▮▮▮▮▮ A forensic image was made.
- RMF_FLASH4 - 8 GB Generic Blue Colored Flash Drive, USB S/N: ▮▮▮▮▮▮ A forensic image was made.
- RMF_FLASH5 - 8 GB Generic Blue Colored Flash Drive, USB S/N: ▮▮▮▮▮▮ A forensic image was made.
- RMF-FLASH6 - 8 GB Generic Blue Colored Flash Drive, USB S/N: ▮▮▮▮▮▮ A forensic image was made.
- RMF-FLASH8 - 64 Megabyte (MB) Dell Flash Drive, USB S/N: ▮▮▮▮▮▮ A forensic image was made.
- RMF-FLASH9 - 8 GB Generic Blue Colored Flash Drive, USB S/N: ▮▮▮▮▮▮ A forensic image was made.
- RMF-FLASH10 - 4 GB Highcountry Investments Limited Flash Drive, no S/N. A forensic image was made.

- RMF-FLASH11 - 8 GB Generic Blue Colored Flash Drive, USB S/N: ███████ A forensic image was made.
- RMF-FLASH12 - 8 GB Generic Blue Colored Flash Drive, USB S/N: ███████ A forensic image was made.
- RMF-FLASH13 - 1 GB Blue KWC Flash Drive, no S/N. A forensic image was made.
- RMK_MACBOOK_AIR - Apple Macbook Air (13-inch, Early 2015), Model: A1466, S/N: ██████████ EMC No: 2925 containing a 500 GB Apple SSD, Model: SM0512G, S/N: ████████ The owner entered the password to unlock the computer. The internal SSD was Apple Filevault encrypted. A memory capture was made of the running computer. A decrypted image of the computer was made.
- RMK_IPHONE7 - White Apple iPhone 7 32 GB, Model: A1660 / MN8J2LL/A, S/N: ██████████ IMEI: ████████ ICCID: ████████ MEID: ████████ containing AT&T SIM: ████████ running iOS 10.3.2 (14F89). The Apple ID associated with the phone is ████████ e-mail: ████████ The phone name is: KBM AT&T. A file system and logical extraction was made of the phone and a logical extraction was made of the SIM card.
- RMK_IPHONE7PLUS - Jet Black Apple iPhone 7 Plus 256 GB, Model: A1661 / MN4L2LL/A, S/N: ████████ IMEI: ████████ ICCID: ████████ MEID: ████████ containing AT&T SIM: ████████ running iOS 10.3.2 (14F89). The Apple ID associated with the phone is paul manafort, ████████ The phone name is: Channel 3. A file system and logical extraction was made of the phone and a logical extraction was made of the SIM card.
- RMK_IPAD_MINI1 - Black Apple iPad Mini with Retina Display 32 GB, Model: A1490, S/N: ████████ MSISDN: ████████ ICCID: ████████ IMSI: ████████ containing Verizon SIM: ████████ running iOS 10.3.2 (14F89). The Apple ID associated with the table is paul manafort, e-mail: ████████ The tables name is: iPad. A file system and logical extraction was made of the tablet and a logical extraction was made of the SIM card.
- RMK_IPAD_MINI2 - White Apple iPad Mini 64 GB, Model A1455, S/N: ████████ IMEI: ████████ MEID: ████████ containing Verizon SIM: ████████ running iOS 8.1.2 (12B440). The Apple ID associated with the tablet is paul manafort, e-mail: ████████ The table name is: Paul IPAD Mini. A file system and logical extraction was made of the tablet and a logical extraction was made of the SIM card.
- RMK_IPOD_TOUCH1 - Apple iPod Touch 8 GB 4th Generation, Model: A1367, MC540LL/A, S/N: ████████ A file system and logical extraction was made.
- RMK_IPOD_TOUCH2 - Apple iPod Touch 8 GB 4th Generation, Model: A1367, MC540LL/A, S/N: ████████ A file system and logical extraction was made.
- RMK_CAMERA_MICROSD - 4 GB Toshiba Micro SD HC memory card from an Olympus digital camera, model: Stylus Tough-6000, S/N: ████████ A forensic image was made.
- RMK_SONYCAMERA_SDCARD - 4 GB Sony SD HC memory card from a Sony Cyber-shot digital camera, model: DSC-WX5, S/N: ████████ A forensic image was made.
- RMK_FLASH1 - 512 MB SanDisk Cruzer Micro. A forensic image was made.
- RMK_FLASH2 - 8 GB Generic Blue Colored Flash Drive. A forensic image was made.

- RMQ_CAMCORDER_SDCARD1 - 32 GB SanDisk Ultra SD HC memory card from Slot A of a Canon VIXIA HF G30 camcorder. A forensic image was made.
- RMQ_CAMCORDER_SDCARD2 - 64 GB SanDisk Ultra SD XC I memory card from Slot B of a Canon VIXIA HF G30 camcorder. A forensic image was made.

**Attachment C**

████████████████████

7/26/2017

collected item log - possible
attorney client privilege

T1 - Green hanging file documents described as possible
attorney/client priv.
Room F, Drawer 2 of filing cabinets
SA
SA ████████████████████

T2 - blue folder with foreign letters: possible attorney-client
letters/papers
Room F, computer desk, top of desk R side
SA
SA ████████████████████

T3 - SIØ, drawer three; including legal documents 1 of 2
SIØ, drawer three
SA
SA ████████████████████

T4 - SIØ, drawer three; including legal document 2 of 2
SIØ, drawer three
SA
SA ████████████████████

T5 - SIØ, drawer two; including legal documents
SIØ, drawer two
SA
SA ████████████████████

T6 - SIØ, drawer one; including letter confirming agreement for
legal services
SIØ drawer one

T6 ( continued )   SA 
                   SA

T7 — Seven (7) documents potentially attorney — client
     privileged. From charles schwab folder on built-in
     library shelf.
     Room F.
     SA
     SA

T8- Three binders and four printed loose papers, possible
    attorney —client
    Room F in between couch and chect in or beside
    green bag.
    SA
    SA

T9— documents in envelope, possible taint
    Room F, computer desk, top of desk on R side
    SA
    SA

T10 — documents in manilla folder — possible taint material
     Room F, hanging file drawer 6
     SA
     SA

## <u>ATTACHMENT A</u>

### The Property to Be Searched

The premises to be searched (the "Subject Premises") is the condominium unit located at

 Alexandria, VA 22314, including the storage unit numbered █

█ as well as any locked drawers, containers, cabinets, safes, computers, electronic devices, and

storage media (such as hard disks or other media that can store data) found therein.

**ATTACHMENT B**

**Items to Be Seized (or, in the alternative, identified)**

1.    Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (failure to file a report of foreign bank and financial accounts); 22 U.S.C. § 611, *et. seq.* (foreign agents registration act); 26 U.S.C. § 7206(1) (filing a false tax return); 18 U.S.C. § 1014 (fraud in connection with the extension of credit); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and conspiracy to commit these offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy); 52 U.S.C. §§ 30121(a)(1)(A) and (a)(2) (foreign national contributions); and 18 U.S.C. §§ 371 and 2 (conspiracy, aiding and abetting, and attempt to commit such offenses) (collectively, the "Subject Offenses"), occurring on or after January 1, 2006, including but not limited to:

a.    Any and all financial records for Paul Manafort, Jr., ███████████, Richard Gates, or companies associated with Paul Manafort, Jr., ██████████, or Richard Gates, including but not limited to records relating to any foreign financial accounts and records relating to payments by or on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

b.    Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Jr., Richard Gates, or companies associated with Manafort or Gates;

c.    Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

d.    Records relating to efforts by Manafort, Gates, or their affiliated entities to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals, including but not limited to the Party of Regions and Viktor Yanukovych;

e.    Records relating to, discussing, or documenting Telmar Investments Limited, Tiakora Ventures Limited, Lucicle Consultants Limited, Actinet Trading Limited, Black Sea View Limited, Bletilla Ventures Limited, Evo Holdings Limited, Global Highway Limted, Leviathan Advisors Limited, Loav Advisors Limited, Peranova Holdings Limited, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records;

f.    Physical items purchased through the use of funds from Cypriot accounts, including but not limited to rugs purchased from ██████████, a Bijan Black Titanium "Royal Way" watch, and clothing purchased from ████████████ ████;

g.  Evidence relevant to any false statements, pretenses, representations, or material omissions in connection with communications with the Department of Justice, the Internal Revenue Service, tax preparers, accountants, or banks;

h.  Communications, records, documents, and other files involving any of the attendees of the June 9, 2016 meeting at Trump tower, as well as Aras and Amin Agalorov;

i.  Evidence indicating Manafort's state of mind as it relates to the crimes under investigation;

j.  The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with Manafort about any matters relating to activities conducted by Manafort on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

k.  Any and all daily planners, logs, calendars, or schedule books relating to Manafort or Gates.

2.  Computers or storage media used as a means to commit the Subject Offenses.

3.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

# ELECTRONIC EVIDENCE & SEARCH WARRANT TRANSMITTAL FORM

Case No. __1:17-SW-449_____     Date: __July 25, 2017_____

(S)AUSA: ▓▓▓▓▓▓▓▓____

## I.   TYPE OF LEGAL REQUEST:

☐ ECPA Grand Jury Subpoena and Non-Disclosure Order (§§ 2703(c)(2), 2705(b))

☐ ECPA Court Order (§ 2703(d))

☐ ECPA Content Search (§ 2703(a), (b)(1)(A))

☐ Pen Register/Trap & Trace (§ 3122(a)(1))

☐ Other _____

☐ PRTT/Search Warrant Hybrid (§§ 3122(a)(1), 2703(c)(1)(A))

✓ Regular Search Warrant (Rule 41(e)(2)(A))

☐ ESI Search Warrant (Rule 41(e)(2)(B))

☐ Tracking Device Search Warrant (Rule 41(e)(2)(C))

## II.   INFORMATION TO BE OBTAINED OR ITEMS TO BE SEARCHED/SEIZED:

☐ Cell Phone Account from Provider

☐ Land Line Account from Provider

☐ Email Account from Provider

☐ IP Address from Provider

☐ Real-Time Cell Site Records from Provider

☐ Social Media/Messaging Account from Provider

☐ Computer/Laptop/Hard Drive/Cell Phone (Rule 41(e)(2)(A))

☐ Tracking Device (Rule 41(e)(2)(C))

✓ Premises/Property/Vehicle (Rule 41(e)(2)(A))

☐ Other _____

## III.   INVESTIGATIVE OFFENSE:

☐ Drugs

☐ Extortion/Racketeering

☐ Fraud

☐ Fugitive/Escape

☐ Immigration

☐ Kidnapping

☐ Sex Offenses

☐ Tax

☐ Terrorism

☐ Theft

☐ Weapons

✓ Other 31 U.S.C. §§ 5314 & 5322(a); 22 U.S.C. § 611 *et seq.* (FARA); 18 U.S.C. §§ 2, 371, 1341, 1343, 1349, 1956, & 1957; and 52 U.S.C. §§ 30121(a)(1)(A) & (a)(2)

## IV.   DELAYED NOTICE:

☐ ECPA Non-Disclosure (§§ 2703(d), 2705(b))

　　☐ Initial – 2 years　　☐ Renewal

☐ ECPA Non-Disclosure for Priority Terrorism Enterprise Investigations (§§ 2703(d), 2705(b))

　　☐ Initial – 3 years　　☐ Renewal

☐ PRTT Non-Disclosure (§ 3123(d)(2))

　　☐ Initial – 5 years　　☐ Renewal

☒ Search Warrant Delayed Notice (§ 3103a(b), Rule 41(f)(3))

　　☐ Rule 41(e)(2)(A), (B), _or_ (C) Warrants
　　☐ § 2703(a), (b)(1)(A), _or_ (c)(1)(A) Searches

　　__30__ Days

　　_____ Days Extension

Updated: 5/2/17

# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Virginia

JUL 2 5 2017

**Under Seal**

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

THE PREMISES LOCATED ██ ████████
██ ██ ALEXANDRIA, VIRGINIA 22314

)
)
)
)
)
)

Case No.   1:17SW449

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*
    See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

   *Code Section*                                   *Offense Description*
See attached Affidavit.

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
   under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

███████████

*Applicant's signature*

██ ██ ██ Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

/s/

Date:   07/25/2017

Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state:   Alexandria, VA

The Honorable Theresa C. Buchanan
*Printed name and title*

## ATTACHMENT A

### The Property to Be Searched

The premises to be searched (the "Subject Premises") is the condominium unit located at

 Alexandria, VA 22314, including the storage unit numbered ███

███ as well as any locked drawers, containers, cabinets, safes, computers, electronic devices, and

storage media (such as hard disks or other media that can store data) found therein.

## ATTACHMENT B

### Items to Be Seized (or, in the alternative, identified)

1.          Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (failure to file a report of foreign bank and financial accounts); 22 U.S.C. § 611, *et. seq.* (foreign agents registration act); 26 U.S.C. § 7206(1) (filing a false tax return); 18 U.S.C. § 1014 (fraud in connection with the extension of credit); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and conspiracy to commit these offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy); 52 U.S.C. §§ 30121(a)(1)(A) and (a)(2) (foreign national contributions); and 18 U.S.C. §§ 371 and 2 (conspiracy, aiding and abetting, and attempt to commit such offenses) (collectively, the "Subject Offenses"), occurring on or after January 1, 2006, including but not limited to:

a.      Any and all financial records for Paul Manafort, Jr., █████████ Richard Gates, or companies associated with Paul Manafort, Jr., █████ or Richard Gates, including but not limited to records relating to any foreign financial accounts and records relating to payments by or on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

b.      Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Jr., Richard Gates, or companies associated with Manafort or Gates;

c.      Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

d.      Records relating to efforts by Manafort, Gates, or their affiliated entities to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals, including but not limited to the Party of Regions and Viktor Yanukovych;

e.      Records relating to, discussing, or documenting Telmar Investments Limited, Tiakora Ventures Limited, Lucicle Consultants Limited, Actinet Trading Limited, Black Sea View Limited, Bletilla Ventures Limited, Evo Holdings Limited, Global Highway Limted, Leviathan Advisors Limited, Loav Advisors Limited, Peranova Holdings Limited, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records;

f.      Physical items purchased through the use of funds from Cypriot accounts, including but not limited to rugs purchased from █████████, a Bijan Black Titanium "Royal Way" watch, and clothing purchased from █████████ █████;

g.   Evidence relevant to any false statements, pretenses, representations, or material omissions in connection with communications with the Department of Justice, the Internal Revenue Service, tax preparers, accountants, or banks;

h.   Communications, records, documents, and other files involving any of the attendees of the June 9, 2016 meeting at Trump tower, as well as Aras and Amin Agalorov;

i.   Evidence indicating Manafort's state of mind as it relates to the crimes under investigation;

j.   The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with Manafort about any matters relating to activities conducted by Manafort on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

k.   Any and all daily planners, logs, calendars, or schedule books relating to Manafort or Gates.

2.   Computers or storage media used as a means to commit the Subject Offenses.

3.   For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JUL 2 5 20??

THE PREMISES LOCATED AT █████
████████████████ ALEXANDRIA,
VIRGINIA 22314

Criminal No. 1:17-sw-449

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH WARRANT**

███████████████ Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.     I am a Special Agent with the FBI and have been since 2015.  I am currently assigned to the investigation being conducted by the Department of Justice Special Counsel.  As a Special Agent of the FBI, I have received training and experience in investigating criminal and national security matters.  Prior to my employment with the FBI, I spent seven years in the software industry and have extensive experience working with computer technology.

2.     I make this affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at █████████████ ████████ Alexandria, Virginia 22314 (the "Subject Premises"), which is described more particularly in Attachment A, in order to locate and seize (and/or photograph) the items described in Attachment B.  This affidavit is based upon my personal knowledge, my review of documents and other evidence, my conversations with other law enforcement personnel, and my training and experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my

1

investigation. Where the contents of documents and the statements, and conversations of others are reported herein, they are reported in substance and in pertinent part, except where otherwise indicated.

### B. The Subject Offenses

3.      For the reasons detailed below, there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of: 31 U.S.C. §§ 5314, 5322(a) (failure to file a report of foreign bank and financial accounts); 22 U.S.C. § 611, *et. seq.* (foreign agents registration act); 26 U.S.C. § 7206(1) (filing a false tax return); 18 U.S.C. § 1014 (fraud in connection with the extension of credit); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and conspiracy to commit these offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy); 52 U.S.C. §§ 30121(a)(1)(A) and (a)(2) (foreign contribution ban); and 18 U.S.C. §§ 371 and 2 (conspiracy, aiding and abetting, and attempt to commit such offenses) (collectively, the "Subject Offenses").

## II.  Probable Cause

4.      As set forth herein, there is probable cause to believe that the Subject Offenses have been committed by Paul J. Manafort, Jr., the former campaign chairman of Donald Trump for President, Inc., and others known and unknown. Between at least 2006 and 2014, Manafort, a United States citizen, worked as a lobbyist and political consultant for the Party of Regions, a Ukrainian political party commonly believed to be aligned with Russia. There is probable cause to believe that Manafort engaged in a scheme to hide income paid on behalf of Ukrainian politicians and others through foreign bank accounts in Cyprus and elsewhere, to and on behalf of Manafort and related people and companies.

5.      There is also probable cause to believe that Manafort participated in a scheme to

███████████████████████████████████████████████████ financial

institution, by providing false information to, and withholding material information from, ██████

related to the loans. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████

     6.     By way of background concerning Manafort, based on publicly available information, in March of 2016, Manafort officially joined Donald J. Trump for President, Inc. (the "Trump Campaign"), the presidential campaign of then candidate Trump, in order to, among other things, help manage the delegate process for the Republican National Convention.  In May of 2016, Manafort became chairman of the Trump Campaign.  In June of 2016, Manafort reportedly became *de facto* manager for the Trump Campaign with the departure of prior campaign manager Corey Lewandowski.  On August 19, 2016, after public reports regarding connections between Manafort, Ukraine, and Russia – including an alleged "black ledger" of off-the-book payments from the Party of Regions to Manafort – Manafort left his post as chairman of the Trump Campaign.

     7.     Portions of the information set forth below (as well as certain additional facts not relevant herein) were set forth in (1) an affidavit by Special Agent ████████████████ ██████ submitted in support of a warrant to search a storage locker in Alexandria, Virginia used by Manafort ("Storage Locker Search Warrant"); (2) an affidavit by Special Agent ████ ████████████ submitted in support of a search warrant for the email account used by Manafort ("Email Search Warrant"); and (3) an affidavit by Special Agent ██████████ ████████████ submitted in support of a warrant to search a hard drive associated with Manafort's business entities ("Hard Drive Search Warrant").  On May 27, 2017, the Honorable Theresa Carroll Buchanan, United States Magistrate Judge for the Eastern District of Virginia,

issued the Storage Locker Search Warrant upon a finding of probable cause; on June 21, 2017, the Honorable James L. Cott, United States Magistrate Judge for the Southern District of New York, issued the Email Search Warrant upon a finding of probable cause; and on June 14, 2017, Chief Judge Beryl Howell of the District of the District of Columbia issued the Hard Drive Search Warrant upon a finding of probable cause.  Copies of the search warrant affidavits are attached hereto as Attachments C-E, respectively.

### A.  Manafort's Work for Ukraine

8.     The information contained herein is based on public records; bank records and reports; Davis Manafort records; tax filings by Manafort and Richard W. Gates, III, a Davis Manafort employee; the June 2017 filing by DMP International, LLC, Manafort, and Gates under the Foreign Agents Registration Act (FARA); and statements by Manafort and Gates to the FBI, among other things.

9.     Manafort and Gates have been employed for many years through Davis Manafort and related entities as lobbyists and political consultants working both in the United States and internationally.  Beginning in or about 2006 and at least until 2014, Manafort provided political and policy services to the Ukrainian Party of Regions, including Viktor Yanukovych, head of the Party of Regions and the President of Ukraine from 2010 to 2014.  Gates told the FBI in an interview in July 2014 ("the Gates Interview") that he was hired by Manafort in 2006 and worked on Ukrainian election and policy advice, up to the time of the interview.  Gates advised that in 2010, he and Manafort were in Ukraine for over two months leading up to the election that brought Yanukovych to power.  Manafort told the FBI in an interview also in July 2014 ("the Manafort Interview") that he performed work for the Party of Regions, as well as significant work for Rinat Akhmetov, a financial supporter of President Yanukovych, and for Oleg Deripaska, a Russian oligarch.

10.     Based on reporting from multiple sources, the FBI believes that Yanukovych's government engaged in systematic public corruption. The same sources report that corrupt government officials and their allies in the business community during Yanukovych's presidency looted Ukraine's public coffers of millions of dollars and funneled those assets to foreign bank accounts to hide the embezzlement. The current government of Ukraine has sought the assistance of the United States and Cyprus to locate and recover these misappropriated assets. Yanukovych, who fled to Russia in 2014, is currently wanted in Ukraine for numerous criminal violations, including the embezzlement and misappropriation of public property.  In late June 2017, media outlets such as Bloomberg reported that Ukrainian prosecutors had uncovered no evidence of illicit payments to Manafort as part of their investigation into suspected criminal conduct by former Ukrainian officials.  In a statement available on its public website dated June 29, 2017, Ukraine's National Anti-Corruption Bureau of Ukraine (NABU) provided the following context by announcing that it "did not conduct an official investigation regarding Paul Manafort. He has never been a Ukrainian official, and therefore cannot commit corruption acts, according to the Ukrainian laws. An assessment of the actions of the abovementioned person should be made by the competent authorities of other countries, whose jurisdiction extends to the investigation of the facts of probable offenses."

### 1.      Payments from Cypriot Accounts to and for Manafort

11.     From in or about at least 2008 to at least 2014, payments from bank accounts in Cyprus  – nominally owned by foreign companies – were used to make payments to (a) United States corporate and personal bank accounts controlled by Manafort or Gates and (b) United States vendors for services provided to Manafort or Gates.  During this time period, tens of millions of

dollars from these foreign accounts were paid "directly"[1] and indirectly to Manafort, Gates, and Manafort-related entities.

12.     Based on the evidence set forth more fully below, there is probable cause to believe that Manafort and Gates maintained Cypriot bank accounts held in the names of numerous entities, which include those listed in the chart below:

| Company | Bank Name | Account # | Transaction Example |
|---------|-----------|-----------|---------------------|
| Telmar Investments Limited | Bank of Cyprus PCL Ltd | ███████████████ | On or about June 27, 2014, $250,000 was sent to an account in the name of DMP International, LLC at HSBC Bank. |
| Yiakora Ventures Limited | Bank of Cyprus PCL Ltd | ███████████████ | On or about September 2, 2010, $1 million was sent to an account in the name of Global Sites LLC at Wachovia Bank. On or about June 4, 2008, $8 million was sent to an account in the name of Jesand Investment Corporation at First Republic Bank. |
| Lucicle Consultants Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████████ | On or about November 9, 2012, $300,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |
| Actinet Trading Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████████ | On or about August 1, 2012, $70,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |

---

[1] The term "directly" is used to differentiate the "indirect" Manafort payments made to vendors that provided services to Manafort. Wires from Cypriot accounts that were sent to Davis Manafort would also at various times be passed through more than one United States account affiliated with Manafort before being used to pay for Davis Manafort expenses as well as other items.

| Company | Bank Name | Account # | Transaction Example |
|---|---|---|---|
| Black Sea View Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ████████████ | On or about December 21, 2011, $1 million was sent to an account in the name of Paul J Manafort and ████████ at First Republic Bank. |
| Bletilla Ventures Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ████████████ | On or about April 10, 2012, $900,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |
| Evo Holdings Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ████████████ | On or about January 30, 2009, $70,000 was sent to an account in the name of Davis Manafort Partners, Inc. at Wachovia Bank. |
| Global Highway Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ████████████ | On or about December 23, 2009, $500,000 was sent to an account in the name of Davis Manafort Partners, Inc. at Wachovia Bank. |
| Leviathan Advisors Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ████████████ | On or about May 27, 2011, $258,000 was sent to an account in the name of Davis Manafort Partners, Inc. at First Republic Bank. |
| Loav Advisors Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ████████████ | On or about October 7, 2010, $120,000 was sent to an account in the name of Paul J Manafort and ████████ at Wachovia Bank. |
| Lucicle Consultants Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ████████████ | On or about June 27, 2012, $650,000 was sent to an account in the name of DMP International, LLC at JPMorganChase Bank. |

| Company | Bank Name | Account # | Transaction Example |
|---|---|---|---|
| Peranova Holdings Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about February 1, 2012, $1.5 million was sent to an account in the name of DMP International, LLC at First Republic Bank. . |
| Telmar Investments Limited | Eurobank Cyprus Ltd | ███████████ | On or about January 16, 2014, $500,000 was sent to an account in the name of DMP International, LLC at HSBC Bank. |
| Actinet Trading Limited | Hellenic Bank PCL Ltd | ███████████ | On or about April 8, 2013, $200,000 was sent to an account in the name of DMP International, LLC at HSBC Bank. |
| Bletilla Ventures Limited | Hellenic Bank PCL Ltd | ███████████ | On or about March 1, 2013, $300,000 was sent to an account in the name of Symthson LLC at JPMorganChase Bank. |
| Lucicle Consultants Limited | Hellenic Bank PCL Ltd | ███████████ | On or about February 15, 2013, $500,000 was sent to an account in the name of Symthson LLC at JPMorganChase Bank. |

13.    The FBI has obtained bank records that evidence that Manafort controlled and/or held executive positions at the following United States entities, which received tens of millions of dollars from the above-listed financial accounts in Cyprus between at least 2008 to at least 2014:

(1) Davis Manafort Partners, Inc.;
(2) DMP International, LLC;
(3) Global Sites LLC; and
(4) Jesand Investment Corporation[2].

---

[2] Jesand Investment Corporation was incorporated in Virginia in 2002 and dissolved in 2013. It lists its addresses as Manafort's addresses in Alexandria, Virginia and Palm Beach Gardens, Florida. ███████ the name "Jesand" is ████████████████████████████ ██████

Bank records also reflect that Gates held signature authority over the account in the name of Symthson LLC[3].

14.     In addition, bank records evidence that millions of dollars were wired directly from the Cypriot accounts to pay vendors for goods and services provided to and for Manafort. For instance, funds from these foreign accounts were used to rent a villa in Italy at which the Manaforts vacationed (over $49,000); to pay for rugs from an Alexandria store called ███████ (over $360,000); to pay for landscaping services for the Manaforts (over $395,000); and to pay two separate clothiers ████████████████ for clothing purchased by Manafort (over $400,000 and $360,000 respectively). The records for one of the clothiers ████████ – evidence that Manafort was aware of and controlled these foreign wire payments, as he noted to the vendor in two spring 2011 emails that the vendor would be paid shortly from the Leviathan Holdings Cypriot account, noted above.

15.     Manafort and Gates have both told the FBI in interviews in 2014 that they were paid for their work for the Ukrainian Party of Regions through Cypriot bank accounts. In the Manafort Interview, Manafort claimed he did not know who specifically set up the Cypriot accounts, but they were vehicles used to pay him for public political services. Manafort specifically acknowledged that any money flowing from the accounts held in the name of Global Highway Ltd. and Leviathan (two entities listed above) would have been money he earned from his services. In the Gates Interview, Gates admitted he was directed to open accounts in Cyprus by President Yanukovych's Chief of Staff Boris Kolesnikov. He was told it was easier for them to be paid from one Cyprus account to another Cyprus account. Gates said that various oligarchs

---

[3] Smythson LLC was incorporated in Delaware in 2008. Note that bank accounts for this company were opened under the name "Symthson," using addresses listed for Manafort in other of his companies.

would chip in to pay them for their consulting work. Gates identified Lucicle, Bletilla, Leviathan, and Global Endeavor (among others) as accounts opened to receive such payments.

16.    In addition, in 2014 Manafort wrote to the First Republic Bank, a United States financial institution, to object to the bank's determination to close all the Manafort-related accounts based on its anti-money laundering policies and concerns about incoming international wires. In his correspondence to the bank, Manafort admitted he was paid by Ukraine but he claimed that the money he received from Ukraine was for "very public consulting services" from "legitimate activities that were totally legal." Manafort also wrote the bank that he had "[n]o interaction with oligarchs for business." However, in the Manafort Interview conducted that same year, Manafort told the FBI that he did significant work for Deripaska, a Russian oligarch. And in March 2017, in response to press reports concerning a written annual contract between Manafort and Deripaska, Manafort publicly confirmed that he had provided investment consulting services to Deripaska interests. ████████████████████████ also told the FBI that Deripaska helped fund Manafort's Ukrainian work when it began in 2005-06.[4] And the 2010 tax returns for a company jointly owned by Manafort and his wife – John Hannah, LLC[5] – reveals a $10,000,000 loan to the company from a "Russian lender." A court-authorized search in May 2017 of a storage locker in Virginia used by Manafort revealed documents that show that the

---

[4] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

[5] John Hannah, LLC was located at the same address as Davis Manafort, Inc. ████████████
████████████ Alexandria, Virginia, 22314, and received mail there. The company also received mail at the Manafort home in Florida. ████████ the name of the company is derived from the respective middle names of Manafort and Gates. Manafort declared on his tax returns, discussed below, income from John Hannah, LLC.

identity of the Russian lender was "Derapaska." Finally, in the Gates Interview, Gates admitted

that Manafort met with another oligarch, ▮▮▮▮▮▮ to discuss a New York real estate

transaction they would undertake together and to pitch other ideas. In the Manafort Interview,

Manafort also admitted approaching ▮▮▮▮ to propose the New York deal, which according to

business records publicly filed in a New York litigation was initiated in 2008.

### 2.    Manafort and Gates Tax Returns

17.    There is probable cause to believe that Manafort failed to properly disclose to the

United States government his relationship to the Ukrainian Party of Regions, the income he

received (directly or indirectly) as a result of his work for that party, and the existence of foreign

accounts in which he held a financial interest (and into which payments from Ukrainian politicians

were deposited, as discussed above).

18.    Pursuant to a tax order from the Eastern District of Virginia (Buchanan, J.) dated

April 14, 2017, the FBI has obtained and reviewed, among others, the tax returns for Manafort

and Gates for 2009-2014. In all of the tax returns, Manafort and Gates submitted a Schedule B

form, which required them to declare whether they have "an interest in or a signature or other

authority over a financial account in a foreign country, such as a bank account, securities

account, or other financial account." Each year, Manafort and Gates declared "No." That same

form also contained a cross-reference to the requirement to file a Report of Foreign Bank and

Financial Accounts (FBAR) to report overseas financial interests or signature authority.  An

FBAR filing is required, on a yearly basis, if a United States person has a financial interest in or

signatory authority over at least one financial account located outside the United States and at

least $10,000 in aggregate value in foreign accounts at any time during the calendar year.  As

discussed above, there is probable cause to believe that Manafort and Gates had a financial

interest, in excess of $10,000, in various accounts in Cyprus in at least 2008-14. A review of data from the Financial Crimes Enforcement Network (commonly known as FinCEN) shows that Manafort and Gates have not filed an FBAR for at least the years 2008 to the present.

19.     A search of the United States Department of Justice database of all agents currently or previously registered under FARA, conducted in July 2017, also discloses that Manafort, Gates, and their affiliated entities, including Davis Manafort, failed to register as agents of a foreign government until June 27, 2017.[6]  As long-time lobbyists, Manafort and Gates would know about the FARA requirements.  Indeed, in email communications between Gates and ███████████ (a United States lobbying and public affairs firm) concerning joint Ukraine work, Gates demonstrated that he was clearly aware in 2012 of FARA filing rules.

20.     In addition, the foreign source income listed in the tax returns for Manafort does not appear to account for the above distributions to or from the Cypriot accounts on his behalf. For instance, the 2009 Manafort tax return indicates $17,736 in gross foreign source income; in 2010, $42,789; in 2011, $165,871; in 2012, $129,777; in 2013, $38,375; and in 2014, $39,468.

21.     The bank records, however, reveal the following:

- In 2008, the Cypriot accounts transferred at least $3,500,000 to accounts in the joint names of Paul and ███████ Manafort and transferred at least $9,000,000 to accounts of United States entities affiliated with Manafort.

- In 2009, the Cypriot accounts transferred at least $1,500,000 to accounts in the joint names of Paul and ███████ Manafort, transferred at least $35,000 to accounts in the names of Manafort's relatives, transferred at least $3,000,000 to accounts of

---

[6] The database is publicly available at https://www.fara.gov/.

United States entities affiliated with Manafort, and transferred at least $200,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2010, the Cypriot accounts transferred at least $2,000,000 to accounts in the joint names of Paul and ███████ Manafort, transferred at least $80,000 to accounts in the names of Manafort's relatives, transferred at least $6,000,000 to United States entities affiliated with Manafort, and transferred at least $600,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2011, the Cypriot accounts transferred at least $1,800,000 to an account in the joint names of Paul and ███████ Manafort, transferred at least $30,000 to an account in the name of a Manafort relative, transferred at least $3,000,000 to an account of a United States entity affiliated with Manafort, and transferred at least $500,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2012, the Cypriot accounts transferred at least $200,000 to an account in the joint names of Paul and ███████ Manafort, transferred at least $8,500,000 to accounts of United States entities affiliated with Manafort, and transferred at least $1,000,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2013, the Cypriot accounts transferred at least $2,500,000 to accounts of United States entities affiliated with Manafort and transferred at least $1,000,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2014, the Cypriot accounts transferred at least $5,000,000 to accounts of United States entities affiliated with Manafort.

22.     There appears to be no legitimate business reason for these transactions, which appear to pass funds from a Ukrainian political party through more than one Cypriot bank

account; have payments made directly to United States vendors from the Cypriot accounts; and pass money brought onshore from Cyprus through multiple United States accounts. Based on my training and experience, these transactions evidence in my view the crimes of tax evasion and money laundering to conceal the origins of the funds paid to Manafort and Gates.

**B.     Manafort's Loan Applications**

23.     There is also probable cause to believe that Manafort made misrepresentations and material omissions for the purpose of securing loans from ███████████████████ ████████████████████ and is a Federal Deposit Insurance Corporation member bank. The information contained herein is based on information set forth in the attached ████████ Affidavit, which is based on public records, financial records and reports, court records, and information provided by other law enforcement personnel, among other things.

24.     Based on court filings and records obtained from Genesis Capital Corporation ("Genesis"), in February 2016, Genesis, through an affiliated entity, extended two loans to MC Brooklyn Holdings LLC ("MC Brooklyn Holdings") totaling approximately $5.3 million. MC Brooklyn Holdings is the holding company for a townhouse located at ████████████, Brooklyn, New York 11231 ("Brooklyn Property"). MC Brooklyn Holdings' members are Manafort, ████ ████████████████████████████████████████████████████████████ ████ Manafort also personally guaranteed the $5.3 million loans from Genesis.

25.     Additionally, based on documents obtained from ████ in February 2016, Genesis funded a refinance and construction loan for approximately $3.7 million, secured by a property located ████████████████Los Angeles, California ("Los Angeles Property"). The Los Angeles Property was held by ████████████████ LLC, a company in which (as of February 2016) Manafort and ████ held equal interest.

26. Both sets of Genesis loans went into default in 2016. As a consequence, on September 20, 2016, a Genesis affiliate filed an action in New York Supreme Court, Kings County (the "Foreclosure Action"), seeking to foreclose the loans encumbering the Brooklyn Property. After its initiation, the Foreclosure Action was adjourned several times as Manafort and ▇▇▇ sought refinancing.

27. As explained in the ▇▇▇ Affidavit attached hereto, based on documents obtained from ▇▇▇ beginning in 2016, Manafort began negotiations with ▇▇▇ for the extension of loans for several purposes, including to refinance the Genesis loans that were in default. These negotiations ultimately resulted in ▇▇▇ extending two sets of loans to Manafort-linked entities in the total amount of approximately $16 million. One loan, for approximately $9.5 million (enough to cover the outstanding balance on the Genesis loan secured by the Los Angeles Property) was extended to a company called Summerbreeze LLC that was owned by ▇▇▇▇▇▇ (hereinafter, the "▇▇▇ Summerbreeze Loan"). A second set of ▇▇▇ loans, in the amount of $6.5 million, was secured by the Brooklyn Property and was used to refinance the Genesis loans secured by that property (hereinafter, "the ▇▇▇ Brooklyn Property Loan"). That refinancing ultimately terminated the Genesis Foreclosure Action.

28. As described below, Manafort made several materially inconsistent representations during the process of negotiating for the ▇▇▇ loans, including by making substantially different representations about his income and net worth on different loan applications (signed and unsigned) within a three-month period. And ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

███████████████████████████████████████████████████████

██████████████████████████████████████

### 1.   Extension of Refinancing Loan

29.   According to documents obtained from ████ on or about July 27, 2016, Manafort met with ████████████████████████████████████████████ to discuss a proposed loan from ████ to refinance the Genesis loan secured by the Los Angeles Property ("the Genesis Los Angeles Loan"). ████ and other members of the ████ loan committee approved the terms of this loan the next day. ████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████

30.   ███████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████

31.   ███████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████

32.   ███████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████

33.     On or about September 8, 2016, Manafort's attorney transmitted to ████ a demand

letter to ████████████████ sent by a debt collector, which demanded payoff for missed June

and July payments on the Genesis Los Angeles Loan, including late fees and over $2,000 daily

interest on the late fees.  ████ forwarded this document to ████████████████████████████

writing: "Just a fyi – looks like these guys are in default to Genesis......."  ████ wrote back:

"It is what it is.  Let's send it off to ████ and have it be part of the file. ██████████████

████████████

## 2.     Extension of Additional Refinancing Loan Despite Manafort's Initial $1 Million Understatement of Original Loan Amount

34.     Based on documents obtained from ████ in late August 2016, at approximately

the time when Manafort officially left his position with the Trump Campaign, the company

Summerbreeze LLC was formed, with ████████████████████████ as the sole member.

████ records show that Summerbreeze LLC then took out a loan from a subsidiary of the real

estate investment company ████████████████ in the amount of approximately $3.5 million,

secured by real estate in Water Mill, New York (hereinafter, the "████ Loan").

35.     ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

36.   ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████

37.     On September 27, 2016, ███████████████ copies of mortgage

statements showing that the ███████ Loan was for approximately $3.5 million. ███████

█████████████ replied to all recipients: "What the hell he just took the loan out at the end

of August how can he be $1,000,000 off!" ███████ replied, ████████████████████

█████████████ "He is so in debt."

38.     ████████████████████████[7]  FBI agents interviewed ████████

who stated in substance, among other things, as follows:

    a.   She discussed the loan with ████████████████████ in the course of

       her work on the loan, and ███████ expressed to her on several occasions that the

       proposed Manafort loan was a bad loan.

    b.   There were several issues with the proposed Manafort loan.  For example, when

       she ran Manafort's credit report in August of 2016, she saw that his credit had

       dropped significantly compared to his last credit report in June, due to an

[7] ███████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

approximately $300,000 debt Manafort had incurred on his American Express card (which Manafort claimed was because he had allowed a friend to use it to buy New York Yankees season tickets). Additionally, a number of Manafort's assets turned out to be less valuable than expected. Two pieces of real estate considered as collateral were each appraised at over $1 million less than the expected value, and an investment account of Manafort's, which ███ had believed would have a balance of $10 million, had a lower effective value because Manafort had taken out a $5 million line of credit against it. ███ also considered it unusual to approve a construction loan (as the proposed Manafort loan was planned to be) for borrowers who, like Manafort and ███ lacked construction experience. She also considered it unusual that ███ was willing to fund the loan despite Manafort's and ███ default to Genesis Capital.

c. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████

d. ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████

39.



40.     In early October 2016, before Manafort and ▮ closed on the originally contemplated refinancing of the Genesis Los Angeles Loan, documents provided by ▮ show that Manafort sought a second loan from ▮ that would refinance the Genesis loans secured by the Brooklyn Property, which were the subject of Genesis's Foreclosure Action filed in September 2016.

### 3.     Manafort's Conflicting Representations in His Loan Applications

41.     During the course of applying and negotiating for lending from ▮ Manafort made a series of conflicting representations in his loan applications about his income and net worth. Documents produced by ▮ show that on August 11, 2016, Manafort digitally signed a loan application for the proposed Los Angeles Property refinancing that listed his income as $275,000 per month and his personal net worth as $17,051,676.17.

42.     Two loans applications for the ███ Summerbreeze Loan were also produced by ███ unsigned by Manafort but dated October 26, 2016.  Both listed Manafort's income as approximately $224,846 per month.  One listed the net worth of Manafort and his wife, as co-borrowers, as $21,376,722.13, and the other listed their net worth as $6 million lower, or $15,376,722.13.

43.     Two days after the date of these applications, on or about October 28, 2016, Manafort and his wife signed a loan application for the TFSB Summerbreeze Loan listing Manafort's income as $100,652 per month and their net worth as co-borrowers as $34,685,418.13.

44.     On or about three days after that application was submitted, or November 1, 2016, Manafort and his wife signed a loan application for the ███ Brooklyn Property Loan, which listed Manafort's income as $224,846 per month and their net worth as co-borrowers as $14,994,402.13.

45.     Following these representations, the ███ Summerbreeze Loan closed on November 16, 2016.  Of the total loan amount of $9.5 million, $7 million was underwritten by ████████████████ The final ███ credit approval memorandum produced by ███ did not mention the Los Angeles Property Loan default or the Foreclosure Action against Manafort, and it assigned the ███ Summerbreeze Loan a risk factor of "4 (Average)." ███

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

46.     On January 17, 2017, the ███ Brooklyn Property Loan was funded, resulting in $6.5 million being paid for the benefit of Manafort and his wife.  The Genesis Foreclosure Action

was terminated by stipulation executed the next day.  The final ███ credit approval memorandum produced by ███ did not mention the default on the Genesis loans or the Foreclosure Action and assigned the ███ Brooklyn Property Loan a risk factor of "4 (Average)."













### D.     The Subject Premises

60.     Law enforcement databases and mortgage records show that Manafort maintains several residences, including a residence at the Subject Premises.  The Subject Premises is located in a complex called ███████████████.  Appraisal and title insurance documentation obtained from ████ indicate that the Subject Premises is a three-bedroom condominium unit with 2779 square feet of living space and includes two parking spaces numbered ████ and ████ and one storage unit numbered ████  A law enforcement database shows that the property was purchased by Paul and ████ Manafort on or about January 15, 2015 for $2,700,000 in cash.

61.     In email communications in July 2016, bank officials at ████████████ who were working to approve loan to Manafort-related entities (as described above) characterized the Subject Premises as Manafort's "primary residence."  In subsequent paperwork, ████ identified Manafort's residence in Florida as his primary residence on the basis of Manafort's use of that address for income tax purposes.

62.     In several voluntary meetings with the FBI, ████████, an individual who works for Manafort, confirmed that Manafort maintains a residence at the Subject Premises. ████ informed the FBI that he previously worked for Davis Manafort and that in late 2011 he began working more directly for Manafort. He currently receives his salary from Steam Mountain, LLC, which is another business operated by Manafort. ████ advised that he performs a variety of functions for Manafort and his companies, as directed by Manafort.

63.    In spring of 2017, ▮▮▮▮ advised the FBI that in approximately 2015, at the direction of Manafort, ▮▮▮▮ moved boxes of office files for Manafort's businesses from one smaller storage unit at 370 Holland Lane, Alexandria, Virginia, to a larger storage unit (Unit 3013) at the same storage facility. ▮▮▮▮ advised that he personally moved the office files into Unit 3013. A search of Unit 3013 at 370 Holland Lane was conducted in late May of 2017 pursuant to a warrant issued by Magistrate Judge Theresa Carroll Buchanan. That search confirmed the information ▮▮▮▮ provided the FBI. Among the items that the FBI identified in that search were tax returns for Manafort and various Manafort-related business entities, documents related to Ukraine and the Party of Regions, and various financial documents. A copy of that search warrant affidavit is attached hereto.

64.    ▮▮▮▮ told the FBI that Manafort moved from his former residence on Mount Vernon Circle (also in Alexandria, VA) to the Subject Premises in or around May of 2015, and that he ▮▮▮▮ personally helped Manafort move belongings from the former residence to the Subject Premises and to the aforementioned storage locker on 370 Holland Lane. ▮▮▮▮ also advised that the Subject Premises includes its own separate locked storage unit, which is used to store, among other things, miscellaneous items of furniture. The last time ▮▮▮▮ accessed the storage unit was in March or April 2017.

65.    ▮▮▮▮ indicated that Manafort used his home to do business and maintained records of his businesses at his home. For instance, some of the material that was moved to Unit 3013 included files from Manafort's former residence on Mount Vernon Circle in Alexandria, Virginia. ▮▮▮▮ indicated that Manafort was using his former residence as an office at the time. ▮▮▮▮ also advised the FBI that company documentation was being kept at the Subject Premises. In particular, ▮▮▮▮ informed the FBI that in late April or early May of 2017, ▮▮▮▮

████ told him that she and Manafort were reorganizing their lives and as part of that process were getting documents ready for meetings with their attorney.  At the same time, ████ saw miscellaneous documents on a coffee table at the Subject Premises, including but not limited to Federal Election Commission documents.

66.      ████ also informed the FBI that one of the rooms in the Subject Premises is used as an office, and that ████ has seen business records in that office, including in one or two drawers.  Among the records maintained in the drawers were records related to Manafort's various business entities, including John Hannah LLC (as discussed in Paragraph 16 above) and, he believes, DMP International, LLC.

67.      In an interview with the FBI on July 19, 2017, ████ indicated that the last time he was inside the Subject Premises was on or about July 5, 2017, when he picked up Manafort's mail and shipped a suit to another Manafort residence at Manafort's request; and the last time he was at the Subject Premises was on or about July 11, 2017, when he took ████████ to the airport.

68.      It is reasonable to believe that business records related to Manafort's work in Ukraine, including historical records, would be maintained among the business files kept at the Subject Premises, including the files kept for use in consulting with counsel.  On June 27, 2017, Manafort, Gates, and DMP International, LLC registered under FARA for the years 2012-2014 as a result of their political work in Ukraine, having failed to do so previously.  This registration followed a series of communications between Manafort, his counsel, and officials in the United States Department of Justice's National Security Division (which administers the FARA registration process) about the FARA requirements.  At least one of these communications, dated September 13, 2016, was directed to Manafort at "████████████" in Alexandria, VA,

*i.e.*, the Subject Premises. It is therefore reasonable to believe that records relating to this filing (and thus related to Manafort's failure to file previously) are maintained at the Subject Premises, including records of Manafort's work on behalf of the Party of Regions and payments received from them. Among other things, in the Gates Interview, Gates told the FBI that Manafort and he used "standard English" common law contracts for their Ukrainian work and would invoice the customer for payment.[9]

69.     These records are particularly valuable since counsel for Manafort has informed the United States Department of Justice that at least as of November 23, 2016, DMP International, LLC purports to have an "Email Retention Policy" which results in its not retaining "communications beyond thirty days." In spite of its title, the policy purports to cover not just email, but "information that is either stored or shared via electronic mail or instant messaging technologies, and documentation residing on any computer or server." The policy also purports to provide that "[e]ach employee may at its [sic] discretion archive certain electronic information that pertains to the company's business or mission," but the the employee "must do so with the knowledge that all emails, electronic documents and other electronic material shall be deleted from corporate equipment, including but not limited to, computers, servers, and mobile devices, within 30 days of possession of the information."

70.     There is also probable cause to believe that the Subject Premises contains records related to Manafort's efforts to secure loans from ███ on the basis of inconsistent representations about his income and net worth, as described above. Records obtained from ███ show that in

---

[9] In contrast, in their June 27, 2017, FARA filings, Gates, Manafort, and DMP International, LLC indicated that there was no formal written contract of exchange of correspondence between the parties. In such circumstances, the FARA form requires the filer to "give a complete description" of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received." The June 2017 filings provide none of that information.

approximately August 2016, Manafort submitted bank statements for two accounts at Citi to ███

in connection with his application for lending. One of the two bank statements submitted to ███

is addressed to ████████ at the address of the Subject Premises. Bank records also show

that beginning in December 2016, bank statements for the other account were directed to the same

address. Accordingly, there is probable cause to believe that bank statements and other

documentation related to those accounts, which formed part of the ███ consideration of

Manafort's request for lending, could be found at the Subject Premises.

71.    Additionally, there is probable cause to believe that other financial records relevant

to the Subject Offenses will be found at the Subject Premises. Manafort's prior residence in

Alexandria, ████████████, was listed as the address of record for a number of

accounts, including accounts at First Republic Bank in Chicago that were closed in 2014 following

anti-money laundering concerns by the bank, as discussed in Paragraph 16 above. From my

training and experience, I am aware that individuals and businesses often retain copies of financial

records for several years, including in connection with tax filing obligations. Accordingly, and

given the fact that Manafort and his wife moved to the Subject Premises from his prior residence

in the same city in approximately May of 2015, it is reasonable to believe that financial records

sent to his prior residence may be found at the Subject Premises. Additionally, a mail cover

conducted by the FBI, involving the review of the outside cover of United States Postal Service

(USPS) mail addressed to the Subject Premises, reveals that during the period between

approximately June 13, 2017 and July 12, 2017, mail to the Subject Premises included, among

other things, a first class mailing from ████████████ mail from M&T Bank,

and a statement from American Express addressed to both Paul Manafort and "Davis Manafort

Part," which I believe to refer to Davis Manafort Partners.

72.     Further, there is probable cause to believe that the Subject Premises contains physical evidence in the form of physical items purchased through the use of funds from foreign bank accounts, including from the Cypriot bank accounts described above.  For instance, given that Manafort lives at the premises, there is probable cause to believe that men's clothing and accessories purchased at one or both of the clothing vendors and paid for by wire transfers from various Cyprus accounts, as referenced in Paragraph 14 above, will be found at the Subject premises.  Bank records and records obtained from the clothiers show that between 2009 and 2012, Manafort purchased more than approximately $760,000 in merchandise from these two clothiers using funds wired from several of the Cypriot accounts.  Purchases included multiple suits and jackets in excess of $10,000 and at least one limited edition Bijan Black Titanium "Royal Way" watch, purchased for $21,000.  Between approximately 2009 and spring 2015, invoices for Manafort's purchases from ███████ were sent to Manafort's previous Alexandria residence on ████████████; more recently, invoices have been sent to Manafort at the Subject Premises.  According to ██████ there are two closets at the Subject Premises that contain clothing and jewelry.

73.     There is also reason to believe that rugs purchased with funds from the Cypriot accounts would be found at the Subject Premises.  Wire transfers totaling more than $360,000 were sent from Cypriot accounts directly to ████████████, a carpet store located in Alexandria, Virginia, near to the Subject Premises.  The funds were used to pay for rugs acquired by Manafort.  In an interview with the FBI, one of the owners ██████ ██████████ advised that Manafort brought several of his purchases back to the store for cleaning, which remain at the store.  It is reasonable to believe that the remaining rugs purchased by Manafort with funds funneled

through the Cypriot accounts will be found at the Subject Premises (to include Premises' storage unit).

74.     Although I submit that there is probable cause to seize the aforementioned rugs and clothing as fruits of the Subject Offenses, the FBI does not intend to seize those items. Rather, upon an authorized search of the Subject Premises, the FBI intends to identify and photograph those items.

### Computers, Electronic Storage, and Forensic Analysis

75.     As described in Attachment B, this application seeks permission to search for records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.[10] Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

76.     In a July 2017 interview, ▮▮▮▮ advised the FBI that there is a Mac desktop computer on the desk in the office at the Subject Premises, which is used by Manafort. For a variety of reasons, copies of historical records and current records are also frequently stored on external hard drives, thumb drives, and magnetic disks. There is reasonable cause to believe such media may be contained in and among records of Manafort's business and financial activity at the Subject Premises. FBI interviews of ▮▮▮▮ further confirm that Manafort has made widespread use of electronic media in the course of his business activity. For example, ▮▮▮▮ told the FBI that Manafort had a drawer full of phones and electronic equipment at his old residence in Mount Vernon Square. At one point, Manafort gave ▮▮▮▮ a bag of computers and directed ▮▮▮▮ to

---

[10] A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

have the drives wiped before giving them to charity.  Manafort also gave ███ several additional devices, both laptops and cellular phones.

77.    I submit that there is probable cause to believe that evidence of the Subject Offenses may be found on storage media located at the Subject Premises, including but not limited to a desktop computer, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file –for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system

35

data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

78.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or alternatively, to exclude the

innocent from further suspicion.  In my training and experience, information

stored within a computer or storage media (e.g., registry information,

communications, images and movies, transactional information, records of

session times and durations, internet history, and anti-virus, spyware, and

malware detection programs) can indicate who has used or controlled the

computer or storage media.  This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence.

The existence or absence of anti-virus, spyware, and malware detection programs

may indicate whether the computer was remotely accessed, thus inculpating or

exculpating the computer owner.  Further, computer and storage media activity

can indicate how and when the computer or storage media was accessed or used.

For example, as described herein, computers typically contain information that

log: computer user account session times and durations, computer activity

associated with user accounts, electronic storage media that connected with the

computer, and the IP addresses through which the computer accessed networks

and the internet.  Such information allows investigators to understand the

chronological context of computer or electronic storage media access, use, and

events relating to the crime under investigation.  Additionally, some information

stored within a computer or electronic storage media may provide crucial

evidence relating to the physical location of other evidence and the suspect.  For

example, images stored on a computer may both show a particular location and

have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

79.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large

volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

80.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

81.     Based on the foregoing, I respectfully submit there is probable cause to believe that the Subject Offenses have been committed and that there is probable cause that evidence of the Subject Offenses, as described in Attachment B, is to be found at the Subject Premises.

## III.   Conclusion and Ancillary Provisions

82.     Based on the foregoing, I respectfully request the Court to issue a warrant to search the Subject Premises, as described in Attachment A to this affidavit, and to seize the items and information specified in Attachment B.

83.     In light of the confidential and highly sensitive nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Respectfully submitted,

Special Agent
Federal Bureau of Investigation

Sworn to before me on
July 25, 2017
                        /s/
Theresa Carroll Buchanan
United States Magistrate Judge

## **ATTACHMENT A**

### **The Property to Be Searched**

The premises to be searched (the "Subject Premises") is the condominium unit located at , Alexandria, VA 22314, including the storage unit numbered█ █ as well as any locked drawers, containers, cabinets, safes, computers, electronic devices, and storage media (such as hard disks or other media that can store data) found therein.

**ATTACHMENT B**

**Items to Be Seized (or, in the alternative, identified)**

1.      Records relating to violations of 31 U.S.C. §§ 5314, 5322(a) (failure to file a report of foreign bank and financial accounts); 22 U.S.C. § 611, *et. seq.* (foreign agents registration act); 26 U.S.C. § 7206(1) (filing a false tax return); 18 U.S.C. § 1014 (fraud in connection with the extension of credit); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and conspiracy to commit these offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy); 52 U.S.C. §§ 30121(a)(1)(A) and (a)(2) (foreign national contributions); and 18 U.S.C. §§ 371 and 2 (conspiracy, aiding and abetting, and attempt to commit such offenses) (collectively, the "Subject Offenses"), occurring on or after January 1, 2006, including but not limited to:

    a.      Any and all financial records for Paul Manafort, Jr., ▉▉▉▉▉▉▉▉▉ Richard Gates, or companies associated with Paul Manafort, Jr., ▉▉▉▉▉▉ or Richard Gates, including but not limited to records relating to any foreign financial accounts and records relating to payments by or on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

    b.      Any and all federal and state tax documentation, including but not limited to personal and business tax returns and all associated schedules for Paul Manafort, Jr., Richard Gates, or companies associated with Manafort or Gates;

    c.      Letters, correspondence, emails, or other forms of communications with any foreign financial institution, or any individual acting as the signatory or controlling any foreign bank account;

    d.      Records relating to efforts by Manafort, Gates, or their affiliated entities to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals, including but not limited to the Party of Regions and Viktor Yanukovych;

    e.      Records relating to, discussing, or documenting Telmar Investments Limited, Tiakora Ventures Limited, Lucicle Consultants Limited, Actinet Trading Limited, Black Sea View Limited, Bletilla Ventures Limited, Evo Holdings Limited, Global Highway Limted, Leviathan Advisors Limited, Loav Advisors Limited, Peranova Holdings Limited, including but not limited to bank records, canceled checks, money drafts, letters of credit, cashier's checks, safe deposit records, checkbooks, and check stubs, duplicates and copies of checks, deposit items, savings passbooks, wire transfer records, and similar bank and financial account records;

    f.      Physical items purchased through the use of funds from Cypriot accounts, including but not limited to rugs purchased from ▉▉ ▉▉▉▉▉▉▉, a Bijan Black Titanium "Royal Way" watch, and clothing purchased from ▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉

1

g.    Evidence relevant to any false statements, pretenses, representations, or material omissions in connection with communications with the Department of Justice, the Internal Revenue Service, tax preparers, accountants, or banks;

h.    Communications, records, documents, and other files involving any of the attendees of the June 9, 2016 meeting at Trump tower, ████████████████ ██████

i.    Evidence indicating Manafort's state of mind as it relates to the crimes under investigation;

j.    The identity of any person(s)—including records that help reveal the whereabouts of the person(s)—who communicated with Manafort about any matters relating to activities conducted by Manafort on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

k.    Any and all daily planners, logs, calendars, or schedule books relating to Manafort or Gates.

2.    Computers or storage media used as a means to commit the Subject Offenses.

3.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the lack of such malicious software;

d.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

2

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.