AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Columbia



**FILED**

**JUL 1 4 2017**

Clerk, U.S. District and
Bankruptcy Courts

In the Matter of the Search of
)
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
)
)
HARD DRIVE WITH SERIAL NUMBER
)
WXB1AA006666
)

Case: 1:17-mj-000496
Assigned To : Howell, Beryl A.
Assign. Date : 07/14/2017
Description: Search & Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.I.

located in the _____ District of   the District of Columbia  , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment A.II.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

See attached Affidavit, para. 6.

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

█████████████████████

*Printed name and title*

Sworn to before me and signed in my presence.

Date:      07/14/2017

*Judge's signature*

City and state:  Washington, D.C.

Hon. Beryl A. Howell, Chief U.S. District Judge
*Printed name and title*

**FILED**

**JUL 14 2017**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Clerk, U.S. District and
Bankruptcy Courts

Case: 1:17-mj-000496
Assigned To : Howell, Beryl A.
Assign. Date : 07/14/2017
Description: Search & Seizure Warrant

IN THE MATTER OF THE SEARCH OF
HARD DRIVE WITH SERIAL NUMBER
WXB1AA006666

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

██████████ Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.      I have been a Special Agent with the Federal Bureau of Investigation for approximately 15 years.  For approximately two years, I have been assigned to an international corruption squad in Washington, D.C.; I am now assigned to the investigation by the Department of Justice Special Counsel.  I have received training regarding fraud and public corruption offenses.  I have participated in the execution of search warrants involving electronic evidence.

2.      I make this affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic device specified below (the "Subject Device") for the items and information described in attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience, and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.

Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B.  The Subject Device

3.      The Subject Device is particularly described as a hard drive with serial number WXB1AA006666.  It is believed to be a copy of the electronic files maintained as of 2011 by Davis Manafort, Inc., located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Davis Manafort, Inc. housed the electronic records of various Davis Manafort-related companies, including Davis Manafort Partners, Inc. (collectively, "Davis Manafort").  Davis Manafort was a well-known political consulting and lobbying firm for domestic and international clients.  Paul J. Manafort, Jr. was a principal of the companies. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4.      Based on my training, experience, and research, I know that the Subject Device has the capabilities that allow it to store files, including spreadsheets and other account files. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.     I know that the Subject Device was subpoenaed from ▮▮▮ in June 2017 pursuant to a grand jury subpoena in this district and as a consequence it is presently located in the District of Columbia and is in the custody of the FBI. The FBI intends to execute the warrant, if granted, in this district.

## C.  The Subject Offenses

6.     For the reasons detailed below, there is probable cause to believe that the Subject Device contains evidence, fruits, and instrumentalities of: 31 U.S.C. §§ 5314, 5322(a) (failure to file a report of foreign bank and financial accounts); 22 U.S.C. § 611, *et. seq.* (foreign agents registration act); 26 U.S.C. § 7206(1) (filing a false tax return); 18 U.S.C. §§ 1341, 1343, and 1349 (mail fraud, wire fraud, and conspiracy to commit these offenses); 18 U.S.C. §§ 1956 and 1957 (money laundering and money laundering conspiracy), and 18 U.S.C. §§ 371 and 2 (conspiracy, aiding and abetting, and attempt to commit such offenses) (collectively, the "Subject Offenses").

## II.  Probable Cause

7.     As set forth herein, there is probable cause to believe that the Subject Offenses have been committed by Manafort, and others known and unknown. Between at least 2006 and 2014, Manafort, a United States citizen, worked as a lobbyist and political consultant for the Party of Regions, a Ukrainian political party commonly believed to be aligned with Russia. There is probable cause to believe that Manafort engaged in a scheme to hide income paid on behalf of Ukrainian politicians and others, through foreign bank accounts in Cyprus and elsewhere, to and on behalf of Manafort and related people and companies.

8.     By way of background concerning Manafort, based on publicly available information, in March of 2016, Manafort officially joined Donald J. Trump for President, Inc. (the "Trump Campaign"), the presidential campaign of then candidate Trump, in order to, among other things, help manage the delegate process for the Republican National Convention. In May of

2016, Manafort became chairman of the Trump Campaign. In June of 2016, Manafort reportedly became *de facto* manager for the Trump Campaign with the departure of prior campaign manager Corey Lewandowski. On August 19, 2016, after public reports regarding connections between Manafort, Ukraine, and Russia – including an alleged "black ledger" of payments from the Party of Regions to Manafort – Manafort left his post as chairman of the Trump Campaign.

### A. Manafort's Work for Ukraine

9.      The information contained herein is based on public records; bank records and reports; Davis Manafort records; tax filings by Manafort and Richard W. Gates, III, a Davis Manafort employee; the June 2017 filing by DMP International, LLC, Manafort, and Gates under the Foreign Agents Registration Act (FARA); and statements by            Gates, and      to the FBI, among other things.

10.      Manafort and Gates have been employed for many years through Davis Manafort and related entities as lobbyists and political consultants working both in the United States and internationally. Beginning in or about 2006 and at least until 2014, Manafort provided political and policy services to the Ukrainian Party of Regions, including Viktor Yanukovych, head of the Party of Regions and the President of Ukraine from 2010 to 2014. Gates told the FBI in an interview in July 2014 ("the Gates Interview") that he was hired by Manafort in 2006 and worked on Ukrainian election and policy advice, up to the time of the interview. Gates advised that in 2010, he and Manafort were in Ukraine for over two months leading up to the election that brought Yanukovych to power.

11.    Based on reporting from multiple sources, the FBI believes that Yanukovych's government engaged in systematic public corruption.  The same sources report that corrupt government officials and their allies in the business community during Yanukovych's presidency looted Ukraine's public coffers of millions of dollars and funneled those assets to foreign bank accounts to hide the embezzlement. The current government of Ukraine has sought the assistance of the United States and Cyprus to locate and recover these misappropriated assets. Yanukovych, who fled to Russia in 2014, is currently wanted in Ukraine for numerous criminal violations, including the embezzlement and misappropriation of public property.  In late June 2017, media outlets such as Bloomberg reported that Ukrainian prosecutors had uncovered no evidence of illicit payments to Manafort as part of their investigation into suspected criminal conduct by former Ukrainian officials.  In a statement available on its public website dated June 29, 2017, Ukraine's National Anti-Corruption Bureau of Ukraine (NABU) provided the following context by announcing that it "did not conduct an official investigation regarding Paul Manafort.  He has never been a Ukrainian official, and therefore cannot commit corruption acts, according to the Ukrainian laws. An assessment of the actions of the abovementioned person should be made by the competent authorities of other countries, whose jurisdiction extends to the investigation of the facts of probable offenses."

**B.    Payments from Cypriot Accounts to and for Manafort**

12.    From in or about at least 2008 to at least 2014, payments from bank accounts in Cyprus  – nominally owned by foreign companies – were used to make payments to (a) United States corporate and personal bank accounts controlled by Manafort or Gates and (b) United States vendors for services provided to Manafort or Gates.  During this time period, tens of millions of

dollars from these foreign accounts were paid "directly"[2] and indirectly to Manafort, Gates, and Manafort-related entities.

13.    Based on the evidence set forth more fully below, there is probable cause to believe that Manafort and Gates maintained Cypriot bank accounts held in the names of numerous entities, which include those listed in the chart below:

| Company | Bank Name | Account # | Transaction Example |
|---------|-----------|-----------|---------------------|
| Telmar Investments Limited | Bank of Cyprus PCL Ltd | | On or about June 27, 2014, $250,000 was sent to an account in the name of DMP International LLC at HSBC Bank. |
| Yiakora Ventures Limited | Bank of Cyprus PCL Ltd | | On or about September 2, 2010, $1 million was sent to an account in the name of Global Sites LLC at Wachovia Bank. On or about June 4, 2008, $8 million was sent to an account in the name of Jesand Investment Corporation at First Republic Bank. |
| Lucicle Consultants Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about November 9, 2012, $300,000 was sent to an account in the name of DMP International LLC at JPMorganChase Bank. |
| Actinet Trading Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about August 1, 2012, $70,000 was sent to an account in the name of DMP International LLC at JPMorganChase Bank. |

---

[2] The term "directly" is used to differentiate the "indirect" Manafort payments made to vendors that provided services to Manafort. Wires from Cypriot accounts that were sent to Davis Manafort would also at various times be passed through more than one United States account affiliated with Manafort before being used to pay for Davis Manafort expenses as well as other items.

| Company | Bank Name | Account # | Transaction Example |
|---|---|---|---|
| Black Sea View Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about December 21, 2011, $1 million was sent to an account in the name of Paul J Manafort and Kathleen B Manafort at First Republic Bank. |
| Bletilla Ventures Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about April 10, 2012, $900,000 was sent to an account in the name of DMP International LLC at JPMorganChase Bank. |
| Evo Holdings Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about January 30, 2009, $70,000 was sent to an account in the name of Davis Manafort Partners, Inc. at Wachovia Bank. |
| Global Highway Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about December 23, 2009, $500,000 was sent to an account in the name of Davis Manafort Partners, Inc. at Wachovia Bank. |
| Leviathan Advisors Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about May 27, 2011, $258,000 was sent to an account in the name of Davis Manafort Partners, Inc. at First Republic Bank. |
| Loav Advisors Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about October 7, 2010, $120,000 was sent to an account in the name of Paul J Manafort and Kathleen B Manafort at Wachovia Bank. |
| Lucicle Consultants Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | ███████████ | On or about June 27, 2012, $650,000 was sent to an account in the name of DMP International LLC at JPMorganChase Bank. |

| Company | Bank Name | Account # | Transaction Example |
|---|---|---|---|
| Peranova Holdings Limited | Cyprus Popular Bank (Previously Marfin Popular Bank) | | On or about February 1, 2012, $1.5 million was sent to an account in the name of DMP International LLC at First Republic Bank. |
| Telmar Investments Limited | Eurobank Cyprus Ltd | | On or about January 16, 2014, $500,000 was sent to an account in the name of DMP International LLC at HSBC Bank. |
| Actinet Trading Limited | Hellenic Bank PCL Ltd | ; | On or about April 8, 2013, $200,000 was sent to an account in the name of DMP International LLC at HSBC Bank. |
| Bletilla Ventures Limited | Hellenic Bank PCL Ltd | | On or about March 1, 2013, $300,000 was sent to an account in the name of Symthson LLC at JPMorganChase Bank. |
| Lucicle Consultants Limited | Hellenic Bank PCL Ltd | | On or about February 15, 2013, $500,000 was sent to an account in the name of Symthson LLC at JPMorganChase Bank. |

14.    The FBI has obtained bank records that evidence that Manafort controlled and/or held executive positions at the following United States entities, which received tens of millions of dollars from the above-listed financial accounts in Cyprus between at least 2008 to at least 2014:

       (1) Davis Manafort Partners, Inc.;
       (2) DMP International LLC;
       (3) Global Sites LLC; and
       (4) Jesand Investment Corporation[3].

---

[3] Jesand Investment Corporation was incorporated in Virginia in 2002 and dissolved in 2013. It lists its addresses as Manafort's addresses in Alexandria, Virginia and Palm Beach Gardens, Florida.

Bank records also reflect that Gates held signature authority over the account in the name of Symthson LLC[4].

15.     In addition, bank records evidence that millions of dollars were wired directly from the Cypriot accounts to pay vendors for goods and services provided to and for Manafort. For instance, funds from these foreign accounts were used to rent a villa in Italy at which the Manaforts vacationed (over $49,000), to pay for rugs (over $360,000), to pay for landscaping services for the Manaforts (over $395,000), and to pay two separate clothiers for Manafort (over $400,000 and $360,000 respectively). The records for one of the clothiers – Alan Couture – evidence that Manafort was aware of and controlled these foreign wire payments, as he noted to the vendor in two spring 2011 emails that the vendor would be paid shortly from the Leviathan Holdings Cypriot account, noted above.

16.     ▇▇▇▇▇▇▇ Gates have both told the FBI in interviews in 2014 that they were paid for their work for the Ukrainian Party of Regions through Cypriot bank accounts. ▇▇▇

▇▇▇▇▇▇. In the Gates Interview, Gates admitted he was directed to open accounts in Cyprus by President Yanukovych's Chief of Staff Boris Kolesnikov. He was told it was easier for them to be paid from one Cyprus account to another Cyprus account. Gates said that various oligarchs

---

[4] Smythson LLC was incorporated in Delaware in 2008. Note that bank accounts for this company were opened under the name "Symthson," using addresses listed for Manafort in other of his companies.

would chip in to pay them for their consulting work.  Gates identified Lucicle, Bletilla, Leviathan, and Global Endeavor (among others) as accounts opened to receive such payments.

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ And in March 2017, in response to press reports concerning a written annual contract between Manafort and Deripaska, Manafort publicly confirmed that he had provided investment consulting services to Deripaska interests. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[5] John Hannah, LLC was located at the same address as Davis Manafort, Inc. – ████████████ ████████████████████████, and received mail there.  The company also received mail at the Manafort home in Florida. ████████████████████████████████ ████████████████████████████  Manafort declared on his tax returns, discussed below, income from John Hannah, LLC.

C.    **Manafort and Gates Tax Returns**

18.    There is probable cause to believe that Manafort failed to properly disclose to the United States government his relationship to the Ukrainian Party of Regions, the income he received (directly or indirectly) as a result of his work for that party, and the existence of foreign accounts in which he held a financial interest (and into which payments from Ukrainian politicians were deposited, as discussed above).

19.    Pursuant to a tax order from the Eastern District of Virginia (Buchanan, J.) dated April 14, 2017, the FBI has obtained and reviewed, among others, the tax returns for Manafort and Gates for 2009-2014.  In all of the tax returns, Manafort and Gates submitted a Schedule B form, which required them to declare whether they have "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  Each year, Manafort and Gates declared "No."  That same form also contained a cross-reference to the requirement to file a Report of Foreign Bank and Financial Accounts (FBAR) to report overseas financial interests or signature authority.  An FBAR filing is required, on a yearly basis, if a United States person has a financial interest in or signatory authority over at least one financial account located outside the United States and at least $10,000 in aggregate value in foreign accounts at any time during the calendar year.  As discussed above, there is probable cause to believe that Manafort and Gates had a financial interest, in excess of $10,000, in various accounts in Cyprus in at least 2008-14.  A review of data from the Financial Crimes Enforcement Network (commonly known as FinCEN) shows that Manafort and Gates have not filed an FBAR for at least the years 2008 to the present.

11

20.     A search of the United States Department of Justice database of all agents currently or previously registered under FARA, conducted in July 2017, also discloses that Manafort, Gates, and their affiliated entities, including Davis Manafort, failed to register as agents of a foreign government until June 27, 2017.[6]  As long-time lobbyists, Manafort and Gates would know about the FARA requirements.  Indeed, in email communications between Gates and ████████ (a United States lobbying and public affairs firm), concerning joint Ukraine work, Gates demonstrated that he was clearly aware in 2012 of FARA filing rules.

21.     In addition, the foreign source income listed in the tax returns for Manafort does not appear to account for the above distributions to or from the Cypriot accounts on his behalf. For instance, the 2009 Manafort tax return indicates $17,736 in gross foreign source income; in 2010, $42,789; in 2011, $165,871; in 2012, $129,777; in 2013, $38,375; and in 2014, $39,468.

22.     The bank records, however, reveal the following:

- In 2008, the Cypriot accounts transferred at least $3,500,000 to accounts in the joint names of Paul and Kathleen Manafort and transferred at least $9,000,000 to accounts of United States entities affiliated with Manafort.

- In 2009, the Cypriot accounts transferred at least $1,500,000 to accounts in the joint names of Paul and Kathleen Manafort, transferred at least $35,000 to accounts in the names of Manafort's relatives, transferred at least $3,000,000 to accounts of United States entities affiliated with Manafort, and transferred at least $200,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2010, the Cypriot accounts transferred at least $2,000,000 to accounts in the joint names of Paul and Kathleen Manafort, transferred at least $80,000 to accounts in

---

[6] The database is publicly available at https://www.fara.gov/.

the names of Manafort's relatives, transferred at least $6,000,000 to United States entities affiliated with Manafort, and transferred at least $600,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2011, the Cypriot accounts transferred at least $1,800,000 to an account in the joint names of Paul and Kathleen Manafort, transferred at least $30,000 to an account in the name of a Manafort relative, transferred at least $3,000,000 to an account of a United States entity affiliated with Manafort, and transferred at least $500,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2012, the Cypriot accounts transferred at least $200,000 to an account in the joint names of Paul and Kathleen Manafort, transferred at least $8,500,000 to accounts of United States entities affiliated with Manafort, and transferred at least $1,000,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2013, the Cypriot accounts transferred at least $2,500,000 to accounts of United States entities affiliated with Manafort and transferred at least $1,000,000 to accounts of third parties as payment for the benefit of Manafort.

- In 2014, the Cypriot accounts transferred at least $5,000,000 to accounts of United States entities affiliated with Manafort.

23.     There appears to be no legitimate business reason for these transactions, which appear to pass funds from a Ukrainian political party through more than one Cypriot bank account; have payments made directly to United States vendors from the Cypriot accounts; and pass money brought onshore from Cyprus through multiple United States accounts. Based on my training and experience, these transactions evidence in my view the crimes of tax evasion and money laundering to conceal the origins of the funds paid to Manafort and Gates.

13

### D.     The Subject Device

24.     There is also probable cause to believe that the Subject Device contains evidence, fruits, and/or instrumentalities of the Subject Offenses described above. ███████



These business records are directly relevant to the Subject Offenses discussed above.[7]

25.     Such records are particularly valuable since counsel for Manafort has informed the United States Department of Justice that at least as of November 23, 2016, DMP International, LLC purports to have an "Email Retention Policy" which results in its not retaining "communications beyond thirty days." In spite of its title, the policy purports to cover not just email, but "information that is either stored or shared via electronic mail or instant messaging technologies, and documentation residing on any computer or server."

26.     The contents of the Subject Device are also confirmed by the following events. In the winter of 2017, ███████████████████████████████████ ██████████████████████████████████ The article reports that Davis Manafort records demonstrate that at least two payments were made to Davis Manafort that

---

[7] Even assuming *arguendo* the applicability of a five-year statute of limitations to the subject conduct (*i.e.*, the most conservative assumption), business records for Davis Manafort from 2011 and earlier would be relevant to conduct falling within the past five years (including payments from Cypriot accounts to Davis Manafort in 2013 and 2014). For example, such records would be relevant to Manafort's interest in, and control over, the Cypriot accounts; his knowledge and intent with respect to disclosures (or non-disclosures) to the United States government respecting the Cypriot accounts; and the identity of others involved.

correspond to payments noted in the Ukrainian handwritten "black ledger" (discussed above). That ledger on its face seemed to detail payments to Manafort. It was first reported on in August 2016 and led to considerable press attention, shortly after which Manafort announced he would leave the Trump Campaign. In August 2016, Manafort issued a statement asserting that he had "never received a single 'off-the-books cash payment'" and denying that he had "ever done work for the governments of Ukraine or Russia." After the April 12, 2017 Associated Press article, Manafort through a spokesman said that he had been paid according to his clients' "preferred financial institutions and instructions."

27.     In the same April 12, 2017 article, Manafort's spokesman said that Manafort intended to register as a foreign agent pursuant to FARA as a result of his political work in Ukraine, which (as noted above) Manafort had previously failed to do. DMP International, LLC, Manafort, and Gates subsequently made their FARA filings on June 27, 2017 for the years 2012-14 based on work for the Ukrainian Party of Regions (no other principal for whom they performed work is identified in the filings, nor do the filings address the time period prior to 2012). The filings check off the box indicating that there was no formal written contract or exchange of correspondence between the parties, *i.e.*, between the Party of Regions and DMP International, LLC, Manafort, and Gates. In such circumstances, the FARA form requires the filer to "give a complete description" of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received." The June 2017 filings provide none of that information. In the Gates Interview, however, Gates said that Manafort and he used "standard English" common law contracts for their Ukrainian work and would invoice the customer for payment.

28.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Based on my discussions with computer experts

and my experience and the information set forth in paragraphs 26-27 above, I believe it is likely that information from the Subject Device, including but not limited to payment records, will be retrievable irrespective of when the data was created.

29.     Based on the foregoing, I respectfully submit there is probable cause to believe that the Subject Offenses have been committed and that there is probable cause that evidence of the Subject Offenses is to be found on the Subject Device.

## III.  Procedures for Searching ESI

### A.  Review of ESI

30.     Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Device for information responsive to the warrant.

31.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data,

yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

32.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a review of all the ESI from the Subject Device to locate all data responsive to the warrant.

**B.  Return of the Subject Device**

33.     Because the Subject Device was validly obtained by grand jury subpoena, it will not be returned until such time that it is determined that it will not be useful to have the data on the device. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**IV.  Conclusion and Ancillary Provisions**

34.     Based on the foregoing, I respectfully request the Court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

35.     In light of the confidential and highly sensitive nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Respectfully submitted,

Special Agent
Federal Bureau of Investigation

Sworn to before me on
July /, 2017

HON. BERYL A. HOWELL
UNITED STATES DISTRICT JUDGE

18

**Attachment A**

## I. Device Subject to Search and Seizure

The device that is the subject of this search and seizure warrant (the "Subject Device") is described as follows:

a hard drive with serial number WXB1AA006666.

## II. Review of ESI on the Subject Device

Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence, fruits, and instrumentalities of the Subject Offenses" described as follows:

1.     Evidence relevant to the identity or location of the owner(s) or user(s) of the material contained on the Subject Device;

2.     Evidence relevant to the locations and movements of, and communications between, Manafort, Gates, or employees, agents, or clients of the same or their companies;

3.     Evidence relevant to any false statements, pretenses, representations, or material omissions in connection with communications with the Department of Justice, the Internal Revenue Service, tax preparers, accountants, or banks;

4.     Any and all financial records for Paul Manafort Jr., Richard W. Gates III, and associated Davis Manafort business entities, including but not limited to records relating to foreign financial accounts and records relating to payments by or on behalf of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

5.     Records relating to efforts by Manafort, Gates, or their affiliated entities to conduct activities on behalf of, for the benefit of, or at the direction of any foreign government, foreign officials, foreign entities, foreign persons, or foreign principals;

6.     Evidence relevant to any money, financing, position or thing of value being offered or given to Manafort, Gates, and employees, agents, or clients of the same or their companies;

7.     Evidence relevant to FARA violations, FBAR violations, false reports, fraud, money laundering, and tax violations, involving Manafort, Gates, or their companies; and

8.     Evidence relevant to identifying any other locations capable of storing electronic data, financial accounts, or locations where any physical items may be stored under the control of Manafort, Gates, their companies, or any coconspirators, along with any password, account name or number, or other means of access to such accounts or locations.