# Exhibit A

1

```
 1                  UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3   -----------------------------x
                                  :
 4   UNITED STATES OF AMERICA,    : Criminal Action No.
                                  : 1:18-CR-83
 5            versus              :
                                  :
 6   PAUL J. MANAFORT, JR.,       :
                                  : July 23, 2018
 7                 Defendant.     :
     -----------------------------x
 8
                   TRANSCRIPT OF MOTIONS HEARING
 9          BEFORE THE HONORABLE T.S. ELLIS, III
                  UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     FOR THE GOVERNMENT:         UZO ASONYE, ESQ.
12                               GREG ANDRES, ESQ.
                                 BRANDON LANG VAN GRACK, ESQ.
13                               US Attorney's Office
                                 2100 Jamieson Avenue
14                               Alexandria, VA 22314

15   FOR THE DEFENDANT:          JAY ROHIT NANAVATI, ESQ.
                                 Kostelanetz & Fink LLP
16                               601 New Jersey Avenue NW
                                 Suite 620
17                               Washington, DC 20001
                                    and
18                               THOMAS ZEHNLE, ESQ.
                                 Miller & Chevalier, Chartered
19                               900 Sixteenth St NW
                                 Washington, DC 20006
20                                  and
                                 KEVIN DOWNING, ESQ.
21                               Law Office of Kevin Downing
                                 601 New Jersey Avenue NW
22                               Washington, DC 20001

23   ALSO PRESENT:               RICHARD WESTLING, ESQ.

24   OFFICIAL COURT REPORTER:    TONIA M. HARRIS, RPR
                                 U.S. District Court, Ninth Floor
25                               401 Courthouse Square
                                 Alexandria, VA 22314
```

U.S. v. Manafort

2

TABLE OF CONTENTS
MISCELLANY

Preliminary matters................................. 03
Motions............................................. 04
Court's continuance ruling.......................... 29
Court's motion in limine ruling..................... 40
Certificate of Court Reporter....................... 57

U.S. v. Manafort

3

# **P R O C E E D I N G S**

1

2  (Court proceedings commenced at 11:28 a.m.)

3          THE COURT:  Good morning.  You may call the first

4  matter.

5          THE DEPUTY CLERK:  United States versus Paul J.

6  Manafort, Jr., Criminal Case No. 1:18-CR-83.

7          Counsel, please note your appearance for the record.

8          MR. ANDRES:  Good morning, Your Honor.  Greg Andres,

9  Uzo Asonye, and Brandon Van Grack for the Government.

10          THE COURT:  All right.  Who will be heard today?

11          MR. ANDRES:  Excuse me?

12          THE COURT:  Which of the three of you will be heard?

13          MR. ANDRES:  I think we're going to handle different

14  issues, Judge, so all three of us may be speaking.

15          THE COURT:  Well, I'm going to hear your continuance

16  argument first.  There are a number of other matters, which I

17  may postpone until I deal with other matters this morning and

18  will be the afternoon.

19          MR. ANDRES:  Understood.  Mr. Asonye is going to

20  deal with that issue, Judge.

21          THE COURT:  All right.  And for the defendant.

22          MR. DOWNING:  Good morning, Your Honor.  It's Kevin

23  Downing, Thomas Zehnle, Jay Nanavati, and Rich Westling for

24  the defendant, Paul Manafort.

25          THE COURT:  All right.  And who will argue today on

U.S. v. Manafort

4

1  the continuance?

2          MR. DOWNING:  I will.

3          THE COURT:  All right.  Thank you.  In fact, you may

4  begin.  I have your briefs, so I'm aware of what you've said

5  in the briefs.  And I'm also aware of the Government's.

6          When were they filed?

7          MR. ASONYE:  The response was filed on July 11.

8          THE COURT:  All right.

9          MR. ASONYE:  We filed a motion -- a response to a

10 supplemental motion in limine yesterday, Your Honor.

11         THE COURT:  That's right.

12         All right.  Go ahead, sir.

13         MR. DOWNING:  So, Your Honor, just to be helpful to

14 the Court, the Government did produce an exhibit that would be

15 helpful for the Court to be able to take a look at the volume

16 of materials that have been produced.

17         THE COURT:  I have that.  I already have that.

18         MR. DOWNING:  You have it.  Okay.  There's a revised

19 one, Your Honor.

20         THE COURT:  Revised as of when, Mr. Asonye?

21         MR. ASONYE:  Your Honor, this -- the revised one

22 includes all of the Government's productions up to date.  So

23 we have made a -- I believe, two additional productions

24 since --

25         THE COURT:  All right.

1        MR. ASONYE:  -- July 11.

2        THE COURT:  I will look at it.

3        (A pause in the proceedings.)

4        THE COURT:  I think what I got is more helpful.

5        Let me ask you this --

6        MR. DOWNING:  Your Honor, it might be helpful -- not

7   to go through every entry on here, but --

8        THE COURT:  Oh, no, I don't intend to go through

9   every entry, but I think the only one that's really pertinent

10  is the 20,000 documents in July.  Am I correct?

11       MR. DOWNING:  Well, I would point out the Gates

12  MacBook has 40,000 pages.  The Gates -- the second part of the

13  Gates file has 30,000 separate documents.  And there's an

14  entry here from 7/6, NKSFB is the bookkeeping company that

15  handled the bookkeeping for Mr. Manafort and his businesses,

16  and that's 49,000 pages.

17       So even if we forgot everything else, I think if the

18  Court concentrated on those items, that's about 120,000 pages

19  of documents that we have to go through.  I mean, some of

20  these other ones, I mean, the Yankees, I don't know how

21  pertinent all that is.  But as it pertains to Mr. Gates and as

22  it pertains to the bookkeeping company, there's 150,000 --

23  120,000 -- excuse me -- right there.

24       THE COURT:  Do you agree with that, Mr. Asonye?  I

25  may be mistaken, but I think the heart of this request for a

U.S. v. Manafort

6

1   continuance has been dated now within the last month.

2           MR. ASONYE:  Yes, Your Honor.  And to be clear, and

3   we've communicated this to defense counsel, the Gates devices

4   do not contain any e-mails.  What's on those documents are

5   images, pictures, perhaps search results, data that is

6   contained in actual like apps, data apps.

7           There are no e-mails.  The Government has produced

8   all of -- previously produced Mr. Gates' e-mails.  And if

9   there are any e-mails included in that, in any of the devices,

10  they were previously produced.  So --

11          THE COURT:  What is the size of the volume of

12  documents provided to the defendant in early July?  July 6, I

13  think, was the last provision of documents.  I think it was

14  20,000.  Am I correct?

15          MR. ASONYE:  There was -- yes, Your Honor.  The

16  NKSFB production, which is 20,000, that's the financial

17  records that -- on July 6.  However, Your Honor, our

18  understanding is that the defendant previously would have had

19  access to those records.  They are records of his own

20  accounting firm.

21          And the reason the Government got them so late was

22  that there was a privilege issue.  My understanding is that

23  the defense counsel had to go through those documents to pick

24  out what was privileged and what was not before it came to the

25  Government and then we literally just reproduced it back.

─U.S. v. Manafort─
7

1          THE COURT:  So what is the volume of documents, the

2     last volume of documents that you provided of any size?

3          MR. ASONYE:  Your Honor, since --

4          THE COURT:  Was it the 20,000 documents on the 6th

5     of July?

6          MR. ASONYE:  There have been two additional

7     productions since the 6th of July.

8          The best date I have, Your Honor, is since the

9     defendant was incarcerated in mid-June, the Government has

10    produced 69,000 total new documents.  Again, 20,000 of those

11    documents, we understand, the defendant would have already had

12    access to on its own prior to the Government producing them.

13          And then another 42,000 of those documents, we

14    understand, are Gates -- media on Rick Gates' devices.  But,

15    again, those don't contain any e-mails.  They're pictures,

16    they are data in actual applications on the phone and on his

17    MacBook and his iPad.

18          So, again, what I think the defendant --

19          THE COURT:  Does the Government intend to offer into

20    evidence any part of that?

21          MR. ASONYE:  I don't -- currently on the

22    Government's exhibit list, I don't believe we have any

23    information from those devices.

24          THE COURT:  Confirm that.

25          MR. ASONYE:  I will confirm that.  My paralegal is

─────U.S. v. Manafort─────

8

1   telling us that at this time the Government's exhibit list

2   does not contain any information from those Gates devices.

3           THE COURT:  All right.  Let me see if I have your

4   representation accurately.

5           You say that 20,000 documents were produced on the 6

6   of July.  Those documents were documents of the defendant from

7   his accountant and the reason that you relate on those,

8   if that's an accurate characterization, is that the defendant

9   had asserted a privilege and ultimately had to go through

10  those documents to determine which were not privileged and

11  which were.

12          Is that correct?

13          MR. ASONYE:  That's correct, Your Honor.

14          THE COURT:  And so the result of that effort was

15  that 20,000 documents were not privileged and --

16          MR. ASONYE:  Were reproduced --

17          THE COURT:  -- were produced to the Government, then

18  the Government, in turn, produced those to the defendant.  Do

19  I have that right?

20          MR. ASONYE:  Yes, Your Honor.

21          THE COURT:  Now, what is this Gates material?

22          MR. ASONYE:  So there are a number of Gates's

23  devices.  He -- the Government produced four phones or iPads

24  and essentially his laptop.  Those devices had previously

25  been -- the e-mails had previously been extracted and produced

9

1    to defense counsel.

2            So my understanding is that these devices do not

3    contain any e-mail.  They contain largely images and data that

4    are found on applications on those phones.

5            THE COURT:  All right.

6            MR. ASONYE:  So the suggestion is they are not as

7    relevant, Your Honor.

8            THE COURT:  All right.  I -- you keep saying "your

9    understanding."  My understanding is that when you tell me

10   something like that, you are making a representation to the

11   Court as to what it is.  So I wanted you to understand that

12   clearly.

13           All right.  So I take it the Government has had

14   access to this Gates stuff for quite a long time.

15           MR. ASONYE:  Your Honor, in one sense there's a

16   taint team that does a privilege review and also because

17   Mr. Gates did have counsel prior to pleading in this case, and

18   so we are turning over producing materials to us as soon as we

19   have them, but there is an additional step before the

20   prosecution team itself actually gets these documents.  And so

21   as soon as we receive them from taint review, we produce them.

22           THE COURT:  All right.  So before I ask counsel to

23   continue with the argument , let me be sure I have this right.

24   We talked about the 20,000.  We've talked about the Gates

25   material.  What is this figure of 40,000?

U.S. v. Manafort

10

1          MR. ASONYE:  Your Honor, I believe the 40,000 is if

2    you add up the total amount of documents -- we call them

3    "documents," but data on the Gates laptop, iPhones, and iPads,

4    you get to around 40,000 -- we call them documents.

5          THE COURT:  And you're saying that the materials in

6    addition to the 20,000 are not e-mails.  But are they still

7    documents with information on them?

8          MR. ASONYE:  They are -- Your Honor, some of them

9    can be -- for example, on an iPhone or a iPad, there's an

10   application called "Notes."  And so there may be -- someone

11   can type in notes in that application.  It is not

12   communications necessarily.  It's a way to save notes to

13   yourself.

14          There could be -- I mean, there are various

15   applications on a phone where information can be stored.  And

16   so I want to be clear, Your Honor, we know that they are not

17   e-mails, they are not new e-mails.  But there may be notes.

18   There may be -- there could be documents.  You could store

19   some more documents on your phone.

20          But my understanding is that the overwhelming

21   majority of the data on those devices are images, are pictures

22   from when you go to a website and you search, it may download

23   onto your laptop or onto your phone an image from that

24   website.  That's my understanding what is contained -- the

25   vast majority of data contained on that.

1          Your Honor, if I could add one other -- just one

2    other issue on the accountant's information and the privileged

3    review.  That privilege issue was raised with defense counsel.

4    They were -- they had access to those documents in -- last

5    summer, in July of '17.

6          So this isn't a recent issue.

7          THE COURT:  What documents?

8          MR. ASONYE:  The 20,000 documents from the

9    accountants.  The Government and defense counsel were dealing

10   with this issue in the summer, last summer.  So he's had them

11   for -- essentially he's had access to them for essentially a

12   year.

13         THE COURT:  And how long has he had access to the

14   documents off the Gates devices?

15         MR. ASONYE:  The Gates -- well, the first Gates

16   device was produced June 20, 2018.  Another Gates device was

17   produced July 17th.  And then on July 20th, the Government

18   produced a small -- smaller production from Gates devices.

19         And, again, Your Honor, we produce those as soon as

20   they come out from the taint review.

21         THE COURT:  You show that you produced 236 documents

22   on the 20th of July.  That's this past Friday, correct?

23         MR. ASONYE:  Yes.  But, Your Honor, the 236 that

24   you're looking at, that's the page count.  I believe that's

25   actually eight documents, if we're looking at the same line.

1    THE COURT:  All right.  And -- but it's eight

2  documents consisting of 236 pages.

3    MR. ASONYE:  Correct, Your Honor.

4    THE COURT:  Why is that so late?

5    MR. ASONYE:  Some of them, Your Honor, are trial

6  subpoenas that have come in and there's no obligation from the

7  producing entity to produce in advance of the trial.  So we

8  are -- so these aren't materials, Your Honor, that we've had

9  and we've just been sitting on.  They're -- they've -- we

10 produced them as soon as we receive them, either from taint or

11 from the producing entity.  At times we're in preparation for

12 trial and we're talking to a witness, and they realize that

13 there are additional records that they have in their

14 possession.

15    THE COURT:  Well, those are SunTrust bank documents.

16    MR. ASONYE:  Correct.  I believe that is the result

17 of a trial subpoena.  That is, Your Honor.

18    THE COURT:  Issued by whom?

19    MR. ASONYE:  Issued by the Government.  I will note,

20 Your Honor, I don't believe there's any issue about financial

21 records in this case because the parties have been

22 communicating.  And we've already stipulated to the

23 authenticity of all financial records, all domestic financial

24 records.  A lot of these -- a lot of these financial records,

25 we've already produced.  We had it from a vendor who had their

─────────U.S. v. Manafort─────────

13

1   bank record.

2          And out of the abundance of caution, the Government

3   subpoenaed the actual bank record from their financial

4   institution just to be safe.  But I don't believe there's any

5   dispute that the vendor's record that they -- their -- the

6   copy of their bank statement is actually authentic, which is

7   why we believe we've been able to stipulate with defense

8   counsel that financial institution records are authentic and

9   business records.

10         THE COURT:  All right.

11         MR. ASONYE:  So I don't think they need to review

12  those records.

13         THE COURT:  All right.  Thank you, Mr. Asonye.

14         Mr. Downing?

15         MR. DOWNING:  Your Honor, the issue about NKSFB, the

16  49,000 pages, so those are documents of a bookkeeping company,

17  not the accountants.  And just to be clear, since the first

18  subpoena was --

19         THE COURT:  So what's the difference?

20         MR. DOWNING:  Well, I'm getting to the point.  We

21  have not had access to any of these records, any of them, and

22  we have not been part of any privilege review with respect to

23  NKSFB.  And so I don't know where that comes from.

24         THE COURT:  All right.  Let's find out.  Mr. Asonye,

25  return.

─────────────── U.S. v. Manafort ───────────────

14

1          MR. ASONYE:  Your Honor, my understanding is that

2  Mr. Manafort was, at one time, represented by a different law

3  firm, Wilmer Cutler Pickering, and that the privileged

4  discussion was with that law firm.  So we would -- we would

5  have assumed that Mr. Manafort's prior counsel relayed that

6  information to his current counsel.  But they had access to

7  it.

8          MR. DOWNING:  And, Your Honor, to be clear, I came

9  on board in September.  And I can tell you since September of

10  2017, we had no access to these records, none.

11          THE COURT:  All right.  Did you talk to Wilmer

12  Cutler?

13          MR. DOWNING:  Wilmer Cutler did not have the records

14  either.

15          THE COURT:  How can you say that?  I asked you:  Did

16  you speak to them?  And you're already telling me they didn't

17  have access.  So you --

18          MR. DOWNING:  Well, I was cutting to the chase.

19          THE COURT:  -- must've spoken to them.

20          MR. DOWNING:  I was cutting to the chase.  The issue

21  that came up is this company, when they --

22          THE COURT:  Did you speak to Wilmer Cutler when you

23  assumed this representation?

24          MR. DOWNING:  I did.

25          THE COURT:  And were you advised that a privilege

──────U.S. v. Manafort──────

15

1  review had occurred?

2         MR. DOWNING:  I was not.  But I'm addressing a

3  different issue.  There was a privilege --

4         THE COURT:  All right.  And I do want you to address

5  that, but I want to finish mine.

6         Mr. Asonye, what was your point?  You say Wilmer

7  Cutler did do a privilege review?

8         MR. ASONYE:  Yes, Your Honor.  Before those records

9  were produced to the Government, Wilmer Cutler Pickering had

10  done a privilege review.  So quite frankly, the Government was

11  under the impression that the defendant had access to these

12  records.  Again, as -- so -- however, out of the abundance of

13  caution, making sure that we have produced all records in our

14  position as -- possession as we've had them, we reproduced

15  these records that we assumed they already had and had gone

16  through because his prior counsel has conducted a privileged

17  review of these very documents.  And that was the first time

18  that we've heard they'd never seen them.

19         THE COURT:  Well, this particular --

20         MR. ASONYE:  This --

21         THE COURT:  -- counsel has not seen them.

22         MR. ASONYE:  Correct, Your Honor, yes.

23         THE COURT:  Did Wilmer Cutler have physical

24  possession of the documents?

25         MR. ASONYE:  I -- Your Honor, I don't know the

────U.S. v. Manafort────

16

1    answer to that.  I would assume in order to do a privileged

2    review of records, that they would have to physically view

3    them.  But we don't know what they did.

4             THE COURT:  And what documents do you understand

5    we're talking about now, Mr. Asonye?

6             MR. ASONYE:  These are -- if Your Honor looks at

7    the -- these are records from NKSFB.

8             THE COURT:  49,000 pages?

9             MR. ASONYE:  That's the 49,000 pages, the 20,000

10   documents.

11            THE COURT:  And what is NKS. . .

12            MR. ASONYE:  It's the -- it's the bookkeeper,

13   Your Honor, of Mr. Manafort.  It's their records.

14            THE COURT:  All right.  Thank you.  Let's go back to

15   Mr. Downing.

16            Mr. Downing, you're telling me that you didn't have

17   any access to NKSF [sic] bookkeeping records, Mr. --

18            MR. DOWNING:  Correct, Your Honor.

19            THE COURT:  Really?

20            MR. DOWNING:  Yes.

21            THE COURT:  It's your own bookkeeper.

22            MR. DOWNING:  It's your own bookkeeper until your

23   bookkeeper gets a subpoena from the United States Government

24   and demands --

25            THE COURT:  Until what?

1          MR. DOWNING:  The bookkeeper got the subpoena from

2     the U.S. government, at which point in time the bookkeeper was

3     demanding that we reimburse the bookkeeper for the subpoena

4     production.  We did not do that and they refused to turn the

5     records over to us so --

6          THE COURT:  And what steps did you take?

7          MR. DOWNING:  We had communications with the

8     bookkeeper on more than one occasion to get the files back --

9          THE COURT:  Well, go to court and get the documents.

10    They belong to your client.

11         MR. DOWNING:  Well, we thought we'd get them in

12    discovery, Your Honor.  It's a lot cheaper.

13         THE COURT:  No.  It depends on how you calculate the

14    expense other than dollars and cents.

15         MR. DOWNING:  Your Honor, I'd just point out between

16    Mr. Gates and NKSB -- NKSFB, I mean, these are -- this is the

17    heart of the case.  These are items that we have to go

18    through.

19         THE COURT:  Why do you say that the Gates matters

20    that have now been produced to you are the heart of the case

21    when the Government says they're not even citing any of them

22    in their exhibits?

23         MR. DOWNING:  Well, one, I believe Mr. Gates is --

24    who I'm referring to as at the heart of the case.  And number

25    two, the Government --

U.S. v. Manafort

18

1          THE COURT:  I'm sorry.  Say that again, sir.

2          MR. DOWNING:  Mr. Gates, as a witness, I'm talking

3   about as being at the heart of the Government's case.

4          THE COURT:  All right.  But not necessarily these

5   documents.

6          MR. DOWNING:  No.  But the Government doesn't

7   necessarily pick for exhibits things that may not be good for

8   the Government's case.

9          THE COURT:  Quite true.

10         MR. DOWNING:  And it's incumbent upon us to review

11  these materials to see.

12         THE COURT:  All right.  Have you started your

13  review?

14         MR. DOWNING:  We have.

15         THE COURT:  Which one is this on here?

16         MR. DOWNING:  So it's Gates MacBook on 7/2, 40,000

17  pages.  And then Gates load ready (ph) on 7/17, 30,000

18  documents.  And then the NKSFB is on July 6th.

19         THE COURT:  Now, what is this New York Yankees?

20  You're adding that in the documents and that doesn't add up.

21  New York Yankees doesn't have anything to do, does it, with

22  this case?

23         MR. DOWNING:  I believe it does, Your Honor.

24         THE COURT:  And how?

25         MR. DOWNING: It's a item with respect to one of the

1  loan fraud counts.

2  　　　　THE COURT:  So tell me again, Mr. Downing, what

3  documents you're now reviewing that you don't think you have

4  enough time to review before this trial starts?

5  　　　　MR. DOWNING:  The two entries for Gates on 7/2,

6  40,272 pages.

7  　　　　THE COURT:  Just a moment.

8  　　　　(A pause in the proceedings.)

9  　　　　THE COURT:  All right.  What else?

10  　　　　MR. DOWNING:  NKSFB on 7/6, 49,016 pages.  And the

11  go -- Gates load ready on July 17th.  It looks like 30,000

12  documents.  I don't know how many pages.

13  　　　　Now, Your Honor, we're reviewing -- we will review

14  all of this.  But I'm just concentrating on those because

15  those are very big items to look at and what I would consider

16  for us to be very important items to look at before we have

17  this trial.  We're going to look at the rest, but I'm not

18  complaining about the rest.  I just want to point out for the

19  Court, that's another 30,000 pages that we're looking at.  But

20  this 120,000 pages is really, I think, at the heart of the

21  issue for us right now.

22  　　　　THE COURT:  All right.  Mr. Asonye?

23  　　　　MR. ASONYE:  Your Honor, I'm just not sure on the

24  Gates devices, what looking at pictures is going to do for

25  their case.  That's what compromise -- that's what constitutes

—U.S. v. Manafort—

20

1  the overwhelming majority of these documents.  We've

2  represented to the Court and that's why we're not using them

3  as trial exhibits, because they're pictures.  And I don't

4  think, to my knowledge, that there are any exculpatory

5  pictures in this case from Mr. Gates' MacBook.  We have

6  already produced all of Mr. Gates' e-mails and we will not be

7  using any e-mails from these productions.  That's what you

8  would --

9        THE COURT:  Well, of course, so that I'm clear, the

10  fact that you're not using something doesn't mean it wouldn't

11  be usable by the defendant.

12        MR. ASONYE:  Correct, Your Honor.

13        THE COURT:  All right.  I think I have a better

14  picture now of what remains to be done.

15        What I'm going to do is to resolve the continuance

16  motion today, but I'm going to have to see you-all this

17  afternoon as well on some other matters.  So I'm going to

18  recess it now.  I'll give you each five minutes, starting with

19  you, Mr. Downing, you're the movant, to say anything further

20  you want in terms of the continuance and then Mr. Asonye.  But

21  I think I have the facts more clearly in front of me now.

22        MR. DOWNING:  Sure, and I won't take five minutes.

23  I just want to point out that Mr. Asonye did state that there

24  are -- some of these images could be notes.

25        THE COURT:  Yes.

21

1      MR. DOWNING:  And not knowing where they are and

2  searching for them is part of one of our issues.  So I just

3  would like the Court to understand that we have to search the

4  whole database to find what it is, may be relevant and it may

5  be notes.

6      THE COURT:  All right.  I think that's -- I

7  understood that point, but I thank you for calling my

8  attention to it.  Anything further, Mr. Asonye?

9      MR. ANDRES:  Not on that issue, Judge.  If we could

10  just -- if I could just raise one other issue before the --

11      THE COURT:  Well, we're going to raise a couple of

12  other issues.  I'm going to have you-all at the bench here in

13  a moment.  But what do you have?

14      MR. ANDRES:  Just a scheduling issue, Judge.  I

15  understand that we have an appearance before Your Honor

16  tomorrow at 9:00 a.m.  There's also an appearance --

17      THE COURT:  Yes, I've talked to Judge Jackson.

18      MR. ASONYE:  Okay.

19      THE COURT:  And she is -- very kindly offered to

20  move her matter to the afternoon.  But, of course, what I do

21  on the continuance may impact that as well.  But I have been

22  in touch with Judge Jackson.  You-all can't be in two places

23  at once, and I would ordinarily defer to her because she was

24  first and she set this hearing and so forth.  But then I was

25  reminded that we're going to do questionnaires tomorrow.  So

─────U.S. v. Manafort─────
22

1  calling off a large number of people was a daunting prospect,

2  and I'm glad Judge Jackson accommodated me on that.

3          MR. ASONYE:  Thank you, Judge.

4          THE COURT:  Let me have counsel for the government

5  quickly at the bench.

6          (Bench Conference.)

7          THE COURT:  I received a number of motions that were

8  under seal, requested to be under seal for these witnesses.

9          Why do they need to be under seal?  These are

10  witnesses, as I understand it, who have been granted immunity

11  by the Government and yet are reluctant to testify or don't

12  want to testify.  And therefore, you're asking the Court to

13  issue an order because you've granted them immunity, use

14  immunity presumably on their testimony.  They still don't want

15  to testify and you want an order.

16          Now, why in the world should all of that be under

17  seal and ex parte?

18          MR. ASONYE:  Your Honor, to be clear, the Government

19  hasn't granted these individuals immunity.  We've sought and

20  received approval from the appropriate officials.

21          THE COURT:  Well, have you told them they now have

22  immunity?

23          MR. ASONYE:  No, we have not.  We told them that --

24          THE CSO:  The Court is still in session.

25          MR. ASONYE:  -- immunity from the Court, which I

─────────U.S. v. Manafort─────────
23

1   understand the Court must grant under the statute.  And the

2   reason it's under seal, Your Honor --

3           THE COURT:  Well, I would grant it only if they

4   refused to testify.

5           MR. ASONYE:  Yes, and we -- they've all indicated

6   that they would assert their Fifth Amendment privilege if they

7   were called to testify without a grant of immunity so --

8           THE COURT:  Yes, but typically the grant of immunity

9   can be given by the Government and there's no court order

10  needed.

11          MR. ASONYE:  Your Honor, we -- and Your Honor is

12  correct and particularly here in this Court and the U.S.

13  Attorney's Office, we often grant immunity by letter.

14          THE COURT:  Yes.

15          MR. ASONYE:  We've made a policy decision in this

16  matter to only do statutory immunity.  In this case, we are

17  not doing letter immunity for a number of reasons, Your Honor.

18  In part, because letter immunity only applies to the office

19  that actually signs it.  So we're seeking the formal immunity

20  from the Court, Your Honor.  And the reason it's under seal,

21  these individuals, their involvement in this case have not

22  been made public.  And the department has a policy, for

23  uncharged individuals, to not name them unless we have --

24          THE COURT:  I don't have that policy and it's going

25  to be public.

U.S. v. Manafort

1         I don't disagree with the policy of the department.

2  It has a different perspective and there are good reasons for

3  it.  But once we're here, everything ought to be in open

4  court.

5         MR. ASONYE:  Your Honor, can I make one other -- one

6  other point?

7         THE COURT:  Yes.

8         MR. ASONYE:  Some of these witnesses we've prepared,

9  out of the abundance of caution, we're prepared to call these

10  witnesses, but there's a chance depending on how the evidence

11  comes in, that we will not call them.  And so again, unsealing

12  these records for a witness who is essentially admitting, at

13  some level, criminal exposure, and then we don't call them as

14  a witness, we're just trying to be thoughtful.

15         THE COURT:  If I do it here in court, I issue an

16  order, it's going to be public.

17         MR. ASONYE:  Oh, no question, Your Honor.

18         THE COURT:  I don't care whether they testify or

19  not.  I understand your reasons for wanting it to be under

20  seal, but I think it is appropriate to identify.  You have a

21  witness list, which I assume you've given to the defendant

22  already?

23         MR. ANDRES:  Not yet.

24         MR. ASONYE:  Not yet.  Usually we do it the day of

25  trial, Your Honor.

U.S. v. Manafort

25

1          THE COURT:  Well, I'm going to make you do it today.

2   Get ready.  How many witnesses are there?

3          MR. ANDRES:  Roughly 30.

4          THE COURT:  Yes, I'm going to have you do it today.

5   Typically, I would have ordered it long before today.  You

6   know, the day before trial is fine if there are three, four,

7   five witnesses.  But 30, no.

8          MR. ASONYE:  Your Honor, we have produced Jenks

9   material to the defense.

10          THE COURT:  So they can guess who is --

11          MR. ASONYE:  Absolutely, Your Honor.

12          THE COURT:  That's good.  We're going to make it

13   clear.

14          Now, let me see, with these people, I'm really

15   deeply concerned about having things under seal.

16          MR. ASONYE:  Understood, Your Honor.

17          THE COURT:  So I think I'm not going to file them

18   under seal.  And how do you suggest I handle it?  Should I do

19   it when the witness is called and then issue an order when the

20   witness is called?

21          MR. ASONYE:  Absolutely.

22          MR. VAN GRACK:  Yes, Your Honor.

23          THE COURT:  All right.  I will do it that way.

24          MR. ASONYE:  Your Honor, that's what the Government

25   anticipated that Your Honor would do, because they -- these

1   orders -- that you would issue the order --

2        THE COURT:  Yes, but I got the sense that you filed

3   it all under seal and you wanted it to be under seal in some

4   sense to limit the embarrassment, potential embarrassment to

5   people and, of course, that has no role to play here.

6        So I'll go ahead and remove the seal.  I'll tell

7   that certain persons have asserted their Fifth Amendment

8   privilege, the Government has decided to provide use immunity

9   for their testimony and if they decline to testify, I will

10  issue an order requiring that they testify on the basis of

11  their having been granted --

12       MR. ASONYE:  So, Your Honor, I just want to make

13  sure I understand.  Will your order identify -- if you issue

14  that order today or tomorrow, will that identify -- will it

15  lift the seal and identify the individual that we sought to --

16  so we'll just notify them in advance.

17       THE COURT:  Right.  It's very harmful to the process

18  to do things under seal.  I don't like doing this.  That's why

19  I'm going to tell them now what we're doing.  It's very

20  important.

21       All right.  Thank you.  And I'm going to consider --

22  well, I'll do this in open court.

23       (Open court.)

24       THE COURT:  All right.  Ladies and gentlemen, the

25  reason we had a bench conference with -- an ex parte bench

27

1  conference with Government lawyers is that the Government has

2  filed appropriately a number of motions seeking court orders

3  to require certain witnesses to testify because the Government

4  has granted them use immunity for their testimony.  So their

5  Fifth Amendment privilege will not preclude them from

6  testifying.  And it is typical in circumstances of that sort,

7  if the witness refuses to testify, for the Court to issue an

8  order requiring the testimony.  And the Court will do that.

9          Now, I don't like doing things at the bench, but

10  that's what I just did.  And I also -- I am taking the seal

11  off of the documents that have been filed.  They will be in

12  the public file, and the persons involved will be identified.

13          Also, I want the Government to provide the defendant

14  today with a list of witnesses, the approximately 30

15  witnesses.  So the defendant will have a list of witnesses

16  today.

17          Now, I am going to consider carefully what you've

18  said in terms of a continuance.  And I will rule on it,

19  probably from the bench this afternoon.  I have a number of

20  other matters this morning and this afternoon as well, I

21  believe; is that correct?

22          So what time does the docket go to this afternoon?

23          (A pause in the proceedings.)

24          THE COURT:  Come back at 2 o'clock.  I will first

25  resolve the continuance motion.  That may affect other things,

U.S. v. Manafort

28

1   but then I will take into -- or I will hear from you on

2   various motions in limine, including some filed last night, by

3   both sides.  But I think it's important to consider those.

4           Yes?

5           MR. DOWNING:  Your Honor, the defense would like to

6   move to excuse Mr. Manafort from this afternoon's hearing.

7           THE COURT:  Yes, of course.

8           MR. DOWNING:  Thank you.

9           THE COURT:  That's quite all right.  He can waive

10  his presence for that.

11          MR. DOWNING:  Thank you.

12          THE COURT:  In fact -- no, I'm not going to seek any

13  further waivers.  He can decide a waiver if he wants to.

14  Tomorrow morning, if we proceed -- I haven't decided it yet --

15  but if we proceed, of course he must be here.  And, of course,

16  he must also be here appropriately clothed.  And -- and I want

17  to accommodate Judge Jackson, so I don't think that will take

18  any more than a hour, but I could be wrong.

19          MR. DOWNING:  Understood.

20          THE COURT:  I'm just going to greet the panel and

21  tell them about the questionnaire and something about the case

22  so that they have that in mind when they proceed to respond to

23  the questionnaire.  And we'll talk more about the

24  questionnaire and the timing of it this afternoon when we meet

25  again.  But this afternoon I intend to take up the motions in

─────U.S. v. Manafort─────

1   limine, and I think there are a number of those.  I'm not sure

2   there's anything else pending, is there?

3            MR. ANDRES:  Not that I'm aware of, Judge.

4            THE COURT:  All right.

5            MR. DOWNING:  Thank you, Your Honor.

6            THE COURT:  All right.  I thank you for your

7   cooperation.

8            It's now -- we're into the next docket.  So I'll

9   ask -- I'll take a brief recess so that the marshals can clear

10  the court.  What's the first case we're going to take up?

11           (Recess.)

12           (Court proceedings continued at 3:07 p.m.)

13           THE COURT:  All right.  I have in mind the

14  appearances.  Counsel are present and prepared to proceed.

15           I have before me a motion for a continuance.  There

16  are equities and good reasons on both sides of this motion.

17           In the end, what I've decided to do is I have

18  decided to postpone the commencement of this case until the

19  31st of July.  In other words, it gives you approximately

20  another week and then we're going ahead.  We will start

21  tomorrow with the juror questionnaires.  You'll have time to

22  review those before I start the voir dire, so that's a plus on

23  your side.  And you will simply have to work hard to complete

24  your review.

25           I have ordered today for the Government to provide

30

1   the defendant with a list of witnesses and a list of exhibits,

2   which I am advised they have done or will do.

3          I have also lifted the seal motions filed by the

4   Government with respect to certain witnesses.  That was what I

5   had the discussion of at the bench.  So if any of you in the

6   courtroom are interested in what went on at the bench, that's

7   what the subject was.  And when it's ultimately transcribed,

8   which will happen at the Court's convenience, you will have

9   access to it.

10          And what I am leaving out today until later, because

11  I want to deal with other matters, are the motions in limine.

12  And then we will proceed to select the jury with voir dire on

13  Tuesday.

14          I will start tomorrow.  And I've already indicated

15  that Mr. Manafort need not be present.  He's not here?

16          MR. ZEHNLE:  No, Your Honor.  Prior to --

17          THE COURT:  I've excused him?

18          MR. ZEHNLE:  You did, Your Honor.

19          THE COURT:  Well, it's not a matter of my excusing

20  him, it's a matter of him waiving his right to be here.  And

21  he has.  I would like for that to be submitted to the Court in

22  writing, please.

23          MR. ZEHNLE:  Yes, Your Honor.

24          THE COURT:  Now, what I intend to do tomorrow, and

25  you can make a decision as to whether he wants to waive or to

U.S. v. Manafort

31

1    be present, is the people will be present.  I will greet them,

2    thank them for their service, give them a thumbnail sketch of

3    the case by way of the superseding indictment, and then tell

4    them they must fill out the questionnaire, advise them that

5    they must do so truthfully and accurately.  And that I will be

6    asking them further questions, both individually and in a

7    group, at the time of when we reconvene.  But I will try to

8    move briskly through the voir dire based on the fact that we

9    have these questionnaires.

10           Obviously, the main part of the voir dire will focus

11   on what they've seen or read or known or know about this case

12   from any source, whatever, whether they formed any opinion of

13   any kind with respect to the case, and whether they can put

14   whatever they have read or seen or heard or -- about this case

15   to one side and judge the case fairly and impartially based

16   only on the evidence and the Court's instructions on the law.

17           That will be the main focus of the voir dire.  A

18   good bit of that voir dire will be conducted at the bench for

19   individuals.  I do that to preserve their privacies as to any

20   information they may have to provide because there may be --

21   for example, some jurors may come forward and tell me why they

22   can't sit for hours at a time because they have this or that

23   condition or something of that order.  I get many of those.

24   And I preserve their privacy as to that.

25           Then, of course, we'll have at that time motions to

1  strike for cause.  We're going to seat 16 jurors.  So there

2  will be -- there will be three extra strikes; is that right?

3  No, two extra strikes.  You get an extra strike for every two

4  additional jurors.  And so as there will be four additional

5  jurors.  After we select the 12, then we will proceed to

6  select four alternates.  And if you saved any strikes, you may

7  then use them.  If you haven't, then whoever is called will be

8  the alternate.  A juror that survives a round is a juror.

9  Cannot be stricken thereafter.

10          In other words, if you have some doubts about

11  striking a particular juror in your peremptory challenges and

12  you say, "Well, I'll think about it and see who else gets

13  seated," that's not the way it's done.  You have one shot at

14  each group.

15          In other words, after -- after we go through the

16  voir dire, the deputy clerk will call 12 names and they'll

17  come and sit, you'll exercise strikes and after that you'll

18  replace the people.  You'll exercise strikes.  And when you're

19  all done with 12, if you have strikes remaining then she will

20  call four additional names.  And any additional strikes that

21  you have remaining you can then exercise.

22          When you make your strike -- I'll probably have to

23  repeat this on Tuesday.

24          When you make your strike, number them and we'll put

25  them on the board here.

33

1          I don't think you should have any serious questions.

2    You -- you've done it before, Mr. Asonye here, am I correct?

3          MR. ASONYE:  Yes, Your Honor.

4          THE COURT:  All right.  Anything further in this

5    matter until we reconvene for the motion in limine?

6          MR. ANDRES:  Judge, just two things just to be

7    clear.  So tomorrow we'll meet and the jurors will get the

8    questionnaires and then we'll pick the jury on July 31st?

9          THE COURT:  That's correct.

10         MR. ANDRES:  Okay.  And then just in addition to the

11   motions in limine, I think each side has added at the Court's

12   invitation some additional questions.  So I'm not sure if Your

13   Honor has a ruling on that or wanted to hear argument or --

14         THE COURT:  Yes, I've looked at them.

15         MR. ANDRES:  Okay.

16         THE COURT:  And I'm not moved.

17         MR. ANDRES:  Understood.  I just wanted to make

18   sure.  Thank you, Judge.

19         THE COURT:  You have your requests in there.  And

20   I'm not forbidding you.  You know, I told you you can

21   participate in three ways:

22         One, you can submit voir dire in advance, which you

23   have both done and which I have reviewed.

24         Second, when I question jurors at the bench and

25   excuse that particular juror to return to his or her seat in

34

1  the courtroom, you may then request that the juror be called

2  back and ask additional questions.

3          And if your questions are narrowly tailored to

4  ferret out some impermissible bias, if I overlook something

5  then I will have the person return, but it's got to be not

6  unduly intrusive.  And I've already been through some of that.

7          Some of your additional questions tried to get to

8  something I've already indicated I'm not going to do.

9          We're not going to inquire into how people voted.  I

10 don't know what you would do with that.  You wouldn't want

11 anybody seated who voted for one side and you wouldn't want

12 anybody seated who voted for the other side.

13         But, of course, people can be fair and impartial no

14 matter who they voted for.

15         So anything further on that matter?

16         MR. ANDRES:  No, Judge.

17         THE COURT:  Now, we will reconvene after I finish

18 the civil docket.  I don't know quite when that will be.  I'll

19 move it along.  And then we will do the motions in limine.

20         MR. ANDRES:  Thank you, Judge.

21         THE COURT:  I'll give you a heads up on one of the

22 motions in limine that was filed this weekend.  Last night or

23 the other night.

24         It is very difficult for me to ascertain or to

25 determine or to make a judgment about whether a particular

35

1  subject matter or a document would be admissible under 402 and

2  403 and so forth just on the basis of a general description.

3  For example, I think the defendant says, "Look, you don't need

4  all this stuff about what work he did for this or that

5  entity."

6         Well, I don't know.  I don't know what his position

7  is going to be on whether he was paid, how much he was paid,

8  and by whom, and whether he's going to deny that he was paid.

9  I just don't know any of those things, so it's very hard to

10  make a judgment about it.

11         But you may be comforted by the fact that I'm not

12  going to allow this trial to drag on and to encompass or to

13  engulf a bunch of irrelevant stuff, or arguably irrelevant,

14  that has little to do with the guilt or innocence and a lot to

15  do with theatre.  I'm not in the theatre business.  You have

16  to be better looking for that.

17         All right.  Thank you for your patience.

18         (Recess.)

19         (Court proceedings continued at 4:36 p.m.)

20         THE DEPUTY CLERK:  United States versus Paul J.

21  Manafort, Jr., Criminal Case Number 1:18-CR-83.

22         THE COURT:  All right.  The record will reflect that

23  counsel are present.  The defendant is not present but he has

24  waived his appearance, and counsel for the defendant will file

25  a pleading determining his waiver.  Thank you.

36

1           Now, this -- the rest of the hearing was for the

2    motions in limine.  Just a moment and I'll have them all

3    before me.

4           The Government seeks to preclude defendant from

5    presenting argument or evidence at trial that the Government

6    was not authorized to prosecute the case.

7           You don't intend to offer or argue or present any

8    such evidence, do you, or argument?

9           MR. ZEHNLE:  No, Your Honor.

10          THE COURT:  All right.  So the motion in limine will

11   be denied as moot based on that representation.

12          Next, the Government seeks to preclude presentation

13   of argument or evidence at trial that the defendant was

14   selectively or vindictively prosecuted.  Does the Government

15   intend to -- I mean, does the defendant intend to present such

16   evidence?

17          MR. ZEHNLE:  Your Honor, may I be heard?

18          THE COURT:  Yes.

19          MR. ZEHNLE:  So in terms of the selective or

20   vindictive prosecution, no, the defendant does not intend to

21   make any arguments.  Those are legal terms of art, as the

22   Court is well aware.

23          The only issue that the defense would raise with

24   respect to this particular motion in limine is where it

25   says -- and I'm quoting from the Government's motion -- "To

U.S. v. Manafort

37

1    prevent the defense from presenting argument or evidence at

2    trial concerning selective or vindictive prosecution or the

3    motive and mandate of the Department of Justice leading to

4    this prosecution."

5            And it's the motive that concerns the defense, Your

6    Honor.  Trying to preclude defense argument, for example, in

7    summation with respect to the motivations.  Especially when

8    this Court has, in open court and in filings, commented upon

9    the motivation of the prosecution of Mr. Manafort in this

10   particular matter.

11           THE COURT:  Well, that doesn't give you license to

12   argue that to the jury.

13           MR. ZEHNLE:  That is correct, Your Honor, but --

14           THE COURT:  So what precisely would you argue about

15   the Government's motive or the Government's selective or

16   vindictive motive here?

17           MR. ZEHNLE:  Again, I just want to make sure -- I'm

18   trying to be clear with the Court.  Selective or vindictive

19   prosecution, understand those are terms of art.  Those should

20   be raised in Rule 12.  There's no argument from the defense

21   that that is appropriately handled in a pretrial matter.

22           The problem is trying to, in a prospective fashion,

23   think about arguments that may come about as evidence as heard

24   in the case or that may be --

25           THE COURT:  Maybe I can shorten this.  I can't

1  anticipate all the evidence that will be offered.  I can't

2  anticipate all the arguments that both sides might make at

3  this point.  But I can ascertain and determine with some

4  accuracy whether the Government or whether the defendant

5  intends to present argument or evidence at trial that the

6  defendant was selectively or vindictively prosecuted.

7           If the answer to that is, no, we don't, then I can

8  deny that motion on the basis of that representation.  And

9  whether or not the Government wishes to renew a more pointed

10  motion based on the evidence it's heard at trial in terms of

11  closing arguments, we can cross that bridge when we come to

12  it.

13           What's -- what's your view, Mr. --

14           MR. ANDRES:  Andres.

15           THE COURT:  Andres, yes.

16           MR. ANDRES:  We argue that the motive of the

17  prosecutor under -- under any circumstances is not --

18           THE COURT:  The what?

19           MR. ANDRES:  The motive of the prosecutor under any

20  circumstances is not appropriate at trial.  That would govern

21  the trial or the facts and the evidence in whether the

22  Government has proved each and every element of the crime by

23  the facts, not the motive or --

24           THE COURT:  I think that's correct.  Even though

25  I've said what I think the motive was, that doesn't mean that

—U.S. v. Manafort—

39

1   it's admissible at trial.  But I can think that there might be

2   circumstances where -- well, I think I can take care of this

3   just by concluding that the Government or that the defendant

4   does not intend to argue that the defendant was selectively or

5   vindictively prosecuted.

6          As far as what motive the Government might have for

7   prosecuting Mr. Manafort, while I agree with counsel that a

8   prosecutor's motive is not typically relevant, if you want to

9   make an argument at the end, I'm going to -- or some other

10  time, I will require that you come to the bench first and

11  we'll hear it in its then living color and I can make a

12  determination.  But typically you don't -- if you're not going

13  to say he was vindictively or selectively prosecuted, that

14  pretty much eliminates any argument that would be pertinent to

15  a prosecutor's motive.  That's your view, isn't it?

16         MR. ANDRES:  Correct, Judge.

17         THE COURT:  All right.  Let's go on.  I'll issue the

18  order that way.

19         And then the third one is that the defendant or --

20  no -- that any Government investigation that preceded Special

21  Counsel's appointment ended with the decision not to prosecute

22  defendant.

23         Do you intend to offer any evidence as to that?

24         MR. ZEHNLE:  Your Honor, I think the defense

25  position on that would simply be that if the prosecution opens

40

1   the door to that kind of discussion that Mr. Manafort was

2   under investigation from years before and attempts to portray

3   that this ongoing investigation from 2014 up until the present

4   day, and I think the defense would say that we should be able

5   to present our version of that.

6           Other than -- other than that, responding to where

7   the Government opens the door, I don't believe the defense has

8   an issue with that.

9           THE COURT:  Well, I'm frankly not even aware that

10  that's a fact.  Namely, that Government investigation

11  preceding Special Counsel's appointment made the decision not

12  to prosecute.

13          Is that a fact?

14          MR. ZEHNLE:  We don't know, Your Honor.  This is the

15  Government's motion.

16          THE COURT:  Well, I can't really determine, but what

17  I'll do is grant the motion in limine with the proviso or with

18  the condition that if trial evidence shows that that then

19  might become relevant is one possibility that occurs to me.

20          Today, I lifted the seal on request by the

21  Government to have orders entered to require certain witnesses

22  to testify after they had been granted use immunity for their

23  testimony but still decline to testify.  I could see possibly

24  it could become relevant if a witness testifies, and the

25  witness will testify pursuant to a grant of use immunity, I

─U.S. v. Manafort─

41

1   take it it would be pertinent or relevant for the defendant to

2   inquire of this witness.  Isn't it true that you asserted a

3   Fifth Amendment privilege?

4           Would it be?  The Government seems to be indicating

5   not.  I think it is.  The jury would be entitled to know all

6   of the circumstances under which a witness is testifying.  All

7   of it.  And then suppose that witness were to say, "Yeah, I

8   didn't want to do it."

9           Why not?  Who knows.  Maybe they'd say because they

10  told me they weren't going to prosecute him some years ago.  I

11  don't know that and I don't know anybody in this courtroom can

12  say that.  I don't think I can rule definitively on that, but

13  it does seem to me that I can say that the motion is granted

14  except that defendant is free to renew its request to offer

15  such evidence, depending on what's offered.  I just don't know

16  what's going to come up.  So I can't -- now that one -- when I

17  do that, though, that means you can't say anything in your

18  opening statement about it or anything of that sort.

19          MR. ZEHNLE:  Understood, Your Honor.

20          THE COURT:  Because it's not a fact.

21          MR. ZEHNLE:  Understood.

22          THE COURT:  You have no idea.  We don't.  I don't.

23  All right.  Then let's go on.  I think that takes care of the

24  Government's motion in limine, does it not?

25          MR. ANDRES:  That's correct, Your Honor.

1          THE COURT:  Then we go to the defendant's motion in

2  limine, which defendant seeks to preclude argument concerning

3  any alleged collusions with the Russian government and

4  defendant's affiliation with the Trump campaign.  The

5  Government, I think, filed a response and said that it didn't

6  intend to offer.

7          MR. ANDRES:  Judge, we did file a response.  As

8  to -- as to Point 1 what we said is we don't intend to admit

9  any evidence about Russia collusion.  But we said that as to

10  Mr. Manafort's involvement in the Trump campaign, that a very

11  small portion of the trial, Counts 29 through 32, deal with

12  his bank fraud relating to a particular bank.

13          And in that instance Mr. Manafort's role in the

14  Trump campaign was relevant because one of the motivations of

15  the chairman of the bank to extend the loan, notwithstanding

16  the fraud, was that he sought and obtained a position in

17  the -- in the Trump campaign from Mr. Manafort and then sought

18  but did not ultimately obtain a position in the Trump

19  administration.

20          THE COURT:  Did this person know that the

21  information submitted was not accurate?

22          MR. ANDRES:  He did.

23          THE COURT:  Doesn't that present you with a problem

24  of fraud since he knew?

25          MR. ANDRES:  It doesn't because the fraud was on the

43

1   bank and not just the individual, Judge.

2            THE COURT:  All right.

3            MR. ANDRES:  But -- but the e-mails and the

4   circumstances relating to these counts, the fact that

5   Mr. Manafort's involvement in the Trump campaign was prevalent

6   throughout.  So we'll try to do it in a discrete way, but it's

7   hard to take out those facts, if not impossible.

8            THE COURT:  All right.  So it seems to me that the

9   proper resolution of this motion about concerning any alleged

10  collusion with the Russian government that the motion about

11  alleged collusions with the Russian government is denied on

12  the basis of -- as moot because the Government has represented

13  that it does not intend and will not offer any argument or

14  evidence of collusion with the Russian government.

15           And then with respect to affiliation with the Trump

16  campaign, that motion would be denied in part and granted in

17  part.  It's denied as to what you just referred to and it

18  is -- that is the bank loan with respect to the banker who

19  went along with the fraud so that he could get a job.

20           And then we come to concern -- the motion to

21  eliminate or to preclude charges filed against defendant in

22  D.C.  It seems to me that should be granted.  There shouldn't

23  be anything except for Gates' plea.  Now, with Gates' plea

24  he's going to testify pursuant to a plea agreement, which will

25  be admitted.  And in that plea agreement, the -- some way or

44

1  other the jury is going to need to know what he pled guilty

2  to.  And presumably he pled guilty to engaging in a conspiracy

3  with Mr. Manafort; is that correct?

4          MR. ANDRES:  Yes, Judge.

5          THE COURT:  So they have to know that.  So that's

6  only part of the D.C. case is -- is here; is that right?

7          MR. ANDRES:  That's right, Judge.  There's one other

8  part but it's related, which is in the plea Mr. Manafort --

9  Mr. Gates pled guilty to two counts.

10         The first one, as you correctly noted, is a

11 conspiracy to conspire with Mr. Manafort as to various crimes.

12         And the second count is a false statement count.

13 And the false statement that Mr. Gates pled guilty to related

14 to some conduct or some activity relating to Mr. Manafort.

15 And, again, we'll do that in a very discrete way and don't

16 intend to harp on it, but Mr. Manafort's name will come up in

17 that context too.  So it's all part of the plea.  It all falls

18 within the scope of his plea being admitted.

19         THE COURT:  So there are two counts he pled to?

20         MR. ANDRES:  Correct.

21         THE COURT:  So those two counts would have to come

22 in?

23         MR. ANDRES:  Correct.

24         THE COURT:  That is, the substance of that.

25         MR. ANDRES:  Correct.

────U.S. v. Manafort────

45

1          THE COURT:  But nothing beyond that?

2          MR. ANDRES:  Nothing beyond that, Judge.

3          THE COURT:  And then the information concerning

4   defendant's recent remand into custody as a result of

5   additional charges in D.C.  That -- the Government doesn't

6   intend to offer anything there, does it?

7          MR. ANDRES:  No, Judge.

8          THE COURT:  All right.  So that's -- that will be

9   denied as moot on the basis of that representation.

10          Now we come to the last matter in limine, which is

11   the matters that were filed last evening by the defendant.  I

12   think you filed a motion.

13          MR. ZEHNLE:  Yes, Your Honor.  We filed it, I

14   believe, on Friday, actually.  I think the response was last

15   night.

16          THE COURT:  All right.  Something happened last

17   night, I know.

18          MR. ANDRES:  It was our response, Judge, but

19   obviously we got the motion on Friday.

20          THE COURT:  All right.  My -- my recollection of

21   that -- and I'm going to let you refresh my recollection, you

22   can stay -- is that you're seeking to preclude the Government

23   from offering evidence about the nature of the work

24   Mr. Manafort did for the Ukrainian government or Ukrainian

25   president; is that right?

─────────────────── U.S. v. Manafort ───────────────────

46

1        MR. ZEHNLE:  That's correct, Your Honor.

2        THE COURT:  And why wouldn't that be relevant --

3   well, let me tell you more about my view so that you can

4   address what I'm thinking.

5        The tax allegations are simply subscribing false tax

6   returns, signing a false tax return.  That is, that you didn't

7   include income that you knew you had and you signed the return

8   knowing that the return was false because it didn't have

9   income you knew you had.

10        Now, sometimes those cases, which are not rare, are

11   pretty easily disposed of because someone has a pay stub, they

12   got paid a certain amount.  There's no denial of that.  And

13   the only question is whether when the person signed it it knew

14   that that money wasn't included in the return.

15        Well, I don't know if we have pay stubs here.  I

16   don't know what the situation is on how Mr. Manafort received

17   money or payment from the Ukrainian government, and I can see

18   how there might be a need for evidence as to what he did for

19   this money if there's a dispute about how much he received or

20   why he received it.  Then, I think, the Government would be

21   entitled to introduce evidence about what he did to receive

22   this money.

23        What's your view?

24        MR. ZEHNLE:  Well, Your Honor, I want to be very

25   clear about this.  I understand exactly what you're saying

1   with respect to the tax fraud charges that have been brought

2   in this case.  And the defense does not take issue with any

3   evidence that the Government seeks to introduce with respect

4   to income items, expense items, things that would obviously be

5   very relevant to determining whether or not there was

6   unreported income on the tax returns.  That's as the Court

7   said.

8          The issue that we had and the reason that we filed

9   this on Friday, was that in first looking through the exhibit

10  list the night before and then upon actually receiving the

11  exhibits, the defense noted that a number of these were

12  essentially just dealing with the strategy, the PR strategy,

13  of these Ukrainian politicians and in a purely Ukrainian

14  matter.

15         Now, to the extent that Mr. Manafort earned income

16  in the Ukraine is not -- is not in dispute.  The reporting of

17  it, whether or not that was actually income, whether that was

18  a loan, things like that, those are things, of course, that

19  the Government does have to prove.  And the defense doesn't

20  have any objection to that because we understand the charges

21  that have been brought.

22         And this is probably my fault, Your Honor, since I'm

23  the one who did it.  We should have attached some of the

24  exhibits so that you can see what we're talking about,

25  strategy memos, PR, public relations memos, things like that,

1   that don't necessarily go to any of the financial issues that

2   are involved in the case before this Court.

3           Indeed, I mean, there's multiple pictures of

4   Mr. Yanukovych, which I don't understand how that would be

5   actually relevant at all to a tax fraud or a bank fraud case

6   in the Eastern District of Virginia.  But we could provide

7   those if the Court wished to address the issues in advance of

8   trial.  I could certainly get these items and present them to

9   the Court.

10          Otherwise, we could take them up on a

11   matter-by-matter basis during the trial.

12          THE COURT:  I may take you up on that.  Let me hear

13   from the Government.

14          MR. ANDRES:  Judge, these exhibits are absolutely

15   relevant.  They are the core of the case as to how --

16          THE COURT:  So you know which exhibits he's talking

17   about?

18          MR. ANDRES:  Yes.  They are the core -- I know the

19   ones that were cited in the brief.  They go directly to how

20   Mr. Manafort made his money.  And he didn't make some money,

21   he made millions and millions of dollars.

22          And so to show both his relationship with President

23   Yanukovych of Ukraine, who was his principal benefactor, to

24   show his interactions with Mr. Manafort during the charged

25   period and how he met Mr. Manafort and the work that they did

1    is important, because that's -- that's how he earned his

2    income.  There aren't bills and invoices and receipts and

3    there certainly are not paychecks.  That income --

4            THE COURT:  Well, how does the money get from the

5    Ukraine to Mr. Manafort?

6            MR. ANDRES:  That's -- it goes from a -- so just --

7    those bills are paid by Ukrainian oligarchs, a variety of whom

8    are listed on the memos that we seek to admit as evidence.

9    They go from Ukrainian oligarchs to a Cypriote entity

10   controlled oligarchs, which is in a different name.

11           So it doesn't go from an account that's named

12   "President Yanukovych" or the "Party of Regions."  It goes to

13   a company name, for example, Telmar, which is a company

14   controlled by the Ukrainian oligarch in Cyprus and that money

15   is then paid to a Cyprus bank account that's controlled by

16   Mr. Manafort also in a different name and which form the basis

17   of the FBAR charges.

18           So both to show the relationship between

19   Mr. Manafort and President Yanukovych, the Party of Regions,

20   it's essential to show how he made the income.

21           And the memos are not -- the memos are not included

22   to show that President Yanukovych believed in high inflation

23   or low inflation or any public policy issue in the Ukraine,

24   it's to show the constant interaction between Mr. Manafort and

25   people in the Ukrainian government, including the oligarchs

U.S. v. Manafort

50

1   who are paying him.

2           The comment about -- I think that deals with the

3   memos that are concerned with.

4           The comment about the photographs of President

5   Yanukovych, those aren't photographs of only President

6   Yanukovych.  Those are photographs of a photo shoot of

7   President Yanukovych, that is, those are photographs of people

8   who Mr. Manafort hired as part of the campaign to create

9   commercials for President Yanukovych, which is the very work

10  that he was doing, that he was paid for by the Ukrainian

11  government.

12          So the point is that the Government is trying to

13  prove how Mr. Manafort made not just hundreds of thousands of

14  dollars, but millions and millions of dollars and to prove the

15  actual work that he did at the Ukraine.

16          And I'll say one last thing before I sit down.

17          This information is absolutely in dispute.  It

18  absolutely is in dispute that Mr. Manafort made money there

19  and that he didn't pay taxes.  There's been no stipulation

20  that Mr. Manafort made X amount of money in the Ukraine, that

21  he was paid X amount of money, that he was paid through the

22  Cypriote accounts, that he was paid by particular oligarchs.

23          The Government has the burden to prove those facts

24  at trial.  And beyond that, we have some latitude, the courts

25  have said, to prove our case.  So to suggest that this is

51

1  something that is not in dispute or is not relevant to the

2  case, I think, is inaccurate.

3          THE COURT:  Yes, but this latitude point you need to

4  be cautious about, because there is 403 potential here.  In

5  this country, the amount of publicity in this case, and

6  especially the antipathy towards Russians, most people don't

7  distinguish -- most people in this country don't distinguish

8  between Ukrainians and Russians.

9          I can tell you, since my mother's family came from a

10  shtetl in a part of Russia that became Poland that became

11  Russia that became Poland -- you know, I learned from them

12  that a lot of Ukrainians hate Russians and the Russians hate

13  the Ukrainians.  And then, of course, then my mother's family

14  were Jews; everyone hated them.

15          And then Stalin and the others brilliantly began to

16  populate in Europe with Russians.  They populated the Balkans.

17  They populated the Baltics with Russians.  And we see today

18  they populated Crimea with Russians.  But most people don't

19  have all that history.

20          I don't want -- there's a lot of two -- a lot of 403

21  potential here that I want to avoid.  I understand your point

22  that it's disputed how much he got and it's disputed how he

23  got it.  Am I correct?

24          MR. ANDRES:  Correct.

25          THE COURT:  All right.  So you are entitled to show

─────────────U.S. v. Manafort─────────────

52

1    a lot of that, but there are limits to that.

2             MR. ANDRES:  Can I address that issue, Judge?

3             THE COURT:  If there are pictures of them at a

4    cocktail party with scantily clad women, no, I'm not going to

5    permit that.

6             MR. ANDRES:  Judge, if I could address that.  The

7    Government has been mindful of that.  There will be no

8    pictures of scantily clothed women, period.  There will be no

9    pictures of Russian flags.  I don't anticipate that a

10   government witness will utter the word "Russia."

11            So we've tried to be mindful of that.  And I'll just

12   give you one example that was raised in the defense.

13   President Yanukovych, when he is deposed, flees to Russia.

14   That's a fact.  We're not -- and it's relevant to that case.

15   We're not intending to elicit that fact.

16            We will elicit that President Yanukovych lost power

17   in an innocuous way, but it's particularly relevant because at

18   that moment Mr. Manafort, his income, based on the Ukraine

19   elections, is diminished substantially.  And it's that

20   diminishment, as outlined in the indictment, of his income

21   that ultimately leads to bank fraud.

22            So we're well aware of the --

23            THE COURT:  Well, the right way to do this is

24   simple, and I think you mentioned it, you raised it.  You pick

25   out the documents that they have identified as exhibits and

1  submit those.  Now, you can also submit with it a very brief

2  description of why you think 403 and 402; 402 is not met and

3  403 is implicated.  And you may respond.  But then I can focus

4  on a specific document, a specific context, and I can make a

5  better judgment or evaluation about 402 and 403, because those

6  are the two rules involved.  Am I correct?

7          MR. ANDRES:  Correct, Judge.  Thank you.

8          THE COURT:  All right.  Let's do it that way.  I'm

9  reluctant to impose a further burden on you-all so close to

10  the trial, but I think that's the only way we can do this

11  sensibly.  And would it be unrealistic to have you do it by

12  the close of business on Thursday?

13          MR. ZEHNLE:  Yes, Your Honor, we can do that.

14          THE COURT:  And you can respond a day later?

15          MR. ANDRES:  Judge, if we could have a little bit

16  more time.  The only reason -- we certainly will try.  The

17  only reason I'm asking is I don't know if --

18          THE COURT:  Mr. Asonye works on weekends.

19          MR. ANDRES:  I plan to have him working.  He works

20  nights too.  But the -- I don't know the volume of -- you

21  know, if it's five exhibits, we will endeavor to respond on

22  Friday.  If it's 40, it might take a little more work.

23          So the only reason I'm hedging is I don't know

24  the --

25          THE COURT:  I understand and I -- and I sympathize

—U.S. v. Manafort—

54

1   with you.  Let's make it Friday, assuming it's a few.  If it's

2   a bunch, then you can go ahead and do it by the close of

3   business Monday.  How is that?

4           MR. ANDRES:  Thank you, Judge.

5           THE COURT:  But if it's a few, let me see it.

6           MR. ANDRES:  Yes.

7           THE COURT:  All right.  Anything further to be

8   accomplished in this matter today?

9           MR. ANDRES:  Just one scheduling question, Judge, so

10  that we can be ready.

11          We start trial with jury selection on Tuesday.  Will

12  you be sitting on Friday?  I want to make sure we have

13  witnesses available.

14          THE COURT:  Usually, you know, I have other cases.

15          MR. ANDRES:  I'm aware of that.

16          THE COURT:  Comes as a big surprise to everybody.  I

17  have a lot of other cases.  I will try not to sit on Friday.

18  As much as I can, I want to get this matter done.  But it may

19  be that some Friday I'll sit.

20          Let me see.  I'll sit on Friday. MR. ANDRES  okay.

21          THE COURT:  And ask me on Friday whether I'm going

22  to sit the next Friday and so on until we finish.

23          MR. ANDRES:  Understood.

24          THE COURT:  I may have to say yes or no I won't sit

25  on Fridays, but there are, you know, several hundred cases

─────U.S. v. Manafort─────

55

1  that I have to keep in the air and going.

2          MR. ANDRES:  I understand.  Lastly, Judge, there

3  have been some stipulations entered into by both parties.

4          THE COURT:  Good.

5          MR. ANDRES:  And I just want to make sure I

6  understand the process for the Court to the extent that we

7  wanted to excuse one of those witnesses or more who we've

8  subpoenaed, we'll just bring that to the Court's attention,

9  but we have entered into some stipulations.

10         THE COURT:  That's fine.  I read stipulations to the

11 jury.

12         MR. ANDRES:  Great.

13         THE COURT:  And as far as the witnesses are

14 concerned, you may excuse them if you don't need them.

15         MR. ANDRES:  Great.  Thank you, Judge.

16         THE COURT:  They are subpoenaed, I suppose.

17         MR. ANDRES:  Correct.

18         THE COURT:  Yes, you may -- you may excuse them.

19         MR. ANDRES:  Thank you.

20         THE COURT:  Anything else today?

21         MR. ZEHNLE:  No, Your Honor.

22         THE COURT:  Thank you.

23         MR. ANDRES:  Thank you, Judge.

24         THE COURT:  Thank you all.  I will see you next

25 Tuesday morning.

U.S. v. Manafort

56

1          MR. ANDRES:  Tomorrow morning.

2          THE COURT:  Oh, tomorrow morning for the --

3          MR. ANDRES:  For the questionnaire.

4          THE COURT:  For the questionnaire.  And this will

5   give you time to review the questionnaire.

6          MR. ANDRES:  Correct.  And as we notified the

7   defense, we've ordered Mr. -- we've ordered up Mr. Manafort to

8   be present as well.

9          THE COURT:  All right.

10         MR. ZEHNLE:  That's fine.

11         THE COURT:  And -- is that the end of the docket?

12   Court stands in recess.  Thank you.

13

14            **(Proceedings adjourned at 5:08 p.m.)**

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, Tonia Harris, an Official Court Reporter for

 4   the Eastern District of Virginia, do hereby certify that I

 5   reported by machine shorthand, in my official capacity, the

 6   proceedings had and testimony adduced upon the Motions

 7   Hearing in the case of the UNITED STATES OF AMERICA versus

 8   PAUL J. MANAFORT, JR., Criminal Action No. 1:18-CR-83, in

 9   said court on the 23rd day of July, 2018.

10          I further certify that the foregoing 57 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15          In witness whereof, I have hereto subscribed my

16   name, this July 23, 2018.

17

18

19

20

21                           _____
                             Tonia M. Harris, RPR
22                           Official Court Reporter

23

24

25

                                                              57
```