# Exhibit B

U.S. v. Manafort

2358

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3     -----------------------------x
                                    :
 4     UNITED STATES OF AMERICA,    : Criminal Action No.
                                    : 1:18-CR-83
 5              versus              :
                                    :
 6     PAUL J. MANAFORT, JR.,       :
                                    : August 15, 2018
 7                    Defendant. : Volume XII
       -----------------------------x
 8
                        TRANSCRIPT OF JURY TRIAL
 9           BEFORE THE HONORABLE T.S. ELLIS, III
                    UNITED STATES DISTRICT JUDGE
10
       APPEARANCES:
11
       FOR THE GOVERNMENT:        UZO ASONYE, AUSA
12                                United States Attorney's Office
                                  2100 Jamieson Avenue
13                                Alexandria, VA 22314
                                        and
14                                GREG ANDRES, SAUSA
                                  BRANDON LANG VAN GRACK, SAUSA
15                                Special Counsel's Office
                                  U.S. Department of Justice
16                                950 Pennsylvania Avenue NW
                                  Washington, DC 20530
17
       FOR THE DEFENDANT:         JAY ROHIT NANAVATI, ESQ.
18                                BRIAN KETCHAM, ESQ.
                                  Kostelanetz & Fink LLP
19                                601 New Jersey Avenue NW
                                  Suite 620
20                                Washington, DC 20001
                                        and
21                                THOMAS E. ZEHNLE, ESQ.
                                  Law Office of Thomas E. Zehnle
22                                601 New Jersey Avenue NW
                                  Suite 620
23                                Washington, DC 20001
                                        and
24

25
```

U.S. v. Manafort

2359

1   Appearances continued:

2                               KEVIN DOWNING, ESQ.
                                Law Office of Kevin Downing
                                601 New Jersey Avenue NW
3                               Suite 620
                                Washington, DC 20001
4                                  and
                                RICHARD WILLIAM WESTLING, ESQ.
5                               Epstein, Becker, & Green, PC
                                1227 25th Street NW
6                               Washington, DC 20037

7   OFFICIAL COURT REPORTER:    TONIA M. HARRIS, RPR
                                U.S. District Court, Ninth Floor
8                               401 Courthouse Square
                                Alexandria, VA 22314

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

2360

TABLE OF CONTENTS

MISCELLANY

Preliminary matters...................................... 2361
Closing argument of Mr. Andres.......................... 2366
Closing argument of Mr. Westling........................ 2433
Closing argument of Mr. Downing......................... 2461
Rebuttal closing argument of Mr. Andres................. 2512
Jury instructions....................................... 2520
Certificate of Court Reporter........................... 2587

EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

2361

# P R O C E E D I N G S

1
2  (Court proceedings commenced at 9:54 a.m.)

3          THE COURT:  All right.  Good morning.  The record

4  will reflect that counsel and the defendant are present and

5  prepared to proceed.  We're at the point now of closing

6  arguments by counsel.

7          Anything I need to address before that?

8          MR. DOWNING:  One item, Your Honor.  We'll need to

9  do it at sidebar.

10          THE COURT:  I'm sorry, I didn't hear that.  One

11  item?

12          MR. DOWNING:  One item and we need to do it at

13  sidebar.

14          THE COURT:  All right.  Come forward.

15          (Sealed bench conference held.)

16          (Bench Conference.)

17          MR. DOWNING:  One other housekeeping, Your Honor.

18          THE COURT:  Yes.

19          MR. DOWNING:  Mr. Westling and I are going to split

20  the closing and he's going to handle the loan fraud of the

21  case.  I'm going to handle the task of the FBAR part of the

22  case.  I wanted to let you know that beforehand.

23          THE COURT:  Well, all right.  That's all right.  But

24  you aren't telling me, you're asking me to do that.

25          MR. DOWNING:  I'm requesting, Your Honor.

U.S. v. Manafort

2362

1          MR. WESTLING:  Yes.

2          THE COURT:  Any objection?

3          MR. ANDRES:  It's just me, Your Honor.  Sorry.

4          THE COURT:  All right.  You may do so.  And if you

5    decide you want to split, you may do so.

6          MR. DOWNING:  Thank you, Your Honor.

7          MR. WESTLING:  One final matter I just wanted to

8    make sure you're aware of.  I plan to use this chart in

9    talking about reasonable doubt.  Just a demonstrative.  I've

10   shown it to Mr. Andres.  I don't think he has any objection.

11   But I didn't want to do it without the Court being aware.

12         MR. ANDRES:  No objection.

13         THE COURT:  Let's proceed.

14         MR. WESTLING:  Thank you, Your Honor.

15         (End of bench conference.)

16         THE COURT:  All right.  We're prepared to proceed

17   with closing arguments.  We'll have the jury in.  We'll

18   proceed, as always, with the jury in the morning.  And then,

19   Mr. Andres, you -- I will ask you whether you are ready to

20   make your closing argument and you tell me yes, you may come

21   to the podium and do so.

22         All right.  You may bring the jury in.

23         (Jury present.)

24         THE COURT:  All right.  You may be seated.

25         Good morning, ladies and gentlemen.  We'll begin, as

—U.S. v. Manafort—

2363

1   we always do, with the calling of the roll by number.

2           THE DEPUTY CLERK:  Ladies and gentlemen, as I call

3   your name, please answer "present" or "here."

4           Juror 0008.

5           THE JUROR:  Here.

6           THE DEPUTY CLERK:  Juror 0037.

7           THE JUROR:  Here.

8           THE DEPUTY CLERK:  Juror 0276.

9           THE JUROR:  Present.

10          THE DEPUTY CLERK:  Juror 0017.

11          THE JUROR:  Present.

12          THE DEPUTY CLERK:  Juror 0145.

13          THE JUROR:  Present.

14          THE DEPUTY CLERK:  Juror 0115.

15          THE JUROR:  Present.

16          THE DEPUTY CLERK:  Juror 0082.

17          THE JUROR:  Present.

18          THE DEPUTY CLERK:  Juror 0009.

19          THE JUROR:  Present.

20          THE DEPUTY CLERK:  Juror 0299.

21          THE JUROR:  Present.

22          THE DEPUTY CLERK:  Juror 0091.

23          THE JUROR:  Present.

24          THE DEPUTY CLERK:  Juror 0302.

25          THE JUROR:  Present.

┌─────────────────────────────────────────────────────────
U.S. v. Manafort

2364

1            THE DEPUTY CLERK:  Juror 0060.

2            THE JUROR:  Present.

3            THE DEPUTY CLERK:  Juror 0296.

4            THE JUROR:  Present.

5            THE DEPUTY CLERK:  Juror 0054.

6            THE JUROR:  Present.

7            THE DEPUTY CLERK:  Juror 0127.

8            THE JUROR:  Present.

9            THE DEPUTY CLERK:  And Juror 0133.

10           THE JUROR:  Present.

11           THE DEPUTY CLERK:  Thank you.

12           THE COURT:  Once again, good morning, ladies and

13   gentlemen.

14           THE JURORS:  Good morning.

15           THE COURT:  Good morning, ladies and gentlemen.  Let

16   me ask you to confirm to me, if you will, if it's true, that

17   you were able to abide by, to adhere to the Court's

18   instructions to refrain from discussing the matter among

19   yourselves or with anyone or undertaking any investigation.

20           THE JURORS:  Yes, Your Honor.

21           THE COURT:  All right.  The record will reflect that

22   the answer is affirmative unanimously.

23           All right.  We have reached the point -- you've

24   heard all the evidence in the case.  We've now reached the

25   point where counsel will have an argument or will have an

U.S. v. Manafort

2365

1  opportunity to make argument in which they'll summarize and

2  interpret the evidence for you as they see it.

3           Now, if any counsel asserts a fact that they think

4  there has been evidence on in their memory, and your memory is

5  different, in other words, if you remember the fact or the

6  evidence as being different, it's your recollection that

7  controls, because you're the sole judges of the facts of this

8  case.

9           Similarly, counsel know what rules of law I will

10  instruct you on after their argument, but, again, if any

11  difference appears to you between what they say the law is and

12  what I tell you the law is, of course, you're to be governed

13  by what I tell you the law is.

14           All right.  We're ready to begin.  Now, I've told

15  you that these closing arguments will be about -- we hope less

16  than two hours, but they can be as long as two hours.  We've

17  heard a lot of evidence in this case.

18           Now, we won't recess -- we'll recess after the first

19  argument, and then we'll hear the second argument.  And I'm

20  not sure whether we can get all of that in before lunch, but

21  we'll see.

22           All right.  Are you ready to make your closing

23  argument, Mr. Andres?

24           MR. ANDRES:  Yes, Your Honor.

25           THE COURT:  All right.  You may proceed, sir.

U.S. v. Manafort

2366

1              **CLOSING ARGUMENT**

2         MR. ANDRES:  Good morning.

3         THE JURORS:  Good morning.

4         MR. ANDRES:  Mr. Manafort lied to keep more money

5    when he had it and he lied to get more money when he didn't.

6    This is a case about Mr. Manafort and his lies, the lies on

7    his tax returns and the lies to bank after bank after bank.

8    When you follow the trail of Mr. Manafort's money, it is

9    littered with lies.

10        The evidence at this trial has followed that money

11   and the document -- and the lies have been documented in

12   e-mails, in memos, financial records.

13        For the period from 2010 to 2014, when Mr. Manafort

14   was making money, in that period he didn't pay his taxes.

15   They filed false returns.  The money trail continues to the

16   period of 2015 to 2017, when Mr. Manafort was losing money.

17        In these two schemes, one that involved the filing

18   of false tax returns and one that involved defrauding banks,

19   Mr. Manafort profited.

20        In the first scheme, Mr. Manafort earned millions of

21   dollars in income working for President Yanukovych and the

22   Party of Regions, among others, in Ukraine.  He hid that money

23   in foreign bank accounts in Cyprus, in St. Vincent's and the

24   Grenadines, and the United Kingdom.

25        And he later spent that money on various personal

─────U.S. v. Manafort─────

2367

1   items and real estate properties.  These purchases were traced

2   and charted by FBI forensic accountant, Morgan Magionos.  And

3   you saw those charts.

4        Mr. Manafort lied to his bookkeeper about these

5   foreign accounts, about the income and the existence of the

6   accounts, and he lied to his tax preparers.  That income never

7   made it on to his books and was never reported on his tax

8   returns.

9        Mr. Manafort filed false tax returns not in one year

10  but five.  He filed false tax returns in 2010, in 2011, in

11  2012, 2013, and 2014.

12       Mr. Manafort failed to file FBAR reports not in one

13  year, but in four.  He failed to file FBARs in 2011, 2012,

14  2013, and 2014.

15       In total, Mr. Manafort failed to pay taxes on more

16  than $15 million.  That was the money that was used from the

17  overseas accounts to pay the various vendors.

18       Remember, Mr. Manafort also called certain income

19  loans to reduce his tax exposure.  He did that again with

20  respect to Peranova and Telmar.  Ladies and gentlemen, a loan

21  is not income and income is not a loan.  You don't need to be

22  a tax expert to understand that.  It's common sense.  That is

23  how Mr. Manafort kept more money than the criminal -- tax laws

24  allow.  He is not above the law.

25       In the second scheme, Mr. Manafort lied to get more

U.S. v. Manafort

2368

1   money when he was -- when his business was failing.  In this

2   scheme, Mr. Manafort secured money from a series of banks

3   through false and fraudulent statements.  He applied not

4   for -- not for one bank but to three, and not for one loan but

5   five.

6          Securing more than $20 million through his false

7   statements, Mr. Manafort lied and lied again.  He lied about

8   where he lived and the liens on his properties.  He lied to

9   each bank about his profits and losses and he submitted false

10  profit and loss statements repeatedly.  He altered some

11  documents and backdated others.

12         He lied about his American Express bill.  That is

13  how Mr. Manafort defrauded banks and violated the criminal

14  bank fraud laws.  He is not above the law.

15         You will see many documents related to the tax and

16  FBAR accounts.  But let me start with Government Exhibit 65M1,

17  which is on the screen now.  It is one of many e-mails that

18  Paul Manafort wrote when no one was looking, when he did not

19  know that one day he would be sitting in this very courtroom.

20         In Government Exhibit 65M1, Mr. Manafort writes to

21  the Dr. K group in Cyprus, the group that manages his Cypriote

22  accounts, and he asked to move money and he refers to the

23  overseas foreign bank account as "My Yiakora Ventures

24  accounts."

25         He didn't say DMP's account, he didn't say Dr. K's

─────────U.S. v. Manafort─────────

2369

1    accounts, he didn't say Rick Gates' account.  These are Paul

2    Manafort's own words:  "My Yiakora account."  Mr. Manafort

3    owned and controlled the Cyprus accounts.

4         Now, this payment and this e-mail goes to SP&C.

5    Remember that's Steve's Painting & Construction.  And you

6    heard from Mr. Jacobson, Steve, who testified that he did

7    millions and millions of dollars of renovation and other

8    construction work at Mr. Manafort's house in the Hamptons, his

9    apartment in Trump Tower, the Howard Street apartment, and

10   other properties.  He was paid from this Cypriote account and

11   Cypriote accounts like Yiakora.

12        This is evidence of Mr. Manafort's unreported

13   income.  It is evidence of Mr. Manafort's foreign bank

14   accounts.  The bank accounts that he owned and controlled and

15   that he had a financial interest in, in which he did not pay

16   any taxes, in which he did not report on Schedule B of his tax

17   returns.

18        Now, with respect to the bank fraud accounts, you

19   will also see many documents and you have seen many documents.

20   But let me begin with Government Exhibit 282 as one example.

21   Call up.

22        If you have any doubt about whether or not

23   Mr. Manafort is guilty of the counts of the charges in

24   Counts 29 through 32, which involved the bank fraud and bank

25   fraud conspiracy with respect to The Federal Savings Bank,

─────U.S. v. Manafort─────

2370

1  remember Government Exhibit 282.  Mr. Manafort sends a fake

2  P&L to Dennis Raico at The Federal Savings Bank.  The profit

3  and loss statement is altered and false.

4          Remember that DMP had no income, no income at this

5  time.  And Heather Washkuhn, Mr. Manafort's bookkeeper,

6  testified to that.

7          Government Exhibit 282 -- in Government Exhibit 282,

8  Mr. Manafort makes a material false statement to The Federal

9  Savings Bank about his income.  And income was an important

10 and material factor to the bank.

11         Now, that's just one example of the false statements

12 Mr. Manafort made or caused to be made to these banks.  There

13 are many more.

14         Over the course of the next 90 minutes, and

15 certainly less than two hours, I will address the charges and

16 the evidence and I will point to the testimony and the

17 exhibits which support the 18 criminal counts that

18 Mr. Manafort is charged with.  And I will generally do that in

19 two groups, the tax and FBAR charges and the bank and bank

20 fraud charges.

21         Now, before I turn to the charges, let me just say a

22 word about the evidence.  The evidence in this trial is the

23 testimony and exhibits that have been admitted through the

24 witness stand behind me.  I'm going to cite to specific

25 evidence, specific exhibits.  So if you're taking notes, write

U.S. v. Manafort

2371

1   down the exhibits so you can review them in the jury room

2   during your deliberations.

3          Let me also stop for a moment and thank you for your

4   service, for your patience, for your diligence.  We understand

5   the trial has been long and there have been many, many, many

6   documents.  You sacrificed your time to serve on this jury, so

7   we thank you.

8          Let me address the tax fraud charges and FBAR

9   charges first.  Let me start with the law.  As Judge Ellis

10  told you, he will instruct you on the law and what he says and

11  those instructions control.

12         Each of the charged crimes have elements that the

13  Government must prove beyond a reasonable doubt.  That is the

14  burden that we embrace.  Let me recite to you the elements of

15  the relevant statute governing the false tax fraud filings.

16         Title 26 United States Code 20 -- 7602, to establish

17  that the defendant, Mr. Manafort, is guilty of filing false

18  tax returns, the Government must prove beyond a reasonable

19  doubt the following five elements:

20         First, that the defendant made and subscribed a

21  return, statement, and other document, which was false as to a

22  material matter as detailed in the return.

23         Remember, here, Mr. Manafort is charged with filing

24  false tax returns because his income was false and because he

25  failed to identify the false bank -- the foreign bank accounts

U.S. v. Manafort

2372

1  in Schedule B.

2         You don't need to find both bases with respect to

3  any count.  If Mr. -- if you find that Mr. Manafort's income

4  was false, that's sufficient to find him guilty and/or if you

5  find that he failed to identify his foreign bank accounts,

6  that's also a basis to find him guilty.

7         Now, the second element that the Government must

8  prove is that the defendant knew the information on his tax

9  returns was false.

10        Third, the Government must prove that the false

11  information was material and that the return contained a

12  written declaration that it was being signed subject to the

13  penalties of perjuries.

14        And lastly, that the filing of the false return or

15  that in filing the false return, the defendant acted

16  willfully.

17        With respect to the fourth element that the returns

18  were signed under penalty of perjury, each return was, and

19  just as an example here, is Mr. Manafort's tax return in 2010,

20  and this is Government Exhibit 337A.  Here, you see that

21  Mr. Manafort signed his tax return and above his signature,

22  there's a statement that says (as read): "Under penalty of

23  perjury, I declare that this return and the accompanying

24  schedules and statements, and as to the best of my ability,

25  they are -- they are true, correct, and complete."  And so

U.S. v. Manafort

2373

1   this is the tax return in 2010 and it's contained in

2   Government Exhibit 337A.

3        For the ensuing years, from 2011 to 2014, which are

4   in Government Exhibits 337B, C, D, and E, for those returns,

5   Mr. Manafort signed them electronically.  And so Government

6   Exhibit 204 is a form that authorizes the tax returns to be

7   filed electronically, and in that document, Mr. Manafort also

8   agrees and signs that those returns will also be submitted

9   under penalty of perjury and that he's reviewed the return and

10  it's correct and complete.  That's Government Exhibit 204.

11       Now, just one note about the exhibit numbers because

12  they come from different sources, the exhibits aren't always

13  sequential.  So, for example, if you were to look at the bank

14  fraud charges that related to the Banc of California, the

15  exhibits won't necessarily come in as 100, 101, 102, because

16  they come from different sources.

17       They may come in as 100, 101, 240, 350, something

18  like that.  So, again, I'm going to do my best to refer to the

19  actual numbers of exhibits so that you can write them down.

20       And one other note, some of the exhibits, you'll

21  know, have been admitted into evidence as a legal matter, that

22  they either weren't published to the jury or there wasn't any

23  testimony about them.  So some of the exhibits you'll be

24  seeing for the first time, and again, I'll do my best to refer

25  to the exhibits by number.

U.S. v. Manafort

2374

1        Let's talk about this unreported income, the income

2  that was not reported by Mr. Manafort on his tax returns.  As

3  you know well by now, that income came from his work in the

4  Ukraine.  That money was deposited into the bank accounts of

5  Ukrainian businessmen in Cyprus and then they went to

6  Mr. Manafort's Cyprus accounts.

7        Mr. Manafort had 31 overseas bank accounts.  31.

8  From the period of 2010 to 2014, and those accounts, those 31

9  accounts had more than $60 million that flowed in them.  These

10  were Mr. Manafort's accounts.  He owned them and he controlled

11  them.

12        Now, the businessmen that paid Mr. Manafort for his

13  political work, they had names like Serhiy Lovochkin, Rinat

14  Akhmetov, Borys Kolesnikov.  By now, after the evidence in

15  this trial, you know them by their initials:  SL, RA, BVK.

16        These men had Cyprus accounts by the names of Telmar

17  and Taunton, Bedel, Dresler Holdings, among others, and that

18  money was transferred from those accounts to Mr. Manafort's

19  Cyprus accounts, and you know those names as well.  You've

20  seen them over and over again.  Leviathan, Peranova, Global

21  Highway, Global Endeavor.

22        Mr. Manafort hid, in these accounts, his money from

23  those overseas work and he hid those accounts from his

24  bookkeeper, Heather Washkuhn, who testified in this courtroom,

25  and he hid them from his tax preparers, Philip Ayliff, Cindy

─── U.S. v. Manafort ───

2375

1  Laporta.  He lied to all three, never disclosing that the

2  accounts existed.

3          FBI forensic accountant, Morgan Magionos, traced all

4  of those payments in a very detailed way, and many of the

5  charts that she created are in evidence as Government

6  Exhibit 65.  That, ladies and gentlemen, is the money the

7  income earned by Mr. Manafort and that's how it got from the

8  Ukraine to the United States.

9          Now, you'll know that in some instances,

10  Mr. Manafort used the Cyprus money to pay for his vendors.

11  But in other instances, when he needed money in his own

12  business at DMP, he transferred money from the Cypriote

13  accounts to his DMP accounts, although he disguised who the

14  money came from.  He told Ms. Washkuhn that it came from a

15  third party.

16          So that same pot of money, that same money in the

17  foreign accounts are deposited in Mr. Manafort's DMP accounts,

18  at some point, and treated as income.  That same money is also

19  used to pay for the vendors and that money, too, is income.

20  That money was not declared.  Revenue agent, Mike Welch, the

21  expert witness, confirmed that the money that went from the

22  Cypriote accounts to pay for the vendors was income.

23          Now, again, just briefly, I'm going to run you

24  through just a few documents that show how the payments are

25  made.  So, here, you have just one example.  You have a memo

U.S. v. Manafort

2376

1    in Government Exhibit 359 from Paul Manafort to Serhiy

2    Lovochkin, PJM to SL, relating to payment for consulting work.

3    The memo is dated October 11, 2011.  The first line describes

4    payments from the consulting firm, Telmar, which is Serhiy

5    Lovochkin's, to Cyprus entity, Leviathan, controlled by

6    Mr. Manafort.

7            And, of course, you know in Government Exhibit 66F,

8    that there was a consulting agreement between Leviathan and

9    Telmar.  There are many of these agreements in Government

10   Exhibit 66F.  And then you see the payments from Leviathan to

11   Mr. Manafort's vendors for his cars and his clothing, the

12   construction, the condo in Soho.  And here you have -- in

13   Government's Exhibit 65B1, you have Mr. Manafort making a

14   payment from Leviathan to Alan Couture, who you know is one of

15   his vendors.  And in all -- all of these payments that went to

16   the overseas -- from the overseas accounts to his vendors

17   totalled more than $15 million.

18           Just a few short examples, this is one of them, of

19   how Mr. Manafort was using the money in the overseas accounts.

20   You know also -- and, again, referring to the charts in

21   Government Exhibit 65, this one is 65K from Morgan Magionos.

22   Here, you have payments from Leviathan to Scott Wilson

23   Landscaping.  Mr. Wilson didn't testify, but there was a

24   stipulation that he did landscaping work on Mr. Manafort's

25   Bridgehampton property.  And, again, here are other payments

U.S. v. Manafort

2377

1  for personal services from Leviathan in Cyprus to a U.S.

2  vendor.

3         In Government Exhibit 370, you see Mr. Manafort

4  directing Mr. Gates how to move money around the various

5  Cypriote accounts, including Leviathan and Peranova.

6         And in Government Exhibit 72, another of the charts

7  from Morgan Magionos, she traced all of the payments from the

8  Cypriote accounts to the vendors who served Mr. Manafort, and

9  the total of all that was over $15 million.

10        Now, Mr. Manafort's scheme, when you break it down,

11  was not that complicated.  But it was hidden to be sure.  And

12  ask yourself in deliberations:  Why would Mr. Manafort lie to

13  his bookkeeper about his overseas accounts?  Why would he lie

14  to his tax preparers about his overseas accounts?  Why would

15  he use names like Leviathan and Peranova and Global Highway?

16  Those questions, ladies and gentlemen, answer themselves.

17        He lied to his tax preparer, he lied to his

18  bookkeeper because he wanted to hide that money and evade

19  taxes.  Now, let me say one more thing about these payments

20  and the money that went through these accounts.  They're

21  necessary to show Mr. Manafort's unreported income.  The money

22  that pays for the clothes and the cars and the condos and the

23  construction are income.  They're evidence of the unreported

24  income.  Each payment is evidence of that income and the ones

25  that are over $10,000 are also ones that show that

─U.S. v. Manafort─

2378

1    Mr. Manafort had an obligation to file an FBAR.

2              Now, that's what Mr. Manafort bought with those

3    monies.  He bought clothes and cars and other things.  If

4    he -- if he purchased widgets, we would have showed you

5    examples of those widgets because this case is not about

6    Mr. Manafort's wealth.  It is not a crime in this country to

7    be wealthy and it's not a crime to have nice things.

8              We're not in this courtroom today because

9    Mr. Manafort's wealthy.  We're in this -- in this courtroom

10   today because Mr. Manafort filed false tax returns and because

11   he failed to file FBARs.  And the evidence with respect to the

12   cars and the clothes and the other things he bought is

13   evidence of his unreported income.

14             Now, let me turn to Schedule B of the tax return and

15   explain that because it's straightforward.  Call out.

16             This is Schedule B and this is the question that

17   asked 7A, asked about whether you have foreign tax accounts.

18   And basically it reads on your tax return (as read): "At any

19   time during, insert the year, did you have a financial

20   interest or signature authority over a financial account, such

21   as a bank account, securities agreement, or brokerage account

22   located in a foreign country."

23             This, ladies and gentlemen, this document is in

24   evidence.  It's Mr. Manafort's tax return for 2011, it's 337B.

25   But you know that whole series from A to E are Mr. Manafort's

—U.S. v. Manafort—

2379

1  tax returns from 2010 to 2014.

2          Now, in every year, from 2010 to 2014, Mr. Manafort

3  answered "no" to the question of whether he had foreign bank

4  accounts.  And at the time, over this time period, you know he

5  had the 31 different foreign bank accounts in three countries.

6  This, as I said, is Government Exhibit 337.  Mr. Manafort

7  answered "no" on each one of those counts.

8          Now, one of Mr. Manafort's lawyers suggested in his

9  opening statement that for each of these tax returns, as it

10  related to Mr. Manafort's foreign accounts, he simply forgot

11  to check a box.  That's not true.  Mr. Manafort affirmatively

12  answered "no" in each of those years to the question as to

13  whether he had foreign bank accounts.  It wasn't a clerical

14  error.  It wasn't a failure to check a box.  It was failure,

15  an affirmative decision to answer "no."

16          Now, with respect to each of the years from 2010 to

17  2014, Mr. Manafort had foreign bank accounts that had

18  aggregate amounts well over $10,000, in some cases, millions

19  above the $10,000 aggregate amount that's necessary to file an

20  FBAR, in some cases, hundreds of thousands.

21          So, again, if you turn to Ms. Magionos's charts, in

22  Government Exhibit 73A is the total aggregate amount of money

23  for all of Mr. Manafort's foreign bank accounts in 2010.  And

24  you see that the aggregate amount is more than $5 million.

25  That's Government Exhibit 73A.

─────U.S. v. Manafort─────

2380

1        And Government Exhibit 72 lists the total amount

2  from those accounts and the payments to the vendors.  And the

3  total for 2010 was a little more than 1.5 million.  So I'm not

4  going to show you the charts for each one of those years.

5  They're in the Government exhibits, as I said, in the 72 --

6  73B series.  I think it's A through E and also in Government

7  Exhibit 72.

8        But here's what those charts would say:  In 2011,

9  Government Exhibit 73B, forensic accountant, Morgan Magionos,

10  concluded that the aggregate maximum value for Mr. Manafort's

11  foreign accounts in 2011 was more than $8 million, and in that

12  year, the total payments to vendors was more than

13  $1.4 million.

14        What about 2012?  What happened in that year?  Well,

15  in Government Exhibit 73C, Morgan Magionos concluded that the

16  value of all of Mr. Manafort's foreign bank accounts was more

17  than $25 million.  And you'll remember that in 2012,

18  Mr. Manafort bought the properties in New York City, the condo

19  in Soho, and the property in Brooklyn, and he also bought the

20  house in the Arlington.  For that year, in 2012, there was a

21  total payments to vendors of more than $9 million.

22        How about 2013?  Things were not different.  In

23  Government Exhibit 73D, Morgan Magionos concluded that the

24  aggregate maximum value for Mr. Manafort's foreign accounts

25  was more than $18 million.  And in Government Exhibit 72, she

2381

1  concluded that the total payments to vendors from foreign

2  accounts in 2013 was more than $2.8 million.

3        Finally, in 2014, the aggregate maximum value for

4  the foreign accounts was $2.7 million and the total amount of

5  payments from those foreign accounts into the United States

6  was more than $400,000.

7        Remember, that in 2014, President Yanukovych and the

8  Party of Regions lost power and Mr. Manafort's source of

9  income in the Ukraine dried up.

10        Now, these exhibits that I've shown you are relevant

11  for all of the tax charges, for the failure to identify income

12  or the filing of false income taxes as it relates to income.

13  It also shows that there were foreign accounts, which weren't

14  disclosed on his tax returns, and they're also relevant to the

15  FBAR charges, again, because the amount exceeds $10,000.

16        And remember that the difference between the false

17  tax filings as it relates to the bank accounts and the FBAR

18  charges, the only difference is the amount that's required.

19  So there's no requirement or minimum for an amount with

20  respect to the foreign bank accounts that have to be disclosed

21  on your tax returns.  But in order to trigger the FBAR filing

22  requirement, the accounts have to have more than $10,000.

23        Now, I said earlier that there was one other way,

24  and again, I think you're well aware of this from the

25  testimony and exhibits in this case, but there was one other

─────────U.S. v. Manafort─────────

2382

1  way in which Mr. Manafort's taxes were false.  Remember, that

2  he characterized certain income as loans, and we'll go over

3  this in greater detail when we discuss the bank fraud.  But

4  you remember there was the Peranova loan and there was the

5  Telmar loan.

6          And here in Government Exhibit 190, is the ledger

7  that Ms. Washkuhn testified about which classifies Peranova as

8  a loan.  The evidence was clear in this case that there was

9  never a loan from Peranova, never a loan from any Ukraine

10 businessmen to one of Mr. Manafort's Cypriote accounts.  And

11 then if you look at the next slide, also in Government

12 Exhibit 190, here it is that the loan from Peranova magically

13 becomes income, just like that, poof.  $1.5 million loan is

14 forgiven and becomes income.  Remember, that Mr. Manafort both

15 controlled Peranova and could obviously, with the stroke of a

16 pen, forgive any loans.  But remember that these were never

17 really loans in the first place.  They were income.

18         Now, the same was true of the Telmar loan, and

19 Government Exhibit 158 is an e-mail from Conor O'Brien who

20 also worked with Phillip Ayliff and Cindy Laporta at KWC.  And

21 in this document, Government Exhibit -- I'm sorry, this is

22 219, Government Exhibit 219, they're talking about the amount

23 of the loan that Mr. Manafort should claim on his tax returns,

24 again, to reduce his tax liability.

25         Cindy Laporta, you may remember, testified that Rick

U.S. v. Manafort

2383

1    Gates asked her to classify Telmar as a loan to reduce

2    Mr. Manafort's tax liability.  Remember, these are

3    Mr. Manafort's tax returns, not Mr. Gates's.  She testified at

4    the time, she knew it was wrong, but did it anyway because she

5    didn't want to expose her accounting firm to any litigation.

6    She didn't want to call her firm's long-time client,

7    Mr. Manafort or Mr. Gates liars, and she testified that she

8    regretted treating the Telmar income as a loan.  But more

9    importantly, she testified that that money was income.

10            You also heard from revenue agent, Mike Welch, from

11   the IRS, he's been a revenue agent for more than 35 -- 34

12   years.  He's assisted in more than 500 criminal investigations

13   and he confirmed the work of forensic accountant, Morgan

14   Magionos.  He looked through her same charts and reviewed the

15   same documents and confirmed the payments from overseas.

16   Revenue Agent Welch testified as an expert witness.

17            If you look now at Government Exhibit 79, and just

18   remember, this chart was admitted as a demonstrative exhibit.

19   So it's not an exhibit that will go back to the jury room.  It

20   was simply displayed to demonstrate to you the flow of money

21   from the foreign sources all the way to the United States.

22   And this chart covers the years 2010 to 2013.

23            Now, the blue are the wires that went from the

24   overseas accounts to Mr. Manafort's DMP entities.  The gray

25   traces from a foreign account to a bank account for

U.S. v. Manafort

2384

1  Mr. Manafort.  And the orange box -- and I think Mr. Asonye

2  referred to this as mango.  I'm allergic to mango, so I'm

3  going to call it orange.

4          (Laughter.)

5          MR. ANDRES:  But those are the personal expenses.

6  So you see the tracing from the foreign sources to the foreign

7  bank accounts to the vendors, and that's the unreported

8  income.  And Revenue Agent Welch went through that in great

9  detail.

10          He then went through each of the foreign accounts,

11  that is, each of the flow of payment for each of the Ukrainian

12  businessmen.  And I'm not going to show you all of them, but

13  here are the transfers from Telmar because you've heard a

14  great deal about Telmar.  You know that it was controlled by

15  Serhiy Lovochkin.  That is the evidence established it was

16  controlled by Serhiy Lovochkin.  And, again, you have the same

17  process here where the money goes from Telmar to the -- to

18  Leviathan in this case.  You know that Leviathan is the

19  foreign account controlled by Mr. Manafort.  And then it comes

20  again to the United States and the orange boxes are the

21  unreported income.

22          And, again, remember the point here.  In some

23  instances the income is going to pay for vendors, and that

24  income is not declared.  That same pot of money from the

25  foreign overseas accounts also goes to Mr. Manafort's personal

─────── U.S. v. Manafort ───────

2385

1  accounts and to DMP; and when that happens, it's declared as

2  income.  It's the same money, the same source of money.  The

3  difference is how it's declared.  When it goes to DMP, it's

4  declared as income.  Mr. Manafort has to show some income each

5  year and he has to pay for his business expenses, and taxes

6  are paid on that money.  But that same pot of money goes to

7  the vendors, and that's the undeclared income where no taxes

8  were paid.

9        Now, Revenue Agent Welch confirmed what several

10  other witnesses testified about, and that's the fact that

11  Mr. Manafort did his books on a cash basis.  He also testified

12  that when the payments were made directly to the offenders, as

13  I've described, that that was income that should have been

14  reported on his tax returns.

15        Now, how specifically is Mr. Manafort's tax returns

16  false each of the relevant years?  Well, in Line 22 of each of

17  those tax returns, it reports his total income.  Okay.  And so

18  you see in Government's Exhibit 77 -- and this is in

19  evidence -- there are two -- there's a larger chart, but the

20  two columns that are called out are the income that

21  Mr. Manafort reported on his tax return -- that's in the first

22  chart where it says, "Line 22" -- and then next to that is the

23  amount of money that was not declared as determined by Revenue

24  Agent Welch.

25        So here you have it, ladies and gentlemen, each of

U.S. v. Manafort

2386

1  the relevant years.  In 2010 Mr. Manafort declares $500,000,

2  approximately, on his tax returns.  And there's more than

3  $1.6 million that is not reported.  Those are the conclusions

4  of Revenue Agent Welch.  That makes Mr. Manafort's tax returns

5  in 2010 false.

6          Then you have it again in 2011.  Mr. Manafort

7  declares approximately $3 million.  And you heard from Revenue

8  Agent Welch that there was 1.4 approximately in unreported

9  income.  That makes Mr. Manafort's tax return in 2011 false.

10 The same is true of 2012, 2013, and 2014, if you review in

11 Government's Exhibit 77 the amount listed in the tax return in

12 Line 22 to the total unreported income.

13         Now, this analysis was based on the date that the

14 foreign money from the Ukraine was onshore to the United

15 States to the various vendors and to Mr. Manafort's company

16 under a cash accounting system, which you know is the

17 accounting system from Mr. Manafort himself chose.

18         Finally, Revenue Agent Welch testified that the 2014

19 tax returns were false because the Telmar income was

20 calculated on a loan when there was, in fact, income.  Revenue

21 Agent Welch testified as an expert witness.  He said that

22 Mr. Manafort had unreported income in each year.  Millions of

23 dollars of unreported income each year.  He told you that that

24 unreported income was material to the IRS.  He told you that

25 Manafort's tax returns were false.

U.S. v. Manafort

2387

1          He also said that Mr. Manafort had a financial

2   interest and a signature -- and a signatory authority over the

3   foreign bank account that should have answered "yes," should

4   have answered "yes" and not "no" on Schedule B.  And he said

5   that the failure to answer "yes" was also material to Mr.

6   Manafort's tax returns.

7          Now, during this trial you've seen and you're now

8   experts on the fact that there's direct examination and

9   there's cross-examination, and we invite you to

10  review both the direct examination -- and there's redirect.

11  Sorry.  Sometimes there's more cross and more redirect, but,

12  again, you know about all of that because you were here.

13         So when you review the evidence of this trial,

14  ladies and gentlemen, we invite you -- the Government invites

15  you to review the direct testimony, the cross-examine, the

16  whole lot of testimony exhibits.

17         And when Revenue Agent Welch testified, you'll

18  remember, Mr. Asonye questioned him on direct examination and

19  then on cross-examination he was asked a series of questions.

20  And then lastly -- sorry this is a little long -- but, lastly,

21  Mr. Asonye then did redirect examination and he asked this

22  question.  He asked Agent Welch if there was anything that he

23  was asked on cross-examination, anything, that changed his

24  opinion that Mr. Manafort filed false tax returns in each year

25  from 2010 to 2014.  He was asked that question.

U.S. v. Manafort

2388

1        And Revenue Agent Welch said, "No."  His opinions

2   remained the same, notwithstanding any questions asked on

3   cross-examination, tips you -- that Mr. Manafort, for the

4   reasons he stated, filed false tax returns.

5        Let me turn now to the FBAR charges.  And we've

6   discussed this a little because they relate to the same

7   foreign accounts.  It's Counts 11 through 14.  You'll remember

8   that Paula Liss from the Treasury Department testified.  She

9   actually testified twice.  She was the last witness, but she

10  testified that she checked the records of the Treasury

11  Department and there were no FBAR filings for Mr. Manafort

12  from 2011 to 2014 and there were no filings from

13  Mrs. Manafort.

14       And then later she came back and she testified that

15  during the same period there were no FBAR filings for Davis

16  Manafort Partners or DMP International during the relevant

17  period.

18       So let me now talk to you about the elements of a

19  criminal offense of an FBAR filing.  To establish that

20  Mr. Manafort is guilty of failing to file an FBAR, the

21  Government must prove first the defendant was a United States

22  citizen.  Not really in dispute, but if you have any questions

23  you can look at Government Exhibit 412A, which is a copy of

24  Mr. Manafort's passport and establishes during the relevant

25  time period he was a U.S. citizen.  There's no slide.  We're

─────U.S. v. Manafort─────

2389

1    not going to look at his passport.

2            Second, the defendant had a financial interest in or

3    signatory authority over a bank, securities, or other

4    financial accounts in a foreign country during the relevant

5    time period.  This too is not really in dispute.  Mr. Manafort

6    had a financial interest beneficial control over all of these

7    31 foreign bank accounts.  He owned those accounts and he

8    controlled them.  He moved money from those accounts as well.

9    You'll see that some of the accounts actually had his name on

10   it.  And here on the screen is Government's Exhibit 66D, which

11   show that his name is listed as the beneficial owner in the

12   Actinet Trading Limited account.  And you'll also see that

13   Mr. Manafort's passport is also included in that Actinet

14   account.

15           And Government Exhibit 65B1, 65K2, 65E1, 65J1, these

16   are all e-mails that Mr. Manafort wrote himself -- there's no

17   Rick Gates on these e-mails, not one -- where Mr. Manafort is

18   moving money from the Cypriote account to his different vendor

19   payments.  Okay.  And, again, you see another example where

20   Mr. Manafort in his own words characterized the account as "My

21   Global Highway Limited account."  These are his accounts.  He

22   controls them.  He owns them.

23           Now, Government Exhibit 63 is a list of all of the

24   31 bank accounts, and there are blue stars and here come the

25   yellow stars where -- show that Mr. Manafort's name is

─────U.S. v. Manafort─────

2390

1    actually listed on those accounts.  So you know for those that

2    he's either the beneficial owner or he is the signatory on all

3    of those.

4            But even for the accounts where Mr. Manafort is not

5    listed, and either Mr. Gates or Konstantin Kilimnik are

6    listed, or Dr. K, those are Mr. Manafort's agents or attorneys

7    and they are acting on his behalf.  And for those accounts,

8    Mr. Manafort is responsible as well.  You'll see in the jury

9    instructions that if somebody is an agent or attorney that the

10   individual whose agent or attorney that is responsible for

11   those accounts.

12           And these are all the 31 accounts.  And that's

13   Government Exhibit 63 and that's in evidence.

14           Now, I said to you earlier -- and the Government

15   invites you to review all of the testimony in this case, the

16   direct testimony, and the cross-examination.  So remember when

17   Morgan Magionos testified.  She's the FBI agent -- I'm

18   sorry -- she's a forensic accountant at the FBI.  She went

19   through all the charts and all the work that she did.  All the

20   tracing from the money from the Ukraine to Cyprus, the

21   Ukrainian businessmen Cyprus accounts to Mr. Manafort's Cyprus

22   accounts, and then the money went through the clothing

23   manufacturers at House of Bijan or Alan Couture or for cars or

24   other expenses, all of that is in evidence.

25           Now, remember, again, during the cross-examination

─U.S. v. Manafort─

2391

1   of Morgan Magionos, she was shown a series of signatures and

2   asked if they were the same.  She's not a handwriting expert,

3   but that's fine, everybody can review those accounts.  She was

4   asked about whether the signatures looked the same.  How she

5   knew -- and she testified that she couldn't say whether they

6   were the same or not but they looked different.  Anybody can

7   take that or do that experiment.  And she was asked how she

8   knew that those accounts were for Mr. Manafort and she said,

9   "Because all the money that was transferred from those

10  accounts into the United States were for the benefit of

11  Mr. Manafort."

12          But let's step back again and review the -- what

13  defense counsel was getting at and suggesting that

14  Mr. Manafort maybe didn't sign these accounts.

15          Is it possible or plausible that somebody unnamed,

16  or maybe even Rick Gates, signed Mr. Manafort's Cypriote bank

17  accounts and then unbeknownst to Mr. Manafort somebody put in

18  $60 million in those 31 accounts and then somehow Mr. Manafort

19  was able to tap into that $60 million and spend $15 million of

20  that money for personal expenses for himself and his family?

21          Does that make any sense at all?

22          We should all be so lucky.

23          (Laughter.)

24          The third element with respect to the FBAR charges

25  or the aggregate value of the bank accounts, securities, and

─────────────────────────U.S. v. Manafort─────────────────────────

2392

1    other financial accounts have to exceed $10,000.

2            And, again, we've been over that repeatedly and I

3    don't think there's really any dispute that there were

4    millions of dollars in these accounts in 2014, approximately

5    $400,000.  But, again, to the extent you have any doubts at

6    all, you have Morgan Magionos' charts in evidence.

7            The fourth element is willfulness, and that the

8    defendant willfully failed to file an FBAR or on the due date

9    following the following year.

10           Now, each of the tax accounts have a willful

11   element.  That is different from the intent element in the

12   bank fraud charges.  Willfulness is different.  And, again,

13   Judge Ellis will provide you instructions about all of the

14   law.  And if anything I say conflicts with what Judge Ellis

15   says, obviously -- this is very obvious -- what Judge Ellis

16   says controls.  And with respect to willfulness, though, the

17   requirement in the law is generally that the defendant had to

18   know the law and then violate it.  So he had to be aware of

19   what his obligations under the law was and, therefore, violate

20   it.

21           And Mr. Manafort was willful with respect to the

22   failure to identify his income in filing false tax returns as

23   to income.  He was willful in not identifying his false -- not

24   identifying his overseas bank accounts and he was willful in

25   not filing FBARs.  What does that mean?  It means that

—U.S. v. Manafort—

2393

1    Mr. Manafort knew the law, and he violated it anyway.

2           And, ladies and gentlemen, you've seen witness after

3    witness testify about what they told Mr. Manafort about the

4    law.  Phillip Ayliff, Cindy Laporta instructed him in written

5    documents, in e-mails, in engagement letters, in tax

6    organizers, and they orally advised him as to what the rules

7    were.  And you'll see e-mails in which Mr. Manafort is

8    conversing in the language of tax law where he's talking about

9    revenue and income and expenses and ledgers.  Mr. Manafort

10   knew the tax law.  He was told it orally and he was sent

11   e-mails which described it.

12          Now, let's just step back a second and talk a little

13   bit about Mr. Manafort.  You know that he was a successful

14   international political consultant.  You know that

15   President Yanukovych was sort of -- his political career was

16   considered over before Mr. Manafort went and revived it, and

17   he was wildly successful.  President Yanukovych was ultimately

18   elected president.

19          Mr. Manafort is capable and bright.  There is no

20   question about that.  He is trained as a lawyer.  And even if

21   he doesn't practice as a lawyer, he has that as a background.

22          Next, you know that he met regularly with his own

23   tax accountants or tax preparers -- excuse me -- Mr. Ayliff,

24   from 2011 to 2013, and Ms. Laporta in 2014.  They advised him

25   in several ways about the law as it relates to the tax issues

U.S. v. Manafort

2394

1   and the FBAR.

2           Now, let me just step back one second.  You'll

3   remember that Ms. Laporta testified under a grant of immunity

4   because she had engaged in conduct which is also criminal.

5   That is, she testified that she backdated a letter or allowed

6   a backdated letter to go out.  She testified that she

7   classified certain income as loans.  She testified all about

8   that here, and you saw her testimony.  When you consider her

9   testimony, remember this:  There's only one year in which

10  Ms. Laporta prepared Mr. Manafort's tax returns.  2014.  The

11  other three years was Mr. Ayliff.  He did not testify under

12  grant of immunity.  And while he was asked to lie by

13  Mr. Manafort as to one apartment, he refused to.  So keep in

14  mind while there are two accountants, Mr. Ayliff testified for

15  the bulk of the years that are under consideration.

16          Can you do the call out, please?

17          Okay.  So as we look at the documentary evidence

18  with respect to how do you know that Mr. Manafort knew the tax

19  law, Government Exhibit 199 is an e-mail string in which

20  Mr. -- Mr. Manafort and Mr. Ayliff are e-mailing back and

21  forth and Mr. Manafort is asked directly if he has an interest

22  or signature authority over financial interest in foreign

23  accounts, such as a bank account.  He's basically asked what

24  the law is and he says, "No."  He responds "no" at a time when

25  he's told what the law is, and that's a lie.

U.S. v. Manafort

2395

1        The testimony of Mr. Ayliff and Cindy Laporta and

2   Heather Washkuhn are all consistent with this.  They asked

3   repeatedly, or at least the tax preparers did, if there were

4   foreign accounts, and Mr. Manafort answered "no."

5        In the next slide in Government Exhibit 152, it's a

6   tax organizer that's sent to Mr. Manafort.  The document was

7   found in Mr. Manafort's house during the court-authorized

8   search in 2017 and it walks the tax preparers through all of

9   the law and requirements.  Ladies and gentlemen, Mr. Manafort

10  knew the law.

11        If you look at Government Exhibit 2 -- Government

12  Exhibit 198, which is a 2011 memo to Phillip Ayliff,

13  Mr. Manafort now shows that he both got the tax report and he

14  fills it out.  Because in this document he says, "In addition

15  to the organizer for Kathy and me, I'm enclosing 2010 tax

16  records for the tax payers listed below."

17        He gets the law.  He reviews it.  He fills the form.

18  Mr. Manafort knew the tax law.

19        There's also the question of Mr. Manafort's billing

20  records from KWC.  And if there's any question about whether

21  or not he was actually meeting with his accountants, those

22  records show the meetings.  And there's the engagement letters

23  that were sent year after year, which also detailed what the

24  law was and set it out.  Those are concluded in Government

25  Exhibit 153.

U.S. v. Manafort

2396

1           Mr. Manafort knew the law.

2           If you look at Government Exhibit 59D, it's another

3    document found in Mr. Manafort's house.  And here again he's

4    writing a memo.  He's talking in tax terms.  He's talking

5    about taxes, estimates, and the last -- the last line, 4C3,

6    Mr. Manafort is talking about whether DMP had income.  He

7    understood the concept of income.

8           If you look now at Government Exhibit 201, this

9    document is critical.  This is a document in which

10   Naji Lakkis, who worked at KWC -- and it's in the last exhibit

11   that we just referred to -- this is an e-mail at June of 2012

12   and it's overwhelming proof that Mr. Manafort knew what the

13   tax law said.  This document, this e-mail Mr. Manafort is CC'd

14   on this document.  Naji Lakkis is asking Mr. Manafort if he

15   can help identify foreign financial accounts, and he includes

16   the actual regulations that govern.

17          So if you look, there's a reference to financial

18   advisement, financial interest, and it talks about who is the

19   owner of record holder, regardless of whether the account is

20   maintained as the benefit of another U.S. person.  And, No. 2,

21   it talks about the owner of record or holder of legal title as

22   one of the following, and then it lists the regulations about

23   an agent.  You'll see as you get the law and Judge Ellis

24   instructs you about it, this is the actual law.  This is what

25   sets out who owns and controls the financial accounts.  And

U.S. v. Manafort

2397

1  you'll see that when you look at that Mr. Manafort clearly

2  did.

3         And here he's being told about the specific law that

4  governs his overseas accounts.  They are also at the bottom as

5  a reference to signature authority.

6         Now, as I said, there are the affirmative documents

7  and oral statements that were provided to Mr. Manafort, which

8  he saw and reviewed and read and returned, and then you'll

9  also see that in some documents Mr. Manafort is speaking the

10 language of taxes.

11        So here you have in Government Exhibit 127, it deals

12 with the Howard Street apartment, but you'll see that some

13 evidence comes in for different reasons.  And not every one

14 piece of evidence can only be used for a specific charge, you

15 can use it for other charges.

16        Here is the question about the Howard Street

17 charges.  And, again, Mr. Manafort is talking the language of

18 taxes, expenses, revenue, gross revenue, write-offs, income,

19 and MC Soho for distribution.  So when you're considering

20 whether or not Mr. Manafort was willful, consider Government

21 Exhibit 127.

22        And, again, ask yourself why he lied to Ms. Washkuhn

23 and lied to Phil Ayliff and Cindy Laporta.  Ask yourself this

24 question: Why would Mr. Manafort pay Ms. Washkuhn $100,000 a

25 year to pay his bills?  Why would he do that?  And then when

U.S. v. Manafort

2398

1  the bills related to payments from the Cyprus accounts, why

2  would he do those -- why would he pay those bills himself or

3  have Mr. Gates do it when he's already paying Ms. Washkuhn

4  $100,000 to pay his bills?  The answer is, again, because he

5  wanted to hide those accounts.

6        And, again, use your common sense.  Does it make

7  sense that Mr. Manafort could have had 1 or 2 or 5 or 31

8  overseas accounts that had more than $60 million in it and he

9  forgot to ask his tax preparers about the tax treatment?

10  Mr. Manafort worked overseas and understood the rules with

11  respect to taxes.

12        He's being asked directly about whether or not he

13  had overseas accounts.  Remember, Rick Gates figured it out.

14  He had overseas accounts as well.  He knew that they were

15  overseas.  He knew he had money in bank accounts.  And he pled

16  guilty to the same crimes.  For all of those reasons,

17  Mr. Manafort was willful with respect to the tax crimes.

18        Now, I just mentioned Rick Gates' name.  I haven't

19  referred to his testimony in any specific way because the tax

20  in FBAR evidence alone, before you consider Mr. Gates'

21  testimony, is more than sufficient to prove beyond a

22  reasonable doubt that Mr. Manafort was guilty.  That includes

23  evidence of foreign bank records, vendor payments, the

24  testimony of Heather Washkuhn, the testimony of Phil Ayliff,

25  the testimony of Cindy Laporta, the lies that Mr. Manafort

─────U.S. v. Manafort─────

2399

1  told to each of them.  It includes the testimony of Morgan

2  Magionos and also Mike Welch.  More than ten witnesses

3  testified about the tax -- the tax and FBAR frauds before you

4  ever get to Mr. Gates.  And that evidence alone is more than

5  sufficient to convict Mr. Manafort.

6          Now, let's talk about the testimony of Rick Gates,

7  which is further proof of Mr. Manafort's involvement in these

8  crimes.  We'll say a few words about how the Government

9  believes that you should consider that testimony.

10         First, the Government is not asking that you take

11  Mr. Gates' testimony or statements at face value.  We're not

12  asking that.  We're not asking that you trust each and every

13  word that Mr. Gates said.  We're not asking you to like him

14  either.

15         What we're asking you to do is to consider his

16  testimony and test it and verify it.  Test it against the

17  testimony of other witnesses and see if it's consistent.

18  Ms. Washkuhn testified she had absolutely no reason to lie.

19  Phil Ayliff did and Cindy Laporta.  Compare the testimony of

20  Mr. Gates to the testimony of those witnesses and see if it's

21  consistent.  That's how you know if you can trust the

22  testimony of Mr. Gates.

23         Then take that same testimony, compare it against

24  the documents that Mr. Gates is on, and see if that's

25  consistent.  See if Mr. Gates' testimony is consistent with

───── U.S. v. Manafort ─────

2400

1    the documents that other witnesses testified about.  That's

2    how you test and verify his testimony.  And, again, you can do

3    it for any witness.  You can do it for Tad Devine and Dan

4    Rabin.  You may remember, it was some time ago, they were the

5    first two witnesses that testified and they testified about

6    Mr. Manafort's work in the Ukraine.

7           Test there and compare their testimony to that of

8    Mr. Manafort or compare it to Ms. Washkuhn.  You know that

9    Ms. Washkuhn said she was never told about the foreign

10   accounts.  And you know that Mr. Gates testified that

11   Mr. Manafort told him not to disclose the foreign accounts.

12   So it's similar.

13          And when Mr. Gates tells you about the fact that DMP

14   is losing money, take a look at the -- at the ledgers and the

15   financial documents that Ms. Washkuhn provided.

16          Again, you can do that for any of the witnesses or

17   other evidence, but compare it.  The Government is asking you

18   to do that.

19          Now, the other thing that you should do is compare

20   and consider the cooperation agreement that Mr. Gates signed.

21   That's in evidence.  It's Government Exhibit 2F.  Take a look

22   at it.  We invite you to.  And see what the terms are.  See

23   what it says about the sentence that he's facing.  See what it

24   says about the indictment here in the Eastern District of

25   Virginia which was dismissed and for which he's facing

U.S. v. Manafort

2401

1    additional time.  If he lies, that indictment can be

2    reinstated and Mr. Manafort -- Mr. Gates told you that he can

3    face years and years in jail on that indictment and that -- if

4    you -- and that he was guilty of all those charges.  So

5    consider that.  It's important.  And, again, you have a copy

6    of that document.

7            You'll remember that defense counsel suggested to

8    Mr. Gates that the Government's had agreed that he would get a

9    sentence of probation.  That's not correct, and you know

10   that's not correct when you review the actual document and

11   look at Paragraph 9.

12           One day Mr. Gates is going to be sentenced by a

13   United States federal judge in Washington, D.C. in all of his

14   crimes, the ones that he was charged with and the ones he

15   admitted from the stand behind me will be presented to that

16   judge and that judge will decide what Mr. Gates' sentence

17   is -- will be.  This is not a trial in which Mr. Gates -- his

18   guilt is being considered.  He's pled guilty.  He's told you

19   he was guilty.

20           Now, what about Mr. Gates' affair?  Why were there

21   so many questions about Mr. Gates' affair and almost no

22   questions, almost no questions about Mr. Gates' involvement in

23   bank fraud with Mr. Manafort?  Why did we concentrate -- or

24   why did the defense concentrate on the affair and not the

25   charges in this case?  Was it to distract you?  Does it

U.S. v. Manafort

2402

1  matter?

2          Does the fact that Mr. Gates had an affair more than

3  ten years ago -- does that make Mr. Manafort any less guilty

4  of tax fraud?  Of failing to file the FBAR?  Of the bank fraud

5  charges, the same charges that Mr. Gates pled guilty to or

6  testified about his own guilt?

7          Or does it make sense that the manner in which

8  Mr. Gates filed false tax returns that he took money from the

9  Cyprus and brought it to the United States and that he didn't

10 report it on his income?  Does it matter that he -- that he

11 violated the tax laws in the exact same way as Mr. Manafort?

12 Is that relevant?  Of course it is.

13         In many ways, Mr. Manafort was a mentor to

14 Mr. Gates, particularly as to his own criminal activity.  When

15 Mr. Manafort chose somebody to commit crimes with, when he

16 chose somebody to ask him to lie to his accountants, he didn't

17 chose a boy scout.  He chose somebody who, together with

18 Mr. Manafort, would engage in this criminal activity.  And

19 Mr. Gates has testified about all those facts.

20         Now, lastly, just a few more things about Mr. Gates.

21 There was a lot of cross-examination about the fact that he

22 stole money from Mr. Manafort.  You only know about that fact

23 that Mr. Gates admitted it to the Government.  He wasn't

24 otherwise charged with that anywhere.  Mr. Manafort never

25 confronted him.  And that's a crime, like all of them, that

─U.S. v. Manafort─

2403

1   will be presented to the judge at his sentencing.

2           You'll also remember that in his opening statement,

3   one of Mr. Manafort's defense lawyers said that Mr. Gates had

4   his hand in the cookie jar stealing money from Mr. Manafort.

5   Ladies and gentlemen, that wasn't a cookie jar.  It was a huge

6   Dumpster of hidden money in foreign bank accounts.  That was

7   Mr. Manafort's money in his foreign bank accounts.  And that's

8   proof that he failed to -- that he filed false tax returns.

9           Let me turn now to the bank fraud charges, and those

10  were from the years 2015 through 2017, when Mr. Manafort had,

11  in effect, run out of money.  Those are five loans for $20

12  million secured by loan applications riddled with false

13  statements and material false statements.

14          The testimony and the evidence with respect to these

15  counts come from the bank witnesses, Ms. Washkuhn and

16  Ms. Laporta.  And virtually every fact that any witness

17  testified about with respect to these bank fraud charges is in

18  a document.  Ladies and gentlemen, the star witness in this

19  case is the documents.

20          Now, Mr. Gates testified about these issues as well,

21  that he told you he was guilty of the bank fraud charges here

22  in the Eastern District of Virginia.  But, again, virtually

23  everything that he testified about was in the documents.  And

24  remember this as well, and this is undisputed, none of these

25  loans are for the benefit of Mr. Gates.  These are for

U.S. v. Manafort

2404

1   Mr. Manafort.  And absolutely Mr. Gates participated, but he

2   didn't benefit from the money.

3          Consider that in light of the claim that

4   Mr. Manafort's -- or the opening statement of Mr. Manafort's

5   lawyers, who said the only reason that Mr. Manafort is in this

6   courtroom is because of Rick Gates.  You know that's not true.

7   Mr. Manafort is here today because of his own intentional and

8   in some cases willful conduct.

9          Now, again, the evidence, I think, has been

10  relatively clear that in 2000 -- late 2015 and 2016,

11  Mr. Manafort was going broke.  His company was losing money.

12  Ms. Washkuhn testified about that over and over.  And if you

13  have any doubt, look at Government Exhibit 121 to 126.  Those

14  are the financial records that Ms. Washkuhn testified about.

15         You know, again, that President Yanukovych was out

16  of power.  You know that at this time Mr. Manafort couldn't

17  pay his bills because Ms. Washkuhn testified about his series

18  of e-mails in which she was asking Mr. Manafort to pay his

19  bills and he wasn't able to.  And as you'll hear about

20  shortly, you sure know that Mr. Manafort couldn't pay his

21  American Express bill for $200,000 for the Yankees because

22  that was an issue with respect to one of the bank frauds.

23         So let me turn to each one of these charges and go

24  through each of the elements, but first let me tell you the

25  law.  In order to prove the crime of conspiracy to commit bank

U.S. v. Manafort

2405

1    fraud, the Government must prove three elements, elements

2    beyond a reasonable doubt.  We have to prove all of those

3    elements beyond a reasonable doubt.

4           So first was the conspiracy, the Government has to

5    prove the conspiracy agreement or understanding to commit bank

6    fraud as charged in the superseding indictments formed,

7    reached, or entered into by two or more persons.

8           Here you principally have Mr. Manafort and Gates,

9    one instance Ms. Laporta, conspiring.

10          Second, the Government has to prove that at some

11   time during the existence of the life of the conspiracy or

12   agreement or understanding the defendant knew the purpose of

13   the agreement or understanding.

14          And third, the Government had to prove that with

15   knowledge or the purpose of the conspiracy agreement or

16   understanding the defendant then deliberately joined the

17   conspiracy agreement or understanding.

18          Again, don't be confused because the intent standard

19   here is different from those for the tax fraud charges, which

20   is willful.  There is no willful in this requirement with

21   respect to the bank fraud charges.

22          Now, in order to prove the substantive crimes, and

23   remember for most of the bank fraud crimes, there's a

24   conspiracy count and a substance account.  All of that is true

25   except for the loans with respect to the Union Street property

────────── U.S. v. Manafort ──────────

2406

1    from Citizens Bank.  For that loan it's only a conspiracy

2    charge.

3            Now, for the substantive counts, the Government must

4    prove the following four elements:  One, that the defendant

5    knowingly executed or attempted to execute a scheme or

6    artifice to defraud a financial institution or a scheme or

7    artifice to obtain the money, funds, or other property owned

8    by or under the control of a financial institution by means of

9    material, false, or fraudulent pretenses, representations, or

10   promises.

11           And, again, you've heard evidence and testimony

12   about the false statements about where Mr. Manafort lived,

13   about the P&Ls, about the backdated documents, about the

14   American Express records.  We'll go over those in more detail.

15           The Government also has to prove that the false or

16   fraudulent pretenses, representations, or promises employed in

17   scheme were material.  And that means that they were important

18   to the bank or they were factors that the bank considered.

19   And for that element, for each of the bank fraud counts, we're

20   going to rely on the testimony of the underwriters from those

21   banks, Peggy Miceli, who testified from Citizens Bank, Gary

22   Seferian, who testified from the Banc of California, and James

23   Brennan, who testified from The Federal Savings Bank, who was

24   the second-to-last witness to testify.

25           The third element the Government has to prove is

──────────────── U.S. v. Manafort ────────────────

2407

1    that the defendant acted with intent to defraud.  Among other

2    issues for intent, you've seen during the trial and we'll

3    review, there are any number of bank documents that

4    Mr. Manafort signed that say explicitly the following:  You

5    are required -- that the information that you provided on

6    these documents was truthful.  And if it's not truthful,

7    you're subject to prosecution.  That puts Mr. Manafort on

8    notice, on notice that the information that he provides must

9    be accurate.  And you know from the testimony and the evidence

10   that time and time and time again Mr. Manafort provided false

11   information on those loan applications.

12          Fourth and final, the financial institutions at

13   issue have to be insured or charted by the United States.  And

14   this is an issue that's not in dispute.  So you've seen

15   stipulations come in during the course of the trial.  And as

16   Judge Ellis explained, when there is a stipulation, the

17   parties agree to the fact at issue and there's no testimony

18   about it.

19          So Government Exhibit 449 establishes the fourth

20   element of the bank fraud for bank fraud conspiracy charges.

21   It says that each one of those banks was insured by the FDIC.

22   And nobody disputes that, so there was no testimony about it.

23          Let me turn to the loans.  First, you know that

24   there was a Citizens Bank loan for $3.4 million.  It's charged

25   in Counts 24 and 25, that Mr. Manafort applied for that loan

─────U.S. v. Manafort─────

2408

1   in January of 2016.  As I said, the loan was for $3.4 million.

2   It was paid out in two tranches.

3           Here, ladies and gentlemen, are the three false

4   statements that are alleged with respect to Counts 24 and 25.

5   There was lies that Mr. Manafort testified about with respect

6   to whether he lived or used the Howard Street apartment as a

7   second home, there are lies about the Peranova loan

8   forgiveness, and there are lies about Mr. Manafort falsely

9   claiming that there was not a mortgage on the Union Street

10  property.

11          Now, again, with respect to Counts 24 and 25, it's

12  sufficient that you find any one of these false statements,

13  that's sufficient proof for -- to find Mr. Manafort guilty

14  with respect to any -- with respect to Counts 24 and 25.

15          Let me start with the first one, which is the lie

16  about the Howard Street apartment.  And, ladies and gentlemen,

17  the evidence with respect to this count is overwhelming.

18  Mr. Manafort claimed that the Howard Street apartment was a

19  second apartment or a second residence.  And it absolutely was

20  not.  Not in 2015 and not in -- not in 2016.  Mr. Manafort

21  never used this apartment as a second home.  Never ever.

22          You know that from the e-mails, which you'll see.

23  You know that from Airbnb records, which you'll see.  You knew

24  that from Mr. Manafort's own tax returns.  In 2015 and 2016,

25  Mr. Manafort listed the number of days that he lived in that

─────U.S. v. Manafort─────

2409

1    apartment and the number was zero.  Zero in 2015 and zero in

2    2016.  Mr. Manafort never lived at the Howard Street

3    apartment.

4              In fact, he earned income from rental at that

5    apartment.  And why did he lie?  He lied as -- as, again, in

6    his own words in Government Exhibit 380, he lied as he told

7    Rick Gates that he wanted to get the maximum value for that

8    loan.  And you get a better value if the loan is a second home

9    as opposed to an investment property.

10             In this e-mail, in Government Exhibit 360,

11   Mr. Manafort says, "I need Phillip to answer correctly."

12   Philip Ayliff is his accountant.  Philip Ayliff, there's no

13   reason to believe he wouldn't answer questions correctly.

14   When Mr. Manafort says he has to answer correctly, that's

15   because he's going to provide false facts.

16             Now, Cindy Laporta also testified about the maximum

17   value issue.  She also said she agreed to look the other way

18   when she stated the property would be used as a second

19   residence when she told that to the bank.

20             If you look at Government Exhibit 227, this is

21   Mr. Manafort's application to the bank.  And here he makes the

22   false statement.  He checks the box for secondary residence.

23   And the application defines what the secondary residence is.

24   A property is either currently or will be occupied by at least

25   one of the borrowers.  It would not be income producing.

U.S. v. Manafort

2410

1          In Government Exhibit 229, Mr. Manafort repeats the
2   lie on February 2, 2016.  In a letter or memo to David
3   Fallarino to Citizens Bank, he says that the Howard Street
4   property, it is used as a second home to us.

5          In Government Exhibit 245, Mr. Manafort signs the
6   loan.  And while on this document you can't see the wording
7   above the signature, again, it is basically having
8   Mr. Manafort certify that the information is accurate and true
9   and that he's subject to prosecution if he doesn't provide
10  truthful information.  You should look at this document
11  yourself.  It's Government Exhibit 245.

12         And, again, evidence that Mr. Manafort never lived
13  or used the apartment as a -- as a second home is
14  overwhelming, ladies and gentlemen.

15         Here you have in Government's Exhibit 337L -- 337M
16  you have the tax returns that I referenced.  And you see that
17  both Mr. Manafort is making money -- and you can't see because
18  it doesn't show it on the slide, but if you look at these tax
19  returns, it lists the number of days that the apartment is
20  rented.  It's 365 both in 2014 and 2015 and also the number of
21  days that he lived there, which is zero.

22         Compare those dates to the dates of the loan
23  application, you'll see that Mr. Manafort lied to the bank.

24         Now, if you look at Government Exhibit 127, this is
25  at or around the time, I think, shortly after the application

─────U.S. v. Manafort─────

2411

1   is signed.

2          This e-mail has Mr. Manafort talking about the

3   Howard Street rental.  Again, in his own words, he's talking

4   to Heather Washkuhn and his son-in-law, Jeffrey Yohai, and

5   he's dictating the terms of how the money from the rental

6   should be split up.  And again, Mr. Manafort's own words prove

7   that his lies to the bank were -- that he lied to the bank.

8          Within a relative time of the loan, as well, in

9   Government Exhibit 503, Mr. Manafort is talking to Heather

10  Washkuhn about the rental income from the Howard Street

11  apartment and he references Airbnb.  Mr. Manafort knew that

12  the apartment was on Airbnb.  He says so in Government

13  Exhibit 503.  And you'll remember the testimony from the

14  witness from Airbnb about the records, about how long the

15  property was online and being rented, and it was being rented

16  during the period of time before and after the loan, and

17  curiously -- and by the way, why is this?  Right before the

18  loan, the property gets taken off Airbnb and then after the

19  loan is extended, it gets put back in.

20         Government Exhibit 225 is an e-mail from David

21  Fallarino to Paul Manafort in which he notes that the bank has

22  noticed that the Howard Street property is listed for rent and

23  that it can't be.  So what does Mr. Manafort do?  Does he say

24  to the bank, sorry, I was wrong.  It's -- it is a rental

25  property.  Does he confront Mr. Fallarino with the true and

U.S. v. Manafort

2412

1    accurate information?  He doesn't.

2           And what he does, ladies and gentlemen, is nothing

3    short of absurd and shows the lie that he told to the bank.

4    What Mr. Manafort does is he writes to Mr. Yohai, his

5    son-in-law, and this is Government Exhibit 422, January 26,

6    2016.  He says to Mr. Yohai, "the appraiser for Howard Street

7    is calling to make an appointment to view the condo."

8           And then Mr. Manafort says, "remember, he believes

9    that you and Jessica are living there."  Ladies and gentlemen,

10   if you're living in a residence, do you need to be reminded of

11   that fact?  It's absurd.

12          Does it make sense somebody would be living in an

13   apartment and have to be reminded of the fact that they were

14   living in an apartment?  They weren't living there and they

15   had to be reminded so that they could lie to the appraisers.

16   As I said, the Airbnb records show this evidence as well,

17   that's in Government's Exhibit 118.  And this lie alone, this

18   lie with respect to claiming the Howard Street property is a

19   second property, that lie alone is sufficient to convict

20   Mr. Manafort of Counts 24 and 25 of the bank fraud and bank

21   fraud conspiracy, that alone.  But as I said, there are

22   additional evidence.

23          And the issue I said, as I said earlier, with

24   respect to materiality, Peggy Miceli testified to the

25   materiality of these statements.

U.S. v. Manafort

2413

1           Now, the second false statement with respect to
2    the -- to the Howard Street loan from Citizens Bank was about
3    Peranova.  I won't spend much time on this, but again, this is
4    when the Peranova loan, which is really income, gets turned
5    back to income.

6           Now, again, not to be too confusing, but the
7    Peranova money was always income.  It always was.  It came for
8    the work in the Ukraine.  Mr. Manafort treated it as a loan so
9    he could avoid paying taxes on that money.  And then when
10   Citizens Bank said, we can't give you this loan because you
11   don't have enough income, and the problem is with the Peranova
12   loan for $1.5 million, what happens, poof again.  The loan
13   becomes income and is forgiven.  And now Mr. Manafort
14   qualifies for the -- for the loan from Citizens Bank and
15   basically the e-mail in 163 is the bank identifying this issue
16   for Mr. Manafort.

17          If you turn to Government Exhibit 163, and again,
18   this is David Fallarino saying (as read): "We qualify for
19   everything, but fail the liquidity test.  We fail because of a
20   liability in the amount of 1.5 million, which looks like a
21   debt owed to Peranova Holdings."  That's why the loan gets
22   changed back from a loan to income.  And you know you've heard
23   a lot of the evidence about what Peranova is, it's a Cypriote
24   entity controlled by Mr. Manafort.

25          Literally four days after David Fallarino identifies

———U.S. v. Manafort———

2414

1  this issue, this is Government Exhibit 389, the forgiveness

2  letter comes.  And you know that the letter is backdated.  You

3  know that when you compare the date of the e-mail and the date

4  of the memo, and Cindy Laporta testified about that as well as

5  did Rick Gates.  So, again, when you're considering the

6  testimony of Rick Gates, did the documents support his

7  testimony to other witnesses?  In this case, it certainly

8  does.

9          Ms. Laporta ultimately, in Government Exhibit 168,

10  sends the letter to the bank and identifies the issue with

11  Peranova loans, and all along, Mr. Manafort is either on or

12  copied on the e-mails.  He's aware of what's going on.

13  Peranova is a company that he controls and manages and, poof,

14  as I said, the loan is gone and Mr. Manafort qualifies for the

15  loan.

16          Now, the third and final issue with respect to

17  the -- with respect to the Howard Street loan relates to the

18  Union Street property.  We know by now that when Mr. Manafort

19  applies for a bank loan, he's required to list all the

20  properties he owns and what the mortgages are, so that the

21  bank can understand if he's keeping up on those mortgages.

22          This is also true of the American Express issue.

23  The bank wants to know if the borrower is paying back his

24  bills and what those obligations are and whether he's making

25  enough money so that he can pay back all of his obligations,

U.S. v. Manafort

2415

1    including the loan that's about to be extended.

2            And there is an extensive back-and-forth with

3    respect to the Union Street mortgage because it's not listed

4    on the loan application.  Mr. Manafort doesn't list it on his

5    loan application, and to be clear, to be 100 percent clear,

6    there is no dispute, whatsoever, that there is a mortgage on

7    the Union Street property.

8            If you look at the stipulation in Government Exhibit

9    500, it identifies, and here it is on the screen, it

10   identifies the fact that there is a mortgage from Genesis

11   Capital on the Union Street property.  That is not in dispute.

12   And take that and review that stipulation when you're

13   reviewing all of the other evidence with respect to the Union

14   Street loan.  There is absolutely a mortgage on that property.

15           And you'll see, when you see the insurance documents

16   that go back and forth to the bank, that Genesis property,

17   it's like a hot potato.  It's on and off and on and off and on

18   and off.  Mr. Manafort didn't identify that on the loan

19   application, and ultimately, he gets old and backdated

20   insurance documents and sends those to the bank, sends those

21   to Citizens Bank with respect to the loan.

22           So I'm just going to run through these documents

23   quickly.  But you've seen the Exhibit 500, which is the

24   stipulation.  You see in Government Exhibit 235, Ms. Francis

25   sends an e-mail to Mr. Manafort, not to Mr. Gates, and asks

─U.S. v. Manafort─

2416

1   about the documentation for the property.  She needs to

2   know -- this is Citizens Bank -- whether or not the properties

3   at issue that are listed on the application or that

4   Mr. Manafort has, whether or not there are mortgages on them

5   or not.

6           Mr. Gates then responds and sends the wrong

7   document, that is, he sends the right document, which shows

8   the mortgage from Genesis Capital and the -- and the date, the

9   February 2016 date.  That's the right document that identifies

10  the fact that there is a mortgage on the Union Street

11  property, and that's consistent with the Government

12  Exhibit 500, the stipulation.

13          But that wasn't Mr. Manafort's plan.  The plan was

14  to not identify that mortgage.  And so Melinda Francis writes

15  back and says, time out, I'm confused on the loan application

16  for Mr. Manafort.  It doesn't list any mortgages on the Union

17  Street property and now Mr. Gates has sent me this document

18  that is contrary to that.

19          So what happens?  You learn that Mr. Gates get ahold

20  of the insurance broker, Donna Duggan.  You remember that

21  Heather Washkuhn also testified about Donna Duggan, and she

22  dealt with her from time to time on the -- on the insurance

23  issues.  And Mr. Gates basically asked -- and he testified to

24  this, but he basically asked Ms. Duggan to give him the old

25  insurance document, the false one, so they can send it to the

U.S. v. Manafort

2417

1  bank.

2       And he -- and he, next in Government Exhibit 384, is

3  reporting this to Mr. Manafort.  So Mr. Manafort is not in the

4  dark here.  Even though he's not on every one of the e-mails,

5  he's being updated by Mr. Gates who says in this e-mail, the

6  circles are now squared and he later says that he spoke

7  directly to Donna Duggan.

8       And what happened?  Mr. Manafort then, in Government

9  Exhibit 428, sends an e-mail to the loan person managing the

10 loan at Citizens Bank and says, hey, this issue with the

11 mortgages, I've now resolved it and Rick Gates is going to be

12 sending the documentation to Melinda Francis.  Mr. Manafort is

13 directly involved with this issue, he's updated, he's

14 e-mailing the bank himself.

15      Then on the same day, the fraud is completed.

16 Mr. Manafort sends the older version of the policy, the one

17 that's consistent with Mr. Manafort's original lie and, poof,

18 again, the mortgage on the Union Street property is gone.

19      Peggy Miceli will testify about the materiality of

20 the fact that that was missing.  You'll see that after this

21 loan closes, after the Howard Street loan closes with Citizens

22 Bank, at some point, David Fallarino and the bank find out

23 about the Union Street loan.  And in Government Exhibit 252,

24 he asked Mr. Manafort about it.  He says (as read): "We have

25 also confirmed that there are -- we are now aware of one loan

U.S. v. Manafort

2418

1    on 377 Union.  We do need the statement of this, please."

2          So at some point, the bank finds out, but not until

3    later.  And, again, consider all of the evidence in this

4    trial.  The evidence that came in for the Government, the

5    evidence that came in for the defense.

6          You'll remember that Taryn Rodriguez with Citizens

7    Bank was -- testified -- she testified about her involvement

8    in the Union Street loan, which we're coming up to, and she

9    was asked, isn't it true that the bank always knew about the

10   mortgage on the Union Street property?  And she was asked that

11   on cross-examination, and she said, no, we didn't know that

12   until later.  And then she was asked a second time and she

13   answered the same, she said no.  The evidence is clear that

14   Citizens Bank did not learn about the Union Street mortgage

15   until after the loan closed.

16         Let me turn now to the Banc of California loan.

17   This is a million-dollar loan with the Banc of California and

18   Mr. Manafort and his son-in-law, Jeffrey Yohai.  You remember

19   that Mr. Manafort originally applied for a $5 million

20   commercial loan.  But even with his misrepresentation, the

21   bank determined he only qualified for a million dollars.

22         Ultimately, the loan was extended.  There are two

23   reasons why this application is false.  There are false

24   statements about the mortgages relating to Howard Street on

25   that application, and there's a fake P&L that was sent

─────U.S. v. Manafort─────

1   relating to the year 2015.

2           So first, the issue about Howard Street, there was a

3   $3.4 million loan on Howard Street from Citizens Bank that was

4   not disclosed on the loan application for Banc of California.

5   Now, let's just stop again for a minute -- for a moment.  How

6   do you know that there was a $3.4 million loan from Citizens

7   Bank?  How do you know that?  Well, aside from the fact that

8   I've just spoken for 20 minutes about that loan, you saw the

9   testimony at this trial about that very loan, which is then

10  not disclosed on the Banc of California application.

11          Mr. Manafort lies about the mortgage, claims it was

12  1.3 million when, in fact, it had been for $3.4 million.  Here

13  is the loan application, which was signed by Mr. Manafort, and

14  which has the material false statements.

15          So, first, you have the e-mail.  Can we just go back

16  one?  We have the e-mail that -- which shows Mr. Manafort

17  sending -- again, Mr. Manafort, not Mr. Gates -- sending his

18  personal financial application to the bank, and then attached

19  you have the application which has the false statements with

20  respect to his real estate and what is listed and what is not

21  listed.

22          Again, Mr. Manafort signs this document and he is

23  attesting to the truthfulness.  But when you're looking at

24  these documents and considering -- consider that Mr. Manafort

25  has not been accurate with respect to the Howard Street loan.

─────U.S. v. Manafort─────

2420

1   Now, he signs, again, not just one document for the Banc of

2   California, attesting to the truthfulness, in Government

3   Exhibit 305, he signs on behalf of the business entity, Baylor

4   Holdings, that the information is true.  And then he signs a

5   second time in Government Exhibit 306, which relates to his

6   status as a guarantor of the loan.

7           With respect to the Banc of California loan, the

8   second loan is the false statement loan.  Mr. Manafort, with

9   the help of Mr. Gates, submitted a false profit and loss

10  statement, which overstated his income by more than

11  $4 million.

12          If you look on Government Exhibit 391, here is

13  Mr. Manafort saying to Mr. Gates, you are the quarterback.

14  This is not criminal activity that Mr. Gates benefits from or

15  initiates.  This is Mr. Manafort's application to the Banc of

16  California and he's asking Rick Gates to help him.

17          Gates then contacts Heather Washkuhn -- I'm not

18  going to go through this e-mail in detail, but I believe you'd

19  likely remember it because this is when Mr. Gates is

20  chastising Heather Washkuhn about the fact that her scanner is

21  no good and how -- can't get the document in Word and he needs

22  to change the P&L and he needs to add accrued interest --

23  accrued income to the P&L.

24          Ultimately, in Government Exhibit -- ultimately, he

25  gets a copy and he -- and he alters it.  But all along, as I

──────U.S. v. Manafort──────

2421

1  said, Mr. Manafort is reviewing these documents, and here, you

2  see an e-mail where Mr. Gates is telling Mr. Manafort -- or

3  Mr. Manafort is telling Mr. Gates that he needs to see the P&L

4  and then the loan is fine to go.

5          So, again, ultimately, Mr. Gates gets a copy of the

6  P&L, he alters it, and ultimately, in Government Exhibit 298,

7  which is on the screen, he sends it to the Banc of California.

8  So here it is, Mr. Manafort is CC'd, is aware of what's

9  happening on the false P&L, it's sent to the bank.

10         And how do you know that P&L is false?  Because when

11  you compare it to the document that Ms. Washkuhn produced, and

12  you heard her testify, you see the difference between the two

13  P&Ls.  You see that they're not the same.  You see that in

14  the -- net income is different, that Mr. Gates has altered

15  that net income, and that false document has been sent to the

16  bank.  This is overwhelming proof, again, about false

17  statements being produced to the Banc of California.

18         Next, is the Union Street loan, and again, there are

19  two false statements that are made with respect to the Union

20  Street loan.  One is 2016 profit and loss statements and the

21  second relates to the Peranova loan.

22         Why did Mr. Manafort lie again about the fake P&L

23  and about the Peranova?  Again, he needs to show income to be

24  able to qualify for the loan, and you know at this time, DMP

25  is not generating income.  In the e-mail from David Fallarino

———U.S. v. Manafort———

2422

1    to Paul Manafort, Mr. Fallarino says, look for this second

2    loan from Union Street.  We're going have to have equal or

3    better income than in 2014 and that's just not true.

4         In Government Exhibit 377, you see that Mr. Gates

5    identifies this issue and tells Mr. Manafort, hey, we're not

6    even close with respect to the income.  And Mr. Manafort

7    replies to send him the P&Ls that were used for the other

8    refi.  So as of the time of this Banc of California loan, the

9    Banc of -- I'm sorry, of the Union Street loan, they've

10   already submitted the false P&L to the Banc of California.

11        Government Exhibit 257, the next document is the

12   fake P&L on file at the bank for Mr. Manafort.  Here, the

13   e-mail and attachment shows the net income in July of 2016 of

14   $1.7 million.  Ladies and gentlemen, that's false.  How do you

15   know it's false?  When you compare the P&L that's on file for

16   the bank with the P&L provided by Ms. Washkuhn, you see that

17   the bank has a P&L listed of $1.7 million, in Government

18   Exhibit 257, and that -- and that that is not the net income

19   that's shown by Ms. Washkuhn.  It's less -- it's a loss of

20   $600,000.  Again, just compare the documents.  Compare the

21   documents that have been submitted to the bank to the

22   documents that Ms. Washkuhn testified about.

23        Now, this Peranova loan issue comes up again with

24   the Citizens Union Bank because, again, Mr. Manafort has to

25   explain his income.  You know already that the -- that a lie

U.S. v. Manafort

2423

1   has been told with respect to Peranova, that the documents are

2   backdated, that the loan was really income before it became a

3   loan, before it became income.  So I won't go over this issue

4   in detail.  But Peranova, again, is an issue with respect to

5   the Union Street loan from Citizens Bank.

6            And the slides and the exhibits show that in

7   Government Exhibit 174, a copy of the letter -- a letter is

8   later sent, which repeats the lies about the loan that's sent

9   by Ms. Laporta.

10            Okay.  Let me stop for a minute and take a breath.

11   It's been a mouthful so far.  But we're almost done.  Here are

12   the last set of charges and the last loans.  There are two

13   loans and four charges with respect to The Federal Savings

14   Bank, and those are in Counts 29, 30, 31, and 32.

15            Again, this is the final set of charges.  You know

16   that in late 2016 and early 2017, Mr. Manafort applied for two

17   loans from the bank, The Federal Savings Bank.  One for the

18   $9.5 million loan and one for 6.5.  And these applications are

19   largely the same.  They went through the process largely at

20   the same time and the bank relied on a series of false

21   statements made by Mr. Manafort, which were false.  There were

22   four of them.

23            False P&L for 2015.

24            There's a false P&L for 2016.

25            You know that Mr. Manafort also lied about his

─────────── U.S. v. Manafort ───────────

2424

1   American Express delinquency and the Yankees tickets.  And let

2   me just stop on that for one point, because, again, I think

3   the evidence is overwhelming.  You saw Mr. Manafort's American

4   Express bill.  You knew at the time he couldn't pay his bills.

5   You know there's a memo in the file for Mr. Manafort saying

6   Mr. Gates borrowed his credit card to spend more than 2,000 --

7   $200,000 on Yankee tickets.

8           And put aside for a moment, ladies and gentlemen,

9   put aside that it doesn't make any sense that you would lend a

10  credit card to somebody else to incur $200,000 of charges

11  which aren't paid for more than 90 days.  Obviously ruins Mr.

12  Manafort's credit rating.  Put all of that aside, you know for

13  a fact that it's Mr. Manafort who was the Yankees fan and a

14  longtime ticket holder and not Mr. Gates.  You don't have to

15  rely on the testimony of Mr. Gates for that, at least not at

16  first.

17          You can rely on the testimony of the witness from

18  the New York Yankees that testified that Mr. Manafort had for

19  years, including in 2016, been a season ticket holder.  And,

20  again, when you put it all together and you think about all

21  the evidence and all the charges, compare with the witness

22  from the New York Yankees testified to, compare that to the

23  testimony of Mr. Gates who said, "I didn't buy the tickets,

24  they were Mr. Manafort's," that's the reason why you can

25  believe and trust the testimony of Mr. Gates as to that point.

─────────────U.S. v. Manafort─────────────

2425

1          Now, again, just the last issue with the American

2    Express, consider from the bank's point of view, the bank

3    needs to know that the borrower can pay his bills.

4    Mr. Manafort is getting $16 million of loans from The Federal

5    Savings Bank.  $16 million.  The bank needs to know if he is

6    paying his credit cards and other bills, and the fact alone

7    that Mr. Manafort can't pay his American Express bill is

8    important to the bank.  It's material.  And James Brennan

9    testified about that.

10          So I'm going to go through my remaining time this

11   last loan.  Remember, we'll talk about it at the end, that

12   throughout this loan process for The Federal Savings Bank

13   there was a guiding hand that was pushing the loans through

14   towards the end, notwithstanding some of these false

15   statements, the fake P&L, the American Express issue.  There

16   was a guiding hand, Steve Calk, pushing the loan through

17   because he was interested in serving both on the campaign and

18   the administration.

19          So here we go quickly with the last loan.

20          You know that in Government Exhibit 145 is the false

21   P&L that involves -- where Mr. Manafort is CC'd.  It has the

22   2015 P&L on file.  It lists $4.45 million.  We know that's not

23   true when you compare it to the documents produced by

24   Ms. Washkuhn.  And here you go, the comparison on -- from 145,

25   which is with the bank, and 138, which comes from

─────U.S. v. Manafort─────

2426

1  Ms. Washkuhn, you see again the disparity in the P&L statement

2  and it proves conclusively that Mr. Manafort's P&L statements

3  are false.

4       And, again, this is not -- this is not accrued

5  income for Mr. Manafort.  Put aside whether accrued income can

6  be put on a cash basis P&L.  You know that the only accrued

7  income that Mr. Manafort had was in 2014 for his work for the

8  Opposition Bloc.

9       And if you look at the Government exhibits, there

10  are bills in which he's trying to collect that with Mr. Gates.

11  That money never comes in.  But that accrued interest --

12  accrued income with debt was not in 2015 and it was not in

13  2016.  You know there was some testimony about whether these

14  loans should have gone through because they were

15  over-collateralized, and James Brennan testified that that

16  wasn't relevant.

17       What's relevant for the Bridgehampton loan, the $9.5

18  million loan, is the fact of Mr. Manafort's income.

19       Line No. 2 is the false P&L for 2016.  In Government

20  Exhibit 274 there's an e-mail from Anna Ivakhnik in which she

21  says she's spoken to Paul and his income is on the upswing.

22  That is not true.  Mr. Manafort's income after 2014 is not on

23  the upswing, and you know that from the testimony of

24  Heather Washkuhn.

25       She also writes to others in that exhibit about the

─────U.S. v. Manafort─────

2427

1    issues with Mr. Manafort's income.  And then in Government's

2    Exhibit 276, 276 is the document in which talks about the

3    income being on the upswing.  On August 11, Ms. Washkuhn,

4    herself, submits the real July 2016 P&L to the bank which

5    shows negative $600,000.  October 21st you see Mr. Manafort

6    preparing to alter the P&L.  He and Mr. Gates are e-mailing

7    back and forth, and Mr. Manafort says, "How do I convert into

8    a non-PDF Word document?"

9         He wants to change the document that Ms. Washkuhn

10   has sent, a PDF, into a Word document so she can -- he can

11   change it and alter it and send a fake one to the bank.  And

12   later he asks Mr. Gates to actually convert the document to a

13   PDF.  And in the interim there's a series of e-mails from

14   Mr. Gates.  Along the way there's an e-mail to Dennis Raico

15   telling Mr. Manafort the importance of his economic profile.

16        And then in Government Exhibit 282 you get the fake

17   P&L sent not from Mr. Gates -- not from Mr. Gates -- but Mr.

18   Manafort to Dennis Raico at The Federal Savings Bank.

19        Remember the witnesses from The Federal Savings Bank

20   said that they had never communicated with Mr. Gates at all

21   during this process.

22        Ultimately, you have the comparison between the P&L

23   sent by Mr. Manafort and the real P&L.  And, again, you see

24   the distinction between the two, and proves that Mr. Manafort

25   has made a false statement to the bank.

─────U.S. v. Manafort─────

2428

1          As I said, I've discussed the Yankees tickets issue

2     already, but here are the relevant documents.  Mr. Manafort

3     tells the bank that he lent his credit card to a friend so he

4     could purchase season tickets and that he's waiting to be paid

5     back.  Here in Government's Exhibit 274, the American Express

6     records, Mr. Manafort's American Express records.  Here is the

7     memo to Mr. Gates that Mr. Manafort submits to the bank, which

8     is false.  These are not Rick Gates' tickets.

9          THE COURT:  Mr. Andres, I assume you want to reserve

10    some of your time for rebuttal?

11         MR. ANDRES:  I do, Your Honor.  I'm going to be done

12    in one moment -- quickly.

13         THE COURT:  All right.  The Government has an

14    opportunity to come back and give you rebuttal argument for a

15    limited period because the Government has the burden of proof

16    in this matter.  Go ahead, Mr. Andres.

17         MR. ANDRES:  Thank you, Your Honor.  There are

18    then --

19         THE COURT:  You have a question, Mr. Downing?

20         MR. DOWNING:  I'm sorry, Your Honor.

21         THE COURT:  I thought you had a question.

22         MR. DOWNING:  No, I do not.

23         THE COURT:  All right.  Go ahead, sir.

24         MR. ANDRES:  Then there are a series of e-mails,

25    again, with respect to remaining issue with Mr. Raico, e-mails

U.S. v. Manafort

2429

1   relating to what's reported on The Federal Savings Bank loan

2   application with respect to the other mortgages, and

3   specifically the Howard Street mortgage.

4           Let me turn now a couple slides ahead to Slide 89,

5   which, again, I won't spend long on this.  These are the

6   e-mails -- oops.  Yeah, there are a couple of e-mails from

7   Mr. Calk, to Mr. Calk and Mr. Manafort.  You haven't seen all

8   of these because some of them were admitted, but there wasn't

9   testimony about it.  So in 269 Mr. Manafort, who is still

10  working on a campaign, offers Mr. Calk a position on the

11  National Economic Advisory Committee.

12          Government Exhibit 443, Mr. Calk sends a list of

13  positions in the Government that he would be willing to

14  consider to Mr. Manafort, everything from secretary of the

15  treasury to secretary of the Army and a series of different

16  ambassadorships.  And you've heard testimony from Mr. Raico

17  that Mr. Calk was intimately involved in the details.  Now,

18  Mr. Calk owns a substantial part of the bank but not all the

19  bank.  The fraud is at least in part against the other

20  shareholders of the bank.  And the purpose of admitting this

21  evidence and showing you Mr. Calk's involvement is just to

22  show why the loan went through notwithstanding the red flags.

23          Slide 91 is a summary of all the loans we've gone

24  through and the false statements.

25          Ladies and gentlemen, this is the case about

U.S. v. Manafort

2430

1  Paul Manafort and his money, how he kept that money when he

2  had it, millions, by submitting false tax returns as to his

3  income and his failure to identify his foreign bank accounts.

4  The evidence in this case is overwhelming.  Mr. Manafort's

5  guilt on the tax fraud charges in 2010 to 2014 is overwhelming

6  as to the FBAR charges 2011 and 2014.

7       And it's a case about how when Mr. Manafort didn't

8  have money he lied to get more from bank after bank after

9  bank.  And the evidence of the false statements to those banks

10  is also clear.  Ladies and gentlemen, at the end of the day

11  the Government asks that you return the only verdict, the only

12  verdict that is consistent with the evidence in this case, and

13  that's a verdict of guilty on all charges.  Thank you.

14       Thank you, Your Honor.

15       THE COURT:  Ladies and gentlemen, we'll take a

16  morning recess now.  Pass your books to the right.  In fact, I

17  don't think I'll begin the defense argument until after lunch

18  because it would break it up in the middle.  And I want each

19  party to have an opportunity to do what they've done, to do

20  what they wish to do, in one fell swoop.  I have about

21  17 minutes for rebuttal, Mr. Andres.  It won't be draconian,

22  but you need to focus on that.  And I take it, Mr. Downing,

23  you wish to go first?

24       MR. DOWNING:  Mr. Westling will be going first.

25       THE COURT:  All right.  Mr. Westling, you'll go

———U.S. v. Manafort———

2431

1   first and you'll be followed by Mr. Downing because you're

2   dividing up issues?

3           MR. WESTLING:  Correct, Your Honor.

4           MR. DOWNING:  Correct, Your Honor.

5           THE COURT:  All right.  And -- all right.  You pass

6   your books to the right.  Now, we won't reconvene now because

7   I don't think Mr. Flood can get the lunches to you any sooner

8   than 12:30, but an effort will be made.  We'll reconvene

9   sharply at 1:30, and at that time we'll hear defense argument.

10  And following that there will be a brief rebuttal and then I

11  will give you instructions on the law and permit you to retire

12  and deliberate on your verdict.

13          Now, I have to warn you, my instructions may take

14  quite a while.  It may take as much as an hour and a half.

15  And you won't have these in written form.  They're not in a

16  form suitable for that, but you will have a tape recording, if

17  you wish to listen to it.  Ms. Pham will have a tape recording

18  of it that will be provided to you.  All right.  Remember to

19  refrain from discussing the matter among yourselves or with

20  anyone or undertaking any investigation of any kind, and you

21  may follow Mr. Flood out.  He'll bring your lunches to you as

22  soon as they're available.  Thank you.

23          (Jury dismissed.)

24          THE COURT:  All right.  Court stands in recess until

25  1:30.

─────U.S. v. Manafort─────

2432

1          (Lunch Recess 11:44 a.m.)

2                    **P R O C E E D I N G S**

3               **A F T E R N O O N   S E S S I O N**

4          THE COURT:  All right.  We will -- yes.

5          MR. ANDRES:  Your Honor, just clarification, will we

6     take a break after defense closing?

7          THE COURT:  Do you want one?

8          MR. ANDRES:  I would.

9          THE COURT:  I'll give it to you.

10         MR. ANDRES:  Thank you, Your Honor.

11         THE COURT:  Now, you -- who will go first,

12    Mr. Westling?

13         MR. WESTLING:  I will, Your Honor.

14         THE COURT:  All right.  I'll tell the jury that you

15    divided it and that's typical and I allow that --

16         MR. WESTLING:  Thank you, Your Honor.

17         THE COURT:  -- for matters this long.  And -- but you

18    don't intend to take the whole two hours together, do you?

19         MR. WESTLING:  I don't expect so, Your Honor.

20         THE COURT:  All right.  Bring the jury in, please.

21         (Jury present.)

22         THE COURT:  All right.  You may be seated.

23         Mr. Westling.  Ladies and gentlemen, I've permitted

24    the defendant to divide their argument.  One lawyer will do a

25    part of it, another, another part of it.  I typically allow

┌─ U.S. v. Manafort ─┐

2433

1    that in cases that involve arguments of this length.  It was

2    an option available to both sides and I typically do allow it.

3            All right.  Mr. Westling, you may proceed, sir.

4            MR. WESTLING:  Thank you, Your Honor.

5                          **CLOSING ARGUMENT**

6            MR. WESTLING:  May I please the Court, ladies and

7    gentlemen.  By now you know my name is Richard Westling.  And

8    together with my colleagues we are proud and honored to be

9    able to represent Paul Manafort through this trial.

10            As the Judge just mentioned to you, we're going to

11   divide our time.  I'm going to take the first portion of time

12   and Mr. Downing is going to take the second portion.  And as a

13   result, we're dividing up the subject matter to some degree.

14   You may see some overlap, but we'll try to keep that to a

15   minimum.  So if there are things I don't address, I suspect

16   you can expect that he will, just so you know how we're going

17   to work through this.

18            I want to start by thanking you-all, for thanking

19   you for your time, your attention, and your service.  As the

20   Judge said when this trial began, jury service is among the

21   most hallow traditions of our country and it's an essential

22   part of the work that we do together in this courtroom, and we

23   couldn't do it without all of you.  I know the days have been

24   long and sometimes the testimony detailed, but you've all paid

25   attention and we thank you for that.

U.S. v. Manafort

2434

1          We ask that you continue to be steadfast and to do

2     your best and to honor the oath that you took when you came

3     into this courtroom on the first day.  We ask you to continue

4     to be attentive, deliberate, and thoughtful.

5          So let's talk about the oath that we started with.

6     You took a solemn oath to follow the Judge's instructions, to

7     weigh this case only by the evidence that was introduced in

8     this courtroom, and I know each and every one of you took it

9     seriously.  I can only ask that you continue to do so as you

10    reflect on the charges against my client, Paul Manafort.

11          I want to start today by talking about some of the

12    things that we deal with in the law that you're going to be

13    instructed by the Judge about, and they have to do with some

14    primary issues in every criminal case:  The presumption of

15    innocence, the burden of proof, and reasonable doubt.  Those

16    are the hallmarks of our criminal justice system and the work

17    that you are getting ready to set out to do as a collective

18    body later today.  The presumption of innocence alone requires

19    you to acquit the defendant until unless the evidence proves

20    his guilt beyond a reasonable doubt.

21          Sitting here today, Mr. Manafort is innocent and he

22    will continue to be innocent until you render a verdict.  But

23    if you are thinking right now that any of this evidence adds

24    up to something, you shouldn't be.  Put it out of your mind.

25    The Judge has told you that repeatedly and I have confidence

U.S. v. Manafort

2435

1   each and every one of you have done that.  I know it's not

2   easy, but I can tell you've taken this job seriously.  And,

3   again, we thank you for that.

4           The other premise of our system is that the

5   defendant has no burden.  It's up to the Government to prove

6   its case.  And you know at this point we've made a decision

7   not to put on evidence.  And that's because we believe, and I

8   will argue to you in various ways the Government has not met

9   that burden.  And the Constitution guarantees each and every

10  American that's charged with an offense the right to put the

11  Government to its burden.  And it's your job to ensure that

12  burden has been met.

13          So let's talk a little bit about reasonable doubt.

14  Can you put the chart up?

15          This chart is just an effort to kind of give us a

16  way to talk through what reasonable doubt is.  The Judge is

17  going to instruct you, and you should listen to his

18  instructions about all of the legal issues in this case, but

19  it's sometimes difficult for someone who hasn't encountered

20  reasonable doubt before to understand what a high burden it is

21  beyond a reasonable doubt.

22          And this chart is an effort to kind of give you a

23  sense of how high a burden that is.  It's not enough to think

24  that someone is possibly guilty.  That's clearly not

25  reasonable doubt.  It doesn't overcome reasonable doubt.  It's

U.S. v. Manafort

2436

1    not enough to think somebody is probably guilty or even that

2    they're likely guilty.  In fact, it's not even enough that

3    they are highly likely to be guilty.  They must be guilty

4    beyond a reasonable doubt.

5            The Judge will tell you that's not beyond all doubt,

6    but it's beyond a reasoned doubt based on your evaluation of

7    the evidence.  And we ask that you keep this grading process,

8    this working process, hold the Government to its burden,

9    ladies and gentlemen, because that's what our system is built

10   on.  And, again, I can tell by your attention through the

11   trial that you've been working hard to do that, and we thank

12   you for that.

13           Ladies and gentlemen, I want to talk to you a little

14   bit about Paul Manafort and the evidence that's come in this

15   trial about him as a person.  You've heard witnesses talk

16   about his talent as a political consultant.  You've heard that

17   Mr. Devine and Mr. Rabin, who are actually from the other side

18   of the aisle, have great respect for Mr. Manafort and the work

19   he did both here in the United States and in the Ukraine.  You

20   also will know, based on evidence in the record, namely,

21   Defense Exhibit 41, that Mr. Manafort has been an advisor to

22   the presidential campaigns of Gerald Ford, Ronald Reagan,

23   George H. W. Bush, Bob Dole, and Donald Trump.  This is a

24   gentlemen whose been involved in American politics for most of

25   my lifetime, and he is endeavored to serve.

U.S. v. Manafort

2437

1       He's also been a businessman.  He cofounded Black,

2   Manafort, Stone and Kelly, a successful lobbying firm in

3   Washington in 1980 with his partners before going on to found

4   the companies that you've heard something about in this case,

5   Davis Manafort Partners and DMP International.  These are

6   highly regarded political consultants based on the testimony

7   of Mr. Rabin and Mr. Devine.

8       Again, they told you about his skills and his

9   ability, but Mr. Manafort doesn't do that alone.  No one does

10  anything alone.  You can see from our effort we have not done

11  this alone.  And so what he did throughout his career, both

12  what you learned about his work in Ukraine and work in running

13  DMP, he turned to other people to work together as a team and

14  had to rely on those people.

15      And sometimes the people we rely on are trustworthy

16  and sometimes they're not.  You're going to hear more about

17  that later.  I'm not going to dwell on it right now.  But

18  what's important is Mr. Manafort's style is evidenced in this

19  case has been to get people together to do things.  And so

20  instead of what we typically see in a fraud case where someone

21  turns away and covers up and doesn't disclose what they're

22  doing, Mr. Manafort involved his bookkeeper, his accountant,

23  Mr. Gates, and others in the way that he communicated with

24  bankers and other people.  That's not consistent with someone

25  who is attempting to commit a fraud.  Fraud is about secrecy

─────U.S. v. Manafort─────

2438

1   at its very core.

2          And what we know is that Ms. Washkuhn came in here

3   and she testified and she was clearly not someone who was

4   somehow involved in any of this.  She played a role.  She

5   indicated she did her best to track various expenses.  And

6   when it came time to deal with loans on the book, she

7   classified them as she thought was appropriate.  And so he

8   built these teams.

9          And just as an example, Tim, put up No. 2.

10         This is an e-mail that just kind of shows you the

11  way this goes.  It's an e-mail that is written relating to

12  getting information to one of the banks in this case, and

13  Cindy Laporta is sending the e-mail and involving Mr. Gates

14  and Ms. Washkuhn.  And all those folks are being tasked with

15  pulling together information to help submit for Mr. Manafort's

16  loan applications.  This is a sample.  There are several

17  throughout the record.

18         But the point is only that we saw lots of these

19  through the trial.  Washkuhn, Laporta, Gates, Manafort in

20  various combinations.  Sometimes with loan officers.

21  Fallarino.  You remember seeing those e-mails?  Mr. Seferian

22  at points or Mr. Kaufman from the Banc of California.  Mr.

23  Raico from The Federal Savings Bank.

24         You can take that down.

25         So what I'm here to talk to you about today is the

──────U.S. v. Manafort──────

2439

1    bank fraud part of the case.  And I want to start by trying to

2    understand the story that has been told through the

3    Government's presentation.  And what their premise has been

4    when it comes to the bank fraud is, one, Mr. Manafort did not

5    have money, and, two, Mr. Manafort needed loans for his

6    lifestyle.

7            I suggest to you, ladies and gentlemen, the evidence

8    has not supported those points.

9            We're going to take a look at Defendant's

10   Exhibit 41, which is a page from the credit memo that

11   Mr. Brennan at the Banc of California prepared, who is one of

12   the last witnesses to testify, analyzing Mr. Manafort's cash

13   and net worth.  This is that page.  And the next slide I'm

14   going to show you is just one with a few numbers pulled out so

15   you can see them.

16           And so at the end of 2016, Mr. Manafort had cash in

17   other financial institutions, which mean securities and all

18   other kinds of deposits, of $8.6 million and he had an

19   adjusted net worth of $21.3 million.  Given this evidence, how

20   can we say he didn't have money?  Well, there were some

21   e-mails that talked about having trouble paying bills.  I

22   suspect many of us have had trouble paying bills.  I sure know

23   I have.  But that's a lot different from whether you have the

24   ability, the wherewithal to take on debt and repay it.  And

25   this financial statement, at the end of all of these loans

U.S. v. Manafort

2440

1  being granted, suggests Mr. Manafort still had substantial

2  cash holdings and a very robust net worth.

3          So why does the Government come and try to put

4  witnesses on to say he didn't have any money?

5          The other premise is he needed money for his

6  lifestyle, but there has been no evidence, ladies and

7  gentlemen, that any of the money from the loans actually went

8  to support his lifestyle.  We've seen a lot of lifestyle

9  evidence in this case, a lot of expenditures, personal and

10 otherwise, but there has not been a dollar that the Government

11 demonstrated went from those loans into buying any kind of

12 luxury good or paying a bill or that sort of thing.

13         What generally was going on, and you can see it

14 through the e-mail, is that there were a series of properties

15 that were being refinanced in various ways.  In some cases

16 they were -- I think the term was "cash-out refinance."  So

17 we're refinancing the existing debt, taking on some more, we

18 may get some cash out.  In many cases that money, as you know,

19 from The Federal Savings Bank loan was being held as

20 collateral by the bank, was being used to set aside money to

21 pay the loan in the future, or various other things.

22         But there is simply no evidence, the Government has

23 not proffered or produced any evidence, that Mr. Manafort used

24 these items of money that he generated from these loans to pay

25 his living expenses to the degree they talk about those at a

U.S. v. Manafort

2441

1    great deal of the trial.

2            The other thing I want to start with, because I

3    think it's important, is Mr. Andres came up and immediately

4    set the stage by saying, "There's no question there was a

5    fraud on Federal Savings Bank because we know there was a P&L

6    that had a number on it that didn't seem to be supported."

7            He would say it is false, I would say it didn't seem

8    to be supported.  But I'm going to ask to put up the next

9    exhibit.  This is from that same credit memorandum that

10   Mr. Brennan prepared.  And, remember, the claim that the

11   Government has made is that the bank received a false 2016 P&L

12   that showed income that the bank somehow relied on, and yet

13   this is the bank's memo evaluating the loan in which they show

14   Mr. Manafort lost $638,000 in 2016.  And you'll recall

15   Mr. Brennan testifying about the bank's knowledge that

16   Mr. Manafort did not have income in 2016 because of his work

17   as a volunteer on a political campaign.

18           So, ladies and gentlemen, we need to take ourselves,

19   now you've got all the evidence, and pull the lens back and

20   begin to re-examine.  What is going on here?  What have you

21   seen?  Why has the case been presented by the Government the

22   way that it has?

23           Well, let me start out by saying there are obviously

24   a lot of charges of bank fraud.  You're familiar with those

25   now.  Mr. Andres went through those.  You've heard testimony

U.S. v. Manafort

2442

1    about them all.  There is not a single bit of evidence that

2    any of these banks came to the Government and complained about

3    a fraud.  These are frauds that were discovered in the course

4    of the Special Counsel's investigation of Mr. Manafort.  They

5    claim they're frauds, but this is basically a group that has

6    come along and looked at every financial angle, poured through

7    the documents, and tried to find any place that something

8    doesn't match up.

9          And they've done a good job of selectively pulling

10   that information together, but it has been a selection.  And

11   how do we know that?  Because while they will talk at a great

12   deal about how something wasn't disclosed, there's been

13   evidence of disclosure.  We'll talk about some of these things

14   specifically.  And there seems to be acknowledgment of that or

15   the fact that you didn't get it right at the first means that

16   you were somehow committing a crime.

17         Remember, ladies and gentlemen, this is a bank fraud

18   case.  It requires a specific intent to defraud the bank in

19   order to obtain money through false pretenses,

20   representations, and promises.  It is not enough that wrong

21   information or even false information was given to the bank

22   unless it can be shown that that information was given to the

23   bank, it was a material to their decision.

24         In other words, they didn't learn the truth before

25   they made a decision and it was done with the intent to

U.S. v. Manafort

2443

1   deceive them.  And I suggest to you, ladies and gentlemen,

2   there has been very little, if any, evidence, other than from

3   Rick Gates, to suggest that's what was going on here.  The

4   bank people that have testified have testified over and over

5   about what they would have liked to know, but that's a far cry

6   from saying they were somehow misled.

7            There's also no evidence that any of the banks filed

8   anything that they normally would with their regulators or

9   otherwise to report Mr. Manafort.

10           So to the extent you have a problem at the bank,

11   there's a process, nobody went through with that process,

12   nobody came forward and said, "We're concerned about what

13   we're seeing here," not until the Special Counsel showed up

14   and started asking questions.

15           In fact, you heard testimony from Mr. Brennan that

16   The Federal Savings Bank was actually examined by its

17   regulators on a specific loan, the $9.5 million Bridgehampton

18   loan, and that the Office of Comptroller of the Currency did

19   not cite the underlying problems with the loan, nor did anyone

20   at the bank report any issue about the loan.

21           So what is the purpose of going through and engaging

22   in this sort of selective process of pulling, well, this

23   doesn't match up with that, and cobbling it together to try to

24   suggest that this is some elaborate fraud scheme?  Well,

25   ladies and gentlemen, clearly the goal was to put all the

─U.S. v. Manafort─

2444

1   evidence they could together against Mr. Manafort to stack up

2   the counts, to make it not just about taxes or not just about

3   FBARs, but to add in banks, and to give you a sense that

4   everything is so overwhelming that there's only one

5   conclusion.

6           I know you've been paying attention and I know that

7   you will carefully evaluate what you've heard, but do it with

8   skepticism because there are plenty of things that have not

9   come out in this courtroom.  And the Government is the one

10  with the burden of proof that leaves significant questions and

11  doubts about this evidence.

12          So let's talk about some of those things.  The first

13  thing that we can puzzle about together is that the Government

14  has chosen a series of witnesses to call from these banks.

15  And they were pleasant people.  I'm sure they are nice people

16  that do nice things day in and day out.  And I don't mean to

17  disparage any of them.  That's not my goal here.

18          But they were typically folks that were not involved

19  in making any decisions.  Melinda James was a mortgage sales

20  assistant.  Peggy Miceli was an underwriting manager.

21  Taryn Rodriguez was a loan officer assistant.  For the most

22  part, their jobs in these banks was to take information in and

23  get it into the system at Federal Savings.  I think it was

24  called Encompass.  At some of the other banks, it had a

25  different name but there were not -- maybe with the exception

─────U.S. v. Manafort─────

2445

1  of Ms. Miceli, in the evaluation process of these loans.

2  And so when they were asked would you like to know,

3  would the bank like to know, they're not really in a position

4  that we'd like to know everything.  And that's a fair thing

5  for a bank to want.  It doesn't mean it happens with every

6  borrower.  I mean, I'm sure that you heard Mr. Brennan talk

7  about the underwriting process, in which there's kind of a

8  back-and-forth in an effort to make sure everything matches up

9  and the bank does its due diligence to ensure the information

10 it's gotten is accurate.  And various things come out and

11 things are changed.

12 And what the Government has done throughout this

13 case, ladies and gentlemen, is to point to what happened on

14 the day the loan was applied for and say, well, that was false

15 even though perhaps something didn't happen to make it a

16 problem until two or three months later.  And we'll talk about

17 some of these things.  So it's important for you to think

18 about the timeline and the effort that we're engaged in here.

19 Ladies and gentlemen, there are also a number of

20 witnesses that we haven't heard from:  David Fallarino, the

21 loan officer at Citizens, we've seen a lot of e-mail; Perris

22 Kaufman, the loan officer, the -- these are both the primary

23 contacts for Mr. Manafort and his folks, his team.  Perris

24 Kaufman was at the Banc of California.  We've seen some of

25 those e-mails.  Steven Calk, the chairman of Federal Savings

─────U.S. v. Manafort─────

2446

1   Bank, and the other members of the loan committee, Javier

2   Ubarri and James Norini, none of them have been witnesses here

3   in court.

4           It's for you to determine what that means.

5           So, ladies and gentlemen, let's talk about some of

6   the specifics of the loan allegations.  So the first loan,

7   $3.4 million loan on 29 Howard Street, there are two counts.

8   And as I think you remember from Mr. Andres' presentation,

9   most of these loans have a count of conspiracy and then what

10  we call a substantive count or a count of bank fraud.

11          The distinction is conspiracy requires an agreement

12  of two or more people to actually engage in the crime.  The

13  fraud itself can be committed by any person if they meet all

14  of the elements.

15          I suggest to you, ladies and gentlemen, there has

16  been a failure to show conspiracies here in several ways.

17          First, the Government proffers Mr. Gates as the

18  primary co-conspirator, and yet it is readily arguing he had

19  nothing to gain.  It didn't require him to plead guilty to any

20  bank fraud charges.  Those have all been dismissed as to

21  Mr. Gates.  And his testimony, frankly, did not in any way

22  indicate that he was seeking to deceive a bank.  And in order

23  for there to be a conspiracy, both parties would have to do

24  that together.  So there is an absence of much evidence of

25  there being a co-conspirator.

U.S. v. Manafort

2447

1        In addition, you'll note that when it comes to The

2  Federal Savings Bank, the Government went to great lengths

3  with the witnesses that testified to point out that Mr. Gates

4  had very minimal involvement.  So, clearly, there must be some

5  other co-conspirator, although that person has not been

6  identified and there has been no evidence.

7        So I would submit to you, ladies and gentlemen, that

8  the Government has failed in meeting its burden, because it

9  has failed to show an agreement to act collectively to defraud

10 the bank.  Now, I'm also going to argue, as I'm sure you're

11 not surprised, that for a variety of reasons there has not

12 been a fraud at all.

13       But you should begin by understanding since the

14 conspiracy counts come before each of the substantive counts

15 that there is an absence of proof with regard to any kind of

16 agreement.

17       Next, the fraud that relates to the alleged fraud

18 that relates to the pretend fraud that relates to the $3.4

19 million loan on Howard Street.

20       So what do we know?  We know that there was an issue

21 about a 2015 P&L.  We know there's an issue about the alleged

22 omission of the Genesis mortgage.  And we know that there is a

23 question about the personal residence of the Howard Street

24 property post closing, which is the question the bank was

25 asking about.

U.S. v. Manafort

2448

1          So if we could put up the next one, Tim.

2          So this relates to the Union Street mortgage

3   question.  The Government has gone to great lengths to say

4   that the bank, Citizens, was not aware that there was a

5   mortgage by Genesis Capital on the Union Street property.

6          Exhibit 241 is Mr. Manafort telling Ms. Francis,

7   Ms. James, she's changed her name since the e-mails were

8   written, that we've gotten a mortgage.  And there was also

9   other evidence in the form of an acknowledgment, which is the

10  next slide, from Ms. James saying, "Thank you for clearing

11  that up."

12         Remember what was going on here.  There were two

13  issues about mortgages.  Was there one on Union Street and was

14  there one on Baxter?  And if we go -- can you go back to the

15  last one?  I'm sorry.

16         This one is Mr. Manafort clearing up there was no

17  mortgage on Baxter, and there wasn't, no evidence of a

18  mortgage on Baxter, and that we have recently got a mortgage

19  on Union.  And Ms. James, Francis at the time, acknowledging

20  that and indicating, "Thank you for telling me that."

21         This e-mail, in the records of the bank, no question

22  about that.  If you go back to when the loan was applied for

23  in January, or even late December of the prior year, there was

24  no mortgage on Union Street.  This was a mortgage that you-all

25  have learned came into existence in late February.  And so

───── U.S. v. Manafort ─────

1   here we have a disclosure of that mortgage.

2          Next one, Tim.

3          And, in fact, here is an e-mail, which is before the

4   second Citizens loan, which actually never happens, in which

5   Mr. Fallarino says, "We're aware of it."  Now, we could be

6   dancing around timing on this, and I suppose that's what the

7   Government is going to ask you to do, but keep in mind this is

8   between the closing of Loan 1 and during the application of

9   Loan 2.  The bank clearly knows this, clearly aware,

10  Mr. Fallarino is acknowledging it.  And we go back to the

11  prior e-mail, which was prior to the closing of the first

12  loan.  So what's the big mystery?

13         Now, Mr. Gates had some testimony about some things

14  he was involved in, and you can decide whether to believe him.

15  I'm sure Mr. Downing will talk to you more about Mr. Gates and

16  his credibility.  But in terms of the actual evidence in the

17  record, it is clear that Mr. Manafort told Citizens Bank that

18  the Genesis mortgage was out there.  And they did their work

19  and they made sure they knew it and they were aware.  So where

20  is the fraud?

21         That's the first item.

22         The second item relates to this question over the

23  rental property, personal residence of the underlying property

24  at 29 Howard Street.

25         Now, keep in mind, ladies and gentlemen, if you look

U.S. v. Manafort

2450

1   at the loan documents in evidence, you will see a variety of

2   things that make clear that the question that's being asked

3   for purposes of financing a property that is a personal

4   residence or a second residence is not what is its current

5   status.  It's what is its status going to be -- what you

6   intend it to be at the time that you complete the loan.

7           So it's not really relevant to say it was being

8   rented in January.  That's not the issue.  The issue is what's

9   going to happen.  And we'll look at a couple of items.

10          So the first is -- the next item is a e-mail from

11  Mr. Fallarino in which he is talking about the fact that he

12  now knows the property has been being rented in January and

13  that he has spoken to Mr. Yohai about clearing that up and he

14  understands it's been taken care of.

15          So there is an understanding based on a person who

16  has not been a witness in this trial that he has handled this

17  and the property is not going to be rented.

18          And then we're going to go to the next one.  This is

19  an e-mail from Mr. Fallarino to Mr. Manafort asking for a

20  letter.  And it's asking for Mr. Manafort to provide a letter,

21  understanding his primary home, meaning his principal

22  residence is in Florida.  The bank knows that.

23          And they want to think about whether this is a

24  second home.  This actually relates to Union Street.  You see

25  the last sentence?  And the 29 Howard Street would be occupied

U.S. v. Manafort

2451

1  full-time by Jeff and Jessica.  Clearly, the intent was for

2  that to happen.

3          Now, ladies and gentlemen, if that was the intent on

4  the day the loan closed, but something later happens in the

5  future, that does not make that closing a fraud.  You have to

6  be aware of the problem at the time and not disclose it or lie

7  about it.

8          And, ladies and gentlemen, you heard that from the

9  Airbnb representative about this challenge of folks today who

10 use Airbnb to rent out their primary residence.  And, in fact,

11 I think Citizens Bank has a program that acknowledges that you

12 would use Airbnb money to help fund your primary residence.

13 So, clearly, Airbnb alone does not create a problem of whether

14 this is primary residence.  There has been no proof about the

15 use of this property.

16          Now, there is a tax return, and that is an issue.

17 But the tax return doesn't make the intent at the time this

18 was going on clearly reflected in the communication from the

19 bank about their understanding of what was going to happen

20 here.

21          Moreover, ladies and gentlemen, I submit to you that

22 if this were the fraud, we would have courts across the

23 country filled with bank frauds.  This is simply not a

24 material term of a loan.

25          People do not get prosecuted by typical Justice

─────U.S. v. Manafort─────

2452

1  Department prosecutors when what they have done is had some

2  issue about whether their property is being rented or

3  personally owned and it changes.  This is part of that going

4  through each piece of paper and finding anything that doesn't

5  match up to add to the weight of the evidence against

6  Mr. Manafort.

7          So let's talk about the profit and loss statement.

8  So you know there was a P&L prepared by Ms. Washkuhn, reviewed

9  by Ms. Laporta, based on the Peranova loan forgiveness.  The

10  Government says, "Well, that's not what happened.  It wasn't

11  real.  We listened to Mr. Gates, and that's what he tells us."

12          But the reality is that if we go back to the spring

13  of 2016, you saw Cindy Laporta.  Now, she seemed to be someone

14  who worked pretty hard to stay on the right side of things to

15  me.  You get to make your own judgments about that.  She was

16  brought in here and prodded and came under the cloud of

17  immunity and said, "I feel terrible about what happened."

18          The question is:  What did she believe at the time?

19  Because that's what matters here.  It's not how we all feel

20  when the FBI shows up.  Suddenly we all feel a little guilty

21  when the FBI shows up.  It's just human nature.  What were

22  they thinking at the time?  Did they believe this was true?

23          Well, we know there were years of loans on the books

24  that Ms. Washkuhn kept and Ms. Laporta reviewed and Mr. Ayliff

25  reviewed and nobody was troubled.  Nobody called anybody.

U.S. v. Manafort

2453

1   Nobody quit their engagement.  Nobody resigned from the

2   account.

3          It's only when the Government comes up and starts

4   saying, "Well, how do you explain this," that people get

5   nervous, they need immunity, and they suffer through making

6   difficult admissions based on hindsight.

7          But the burden of proof here is about what happened

8   at the time, not what the Government believes today, ladies

9   and gentlemen.  And I submit to you that the P&L related to

10  the Peranova loan forgiveness was submitted with everyone

11  believing that was an appropriate way to handle it.  And we

12  know that in part because when the loan was forgiven, the

13  income was reported on a tax return.

14         That doesn't sound like an elaborate scheme to keep

15  all of this from looking like it lines up and balances.

16  That's the kind of thing that a good accountant and a good

17  bookkeeper do when they're working with their client.

18         All right.  So let's talk about the Banc of

19  California.  The issues there are again the Genesis loan.  And

20  I may have misunderstood, but I think that Mr. Andres said it

21  was also something about the Howard Street mortgage when he

22  was arguing earlier.  I'm not clear about that, but I think

23  that was what he presented.

24         So let's look at the next slide.  This is an e-mail

25  from Rick Gates to Perris Kaufman, who is the banker, the loan

─────── U.S. v. Manafort ───────

2454

1    officer at the Banc of California.  And it is a e-mail cover

2    with lots of attachments.  And there's lots of pages.  When

3    you get back into the jury room, if you want to look through

4    all the pages, there's tax returns and all that other thing.

5            I'm going to jump to the end of the document.  I

6    think it's somewhere around Page 300.  And you'll see here

7    this is a question being asked, and the highlighted portion is

8    the key portion of the question, by the Banc of California

9    about the Union Street mortgage.

10           So they clearly know about it.  They're asking who

11   the guarantors are on this loan.  And if you'd go to the next

12   page.

13           So it seems like it came in last month, is what that

14   said.  And then this is the answer that's being provided.  It

15   explains who the guarantors are, what it was done for, the

16   amount of the loan, all clearly disclosed on that e-mail,

17   which was, by the way, an e-mail sent on March 16, 2016, long

18   before the Banc of California had lent any money.

19           Now, as far as the Howard Street loan, again, I

20   can't be sure about the argument the Government made.  But

21   just so we're clear -- if you'd put up the next slide -- this

22   is a page of the loan application, which was Government's

23   Exhibit 297.  And it's a little hard to read because the

24   quality isn't great.  But you'll see that in the initial

25   application, there's a disclosure of ownership of Howard and

U.S. v. Manafort

2455

1  of a mortgage on that property.

2          So to the extent I may have misheard, and I don't

3  mean to do that, I was trying to listen closely and take my

4  notes during the argument.  But if the Government argued that

5  Banc of California didn't know about the Howard Street loan,

6  this document suggests otherwise from the very beginning.

7          Now, we also know about the P&L.  This is the P&L

8  that related to a series of e-mails about Word and PDFs.  And

9  you never learned about computer programs than you have

10  probably in this trial, because we're taking a Word document

11  and converting it and converting it back.  And the Government

12  showed you several e-mails that talk about that.

13          What we know, ladies and gentlemen, is that -- we

14  know, ladies and gentlemen, that there was a P&L that was

15  being done on a accrual basis.  And there's been testimony in

16  this trial that that is not improper, that it's not illegal,

17  that to the extent that someone has anticipated future income

18  based on work that's been done, that can be accrued income.

19          We've also heard testimony about accounts receivable

20  and how one might use those and put them on a financial

21  statement.  And, again, the reality is that the question is at

22  the time it was put on that document, did someone anticipate

23  receiving it?  Because that's the test for accounts receivable

24  or accrual income.

25          And I submit to you, ladies and gentlemen, again,

─────U.S. v. Manafort─────

2456

1  that its only Mr. Gates that says otherwise.  In fact, he may

2  have even said there was an outstanding bill for some work

3  being done for the Opposition Bloc that related to that

4  amount.

5          And so in this case, that P&L, again, reflected

6  information that was in the books of DMP because there had

7  been work done.  Now, it's, again, easy to say two years

8  later, "Well, that never came in, so you were lying at the

9  time."

10          But just -- you know, I always think of the problem

11 of e-mail evidence is very much the challenge of what does it

12 all look like later.  Right?  We all send e-mail pretty much,

13 except Judge Ellis.  And -- and, you know, as a practical

14 matter, I don't like the idea of going back and looking at

15 mine sometimes because I'm not sure it's always clear what I

16 was saying or what I meant.  And yet this case has largely

17 been about what do those e-mails mean.  Think about what was

18 testified to and who testified about it.  We'd ask that you

19 rely on that.

20          I'm just going to spend a minute, because I want to

21 keep my time short, on the Citizens Bank $5.5 million loan

22 relating to Union Street.

23          And this is the next P&L.  So you can put that up,

24 Tim.

25          And this document, I don't know what to make of it,

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────────── U.S. v. Manafort ───────────────

2457

1    because if you look at it -- and there was testimony about

2    this from Ms. Washkuhn -- it is a document that shows zero

3    income from operations, $2.4 million in expenses, bad math and

4    a false bottom line because the math doesn't make sense.

5            It's not false in the sense that -- we can't tell if

6    it is true because it says there was no income, but somebody

7    added it up and ended up with it being 1.7 million and yet

8    there isn't any income on any line on that above it.  So how a

9    bank could possibly rely on a document like that, I have no

10   idea.

11           But the good news for you and for me is that this is

12   a loan that was never granted, it was never offered, and so it

13   doesn't appear that there was reliance.  But the idea that

14   someone would set out to use this document to influence a bank

15   to make a loan when it shows zero income from operations, it's

16   a little hard to imagine, and yet it is in the indictment.

17   It's part of charges that Special Counsel has brought.

18           Why would you need that additional count?  What

19   would that be about?  What would be the motivation to add one

20   more for a loan that Mr. Manafort got no money from and where

21   the underlying documentation is nonsensical?  I'll leave you

22   to determine what's behind that.

23           Finally, ladies and gentlemen, I want to talk to you

24   about The Federal Savings Bank.  The Federal Savings Bank, the

25   last few witnesses at the trial.  You heard from Mr. Raico who

U.S. v. Manafort

2458

1    talked about the bank's position, the amount of collateral the

2    bank took.  You know from my earlier discussion about the P&L

3    in 2016, that there was a larger number, but by the time the

4    bank made the loan, it was entirely clear to the bank Mr.

5    Manafort had had no income in that year, and they structured

6    the loan accordingly.  And they understood that before making

7    the loan both on the Bridgehampton property and on the Union

8    Street property, because remember, this is a refinance at this

9    point.  They're taking Genesis, the prior mortgage holder, out

10   and starting again, cash-out refinance.

11          You also heard testimony about the bank's attitudes

12   with the loans and the Government has tried to say, well, this

13   was because of these e-mails about a position and all of that.

14   But there really has been no evidence other than people

15   talking about it.  I mean, even Mr. Gates, who seemed to be

16   able to testify about everything, didn't have much to say

17   about that subject.

18          And so here we are, we know there was a unanimous

19   vote by the credit committee.  That's what's in the evidence.

20   We know that Mr. Brennan, the underwriter, says I raised the

21   loan so it could be made.  He suggests he felt pressure, says

22   I wasn't told by anyone to do that and I knew all the facts

23   and we made the loan anyway.

24          Ladies and gentlemen, I submit to you there is no

25   fraud on The Federal Savings Bank.  They understood the true

U.S. v. Manafort

2459

1    circumstances around Mr. Manafort's financial position.  They

2    made the loan knowing that and they did it in a way to secure

3    themselves by having collateral that was millions of dollars

4    over the debt in both cases.

5           You'll recall that I think the number was roughly

6    60 percent loan to value in one and maybe 70 in the other.

7    Don't rely on me, the evidence is in the record.  But these

8    were loans that had a lot of collateral where the bank was

9    looking after its interests where they were paid hundreds of

10   thousands of dollars in fees and were charging 7.25 percent

11   interest.

12          So they don't feel like buddy loans, which is really

13   what the Government wants you to believe.  Instead, these were

14   decisions made by bankers of long experience in the industry,

15   three gentlemen, all to approve both of those loans based on

16   real information.  There is simply no evidence that The

17   Federal Savings Bank was a victim of fraud.

18          Now, ladies and gentlemen, I'm coming to the amount

19   of time I hoped I would use.  I don't want to take much more

20   of your time.  Again, you have been attentive to me and to my

21   comments and I appreciate that, and I know you'll continue to

22   be so.  But I want to talk about one more issue because it

23   came up with the witness that I examined and then Mr. Downing

24   is going to come up and talk to you about some other things.

25          And that is the foreign bank issue with regard to

U.S. v. Manafort

2460

1   whose signatures these were on these records.  And if you look

2   up at the screen, we pulled those exhibits back up.  They were

3   Defense 24, 25, and 26.  So this is 24, you'll see that's Paul

4   Manafort in the yellow box.  Take a look at that because we're

5   making the comparison.  Put up the next one.

6           This is, again, allegedly Mr. Manafort's signature.

7   Not like the other one, that's for sure.  And the next page,

8   again, a third version.

9           And then finally, I'd like to put up Government

10  Exhibit 36, which is a loan application of the Banc of

11  California.  That is Mr. Manafort's signature.  That's a

12  document that was found in his house.  It's in the files of

13  the bank that he submitted and applied a loan to.

14          Clearly, something was going on in the way the

15  foreign bank records were being signed.  I can't help you with

16  that.  There's no evidence about that.  But what I can show

17  you is these signatures do not match up.  It's plain and

18  simple, right in front of your face.

19          The question is:  Why didn't the Government ask that

20  question?  Why, given all the charts, all the graphs, all the

21  things, did they rely on information at face value?  And I

22  suggest to you, ladies and gentlemen, it's because it was

23  consistent with their theory, which is the same problem that

24  infects the entire bank fraud portion of this case.

25          Again, I appreciate your time and attention.  I'm

─U.S. v. Manafort─

2461

1  now going to ask my colleague, Mr. Downing, to come up and to

2  conclude our argument.

3                    **CLOSING ARGUMENT**

4          MR. DOWNING:  Your Honor.

5          THE COURT:  You may proceed.

6          MR. DOWNING:  So the signatures that Mr. Westling

7  was just talking about, why are they so important?  They're so

8  important because part of the case, and what we opened on and

9  said was a rush to judgment, is charging Mr. Manafort with

10  knowingly and willfully not filing FBARs and knowing and

11  willfully filing false tax returns.

12          The FBAR rules ask a question, you'll be instructed

13  on this and they're very long instructions, but the FBAR rules

14  ask a question about signature authority over foreign bank

15  account.  Those signatures that were on those applications are

16  not Mr. Manafort's signatures.  They're someone else's.  Why

17  do you know they're not Mr. Manafort's signatures?  Because of

18  the testimony of Rick Gates as corroborated by Ms. Laporta.

19          Gates told Laporta that the offshore accounts were

20  set up in a manner so they did not have to be reported in the

21  United States.  Laporta's confirmed that that was told to her.

22  Gates said that Manafort believed if his -- he wasn't the

23  signature on those accounts, he didn't have to report them.

24  That's why those signatures are so important, and that's why

25  you know they're not Mr. Manafort's.

─────U.S. v. Manafort─────

2462

1       Mr. Gates also testified, against some of his

2   interest, that Mr. Manafort told him to get off of signature

3   on those accounts, but he stayed on.  But you know his

4   motivation to stay on those accounts.  It was to continue the

5   embezzlement, what ended up to be a few million dollars from

6   DMP International's offshore accounts.

7       He is the one that had the signature authority, even

8   though he was supposed to be removed from those accounts.  He

9   was supposed to do it himself.  This is somebody that

10  Mr. Manafort trusted.  He trusted him so much, he gave him the

11  key to all the financial information, the bank accounts.  He

12  let him do wire transfers, conduct all these transactions

13  without any oversight over him.  Now, what a big mistake that

14  was.

15      Indeed, as Mr. Manafort sits here and had to sit

16  through this trial and how foolish he must feel, he did not

17  know the Rick Gates that you saw on cross-examination.  He saw

18  the Rick Gates that the Government prepped and put up on

19  direct.  He came in here, Mr. Gates, trying to look all clean

20  shaven, a real decent person that you could rely upon.

21      Well, when the prep of his direct was done, on the

22  first question out of the box, he fell apart and showed

23  himself to be the liar that he is.  All the frauds that you

24  heard about that he committed, credit card, mortgage, he had a

25  mail wire fraud, a Ponzi scheme.

U.S. v. Manafort

2463

1          He testified that he had taken large amounts of

2    money from Mr. Manafort.  He said it was unauthorized.  Do you

3    guys remember how many times I had to ask him the question

4    that he finally admitted he had embezzled money?  Now, that is

5    the real Rick Gates and that is the Rick Gates that

6    Mr. Manafort did not know about.  Most of the world didn't

7    know about it.

8          And when we asked questions, when I, in particular,

9    asked questions, I asked questions about a secret life.  We're

10   not the moral police here.  The reasons for the questions

11   about a secret life came out over time when Mr. Gates finally

12   admitted he was living beyond his means.  He could not afford

13   the lifestyle he was living, and that's why he was stealing

14   money.

15         That's what the secret life was all about.  That was

16   a secret to Mr. Manafort.  It was a secret to everybody.  And

17   that's why we asked those questions, it had to do with why was

18   he embezzling so much money?  And he couldn't even get his

19   story straight with you.  His story went from it was

20   authorized bonuses.  Here's someone that was making 200- to

21   $240,000 a year, got bonused approximately $60,000 a year, and

22   then had the nerve to say to you, at multiple points in time,

23   oh, Mr. Manafort said I could have another 250.  $250,000.

24   Oh, Mr. Manafort said I could have 350.  $350,000.  And it

25   went on and on, and whenever he didn't know what to say, he

─────────────────────── U.S. v. Manafort ───────────────────────

2464

1  said it was a bonus like that was some kind of magic word for

2  him.

3          So to the very end, he lied to you.  He would not

4  admit that that $3 million, and it was an exhibit that you

5  saw, it was Defendant's Exhibit 17, take a look at it.  From

6  2010 to 2014, transaction after transaction after transaction,

7  out of multiple offshore accounts, DMP International's

8  offshore accounts, take a look at it.  And he admitted

9  finally, although on -- I was really surprised about this.  He

10  said he had some short period of time where he had an

11  indiscretion, and then I went back and questioned him again,

12  and then he finally admitted that his secret life was

13  conducted over this period of time from 2010 to 2014.

14          So you know what he was doing with the money.  He

15  was paying for his apartment in London.  He was paying for

16  fancy hotels and restaurants.  That's where all the money

17  went, and Mr. Gates said he was taking responsibility.  When I

18  asked him what, if anything, he was doing to pay back Mr.

19  Manafort for the money he embezzled or anybody else he

20  defrauded, he said he's done nothing because he spent the

21  money.

22          So let's talk about what he considers

23  responsibility.  The Government, so desperate to make a case

24  against Mr. Manafort, made a deal with Rick Gates.  Despite

25  Mr. Gates admitting or being confronted with a lifetime of

─────────────────── U.S. v. Manafort ───────────────────

2465

1    fraud, I think multiple lifetimes worth of fraud, and his own

2    tax fraud, his own failure to report over -- I think it was

3    $2.5 million from investments, that he had stolen money from

4    Mr. Manafort and made investments, and he failed to report the

5    offshore accounts, that he finally 'fessed up to, and he

6    failed to report other income.

7            Not only did he fail to do this on his returns

8    during the years he filed them, after the Office of Special

9    Counsel was conducting an investigation of Mr. Gates and

10   Mr. Gates knew of it, he went and filed amended returns that

11   were false in the middle of the investigation.

12           So Mr. Gates, how he was able to get the deal he

13   got, I have no idea.  But for the Government to walk Mr. Gates

14   in this courtroom after prepping him on over 20 occasions, he

15   stated, he was flawless on direct.  In fact, I don't even

16   think the Government had to ask some of the questions, he

17   started giving the answer.

18           But on cross-examination, he fell apart and he was

19   seen for who he is and you saw him.  And now you know why he

20   came in here and tried to get one over on you.  The Government

21   said basically in a plea agreement, I think the plea agreement

22   is an exhibit, you can read it.  But effectively, Mr. Gates

23   says his understanding is that the Government is happy with

24   his testimony here.  His lawyer gets to argue that he gets

25   probation.  All the frauds and the tax fraud and the bank

U.S. v. Manafort

2466

1    fraud and everything, he gets to walk out of here on

2    probation.  That's the deal that this Government made, the

3    Office of Special Counsel made because they were so desperate

4    to try to make the case.

5           The problem is:  They thought they needed Mr. Gates

6    to make the case, they brought him in here, and you know

7    that's the very reason why they can't.  Mr. Gates is the

8    only -- has the only testimony for you in terms of the tax and

9    the FBAR.  He's the only one that testified that he had

10   discussions with Mr. Manafort.  That was the agreement.  It

11   was agreed to do this, it was agreed to do that.  When I

12   confronted him, I said other than your own say-so, are there

13   any documents that support the fact that you had discussions,

14   and he said no.

15          So trusting what the Government told you, if he's

16   not corroborated, you cannot believe him, and you cannot

17   believe him that he had discussions.  He's just fabricating it

18   to get his probationary deal.  That's what he did in here.

19   Know that.  He did it.  You saw him do it, you watched him on

20   the stand.  You were able to assess his credibility and we ask

21   that you do so very carefully.  Because once you discredit

22   Mr. Gates, once you decide if he's not corroborated, you will

23   not listen to his testimony, you will not have any weight

24   assigned to it, once you do that, then the Government has had

25   a major failing in here.  Because to find Mr. Manafort guilty

U.S. v. Manafort

2467

1   for the FBAR, failure to file the FBAR or for the false

2   returns that they allege, you have to find that he knowingly

3   and intentionally did it, knowingly and intentionally.

4           There may be falsities on those returns.  That's an

5   issue that could have been taken care of in an audit.  You

6   heard the revenue agent testify.  They would have come in and

7   conducted an audit, the first thing, and here's someone who's

8   been around a long time, experience.  He said what do we do

9   with partnerships and closely-held corporation?  We look at

10  income.  We look at distributions to shareholders and then we

11  look at shareholder loans.

12          Distributions to shareholders and shareholder loans

13  were a main part of the testimony of Ms. Laporta earlier in

14  this case.  And with Ms. Laporta, I asked her to go back to

15  some worksheets she had put together, and I asked her to take

16  a look at the ten-year history of DMP International, DMP and

17  Mr. Manafort's reporting.  And if I can have one second.

18          (A pause in the proceedings.)

19          MR. DOWNING:  So let's first turn to Defendant's

20  Exhibit 2, would you, please?  So on the second page of

21  Defense Exhibit 2, it showed that from 2005 to 2015, the Davis

22  Manafort entities reported $92.5 million in revenue.  Of that,

23  $30,249,398 was picked up by Mr. Manafort on his personal tax

24  returns and paying 8.3 million in tax over that period of

25  time.

U.S. v. Manafort

2468

1          I believe in the Government opened, it just said

2     that Mr. Manafort had reported some of the income.  And I

3     think if you compare the Government's charts at the end of the

4     case, the revenue agent, with this chart, you will see that

5     almost all of it was reported.

6          The second chart that I used with Ms. Laporta was

7     Defense Exhibit 3.  And it's a bit of a complicated chart, but

8     it does bear out an important issue.  Ms. Laporta, you heard,

9     had asked for immunity to testify, and she said she -- when

10    she testified, she was uncomfortable about booking some of

11    these items as loans, and she talked about Telmar in

12    particular, and I think it was about $1.9 million.

13         She did testify, however, that -- and it's in her

14    note on this worksheet, that Telmar was supposed to be picked

15    up in 2016 on Mr. Manafort's tax return.  And, in fact, you

16    heard testimony that it was picked up in income.  And the

17    issue that we wanted to point out, and it ties to these loans

18    and it's a tax issue and it goes on all the time, it's called

19    a deferral.

20         So if, in fact, when determining income in a given

21    year, it's determined by the accountants that some of the

22    money would be reclassified as a loan, it's not picked up in

23    income that year.  But the next year it gets written off, if

24    it's not paid back, and it gets picked up in income.  And she

25    testified that's what happened, but she was uncomfortable with

─────U.S. v. Manafort─────

2469

1    it, and for a good reason.  She was confronted by the Office

2    of Special Counsel and some FBI agents, that really, really

3    came down hard on her, and you heard her testimony.  She said

4    she shouldn't have done it.  She said she didn't trust Gates.

5    She also said she didn't pick up the phone and call

6    Mr. Manafort.  There was no indication for Ms. Laporta or for

7    Mr. Ayliff, for that matter, that this loan issue was a --

8    was, in fact, an issue.  It was a problem.  None at all.

9            In fact, if you look at Defendant's Exhibit 3, from

10   2006 to 2015, there are over $30 million in loans that the

11   accountants at KWC had booked on tax returns.

12           Now, why is that important?  It's important because

13   when the Peranova loan came up or when Telmar came up, it was

14   not the first time that KWC decided to allocate income as a

15   loan.  It had been happening for years.  There is -- there's

16   been no testimony, no reason to believe that Mr. Manafort

17   would have known that what the accountants were doing was

18   improper over all these years, $30 million in loans.  She also

19   testified, if you remember, of the 30 million, 7.4 million

20   were written off in the manner in which the Peranova loan was

21   written off.  7.4 million.  The Peranova loan was only 1.5.

22   So you can look at this chart more closely but know that this

23   was something that KWC did for many years.  You also heard

24   from the revenue agent.  The revenue agent gave testimony that

25   if money was being received under a contract, let's say

———U.S. v. Manafort———

2470

1  consultancy contract, and the contract was for services that

2  would be provided over a period of time, there is a method to

3  elect to report the receipt of that money as income over time,

4  over the time span of the contract.  And that's -- that's

5  acceptable.  There are rules and there are complicated rules,

6  but that's acceptable.  Important about the revenue agent's

7  testimony, real experienced guy, he's been around a long time,

8  I think he said he was involved in over 500 criminal cases.

9  When I asked him how he determined what the income was, he

10 said that he had relied upon another chart that was prepared

11 by someone at the FBI.  When I asked him, "Did you look at the

12 consultancy agreements to establish that, in fact, each of

13 these payments were income, that they weren't some other form

14 of payment, there wasn't a payment that could have spanned

15 years?"

16         He said, "I looked at some."

17         Just some.  So he assumed after looking at some that

18 every single deposit in all those accounts were income, and

19 they weren't.  And he can't assume it, because the

20 Government's burden is to prove this beyond a reasonable

21 doubt.  Speculating or assuming is not the basis for a

22 criminal conviction on a knowingly, intentionally, willful

23 violation of income tax laws.  It just -- it would shock me

24 that he just said I took them off of there.

25         So what you have to do is you have to go back and

U.S. v. Manafort

2471

1  think about his testimony and how comfortable you are as to

2  what he knew or didn't know.  Because Mr. Gates had even

3  testified that millions of dollars had flown through those

4  accounts for other consultants, that it wasn't for DMP or DMP

5  International.  You heard that testimony.

6          The revenue agent also -- part of his testimony

7  really surprised me.  Let me get --

8          (A pause in the proceedings.)

9          MR. DOWNING:  Thank god for Tim because we'd be in a

10  lot of trouble here without him.

11          Look at this chart.  It's very interesting.  This is

12  one of the charts that was presented by the revenue agent to

13  talk about one of the ways in which you can determine whether

14  or not there was unreported income for a given year.  And this

15  issue goes back to what is a very confusing issue, and,

16  believe me, it's a source of many audits by the IRS.  You have

17  a partnership or closely held company that's on an accrual

18  basis.

19          And I'm not going to bore you to tears about it, but

20  accrual means you -- you pick up income, and even though you

21  may not receive the cash, you know, you sell something, even

22  though the customer didn't pay you.

23          On the cash basis you only pick up the income when

24  the customer pays you.  It's a little small one, but it's the

25  same thing with expenses.

U.S. v. Manafort

2472

1          On an accrual basis you can deduct expenses against

2    income, even though you don't actually pay the expense.  But

3    it creates a mismatch.  And this chart should help you denote

4    a mismatch between the partnership, accounting, and Mr.

5    Manafort.  Mr. Manafort's reporting on his tax return is

6    supposed to flow through the DMP International partnership

7    return.  We've heard testimony from the revenue agent.  I

8    think he had some charts up there for you to show you how it

9    flows through.  If you look at -- if you look at this chart,

10   that chart tells you for 2010 and 2014 Mr. Manafort would have

11   had giant losses.  I think one is 1.5 million and the other

12   one is over $900,000.

13          Those are substantial losses to which he would be

14   entitled to very large refunds.  That is very inconsistent

15   with the claim of filing false returns for those two years,

16   but it does let you know how complicated the issue is because

17   the revenue agent presented it to try to explain to you the

18   difference between the cash basis and the accrual basis.  It's

19   complicated.  It is not simple and it's not straightforward.

20   And that's another issue that you really should think about.

21          Here is -- here is a taxpayer, Mr. Manafort, in

22   international business generating, you saw, $92 million in

23   revenue over ten years.  Multiple investment vehicles,

24   multiple real estate investments with different investors,

25   lots of different issues.  You heard the accountant state he

─────U.S. v. Manafort─────

2473

1  was a pretty complicated client, and a difficult one because

2  Mr. Gates, year in and year out, couldn't get his act

3  together, couldn't get the information to them.  But they made

4  one thing clear:  His tax returns, Mr. Manafort's, had some

5  complicated issues.  And why don't we just take a minute to

6  talk about one of them.

7          One of the complicated issues has to do with whether

8  or not Mr. Manafort had an obligation of filing FBAR.

9  Remember they talked about EVO Holdings.  It was an entity

10 that was offshore.  The accountants were asking a bunch of

11 questions about it.  Now, Mr. Ayliff, one of the accountants,

12 testified he knows how to file the form but he doesn't have

13 expertise in determining whether or not it needs to be filed.

14         Do you remember that?

15         So what did they do when they were trying to figure

16 out whether or not it had to be filed?  Mr. Ayliff had been a

17 accountant, a CPA for, I don't know, over 30 years I think he

18 stated.  He went to an expert in the firm.  It ends up it's

19 not such a simple question.  It is a complicated question.  So

20 much so that they have someone with expertise in that

21 accounting firm that deals with the issue.  And you saw the

22 e-mail traffic that went back and forth.  The e-mail traffic

23 ended with Mr. Gates saying to the accountants, "My

24 understanding is the way this account is structured that

25 Mr. Manafort did not have to file a FBAR."

U.S. v. Manafort

2474

1        When I questioned Mr. Gates about his answer to the

2   accountant's inquiry, he did agree that it was the accountants

3   with the expertise that decided whether or not that FBAR was

4   to get filed and not Mr. Gates.  But it was a complicated

5   question.  It was not simple at all.  So any idea that has

6   been given to you by the United States government, the Office

7   of Special Counsel that this stuff is straightforward and

8   simple, it is just not true.

9        All right.  So what I would like to do is I'd like

10  to talk to you a little bit about what you would have expected

11  to have seen if, in fact, there was this big scheme to conceal

12  these -- these offshore accounts and to conceal wire

13  transfers.  At the heart of any type of conspiracy or scheme

14  is concealment.  It's you hiding stuff from the Government.

15  And that's the idea here.  The idea here is that you would

16  have to believe that Mr. Manafort was trying to hide stuff

17  from the Government.

18        The problem is when you look closer there is a clear

19  trail from DMP's business accounts, Mr. Manafort's personal

20  accounts, the general ledgers, the vendors bank accounts, a

21  clear trail directly back to the accounts in Cyprus.  You

22  heard testimony from the vendors.  They came in.  They showed

23  their invoices.  They confirmed payment came in through wire

24  transfer.  That it hit their bank accounts.  A clear trail

25  back.

─────U.S. v. Manafort─────

2475

1          You heard DMP's bookkeeper, Heather.  She came in

2    and testified how she was booking all these wire transfers in.

3    She had all the names of the offshore entities.  You heard

4    about all the different names.  I think there was about 31.

5          What I was shocked about was how well prepared Mr.

6    Gates was when he was able to name all but two off the top of

7    his head.  He is the guy that knew what was going on with

8    those accounts.  He rattled them right off the top of his

9    head.  But so did the -- so did the bookkeeper.  The

10   bookkeeper's records, the general ledger, it's made very clear

11   for each of these entities that the money was coming in and

12   was being reported as income.  As well as for any of the real

13   estate purchased in 2012, that money was wired directly to

14   real estate attorneys.  The -- the Government has exhibits in

15   there that you can go and look to that shows the wires

16   directly.

17          I also asked Mr. Gates some questions about wires

18   that he had used to embezzle money from Mr. Manafort and DMP

19   International's accounts.  The wire transfer itself, the wire

20   advice, and if you've ever wired any money, you would notice

21   from your bank account there is detailed information about if

22   you're sending money out where you're sending it, but when

23   it's coming in, there's detailed information about what came

24   in.

25          And do we have an example of one of those?

U.S. v. Manafort

2476

1          And -- I'm sorry, for one second I just want to

2    check the notation at the bottom.

3          So this document is marked SCO, I believe, Special

4    Counsel's Office, MLAT, and it's Mutual Legal Assistance

5    Treaty.  And there are exhibits that are in evidence that

6    records were obtained regarding the offshore accounts from

7    Cyprus using an MLAT.  On this wire advice, though, what I

8    want you to look at is at the bottom you see -- or towards the

9    bottom you see Global Endeavours.

10         Can we blow that up a little more?

11         And so there is the name of the account, there's an

12   account number, and it tells you where this account is located

13   in St. Vincent's in the Grenadines.  And if you go down just a

14   little more, it's got the actual account number on it.  Now,

15   this is what you would have for wire advice for all the wires

16   that came into DMP's account.  All the different entities.

17   The actual bank statements include the wire advice that has

18   all this information.

19         So how could this be this grand concealment?  It

20   doesn't make any sense.  But it actually is worse than that

21   for the Government.  You heard Mr. Gates testify in 2014 the

22   FBI came and was asking some questions and wanted to know why

23   they were banking in Cyprus, and Mr. Manafort told Mr. Gates,

24   "You tell them everything, be open about this."  And, in fact,

25   Mr. Gates admitted that he talked about the various accounts.

─U.S. v. Manafort─

2477

1    He named a bunch of entities.  Yiakora is the one that stands

2    out to me.  But he said that he was truthful and let the FBI

3    know what was going on.  That payments were coming into Cyprus

4    because the businessmen who were paying for the political

5    consultancy wanted the transactions to occur in Cyprus.  It

6    would be easier for them.  So the accounts were opened for

7    that stated purpose.  And there's no disagreement about that

8    or no proof to the contrary.  That's the stated purpose.  Not

9    to conceal income from the IRS.  That's why they were set up.

10           But in 2014, Mr. Gates and Mr. Manafort disclosed

11   the existence of the offshore accounts and their location, the

12   banks that they were at, to the FBI.  The same FBI that's

13   sitting right here at the Government counsel table.  It's the

14   FBI.  In 2014.  This case doesn't come about for years.  This

15   case you're in right now.  When in 2014, Mr. Manafort told

16   Mr. Gates, "Go tell the FBI the truth.  Don't conceal it.

17   Don't lie about it."

18           And that's a major failing, and I want everybody to

19   take some time to think about that.  If you're in this major

20   concealment scheme, why would you just disclose it?  Naming

21   the very accounts in the entities that were being used in

22   Cyprus to get this money from the Ukrainian businessmen and

23   bring it back into the United States.  It makes no sense.

24           Another issue that you'll be confronted with in our

25   deliberations has to do with who has attributed the ownership

U.S. v. Manafort

2478

1   of these offshore accounts.  And the Government just stands up

2   and says they are Mr. Manafort's accounts, but, again, I would

3   like to bring you back to some of the testimony that you

4   heard.  On direct when Mr. Gates was asked about the offshore

5   accounts he called them Mr. Manafort's accounts.  When I

6   crossed him and I asked him if these were the accounts of DMP

7   and DMP International, he said, "Yes, they were."

8           And that's really what they were.  Those accounts

9   were set up to conduct the business of DMP International.  And

10  the Government saw some of those contracts.  Not all of them,

11  but some.  That's what they were set up for.

12          We have a stipulation and I think earlier in the

13  case the Government read the stipulation in to you, and the

14  stipulation, simple version, is we've agreed to something.

15  And what we've agreed to in the stipulation -- and it's marked

16  Exhibit 456.  So I would like, if you have an opportunity, to

17  go take a look at that when you're deliberating.

18          It says, "With respect to the offshore bank account

19  information that we produced, these are the accounts of DMP

20  International.  Mr. Rick Gates had no control over, no

21  financial interest, and ownership interest in those accounts.

22  He was not a trustee, as defined by U.S. law, of those

23  accounts.  He was merely an employee of DMP International.

24  And only had the authority to act as an employee with respect

25  to those accounts."

U.S. v. Manafort

2479

1              Now, that's an important stipulation for two

2    reasons.  One, it's been agreed that these are DMP

3    International's accounts.  That's an important issue.  Because

4    that -- that defines how you determine what Mr. Manafort's

5    filing requirement would be.  That's a question to ask -- be

6    answered, and you're going to get an instruction on it.  But

7    let me draw your attention back to the issue.  It's not a

8    cut-and-dry issue.  It's not a simple issue.  It's an issue

9    that you would go to an accountant, you would talk to them

10   about, you'd have to go through the rules and try to figure it

11   out.  The idea that Mr. Manafort could have the specific

12   intent, the knowledge of whether or not he would have to file

13   a form is belied by the evidence and is belied by the

14   accountants that testified here.  They were quite clear.  It's

15   a complicated situation.  It's a difficult question.

16              But, second of all, it's important for you to know

17   that we've agreed that Mr. Gates did not have the financial

18   interest in those accounts.  So when he was wiring out all

19   this money to his own accounts and he was embezzling funds,

20   that's exactly what it was.  It was a crime against DMP

21   International and Mr. Manafort.  He only had the authority to

22   conduct the business of DMP International that he was

23   authorized to conduct.  And he did not have a financial

24   interest in any of those accounts that would have given him

25   the legal right to take that money that he took.

─────────────U.S. v. Manafort─────────────

2480

1          Just a couple of final issues.  Let's go back to the

2    accountants for a minute.  There was one other issue that I

3    wanted to cover with you that I found very disconcerting when

4    it came out there in trial.  When Ms. Laporta said that she

5    got to a point where she didn't trust what Rick Gates was

6    telling her, you know, for whatever reason she just said, "I

7    didn't trust him.  I didn't believe what he was telling me."

8          But she said that she didn't pick the phone up and

9    call Mr. Manafort.  And she really couldn't explain why.  But

10   she had a faulty premise that she was under that Mr. Manafort

11   knew what Mr. Gates was doing.  And you remember when I asked

12   the question at the end, "Well, what if, in fact, this is the

13   same Rick Gates who was embezzling all this money and

14   transferring the stuff out of accounts?"

15         And she explained to you that her training -- and

16   they called it continuing professional education, I think CPE,

17   as a CPA is that when the -- when someone who's got control

18   over the finances in the reporting for a business is

19   embezzling money, you can't trust anything they've told you

20   because they're trying to conceal it.  They'll try to cover it

21   up.  They're not going to just come out and give information

22   that would give them up.  And she said, "Quite often, the two

23   last folks to know about it are the person who -- their

24   company whose getting embezzled -- the money is getting

25   embezzled from, and the accountants."

U.S. v. Manafort

2481

1        And she even said in their retainer agreements

2   they -- they disavow any responsibility to detect fraud, and

3   for the very reason that she explained here in the courtroom.

4   That person whose got control over all the financial

5   information can really get pulled over on everybody else, and

6   that's what Mr. Gates did.  Mr. Gates was orchestrating a

7   multimillion dollar embezzlement scheme and he was trying to

8   keep it outside of the purview of the accountants.  So if the

9   accountants would have picked up the phone, maybe none of us

10  would be here right now.  Maybe we all could have gotten to

11  the bottom of it.  Maybe if there was an audit and there would

12  have been an opportunity to look at this more closely none of

13  us would be here right now.  But I can tell you as you sit

14  here right now, the Government has not met their burden beyond

15  a reasonable doubt that Mr. Manafort knowingly and willfully

16  filed false returns or knowingly or willfully failed to file

17  FBARs.

18        And, Your Honor, I would like one minute to confer.

19        THE COURT:  You may.

20        (A pause in the proceedings.)

21        MR. DOWNING:  Ladies and gentlemen, thank you again

22  for your attention and we really appreciate you considering

23  some difficult issues, weighing the evidence, assessing the

24  credibility of the witnesses that have been in here.  And

25  we're going to ask that at the end of it that you find

U.S. v. Manafort

2482

1    Mr. Manafort not guilty of all charges.

2              Thank you.

3              THE COURT:  All right.  Ladies and gentlemen, we're

4    going to take a recess, midafternoon recess.  And then we have

5    to hear, finally, once more, Mr. Andres.  And how much --

6    what's your estimate?

7              MR. ANDRES:  20 minutes, Your Honor.

8              THE COURT:  Beg your pardon.

9              MR. ANDRES:  20 minutes.

10             THE COURT:  All right.  I was going to give you 15

11   because I added up the figures.

12             MR. ANDRES:  I think you said I had 17.  I rounded

13   down.

14             THE COURT:  You're absolutely right.  Take 17.

15             Pass your books to the right, please.  Mr. Flood

16   will collect them.  Maintain their security.  Remember to

17   refrain from discussing the matter among yourselves or with

18   anyone or undertaking any investigation.  As you'll recall,

19   once we hear from Mr. Andres I will then proceed directly

20   without any further recesses to give you the instructions on

21   the law applicable to this case.  And that will take, I think,

22   about an hour and 30 minutes.

23             And then you'll be in a position to deliberate on

24   your verdict.  And we'll talk more about that when I finish

25   the instructions.

U.S. v. Manafort

2483

1          You may follow Mr. Flood out.

2          (Jury dismissed.)

3          MR. ANDRES:  Your Honor, I don't want to waste the

4   time now, but both Mr. Westling and Mr. Downing violated a few

5   of your orders with respect to their arguments, most notably

6   Your Honor ruled in the beginning of the case that there was

7   to be no mention of audit.

8          You may remember that's something Mr. Zehnle opened

9   on.  Mr. Downing referenced an "audit" at least four times in

10  his closing.  And Your Honor ruled on that specifically.  So

11  we'd ask for some sort of remedy by way of instructions.  And,

12  again, Your Honor, we can deal with this later just to catalog

13  the issue.

14         THE COURT:  Well, we really can't deal with it

15  later.  It has to be dealt with now.

16         Think about it, Mr. Downing.  I think that it would

17  be appropriate to give the jury an instruction that says that

18  the Government isn't obligated to provide an audit.  I don't

19  know that I'd go much beyond that.

20         MR. ANDRES:  Or that it's not relevant, Your Honor.

21         THE COURT:  Well, the fact that they -- I'm going to

22  tell them that the Government doesn't have an obligation to

23  provide an audit, and therefore whether or not an audit was

24  provided is not relevant.

25         MR. ANDRES:  Okay.  And then secondly, I just want

U.S. v. Manafort

2484

1   to --

2           MR. DOWNING:  Well, before we move on --

3           THE COURT:  I haven't decided to do that.  He hasn't

4   been heard yet.

5           MR. ANDRES:  I wasn't saying that you did, Your

6   Honor.

7           THE COURT:  All right.  Let him be heard on this.

8   But I think you have got a good point, Mr. Andres.  Go on.

9           MR. DOWNING:  Your Honor, the point about the audit

10  was in the context of no concealment.  And I was allowed to

11  ask the question of Mr. Ayliff during the trial about why they

12  keep the records.  And he said, "In case there's a audit."

13          And I said, "Would you turn them over like the

14  general ledger?"

15          And he said, "Yes, I would."  And that was the

16  context.  I just want to be clear.

17          THE COURT:  Yes.  You and Mr. Andres discuss it

18  more.  I think the important thing for the jury to know is

19  that the Government is not obligated to audit somebody before

20  they prosecute them criminally.

21          MR. DOWNING:  Yes, Your Honor.

22          THE COURT:  I'm a little more reluctant, Mr. Andres,

23  to tell them that the -- that it has no relevance at all,

24  because the argument that's relating to concealment -- ladies

25  and gentlemen, sit down, please.

U.S. v. Manafort

2485

1           -- because of the concealment point.

2           But I'll give you an opportunity to say more about

3   that in a few moments.  I do think you've raised a good point

4   about a reference to an audit does, I think, call for some

5   sort of curative instruction and I'll consider what that is

6   and disclose it to you before I do it.

7           What's the --

8           MR. ANDRES:  Thank you, Your Honor.

9           THE COURT:  -- next one?

10          MR. ANDRES:  The second issue is Mr. Westling

11  repeatedly referenced the notion that the Special Counsel's

12  Office is involved in selective prosecution of Mr. Manafort.

13  That, too, is something that Your Honor ruled on at the very

14  beginning.

15          He said quite clearly that these types of bank fraud

16  cases are not typically prosecuted in the United States.  And

17  both Mr. Downing and Mr. Westling have repeatedly said that

18  the Government was so intent on prosecuting Mr. Manafort, that

19  they went after these crimes that wouldn't be prosecuted

20  otherwise.  And that is a clear violation of the in limine

21  motion that the Government made at the beginning of the case.

22          MR. DOWNING:  I believe what I was referring to was

23  the desperation of the Office of Special Counsel had to do

24  with cutting a deal with Mr. Gates.  So that's number one.

25          And number two, I believe Mr. Westling's reference

─────────────────── U.S. v. Manafort ───────────────────

2486

1   was if these types of cases are to be brought, god help

2   everybody because there will be hundreds of them.

3           THE COURT:  That's not, I think, what Mr. Andres was

4   pointing to.  He's concerned about the allegation of a

5   selective prosecution.

6           I think the short answer to that is that that's not

7   before the jury.  Any member of the public, of course, can

8   have a view about what is really underway, but that's not what

9   this jury has to consider.

10          So I do think, Mr. Andres, that you have a point

11  about a -- about a brief curative instruction in which I would

12  tell the jury that to the extent any argument was made that

13  the Government has prosecuted Mr. Manafort selectively, you

14  should ignore that.  I'm very unlikely to be persuaded to say

15  anything more.

16          Confer with Mr. Westling and Mr. Downing on that.

17          MR. ANDRES:  And, Judge, sorry, just one last thing.

18  And you had asked that I approach the bench before I addressed

19  this argument, and it wasn't my intent to do that.

20  Mr. Westling in his closing mentioned again that The Federal

21  Savings Bank was making money off the loan.

22          So I intend to notice, as I mentioned yesterday,

23  that the loans were, in fact, written off and the bank didn't

24  make any money.  But that would be directly in response to his

25  argument that the bank made money.

─────────────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────────────

─────────────── U.S. v. Manafort ───────────────

2487

1        MR. WESTLING:  Your Honor, I specifically avoided

2   the loss issue.  There were fees paid.  I don't think I said

3   "made money."  I think I talked about -- I mean, I don't know,

4   but I don't think I did.  I thought I said they had points and

5   there were interest rates, these weren't buddy loans.

6        MR. ANDRES:  Hundreds of thousands of dollars is the

7   quote.

8        MR. WESTLING:  Which is what the points were.

9        THE COURT:  You said?

10        MR. ANDRES:  Hundreds of thousands of dollars, that

11   the bank made hundreds of thousands of dollars.

12        MR. WESTLING:  I think the -- again, I would have to

13   check, but I think the reference was that he paid hundreds of

14   thousands of dollars in points and that there was a 7.5

15   percent interest rate, which didn't seem like a great deal.

16        THE COURT:  Well, I would say two things to you,

17   Mr. Andres.  I think there's, again, some force to your point

18   you make.  You might have raised it at the time, but that's a

19   matter of judgment.

20        I generally -- well, in any event, I'll ask the

21   court reporter to find that for me.  And if there is that, I

22   may give a curative instruction that they're to disregard that

23   particular argument.

24        You asked, I think, Mr. Andres -- I've forgotten

25   which of the two of you asked -- for some additional evidence

U.S. v. Manafort

2488

1    on whether or not the bank could still survive or do okay

2    because it had all the collateral.

3           I didn't permit that.  I didn't permit it because

4    the Government is seeking forfeiture of all of that collateral

5    in this case.  So I'm not sure that leads to any -- any

6    conclusion the jury should be thinking about.

7           MR. ANDRES:  I think that's a different issue, Your

8    Honor.

9           THE COURT:  It is a different issue, but I raise it

10   anyway.

11          MR. ANDRES:  I'm sorry, I didn't mean to interrupt.

12          THE COURT:  Well, I think -- let me recapitulate

13   briefly.  There are three matters you've brought to my

14   attention.  One is the reference to selective prosecution.

15          I've indicated to you that I'm prepared to consider

16   a very, very concise, very brief curative instruction that

17   tells the jury that to the extent there has been any

18   intimation of a selective prosecution, they're to ignore that.

19          And I'm inclined to deal with the second issue,

20   which is the -- the issue of -- what was the --

21          MR. ANDRES:  The audit.

22          THE COURT:  Beg your pardon?

23          MR. ANDRES:  The audit.

24          THE COURT:  That's right.

25          -- of the audit that it is no bar to a criminal

U.S. v. Manafort

2489

1    prosecution that an audit could have been undertaken.

2            That's it.  That's all that needs to be said.

3    Because I think reference to an audit in the context of an

4    argument that look -- it wasn't concealed is maybe a strong or

5    weak argument depending on where you stand, but it is an

6    argument they can make.

7            What I think the jury needs to know is that the

8    Government is not required to proceed in that fashion.  It's

9    not required to provide an audit before it decides whether

10   criminal conduct has occurred.  And that's what you want to be

11   clear, isn't it?

12           MR. ANDRES:  Correct, Your Honor.

13           THE COURT:  What was the third issue?

14           MR. ANDRES:  It's just I want to be able to say in

15   simply one sentence to the jury that in rebuttal to the

16   question about whether Mr. Manafort had a lot of money and

17   whether he -- whether the bank made money from The Federal

18   Savings Bank loan, that, in fact, he didn't pay the loan and

19   the bank ultimately had to write off the loans, which is what

20   the testimony was that Your Honor allowed for Mr. Brennan

21   because Mr. Westling opened the door.

22           He opened the door by saying did the bank money from

23   the loan.  They didn't ultimately, and that is the

24   suggestion -- or the direct statement, frankly, explicitly

25   that he's now made to the jury.

U.S. v. Manafort

2490

1        THE COURT:  Well, we're going to be precise about

2   what you want to say.  Say it again, please.

3        MR. ANDRES:  I just want to say that The Federal

4   Savings Bank did not make money from Mr. -- from their

5   loans -- from the loans they extended to Mr. Manafort, and

6   that the argument that Mr. Manafort had plenty of money and

7   didn't need to lie to the bank is undermined by the fact that

8   he wasn't able to pay the mortgage --

9        THE COURT:  I don't need to make any ruling to that.

10        MR. ANDRES:  Well, I thought you had asked that I

11   approach the bench and I just didn't want to violate the --

12        THE COURT:  Well --

13        MR. WESTLING:  Your Honor, if I may.

14        THE COURT:  Yes.

15        MR. WESTLING:  I think specifically -- and, again,

16   it was not intentionally if I violated -- we can check the

17   record.  But before this argument began, there was a specific

18   discussion about whether the Government would be arguing the

19   loss on the loan.  And I specifically avoided part of my

20   argument in an effort to avoid that.

21        I may have stepped in the wrong place otherwise.  I

22   don't think I did.  I think my comment was simply that they

23   had charged and collected money, which was to suggest that the

24   loan terms were not favorable in direct and thorough reply is

25   the argument that Mr. Andres made, which is that the fix was

─U.S. v. Manafort─

2491

1    in, Steve Calk was behind this.

2              So, I mean, I can't be obviously put in a position

3    of having to respond to the Government, and then in the

4    process, forced to open the door to something we sort of all

5    agreed wasn't going to come up.

6              MR. ANDRES:  But then did come up because

7    Mr. Westling argued it.

8              THE COURT:  Well, there seems to be some dispute

9    about that.  I'll look at the record.

10             MR. WESTLING:  Thank you, Your Honor.

11             MR. ANDRES:  Your Honor, can we -- can we have a

12   little more time to come back?

13             THE COURT:  I may take a little more time, yes.

14             (Laughter.)

15             THE COURT:  And I'll tell you when that is.

16             MR. ANDRES:  Okay.  Thank you, Your Honor.

17             (Recess.)

18             THE COURT:  All right.  There were three issues, as

19   I recall, that were left open and they should be resolved

20   before Mr. Andres makes his final 17 minutes.

21             The first is -- relates to audits, and Mr. Andres is

22   quite correct that there should be a curative instruction

23   there.  However, I think it is important to be careful because

24   the reference to audits was in the context here of not that

25   they should have audited before they prosecuted, but rather

U.S. v. Manafort

2492

1   that an audit would have disclosed this.  And if you really

2   wanted to conceal things, you wouldn't have done it in a way

3   that would have disclosed it in an audit.  That was the

4   argument I understood the defendant to make.

5            But I think the reference to an audit that

6   Mr. Andres raises does entitle him to seek a curative

7   instruction that tells the jury that the Government is not

8   required to provide an audit before bringing a criminal

9   prosecution.  And I think that's the simple fact.

10           Am I wrong, Mr. Andres?

11           MR. ANDRES:  Mr. Downing referenced an audit four

12   times, and at least once he said we could have all resolved

13   this meeting and could have avoided the prosecution if there

14   was just an audit.

15           THE COURT:  Yes, I take that.  But what about my

16   saying simply that the Government is not required to provide

17   an audit before bringing a criminal prosecution?

18           MR. ANDRES:  We agree, Your Honor.  Thank you.

19           THE COURT:  So I didn't have any doubt that you

20   raised a good point, and I'm accommodating it.  But I also

21   wanted to make clear that there is a legitimate reason for

22   arguing.  I'm not -- you're saying they crossed the line.  I

23   hope they didn't.  I hope this curative instruction will be

24   all right.

25           Now, the second point is the point of selective

———————U.S. v. Manafort———————

2493

1   prosecution.  And here, again, I'm inclined to give a very

2   brief instruction that tells the jury that they are to ignore

3   any suggestion that -- well, I forgot to ask you, Mr. Andres,

4   what would you suggest?

5         MR. ANDRES:  Well, Your Honor, again, and I

6   appreciate the difficulty.  But the same reason I didn't

7   object during the closing is I don't want to highlight the

8   issue.

9         THE COURT:  What would you suggest I tell the jury?

10        MR. ANDRES:  That there's nothing inappropriate

11  about the charges that the Government has brought, that is,

12  that they -- I'm not suggesting that they're --

13        THE COURT:  No, I can't tell them that because --

14        (Laughter.)

15        THE COURT:  -- if it's false, if they don't find --

16        MR. ANDRES:  I wasn't --

17        THE COURT:  If they don't find that you've proved

18  your case, I'd say it's inappropriate.

19        MR. ANDRES:  Well, I wasn't suggesting that, but

20  there's nothing defective about the indictment.

21        THE COURT:  Yes, you're quite right about that.  So

22  let's see if, together, we can formulate an instruction here

23  that tells the jury that -- I think maybe the way to do it,

24  Mr. Downing, Mr. Westling, is simply to say that you should

25  ignore and not consider any allegation of a selective

─────U.S. v. Manafort─────

2494

1   prosecution.  I think it is relevant for them to point out

2   some of the things they did, but selective prosecution is not

3   an issue.

4           What suggestion do you have, Mr. Andres?

5           MR. ANDRES:  You know, I'm trying to think how to

6   word it, Judge.  The words that I'd like to avoid are

7   "selective prosecution."  So, again, I'm -- I think there's a

8   danger in highlighting that.

9           THE COURT:  How about if I say you should ignore any

10  suggestion that the independent prosecutor has proceeded

11  illegitimately or has proceeded improperly.

12          MR. ANDRES:  And one -- I maybe start with the

13  Department of Justice, so that we avoid the very issue that

14  the defense is trying to allege that he --

15          THE COURT:  All right.  I don't -- I don't mind

16  that.

17          MR. ANDRES:  But I think what I would say -- can you

18  just repeat that, Your Honor?

19          THE COURT:  Well, let's wait and see what

20  Mr. Downing says.  I will repeat it for you.

21          MR. DOWNING:  Your Honor, I just wanted -- I think

22  if we could have five minutes to think about it because it --

23  what I'm worried about is that you're going to start saying

24  selective prosecution and --

25          THE COURT:  All right.  Just a moment.  I'm going to

U.S. v. Manafort

2495

1  give you and Mr. Andres an opportunity to do that.  He doesn't

2  want to use the term "special prosecutor," that's fine with

3  me.  I think that's appropriate to use the Department of

4  Justice.  And he doesn't want to use "selective prosecution,"

5  and I don't mind that either.  Find a way that accomplishes or

6  assuages Mr. Andres and makes the point.  We don't want the

7  jury deciding this case on that issue.

8              What's the third point, Mr. Andres?

9              MR. ANDRES:  Just want to be able to argue that

10  Mr. Manafort, that the claim that Mr. Manafort had so much

11  money, that -- you know, that he didn't have to lie about his

12  income is belied, in part, by the fact that he couldn't pay

13  off the loan.

14              THE COURT:  I don't see any reason why he can't make

15  that argument.

16              MR. WESTLING:  Your Honor, I think, first, there's

17  been no evidence that that's the reason the bank charged off

18  the loan.  So it would be pure conjecture and not based on

19  any --

20              THE COURT:  Well, you say that the bank charged off

21  the loan.  There was evidence of that.

22              MR. WESTLING:  Well, Your Honor, I think -- I'm

23  struggling with -- this is the following problem:  We

24  addressed this issue in advance.  I offered an argument that

25  was responsive to one that Mr. Andres made and now the

─────────────── U.S. v. Manafort ───────────────

2496

1    challenge is that that apparently opened the door to something

2    we agreed was not going to come in that's happening at a time

3    where I can't remedy the problem.  The objection should have

4    been made timely and temporally so I could have fixed the

5    issue, addressed it, and not just be left not able to reply.

6              THE COURT:  Well, I can fix that.  Do this:  I'll

7    take another recess.  Tell the jury we'll be another

8    15 minutes.  I'll take another recess.  Please confer, open-

9    mindedly with each other, and see if you can agree.  I think

10   there's -- I'm satisfied that a curative instruction that the

11   Government -- I tell them that the Government is not required

12   to provide -- I'll say you've heard some testimony about an

13   audit.  You should know that the Government is not required to

14   provide an audit before bringing a criminal prosecution and

15   leave it because I've indicated to you how an audit could be

16   something they can consider in terms of the concealment issue.

17             Selective prosecution, you're going to talk about.

18             And the third point you want to be able to argue,

19   Mr. Andres, that the bank wrote the loan off.  That's what you

20   want to be able to say.

21             MR. ANDRES:  Correct.

22             THE COURT:  And your argument there is that there

23   wasn't any evidence of that.

24             MR. WESTLING:  And that we had an agreement about

25   how that would work, and I haven't seen what I allegedly did

U.S. v. Manafort

2497

1    in the record to open the door.

2              THE COURT:  Well, I have a gift for you.

3              (Laughter.)

4              THE COURT:  Margaret, can you reproduce it and bring

5    it to me?  One for each.

6              MR. DOWNING:  Thank you.

7              THE COURT:  So I'll take another recess and let's

8    see if we can get to the bottom of this quickly.

9              MR. DOWNING:  Thank you, Your Honor.

10             MR. ANDRES:  Thank you.

11             THE COURT:  You can all take comfort from the fact

12   that however ponders either of you, any of you, may have been

13   in your arguments, I will hold the record.

14             Court stands in recess.

15             (Recess.)

16             THE COURT:  You may be seated.  Let me summarize

17   briefly to come to the third point.

18             The first point was that I intend to instruct the --

19   instruct the jury that the Government is not required to

20   provide an audit before bringing a criminal prosecution and

21   then to tell the jury, because you all agreed to it, you are

22   to ignore any argument about the Department of Justice's

23   motives or lack thereof in bringing this prosecution.  The

24   parties have satisfied that that takes care of the second

25   issue.

U.S. v. Manafort

2498

1        Now we come to the third issue, and I've provided

2   the parties with the transcript of the closing argument

3   Mr. Westling made, and I'm told that the -- I could be wrong,

4   but I'm told that the matter in dispute arises at Page 103.

5        But let me ask, first of all, have you reached any

6   joint agreement on that?

7        MR. ASONYE:  We have not, Your Honor, although I

8   think we've clarified the simple fact that the Government

9   wants to elicit in our rebuttal argument is that, as was

10  elicited during the trial, that these two loans were written

11  off, that they suffered a loss.  And that's in direct response

12  to the paragraph in Page 103 where Mr. Westling argued that

13  not only did Mr. Manafort pay hundreds of thousands of dollars

14  in fees, but there's simply no evidence that The Federal

15  Savings Bank was a victim of fraud, and that they didn't feel

16  like these were buddy/buddy loans.

17       It's -- I actually -- quite frankly, I don't know

18  that --

19       THE COURT:  Well, why don't we do this?  You don't

20  dispute that he did pay lots of points and money.  That's in

21  the record, too.

22       MR. ASONYE:  Yes, Your Honor.

23       THE COURT:  I mean, there are several hundred

24  thousand dollars.

25       MR. ASONYE:  Yes, Your Honor.

U.S. v. Manafort

2499

1          THE COURT:  And you don't dispute that the loan was

2     written off and there was evidence of that.

3          MR. WESTLING:  That's correct, Your Honor.

4          THE COURT:  The thing that I'm concerned about is I

5     don't want it to go forward and say Mr. Westling argued there

6     is simply no evidence that The Federal Savings Bank was a

7     victim of fraud.  Now, there, the parties clash pretty

8     significantly.  But that's their problem to resolve.  And I am

9     not going to give an instruction that in any way intrudes on

10    their ability to resolve that issue.  So we need to think

11    about a creative way to do this.

12         MR. ASONYE:  Your Honor, to be clear on this issue,

13    I don't believe the Government is asking for instruction.  We

14    simply want to be able, in our rebuttal, to state to the jury

15    there will be -- two loans were written off.  That's it.

16         THE COURT:  Well, but then Mr. Westling says, wait a

17    minute, they weren't supposed to do that, as I -- that's

18    your --

19         MR. WESTLING:  That was my understanding of our

20    agreement.

21         THE COURT:  He might have said something in his

22    closing that would have addressed that.  Now, he can't change

23    the fact that they wrote off the loans.

24         MR. WESTLING:  That's true.

25         THE COURT:  But what he can do is to say something

U.S. v. Manafort

2500

1    about that doesn't mean that they were harmed by fraud.

2            MR. ASONYE:  Your Honor, it's a fact in evidence

3    that the loans were written off.  The idea that the Government

4    cannot say that to the jury is perplexing to me.

5            THE COURT:  I'm pleased that I can occasionally

6    perplex you.

7            (Laughter.)

8            THE COURT:  Of course, he is right.  It is in the

9    record.

10           MR. WESTLING:  Your Honor, I don't deny that it's in

11   the record and my trouble is simply that we came to an

12   accommodation, and as a result, I did not raise the issue.  I

13   don't believe the comments I made --

14           THE COURT:  Well, tell me about the accomodation

15   that you are talking about.

16           MR. WESTLING:  Well, it was that it was not going to

17   be argued as an issue.  Your Honor, this came up in dealing

18   with the judicial notice issue of trying to close the loop on

19   what had happened as to why the loans were not paid.  And at

20   that point, I believe Mr. Andres, and I don't want to speak

21   for him because he's here --

22           MR. ANDRES:  Pardon me, Your Honor.

23           MR. WESTLING:  -- represented that that was not

24   something he planned to argue in closing.  As a result, I did

25   not plan to either.  I don't think what I said here actually

──────U.S. v. Manafort──────

2501

1   goes to that issue.  It simply goes to one of the loans.

2          THE COURT:  Goes to what issue?  Goes to what issue?

3          MR. WESTLING:  Whether there was a loss or not or

4   whether anybody made money, for that matter.  This really just

5   said he was charged a lot of money.

6          MR. ASONYE:  Your Honor, there's two separate

7   issues.  The first issue was whether, initially, when The

8   Federal Savings Bank witnesses were on the stand, whether the

9   Government could elicit that there was a loss suffered.  And

10  typically, in a bank fraud case, we would not.

11         However, Mr. Westling opened the door by talking

12  about the fees and how much money the bank made.  That's issue

13  number one.  That's in the record.  We can refer to that.

14         The second issue was brought up about this judicial

15  notice motion about forfeiture allegations and that was

16  resolved.  We're not going to be talking about forfeiture and

17  judicial notice there.  That has nothing to do with the first

18  matter that was resolved.  They opened the door, we put into

19  evidence about the loans written off --

20         THE COURT:  Mr. Asonye, I am aware of that first --

21  I don't think there's any confusion of issues.  I resolved

22  that earlier one.

23         The point here is, I think, quite simple.  He now

24  wants to argue that the loans were written off.  I don't see

25  how you can complain about that since there was evidence that

─────U.S. v. Manafort─────

2502

1   the loans were written off.

2           MR. WESTLING:  Well, Your Honor --

3           THE COURT:  What you're saying is, look, I thought

4   we had an understanding that they weren't going to say that,

5   and therefore, I didn't argue what, Mr. Westling.

6           MR. WESTLING:  I didn't argue about why there was a

7   loss and that the loans were performing in June, prior to the

8   indictment, or any other issue I might have argued about why

9   the Government is the cause of the loss.

10          THE COURT:  Mr. Andres, do you or Mr. Asonye want to

11  address that?

12          MR. ANDRES:  I'm sorry, Judge.  Excuse me for being

13  late.  We're not going to argue that.  That's -- the agreement

14  related to the issue with the judicial notice, we're not going

15  to argue about the -- that issue.  We're simply going to

16  refer --

17          THE COURT:  Well, they lost that issue.

18          MR. ANDRES:  Right.  Well --

19          THE COURT:  Although, if you read the newspapers,

20  it's otherwise.  They win everything, you lose everything.

21          (Laughter.)

22          MR. DOWNING:  Let's keep it that way, Your Honor.

23          (Laughter.)

24          MR. ANDRES:  I simply want to refer to the evidence

25  in the record that the loans were charged off as evidence

U.S. v. Manafort

2503

1   Mr. Manafort didn't have all the funds that he claimed he had.

2             THE COURT:  All right.

3             MR. WESTLING:  Your Honor, I'm troubled because the

4   Government made an agreement.  I don't understand why they

5   were released from that agreement because I clearly did not

6   make an argument to --

7             THE COURT:  Now, what do you understand the

8   agreement was?

9             MR. WESTLING:  That that issue would not be raised

10  in closing, the issue of a loss on these loans.

11            THE COURT:  And the only thing you would say, had

12  you known that, that it would be raised, is that you would

13  point out what?

14            MR. WESTLING:  I would have argued that there was

15  evidence in the record that Mr. Brennan, when he was first

16  interviewed by the FBI, indicated the loans were performing,

17  and that anything else that had happened, happened after there

18  was an investigation, all of which is in the record.

19            In addition, I would have argued about the

20  collateral of the loan that the bank did not seem to be

21  collecting, despite their charge-offs.  So there's a number of

22  facts I would have gotten to, had I understood this issue was

23  going to be raised.

24            MR. ANDRES:  What agreement, Your Honor?  Where is

25  that agreement?  Where in the transcript anywhere is there an

─U.S. v. Manafort─

2504

1   agreement about that issue?  The agreement related to the

2   judicial notice issue and whether or not the issue of

3   forfeiture was going to come up.  But I would ask Mr. Westling

4   to find that agreement in the record because I don't think it

5   exists.

6            THE COURT:  Mr. Westling?

7            MR. WESTLING:  Well, I can only say that when

8   Mr. Andres approached this issue, he said I had not decided to

9   go into this.  I thought that was because we had an agreement.

10  But now I should be allowed to.  And the only reason I can

11  think to approach the Court about that before doing it, since

12  it is evidence in the record, is that there was some other

13  prohibition that was in place already, which was my

14  understanding.

15           THE COURT:  And I don't suppose, Mr. Andres, that

16  you plan, when you tell them that the loans were written off,

17  that Mr. Manafort paid hundreds of thousands of dollars in

18  points that the bank kept?

19           MR. ANDRES:  Judge, I'm sorry, I'm not responsible

20  for making the defense case.  They made it already.  I'm

21  responding to it.  I'm --

22           THE COURT:  I -- just answer my question.  You don't

23  propose to tell them that, of course.

24           MR. ANDRES:  No.

25           THE COURT:  Of course not.  All right.  Thank you.

U.S. v. Manafort

2505

1          And, no, you're not responsible for the defendant's

2    case.  I'm responsible for making sure this is a fair trial.

3          I don't -- he's quite right, Mr. Westling.  I don't

4    know of any place in the transcript where this was said when

5    we had the exchange about the forfeiture.  I do recall I

6    denied the defendant's motion to take judicial notice of

7    what's alleged in the indictment seeking forfeiture of all the

8    properties.  I can't say that I remember all of the

9    conversation about that.  I certainly don't remember anything

10   that contradicts Mr. Andres.  I'm not sure I see any

11   agreement.  I think what's happened is that --

12          MR. WESTLING:  Well, I think the question is or the

13   problem is we don't have the transcript to know, and so

14   we're --

15          THE COURT:  Say it again?

16          MR. WESTLING:  I said I think the problem is we

17   don't have the transcript to know.  Again, I know that I would

18   have dealt with that issue had I thought it was coming, and I

19   had a reason to believe it was not.  So there's where my

20   trouble is.  And if that's my fault, obviously I accept that.

21   But I think -- what I don't want to do is prejudice

22   Mr. Manafort because of some error I made because of an

23   agreement I thought I had with the United States.

24          THE COURT:  Well, lawyers often prejudice their

25   clients by what they do.  Well, I think there's no doubt,

─────────────U.S. v. Manafort─────────────

2506

1  Mr. Andres, that you can tell this jury, no doubt at all, that

2  the evidence in the case was that the banks -- this bank wrote

3  the loan off.  I don't think there's any doubt in my mind

4  about that.

5           The only question I have, and I don't remember any

6  agreement and I don't have that transcript, about not going

7  into it as part of our forfeiture discussion.

8           Was it on the record, Mr. Westling?

9           MR. WESTLING:  Your Honor, I believe so, but I can't

10 answer.

11          THE COURT:  Well, I didn't have any discussions with

12 you-all that wasn't on the record.

13          MR. WESTLING:  Well, we did discuss what the reason

14 why the Government was arguing against the judicial notice and

15 I believe there was --

16          THE COURT:  But that was on the record.

17          MR. WESTLING:  That may have been.  I just don't

18 remember, Your Honor.

19          THE COURT:  Well, Mr. Westling I don't see -- do you

20 feel you were precluded by -- from mentioning that he paid for

21 points?  That's in the record.

22          MR. WESTLING:  No, I don't feel like I was.  In

23 fact, I made the argument that he paid for points --

24          THE COURT:  Right.

25          MR. WESTLING:  -- just a few moments ago.  What I

U.S. v. Manafort

2507

1   didn't anticipate was that that would open the door to the

2   Government putting in information about a loss on the loan

3   that again and -- again, I --

4            THE COURT:  All right.  I'm going to permit you,

5   Mr. Andres, to tell them that the loan was written off.

6   That's a matter in the record.  And you -- if you're surprised

7   by that because you think of something that the Court did, I

8   would be prepared to give you another minute or two of

9   argument to say something about that and then you could

10  respond to that.  I don't remember any reason why you wouldn't

11  have mentioned that in your first opening, but putting that to

12  one side.

13           MR. WESTLING:  Your Honor, if the way to deal with

14  this is to have him mention it and for me to be able to

15  respond I would be pleased --

16           THE COURT:  No.  They get the last word.

17           MR. WESTLING:  Well, however you want.  I don't know

18  how quite to do it.

19           THE COURT:  I would give you a couple of sentences

20  to say, in effect, I said to you that there was no evidence

21  that The Federal Savings Bank was a victim of the fraud.

22  That's what you told them.

23           MR. WESTLING:  Right.  And I still think that's true

24  because I don't think there was a fraud.

25           THE COURT:  All right.  What is it that you think

─────────U.S. v. Manafort─────────

2508

1   you need to respond to if he says they wrote the loans off?

2           MR. WESTLING:  Your Honor, the Government throughout

3   this case has taken the position that loss is not an element.

4   It is not relevant for the jury.  I stepped into it when I

5   examined the witness and allowed them to get into the record,

6   but the jury will not be allowed to consider loss, one way or

7   another, and that's why I didn't argue it.

8           And so now what we're saying is the Government can

9   argue it because I argued that Mr. Calk charged Mr. Manafort a

10  lot of money for these loans.  And I don't see how that lines

11  up.  Whatever the evidence is in the record.

12          MR. ANDRES:  The evidence is in the record, Judge.

13  I just want to refer to it.  I'm not going to spend a lot of

14  time on it.  I don't think because the defense raised it in

15  closing -- I don't think they should be allowed some sort of

16  surrebuttal to get another bite at the apple.  They raised it.

17  Their arguments were cogent throughout and --

18          THE COURT:  Their arguments were cogent?

19          MR. ANDRES:  I thought so.

20          THE COURT:  All right.

21          MR. ANDRES:  And I just don't think it merits

22  Mr. Westling getting another shot and taking up -- I'm not

23  going to highlight the issue that much.  I'm just going to

24  mention in response to a direct question in the closing and

25  refer to evidence that's on the record.

U.S. v. Manafort

2509

1          MR. WESTLING:  Your Honor, if I may, I have the

2    transcript from the proceeding that I was remembering.  It may

3    or may not support me but I can offer it to the Court if

4    that's helpful.

5          THE COURT:  All right.  Read it to me.

6          MR. WESTLING:  So it says, "MR. ANDRES:  Nothing, I

7    was just trying to clear up what I thought was a misimpression

8    that was left with the jury.

9          "THE COURT:  So you don't intend to the tell the

10   jury tomorrow, look, he cost them millions of dollars?

11         "MR. ANDRES:  Only in rebuttal to some argument the

12   defense made.  In my summation, I don't -- I don't have enough

13   time, Your Honor."

14         "All right.  Well, I don't see a basis for taking

15   judicial notice.  I'll deny it at this time for the reasons

16   I've stated.  It's not relevant," et cetera.

17         So that's where my impression came from.  My

18   argument is simply I don't think what I did was open the door

19   in any way to that issue.  And so I was acting based on what

20   Mr. Andres represented to the Court during that proceeding.

21         MR. ANDRES:  During the proceeding --

22         THE COURT:  Just a moment.  But the problem with

23   that, Mr. Westling, is that the evidence that the bank wrote

24   the loans off is in the record without objection.  And I see

25   no basis for not allowing Mr. Andres to elicit that.  I

─U.S. v. Manafort─

2510

1   understand what you say you understood and why you might have

2   said more, but I don't think it really amounts to much more.

3   What you would have said is, "He paid a lot of money in points

4   and fees and the bank kept all of that."

5          MR. WESTLING:  Well, Your Honor actually said the

6   first part of that.  My point here is only that if the

7   Government were going to bring out the bank losing money, I

8   would simply want to emphasize the fact that Mr. Brennan

9   testified that prior to the FBI's arrival the loan was

10  performing.

11         THE COURT:  All right.  Well, I'm -- you may do it,

12  Mr. Andres.  And I'll note your objection and the basis for

13  it.

14         All right.  So I think I've resolved the three

15  issues.  The first issue was -- that I will instruct the jury

16  that the Government -- I think I will do that -- suppose I

17  tell the jury the following:  "In argument you heard reference

18  to Government audits.  You're instructed that the Government

19  is not required to provide an audit before bringing a criminal

20  prosecution.  You may, however, consider what was said about

21  an audit in other respects because it had to do with

22  disclosures."

23         And then I'm going to instruct them that they are to

24  ignore any reference to the Department of Justice's motives or

25  lack of motives in bringing this particular prosecution and

———U.S. v. Manafort———

2511

1    leave it at that.

2              Any objections to those?

3              MR. ANDRES:  No, Your Honor.  Thank you.

4              MR. DOWNING:  No, Your Honor.

5              THE COURT:  All right.  And we'll now bring the jury

6    in.  And, Mr. Andres, you can now have your --

7              MR. DOWNING:  Sorry to interrupt.  Can I just have

8    one minute to confer with my client before we start?

9              THE COURT:  Yes.

10             (A brief interruption in the proceedings.)

11             THE COURT:  I won't cut you off at 17 minutes,

12   Mr. Andres, but try to make it close to that if you can.

13             MR. ANDRES:  I'll do my best, Your Honor.  I

14   promise.

15             THE COURT:  I try to keep both sides to roughly the

16   same time and they've taken less than two hours.

17             MR. DOWNING:  Thank You, Your Honor.

18             THE COURT:  Anything further?

19             MR. DOWNING:  Nothing.

20             THE COURT:  All right.  Let's bring the jury in.

21             THE DEPUTY CLERK:  All rise.

22             (Jury present.)

23             THE COURT:  All right.  You may be seated.  I assure

24   you it was necessary.  We're going to move on now.  Mr. Andres

25   has another few minutes, between 15 and 20 minutes, which he's

———————U.S. v. Manafort———————

2512

1   allotted because the Government has the right to rebut, but

2   that's because the Government has the burden of proof of

3   proving each and every element beyond a reasonable doubt.  And

4   then I will give you instructions and I can assure you that

5   will take the rest of the day.

6         All right.  Mr. Andres.

7         MR. ANDRES:  Thank you, Your Honor.

8                   **REBUTTAL CLOSING ARGUMENT**

9         MR. ANDRES:  Ladies and gentlemen, the defense wants

10  you to believe that this is a case about Rick Gates and he's

11  to blame for all of Mr. Manafort's crimes.  They haven't

12  explained the dozens and dozens of documents that Mr. Manafort

13  is on that he authors and he writes.  Here is a few.

14        Not working.

15        This is an e-mail, Government Exhibit 199, where

16  Philip Ayliff, who is the tax preparer for Mr. Manafort, in

17  2001 writes Mr. Manafort an e-mail directly, directly, and

18  asked him if he has any foreign accounts.  Rick Gates is not

19  on this e-mail.  Not in the "to" line, not in the "from" line,

20  and not in the CC line.

21        Mr. Manafort tells you that the overseas accounts

22  are DMP's or Rick Gates or somebody else's, but when he writes

23  an e-mail because he needs money to pay for his home

24  construction from Bridgehampton, he says, "They are my Yiakora

25  accounts."

─────U.S. v. Manafort─────

2513

1           That's Mr. Manafort's statements at a time before he

2   was under investigation, before he was presenting a defense.

3   That's what he referred to those accounts as.

4           Now, Mr. Manafort sends false P&Ls to the banks.

5   Mr. Manafort does.  He sends it to Dennis Raico at The Federal

6   Savings Bank.  There's not a reference to Mr. Gates on that

7   e-mail.  Not in the "to" line, not in the "from" line, and not

8   in the CC line.

9           And what about -- what about the cases where

10  Mr. Manafort is directing Mr. Gates to commit crimes?

11  Remember those?  They weren't referenced by the defense.  Look

12  at Government Exhibit 391.  This is Mr. Manafort on the Banc

13  of California loans saying to Mr. Gates, "You're the

14  quarterback.  You run the show.  You're the quarterback.  You

15  get the documents together."

16          Ladies and gentlemen, guess who the coach of that

17  team is.  Guess who owns and controls that team.

18  Mr. Manafort.

19          How about these documents, Government Exhibit 405

20  and 406.  Here is Mr. Gates -- Mr. Manafort asking Mr. Gates

21  to convert a non-PDF Word document, right, because

22  Mr. Manafort wants to alter the P&L statements.

23          Now, you've also heard some -- you've also heard

24  some testimony -- or, I'm sorry, you've heard some argument

25  about Stipulation 456 and you should absolutely read this

U.S. v. Manafort

2514

1   document in the jury room.  Mr. Downing represented that the

2   parties agreed to who owned DMP.  That is not in agreement in

3   this document.  The parties agreed to what Mr. Manafort said

4   about the documents.  That's all.  And that's -- the statement

5   in here is what Mr. Manafort's representative said.  And guess

6   what else you'll see when you read this document in 456?

7   Mr. Manafort produces to the Government virtually all of the

8   foreign bank accounts in response to the subpoena.

9           So ask yourself this question:  How is it when

10  Mr. Manafort has nothing to do with these counts it just so

11  happens he has all of the records and he produces all of them

12  to the Government?

13          And forensic accountant Morgan Magionos testified

14  about that.  Read this document if you want to see what it

15  really says.

16          There has been a series of arguments about witnesses

17  who weren't called.  Mr. Calk, Mr. Fallarino, et cetera.  The

18  Government would submit that many of those witnesses appeared

19  on the documents in these cases so you know at least what they

20  said in the documents.

21          And, ladies and gentlemen, does anybody really think

22  we need more witnesses or more documents?  There were 27, and

23  388 documents.

24          Now, why is the defense telling you this?  Why are

25  they talking about witnesses who didn't appear?  Why is

U.S. v. Manafort

2515

1  Mr. Westling talking about bank fraud cases in other courts

2  all over the country?  They're telling you that because they

3  want to distract you from the evidence and exhibits that came

4  in from that witness stand in this courtroom.  That is what

5  controls in this case.  Not what happened in some other

6  courtroom, not for some witness who wasn't called.  It's the

7  witnesses in this case and the evidence in this case that the

8  defense is afraid of.

9         There's been discussion about accrued interest --

10 sorry -- accrued income, right?  So all of the claims about

11 the fake P&L are that Mr. Manafort was trying to include his

12 accrued income, right?  So his accrued income, let's talk

13 about that.  Here is three things to remember:  The

14 professionals in this case, Heather Washkuhn told you that he

15 kept his -- his P&L on a cash basis and he can't mix the two

16 systems.  Revenue Agent Welch said the same thing, that

17 Mr. Manafort kept his books on a cash basis.  That's No. 1.

18 Look at Government Exhibit 140 where Ms. Washkuhn specifically

19 refuses to add accrued income to the P&L.

20        What else do you know about it?  That $2.4 million,

21 it wasn't earned in 2015 and it wasn't earned in 2016.  It was

22 earned in 2014.  So even if it existed, Mr. Manafort is trying

23 to put it in a P&L for the wrong year.

24        What else do you know about it?  Mr. Manafort claims

25 that there was 2.4 million in accrued income, right?  What

U.S. v. Manafort

2516

1   does Mr. Manafort put in the P&Ls?  He puts $4 million, he

2   puts $3 million, he puts $4.2 million.  He's inflating the

3   income irrespective of whatever accrued income there is.

4   Mr. Manafort has told so many lies about his accrued income

5   even he can't keep them straight.

6            Mr. Westling said there are no co-conspirators in

7   this case.  Rick Gates and Cindy Laporta both told you about

8   their involvement in the bank fraud.

9            And Mr. Gates told you that he was guilty of those

10  crimes.  Mr. Westling also says, "Why would the Government

11  ever charge Mr. Manafort for a loan that was never paid out

12  on?"

13           The reason is, and Judge Ellis will tell you, that

14  conspiracy is a crime.  It is a crime in the United States to

15  conspire to commit a crime, even if it isn't completed.

16           Why is the defense trying to distract you from the

17  law in this case?

18           They ask you questions about the FBI interview,

19  right?  What is the testimony about what Mr. Manafort did when

20  he learned he was going to be interviewed by the FBI?  He sent

21  Mr. Gates over to talk to one of the Ukrainian businessmen so

22  Mr. Manafort can make sure that he cleaned up any tracks .

23  What else did you know?  At the time he was interviewed he was

24  told he wasn't a target or a subject of the investigation.

25  And guess who investigates tax fraud, ladies and gentlemen?

U.S. v. Manafort

2517

1  Not the FBI, the IRS.

2          Mr. Westling had a chart about reasonable doubt and

3  it had different colors and it showed sort of different

4  things.  Here is what you need to know about the chart.  When

5  Judge Ellis gives you the law about reasonable doubt in this

6  case, he's not going to tell you look at Mr. Westling's chart

7  and he's not going to refer to a single term on that chart

8  aside from reasonable doubt.

9          Mr. Gates stole money from Mr. Manafort.  However

10  Mr. Downing wants to say that, Mr. Downing talks about, who

11  puts words into witness' mouth?  Do you remember how many

12  times Mr. Downing had to ask Mr. Gates to respond in the exact

13  terms that Mr. Downing asked, right?

14          Mr. Gates said, "I took the money and it wasn't

15  authorized."

16          He said, "You embezzled it."

17          He said, "I took it.  I didn't have a right to."

18          He said, "You embezzled it, right?"

19          The only time that Mr. Gates used the word that

20  Mr. Downing required him to was when Mr. Downing wouldn't stop

21  asking that question.  Nonetheless, Mr. Gates admitted that he

22  took money from Mr. Manafort.

23          That is not in dispute.  And guess what it proves?

24  It proves that Paul Manafort had a accounts outside the United

25  States in Cyprus and that he didn't report them on his tax

─U.S. v. Manafort─

2518

1  returns.  You know that from his tax returns.  He didn't

2  report either the income or the accounts.  How else could he

3  possibly claim that Rick Gates stole money from him?  He took

4  it from the accounts.  Those are accounts of Paul Manafort's.

5       Now, the defense has made some arguments about

6  materiality.  They claim that, yeah, the banks knew about all

7  the false statements ans they couldn't have possibly been

8  deceived.  That is false.  It is false because of the witness

9  that -- the testimony that came in from that witness stand.

10  Remember, the evidence in this case, it comes in from the

11  witness stand, not from this podium.  And the witnesses that

12  testified about materiality, Peggy Miceli from Citizens Bank,

13  Gary Seferian from the Banc of California, and James Brennan

14  from Federal Savings Bank, they all said that they relied on

15  the statements that Mr. Manafort said, that the issues about

16  his income and his debt were material and the fact that he

17  gave false statements goes to his character.

18       Ladies and gentlemen, when you are considering

19  materiality, rely on the instructions that Judge Ellis will

20  give you.  He will tell you that the false statements only

21  have to be capable of influencing the decisionmaker, that the

22  representations only have to be objectively reasonable.

23       And, ladies and gentlemen, you don't need to be an

24  underwriter to know.  You do not need to be an underwriter to

25  know that providing false information about your income by

U.S. v. Manafort

2519

1  millions of dollars would be relevant to the bank's decision.

2          You don't need to be an underwriter to know that

3  false statements about your mortgages and the property, that

4  that's something that's important to the bank in making loan

5  decisions.

6          And you don't need to be a underwriter to know that

7  lies about your credit card account and the delinquency on it

8  for $200,000 is relevant to the bank's decision about whether

9  you can repay your loan.  That's common sense.  And the

10  defense is asking you to ignore your own common sense.

11          In the end, the evidence in this case, the evidence,

12  the testimony, and the exhibits is what control.  And all of

13  that evidence and all of that testimony proves to only one

14  conclusion, and that's that Mr. Manafort is guilty and guilty

15  as charged.

16          One last point.  Mr. Westling showed you a chart

17  that suggested that Mr. Manafort had all kinds of assets,

18  right?  And suggesting, why would he lie to banks because he

19  was already so wealthy?  He gave you the list of all the

20  assets.  The question is, if Mr. Manafort was so wealthy, why

21  was he applying for $20 million in loans?

22          The reason is because Heather Washkuhn told you that

23  his business was losing money at the time.  He did not have

24  the assets that he claimed he did.  And, by the way, I would

25  suggest that that chart that Mr. Westling showed you is about

─────── U.S. v. Manafort ───────

2520

1   as good -- worth as much as the false P&Ls that Mr. Manafort

2   provided.  He's providing that information and he has history

3   of providing false information to the banks.

4           One more thing -- I'm sorry, this is the last.  One

5   more thing, Mr. Downing showed you an exhibit, I think it was

6   Defense Exhibit 3, that talks about the different loans and

7   different incomes.

8           When you review that document in the jury room,

9   check the date.  It goes from 2005 to 2015, more than five

10  years prior to the charges in this case.  It's not relevant.

11  The totals in that document are not relevant to the totals in

12  the tax return because they cover a completely different time.

13          Ladies and gentlemen, the evidence in this case is

14  what controls.  It's the evidence that comes from that witness

15  stand and it leads to only one conclusion, and that is that

16  Mr. Manafort is guilty and guilty as charged.

17          Thank you, Your Honor.

18          THE COURT:  All right.  You may move the podium.

19                         JURY INSTRUCTIONS

20          THE COURT:  Members of the jury, now that you have

21  heard the evidence and the arguments of counsel, it becomes my

22  duty to give you instructions as to the law applicable to this

23  case.  All of the instructions -- and let me say -- let me

24  tell the court security officer, once I begin giving

25  instructions, close the courtroom.  You either are in here or

─────── Tonia M. Harris OCR-USDC/EDVA 703-646-1438 ───────

EASTERN DISTRICT OF VIRGINIA

─────U.S. v. Manafort─────

2521

1   you're out.  Good choice.

2              (Members of the gallery exit.)

3              THE COURT:  People need to understand that while I'm

4   instructing the jury, I don't want people filing in and out,

5   as they do.  If it's necessary to lock the door, you may do

6   so, but I'd rather leave it open unless it's really necessary.

7              (A pause in the proceedings.)

8              THE COURT:  And they need to be quiet out there.

9              (A pause in the proceedings.)

10             THE COURT:  All right.  Members of the jury, let me

11  begin again.  Now that you have heard the evidence and

12  arguments of counsel, it becomes my duty to give you

13  instructions as to the law applicable to this case.

14             All of the instructions of law given to you by the

15  Court, those given to you at the beginning of the trial, those

16  given to you during the trial, and these final instructions

17  must guide and govern your deliberations.

18             It's your duty as jurors to follow the law as stated

19  by the Court and to apply the rules of law to the facts as you

20  find them from the evidence in the case.

21             Now, counsel have quite properly referred to some of

22  the governing rules of law in their arguments.  If, however,

23  any difference appears to you between the law as stated by

24  counsel and the law that I give to you in these instructions,

25  of course you're to be governed by the Court's instructions.

U.S. v. Manafort

2522

1          Nothing I say in these instructions is to be taken

2     as an indication that I have any opinion about the facts of

3     the case or what that opinion is.  It's not my function to

4     determine the facts.  It is yours.

5          You're not to single out one instruction alone as

6     stating the law, but must consider the instructions as a

7     whole.  Neither are you to be concerned with the wisdom of any

8     rule of law as stated by the Court.  Regardless of any opinion

9     you may have as to what you think the law ought to be would be

10    a violation of your sworn duties as jurors.

11         If you ignore the law as I give it to you in these

12    instructions and apply some other law, it would also be a

13    violation of your sworn duty as jurors of the facts to base

14    the verdict upon anything but evidence in the case.

15         Now, you've been chosen as jurors for this trial in

16    order to evaluate all of the evidence received and to decide

17    each of the factual questions presented by the allegations

18    brought by the Government in the indictment and the plea of

19    not guilty by the defendant.

20         In deciding the issues presented to you for decision

21    in this trial, you must not be persuaded by bias, by

22    prejudice, or by sympathy for or against any of the parties in

23    this case or by any public opinion.  You should not be

24    influenced by any person's race, color, religion, national

25    ancestry, or sex.

U.S. v. Manafort

2523

1        Justice through trial by jury must always depend

2   upon the willingness of each individual juror to seek the

3   truth as to the facts from the same evidence presented to all

4   jurors and to arrive at a verdict by applying the same rules

5   of law given to you by the Court.  You must not base your

6   verdict, as I've said, in any way upon sympathy, bias,

7   guesswork, or speculation.  Your verdict must be based solely

8   on the evidence and the Court's instructions.

9        Now, as I told you at the outset, the law presumes

10  the defendant to be innocent of a crime.  Thus a defendant,

11  although accused, begins the trial with a clean slate with no

12  evidence against him, and the law permits nothing but legal

13  evidence presented before the jury to be considered in support

14  of any charge against the accused.  So the presumption of

15  innocence alone is sufficient to acquit a defendant unless the

16  jurors are satisfied beyond a reasonable doubt of the

17  defendant's guilt after careful and impartial consideration of

18  all the evidence in the case.  It is not required that the

19  Government prove guilty beyond all possible doubt.  The test

20  is one of reasonable doubt.

21        The jury will remember that a defendant is never to

22  be convicted on mere suspicion or conjecture.  The burden is

23  always on the prosecution to prove guilt beyond a reasonable

24  doubt.  The burden never shifts to a defendant.  The law never

25  imposes on a defendant in a criminal case the burden or duty

─U.S. v. Manafort─

2524

1    of calling any witnesses or producing any evidence.

2            So if the jury, after careful and impartial

3    consideration of all the evidence in the case, has reasonable

4    doubt that the defendant is guilty of a charge, it must

5    acquit.

6            Now, there's nothing particularly different in a way

7    that a juror should consider the evidence in a trial from that

8    in which any reasonable and careful person would treat any

9    very important question that must be resolved by examining

10   facts, opinions, and evidence.  You're expected to use your

11   good sense in considering and evaluating the evidence in the

12   case for only those purposes for which it has been received

13   and to give such evidence a reasonable and fair construction

14   in light of your common knowledge of the natural tendencies

15   and inclinations of human beings.

16           If a defendant be proved guilty beyond a reasonable

17   doubt, say so.  If not proved guilty beyond a reasonable

18   doubt, say so.  Keep constantly in mind, as I've said, that it

19   would be a violation of your sworn duty to base a verdict upon

20   anything other than the evidence received in the case and the

21   Court's instructions.

22           Remember as well that -- as I've told you before,

23   that the law never imposes on a defendant in a criminal case

24   the burden or duty of calling any witnesses or producing any

25   evidence because the burden of proving guilt beyond a

─────U.S. v. Manafort─────

2525

1    reasonable doubt is always with the Government.

2            Now, I'm advised that reports about this trial have

3    appeared in the newspapers and on radio and television on the

4    internet.  The people who are reporting about this trial may

5    not have listened to all of the testimony as you have, maybe

6    getting information from people who you -- who you may not see

7    here in court under oath and subject to cross-examination.

8    They may emphasize an unimportant point or may simply be

9    wrong.

10           I've instructed you please do not read or listen to

11   anything or watch anything with regard to this trial.  The

12   case must be decided by you solely and exclusively on the

13   evidence received here in court.

14           To rely on anything you see or hear outside this

15   courtroom in reaching your verdict is a violation of your oath

16   as a juror.

17           Now, the evidence in this case consists of the sworn

18   testimony of the witnesses, regardless of who may have called

19   them, all exhibits received in evidence, regardless of who may

20   have produced them, and all facts which may have been agreed

21   or stipulated to, and all facts and events -- I didn't

22   ultimately take any judicial notice, did I?

23           MR. ANDRES:  On one issue, Judge.  We can come to

24   sidebar, but if not I'm happy to tell you.

25           THE COURT:  Is it venue?

U.S. v. Manafort

2526

1          MR. ANDRES:  Yes.

2          THE COURT:  Is it going back to the jury?

3          MR. ANDRES:  I don't believe so, Your Honor.

4          THE COURT:  All right.  So I -- I won't give the

5    instruction on judicial notice.  But I will tell you, ladies

6    and gentlemen, that when the attorneys on both sides stipulate

7    or agree as to the existence of a fact, you may accept the

8    stipulation as evidence and regard that fact as proof.  You're

9    not required to do so, however, since you're the sole judges

10   of the facts of this case.

11          In other words, the fact that juror -- that the

12   parties may stipulate to something allows you to accept that

13   fact as having been proved, but you're not required to because

14   you're the sole judges of the facts in this case.

15          Now, when the attorneys on both sides stipulate or

16   agree as to the existence of a fact, as I said, you may accept

17   the stipulation as evidence and regard the fact as proved.

18   You're not required to do so since you're the sole judges of

19   the facts in this case.

20          Any proposed testimony or proposed exhibit to which

21   an objection was sustained by the Court and any testimony or

22   exhibit ordered stricken by the Court must be entirely

23   disregarded and anything you may have seen or read or heard

24   outside the courtroom is not proper evidence and must be

25   entirely disregarded.

U.S. v. Manafort

2527

1        Questions, objections, statements, and arguments of

2   counsel are not evidence in the case.

3        You're to base your verdict only on the evidence

4   received in the case.  And in your consideration of the

5   evidence received, however, you're not limited to the bald

6   statements of the witnesses or to the bald assertions in the

7   exhibits.  In other words, you're not limited solely to what

8   you see and hear as the witnesses testify or as the exhibits

9   are admitted.

10       You're permitted to -- you are permitted to draw

11   from the facts which you find have been proved such reasonable

12   inferences as you feel are justified in the light of your

13   experience and common sense.

14       Now, as I told you at the outset, there are two

15   kinds of evidence which are generally presented during a

16   trial, direct and circumstantial evidence.

17       Direct evidence is the testimony of a person who

18   asserts or claims to have actual knowledge of a fact such as

19   an eyewitness.

20       Circumstantial evidence is proof of a chain of facts

21   and circumstance indicating the existence of a fact.  The law

22   makes no distinction between the weight or the value to be

23   given to either direct or circumstantial evidence, nor is a

24   greater degree of certainty required of circumstantial

25   evidence than of direct evidence.

U.S. v. Manafort

2528

1          You should weigh all the evidence in the case.  And

2     after weighing all the evidence in the case, if you're not

3     convinced of the guilt of a defendant beyond a reasonable

4     doubt, you must find the defendant not guilty.

5          Now, inferences are simply deductions or conclusions

6     which reason and common sense lead the jury to draw from the

7     evidence in the case.

8          Now, testimony and exhibits can be admitted into

9     evidence during a trial only if certain criteria or standards

10    are met.  It is the sworn duty of the attorney on each side of

11    a case to object when the other side offers testimony or an

12    exhibit which that attorney believes is not properly

13    admissible under the rules of law.  Only by raising an

14    objection can a lawyer request and obtain a ruling from the

15    Court on the admissibility of the evidence being offered by

16    the other side.

17         You should not be influenced against an attorney or

18    his or her client because the attorney has made objections.

19    Do not attempt, moreover, to interpret my rulings or on

20    objections as somehow indicating how I think you should decide

21    the case.  I'm simply making a ruling on a legal question.

22         By allowing the testimony or other evidence to be

23    present introduced over the objections of an attorney, the

24    Court does not, unless I expressly state it, indicate any

25    opinion as to the weight or effect of such evidence.

U.S. v. Manafort

2529

1     As stated before, you're the sole judges of the

2  credibility of all the witnesses and the weight and effect of

3  all the evidence.

4     Now, on the other hand, where the Court sustains an

5  objection to a question addressed to a witness, jurors must

6  disregard the statement entirely and you may draw no inference

7  in the wording of it or speculate as to what the witness would

8  have said had he or she had been able to answer the question.

9     Now, it's the duty of the Court to admonish an

10  attorney who out of zeal for his cause does something which I

11  feel is not in keeping with the Rules of Evidence or

12  Procedure.  You're to draw no -- absolutely no inference

13  against the side to whom an admonition of the Court may have

14  been addressed during the trial of this case.

15     And since you're the sole and exclusive judges of

16  the facts in this case, you should not construe any comments

17  the Court may have made on any question -- or any questions

18  the Court asked witnesses as expressing an opinion on the

19  evidence.

20     The rulings I have made during trial should not be

21  taken by you as any indication that I have any opinion as to

22  what your verdict should be.  What your verdict is, is your

23  sole and exclusive responsibility.  And when the Court asks

24  questions of witnesses, these questions were intended for

25  clarification or to expedite matters and not intended to

U.S. v. Manafort

2530

1   suggest any opinion on my part as to the verdict you should

2   render or on the credibility of any witness.

3            You, as jurors, are the sole judges of the facts, as

4   I've told you many times.  It is your recollection and

5   evaluation of the evidence that's important to the verdict in

6   this case and you may disregard some or all of my comments as

7   you deem appropriate.

8            You must ultimately perform the duty of fact-finding

9   without bias or prejudice to any party.

10           Now, in certain instances, evidence was admitted for

11  a limited or a particular purpose, not generally for all

12  purposes, for the limited purpose for which this evidence may

13  have been received.  You may give it such weight as you feel

14  it deserves.  You may not, however, use this evidence for any

15  other purpose or against any party not specifically mentioned.

16           Now, some charts or summaries have been prepared by

17  the parties and shown to you during the trial for the purpose

18  of explaining facts that are allegedly contained in books,

19  records, and other documents which are in evidence in the

20  case.

21           Such charts or summaries are not evidence in this

22  trial or proof of any fact.  If you find that these charts are

23  summaries do not correctly reflect the facts or figures shown

24  by the evidence in the case, the jury should disregard -- if

25  you find that, should disregard the charts or summaries.

U.S. v. Manafort

2531

1        In other words, charts or summaries are used only as

2   a matter of convenience for you.  That applies to charts or

3   summaries that were not admitted into the record.  Some charts

4   or summaries have been prepared by the parties that have been

5   admitted.  And as to those -- and they've been shown to you

6   during the trial -- and as to those, they've been admitted

7   because they contain or explain facts that are allegedly

8   contained in books, records, or other documents which are in

9   evidence in the case.  You may consider the charts and

10  summaries as you would any other evidence admitted during the

11  trial and give it such weight or importance, if any, as you

12  feel.

13       You'll -- you'll have with you in the jury room all

14  of the exhibits.  Now, some charts and other demonstrative

15  pieces of evidence won't be sent back to the jury room.  In

16  other words, there's a difference between what I admitted into

17  the record, that is evidence, you will have that.  Anything

18  used as demonstrative or something to aid the lawyers in their

19  exposition or argument that were not admitted, those are not

20  evidence.

21       Now, if any reference by the Court or by counsel to

22  matters of testimony or exhibits does not coincide with your

23  own recollection of that evidence, your -- it is your

24  recollection that should control during your deliberations and

25  not the statements of the Court or counsel.

U.S. v. Manafort

2532

1          Your decision on the facts of the case should not be

2     determined by the number of witnesses testifying for or

3     against a party.  You should consider all the facts and

4     circumstances in evidence to determine which of the witnesses

5     you choose to believe or not to believe.  You may find that

6     the testimony of a smaller number of witnesses on one side is

7     more credible than the testimony of a greater number of

8     witnesses on the other.

9          Now, you, as jurors, are the sole and exclusive

10    judges of the credibility of each of the witnesses called to

11    testify in this case.  And only you determine the importance

12    or the weight that their testimony deserves.  And after making

13    your assessment concerning the credibility of a witness, you

14    may decide to believe all of that witness' testimony, only a

15    portion of it, or none of it.

16          In making your assessment, you should carefully

17    scrutinize all of the testimony given, the circumstances under

18    which each witnesses has testified and all of the other

19    evidence which tends to show whether a witness is worthy of

20    belief.

21          Consider each witness' intelligence and motive to

22    falsify, state of mind, and appearance and manner while on the

23    stand.  Consider the witness' ability to observe the matters

24    as to which he or she has testified and consider whether he or

25    she impresses you as having an accurate memory or recollection

U.S. v. Manafort

2533

1    of these matters.

2         Consider also any relation a witness may bear to

3    either side of the case, the manner in which each witness

4    might be affected by your verdict and the extent to which, if

5    at all, each witness is either supported or contradicted by

6    other evidence in the case.

7         Now, inconsistencies or discrepancies in the

8    testimony of a witness or between the testimony of different

9    witnesses may or may not cause you to disbelieve or discredit

10   such testimony.

11        Two or more persons witnessing an -- an incident or

12   transaction may simply see or hear differently.  An innocent

13   misrecollection, like failure of recollection, is not an

14   uncommon experience.

15        So in weighing the effect of a discrepancy, always

16   consider whether it pertains to a matter of importance or to

17   an unimportant or insignificant detail and consider whether

18   the discrepancy results from innocent error or intentional

19   falsehood.

20        After making your own judgment or assessment

21   concerning the believability of a witness, you can then attach

22   such importance or weight to that testimony, if any, that you

23   feel it deserves.  You'll then be in a position to decide

24   whether the Government has proven the charges beyond a

25   reasonable doubt.

U.S. v. Manafort

2534

1          Now, as I told you in the course of the trial, the

2   Rules of Evidence do not ordinarily permit witnesses to

3   testify as to their own opinions or their own conclusions

4   about questions in the trial.  An exception to this rule

5   exists as to those persons who were described as expert

6   witness.  An expert witness is someone who, by education or by

7   experience, may have become knowledgeable in some technical,

8   scientific, or very specialized area.  If such knowledge or

9   experience may be of assistance to you in deciding or

10  understanding some of the evidence in the case or in

11  determining a fact, an expert witness in that area may state

12  an opinion as to a matter in which he or she claims to be an

13  expert.

14          Now, you should consider each expert testimony

15  received in this case and give it such weight, if any, as you

16  may think it deserves.  You should consider the testimony of

17  expert witnesses just as you consider other evidence in the

18  case.  If you should decide that the opinion of an expert

19  witness is not based upon sufficient education or experience,

20  or if you should conclude that the reasons given in support of

21  the opinion are not sound, or if you should conclude the

22  opinion is outweighed from other evidence, you may disregard

23  the opinion entirely because, as I've told you several times,

24  you, the jury, are the sole judges of the facts in this case.

25          Now, the testimony of a witness may be discredited

U.S. v. Manafort

2535

1  or, as we say -- sometimes say, impeached by showing that he

2  or she previously made statements which are different from or

3  inconsistent with his or her testimony here in court.  The

4  earlier inconsistent or contradictory statements are

5  admissible only to discredit or impeach the -- only to

6  discredit or impeach the credibility of the witness and not to

7  establish the truth of the earlier statements made somewhere

8  other than here during this trial.  It's the province of the

9  jury to determine the credibility, if any, to be given the

10  testimony of a witness who has made prior inconsistent or

11  contradictory statements.

12          If a person has shown to have knowingly testified

13  falsely concerning any important or material matter, you

14  obviously have a right to distrust the testimony of such

15  individual concerning other matter.  You may reject all of the

16  testimony of that witness or give it such weight or

17  credibility as you may think it deserves.

18          Now, the testimony of certain witnesses must be

19  examined and weighed by the jury with greater care.  This

20  includes, for example, the testimony of an informant or

21  someone who provides evidence against someone else for money

22  or to escape punishment for his or her own misdeeds or crimes

23  or for other personal reasons or advantages, as well as the

24  testimony of an immunized witness, someone who has been told

25  either that his or her crimes will go unpunished in return for

U.S. v. Manafort

2536

1    testimony or that his or her testimony will not be used

2    against him or her in return for that cooperation.

3          You must also examine, with greater care, the

4    testimony of an alleged accomplice, someone who said he or she

5    participated with another person in the commission of a crime,

6    as well as the testimony of a witness who is testifying

7    pursuant to a plea agreement, under which he or she has agreed

8    to cooperate with the Government in the hope of obtaining a

9    sentence reduction.

10          The testimony of these particular witnesses must be

11   examined and weighed by the jury with greater care than the

12   testimony of witnesses who are not so motivated or who are

13   not -- or who are appearing in court without the need for such

14   an agreement with the Government.

15          The jury must also determine whether the particular

16   witness's testimony has been affected by self-interest or by

17   the agreement he or she has with the Government or by his or

18   her own interest in the outcome of the case or by prejudice

19   against the defendant.

20          The testimony of a witness may be discredited or

21   impeached by evidence showing that the witness has been

22   convicted of a felony, a crime for which a person may receive

23   a sentence -- or a prison sentence of more than one year.

24          Now, prior conviction of a crime that is a felony is

25   one of the circumstances which you may consider in determining

─────────────── U.S. v. Manafort ───────────────

2537

1    the credibility of that witness.  And it's the sole and

2    exclusive right of the jury to determine the weight to be

3    given to any prior conviction as impeachment and the weight to

4    be given to the testimony of anyone who has previously been

5    convicted of a felony.

6            Now, the defendant in a criminal case has an

7    absolute right, under our Constitution, not to testify.  The

8    fact that the defendant did not testify must not be discussed

9    or considered by the jury in any way when deliberating and in

10   arriving at your verdict.  No inference of any kind may be

11   drawn from the fact that the defendant decided to exercise his

12   privilege under the Constitution and did not testify.  As I've

13   told you before, the law never imposes on a defendant in a

14   criminal case the burden or duty of calling any witnesses or

15   producing any evidence.

16           Now, as I told you at the outset, the indictment is

17   only a formal means used by the Government to accuse a

18   defendant of a crime.  It is not evidence of any kind against

19   the defendant.  The defendant is presumed to be innocent of

20   the crime or crimes charged.  Even though this indictment has

21   been returned against the defendant, the defendant begins the

22   trial with absolutely no evidence against him or her.  He's

23   pled not guilty, and therefore, denies that he is guilty of

24   the charges in the indictment.

25           The defendant is not on trial for any act or any

U.S. v. Manafort

2538

1    conduct not specifically charged in the indictment.  What I

2    intend to do is I'm going to send portions of the indictment

3    back and I'll review that with counsel in a few minutes,

4    specifically, the counts.

5           Now, you're here to determine whether the Government

6    has proven the guilt of the defendant for the charges in the

7    indictment beyond a reasonable doubt.  You're not called upon

8    to return a verdict as to the guilt or innocence of any other

9    person or persons.  So if the evidence in the case convinces

10   you beyond a reasonable doubt of the guilt of the defendant

11   for the crimes charged in the indictment, you should so find,

12   even though you may believe that one or more other unindicted

13   persons are also guilty.  But if any reasonable doubt remains

14   in your mind after impartial consideration of all the evidence

15   in the case, it is your duty to find the defendant not guilty.

16          A separate crime is charged in each count of the

17   indictment.  Each charge and the evidence pertaining to it

18   should be considered separately by the jury and the fact that

19   you may find defendant guilty or not guilty as to one of the

20   offenses charged should not control your verdict as to the

21   other offense charged.

22          The indictment charges that the offenses alleged

23   were committed on or about a certain date.  Although it is

24   necessary for the Government to prove beyond a reasonable

25   doubt that the offenses were committed on a date reasonably

U.S. v. Manafort

2539

1    near the dates alleged in the indictment, it is not necessary

2    for the Government to prove that the offenses were committed

3    precisely on the dates charged.

4            Now, I'm going to give you instructions in a few

5    minutes about intent and other things.  But at this point, I

6    want to point out that intent and motive are different

7    concepts and should not be confused.

8            Motive is what prompts a person to act or fail to

9    act.  Intent only refers to the state of mind with which --

10   with which the act is done or omitted.  Personal advancement

11   and financial gain, for example, are two well recognized

12   motives of human conduct.  These praiseworthy motives,

13   however, may prompt one person to voluntary acts of good while

14   prompting another person to voluntary acts of crime.

15           Good motive alone is never a defense for the act

16   done or omitted as a crime.  The motive of defendant is,

17   therefore, immaterial except insofar as evidence of motive may

18   aid you in your determination of the defendant's state of mind

19   or the defendant's intent.

20           Now, the intent of a person or the knowledge that a

21   person possesses at any given time may not ordinarily be

22   proved directly because there's no way of directly

23   scrutinizing or fathoming the workings of the human mind.

24           In determining the issue of what a person knew or

25   what a person intended at a particular time, you may consider

U.S. v. Manafort

2540

1    any statements made or acts done by that person and all other

2    facts and circumstances received in evidence, which may aid in

3    your determination of that person's knowledge or intent.

4         You may infer, but you are certainly not required to

5    infer that a person intends the natural and probable

6    consequences of acts knowingly done or knowingly omitted.

7    It's entirely up to you, however, to decide what facts to find

8    from the evidence received during the trial.

9         To act with intent to defraud, as alleged in the

10   superseding indictment, means to act knowingly and with the

11   intention or the purpose to deceive or to cheat.  An intent to

12   defraud is accompanied by a desire or a purpose to bring about

13   some gain or benefit to one's self or some other person or by

14   a desire or purpose to cause some loss to some person.

15        Knowingly.  The term "knowingly" as used in these

16   instructions to describe the alleged state of mind of the

17   defendant, means that he was conscious and aware of his action

18   or omission, and realized what he was doing or what was

19   happening around him and did not act because of ignorance,

20   mistake, or accident.

21        Now, defendant is charged in this superseding

22   indictment with 18 counts.  The crimes charged in Counts 1

23   through 5 of the superseding indictment is signing,

24   subscribing, or causing to be subscribed a false individual

25   income tax return in violation of Title 26 of U.S. Code

─────U.S. v. Manafort─────

2541

1   Section 7206.  And those crimes are for specific years, which

2   I'll come to.

3            The crimes charged in 11 through 14 of the

4   superseding indictment are failures to file reports of foreign

5   bank accounts, known as FBAR, as alleged are in violations of

6   Title 31, U.S. Code Section 5314 and 5322.  I'll go into a

7   little more detail in a few minutes.

8            The crimes charged in 24 through 26, 28, 29, and 31

9   of the superseding indictment -- and you'll have those with

10  you in the jury room.  In other words, those will be set out

11  from the indictment.  But remember, the indictment is not

12  proof or evidence of any kind.

13           So the crimes charged in Counts 24, 26, 28, 29, and

14  31 of the superseding indictment, that is conspiracy to commit

15  bank fraud in violation of Title 18, Sections 1344 and 1349,

16  and the crime charged in -- crimes charged in Counts 25, 27,

17  30, and 32 of the superseding indictment are bank fraud in

18  violation of Title 18, Section 1344.

19           Now, let me give you additional instructions on the

20  elements of each of those.  I'll take each group.

21           Counts 1 through 5 of the superseding indictment

22  charged that on or about the dates specified, as I'm going to

23  come to that, in the Eastern District of Virginia and

24  elsewhere, the defendant willfully and knowingly did make and

25  subscribe, meaning sign, and aid and abet and cause to be made

U.S. v. Manafort

2542

1    and subscribed, United States individual income tax returns

2    forms 1040 and Schedule B for the tax years set out below,

3    which are 2010, 2011, 2012, 2013, and 2014.

4              And it's alleged that those returns contained and

5    were verified by written declaration of the defendant that

6    they were made under penalty of perjury and which returns the

7    defendant did not believe to be true and correct as to every

8    material matter and that the returns claim that the defendant

9    did not have a financial signature in, interest in, and

10   signature or -- and other authority over a financial account

11   in a foreign country.  That's one failure.

12             And the second failure is failure to report income

13   whereas the defendant, then and there, well knew and believed

14   that he had a financial interest in and signature and other

15   authority over bank accounts in a foreign country and had

16   earned total income in excess of the reported amounts noted.

17             I don't think I need to read anything in that table,

18   do I, counsel?

19             MR. ASONYE:  No, Your Honor.

20             THE COURT:  Now, in those counts, as I told you, are

21   allegations that are violations of 7206 of Title 26.  That

22   statute provides any person who willfully makes, subscribes --

23   I'm sorry, who willfully makes and subscribes any return,

24   statement, or other document which contains or is verified by

25   a written declaration that it is made under penalties of

U.S. v. Manafort

2543

1   perjury in which he does not believe to be true and correct,

2   as to every material matter, shall be guilty of an offense

3   against the United States.

4          So in order to sustain its burden of proof for the

5   crime of willfully filing false tax returns as charged in

6   Counts 1 through 5 of the superseding indictment, the

7   Government must prove the following five essential elements

8   beyond a reasonable doubt:  First, that the defendant made and

9   subscribed or caused to be made and subscribed a tax return

10  for the specified year that contained false information as to

11  a material matter as detailed in the indictment.

12         Second, that the defendant knew this -- that this

13  information was false.

14         Third, that the false information was material.

15         Fourth, that the return contained a written

16  declaration that it was being signed subject to the penalties

17  of perjury.

18         And fifth, that in filing the false return, the

19  defendant acted willfully.

20         Now, in general, the word "subscribe" simply means

21  to sign one's name to a document.  And in the case of an

22  electronically filed return, an electronic signature made in

23  accordance with the guidance published by the Internal Revenue

24  Services, for all purposes, is the same as a written signature

25  on a paper tax return.

U.S. v. Manafort

2544

1          And the U.S. Code provides, in part, that the fact

2    that an individual's name is signed to a return shall be prima

3    facie evidence, for all purposes, that the return was actually

4    signed by him.  In other words, you may infer and find that a

5    tax return was, in fact, signed by the person whose name

6    appears to be signed to it.  You are not required, however, to

7    accept any such inference or to make any such finding.

8          If you should find, if you find beyond a reasonable

9    doubt from the evidence in the case that the defendant signed

10   or caused to be signed the tax return, then you may also draw

11   the inference and may also find, but are not required to find,

12   that the defendant knew of the contents of the return that he

13   signed or caused to be signed.

14         Now, a statement or representation is material if it

15   has a natural tendency to influence or is capable of

16   influencing a decision or an action.  To be material is not

17   necessary that the statement or representation, in fact,

18   influenced or deceived.  For a violation of filing a false tax

19   return, materiality has been defined as whether a particular

20   item must be reported in order that the taxpayer estimate and

21   compute his tax correctly or a misstatement that could hinder

22   the Internal Revenue Service in carrying out such functions as

23   the verification of the accuracy of a tax return.  Although

24   the Government is required to prove beyond a reasonable doubt

25   that the defendant willfully -- just a moment.

U.S. v. Manafort

2545

1          An income tax return may be materially false not

2    only because of a misstatement of a material matter, but also

3    because of an omission of a material matter.

4          Now, although the Government is required to prove

5    beyond a reasonable doubt that the defendant willfully filed

6    or caused to be filed a false tax return as charged in Counts

7    1 through 5 of the superseding indictment, the Government is

8    not required to prove that any additional tax was due to the

9    Government or that the Government was deprived of any tax

10   revenues by reason of any false tax return.

11         And I should also point out to you that the -- you

12   heard argument about audits.  The Government is not required

13   to provide an audit before bringing a criminal prosecution.

14   But you may, nonetheless, consider anything you heard about an

15   audit or for other purposes.  I think the argument was made

16   about concealment, but it's not a requirement.  The Government

17   is not required to audit before it brings a criminal

18   prosecution.

19         Any willful failure to comply with the requirement

20   of the Internal Revenue Service -- Internal Revenue Code for

21   one year is a separate matter from any such failure to comply

22   for a different year.  The tax obligations of the defendant in

23   any one year must be determined separately from the tax

24   obligations and any other year.

25         The superseding indictment charges in Counts 1

─────────── U.S. v. Manafort ───────────

2546

1    through 5 that the defendant's tax returns for 2010 through

2    2014 were false in two material respects in that each return

3    claim that the defendant did not have a financial interest in

4    or signature or other authority over a financial account in a

5    foreign country.

6            And, B, secondly, failed to report income.  Whereas

7    defendant then and there well knew and believed that he had a

8    financial interest in and signature or other authority over

9    bank accounts in a foreign country and had earned total income

10   in excess of the reported amounts.

11           You're instructed that it is sufficient if you find

12   that the Government has established beyond a reasonable doubt

13   that either of these two items were both material and falsely

14   reported on the income -- on the defendant's tax returns.

15           In other words, the Government does not have to

16   prove that in each year both of the items were false and

17   material.  Proof of the falsity and materiality of the single

18   item in each year is sufficient.  You must unanimously agree

19   on that item.  On the other hand, if you unanimously find that

20   none of these items was material and falsely reported on

21   defendant's return then you should acquit the defendant.

22           Income is taxed to the person or entity who earns

23   it, even when it is paid or assigned by that person or entity

24   or that person's entity or -- let me restate that.

25           Income is taxed to the person or the entity who

U.S. v. Manafort

2547

1    earns it, even where it is paid or assigned by that person or

2    entity at that person's or entity's direction to someone else

3    or a corporate entity.

4           Such payments or assignments made for the purpose of

5    avoiding a tax liability are not recognized under the tax laws

6    of the United States.  Gross income includes all income from

7    whatever source derived in any location.  Gross income

8    includes the following:  Compensation for services, including

9    fees, commissions, and similar items; gross income derived

10   from business activity; a gains derived from dealings and

11   property interest, rents, royalties dividends, alimony;

12   separate maintenance payments; annuities; income from life

13   insurance and endowment contracts; pensions; income from

14   discharged of indebtedness, distribution, or distributive

15   share of partnership gross income; income in respect of a

16   descendent; and income from an interest in an estate or trust.

17   Wages and salaries fall within this definition and are

18   included in gross income.

19          Now, a partnership is not subject to income tax.

20   Instead, each partner is individually taxed on and must report

21   his or her -- excuse me -- and must report his or her share of

22   the partnership income on an individual tax return, even if

23   the income is not actually distributed to the partners.

24          If the partnership incurs a loss, each partner can

25   deduct his or her share of the loss on that partner's

U.S. v. Manafort

2548

1  individual tax return.

2         The term "S corporation" means with respect to any

3  taxable year a small business corporation for which an

4  election under the Internal Revenue Code is in effect for such

5  year.  In general, an S corporation does not pay any income

6  tax.  Instead, the corporation's income and expenses are

7  divided among and passed through to its shareholders.  The

8  shareholders then must report the income and expense on their

9  own individual tax returns.

10        The Internal Revenue Code defines gross income as

11  all income from whatever source derived.  Loan proceeds are

12  not included in gross income because of the obligation to

13  repay a loan.  Whether a particular transaction constitutes a

14  loan is a question of fact to be determined by considering all

15  of the pertinent facts in the case.

16        A loan requires both parties to have an actual good

17  faith intent to establish a debt or credit relationship when

18  the funds are advanced and attempt to establish a debtor

19  credit relationship exists if the debtor intends to repay the

20  loan and the creditor intends to enforce the repayment.

21        So in making your determination whether the parties

22  intended a loan, you should take into consideration the

23  following nonexclusive list of factors, no one of which is

24  controlling:

25        First, the ability of the borrower to repay.

U.S. v. Manafort

2549

1          Second, the existence or nonexistence of a debt

2    instrument.  That is, a written loan document.

3          Third, whether any security was provided given by

4    the debtor.

5          Fourth, whether the loan agreement required the

6    payment of interest and whether any interest was, in fact,

7    paid.

8          Fifth, whether the loan agreement had a fixed

9    repayment and repayment schedule.

10          Sixth, how the person's record and conduct reflect

11    the transaction.

12          Seventh, whether the borrower made repayments on the

13    loan.

14          Eight, whether the lender had demanded repayment.

15          And, ninth, the likelihood that the loan was

16    disguised compensation for services.

17          And, tenth, testimony, if any, of the purported

18    borrower and lender or others' knowledge about the

19    transaction.

20          The word "false" means contrary to the truth.  As

21    used in the law the word "false" generally means more than an

22    innocent mistake or a simple error of fact.

23          A statement or representation is false if it was

24    untrue when made and was then known to be untrue by the person

25    making it or causing it to be made or made or caused to be

─U.S. v. Manafort─

2550

1  made with reckless indifference as to its truth or falsity.

2          Now, the term "willfully," in order to sustain its

3  burden of proof for the crimes charged in Counts 1 through 5

4  and Counts 11 through 14 of the superseding indictment, the

5  Government must prove that beyond a reasonable doubt the

6  defendant acted willfully.  Now, to act willfully means to act

7  voluntarily and deliberately intending to violate a known

8  legal duty.  Negligent conduct is not sufficient to constitute

9  willfulness.  In determining the issue of willfulness, you are

10  entitled to consider anything done or omitted to be done by

11  the defendant and all facts and circumstances in evidence that

12  may aid in the determination of the defendant's state of mind.

13          It's obviously impossible to ascertain or prove

14  directly the operations of the defendant's mind, but a careful

15  and intelligent consideration of the facts and circumstances

16  shown by the evidence in -- in the case may enable one to

17  infer what others -- what another's intentions were in doing

18  or not doing things.

19          With the knowledge of definite acts -- with the

20  knowledge of definite acts we may draw definite and logical

21  conclusions.  We are in our daily affairs continuously called

22  upon to decide from the acts of others what their intentions

23  or purposes are and experience -- and what experience has

24  taught us that frequently actions speak more clearly than

25  spoken or written words.  To this extent you may rely in part

U.S. v. Manafort

2551

1  on circumstantial evidence in determining the guilt or

2  innocence of the defendant.

3          Now, we turn to Counts 11 through 14 of the

4  superseding indictment, which charged that on the filing dates

5  listed, which are 2011, '12, '13, and '14 in the Eastern

6  District of Virginia and elsewhere.  The defendant,

7  Paul Manafort, unlawfully, willfully, and knowingly did fail

8  to file with the treasury's report of foreign bank financial

9  accounts, known as the FBAR, disclosing he had a financial

10  interest in and signature and other authority over bank

11  securities and other financial account in a foreign country,

12  which had an aggregate value of more than $10,000 in a

13  12-month period during the years that I've listed.  That is,

14  2011, '12, '13, and '14.

15          Now, Section 5314 of the U.S. Code provides that the

16  Secretary of the Treasury shall require a resident or a

17  citizen of the United States or a person in and doing business

18  in the United States keep records, file reports, or keep

19  records and file reports when the resident, citizen, or person

20  makes a transaction or maintains a relation for any person

21  with a foreign financial agency.

22          And then 5322 of Title 31 provides that a person

23  willfully violating this subchapter regulation or a regulation

24  prescribed under this subchapter shall be guilty of an offense

25  against the United States.

U.S. v. Manafort

2552

1          And Section 1010.350 of the Code of Federal

2    Regulations provides that each United States person having a

3    financial interest in or signature or other authority over a

4    bank securities or other financial account in a foreign

5    country shall report such relationships to the commissioner of

6    the Internal Revenue for each year in which such relationship

7    exists and shall provide such information as shall be

8    specified in the reporting form prescribed under 31 U.S.C.,

9    Section 5314 to be filed by such person.

10          So in order for the Government to prove the charge

11   in Counts 11 through 14 of failing to file an FBAR, the

12   Government must establish beyond a reasonable doubt each of

13   the following four elements:  First, that the defendant was a

14   U.S. person during calendar year specified in the count.

15          Second, that the defendant had a financial interest

16   in or signature or other authority over bank securities or

17   other financial account in a foreign country during the

18   calendar year specified in the count.

19          Third, that the aggregate value of the defendant's

20   foreign bank securities or other financial account exceeded

21   $10,000 at any time during the calendar year specified in the

22   count.

23          And, fourth, that the defendant willfully failed to

24   file an FBAR on or before the due date following the calendar

25   year specified in the count.

U.S. v. Manafort

2553

1     So for purposes of Counts 11 through 14, a United

2  States person means a citizen or resident of the United States

3  or an entity formed under the laws of the United States, any

4  state, the District of Columbia, any territory or possession

5  of the United States, or an Indian tribe.

6     Now, financial interest or signatory or other

7  authority.  A person has a financial interest in each account

8  for which such person is the owner of record or has legal

9  title whether the account is maintained for his or her own

10  benefit or for the benefit of others.

11     If an account is maintained in the name of more than

12  one person, each United States person in whose name the

13  account is maintained has a financial interest in that

14  account.  A person also has a financial interest in each

15  account for which the -- the owner of record or holder of

16  legal title is a person acting as an agent nominee, attorney,

17  or in some other capacity on behalf of the United States

18  person with respect to the account or a corporation in which

19  the United States person owns directly or indirectly more than

20  50 percent of the voting power or the total value of the

21  shares.  A partnership in which the United States person owns

22  directly or indirectly more than 50 percent of the interest in

23  profits or capital.  And any other entity other than an

24  entity -- which I'll leave out.  Any objection leaving that

25  out?

U.S. v. Manafort

2554

1          MR. ASONYE:  No, Your Honor.

2          THE COURT:  All right.  So let me say it again.  A

3 person has a -- if an account is maintained in the name of --

4 first of all, a person has a financial interest in each

5 account for which the person is the owner of record or has

6 legal title.  Whether the account is maintained for his or her

7 own benefit or for the benefit of others.  If an account is

8 maintained in the name of more than one person, each United

9 States person and whose name the account is maintained has a

10 financial interest in the account.  A person also has a

11 financial interest in each account for the owner of record or

12 holder of the -- in each account for which the owner of record

13 or holder of legal title is a person acting as an agent,

14 nominee, or attorney or in some other capacity on behalf of

15 the United States person with respect to the account.

16          Also, a corporation in which the United States

17 person owns directly or indirectly more than 50 percent of the

18 voting power or the total value of the shares or a partnership

19 in which the United States person owns directly or indirectly

20 more than 50 percent of the interest in profits or capital or

21 any other entity other than -- any other entity.

22          I don't think the entities in those paragraphs are

23 relevant.  Do you agree?

24          MR. ASONYE:  That's fine, Your Honor.

25          THE COURT:  Now, United States person that causes an

─────U.S. v. Manafort─────

2555

1   entity, including, but not limited to, a corporation

2   partnership or trust, to be created for the purpose of evading

3   the regulation shall have a -- shall have a financial interest

4   in any banks, securities, or other financial account in a

5   foreign country for which the entity is the owner or holder of

6   record.

7          A person has signature or other authority over an

8   account as such person alone or in conjunction with another

9   that controls the disposition of money, funds, or other assets

10  held in a financial account by direct communications, whether

11  in writing or otherwise, to the person with whom the financial

12  account is maintained.

13          Now, we turn to Counts 24.  Count 24 of the

14  superseding indictment charges that on or about December 2015

15  or between the time of December 2015 and March 2016, both

16  dates being proximate and inclusive in the Eastern District of

17  Virginia and elsewhere, Paul Manafort knowingly and

18  intentionally conspired to execute a scheme and artifice to

19  defraud in one or more financial -- artifice or to defraud one

20  or more financial institutions to wit, Citizens Bank.  The

21  deposits of which were insured by the Federal Deposit

22  Insurance Corporation to obtain money, funds, and credits

23  owned by and under the custody and control of such financial

24  institutions by means of materially false and fraudulent

25  pretenses, representations, and promises.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

U.S. v. Manafort

2556

1        Contrary to Title 18 or in violation of Title 18,

2   U.S. Code, Section 1344.

3        Defendant has pled not guilty to this allegation and

4   the Government is, therefore, required to prove each of the

5   essential elements of the crime of conspiracy to commit bank

6   fraud.

7        Now, that was Count 24.

8        Count 26 of the superseding indictment charges that

9   from on or about March 2016 and May 2016, both dates being

10  approximate and inclusive, in the Eastern District of Virginia

11  and elsewhere that Paul Manafort did knowingly and

12  intentionally conspire to execute a scheme and artifice to

13  defraud the Banc of California, the deposits of which were

14  insured by the Federal Deposit Insurance Corporation and to

15  obtain monies, funds, and credits owned by and under the

16  custody and control of such financial institution by means of

17  materially false and fraudulent pretenses and representations

18  and promises contrary to or in violation of Section 1344,

19  Title 18.

20       The defendant has entered a plea of not guilty to

21  this allegation, and the Government is, therefore, required to

22  prove each of the essential elements of the -- this alleged

23  conspiracy to commit bank fraud.

24       Now, Count 28 of the superseding indictment charges

25  that on or about and between March 2016 and August 2016, both

─U.S. v. Manafort─

2557

1   dates being approximate and inclusive in the Eastern District

2   of Virginia and elsewhere, the defendant, Paul Manafort, did

3   knowingly and intentionally conspire to execute a scheme and

4   artifice to defraud the Citizens Bank, the deposits of which

5   were insured by the Federal Deposit Insurance Corporation to

6   obtain money, funds, and credits owned by and under the

7   custody and control of such financial institution by means of

8   materially false and fraudulent pretenses, representations,

9   and promises in violation of Title 18 Section 1344.

10          The defendant here as well has pled not guilty, and

11  therefore the Government is required to prove each of the

12  essential elements of the crime of conspiracy to commit bank

13  fraud.

14          Now, Count 29 of the superseding indictment charges

15  that from on or about and between April 2016 and November

16  2016, both dates being approximate and inconclusive in the

17  Eastern District of Virginia and elsewhere, that Paul Manafort

18  did knowingly and intentionally conspire -- conspire to

19  execute a scheme and artifice to defraud The Federal Savings

20  Bank, the deposits of which were insured by the Federal

21  Deposit Insurance Corporation to obtain monies, funds, credits

22  owned by and under the custody control of such financial

23  institution by means of materially false and fraudulent

24  pretenses, representations, and promises.

25          And as you know, the defendant has pled not guilty

─U.S. v. Manafort─

2558

1  to this allegation, and the Government is therefore required

2  to prove the essential elements of the crime of conspiracy to

3  commit bank fraud.

4          Count 31 charges that from on or about April 2016

5  and January 2017, both dates being inclusive -- being

6  approximate and inclusive in the Eastern District of Virginia

7  and elsewhere, that Paul Manafort did knowingly and

8  intentionally conspire to execute a scheme and artifice to

9  defraud The Federal Savings Bank, the deposits of which were

10 insured by the Federal Deposit Insurance Corporation, and to

11 obtain monies, funds, credits owned by and under the custody

12 and control of such financial institution by means of

13 materially false and fraudulent pretenses, representations,

14 and promises in violation of Section 1344, Title 18.

15         Again, defendant has entered a plea of not guilty to

16 this charge in the superseding indictment, and the Government

17 is therefore required to prove each of the essential elements

18 of the crime of conspiracy to commit bank fraud.

19         Now, Title 18 of Section 1349 provides in pertinent

20 part that any person who conspires to commit any offense under

21 this chapter, which includes the offenses in Section 1344,

22 shall be guilty of an offense against the laws of the United

23 States.

24         Now, 1344 itself provides whoever knowingly executes

25 or attempts to execute a scheme or artifice to defraud a

─U.S. v. Manafort─

2559

1    federally chartered or insured financial institution or to

2    obtain any of the monies, funds, or other property owned by or

3    under the custody or control of a federally chartered or

4    insured financial institution by means of false or fraudulent

5    pretenses or representations or promises shall be guilty of an

6    offense against the United States.

7            So in order to prove a conspiracy to commit bank

8    fraud as alleged in Counts 24, 26, 28, 29, and 31 as to the

9    defendant, the Government must prove the following three

10   essential elements beyond a reasonable doubt:

11           First, that the conspiracy or agreement or

12   understanding to commit bank fraud is charged in the

13   superseding indictment was formed, reached, or entered into by

14   two or more persons.

15           Second, that at sometime during the existence of the

16   life of the conspiracy or agreement or understanding, the

17   defendant knew the purpose of the agreement and -- or

18   understanding.

19           And third, that with the knowledge of the purpose of

20   the conspiracy agreement or understanding, the defendant then

21   deliberately joined the conspiracy agreement or understanding.

22           Now, a criminal conspiracy is an agreement or a

23   mutual understanding knowingly made or knowingly entered into

24   by at least two people to violate the law by some joint or

25   common plan or coercive action.  So a conspiracy is, in a very

U.S. v. Manafort

2560

1    true sense, a partnership in crime.

2         A conspiracy or agreement to violate the law, like

3    any other agreement or understanding, need not be formal,

4    written, or even expressed directly in every detail, but the

5    Government must prove that the defendant and at least one

6    other person knowingly and deliberately arrived at an

7    agreement or understanding that they, and perhaps others,

8    would violate some laws by means of some common plan or course

9    of action as alleged in Counts 24, 26, 28, 29, and 31 of the

10   superseding indictment.

11        It is proof of this conscious understanding and

12   deliberate agreement by the alleged members that should be

13   central to your consideration of the charge of conspiracy.

14        Now, to prove the existence of a conspiracy or an

15   illegal agreement, the Government is not required to produce a

16   written contract between the parties or even produce evidence

17   of an expressed oral agreement spelling out all of the details

18   of the understanding.

19        To prove that a conspiracy existed, moreover, the

20   Government is not required to show that all of the people

21   named in the superseding indictment as members of the

22   conspiracy were, in fact, parties to the agreement or that all

23   of the members of the alleged conspiracy were named or charged

24   or that all of the people whom the evidence shows were

25   actually members of a conspiracy agreed to all of the means

U.S. v. Manafort

2561

1   and method set out in the superseding indictment.

2            Unless the Government, however, proves beyond a

3   reasonable doubt that a conspiracy actually -- as explained

4   actually existed, then you must acquit the defendant of the

5   charge contained in counts 24, 26, 28, 29, 31 of the

6   superseding indictment.

7            Now, before you may find that the defendant or any

8   other person became a member of the conspiracy as charged in

9   those counts, the evidence in the case must show beyond a

10  reasonable doubt that the defendant knew the purpose or goal

11  of the agreement or understanding and then deliberately

12  entered into the agreement intending in some way to accomplish

13  the goal or purpose by this common plan or joint action.

14           If the evidence establishes beyond a reasonable

15  doubt that the defendant knowingly and deliberately entered

16  into an agreement to commit the offenses charged in Counts 24,

17  26, 28, 29, and 31, the fact that the defendant did not join

18  in the agreement at its beginning or did not know all of the

19  details of the agreement or did not participate in each act of

20  the agreement or did not play a major role in accomplishing

21  the unlawful goal , is not important to your decision

22  regarding membership in a conspiracy.

23           Even a slight connection to a conspiracy may be

24  sufficient to establish the defendant's membership in that

25  conspiracy proved beyond a reasonable doubt, but merely

U.S. v. Manafort

2562

1  associating with others and discussing common goals and mere

2  similarity of conduct between or among such persons, merely

3  being present at the place where a crime takes place or is

4  discussed or even knowing about criminal conduct does not of

5  itself make someone a member of the conspiracy or a

6  conspirator.

7       Now, evidence has been received in this case of

8  certain persons, who are alleged in Counts 24, 26, 28, and 29,

9  and 31 of the superseding indictment to be co-conspirators of

10  defendant, have done or said things during the existence or

11  life of the alleged conspiracy in order to further or advance

12  its goals.  And such acts or statements of these other

13  individuals may be considered by you in determining whether or

14  not the Government has proven the conspiracy as charged in

15  those counts, 24, 26, 28, 29, and 31, against the defendant.

16  You may consider those statements in deciding whether the

17  Government has proved the conspiracy beyond a reasonable

18  doubt.

19       Since these acts may have been performed and these

20  statements may have been made outside the presence of the

21  defendant and even done or said without the defendant's

22  knowledge, these acts or statements should be examined with

23  particular care by you before considering them against a

24  defendant who did not do the particular act or make the

25  particular statement.

U.S. v. Manafort

2563

1          Acts done or statements made by an alleged

2   co-conspirator before a defendant joined a conspiracy may also

3   be considered by you in determining whether the Government has

4   sustained its burden of proof in Counts 24, 26, 28, 29, and 31

5   of the superseding indictment.

6          Acts done or statements made before an alleged

7   conspiracy began, or after an alleged conspiracy ended,

8   however, may only be considered by you regarding the person

9   who performed that act or made that statement.

10         Now, when two or more persons knowingly associate

11  themselves together to carry out a common scheme or

12  arrangement and intend either to accomplish some unlawful

13  purpose or accomplish some lawful purpose by unlawful means,

14  there arises from that association a kind of partnership in

15  which each member becomes the agent of every other member.

16         So if you find that the evidence in this case shows

17  that a common plan or arrangement shows such a common plan or

18  arrangement, then an act knowingly done or a statement

19  knowingly made by a member while the common plan or

20  arrangement is continuing and done or made in furtherance of

21  some object or purpose thereof is admissible all the members.

22         In order to establish such a common plan or

23  arrangement existed, the evidence must show that the parties

24  to the plan or arrangement in some way or manner came to a

25  mutual understanding to accomplish some common object or

U.S. v. Manafort

2564

1  purpose.

2          Now, in order to establish that the defendant or any

3  other person was a party or member of such a common plan or

4  arrangement, the evidence must show that the plan was

5  knowingly formed and that the defendant or other person was

6  alleged to have been a member of it knowingly participated in

7  it, intending to advance or further some common object or

8  purpose of the plan arrangement.

9          In determining whether or not the defendant or any

10 other person was a party to a -- to or a member of such a

11 common plan or arrangement, the jury should not consider what

12 other parties may have said or done.

13         The membership of a defendant or any other person in

14 such a common plan or arrangement, in other words, must be

15 established by evidence as to the defendant's own conduct,

16 what the defendant himself or herself knowingly said or

17 knowingly did.

18         If and only if it appears from such evidence in the

19 case that a common plan or arrangement did exist and that the

20 defendant was one of the members of the plan or arrangement --

21 if and only if it appears from such evidence in the case that

22 a common plan or arrangement did exist and that the defendant

23 was one of the members of the plan or arrangement, then the

24 acts and statement by any person likewise found to be a member

25 may be considered by the jury as evidence in the case as to

U.S. v. Manafort

2565

1    the defendant found to have been a member.

2         This is true even though the acts and statements may

3    have occurred in the absence of and without the knowledge of

4    the defendant provided that such acts and statements were

5    knowingly done or knowingly made during the existence of the

6    common plan or arrangement then in furtherance of some

7    intended object or purpose of the plan or arrangement.

8         Otherwise, any admission or incriminating statement

9    made or act done by any one person outside the Court may not

10   be considered as evidence against any person who was not

11   present and saw the act done or heard made statement made.

12        Now, the Government is not required to prove that

13   the parties or members of the alleged agreement or conspiracy

14   were successful in achieving any or all of the objects of the

15   agreement or conspiracy.

16        And under the law, the participating in a conspiracy

17   to commit a crime is an entirely separate and distinct charge

18   from the actual violation of the substantive charge which may

19   be the object of the conspiracy.

20        Therefore, all of the underlying elements of the

21   substantive participation in an act affecting bank fraud need

22   not be met in order for you to find that there was a

23   conspiracy to commit that offense.

24        All that you must find is that there was an

25   agreement to commit that offense and that a defendant

U.S. v. Manafort

2566

1   voluntarily joined the conspiracy.

2          I'll give you instructions in a minute here about

3   bank fraud separately.  You should consider these elements in

4   determining whether the defendant knowingly and intentionally

5   conspired to participate in bank fraud.

6          As I've explained to you previously, however, the

7   Government need not prove each of the underlying elements to

8   prove that the defendant conspired to participate in bank

9   fraud.

10          Now, Count 25 is bank fraud and so is Count 27,

11  Count 30, Count 32.  Those are all allegations of specific

12  bank fraud.

13          Count 25 of the superseding indictment charges that

14  from on or about and between December 2015 and March 2016,

15  both dates being approximate and inclusive in the Eastern

16  District of Virginia and elsewhere, Paul Manafort did

17  knowingly and intentionally execute and attempt to execute a

18  scheme and artifice to defraud one or more financial

19  institutions to wit Citizens Bank, the deposits of which were

20  insured by the FDIC, Federal Deposit Insurance Corporation,

21  and to obtain monies, funds, and credits owned and under the

22  custody and control of Citizens Bank by means of materially

23  false and fraudulent pretenses, representations, and promises.

24          The defendant has pled not guilty to this, and

25  therefore the Government must prove, as required to prove,

———————— U.S. v. Manafort ————————

2567

1   beyond a reasonable doubt each essential element of the crime

2   of bank fraud.  That was Count 25.

3              Count 27 is an allegation of bank fraud involving

4   the Banc of California.  Any reason to read all of that again?

5              MR. ASONYE:  No, Your Honor.

6              THE COURT:  That's Count 27.

7              Count 30 is another charge of bank fraud.  This time

8   it's The Federal Savings Bank.  And the Count 32 is yet

9   another allegation of bank fraud, and in this case it's also

10  Federal Savings Bank.

11             Now, all of those, that is, Counts 25, 27, 30, and

12  32 are allegations of bank fraud in violation of Section 1344

13  of the U.S. Code.  That section provides that whoever

14  knowingly executes or attempts to execute a scheme or artifice

15  to defraud a federally chartered or insured financial

16  institution or to obtain any of the monies, funds, or other

17  property owned by or under the custody or control of a

18  federally chartered or insured financial institution by means

19  of false or fraudulent pretenses, representations, or promises

20  shall be guilty of an offense against the United States.

21             So in order to sustain its burden of proof for the

22  crime of bank fraud, that is, knowingly executing a scheme or

23  artifice -- a scheme or plan to defraud and knowingly

24  executing a scheme and plan to obtain money, funds, credits

25  owned by or under the control of a financial institution, as

─────U.S. v. Manafort─────

2568

1    charged in Counts 25, 27, 30 and 32 of the superseding

2    indictment, the Government must prove beyond a reasonable

3    doubt all of the following elements:  First, that the

4    defendant knowingly executed or attempted to execute a scheme

5    or artifice to defraud a financial institution or scheme and

6    artifice to obtain the money, funds, or other property owned

7    or under the control of a financial institution by means of

8    materially false -- material false or fraudulent pretenses,

9    representations, or promises as described in those counts of

10   the superseding indictment.  That's the first element.

11          Next, the Government must prove beyond a reasonable

12   doubt that the false or fraudulent pretenses, representations,

13   or promises employed in the scheme were material.

14          Third, the Government must prove beyond a reasonable

15   doubt that the defendant acted with the intent to defraud.

16          And four -- fourth, the financial institution was

17   chartered or insured by the United States.

18          Now, the term "federally chartered or insured

19   financial institution" means a bank organized or operating

20   under the laws of the United States.  The bank with deposits

21   insured by the Federal Deposit Insurance Corporation or a

22   mortgage lending business or any person or entity that makes

23   it whole or, in part, a federally related mortgage loan.

24          Now, the phrase "a scheme and artifice to defraud in

25   any scheme or artifice for obtaining property, money" means

U.S. v. Manafort

2569

1  any deliberate plan of action or course of conduct by which

2  someone intends to deceive or to cheat another and by which

3  someone intends to deprive another of something of value.

4        The term "false or fraudulent pretenses,

5  representations, or promises" means a statement or an

6  assertion which concerns a material or important fact or

7  material or important aspect of the matter in question and

8  that was either known to be untrue at the time it was made or

9  that it was made used -- or that was made or used with

10  reckless indifference as to whether it was, in fact, true or

11  false and made or used with intent to defraud.

12        A material fact is a fact that would be of

13  importance to a reasonable person making a decision about a

14  particular matter or transaction.

15        The term "false or fraudulent pretenses,

16  representations, or promises" includes actual, direct false

17  statements as well as half truths, includes the knowing

18  concealment of facts that are material or important to the

19  matter in question, and that were made or used with intent to

20  defraud.

21        It's not necessary for the Government to prove that

22  the defendant was actually successful in defrauding anyone or

23  in obtaining money or property by means of false or fraudulent

24  pretenses, representations, or promises.

25        It's not necessary for the Government to prove that

U.S. v. Manafort

2570

1  anyone lost any money or property as a result of the scheme or

2  plan to defraud or to obtain money by means of false or

3  fraudulent pretenses, representations, or promises.  An

4  unsuccessful scheme or plan to defraud or to obtain money by

5  false or fraudulent pretenses, representations, or promises is

6  as illegal as a scheme or plan that is ultimately successful.

7       Now, the good faith of the defendant is a complete

8  defense to the charges of subscribing a false individual

9  income tax return, failing to file an FBAR, conspiracy to

10  commit bank fraud, and bank fraud contained in the various

11  counts.  Because good faith, on the defendant's part, is

12  simply inconsistent with the intent to subscribe false tax

13  returns, intent to fail to file an FBAR, intent to conspire,

14  intent to defraud, or intent to obtain money or property by

15  false or fraudulent pretenses, representations, or promises as

16  alleged in the counts.

17       A person who acts or causes another person to act on

18  a belief or opinion honestly held is not punishable under this

19  statute merely because the belief or opinion turns out to be

20  inaccurate, incorrect, or wrong.  An honest mistake in

21  judgment or an error in management does not rise to the level

22  of criminal conduct.

23       A defendant does not act in good faith if, even

24  though he honestly holds a certain opinion or belief, that

25  defendant also knowingly makes false or fraudulent pretenses,

─U.S. v. Manafort─

2571

1 representations, or promises to others.

2          The law is written to subject to criminal punishment

3 only those people who willfully subscribe a false tax return,

4 willfully fail to file an FBAR, knowingly execute -- I beg

5 your pardon, knowingly conspire, knowingly defraud or attempt

6 to defraud or knowingly obtain money or property or attempt to

7 obtain money or property by means of false or fraudulent

8 pretenses, representations, or promises.

9          While the good faith -- while the term "good faith"

10 has no precise definition, it means, among other things, a

11 belief or opinion honestly held, an absence of malice, ill

12 will, and an intention to avoid taking unfair advantage of

13 others.

14          In determining whether or not the Government has --

15 I'm sorry, in determining whether or not the Government has

16 proven that the defendant acted with an intent to subscribe a

17 false tax return, failure to file an FBAR, conspiring to

18 defraud or obtain money or property by means of false or

19 fraudulent pretenses, representations, or promises, or whether

20 the defendant acted in good faith, the jury must consider all

21 the evidence in the case bearing on the defendant's state of

22 mind.

23          The burden of proving good faith does not rest with

24 the defendant because the defendant does not have any

25 obligation to prove anything in this case.  It is the

U.S. v. Manafort

2572

1   Government's burden to prove to you beyond a reasonable doubt

2   that the defendant acted with the intent to subscribe, that

3   is, sign a false tax return, with the intent to file an

4   FBAR -- I'm sorry, with the intent to fail to file an FBAR and

5   with the intent to conspire and with the intent to defraud or

6   attempt to defraud -- obtain money or property by means of

7   false or fraudulent pretenses, representations, or promises.

8           If the evidence in the case leaves the jury with the

9   reasonable doubt as to whether the defendant acted with an

10  intent to subscribe false tax return or fail to file an FBAR,

11  conspire to defraud or obtain money, property -- money or

12  property by means of false or fraudulent pretenses,

13  representations, or promises or aid and abet the substantive

14  offenses or in good -- or in good faith, the jury must acquit

15  the defendant.

16          You'll have a copy of the superseding indictment.

17  Although the superseding indictment charges the defendant with

18  committing an offense in several ways using the conjunctive

19  language, it isn't necessary for the Government to prove that

20  the defendant did each of those things.  It 's sufficient for

21  the Government -- if the Government proves beyond a reasonable

22  doubt that the defendant did any of these alternative acts as

23  charged.

24          Now, there's also, you'll see in the indictment,

25  that the defendant aided and abetted.  A person may violate

─U.S. v. Manafort─

2573

1    the law, even though he or she does not personally do each and

2    every act constituting the offense, if that person aided and

3    abetted the commission of the offense.  Section 2A of Title 18

4    of the Code provides that whoever commits an offense against

5    the United States or aids, abets, counsels, commands, induces,

6    secures the commission is punishable as a principal.

7            So before the defendant may be held responsible for

8    aiding and abetting others in the commission of the crime -- a

9    crime, it is necessary that the Government prove beyond a

10   reasonable doubt that the defendant knowingly and deliberately

11   associated himself in some way with the crime charged and

12   participated in it with the intent to commit the crime.

13           In order to be found guilty of aiding and abetting

14   the commission of the crimes charged in Counts 1 through 5, 11

15   through 14, 25, 27, 30, and 32 of the superseding indictment,

16   the Government must prove beyond a reasonable doubt that the

17   defendant first knew that the crime charged was to be

18   committed or was being committed.

19           And second, knowingly did some act for the purpose

20   of aiding, commanding, or encouraging the commission of that

21   crime.

22           And third, acted with the intention of causing the

23   crime charged to be committed.

24           Before the defendant may be found guilty as an aid

25   or an abettor of the crime, the Government must also prove

─────U.S. v. Manafort─────

2574

1  beyond a reasonable doubt that some person or persons

2  committed each of the essential elements of the offenses

3  charged in Counts 1 through 5, 11 through 14, 25, 27, 30, and

4  32 of the superseding indictment.

5          Merely being present at the scene of the crime or

6  merely knowing that a crime is being committed or is about to

7  be committed is not sufficient conduct for the jury to find

8  the defendant -- that the defendant aided and abetted the

9  commission of that crime.  The Government must prove the

10 defendant knowingly associated with -- himself with the crime

11 in some way as a participation, someone who wanted the crime

12 to be committed, not as a mere spectator.

13         A defendant need not commit all of the acts

14 constituting an offense in order to be guilty of that act.

15 Title 18, Section 2B of the U.S. Code states that whoever

16 willfully causes an act to be done, which if directly

17 performed by him or another, would be an offense against the

18 United States, is guilty of an offense.

19         In other words, the defendant can be guilty of an

20 offense if the defendant causes another person to take an

21 action, which if the defendant had done the act himself, would

22 have made the defendant guilty of the offense.  In this

23 regard, it doesn't matter whether the person, himself or

24 herself, was knowingly involved in the offense or was just an

25 innocent party.

U.S. v. Manafort

2575

 1          The defendant, however, must have willfully, that

 2   is, knowingly and deliberately and intentionally, as

 3   contrasted with accidentally, carelessly, or unintentionally,

 4   caused the other person to take the action which the defendant

 5   had done -- which if the defendant had done it himself, would

 6   have made the defendant guilty.

 7          This means that the defendant must have done an act

 8   either with the knowledge that the other person's act would

 9   follow in the ordinary course of business or where the

10   person's act could reasonably have been foreseen.

11          In order to sustain its burden of proof, it's not

12   necessary for the Government to prove that the defendant

13   personally did every act constituting the offense charged.  As

14   a general rule, whenever any person legally capable of doing

15   himself -- whatever any person is legally capable of doing

16   himself, he can do through another acting as his agent.

17          So if the acts or conduct of another is deliberately

18   ordered or directed by the defendant or deliberately

19   authorized or consented to by a defendant, then the law holds

20   that defendant responsible for such acts or conduct just as --

21   just the same as if the -- if personally done by him.

22          Now, ladies and gentlemen, we're close to done.  The

23   verdict must represent the considered judgment of each juror.

24   In other words, in order to return a verdict, it's necessary

25   that each juror agree thereto.  Your verdict must be

─────U.S. v. Manafort─────

2576

1    unanimous.

2         It is your duty as jurors to consult with one

3    another and to deliberate with a view to reaching an agreement

4    if you can do so without violence to your individual judgment.

5         You must each decide the case for yourself, but do

6    so only after an impartial consideration of all the evidence

7    in the case with your fellow jurors.  And in the course of

8    your deliberations, do not hesitate to re-examine your own

9    views and to change your opinion if convinced it is erroneous.

10   But do not surrender your honest conviction as to the weight

11   or effect of the evidence solely because of the opinion of

12   your fellow jurors or for the mere purpose of returning a

13   verdict.

14        Remember, at all times, you are not partisans.

15   You're not -- you are the judges of the facts of this case.

16   Your sole interest is to seek the truth from the evidence in

17   the case.

18        Now, the punishment provided by law for the offenses

19   charged in the indictment is a matter exclusively within the

20   province of the Court and should never be considered by the

21   jury in any way in arriving at an impartial verdict as to the

22   offenses charged.

23        Now, the indictment alleges a number of separate

24   means or methods by which the defendant is accused of

25   violating a federal law.  The Government is not required to

─────── U.S. v. Manafort ───────

2577

1   prove all of the means or methods alleged in the indictment.

2   Each juror must agree with each of the other jurors, however,

3   that the same means or methods was, in fact, used or engaged

4   in or employed by the defendant in committing the crime

5   charged in the indictment.

6           The jury need not unanimously agree on each means or

7   method, but in order to convict, must unanimously agree upon

8   at least one such means or method as one engaged in by the

9   defendant.  Unless the Government has proven the same means or

10  methods to each of you beyond a reasonable doubt, you must

11  acquit the defendant of the crime charged.

12          Refresh my recollection, counsel.  I don't think

13  means or methods are set out in much detail; am I correct?

14          Well, let's do it this way.  I'm going to finish

15  because I'm very close to the end.  But I want you to look

16  carefully at the indictment.  We'll have a brief conference

17  here at the bench, and tell me what portions of the

18  indictment -- I have in mind sending back the counts only, not

19  the prefatory part.  But I'll give you an opportunity to

20  persuade me to the contrary.

21          Now, during your deliberations, you must not

22  communicate with or provide any information to anyone by any

23  means about this case.  You may not use any electronic device

24  or media.  I could go through a whole list.  Nothing about a

25  cell phone or an iPhone or, good heavens, this is now

U.S. v. Manafort

2578

1    outdated, BlackBerry.

2         (Laughter.)

3         THE COURT:  There are a number of things.  Don't use

4    any electronic or other means in any way to communicate with

5    anyone about this case.  Don't undertake any research on your

6    own.  And I would hope that members of the press would keep

7    that in mind and leave the jury alone.  If I get word

8    otherwise, I will take steps.  We can't at all -- can't go up

9    to a juror and say what's happening.  But you all know that.

10        All right.  Now, when you retire to the jury room,

11   you'll select one of your number to act as your foreperson.

12   The foreperson will preside over your deliberations and will

13   be your spokesperson here in court.  The forms of the verdict

14   have been prepared for your convenience and I'll review that

15   with you now.

16        It's a -- it's a three-page document and it's quite

17   simple.  It just lists each count with a shorthand description

18   of that count and then permits you to mark either not guilty

19   or guilty, as you may find, and then you will have your

20   foreperson sign it, date it, and then indicate that you're

21   finished and you can return to the courtroom for the

22   publication of your verdict.

23        Now, if it becomes necessary during your

24   deliberations to communicate with the Court, you may send a

25   note by the court security officer, Mr. Flood, and it can be

U.S. v. Manafort

2579

1  signed by the foreperson or by one or more members of the

2  jury.

3          No member of the jury should ever attempt to

4  communicate with the Court by any means other than assigned

5  writing, and the Court will never communicate with any member

6  of the jury on any subject touching the merits of the case

7  other -- otherwise, and in writing or orally here in open

8  court.  Of course, I will communicate with you on logistical

9  matters, administrative matters.

10          You'll note from the oath about to be taken by

11  Mr. Flood, that he too, as well as all other persons are

12  forbidden to communicate in any way or manner with any member

13  of the jury on any subject touching the merits of the case.

14  And I'll have the deputy clerk now administer the oath to the

15  court security officer.

16          (Court security officer sworn.)

17          THE COURT:  All right.  I omitted one point I just

18  want to make.  You're to ignore any argument about the

19  Department of Justice's motives or lack of motives in bringing

20  this prosecution.

21          All right.  Let me have counsel quickly at the

22  bench.

23          (Bench Conference.)

24          THE COURT:  THE COURT:  All right.  What's the

25  parties' view of portions of the indictment that -- well,

─────────────── U.S. v. Manafort ───────────────

2580

1   first of all have the jury been fully and fairly instructed or

2   did I omit something?

3               MR. ANDRES:  No, Your Honor.

4               MR. ZEHNLE:  Nothing from the defense, Your Honor,

5   no.

6               THE COURT:  All right.  So the parties agree that,

7   in accordance with the instructions conference, the jury has

8   been fully and fairly instructed?

9               Now what about the indictment?  What parts do you

10  think should go back?

11              MR. ANDRES:  Can I ask one question?  Are you

12  going -- they are not going to deliberate tonight?

13              THE COURT:  No.

14              MR. ANDRES:  You're just going to send them home?

15              THE COURT:  I'm going to send them home.

16              MR. ANDRES:  We don't have to resolve this issue

17  tonight.  I think I'm fine with it, but it might make sense if

18  we all agree on it.

19              THE COURT:  All right.  That's fine.  That's fine.

20              MR. DOWNING:  Your Honor, one other --

21              (Sealed bench conference.)

22              MR. ASONYE:  Can I ask a question, Your Honor?

23              THE COURT:  Yes.

24              MR. ASONYE:  When you excuse the alternates, are

25  they instructed not to discuss the case?

U.S. v. Manafort

2581

1        THE COURT:  Yes, they are.  Yes, they are.  And

2   they're instructed not to and to let me know if anybody tries

3   to talk to them about it.  They'll be called as soon as

4   there's a result.  They'll be told a result and at that point

5   they'll be free to speak to whomever they wish, but I'm going

6   to give them a caution about that.

7        MR. ANDRES:  Judge, when you say "they're excused,"

8   does that mean that they are -- they can leave, in other

9   words --

10        THE COURT:  No.  Except for the one whose going to

11   take her son.

12        MR. ANDRES:  Yeah.

13        THE COURT:  But the rest can go and if we need them,

14   we will call them.  I'll explain to them that there could

15   arise circumstances where they would be needed.

16        MR. ANDRES:  Understood.  Thank you.

17        THE COURT:  Anything else?

18        MR. ANDRES:  No.  Thank you, Your Honor.

19        (End of bench conference.)

20        THE COURT:  Ladies and gentlemen, once again, thank

21   you for your patience.  Let me start and say something very

22   important.  In about 15 minutes, you're going to be able to go

23   home.  That's the important thing.

24        But we need to do a couple of matters.  We need to

25   deal with a couple of matters.  As many of you, I'm sure know,

U.S. v. Manafort

2582

1  and -- well, let me say more.  We're going to go home in about

2  15 minutes, come back at 9:30 tomorrow morning.  I'll convene

3  you, and then you will then retire to the jury room and begin

4  your deliberations.  When you get into the jury room,

5  Mr. Flood will have brought in all of the exhibits.

6          It's a pretty small jury room.  Can we do it?

7          THE CSO:  We can try.

8          THE COURT:  I don't know whether it was designed --

9  I was one of the persons involved, three judges involved, in

10  designing this.  I confess I never paid any attention to the

11  size of jury rooms.  It's not the only mistake I've made.

12          Now -- but all of the exhibits will be in there for

13  you and the jury verdict form.  The tape recorder with the

14  instructions will all be in there for you.  But I'm going to

15  convene you first, and I'll remind you of that.

16          And so that's what we'll do in the morning.  Right

17  now, as many of you are, I'm sure, aware, a federal criminal

18  trial requires 12 jurors.  So four of you have been -- have

19  been alternates.  We could not have proceeded without you.

20  You played a vital role in this trial, and we may still need

21  you.  Circumstances could arise, they're rare, but they could

22  arise where we will need you.

23          So as soon as I identify you, I'm going to excuse

24  you.  I'm going to require that Mr. Flood keep your book here,

25  because if you come back, then we will give you your book.

─U.S. v. Manafort─

2583

1   And when its all over, we'll mail it to you.  And we won't

2   look at it in the interim.

3          Now, the alternates are No. 296, 54, 127, and 133.

4          Now, one of those -- which of you has a son you're

5   taking to school on Friday?

6          THE JUROR:  My son.

7          THE COURT:  That's you?

8          THE JUROR:  Yes.

9          THE COURT:  And you're --

10          THE JUROR:  133.

11          THE COURT:  All right.  Now, go ahead and plan it.

12   You're excused.  And --

13          THE JUROR:  Thank you.

14          THE COURT:  But now let me give you some

15   instructions about that.  I don't -- you're not to discuss the

16   case with anybody until it's over.  Ms. Pham will call you

17   when the case is over.  Until then, don't let anybody talk to

18   you.  There will be lots of people who want to.  Don't say

19   anything to anybody or investigate anything.  There could be

20   circumstances under which we will need you, but in the interim

21   I want you to plan to go take your son to school and go ahead

22   and take him.

23          THE JUROR:  Thank you, Your Honor.

24          THE COURT:  And we'll keep your book here.  Now, I

25   want to be very clear about the need for you-all who are being

U.S. v. Manafort

2584

1   excused and everyone not to discuss the matter with anyone.

2          When the case is over, and you're informed, then

3   you'll be free to speak to whomever you please about the case.

4   But in that regard, let me offer a caution that I want you to

5   take quite seriously.  I'm always disturbed when I see in the

6   media, and I do see it -- in the past I saw it fairly

7   frequently, I don't know if I've seen it much in the last few

8   years, but I've seen jurors discussing what went on in the

9   course of deliberations in the jury room.  That seems to me to

10  do an injury to the deliberate process.  If jurors knew in

11  advance everything they said and did in the course of their

12  deliberations was going to be grist for the media mill, I

13  think it might well have a chilling effect on deliberations.

14         So I suggest to you, and it is a suggestion, you're

15  not ordered, it's a suggestion to you that you have a duty of

16  confidentiality to your fellow jurors as to what went on in

17  the course of deliberations.  And I hope you will take that

18  suggestion seriously and consider it.  It's quite important.

19         All right.  Now, pass your books to the right.

20  Court security officer will collect them.  And the four of you

21  who are alternates I am now excusing, you may leave now too.

22  Let's keep your books here.  And if you're needed -- the four

23  of you, if you're needed and have to return for some reason --

24  I've been doing this for 31 years and its never happened, so I

25  think we can be somewhat reasonable in thinking it isn't going

─────────────U.S. v. Manafort─────────────

2585

1   to happen here.  But it does happen occasionally.  And if it

2   does, I will have to call you in the order in which you were

3   selected.

4         But, anyway, we'll keep the books here.  When the

5   case is over, we'll mail it back to you.  Tonight, as always,

6   do not discuss the case with anybody, do not undertake any

7   investigation on your own.  And I will see you tomorrow

8   morning at -- the 12 of you tomorrow morning at 9:30.  And I

9   will convene you and then permit you to retire and deliberate

10  on your verdict.

11        Your lunches will be here.  There will be other

12  matters going on in the courtroom the entire day, I think.  No

13  rest for the weary.  But I don't believe you can hear it in

14  there.  And if you can, knock on the door, tell Mr. -- well,

15  tell Mr. Flood and I'll make arrangements to ensure that

16  you're not disturbed.

17        Thank you.  Anything further?

18        9:30 tomorrow morning.  Thank you for your careful

19  consideration of everything.  A great deal happened.  Thank

20  you.  You may follow Mr. Flood out.

21        THE DEPUTY CLERK:  All rise.

22        (Jury dismissed.)

23        THE COURT:  All right .  You may be seated.

24        All right.  Now, counsel are going to confer about

25  paring the superseding indictment down, so -- and we don't

U.S. v. Manafort

2586

1   need to caption or anything else.  All we need is maybe a

2   single caption and then for the counts.  That's what I have in

3   mind, but I'm prepared to change my mind if you-all feel

4   otherwise.

5          Anything further this evening?

6          MR. ANDRES:  No, Your Honor.

7          MR. DOWNING:  No, Your Honor.

8          THE COURT:  All right.  I thank counsel for your

9   cooperation.  Court stands in recess.

10          **(Proceedings adjourned at 6:05 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial

7    in the case of the **UNITED STATES OF AMERICA versus PAUL J.**

8    **MANAFORT, JR.,** Criminal Action No. 1:18-CR-83, in said

9    court on the 15th day of August, 2018.

10           I further certify that the foregoing 230 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15           In witness whereof, I have hereto subscribed my

16   name, this August 15, 2018.

17

18

19

20

21                              _____
                               Tonia M. Harris, RPR
22                             Official Court Reporter

23

24

25

                                                            2587