```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,        ) Criminal Action
                                        ) No. 17-CR-201-1
 4                      Plaintiff,      )
                                        ) MOTIONS HEARING
 5     vs.                              )
                                        ) Washington, DC
 6     Paul Manafort, Jr.,              ) Date:  August 28, 2018
                                        ) Time:  9:30 a.m.
 7                      Defendant.      )
                                        )
 8     _____

 9                    TRANSCRIPT OF MOTIONS HEARING
                               HELD BEFORE
10           THE HONORABLE JUDGE AMY BERMAN JACKSON
                    UNITED STATES DISTRICT JUDGE
11     _____

12                    A P P E A R A N C E S

13     For Government:     ANDREW WEISSMANN
                           GREG D. ANDRES
14                         JEANNIE S. RHEE
                           U.S. Department of Justice
15                         Special Counsel's office
                           950 Pennsylvania Avenue NW
16                         Washington, D.C.  20530
                           202-514-1746
17                         E-mail: Aaw@usdoj.gov
                           E-mail: Gda@usdoj.gov
18                         E-mail: Jsr@usdoj.gov

19     For Defendant:      KEVIN M. DOWNING
                           815 Connecticut Avenue, N.W.
20                         Suite 730
                           Washington, D.C. 20006
21                         (202) 754-1992
                           E-mail: Kevindowning@kdowninglaw.com
22                         THOMAS EDWARD ZEHNLE
                           Law Office of Thomas E. Zehnle
23                         601 New Jersey Avenue, NW
                           Suite 620
24                         Washington, DC 20001
                           (202) 368-4668
25                         E-mail: Tzehnle@milchev.com
```

```
 1     For Defendant:          RICHARD WILLIAM WESTLING
                               Epstein Becker & Green, P.C.
 2                             1227 25th Street, NW
                               Suite 700
 3                             Washington, DC 20037
                               (202) 861-1868
 4                             e-mail: Rwestling@ebglaw.com

 5     ALSO PRESENT:           Omer Meisel, Special Agent
                               Jeffrey Weiland, Special Agent
 6
       Court Reporter:         Janice E. Dickman, RMR, CRR
 7                             Official Court Reporter
                               United States Courthouse, Room 6523
 8                             333 Constitution Avenue, NW
                               Washington, DC  20001
 9                             202-354-3267

10                                     *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Your Honor, this morning we

2     have criminal case number 17-201-1, the United States of

3     America v. Paul J. Manafort, Jr.

4          The defendant's presence has been waived for this

5     hearing.

6          Will counsel for the parties please approach the

7     lectern, identify yourself for the record.

8          MR. WEISSMANN:  For the Government, Andrew Weismann,

9     Jeannie Rhee, Greg Andres.  And from the FBI, Omer Meisel and

10    Jeff Weiland.

11         THE COURT:  All right.  Good morning.

12         MR. ZEHNLE:  Good morning, your Honor.

13         Thomas Zehnle on behalf of Mr. Manafort.  With me is

14    Mr. Downing, Mr. Westling, and Tim Wang, our paralegal.

15         THE COURT:  All right.  Good morning.  Welcome back

16    to the District of Columbia.

17         I want to just speak to counsel briefly at the bench

18    before we get started on a couple of preliminary issues.  So I

19    don't know how many of you we need, but some group from each

20    side, if you could just come up.

21         (Whereupon, a bench conference was held.)

22         THE COURT:  I just wanted to say that the date for --

23    that the jury is coming in to complete the jury questionnaire.

24    As far as I know, it has not received a lot of public

25    attention.  So I don't think we'll mention it on the record,

1    although I plan to talk about the questionnaire.

2              You have waived the defendant's right to be present,

3    except for jury selection.  Are you including that date?  Is he

4    going to be here on that date, or not?  You need to let me know

5    because we have to figure out the logistics.

6              MR. DOWNING:  We'll let you know today, Judge.

7              THE COURT:  Okay.  All right.

8              Trial is going to involve the use of this new jury

9    software that enables the jury to pull up all of the exhibits

10   on the computer and to review them, to sort them, to search

11   them.  It's really quite incredible.  And so there are going to

12   be specific requirements for the foreman, and which you need to

13   provide the exhibits to Mr. Haley.  So he's going to give you

14   that information today.

15             Feel free between now and the trial date to schedule

16   a meeting with John Cramer.  He is the court personnel person

17   who is in charge of courtroom technology.  I expect you to know

18   how to work it the day the trial starts.  And they will make

19   this courtroom and him available to you any time you need to to

20   get all that together.

21             I was a little surprised when I read the joint

22   pretrial statement, that the defendant had voiced no objections

23   whatsoever to any of the Government's exhibits.  I have now

24   read the pretrial statement in more detail and note that you

25   are planning to do so at a later date.

```
 1              I point out, obviously, that you sought an extension.
 2    I granted the extension.  It was until the 24th; it's now the
 3    28th.  I'm not satisfied with your just granting yourselves an
 4    extension without coming back to me.  And even the date you
 5    requested was the 27th, which was yesterday.
 6              The reason I picked the 24th was so I would actually
 7    have time to rule on these objections.  You all have been
 8    dealing with these exhibits for months.  They just showed up in
 9    my chambers this week.  So I need your objections to the
10    exhibits tomorrow.
11              MR. ZEHNLE:  It's --
12              THE COURT:  I understand --
13              MR. ZEHNLE:  It's not going to happen, Your Honor.  I
14    apologize, but we got dumped 1500 exhibits just the other day,
15    1500; only 388 are from the other trial.  So they have been
16    organized in a matter in which we are going to be able to kind
17    of officially go through it, but there's no way, 1,000
18    exhibits -- 1100.
19              THE COURT:  Well, are they designated which ones are
20    for impeachment and which ones you're actually planning to
21    introduce?
22              MR. WEISSMANN:  Yes.  Yes.
23              THE COURT:  So how many are you planning to introduce
24    in your case in chief?
25              MR. WEISSMANN:  Every single exhibit that's on that
```

1      list is something that we intend to offer in our case.

2              And there are two points I want to make.  One, the

3      reason for the charts that we specifically culled out to the

4      Court and to the defense was because the way that -- many of

5      the exhibits we're planning, because we have an overachiever

6      scheme of lobbying, all of those exhibits go to government

7      relations lobbying, press lobbing, all things that are relevant

8      to the jury.

9              We don't intend to show each and every exhibit to the

10     jurors, given it's so much, but we do have summary charges that

11     we're intending to have someone walk through with the jury, so

12     then they will have all of the backup so that the jurors can

13     see exactly how those charts were created.

14             I also do take issue with the defense position to

15     justify not providing us a single specified objection because,

16     as the Court knows, our submission with respect to the initial

17     request for an extension of time to the August 1st joint

18     pretrial statement, we provided starting at ten days -- the

19     dates are specified in our submission.  We provided --

20             THE COURT:  I read all that.  From the first time you

21     asked for an extension, I made it a little shorter than what

22     you asked for, but you asked for a date that's already passed.

23     The second time you asked for an extension, you asked for a

24     date that is already passed.

25             My plan, and I said this a year ago when you all said

 1    you wanted to go to trial in April, is to, at the pretrial

 2    conference, rule on the admissibility of exhibits so that

 3    everybody knows it in their opening, and knows exactly what's

 4    going to trial and what's not.

 5            Now, I understand, it wasn't my decision to move

 6    another trial in front of this.  It wasn't my decision to push

 7    that trial up to accommodate that judge's schedule.  And, you

 8    know, it was your decision to push it further.  And so you're

 9    under extraordinary time pressures that don't happen on a daily

10    basis.  But we have a pretrial conference scheduled on

11    September 5th and I need to know what objections you have to

12    the exhibits.

13            So what are we going to do?

14            MR. DOWNING:  I don't know, Your Honor.  We don't

15    have the resources of the U.S. Government.  We don't have two

16    trial teams to get ready for two trials.  This is us, three

17    here and a paralegal.  I don't see how it's going to get done

18    with all the parts.

19            THE COURT:  The day you asked for was yesterday.  So

20    what are you asking for?  You just can't say, I don't know.

21    You haven't moved to continue the trial.  I don't want to

22    continue the trial.  We have 120 jurors coming in who have been

23    pre-qualified to be available for this period of time.

24            A lot of these documents you have been provided in

25    discovery.  You know that.  We've been living with them.

1    You've been figuring out what your defense is based on them.  A

2    lot of the documents there is overlap with the other trial.  I

3    realize -- I mean, I need an answer as to what you think.

4              MR. ZEHNLE:  Your Honor, I've had some big trials in

5    my career; I've never been presented with 1500 exhibits a

6    couple weeks before trial, a few weeks before trial.  Never

7    seen it before.  We don't even have Jencks yet.  So I have no

8    idea how you think we're going to be able to be prepared to go

9    to trial on the 17th with all of this --

10             THE COURT:  Are you asking for -- have you moved for

11   a continuance?  Are you asking for a continuance?  Let's talk

12   about that before --

13             MR. ZEHNLE:  Your Honor --

14             THE COURT:  I will ask you at end of this hearing.

15   You have to -- you have to make a proposal to me.  You made one

16   in writing and it said yesterday, and now you're telling me

17   that tomorrow is impossible.  What am I supposed to do?  I told

18   you when I wanted it.  Now I'm asking you, when do you want it

19   and you won't even tell me.  You need to tell me.

20             MR. ZEHNLE:  Well, I would like to confer with

21   counsel on this.

22             THE COURT:  All right.

23             MR. ZEHNLE:  And then and I would like --

24             THE COURT:  We'll talk about this at the end of the

25   hearing, again.

1              MR. ZEHNLE:  I appreciate it, Your Honor.

2              THE COURT:  We need a schedule.

3              MR. ZEHNLE:  Yes.

4              THE COURT:  And I'm very reluctant to move the trial.

5     I think we need to get these jurors in here.  We need to pick

6     them.  You know, we can maybe have some flexibility given that

7     there's a holiday in the middle of that week already, in terms

8     of when we open, but I want to start picking the jury on the

9     17th.

10             But I need to be able to look at these exhibits.

11    I've had less time -- you think you just got them; I literally

12    just got them.

13             MR. ZEHNLE:  No.  And I understand, Your Honor.  But

14    what our problem is, we're not trying to move the trial date.

15    We just don't know if we can get this done before the trial

16    starts.

17             THE COURT:  All right.

18             MR. ZEHNLE:  That's the problem that we're having.

19             THE COURT:  Okay.  That would make this trial 20

20    times longer.  The overwhelming majority of these documents --

21    let's put aside the summaries for a second.  The documents are

22    business-type records.

23             MR. ZEHNLE:  A thousand exhibits, your Honor.  We

24    have --

25             THE COURT:  I understand that, but they aren't all

1    brand-new to you.

2              MR. ZEHNLE:  Well, like I said, until we go through

3    them -- and we don't even know if they're complete.  We don't

4    even know, some of the documents, where they came from.  We

5    don't even know if they can be authenticated.  I mean, all the

6    things you would expect someone to be able -- lawyers to be

7    able to do before trial.  We're just saying.

8              THE COURT:  I understand that.

9              MR. ZEHNLE:  And we just finished trial last week.

10             THE COURT:  I know.  But, you know, there was a

11   period of time -- but there's been some time when you've had

12   these materials.  And you need to divide them up, and you need

13   to figure it out.

14             MR. ZEHNLE:  Yes.  I agree.

15             THE COURT:  All right.

16             MR. ZEHNLE:  Thank you.

17             THE COURT:  Let me just see if there was anything

18   else I wanted to talk about up here.

19             Oh, we've got a motion filed by the taint team.  I

20   asked that it be docketed because I don't want just things

21   dropped off in my chambers.  But I permitted it to be filed

22   under seal, just to ensure that there would be no mistakes and

23   no access by the trial team.  And so I had them file it under

24   separate file redacted, so even if the trial team got access to

25   it they wouldn't be able to see what they weren't supposed to

1    see.

2              So that's been done.  But I want to just confirm that

3    you got the unredacted version.

4              MR. WESTLING:  That's correct, Your Honor.

5              THE COURT:  Okay.  And now you've also received a

6    transcript of the hearing before Chief Judge Howell?

7              MR. WESTLING:  I believe so.  I need to double-check

8    that.

9              THE COURT:  Okay.  But I don't think I have.  I think

10   I need that.

11             And so, is there any reason why what's been filed,

12   which is redacted, has to be under seal?  Is there anything

13   secret about the fact that we're having a dispute about this?

14   We've got a motion in limine about the same thing.  So as long

15   as the --

16             MR. WESTLING:  Right.  As long as the information

17   itself is --

18             THE COURT:  Right.

19             MR. WESTLING:  -- covered.

20             THE COURT:  Is there any reason why we can't lift the

21   seal --

22             MR. WESTLING:  I don't think so, Your Honor.

23             THE COURT:  -- as long as it's redacted?

24             MR. WESTLING:  I think our pleading, in particular,

25   was filed in a manner that didn't mention any of the materials

 1     specifically.

 2              THE COURT:  Okay.  All right.

 3              MR. WEISSMANN:  The attorney from the taint team is

 4     handling this.  We have not been handling this, for obvious

 5     reasons.

 6              THE COURT:  Okay.

 7              MR. WEISSMANN:  So in case the Court has some issue,

 8     we do have the attorney present to address anything with the

 9     Court.

10              THE COURT:  Okay.  All right.  Well, one issue I

11     have -- and I don't know who it is for -- is that you all said

12     at the hearing on the bill of particulars, that the witness who

13     is going to say that the defendant caused the false FARA filing

14     is the lawyer.

15              So, presumably, putting aside the motion in limine,

16     which I haven't decided yet, but if I don't bar the testimony,

17     they're going to be entitled to the Jencks material from this

18     witness.  It seems to be that that's the same material they're

19     asking for now.

20              If the trial is coming, is there any reason why we

21     have to delay, so that when we're all talking about what we're

22     excluding and what we're not excluding and what should come in

23     and whether there's an exception, and everybody is dealing with

24     the same record?

25              MR. WEISSMANN:  There's none to -- with respect to

1    that.  And, in fact, we, at a prior court appearance, actually

2    set forth on the record what it is that the lawyer will say

3    with respect to the -- I believe it was seven questions that we

4    were granted to ask by Chief Judge Howell.

5           And so, one, I think the defense has that.  But, two,

6    with respect to the Court's --

7           THE COURT:  Well, then, your very terse summary of

8    it, which I basically just said she's going to say they caused.

9    So --

10          MR. WEISSMANN:  No.  There was more than that.  We

11   actually gave what the specific answers were.  But we have no

12   objection to turning over the 3500 materials for -- to defense

13   through USB.

14          THE COURT:  All right.  I think you should do that in

15   connection with my consideration of the taint team's motion and

16   their the motion in limine.  And then -- because I don't know

17   how I'm going to rule on it, but everybody should be working

18   from the same record.  All right.

19          Let's go on to the 404(b) material.

20          MR. WESTLING:  Your Honor, just one thing.  Could we

21   just have a five-minute break at the end of this hearing before

22   we go so we can confer?

23          THE COURT:  Yes.

24          MR. WESTLING:  Don't need more than five minutes.

25          THE COURT:  Yes.

```
 1              MR. WESTLING:  And just the other issue I wanted to
 2    raise.  There was discussion early on about getting Jencks in
 3    advance of trial, and you had never ended up setting a date for
 4    that.  But trial is approaching, and we don't have it.
 5              THE COURT:  All right.
 6              MR. WESTLING:  And we have no idea how many witnesses
 7    they're going to call either.  So, just in terms of
 8    consideration for the trial calendar, the later this stuff gets
 9    dumped on us --
10              THE COURT:  All right.  Well, what's your plan?
11              MR. WEISSMANN:  First, obviously, with respect to the
12    witnesses on the tax part of the case, that, obviously, has
13    been turned over already because we don't expect any additional
14    witnesses on the tax part of the case.  So it's been turned
15    over in the District of Virginia case.
16              And with respect to the FARA instruction part, our
17    plan was to turn that over at least one week before the trial
18    starts.  And, again, for each witness, there is not a
19    voluminous amount of material.  I think there is, like, one or
20    two 302s, the FBI reports for each of these witnesses.
21              THE COURT:  All right.  Well, the trial is supposed
22    to start on the 17th.  I think everything we're doing is on a
23    very truncated basis.  At this point we are not talking about
24    witnesses who are in danger, and I think we can accelerate that
25    date at the beginning.  Early on, when we talked about
```

1     discovery, I think you indicated a little bit more flexibility

2     than that.

3              Now, then, of course they're going to claim now that

4     then they have too much information to deal with in the short

5     period of time.  But, I don't see why it can't be produced at

6     the time of the pretrial conference on the 5th.

7              MR. WEISSMANN:  That would be fine.  I just would ask

8     the Court -- I don't want to be tit for tat, but -- we can do

9     that, but we don't have the defense claim that puts them in a

10    posture to put the trial off.

11             And one of the things that we were concerned about in

12    not having all the information from the defense about the

13    exhibits is we're in the position now of not knowing what we

14    have to do in terms of authentication and business records for

15    each and every one of our exhibits.  So, we had anticipated

16    knowing that so that we won't -- there were a number of --

17             THE COURT:  All right.  What we're going to do, then,

18    at the conclusion of this, we're going to take a break.  And

19    you can talk among yourselves -- and then you can talk among

20    yourselves and then we'll talk about the trial date, the date

21    for the objections to the exhibits, which, notwithstanding the

22    position you're in, I don't think you just get to say:  I'm in

23    a position to not comply with the Court order, so I just won't

24    and I won't tell anybody or ask anybody.  That was not

25    acceptable to me.

1          MR. ZEHNLE:  That was not our intent, Your Honor.

2          THE COURT:  All right.  Well, that is what happened.

3     And I need this information, and they need the information.

4          I can tell you, I really, really, really do not want

5     to continue this trial because so much has been placed around

6     it.  And to think about the Jencks in connection with all that.

7     And we will talk about all that, again, at the end.

8          But let's go ahead and deal with what we need to deal

9     with right now, and then we'll talk a break and you can talk to

10    each other and then we can proceed and we'll see if we have a

11    combined plan.

12         MR. WEISSMANN:  Judge, one thing that you mentioned

13    was the date the jurors would be coming in to do the

14    questionnaire.  And maybe I forgot this, but do we have a set

15    date and time?

16         THE COURT:  Yes.

17         MR. WEISSMANN:  Okay.  Because --

18         THE COURT:  You don't know when it is?

19         MR. WEISSMANN:  No, I don't think so.  And it could

20    be that, as I said, we may know, but I don't have it to --

21         THE COURT:  It's the day after Labor Day, at 10:00

22    o'clock in the morning, in the ceremonial courtroom.

23         MR. WEISSMANN:  Okay.  We will be there.

24         THE COURT:  The plan will be for me to instruct them,

25    and then all of us to leave.  And they're going to sit in the

1  courtroom and fill it out with Mr. Haley.  And so that's why I

2  need to know whether or not Mr. Manafort is waiving that or

3  he's not.  Okay.  All right.

4          MR. ZEHNLE:  Thank you, Your Honor.

5          MR. WEISSMANN:  Yes, thank you.

6          THE COURT:  In connection with decisions about

7  waiving his appearance.  And the order you gave me for him to

8  dress in ordinary clothes will be granted.

9          MR. DOWNING:  Okay.  Thank you.

10          THE COURT:  All right.

11          (Whereupon, the bench conference concludes.)

12          THE COURT:  All right.  We're here this morning for a

13  hearing on the Government's motion to introduce evidence under

14  Federal Rule of Evidence 404(b).

15          In its motion, Docket 327, the Government identified,

16  first, information that it was interested in introducing

17  concerning the Ukrainian procurement process, that the work for

18  the law firm was priced at $12,000 due to limits imposed by the

19  Ukrainian public procurement law.

20          In its reply to the defendant's opposition, the

21  Government withdrew its request to introduce this information,

22  and that's in Docket 358.  It reserved the right to re-raise

23  the issue if the defendant opened the door.  But in light of

24  its withdrawal of its intention to introduce that evidence, I

25  don't think I need to address it this morning.

 1          With respect -- the second area of 404(b) evidence

 2     that the Government proposed to introduce were alleged false

 3     statements made to the IRS from 2008 to 2014, that an apartment

 4     in New York City was rented by Davis Manafort Partners from

 5     John Hannah, another Manafort entity, for business purposes,

 6     with Davis Manafort deducting rent as a business expense, and

 7     Hannah deducting the depreciation.  But then, later, calling it

 8     a residence in 2015 when trying to use it to secure a loan.

 9          Again, the Government backed off this information,

10     somewhat, in its reply and said it would only be relevant if

11     the defendant pursues certain defenses such as:  Tax preparers

12     told me what I was doing was legal.

13          I still think it's important to rule on it at this

14     point.  And I guess I had some questions about how this fits in

15     to the conspiracy count in Count 1.

16          You specifically alleged in the indictment, in

17     Paragraphs 2 and 5, that the defendant and coconspirators

18     generated millions of dollars in income and failed to pay

19     income taxes on the money earned, and that there was a scheme

20     to hide that money from the Government.

21          And then, in Paragraphs 14 through 18, there are

22     allegations that money was wired directly from offshore

23     accounts to vendors so that the money could be used without

24     paying taxes, and that there were transfers that were called

25     loans for the same reason.  And so those allegations are

1      plainly in the indictment.

2              Count 1, though, alleges a conspiracy.  First, to

3      defraud the Government by impeding and impairing and

4      obstructing lawful governmental functions of the Department of

5      Justice and Treasury; and, then, a conspiracy to commit

6      specific offenses against the United States.  And it says, To

7      wit, and it lists Counts 3, 4, and 5, the money laundering,

8      FARA, and false statement charges.  And it also says the

9      failure to file the disclosures about the foreign bank

10     accounts.

11             And then it explains that Paragraphs 8 and 11 and 14

12     through 18 -- which, I think, talks, again, about income tax --

13     are overt acts committed in furtherance of the conspiracy, but

14     they're not the offenses that they conspired to commit.

15             So, I guess, one question I have, are you alleging

16     that the failure to pay taxes on the income earned is embraced

17     in the conspiracy to defraud or impede the Department of

18     Treasury?

19             MR. WEISSMANN:  So, I think the answer -- the

20     technical answer is, yes, it could be; but we are not relying

21     in this case and we will not make the argument that the tax

22     fraud of declaring the Trump Tower apartment as a business

23     residence and all of the various ways in which that had

24     advantageous tax treatment to Mr. Manafort, that that's part of

25     the tax charges that are charged here.  So, we will not be

1    making that argument.

2          THE COURT:  But what even are the tax charges that

3    are charged here?  There is the three counts in the indictment

4    that aren't tax charges, there's the conspiracy to not disclose

5    the foreign bank accounts in tax filings, and there's the overt

6    acts, and the allegations in the complaint about the failure to

7    pay income taxes, or the desire to avoid paying income taxes on

8    the money involved, allegedly, from these activities on behalf

9    of the foreign clients.

10          But, what is the jury going to be asked to decide

11   about failure to file or failure to pay or tax evasion?  I

12   don't actually see that.

13          MR. WEISSMANN:  So, it's going to be substantially

14   similar to the charges in the Eastern District of Virginia with

15   respect to the -- except here, it's a tax conspiracy.  There

16   are two components to that.  One is failing to report all of

17   Mr. Manafort's income and the other is failing to report

18   foreign bank accounts, precisely.

19          Because the motive, we will contend, is that that

20   would have revealed the source of the tax-free income that was

21   used by Mr. Manafort in -- to take Cyprus accounts and other

22   foreign accounts and pay vendors directly without notifying his

23   bookkeeper or his tax preparers.  So, there's two components.

24          A piece of the failure to report income is not just

25   the money that went directly to vendors without ever disclosing

1       that as income; also, reporting as loans what was, in fact,

2       income.  So those are the two pieces of that.

3               THE COURT:  Well, there's allegations that those

4       activities were undertaken to fail to report income, is plainly

5       set out in the indictment, and it is plainly indicated that it

6       is alleged to be overt acts in furtherance of the conspiracy.

7       But where is the charge with conspiring to do that, to fail to

8       pay the income?

9               What I'm saying is, the conspiracy in Count 1 has two

10      prongs.  To impede the governmental functions of -- I guess

11      we're talking about Treasury now --

12              MR. WEISSMANN:  Right.

13              THE COURT:  -- and, second, to commit specific

14      offenses, to wit.  And one of those offenses is not failure to

15      pay income tax.

16              MR. WEISSMANN:  If I can have one moment?

17              THE COURT:  Yes.

18              MR. WEISSMANN:  So, I think, Count 1 in Paragraph 38,

19      the first prong, which is the -- what is, I think, a so-called

20      Klein conspiracy, which --

21              THE COURT:  Impeding, impairing.  That's what I was

22      asking, does that include failing to pay tax?

23              MR. WEISSMANN:  Yes.

24              THE COURT:  All right.  I find -- I do think, though,

25      that the characterization of the apartment and how he used it

1    is a little far afield of the particular charges here to be

2    admissible under 404(b).  It's a tax matter of a completely

3    different nature.  It involves different witnesses, and it

4    seems to be entirely collateral to what we have going on here.

5    So I'm inclined, at this point, to exclude the evidence.  If

6    there's a point where you believe they've actually opened the

7    door to this, you can bring it back to me.  But I don't see

8    that we need, in your case in chief, to be getting into the

9    characterization of the apartment.

10             MR. WEISSMANN:  We agree with that.

11             THE COURT:  All right.

12             MR. WEISSMANN:  And -- but if I can just tell Your

13    Honor why I think it might come up, just so you have a preview,

14    is that the other component of this is that although there is a

15    tax component, which we agree that we're not alleging, and it's

16    not going to be considered by us and we're not going to put

17    before the jury, certainly in light of the Court's ruling that

18    it's -- it's part of this case.

19             The other part of this is that when it was convenient

20    for Mr. Manafort to apply for a loan with respect to that

21    apartment, he sought Mr. Ayliff's assistance in trying to

22    mischaracterize the apartment.

23             Where it could be useful is if there is any

24    cross-examination of Mr. Ayliff to suggest that he was,

25    somehow, in on schemes or was acceding to Mr. Manafort's

1    requests, there is not just his testimony, but contemporaneous

2    documentation where he said:  No, I can't do that, that what

3    you're asking me to do is completely contrary to how we've been

4    reporting it to the IRS.

5            Again, that doesn't need to come up in our case in

6    chief.  It's not something that we would affirmatively need to

7    bring out.  But if they were to go down that road, we would

8    want to be able to respond.

9            THE COURT:  Well, again, if we're talking about

10   different alleged tax failings, it really depends on what the

11   question is and what they ask and it's whether it's going to

12   open the door to that or not.  And I think you know that if you

13   think they have, before you start asking about it you'll let me

14   know, and we'll talk about it.

15           MR. WEISSMANN:  Absolutely.  And the reason to bring

16   it up here is that we don't want to be in a position where the

17   Court or the defense says:  Well, we had no idea we were

18   opening the door.

19           And so we've laid out -- and, obviously, there's also

20   now been a trial record.  So all we're trying to do is make it

21   clear what we think could open the door.  We, of course, in any

22   situation like that will come to the Court if we were to do

23   something.

24           THE COURT:  All right.  All right.  And I haven't

25   ruled, one way or the other, yet, until I hear what it is that

1  you allege has opened the door, whether it has or whether it

2  hasn't.

3           The third thing you identified as 404(b) evidence in

4  your pleading was related to the Cypriot loans, and whether

5  transfers between various entities in Cyprus in 2009 to 2014

6  were structured as loans to avoid the recognition as income.

7  These are the same transfers that you alleged in Paragraphs 17

8  and 18; is that correct?

9           MR. ANDRES:  Judge, they relate to them, but they're

10  not exactly the same.  So, just, if I could, give you two

11  minutes of background --

12           THE COURT:  All right.

13           MR. ANDRES:  -- on these Cypriot loans.  And let me

14  not bury the lead.  We don't anticipate that this will come up

15  at trial either.

16           These actually relate to an audit in Cyprus of the

17  various Cyprus accounts, so they go to the maintenance of those

18  accounts.  And the Cypriot authorities required an audit of the

19  accounts over there.  So they're not exactly related to the

20  loans that are in the indictment in 17.  But, as I said, we

21  don't anticipate that these will come up during trial.  We

22  wanted to, at least, again, alert the defense, to the extent

23  that they open the door.

24           There was some testimony about this at the trial in

25  the Eastern District of Virginia.  It was not significant, but

1    it just went to the maintenance of these accounts.  And there

2    were e-mails that established these audits by a Cypriot

3    accounting firm.  So, again, they're slightly different from

4    the ones in 17.  And, more importantly, the Government doesn't

5    anticipate that this will come up at trial again, except for

6    the fact that -- excuse me -- the defense --

7            THE COURT:  Well, in your pleading, you didn't talk

8    about if the door opened.  You said that you want to be able to

9    refer to the transfers as part of the explanation of how the

10   money that was allegedly being paid for lobbying flowed from

11   the Ukraine to the defendant, which, I think, is proper.  You

12   have to show where the money came from if you're alleging that

13   he was doing those activities and he was being paid for it here

14   in the United States.  So, to that extent, I think evidence

15   that shows the money flow is relevant.

16           But you also seem to agree with the defense concern

17   that whether it was -- violated Ukrainian law or not is not

18   relevant, and you weren't seeking to admit it.  So -- and you

19   proposed a limiting instruction for how the evidence could be

20   received.  But that's different than saying we're not even

21   planning to put it in, and we're just going to put it in if the

22   door is opening.  So where are we at this right now?

23           MR. ANDRES:  So, Judge, this is a second way to

24   demonstrate the flow of money.

25           THE COURT:  Okay.

1          MR. ANDRES:  So there are consultancy agreements

2     between these Cypriot entities that are controlled by Ukrainian

3     oligarchs that come into Mr. Manafort's controlled Cypriot

4     accounts.  And so those agreements establish the flow of money.

5          This audit is sort of an after-the-fact effort to

6     justify those payments, and so it's a second and separate way

7     to demonstrate what the money flow is.  But it's not necessary,

8     or it's not -- that evidence isn't necessarily key to show the

9     money flow.

10          So, again, it's part of an audit that took place

11     after the fact by a Cypriot accounting firm to justify the

12     payments to the Cypriot authorities.  We don't intend to prove

13     or intend to admit any evidence to suggest it's a violation of

14     Cypriot law or anything like that; to the extent that the

15     evidence came in, we don't anticipate it would be.  It would

16     simply be for the reason Your Honor said, which is to show the

17     money flow.

18          THE COURT:  But are you seeking now to introduce this

19     document, which is an audit, or are you not?

20          MR. ANDRES:  No.

21          THE COURT:  Okay.  Well, then, I guess I don't have

22     to rule on its admissibility.

23          MR. ANDRES:  Thank you, Your Honor.

24          THE COURT:  If it comes up that you believe it's

25     necessary, then we'll talk about it.  It sounds like it might

1    have some hearsay elements to it as well.  All right.

2         MR. ANDRES:  Thank you, Your Honor.

3         THE COURT:  In the Government's supplement to its

4    404(b) motion, Docket 350, you brought up the issue of

5    Department of Justice inspections of the Manafort firm's FARA

6    filings back in the '80s, in 1986 and 1987, letters concerning

7    their FARA obligations.  You stated that your purpose of

8    putting this information in evidence is to show his knowledge

9    of his FARA obligations and not any pattern or propensity to

10   violate the statute.

11        I think this is a closer or difficult question.  The

12   conduct is very old, and it gives rise to a greater risk that

13   the introduction of evidence concerning prior deficiencies is

14   being used to establish some sort of habit or propensity.

15        The defense has said it shouldn't come in based on

16   *United States v. Sheffield*, 832 F.3d 296 out of the D.C.

17   Circuit in 2016.  I'm not sure that case is really quite on

18   point.  It supports the notion that evidence of prior conduct

19   can be used to demonstrate knowledge, but it also supports the

20   fact that the length of time that its -- how old, how stale the

21   event is starts to diminish the probative value and increase

22   the prejudicial value.

23        But the biggest problem in that situation was that it

24   was just the fact of the prior conviction that came in and

25   nothing about the underlying conduct.  So, it seemed to be

1    tending more to show propensity than any knowledge of how to go

2    about the business of dealing narcotics.

3           So, here, I actually called for in camera review of

4    the documents that you were seeking to introduce on this issue,

5    and got a binder with more than 30 tabs.  And that starts to

6    raise some concerns right here about jury confusion and a trial

7    within a trial on matters that are somewhat collateral when we

8    already, I think, as far as I can tell, have plenty to try.

9           It struck me, as I went through your pleading and as

10   I went through the materials, that the issue of whether he

11   could or could not engage in lobbying while also serving as a

12   director of OPEC and the resolution of that conflict is not

13   relevant in any way, shape, or form.

14          I'm also not sure about the many FARA filings that he

15   did make that are in the binder, or the list of FARA

16   findings -- FARA filings.  I think your point is that there are

17   certain communications about:  You have to declare this, you

18   have to declare that, that could show that he's been on notice

19   for a long time of what his FARA obligations are.  And that, I

20   think, is where you're on your strongest footing.

21          But I think the existence of issues with compliance,

22   like, You made a mistake here, and you made a mistake there,

23   given the age and given the risk of the fact that it tends to

24   show a propensity, particularly since these aren't convictions

25   or findings but, really, discussions back and forth between the

1    agency and the entity, I'm not sure whether the particular

2    deficiencies are relevant.  Particularly given the number of

3    documents it takes to explain:  Well, he represented this

4    company, and they did that for them and that for them, it

5    starts to really become a trial within a trial on things that

6    happened a really long time ago.

7            So, what struck me is that the substance of some of

8    the communications could be admissible for the instructions

9    they convey, to show knowledge, but the findings seem to be

10   outside the scope of what is needed and have a risk of

11   prejudice.  And, also, I'm really troubled by the level of

12   detail on collateral matters that we need to even make the

13   point.

14           So one thing I would like the parties to think

15   about -- and I realize I haven't asked you to say anything, but

16   I think I do understand your objection here -- is that whether

17   it's possible to develop a stipulation that indicates that the

18   defendant was subject to FARA requirements at various points in

19   his career, including when he was at Black, Manafort.

20           And then, in connection with filings made by that

21   entity, there were exchanges of correspondence between him and

22   the Department of Justice concerning what did and did not have

23   to be disclosed, including things such as the paragraph that

24   you pointed out to me in the May 29th, 1987 letter where

25   Justice said:  Note that detailed disclosures of political

1    activities must, including the identity of the persons

2    involved, the date, the place, the nature of all contacts, the

3    purpose of the context, political activities undertaken as

4    background, or to prepare for a proposal or a piece of

5    legislation must be fully disclosed even though the proposal

6    may have been subsequently delayed.

7            In other words, general information, putting him on

8    notice that this is what the rules are is different, to me,

9    than correspondence that says:  With respect to this meeting by

10   the Bahamians, or this press report by the Saudis, gets your

11   point that he had knowledge, without getting into litigating

12   things that really shouldn't be litigated in this case.

13           I didn't read every single one of these 30 documents

14   with a fine-tooth comb, but I'm not sure that there's much else

15   in there that's similar.  But any other paragraph that

16   generally sets out what FARA obligations are, it seems to me,

17   is relevant to show his knowledge.  But taking out anything

18   that would suggest that he had a propensity to sidestep those

19   requirements would be necessary.

20           So, I think, with that guidance, I want to give the

21   parties an opportunity to craft something.  But, I think

22   putting in a whole binder full of documents and getting into

23   all the back and forth about a different organization and

24   different clients and different meetings is just way beyond

25   what we need to do in the scope of this trial.

1          Is there anything you want to say in response to

2     that?  And I'll ask the defense the same thing.

3          MR. WEISSMANN:  Thank you.

4          So, first, we will go ahead and try and work out a

5     stipulation along the lines that the Court has suggested.  And

6     I think the Court completely understands exactly the reason

7     that we're seeking to use this 404(b) evidence, and it is much

8     more about notice of what the rules are than needing to have

9     the jury be exposed to whether there was a violation, even

10    though, by the way, there's no allegation on our part that this

11    was intentional.  But even going down that road, that's not the

12    key to what we're doing.

13         I just would like to point out two things that --

14    one, that there are some ways in which the FARA unit made the

15    defendant aware of the rules in ways that are particularly apt

16    here.  And we would propose to put that into a stipulation.

17    And let me just give you an example, because one of our jobs is

18    to anticipate defenses.

19         And so, for instance, where the defendant is crafting

20    or ghostwriting an op-ed that is then submitted into the United

21    States, even through someone else, the FARA unit said that has

22    to be disclosed.

23         Where the defendant is --

24         THE COURT:  Well, I think that sort of instruction is

25    fine, as opposed to saying you submitted something and you

1    didn't include it and it happened.  That's the part I don't

2    want to come in.

3             MR. WEISSMANN:  Absolutely.  And I totally understand

4    that, and I'm not raising this to suggest that we would say the

5    second part in any way.  And there is a litany of those, but

6    that's not what we need it for.  It's not to say:  By the way,

7    and then you violated this one time or seven times.  That's not

8    needed.  Just the fact that there is notice that that was the

9    position of the Government, as articulated and given to the

10   defendant.

11            And there are similar instances like that where there

12   are examples where the FARA unit had said:  This is what you

13   need to do.  Again, we would leave out whether there was a

14   violation or not; that's not what we need.

15            And then I just wanted to briefly address a point

16   about staleness, which could become relevant if the defendant

17   is going to say:  Well, I just didn't remember, it was so long

18   ago.

19            That's where the consequences of how this arose, if

20   the defendant were to go down that road, could become, I think,

21   pertinent.  Because, I think, if the defense were to take the

22   position:  Well, yes, but he forgot and he didn't really

23   remember and it wasn't a big deal.  That's where, I think, it

24   is relevant that the defendant gave up a presidential

25   appointment, was not given a waiver by the White House counsel

1    to stay as a director of OPEC precisely because of the FARA

2    issue.

3             I think that there may be ways to fashion it so that

4    there's -- it doesn't raise 403 concerns, but I do think it

5    becomes stale --

6             THE COURT:  But, I think, it was that he gave it up

7    because of a concern about whether he could do it as a

8    government official, which is different than the disclosure

9    obligation.  I just -- I think there's a difference there.  I

10   understand what you're saying, that the fact that this came up

11   and was very important at the time makes it unlikely that he

12   forgot.  But that -- it's a slightly different issue, whether

13   he can lobby versus what is lobbying.

14            MR. WEISSMANN:  I agree with that.  I'm just

15   saying -- well, obviously, maybe there's no reason to raise it

16   now.  What -- we would, obviously, not raise this in any way

17   until we came back to the Court.

18            What I'm, again, trying to do is say if the argument

19   represented that this is something he did not remember, and it

20   was so long ago, we would like to come back to the Court to

21   explain why we think that the circumstances of this having come

22   up --

23            THE COURT:  Well, I don't think I've ever ruled on

24   anything and said nobody can come back and raise it again if

25   the circumstances change.  So that's noted.

1          MR. WEISSMANN:  Okay.

2          THE COURT:  If -- I mean, so I can't make the defense

3     agree to a stipulation if you don't agree to the stipulation.

4     But if you can't craft something that's agreeable to both

5     sides, based on the guidance I've just provided, then what I

6     would entertain is permitting redacted -- substantially

7     redacted versions of a much smaller universe of the documents

8     being moved in that have the date and the fact that it's being

9     sent by the Department of Justice and who it's being sent to

10     and then the language that you want to come in, come in.

11          So there's ways to do this, obviously, if the defense

12     cannot reach agreement.

13          MR. WEISSMANN:  We will work on a proposed

14     stipulation with the defense.

15          THE COURT:  All right.

16          MR. WEISSMANN:  And if that doesn't work out, we will

17     provide something to the Court that is redacted in a way that

18     we think is appropriate so that the Court can rule on it.

19          THE COURT:  All right.  And I understand that there

20     are multiple other stipulations that are pending.  And of the

21     various things that I have a schedule for, it seems to me that

22     that really doesn't need to be agreed upon until we walk into

23     the courtroom.  I'm more concerned about the exhibits and some

24     of the other things, if we're prioritizing tasks.  All right.

25          Do you want to say anything about this issue?

1          MR. ZEHNLE:  Actually, Your Honor, I think he covered

2    it pretty well for us.  We'll work with the Special Counsel's

3    Office.

4          THE COURT:  Okay.  All right.  That's, as I

5    understand it, all the 404(b) issues.  Am I correct about that?

6    There are motion in limine issues, but they're slightly

7    different.

8          MR. WEISSMANN:  Yes, Your Honor.

9          THE COURT:  Okay.

10         MR. ZEHNLE:  Nothing further.

11         THE COURT:  All right.  So I want to talk about the

12   jury questionnaire a little bit.

13         In terms of that, I think I've got an understanding

14   of your thoughts about the length of the trial -- which is

15   something we need to tell the jury about -- from your pretrial

16   statement.  So I was going to ask about that.  But I take it

17   what you put in the pretrial statement is your current thoughts

18   about that.

19         All right.  With respect to the Eastern District of

20   Virginia, I know there was a jury questionnaire that was used.

21   Was it substantially similar to the draft-agreed questionnaire

22   that you gave me?

23         MS. RHEE:  Short answer is, yes, Your Honor.

24   Although, the one that both parties are proposing for the

25   District of Columbia has additional follow-up questions to the

1  topical matters that were also covered in the Eastern District

2  of Virginia.  So the parties agree as to an expanded version of

3  what was submitted in the EDVA, with the exception of one

4  question.

5          THE COURT:  Did you have a procedure at that time?

6  And one question I would like to ask both sides is whether we

7  should, even if you didn't, of dealing with strikes for cause,

8  based on the paper alone, before we brought the jurors in for

9  individual voir dire?  Or they just brought them all in and

10  after there was follow-up questioning, then motions were made?

11          MS. RHEE:  I am told that the Court, of its own

12  volition, struck some of the proposed jurors on the basis of

13  the questionnaire, but the parties did not.  And there was no

14  prearranged, agreed-upon process of striking in advance of the

15  jurors coming in.

16          THE COURT:  All right.  I mean, it does make sense to

17  me that if there are some people whose questionnaires make it

18  so obvious that they cannot be fair and impartial jurors, that

19  there's no point in taking the time and the individual voir

20  dire to do the follow-up.  And I will have the jury

21  questionnaires and I can perform that function.

22          But I'm also willing to schedule an opportunity for

23  each side to give me a list of juror numbers that you each

24  believe -- I don't think we need to have a hearing and

25  argument, but at least a written submission under seal that

1    these are the jurors that we think should be struck for cause,

2    so that I can look more closely at any questionnaires that

3    either side believes I should, and then the people we have in

4    the courtroom when we pick the jury will reflect some

5    winnowing.

6              So, I think I'm going to schedule a date where you

7    can do that between the date of the completion of the

8    questionnaire and the date that we come back for voir dire, on

9    the 17th.

10             Does that make sense to both sides?

11             MR. WESTLING:  That's fine from the defense, Your

12    Honor.

13             MS. RHEE:  Yes, the Government would like an

14    opportunity.

15             THE COURT:  All right.  So I'm going to do that.

16             And then the question is how we go about the

17    individual voir dire.

18             As I understand it, what happened in the Eastern

19    District is that individual jurors were questioned in the

20    courtroom, but they were at the bench using the husher; is that

21    right?

22             MR. WESTLING:  That's correct, Your Honor.

23             MR. ANDRES:  Yes, Your Honor.

24             THE COURT:  So, in essence, the public was not privy

25    to what the individual jurors were saying.  That's correct.

 1          And does the defense have any objection to that?

 2          I mean, here's my thoughts:  I would like to avoid

 3     the necessity of the husher.  But to achieve the same result, I

 4     think that the physical structure of this courtroom makes

 5     questioning at the bench with the counsel, the defendant, the

 6     lawyers, even if the defendant is listening with headphones,

 7     awkward and unpleasant, and the rest of the people are just

 8     sitting in the room listening to the husher.

 9          So my thought would be that we fill the courtroom

10     with the jurors, and then we question them in the jury room

11     with the Court reporter and the defendant and the counsel and

12     we can all hear each other and no one else can hear us.

13          Does the defendant or the Government have any

14     objection to that procedure?

15          MS. RHEE:  No objection.

16          MR. WESTLING:  No objection, Your Honor.

17          THE COURT:  All right.  That does involve some

18     limited exclusion of the public from the criminal trial.  And

19     so while I think these answers are typically taken at the bench

20     using a husher, in an abundance of caution, I've looked at the

21     case law involving the exclusion of the public from any portion

22     of a criminal trial, and the case that I need to follow is

23     *Waller v. Georgia*, 467 U.S. 39.

24          And so I hold, pursuant to that case and local

25     rule -- Local Criminal Rule 57.7(c), that there's a significant

1      level of public interest in this trial that's engendered an

2      unusually high level of media coverage, as well as high volume

3      of individual online postings and communications with or about

4      the Court.  There's a need to accommodate all the jurors in the

5      courtroom during the jury selection process and a limited

6      amount of space.

7              There's a need to preserve the potential jurors'

8      privacy during the individual questioning that will follow the

9      completion of the questionnaire.

10             There's a need to avoid any inadvertent or

11     intentional communication between potential jurors and

12     representatives of either side and the press or the public;

13     that the defendant has waived his right to have that portion of

14     the trial be public.

15             And all of those needs override any public interest

16     in having that limited portion of the trial be public.  So, for

17     that limited purpose I'm going to close the courtroom.  The

18     jurors will be seated in the benches and we will take

19     individual voir dire in the jury room.

20             With that, I had a couple of questions about the

21     questionnaire.  And you can stand there, or you don't have to

22     stand there.

23             MS. RHEE:  I am happy to sit down.

24             THE COURT:  I mean, I think back -- you're going to

25     have to go back and forth as we go through some of the

1    questions.

2           I just want to know -- and I really, really

3    appreciate the work and the comity that went into both sides

4    coming up with a single questionnaire for me to look at.  But I

5    do have some questions about it.  And I do think that if you

6    were at a point when you wrote it where pretrial publicity was

7    an issue, we're at a whole different point now.  And so we need

8    to look at it with that in mind.

9           When you get to page 4, we ask the question:  What is

10   your main source of news?  List any newspapers, magazines,

11   etcetera that you read, websites that you watch or listen to on

12   a regular basis.  I take it we mean for news, or in general?

13   So I was going to add that edit to that.  And if people don't

14   ask to be heard, then I'm going assume you don't have a problem

15   with what I'm saying.

16          I guess I don't understand why the question on

17   page 5, Do you or your spouse own a home, when this case does

18   not involve the bank loans.  And so I don't know why we need to

19   ask people that question.  Just to the extent anything we can

20   do to make it shorter, I think is helpful.

21          Is there any particular reason why people think that

22   question is important?

23          MS. RHEE:  We're just looking across the table from

24   each other.  I think the parties -- I don't want to speak for

25   you, Kevin -- but I think the parties agree that we can strike

1    that.

2              THE COURT:   Okay.

3              With respect to the criminal justice experience, have

4    you or any member of your family or close friend or relative

5    ever been the victim of or witness to a crime?

6              And then we've got:   Ever been accused of, arrested

7    for, or charged with a crime?   I think I may compress those.   I

8    was also wondering whether we could say:   In the last ten

9    years.   I think "ever" is -- given what happens when you ask

10   that question in these courtrooms, I think the last ten years

11   would be more than sufficient.

12             So any problem with limiting it?   I mean, we're going

13   to ask other questions about feelings about police officers and

14   feelings about investigators and feelings about defenses --

15   defense attorneys and that sort of thing.   So that's why I feel

16   like we can truncate this somewhat.

17             MS. RHEE:   Your Honor, the Government's concern would

18   be the time period.   There may be a very significant event that

19   may fall outside of that period that both parties would want to

20   know about with respect to a traumatic event or deeply moving

21   experiences, notwithstanding the fact that they may have

22   happened outside of that ten-year period.

23             THE COURT:   Well, what if we added just a broader

24   question, saying:   Have you had any experience at any time that

25   has left you with a strong opinion about the criminal justice

1    system?

2              MS. RHEE:  I think the concern about that, Your

3    Honor, is there are other questions that capture that.  It is,

4    rather than asking the subject of question, the disclosure of

5    the event in question forms information to both the parties to

6    make their own determination about what impact that could have

7    been.

8              THE COURT:  All right.  Well, because we are doing

9    this in writing, and we're not going to have the Superior Court

10   line from the bench all the way out the door of all the people

11   who have stood up to answer this question, I suppose we can ask

12   the broad question, but I'm going to take the lead on the

13   follow-up.

14             And, you know, if somebody has something that's a

15   long time ago and it has nothing to do with anything, I think

16   the follow-up is going to be relatively limited.  So I'll ask

17   the question as the parties have asked to ask it.

18             I wonder about where we ask them to describe it, if

19   they've been charged.  It seems to me that might be better for

20   oral follow-up than asking people to write an essay on the day

21   I got arrested.

22             MS. RHEE:  Government agrees, Your Honor.

23             MR. WESTLING:  That's fine.

24             THE COURT:  All right.

25             Should we broaden out Question 22, since this case

1    isn't as directly about -- it involves taxes and the IRS to

2    some extent, but I don't know that if we have a question that

3    says:  Have you ever been subject to any administrative

4    investigation or enforcement proceeding?  We have "Arrested and

5    charged with a crime," and we have "IRS audit."

6         But this case involves, largely, compliance with an

7    administrative regime.  So do we need to add something like

8    that to this questionnaire?

9         MS. RHEE:  There's no objection from the Government

10    to supplement that.

11         MR. WESTLING:  Your Honor, I think broader is,

12    generally, going to be better for getting more information.  So

13    we're fine with that.

14         THE COURT:  All right.  I was a little -- when we get

15    to page 8, a little concerned with the verbiage of the grand

16    jury question.  If somebody was on a grand jury, we ask them

17    were they able to reach agreement, yes or no.  I mean, even if

18    there was one no, I think all we really need to ask is:  Were

19    there any circumstances where they didn't, or something.

20         But I just thought that dichotomy, nobody is going to

21    know how to fill that out because it's either yes and no, or

22    yes, but it's not yes or no, I would think.  So I may tinker

23    with that one.

24         On page 10, Question 28 is where we raise the Special

25    Counsel.  And it just says:  Is there anything regarding the

1   Special Counsel's Office that would prevent or hinder you in

2   any way?

3          And I was thinking that that might be better phrased,

4   Is there anything about the fact that this case is being

5   prosecuted by the Office of Special Counsel.  But I'll defer to

6   you on how you'd like that.

7          MS. RHEE:  I think the reason for the wording, Your

8   Honor, was to make it more broad so that it would capture not

9   just the fact that this was being brought by the Special

10  Counsel's Office, but anything else with respect to any other

11  component or facet of Special Counsel's Office that the

12  potential juror would want to disclose about potentially

13  affecting their views.

14         THE COURT:  All right.  I'll continue to do it more

15  broadly.

16         Do we need:  Have you ever worked as an employee of a

17  bank or financial institution, given that the bank fraud is not

18  part of this case?

19         MS. RHEE:  I don't think the parties object to that.

20         MR. WESTLING:  We have no problem with that.

21         THE COURT:  All right.  Try to get lawyers out of

22  here.  That'll be interesting.

23         A couple points we talk about; is there something

24  that will prevent you from evaluating the testimony fairly and

25  impartially?

1           I think we've got it, Question 36, where we're

2     talking about cooperators.  And I think we might want to get to

3     prevent in the individual voir dire.  But, for this, we might

4     want to say make it difficult, to see what people have to say

5     about this.  And there might be something similar with the

6     police officer question.

7                 MS. RHEE:  That's an excellent edit, Your Honor.

8                 MR. WESTLING:  It's fine, Your Honor.

9                 THE COURT:  All right.  When we get to knowledge of

10    the case, Question 37 on page 14, Part B:  If yes, has the news

11    coverage or other information caused you to form an opinion

12    about the defendant's guilt or innocence?  I think I need to

13    add:  In this case.

14          And then, when we're talking about news coverage, I

15    think we should add a question and ask if anyone has personally

16    posted anything on social media about this case.  I think we

17    would like to know that.

18                MR. WESTLING:  Your Honor, on that one point, I

19    guess, if we're going to ask that question, it has to be

20    broader than just this case.  Because, obviously, it could be

21    about the last case, and I don't want --

22                THE COURT:  Or about this defendant or this case?

23                MR. WESTLING:  Yeah.

24                THE COURT:  We're asking:  Would you be able to put

25    aside what you've read and consider the case fairly?  And,

1    obviously, that's an important question.

2              I think it might be useful to ask is there any reason

3    why they think they're not going to be able to comply with the

4    Court's instructions to avoid reading about this and listening

5    to news accounts about this between now and the conclusion of

6    the trial.

7              Hopefully, people will say no.  But if somebody

8    really thinks it's going to give them a problem because

9    their -- where they work or what they do, I think we would like

10   to know the answer to that question.  So I would like to add

11   that.

12             MS. RHEE:  No objection, Your Honor.

13             MR. WESTLING:  No objection, Your Honor.

14             THE COURT:  All right.  Question 39:  Have you ever

15   been a volunteer, member, or contributor to a political

16   campaign or political party?

17             Well, "member of a political party" seems a little

18   broad.  I -- and I don't know what a member of a political

19   campaign would be.  So, I think we might want to say:  Have you

20   ever been a volunteer, actively involved in, or contributor to

21   a political campaign or a political organization?

22             Otherwise, I wasn't quite sure what you mean by "a

23   member of a political party."

24             MR. WESTLING:  That's fine, Your Honor.

25             MS. RHEE:  Government agrees, Your Honor.

1          THE COURT:  And I have questions about why you want

2     to ask about whether they voted in 2016.

3          MR. WESTLING:  Your Honor, I think we're just trying

4     to get a sense of their level of participation.  And that's --

5     obviously, you're a voter or you're not.  It tells me a lot

6     about sort of what your general appetite is for things

7     political.  We're not asking who they voted for or what their

8     vote was, simply did they participate.

9          THE COURT:  Well, it's hard to draw -- necessarily

10    draw conclusions about that, particularly when you're talking

11    about the District of Columbia, where people may wake up in the

12    morning and have a better sense of what the outcome is than in

13    the Eastern District of Virginia.  And I'm just not sure what

14    it shows.

15          And, I think, there are people who feel like who they

16    voted for is so -- I know you're not asking who you voted for,

17    but I think -- people are supposed to vote, and there's

18    other -- there are other offices to vote for than just

19    president on that day, I believe, and issues and referenda and

20    things like that.

21          So I would rather broaden out 39 to active

22    involvement in politics, and try to get the people who work in

23    politics, care about politics, give money to politics than just

24    asking whether they voted or not, I'm not sure that gets us

25    anywhere.

1            MR. WESTLING:  Your Honor, I think -- look, our

2     interest here is trying to figure out this presidential

3     election.  But, obviously, we think there is an overlay in this

4     case that looms out there.  And it's just information we'd like

5     to know better to determine how we strike jurors going forward.

6     So we continue to ask for the question we propose.

7            MS. RHEE:  Your Honor, the Government objects.  It's

8     noted this is the one question that the Government has objected

9     to the otherwise agreed-upon questionnaire for precisely the

10    reasons the Court articulated.

11           The standard with respect to ascertaining selection

12    of a jury is whether or not the question gets at the juror's

13    potential bias, opinion, or prejudice that would, in fact,

14    alter the outcome.

15           And here, the mere fact of voting, which is a

16    specific duty and participation in the electoral process,

17    without any more, doesn't get at any of those questions.  We

18    agreed with the prior one because it's an issue of whether or

19    not there is such a degree of interest, participation, focus on

20    politics that that would be relevant to the parties'

21    determination and the Court's determination.  But the mere fact

22    of voting doesn't get at anything.

23           THE COURT:  Right.  And I don't know -- I mean, if

24    they say yes, what does that tell you?  And if they say no,

25    what does it tell you?  And if they say yes or no, if the only

1   way to figure out what it tells you is to ask them in the

2   individual voir dire, I just think that seems invasive, and

3   we're getting into things that don't really get to their point

4   of view in this case.

5        So, I'm not really inclined to ask the question

6   because I'm not sure what we're going to do with the

7   information.

8        I'm also, to be frank, not sure how the information

9   of:  Are you single or have you never been married, have you

10  been married, are you widowed, tells us anything either.  You

11  both agreed to it.

12       MS. RHEE:  Your Honor, that was really for purposes

13  of laying a predicate because there are all sorts of follow up

14  on questions about spouses, close family members, and other

15  relations.

16       THE COURT:  Right.  But every question thereafter we

17  always say:  Have you or a close friend or family member?  We

18  don't say spouse.  It doesn't really matter if the person --

19  some people will say:  My cousin Jimmy is a police officer

20  and -- just because their family is constructed differently.

21       So, you know, frankly, I would be perfectly happy to

22  cut the family background, also, because I don't know what we

23  do with it once we get it.

24       MR. WESTLING:  We have no problem with that, Your

25  Honor.

```
 1                THE COURT:  All right.

 2                MS. RHEE:  Neither does the Government.

 3                THE COURT:  All right.

 4           We have:  Do you or any immediate member of your

 5     family or close friend have any connection to the Ukraine?

 6     When we say:  If there's anything about that connection that

 7     would cause you to form an opinion about the defendant's guilt

 8     or innocence, do we want to say -- or, the fact that there will

 9     be evidence that the defendant worked for the Party of Regions

10     and former President Yanukovych, do we want to call that out,

11     in the event someone has Ukrainian connections, that that might

12     be something they have a strong opinion about one way or the

13     other?

14                MR. WESTLING:  We think that may be helpful, Your

15     Honor.  We appreciate the suggestion.

16                MS. RHEE:  Your Honor, there's no objection from the

17     Government.  One request would be if there is follow-up with

18     greater specificity about the nature of the work, it would not

19     just be for the Party of Regions, but then for the subsequent

20     opposition bloc.

21                THE COURT:  Well, I think the main thing is to

22     mention Yanukovych.  And I think then they'll -- you know, if

23     they're Ukrainian and it bothers them or makes them happy,

24     they'll know whether it does or doesn't, and they'll have a

25     point of view about it.  So I think if his name is included,
```

1     but I'll try to be as broad as possible.

2            We've got a list of individuals who may be associated

3     with the case.  So, No. 41, we're not necessarily saying it has

4     be the witness list, but it's also going to be people who get

5     talked about who aren't necessarily going to testify.

6            I need the list.  I have to paste it into this

7     document so this document will be available for use soon.  So,

8     each party needs to submit to me, promptly, the names that need

9     to be added in there.  And, frankly, I need them by close of

10    business on Thursday.  If you can, e-mail it to the ECF inbox

11    the way we have, in Word, then I can cut and paste it into my

12    document.

13           MR. WESTLING:  Your Honor, just as a proposal, it

14    would probably be most useful for us, if it's possible, if the

15    Government can propose a list, and if we add names if we see

16    things that are missing, just in an interest of trying to make

17    this more streamlined.

18           THE COURT:  That's fine.

19           MS. RHEE:  Government is well under way.  It's long.

20    So we will get it to the defense as soon as possible.

21           THE COURT:  Okay.  Well, it's one of the most

22    important parts of this.  So I think we need to get that list

23    pasted in here, and I need it done by a particular date.

24           We don't have a question saying:  These are the

25    lawyers likely to be working on the case, on this, and do you

1      know them?  Do you know me?  And I think it might be useful,

2      given how many people are here and how small the District of

3      Columbia is, to include that question.  So, I think I would

4      have a question with your three names.

5              And are you going to be the lead trial counsel, the

6      three of you?

7              MS. RHEE:  Yes, Your Honor.

8              THE COURT:  Okay.  With your names and me.  And just

9      ask if anybody believes they know any of us.  And, if so, what

10     the association is.

11             And then, with respect to whether they suffer from a

12     condition that makes it difficult to sit, I'm going to be more

13     specific about how long I sit and when I take breaks and that

14     sort of thing.  And just for everybody's information, my usual

15     practice is to start trial at 9:30 in the morning, to take a

16     midmorning break, to break for lunch for approximately an hour

17     at somewhere like 12:30, 1:00, and then a midafternoon break,

18     and to try to excuse the jury by 5:00.

19             And so that's what I'll be telling them.  I mean,

20     clearly, if we get to the end of a witness at 4:30, we may stop

21     rather than breaking it up.  I mean, we'll try to be reasonable

22     as we go through.

23             MR. WEISSMANN:  Your Honor, will you be sitting on

24     Fridays?

25             THE COURT:  That's a good question.  I think, given

1    the length of the trial, it would be my intention to sit on

2    Fridays.  But we can continue to talk about that, if we can

3    move efficiently.  I certainly appreciate the need to catch a

4    breath and prepare and use Friday for other things, and there

5    are Fridays -- there are a lot of people that want to have

6    hearings in front of me that I could use Fridays for.

7           But particularly with that first week, with the

8    missing Wednesday, I'm a little concerned about committing to

9    not sit Fridays at this point.  And so, we can also talk about

10   that as we go on.

11          All right.  Now, I know that there's a pending motion

12   in limine about mentioning the campaign at all.  And the

13   Government responded that it's relevant for very limited

14   circumstances with respect to the allegedly false later letters

15   to the Department of Justice.

16          And so we ask a question, Question No. 47, Was there

17   anything about the nature of this case, that goes through

18   everything, that asks:  If there's anything about any of that

19   that would make it difficult for you to be fair and impartial?

20          Do you want to add:  Or that you may hear evidence

21   that individuals involved in this case held positions in the

22   Trump campaign?

23          You know, do we want to find out if that prompts an

24   answer from someone, or do we want to leave it out?  I mean, I

25   don't...

1          MR. WESTLING:  I think we would like to include that,

2     Your Honor.  I mean, I think, again, you know, we're all trying

3     our best to gather the information we need.  And so...

4          THE COURT:  Okay.

5          MS. RHEE:  Your Honor, certainly that is not going to

6     come up at all in the trial.  And I think you get at the same

7     information by asking about whether or not, in advance of the

8     trial beginning, any of the prospective jurors know anything at

9     all or have heard anything at all about the defendant in the

10     case.

11          We don't think it's appropriate, for all of the

12     reasons that have been articulated, to bring the campaign or

13     his subsequent position in the campaign into this proceeding.

14          THE COURT:  Well, you objected to their motion in

15     limine to keep it out.  And so there were limited circumstances

16     where you thought it was relevant that these questions came up

17     while he was in the campaign, when he was -- so are you not

18     planning to introduce that evidence at any point in your case

19     in chief?  I mean, it seems to me it came up -- their

20     association came up in either the direct or cross-examination

21     of Mr. Gates.

22          MS. RHEE:  The Government does not intend to bring it

23     into the case in its case in chief.  Of course, if the door is

24     opened and it becomes an issue because of something that's

25     happened in the course of the defense examinations.  But the

1    Government's present intention is not to bring it up.

2         THE COURT:  All right.

3         What do you think?

4         MR. WESTLING:  Obviously, I don't know exactly who

5    the witnesses will be, but the Court aptly points to the

6    testimony of Mr. Gates in the last trial.  We can anticipate

7    now that should he be a witness in this case, there is likely

8    to be cross-examination that relates to certain offenses he

9    committed against the Inauguration Committee and other things.

10        So, I mean, I think the idea that we're going to be

11   able to keep it out in its entirety -- again, he may not be a

12   witness, that's always possible -- but, it seems difficult.

13   And we think it would be better off if we know where the jury

14   stand on this issue up front.

15        THE COURT:  Well, and I think that's certainly more

16   close to getting at it than saying:  Did you vote?  So I think

17   we should -- it can be broad:  You may hear evidence that

18   individuals involved in this case held positions, if they have

19   a point of view about that.  They may not know who he is -- who

20   the defendant is.  It is actually possible.  But, they might

21   have an opinion about that even if his name doesn't ring a

22   bell.  So I think we should ask.

23        MS. RHEE:  Your Honor, the Government would ask, if

24   the Court is so inclined to add that part of the question, to

25   keep it as a subjective -- subjunctive "may," and at least for

1    the Court to entertain why one particular candidate rather than

2    the other needs to be mentioned.

3           THE COURT:  Well, I think that's the -- that's the

4    bias we're trying to probe, whether that alone would affect

5    their assessment of the case.  And so I think we should include

6    it:  You may hear evidence that individuals involved in the

7    case held positions in the Trump campaign.

8           I don't think saying "a political campaign" gets you

9    anywhere.

10          MR. WEISSMANN:  Your Honor, would the Court consider

11    saying, at least, that there may be very limited evidence?

12    Because even the defense has pointed to cross-examination of

13    Mr. Gates with respect to -- not the campaign, but the

14    Inaugural Committee.

15          And so the only thing we could think of that could

16    possibly come up with respect to somebody having a position on

17    the campaign -- which we did not bring out with respect to Mr.

18    Gates or his position in the campaign -- would be a very narrow

19    piece, which is that when the FARA unit approached Mr. Manafort

20    in September of 2016, it was as a result of various news

21    articles about Mr. Manafort.

22          But we were not intending to inject that because why

23    they brought -- why they approached him is not particularly

24    relevant to our contention, which is that he then submitted to

25    the number of false answers.  So it would be a very -- even if

1   it were relevant, it would be a very narrow sliver that would

2   make this even permissible at the trial.

3                MR. WESTLING:  You know, I think regarding --

4                THE COURT:  What do you think I should ask?

5                MR. WESTLING:  I don't think we have a problem with:

6   The evidence in this case may include very limited reference to

7   individuals who -- or, activities that relate to -- I don't

8   know the right way to put that, but -- the Trump campaign.  Or

9   something of that sort.  I don't have any problem with the

10  characterization of limited evidence.  I mean, we're just

11  trying to get to the sense of, if it comes up at all, is it

12  going to matter to these prospective jurors?

13               THE COURT:  All right.  I will circulate a revised

14  version before I provide it to the jurors when they come in.  I

15  think I can accommodate everybody's concerns, and I think this

16  will be a little bit better and ready to go after I've done

17  that process.

18               Has everybody had a chance to review what I intend to

19  say to the jury before they fill it out?  And do you have any

20  reactions to that?

21               MR. WESTLING:  We have reviewed it, Your Honor.  We

22  have no issue with it.  It seems appropriate.

23               THE COURT:  All right.

24               MS. RHEE:  Your Honor, the Government has also

25  reviewed it.  The one question that the Government wants to

1    raise is on page 1, the third-to-the-last paragraph, the last

2    line that states:  Our goal is to make sure we are picking a

3    group of people who don't already know anything about the case

4    or the people involved in the case.

5          We certainly don't have an objection if the intent of

6    the Court's statement is to get at the personal knowledge of

7    either the parties or direct and personal involvement somehow

8    in the underlying facts.  But, just as a legal standard, none

9    of the parties are entitled to -- the law does not require a

10   jury that is wholly unaware and has never been exposed --

11         THE COURT:  Yeah.  I think that language comes from

12   my standard situation with jurors who, literally, don't know

13   anything about the case.  But I will tweak it with that in

14   mind.

15         Thank you.

16         All right.  I've reached the end of the issues that I

17   want to talk about, other than following up on the scheduling

18   matters that we mentioned at the bench at the beginning.  So

19   I'm going to take a break for about ten minutes and come back.

20   And at that point I would like to come up with a schedule for

21   proposing objections to exhibits, the summary exhibits being

22   finalized, jury instructions, and the various things that we

23   need dates for to move forward.

24         All right.  Thank you everyone.

25         (Recess.)

 1              THE COURTROOM DEPUTY:  Your Honor, recalling criminal

 2     case number 17-201-1, United States of America v. Paul J.

 3     Manafort, Jr.

 4              THE COURT:  All right.  Let me just pull up my

 5     calendar.  I had some thoughts about how we could possibly

 6     structure this while you were thinking about it.  Hopefully, we

 7     won't be too far apart.

 8              It occurs to me that we could do some of what we need

 9     to do at the pretrial conference, like the motions in limine,

10     on the date it's scheduled, and perhaps do the exhibits on

11     another day.  And then, between now and then, have the

12     exhibits -- objections coming in on a rolling basis.  But they

13     have to start right away because we have to build in time for

14     me to rule on them.

15              But, what is it that you all were going to suggest?

16     And then we'll see how that works in terms of what I was

17     thinking.

18              MR. WESTLING:  Well, Your Honor, on behalf of

19     Mr. Manafort, I don't know that we have an agreement with the

20     Government.  But what we were trying to do is to best, you

21     know, use the current schedule.

22              What we would like to do is ask that the Court

23     consider pushing the trial by one week, from the 17th to the

24     24th, which would then allow us to move the pretrial conference

25     by one week.  And we would commit to having all of the

1    objections to the exhibits filed by a week from tomorrow.  So

2    that would give the Court a week in advance of the pretrial to

3    look at those and rule on them, all without really doing much

4    harm to the current setting, understanding everybody's desire

5    to get this case going as soon as possible.

6            As the Court is well aware, we finished a trial,

7    literally, a week ago today.  We've been doing our best in the

8    time we've had since then to, obviously, pick up the ball.  But

9    there are approximately 1100 new exhibits.  The Government has

10   been cooperative with providing us with a copy, but we didn't

11   get that copy because we didn't ask until just before the

12   pretrial order was due.  We got it Friday morning, so we've

13   been doing our best to make our we through that.

14           THE COURT:  All right.  At this point I don't need to

15   hear any more about everybody's good faith and when they got

16   what they got.

17           MR. WESTLING:  I understand.  I understand.

18           THE COURT:  I understand the circumstances, and we're

19   all working on it.  I'm just tying to figure out what to do

20   about it.

21           So one question I have is, we have pre-cleared jurors

22   who have X amount of time available.  And I'm already a little

23   concerned because, apparently, a date they were given for "Do

24   you have a month," is the date that they're filling out the

25   questionnaire, not the date the trial is supposed to start.

1          I'm also concerned that notwithstanding the

2     efficiency with which you were able to pick a jury, given the

3     level of pretrial publicity and the availability of a jury

4     questionnaire in the first trial, that the amount of pretrial

5     publicity and the likelihood that the population that's going

6     to be in the jury pool is familiar with it has just increased.

7          So I believe it may take us longer than a day to pick

8     a jury.  And, therefore, I'm concerned that if we start the

9     entire trial the week after, it could be well into that week

10    before we're actually opening and putting on evidence.

11         So, one question I have is, if we could pick the jury

12    on the day we're supposed to pick the jury, but say we'll -- we

13    won't open, if we've got them in the box, until the following

14    Monday, that gives you a little more time.  I realize it's not

15    a lot of time, but I am really concerned about losing the --

16    the combination of the pretrial publicity and the length of the

17    trial is going to make it so difficult to pick a jury.  That's

18    why we pre-cleared these jurors for a length of trial

19    beforehand.

20              MR. WESTLING:  Understood, Your Honor.

21              THE COURT:  So before we get into the date of the

22    pretrial conference and objections and all that, what's the

23    Government's point of view about the date that we start the

24    trial?

25              MR. WEISSMANN:  Your Honor, we would like to start on

1      the 17th.  We understand that the actual start date for the

2      openings and the evidence may, in fact -- if it takes more than

3      that first day, that it may make sense to start on Thursday,

4      since the Court is off on Wednesday, and that way the defense

5      has a little bit more time, knowing that -- but I --

6              THE COURT:  We've already had that date cleared.

7      We're not going to sit on Wednesday.

8              MR. WEISSMANN:  Yes.

9              THE COURT:  That makes issues for the jurors.  That

10     makes issues for other participants in the case.

11             MR. WEISSMANN:  Right.  But we would oppose that.

12     The date has been set for a long time.  I'm not going to -- I

13     know the Court wants to deal with it.  We are where we are, but

14     this is a date that's been set for a substantial time.

15             The -- I can say that there are witnesses who have

16     been told exactly when the trial is.  We have witnesses who

17     have medical issues that have worked around this.  We have

18     witnesses from overseas.  I mean, the idea that it's now going

19     to move again, it does create a substantial problem for the

20     Government.

21             I also think that the Court's concern about the jury

22     is a real one, and that the jury understands the timeframe

23     which they were supposed to be sort of cleared for.  I think

24     putting it off again for a week doesn't facilitate that in any

25     way.  And if we were to lose the ability to get a jury from

1    that pool, it would then lead to a quite a substantial delay in

2    terms of having to have another jury here.

3            And I would just point out that -- the reason for the

4    delay.  And I just want to focus on one example.  There was a

5    trial in the Eastern District of Virginia on, substantially,

6    the same tax charges.  They're the same exhibits.  They're the

7    same stipulations.  And in spite of the fact -- whenever the

8    pretrial -- joint pretrial statement was due, and whatever the

9    changes were, we are in a position today of being told that

10   even those stipulations and any objections to those exhibits

11   that were agreed to by the defense, they have said we have not

12   even given you an answer as to those.

13           So, it's hard, from the Government's position, to say

14   there should be a week -- another week because we need more

15   time to go through exhibits that have been given to the

16   defense, as identified exhibits, in mid-July.  And even as to

17   the ones that they've agreed to, we've gotten the response that

18   we can't even get back to you as to those.

19           THE COURT:  How are the exhibits in the exhibit

20   binder and exhibit list organized?  Is it clear, numerically,

21   these are the tax accounts?  These are the FARA?  These are the

22   witness intimidation?  Or are they just chronological?  Or is

23   there some other order to them?  Or is there a way that if you

24   divided them numerically, it is clear what's what?

25           MR. WEISSMANN:  So, the answer to that is yes.  And

1    let me just explain that you can figure out what they are.

2              It is true there may be a document that's relevant to

3    different types of charges.  So we can't say --

4              THE COURT:  Obviously, the money flow is related to a

5    lot of charges.

6              MR. WEISSMANN:  Right.  So it isn't identified by

7    count.  But, yes, there are bands of documents that have

8    exhibit numbers.  So that if I were looking, for instance, for

9    the documents from Lobbying Firm A, Lobbying Firm B, Law Firm

10   A, you can see all of that so that you -- they're all grouped

11   in the 100 series, the 200 series, so that -- but for ease of

12   the Court, ease of the parties, the jury, we regrouped it so

13   you can see all of that.

14             THE COURT:  All right.  But it's not -- well, for

15   instance, documents that were admitted already in the Eastern

16   District of Virginia, is it obvious what number they are?

17             MR. WEISSMANN:  Yes.  Yes.

18             THE COURT:  So what number are they?

19             MR. WEISSMANN:  There are about 300 exhibits.  So...

20             THE COURT:  The first 300, or is it --

21             MR. WEISSMANN:  No.  I don't have that in front of

22   me, but it is clear from the exhibit list.  And I can,

23   obviously, report -- after the conference date I can,

24   obviously, report to the Court exactly where it is.  And also,

25   during a break I can talk to our paralegals who are here, and

1    they can identify the numbers, if you would like them sooner.

2              THE COURT:  All right.

3              And, Mr. Westling, when did you say you could note

4    objections to all exhibits by?  Did you say a week from today?

5              MR. WESTLING:  Week from today, Your Honor, by close

6    of business.

7              And, Your Honor, we also have no problem with the

8    Court's proposal regarding rolling with the provisions.  As

9    soon as we have some, we're happy to pass those along as soon

10   as possible.

11             THE COURT:  That's what I need, with it ending on

12   September 4th.  But it seems to me any objections to exhibits

13   that were utilized in the trial in Virginia and the first 300

14   we ought to be able to get by tomorrow.  And then, if possible,

15   to get more on Thursday and Friday, and then complete it on the

16   4th.  Because that would give me something to do in the event I

17   have nothing to do on Labor Day.  But to have it all on top of

18   the next week, I think, is going to be a lot.

19             MR. WESTLING:  We understand, Your Honor.

20             THE COURT:  So I would endeavor to have it on a

21   rolling basis between now and then, with close of business

22   September 4th as the drop-dead due date for your objections to

23   any exhibits.

24             MR. WESTLING:  Understood.

25             THE COURT:  All right.

1          I'm going to continue to keep the pretrial conference

2     on the calendar for September 5th because we have, I think, 11

3     issues in limine to deal with.  So I'm not going to take up the

4     exhibits on that date, but I'm not going to take it off the

5     calendar.

6          MR. WESTLING:  Okay.

7          THE COURT:  And we don't have to deal with voir dire

8     because that's been dealt with.  But, I'm going to keep it on

9     the calendar for that purpose, and then we can come back on

10    the -- let's say the 12th to complete the pretrial conference

11    for the admissibility of the exhibits.  And I have some other

12    things scheduled that day, and I have to move them.  But let's

13    say 9:30 a.m. on September 12th would be the second half of the

14    pretrial conference.

15         With respect to the trial, while I absolutely

16    understand the position of the Office of Special Counsel, I

17    also understand the position that the defense is in.  And so,

18    I'm not going to give anybody everything that they're seeking,

19    but I'm going to try to give you a little more breathing room.

20    The fact is that if we pick a jury starting on September 17,

21    and start opening immediately after we've got 12 in the box, it

22    could very well not begin until Thursday, anyway.

23         So openings and the presentation of the evidence will

24    start on September 24th, but we're going to keep September 17

25    for jury selection.  The more efficient we are in questioning

1    the jury, the more time you'll have that week thereafter to

2    prepare for trial.

3         But we will not -- once we have the jury, we're not

4    going to swear them.  We'll tell them to come back on the 24th,

5    and then you'll have the rest of the week to prepare.  I think

6    that's really the best I can do under all the circumstances.

7         MR. WESTLING:  Your Honor, one request I would make

8    as to the place where the Court started, is if we could have

9    until the day after tomorrow to get the first rolling

10   production to the Court.

11        I know it appears that we had all these exhibits come

12   in in Virginia and so it should be an easy feat to agree that

13   they should be admitted again.  I can tell you that one of the

14   questions we're sort of asking ourselves in working through

15   that is whether some of the stipulations we entered into didn't

16   expose us to some unanticipated consequences.  And so we really

17   are rethinking that.

18        THE COURT:  All right.  Well, and I'm --

19        MR. WESTLING:  I think we can get it done.  But --

20        THE COURT:  -- just talking about exhibits right now,

21   not stipulations.  We haven't even come up with a date for

22   stipulations.

23        But to the extent -- and the problem is if I say

24   Thursday and you file it at 7:00 p.m., so I'm not even looking

25   at them until Friday.  So I would like to have some to be

1        looking at on Thursday.  So if it's possible to get them to me

2        before that, I would appreciate that.

3                    MR. WESTLING:  Sure.

4                    THE COURT:  In terms of the stipulations, I think we

5        need to know -- as I said, we're going to deal with the motions

6        in limine on the 5th.  I think, if you can give -- continue the

7        process of responding to the stipulations so that we know by

8        the second portion of the pretrial conference what's being

9        stipulated to and what's not, because people need to plan their

10       openings and figure out what they have to prove.

11                   So, I want your first priority to be the objections

12       to exhibits, and then have any responses to the stipulations

13       back to the Government, let's say, by the 6th.

14                   And then, I think the United States needs to have

15       their summary exhibits in final form and not just in draft form

16       so that they know what they're responding to, and we need that

17       before the pretrial conference, also.

18                   MR. WEISSMANN:  Would that be the first or the

19       second?  And the one issue I would raise with respect to the

20       summary exhibits is that's going to be informed by the

21       objections to the exhibits because --

22                   THE COURT:  Right.  Right.  So, I mean, we've got

23       holidays and things that get in the way.  So, if -- I think by

24       the morning of the 11th they have seen your summary exhibit,

25       the final version, they've already got the draft so they know,

1    generally, what they're doing.  But, so that people can tell me

2    on the 12th whether they object or not, that would be helpful.

3    So they have to have them by the 11th, or before.

4            MR. WEISSMANN:  Your Honor, the one thing I think I

5    heard the Court say, and if I heard correctly, I think we would

6    like to raise an objection to, is with respect to the date that

7    the stipulations are due.

8            THE COURT:  All right.

9            MR. WEISSMANN:  I believe that the Court had said

10   that the stipulations -- the response on the stipulations would

11   be due on the 12th.

12           THE COURT:  No.  I think I said the 6th.  Didn't I

13   say the 6th?  Because we want to know by the 12th whether we

14   have them or not.

15           MR. WEISSMANN:  So I hope I did mishear that.

16           THE COURT:  Okay.

17           MR. WEISSMANN:  And I hope it is the 6th.  Because

18   the reason is, obviously, that informs the number -- who has to

19   come as witnesses.  So if we have a stipulation for a

20   particular vendor, we need to be able to tell that person

21   you're on call, you may be needed, etcetera.

22           THE COURT:  All right.

23           MR. WEISSMANN:  And to have that happen on the

24   12th --

25           THE COURT:  Well, they'll be finished with their

 1   exhibits by the 4th.  And as they're thinking about exhibits,

 2   they can be thinking about stipulations.  So, you know, all

 3   this was due four days ago.  So I think it's giving additional

 4   time, and we're going to make it the 6th.

 5          MR. WESTLING:  Understood, Your Honor.

 6          THE COURT:  All right.  So is there anything else --

 7   we still have jury instructions that you've told me you agree

 8   with some but you disagree with others.  That's a little bit

 9   longer-term assignment, but I am going to need to know.  So

10   when do you think you could let me know about that?

11          I think people -- you know, I'm going to have a jury

12   instruction conference at the end of the trial, but it is

13   useful to have -- I don't know, I couldn't tell from the

14   numbers how basic or -- what the ones were that you were

15   objecting to, whether they're really substantive in their

16   elements of the key offenses.

17          I think people need to know before they open

18   generally where we are on jury instructions.  So, I think, it

19   would be helpful to know what's disputed by the time you walk

20   in here for the pretrial conference, even if I'm probably not

21   going to rule on them.

22          MR. WESTLING:  I think we can get you our objections

23   prior to the pretrial conference on the 12th.  I think that,

24   obviously, we want to be sure that it's clear that we may be

25   objecting at this point.  That doesn't necessarily mean that as

1    the trial comes in and the evidence is before the Court there

2    won't be different objections or different views, depending on

3    how the case is proved up.

4            But, to the extent we have objections we can identify

5    at this point, I think we can do that before that date of the

6    12th.

7            THE COURT:  Right.  And if you're counter-proposing,

8    then I need to know what law you're relying on for that.

9            MR. WESTLING:  Understood.

10           THE COURT:  Yes.

11           MR. WESTLING:  Your Honor, I would ask there be a

12   distinction in the general jury instructions and the special

13   instructions.  The Government had requested the Court to take

14   judicial notice or, alternatively, to have it as a special

15   instruction about the particular rules and requirements under

16   FARA in terms of what a FARA filing would entail, as opposed to

17   a Lobbying Disclosure Act filing.

18           And we thought of that because the alternative is

19   that we have -- it seemed odd we would have a witness walk

20   through all of that, but it seemed odd to have a witness

21   talking about what is legally required.

22           THE COURT:  No.  I think I should be the one telling

23   the jury what's legally required.

24           MR. WEISSMANN:  So that was our thought, as well.

25   But we saw that the defense objected to that, and so we would

1     like to have that teed up so that we know whether we have to

2     have that witness and prepare the witness.  And, again, we feel

3     like we're being sort of jammed up on that.  And that seems,

4     one, the defense should have to articulate its reason to stand

5     by that before the 6th, so we know what it is we're prepared to

6     do.

7             THE COURT:  All right.  Well, was your objection to

8     some of the content, or to the notion of a jury instruction

9     from me on that issue?

10            MR. WEISSMANN:  Not to the notion, Your Honor.

11    Frankly, we did not have time to review the contents.  So we

12    wanted to do that before we said whether we had an objection

13    and gave the Court a sense of what that objection would be.

14            THE COURT:  All right.  But you agreed to the

15    concept, that it should be the Court explaining to the jury

16    what is and what is not required as a matter of law?

17            MR. WESTLING:  Yeah.  In fact, I think the Government

18    originally proposed that might be done by judicial notice.  We

19    don't think that is appropriate.  We think it should be part of

20    the instructions the Court should give.  So, thus, we'll be

21    commenting on those, as well as the other jury instruction.

22            THE COURT:  All right.  Well, I think that gives you

23    some understanding of where you're headed in terms of your

24    witnesses.  All right.

25            I think I realize none of this gets everybody

1    everything they're seeking right now, but I think it will help,

2    and it will alleviate some of the pressure.  So, I'll issue a

3    written order later with all this.  I think you understand what

4    your schedule is.

5              Yes?

6              MR. WESTLING:  Your Honor, there are two more issues

7    that are direct connected to that --

8              THE COURT:  Okay.

9              MR. WESTLING:  -- but they still amount to

10   scheduling.

11             The first, I know, is, we've had some discussions.  I

12   don't know where we stand in terms of the production of Jencks,

13   but we would, obviously, like some clarity along that line.

14             THE COURT:  Right.

15             MR. WEISSMANN:  The other is just to give the Court

16   notice that we will file, this week, a motion for change of

17   venue.  I understand that it is very much a question of making

18   a record, particularly in light of the points the Court has

19   made about the publicity over the last few weeks.

20             We understand the Court is already engaging in a

21   questionnaire, and that may well address many of those issues.

22   But we wanted to just give you notice and not, you know, be in

23   a situation where that came tomorrow or at the end of the week

24   and you would be surprised by it.  So...

25             THE COURT:  Where do you want to go?

1          MR. WESTLING:  I don't know that I have the answer to

2     that yet, Judge.  It may be that there is no place, but we feel

3     it's important to make the record on the issue and to brief it

4     for the Court.

5          THE COURT:  All right.  I understand that.  I believe

6     that the overwhelming majority of the publicity is national.

7     So, you can file what you need to file, and I won't prejudge

8     it.  But, I think the goal of the questionnaire is to enable us

9     to find a fair and impartial jury, and this jurisdiction has

10    had very high-profile cases before where we have been able,

11    through a questionnaire, followed by individual voir dire, to

12    impanel a jury.  And I'm likely to believe that that's still

13    possible.

14         Clearly, if it turns out that it is not possible at

15    the end of the questionnaire and the voir dire proceeding, we

16    can still take action at that time.  But you are entitled to

17    file whatever you want to file.

18         MR. WESTLING:  Understood, Your Honor.  Thank you.

19         THE COURT:  Yes?

20         MR. WEISSMANN:  Your Honor, could the Court schedule

21    that so that --

22         THE COURT:  When do you want to file it,

23    Mr. Westling?  I think I have to be able to rule on it at the

24    pretrial conference.

25         MR. WESTLING:  Close of business tomorrow, Your

```
 1    Honor.
 2              THE COURT:  All right.
 3              MR. WEISSMANN:  We would ask for three or four days
 4    to respond.  I think we responded to a similar motion in the
 5    Eastern District of Virginia.
 6              THE COURT:  All right.  We've got -- it's a three-day
 7    weekend.  So we can either have it be due on the 31st or
 8    September 4th.  What do you --
 9              MR. WEISSMANN:  I'm confident I know the answer to
10    that one.
11              THE COURT:  All right.  All right.
12              MR. WEISSMANN:  September 4th.
13              THE COURT:  Let's say the morning -- like, noon on
14    the 4th, please, so that I can read it.
15              MR. WEISSMANN:  And if we can get it in sooner, we
16    will.
17              THE COURT:  All right.  And, you know, you're welcome
18    to reply.  I don't know that replies ever add that much.
19              MR. WESTLING:  Understood.
20              THE COURT:  All right.
21              MR. WESTLING:  And noted, Your Honor.
22              THE COURT:  All right.  I think we've covered
23    everything we need to cover this morning.  Or do you have
24    anything further?
25              MR. WEISSMANN:  We have two items.
```

1          THE COURT:  Okay.  Oh, and we didn't pick a date for

2     the Jencks, which you just asked me for.  Yes.

3          Given now that you know when the trial is going to

4     take place, what --

5          MR. WEISSMANN:  Your Honor, we had proposed a week

6     before.  But we understand Your Honor's preference, and we can

7     provide it two weeks before.

8          THE COURT:  All right.

9          MR. WEISSMANN:  As I said, there is not a substantial

10    amount.  With respect to all of the tax witnesses, that's

11    already been provided.

12         THE COURT:  All right.  Two weeks before trial.  All

13    right.

14         Anything further?

15         MR. WESTLING:  We would like to make sure we know the

16    date, Your Honor.  I'm not sure I know which reference point

17    we're using, so -- whether it's two weeks before the 17th or

18    the 24th.

19         THE COURT:  Well, before, you were talking about

20    September 10th, which is a week before the 17th.  And now we're

21    talking about September 4th, which is, essentially, two weeks

22    of business days before the 17th.

23         MR. WEISSMANN:  Okay.  I was actually thinking it

24    should be two weeks before.

25         THE COURT:  Two weeks before the 24th?

1          MR. WEISSMANN:  Yes.  That gives -- it gives the

2    defense way more than is statutorily required.  We, of course,

3    are not standing on that.  But again, it is not a substantial

4    amount.

5          MR. DOWNING:  Is that way more time to be prepared

6    for this trial?

7          THE COURT:  All right, Mr. Downing.  I'm on your side

8    here.  I'm trying to get you this information.  So --

9          MR. DOWNING:  No.  Your Honor, I apologize.

10          THE COURT:  We don't need to be smug.  We don't need

11    to be cute.  You know, they don't have to give it to you,

12    legally, until it's time to cross-examine the witness in a

13    white collar case.  That doesn't make any sense.

14          But to the fact that you're saying they already have

15    three quarters of this anyway cuts both ways.  I don't see the

16    harm to giving it to them with some reasonable time to use it

17    and absorb it.  I think courts are free to come up with

18    schedules, and they often do.

19          And given the volume of the charges and the evidence,

20    it's not -- and the lack of any particular prejudice that will

21    be suffered by the Government, if there's a particular witness

22    that you think, for some reason, this schedule is unfair or

23    untoward for some reason, you can file something with me and

24    let me know.

25          But, we're going to pick the jury on September 17,

1     and so the Jencks will be provided on September 4th.

2          I've mentioned this once before, and I don't need to

3     call you out individually because I think I've already called

4     you out individually on this, but there are people who are very

5     expressive in this courtroom about what they think about what I

6     just said or what the Government just said or what the defense

7     just said, and that is not going to happen when there is a jury

8     in the box.  Please keep that in mind.  All right.

9          Is there anything further I need to take up right

10    now?

11         MR. WEISSMANN:  Yes, Your Honor.  Two things; one

12    substantive, one housekeeping.

13         With respect to the substantive point, in the joint

14    pretrial statement provided to the Court, the defense said that

15    it may have experts but provided no notice to the Government as

16    to any experts and who they are and what they would be

17    testifying to.  As you know, the Government has provided that

18    information to the defense, and we think that --

19         THE COURT:  September 4th.

20         MR. WEISSMANN:  Thank you.

21         THE COURT:  All right.

22         MR. WEISSMANN:  And the housekeeping matter is just a

23    question for the Court with respect to how the Court would like

24    the Government and the defense to deal with exhibits that are

25    admitted into evidence once the trial starts.

1          One of the things we -- that happened in the Eastern

2     District of Virginia -- and I'm not saying it should govern

3     what happens here -- is that with the Court's encouragement,

4     our press office made what was admitted into evidence, subject

5     to redaction of personal identifying information, available to

6     the press.  But, I didn't know the Court's practice, and we

7     want some guidance.

8          THE COURT:  I think we would very much appreciate

9     your continuing to do that in connection with this trial.

10    There's a very strong public interest in receiving the

11    information, and I think it would be much too much of a burden

12    on the clerk's office to have to do it.  So, yes.

13         MR. WEISSMANN:  That's fine.  I just -- we wouldn't

14    do that on our own, without having the Court's permission.

15         THE COURT:  All right.

16         MR. WEISSMANN:  Thank you.

17         THE COURT:  All right.

18         Anything further?

19         All right.  Thank you.

20         MR. WESTLING:  No, Your Honor.  Thank you.

21         THE COURT:  Wait.

22         THE COURTROOM DEPUTY:  9:30 on the 5th and the 12th?

23         THE COURT:  Yes, 9:30 on the 5th and the 12th.

24         All right.  Thank you, everyone.

25                         *   *   *

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above

4     and foregoing constitutes a true and accurate transcript of my

5     stenograph notes and is a full, true and complete transcript of

6     the proceedings to the best of my ability.

7                    Dated this 28th day of August, 2018.

8

9

10                    /s/_____

11                    Janice E. Dickman, CRR, RMR
                      Official Court Reporter
12                    Room 6523
                      333 Constitution Avenue NW
13                    Washington, D.C. 20001

14

15

16

17

18

19

20

21

22

23

24

25