1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3   United States of America,      ) Criminal Action
                                   ) No. 17-CR-201
4                  Plaintiff,      )
                                   ) PRETRIAL CONFERENCE
5   vs.                            )
                                   ) Washington, DC
6   Paul Manafort, Jr.,            ) Date:  September 5, 2018
                                   ) Time:  9:30 a.m.
7                  Defendants.     )
                                   )
8   _____

9          TRANSCRIPT OF PRETRIAL CONFERENCE
                    HELD BEFORE
10     THE HONORABLE JUDGE AMY BERMAN JACKSON
              UNITED STATES DISTRICT JUDGE
11  _____

12              A P P E A R A N C E S

13  For the Plaintiff: ANDREW WEISSMANN
                       GREG D. ANDRES
14                     JEANNIE S. RHEE
                       U.S. Department of Justice
15                     Special Counsel's office
                       950 Pennsylvania Avenue NW
16                     Washington, D.C.  20530
                       202-514-1746
17                     E-mail:  Aaw@usdoj.gov
                       E-mail:  Gda@usdoj.gov
18                     E-mail:  Jsr@usdoj.gov

19  For Defendant:     KEVIN M. DOWNING
                       815 Connecticut Avenue, N.W.
20                     Suite 730
                       Washington, D.C. 20006
21                     (202) 754-1992
                       E-mail:  Kevindowning@kdowninglaw.com
22
                       THOMAS EDWARD ZEHNLE
23                     Law Office of Thomas E. Zehnle
                       601 New Jersey Avenue, NW
24                     Suite 620
                       Washington, DC 20001
25                     (202) 368-4668
                       E-mail:  Tzehnle@milchev.com

ALSO PRESENT:          Jeffrey Weiland, Special Agent


Court Reporter:        Janice E. Dickman, RMR, CRR
                       Official Court Reporter
                       United States Courthouse, Room 6523
                       333 Constitution Avenue, NW
                       Washington, DC  20001
                       202-354-3267

                              *    *    *

1          THE COURTROOM DEPUTY:  Your Honor, this morning we

2     have criminal case number 17-201-1, the United States of

3     America v. Paul J. Manafort, Jr.

4          The defendant's presence has been waived for this

5     proceeding.

6          Will counsel for the parties please approach the

7     lectern and identify yourself for the record.

8          MR. WEISSMANN:  Good morning, Your Honor.

9          For the Government, Andrew Weissmann, Jeannie Rhee,

10    and Greg Andres, Special Agent Jeff Weiland, and two paralegals

11    who will working on the trial with us, Lorna Mosher and

12    Mike Brennan.

13          THE COURT:  All right.  Good morning.

14          MS. WESTLING:  Good morning.

15          Richard Westling and Thomas Zehnle and Kevin Downing

16    for the defendant.

17          THE COURT:  I think it's important to note an

18    extraordinary amount of work has been done since we last saw

19    each other in this courtroom.  We've gotten the jury

20    questionnaires completed.  I have a exhibit lists that note all

21    of your objections.  And I just want everybody to know that I

22    recognize and appreciate the amount of work that's gone into

23    it.

24          I understand that that's to the detriment of sleep,

25    sometimes eating, your personal lives and times with your

1    family.  I've sat where you sit, and I know what that feels

2    like.  So I just want to say I very much appreciate the level

3    of effort and commitment that's being shown by all the

4    attorneys in this courtroom, and the fact that it's all being

5    done with civility and professionalism and open communication

6    between the two sides.  So I appreciate all of that.

7         What I wanted to do today, given the time that was

8    needed to deal with the exhibits, was to go through the motions

9    in limine, and then take up a few other preliminary matters.

10   But I think we'll talk about exhibits at the next hearing, is

11   the way we set this up.

12        Both parties filed motions in limine on July 9.

13   They're Dockets 341 and 343, and there were responses to those

14   motions on July 23rd, Dockets 360 and 361.  The Government

15   moved to supplement its motions in limine in light of the

16   proceedings in the Eastern District of Virginia, and those were

17   Dockets 366, 381, and 382.

18        Just for the record, the motions to supplement, as

19   opposed to the motions in limine themselves, are now granted.

20   The defense has had an opportunity to respond to all of it.

21        Let me start with the defense motions.  The defendant

22   moved in limine to preclude evidence or argument concerning

23   Mr. Manafort's role with the Trump campaign, and allegations

24   related to purported collusion with the Russian government;

25   that was Docket 343.

1          The Government has raised a limited objection to the

2     motion in Docket 360.  Certainly with respect to any reference

3     to the ongoing investigation into links or coordination between

4     the Trump campaign and the Russian government, including, in

5     particular, any allegations that may involve the Government,

6     the motion will be granted.

7          I agree wholeheartedly with the defendant that any

8     evidence or argument related to the special counsel's

9     investigation of the campaign's alleged collusion with the

10    Russian government is wholly irrelevant to the charges in this

11    case, and unduly prejudicial, as well.

12         But I do have a couple of questions for the defense.

13    And that is, it appeared -- and I will say that I have not read

14    the transcript of the prior trial.  So anything I know about

15    the trial I know from public accounts, and so it may not be 100

16    percent accurate, and I wasn't tracking it on a super detailed

17    basis.

18         But, I believe there was some questioning of Gates

19    during cross-examination about ongoing cooperation with the

20    Government, and I'm concerned that that treads a little close

21    to opening up this area that you've just said should not even

22    be touched in this case.  And, so, I want to know if you're

23    planning to ask him questions about that because I'm concerned

24    that that could risk going in where we don't want to go.

25         MR. DOWNING:  Good morning, Your Honor.

1          I'm not even sure Mr. Gates is going to be a witness

2     in this trial.  So, I mean, I think that might be a question

3     for the Government to answer.

4          But, we had a limited inquiry about an allegation

5     that Mr. Gates was involved with putting personal expenses

6     through the Inauguration Committee.  That's where we ended with

7     our questioning on that.  We don't -- at this time, we don't

8     intend on asking -- if he was to be called, we don't believe

9     there are any further questions of the campaign that we would

10    be wandering into.  If that changes, certainly we would be

11    notifying the Court.

12         THE COURT:  All right.  Well, I just think if you

13    transition in your cross, that the opening question be focused.

14    As opposed to saying, you know, Have you been subject to

15    ongoing cooperation with the Government, you might want to say,

16    And have you been talking about X, so that he's focused and

17    you're focused and everybody knows where we're headed.

18         MR. DOWNING:  Okay.  That makes sense, Your Honor.

19    Thank you.

20         THE COURT:  All right.  Also, while you're there, why

21    doesn't your entirely correct position that the Office of

22    Special Counsel investigation has no bearing on this case also

23    militate in favor of my granting the Government's motion

24    in limine that you be prohibited from making any arguments that

25    these allegations were selected, or that these facts were only

1    looked into because there was a special counsel appointed and

2    he began looking into those issues?

3              MR. DOWNING:  So, I guess we would distinguish

4    between unrelated matters to this case and actually the

5    admission of the Office of Special Counsel.  We think those are

6    two different issues.  So we have asked to preclude references

7    to items that have nothing to do with this case.

8              But, this case itself was instituted by the Office of

9    Special Counsel, and we think it was motivated directly at

10   Mr. Manafort because of his involvement in the Trump campaign.

11   So we look at these as two different issues:  One, what's not

12   related to this case; and, two, why we're here in this

13   courtroom.

14             THE COURT:  All right.  Well, I'm going to hear

15   argument about why that would possibly be relevant when we get

16   to the Government's motions.  I'm not confident that it is, and

17   I'm not even sure that that argument is consistent with the

18   chronology here, where we have evidence that the Department of

19   Justice was asking about the FARA registrations during the

20   campaign, well before the election and long before there was

21   any special --

22             MR. DOWNING:  I actually think that's incorrect, Your

23   Honor.

24             THE COURT:  All right.  Well, the communications that

25   form the basis of some of the counts were in 2016; isn't that

```
 1     correct?

 2                MR. DOWNING:  Were in October of 2016 and February of

 3     2017.

 4                THE COURT:  All right.  And when was the special

 5     counsel appointed?

 6                MR. DOWNING:  May of 2017.

 7                THE COURT:  All right.  All right.  Well, let me --

 8     I'm going to grant your motion that nothing about the fact that

 9     there is an investigation going on right now into contacts with

10     the Russians come into evidence here.  But you've also asked me

11     to exclude any evidence related to Mr. Manafort's position in

12     the Trump campaign.

13                What is your response to the Government's argument

14     that that limited evidence is relevant to a motive for the

15     alleged false statements made to the press and the Department

16     of Justice and there could be a limiting instruction?

17                MR. DOWNING:  Your Honor, could I have one moment?

18                THE COURT:  Sure.

19                MR. DOWNING:  I just want to make sure I have my

20     dates correct before I address the Court.

21                THE COURT:  Okay.

22                (Pause.)

23                MR. WEISSMANN:  Your Honor, before we move on to this

24     next topic, I wanted to know -- there was some questioning that

25     happened in the Eastern District of Virginia that I do think,
```

1    if it repeated here, would tread very close to the Court's

2    ruling and, I think, would fairly -- we would want to be able

3    to respond.

4            So two examples are --

5            THE COURT:  You mean -- can you come to the

6    microphone?

7            MR. WEISSMANN:  Two examples are, there was

8    questioning about the number of times that Mr. Gates met with

9    the Government.  Normally, that's a fine inquiry.  But if it

10   was to suggest that all of those times were in preparation for

11   the trial, as opposed to the ongoing investigation, I think --

12   I think there's a way to accomplish that but in a more

13   streamlined way, because there were many aspects to the

14   meetings that were not related to the case before Your Honor.

15           Similarly, one of the questions was -- as I

16   understand it, was a question about, essentially, what were you

17   asked about?  I mean, what kind of information were you're

18   giving?  Which, obviously, that sort of calls directly for the

19   information that I understand the Court is saying should be

20   barred, and we agree that should be barred.

21           THE COURT:  Well, I think there's ways to do it that

22   permits them to do the traditional cross-examination of a

23   cooperating witness:  You've met with the Government; you've

24   met with them X times.  And then you can say, At some of those

25   meetings you've talked about your testimony in court and the

1    usual -- I think if you get -- do an open-ended question, then

2    you risk opening the door and bringing in things that nobody

3    wants to be part of this trial.  So --

4              MR. WEISSMANN:  And we agree with that.  I just --

5              THE COURT:  And, I think, the fact that some of those

6    meetings may have concerned other topics and it may sound like

7    there's more meetings, I think they have to be able to ask that

8    question.  And as long as they don't get into the subject

9    matter of the meetings, I think we're okay.

10             MR. WEISSMANN:  Yeah.  Again, the Government is not

11   saying that that line of inquiry is not a totally appropriate

12   line for cross-examination.  I'm flagging it so that there's

13   some sensitivity to the nature of the questions so it doesn't

14   go too far.

15             THE COURT:  All right.  All right.  I think the

16   tighter the cross, the more likely we are to not have a

17   problem.

18             MR. DOWNING:  I think that's correct, Your Honor.

19   And, I think, beforehand, if there's anything that treads in

20   this territory, we'll advise the Court.  We have no problem

21   with that.

22             THE COURT:  All right.

23             MR. DOWNING:  Back to the other question about the

24   campaign.  I think the two letters that have been included in

25   the indictment come in November 2016 and February 2017.  And, I

1    believe, as of only -- early August 2016 is when Mr. Manafort

2    discontinued his involvement with the campaign.

3            So, I think, just chronologically, I would like the

4    Court to keep that in mind when looking at this issue, as to

5    what relevance his time at the campaign would have to what's

6    going on in, you know, the late fall and early winter of the

7    following year.

8            THE COURT:  Well, I think we're talking about two

9    different things.  I think in terms of their saying that his

10   position in the campaign has something to do with the fact that

11   he was -- that he allegedly made false statements to the press

12   and to the Department of Justice were, in part, motivated by

13   his connection to the campaign, that's a question about

14   whether, for that limited purpose, the fact that he had a role

15   in the campaign is relevant.

16           That's a little different from my issue with you

17   about the timing and the selective prosecution, which I

18   think -- whether or not the argument made sense in connection

19   with the bank fraud, I don't think it makes sense in connection

20   with the FARA inquiry, which began before the election.

21           MR. DOWNING:  Well, I think it's kind of interesting

22   that, on one hand, we're saying that the involvement with the

23   campaign can be used by the Government; on the other hand, we

24   can't raise the fact that that's why we're here.  I mean, that

25   seems to be a little unbalanced in terms of the Government

1       wanting to use his position as a sword, but also have it as a

2       shield, that we can't mention to anyone here in this courtroom

3       and the jury that that's why we're here.  And that's --

4                   THE COURT:  Well --

5                   MR. DOWNING:  And I --

6                   THE COURT:  Well, is that a fact that's going to

7       be -- I mean, that's just argument that is not going to be

8       based on the evidence.  So why would it be appropriate?

9                   MR. DOWNING:  We actually believe it's going to be

10      based on the evidence.  We're going to make inquiries of the

11      agents that were involved with the investigation.  We are going

12      to also call witnesses that were agents in earlier

13      investigations that were discontinued.  So we do intend to do

14      it factually -- not just argument, but to do it factually with

15      government witnesses.

16                  THE COURT:  To establish what?

17                  MR. DOWNING:  To establish the selectiveness of why

18      Mr. Manafort was targeted; because he was the campaign manager

19      for Trump.

20                  THE COURT:  And why is that an appropriate question

21      for the jury?  What does that have to do with whether he's

22      guilty of the charges or not?  I can understand why you might

23      amass all of that in a motion to dismiss for selective

24      prosecution, which would be governed by legal considerations,

25      but why is that a question of fact for the jury?

1          MR. DOWNING:  Well, I think what we're seeing -- and

2     we just got the Jencks yesterday, but we are seeing that other

3     entities in other firms engaged in the same activity have not

4     been prosecuted.  In fact, the FARA office have even made

5     contrary conclusions about their activity to what was done here

6     by the Office of Special Counsel; not the FARA office, but the

7     Office of Special Counsel.

8          So we do think it's going to come out through

9     witnesses that the Government has put on their list, from

10    Skadden, the Podesta Group, from Mercury, from FTI, from

11    Edelman.  I mean, these are all folks that were treated very

12    differently by the FARA office than the Office of Special

13    Counsel decided to treat Mr. Manafort.  So we do think it is

14    relevant.

15         THE COURT:  Why is that a question of fact for the

16    jury, as opposed to a legal question that you put to the judge

17    about the legitimacy of the prosecution?  Why does the jury get

18    that information?

19         MR. DOWNING:  Sure.  I think what our intent is to

20    show how vague this statute is and its enforcement has been and

21    the advice out of the FARA office.  And, I think, that's going

22    to come out quite clearly that it wasn't the FARA office that

23    instituted this prosecution; it was the Office of Special

24    Counsel.  And that's a departure from how, ordinarily, these

25    cases would come about.

1          And we've mentioned earlier, Your Honor, in our

2     filings, that there's been six FARA cases since 1966.  The FARA

3     office itself -- and we're going to get this out through

4     government witnesses, that --

5          THE COURT:  This comes up a lot when people claim

6     other people have made false statements and they weren't

7     prosecuted; other people have submitted false claims for

8     workman's comp benefits and they didn't end up in this

9     courtroom.

10          That sort of selective prosecution argument gets

11     raised all the time, and there's law that bears on it and

12     whether that would even be a basis to dismiss the charges as a

13     legal basis.  But you're going to have to provide me with some

14     law that says you get to argue that to the jury.

15          MR. DOWNING:  And we're happy to do that.

16          But I do want to make clear, because maybe I haven't

17     been clear about it, we think it goes to the vagueness issue.

18     And we think the FARA office has intentionally not given any

19     public direction as to what all these filing requirements are

20     and how they should be interpreted.  The office has only done

21     it privately, has not published any of it.

22          So what I think is going to come out at trial, this

23     is going to go to the knowing and intentional.  The knowing and

24     intentional, when you have a law that's that vague that has not

25     been enforced, the guidance has not been issued on, we

1    definitely think is relevant to the jury determining whether or

2    not Mr. Manafort had the requisite knowing and intent to

3    violate the law.  And that's where we would direct, and we're

4    happy to brief that, Your Honor.

5              THE COURT:  All right.  Well, you --

6              MR. DOWNING:  Now that we're done with the exhibit

7    list, we're fine with that.

8              THE COURT:  Well, I still think that what you're

9    talking about, you know, is there something on the agency's

10   website that says when you have to register?  And do you have

11   printed guidelines as to when people register?

12             Those sorts of questions that might go to his

13   knowledge is a very different situation than, How many people

14   have been prosecuted for this before?  And why is it that it's

15   only the special counsel that's doing it here?

16             That's where you're treading into something that I

17   don't see the relevance of.  I don't think it's a fact question

18   for the jury.  I think it's an opportunity to bring the

19   politics into the trial that we've tried to exclude through all

20   of our jury questionnaire.  So --

21             MR. DOWNING:  I know, Your Honor.  But you can't

22   exclude the politics.  Paul Manafort is here because he was

23   Trumps's campaign manager.  And I understand your point, and I

24   would like to have the chance to brief it as to this vagueness

25   issue, and make sure the Court understands that we're not

1    trying to inflame the jury because Mr. Manafort was, you know,

2    the manager of the Trump campaign.

3            So we would be happy to do that.  We can do it in the

4    next couple of days.

5            THE COURT:  Well, I don't think you get to make the

6    argument to the jury that you've made to the press and, just

7    now, to me.  I think that goes to -- it may have gone to a

8    motion to dismiss, and it was somewhat implicated in your

9    original motion to dismiss.

10           It may go, if there's a conviction, to sentencing.

11   It goes to a lot of things.  But, I don't think it goes to the

12   question of whether the Government has proved beyond a

13   reasonable doubt what's charged in the indictment, and you're

14   going to have to tell me why it does.

15           MR. DOWNING:  Okay.  Thank you, Your Honor.

16           THE COURT:  All right.  Can you -- I think, since

17   we're still on the defendant's motion to preclude evidence

18   concerning the role in the campaign, can you articulate for me,

19   from the Office of Special Counsel, a little more crisply about

20   how it gets relevant, and what is the limited way in which you

21   intend to use that?

22           MS. RHEE:  So, Your Honor, it is going to be limited,

23   as set out in our papers, in a twofold fashion.  And the first

24   is evidence of intent.  Because, as you are -- noted to defense

25   counsel, while Mr. Manafort was still on the campaign, in early

1   August, press inquiries started to appear about his work in

2   Ukraine.  And there was a flurry of activity in order to come

3   up with talking points, messaging a response.  And that

4   messaging carries over into the subsequent correspondence and

5   letters that are then submitted to DOJ.  And it's during the

6   campaign, when he is still vying to stay in his position, that

7   the beginnings of the false narrative are made public and

8   formulated.

9            So that's one part of why, for limited reasons, the

10  Government wants to have at least the option of being able to

11  introduce that evidence.

12           And then the second point, as we spell out in our

13  papers, is to be able to just tell the complete narrative.  And

14  that is, Why was it that DOJ asked questions in the fall of

15  2016 about Mr. Manafort's work in Ukraine?

16           And it's because --

17           THE COURT:  And we've got the dates of the letters.

18  When were the first inquiries from DOJ to him that prompted the

19  letters that you allege are false?

20           MS. RHEE:  My understanding is that those dates were

21  in September, Your Honor.

22           THE COURT:  All right.  So they predate the election.

23           MS. RHEE:  Yes.

24           THE COURT:  And they predate the Office of Special

25  Counsel.

1          MS. RHEE:  Yes.  And they're a direct outgrowth of

2     the press coverage in August about Mr. Manafort's work for

3     Ukraine.

4          THE COURT:  Well, I'm a little concerned that -- that

5     I really don't want to dwell on his position in the campaign.

6     I think the fact that press inquiries were made and

7     communications then go on, which are then recapitulated in the

8     communications of the Department of Justice, is clearly a part

9     of your case, and I think it's relevant.

10          But, I think -- what you say about what he was doing

11     at the time, I think it's very hard to keep it tailored.  So I

12     think we need to think about whether you just want to have a

13     one-sentence stipulation or something that at that time he was

14     working on a presidential campaign, and leave it at that.

15          But, I think that while I'm trying to keep them tight

16     and focused, that it has to be the same for the Office of

17     Special Counsel.

18          MS. RHEE:  We couldn't agree more, your Honor.  Which

19     is the reason why when we were last here before you talking

20     about the questionnaire, the Government's position was we don't

21     need to tell the jury and every single one of the prospective

22     jurors about Mr. Manafort's role on the Trump campaign.

23          That is not the point of the Government's request.

24     It is just so that the Government doesn't have a gaping hole in

25     its presentation about why things occurred in August,

1    September, October, November of 2016.

2            THE COURT:  Well, I think the fact that even if it's

3    going to be said in one sentence at trial is why we had to find

4    out from the jurors if that was going to influence them.  And

5    so we asked the question, and I'm glad we did.

6            So, I think the fact that at the time that these

7    communications began he occupied a position in the campaign is

8    relevant.  But I think -- I'm not sure it's necessarily

9    important to talk about when he left or how he left.  It's just

10   that when it started, that's what was going on.

11           MS. RHEE:  As we set out in our papers, Your Honor,

12   again, we totally agree.  We have no intention of raising or

13   eliciting testimony about when Mr. Manafort left or the

14   circumstances under why he left.  But, rather, what's important

15   for us is that he was still in a position that was highly

16   visible and very public at the time that the press started to

17   inquire, and that informed why he chose to try to craft a

18   narrative that he then continued to stick to when DOJ picked up

19   that thread.

20           THE COURT:  All right.  Well, I think that much I'm

21   not going to exclude.  I think that you proposed a potential

22   limiting instruction and a way to get it before the jury.  And

23   I know we've talked about continuing to communicate with each

24   other about stipulations and how to do things.  And if you can

25   agree on it among yourselves, that would be ideal; and if you

1    can't, then I'll look at what you're planning to do.

2         But that's my ruling on the motion in limine.  That

3    information can come in for that limited purpose, but anything

4    related to the collusion investigation is out.

5         MS. RHEE:  And, again, there was no objection on the

6    Government's part.

7         THE COURT:  All right.

8         The second defense motion in limine is seeking to

9    preclude evidence or argument about the charges brought in the

10   Eastern District of Virginia.  The Government's only objection

11   to the motion related to the potential use of the verdict for

12   impeachment.

13        So that motion will be granted.  The fact that he was

14   indicted or prosecuted in Virginia for any of the charges is

15   entirely irrelevant here.  The fact that he was convicted of

16   some counts may not be mentioned in the case in chief, and will

17   not be relevant until and unless he testifies; at which time it

18   would only be the classic impeachment question, you know:  Were

19   you convicted of X, Y, and Z, and not the underlying

20   information that led to the convictions.

21        This holding, obviously, does not bar the Government

22   from introducing evidence, There's also evidence in the

23   Virginia prosecution, but the jury cannot be told what use was

24   made of it before.

25        So, one question I do have, though, with respect to

1  the use of the conviction under Federal Rule of Evidence 609.

2  Does the defense agree that the conviction would be admissible

3  for those purposes if Mr. Manafort were to take the stand?

4          MR. DOWNING:  Your Honor, can we have one moment?

5          THE COURT:  Yes.

6          (Pause.)

7          MR. DOWNING:  Your Honor, I apologize for this.  I

8  don't want to waste the Court's time, but we just want to check

9  as to whether or not the conviction, as it stands now, would

10  be --

11          THE COURT:  Well, that was my next question, I was

12  going to -- that was my next question.

13          Has anybody researched the question about whether

14  there's any D.C. Circuit authority on whether the defendant has

15  to be sentenced and judgment entered before it can be used?

16          I looked into it myself and I found case law

17  elsewhere that said it can be used.  I don't know that there's

18  any controlling case law in the Circuit, but you're welcome --

19  I think this is a question that's not going to come up for a

20  while.  You're welcome to let me know, one way or the other,

21  whether you found any authority by the time the trial starts.

22  But, I believe, to the extent there is case law on it, it could

23  be used for that limited purpose.

24          MR. DOWNING:  Thank you, Your Honor.

25          THE COURT:  I think, though, that that requires

1    everybody to think carefully through the question of how are

2    you going to use prior testimony in cross-examination?  So, I

3    think we need to have a convention that the lawyers are going

4    to use and that the witnesses are prepared to respond to

5    without saying, Oh, yeah, when I was in that other trial in the

6    Eastern District of Virginia, I was asked that question.

7           So, I think if you're going to impeach somebody with

8    grand jury testimony, that's easy; Did you appear before the

9    grand jury on blah, blah, blah date?

10          I think that we may want to come up with something

11   like, Sir or ma'am, did you previously testify in a court

12   proceeding about this matter?  And then that will be the signal

13   to the witness that we're talking about a court proceeding, if

14   there are any witnesses that overlap.  There may not be, but I

15   think there are.  Then you can do your usual cross where, You

16   were sworn and there was a court reporter there.

17          But, you need to be careful and they need to know

18   what you're going to say so that the witnesses are cautioned,

19   before they take the stand, that we're not going to make any

20   overt references to it, other than you'll have an absolute

21   right -- and you may have to rehabilitate someone with a prior

22   inconsistent statement or refreshing recollection, and you just

23   have to do it in a way that signals that it's -- that it was

24   sworn and it was -- relates to court, without signaling that

25   there's been a prior trial of the defendant.

1          So, does that make sense to everybody?

2          MR. WEISSMANN:  Your Honor, that makes total sense.

3     And we were also thinking about that issue.  The one amendment

4     that we would propose is that the nomenclature that the parties

5     use include that it was a different or separate proceeding, so

6     there isn't a sense that this is a retrial, and that there's no

7     inference of that, so that there was some separate or different

8     court appearance.

9          THE COURT:  Well, I think it's okay if they think

10    it's a hearing or something that previously happened.  I think

11    "a court proceeding" probably does the trick.  I'm a little

12    concerned that "a separate court proceeding" starts to make it

13    sound like he's been tried twice.

14          But, again, I think that's something I'm going to let

15    the two of you see if you can come up with.  But I'm not sure

16    that's an essential word, as I think about it.  I think the

17    goal is to make sure that the word "court" comes out and "oath"

18    comes out and nothing else.  All right.

19          So, basically, that means that that aspect of the

20    motion in limine is going to be granted, with a limited

21    exception of the use of the conviction for impeachment

22    purposes, unless the law prohibits it in this Circuit.

23          The defendant also moved in limine to preclude

24    evidence or argument related to his remand to the custody of

25    the U.S. Marshal Service pending trial, in Docket 343.  And

1    that's, obviously, going to be granted.  It's completely

2    irrelevant.  And we will make sure that he's seated at counsel

3    table before the jury comes and goes.

4          The defense also moved in limine seeking to preclude

5    testimony and evidence from attorneys who provided Mr. Manafort

6    with FARA-related advice and represented him in connection with

7    the DOJ FARA office.  The Government opposed the motion, noting

8    that the purported claim of privilege had been considered and

9    rejected by Chief Judge Howell during the grand jury

10   proceedings.

11         This overlaps substantially with the motion filed by

12   the taint team seeking authority to disclose the material to

13   the trial team.  And I understand that the attorney on that

14   motion can't be here today to argue.  And, also, I've given the

15   defendant one more opportunity to brief the matter.  So I'm not

16   planning to rule on it today.

17         I do have a couple of questions, though.  I do want

18   to confirm that both the defendant and the other holder of the

19   privilege, Mr. Gates, at the time participated through counsel

20   in the grand jury proceedings concerning the motion to compel

21   the witness's testimony.

22         It's my understanding -- and which one of you is

23   handling this?  So maybe one of you can come up, and then I'll

24   have more than just the nodding on the record.

25         All right.  So, Mr. Westling, it's my understanding

```
 1    that counsel for Mr. Manafort and an attorney for Mr. Gates

 2    participated in the proceedings, although they did not, at the

 3    time, have access to the Government's proffer; is that correct?

 4              MS. WESTLING:  That's my understanding, Your Honor.

 5              THE COURT:  So they were at portions of the hearing,

 6    except when the agents were testifying and/or when proffers

 7    were made on the record, and they filed briefs and letters with

 8    their legal position?

 9              MS. WESTLING:  That's correct, Your Honor.

10              THE COURT:  Okay.  And at this time, the defense does

11    now have Chief Judge Howell's opinion in its entirety?

12              MS. WESTLING:  That's correct.

13              THE COURT:  And at this time, you have the

14    submissions the Office of Special Counsel made in support of

15    the applicability of the crime fraud exception in their

16    entirety?

17              MS. WESTLING:  That's also correct.

18              THE COURT:  And you have the FBI 302s describing the

19    results of the interviews with the witness in their entirety?

20              MR. WESTLING:  Yes, Your Honor.

21              THE COURT:  And you have the transcripts of all the

22    hearings in their entirety?

23              MS. WESTLING:  I believe so.  I'm not as sure of that

24    one, but I will double check with special counsel and ensure

25    that we do.
```

1          THE COURT:  I believe I've seen the transmittal

2     letters, and I think that's true.

3          So, initially, a portion of your objection was that

4     you didn't have this material.

5          MR. WESTLING:  Correct.

6          THE COURT:  Now you have the material.  And I want to

7     make sure that you got a full chance to let me know what you

8     think, based upon your consideration of that material.

9          One question I have, though, for both of you is,

10    what -- what is this standard here?  Am I reviewing this from

11    scratch, de novo, or is Chief Judge Howell's opinion the law of

12    the case, so there has to be some compelling reason or change

13    in circumstances before I go -- if I were going to move in an

14    opposite direction?

15          And then the other question I have is, I have now

16    given you an opportunity to submit anything you want me to

17    consider based on the full record.  Once I -- if I examine the

18    full record, is there any reason why we need to hold an

19    evidentiary hearing, or can I do this based on the submissions

20    that everybody has made to me?

21          MR. DOWNING:  Your Honor, I guess, to answer the

22    second question first, if that's okay, to be very frank, I have

23    not gotten through all of the material.  So I would feel

24    somewhat remiss in saying you could rule on the paper alone

25    because there's always possibilities of there being something

1    there that I don't know.  And so, I think that, generally, this

2    is a matter that likely could be handled on the papers,

3    assuming the record has been fully made elsewhere.  But I still

4    have a question mark about that issue.

5              THE COURT:  All right.  And, obviously, if after I

6    read what you submit there's an argument that I think would be

7    helpful, I'll bring everybody in.

8              But it seems to me that the question of whether the

9    record supports the finding that was made is based on the

10   record, and I'm going to ask the Government -- I don't think

11   they're seeking to put on additional evidence, in addition to

12   what's been provided.  And so, if they're not, then we may be

13   able to do this.

14             But why don't we do this:  When you submit whatever

15   you're going to submit, if you can note whether you have an

16   opinion at that point about whether additional testimony is

17   required, that would be helpful.

18             MS. WESTLING:  Yes, Your Honor.

19             THE COURT:  All right.  And, also, let me know

20   whether you think -- and the Government argued in its pleading,

21   Chief Judge Howell has already ruled.  So, you know, we need

22   some reason why that wouldn't govern anymore.  But I don't

23   recall that there was necessarily a legal citation after that

24   sentence.

25             So if you want to let me know what you think, whether

1    there is a de novo issue or a law of the case issue, that would

2    be helpful.

3              MS. WESTLING:  Yes, Your Honor.

4              THE COURT:  All right.

5              What's the Government's position -- are any of you

6    prepared -- well, you've got the motion in limine, but you

7    can't -- are you prepared -- do you know if there's any reason

8    why I shouldn't base my ruling just on the record, or whether

9    you're planning to put on testimony on this issue?

10             MR. WEISSMANN:  So, the two questions that the Court

11   asked, which is, is it law of the case, and is an evidentiary

12   hearing necessary?  One, we will submit something on the issue

13   of is it law of the case.  We believe it is law of the case.

14             But with respect to the factual basis, we do not take

15   the position that the defendant is precluded from raising a

16   factual argument to this Court, precisely because we proceeded,

17   as a grand jury matter, ex parte.  So we think due process

18   requires that he have that opportunity to present evidence.

19   But, to date, no evidence has been presented at all by the

20   defendant.

21             So, given that, our view is that it is law of the

22   case, and no facts have been presented to the Court to warrant

23   the Court revisiting Judge Howell's decision.

24             THE COURT:  In terms of your position though, I have

25   the facts that you would want me to rely on.  You're not

 1    seeking to introduce new facts?

 2              MR. WEISSMANN:  We are not.

 3              THE COURT:  Okay.

 4              MR. WEISSMANN:  Subject to, of course, we don't have

 5    the defendant's --

 6              THE COURT:  All right.

 7              MR. WEISSMANN:  -- any presentation.  If there is

 8    some fact that is presented, then we would want to have the

 9    opportunity, if we believed it was necessary.

10              As the Court knows, we presented, literally,

11    thousands of exhibits.  So, there are summary charts that

12    really are responsive that would augment the presentation to

13    Chief Judge Howell.  We don't think it's necessary, in light of

14    the findings that Judge Howell made, but we are prepared, if it

15    becomes necessary, to supplement the record factually.

16              THE COURT:  All right.

17              Mr. Westling, do you recall when your submission on

18    this issue is due?

19              MS. WESTLING:  I believe it's the 10th, Your Honor,

20    Monday of this coming week.

21              THE COURT:  Okay.  All right.  If the Government can

22    have that date, as well.  I realize it's a problematic date,

23    but if I could get your position on what the standard is at the

24    same time, then I could be looking at it at the same time.

25    That would be helpful.

1          Thank you.  All right.

2          MS. WESTLING:  Thank you, Your Honor.

3          THE COURT:  All right.  So, as I understand it, we've

4    now at least talked about, although I haven't ruled on, all of

5    the defendant's motions in limine.  And everyone is nodding

6    their head from defense table.  So I'm going to go to the

7    Government's motion.

8          The Government moved in limine for an order

9    precluding argument or evidence in trial concerning selective

10   or vindictive prosecution or the motive and mandate of the

11   Department of Justice office leading this prosecution or

12   suggesting that any government investigation into Mr. Manafort

13   that preceded the special counsel's appointment ended with the

14   decision not to prosecute him.

15         I think I've already indicated that I'm inclined to

16   grant this motion; that I don't believe it's relevant.  I

17   believe there was some specific argument that was made during

18   the defendant's closing in the Eastern District of Virginia,

19   and I believe it was -- would -- I would preclude that here.

20         But, Mr. Downing has asked for an opportunity to

21   brief why it would be relevant, and so I'm going to give you

22   that opportunity before I rule on this.  But, at this point, I

23   see it to be irrelevant and unduly prejudicial.

24         MR. ANDRES:  Your Honor, may I just address that for

25   a second?

1            THE COURT:  Yes.

2            MR. ANDRES:  That's fine.  I understand that Mr.

3     Downing wants to brief that.  We'd just like to know when that

4     was.  Obviously, the date he was supposed to brief it has

5     passed.  And, Your Honor, we would like a very specific ruling

6     on this for the very fact Your Honor just referenced.

7            Notwithstanding a specific ruling by Judge Ellis in

8     that case, the defense violated that on multiple occasions

9     during their closing.  They made the argument, which,

10    apparently, they hope to make in this case as well, that

11    typical Justice Department prosecutors don't bring this type of

12    bank fraud case.

13           The motive for the Special Counsel's Office or the

14    reason for the prosecution has nothing to do with either the

15    elements of the crime or the facts.  Your Honor has already

16    gone through that.  We've cited numerous cases --

17           THE COURT:  Well, and I don't think there will be a

18    factual basis in the record about who gets prosecuted for what,

19    or that it's a question for the jury.  I do want to read what

20    the defense has to say, in the event I'm incorrect about that.

21           When do you think you can provide me with anything

22    you want to provide on that issue?

23           MS. WESTLING:  Could we have until the 10th, Your

24    Honor, as well?

25           THE COURT:  All right.  And there's -- I assure you

1     that if I rule, my ruling is going to be clear.

2          MR. ANDRES:  I appreciate that, Judge.  I wasn't

3     suggesting otherwise.

4          As you can appreciate, this sort of -- I'm not sure

5     what the right analogy -- but it's the ringing of the bell and

6     the unringing of the bell that's really hard to do.  So even

7     though Judge Ellis gave a curative instruction, we didn't

8     object during the closing because we didn't want to highlight

9     the issue.

10          So, again, to the extent that the defense violated

11     the order, the Government would be asking for a curative

12     instruction that notified the jury that the Court had --

13          THE COURT:  All right.  Well, I'm not going to make

14     any findings based upon whether Judge Ellis's orders were

15     violated or they weren't.  I'm not privy to everything that was

16     said and every bench conference and what the instructions were.

17          I'm going to determine whether it's admissible in

18     this trial.  And if it's not admissible in this trial, you're

19     not going to stand up and do it in this courtroom.

20          MR. ANDRES:  Thank you, Judge.

21          THE COURT:  All right.

22          The Government also moved in limine, and I think this

23     is somewhat similar and overlapping, precluding the defendant

24     from presenting argument or soliciting evidence concerning the

25     fact that there was no civil IRS audit of Mr. Manafort or his

1   companies, or the absence of a civil foreign agent's

2   registration action against Mr. Manafort or his companies, or

3   suggesting that those would have been necessary, and that the

4   absence of them is somehow indicative of the absence of

5   evidence of a crime.  That was Docket 366.

6           What's the defendant's point of view about why that

7   would be relevant?

8           MR. DOWNING:  Your Honor, when we raised the issue in

9   the Eastern District of Virginia, it had to do with the idea

10  that the Government was alleging that Mr. Manafort was

11  concealing information from the federal government, from the

12  Department of Treasury.

13          What we elicited from the accountant, one of the

14  accounts, Mr. Ayliff, is -- I believe is his name -- was that

15  they kept records -- they kept underlying accounting records

16  that had the information about the foreign bank accounts.  And

17  they kept those records in case there was an audit, they would

18  produce those records to the IRS.

19          So we had it for the limited purpose of to refute

20  this claim of concealment.  We did not introduce it to say,

21  They have to audit first.  And I think that's what the

22  Government was concerned about.  And I think the -- Judge Ellis

23  did issue an instruction that said Government doesn't have to

24  do a civil proceeding first.

25          But we raised it for -- to refute the Government's

1    claim of concealment of information from the Department of

2    Treasury.

3            THE COURT:  Well, isn't there a question on the tax

4    return that asks, Do you have any foreign bank accounts?

5            MR. DOWNING:  There is.  But there's no question on

6    there that says, Do you have a general ledger?  Do you have

7    foreign bank information?  Do you have -- so these are all the

8    records that the accountants were in possession of.  So it goes

9    to --

10           THE COURT:  All right.

11           MR. DOWNING:  So it goes to refute the claim of

12   concealment, Your Honor.  That was it.  That was the only

13   purpose.

14           THE COURT:  That they gave it to their accountant --

15           MR. DOWNING:  The accountants --

16           THE COURT:  -- and their accountants had it if they

17   needed it.

18           MR. DOWNING:  The accountants retained the

19   information in case there was an audit.  If there was an

20   audit -- and we can get you the transcript cite -- they would

21   produce that information to the IRS.  So it was to refute the

22   claim of concealment.

23           THE COURT:  All right.

24           Somebody over there want to talk about this?

25           MR. WEISSMANN:  So, first, there is a whole issue of

1    what was argued in the other trial.  I'm not sure how relevant

2    that is here.

3              THE COURT:  Well, let's stick to what's here and that

4    will make it easy.

5              MR. WEISSMANN:  Exactly.

6              So, one, what I don't hear from the defense is

7    whether or not they're going to make the argument, which was

8    made -- but regardless of whether it was or was not, the

9    argument that the Government should have proceeded civilly,

10   both with respect to a civil tax audit and civil FARA

11   enforcement, the Government's view, in its papers, as we

12   briefed to Your Honor, is that that is irrelevant.

13             The issue of whether KWC, the tax preparers, kept

14   documents seems like a legitimate question that could be asked,

15   if they want to argue that Mr. Manafort understood that certain

16   documents would be kept by KWC.  That does not seem to open the

17   door to issues about proceeding civilly.  That's a very

18   different inquiry.

19             It is also contingent on Mr. Manafort's state of

20   mind.  So it would have to be linked up to that in terms of

21   whether the defendant understood that.  Because whether KWC

22   kept it or not is only relevant -- as I hear Mr. Downing, is

23   that it's only relevant to that particular issue.

24             How that becomes from a 401 or 403 issue, something

25   that really relates to income tax fraud or not reporting a

1   foreign bank account, is a little hard to see.  But we're not

2   seeking to preclude a line of inquiry that would go to, Did the

3   defendant himself understand that KWC would keep documents?

4          THE COURT:  All right.  Well, I don't have any

5   problem with the defendant eliciting, if these accounts

6   testify, again, as either government witnesses or defense

7   witnesses, whether Davis Manafort or Mr. Manafort, personally,

8   provided them with information about the existence of all these

9   things, which then you can argue shows you he wasn't trying to

10  hide it.

11         But, I don't think you can get into, Which would have

12  been given to the Government, if they had only audited.

13  Because that does seem to be suggesting that an audit was

14  necessary, and it's completely speculative as to whether he

15  would have authorized it to be produced at that time or not,

16  unless there's some -- something you can point to that -- that

17  that instruction was provided.

18         But I think there's a difference between, I wasn't

19  hiding the ball, I was completely open with the people who

20  handle my money, they had all the information, it was just

21  sitting there; and saying, Too bad the Government didn't ask

22  for it in some other format, other than the format that they're

23  alleging is false.

24         So I don't want to stop you from bringing in the fact

25  that the accountants were armed with information that you think

1    it's important to bring out that they were armed with.

2            MR. DOWNING:  Well, Your Honor --

3            THE COURT:  But I don't think that it should be a

4    backdoor to bringing out, Well, gee.  They didn't audit him; so

5    why are they prosecuting him?

6            MR. DOWNING:  I agree with that.  But the records

7    don't reside with the accountant for no reason.  They reside

8    with the accountant because the accounts know if an audit comes

9    up, that they have the underlying information to provide.  It's

10   not just you gave it to the accountants.

11           The Government has alleged that Mr. Manafort

12   concealed his offshore accounts from the United States

13   government.  I think it is very important for the jury to

14   understand why the records reside with the accountant.  Why do

15   they get them?  Why do they need them?

16           Because the Government was very careful, in examining

17   the accounts, to say, They have no responsibility to look

18   behind the information that's given to them.  So they elicited

19   that from the accountants, as if the accountants were some kind

20   of bystander, as opposed to the professionals that they are,

21   and as opposed to professionals that require records to be

22   provided for them so if and when the IRS audits, that they can

23   produce the records to the IRS.

24           So it is not some kind of logical disconnect to

25   elicit from the CPAs, Why do you keep the records?  Because,

1     otherwise, they could just give the records back and say, We

2     don't have any responsibility here.  Which is what the

3     Government tried to elicit from the accountants on direct

4     examination, that they just wrote numbers down, which is not

5     the case.  And they keep the records because of if and when.

6               And, by the way, I think -- in the other proceeding,

7     I believe we limited it to in case there was any other

8     government --

9               THE COURT:  Inquiry.

10              MR. DOWNING:  -- administrative -- yeah.  Something

11    like that.  So it was limited, that we weren't triggering this

12    whole idea about an IRS audit.

13              But we think it's highly relevant, and we think it's

14    important, also, for the jury to understand why these records

15    are retained by the accountants.

16              THE COURT:  Well, I think it's okay to say, Did you

17    receive these records?  And did you retain them?  And are you

18    required to retain your records in the event of future

19    inquiries?  But that's it.  I think that you're treading very

20    close to trying to make something out of the absence of an

21    audit, and I agree with the Government that that would not be

22    appropriate.

23              MR. DOWNING:  But when I asked the question, If the

24    Government asked for the records, would you produce them? the

25    answer was very clear:  Yes, we would.

1          So, again, I don't know how the Government gets to

2    allege that Mr. Manafort concealed this information from the

3    Department of Treasury when, in fact, a CPA was sitting there

4    with the material --

5          THE COURT:  All right.  Well, I'm not who you have to

6    make your closing argument to.  I'm not going to be the fact

7    finder in --

8          MR. DOWNING:  But you're limiting what my closing

9    argument would be, Your Honor.  And that's really what we're

10   taking issue with.

11         THE COURT:  No.  I think you can say what we've said,

12   that his accountants had it, it's all standing by.  But, I

13   think that's a different situation.

14         MR. DOWNING:  But the why is important, Your Honor.

15   The why tells the average jury why these records reside with

16   the accountants.

17         THE COURT:  All right.

18         MR. DOWNING:  It tells them the why.

19         THE COURT:  Mr. Weissmann?

20         MR. WEISSMANN:  I have one request, which is that

21   the -- because we don't want a repeat of the Eastern District

22   of Virginia, where there's a ruling which has been, in our

23   view, not complied with, is that the Court consider carefully

24   delineating what the defense counsel can and cannot do.

25         With respect to this particular issue, we have

1    submitted to the Court transcripts so that you can read, to the

2    extent it's relevant to you, why we have that concern.

3           Here, two points.  There is nothing that Mr. Downing

4    said that is pertinent to the issue that these records would

5    need to be kept for a civil audit, as opposed to a criminal

6    audit.  What -- if the Government is asking for them, they

7    would be there.  But, the necessity to do a civil audit is

8    clearly so that the jury will think, Well, why was this case

9    brought criminally and not brought civilly?

10          Of course, there are many, many good answers to that,

11   if the door were to be opened to that.

12          THE COURT:  So do you agree that he would be

13   permitted to say, Tell me what records you received from Davis

14   Manafort?  Did you retain those records?  And you retained

15   those records in the event the Government ever asked for them?

16          That's -- he can do that.

17          MR. WEISSMANN:  He can do that.  I'm not sure he will

18   get -- with respect to the second prong, I'm not sure that

19   what -- the answer will be something that the defense is

20   looking for in terms of why it's retained, as opposed to that

21   is the standard procedure for a firm like KWC.

22          I really want to make sure the Court understands one

23   issue factually here.  We're not saying the defendant can't ask

24   that, but there is a good faith issue that's raised.

25          The testimony that will be elicited here is the same

1    as what was elicited in the Eastern District of Virginia, which

2    is that the bookkeeper and KWC, the tax preparers, were not

3    given information by Mr. Manafort.  They were not given

4    information about income.  They were not told about foreign

5    bank accounts.

6           So this issue of trying to backdoor in a civil audit

7    because, Oh, Mr. Manafort told them, there are three witnesses

8    who testified that was not true.  They were not cross-examined

9    on that --

10          THE COURT:  Well, that's -- again, I'm not getting

11   into the facts and I don't need to know the facts.  They will

12   ask the questions, presumably, on cross that they're aware,

13   from whatever information they have, they're going to get

14   answers to which the answer will be yes.

15          If they ask a question to which the answer will be

16   no, then they probably won't ask that question.  And if they

17   say no, then that's the end of it.

18          MR. WEISSMANN:  Yes.  But, Your Honor, here the

19   question is, the reason they're saying this is relevant is

20   because they want to elicit that Mr. Manafort gave pertinent

21   records to the tax preparers and to the bookkeeper --

22          THE COURT:  Well, I'm not going to make a finding

23   that depends on whether that happened or not.  I think the

24   ruling would be that if there is testimony that they received

25   these records from Mr. Manafort, they can then also ask if they

1    were kept, and that they were kept and would be produced if the

2    Government asked for them.  And that's it.

3            But I'm not assuming -- I'm not making a finding

4    about the underlying facts.  And I will look again at the

5    transcripts, and I understand what you're talking about.  So

6    I'm -- my order will be -- I'm telling you where I'm headed, so

7    you understand where the boundaries are.  But, I will do a

8    follow-up written order that circumscribes what we're talking

9    about.

10           Do you have language you would like to propose?

11           MR. WEISSMANN:  We have some language that we

12   proposed in one of our motions with respect to --

13           THE COURT:  All right.

14           MR. WEISSMANN:  -- instruction.

15           THE COURT:  But no reference to a civil audit?

16           MR. WEISSMANN:  Yes.  And we can -- in our filing on

17   the 10th, we can propose specific language, if that date works.

18           THE COURT:  Okay.  Okay.  I might try to finish this

19   up this week, just --

20           MR. WEISSMANN:  We'll do it sooner.

21           THE COURT:  -- so something is done, because next

22   week is exhibit week.  All right.  And jury questionnaire week.

23           All right.  The Government moved in limine to seek to

24   admit evidence that the two businesses, Davis Manafort

25   Partners, Inc., and DMP International, LLC, did not file the

1    foreign bank account reports for the accounts identified in the

2    superseding indictment.

3            So, does defense object to evidence of that fact,

4    that the entities didn't file the reports?

5            MR. ZEHNLE:  Good morning, Your Honor.

6            We don't object to the fact that those were not filed

7    by those two entities, but we do object to the admission of

8    that evidence in this particular case.

9            You know, a lot of discussion has been going on about

10    backdoor this and backdoor that.  What we're really talking

11    about here are two separate obligations and responsibilities

12    under the FBAR regulation, one for the individual and one for a

13    U.S. corporation, which also has an obligation to potentially

14    file an FBAR report.

15            Here, they have charged a conspiracy that

16    Mr. Manafort, as an individual, willfully failed to file FBAR

17    reports.  They didn't charge that Mr. Manafort, on behalf of

18    these two separate corporations, failed to file those reports;

19    just him individually.

20            Now, an individual may have an obligation to file a

21    report based upon ownership percentages in corporations,

22    whether or not they have signature authority, etcetera.  But

23    that's a different case than the individual charge that they

24    brought here.

25            And, as this Court knows, I mean, this indictment in

1    this particular case was brought in October of last year.

2    We're now in September of 2018.  The Government has superseded

3    many times on different issues, and yet, the conspiracy still

4    relates solely to Mr. Manafort, as an individual, conspiring to

5    not file individual FBAR reports.

6           Why is this important?  Because it is a backdoor

7    404(b) issue, Your Honor.  They're trying to suggest that

8    because these companies didn't file, well, you know, even if

9    you're not sure Mr. Manafort individually didn't have an

10   obligation to do it, they didn't file it, and so maybe you

11   should consider it all together.

12          Or maybe the jury will mistake that and say, Well,

13   guess what?  The companies with his name in it didn't file.  So

14   that kind of gives me more comfort, even though I might not

15   otherwise find beyond a reasonable doubt on his individual

16   responsibility.

17          So, we would argue it's a backdoor 404(b) issue, Your

18   Honor.  It's not relevant because of the way they've charged

19   it.  And they've had already a year to supersede, if they

20   wanted to bring that charge.  And Judge Ellis noted that to

21   them.

22          And the fact that it would be highly prejudicial

23   because we wouldn't be able to tell whether the jury was making

24   the decision, Okay, there was a conspiracy for him to violate

25   his personal obligation and responsibility to file an FBAR, or

1    whether we're finding him guilty because those companies which

2    bear his name, and of which he has some ownership, failed to

3    file.

4           THE COURT:  Well, I think the allegation is that he

5    was conspiring to hide these assets and their source from the

6    Department of Treasury and the Department of Justice, and

7    conspiring with others, including his business partner.

8           So, I'm not sure why the fact that the entities

9    didn't file them either is unduly prejudicial under those

10   circumstances.  Seems to be relevant to the -- to Count 1.  I

11   mean, in Virginia there were substantive FBAR counts alleging

12   that he violated his personal responsibility to do that.  And,

13   so, I hear your argument more with respect to that than with

14   respect to this indictment, the way it's drafted.

15          MR. ZEHNLE:  Well, Your Honor, I think my response

16   would be, first of all, that's assuming something.  That's

17   assuming that he even had a responsibility to file on behalf of

18   those companies.

19          For example, I mean, there are numerous corporations,

20   large and small, that have obligations to file FBAR reports,

21   right?  But a company, as you know, can't act but through its

22   individuals, people, right?  And there might be particular

23   people, like a treasurer, a secretary of a corporation that

24   might be a person that is specifically tasked with filing that.

25          THE COURT:  But if a company can only act through its

1     people, which way does that cut?

2            MR. ZEHNLE:  Well, it cuts for the defense, Your

3     Honor, because there's no evidence whatsoever, and they didn't

4     present any evidence that -- and they have not charged that

5     Mr. Manafort had the responsibility for filing for those

6     companies.  Now they're trying to, basically, come back and fix

7     a fatal flaw in their conspiracy theory by saying, We should be

8     allowed to put that evidence in, too.

9            But there's no evidence that Mr. Manafort was the one

10    who was responsible for fling those particular FBAR reports,

11    either for DMP or DMP International.

12           THE COURT:  Well, does he have to have been

13    personally responsible for it to be relevant to the conspiracy

14    charge?  I can understand that he would have to be personally

15    responsible for it to be relevant to the individual failure to

16    file charge.

17           MR. ZEHNLE:  Well, I don't want to conflate the --

18    what I call the client conspiracy relating to the impediment --

19    the impairment and impediment of the IRS versus the specific

20    object that they've alleged in their conspiracy, which is he

21    conspired to violate the FBAR regulations.  He, Mr. Manafort.

22    Personally.

23           THE COURT:  Conspired?

24           MR. ZEHNLE:  Yes.

25           THE COURT:  He personally conspired.

 1              MR. ZEHNLE:  He conspired --

 2              THE COURT:  You don't personally have to have the

 3     obligation to conspire.

 4              MR. ZEHNLE:  Well, their argument is he conspired

 5     with others, you know, presumably Mr. Gates and others to fail

 6     to file his own personal FBARs.  They did not charge -- and you

 7     can look through the conspiracy.  They did not charge that, Oh,

 8     he also conspired to fail to file or omit filing for these

 9     particular entities.

10              And I do think there's a real concern that if you

11     start lumping in information that is not relevant to the charge

12     that has been brought against him, that the jury can become

13     confused and it can be misleading to them.  Oh, well, gee, the

14     corporations, the companies, the entities didn't file, so,

15     therefore, you know, Mr. Manafort should be responsible for

16     that.

17              They didn't charge that.  If they want to talk about

18     that, they can make arguments that he was a signatory, he had

19     more than 50 percent ownership.  I mean, there are other ways

20     under the FBAR regulation, which this Court's very familiar

21     with.  They're complicated, but there are ways that an

22     individual is held responsible for the failure to file for an

23     entity.

24              There's ways to do that without saying, Oh, I'm just

25     going to put into evidence that the entity itself failed to

1    file, and I don't have any evidence whatsoever that this person

2    was the specific corporate individual responsible for filing.

3              THE COURT:  All right.  Would you happen to know --

4    I'm paying attention to you, and I'm not just playing with the

5    computer here -- what docket number the superseding indictment

6    is?  Because I didn't bring it on to the bench with me.

7              MR. WEISSMANN:  Your Honor, it's --

8              MR. ZEHNLE:  318, Your Honor.

9              THE COURT:  I'm sorry?

10             MR. ZEHNLE:  Docket Number 318 in this case, Your

11   Honor.

12             THE COURT:  The case number I know by heart.

13             All right.  On Count 1, it says:  In furtherance of

14   the conspiracy, Manafort and his coconspirators committed the

15   overt act noted in Count 4, and the overt act, among others,

16   set forth in paragraphs -- all right.

17             So do we know which paragraph is the FBAR paragraph?

18             MR. ZEHNLE:  Your Honor, I believe it's Paragraph 35.

19   Well, I mean, there are introductory paragraphs at 32 and 33

20   and 34.

21             THE COURT:  Yeah.  All right.  But, yeah, I think it

22   starts -- all right.

23             All right.  Let me hear from whoever is going to talk

24   about this.

25             MR. WEISSMANN:  Your Honor, there is a couple legal

1      arguments, and there's a factual point I would like to make.

2              So, first, this evidence comes in simply as a way of

3      showing intent and a lack of mistake, that this was not an

4      accident.  If you have a scheme to keep foreign bank accounts

5      away from the knowledge of the Treasury Department precisely

6      because you are not paying your taxes, it would be highly

7      relevant to the jury.

8              If, for instance, the shoe was on the other foot, and

9      Mr. Manafort did not personally report these but his companies

10     did, it would be absurd for the Government in that situation to

11     say, Well, no, you can't bring that out.  Because it would

12     clearly go to his intent.

13             Here, it's the converse; which is, it's clearly

14     relevant to the jury that he is going to make sure that

15     companies he controlled did not report the same foreign bank

16     accounts that are at issue here and that are alleged in the

17     indictment.

18             Second, this is not a backdoor 404(b); we actually

19     argued 404(b).  It's a front door 404(b) that, even if the

20     Court does not agree with the first argument about it going to

21     intent and lack of mistake, that this is something that's

22     entirely relevant.

23             And, again, we have submitted to the Court the

24     arguments that were made by the defense in the Eastern District

25     of Virginia.  And one of the questions, I think, that's

1    pertinent is, are they going to make a similar kind of

2    argument?  Because that clearly would open the door to us being

3    able to respond.

4           There were arguments about these are complicated

5    rules, that the companies were the ones that needed to file,

6    and opening the door to the idea that they had filed, in which

7    the Government wanted to say, No, they didn't file.  There was

8    an issue about what were the rules with respect to a 50/50

9    company.

10          I do want to raise for the Court the factual issue

11   about, Oh, these are, somehow, companies and Mr. Manafort

12   doesn't --

13          THE COURT:  Well, then, does this need to come in

14   before they make that argument?

15          MR. WEISSMANN:  Well, that's why I started with the

16   argument that I think it's relevant to intent.  I don't think

17   it's one we're entitled to do regardless of what they argue,

18   but I do think if this is something that they're planning on

19   doing, that makes it, then, clearly, a, sort of, an easy call,

20   I think, for the Court.

21          I do want to point out that the -- both Davis

22   Manafort Partners and what's called DMI, Davis Manafort

23   International, are companies that are controlled and alleged to

24   be controlled by the defendant.

25          As -- and one factual issue I do want to note, just

1      so the record is clear, is that with respect to DMI, Davis

2      Manafort International, the -- Mr. Manafort has two identical,

3      but for one fact, corporate papers for DMI.  One set --

4               THE COURT:  Say that again.

5               MR. WEISSMANN:  So there are identical corporate

6      formation documents for DMI, except for one thing.  And I just

7      want to make sure the Court is aware of that.

8               They have the same date.  They are identical in all

9      language, except for the ownership.  So, Mr. Manafort filed

10     with the Department of Justice, when he did his corrective FARA

11     filing in 2017, a DMI corporate formation document that said

12     that it was a company that is 100 percent owned by

13     Paul Manafort.

14              He also, however, has documents that he provided to

15     his tax preparers because he -- in doing his tax returns for

16     DMI, the tax preparers had a corporate formation document dated

17     the same date that said it was 50 percent owned by Mr. Manafort

18     and 50 percent owned by Mrs. Manafort.

19              I just want to make sure that Your Honor is aware of

20     that discrepancy.  I don't think that legally it makes a

21     difference because he was in control of the company in either

22     way.  We will argue at trial that there are reasons for that,

23     for why there are those two sets of documents.

24              But, in either case, both Davis Manafort Partners and

25     DMI, that are entities alleged in the indictment, are

1    corporations that were controlled by Mr. Manafort.  Thus, to

2    us -- although it's not necessary, as the Court noted, we do

3    think, here, it's not like we're saying as part of the

4    conspiracy somebody else would have made the decision for Davis

5    Manafort Partners or DMI; it is Mr. Manafort who is making

6    those decisions.

7              THE COURT:  All right.  Thank you.

8              Let me ask you a question, Mr. Zehnle.

9              If the defense were to argue, Well, clearly, given

10   the structure of these companies, the structure of these

11   accounts, he didn't have an obligation to file this report,

12   someone else did.  Maybe it was the company.  Why isn't the

13   evidence that they are seeking to introduce relevant at that

14   point?

15             MR. ZEHNLE:  Well, I think what Your Honor was

16   getting to a moment ago, this seems like it's an anticipatory

17   rebuttal.  That's what it seems like.  They're, basically,

18   trying to get you, at the initiation of this case, to do a

19   motion in limine, to, basically, say, We're allowed to put that

20   in, when there -- you know, if that argument comes up, then I

21   think there is a discussion to be had:  Is it rebuttal?  It's a

22   great justice system we have.

23             THE COURT:  Is it?

24             MR. ZEHNLE:  Yeah.

25             THE COURT:  I am asking you.

1          MR. ZEHNLE:  Well, I mean, it depends, right?  I

2     mean, I can't -- Your Honor --

3          THE COURT:  Well, I mean, they're not.

4          MR. ZEHNLE:  -- I can't anticipate all the ways

5     that -- I just can't.

6          THE COURT:  Right.  They're not just, in a vacuum,

7     conjuring up what you might say.  While the jury isn't going to

8     be aware of this, we're all aware that there is a record of

9     what you might say because it's what you did say.  So, I

10    haven't decided yet whether it's something that comes in before

11    you've opened the door, or not.  I'm thinking about that.

12         But my question is:  Putting aside whether they can

13    do it on an anticipatory basis, once it pops up, what would be

14    the rationale for it not being admissible at that point?

15         MR. ZEHNLE:  I mean, it's a fair question, Your

16    Honor, but I think I have to go back to what I said before.

17    It's hard for me to do it in a hypothetical situation, to say,

18    you know, how does it come in?  How is it argued by defense?

19    How might it come up in a cross-examination?  I'm not sure

20    exactly.

21         What I do know is that it wasn't charged conduct.

22    And, you know, despite what Mr. Weissmann said, I mean, the

23    Government's primary argument in its motion was the evidence is

24    admissible, you know, because it's not other act evidence,

25    right?  And then the fallback is the 404(b).

1          But here's my real issue with this:  They're saying

2     that this is relevant to his intent.  What is relevant?  The

3     failure of the company to file an FBAR, an act of omission

4     which, as the Court knows, can go back more than a dozen years,

5     and they're trying to say that that company's failure to -- in

6     fact, we don't know whether or not the company even had an

7     obligation to file back then.  But they're saying that fact,

8     because we're going to present this certificate and tell you

9     these companies didn't file from 2006 on, they're going to say

10    that's relevant of Mr. Manafort's intent.

11         We don't know if the company even had a

12    responsibility.  If the company did have a responsibility, we

13    don't know if it was Mr. Manafort's responsibility back in 2006

14    or not, whether or not he was the one who was tasked with doing

15    that.

16         THE COURT:  You don't have to be tasked with doing it

17    if it's your company, do you?

18         MR. ZEHNLE:  Companies all the time assign

19    individuals, as we were talking about before, who have the

20    responsibility for filing the forms, right?  Company's act

21    through people.  It might not be the owner of the company.  I'm

22    sure that the CEO of, you know, pick a company -- Microsoft --

23         THE COURT:  Well, we're not talking about Microsoft.

24    We're talking about a small company --

25         MR. ZEHNLE:  The policy is still the same, right?  I

1    mean, the idea is that the CEO might not have that

2    responsibility.  There might be other --

3              THE COURT:  The CEO is different from the owner,

4    isn't it?

5              MR. ZEHNLE:  Oh, sure.  In a public company,

6    obviously, we're dealing with shareholders.  And, of course,

7    the shareholders don't have that.

8              THE COURT:  All right.

9              MR. ZEHNLE:  But I'm just trying to make the point

10   that the responsibility for those regulatory filings might be

11   vested in someone else, other than the defendant, and they're

12   just simply, in their argument, assuming that he's the one who

13   has to file on behalf of the company.

14              If they want to make the arguments that Mr. Manafort,

15   as an individual, for various reasons, had his own personal

16   responsibility because he owned, you know, 100 percent -- and,

17   by the way, I would take some issue with the FARA filing, Your

18   Honor.  But this is not a -- I know the Court is not going to

19   be addressing facts here.

20              I'm not sure that the FARA filing that Mr. Weissmann

21   referred to and the way that the question is asked about

22   ownership is exactly the same as what we -- what I would

23   consider beneficial ownership.  I would like the Court at least

24   to be able to go back and look at that, if we were going to

25   address a factual issue.  But that's more of an aside.  Because

 1    they might have worded it a little differently for the FARA

 2    filing, the question.

 3              MR. WEISSMANN:  Can I just clarify that?

 4              MR. ZEHNLE:  Sure.

 5              THE COURT:  A --

 6              MR. WEISSMANN:  The actual document was filed by

 7    Mr. Manafort's counsel in June of 2017.  It's not a wording

 8    issue.

 9              THE COURT:  All right.

10              MR. WEISSMANN:  The actual document was filed.

11              MR. ZEHNLE:  No.  The question, the question posed on

12    the document.

13              THE COURT:  All right.  I don't think that is what

14    this is going to rise or fall on.  All right.

15              So do you have anything else you want to say about

16    this particular motion in limine?

17              MR. ZEHNLE:  No, Your Honor.

18              THE COURT:  Okay.  I'm going to take this one under

19    advisement.  I want to look at the transcripts that were

20    attached again.

21              So, I think I've ruled on all of them, except the

22    Government's selective prosecution, because I want to wait and

23    hear what the defense has to say.  And this one I need to think

24    about and look at the materials again.  And so, I think, with

25    that, I've dealt with every pending motion in limine.

1          I have a few other issues that I want to talk about

2     that no one else has raised.

3          There was testimony in the prior trial concerning --

4     well, is Mr. Gates -- do you know yet, is he going to testify

5     again or not?

6          MR. WEISSMANN:  We do not know yet.

7          THE COURT:  All right.  If he does, there was

8     testimony in the prior trial concerning infidelity.  I'm not

9     suggesting that it came in inappropriately or that it was of

10    any wrongdoing or any violation of any representation made to

11    the Court about where the defense was planning to go and what

12    it wasn't going to get into.

13         As I understand it, again, from my limited knowledge

14    of the accounts of the trial, it -- the witness offered it up

15    in response to a general question asked by the defense about a

16    secret life.  And the defense did not ask the question directly

17    that it said it wasn't going to get into.  At least that's my

18    understanding.

19         Am I right about that, Mr. Downing?

20         MR. DOWNING:  That's correct, Your Honor.

21         THE COURT:  All right.

22         MR. DOWNING:  As an initial matter.

23         THE COURT:  Okay.  And then there was a later

24    follow-up question that brought up that the evidence might be

25    more extensive than what had been volunteered by the witness.

1          I do not believe that this evidence is relevant to

2     his credibility and I don't see any reason why there should be

3     any questioning related to it.  And so, I think, if there are

4     aspects of secret wrongdoing that the defense wants to inquire

5     about, it can say, You had your hand in the cookie jar.  You

6     were making withdrawals that you hadn't discussed with

7     Mr. Manafort.  Whatever the other evidence is.

8          But, I think I'm going to exclude, unless you can

9     tell me why it goes to his credibility, any evidence related to

10    affairs or infidelity.  I think if the shoe were on the other

11    foot, you would be making the same argument.  Anybody in any

12    trial would be making the argument that that's not grist for

13    cross-examination.

14         And I would caution you not -- as you transition from

15    one area to cross or another, if you want to get into

16    unauthorized financial dealings, that you put that into your

17    transitional question so the witness knows where you're headed.

18    But, I think, you can let the witness know that he doesn't have

19    to volunteer this information, because I don't think it's

20    relevant.

21         Is there any objection to that instruction from the

22    defense?

23         MR. DOWNING:  Your Honor, just as a general

24    admission, we were in agreement that we aren't the morality

25    police.  We were asking the question as it pertained to him

1    living beyond his means and maintaining a flat in London and

2    taking fancy trips and going to fancy restaurants that were

3    separate and apart from his life in Richmond.  And that was our

4    goal in -- when --

5          THE COURT:  I'm not suggesting that you engaged in

6    any wrongdoing.

7          MR. DOWNING:  No.  I understand that.  But it got

8    complicated because then the witness, Mr. Gates, started lying

9    about it.  And that's where, I think, it became relevant that

10   he was lying.  Because what he had said on the stand -- and,

11   again, this was not where we were going with it, but:  I had

12   one indiscretion for a few months and my wife knows about it,

13   and it wasn't actually true.

14         He had made disclosures about, you know, over a

15   period of time there being a lot of that.  So we agreed, from

16   the standpoint of the cross of him, we were just pointing out,

17   and he ultimately said he was living beyond his means.

18         So we're in agreement.  I guess I just don't know,

19   when you have a live witness on the stand and he decides he's

20   going to lie under oath about only having one, I'm more than

21   happy next time to come up to the Court, if the Court has any

22   instruction of what we do at that point.

23         THE COURT:  Absolutely.  Well, and what I'm saying

24   is, I think, the one came out in response to your general

25   entrée -- again, I wasn't there.

1          MR. DOWNING:  Yeah.

2          THE COURT:  And I could be incorrect, but I think

3   there was a question of, You have a secret life, don't you?  Or

4   something that had the word "secret" in it.

5          MR. DOWNING:  Yeah.  Yep.

6          THE COURT:  And he thought the jig was up and he was

7   going to have to answer.  And so, as you say, he answered, but

8   he only gave you a half an answer.

9          MR. DOWNING:  Well, he actually lied, Your Honor.

10  But what I'm saying to you is, I'm in total agreement, we're in

11  total agreement.

12         But if he's on the stand and he lies, then we're

13  certainly going to approach and say, Well, now, what do we do

14  with him?

15         THE COURT:  Well, I think if he lies about that

16  issue, I think the goal is that we don't get into that issue.

17  I think you're welcome to get into financial irregularities and

18  unauthorized disbursements that he made, and that the knowledge

19  of those things was one of the things that was on the table in

20  making his deal.

21         You can cross-examine a cooperator up one side and

22  down the other without getting into his marital history, and I

23  don't want you to do it.  If for some reason --

24         MR. DOWNING:  Agreed.

25         THE COURT:  -- you believe he has opened the door,

1    before you ask the next question, you come to the bench and you

2    ask me.

3              MR. DOWNING:  Understood, Your Honor.

4              THE COURT:  All right.

5              MR. DOWNING:  Thank you.

6              THE COURT:  And, I think, to be fair, it's the fact

7    of the money flow to both of them, as opposed to the details of

8    how they allegedly spent it, that's relevant in this case.  I

9    understand that part of the Government's case is that money

10   went to this vendor and this vendor and this vendor and this

11   vendor.  But I don't think we need to belabor the expensive

12   nature of what was purchased.

13             The point is that the money went to the vendor and

14   went on his behalf and it wasn't taxed.  And I think this is

15   the flip side, this is what he was doing with the money.  And,

16   so, I understand that the money trail is important, and that

17   you can get into it to some extent, but I think we can turn

18   down the volume on some of that.

19             MR. WEISSMANN:  So, Your Honor, we have -- in an

20   effort to streamline that aspect of the case, we have done just

21   that.  We have very few live vendors who we are planning on

22   calling.  We have proposed stipulations for a whole series of

23   vendors, including ones that testified in the Eastern District

24   of Virginia.

25             The one aspect, again, that I don't think would

1    violate the letter or spirit of what the Court is saying is

2    that it is important that the money is being spent on personal

3    items, that these are not business expenses.  But, again, that

4    doesn't --

5              THE COURT:  And I'm not precluding any evidence of

6    where the money went.  But I think you understand I'm talking

7    about emphasis and how much time is spent dwelling on that sort

8    of thing.  All right.

9              An issue came up in the prior trial about the

10   definition of the term "oligarch" and whether it had a

11   pejorative connotation that meant it should be avoided.  It's

12   my understanding that it is a term that has a meaning that is

13   specific.  But I also do believe it's fair to say that,

14   perhaps, not everyone knows what it is.

15             So, that is something where if the term is going to

16   come up, money flowed from a Ukrainian oligarch, or money

17   flowed from a Russian oligarch to this Cypriot account or that

18   Cypriot account or this defendant or this person for this

19   purpose, it would be helpful to have a definition of which the

20   Court can take judicial notice, or a stipulation, so that

21   you're not letting the jury make their own conclusion that it's

22   a bad thing, a good thing, what it is.

23             And if you're using the term incorrectly, to simply

24   refer to a well-heeled foreign individual, then maybe you

25   shouldn't use it.  But, I think there has to be some clarity

1    when the word comes in evidence, or in argument, as to what it

2    means and not leaving it as a mystery.

3            And, Mr. Downing, you look like you're objecting to

4    that.  But I think it would be useful for --

5            MR. DOWNING:  Your Honor, I was trying to have no

6    expression.  I was just --

7            THE COURT:  Okay.  That's all right.  And to be

8    fair -- first of all, there's no jury in the box.  And to be

9    fair, you're not the only person in the courtroom, and it's not

10   only on your side of the courtroom where people are reacting to

11   what's going on this morning.

12           So, everybody needs to understand that you're really

13   sitting close to the jury box, and what is perfectly fine with

14   me at the moment isn't fine with me when they're in the box.  I

15   am an expressive human being, and I've managed to control

16   myself during jury trials, and I expect you all to do the same.

17           MR. DOWNING:  Of course.

18           Your Honor, the only issue I would like to raise is,

19   as an evidentiary issue, I'm not sure how the Government would

20   set out to establish any particular person as an oligarch.  So

21   I do agree coming to some definition or understanding what it's

22   going to mean.

23           But just from a standpoint of evidentiary, how do you

24   establish that Person P is what you're saying that person is?

25   Because, I think, the common usage in the press is not really

1       what governs whether or not you're going to give a definition

2       to somebody.  And I think in the last trial, the compromise

3       was, you know, a wealthy Ukrainian businessman.  But I'm not

4       sure how that definition would comport with what is the

5       definition of an oligarch.

6               And that's why I was just thinking to myself, Well,

7       how do we define that?  But I understand.

8               THE COURT:  All right.  Well, and we may not need to.

9       I think it was relevant in connection with the motion to

10      dismiss.  It may not be relevant in connection with the charges

11      in this case, whether there is a governmental connection of the

12      businessman, which, I believe, is what oligarch connotes.

13              So I just want everybody to think about it.  But if

14      you're going to use it, I don't think we should leave it up to

15      the understanding of the average juror to know what it means.

16      And then, if it does have a specific meaning that you have all

17      agreed to, then whether it's relevant or not.  If it's not

18      relevant, we don't need to use it.

19              I'm not concerned that it connotes criminality.  I

20      don't believe it does.  But it could give rise to confusion

21      because it's not a term that everybody has common knowledge of

22      what it means.

23              MR. DOWNING:  Thank you, Your Honor.

24              THE COURT:  All right.

25              On that note, I think, similarly, I think the issue

1    with respect to the work done on behalf of Yanukovych or the

2    Party of Regions and reports that were prepared, I don't think

3    either side should be characterizing the work as being done

4    advancing the cause of freedom and democracy and stamping out

5    corruption or not.

6              I don't think we are going to get into the merits of

7    the underlying Ukrainian politics.  We are not going to try who

8    is more corrupt or who is more -- the better candidate for the

9    Ukrainian people, Yanukovych versus Tymoshenko.  There's not

10   going to be any evidence in the record to support broad

11   generalizations about either one of them.

12             I think the issue is whether the type of work that

13   was performed on behalf of the Party of Regions and on behalf

14   of Yanukovych and the opposition block was the type of work for

15   which one had to register as a foreign agent under the statue.

16             But, I think, and I could be incorrect, that there

17   were some broad statements about so-and-so was fighting for

18   this, that, or the other.  And I just don't think there's going

19   to be a factual record on who the good guy is and who the bad

20   guy is.  I think the point is, there were different parties and

21   he either was working on their behalf and doing lobbying in the

22   United States or he wasn't.

23             But I don't think we want to start spinning which is

24   the good guy and which is the bad guy here because I think

25   that's -- for either side, there won't be evidence to support

1     it and it would be irrelevant and possibly prejudicial.

2                 Mr. Weissmann, you want to say something?

3                 MR. WEISSMANN:  We agree with that.  But the one

4     thing that I think will be impossible to sanitize is that there

5     will be evidence in the record with respect to what the various

6     lobbyists were lobbying about.

7                 So to give the Court one vignette -- it's one of

8     many -- but, there was a Durbin resolution in the fall of 2012,

9     which was condemning the Party of Regions and Yanukovych with

10    respect to the treatment of Tymoshenko and her imprisonment.

11    There was extensive lobbying orchestrated, as we contend, by

12    Mr. Manafort to defeat that resolution.

13                So, that back and forth will be before the jury in

14    terms of what was being lobbied for and why it was important to

15    lobby on that issue; in other words, what was the interest that

16    Ukraine had?  Why were they concerned about this?  And what

17    steps did they take?

18                We do not intend to get into a battle of, Was that

19    the correct view of Mr. Yanukovych?  Was he, in fact, trying to

20    get Ukraine to be closer to the EEU?  Or was he really just a

21    puppet of the Russian regime?

22                The underlying truth is not something we're getting

23    into.

24                THE COURT:  That's my point; I don't want anybody

25    just standing up and opening or closing and making broad

1    statements about the merits of the two parties.  I just think

2    that it's not going to have an evidentiary underpinning.

3         MR. WEISSMANN:  We completely agree.  The reason I

4    just wanted to make sure the Court was aware there would be --

5    the lobbying effort, though, was on behalf --

6         THE COURT:  To advance one party's point of view

7    about their party.

8         MR. WEISSMANN:  Exactly.  And we were not going to

9    get into -- what our view is, a rabbit hole of the debate of

10   whether that, in fact, was Mr. Yanukovych's true intent and was

11   Ms. Tymoshenko going to be more pro-western?  All of that is

12   really irrelevant to the charge.  It doesn't matter what

13   position they were taking and where they wanted to end up, they

14   still would have to have registered.

15        THE COURT:  All right.  Mr. Downing, do you

16   understand kind of where I'm headed here?

17        MR. DOWNING:  I do.  I do.  But I think the

18   Government did a good job of introducing some of it.  But some

19   of the witnesses that are being called specifically go to this

20   issue with Tymoshenko.  It's a series of witnesses that they're

21   calling in, and there was a report written and there was

22   various statements made to the press and different things.  So

23   I think that is going to come in.

24        The other part of it, where it is going to come in,

25   is the Government has alleged that Mr. Manafort was concealing

1    his activities from the United States government.  And, in

2    fact, Mr. Manafort had regular contact with the State

3    Department folks, and some of that correspondence also

4    indicates this -- whether it's EEU leaning or not.  But we do

5    agree, we're not here to argue the merits of what was going on.

6    But I do think quite a few witnesses the Government is

7    intending to call and documents they're intending to use

8    highlight these issues as they were going on.

9            THE COURT:  I think, obviously, we have to get into

10   the fact that the law firm was hired to write a report.  But I

11   don't think whether the report was accurate, that's not what I

12   want to get into.  Whether by taking on this representation the

13   defendant was, you know, a freedom fighter, fighting on behalf

14   of other freedom fighters, that's the point where, I think, it

15   can go too far.

16           MR. DOWNING:  Understood.

17           THE COURT:  All right.

18           I think that's everything I had to say about evidence

19   and argument that could come up.  I did want to briefly talk

20   about a few jury selection issues.

21           The jury questionnaire has now been distributed.  I

22   believe the proposed jury questionnaire was docketed, but there

23   were some changes made to it.  A discussion about what was

24   going to be in it was on the record and public.  So it would be

25   my inclination to docket the -- a sample jury questionnaire.

1        But one question I had was whether anybody had any

2   objection to that.  And, in particular, is there any reason why

3   the list of witnesses -- which weren't necessarily listed as

4   witnesses, they were listed as people associated with the

5   case -- needs to be redacted at this time, or whether I can

6   just docket the jury questionnaire?

7        MR. WEISSMANN:  We have no objection to you docketing

8   the questionnaire.  And the list that we prepared was not

9   intended to be a list of witnesses.  It was a list of prominent

10  names that we thought would come up during the trial.

11       THE COURT:  Could come up in the trial.

12       MR. WEISSMANN:  Yes.

13       THE COURT:  All right.  Does the defense have any

14  objection to the jury questionnaire, the blank one, being part

15  of the record?

16       MR. DOWNING:  No objection.

17       THE COURT:  Okay.  I believe I've provided to you

18  some details about how I go about the voir dire selection

19  process.

20       Are there any questions about that?

21       MR. WEISSMANN:  No, Your Honor.

22       MR. DOWNING:  No, Your Honor.

23       THE COURT:  Okay.  I think we've talked about the

24  fact that the individual follow-up voir dire will happen.  It's

25  not going to happen in this courtroom, but it's going to be a

1    closed courtroom.  I asked at the last hearing whether

2    Mr. Manafort had any objection to that portion of the

3    proceedings not being public, and you said no, but he wasn't

4    here.

5            And I know he's waived his presence because he trusts

6    your judgment, but I think it would be helpful to have him note

7    in writing that he has no objection to the closing of the

8    courtroom for the purposes of the individual follow-up.

9            MR. DOWNING:  We'll do that.  Thank you, Your Honor.

10           THE COURT:  All right.  With respect to the pending

11   venue motion, does the defendant intend to reply to the

12   opposition?

13           MR. WESTLING:  No, Your Honor.

14           THE COURT:  So, I believe you made your record, and I

15   will put my reasons in writing.  But just so everybody needs to

16   know whether they're packing a suitcase or not, it is my

17   intention to deny the motion.  I don't believe that, as yet,

18   the defense has put forward data or facts that indicate we

19   won't being able to impanel a fair jury that is either unaware

20   of or unaffected by the publicity to date.

21           The motion appears to be predicated primarily based

22   on concerns based upon the political affiliation of the D.C.

23   population, as opposed to demonstrated bias.  And I don't

24   believe that's a lawful basis for a venue transfer request, or

25   even that the assumption that party affiliation necessarily is

```
 1   a predictor of bias is substantiated.

 2            But, as I've stated before, if the jury

 3   questionnaires or our efforts at individual follow-up reveal

 4   that we can't qualify a sufficient number of jurors, then I

 5   will revisit the issue at that time.

 6            And maybe if you proposed, I don't know, Hawaii

 7   instead of Roanoke --

 8            MR. WESTLING:  We're open to suggestions, Your Honor.

 9            THE COURT:  All right.  Assuming that we're having a

10   continued pretrial conference to talk about exhibits next week,

11   is there anything further that I need to take up today?

12            MR. WESTLING:  Yes, Judge.

13            THE COURT:  Okay.

14            MR. WESTLING:  I would like to hand up to the Court a

15   document which we got from the defense.  And although we

16   appreciate that we have worked well with the defense --

17            THE COURT:  All right.  Do they know you're about to

18   show me this?

19            MR. WEISSMANN:  Yes.  It's from them.

20            THE COURT:  That's a different question.

21            MR. WEISSMANN:  Yeah.  I'm going to give them a copy.

22            THE COURT:  No.  Do they know whatever is in this

23   e-mail that's going between the two of you, that you're

24   planning to present it to me in open Court?

25            Can you just confer with them before you tell me what
```

1      you're going to tell me before I get involved?

2                MR. WEISSMANN:  Sure.  Sure.

3                (Off-the-record discussion.)

4                MR. WEISSMANN:  Judge, I think they understand.

5                Expert notice was supposed to be given in this case.

6      As the Court has given the defense a number of different

7      deadlines for that, I'm not going to go over the record for

8      that, as the Court is aware of that.

9                We received a purported expert notice yesterday.  It

10     doesn't even have the name of the expert, let alone the CV or a

11     statement of what exactly the person would say that's either

12     relevant or the proper basis for expert testimony.

13               THE COURT:  All right.  Well, remind me, I think it

14     was Mr. Andres last time who stood up at the very end of the

15     status conference and said, We need to know, one way or the

16     other, if they're calling experts.  And I set a date for that.

17     And so that date was yesterday.

18               MR. WEISSMANN:  Yesterday.  Yes.

19               THE COURT:  Okay.

20               MR. WEISSMANN:  And it is now having -- we were

21     supposed to get this on August 1st.  It kept on being

22     continued.  And with the Court's, I think, indulgence to the

23     defense in light of the other trial, it was supposed to be

24     yesterday.

25               We do have a case to prepare for.  We were supposed

1   to get notice.  It is now -- we are started jury selection.

2   And the reason for handing up the document was simply so the

3   Court could see -- and we are happy to make a formal motion,

4   but I didn't want this to linger until next week because --

5          THE COURT:  All right.  Well, now that I know what it

6   is, I'm going to look at it.

7          (Pause.)

8          THE COURT:  All right.  And so your concern is that

9   this does not comport with the rule or my order?

10         MR. WEISSMANN:  Yes, Your Honor.

11         THE COURT:  All right.  Why does this comport with

12   the rule and my order?

13         MS. WESTLING:  Well, Your Honor, I guess I would be `

14   blunt in saying I'm not sure that it does.  The challenge is,

15   we're talking with an expert.  We do not have him retained yet

16   and, therefore, we are simply not in a position to fill out all

17   the things we need to do under Rule 16.  We did expeditiously

18   reach out, you know, when we determined we wanted this expert.

19   We've been trying to talk with him.  It's been over the Labor

20   Day weekend.

21         And so I know we're remiss in sort of having all the

22   details, but we provided what we could.  We still don't know

23   whether, in fact, we're going to be able to retain this person.

24   So that's where our problem comes from, which is also the

25   reason we haven't provided any identity at this point.

1          THE COURT:  All right.  Well, I appreciate your

2    candor.  I set yesterday because, I think, there is a point

3    where fairness to the Government gives them the right to be

4    prepared to respond to this testimony and to prepare their

5    expert based on the substance of this testimony.  This is very

6    general, but it doesn't indicate what the expert's opinions

7    are.  What you talk about more are fact issues, the

8    international banking system, money laundering programs.  So we

9    don't know yet whether you have an expert with opinions that

10   the defense -- I mean, the Government needs to confront.

11         MS. WESTLING:  Understood, Your Honor.

12         THE COURT:  What is your anticipated schedule for

13   when that would happen?  I set September 4th without asking

14   you, I recall.  I did it to be on parity with some of the dates

15   that you'd already asked for.

16         So, when do you think this line gets drawn?

17         MS. WESTLING:  Well, Your Honor, I guess -- I guess

18   what I would ask is this:  We are working in an effort to get

19   an answer from this person.  We expect that is not going to

20   happen -- we've been told that that's not going to happen

21   before Friday.

22         So what we would ask for is at least the opportunity

23   to present what we can by Monday, understanding that the

24   Government, at that point, can object.  They can say it's not

25   sufficient.  But we're simply -- we can't, obviously, provide

1     opinions that we don't yet have, and that's the dilemma.

2         THE COURT:  By the close of business on Monday, which

3     is, for some people, a holiday.  But, in any event, let's get

4     it transferred by that point.  You must identify for the United

5     States the witness and the substance of the opinions the

6     witness will be called to introduce.

7         That doesn't mean that the Government cannot object

8     at that time that the disclosure does not comply with Rule 16.

9     But disclosure thereafter will not comply with Rule 16.  I

10    think they have -- the fact that money laundering was part of

11    this case has been known since the original indictment.  So, I

12    think there's a point where you have an expert or you don't.

13    So, I think that's your deadline, Mr. Westling.

14        MS. WESTLING:  Your Honor, understood.  And we will

15    comply with the Court's order.

16        I guess I'm curious about one other question, which

17    is, the Government has provided us notice of various people

18    without indicating clearly whether they're going to be experts

19    or not.  I assume that should we have concerns about the

20    adequacy of that notice, we should also raise those as soon as

21    possible?

22        THE COURT:  Well, if there is any question about

23    which of the Government's experts -- and they all have

24    quizzical faces -- which of the Government's witnesses are

25    experts and which are not, that that probably could be resolved

1    in an e-mail exchange or a five-minute conversation between the

2    two of you.

3           If it turns out that there is someone that they tell

4    you in a conversation that I don't need to be privy to, that

5    can happen before you leave this room, that one of them is an

6    expert that you were unaware was an expert, or is giving

7    opinions that have not been provided to you, then you can let

8    me know that immediately.

9           MS. WESTLING:  Thank you, Your Honor.

10          THE COURT:  All right.  Is there anything -- I hate

11   to ask.  Is there anything else I should take up before we

12   break for --

13          MR. DOWNING:  We'll say no.

14          THE COURT:  All right.

15          MR. WEISSMANN:  No, Your Honor.

16          THE COURT:  Okay.  All right.  Thank you very much,

17   everybody.

18                              *   *   *

19

20

21

22

23

24

25

1

2                     CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5              I, JANICE DICKMAN, do hereby certify that the above

6       and foregoing constitutes a true and accurate transcript of my

7       stenograph notes and is a full, true and complete transcript of

8       the proceedings to the best of my ability.

9                            Dated this 5th day of September, 2018.

10

11

12                            /s/_____

13                            Janice E. Dickman, CRR, RMR
                              Official Court Reporter
14                            Room 6523
                              333 Constitution Avenue NW
15                            Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25