IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 17-201-1 (ABJ)(S-5) |
| | * | |
| v. | * | Violations: 18 U.S.C. § 371 |
| | * | |
| PAUL J. MANAFORT, JR., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | ******* | |

## SUPERSEDING CRIMINAL INFORMATION

The Special Counsel informs the Court:

1.    PAUL J. MANAFORT, JR. (MANAFORT) served for years as a political consultant and lobbyist.  Between at least 2006 and 2015, MANAFORT conspired with Richard W. Gates (Gates), Konstantin Kilimnik (Kilimnik), and others to act, and acted, as unregistered agents of a foreign government and political party.  Specifically, MANAFORT conspired to act and acted as an agent of the Government of Ukraine, the Party of Regions (a Ukrainian political party whose leader Victor Yanukovych was President from 2010 to 2014), President Yanukovych, and the Opposition Bloc (a successor to the Party of Regions that formed in 2014 when Yanukovych fled to Russia). MANAFORT generated more than 60 million dollars in income as a result of his Ukraine work. In order to hide Ukraine payments from United States authorities, from approximately 2006 through at least 2016, MANAFORT, with the assistance of Gates and Kilimnik, laundered the money through scores of United States and foreign corporations, partnerships, and bank accounts.

2.    In furtherance of the scheme, MANAFORT funneled millions of dollars in payments into

1

foreign nominee companies and bank accounts, opened by him and his underlings in nominee names and in various foreign countries, including Cyprus, Saint Vincent & the Grenadines (Grenadines), and the United Kingdom.  MANAFORT hid the existence of the foreign companies and bank accounts, falsely and repeatedly reporting to his tax preparers and to the United States that he had no foreign bank accounts.

3.      In furtherance of the scheme, MANAFORT concealed from the United States his work as an agent of, and millions of dollars in payments from, Ukraine and its political parties and leaders. Because MANAFORT directed a campaign to lobby United States officials and the United States media on behalf of the Government of Ukraine, the President of Ukraine, and Ukrainian political parties, he was required by law to report to the United States his work and fees.  MANAFORT did not do so, either for himself or any of his companies.  Instead, when the Department of Justice sent inquiries to MANAFORT in 2016 about his activities, MANAFORT responded with a series of false and misleading statements.

4.      In furtherance of the scheme, MANAFORT used his hidden overseas wealth to enjoy a lavish lifestyle in the United States, without paying taxes on that income.  MANAFORT, without reporting the income to his bookkeeper or tax preparers or to the United States, spent millions of dollars on luxury goods and services for himself and his extended family through payments wired from offshore nominee accounts to United States vendors.  MANAFORT also used these offshore accounts to purchase multi-million dollar properties in the United States.  Manafort then borrowed millions of dollars in loans using these properties as collateral, thereby obtaining cash in the United States without reporting and paying taxes on the income.  In order to increase the amount of money he could access in the United States, Manafort defrauded the institutions that loaned money on

2

these properties so that they would lend him more money at more favorable rates than he would otherwise be able to obtain.

5.     Manafort laundered more than $30 million to buy property, goods, and services in the United States, income that he concealed from the United States Treasury, the Department of Justice, and others.  MANAFORT cheated the United States out of over $15 million in taxes.

### Relevant Individuals And Entities

6.     MANAFORT was a United States citizen.  He resided in homes in Virginia, Florida, and Long Island, New York.

7.     In 2005, MANAFORT and another partner created Davis Manafort Partners, Inc. (DMP) to engage principally in political consulting.  DMP had staff in the United States, Ukraine, and Russia.  In 2011, MANAFORT created DMP International, LLC (DMI) to engage in work for foreign clients, in particular political consulting, lobbying, and public relations for the Government of Ukraine, the Party of Regions, and members of the Party of Regions.  DMI was a partnership solely owned by MANAFORT and his spouse.  Gates and Kilimnik worked for both DMP and DMI and served as close confidants of MANAFORT.

8.     The Party of Regions was a pro-Russia political party in Ukraine.  Beginning in approximately 2006, it retained MANAFORT, through DMP and then DMI, to advance its interests in Ukraine, including the election of its slate of candidates.  In 2010, its candidate for President, Yanukovych, was elected President of Ukraine.  In 2014, Yanukovych fled Ukraine for Russia in the wake of popular protests of widespread governmental corruption.  Yanukovych, the Party of Regions, and the Government of Ukraine were Manafort, DMP, and DMI clients.

9.     The European Centre for a Modern Ukraine (the Centre) was created in or about 2012 in

Belgium as a mouthpiece for Yanukovych and the Party of Regions.  The Centre was used by MANAFORT and others in order to lobby and conduct a public relations campaign in the United States and Europe on behalf of the existing Ukraine regime.  The Centre effectively ceased to operate upon the downfall of Yanukovych in 2014.

10.    MANAFORT owned or controlled the following entities, which were used in the scheme (the MANAFORT entities):

Domestic Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Daisy Manafort, LLC (PM) | August 2008 | Virginia |
| | March 2011 | Florida |
| Davis Manafort International LLC (PM) | March 2007 | Delaware |
| DMP (PM) | March 2005 | Virginia |
| | March 2011 | Florida |
| Davis Manafort, Inc. (PM) | October 1999 | Delaware |
| | November 1999 | Virginia |
| DMI  (PM) | June 2011 | Delaware |
| | March 2012 | Florida |
| Global Sites LLC (PM) | July 2008 | Delaware |
| Jesand Investment Corporation (PM) | April 2002 | Virginia |
| Jesand Investments Corporation (PM) | March 2011 | Florida |
| John Hannah, LLC (PM) | April 2006 | Virginia |
| | March 2011 | Florida |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Lilred, LLC (PM) | December 2011 | Florida |
| LOAV Ltd. (PM) | April 1992 | Delaware |
| MC Brooklyn Holdings, LLC (PM) | November 2012 | New York |
| MC Soho Holdings, LLC (PM) | January 2012 | Florida |
| | April 2012 | New York |
| Smythson LLC (also known as Symthson LLC) (PM) | July 2008 | Delaware |

### Cypriot Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Actinet Trading Limited | May 2009 | Cyprus |
| Black Sea View Limited | August 2007 | Cyprus |
| Bletilla Ventures Limited | October 2010 | Cyprus |
| Cavenari Investments Limited | December 2007 | Cyprus |
| Global Highway Limited | August 2007 | Cyprus |
| Leviathan Advisors Limited | August 2007 | Cyprus |
| LOAV Advisors Limited | August 2007 | Cyprus |
| Lucicle Consultants Limited | December 2008 | Cyprus |
| Marziola Holdings Limited | March 2012 | Cyprus |
| Olivenia Trading Limited | March 2012 | Cyprus |
| Peranova Holdings Limited | June 2007 | Cyprus |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Serangon Holdings Limited | January 2008 | Cyprus |
| Yiakora Ventures Limited | February 2008 | Cyprus |

### Other Foreign Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Global Endeavour Inc. (also known as Global Endeavor Inc.) | October 2012 | Grenadines |
| Jeunet Ltd. | August 2011 | Grenadines |
| Pompolo Limited | April 2013 | United Kingdom |

11.     The Internal Revenue Service (IRS) was a bureau in the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the Treasury.

### The Scheme

12.     Between in or around 2006 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, MANAFORT and others devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises from the United States, banks, and other financial institutions.  As part of the scheme, MANAFORT repeatedly provided false information to financial bookkeepers, tax accountants, and legal counsel, among others.

<u>MANAFORT's Wiring Of Money From Offshore Accounts Into The United States</u>

13.     In order to use the money in the offshore nominee accounts of the MANAFORT entities

without paying taxes on it, MANAFORT caused millions of dollars in wire transfers from these

accounts to be made for goods, services, and real estate.  He did not report these transfers as income

to DMP, DMI, or MANAFORT.

14.     From 2008 to 2014, MANAFORT caused the following wires, totaling over $12,000,000,

to be sent to the vendors listed below for personal items.  MANAFORT did not pay taxes on this

income, which was used to make the purchases.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **S.P.&C. Home Improvement Inc.** (Home Improvement Company in the Hamptons, New York) | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova Holdings Limited | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | Global Endeavour Inc. | Grenadines | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | **Total** | **$5,434,793** |
| **Big Picture Solutions** (Home Automation, Lighting and Home Entertainment Company in Florida) | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 8/28/2013 | Global Endeavour Inc. | Grenadines | $179,000 |
| | 10/31/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | 5/23/2014 | Global Endeavour Inc. | Grenadines | $99,960 |
| | 6/20/2014 | Global Endeavour Inc. | Grenadines | $62,960 |
| | | | **Total** | **$1,661,201** |
| **J&J Oriental Rug Gallery** | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Antique Rug Store in Alexandria, Virginia) | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | **Total** | **$934,350** |
| **Vendor D** (Related to J&J Oriental Rug Gallery) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | **Vendor D Total** | **$100,000** |
| **Alan Couture** (Men's Clothing Store in New York) | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |
| | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/25/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/17/2014 | Global Endeavour Inc. | Grenadines | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |
| | | | **Total** | **$849,215** |
| **Scott L. Wilson Landscaping** (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | **Total** | **$655,500** |
| **Vendor G** (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | Vendor G Total | $623,910 |
| Fashion World, Inc. d/b/a/ Bijan (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | Total | $520,440 |
| Aegis Holdings, LLC (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | Total | $500,000 |
| Paul Sabatello Construction (Contractor in Florida) | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | Total | $432,487 |
| New Leaf Landscape Maintenance LLC | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Landscaper in the Hamptons, New York) | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/25/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | 4/15/2014 | Global Endeavour Inc. | Grenadines | $33,211 |
| | 5/13/2014 | Global Endeavour Inc. | Grenadines | $30,965 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $26,769 |
| | | | **Total** | **$255,685** |
| **Don Beyer Motors, Inc.** (Payments Relating to three Range Rovers) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | **Total** | **$163,705** |
| **Federal Stone and Brick LLC** (Contractor in Virginia) | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |
| | | | **Total** | **$125,650** |
| **Sensoryphile, Inc.** (Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, New York) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | **Total** | **$112,825** |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **American Service Center Associates of Alexiandria** (Purchase of Mercedes Benz) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |
| | | | **Total** | **$62,750** |
| **Land Rover of Palm Beach** (Purchase of Range Rover) | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Total** | **$47,000** |
| **Vendor Q** (Property Management Company in South Carolina) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| **Vendor R** (Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| **Vendor S** (Housekeeping in New York) | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

15.     In 2012, MANAFORT caused the following wires to be sent to the entities listed below to purchase the real estate also listed below.  MANAFORT did not report the money used to make these purchases on his 2012 tax return.

| Property Purchased | Payee | Date | Originating Account | Country of Origin | Amount |
|---|---|---|---|---|---|
| Howard Street Condominium (New York) | DMP International LLC | 2/1/2012 | Peranova Holdings Limited | Cyprus | $1,500,000 |
| Union Street Brownstone, (New York) | Attorney Account Of [Real Estate Attorney] | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $299,500 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,800,000 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,200,000 |
| Arlington House (Virginia) | Real Estate Trust | 8/31/2012 | Lucicle Consultants Limited | Cyprus | $1,900,000 |

16.     MANAFORT also disguised, as purported "loans," more than $13 million from Cypriot entities, including the overseas MANAFORT entities, to domestic entities owned by MANAFORT. For example, a $1.5 million wire from Peranova Holdings Limited (Peranova) to DMI that MANAFORT used to purchase real estate on Howard Street in Manhattan, New York, was recorded as a "loan" from Peranova to DMI, rather than as income. The following loans were shams designed to reduce fraudulently MANAFORT's reported taxable income.

| Year | Payor / Ostensible "Lender" | Payee / Ostensible "Borrower" | Country of Origination | Total Amount of "Loans" |
|---|---|---|---|---|
| 2008 | Yiakora Ventures Limited | Jesand Investment Corporation | Cyprus | $8,120,000 |
| 2008 | Yiakora Ventures Limited | DMP | Cyprus | $500,000 |
| 2009 | Yiakora Ventures Limited | DMP | Cyprus | $694,000 |
| 2009 | Yiakora Ventures Limited | Daisy Manafort, LLC | Cyprus | $500,000 |
| 2012 | Peranova | DMI | Cyprus | $1,500,000 |
| 2014 | Telmar Investments Ltd. | DMI | Cyprus | $900,000 |
| 2015 | Telmar Investments Ltd. | DMI | Cyprus | $1,000,000 |
| **Total** | | | | **$13,214,000** |

MANAFORT's Hiding Of Ukraine Lobbying And Public Relations Work

17.     MANAFORT knew it was illegal to lobby government officials and engage in public relations activities (hereinafter collectively referred to as lobbying) in the United States on behalf of a foreign government or political party, without registering with the United States Government under the Foreign Agents Registration Act.   MANAFORT knew he was lobbying in the United States for the Government of Ukraine, President Viktor F. Yanukovych,  the Party of Regions, and the Opposition Bloc (the latter two being political parties in Ukraine), and thus he was supposed to submit a written registration statement to the United States Department of Justice. MANAFORT knew that the filing was required to disclose the name of the foreign country, all the financial payments to the lobbyist, and the specific steps undertaken for the foreign country in the United States, among other information.

18.     MANAFORT knew that Ukraine had a strong interest in the United States' taking economic and policy positions favorable to Ukraine, including not imposing sanctions on Ukraine. MANAFORT also knew that the trial and treatment of President Yanukovych's political rival, former Prime Minister Yulia Tymoshenko, was strongly condemned by leading United States executive and legislative branch officials, and was a major hurdle to improving United States and Ukraine relations.

19.     From 2006 until 2015, MANAFORT led a multi-million dollar lobbying campaign in the United States at the direction of the Government of Ukraine, President Yanukovych, the Party of Regions, and the Opposition Bloc.  MANAFORT intentionally did so without registering and providing the disclosures required by law.

20.     As part of the lobbying scheme, MANAFORT hired numerous firms and people to assist in

16

his lobbying campaign in the United States.  He hired Companies A, B, C, D, and E, and Law Firm A, among others, to participate in what he described to President Yanukovych in writing as a global "Engage Ukraine" lobbying campaign that he devised and led.  These companies and law firm were paid the equivalent of over $11 million for their Ukraine work.

21.     MANAFORT viewed secrecy for himself and for the actions of his lobbyists as integral to the effectiveness of the lobbying offensive he orchestrated for Ukraine.  Filing under the Foreign Agents Registration Act would have thwarted the secrecy MANAFORT sought in order to conduct an effective campaign for Ukraine to influence both American leaders and the American public.

22.     MANAFORT took steps to avoid any of these firms and people disclosing their lobbying efforts under the Foreign Agents Registration Act.  As one example, even though MANAFORT engaged Company E in 2007 to lobby in the United States for the Government of Ukraine, MANAFORT tried to dissuade Company E from filing under the Foreign Agents Registration Act.  Only after MANAFORT ceased to use Company E in the fall of 2007 did Company E disclose its work for Ukraine, in a belated filing under the Act in 2008.

23.     MANAFORT took other measures to keep the Ukraine lobbying as secret as possible.  For example, MANAFORT, in written communications on or about May 16, 2013, directed his lobbyists (including Persons D1 and D2, who worked for Company D) to write and disseminate within the United States news stories that alleged that Tymoshenko had paid for the murder of a Ukrainian official.  MANAFORT stated that it should be "push[ed]" "[w]ith no fingerprints."  "It is very important we have no connection."  MANAFORT stated that "[m]y goal is to plant some stink on Tymo."  Person D1 objected to the plan, but ultimately Persons D1 and D2 complied with MANAFORT's direction.  The Foreign Agents Registration Act required MANAFORT to disclose

17

such lobbying, as MANAFORT knew.  He did not.

The Hapsburg Group and Company D

24.     As part of the lobbying scheme, starting in 2011, MANAFORT secretly retained Company

D and a group of four former European heads of state and senior officials (including a former

Austrian Chancellor, Italian Prime Minister, and Polish President) to lobby in the United States

and Europe on behalf of Ukraine. The former politicians, called the Hapsburg Group by

MANAFORT, appeared to be providing solely their independent assessments of Government of

Ukraine policies, when in fact they were paid by Ukraine.  MANAFORT explained in an "EYES

ONLY" memorandum in or about June 2012 that his purpose was to "assemble a small group of

high-level European infuencial [sic] champions and politically credible friends who can act

informally and without any visible relationship with the Government of Ukraine."

25.     Through MANAFORT, the Government of Ukraine retained an additional group of

lobbyists (Company D and Persons D1 and D2).  In addition to lobbying itself, Company D secretly

served as intermediaries between the Hapsburg Group and MANAFORT and the Government of

Ukraine.  In or about 2012 through 2013, MANAFORT directed more than the equivalent of

700,000 euros to be wired from at least three of his offshore accounts to the benefit of Company

D to pay secretly for its services.

26.     All four Hapsburg Group members, at the direction, and with the direct assistance, of

MANAFORT, advocated positions favorable to Ukraine in meetings with United States

lawmakers, interviews with United States journalists, and ghost written op-eds in American

publications.  In or about 2012 through 2014, MANAFORT directed more than 2 million euros to

be wired from at least four of his offshore accounts to pay secretly the Hapsburg Group.  To avoid

European taxation, the contract with the Hapsburg Group falsely stated that none of its work would take place in Europe.

27.     One of the Hapsburg Group members, a former Polish President, was also a representative of the European Parliament with oversight responsibility for Ukraine.  MANAFORT solicited that official to provide MANAFORT inside information about the European Parliament's views and actions toward Ukraine and to take actions favorable to Ukraine.  MANAFORT also used this Hapsburg Group member's current European Parliament position to Ukraine's advantage in his lobbying efforts in the United States.  In the fall of 2012, the United States Senate was considering and ultimately passed a resolution critical of President Yanukovych's treatment of former Prime Minister Tymoshenko.  MANAFORT engaged in an all-out campaign to try to kill or delay the passage of this resolution.  Among the steps he took was having the Hapsburg Group members reach out to United States Senators, as well as directing Companies A and B to have private conversations with Senators to lobby them to place a "hold" on the resolution.  MANAFORT told his lobbyists to stress to the Senators that the former Polish President who was advocating against the resolution was currently a designated representative of the President of the European Parliament, to give extra clout to his supposedly independent judgment against the Senate resolution.  MANAFORT never revealed to the Senators or to the American public that any of these lobbyists or Hapsburg Group members were paid by Ukraine.

28.     In another example, on May 16, 2013, another member of the Hapsburg Group lobbied in the United States for Ukraine.  The Hapsburg Group member accompanied his country's prime minister to the Oval Office and met with the President and Vice President of the United States, as well as senior United States officials in the executive and legislative branches.  In written

communications sent to MANAFORT, Person D1 reported that the Hapsburg Group member delivered the message of not letting "Russians Steal Ukraine from the West."  The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew.  He did not.

Law Firm Report and Tymoshenko

29.     As another part of the lobbying scheme, in 2012, on behalf of President Yanukovych and the Government of Ukraine's Ministry of Justice, MANAFORT solicited a United States law firm to write a report evaluating the trial of Yanukovych's political opponent Yulia Tymoshenko. MANAFORT caused Ukraine to hire the law firm so that its report could be used in the United States and elsewhere to defend the Tymoshenko criminal trial and argue that President Yanukovych and Ukraine had not engaged in selective prosecution.

30.     MANAFORT retained a public relations firm (Company C) to prepare a media roll-out plan for the law firm report.  MANAFORT used one of his offshore accounts to pay Company C the equivalent of more than $1 million for its services.

31.     MANAFORT worked closely with Company C to develop a detailed written lobbying plan in connection with what MANAFORT termed the "selling" of the report.  This campaign included getting the law firm's report "seeded" to the press in the United States—that is, to leak the report ahead of its official release to a prominent United States newspaper and then use that initial article to influence reporting globally.  As part of the roll-out plan, on the report's issuance on December 13, 2012, MANAFORT arranged to have the law firm disseminate hard copies of the report to numerous government officials, including senior United States executive and legislative branch officials.

32.    MANAFORT reported on the law firm's work on the report and Company C's lobbying plan to President Yanukovych and other representatives of the Government of Ukraine.  For example, in a July 27, 2012 memorandum to President Yanukovych's Chief of Staff, MANAFORT reported on "the global rollout strategy for the [law firm's] legal report, and provide[d] a detailed plan of action[]" which included step-by-step lobbying outreach in the United States.

33.    MANAFORT directed lobbyists to tout the report as showing that President Yanukovych had not selectively prosecuted Tymoshenko.  But in November 2012 MANAFORT had been told privately in writing by the law firm that the evidence of Tymoshenko's criminal intent "is virtually non-existent" and that it was unclear even among legal experts that Tymoshenko lacked power to engage in the conduct central to the Ukraine criminal case.  These facts, known by MANAFORT, were not disclosed to the public.

34.    Manafort knew that the report also did not disclose that the law firm, in addition to being retained to write the report, was retained to represent Ukraine itself, including in connection with the Tymoshenko case and to provide training to the trial team prosecuting Tymoshenko.

35.    MANAFORT also knew that the Government of Ukraine did not want to disclose how much the report cost.  More than $4.6 million was paid to the law firm for its work.  MANAFORT used one of his offshore accounts to funnel $4 million to pay the law firm, a fact that MANAFORT did not disclose to the public.  Instead, the Government of Ukraine reported falsely that the report cost just $12,000.

36.    MANAFORT and others knew that the actual cost of the report and the scope of the law firm's work would undermine the report's being perceived as an independent assessment and thus being an effective lobbying tool for MANAFORT to use to support the incarceration of President

Yanukovych's political opponent.

37.     In addition to the law firm report, MANAFORT took other steps on behalf of the Government of Ukraine to tarnish Tymoshenko in the United States.  In addition to disseminating stories about her soliciting murder, noted above, in October 2012, MANAFORT orchestrated a scheme to have, as he wrote in a contemporaneous communication, "[O]bama jews" put pressure on the Administration to disavow Tymoshenko and support Yanukovych.  MANAFORT sought to undermine United States support for Tymoshenko by spreading stories in the United States that a senior Cabinet official (who had been a prominent critic of Yanukovych's treatment of Tymoshenko) was supporting anti-Semitism because the official supported Tymoshenko, who in turn had formed a political alliance with a Ukraine party that espoused anti-Semitic views.  MANAFORT coordinated privately with a senior Israeli government official to issue a written statement publicizing this story.  MANAFORT then, with secret advance knowledge of that Israeli statement, worked to disseminate this story in the United States, writing to Person D1 "I have someone pushing it on the NY Post.  Bada bing bada boom."  MANAFORT sought to have the Administration understand that "the Jewish community will take this out on Obama on election day if he does nothing."  MANAFORT then told his United States lobbyist to inform the Administration that Ukraine had worked to prevent the Administration's presidential opponent from including damaging language in the Israeli statement, so as not to harm the Administration, and thus further ingratiate Yanukovych with the Administration.

Company A and Company B

38.     As a third part of the lobbying scheme, in February 2012, MANAFORT solicited two Washington, D.C. lobbying firms (Company A and Company B) to lobby in the United States on

behalf of President Yanukovych, the Party of Regions and the Government of Ukraine.  For instance, in early 2012 at the inception of the relationship, Company B wrote in an email to its team about a "potential representation for the Ukraine," having been contacted "at the suggestion of Paul Manafort who has been working on the current PM elections."

39.     MANAFORT arranged to pay Companies A and B over $2 million from his offshore accounts for their United States lobbying work for Ukraine.

40.     MANAFORT provided direction to Companies A and B in their lobbying efforts, including providing support for numerous United States visits by numerous senior Ukrainian officials. Companies A and B, at MANAFORT's direction, engaged in extensive United States lobbying. Among other things, they lobbied dozens of Members of Congress, their staff, and White House and State Department officials about Ukraine sanctions, the validity of Ukraine elections, and the propriety of President Yanukovych's imprisoning Tymoshenko, his presidential rival.

41.     In addition, with the assistance of Company A, MANAFORT also personally lobbied in the United States.  He drafted and edited numerous ghost-written op-eds for publication in United States newspapers.  He also personally met in March 2013 in Washington, D.C., with a Member of Congress who was on a subcommittee that had Ukraine within its purview.  After the meeting, MANAFORT prepared a report for President Yanukovych that the meeting "went well" and reported a series of positive developments for Ukraine from the meeting.

42.     Indeed, MANAFORT repeatedly communicated in person and in writing with President Yanukovych and his staff about the lobbying activities of Companies A and B and he tasked the companies to prepare assessments of their work so he, in turn, could brief President Yanukovych. For instance, MANAFORT wrote President Yanukovych a memorandum dated April 8, 2012, in

which he provided an update on the lobbying firms' activities "since the inception of the project a few weeks ago.  It is my intention to provide you with a weekly update moving forward."  In November 2012, Gates wrote to Companies A and B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013." The resulting memorandum from Companies A and B, with input from Gates, noted among other things that the "client" had not been as successful as hoped given that it had an Embassy in Washington.

43.    To distance their United States lobbying work from the Government of Ukraine, and to avoid having to register as agents of Ukraine under the Foreign Agents Registration Act, MANAFORT with others arranged for Companies A and B to be engaged by a newly-formed Brussels entity called the European Centre for the Modern Ukraine (the Centre), instead of directly by the Government of Ukraine.

44.    MANAFORT described the Centre as "the Brussels NGO that we have formed" to coordinate lobbying for Ukraine.  The Centre was founded by a Ukraine Party of Regions member and Ukraine First Vice-Prime Minister.  The head of its Board was another member of the Party of Regions, who became the Ukraine Foreign Minister.

45.    In spite of these ties to Ukraine, MANAFORT and others arranged for the Centre to represent falsely that it was not "directly or indirectly supervised, directed, [or] controlled" in whole or in major part by the Government of Ukraine or the Party of Regions.  MANAFORT knew that the false and misleading representations would lead Companies A and B not to register their activities pursuant to the Foreign Agents Registration Act.

46.    Despite the Centre being the ostensible client of Companies A and B, MANAFORT knew

that the Centre did not direct or oversee their work.   The firms received direction from MANAFORT and his subordinate Gates, on behalf of the Government of Ukraine.

47.     Various employees of Companies A and B understood that they were receiving direction from MANAFORT and President Yanukovych, not the Centre, which was not even operational when Companies A and B began lobbying for Ukraine.   MANAFORT, Gates, and employees of both Companies A and B referred to the client in ways that made clear they knew it was Ukraine, for instance noting that the "client" had an Embassy in Washington D.C.   The head of Company B told his team to think the President of Ukraine "is the client."   As a Company A employee noted to another company employee: the lobbying for the Centre was "in name only.   [Y]ou've gotta see through the nonsense of that[.]"   "It's like Alice in Wonderland."   An employee of Company B described the Centre as a fig leaf, and the Centre's written certification that it was not related to the Party of Regions as "a fig leaf on a fig leaf," referring to the Centre in an email as the "European hot dog stand for a Modern Ukraine."

<u>Conspiring to Obstruct Justice: False and Misleading Submissions to the Department of Justice</u>

48.     In September 2016, after numerous press reports concerning MANAFORT had appeared in August, the Department of Justice National Security Division informed MANAFORT, Gates, and DMI in writing that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act, without registering.   In November 2016 and February 2017, MANAFORT and Gates conspired to knowingly and intentionally cause false and misleading letters to be submitted to the Department of Justice, through his unwitting legal counsel.   The letters, both of which were approved by MANAFORT before they were submitted by his counsel, represented falsely, among other things, that:

25

a.      DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

b.      MANAFORT did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications.  Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

c.      MANAFORT had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration"; and

d.      DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents."  The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

49.    In fact, MANAFORT had: selected Companies A and B; engaged in weekly scheduled calls and frequent emails with Companies A and B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Companies A and B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the

lobbying firms over $2.5 million from offshore accounts he controlled, among other things.

50.     Although MANAFORT had represented to the Department of Justice in November 2016 and February 2017 that he had no relevant documents, in fact MANAFORT had numerous incriminating documents in his possession, as he knew at the time.  The Federal Bureau of Investigation conducted a court-authorized search of MANAFORT'S home in Virginia in the summer of 2017.  The documents attached hereto as Government Exhibits 503, 504, 517, 532, 594, 604, 606, 616, 691, 692, 697, 706 and 708, among numerous others, were all documents that MANAFORT had in his possession, custody or control (and were found in the search) and all pre-dated the November 2016 letter.

Money Laundering Conspiracy

51.     In or around and between 2006 and 2016, MANAFORT, together with others,   did knowingly and intentionally conspire (a) to conduct financial transactions, affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, to wit, felony violations of FARA in violation of Title 22, United States Code, Sections 612 and 618, knowing that the property involved in the financial transactions represented proceeds of some form of unlawful activity, with intent to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986; and (b) to transport, transmit, and transfer monetary instruments and funds from places outside the United States to and through places in the United States and from places in the United States to and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: a felony violation of FARA, in violation of Title 22, United States Code, Sections 612 and 618, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(ii) and (a)(2)(A).

52.   MANAFORT caused the following transfers to be made, knowing that they were being made to entities to carry on activities that were required to be timely reported under the Foreign Agents Registration Act, but were not:

| Payee | Date | Payer | Originating Bank Account | Country of... Origin | Country of... Destination | Amount (USD) |
|---|---|---|---|---|---|---|
| Company A | 8/2/2012 | Bletilla Ventures  Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $270,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $90,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $120,000.00 |
| | 11/20/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $182,968.07 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $25,000.00 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $90,000.00 |
| | 9/18/2013 | Global Endeavour Inc. | Loyal Bank Limited Account -1840 | SVG* | US | $135,937.37 |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $167,689.40 |
| | 3/28/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $135,639.65 |
| | 4/3/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $82,979.93 |
| **Total Company A Transfers** | | | | | | **$1,300,214.42** |
| Company B | 5/30/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $195,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $50,000.00 |

| Payee | Date | Payer | Originating Bank Account | Country of... Origin | Destination | Amount (USD) |
|---|---|---|---|---|---|---|
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $54,649.51 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $150,000.00 |
| | 9/3/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $175,857.51 |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $195,857.51 |
| | 3/12/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $26,891.78 |
| | 3/21/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $138,026.00 |
| | 4/15/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,728.81 |
| | 4/25/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,739.23 |
| **Total Company B Transfers** | | | | | | **$1,255,750.35** |
| Law Firm A | 4/19/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $2,000,000.00 |
| | 5/30/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| | 7/13/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| **Total Law Firm A Transfers** | | | | | | **$4,000,000.00** |
| **TOTAL TRANSFERS** | | | | | | **$6,555,964.77** |

\* SVG refers to St. Vincent and the Grenadines.

MANAFORT's Hiding Of Foreign Bank Accounts And False Tax Filings

53.     United States citizens who have authority over certain foreign bank accounts—whether or not the accounts are set up in the names of nominees who act for their principals—have reporting

obligations to the United States.

54.     First, the Bank Secrecy Act and its implementing regulations require United States citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeds $10,000 at any point during the year. This is commonly known as a foreign bank account report or "FBAR."  The Bank Secrecy Act requires these reports because they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.  The United States Treasury's Financial Crimes Enforcement Network (FinCEN) is the custodian for FBAR filings, and FinCEN provides access to its FBAR database to law enforcement entities, including the Federal Bureau of Investigation.  The reports filed by individuals and businesses are used by law enforcement to identify, detect, and deter money laundering that furthers criminal enterprise activity, tax evasion, and other unlawful activities.

55.     Second, United States citizens also are obligated to report information to the IRS regarding foreign bank accounts.  For instance, in 2010 Form 1040, Schedule B had a "Yes" or "No" box to record an answer to the question: "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?"  If the answer was "Yes," then the form required the taxpayer to enter the name of the foreign country in which the financial account was located.

56.     For each year in or about and between 2007 through at least 2014, MANAFORT had authority over foreign accounts that required an FBAR report.  Specifically, MANAFORT was

required to report to the United States Treasury each foreign bank account held by the foreign MANAFORT entities noted above in paragraph 10.   No FBAR reports were made by MANAFORT for these accounts.

57.   Furthermore, in each of MANAFORT's tax filings for 2007 through 2014, Manafort represented falsely that he did not have authority over any foreign bank accounts.   MANAFORT had repeatedly and falsely represented in writing to MANAFORT's tax preparer that MANAFORT had no authority over foreign bank accounts, knowing that such false representations would result in false MANAFORT tax filings.   For instance, on October 4, 2011, MANAFORT's tax preparer asked MANAFORT in writing: "At any time during 2010, did you [or your wife or children] have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?"   On the same day, MANAFORT falsely responded "NO."   MANAFORT responded the same way as recently as October 3, 2016, when MANAFORT's tax preparer again emailed the question in connection with the preparation of MANAFORT's tax returns: "Foreign bank accounts etc.?"   MANAFORT responded on or about the same day: "NONE."

<u>MANAFORT's Fraud To Increase Access To Offshore Money</u>

58.   After MANAFORT used his offshore accounts to purchase real estate in the United States, he took out mortgages on the properties thereby allowing MANAFORT to have the benefits of liquid income without paying taxes on it.   Further, MANAFORT defrauded the banks that loaned him the money so that he could withdraw more money at a cheaper rate than he otherwise would have been permitted.

59.    In 2012, MANAFORT, through a corporate vehicle called "MC Soho Holdings, LLC"

owned by him and his family, bought a condominium on Howard Street in the Soho neighborhood in Manhattan, New York.  He paid approximately $2,850,000.  All the money used to purchase the condominium came from MANAFORT entities in Cyprus.  MANAFORT used the property from at least January 2015 through 2016 as an income-generating rental property, charging thousands of dollars a week on Airbnb, among other places.  In his tax returns, MANAFORT took advantage of the beneficial tax consequences of owning this rental property.

60.     Also in 2012, MANAFORT -- through a corporate vehicle called "MC Brooklyn Holdings, LLC" similarly owned by him and his family -- bought a brownstone on Union Street in the Carroll Gardens section of Brooklyn, New York.  He paid approximately $3,000,000 in cash for the property.  All of that money came from a MANAFORT entity in Cyprus.

## COUNT ONE

## Conspiracy Against The United States

61.     Paragraphs 1 through 60 are incorporated here.

62.     From in or about and between 2006 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., together with others, including Gates and Kilimnik, knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of a government agency, namely the Department of Justice and the Department of the Treasury, and to commit offenses against the United States, to wit, (a) money laundering (in violation of 18 U.S.C. § 1956); (b) tax fraud (in violation of 26 U.S.C. § 7206(1)); (c) failing to file Foreign Bank Account Reports (in violation of 31 U.S.C. §§ 5312 and 5322(b)); (d) violating the Foreign Agents Registration Act (in violation of 22 U.S.C. §§ 612, 618(a)(1), and 618(a)(2));

and (e) lying and misrepresenting to the Department of Justice (in violation of 18 U.S.C. § 1001(a) and  22 U.S.C. §§ 612 and 618(a)(2)).

63.     In furtherance of the conspiracy and to effect its illegal object, MANAFORT, together with others, committed the overt acts, in the District of Columbia and elsewhere, as set forth in the paragraphs above, which are incorporated herein.

(18 U.S.C. §§ 371 and 3551 <u>et</u> <u>seq.</u>)

**<u>COUNT TWO</u>**

**<u>Conspiracy to Obstruct Justice (Witness Tampering)</u>**

64.     Paragraphs 1 through 60 are incorporated here.

65.     From in or about and between February 23, 2018 and April 2018, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., together with others, including Konstantin Kilimnik, knowingly and intentionally conspired to corruptly persuade another person, to wit: Persons D1 and D2, with intent to influence, delay and prevent the testimony of any person in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1).

66.     On February 22, 2018, MANAFORT was charged in the District of Columbia in a Superseding Indictment that for the first time included allegations about the Hapsburg Group and MANAFORT's use of that group to lobby illegally in the United States in violation of the Foreign Agent Registration Act.  MANAFORT knew that the Act prescribed only United States lobbying. Immediately after February 22, 2018, MANAFORT began reaching out directly and indirectly to Persons D1 and D2 to induce them to say falsely that they did not work in the United States as part

33

of the lobbying campaign, even though MANAFORT then and there well knew that they did lobby in the United States.

67.     MANAFORT committed the following overt acts directly and through his conspirators.

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| *MANAFORT contacted Person D1 by phone and a messaging application:* | | | |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call: 1 min, 24 second call. |
| 2/24/2018; 15:53 (UTC) | MANAFORT | Person D1 | Text: "This is paul" |
| 2/25/2018; 18:41 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/26/2018; 23:56 (UTC) | MANAFORT | Person D1 | Text: "http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T" |
| 2/26/2018; 23:57 (UTC) | MANAFORT | Person D1 | Text: "We should talk. I have made clear that they worked in Europe." |
| 2/27/2018; 11:03 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/27/2018; 11:31 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| *Kilimnik contacted Person D2 a messaging application, sending four messages:* | | | |
| 2/28/2018; 01:49 (CEST) | Kilimnik | Person D2 | "[Person D2], hi! How are you? Hope you are doing fine. ;))" |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on." |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [Person D1] - would be great" |

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/28/2018; 01:53 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |
| *Kilimnik contacted Person D2 using a different messaging application, sending five messages:* | | | |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "Hey, how are you? This is K." |
| 2/28/2018; 06:01(CEST) | Kilimnik | Person D2 | "Hope you are doing fine." |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on" |
| 2/28/2018; 06:02 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |
| 2/28/2018; 06:03 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [First Initial of Person D1's Name]. - it would be great. It would be good to get them connected to discuss in person. P is his friend." |
| *Kilimnik contacted Person D2 using two different applications, sending three messages:* | | | |
| 4/4/2018; 08:53 (CEST) | Kilimnik | Person D2 | "Hey. This is Konstantin. My friend P asked me again to help connect him with [Person D1]. Can you help?" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "Hey. My friend P has asked me again if there is any way to help connect him through [Person D1]" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "I tried him on all numbers." |
| *Kilimnik contacted Person D1 using a messaging application:* | | | |
| 4/4/2018; 13:00 (UTC) | Kilimnik | Person D1 | "Hi. This is K. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." |

*UTC and CEST refer to Coordinated Universal Time and Central European Summer Time, respectively.

35

(18 U.S.C. §§ 371 and 3551 et seq.)

## FORFEITURE ALLEGATIONS

68.     Upon conviction of the offense charged in Count One, the defendant PAUL J. MANAFORT, JR., shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, and any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1), and Title 28, United States Code, Section 2461(c).  The United States will also seek a judgment against the defendant for a sum of money representing the property described in this paragraph (to be offset by the forfeiture of any specific property).

69.     The property subject to forfeiture by PAUL J. MANAFORT, JR., includes, but is not limited to, the following listed assets:

        a.      The real property and premises commonly known as 377 Union Street, Brooklyn, New York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

        b.      The real property and premises commonly known as 29 Howard Street, #4D, New York, New York 10013 (Block 209, Lot 1104), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

        c.       The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

d.      All funds held in account number XXXXXX0969 at The Federal Savings Bank, and any property traceable thereto;

e.      All funds seized from account number XXXXXX1388 at Capital One N.A., and any property traceable thereto; and

f.      All funds seized from account number XXXXXX9952 at The Federal Savings Bank, and any property traceable thereto;

g.      Northwestern Mutual Universal Life Insurance Policy 18268327, and any property traceable thereto;

h.      All funds held in account number XXXX7988 at Charles A. Schwab & Co. Inc., and any property traceable thereto; and

i.      The real property and premises commonly known as 1046 N. Edgewood Street, Arlington, Virginia 22201, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto.

## Substitute Assets

70.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853, to seek forfeiture of any other property of said defendant.

By: _____

Robert S. Mueller, III
Special Counsel
Department of Justice

38