

**FILED**

**SEP 1 4 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO.  17-201-1 (ABJ) |
| | * | |
| v. | * | Violations: 18 U.S.C. § 371 |
| | * | (Conspiracy Against the United States |
| | * | and Conspiracy to Obstruct Justice) |
| PAUL J. MANAFORT, JR., | * | |
| | * | |
| Defendant. | * | |
| | ******* | |

## STATEMENT OF THE OFFENSES AND OTHER ACTS

Pursuant to the Federal Rules of Criminal Procedure 11, the United States and the defendant PAUL J. MANAFORT, JR. (MANAFORT) stipulate and agree that the following facts are true and accurate.  These facts do not constitute all of the facts known to the parties concerning the charged offense and covered conduct.  This statement is being submitted by the parties to demonstrate that sufficient facts exist to establish that the defendant committed the offenses to which he is pleading guilty.

### Count 1: Conspiracy Against the United States (18 U.S.C. § 371)

1.     At all relevant times herein, MANAFORT was an owner of Davis Manafort Partners, Inc. (DMP) or DMP International, LLC (DMI) or both.  MANAFORT engaged in a variety of criminal schemes, and knowingly, intentionally, and willfully conspired with Richard W. Gates, Konstantin Kilimnik, and others to carry out the criminal schemes that make up Counts One and Two of the Information, as more fully set forth below.

    **A.  FARA Conspiracy**
    **22 U.S.C. §§ 612 and 618(a)(1)**

**MANAFORT's Lobbying in the United States on Behalf of the Government of Ukraine**



2.       MANAFORT knew it was illegal to lobby government officials and engage in public relations activities (hereinafter collectively referred to as lobbying) in the United States on behalf of a foreign government or political party, without registering with the United States Government under the Foreign Agents Registration Act.   MANAFORT knew he was lobbying in the United States for the Government of Ukraine, President Viktor F. Yanukovych, the Party of Regions, and the Opposition Bloc (the latter two being political parties in Ukraine), and thus he was supposed to submit a written registration statement to the United States Department of Justice. MANAFORT knew that the filing was required to disclose the name of the foreign country, all the financial payments to the lobbyist, and the specific steps undertaken for the foreign country in the United States, among other information.

3.       MANAFORT knew that Ukraine had a strong interest in the United States' taking economic and policy positions favorable to Ukraine, including not imposing sanctions on Ukraine. MANAFORT also knew that the trial and treatment of President Yanukovych's political rival, former Prime Minister Yulia Tymoshenko, was strongly condemned by leading United States executive and legislative branch officials, and was a major hurdle to improving United States and Ukraine relations.

4.       From 2006 until 2015, MANAFORT led a multi-million dollar lobbying campaign in the United States at the direction of the Government of Ukraine, President Yanukovych, the Party of Regions, and the Opposition Bloc.   MANAFORT intentionally did so without registering and providing the disclosures required by law.

5.       As part of the lobbying scheme, MANAFORT hired numerous firms and people to assist in his lobbying campaign in the United States.   He hired Companies A, B, C, D, and E, and Law Firm A, among others, to participate in what he described to President Yanukovych in writing as a global



"Engage Ukraine" lobbying campaign that he devised and led.  These companies and law firm were paid the equivalent of over $11 million for their Ukraine work.

6.     MANAFORT viewed secrecy for himself and for the actions of his lobbyists as integral to the effectiveness of the lobbying offensive he orchestrated for Ukraine.  Filing under the Foreign Agents Registration Act would have thwarted the secrecy MANAFORT sought in order to conduct an effective campaign for Ukraine to influence both American leaders and the American public.

7.     MANAFORT took steps to avoid any of these firms and people disclosing their lobbying efforts under the Foreign Agents Registration Act.  As one example, even though MANAFORT engaged Company E in 2007 to lobby in the United States for the Government of Ukraine, MANAFORT tried to dissuade Company E from filing under the Foreign Agents Registration Act. Only after MANAFORT ceased to use Company E in the fall of 2007 did Company E disclose its work for Ukraine, in a belated filing under the Act in 2008.

8.     MANAFORT took other measures to keep the Ukraine lobbying as secret as possible.  For example, MANAFORT, in written communications on or about May 16, 2013, directed his lobbyists (including Persons D1 and D2, who worked for Company D) to write and disseminate within the United States news stories that alleged that Tymoshenko had paid for the murder of a Ukrainian official.  MANAFORT stated that it should be "push[ed]" "[w]ith no fingerprints."  "It is very important we have no connection."  MANAFORT stated that "[m]y goal is to plant some stink on Tymo."  Person D1 objected to the plan, but ultimately Persons D1 and D2 complied with MANAFORT's direction.  The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew.  He did not.

The Hapsburg Group and Company D

9.     As part of the lobbying scheme, starting in 2011, MANAFORT secretly retained Company

D and a group of four former European heads of state and senior officials (including a former Austrian Chancellor, Italian Prime Minister, and Polish President) to lobby in the United States and Europe on behalf of Ukraine. The former politicians, called the Hapsburg Group by MANAFORT, appeared to be providing solely their independent assessments of Government of Ukraine policies, when in fact they were paid by Ukraine.   MANAFORT explained in an "EYES ONLY" memorandum in or about June 2012 that his purpose was to "assemble a small group of high-level European infuencial [sic] champions and politically credible friends who can act informally and without any visible relationship with the Government of Ukraine."

10.     Through MANAFORT, the Government of Ukraine retained an additional group of lobbyists (Company D and Persons D1 and D2).  In addition to lobbying itself, Company D secretly served as intermediaries between the Hapsburg Group and MANAFORT and the Government of Ukraine.  In or about 2012 through 2013, MANAFORT directed more than the equivalent of 700,000 euros to be wired from at least three of his offshore accounts to the benefit of Company D to pay secretly for its services.

11.     All four Hapsburg Group members, at the direction, and with the direct assistance, of MANAFORT, advocated positions favorable to Ukraine in meetings with United States lawmakers, interviews with United States journalists, and ghost written op-eds in American publications.  In or about 2012 through 2014, MANAFORT directed more than 2 million euros to be wired from at least four of his offshore accounts to pay secretly the Hapsburg Group.  To avoid European taxation, the contract with the Hapsburg Group falsely stated that none of its work would take place in Europe.

12.     One of the Hapsburg Group members, a former Polish President, was also a representative of the European Parliament with oversight responsibility for Ukraine.  MANAFORT solicited that

official to provide MANAFORT inside information about the European Parliament's views and actions toward Ukraine and to take actions favorable to Ukraine.  MANAFORT also used this Hapsburg Group member's current European Parliament position to Ukraine's advantage in his lobbying efforts in the United States.  In the fall of 2012, the United States Senate was considering and ultimately passed a resolution critical of President Yanukovych's treatment of former Prime Minister Tymoshenko.  MANAFORT engaged in an all-out campaign to try to kill or delay the passage of this resolution.  Among the steps he took was having the Hapsburg Group members reach out to United States Senators, as well as directing Companies A and B to have private conversations with Senators to lobby them to place a "hold" on the resolution.  MANAFORT told his lobbyists to stress to the Senators that the former Polish President who was advocating against the resolution was currently a designated representative of the President of the European Parliament, to give extra clout to his supposedly independent judgment against the Senate resolution.  MANAFORT never revealed to the Senators or to the American public that any of these lobbyists or Hapsburg Group members were paid by Ukraine.

13.     In another example, on May 16, 2013, another member of the Hapsburg Group lobbied in the United States for Ukraine.  The Hapsburg Group member accompanied his country's prime minister to the Oval Office and met with the President and Vice President of the United States, as well as senior United States officials in the executive and legislative branches.  In written communications sent to MANAFORT, Person D1 reported that the Hapsburg Group member delivered the message of not letting "Russians Steal Ukraine from the West." The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew.  He did not.

Law Firm Report and Tymoshenko

14.     As another part of the lobbying scheme, in 2012, on behalf of President Yanukovych and the Government of Ukraine's Ministry of Justice, MANAFORT solicited a United States law firm to write a report evaluating the trial of Yanukovych's political opponent Yulia Tymoshenko. MANAFORT caused Ukraine to hire the law firm so that its report could be used in the United States and elsewhere to defend the Tymoshenko criminal trial and argue that President Yanukovych and Ukraine had not engaged in selective prosecution.

15.     MANAFORT retained a public relations firm (Company C) to prepare a media roll-out plan for the law firm report.  MANAFORT used one of his offshore accounts to pay Company C the equivalent of more than $1 million for its services.

16.     MANAFORT worked closely with Company C to develop a detailed written lobbying plan in connection with what MANAFORT termed the "selling" of the report.  This campaign included getting the law firm's report "seeded" to the press in the United States—that is, to leak the report ahead of its official release to a prominent United States newspaper and then use that initial article to influence reporting globally.  As part of the roll-out plan, on the report's issuance on December 13, 2012, MANAFORT arranged to have the law firm disseminate hard copies of the report to numerous government officials, including senior United States executive and legislative branch officials.

17.     MANAFORT reported on the law firm's work on the report and Company C's lobbying plan to President Yanukovych and other representatives of the Government of Ukraine.  For example, in a July 27, 2012 memorandum to President Yanukovych's Chief of Staff, MANAFORT reported on "the global rollout strategy for the [law firm's] legal report, and provide[d] a detailed plan of action[]" which included step-by-step lobbying outreach in the United States.

18.     MANAFORT directed lobbyists to tout the report as showing that President Yanukovych

had not selectively prosecuted Tymoshenko.  But in November 2012 MANAFORT had been told privately in writing by the law firm that the evidence of Tymoshenko's criminal intent "is virtually non-existent" and that it was unclear even among legal experts that Tymoshenko lacked power to engage in the conduct central to the Ukraine criminal case.  These facts, known by MANAFORT, were not disclosed to the public.

19.    MANAFORT knew that the report also did not disclose that the law firm, in addition to being retained to write the report, was retained to represent Ukraine itself, including in connection with the Tymoshenko case and to provide training to the trial team prosecuting Tymoshenko.

20.    MANAFORT also knew that the Government of Ukraine did not want to disclose how much the report cost.  More than $4.6 million was paid to the law firm for its work.  MANAFORT used one of his offshore accounts to funnel $4 million to pay the law firm, a fact that MANAFORT did not disclose to the public.  Instead, the Government of Ukraine reported falsely that the report cost just $12,000.

21.    MANAFORT and others knew that the actual cost of the report and the scope of the law firm's work would undermine the report's being perceived as an independent assessment and thus being an effective lobbying tool for MANAFORT to use to support the incarceration of President Yanukovych's political opponent.

22.    In addition to the law firm report, MANAFORT took other steps on behalf of the Government of Ukraine to tarnish Tymoshenko in the United States.  In addition to disseminating stories about her soliciting murder, noted above, in October 2012, MANAFORT orchestrated a scheme to have, as he wrote in a contemporaneous communication, "[O]bama jews" put pressure on the Administration to disavow Tymoshenko and support Yanukovych.  MANAFORT sought to undermine United States support for Tymoshenko by spreading stories in the United States that

a senior Cabinet official (who had been a prominent critic of Yanukovych's treatment of Tymoshenko) was supporting anti-Semitism because the official supported Tymoshenko, who in turn had formed a political alliance with a Ukraine party that espoused anti-Semitic views. MANAFORT coordinated privately with a senior Israeli government official to issue a written statement publicizing this story. MANAFORT then, with secret advance knowledge of that Israeli statement, worked to disseminate this story in the United States, writing to Person D1 "I have someone pushing it on the NY Post. Bada bing bada boom." MANAFORT sought to have the Administration understand that "the Jewish community will take this out on Obama on election day if he does nothing." MANAFORT then told his United States lobbyist to inform the Administration that Ukraine had worked to prevent the Administration's presidential opponent from including damaging language in the Israeli statement, so as not to harm the Administration, and thus further ingratiate Yanukovych with the Administration.

<u>Company A and Company B</u>

23.     As a third part of the lobbying scheme, in February 2012, MANAFORT solicited two Washington, D.C. lobbying firms (Company A and Company B) to lobby in the United States on behalf of President Yanukovych, the Party of Regions and the Government of Ukraine. For instance, in early 2012 at the inception of the relationship, Company B wrote in an email to its team about a "potential representation for the Ukraine," having been contacted "at the suggestion of Paul Manafort who has been working on the current PM elections."

24.     MANAFORT arranged to pay Companies A and B over $2 million from his offshore accounts for their United States lobbying work for Ukraine.

25.     MANAFORT provided direction to Companies A and B in their lobbying efforts, including providing support for numerous United States visits by numerous senior Ukrainian officials.



Companies A and B, at MANAFORT's direction, engaged in extensive United States lobbying. Among other things, they lobbied dozens of Members of Congress, their staff, and White House and State Department officials about Ukraine sanctions, the validity of Ukraine elections, and the propriety of President Yanukovych's imprisoning Tymoshenko, his presidential rival.

26.     In addition, with the assistance of Company A, MANAFORT also personally lobbied in the United States.  He drafted and edited numerous ghost-written op-eds for publication in United States newspapers.  He also personally met in March 2013 in Washington, D.C., with a Member of Congress who was on a subcommittee that had Ukraine within its purview.  After the meeting, MANAFORT prepared a report for President Yanukovych that the meeting "went well" and reported a series of positive developments for Ukraine from the meeting.

27.     Indeed, MANAFORT repeatedly communicated in person and in writing with President Yanukovych and his staff about the lobbying activities of Companies A and B and he tasked the companies to prepare assessments of their work so he, in turn, could brief President Yanukovych. For instance, MANAFORT wrote President Yanukovych a memorandum dated April 8, 2012, in which he provided an update on the lobbying firms' activities "since the inception of the project a few weeks ago.  It is my intention to provide you with a weekly update moving forward."  In November 2012, Gates wrote to Companies A and B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013." The resulting memorandum from Companies A and B, with input from Gates, noted among other things that the "client" had not been as successful as hoped given that it had an Embassy in Washington.

28.     To distance their United States lobbying work from the Government of Ukraine, and to avoid having to register as agents of Ukraine under the Foreign Agents Registration Act,



MANAFORT with others arranged for Companies A and B to be engaged by a newly-formed Brussels entity called the European Centre for the Modern Ukraine (the Centre), instead of directly by the Government of Ukraine.

29.    MANAFORT described the Centre as "the Brussels NGO that we have formed" to coordinate lobbying for Ukraine.  The Centre was founded by a Ukraine Party of Regions member and Ukraine First Vice-Prime Minister.  The head of its Board was another member of the Party of Regions, who became the Ukraine Foreign Minister.

30.    In spite of these ties to Ukraine, MANAFORT and others arranged for the Centre to represent falsely that it was not "directly or indirectly supervised, directed, [or] controlled" in whole or in major part by the Government of Ukraine or the Party of Regions.  MANAFORT knew that the false and misleading representations would lead Companies A and B not to register their activities pursuant to the Foreign Agents Registration Act.

31.    Despite the Centre being the ostensible client of Companies A and B, MANAFORT knew that the Centre did not direct or oversee their work.   The firms received direction from MANAFORT and his subordinate Gates, on behalf of the Government of Ukraine.

32.    As MANAFORT knows from giving directions to Companies A and B, and from the discovery material provided herein, various employees of Companies A and B understood that they were receiving direction from MANAFORT and President Yanukovych, not the Centre, which was not even operational when Companies A and B began lobbying for Ukraine. MANAFORT, Gates, and employees of both Companies A and B referred to the client in ways that made clear they knew it was Ukraine, for instance noting that the "client" had an Embassy in Washington D.C. The head of Company B told his team  to think  the President of Ukraine "is the client."  As a Company A employee noted to another company employee: the lobbying for the



Centre was "in name only.  [Y]ou've gotta see through the nonsense of that[.]"  "It's like Alice in Wonderland."  An employee of Company B described the Centre as a fig leaf, and the Centre's written certification that it was not related to the Party of Regions as "a fig leaf on a fig leaf," referring to the Centre in an email as the "European hot dog stand for a Modern Ukraine."

Conspiring to Obstruct Justice: False and Misleading Submissions to the Department of Justice

33.    In September 2016, after numerous press reports concerning MANAFORT had appeared in August, the Department of Justice National Security Division informed MANAFORT, Gates, and DMI in writing that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act, without registering.  In November 2016 and February 2017, MANAFORT and Gates conspired to knowingly and intentionally cause false and misleading letters to be submitted to the Department of Justice, through his unwitting legal counsel.  The letters, both of which were approved by MANAFORT before they were submitted by his counsel, represented falsely, among other things, that:

a.    DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

b.    MANAFORT did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications.  Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

c.    MANAFORT had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based

consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

    d.    DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents." The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

34.    In fact, MANAFORT had: selected Companies A and B; engaged in weekly scheduled calls and frequent emails with Companies A and B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Companies A and B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the lobbying firms over $2.5 million from offshore accounts he controlled, among other things.

35.    Although MANAFORT had represented to the Department of Justice in November 2016 and February 2017 that he had no relevant documents, in fact MANAFORT had numerous incriminating documents in his possession, as he knew at the time. The Federal Bureau of Investigation conducted a court-authorized search of MANAFORT'S home in Virginia in the summer of 2017. The documents attached hereto as Government Exhibits 503, 504, 517, 532, 594, 604, 606, 616, 691, 692, 697, 706 and 708, among numerous others, were all documents that MANAFORT had in his possession (and were found in the search) and all pre-dated the November 2016 letter.

### B. Money Laundering Conspiracy

36.    In or around and between 2006 and 2016, MANAFORT, together with others,   did

knowingly and intentionally conspire (a) to conduct financial transactions, affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, to wit, felony violations of FARA in violation of Title 22, United States Code, Sections 612 and 618, knowing that the property involved in the financial transactions represented proceeds of some form of unlawful activity, with intent to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986; and (b) to transport, transmit, and transfer monetary instruments and funds from places outside the United States to and through places in the United States and from places in the United States to and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: a felony violation of FARA, in violation of Title 22, United States Code, Sections 612 and 618, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(ii) and (a)(2)(A).

37.     MANAFORT caused the following transfers to be made, knowing that they were being made to entities to carry on activities that were required to be timely reported under the Foreign Agents Registration Act, but were not:

| Payee | Date | Payer | Originating Bank Account | Country of... | | Amount (USD) |
| | | | | Origin | Destination | |
|---|---|---|---|---|---|---|
| Company A | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $270,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $90,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $120,000.00 |
| | 11/20/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $182,968.07 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $25,000.00 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $90,000.00 |
| | 9/18/2013 | Global Endeavour Inc. | Loyal Bank Limited Account -1840 | SVG* | US | $135,937.37 |

| Payee | Date | Payer | Originating Bank Account | Country of... | | Amount (USD) |
| | | | | Origin | Destination | |
|---|---|---|---|---|---|---|
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $167,689.40 |
| | 3/28/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $135,639.65 |
| | 4/3/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $82,979.93 |
| **Total Company A Transfers** | | | | | | **$1,300,214.42** |
| Company B | 5/30/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $195,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $50,000.00 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $54,649.51 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $150,000.00 |
| | 9/3/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $175,857.51 |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $195,857.51 |
| | 3/12/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $26,891.78 |
| | 3/21/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $138,026.00 |
| | 4/15/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,728.81 |
| | 4/25/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,739.23 |
| **Total Company B Transfers** | | | | | | **$1,255,750.35** |

| Payee | Date | Payer | Originating Bank Account | Country of... Origin | Destination | Amount (USD) |
|---|---|---|---|---|---|---|
| Law Firm A | 4/19/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $2,000,000.00 |
| | 5/30/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| | 7/13/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| **Total Law Firm A Transfers** | | | | | | **$4,000,000.00** |
| **TOTAL TRANSFERS** | | | | | | **$6,555,964.77** |

\* SVG refers to St. Vincent and the Grenadines.

### C. Tax and Foreign Bank Account Conspiracy
### 26 U.S.C. § 7206(1)
### 31 U.S.C. §§ 5314 and 5322(a)

38.     From 2008 through 2014, MANAFORT caused millions of dollars of wire transfers to be made from offshore nominee accounts, without paying taxes on that income. The payments were made for goods, services, and real estate. MANAFORT also hid income by denominating various overseas payments as "loans," thereby evading payment of any taxes on that income by MANAFORT.

39.     MANAFORT directly and through Gates repeatedly misled his bookkeeper and tax accountants, including by not disclosing Manafort's overseas accounts and income. Further, MANAFORT and Gates, acting at Manafort's instruction, classified overseas payments made to MANAFORT falsely as "loans" to avoid incurring additional taxes on the income.

40.     MANAFORT owned and controlled a range of foreign bank accounts in Cyprus, the Grenadines, and the United Kingdom. MANAFORT directly and through Gates maintained these accounts, including by managing them and by making substantial transfers from the accounts to both himself and vendors for personal items for him and his family. MANAFORT was aware that many of these accounts held well in excess of $10,000 in the aggregate at some point during each year in which they existed. MANAFORT did not report the accounts' existence to his bookkeeper

and his tax preparers in an effort to hide them, and to allow him to avoid disclosing their existence on an FBAR filing.

41.     MANAFORT was aware at the time that it was illegal to hide income from the Internal Revenue Service (IRS) by failing to account for reportable income on his income tax returns. MANAFORT was also aware that it was illegal to fail to report information to the IRS regarding the existence of foreign bank accounts, as required by Schedule B of the IRS Form 1040. MANAFORT also understood at the time that a U.S. person who had a financial interest in, or signature or other authority over, a bank account or other financial account in a foreign country, which exceeded $10,000 in any one year (at any time during that year), was required to report the account to the Department of the Treasury.  MANAFORT also understood, after 2010, that the failure to make such a report constituted a crime.

42.     Knowing the existence of his reportable foreign accounts and hidden income, MANAFORT knowingly, intentionally, and willfully filed and conspired to file false tax returns from 2006-2015 in that he said he did not have reportable foreign bank accounts when he knew that he did, he did not report income that he knew he in fact had earned, and he did not file Foreign Bank Account Reports.  MANAFORT failed to report over $15 million in income during the period 2010-2014.

**FORFEITURE**

43.     The following assets constitute or were derived from proceeds of MANAFORT's conspiracy to violate the Foreign Agents Registration Act and/or they constitute property involved in MANAFORT's conspiracy to launder money in violation of 18 U.S.C. § 1956 or are traceable thereto and/or they represent substitute assets for such property which has been made unavailable for forfeiture by the acts or omissions of MANAFORT:

      a)   The real property and premises commonly known as 377 Union Street, Brooklyn, New

York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

b) The real property and premises commonly known as 29 Howard Street, #4D, New York, New York 10013 (Block 209, Lot 1104), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

c) The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

d) All funds held in account number XXXXXX0969 at The Federal Savings Bank, and any property traceable thereto;

e) All funds seized from account number XXXXXX1388 at Capital One N.A. and any property traceable thereto;

f) All funds seized from account number XXXXXX9952 at The Federal Savings Bank and any property traceable thereto;

g) Northwestern Mutual Universal Life Insurance Policy          and any property traceable thereto;

h) The real property and premises commonly known as 123 Baxter Street, #5D, New York, New York 10016 in lieu of 1046 N. Edgewood Street; and

i) The real property and premises commonly known as 721 Fifth Avenue, #43G, New York, New York 10022 in lieu of all funds from account number          at Charles Schwab & Co. Inc., and any property traceable thereto.

### Count Two: Witness Tampering Conspiracy (18 U.S.C. § 371)

44.    From in or about and between February 23, 2018, and April 2018, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendant PAUL J.



MANAFORT, JR., together with others, including Konstantin Kilimnik, knowingly and intentionally conspired to corruptly persuade another person, to wit: Persons D1 and D2, with intent to influence, delay and prevent the testimony of any person in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1). The facts set forth with respect to Count One are incorporated herein.

45.    On February 22, 2018, MANAFORT was charged in the District of Columbia in a Superseding Indictment that for the first time included allegations about the Hapsburg Group and MANAFORT's use of that group to lobby illegally in the United States in violation of the Foreign Agent Registration Act. MANAFORT knew that the Act prescribed only United States lobbying. Immediately after February 22, 2018, MANAFORT began reaching out directly and indirectly to Persons D1 and D2 to induce them to say falsely that they did not work in the United States as part of the lobbying campaign, even though MANAFORT then and there well knew that they did lobby in the United States.

46.    MANAFORT committed the following overt acts directly and through his conspirators.

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| *MANAFORT contacted Person D1 by phone and a messaging application:* | | | |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call: 1 min, 24 second call. |
| 2/24/2018; 15:53 (UTC) | MANAFORT | Person D1 | Text: "This is paul" |
| 2/25/2018; 18:41 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/26/2018; 23:56 (UTC) | MANAFORT | Person D1 | Text: "http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T" |

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/26/2018; 23:57 (UTC) | MANAFORT | Person D1 | Text: "We should talk. I have made clear that they worked in Europe." |
| 2/27/2018; 11:03 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/27/2018; 11:31 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| *Kilimnik contacted Person D2 a messaging application, sending four messages:* | | | |
| 2/28/2018; 01:49 (CEST) | Kilimnik | Person D2 | "[Person D2], hi! How are you? Hope you are doing fine. ;))" |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on." |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [Person D1] - would be great" |
| 2/28/2018; 01:53 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |
| *Kilimnik contacted Person D2 using a different messaging application, sending five messages:* | | | |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "Hey, how are you? This is K." |
| 2/28/2018; 06:01(CEST) | Kilimnik | Person D2 | "Hope you are doing fine." |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on" |
| 2/28/2018; 06:02 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/28/2018; 06:03 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [First Initial of Person D1's Name]. - it would be great. It would be good to get them connected to discuss in person. P is his friend." |
| *Kilimnik contacted Person D2 using two different applications, sending three messages:* | | | |
| 4/4/2018; 08:53 (CEST) | Kilimnik | Person D2 | "Hey. This is Konstantin. My friend P asked me again to help connect him with [Person D1]. Can you help?" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "Hey. My friend P has asked me again if there is any way to help connect him through [Person D1]" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "I tried him on all numbers." |
| *Kilimnik contacted Person D1 using a messaging application:* | | | |
| 4/4/2018; 13:00 (UTC) | Kilimnik | Person D1 | "Hi. This is K. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." |

*UTC and CEST refer to Coordinated Universal Time and Central European Summer Time, respectively.

## Other Acts

I.     **Bank/Bank Fraud Conspiracy**
       **18 U.S.C. §§ 1344 and 1349**

**Bank Fraud Conspiracy / Citizens Bank / $3.4 million loan**
**(Charged as Count 24 in the Eastern District of Virginia Superseding Indictment)**

47.     Between December 2015 and March 2016, MANAFORT conspired to intentionally defraud

Citizens Bank in connection with his application for a mortgage for approximately $3.4 million.

The mortgage related to a condominium on Howard Street in the Soho neighborhood of Manhattan,

New York.  During the course of the conspiracy, MANAFORT made and caused to be made, a

series of false and fraudulent representations to the bank in order to secure the loan, including the



following: (a) MANAFORT falsely represented the amount of debt he had by failing to disclose on his loan application the existence of a mortgage on his Union Street property (from Genesis Capital); (b) MANAFORT caused an insurance broker to provide Citizens Bank false information, namely, an outdated insurance report that did not list the Union Street loan (from Genesis Capital); (c) MANAFORT falsely stated that a $1.5 million Peranova loan had been forgiven in 2015; and (d) MANAFORT falsely represented to the lender and its agents that the Howard Street property was a secondary home used as such by his daughter and son-in-law and was not held as a rental property.  These statements were material to Citizens Bank.

48.     Citizens Bank was a financial institution chartered by the United States.

**Bank Fraud Conspiracy / Banc of California / $1 million loan**
**(Charged as Count 26 in the Eastern District of Virginia Superseding Indictment)**

49.     In approximately February 2016, MANAFORT conspired to intentionally defraud Banc of California in connection with his application for a business loan.  During the course of the conspiracy, MANAFORT made and caused to be made a series of false and fraudulent representations to the bank, including the following: (a) the submission of a false statement of assets and liabilities that failed to disclose a loan on the Union Street property (from Genesis Capital) and misrepresented, among other things, the amount of the mortgage on the Howard Street property; and (b) the submission of a doctored 2015 DMI profit and loss statement (P&L) that overstated DMI's 2015 income by more than $4 million.  These statements were material to Banc of California.

50.     Banc of California was a financial institution chartered by the United States.

**Bank Fraud Conspiracy / Citizens Bank / $5.5 million loan**
**(Charged as Count 28 in the Eastern District of Virginia Superseding Indictment)**

51.     Between December 2015 and March 2016, MANAFORT conspired to intentionally

defraud Citizens Bank in connection with his application for a mortgage for approximately $5.5

million on a property at Union Street in Brooklyn, New York.  During the course of the

conspiracy, MANAFORT made or caused to be made a series of false and fraudulent material

representations to the bank in order to secure the loan, including the following: (a) the

submission of a false statement of assets and liabilities that hid a prior loan on the Union Street

property (from Genesis Capital), among other liabilities; and (b) the submission of a falsified

2016 DMI P&L that overstated DMI's income by more than $2 million.

**Bank Fraud/Bank Fraud Conspiracy / The Federal Savings Bank / $9.5 million loan & $6.5**
**million loan**
**(Charged in Counts 29. 30, 31 & 32 in the Eastern District of Virginia Superseding Indictment)**

52.     Between April 2016 and January 2017, MANAFORT conspired to intentionally defraud,

and did defraud, The Federal Savings Bank in connection with his applications for the following

two loans: (a) a loan for approximately $9.5 million related to various properties, including a

house in Bridgehampton, New York, and (b) a loan for approximately $6.5 million related to his

Union Street property.   During the course of the fraudulent scheme, MANAFORT made and

caused to be made a series of false and fraudulent material representations to the bank in order to

secure both loans, including the following: (a) MANAFORT provided the bank with doctored

P&Ls for DMI for both 2015 and 2016, overstating its income by millions of dollars; and (b)

MANAFORT falsely represented to The Federal Savings Bank that he had lent his credit card to

a friend who had incurred more than $200,000 in charges relating to the purchase of Yankee

tickets.

53.     Both loans were extended by The Federal Savings Bank.



54.    The Federal Savings Bank was a financial institution chartered by the United States.


ROBERT S. MUELLER, III
Special Counsel

By:

Andrew Weissmann
Jeannie S. Rhee
Greg D. Andres
Kyle R. Freeny
Senior/Assistant Special Counsels

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorneys Kevin Downing, Thomas Zehnle, and Richard Westling. I am fully satisfied with the legal representation by them, who I have chosen to represent me herein. Nothing about the quality of the representation of other counsel is affecting my decision herein to plead guilty. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorneys in connection with this Agreement and matters related to it.

Date:  9-14-18                        _____
                                      Paul J. Manafort, Jr.
                                      Defendant


## ATTORNEYS' ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, Paul J. Manafort, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date:  9-14-18                        _____
                                      Kevin M. Downing
                                      Richard W. Westling
                                      Thomas E. Zehnle
                                      Attorneys for Defendant