```
1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2
     United States of America,      )  Criminal Action
3                                   )  No. 17-CR-201-1
                         Plaintiff, )
4                                   )  PLEA HEARING
     vs.                            )
5                                   )  Washington, DC
     Paul Manafort, Jr.,            )  Date:  September 14, 2018
6                                   )  Time:  11:00 a.m.
                         Defendants.)
7                                   )
     _____
8
                      TRANSCRIPT OF PLEA HEARING
9                          HELD BEFORE
            THE HONORABLE JUDGE AMY BERMAN JACKSON
10                 UNITED STATES DISTRICT JUDGE
     _____
11
                       A P P E A R A N C E S
12
     For Plaintiff:    ANDREW WEISSMANN
13                     GREG D. ANDRES
                       JEANNIE S. RHEE
14                     KYLE R. FREENY
                       U.S. Department of Justice
15                     Special Counsel's office
                       950 Pennsylvania Avenue NW
16                     Washington, D.C.  20530
                       202-514-1746
17                     Email:  Aaw@usdoj.gov
                       Email:  Gda@usdoj.gov
18                     Email:  Jsr@usdoj.gov
                       Email:  Krf@usdoj.gov
19
     For Defendant:    KEVIN M. DOWNING
20                     815 Connecticut Avenue, N.W.
                       Suite 730
21                     Washington, D.C. 20006
                       (202) 754-1992
22                     Email:  Kevindowning@kdowninglaw.com
                       THOMAS EDWARD ZEHNLE
23                     Law Office of Thomas E. Zehnle
                       601 New Jersey Avenue, NW
24                     Suite 620
                       Washington, DC 20001
25                     (202) 368-4668
                       Email:  Tzehnle@milchev.com
```

```
ALSO PRESENT:          Omer Meisel, Special Agent
                       Jeffrey Weiland, Special Agent

Court Reporter:        Janice E. Dickman, RMR, CRR
                       Official Court Reporter
                       United States Courthouse, Room 6523
                       333 Constitution Avenue, NW
                       Washington, DC  20001
                       202-354-3267

                            *   *   *
```

1          THE COURTROOM DEPUTY:  Your Honor good morning, this

2     morning we have case No. 17-201-1, United States of America v.

3     Paul J. Manafort, Jr.  Mr. Manafort is present in the

4     courtroom.

5          Will counsel for the parties please approach the

6     lectern, identify yourself for the record.

7          MR. WEISSMANN:  Good morning, Your Honor.  Andrew

8     Weissmann for the government.  And with me at counsel table is

9     Greg Andres, Lorna Mosher, Kyle Freeney, Jeannie Rhee, and

10     Special Agents Omer Meisel and Jeff Weiland from the FBI.

11          THE COURT:  All right.  Good morning.

12          MS. WESTLING:  Good morning, Your Honor.  Richard

13     Westling, Thomas Zehnle, and Kevin Downing on behalf of Mr.

14     Manafort.  Good morning.

15          THE COURT:  Good morning.  And I note that Mr.

16     Manafort is present.

17          Mr. Westling, are you going to be handling this

18     morning's proceeding?

19          MS. WESTLING:  I am, Your Honor.

20          THE COURT:  So I understand the defendant wishes to

21     enter a plea of guilty, is that correct?

22          MS. WESTLING:  That's correct, Your Honor.

23          THE COURT:  All right.  Before we proceed any

24     further, he can join you at the lectern.  And I would like to

25     ask the deputy clerk to administer the oath.  And I believe we

1    have to arraign him on the new information before we start.

2              MS. WESTLING:  That's correct, Your Honor.

3              THE COURT:  Okay.  We'll start there.

4              THE COURTROOM DEPUTY:  Are you Paul J. Manafort, Jr.?

5              THE DEFENDANT:  I am.

6              THE COURTROOM DEPUTY:  Are you the person named in

7    the superseding information?

8              THE DEFENDANT:  I am.

9              THE COURTROOM DEPUTY:  Your Honor, please let the

10   record reflect that the defendant and his counsel have received

11   copies of the superseding information which has been filed in

12   this case.

13             Mr. Manafort, you are charged under criminal case

14   number 17-201-1 in a two-count superseding information.  You're

15   charged with Count 1, 18 United States Code §§ 371 and 3551

16   et sec., conspiracy against the United States, and Count 2,

17   18 U.S.C. §§ 371 and 3551 et sec., conspiracy to obstruct

18   justice.

19             Do you waive formal reading of the superseding

20   information?

21             THE DEFENDANT:  I do.

22             THE COURTROOM DEPUTY:  For purposes of arraignment,

23   how do you wish to plead?

24             THE DEFENDANT:  Not guilty.

25             THE COURT:  Please raise your right hand.

1              PAUL J. MANAFORT, JR.,

2      having been duly sworn, states as follows:

3              THE COURT:  All right.  The purpose of the hearing

4      this morning is for you to make a decision.  I know you've

5      discussed it with your attorneys, but it's your formal decision

6      whether you want to go to trial on the government's charges

7      against you, or whether you want to enter a plea of guilty.

8      Obviously, it's an important decision and so it's my job to

9      make sure that you understand everything that's going on and

10     that you understand all the consequences of what you're doing

11     this morning.

12             So I'm going to be asking you a number of questions,

13     some of which are personal, some of which seem like why is she

14     even asking me that question?  But they're all designed to

15     create a record and to establish for me that I -- so that I can

16     make the finding that you're making a knowing and voluntary

17     choice this morning and that you understand the consequences of

18     what you're doing.

19             So the first thing I need to tell you is if I ask you

20     a question and you don't understand what I'm getting at, feel

21     free to ask me to explain it or restate it.  And if I ask you a

22     question and you would like to consult with Mr. Westling before

23     you answer, you have the right to tell me that and I'll give

24     you that opportunity to do so.  So do you understand that much?

25             THE DEFENDANT:  Yes, I do.

1          THE COURT:  And do you also understand that you're

2     now under oath so if you don't answer my questions truthfully,

3     you could be prosecuted for perjury or making a false statement

4     for that?

5          THE DEFENDANT:  I do.

6          THE COURT:  All right.  Now, Mr. Westling, as I

7     understand it, he's pleading to the two counts of conspiracy in

8     the superseding information; one count as a conspiracy to

9     commit a number of offenses, including money laundering, tax

10    fraud, failure to file foreign bank account reports, violating

11    the Foreign Agent Registration Act, and making false statements

12    to the Department of Justice.  And the second conspiracy is to

13    obstruct justice by tampering with witnesses while on pretrial

14    release, is that correct?

15         MS. WESTLING:  That's correct, Your Honor.

16         THE COURT:  And then the superseding indictment,

17    Docket 318, will be dismissed at the time of sentencing, even

18    though Counts 1 and 7 are largely what's recapitulated in the

19    information?

20         MS. WESTLING:  That's correct.

21         THE COURT:  And it's also my understanding that

22    what's been referred to as the remaining counts in the Eastern

23    District of Virginia will also be dismissed at the time of

24    sentencing, and by that you mean the counts for which the jury

25    was unable to reach a unanimous verdict?

```
 1                  MS. WESTLING:  That's correct, Your Honor.

 2                  THE COURT:  Okay.  And I didn't see it, but I don't

 3       believe there's any provision in the plea agreement concerning

 4       his bond status, so that's not subject to change.

 5                  MS. WESTLING:  That's correct.  That's not before the

 6       Court at this time, Your Honor.

 7                  THE COURT:  And, Mr. Manafort, do you understand that

 8       to be generally the terms of the agreement?

 9                  THE DEFENDANT:  I do.

10                  THE COURT:  We're going to go over it in much more

11       detail in a minute.

12                  So to get to the questions that I need to ask you in

13       terms of your understanding of this morning's proceedings, can

14       you tell me how old you are?

15                  THE DEFENDANT:  69.

16                  THE COURT:  And what is the highest level of

17       education that you attained?

18                  THE DEFENDANT:  Juris doctorate.

19                  THE COURT:  And so, obviously, you can read and

20       write?

21                  THE DEFENDANT:  I'm sorry?

22                  THE COURT:  You can read and write?

23                  THE DEFENDANT:  I can.

24                  THE COURT:  And where were you born, sir?

25                  THE DEFENDANT:  New Britain, Connecticut.
```

1          THE COURT:  Have you taken any alcohol or drugs in

2     the last 48 hours or any --

3          THE DEFENDANT:  No.

4          THE COURT:  -- or any medicine that could affect your

5     ability to understand what you're doing by pleading guilty this

6     morning?

7          THE DEFENDANT:  No.

8          THE COURT:  Have you ever received any kind of

9     treatment for any mental illness or emotional disturbance?

10          THE DEFENDANT:  No.

11          THE COURT:  Have you received a copy of the

12     information, the new charges this morning, and the indictment

13     that's pending against you, and have you fully discussed the

14     charges and the case in general with your lawyers?

15          THE DEFENDANT:  I have.

16          THE COURT:  Are you completely satisfied with the

17     services of your lawyers in this case?

18          THE DEFENDANT:  I am.

19          THE COURT:  Have you had enough time to talk with

20     them and discuss the case and the plea offer and whether or not

21     you should accept it?

22          THE DEFENDANT:  I have.

23          THE COURT:  And one question for the prosecution, and

24     that is:  Are you aware of the existence of any exculpatory

25     information that has not been produced to the defendant?

1          MR. WEISSMANN:  No, Your Honor.

2          THE COURT:  Now, Mr. Manafort, you have certain

3     rights in a criminal case and I need to go over all of them

4     with you.  First of all, what you're pleading guilty to this

5     morning is an information, which is basically just a piece of

6     paper on which the government has typed up its charges.  They

7     overlap with the indictment, but you're not pleading guilty to

8     the indictment, so I need to inform you that you still have the

9     right to be charged by a grand jury with the counts to which

10    you're pleading guilty.  And in that instance, the government

11    would have to persuade a majority of the grand jurors that

12    there's probable cause that a crime was committed and that you

13    committed it.

14          Do you understand that you're pleading guilty to

15    charges that weren't themselves presented to a grand jury?

16          THE DEFENDANT:  I do.

17          THE COURT:  All right.  And I have a document in

18    front of me that says Waiver of Indictment.  And is that your

19    signature, giving up your right to be charged by indictment in

20    these counts?

21          THE DEFENDANT:  It is.

22          THE COURT:  I'm going to sign it as well.

23          Now, you have the right to plead not guilty and have

24    a jury trial in this case, and that would mean that 12 citizens

25    of the District of Columbia, chosen from the group that we've

1    already gotten the questionnaires from, would sit over there in

2    that jury box and they would be the ones who would determine

3    your guilt or innocence based on evidence presented in the

4    courtroom.  Do you understand that you have a right to a jury

5    trial?

6              THE DEFENDANT:  I do.

7              THE COURT:  And do you understand that if you had a

8    trial, you would have the right to be represented by your

9    lawyers at that trial?

10             THE DEFENDANT:  I do.

11             THE COURT:  And do you understand that at a trial you

12   would have the right, through your lawyers, to confront and

13   cross-examine the witnesses against you?

14             THE DEFENDANT:  I do.

15             THE COURT:  And do you also understand that you would

16   have the right to present your own witnesses, and that you

17   would have the right to subpoena them, to require them to be

18   here to testify in your defense?

19             THE DEFENDANT:  I do.

20             THE COURT:  And do you also understand that if there

21   were a trial, you would have the right to testify and present

22   evidence on your behalf, if you wanted to, but you wouldn't

23   have to testify or present any evidence if you didn't want to

24   because you can't be forced to incriminate yourself or to

25   participate in the trial against you.  Do you understand that?

1      THE DEFENDANT:  I do.

2      THE COURT:  And do you also understand that unless

3  and until I accept your guilty plea, you are presumed by the

4  law to be innocent because it's the government's burden to

5  prove your guilt beyond a reasonable doubt and until it does,

6  you cannot be convicted of a crime?

7      THE DEFENDANT:  I do.

8      THE COURT:  Now, do you understand if you plead

9  guilty in this case and I accept your guilty plea, you're going

10  to give up all the rights I just described because there will

11  be no trial?

12      THE DEFENDANT:  I understand.

13      THE COURT:  All right.  And that is, obviously,

14  sufficiently important that we ask you to put that in writing.

15  I have a document in front of me called Waiver of Trial by

16  Jury.  Is this your signature where it says "Defendant" and

17  "Paul Manafort"?

18      THE DEFENDANT:  It is.

19      THE COURT:  Now, do you also understand that if you

20  went to trial and you were convicted, you would have a right to

21  appeal your conviction to the Court of Appeals and have a

22  lawyer help you prepare the appeal?

23      THE DEFENDANT:  I do.

24      THE COURT:  Now, do you understand by pleading

25  guilty, you're giving up your right to appeal in this case?

1          THE DEFENDANT:  I do.

2          THE COURT:  And that includes you're giving up the

3     right to appeal the denial of the motions to suppress evidence

4     that was obtained from the searches, you're giving up the right

5     to appeal your motion to dismiss the indictment on the grounds

6     that the investigation of you by the Office of Special Counsel

7     was illegitimate.  Do you understand that?

8          THE DEFENDANT:  I do.

9          THE COURT:  You're also giving up your right to

10    appeal your sentence, unless your sentence exceeds the maximum

11    that the statute says I'm permitted to impose or it exceeds the

12    applicable sentencing guideline range or if your counsel is

13    ineffective in connection with the sentencing, but, otherwise,

14    you can't appeal your sentence either.  Do you understand that?

15          THE DEFENDANT:  I do.

16          THE COURT:  And as I understand it, as part of this

17    plea you're also giving up the right to appeal any pretrial or

18    trial rulings in the criminal case against you in the Eastern

19    District of Virginia, 18 criminal docket 83, and you're

20    admitting your guilt to the remaining counts in that case?

21          THE DEFENDANT:  I do.

22          THE COURT:  Now, the plea agreement also provides

23    that you're going to be waiving your right to ask the

24    government for documents about you under either the Freedom of

25    Information Act or the Privacy Act.  Do you understand that?

1          THE DEFENDANT:  I do.

2          THE COURT:  And you're also waiving rights that you

3    would have under the Federal Rules of Civil Procedure, or

4    28 U.S. Code § 2255, to come back and attack this conviction in

5    court later, with the limited exception of if there was

6    ineffective assistance of counsel or newly discovered evidence,

7    but otherwise you can't come back to court and tell me there

8    was a problem here.  Do you understand that?

9          THE DEFENDANT:  I do.

10         THE COURT:  And you're waiving any right to claim

11   that you were the prevailing party in this case under the Hyde

12   Amendment and would therefore be eligible for attorney fees or

13   any other relief under that law.  Do you understand that?

14         THE DEFENDANT:  I do.

15         THE COURT:  You're also, according to the plea

16   agreement, waiving the statute of limitations, so if for some

17   reason this plea is set aside and these charges are brought in

18   the future, you're waiving your right to say, well, it's to

19   late to bring those charges against me?

20         THE DEFENDANT:  I understand.

21         THE COURT:  And finally, under the Federal Rule of

22   Evidence 410, ordinarily the government could not introduce

23   what you said in court during a guilty plea in a future trial

24   against you if that plea is withdraw, but you're giving up that

25   right and if you are some day tried on these charges, your

1    admissions in court today can be used against you.  Do you

2    understand that?

3              THE DEFENDANT:  I do.

4              THE COURT:  And finally, as part of this plea you're

5    also agreeing not to accept any remuneration or compensation,

6    directly or indirectly, for publishing or disseminating any

7    information concerning this investigation or the conduct in the

8    statement of offense or the prosecution of this case against

9    you.  Do you understand that?

10             THE DEFENDANT:  I do.

11             THE COURT:  Now, going through all those rights that

12   you're waiving, do you still want to plead guilty in this case,

13   give up your right to a trial, your right to an appeal, and all

14   of the other rights that we just talked about?

15             THE DEFENDANT:  I do.

16             THE COURT:  Now, Mr. Manafort, I realize that we have

17   a very lengthy statement of offense in this case and I'm going

18   to follow my standard practice here and I'm going to ask the

19   prosecutor here to summarize orally for you and for me what

20   happened in this case.  And I want you to listen very carefully

21   when he's speaking because when he's through, I'm going to ask

22   you if what he has told me is true and accurate.  Do you

23   understand that?

24             THE DEFENDANT:  I do.

25             THE COURT:  Okay.  You and Mr. Westling can be

1    seated.

2            Mr. Weissmann, obviously, when you get to things like

3    the particular bank accounts, you can say listed in the

4    statement of offense, or listed in the indictment.  But I would

5    like you to explain orally what he's pleading guilty to and

6    what this case would show if it went to trial.

7            MR. WEISMANN:  Thank you, Your Honor.  Before I do

8    that, could I just note, one of the things that you addressed

9    with the defendant and his counsel I believe is slightly

10   different, which is the timing for when we would move to

11   dismiss the remaining counts here and in the Eastern District

12   of Virginia.

13           THE COURT:  Okay.

14           MR. WEISSMANN:  On page 2 of 17 of the cooperation

15   agreement, if you look at section 3 in the last two lines,

16   it's -- the agreement is it would be at the time of sentencing

17   or at the completion of his successful cooperation, whichever

18   is later, and then it continues.

19           THE COURT:  Okay.

20           MR. WEISSMANN:  And again, it's not -- I just wanted

21   to call that to your attention; it's slightly different.

22           THE COURT:  Mr. Westing, you understand that to being

23   the agreement?

24           MS. WESTLING:  I do, Your Honor.

25           THE COURT:  Thank you.

1          MR. WEISSMANN:  The statement of offense that is part

2     of the plea agreement is a summary of the facts, and I'm going

3     to summarize that summary.  What I should say is that

4     everything that's in the statement of offense is based on the

5     exhibits and the anticipated testimony of witnesses.  All of

6     the 302s, the so-called FBI statements, have been provided to

7     the defense, as have all the exhibits.  What's not in the

8     statement of offense is it does not rely on information

9     obtained from Mr. Manafort in the course of his proffer

10    sessions that -- and cooperation that led us to today.  So this

11    is just what we would prove at trial, and a summary of that.

12         So, the government would prove that Mr. Manafort was

13    an owner of Davis Manafort Partners, Inc., which has been

14    referred to as DMP, and DMP International, which has been

15    referred to as DMI.  Mr. Manafort engaged in a variety of

16    criminal schemes; he did so knowingly, intentionally, and

17    willfully, and conspired at various times with Mr. Gates, Mr.

18    Kilimnik and others to carry out these criminal schemes.

19         Let me start with the first one, which is the Foreign

20    Agents Registration Agent conspiracy, which involved Mr.

21    Manafort lobbying in the United States on behalf of the

22    government of Ukraine, President Yanukovych, the Party of

23    Regions, and the Opposition Bloc.  For shorthand, I probably

24    will just say the government of Ukraine, rather than going

25    through that litany each time.

1          Mr. Manafort knew it was illegal to lobby government

2     officials, engage in public relations activity, which is

3     collectively referred to as lobbying, in the United States on

4     behalf of a foreign government or political parties without

5     registering with the United States government under the Foreign

6     Agents Registration Act.  Mr. Manafort knew he was lobbying in

7     the United States for the government of Ukraine.  And, thus, he

8     was supposed to submit a written registration statement to the

9     United States Department of Justice.

10          Mr. Manafort knew that the Ukraine had a strong

11    interest in the United States, taking economic and policy

12    positions favorable to Ukraine, including not imposing

13    sanctions on Ukraine.  He also knew that the trial and

14    treatment of President Yanukovych's political rival, former

15    Prime Minister Yulia Tymoshenko, was strongly condemned by

16    leading United States executive and legislative branch

17    officials, and was a major hurdle to improving the relationship

18    between the United States and the Ukraine.

19          From 2006 until 2015 Mr. Manafort led a multi-million

20    dollar lobbying campaign in the United States at the direction

21    of the government of Ukraine.  He did so intentionally, and did

22    so without registering, as required by law.  As part of that

23    lobbying scheme Mr. Manafort hired numerous firms and people at

24    those firms to assist in the lobbying campaign.  They're

25    referred to in the statement of offense as Companies A, B, C,

1    D, and E, and Law Firm A, among others.  These companies

2    collectively and law firm were paid the equivalent of over

3    $11 million for the Ukraine work.

4          So the filing under the Foreign Agents Registration

5    Act would have undermined the secrecy that Mr. Manafort was

6    seeking in order to conduct the effective campaign for Ukraine

7    to influence American leaders and the American public.  Mr.

8    Manafort took steps to avoid any of the firms and people

9    disclosing their lobbying efforts under the Foreign Agents

10   Registration Agent.  One example that's given in the statement

11   of offense is with respect to Company E.

12         Mr. Manafort and others sought to dissuade Company E

13   from filing a registration statement under the Foreign Agents

14   Registration Act.  And only after Mr. Manafort ceased to use

15   Company E in the fall of 2007 did Company E disclose its work

16   for Ukraine in a belated filing under the Act, in 2008.

17         Mr. Manafort took other measures to keep the Ukraine

18   lobbying as secret as possible.  For example, Mr. Manafort, in

19   a written communication on or about May 16th, 2013, directed

20   his lobbyists to write and disseminate within the United States

21   news articles and stories about -- that allege that Miss

22   Tymoshenko had paid for a murder of a Ukrainian official.

23   Manafort stated that it should be, quote, pushed -- continuing

24   with the quote -- with no fingerprints.  Quote, it is very

25   important we have no connection.  Person D1 objected to the

1      plan, but ultimately Persons D1 and D-2 went along with the

2      plan and disseminated this story about Miss Tymoshenko.   The

3      Foreign Agent Registration Act would have required that to be

4      disclosed, as Mr. Manafort knew, and he did not do so.

5              Let me turn to the Hapsburg Group and Company D.   As

6      part of that lobbying scheme, starting in 2011 going to 2014,

7      Mr. Manafort retained a group of former European heads, four of

8      them, and senior officials, it included an Austrian chancellor,

9      an Italian prime minister and a Polish president, to lobby in

10     the United States and Europe on behalf of Ukraine.   The former

11     politicians, who Mr. Manafort referred to as the Hapsburg

12     Group, appeared to be providing solely their independent

13     assessments of the government of Ukraine policies when, in

14     fact, they were paid by Ukraine.

15             Mr. Manafort explained, in an eyes-only -- that's in

16     quotes -- memorandum in or about June of 2012 that his purpose

17     was to.  Quote, assemble a small group of high-level European

18     influential champions and politically credible friends who

19     could act informally and without any visible relationship with

20     the government of Ukraine.

21             All four Hapsburg Group members, at the direction and

22     with the direct assistance of Mr. Manafort, advocated positions

23     favorable to Ukraine in meetings in the United States.   They

24     did so with lawmakers, interviews with United States

25     journalists, and ghost-written op-eds in American publications.

1    In or about and between 2012 and 2014 Mr. Manafort directed

2    more than 2 million euros to be wired from at least four of his

3    offshore accounts to pay secretly the Hapsburg Group.  To avoid

4    European taxation, the contract with the Hapsburg Group falsely

5    stated that none of its work would take place in Europe.  I'll

6    come back to that when we talk about obstruction and tampering

7    with the witnesses in Count 2.

8         An example of the Hapsburg Group work, a former

9    Polish president, who was also a representative at the time of

10   a European -- of the European parliament, with oversight

11   responsibility for Ukraine, was working, in fact, for Ukraine.

12   Mr. Manafort solicited the official to provide Mr. Manafort

13   inside information about the European parliament, its views and

14   its actions with respect to Ukraine and to take actions

15   favorable to Ukraine.

16        That also was something that was used by Mr. Manafort

17   here in the United States when there was an effort by the

18   senate, in the fall of 2012, led by Senator Durbin to pass a

19   resolution critical of the way in which President Yanukovych

20   was treating Miss Tymoshenko.  Mr. Manafort engaged in an

21   all-out effort to lobby various senators and others to try to

22   either kill or delay that resolution.

23        As part of that effort, in addition to having

24   Companies A and B, which are United States lobbying firms -- in

25   addition to having them reach out to numerous senators and

1  others, Mr. Manafort sought to have the senators be told about

2  the Polish president and his positions to try and make sure

3  that they had the extra clout of being able to use his

4  positions against the resolution, as if they were independent,

5  without informing the senators or anyone else who they were

6  lobbying that in fact that individual was a paid representative

7  of the Ukraine and was doing so and taking his positions on

8  behalf of the Hapsburg Group.

9          Another example, about a year later, in 2013, is that

10  a different member of the Hapsburg Group lobbied in the United

11  States for Ukraine.  That Hapsburg Group member accompanied his

12  country's prime minister to the Oval Office and met with the

13  then president and vice president of the United States, as well

14  as senior United States officials in the executive and

15  legislative branches.  In written communications sent to Mr.

16  Manafort, Person D1 reported that the Hapsburg Group member

17  delivered the message of not letting, quote, Russians steal

18  Ukraine from the West, unquote.  The Foreign Agents

19  Registration Act would have required Mr. Manafort to disclose

20  that meeting.  And he knew that and he did not do so.

21          Now let me turn to Law Firm A and its efforts with

22  respect to Miss Tymoshenko.  Another part of the lobbying

23  scheme which began in 2012 was that on behalf of President

24  Yanukovych and the government of Ukraine's ministry of justice,

25  Mr. Manafort solicited a United States law firm to write a

1    report evaluating the trial of President Yanukovych's political

2    opponent Yulia Tymoshenko.  Mr. Manafort caused Ukraine to hire

3    the law firm, said that its report about that trial could be

4    used in the United States and elsewhere to defend the

5    Tymoshenko criminal trial and argue that President Yanukovych

6    and Ukraine had not engaged in selective prosecution in jailing

7    a political opponent.

8         Mr. Manafort retained a public relations firm,

9    Company C, to prepare a medial roll-out plan for the law firm

10   report.  Mr. Manafort used one of his offshore accounts to pay

11   Company C the equivalent of more than $1 million for its

12   services.  Mr. Manafort worked closely with Company C to

13   develop a detailed, written lobbying plan in connection with

14   what Mr. Manafort referred to as selling -- quote and unquote

15   for that term -- of the report.

16        The campaign included getting the law firm's record

17   seeded to the press in the United States.  That is, to leak the

18   report ahead of its official release to a prominent United

19   States newspaper and then use that initial article to influence

20   reporting globally.  Mr. Manafort reported on the law firm's

21   work, as well as Company C, the lobbying firm that was engaged

22   in the media roll-out.  Mr. Manafort reported on both of those

23   aspects to President Yanukovych and other representatives of

24   the government of Ukraine.

25        Mr. Manafort and others directed the lobbyists to

1    tout the report as showing that President Yanukovych had not

2    selectively prosecuted Miss Tymoshenko.  But in November of

3    2012 Mr. Manafort had been told privately, in writing, by the

4    law firm that the evidence of Miss Tymoshenko's criminal

5    intent, quote, is virtually nonexistent, unquote, and that it

6    was unclear even among legal experts that Miss Tymoshenko

7    lacked power to engage in the conduct central to the criminal

8    case in Ukraine.  Those facts, known to Manafort and others,

9    were not disclosed to the public.

10             Mr. Manafort and others also knew that the report did

11   not disclose that the law firm, in addition to being retained

12   to write the report, was retained to represent Ukraine itself,

13   including in connection with the Tymoshenko case, and to

14   provide training to the trial team prosecuting Miss Tymoshenko.

15   Mr. Manafort also knew that the government of Ukraine did not

16   want to disclose how much the report cost.  More than

17   $4.6 million was paid to the law firm for its work.  Mr.

18   Manafort used one of his offshore accounts to fund

19   approximately $4 million to pay for the law firm's services.  A

20   fact that was not disclosed by Mr. Manafort or others to the

21   public.  Instead, the government of Ukraine reported falsely

22   that the report cost just $12,000.

23             Mr. Manafort and others knew that the actual cost of

24   the report and the scope of the law firm's work would undermine

25   the reports being perceived as independent and the assessment

1    that it would receive from the public in order for it to be an

2    effective lobbying tool for Mr. Manafort and others to say that

3    the incarceration of President Yanukovych's political opponent

4    was justified.

5            In addition to the report, Mr. Manafort took other

6    steps on behalf of the government of Ukraine to tarnish Miss

7    Tymoshenko in the United States.  In October 2012 Mr. Manafort

8    orchestrated a scheme to have a segment of the American

9    community put pressure on the administration to disavow Miss

10   Tymoshenko and support President Yanukovych.  Mr. Manafort

11   sought to undermine the United States' support for Miss

12   Tymoshenko by spreading stories in the United States that a

13   senior cabinet official in the United States who had been a

14   prominent critic of President Yanukovych's treatment of Miss

15   Tymoshenko was supporting anti-Semitism because the official

16   supported Miss Tymoshenko, who in turn had formed a political

17   alliance with a Ukraine party that espoused anti-Semitic views.

18           Mr. Manafort coordinated privately with a senior

19   Israeli government official to issue a written statement

20   publicizing this story.  Mr. Manafort then, with secret

21   knowledge of the Israeli statement, worked to disseminate this

22   story in the United States, writing to person D1, quote, I have

23   someone pushing it on the *New York Post,* unquote.  Manafort

24   sought to have the administration understand, quote, that the

25   Jewish community will take this out on Obama on election day if

1    he does nothing, unquote.

2          Mr. Manafort then told his United States lobbyists to

3    inform the administration that Ukraine had worked to prevent

4    the administration's presidential opponent from including

5    damaging language in the Israeli statement so as not to harm

6    the administration and thus further ingratiate Mr. Yanukovych

7    with the United States administration.

8          Let me turn to Companies A and B.

9          As another part of this scheme, starting in or about

10   February of 2012, Mr. Manafort solicited two Washington, D.C.

11   lobbying firms, referred to as Companies A and B, to lobby in

12   the United States on behalf of the government of Ukraine.  Mr.

13   Manafort arranged to pay Companies A and B over $2 million from

14   his offshore accounts for the United States lobbying work.

15         Mr. Manafort and others provided direction to

16   Companies A and B in their lobbying efforts, as the Court is

17   aware from exhibits in this case.  Those were extensive

18   lobbying efforts.  They involved visits by numerous senior

19   Ukrainian officials, dozens of meetings and calls with members

20   of Congress, their staff, White House officials, state

21   department officials concerning a wide array of topics that

22   were of interest to Ukraine, such as sanctions and the trial of

23   Miss Tymoshenko.

24         In addition to the work that was done by the

25   lobbyists, Mr. Manafort himself participated directly in the

1    lobbying.  He drafted and edited numerous ghost-written op-eds

2    for publication in the United States newspapers.  He also

3    personally met, in March 2013, in Washington, D.C., with a

4    member of Congress who was on a subcommittee that had Ukraine

5    within its purview.  After the meeting, Mr. Manafort prepared a

6    report for President Yanukovych, telling him that the meeting

7    went well and providing details about the substance.

8         To distance the Company A and B lobbying from the

9    government of Ukraine and to avoid having to register as agents

10   of Ukraine under the Foreign Agents Registration Act, Mr.

11   Manafort, with others, arranged for Companies A and B to be

12   engaged by a newly formed Brussels entity called the European

13   Centre for the Modern Ukraine, which we've been referring to as

14   the Centre, instead of directly being retained by the

15   government of Ukraine.

16        Mr. Manafort described the Centre as, quote, the

17   Brussels NGO that we have formed, unquote.  To coordinate

18   lobbying for Ukraine, the Centre was founded by a Ukraine Party

19   of Regions member and Ukraine first vice prime minister.  The

20   head of its board was another member of the Party of Regions,

21   who became the Ukraine foreign minister.

22        Despite the Centre being the ostensible client of

23   Companies A and B, Manafort knew that the Centre did not direct

24   or oversee their work.  The firms received direction from Mr.

25   Manafort and his subordinate, Mr. Gates, on behalf of the

1    government of Ukraine.

2         Mr. Manafort, Mr. Gates, and employees of both

3    Companies A and B referred to the client in ways that made

4    clear that they knew it was Ukraine that was the client and

5    directing their actions; for instance, noting in one memo that

6    the client, in quotes, the client had an embassy in Washington,

7    D.C.  The head of Company B told his team to think of the

8    president of Ukraine as the client.

9         As a Company A employee noted to another company

10   employee, the lobbying for the Centre was, quote, in name only.

11   Continuing the quote, you've got to see through the nonsense of

12   that.  Continuing the quote, it's like Alice in Wonderland.  An

13   employee of Company B described the Centre as a fig leaf and

14   the Centre's written certification that it was not related to

15   the Party of Regions as a, quote, fig leaf on a fig leaf,

16   referring to the Centre in an email as the, quote, European hot

17   dog stand for a modern Ukraine.

18        Let me speak briefly now about the conspiracy to

19   obstruct justice, which is the false and misleading submissions

20   to the Department of Justice.

21        In September 2016, after numerous press reports

22   concerning Mr. Manafort had appeared in August of 2016, the

23   Department of Justice National Security Division informed Mr.

24   Manafort, Mr. Gates, and DMI, in writing, that it sought to

25   determine whether they had acted as agents of a foreign

principal under the Foreign Agents Registration Act, without

registering.

In November 2016 and February 2017 Mr. Manafort and

Mr. Gates conspired to knowingly and intentionally cause false

and misleading letters to be submitted to the Department of

Justice, through its unwitting legal counsel.  And let me just

repeat that, that there is unwitting legal counsel, who had no

awareness of what was being submitted to the Department at the

time was false.

The letters, both of which were approved by Mr.

Manafort, Mr. Gates before they were submitted by his

counsel -- by their counsel, represented falsely, among other

things -- and I'll just point out two.  In the statement of

offense all of the falsehoods are listed.  One is a statement

that DMI's efforts on behalf of the Party of Regions did not

include meetings or outreach within the United States.  And a

second is that DMI does not retain communications beyond 30

days, and as a result of this policy, a search has returned no

responsive documents.  The November 2016 letter attached a

one-page, undated document that purported to be a DMI email

retention policy.

In fact, Mr. Manafort and Mr. Gates, among others,

had selected Companies A and B, engaged in weekly scheduled

calls and frequent emails with Companies A and B, provided them

direction as to specific lobbying steps that they should be

1    taking, sought and received detailed oral and written reports

2    from these firms, and communicated with President Yanukovych to

3    brief him on the lobbying efforts.

4           Although Mr. Manafort had represented to the

5    Department of Justice in November 2016 and February 2017 that

6    he had no relevant documents, in fact, Mr. Manafort had

7    numerous incriminating documents in his possession, as he knew

8    at the time.  The Federal Bureau of Investigation, as the Court

9    knows, conducted a court-authorized search of Mr. Manafort's

10   home in Virginia in the summer of 2017.  Documents attached to

11   the statement of offense and attached to the information are a

12   sampling, a small sampling of the documents that were found in

13   Mr. Manafort's possession, custody or control as part of that

14   search and were in existence at the time of his submitting the

15   letters to the Department of Justice that he was -- that there

16   were no responsive documents.

17          Let me turn to the money laundering conspiracy which

18   is part of the Count 1 charge.

19          In or about between 2006 and 2016 Mr. Manafort,

20   together with others, did knowingly, intentionally conspire to

21   do two types of things:  One is to conduct financial

22   transactions affecting interstate and foreign commerce, which

23   involved the proceeds of specified unlawful activity, to wit;

24   here it's to commit a violation of the Foreign Agents

25   Registration Act, knowing that the property involved in the

1    transactions represented proceeds of some form of unlawful

2    activity, with intent to engage in conduct constituting a

3    violation of the tax laws specified in the paperwork.

4        The second object was to transport -- transmit and

5    transfer monetary instruments and funds from places outside the

6    United States to inside the United States, and the converse,

7    from inside the United States to outside the United States,

8    with intent to promote the carrying on of specified unlawful

9    activity.  And here the specified unlawful activity is a felony

10   violation of the Foreign Agents Registration Act.

11       I'm going to take you up on your suggestion in

12   paragraph -- I believe it's 37 of the statement of offense,

13   there is a list of the various transfers with respect to

14   Company A, Company B, and Law Firm A totaling, together, a

15   little bit over $6.5 million in transfers.

16       Turning to the tax and foreign bank account

17   conspiracy.  From 2008 to 2014 Mr. Manafort caused millions of

18   dollars of wire transfers to be made from offshore nominee

19   accounts without paying taxes on that income.  As Your Honor is

20   aware, this was the subject of the trial in the Eastern

21   District of Virginia.  The payments were made for goods,

22   services, and real estate, which I won't belabor the different

23   types of vendors.  Mr. Manafort hid the income, as well, by

24   denominating various overseas payments coming to him as loans,

25   when in fact they were income.

1          Mr. Manafort directly and through Mr. Gates

2     repeatedly misled his bookkeeper and tax accountants by not

3     disclosing the foreign overseas accounts and income, among

4     other ways.

5          Mr. Manafort owned and controlled a range of foreign

6     bank accounts in Cypress and the Grenadines and the United

7     Kingdom.  Mr. Manafort was aware that many of these accounts

8     held well in excess of $10,000 in the aggregate at some point

9     during each year in which they existed.  Mr. Manafort did not

10    report the accounts' existence to his bookkeeper and his tax

11    preparers in an effort to hide them, to allow him to avoid

12    disclosing them on a FBAR filing, and to hide the income so it

13    wouldn't be reported to the IRS.

14         Mr. Manafort, of course, was aware at the time that

15    it was illegal to hide income from the IRS.  He was aware at

16    the time that it was illegal to fail to report information to

17    the IRS regarding the existence of foreign bank accounts.

18         Mr. Manafort also understood at the time that a

19    United States person who has a financial interest in or

20    signature authority over a foreign bank account or other

21    financial account in a foreign country which exceeded $10,000

22    in any one year was required to report the account.

23         Knowing the existence of his reportable foreign

24    accounts and hidden income, Mr. Manafort knowingly,

25    intentionally, and willfully filed and conspired to file false

1    returns from 2006 to 2015, and that he said he did not have

2    reportable foreign bank accounts when he knew that he did, he

3    did not report income that he knew he in fact earned, and he

4    did not file foreign bank account reports.

5           Mr. Manafort failed to report over $15 million in

6    income during the period 2010 to 2014.  There are forfeiture

7    allegations that are agreed to by the defense.  I'm just going

8    to read out the various properties in short, but it's set out

9    in more detail in the paperwork:  377 Union Street, 29 Howard

10   Street, 174 Jobs Lane in Water Mill, an account at the Federal

11   Savings Bank, Capital One, another account at the Federal

12   Savings Bank, life insurance policies, 123 Baxter Street, and a

13   condo at 721 Fifth Avenue.  All subject to, in the plea

14   agreement, both criminal and civil forfeiture.

15          Count 2 is the witness tampering conspiracy.  From in

16   or about and between February 23rd, 2018 and April 2018, both

17   dates being approximate and inclusive, within the District of

18   Columbia and elsewhere, Mr. Manafort, together with others and,

19   specifically, Mr. Kilimnik, who has been charged in the case

20   before Your Honor, knowingly and intentionally conspired to

21   corruptly persuade another person, to wit:  Persons D1 and D2,

22   with intent to influence, delay, and prevent the testimony of

23   any person in an official proceeding in violation of federal

24   law.

25          On February 22nd, 2018 Mr. Manafort was charged in

1    this District before Your Honor for the first time with

2    allegations concerning the Hapsburg Group and Mr. Manafort's

3    use of that group to lobby illegally in the United States, in

4    violation of the Foreign Agents Registration Act.  Mr. Manafort

5    knew at the time that the Act prescribed only United States

6    lobbying.

7            Immediately after February 22nd, 2018, Mr. Manafort

8    began reaching out, directly and indirectly, through Mr.

9    Kilimnik to Persons D1 and D2 to induce them to say falsely

10   that they did not work in the United States as part of the

11   lobbying campaign, even though Mr. Manafort then and there well

12   knew that they did lobby in the United States.

13           Again, taking you up on your suggestion, the

14   statement of offense lists a series of telephone calls and text

15   messages with Mr. Manafort to Person D1, Mr. Kilimnik to Person

16   D2, and Mr. Kilimnik to Person D1.

17           And then there are other parts of the statement of

18   offense that don't relate to a plea of guilty here, but are

19   admissions by the defendant to all of the remaining bank fraud

20   counts on which the jury was hung in the Eastern District of

21   Virginia, and all of those admissions are set out in the

22   other-acts portion.  But they are set out in writing.

23           THE COURT:  All right.  Thank you.

24           Mr. Westling and Mr. Manafort.

25           I believe it's fair to say that's probably the

1    longest and most detailed summary that's ever preceded this

2    question, but is what the prosecutor just said a true and

3    accurate description of what you did in this case?

4              THE DEFENDANT:  I did.  It is.

5              THE COURT:  So, did you in fact participate and

6    coordinate in public relations and lobbying efforts in the

7    United States on behalf of the Ukrainian government and

8    Ukrainian government officials and/or political parties?

9              THE DEFENDANT:  I did.

10             THE COURT:  And as part of that, did you conspire, in

11   fact, with other people to avoid U.S. tax laws, foreign bank

12   account disclosure laws, laws requiring registration as a

13   foreign agent, and to violate the money laundering statute, and

14   to make false statements to the Department of Justice in 2016

15   in connection with that lobbying work in the United States?

16             THE DEFENDANT:  I did.

17             THE COURT:  And did you also, in fact, conspire with

18   at least one other person to obstruct justice by tampering with

19   witnesses concerning the FARA allegations in 2018?

20             THE DEFENDANT:  I did.

21             THE COURT:  Now, what Mr. Weissmann was summarizing

22   was a detailed statement of offense, which I have a copy of in

23   front of me.  On the last page, page 24, it says "Defendant's

24   Acceptance."  Is that your signature, accepting the statement

25   of facts as true and accurate?

1              THE DEFENDANT:  It is.

2              THE COURT:  And I have asked that not just you, but

3      anyone who appears before me, not just sign the last page where

4      it says "Defendant," but to read the entire thing and to

5      initial every single page to indicate to me that you agree that

6      the facts are true on every page of the statement of offense.

7      There appear to be initials on every page of the original copy

8      of the statement of offense that I have in front of me.  Are

9      you the one who initialed this document?

10             THE DEFENDANT:  I am.

11             THE COURT:  And that's going to be made part of the

12     record as well.

13             I have one other document in front of me, it's also

14     lengthy and it's a copy of a letter written to your attorneys

15     from the attorneys from the Office of Special Counsel.  Have

16     you reviewed this letter to your lawyers?

17             THE DEFENDANT:  I have.

18             THE COURT:  All right.  Now, on the last page, again,

19     there's a signature where it states that you accept the plea

20     agreement, you've been represented by counsel, and you've

21     reviewed the documents.  Is this your signature on the last

22     page, accepting the offer in this plea letter?

23             THE DEFENDANT:  It is.

24             THE COURT:  And have you reviewed every page and

25     initialed it to indicate to me that you've read it and you

1  understand it?

2            THE DEFENDANT:  I have.

3            THE COURT:  I'm not going to go over word by word all

4  of it, but I'm going to go over the key features of the plea

5  agreement.

6            As we discussed, you're agreeing to plead guilty to

7  two counts of conspiracy against the United States, in

8  violation of 18 U.S. Code § 371.  Do you understand that if I

9  accept your guilty plea in this case, you could receive a

10  maximum sentence of up to five years on each count?

11            THE DEFENDANT:  I do.

12            THE COURT:  And do you also understand that the

13  sentences for each count could be consecutive?

14            THE DEFENDANT:  I do.

15            THE COURT:  And do you also understand that the

16  sentences could be consecutive to any sentence that is imposed

17  in the Eastern District of Virginia?

18            THE DEFENDANT:  I do.

19            THE COURT:  And do you also understand that on each

20  count you could be sentenced to serve a term of supervised

21  release after any period of incarceration of up to three years

22  on each count?

23            THE DEFENDANT:  I do.

24            THE COURT:  And that means that if you're sent to

25  prison, upon your release you would be under the court's

1    supervision, you would have to satisfy certain conditions and

2    rules, and if you violated them, you could be sent back to

3    prison for an additional period of time.  Do you understand

4    that?

5              THE DEFENDANT:  I do.

6              THE COURT:  And do you also understand that for each

7    count you could be sentenced to pay a fine of up to $250,000

8    for each.  Do you understand that?

9              THE DEFENDANT:  I do.

10             THE COURT:  I could also, as part of your sentence,

11   order you to pay a fine sufficient to compensate the federal

12   government of the cost of your imprisonment or supervised

13   release.  Do you understand that?

14             THE DEFENDANT:  I do.

15             THE COURT:  And do you also understand that because

16   you're pleading guilty to a felony, and there are two felony

17   counts here, that you have to pay a special assessment of $200

18   to the court, $100 for each?

19             THE DEFENDANT:  I do.

20             THE COURT:  And I believe the parties are agreed that

21   there's no mandatory restitution obligation in connection with

22   these counts, is that correct?

23             MS. WESTLING:  That's correct, Your Honor.

24             THE COURT:  But, there are a significant number of

25   forfeiture allegations in this case.  And without going into

1    too much detail, I want to make sure that, Mr. Manafort, you

2    understand that as a result of this plea agreement, you're also

3    agreeing to the forfeiture of a considerable amount of

4    property.  Do you understand that that includes 377 Union

5    Street?

6              THE DEFENDANT:  I do.

7              THE COURT:  It also includes the real property at 29

8    Howard Street, Apartment 4D.

9              THE DEFENDANT:  I do.

10             THE COURT:  Do you understand that it also includes

11   the Jobs Lane house in New York?

12             THE DEFENDANT:  I do.

13             THE COURT:  And funds held in an account at the

14   Federal Savings Bank?

15             THE DEFENDANT:  I do.

16             THE COURT:  Funds seized from an account at Capital

17   One?

18             THE DEFENDANT:  I do.

19             THE COURT:  Funds seized from another account at the

20   Federal Savings Bank?

21             THE DEFENDANT:  I do.

22             THE COURT:  An insurance policy with Northwestern

23   Mutual?

24             THE DEFENDANT:  I do.

25             THE COURT:  And real property at Baxter Street in New

```
1    York?

2                  THE DEFENDANT:  I do.

3                  THE COURT:  And also real property at Fifth Avenue in

4    New York?

5                  THE DEFENDANT:  I do.

6                  THE COURT:  All right.  But we don't have -- there's

7    not a preliminary order of forfeiture.  Some of these are

8    already subject to orders issued by the chief, is that correct?

9                  MS. RHEE:  Yes, Your Honor.

10                 THE COURT:  Now, do you also understand that pursuant

11   to this plea agreement, you are agreeing to cooperate fully and

12   truthfully with the investigation being conducted by the Office

13   of Special Counsel, including participating in interviews and

14   debriefings, producing any documents in your control, and

15   testifying and agreeing to delays of your sentencing at the

16   request of the government.  Do you understand that?

17                 THE DEFENDANT:  I do.

18                 THE COURT:  And these obligations under the agreement

19   will continue even after your sentencing here and in the

20   Eastern District of Virginia.  Do you understand that?

21                 THE DEFENDANT:  I do.

22                 THE COURT:  And I believe in the agreement it says

23   you waive your right to have your counsel present for every

24   interview and debriefing, is that also correct?

25                 THE DEFENDANT:  That's correct.
```

1          THE COURT:  And the agreement provides that you must

2     be truthful and you must not commit any other offense during

3     this period of time, and that either one, being untruthful or

4     committing another offense, would be a breach of this

5     agreement, relieving the government of its obligations.  Do you

6     understand that?

7          THE DEFENDANT:  I do.

8          THE COURT:  All right.  Now, Mr. Manafort, I'm not

9     going to sentence you today.  In deciding on what a fair and

10    appropriate sentence would be, I have to consider a number of

11    factors that are all set out in 18 U.S. Code § 3553, which

12    include the nature and circumstances of the offense, your

13    history and characteristics, and a number of the purposes that

14    a criminal sentence is supposed to fulfil, such as protecting

15    the community, deterring other people, punishing you, and

16    making sure that your sentence is consistent with the sentences

17    that other people get who have committed similar offenses.

18          In connection with that, the statute requires me to

19    consider what the U.S. Sentencing Guidelines would recommend as

20    a sentence in your case.  Congress appointed a Sentencing

21    Commission and it has issued a complex set of guidelines that

22    have a recommended sentencing range based on what the offense

23    is; the ranges can go up or down based on certain aggravating

24    or mitigating factors.  And once we know what the sentencing

25    range is, it can go up or down, depending on the person's prior

1    criminal history.

2           While we may have some idea, based on your lack of

3    criminal history and the nature of this offense and the amount

4    of money involved, what the sentencing range would be after the

5    guidelines calculation, I'm not going to decide what it is

6    until the probation office has an opportunity to prepare a

7    report, you and your lawyers have had a chance to look at it

8    and object to it, the government has had its chance to look at

9    it and object to it, and it's only at that point, after I've

10   heard from everyone, that I'm going to make my determination as

11   to what I think the advisory sentencing guidelines range would

12   be, the recommended range for the sentence.  And then the Court

13   is permitted to vary from that range, based on other factors in

14   its discretion under the sentencing statute.  And in any event,

15   I can never sentence you to more than the maximum statutory

16   period that I told you about before.

17          With that explanation, have you and your attorneys

18   talked about the sentencing guidelines and how they might apply

19   in your case?

20          THE DEFENDANT:  Yes.

21          THE COURT:  All right.  And what is your general

22   understanding?

23          THE DEFENDANT:  Regarding?

24          THE COURT:  The guidelines.

25          THE DEFENDANT:  That there's -- that there's a number

1    of 37.  As far as the range?  I'm not sure I --

2            THE COURT:  All right.  Well, let me go over it a

3    little bit and tell me if what I've just said is what you've

4    been told.  All right?

5            As I understand it, Mr. Westling, we're starting at

6    level 8 as the base offense level under 2S1.1(a).  That gets

7    adjusted upwards, given the amount of money involved, by 22

8    levels.  There's another two-level enhancement, the parties are

9    agreed, because money laundering was involved under

10   2S1.1(b)(2)(B).

11           Another two-level enhancement for sophisticated

12   means, such as shell corporations and offshore accounts.  A

13   four-level enhancement given his leadership in this scheme of

14   more than five participants.  And another two-level enhancement

15   under section 3C1.1 for obstruction of justice.  The leadership

16   with the five participants was under § 3B1.1(a).

17           This adds up to a base offense level -- an offense

18   level for Count 1 at level 40.  I think the understanding is

19   Count 2 would be level 30.  So when you combine them under the

20   guidelines there's no additional levels involved.

21           Because Mr. Manafort is here accepting his

22   responsibility for this offense, it would be -- the levels

23   would be reduced by three under § 3E1.1(b), resulting in a

24   level 37, assuming his criminal history category is I, which is

25   no prior criminal history.  His advisory sentencing guideline

1    range would be of a sentence between 210 and 262 months and a

2    fine of $40,000 to $400,000.  Is that your understanding of

3    where the guidelines come out in this case?

4           MS. WESTLING:  So to be clear, Your Honor, this -- we

5    understand that computation.  That's the computation that the

6    Office of Special Counsel has estimated.  We have left open our

7    ability to argue for other guidelines, depending on how the

8    presentence report comes together.

9           And so we understand this is his exposure, at least

10   potentially, but we also understand the Court will make an

11   independent determination about the application of the advisory

12   sentencing guidelines.

13          THE COURT:  Well, and at any rate, this sentencing

14   range would be greater than the statutory maximum.

15          MS. WESTLING:  That's correct.

16          THE COURT:  And so the statutory maximum is where

17   this cuts off, no matter how I calculate the guidelines.

18   Everybody understands that.

19          MS. WESTLING:  That's correct, Your Honor.

20          THE COURT:  So, Mr. Manafort, have you discussed how

21   these guidelines work and the fact that there is a range that

22   could be as high as 210 to 262 months of what the guidelines

23   would be recommending that I do, which then would have to be

24   reduced down to where the statutory maximum would be if I

25   followed the guidelines.  Do you understand that much?

1           THE DEFENDANT:  I do.

2           THE COURT:  And the parties have agreed that a

3    guideline sentence capped where the statute caps it would be

4    reasonable in this case.  Do you understand that?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Okay.  Now, do you understand I'm not

7    going to be able to determine even what the guidelines

8    recommend until we go through the whole process with the

9    presentence report and, as your lawyer just pointed out, there

10   may be other adjustments that I'm asked to make based upon that

11   report.  So do you understand that we don't know exactly yet

12   what the guideline calculation is?

13          THE DEFENDANT:  Correct.

14          THE COURT:  And you understand that the sentence

15   imposed or the guideline recommendation that I come up with

16   might be different from the estimate that we've just discussed?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And do you also understand that I have

19   the authority to impose a sentence in some circumstances that's

20   either more severe or less severe than what the guidelines

21   would recommend?

22          THE DEFENDANT:  I do.

23          THE COURT:  And do you understand that while the

24   government has agreed to consider filing a motion for a

25   downward departure from the guideline range based upon your

1        cooperation, that it's going to be their decision whether or

2        not to file that motion, and only theirs; neither your lawyer

3        nor I can force them to file that motion?

4                    THE DEFENDANT:  I do.

5                    THE COURT:  And do you also understand that the final

6        decision about whether to grant that motion and to depart

7        downward based on your cooperation is up to me?

8                    THE DEFENDANT:  I do.

9                    THE COURT:  Now, do you also understand that parole

10       has been abolished for federal offenses, so if you are

11       sentenced to prison in this case, you will serve the sentence I

12       impose, with a possible reduction for good time of up to 54

13       days per year, but you're not going to be released early on

14       parole the way people used to be?

15                   THE DEFENDANT:  I do.

16                   THE COURT:  And do you understand -- I believe if I

17       calculate the guidelines in a way that the government believes

18       is unlawful under the guidelines, the government would have the

19       right to appeal that calculation, is that correct?

20                   MR. WEISSMANN:  (Nods head.)

21                   THE COURT:  All right.  Mr. Weissmann is nodding.  Do

22       you understand that, Mr. Westling?

23                   MS. WESTLING:  That is correct, Your Honor.

24                   THE COURT:  So do you understand that, Mr. Manafort?

25                   THE DEFENDANT:  I do.

1          THE COURT:  Now, do you also understand you're

2    pleading guilty to two felonies.  And so, therefore, if your

3    plea is accepted and you're found guilty of that offense, then

4    that felony may deprive you of certain valuable civil rights,

5    such as the right to vote, the right to hold public office, the

6    right to serve on a jury, and the right to possess a firearm.

7          THE DEFENDANT:  I do.

8          THE COURT:  And do you understand at this point

9    there's no recommendation to me as to what the sentence should

10   turn out to be at the end of the day.  But if your sentence

11   turns out to be more sever than what you are expecting or what

12   you are hoping, you're still going to be bound by your plea,

13   you can't withdraw it for that reason.  Do you understand that?

14         THE DEFENDANT:  I do.

15         THE COURT:  All right.  Mr. Manafort, has anyone,

16   including your attorney, the prosecutors, the investigators, or

17   any other person you've come in contact with during this

18   investigation promised or suggested to you that merely because

19   you're pleading guilty I will give you a lighter sentence?

20         THE DEFENDANT:  No.

21         THE COURT:  Has anybody forced you or threatened you

22   or coerced you in any way into entering this guilty plea?

23         THE DEFENDANT:  No.

24         THE COURT:  Do you understand that this agreement,

25   the letter that we talked about, resulted from negotiations

1    between your attorneys and the government attorneys?

2              THE DEFENDANT:  I do.

3              THE COURT:  Has anybody made any promises to you that

4    aren't set forth in this letter in connection with your guilty

5    plea?

6              THE DEFENDANT:  No.

7              THE COURT:  Has anybody promised you what sentence

8    I'm going to impose in this case if I accept your guilty plea?

9              THE DEFENDANT:  No.

10             THE COURT:  Do you understand at this point I don't

11   even know what sentence I'm going to impose because I haven't

12   read the presentence report and I haven't heard from the

13   lawyers on both sides?

14             THE DEFENDANT:  I do.

15             THE COURT:  And do you understand that between now

16   and the time of your sentence you're still going to be

17   detained, as you are right now?

18             THE DEFENDANT:  I do.

19             THE COURT:  Mr. Manafort, are you entering this plea

20   of guilty voluntarily and of your own free will, because you're

21   guilty and for no other reason?

22             THE DEFENDANT:  I am.

23             THE COURT:  Is there anything you don't understand

24   about this proceeding or about your plea in this case?

25             THE DEFENDANT:  No.

1           THE COURT:  Is there anything you want to ask me or

2    ask your lawyer before I ask you for your final decision in

3    this case?

4           THE DEFENDANT:  There's something I would like to ask

5    my lawyer.

6           THE COURT:  There is something you would like --

7           THE DEFENDANT:  To ask my lawyer.

8           THE COURT:  Go right ahead.

9           (Off-the-record discussion.)

10          THE DEFENDANT:  Okay.  He's answered my question.

11          THE COURT:  All right.  So are you prepared to tell

12   me now whether you wish to plead guilty or whether you wish to

13   go to trial?

14          THE DEFENDANT:  I am.

15          THE COURT:  And what is your decision?

16          THE DEFENDANT:  I plead guilty.

17          THE COURT:  All right.  I am satisfied that this

18   defendant is fully competent and capable of making a decision

19   today, that he understands the nature and consequences of what

20   he's doing, that he's acting voluntarily and of his own free

21   will, and that there is an adequate factual basis for the plea

22   and, therefore, the plea will be accepted.

23          At this point are the parties simply asking that a

24   status report be filed in a certain period of time?  Are we

25   asking to set a sentencing date?  What are we asking to do?

1          MR. WEISSMANN:  Your Honor, I think a status report

2     would be advisable.

3          MS. WESTLING:  That's accept to the defendant, Your

4     Honor.

5          THE COURT:  Okay.  And what would be an appropriate

6     period of time for that to happen?

7          MR. WEISSMANN:  We would propose 60 days.

8          THE COURT:  All right.  All right.  So today is

9     September 14th.  Friday, November 16th, a joint status report

10    from the parties.  And at that time we'll determine whether we

11    need to schedule another in-court proceeding.

12         All right.  Is there anything else I need to take up

13    right now on behalf of the Office of Special Counsel?

14         MR. WEISSMANN:  No, Your Honor.

15         THE COURT:  Anything further on behalf of Mr.

16    Manafort?

17         MS. WESTLING:  No, Your Honor.

18         THE COURT:  All right.  Thank you very much,

19    everyone.

20                         *   *   *

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

        I, JANICE DICKMAN, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of my

stenograph notes and is a full, true and complete transcript of

the proceedings to the best of my ability.

                    Dated this 14th day of September, 2018.




                        /s/_____

                        Janice E. Dickman, CRR, RMR
                        Official Court Reporter
                        Room 6523
                        333 Constitution Avenue NW
                        Washington, D.C. 20001