UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 17-201 (ABJ) |
| ) | |
| PAUL J. MANAFORT, JR., ) | |
| ) | |
| *Defendant.* ) | |

**DEFENDANT PAUL J. MANAFORT JR.'S RESPONSE TO THE SPECIAL COUNSEL'S SUBMISSION IN SUPPORT OF ITS BREACH DETERMINATION**

Defendant Paul J. Manafort, Jr., by and through counsel, respectfully submits this response to the Office of Special Counsel's submission in support of its determination that Mr. Manafort breached the plea agreement in this case. (Doc. 460).

**A. Introduction**

Over the course of twelve meetings with Government attorneys and agents, Mr. Manafort spent numerous hours answering questions. During these interview sessions, Mr. Manafort provided complete and truthful information to the best of his ability. He attempted to live up to the requirements of his cooperation agreement and provided meaningful cooperation relating to several key areas under current government investigation. He also cooperated by providing the government with access to his electronic devices, email accounts, and related passwords. Finally, he continues to cooperate in an effort to ensure the orderly forfeiture of his assets.

Rather than emphasizing Mr. Manafort's substantial and meaningful performance, the Office of Special Counsel ("OSC") claims that he has breached his agreement and provided intentionally false information related to five subjects addressed further below. Despite Mr. Manafort's position that he has not made intentional misstatements, he is not requesting a hearing

on the breach issue. As discussed further below – given the highly deferential standard that applies to the Government's determination of a breach and the Government's stated intention to limit the effect of the breach determination to its advocacy at sentencing in this case[1] – Mr. Manafort suggests that any necessary factual determinations are better addressed as part of the presentencing report ("PSR") process. Should material factual issues remain in dispute at that point, the parties can request a hearing to address those issues.

### B. The Plea Agreement and the Breach Standard

The plea agreement between the parties sets forth the standard governing a determination of whether the defendant has breached the agreement. *See* Plea Agreement at 14 (Doc. 422). It states that the determination of whether there has been a breach by the defendant shall "be judged by the Government in its sole discretion" subject to a showing that the OSC made its determination in "good faith." *Id.* Stated alternatively, practically speaking, given a set of facts that arguably support a breach determination, even if subject to another more benign interpretation, it is incumbent upon the defendant to show that the prosecution somehow acted in *bad faith* in declaring a breach of the agreement based on those facts.

In the instant case, given the language of the plea agreement, it is the defendant's position that a hearing on the specific issue of whether the OSC made its determination regarding the purported breach in "good faith" is not required. Parties can, and regularly do, disagree upon their interpretation of the facts and they do so without accusing the other side of improper motivations.

---

[1] Based upon discussions occurring after the November 30 and December 11 hearings, the OSC has advised that the only remedies it currently plans to seek related to the alleged breach relate to its position regarding sentencing in this matter. Should the Government seek to bring additional charges or take any other adverse action beyond its sentencing position, the defendant reserves his right to challenge the Government's breach determination at that time.

But for sentencing purposes, the matter does not end here. To the extent the facts underlying these issues must be determined in connection with the sentencing, defendant suggests the decision of whether to hold a hearing should be made after the presentence report has been prepared. Waiting until after the presentence report is complete will allow the parties to determine those factual issues, if any, that remain in dispute and that cannot be resolved without a hearing and to narrow any hearing as to those issues.

As its basis for claiming a breach of the plea agreement, the Government has generally identified purported misrepresentations relating to five areas of inquiry. (Doc. 460 at 4-9). The OSC opines that the defendant has intentionally misrepresented facts in response to their questions. The defense contests the Government's conclusion and contends that any alleged misstatements, to the extent they occurred at all, were not intentional.

**C. Background**

On June 15, 2018, the Court remanded Mr. Manafort into custody where he has remained confined in jail since that time. During September and October 2018, he met with attorneys and investigators from the Government on a dozen occasions and has testified twice before the grand jury. On this point, there is no disagreement between the parties. (*See* Doc. 460 at 2-3). During the period he has been cooperating with the OSC, Mr. Manafort has been in solitary confinement away from the facility's general population to ensure his safety. While his physical safety is of primary concern, it is important to note that the conditions of Mr. Manafort's confinement have taken a toll on his physical and mental health. As just one example, for several months Mr. Manafort has suffered from severe gout, at times confining him to a wheelchair. He also suffers from depression and anxiety and, due to the facility's visitation regulations, has had very little contact with his family. Mr. Manafort has only traveled outside of the facility to meet with the

OSC's attorneys and investigators and, on limited occasion, to appear in court. On those occasions he has met with the OSC, he was awoken before dawn, transported to the Special Counsel's offices in Washington, and interviewed for many hours (usually the entire day). These circumstances weighed heavily on Mr. Manafort's state of mind and on his memory as he was questioned at length. In addition, Mr. Manafort commenced his cooperative efforts just days prior to entering into the plea agreement in this case and resumed those efforts the very day after his plea hearing – thus, he was afforded little opportunity to prepare for his meetings with the government's attorneys and investigators. Many of the questions put to Mr. Manafort during the proffer meetings were broad in scope and, more often than not, documentary materials relevant to the areas of inquiry were not provided to him in advance. Because materials were not provided for his review in jail the night before interview sessions, Mr. Manafort often did not have the opportunity to refresh his recollection of events and conversations that occurred many years ago.[2]

Indeed, it is fair to say that mistakes and failed recollections are common to most proffer meetings between the Government and cooperating witnesses. As noted, the OSC generally identifies purported lies relating to five areas of inquiry and opines that the defendant intentionally misrepresented facts in response to their questions. Notably, there is no identifiable pattern to Mr. Manafort's purported misrepresentations – no specific individual or potential crime is identified in the Government's submission. Mr. Manafort addresses the Government's specific allegations below.

---

[2] Of course, nothing requires prosecutors to provide materials in advance of their questioning; nevertheless, in a situation where a defendant has pled guilty and agreed to cooperate with authorities, the failure to do so can be counterproductive.

**D. The Areas Identified by the Government**

1. <u>Mr. Manafort's Interactions with Konstantin Kilimnik</u>

It is accurate that after the Special Counsel shared evidence regarding Mr. Manafort's meetings and communications with Konstantin Kilimnik with him, Mr. Manafort recalled that he had – or may have had – some additional meetings or communications with Mr. Kilimnik that he had not initially remembered. The Government concludes from this that Mr. Manafort's initial responses to inquiries about his meetings and interactions with Mr. Kilimnik were lies to the OSC attorneys and investigators. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

It is not uncommon, however, for a witness to have only a vague recollection about events that occurred years prior and then to recall additional details about those events when his or her recollection is refreshed with relevant documents or additional information. Similarly, cooperating witnesses often fail to have complete and accurate recall of *detailed* facts regarding specific meetings, email communications, travel itineraries, and other events. Such a failure is unsurprising here, where these occurrences happened during a period when Mr. Manafort was managing a U.S. presidential campaign and had countless meetings, email communications, and other interactions with many different individuals, and traveled frequently. ████████████████████████████████████████████████████████████████████████████████████████████████



The simple fact that Mr. Manafort could not recall, or incorrectly recalled, specific events from his past dealings with Mr. Kilimnik – but often (after being shown or told about relevant documents or other evidence) corrected himself or clarified his responses – does not support a determination that he intentionally lied.

    2. <u>Mr. Kilimnik's Role in the Obstruction Conspiracy</u>

The parties agree that Mr. Manafort pleaded guilty to Count Two of the superseding information, which charged him and Mr. Kilimnik with conspiracy to obstruct justice by attempting to contact two potential government witnesses. (*See* Doc. 460 at 6). However, the Government's characterization that, after he pleaded guilty, Mr. Manafort denied that Mr. Kilimnik participated in the conspiracy is disputed. During a proffer session with the OSC on October 16, 2018, Mr. Manafort acknowledged that he and Mr. Kilimnik agreed to reach out to the witnesses. Mr. Manafort was asked to agree that *Mr. Kilimnik*, too, possessed the requisite state of mind to legally establish his guilt. Mr. Manafort balked at this characterization, because he did not believe he could confirm what another person's internal thoughts or understandings were, *i.e.*, another individual's state of mind. Mr. Manafort did not intentionally lie and he did not back away from his own guilty plea to Count Two. In fact, he acknowledged his understanding of Mr. Kilimnik's role in the offense; that is, that he and Mr. Kilimnik agreed with each other to try

to contact witnesses so that the witnesses' views of the facts would be closely aligned with Mr. Manafort's anticipated defense at trial.

### 3. Payment to a Firm Working for Mr. Manafort

The Government alleges that Mr. Manafort made "several inconsistent statements" in response to questions about a $125,000 payment made on Mr. Manafort's behalf in 2017. (Doc. 460 at 7). From the outset, the discussion of this topic with Mr. Manafort was the subject of confusion. For example, when the Government first raised this topic, Mr. Manafort was asked about a much larger payment to the firm on his behalf. Mr. Manafort said he thought it was a smaller amount and had no recollection of a payment in the amount described by the Government. After a break, it became clear that the government's facts were incorrect – it was a $125,000 payment.

Mr. Manafort initially explained that he approached the head of Entity B, who owed him money, seeking help in paying his debt. After further discussion, Mr. Manafort acknowledged that the head of Entity B had the head of Firm A pay the amount for Mr. Manafort. Despite the confusion, at bottom it appears that the Government's evidence corroborates Mr. Manafort's testimony that the head of Firm A paid the money at the head of Entity B's request from money the head of Firm A owed to the head of Entity B.

In a subsequent meeting, Mr. Manafort explained that it was unclear to him how this payment was recorded by his accountants and he believed the original plan was to report the payment as a loan, but that it had actually been reported as income on his 2017 tax return. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

4. Mr. Manafort's Statements Regarding Another DOJ Investigation

The OSC alleges that Mr. Manafort provided the government with information pertinent to an investigation in another district prior to entering into the plea agreement in this case but then, in post-plea proffer meetings with other prosecutors not associated with the OSC, provided a different version of the same events.  (*See* Doc. 460 at 8).  As the Special Counsel acknowledges however, during the second proffer meeting Mr. Manafort's counsel refreshed his recollection with notes from the prior proffer meeting, which led Mr. Manafort to correct his statements to the non-OSC government's attorneys and investigators.  Moreover, the characterization of Mr. Manafort's statement as "exculpatory" ignores the fact that the underlying conduct at issue did not involve any potential crime known to him.  Even if viewed as inconsistent statements, they were nevertheless corrected *during the course of the same proffer meeting* and do not support a conclusion that he lied.

5. Contacts with the Administration

Lastly, the OSC alleges that Mr. Manafort stated that he had no contact with members of the Administration and did not ask others to communicate with members of the Administration on his behalf.  (*See* Doc. 460 at 8).  Mr. Manafort was briefly asked several questions related to contacts with the Administration and explained that, although he knew many individuals who had been appointed to positions within the Administration, he did not believe that he had any direct or indirect communications with any of them during the time that those individuals actually served in the Administration.  Mr. Manafort was asked specifically about communications with two Administration officials but did not recall having a conversation with either individual or reaching

out to either individual during the period they worked in the Administration. In its submission, the OSC cites two examples, first, where Mr. Manafort appears to have authorized a third-party to speak to someone in the Administration and, second, where a witness appears to have told the OSC that Mr. Manafort stated to the witness that that he had contact with another Administration official. The Special Counsel has also provided defense counsel with additional examples that appear to reflect several additional (mostly indirect) contacts with individuals during periods they worked in the Administration.

There is no support for the proposition that Mr. Manafort intentionally lied to the Government.  Prior to and during his proffer meetings, Mr. Manafort was well aware that the Special Counsel's attorneys and investigators had scrutinized all of his electronic communications. Indeed, it is important to note that Mr. Manafort voluntarily produced numerous electronic devices and passwords at the request of the Government.

***

Since he signed the plea agreement with the OSC, Mr. Manafort has met with the government's attorneys and investigators a dozen times and he has testified before a grand jury on two occasions. While a hearing regarding the Government's "good faith" in declaring a breach of the plea agreement is not necessary, to the extent that there are witness statements that the OSC

9

contends demonstrate Mr. Manafort's intentional falsehoods, these should be produced to the defense. After having an opportunity to review such statements and any other documentary evidence, the defendant would then suggest that the issues be narrowed during the usual sentencing process in the parties' submissions to the U.S. Probation Office in the preparation of the PSR. Where factual issues remain after the standard process, a hearing may be necessary prior to the actual sentencing of the defendant to resolve those disputes.

Dated: January 7, 2019                                  Respectfully submitted,

                                                         /s/
                                                         Kevin M. Downing
                                                         (D.C. Bar No. 1013984)
                                                         Law Office of Kevin M. Downing
                                                         601 New Jersey Avenue NW, Suite 620
                                                         Washington, DC 20001
                                                         (202) 754-1992
                                                         kevindowning@kdowninglaw.com

                                                         /s/
                                                         Thomas E. Zehnle
                                                         (D.C. Bar No. 415556)
                                                         Law Office of Thomas E. Zehnle
                                                         601 New Jersey Avenue NW, Suite 620
                                                         Washington, DC 20001
                                                         (202) 368-4668
                                                         tezehnle@gmail.com

                                                         /s/
                                                         Richard W. Westling
                                                         (D.C. Bar No. 990496)
                                                         Epstein Becker & Green, P.C.
                                                         1227 25th Street, N.W.
                                                         Washington, DC 20037
                                                         Tel: 202-861-1868
                                                         Fax: 202-296-2882
                                                         Email: rwestling@ebglaw.com

                                                         *Counsel for Defendant Paul J. Manafort, Jr.*