```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal Action
                                     ) No. 17-CR-201
 4                    Plaintiff,     )
                                     ) PUBLIC VERSION
 5    vs.                            ) Sealed Hearing
                                     )
 6    Paul Manafort, Jr.,            ) Washington, DC
                                     ) Date:  February 13, 2019
 7                    Defendant.     ) Time:  1:30 p.m.
                                     )
 8    _____

 9              TRANSCRIPT OF SEALED HEARING
                       HELD BEFORE
10        THE HONORABLE JUDGE AMY BERMAN JACKSON
                UNITED STATES DISTRICT JUDGE
11    _____

12                 A P P E A R A N C E S

13    For Plaintiff:    ANDREW WEISSMANN
                        GREG D. ANDRES
14                      JEANNIE SCLAFANI RHEE
                        U.S. Department of Justice
15                      Special Counsel's office
                        950 Pennsylvania Avenue NW
16                      Washington, D.C.  20530

17                      ████████████████████████
                        ████████████████████████
18                      ████████████████████████

19    For Defendant:    KEVIN M. DOWNING
                        815 Connecticut Avenue, N.W.
20                      Suite 730
                        Washington, D.C. 20006
21                      (202) 754-1992
                        E-mail:  Kevindowning@kdowninglaw.com
22
                        RICHARD WILLIAM WESTLING
23                      Epstein Becker & Green, P.C.
                        1227 25th Street, NW
24                      Suite 700
                        Washington, DC 20037
25                      (202) 861-1868
                        e-mail:  Rwestling@ebglaw.com
```

1      Also Present:          Michael Ficht
                              Renee Michael
2                             Jeff Weiland

3      Court Reporter:        Janice E. Dickman, RMR, CRR
                              Official Court Reporter
4                             United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
5                             Washington, DC  20001
                              202-354-3267
6
                                     *   *   *
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Good afternoon Your Honor,

2     this afternoon we have case No. 17-201-1, the United States of

3     America v. Paul J. Manafort, Jr.  Mr. Manafort is present in

4     the courtroom, Your Honor.

5          Will counsel for the parties please approach the

6     lectern, identify yourself for the record.

7          MR. WEISSMANN:  For the government, Andrew Weissmann,

8     Jeannie Rhee, Jeff Weiland, Renee Michael, Mike Ficht, and Greg

9     Andres.

10          THE COURT:  Good afternoon.

11          MR. WESTLING:  Good afternoon, Your Honor.  Richard

12     Westling and Kevin Downing on behalf of Mr. Manafort, along

13     with Tim Wang, who's working as our paralegal.

14          THE COURT:  This is a sealed hearing.  It's a

15     continuation of the hearing we began on February 4th.  And at

16     this hearing I'm planning to announce my findings based on the

17     record.  This transcript, once it's complete, will be my

18     ruling.  I'm not going to issue a written opinion, particularly

19     not after I read all of this out loud.

20          There will be -- I think it will be appropriate to do

21     a public minute order shortly after the hearing that

22     encapsulates my findings in a way that's consistent with what's

23     already been made public in this case.  And then we'll set up a

24     procedure to do what we did last time and to release as much as

25     possible of this transcript.

1          I note there's also an ongoing dispute concerning one

2     set of redactions in the transcript of the breach hearing and

3     I'm going to take that up at the end of this proceeding, after

4     I've ruled on the breach allegations.  I really want to commend

5     both sides for how quickly you got through that exercise and

6     how much was agreed.  I don't think there's any -- the current

7     disagreement is bad faith on the part of anyone.  I think it's

8     legitimate disagreement and we'll talk about it.  But I thought

9     the fact that almost all this could be accomplished through

10    agreement of the parties was very commendable.

11         The plea agreement in this case, docket 422, provides

12    in paragraph 8:  Your client shall cooperate fully, truthfully,

13    completely, and forthrightly with the government.  The

14    defendant agreed, in paragraph 8(a), to be debriefed; in

15    paragraph 8(c) to testify at any proceedings, and in 8(f) that

16    he, quote, must at all times give complete, truthful, and

17    accurate information and testimony, and must not commit, or

18    attempt to commit, any further crimes, close quote.

19         Paragraph 8 goes on to say that the defendant, quote,

20    shall testify fully, completely and truthfully before any and

21    all grand juries in D.C. or elsewhere.

22         Paragraph 13, the breach of agreement paragraph

23    provides:  Your client understands and agrees that, if after

24    entering this agreement, he fails specifically to perform or to

25    fulfil completely each and every one of his obligations under

1    this agreement, or engages in any criminal activity prior to

2    sentencing or during his cooperation, he will have breached

3    this agreement.

4         Should it be judged by the government, in its sole

5    discretion, that the defendant has failed to cooperate fully,

6    intentionally, gave false or misleading testimony --

7    intentionally gave false or misleading testimony, has committed

8    or attempted to commit further crimes, or violated any other

9    provision of this agreement, he would not be released from his

10   guilty plea, but the government would be released from its

11   obligation under the agreement, including its promise not to

12   oppose the downward adjustment to the sentencing guidelines

13   calculations for acceptance of responsibility.  The paragraph

14   goes on to say your client understands that the government

15   shall be required to prove a breach of this agreement only by

16   good faith.

17        The defendant accepted the agreement.  His signed

18   acceptance, on the last page, says, quote, I have read every

19   page of this agreement, close quote.  Also, he signed and

20   initialed each page, signifying that to me.  The acceptance

21   also states I've discussed this with my attorneys.  I fully

22   understand the agreement and I agree to it without reservation.

23   I do this voluntarily and of my own free will, intending to be

24   legally bound.  We then deferred the selection of a sentencing

25   date for a period of cooperation and debriefings.

1      The parties informed me, in a joint status report on

2   November 26th, 2018, docket 455, that it was the Office of

3   Special Counsel's position the defendant had breached the plea

4   agreement by making false statements to the FBI and the Office

5   of Special Counsel, and that it was time to set a sentencing

6   date.

7      The defendant disputed the government's

8   characterization of the information he had provided and denied

9   that he had breached the agreement, but had agreed that, given

10  the dispute, it was time to proceed to sentencing.

11     I held a status hearing and ordered the government to

12  provide me with information concerning the alleged breach.  On

13  December 7th, 2018, the government filed its sealed submission

14  in support of its breach determination, docket 461.  On January

15  8th, 2019 the defendant filed his response to the special

16  counsel's submission in support of the breach determination.

17  That was docket 472, the public version, and 473 was the sealed

18  version.

19     The government was then ordered to identify the

20  particular false statements and produce the evidence that

21  supported its determination that they were false.  And on

22  January 15th, 2019 it filed the FBI declaration in support of

23  the government's breach determination.  That was docket 476,

24  was the redacted version; 477, sealed, with a set of

25  accompanying exhibits.  And the defendant responded in docket

1    480 on January 23rd, 2019.

2          As everyone agrees, it is the government's burden to

3    show there's been a breach, but to be relieved of its

4    obligations under the agreement it must simply show that its

5    determination was made in good faith.

6          In its January 8th response to the breach

7    allegations, the defense said that, quote, given the highly

8    deferential standard that applies to the government's

9    determination, it was not challenging the assertion that the

10   determination was made in good faith.  That was in docket 472,

11   page 2.

12         More important, in response to my question at the

13   status hearing we held on January 25th of this year, the

14   defendant conceded that the determination was in fact made in

15   good faith.

16         In light of the defendant's concession, and based

17   upon my independent review of the entire record, including the

18   pleadings I just listed and the supporting exhibits, the facts

19   and arguments placed on the record at the hearing on February

20   4th, 2019 and the post-hearing submissions filed by the

21   defendant, docket 502, and the government, docket 504, I find

22   that the Office of Special Counsel made its determination that

23   the defendant made false statements and thereby breached the

24   plea agreement in good faith.  And, therefore, the Office of

25   Special Counsel is no longer bound by its obligations under the

1    plea agreement, including its promise to support a reduction of

2    the offense level in the guideline calculation for acceptance

3    of responsibility.

4         But that is not the only question before me today.

5    The second issue is whether the statements made to the FBI, the

6    Office of Special Counsel or the grand jury that were

7    identified by the Office of Special Counsel as the basis for

8    its breach determination were in fact intentionally false.

9    Whether this defendant lied to the FBI or the grand jury bears

10   on the applicability of certain guideline adjustments, such as

11   acceptance of responsibility.  And as I noted at the last

12   status hearing, it also bears more generally on my

13   consideration of the statutory sentencing factors, decisions

14   I'm going to have to make about consecutive and concurrent

15   sentences, etcetera.

16        But, in case there's any confusion on this point, no

17   matter what I decide, I cannot sentence him to more than the

18   statutory maximum for these offenses.  I want to underscore

19   that I'm not ruling today on the applicability of the

20   adjustment for acceptance of responsibility or any other

21   guideline provision.

22        At the time of the plea, the defendant swore to me

23   that he was in fact guilty of offenses set forth in the

24   information, as well as those charged in the Eastern District

25   of Virginia.  And whether the defendant should get credit at

1    sentencing for his acceptance of responsibility for the

2    offenses in the indictment that was pending before me, or those

3    in the Eastern District of Virginia, which isn't my decision at

4    all, will involve consideration of other facts, in addition to

5    the narrow question of whether he lied about these five

6    specific topics.

7             I expect that the presentence report and the parties

8    in their sentencing memorandum will address the totality of the

9    circumstances, including the impact of today's findings on that

10   decision.  But as both the parties agreed that it should, the

11   decision that I'm going to announce today will advise you as to

12   whether I find that the Office of Special Counsel has

13   established by a preponderance of the evidence that the

14   defendant made intentional false statements with respect to any

15   of the matters.  And we're going to leave acceptance of

16   responsibility for another day.

17            I want to make a couple general observations at the

18   outset.  It is true that the Office of Special Counsel bears

19   the burden of proof by a preponderance of the evidence, and I

20   will make all of my findings applying that standard.  But I do

21   want to note that if the defense wanted me to reject inferences

22   to be drawn from the facts put forward, I can't do it based on

23   conclusory statements about how hard it is generally for a

24   witness to remember.  I do take the defendant's point that it

25   can be hard to answer questions on a broad range of topics when

1    questioners have the documents in front of them and you don't.

2    But I'm not sure how that bears on anything in particular.

3         I note generally that the allegations that

4    Mr. Manafort lied are not based on times when he said, "I don't

5    remember," which is something a person even under the pressure

6    of a debriefing session could say when they don't remember.

7    And none of the ones I'm concerned about are even based on

8    general denials which later proved to be untrue or they

9    corrected relatively promptly.  My concern isn't with

10   non-answers or simply denials, but times he affirmatively

11   advanced a detailed alternative story that was inconsistent

12   with the facts.

13        I also found the defendant's statements in his

14   submission concerning his health to be particularly conclusory.

15   In his response to the allegations, the defendant specifically

16   asked me to consider the defendant's health issues exacerbated

17   by the conditions of confinement, quote, in particular,

18   solitary confinement, close quote, as a reason why I should

19   find that the inaccuracies were not intentional.  But the

20   submission did not include any chronology, any medical or

21   mental health information, any information about the details of

22   his custodial situation, or any information concerning the

23   state of his health on any of the dates in question.

24        In short, it gave me no basis upon which I could find

25   that it would be a mitigating factor.  So I gave the defense an

1    opportunity to elaborate at the hearing.  And when I asked

2    questions at it that point it all evaporated and counsel had

3    little or nothing to say, other than, It's been shown, One sees

4    an impact, and there really wasn't any specificity there.  And

5    it left the impression that the issue was left in the pleading

6    for public consumption, but not mine.

7         This isn't the first time that the defense made a

8    strong public declaration about his conditions of confinement.

9    I think it may be useful to review how he got to the Alexandria

10   city jail, where he is now.

11        I revoked his bond on June 15th based on a finding

12   that there was probable cause to believe that he had attempted

13   to obstruct justice and interfere with witnesses.  The D.C.

14   Circuit upheld that ruling.  And he has specifically admitted

15   to doing just that under oath when he pled guilty.  So he was,

16   unquestionably, lawfully detained.  And I noticed in a minute

17   order at the time that the defendant must be afforded a

18   reasonable opportunity for private consultation with counsel.

19        It was the U.S. marshal and not the Court who then

20   made the decision regarding his placement.  He was awaiting

21   trial at the Eastern District of Virginia at that time and the

22   marshal there selected Northern Neck Regional jail.  It would

23   have been one of the options for our marshal as well, the other

24   would have been D.C. jail; it wouldn't have been up to the

25   defendant or to me, but I'm not sure the defendant would have

1    found that to be preferable.

2           Northern Neck, though, in my view, presented real

3    concerns about his ability to confer with counsel for the two

4    upcoming trials.  But before anyone presented that issue to me

5    for action, the defendant presented it to the Court in the

6    Eastern District of Virginia in early July.  He complained that

7    given the distance from the District, restrictions on his

8    electronic and phone communications, there was a severe impact

9    on his ability to prepare for trial and review documents,

10   etcetera.  And that was docket 110 in 18 criminal docket 83 in

11   the Eastern District.

12          He also attached a brief from July 5th in which he

13   told the D.C. Circuit that he was in solitary confinement,

14   locked in his cell 23 hours a day.  The Court in the Eastern

15   District of Virginia made the decision to promptly alleviate

16   those concerns by ordering, and not just recommending, that he

17   be housed in the Alexandria jail.  The defendant then

18   immediately turned around and said, Oh, never mind, we

19   respectfully ask the Court to permit him to remain at Northern

20   Neck Regional jail.

21          It became clear why in the government's pleading,

22   docket 117.  There he was housed by himself, it's true, but

23   housed within a private, self-contained living unit, including

24   his own bathroom, shower, phone, laptop, and access to a

25   separate work room for review of trial materials.  And in his

1    reply, docket 125, the defense conceded that the government had

2    not misrepresented the conditions, other than there was a

3    dispute about whether he could or couldn't send emails.

4           I'm not going to split hairs over whether that did or

5    didn't technically qualify as solitary confinement, and I'm not

6    placing any reliance on what the warden tended to call it, but

7    the facts about what it was are not in dispute.  And so that

8    all leaves the distinct impression that some disingenuousness

9    on the part of the defense played a role in how he got to

10   Alexandria.  Indeed, the Court in the Eastern District of

11   Virginia did not reverse the decision it had just made and the

12   transfer was effectuated.  And that made sense to me because I

13   was concerned about his ability to meet with counsel with the

14   two cases coming up, and with his family's ability to visit

15   him.

16          But in any event, he's been there since July 10th.

17   In those six-plus months he has not filed a single motion

18   seeking any sort of relief whatsoever, here or in the Eastern

19   District of Virginia.  There have been no formal complaints

20   lodged concerning his access to or the quality of his medical

21   care.  No information has been provided to me concerning his

22   classification or the conditions of his confinement.

23          Of course, those decisions fall within the purview of

24   the warden.  But to date, as far as I know, no habeas petition

25   has been filed in the appropriate jurisdiction.  So there's

1    nothing in the record about what's happening there now.  And

2    more important, I didn't see any evidence that indicated I

3    should take it into account.

4           I don't mean to be unduly harsh, I don't mean to

5    minimize the burden he is under.  I accept the defendant's

6    representations concerning the considerable emotional strain

7    imposed by all of it.  The combination of incarceration, the

8    realization that he would be sentenced and there would be no

9    trial, the stress and unpleasantness of repeated debriefings

10   and cooperation are difficult to bear up under any

11   circumstances.

12          I also do not question the defendant's representation

13   that he's been diagnosed with gout or that he's experienced

14   flare-ups which have worsened during his incarceration.  But

15   you didn't provide any dates or records associated with the

16   onset of the symptoms or information about the impact of the

17   medical condition on his cognitive or emotional condition.

18          So there's no evidence in the record of the

19   connection between his confinement and the exacerbation of his

20   symptoms.  And when I asked the defense to substantiate it and

21   gave it a chance, they just said, Well, it's likely that

22   there's a connection.  And the other problem is that the

23   chronology that is known doesn't give me anything to work with

24   and isn't entirely consistent with this argument.

25          Mr. Manafort pled guilty here on Friday, September

1   14th.  At that time, fortunately, he had no health complaints,

2   his ability to walk was not impaired.  He stood at the lectern

3   without difficulty, made no request for assistance during the

4   plea colloquy concerning his mental state.  He indicated that

5   he was not taking any medication that could affect his ability

6   to understand.  I'm not saying he wasn't already diagnosed with

7   gout at that time, but as of that date, September 14th, he

8   hadn't demonstrated or, at least, expressed any concerns

9   regarding physical or mental impairment.

10          Well, why is that important?  It's important because

11   three of the debriefings, September 11th, September 12th and

12   September 13th, had already taken place.  The next five were

13   quite soon thereafter, beginning the following week, on the

14   20th, the 21st, and then the 25th, 26th, and 27th, and the

15   following week October 1st and 5th.  He was debriefed again on

16   October 11th and 16th.  So every single debriefing was before

17   his appearance in the Eastern District of Virginia, in the

18   wheelchair, on October 19th when he complained publicly, as far

19   as I know for the first time, that his health was being

20   compromised by the conditions of his confinement.

21          The parties have informed me that he was still having

22   difficulty walking and required the wheelchair for the two

23   sessions before the grand jury, on October 26th and November

24   2nd, so that's a matter of record.  But the transcript, Exhibit

25   4, doesn't reflect any sort of mental impairment.  He was

1    specifically asked if the medication for the inflammation

2    affected his mental state or his ability to understand, and

3    said no.  The Office of Special Counsel did not develop any

4    concerns about his cognitive ability or emotional state during

5    the questioning and, more important, none were brought to its

6    attention.

7          So I've taken all the defense arguments into

8    consideration, but there is little in the record that would

9    explain, excuse or justify the statements of concern,

10   particularly given when they were made.

11         So now I want to turn to each of the five areas of

12   testimony.

13         The first is the payment by ███ Firm A, towards the

14   debt incurred by the defendant with an unrelated law firm.  The

15   defendant says it's not fair to characterize his initial

16   responses as false, given the confusion surrounding the

17   original transaction and confusion in the questioning.  He says

18   it's unremarkable that he wouldn't have immediate recollection

19   of the details.  But the record doesn't seem to reflect the

20   confusion and the defendant didn't profess to be confused.  He

21   does appear, though, to be making a concerted effort to avoid

22   saying what really took place.

23         Exhibit 9 is the FBI 302 of the interview on

24   September 20th.  During that interview the defendant asserted

25   that the money paid to the law firm to which he owed a debt was

1    repayment by ███████████ head of Entity B, the ███████████

2    ████████████████████████ of a loan Mr. Manafort had made to ███,

3    and that Manafort simply had ███ pay on his behalf to the law

4    firm.

5            So the initial answer cut ███ and its head, ███████████

6    ███████████ out of the picture entirely.  But later that same

7    interview he did agree, when confronted with that fact, that it

8    had been ███████ that made the payment to the law firm that it

9    had.  So, on October 1st, Exhibit 3, the FBI 302 of that

10   interview reflects that Mr. Manafort said, Well, ███████ paid

11   it because he had given him a lot of work in the past.

12           On October 16th he's interviewed again.  And Exhibit

13   10, the FBI 302, reports that he said, for the first time,

14   Well, I asked ████████████ to pay the law firm on my behalf as

15   a loan.  And he, thereafter, produced a copy of a promissory

16   note, but it was unsigned.  Page 3 of Exhibit 10 reports that

17   he said originally they planned for the payment to be a loan.

18           Last year, they executed a note, his accountant has

19   it.  He said he dealt with the accountant through the New York

20   lawyer, ████████████ and that ███████, quote, reminded

21   him that he had signed a loan agreement, and that it was just a

22   friend helping a friend.  About a week later, according to

23   paragraph 11 of the FBI declaration, the defense produced an

24   unsigned loan agreement.  It describes the loan as at

25   5 percent, to be repaid in tree installments in 2018; March,

1   June, and September.  In other words, all of them would have

2   been repaid by the time of the October interview.

3           Then he testified in the grand jury on October 26th,

4   Exhibit 4 is the grand jury testimony.  That time he said

5   ██████████, quote, offered to do it and it was income to him

6   because ████████ did it in recognition of the business

7   Manafort had sent his way.

8           During the same grand jury session he also said they

9   did a loan agreement and he stated that he made a payment on

10  the loan.

11          Finally, in the same grand jury session, he testified

12  that ██ went to ███████ and asked ███████ to do it because

13  ████████ owed ██ money.

14          So those are all the different ways he's

15  characterized this.  What does the paper trail reveal?  Exhibit

16  12 is a series of texts dated June 26, 2017 from Manafort to

17  ███ -- not ████████ -- in which Manafort gives ██ all of the

18  necessary banking information to transfer funds to the law

19  firm.

20          Exhibit 2 is a bank wire transfer showing the payment

21  made by ████████'s company, ███, to the law firm on June 26th,

22  2017.  Exhibit 14, ████████████ e-mails Manafort on September

23  24th, 2017, remaining him, I paid the firm on your behalf and

24  the tax documents are going to be forthcoming.

25          Manafort then forwards the email directly to his

1   accountant himself, telling the accountant that the $125,000 is

2   income and a 1099 is on its way.  He says, I had the vendor pay

3   it directly to the law firm, which has several misstatements

4   even in just that one sentence.  He says nothing about a loan

5   and he makes no reference to repayments.

6          Exhibit 16, in the FBI 302 of the interview with the

7   accountant, Mr. ██████████, he said he treated it as income in

8   the 2017 tax return in accordance with Manafort's instructions

9   and he never received a 1099. ████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████

16          ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ██████████████████████████.  So there's no actual evidence on

19  that point and I can't make any findings about why Manafort

20  might have wanted to obscure the details of this transaction.

21          At the hearing the defendant said to me, Yes, but

22  look at the ██████████ 302.  He acknowledged that he saw the

23  promissory note.  The plain implication of that argument was

24  that the loan documents were generated at the time of the

25  transaction.

1         Well, not quite. ████████████████████

2   ████████████████████████████████████████

3   ████████████████████████████████████████

4   █████████████████████████████████████████

5   ████████████████████████████████████████

6   █████████████████████████████████████████

7   ██████████████████████████████████████

8   ████████████████████████   Indeed, the unsigned promissory

9   note itself is dated September 14th, 2017, three months after

10  the payment was made.

11        Four days after the grand jury testimony in Exhibit

12  17 Manafort's lawyer ████████ sends the accountant the loan

13  document for the first time.  It's October 30th, 2018.  The

14  defense said, at the hearing, Well, that's not remarkable, the

15  preparation of the 2017 tax return was still underway.  But the

16  accountant said no.

17        Mr. ████████ said the tax return designating the

18  payment as income had already been prepared and sent to

19  Manafort for his approval and was approved without changes on

20  that point a month before ████████ sent him the email with the

21  loan document.  And that's consistent with Exhibit 17, which is

22  an email from ████████ to ████████ saying, Mr. Manafort wants

23  to know how you handled -- past tense -- the $125,000 note from

24  ████████.

25        ████████ responded that he wasn't aware of any note

1   from that name. ██████████ then said, Well, Paul borrowed

2   125,000 from him last year.  I don't have the signed version,

3   but attached is the draft, which I think was signed without

4   change.  And then he goes on to represent that interest

5   payments were in fact made that year and that Manafort was

6   current on them.  But there is zero evidence in the record that

7   Manafort repaid the amounts on the dates due or any other

8   dates.

9          Now, I was concerned before the hearing that the loan

10  document was a complete concoction to support the latest

11  version of the evolving story.  However, the metadata provided

12  by the defendant in docket 502-1, Exhibit A to defendant's

13  post-hearing submission, reflects that ██████████ created an

14  emailed draft of the promissory note to Mr. Manafort on

15  September 14th, 2017.  And that's consistent with the date on

16  the unsigned document that was sent to the accountant in 2018.

17  And that's not disputed by the Office of Special Counsel.

18         So I'm not basing any finding today on any

19  determination that the defendant had the lawyer gin up a

20  fraudulent piece of evidence a year later.  But the fact

21  remains, there's no evidence that there was ever a signed

22  version of a promissory agreement, and even in September of

23  2017 it was nothing but a post hoc effort to make the completed

24  payment, described by Manafort as income in June, look like

25  something different than it had been three months before.

1      Indeed, ███████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████  We don't know why ██

4  made that request, but it does appear that in September of 2017

5  Manafort was engaged in an effort to re-characterize the nature

6  of the payment.  But that never went anywhere, so the statement

7  to the Office of Special Counsel and the FBI on October 16, and

8  grand jury testimony to the effect that there was a loan

9  agreement in place, especially with the added gloss that he was

10  making payments under it, is false.

11      In the end, what we have is a series of contradictory

12  and misleading answers to the same questions, that are

13  inconsistent with the contemporaneous records.  In particular,

14  Exhibit 12, the transmission of the banking information to ██,

15  and Exhibit 14, Manafort's own email to his accountant, and

16  with the accounts of other witnesses.  He was asked about the

17  transaction for the first time on September 20, and then it was

18  the third time it was discussed, about a month later, on

19  October 16, when he first advanced the theory that it was a

20  loan, and then the story continued to evolve in the grand jury

21  on October 26th.

22      He had plenty of time to think, so the, I-can't-be-

23  expected-to-remember-everything-off-the-top-of-my-head excuse

24  doesn't work here.  And it wasn't just a denial or an omitted

25  detail, he advanced a series of new false narratives, including

1    trying to get the accountant involved, and that can't be

2    explained by the suggestion that he was confused or

3    misremembering.

4         So I find this was a matter about which he provided

5    intentionally false information to the Office of Special

6    Counsel, the FBI, and the grand jury.  I also note, without

7    deciding whether I have to make this finding or not, that the

8    record supports a finding that the Office of Special Counsel's

9    interest in tracings the flow of funds to Manafort,

10   particularly from ███ and vendors associated with the

11   campaign, was material to its investigation.

12        With regard to that issue, I'm applying the law of

13   this circuit as set forth in *United States versus Moore*, 612

14   F.3d 698, on page 701, in the D.C. Circuit from 2010.  In that

15   case the Court said Section 1001 does not define "materially

16   false."  The Supreme Court has said a statement is materially

17   false if it has, quote, a natural tendency to influence, or is

18   capable of influencing, the decision of the decisionmaking body

19   to which it is addressed, close quote.  *Moore* there was quoting

20   *United States versus Gaudin*, G-A-U-D-I-N, 515 U.S. 506.

21        The Court went on to say:  Many of our sister

22   circuits have adopted a somewhat broader approach to

23   determining materiality, asking not only whether a statement

24   might influence a discrete decision, but also whether a

25   statement might affect in any way the functioning of the

1   government agency to which it was addressed.  It cites a series

2   of other circuit opinions by example.  Two, in particular, are

3   *United States versus Lichenstein*, 610 F.2d 1272, which it

4   encapsulates the holding as, A false statement must simply have

5   the capacity to impair or pervert the functioning of a

6   government agency.

7          The Court also cites *United States versus White*, 270

8   F.3d 356, out of the Sixth Circuit.  And in that parenthetical

9   the D.C. Circuit said:  Materiality is a fairly low bar.  The

10  government must present at least some evidence showing how the

11  false statement in question was capable of influencing federal

12  functioning, close quote.  So that is how the Circuit quoted

13  the Sixth Circuit.

14         And the Court then went on to say:  In determining

15  whether a false statement is material, this Court -- the D.C.

16  Circuit -- has consistently asked whether the statement has a

17  tendency to influence a discrete decision of the body to which

18  it was addressed.  Then there's several cites.  It said:  We

19  have, however, suggested a lie distorting an investigation

20  already in progress also would run afoul of Section 1001.  We

21  now join the other circuits in holding a statement is material

22  if it has a natural tendency to influence, or is capable of

23  influencing, either a discrete decision or any other function

24  of the agency to which it is addressed.

25         So it is this precedent from *Moore* that provides the

1    definition of materiality that underlies my findings.

2            I also note that the D.C. Circuit said, in *United*

3    *States versus Winestock*, 231 F.2d 699, the issue to which the

4    false statement is material need not be the main issue, it may

5    be a collateral issue, and it need not bear directly on the

6    issue, but may merely augment or diminish the evidence upon

7    some point.

8            All right.  So those are my findings with respect to

9    issue No. 1.

10           Issue No. 2 was Kilimnik's role in the obstruction

11   conspiracy.  This issue has to do with Manafort's and

12   Kilimnik's joint attempt to get witnesses to the FARA charges

13   against Manafort to say that the advocacy he called upon them

14   to do on behalf of former Ukrainian President Yanukovych and

15   his party was not supposed to be performed in the United

16   States.

17           Exhibit 10 is the FBI 302 from October 16, 2018.  It

18   includes a detailed description of Mr. Kilimnik's state of mind

19   and denies that he was attempting to influence witnesses to

20   give false testimony at trial.

21           The defendant's first explanation about this in its

22   initial response to the breach allegations was:  Well, he was

23   just saying he couldn't speak to Kilimnik's state of mind.

24   That actually wasn't a very fair characterization because he

25   affirmatively stated what it was.  At the hearing, defendant's

1    second explanation was that I should look at this in the

2    context of the previous paragraph in the 302, where

3    Mr. Manafort had just said that he had talked to Kilimnik after

4    the superseding indictment came down and he reports what

5    Kilimnik thought and felt at that time.  And the defense said

6    that as in that paragraph and the next paragraph, he was just

7    transmitting what Kilimnik had said to him.

8           I think it's also fair to say that advancing that

9    version was not just relaying what Kilimnik had said, it

10   appears to be an attempt to exonerate him.  And it's odd and

11   problematic that after he huddled with counsel and returned, to

12   agree that, yes, Kilimnik had conspired with him, as had been

13   admitted in the plea agreement.  He denied that he had ever

14   said anything else in the same debriefing session.  That's in

15   the declaration in paragraph 17.

16          It's also a bit of a stretch because Mr. Manafort

17   doesn't just say to the agents, Kilimnik doesn't believe he was

18   pressuring the witness, or Kilimnik didn't think he was

19   suborning perjury, he didn't intend to violate U.S. law, he

20   makes the affirmative assertion that Kilimnik believed the

21   project was a European project, when Manafort plainly knew that

22   Kilimnik knew it wasn't and the documents plainly reflect that

23   it wasn't, and that was the basis for the conspiracy count to

24   which he pled guilty in the first place.

25          To me, this is definitely an example of a situation

1    in which the Office of Special Counsel legitimately concluded

2    he's lying to minimize things here, he's not being forthcoming,

3    this isn't what cooperation is supposed to be.  This is a

4    problematic attempt to shield his Russian conspirator from

5    liability and it gives rise to legitimate questions about where

6    his loyalties lie.

7         So it bears upon my finding that the Office of

8    Special Counsel was fully justified in its determination and

9    acted in good faith when it found that he didn't live up to his

10   obligations under the plea agreement.

11        But even with the relatively low standard of proof by

12   a preponderance, making a finding of an intentional false

13   statement is challenging in the absence of a transcript or even

14   notes that memorialize the particular question he had asked ask

15   and what he was answering, as opposed to a 302 with the answers

16   only.

17        While I find the defense theory to be strained and

18   I'm not really sure I buy it, the language of the 302 can be

19   read to support the defendant's alternative explanation.  Given

20   that, and given his correction of the record within the same

21   interview, I'm not comfortable that I can go on to find that

22   this particular example rises to the level of an intentional

23   falsehood, a lie to the FBI that would constitute the

24   commission of an independent crime while awaiting sentencing in

25   two cases.  So I am not finding that he intentionally lied with

1    respect to that matter.

2           The third matter is his interactions with

3    Mr. Kilimnik.  The first one that came up was discussions

4    concerning what's been referred to as ██████████  As with

5    the prior incidents, there was much that was re-explained and

6    corrected the number of times this came up.

7           The most problematic to me is described in paragraph

8    29 in the declaration, and Exhibit 101, the FBI 302 from

9    September 21st, on page 4, where he doesn't just say I don't

10   remember discussing ████████ with Mr. Kilimnik after

11   August 2016 and proved to be wrong about it.  He asserted that

12   he put the kibosh on the idea.  He called it a bad idea.  He

13   said he didn't ████████ and he didn't want to ████████

14   ██ and then he gave the FBI a series of specific reasons that

15   he ended the discussion for good at that time.

16          This is not supported by any evidence, even his

17   argument that he was telling the truth because what he told the

18   FBI he said at the time was:  I was opposed to ████████

19   ██████████████████████████, is contrary to

20   the subsequent emails trying to elicit the reaction to ████

21   ██████████████.  Creating an alternative

22   narrative is not the same thing as simply denying or professing

23   not to remember that something happened, and it's not

24   consistent with the defense argument that he just didn't

25   remember.

1          So I find that the September 21st claim that he laid

2     the issue to rest by telling Kilimnik ███████████████████

3     ████████████████████████ was an intentional material false

4     statement.

5          Moreover, there are other misleading, inaccurate

6     statements that reinforce the conclusion that he was lying

7     about his dealings with Kilimnik.

8          He was also asked about a February 2017 meeting ████

9     ██████ regarding ████████████████ and questions about his role

10    doing research in advance of Ukrainian elections and his

11    polling for a Ukrainian candidate.  The defense says, in its

12    reply to the FBI declaration, basically, Gee, it was just all

13    so confusing.  And it points out that at the end of the day he

14    sort of acknowledged most of this.  And maybe if you took each

15    fact separately and each attempt to dissemble about Kilimnik

16    individually, they might not support a finding of criminality.

17         But there are multiple instances of this and they all

18    follow a pattern.  Concessions comes in dribs and drabs, only

19    after it's clear that the Office of Special Counsel already

20    knew the answer.  Again, it's part of a pattern of requiring

21    the Office of Special Counsel to pull teeth; withholding facts

22    if he can get away with it.  And that's just not consistent

23    with what was contemplated by the plea, and it supports the

24    breach determination.

25         Denying the meeting ██████████ was denying a contact

1    that was a part of what the Office of Special Counsel was

2    investigating.

3           With respect to the questions regarding his efforts

4    to conduct polling in the Ukraine in connection with its

5    upcoming elections and to have the polls test the reaction to

6    ████████████████ that Kilimnik ████████████████ were still

7    trying to advance, and questions concerning Kilimnik's

8    knowledge and involvement, we again have a series of revised

9    explanations, grudging revelations and admissions.

10          The defense tries to argue, well, it's only a few

11   questions in the poll and those were collateral to the main

12   thrust of the poll, which is the presidential election.  But I

13   don't think that can really be minimized in that way.  These

14   were the questions that were provided by Manafort and they were

15   important to him and to Kilimnik.

16          On page 6 of docket 470, the defendant's response to

17   the breach determination, the defense explains and tries to

18   minimize Manafort's initial inaccurate statements about meeting

19   Kilimnik ████████ by saying, Well, it's reasonable he wouldn't

20   recall events from that time period because his primary focus

21   was the U.S. presidential campaign, and he's not likely to

22   recall other, less pressing events like conversations about ████

23   ████████████████████████████████ in some other country.

24          Maybe.  But ████████████ seems to have been a recurring

25   ████████████████████████████████████████████████

1   ██████; in particular, the ████████████████████████

2   ██████████████, doesn't seem to have ever been far from

3   Manafort's mind, even when he was working on the campaign.

4          But even if I want to give that argument some weight,

5   running a presidential campaign is, after all, a fairly

6   all-consuming exercise.  That explanation falls apart

7   completely when the defense goes on to say, in the next

8   sentence, quote, The same is true with regard to the

9   government's allegation that Mr. Manafort lied about ██████

10  ████████████ Mr. Kilimnik related to the ████████████████

11  ██████, period, close quote.

12          That's not the same at all.  You can't say you didn't

13  remember that because your focus at the time was on the

14  campaign.  That relates to the campaign.  And he wasn't too

15  busy to arrange and attend the meeting and to send Gates ███

16  ██████████████████████████ that very day.  It's problematic no

17  matter how you look at it.

18          If he was, as he told me, so single-mindedly focused

19  on the campaign, then the meeting he took time to attend and

20  had ██████████████████ had a purpose ████████████████

21  ██████.  Or, if it was just part of his effort to ████████

22  ████████████████████████████████████████████████████

23  ███████████████████████████████████████████████,

24  well, in that case he's not being straight with me about how

25  single-minded he was.  It's not good either way.

1    Plus, his asserted inability to remember rings hollow

2    when the event we are discussing involving ███████████

3    ████████████████████████████████████████████████████████

4    not only ████████████████ but he's █████████████████

5    ████████████ with a specific understanding and intent that

6    ████████████████████████████████████████████████████████

7    ████████████ at a meeting in which the participants made it a

8    point of leaving separate because of the media attention

9    focused at that very time on Manafort' relationships with

10   Ukraine.

11        This is another example of the distinction between a

12   simple denial or failure of recollection and an assertion of

13   fact.  And the concern here is greater because this false

14   statement occurred before the grand jury.

15        He told the grand jury he only told Gates ███████████

16   █████████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ████████████████    The grand jury testimony, Exhibit 4, begins, on

19   page 152 on that matter, quote, █████████████████████████████

20   █████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████

23   █████████████████████████

24        When asked, on page 154, what exactly did you ████████

25   ████████████████████████████████████████████████████████

1    ███████████████████████████████████████

2           All this a contrary to what Gates had to say.

3    Exhibit 222, the FBI 302 of the January 31st, 2018 proffer

4    session, Gates said he ████████████████████████████████

5    ███████████████████████████████████████████████

6    ███████████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ██████████████   Now its true that particular 302 doesn't specify

9    ████████████████   But publicly available ██████████ are

10   publicly available, so why would one need ████████████

11   ██████████████████████████?

12          Exhibit 223, September 27th, 2018, the FBI 302,

13   Mr. Gates said clearly, on that day, the ████████████ he was

14   told ████████████████████████████████████████████████████

15   ██████

16          Defense says I shouldn't believe Gates.  But even if

17   I take into account his lack of recollection of certain details

18   and dates, there's no reason to reject at all in its entirety.

19   The defense pointed to articles outside the record regarding

20   the Virginia trial, whether one or more of the jurors there in

21   fact decided to set aside his testimony because they were

22   concerned about the credibility of a witness who had made a

23   deal.  The verdict, based on the documents alone, if it was,

24   turned out to be consistent with his testimony.  More

25   important, the tax evasion, bank fraud, FBAR, and FARA

1   allegations supported by Gates's testimony have all been

2   admitted to under oath by Manafort himself.  And not everything

3   Gates said was inculpatory.  There were some questions he

4   couldn't answer, and there was a lot of what he said that

5   supports Mr. Manafort's theory.  For instance, as the defense

6   points out, he minimizes the significance of █████████████

7   in the first place.

8          More important to me, there's other corroboration.

9   There's Exhibit 233, an ███████████████████████████████████

10  ███████████████████████████████████████████████  Now,

11  I was told on February 8th, for the first time, in the third

12  pleading that was filed in response to these allegations and

13  after the hearing was over, that when Mr. Manafort said ████████

14  ████████████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████

16  ███████████████████████████████████  There's

17  nothing provided to substantiate that, but there's also nothing

18  in the record to indicate one way or the other that the two men

19  had met previously ████████████████████████████

20          All Gates said to the FBI in Exhibit 236 on January

21  30th was that █████████████████████████████████████████████████

22  █████████.  Is that text alone definitive?  Am I relying on that

23  solely?  No.  But is it corroborative of Gates's statement that

24  ████████████████████████████████████████  Yes.

25          So the defense said at the hearing, Well, it's a

1    recent fabrication.  He didn't say ███████████████████

2    ███████████████████████ until September.  September of

3    2018.  But it turns out the record doesn't support that.

4            Exhibit 222, as I noted, on January 31st, on page 17,

5    he did say ██████████████████ Manafort's direction.

6            Exhibit 236, the 302 from January 2018, Gates says we

7    discussed ███████████████████████████████████

8    ████████████████████████████████████████████.

9    Those are pretty specific words.

10           Exhibit C to docket 504, the FBI 302 from February 7,

11   2018, which has more recently been provided by the government,

12   on page 15 it notes that Manafort said, back in February --

13   that Gates said, back in February, Manafort ███████████████

14   ██████████████████████████████████████████████

15   ████████████████████████████████████████

16   ██████████████████████████ This conclusion is

17   reinforced when you see the series of emails from Kilimnik to ██

18   ██████████████████████████████████████████████

19   ██████████████████████████ and he goes on.

20           So, the defense took another tack then and said,

21   Well, it's not important because these ██████████████ are

22   gibberish.  Who knows what they mean?  I reject that.  It is,

23   perhaps, true that I don't know ██████████████ and it's perhaps

24   true that Mr. █████████████████████████████, but

25   Mr. Manafort, Mr. Gates, and Mr. Kilimnik are ███████████████

1     ████████████████████████████████████████████

2     ████████████████████████████████████████████

3     ████.

4              Indeed, the 302s make mention of the fact that

5     Manafort specifically wanted his own ██████ people, ███████'s

6     company, instead of ██████████, helping out.  And the

7     recently provided 302 from Mr. Gates emphasizes that ████████s

8     ████ was the particular sort of traditional ███████████

9     Manafort found ███████████.  And here they're at a meeting

10    where they specifically talked about ████████████████████

11    ████████████████████████████████████████

12    ████████████████████████████████████████.  So

13    that's not a very strong argument.

14              Also, the evidence indicates that it was understood

15    that ████████ would be ██████ from Kilimnik ████████████

16    ████████ including ██████████████████, and ██████████.

17    Whether Kilimnik is tied to Russian intelligence or he's not, I

18    think the specific representation by the Office of Special

19    Counsel was that he had been, quote, assessed by the FBI,

20    quote, to have a relationship with Russian intelligence, close

21    quote.  Whether that's true, I have not been provided with the

22    evidence that I would need to decide, nor do I have to decide

23    because it's outside the scope of this hearing.  And whether

24    it's true or not, one cannot quibble about the materiality of

25    this meeting.

1        In other words, I disagree with the defendant's

2   statement in docket 503, filed in connection with the dispute

3   over the redactions, that, quote, the Office of Special

4   Counsel's explanation as to why Mr. Manafort's alleged false

5   statements are important and material turns on the claim that

6   he is understood by the FBI to have a relationship with Russian

7   intelligence.

8        I don't think that's a fair characterization of what

9   was said.  The intelligence reference was just one factor in a

10  series of factors the prosecutor listed.  And the language of

11  the appointment order, "any links," is sufficiently broad to

12  get over the relatively low hurdle of materiality in this

13  instance, and to make the ███████████████████████████████████

14  ███ Kilimnik and █████████████████████████████████████

15  material to the FBI's inquiry, no matter what his particular

16  relationship was on that date.

17       At the hearing the defendant pointed me to Exhibit

18  230 as support for its claim that actually Kilimnik was ████

19  ███████████████████████████████████████████████████████████

20  ███████████████████████████████████████████ and,

21  therefore, I should consider the Office of Special Counsel's

22  representation that he was connected to Russian intelligence to

23  be rank speculation.

24       First of all, I don't think these two things are

25  mutually exclusive.  An individual could ██████████████████

1 ████████████████████████████████████████████

2 ███████████████████████.  But as I've said, I'm not making a

3 finding either way and I don't think it's necessary to the

4 decision I have to make.  The fact that Kilimnik's status,

5 loyalties, or activities could be ████████████████████████

6 ██████████████, doesn't make the meeting immaterial or

7 Manafort's testimony about it truthful.

8         I'm also not sure that Exhibit 230 proves the

9 defendant's point.  It is an August 18, 2016 email sent to an

10 individual in ██████████████████████████████████

11 ████████████████████ in which Kilimnik voices his personal

12 opinion about comments being made publicly about any affinity

13 between ████████████████████████████████████████

14 ████████████████████████████████████████████

15 ███████████

16         I note that ██████████████████████████████████

17 ████████████ on the part of Kilimnik, as opposed to what might

18 jump out as ███████████████████████████████████████,

19 because ████████████████████████████████████████

20 ████████████████████████████.  And the focus of the

21 ████████████████████████████████████████.  He advances

22 the view that, as he sees it, ██████████████████████████████

23 ██████████████████████████████████████

24 ████████████████████████████████████████████████

25 ██████████████████████████████████████████.

1       It's also notable that in █████████████████

2    █████████████████████████████████████████████

3    █████████████████████████████████████████████

4    ██████████. And as we know, Manafort was gone the next day.

5       So the email doesn't really answer the question

6    defense counsel raised one way or the other.

7       In a submission related to the dispute over

8    redactions to the hearing transcript, the defendant provided

9    more information, that was docket 503, documents that have been

10   provided in response to his discovery request that do confirm

11   that Kilimnik regularly spoke with officials in the embassy,

12   and the Office of Special Counsel confirmed that at the

13   hearing.

14      Again, and without more guidance on the technical

15   meaning the word has in this context, I don't have the record

16   to decide, don't need to decide, and probably shouldn't decide

17   if the defendant's characterization of Kilimnik ███████████

18   accurate or not, and I'm not making any finding one way or the

19   other on that issue.

20      I do note that in the FBI 302 the defendant asked me

21   to review as an attachment to docket 503, the interviewee ██████

22   ██████████ noted that when ██████████████████████

23   █████████████████████████████████████████████

24   █████████████████████████████████████████████

25   ████████████████████████. So they have that in common.

1          The important thing is neither Exhibit 230 or any of

2     the other information provided changes the outcome in my

3     finding on this matter.  And I find by a preponderance of the

4     evidence that Mr. Manafort made intentional false statements to

5     the FBI and the grand jury with respect to the material issue

6     of his interactions with Kilimnik, including, in particular,

7     the ███████████████████████████.

8          On that note, I also want to say we've now spent

9     considerable time talking about multiple clusters of false or

10    misleading or incomplete or needed-to-be-prodded-by-counsel

11    statements, all of which center around the defendant's

12    relationship or communications with Mr. Kilimnik.  This is a

13    topic at the undisputed core of the Office of Special Counsel's

14    investigation into, as paragraph (b) of the appointment order

15    put it, Any links and/or coordination between the Russian

16    government and individuals associated with the campaign.

17         Mr. Kilimnik doesn't have to be in the government or

18    even be an active spy to be a link.  The fact that all of this

19    is the case, that we have now been over Kilimnik, Kilimnik, and

20    Kilimnik makes the defense argument that I should find the

21    inaccurate statements to be unintentional because they're all

22    so random and disconnected, which was an argument that was made

23    in the hearing, is very unpersuasive.

24         But we now get to go on to another topic, which is

25    IV, about another Department of Justice investigation.  There

1    are allegations in connection with the ███████████████

2    ██████ investigation into potential ████████████ involving

3    ███████████████████████████████████████

4    ███████████████████████████████████.

5          The allegation is that Mr. Manafort offered a version

6    of events that downplayed ████████████ role and/or

7    knowledge, specifically including his knowledge of any

8    involvement of ████████████████ that was inconsistent with

9    and less incriminating of ████████ than what he had already said

10   during a plea proffer, and was inconsistent with what

11   Mr. ████████ himself -- was consistent with what Mr. ████████

12   himself was telling the FBI, and that in this session where he

13   watered down when he'd said before the plea, he had to be

14   redirected by his lawyer multiple times.

15         Defendant suggested it's not really that important

16   because it wasn't about his own wrongdoing and all the

17   statements were corrected in the same interview.  I'm not sure

18   I buy that because the point of seeking cooperation from a

19   person at the highest level of the campaign was to obtain

20   accurate information about the acts of others, in particular,

21   what transpired ████████████████. So it's very troubling to

22   me.

23         Also, you don't have a situation where he reverted to

24   the original version after consultation with counsel, but he

25   cycled through a series of different inaccurate versions.



1          Exhibit 301, the proffer session with the Office of

2     Special Counsel and the FBI on September 13, counsel was

3     present.  He advised the FBI that Mr. ███████ had contacted him

4     regarding a, quote, ████████████████.  So they had to go meet

5     ████████████ that day.  ████████ told Manafort that ████████

6     ████████████████████████████████████████████████████████████

7     ████████████████████████████████████████████████████████████

8     ████████████████████████

9          They had the meeting.  ████████████████, but

10    Manafort didn't recall the name.  And at the meeting ████████

11    said to █████, in Manafort's presence, that ████████████████

12    ████████████████████████████████████████████████████████████

13    ████████████████████████████████████████████████████████████

14    ████████████████████████████.  Later, ████████ told Manafort

15    ████████████████████.  When contacted by ████████████ regarding

16    what Mr. ██████ called a ████████████, Manafort said he didn't

17    discuss it with him, didn't want him involved, and ultimately

18    just told him it had been handled.

19          Okay.  Then he pled guilty and attended a debriefing

20    session where representatives from ████████████████████████

21    ████████████████████████████████ were present.  October

22    5th, 2018, Exhibit 300, FBI 302, we've not got a different

23    version.  The first go-around is totally whitewashed.  He

24    leaves out any reference to ████████████████████ or the nature

25    of the problem.  He says after the ████████ he got a call

1   from ▮▮▮▮ saying ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮ It wasn't specified.  It was later told it was a false

3   alarm, not an issue.  So counsel refreshed him with the notes

4   of the first meeting.

5           Second time Mr. Manafort says, Oh, Mr. ▮▮▮▮ called

6   around the same time about a ▮▮▮▮▮▮ and ▮▮▮▮ mentioned

7   that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  And he

8   told ▮▮▮▮ it would been handled and that he had no knowledge

9   of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮ had come out.

11          There's some more reading of prior notes, he gives a

12  different account.  This time he remembers being at a meeting

13  with ▮▮▮▮▮▮, says they were speaking in shorthand.

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Manafort

15  said that ▮▮▮▮ told him it was ▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

18          The fourth time he says ▮▮▮▮ called, said ▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



1    ████████████████████████████████████████████

2    ███████████

3         I note that at no point has the defense told me in

4    any pleading that the first version was mistaken.  I can't find

5    that these variations can be explained by a failure of

6    recollection.  The versions were not at all consistent with

7    what had been said by the defendant himself only a month

8    before.  The evidence suggests that he decided to obscure what

9    had taken place to shield possibly Mr. ████████████████

10   ██████████████████████████████████████████.

11        This withholding of facts, this begrudging behavior,

12   advancing a new version that's less inculpatory of ████████

13   ███████████████████████████ was significant enough to

14   set off alarm bells with his own lawyers, not consistent with

15   the plea offer, and fairly considered by the Office of Special

16   Counsel to be a breach.  And given the stark difference between

17   what he said and what he reported less than a month before and

18   the effort it took to get him even close to what he said the

19   first time, I find if to be intentionally false.

20        Finally, the fifth category of information was

21   contacts with the administration.  Here, I'm not persuaded that

22   the Office of Special Counsel has presented evidence of an

23   intentional misrepresentation, or really a breach of any moment

24   with respect to this issue, although it's already been conceded

25   that they acted in good faith in making the allegation.

1    The Office of Special Counsel says its concern is his

2    denial of even indirect communication.  They don't challenge or

3    claim that he lied about not having direct communication.  They

4    point to Exhibit 10, page 2, the FBI 302 from October 16th

5    which reports Manafort never asked anyone to try to communicate

6    a message to anyone in the administration.

7    Again, I don't have the specificity I need about what

8    question was asked to prompt that.  Was he asked was it direct

9    or indirect?  What was he asked?  And so I can't deem the grand

10   jury testimony and the documents with which I've been provided

11   to be evidence that what he said in that interview when he said

12   that was false.

13   While there is evidence he agreed to talk to other

14   people outside of the administration on ▮▮▮▮▮▮▮ behalf

15   with the understanding that they might contact the

16   administration about ▮▮▮▮, and he agreed that another

17   ▮▮▮▮▮▮▮▮▮ of the administration could report that he had

18   Manafort's support, I'm not sure that's inconsistent with he,

19   quote, never asked anyone no try to communicate a message to

20   anyone in the administration.

21   I've seen the record regarding the ▮▮▮ matter, and

22   while it does seem as if part of the plan was that somebody was

23   going to contact ▮▮▮▮, I can't find that the government has

24   proved by a preponderance that he intentionally lied during the

25   debriefing with respect to this matter.  If there were other

1    contacts of concern to the Office of Special Counsel, as

2    counsel seem to allude to at the hearing, they haven't been

3    brought to my attention in this proceeding and they don't bear

4    and can't bear on my decision.

5           With that, I believe I've ruled on every issue that's

6    been put to me in connection with the breach proceeding.  I do

7    think it's important to issue a public order and I will try to

8    do one that is consistent with all our previous redactions and

9    doesn't have any sealed material in it.

10          As I said at the outset, I'm going to determine the

11   applicability of any particular guideline provision at the time

12   of sentencing and not today.  What I think we need to do is, as

13   we did before, establish a schedule for the receipt and review

14   of the transcript.

15          Assuming you get the transcript tomorrow by noon, how

16   long would you like to review it to propose redactions before

17   this makes it to the public record?

18          MR. WEISSMANN:  Can I just consult with --

19          THE COURT:  Yes.

20          (Pause).

21          MR. WEISSMANN:  Your Honor, the parties think if we

22   get it by noon tomorrow, we'll make every effort to get

23   something to you by the end of the day, literally, tomorrow.

24   But if for some reason we can't, first thing Friday morning.

25          THE COURT:  Tomorrow is Thursday.  Okay.  Yes.  All

1    right.  Well, as soon as I get it, I'll review it.  Hopefully,

2    I think particularly after we have our next conversation,

3    hopefully there won't be any disputes about what needs to be

4    redacted and what doesn't.  If there are, I'll resolve them

5    promptly and we'll try to get this on the public record as soon

6    as possible.

7         I think there was an understanding back at the

8    beginning that the probation office would need to be informed

9    of my findings so that it could factor them into its

10   recommendation about the various guideline determinations.  So

11   does anybody have a point of view about whether it needs to be

12   informed of the rulings in their entirety, or whether once we

13   post the redacted transcript and we have the minute order, that

14   that is going to be sufficient?

15        And I guess I have the same question because it

16   appears that the Court in the Eastern District of Virginia was

17   waiting to know how I ruled on these issues.  So whether just

18   continuing to complete this docket with the redacted transcript

19   and a minute order is going to be enough for both of those

20   consumers, do you have a thought about that?

21        MR. WEISSMANN:  So, taking those in turn.  First,

22   with respect to probation, we have no objection to probation

23   getting the unredacted transcript.  And we understand that if

24   it's incorporated in some aspect of the presentence report,

25   that's private in any event, since that doesn't become part of

1    the public record.  And to the extent there's some dispute

2    about the presentence report, I don't think the names would be

3    that relevant and we could sort of deal with that issue if

4    there's something in the presentence report that is sensitive.

5           With respect to Eastern District of Virginia, we were

6    planning, after today's appearance, of writing some sort of

7    status report to alert the Eastern District of Virginia to the,

8    sort of, two issues that might be of relevance to it.  Which

9    is, one, the concession with respect to the breach, and then

10   the Court's determination.  We were planning on submitting the

11   redacted version of the transcript, and then if the Court for

12   some reason wants to see the unredacted one, we, of course,

13   would not have an objection to that, but that wasn't initially

14   how we were going to proceed.

15          THE COURT:  Well, I think that makes sense because

16   that's what's public.

17          And do you have any difficulty with their proceeding

18   in that manner?

19          MR. WESTLING:  I can only say that I am a little

20   concerned about sending a judge a redacted version, rather than

21   the whole transcript.  I mean, I think Judge Ellis would have a

22   right to see everything that's there, without having to ask for

23   it.  I mean, I just think that's from a point of view with

24   respect to his position.  I feel uncomfortable that we would be

25   somehow keeping him out of the loop.

1          MR. WEISSMANN:  Well, I guess my view is I'm not

2   asking -- I wouldn't ask this Court to make a ruling with

3   respect to a different judge, but we could always alert the

4   Court that if it wanted that material, of course it would be

5   provided.  The reason I think it's okay to proceed in that way,

6   and I might just be reading between the lines --

7          THE COURT:  I think if you're going to docket there a

8   notice that I have ruled and then you docket there here's what

9   happened, I don't have any problem with your putting into the

10  notice that there's the sealed, unredacted transcript, the

11  parties agree that -- and I would agree that he could have it,

12  if he asked for it.

13         MR. WEISSMANN:  That's fine.

14         MR. WESTLING:  I think that's the point, Your Honor.

15         THE COURT:  All right.  So I think we know how we're

16  going to proceed.

17         The only thing I have left to talk about is the

18  dispute over the redactions. ███████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████































```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

24           THE COURT:  I'm going to try to do something to

25     improve the situation from the defendant's point of view.  I

1   don't think it's going to go as far as unredacting everything

2   that you originally asked me to unredact.  And I would like to

3   look again at the 302s before I decide.

4           MR. DOWNING:  Your Honor, just one other general

5   question:  How are we going to handle the process of unredacted

6   down the road?  I mean, there's been a lot of redactions in

7   this case, and the law enforcement basis for it or ongoing

8   grand jury investigations.  What is going to be the process

9   to -- is the Office of Special Counsel going to notify the

10  Court that the reason stated for a particular redaction no

11  longer exists, or still survives?  Is it going to be some sort

12  of process that we can put in place?

13          THE COURT:  Well, in one case, I know with all the

14  search warrants, it was an evolving process.  There were things

15  that were withheld from you and then you got them but they were

16  still withheld from the press and then the press got them.  But

17  usually things have to be triggered by a motion or request by

18  someone.  There may be reasons related to the defense for

19  everything to stay the way it is.

20          I, right now, without knowing with any particularity

21  what it is that you're concerned about, or if -- and not having

22  the press having filed anything today, asking for anything, I

23  don't know how to answer that question.  But I think that is

24  something that comes up in many cases, cases that were sealed

25  get unsealed later.  And if there's something that you think

1     should be a part of the public record that was sealed and

2     there's no longer any utility for it, obviously you could first

3     find out if it's a joint motion and, if not, then you file a

4     motion.

5             All right.  I just have one question for my public

6     minute order.  The ████████████, the fact that ████████

7     ████████████████████████████████████████████████████████

8     ████████████████████████████████████████████████████████

9     ████████ is still sealed.  So I should not use that in my minute

10    order, is that correct?

11            MR. WEISSMANN:  I believe that's correct, Your Honor.

12            THE COURT:  Okay.

13            MR. WESTLING:  We agree, Your Honor.

14            THE COURT:  Okay.  So, I think then the Roman

15    numerals are a payment from Firm A, interactions with Kilimnik

16    about the obstruction of justice, interactions with Kilimnik,

17    another DOJ investigation, and contacts with the

18    administration.  So I will use that shorthand to refer to them.

19    Is that the best way to proceed?

20            MR. WEISSMANN:  That's fine, Your Honor.

21            MR. WESTLING:  That's fine, Your Honor.

22            THE COURT:  All right.  Appreciate everybody's

23    patience as we move through all this.  And I guess the next

24    time I see everybody is at the sentencing.  I think that's

25    correct.  All right.  Thank you.

1          MR. ANDRES:   Thank you.

2          MR. WEISSMANN:   Thank you.

3                          *   *   *

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                       Dated this 14th day of February 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25