IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 17-201-01 (ABJ) |
| PAUL J. MANAFORT, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## **DEFENDANT PAUL J. MANAFORT, JR.'S SENTENCING MEMORANDUM**

Defendant Paul J. Manafort, Jr. comes before the Court for sentencing after having pled guilty to one count of "conspiracy against the United States" and one count of conspiracy to obstruct justice.  Mr. Manafort submits this sentencing memorandum to aid the Court in determining an appropriate sentence under 18 U.S.C. § 3553(a).  The U.S. Probation Office ("Probation") has calculated, under the U.S. Sentencing Guidelines (the "Guidelines"), a sentencing range of 188 to 235 months in prison.  The two counts of conviction, however, carry a statutorily authorized maximum term of imprisonment of 60 months as to each Count.

## **INTRODUCTION**

Mr. Manafort, who over the decades has served four U.S. presidents and has no prior criminal history, is presented to this Court by the government as a hardened criminal who "brazenly" violated the law and deserves no mercy.  But this case is not about murder, drug cartels, organized crime, the Madoff Ponzi scheme or the collapse of Enron.  Rather, at its core, the charges against the defendant stem from one operable set of facts: Mr. Manafort made a substantial amount of income working as a political consultant in Ukraine, he failed to report to the government the

source and total amount of income he made from those activities, and he attempted to conceal his actions from the authorities.  He has accepted full responsibility by pleading guilty to this conduct.

As the government itself notes, Mr. Manafort committed "garden-variety crimes" and violated the "more esoteric" Foreign Agents Registration Act ("FARA").  *See* Special Counsel Sentencing Submission ("SCO Memo.") at 1.  Importantly, the defendant has *not* been charged with any crimes related to the primary focus of the Special Counsel's investigation; *i.e.,* "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump[,]" otherwise referred to as "Russian collusion" by the national media.  Nevertheless, these "garden-variety" and "esoteric" offenses have led to Mr. Manafort being widely vilified in a manner that this country has not experienced in decades.[1]

Indeed, it is fair to say that, but for the appointment of the Special Counsel and his Office's decision to pursue Mr. Manafort for a rarely prosecuted FARA violation, Mr. Manafort would not have been indicted in the District of Columbia.  To be clear, Mr. Manafort has acknowledged that he should have filed disclosure forms under FARA, and he accepts full responsibility for his actions.  As the Court is aware, however, prior to the May 2017 appointment of the Special Counsel, the National Security Division ("NSD") of the Department of Justice ("DOJ") had been examining the matter which, based on the DOJ's previous practice of handling FARA violations (discussed below), would likely have resulted in Mr. Manafort registering with the NSD for his past transgressions.   In fact, Mr. Manafort had already agreed with the NSD to do so when the Special Counsel took over the case.  With the appointment of a special prosecutor, however, this

---

[1] *See, e.g.*, Martin London, *Spiro Agnew's Lawyer: How the Russia Leaks Could Backfire in Court*, Time.com (June 7, 2017) (*available at*: http://time.com/4808890/donald-trump-russia-investigation-leaks/).

FARA violation went from what was historically an administrative inquiry and proceeding to a federal criminal case and the public vilification of the defendant.[2]

Consider:  This is only the seventh criminal FARA case brought since 1966.  In addition, for the first time in the history of the enforcement of the FARA statute, the government has used the failure to file FARA registration forms as the predicate to charge a money laundering conspiracy—transmogrifying a traditional regulatory violation into a substantially more serious offense accompanied by a potentially severe sentence under that statute.[3]  This case, therefore, involves a magnitude of harshness previously unknown in the enforcement of FARA.

Other cases related to Mr. Manafort's work in Ukraine have been handled administratively and resolved as civil matters.  Mr. Manafort's own work in Ukraine was known to the highest levels of the United States government and disclosed in articles by major new organizations.[4]  As said at the beginning of the case, there is no evidence of Russian collusion.  Mr. Manafort's work involved interests outside of Russia and his efforts to help Ukraine attain membership in the European Union was to further the interests of Ukrainian oligarchs who were trying to protect their assets from Russia.

---

[2] Hyperbole in news stories, of course, cannot be controlled.  But the government sentencing memorandum clearly seeks to paint Mr. Manafort as a hardened criminal.   Again, this case involves no fraud on individuals or pension plans, no violence or drugs, and the defendant is an individual with no prior criminal record.

[3] The decision to charge a money laundering conspiracy triggered the application of the money laundering Guidelines, which provide for a far more severe sentence than the FARA violation.

[4] S*ee, e.g.*, Clifford J. Levy, *Ukrainian Prime Minister, Once Seen as Archvillain, Reinvents Himself*, N.Y. TIMES, Sept. 30, 2007, at A8.

Mr. Manafort has been punished substantially, including the forfeiture of most of his assets.  In light of his age and health concerns, a significant additional period of incarceration will likely amount to a life sentence for a first time offender.

## BACKGROUND

For nearly his entire career, Mr. Manafort worked for elected officials and public office seekers.  Over the course of four decades, he operated businesses engaged in political consulting and government affairs work in the United States and around the globe.  Mr. Manafort served as a high-level advisor to numerous U.S. presidents, going back to President Gerald Ford.  He worked hard and was proud of what he achieved.  Mr. Manafort's career culminated in serving as an advisor and campaign chairman for then-candidate Donald J. Trump's successful presidential campaign in 2016.

Shortly after Mr. Trump's election, the Acting Attorney General appointed the Special Counsel in May 2017 to investigate allegations that his campaign colluded with the Russian government to influence the 2016 election.  The scrutiny was (and remains) intense because the investigation involves a sitting U.S. president.  Not surprisingly, advisors of the candidate were the most closely investigated persons.  Further, not only was the Special Counsel's Office conducting its grand jury investigation of the allegations, but numerous Congressional committees were pursuing their own examinations.  Mr. Manafort was voluntarily cooperating with these Congressional inquiries during the summer of 2017.

Things changed dramatically for the defendant in July 2017.  Just two months after the Special Counsel's appointment, more than a dozen armed federal agents conducted a pre-dawn search of Mr. Manafort's Alexandria, Virginia, residence.  Rousing the defendant and his wife from bed, the federal agents entered their home with guns drawn and searched high and low—not

for evidence of Russia collusion—but rather for evidence of tax and financial crimes and Mr. Manafort's failure to file forms under the obscure FARA statute. Meanwhile, substantial assets were frozen by the government, thus limiting Mr. Manafort's ability to pay his obligations. Such harsh tactics are usually employed in organized crime cases, not tax investigations or cases involving allegations that the defendant failed to file a form identifying lobbying activities. Most certainly, such tactics are not employed when the person is cooperating with the government's inquiries, as Mr. Manafort was with the congressional examinations. All of these actions occurred prior to any formal charges being lodged and the government's forceful maneuvers had their intended effect; *i.e.,* to dramatically ratchet up the pressure on Mr. Manafort.

In October 2017, unable to establish that Mr. Manafort engaged in any Russia collusion, the Special Counsel's Office charged Mr. Manafort in the District of Columbia with crimes that did not relate to Mr. Manafort's work on the 2016 U.S. presidential campaign and generally involved his employment years ago by Ukrainian oligarchs, politicians and the Party of Regions. Several months later, in February 2018, the Special Counsel increased the pressure by charging Mr. Manafort in the Eastern District of Virginia (EDVA) with tax fraud, failing to report foreign bank accounts, and bank fraud—allegations, once again, that predated the 2016 campaign or that were unrelated to collusion between Mr. Trump's campaign and the Russian government.[5]

On June 15, 2018, the Special Counsel brought new allegations in this District that Mr. Manafort conspired with Konstantin Kilimnik, who was an employee of his for many years, to obstruct justice by reaching out to potential witnesses in Europe. The government sought to have

---

[5] As U.S. District Judge T.S. Ellis, III noted in the EDVA matter, the Special Counsel's strategy in bringing charges against Mr. Manafort had nothing to do with the Special Counsel's core mandate—Russian collusion—but was instead designed to "tighten the screws" to compel Mr. Manafort to cooperate and provide incriminating information about others. *See United States v. Manafort*, 18-CR-0083-TSE (EDVA), Tr. of May 4, 2018 Motions Hearing at 5.

Mr. Manafort's bail revoked, and this Court agreed and revoked his bail.  The defendant has since been incarcerated in protective solitary confinement for close to nine months.

On July 31, 2018, Mr. Manafort exercised his constitutional right to a trial by jury and proceeded to trial in Virginia.  On August 21, 2018, the jury found Mr. Manafort guilty on eight counts: subscribing to false income tax returns (Counts 1-5), failure to report his interest in foreign financial accounts (Count 12), and bank fraud (Count 25 and Count 27).  The Court in EDVA declared a mistrial on the majority of the other counts (Counts 11, 13-14, 24, 26, and 28-32), which were subsequently dismissed without prejudice.

Shortly after his conviction in Virginia, Mr. Manafort entered a plea of guilty to a superseding information filed in this District.  In his plea agreement, Mr. Manafort accepted responsibility for the two conspiracy charges before this Court, acceded to a substantial (multi-million dollar) forfeiture order, and admitted his guilt with respect to the conduct underlying the remaining charges in the EDVA case.  Mr. Manafort also agreed to cooperate with the Special Counsel's Office in its investigation and met with attorneys and investigators from the government on numerous occasions.  He also testified before a grand jury in the District of Columbia on two occasions.

Mr. Manafort is *not* the "brazen" criminal that the Special Counsel paints him to be.  As noted above, the charges against the defendant stem from one operable set of facts: Mr. Manafort made a substantial amount of income working as a political consultant in Ukraine and he failed to report to the government the source and amount of all of the income that he made from those activities.  He subsequently attempted to conceal his actions from the authorities.  To be clear: earning income from political consulting in foreign countries like Ukraine is legitimate in and of itself, and many skilled advisors and campaign managers on both sides of the political spectrum

do so.  What made Mr. Manafort's conduct illegal in this regard was that he failed to file disclosure forms under FARA, which would have required that he not only identify the foreign political parties and/or governments on whose behalf he was working, but also the income that he was earning.

Prosecutions that are not brought in a highly politicized environment such as this regularly deal with multi-year patterns of failing to report required information and income.  The defendants in those cases are not presented to the world as hardened criminals who are "a grave risk" of being recidivists after age 70.  Rather, the true—but mundane—consensus view is that individuals who fail to report the source and amount of their income have to revisit that decision each year, understanding that a correct filing in the current year will now risk exposing them to punishment for their initial failure to file accurate forms.  Mr. Manafort has admitted his wrongdoing before this Court and awaits judgment.  The Special Counsel's attempt to portray him as a lifelong and irredeemable felon is beyond the pale and grossly overstates the facts before this Court.

The prosecutions brought against Mr. Manafort have devastated him personally, professionally, and financially.  The charges and intense negative media coverage surrounding them have destroyed his career.  Mr. Manafort, who was always proud of his ability to provide financial support to his immediate and extended family, is now in the process of forfeiting the vast majority of his assets in order to make amends.  A lengthy jail sentence is not called for in this case and would not further the statutory goals of sentencing.  As a result of this widely-reported case, the public now understands what can happen when the full prosecutorial force of the United States government is brought down upon an individual, and would-be violators have been generally deterred from engaging in similar conduct.

## **ARGUMENT**

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of the statute.  In undertaking its analysis, the Court considers the advisory sentencing range recommended by the Guidelines and any relevant Guideline policy statements, as well as other traditional sentencing factors, such as:

(1) the nature of the offense and history and characteristics of the defendant;

(2) the purpose of sentencing;

(3) the kinds of sentences available;

(4) the Sentencing Guidelines;

(5) pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted disparities among similar offenders; and

(7) the need to provide restitution to victims.

18 U.S.C. § 3553(a).

Nearly 20 years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).  The Guidelines are no longer "the only consideration" at sentencing.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Rather, the Guidelines merely provide a "starting point" for the Court's sentencing considerations.  *Id.*; *accord Cunningham v. California*, 549 U.S. 270 (2007).  The Court is to impose its sentence after "mak[ing] an individualized assessment based on the facts presented" in

each particular case.  *Id.*  The Court need *not* find "extraordinary circumstances to justify a sentence outside of the Guidelines range."  *Id.* at 47.

As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[6]  This is especially true in white collar and tax cases such as this, where the sentencing range is largely determined by escalating loss enhancements pursuant to USSG §§ 2B1.1, an increasingly criticized approach that usually results in draconian advisory Guidelines.  *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); *see also United States v. Parris*, 573 F. Supp. 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life.").  The Supreme Court's decisions in *Gall*, *Cunningham*, and *Kimbrough v. United States*, 552 U.S. 85 (2007), significantly broadened the discretion of courts to impose a less stringent sentence than the one suggested by the Guidelines, and in this case the Court should exercise its broad discretion and impose a sentence substantially below the statutory maximum, especially since Mr. Manafort has pled guilty and accepted responsibility for his actions, has been held in protective solitary confinement for almost

---

[6] Terry Carter, *Rakoff's stance on the SEC draws fire, praise—and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

nine months, and has agreed to forfeit the vast majority of his assets accumulated over a lifetime of work.

## 1. The Nature and Circumstances of the Offense

### *Offense Conduct*

In this case, Mr. Manafort pled guilty to "conspiracy against the United States" (Count One)[7] and conspiracy to obstruct justice (Count Two). The offense conduct is set forth in detail in the Statement of the Offenses and Other Acts filed on September 14, 2018 (Doc. 423), which Mr. Manafort accepted during his change of plea hearing. Therefore, the offense conduct is briefly summarized below.

With regard to the Count One conspiracy offense, Mr. Manafort has admitted that he engaged in political affairs work in the United States on behalf of the Ukraine government but failed to file forms to register as a foreign agent under FARA, misled the DOJ about these activities, and engaged in financial transactions using the proceeds from his international consulting activities. Mr. Manafort also admitted that he had interests in various foreign financial accounts, but failed to submit FBAR forms to the Treasury Department and check the box on his income tax returns to report those interests, and that he used the foreign accounts to transfer unreported income into the United States to pay for goods and services and to acquire and improve real estate.

With regard to the Count Two conspiracy offense, Mr. Manafort admitted that he attempted to contact a potential trial witness after a superseding indictment was filed in this case (Doc. 202) and that he asked his former employee and business associate, Mr. Kilimnik, to attempt to contact

---

[7] The actual title of the offense charged by the Special Counsel under 18 U.S.C. § 371 is "conspiracy to commit offense or to defraud United States," not "conspiracy against the United States," which obviously sounds more ominous.

that potential witness and another potential witness.  Despite the attempts, neither Mr. Manafort nor his associate had any substantive discussions with either potential witness.

Finally, in addition to the offense conduct related to Counts One and Two above, in the Statement of Offenses and Other Acts, Mr. Manafort also admitted to bank fraud and bank fraud conspiracy in connection with several loans he applied for and/or obtained.  (*See* Doc. 423 ¶¶ 47-54.)

### a.  FARA Object

With respect to the "FARA object" of the conspiracy set forth in Count One, however, additional context is imperative.  The Department of Justice's own Office of the Inspector General ("OIG") has stated that the prosecution of FARA violations has been an exceedingly rare occurrence. More specifically, the Department has brought just seven criminal FARA cases between 1966 and 2015, only three of which resulted in convictions for FARA-related conduct. Office of the Inspector General, U.S. Department of Justice*, Audit of the National Security Division's Enforcement of the Foreign Agents Registration Act* (Audit Div. 16-24, Sept. 2016) (OIG Report) at ii.  Indeed, the majority of the agents interviewed for the audit believed that DOJ's NSD officials, who must approve FARA cases, are "reluctant to approve these charges." *Id.* Some investigators attributed this reluctance to NSD's "clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution" because FARA can be used as an important counterintelligence tool.  *Id.*  While NSD officials disputed a reluctance to approve FARA cases, they conceded that "the primary goal of FARA is in fact to ensure appropriate registration and public disclosure." *Id.*  Importantly, the OIG audit further found that there is intra-Department confusion about the law as field agents, prosecutors, and NSD officials have offered

differing understandings about the intent of FARA as well as what constitutes a "FARA case." *Id.* at i.

In terms of statistics, both the number of active registrants and new registrants of FARA per year peaked in the 1980s, abruptly declined in the mid-1990s, and continued to trend downward, albeit at a slower pace, until at least 2014. *Id.* at 5. The timing of the public's awareness of the Special Counsel's investigation into Mr. Manafort's FARA-related conduct correlates with a sharply increased number of first time FARA filings and supplemental filings. According to an NBC News analysis, the number of first time FARA filings rose 50 percent to 102 between 2016 and 2017, and the number of supplemental filings more than doubled from 618 to 1,244 in 2017. *See* Julia Ainsley, Andrew W. Lehren and Anna Schecter, *The Mueller effect: FARA filings soar in shadow of Manafort, Flynn probes*, NBC News (Jan. 18, 2018).[8]

### b. Money Laundering Object

Mr. Manafort appears to be the first individual ever charged with money laundering that is based on a FARA filing violation. In considering the money laundering offense conduct for sentencing purposes, it is therefore appropriate for the Court to consider under Section 3553(a) the novelty of the crime charged. To use this "esoteric" law as the backbone of the money laundering conspiracy has pushed the money laundering statute to near its breaking point. Simply stated, the Special Counsel charged that Mr. Manafort's failure to submit a registration statement under FARA (*i.e.,* an act of omission), or false and misleading FARA statements that Mr. Manafort made in 2016 and 2017, transformed otherwise legitimate consulting income earned from 2006 until 2014 into tainted funds that were subsequently involved in financial transactions. Similarly, the

---

[8] *Available at*: https://www.nbcnews.com/news/us-news/mueller-effect-fara-filings-soar-shadow-manafort-flynn-probes-n838571.

Special Counsel alleged that the payment of consulting and professional fees promoted the FARA violation.

The Special Counsel's use of the money laundering statute subjects Mr. Manafort to more severe punishment, increasing both potential jail time and asset forfeiture.   Indeed, while Mr. Manafort is the only person who has ever been charged with FARA-based money laundering, the approach utilized here could be applied to every FARA prosecution.

While this theory and the facts are sufficient to allege the money laundering object conspiracy to which Mr. Manafort has pled guilty, the decision brings to mind the judicial admonition that courts must be "careful not to allow the money laundering statute to become a money spending statute." *United States v. Brown*, 553 F.3d 768, 786 (5th Cir. 2008).  As one court has noted, the goal is to "ensure that the money laundering statute will punish conduct that is really distinct from the underlying specified unlawful activity and will not simply provide overzealous prosecutors with a means of imposing additional criminal liability. . . ."  *United States v. Brown*, 186 F.3d 661, 670 (5th Cir. 1999).   Under the Section 3553(a) factors, the Court should consider the risk that a money laundering conspiracy, when charged in a case like this, can be used to provide for severe punishment even though the underlying FARA violation would not result in a lengthy sentence.  Mr. Manafort's failure to file FARA registration forms, an offense for which the DOJ's recent internal audit shows he would historically have faced little or no jail time, triggered the money laundering conspiracy charge that swept in millions of dollars of otherwise legitimately earned consulting fees.  Layering the money laundering conspiracy on top of the "esoteric" FARA law results in Mr. Manafort facing what could potentially be a life sentence for underlying activity that, while certainly illegal, unquestionably falls on the less serious end of the spectrum of federal felonies.

2.      **The History and Characteristics of the Defendant**

a.  **Personal Life**

Mr. Manafort comes from humble beginnings and he worked hard to succeed.  His grandfather arrived from Italy in the early twentieth century.  Mr. Manafort grew up in a blue-collar family with close ties to their community.  His grandfather established a small construction company in Connecticut that became successful.  Mr. Manafort's father also worked for the company, which continues to operate and is still managed by members of the Manafort family.

In 1971, Mr. Manafort became the first member of his family to graduate from college, earning degrees with honors from Georgetown University in business administration and economics.  In 1974, Mr. Manafort earned a law degree from the Georgetown University Law Center.  In 1978, he married his wife, Kathleen.  They have two daughters together, Jessica and Andrea, and two young grandchildren, with more on the way.

Many already assume they "know" Mr. Manafort from the numerous—and mostly negative—press reports about him and his work as a political consultant in Ukraine.  Others view him adversely solely because of his work during the 2016 campaign on behalf of President Trump.  Those who truly know him, however, paint a very different picture of the man.

Mr. Manafort's wife, Kathleen, writes to the Court about how her husband of 40 years has always put her and his children first and foremost despite a career filled with grueling travel schedules and high-pressure assignments.[9]  Mrs. Manafort describes her and Mr. Manafort as a "great team" and a "partnership of equals" that has shared many memories, challenges, and sacrifices.[10]  She also describes how Mr. Manafort "encouraged me to be my own person and

---

[9] *See* Lttr. of Kathleen Manafort, annexed hereto as Exhibit A.

[10] *Id.*

follow my own interests and have my own career" and never viewed her as a traditional housewife dependent on him.[11]

Kathleen recalls one particular instance where Mr. Manafort turned down an invitation to dine at the White House with then-Vice President George H.W. Bush because the dinner conflicted with Andrea's graduation from the Brownies to the Girl Scouts.  She recalls:

> I will never forget overhearing [Mr. Manafort's] response to a colleague that later asked him why he would miss such an important event, [Mr. Manafort stated] '[i]n 25 years no one will remember if I was at that dinner, but my daughter will remember that I was at her graduation.'  I can assure you that he wanted to be at that dinner very badly, but he didn't hesitate, he didn't complain, and most importantly, he was right.[12]

Mrs. Manafort goes on to detail how, in addition to his unwavering and empowering support for his daughters, Mr. Manafort provided the same support for her, in particular, as she worked through law school night classes, and, most significantly, when she suffered a very serious brain injury and faced a long, uncertain recovery.[13]  Mrs. Manafort also details how her husband's support extended to family members such as her own parents as they got older, her sister-in-law, who suffers from spina bifida and needed a handicapped-accessible home, and nieces and nephews who needed help with their educations.[14]  Mrs. Manafort describes her husband as "the rock the family has relied on for years."[15]

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

Mr. Manafort's daughter, Andrea Shand, has also written to the Court to provide insight into her father's true character. Her letter is filled with memories of her father from her childhood, examples of his generosity with his time and resources for both his immediate and extended family, and the fortitude he displayed after he had been indicted but still stayed up late at night to help Andrea care for her newborn son.[16] We urge the Court to review Andrea's entire letter, but highlight a particularly poignant section here:

> As a father, he has not just taught me the importance of being generous or selfless, but he has shown me what that really means and how to practice it. This is something that I hope to emulate with my own children. I love my dad more than words can describe. I am so blessed that he is my father and I wouldn't change that for anything in the world. While I know that he is not perfect, I love him just as much as if he was. Because he is truly a good man. Something I wish more people would have the opportunity to see – and not just for his sake but for their own. Because knowing him and learning from him has given me faith in humanity and shown me the goodness that people are capable of. And I know he is more than worthy of forgiveness just like every person under God is.[17]

A long-time friend, David Bennett, recalls in his letter to the Court how he came to know Mr. Manafort when their daughters attended elementary school together.[18] That turned into a life-long friendship. Mr. Bennett describes Mr. Manafort as "a natural leader" and a "compassionate" and "loyal . . . family man."[19] Another long-time friend and neighbor, Lt. Col. (Ret.) Wayne Holland—who testified as a witness for the Special Counsel at Mr. Manafort's EDVA trial—has written to the Court to describe that, despite his very busy work schedule, Mr. Manafort always

---

[16] *See* Lttr. of Andrea Shand, annexed hereto as Exhibit B.

[17] *Id.*

[18] *See* Lttr. of David Bennett, annexed hereto as Exhibit C.

[19] *Id.*

made time for his friends and family during family milestones, both happy and sad, such as weddings, funerals, and their children's graduations and sporting events.[20]   It is rare for a government witness to write a letter to the Court asking for leniency for a defendant at the time of sentencing.   Mr. Holland hopes that he will see his old friend soon.   Mr. Manafort grew up with his first cousin, David Cimadon, who recalls how they spent time playing basketball at the Boys Club and how Mr. Manafort has been a steadfast member of his family; in more recent years, Mr. Manafort has provided him with emotional support and offered to help his family because Mr. Cimadon's wife suffers from Alzheimer's disease.[21]

Mr. Manafort's friend from elementary school, Bart Mazzarella, served as an altar boy with Mr. Manafort, played football with him, and recalls that in 9th grade Mr. Manafort became his school's class president due to "his likability and his leadership ability (that was evident even back then)."[22]   Mr. Mazzarella describes Mr. Manafort as "a consummate gentleman, always a good sport and someone we all looked up to."[23]

In his letter to the Court, Kathy Manafort's cousin, Jeff Richards, shares many examples of Mr. Manafort's kindness and generosity over the years, but one particular example reflects how Mr. Manafort often used his political experience to help those in need.   Mr. Richards writes:

> There were many times when [Mr. Manafort] was asked for favors. My youngest sister, studying in Italy, fell for a young Iraqi street painter who had run away after all three of his brothers had been killed in the Iran-Iraq war.  Agents from Iraq found him, raided his room in Italy and took all his papers. In desperation, my sister asked Paul to help, though she and Paul hardly knew each other.  Paul helped him obtain a Green Card, helped him

---

[20] *See* Lttr. of Lt. Col. (Ret.) Wayne Holland, annexed hereto as Exhibit D.

[21] *See* Lttr. of David Cimadon, annexed hereto as Exhibit E.

[22] *See* Lttr. of Bart Mazzarella, annexed hereto as Exhibit F.

[23] *Id.*

out of that dangerous situation, and helped him find work here.  This is just one example, as Paul would always make time to help others.[24]

The list goes on.  In his letter to the Court, Mr. Manafort's youngest brother, Dennis Manafort, recalls how his older brother helped pull him from the clutches of drug addiction and get back on his feet after a difficult period.  He writes:

> Paul has always been there for me, especially after I was divorced and he never gave up on me when I ended up being addicted to drugs myself. My brother was by my side at my darkest hour.  It was because of his support and love that helped me pull my life back together.  This was a very long battle, and he never gave up.  I have been sober for many years now, I have a home and a steady job, and my brother never forgets to remind me how proud he is.[25]

Thom Bond, Mr. Manafort's brother-in-law, writes about how Mr. Manafort stepped up to help when Mr. Bond was diagnosed with cancer, when Mr. Bond's parents needed medical care and adult housing, and how Mr. Manafort took an interest in and looked after his employees.[26] Stacy Bond recalls how when she first met Mr. Manafort she felt intimidated but quickly recognized that "[h]e is a man with a big heart" who formed a special bond with Mrs. Bond's daughter and he helped provide for her over the years.[27]  Rosann Garber Brodie, a long-time family friend, writes about how Mr. Manafort is the "glue" holding their circle of friends together and that Mr. Manafort's friends include "doctors, an electrician, a personal trainer, a receptionist, a

---

[24] Lttr. of Jeff Richards, annexed hereto as Exhibit G.

[25] Lttr. of Dennis Manafort, annexed hereto as Exhibit H.

[26] *See* Lttr. of Thom Bond, annexed hereto as Exhibit I.

[27] *See* Lttr. of Stacy Bond, annexed hereto as Exhibit J.

UPS worker and housewives."[28]   She notes that they are all "lost without [Mr. Manafort] these days."[29]

Probably one of the most poignant examples of the *true* Paul Manafort is reflected by how he stepped up after his middle brother Bob's death at a young age.  In her letter to the Court, Mr. Manafort's niece, Starr Manafort, recalls how, after her father passed away when she was just seven years old, Mr. Manafort stepped in as a loving and supporting father figure who cared for Starr as though she was his own daughter.[30]   Mr. Manafort supported Starr's development and education by paying her school expenses and mentoring her as she embarked on her career.[31]   She writes that Mr. Manafort:

> [H]as provided financial and emotional support in times when I have felt so stuck in my life that it has seemed impossible to move forward.  All it took is one phone call or email to my Uncle and my situation would be improve one way or another.  He is the rock upon which our family supported and the ground from which our success grows.  The hardest thing about these past two years has been not having him here to celebrate our joys, ease or sorrows and fix our problems.[32]

Mr. Manafort's friend, Nicholas Panuzio, who has known Mr. Manafort for almost 50 years, recalls how, following his brother's death, Mr. Manafort essentially adopted Starr "and treated her with the same love and devotion as his two biological daughters" and has "supported Starr in each developmental phase of her life with whatever resource was needed."[33]

---

[28] Lttr. of Rosann Garber Brodie, annexed hereto as Exhibit K.

[29] *Id.*

[30] *See* Lttr. of Starr Manafort, annexed hereto as Exhibit L.

[31] *Id.*

[32] *Id.*

[33] Lttr. of Nicholas Panuzio, annexed hereto as Exhibit M.

These supportive letters from Mr. Manafort's family and friends dispel the public's mistaken impression of Mr. Manafort. He is a loyal and compassionate man upon whom his immediate family, his extended family, and his friends have relied for decades for support and guidance. The fact that these individuals are willing to submit letters of support for Mr. Manafort under the circumstances of this high-profile case—which has received negative media attention beyond compare—is a testament to just how much Mr. Manafort is admired by those who *truly* know him. There are many others who support Mr. Manafort and hope that his current situation will end soon, however, they were not comfortable publicly expressing their thoughts about and experiences with Mr. Manafort out of fear that they will be subjected to harassment and ridicule. In fact, Mr. Manafort himself has expressly asked that some individuals not include a letter of support out of concern for the potential impact a public filing may have on their personal and/or professional lives.

### b. Business Life

#### *Government Service and Contributions to the U.S. Political Process*

Mr. Manafort has spent his life advancing American ideals and principles. He has served as a trusted advisor to four United States Presidents. Mr. Manafort began his career in the Ford Administration, where he served as Associate Director in the Office of Presidential Personnel and acted as liaison between the White House, international and national security, and energy-related departments for all Presidential appointments. Next, President Ronald Reagan appointed Mr. Manafort as a Director of the Overseas Private Investment Corporation. Thereafter, Mr. Manafort served in the Reagan Administration as a member of the Investment Policy Advisory Committee at the Office of the U.S. Trade Representative. With strong organizational and leadership skills, Mr. Manafort was a consultant, strategist and coordinator for the campaigns of Presidents Gerald

Ford, Ronald Reagan, George H.W. Bush, and Donald J. Trump as well as for Senator Bob Dole in his 1996 campaign effort.  In all, Mr. Manafort has advised elected officials at the federal, state, and local levels for over 30 years.

### *International Consulting Work*

During his years outside of government service, Mr. Manafort also worked with world leaders.  Mr. Manafort has spent a lifetime promoting American democratic values and assisting emerging democracies to adopt reforms necessary to become a part of Western society.  At times, he interacted with politicians and business people in emerging countries to assist in the development of American beliefs of equal justice, human rights and free markets.  As an experienced strategist, Mr. Manafort often found ways to build bridges and create economic opportunities between those individuals, their countries and the United States.  As part of his work, Mr. Manafort created, organized, and conducted leadership and educational programs that helped establish functioning democratic processes to oversee elections.  He educated election officials in connection with election management techniques and procedures.  Mr. Manafort also created and managed international election observer programs in over 25 countries.  Mr. Manafort's efforts highlighted the opportunities and benefits of the American system and created commonality which, in turn, fostered substantial relationships between the United States and other countries.

One example of the worldwide impact that Mr. Manafort's work has had can be found in how he persuaded Kenya's former president in 1989 to send a message to the international community by publicly burning millions of dollars' worth of ivory obtained by illegal elephant poaching.  This event, which was featured on the cover of *Time*, together with Mr. Manafort's advocacy in the United States, led the government to declare elephants an endangered species and led Congress to pass the African Elephant Conservation Act.  Another example of Mr. Manafort's

impact can be found in the Caribbean Basin Initiative, which Mr. Manafort helped implement during the Regan administration and which became a landmark program to spread democracy throughout the Caribbean and Central America.

With regard to Mr. Manafort's work in Ukraine, this has been the focus of many simply due to its proximity to Russia.  Many want to characterize it as work on behalf of a "pro-Putin" politician and permit no further discussion of the matter.  Indeed, some stood outside the courthouse accusing him of disloyalty—a man who has advised *multiple* U.S. Presidents over the course of his career.  As is often the case in life, however, the situation was more complicated. Mr. Manafort's efforts were during a time when Ukraine was transitioning from a former Soviet republic into an independent nation focused on its own economic, judicial, and political modernization and reform.  His efforts included assisting with Ukraine's application to become a member state of the European Union and acting as one of the Ukrainian government's liaisons to the European Commission.  Mr. Manafort was in regular contact with U.S. officials at the American Embassy in Kiev to communicate details of his work in Ukraine.  In fact, the very charges which the Special Counsel brought against him and to which he pled guilty involve his work regarding the so-called Hapsburg Group—a group of Western European politicians that were seeking to integrate Ukraine into Europe.  Yet, little thought is given by the Special Counsel to the inherent inconsistency of questioning Mr. Manafort's loyalty even though he now stands convicted of working with a pro-Western group seeking to bring Ukraine closer to the United States and its allies.

The work Mr. Manafort performed for the Ukrainian government was similar to work he performed over his career in helping institute democratic reform in countries all over the world,

including, but not limited to, Pakistan, Kenya, South Africa, Botswana, the Philippines, Argentina, Venezuela, Peru, St. Lucia, the Bahamas, the Dominican Republic, and Jamaica.

### The 2016 Campaign

In 2016, Mr. Manafort served as campaign chairman for Donald J. Trump's successful campaign for the presidency of the United States.  Mr. Manafort served as an advisor and campaign chairman for approximately five months without compensation.   The Special Counsel's investigation and prosecution in this case (and the EDVA case) do not charge him with anything related to Russia collusion or to the presidential campaign.[34]

Mr. Manafort's long career in public affairs and his work for then-candidate Donald J. Trump is perhaps best summarized by political strategist Doug Davenport:

> When I see/hear any of the negative reporting on Paul, I stop and shake my head and wonder how any of this could have gotten to this point.  [Mr. Manafort] was ALL-IN for this current President, and never once (at least to me) ever asked, offered, or suggested any shortcuts or other dirty political tactics – foreign or domestic – to try to further the candidacy of the man who now sits in the most powerful chair on earth.  It is easy to look at 40+ years of someone's accomplished career in DC and around the world and boil it down to a simple summary of short cuts and greased relationships – as opposed to looking at the whole of a man and his contributions to society and government service that was Paul Manafort.[35]

Though some may disagree with Mr. Manafort's politics and may not like some of the individuals he worked for, it cannot be said that Mr. Manafort has had anything but an extraordinary and largely successful career and played a significant role in promoting democratic values.

---

[34] As Judge Ellis noted in the EDVA case: "And so what is really going on … is that this indictment [was] used as a means of exerting pressure on the defendant to give you information that really is in [the Special Counsel's] appointment, but itself has nothing whatever to do with it."  *United States v. Manafort*, 18-CR-0083-TSE (E.D.Va. 2018), Tr. of May 4, 2018 Motions Hearing at 8.

[35] Lttr. of Doug Davenport, annexed hereto as Ex. N.

### c.   Organizational and Charitable Work

Mr. Manafort has been involved with a number of organizations.  He has served as a member of the Board of Directors for the Center for Study of Democratic Institutions, which focused on public health, democracy, and human rights; the Center for Democracy, a think tank Mr. Manafort established to focus on democratic institution building, with particular emphasis on third-world countries and former republics of the Soviet Union; the U.S. Youth Council, an organization that sponsored educational, cultural, political, and business exchange trips and seminars for emerging young leaders in various countries; and as a Senior Fellow of the Center for Strategic and International Studies, a bipartisan think tank dedicated to helping lawmakers and policymakers chart a course for a better world.

Mr. Manafort has also been involved in charitable and community organizations closer to home.  Mr. Manafort's father served as the mayor of New Britain, CT and encouraged his children to become involved in public service and give back to their community.  For example, before he relocated to Virginia to attend college, Mr. Manafort established a program with the local Boys Club that allowed low income children residing in public housing projects to participate in the Club's basketball, baseball, and football leagues, where the children learned skills, teamwork, and sportsmanship.  The program became very successful and continued even after Mr. Manafort left New Britain to attend college.  Mr. Manafort's interest in helping young people continued when he ran his public affairs company, where he established a successful intern program that taught recent college graduates both business and organizational skills; many graduates of the program went on to leadership positions in public relations, the media, and politics.

There are other examples of Mr. Manafort's genuine care for others and contributions to his community.  After his wife Kathy suffered a serious injury in 1998, Mr. Manafort became

active in brain trauma research and fundraising, and he sat on the Brain Trauma Foundation's board of directors.  Mr. Manafort volunteered his time to coach basketball and soccer programs for girls; he served as President of the U.S. Youth Council, which adopted an exchange program to help implement programs for future leaders from foreign counties to promote democratic values and free market principles; and he helped create and manage annual political seminars for young men and women from the Young Republicans National Federation.  Mr. Manafort has also raised money for numerous community and societal causes, including non-profit Inova Alexandria Hospital, the Good Shepard Catholic Church, the National Diabetic Association, Georgetown University Law Center, and the Boy and Girl Scouts of America.  Mr. Manafort also created and funded an annual education scholarship program that allowed boy scouts from low income families located in this father-in-law's district to attend college.  At St. Ann's Church in New Britain, Connecticut, Mr. Manafort established a community resource program for elderly and low income members of his community that provided them with needed food, transportation to medical appointments and shopping trips, and daily in-door activities for senior citizens.

### d.  Age and Health Concerns

Mr. Manafort's age alone suggests that a lengthy sentence of imprisonment would be particularly deleterious.  A study commissioned by the DOJ's National Institute of Corrections concluded that imprisonment is especially problematic for older inmates like Mr. Manafort, finding that "several important factors seem to speed the aging process for those in prison" and identifying numerous management problems associated with older inmates.  *See* National Institute of Corrections, U.S. Department of Justice, *Correctional Health Care* (2004) at 8-9.[36]  This study noted that older inmates are uniquely vulnerable to abuse and predation, that they experience

---

[36] *Available at*: https://info.nicic.gov/nicrp/system/files/018735.pdf

difficulty in establishing social relationships, that they often need special physical accommodations in a relatively inflexible physical environment, and that many need special programs in a setting where special privileges are disdained. *Id.* at 11. The study found that older first-time offenders "are frequently severely maladjusted and especially at risk for suicide, explosiveness, and other manifestations of mental disorder." *Id.* Moreover, "[s]ince their behaviors are not well tolerated by other inmates, their victimization potential is high." *Id.*

Aside from high blood pressure, Mr. Manafort was a relatively healthy 69-year-old man before he was remanded to custody in June 2018, where has been held in protective solitary confinement. As detailed in the PSR, since that time, his health has deteriorated. *See* PSR ¶¶ 140-141. In jail, he has developed severe gout, which causes significant pain and swelling in his right foot. At one point, he needed to be transported to Alexandria Hospital for treatment. *Id.* at ¶ 140. Mr. Manafort requires a wheelchair to ambulate on bad days, or a cane on "good" days. *Id.*

Since his incarceration, Mr. Manafort has been prescribed numerous prescription drugs to address various health challenges, including: Allopurinol and Colchicine to treat his gout symptoms; Amlodipine Besylate and Carvedilol to treat his high blood pressure; Atorvastatin to treat high cholesterol; Otezla and Lac-Hydrin to treat psoriasis; and Meloxicam to treat arthritis, among other prescription and over-the-counter treatments. Although Mr. Manafort downplays his physical health challenges for his family and friends, the reality is he is not the relatively healthy man he was prior to his incarceration. Recently, doctors at the jail identified a potential thyroid problem and Mr. Manafort is currently undergoing diagnostic testing.

This is not to garner sympathy; outside observers have seen the impact of his incarceration. A prominent legal and political commentator, who recently observed Mr. Manafort in the courtroom, stated the following in *The Hill*:

> I saw Paul Manafort in court the other day[.]  This is a man who looks like
> he's dying. He is walking with a cane. He looks disoriented.  He has
> declined so precipitously in prison that when you realize he has now lost his
> cooperation agreement and the chance for a lower sentence and he's facing
> an entirely separate prison sentence in the Virginia case, a 70-year-old man
> is looking like he may die in prison, and it is just a profound thing to think
> about.  Apparently he's using a wheelchair a lot of the time[.]  Prison is
> rough for anybody. Yes, he did wrong and he did wrong over and over
> again.  But, I mean, this man is really, really in danger of losing his life.[37]

The conditions of Mr. Manafort's incarceration have taken an even greater toll on his

mental and emotional health.  *See* PSR ¶¶ 142-144.  To ensure his safety, Mr. Manafort is confined

to solitary confinement at the Alexandria Detention Center where he spends 21 hours a day locked

in a cell alone.  Family visitation time is limited to just two 30-minute visits per week; as a result,

he meets more often with his legal team than his loved ones.  He suffers from severe anxiety, panic

attacks, and a constant feeling of claustrophobia while he is locked alone in his cell each day.

These conditions of confinement were designed for violent offenders who pose risks to the safety

of other inmates or jail personnel, or who are placed in solitary confinement as punishment for

disciplinary infractions; they were surely not intended for the long-term confinement of a first-

time white-collar offender of Mr. Manafort's age and health.

Section 3553(a) recognizes that the Court should take into account any medical issues

facing the defendant and whether the sentence imposed will "provide the defendant . . .  with

needed medical care . . . in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  The advisory

Guidelines likewise provide that:

> Physical condition or appearance, including physique, may be relevant in
> determining whether a departure is warranted, if the condition or
> appearance, individually or in combination with other offender
> characteristics, is present to an unusual degree and distinguishes the cases
> from the typical cases covered by the Guidelines.  An extraordinary physical

---

[37] Joe Concha, *CNN's Toobin: 'Almost unrecognizable' Manafort 'In danger of losing his life' in prison*, CNN (Feb. 14, 2019) (*available at*: https://thehill.com/homenews/media/430004-cnns-toobin-almost-unrecognizable-manafort-in-danger-of-losing-his-life-in).

> impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

USSG §5H1.4.

Courts routinely impose non-custodial sentences in cases involving defendants who suffer from serious medical conditions. For example, following the defendant's conviction after trial for wire fraud in *United States v. Burks*, 2010 WL 1221752 (E.D.N.Y. Mar. 29, 2010) , the sentencing court imposed a sentence of one month incarceration and five years' probation despite a Guidelines range of 57-71 months where, *inter alia*, the defendant suffered from degenerative diabetes. *Id.* at *2; *see also United States v. McFarlin*, 535 F.3d 808, 810-11 (8th Cir. 2008) (affirming variance for 56-year old defendant with numerous health problems, including coronary disease and who had undergone several operations); *United States v. Alatsas*, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (imposing a term of probation, despite Guidelines range of 24-30 months where, *inter alia*, "[d]efendant has multiple complex medical problems, which will be better cared for outside of prison.").

In *United States v. Barbato*, 2002 WL 31556376 (S.D.N.Y. Nov. 15, 2002), a pre-*Booker* decision, the defendant pled guilty to using extortionate means to collect extensions of credit. The sentencing court granted a downward departure from a then-mandatory Guideline range of 24-30 months imprisonment based on the defendant's history of heart problems, and imposed a sentence of home detention and two years of supervised release. Notably, the *Barbato* court imposed home confinement even though the prosecution contended that the Bureau of Prisons would be able to provide adequate treatment for the defendant's health conditions. The court noted that "[i]t is often relevant, though not always controlling, whether the BOP can provide adequate care." *Id.* at *4.

For all of these reasons, Mr. Manafort's physical, mental, and emotional health, together with his age and his almost nine-month solitary confinement, weigh strongly in favor of a sentence in this case that does not include a lengthy period of incarceration.

### 3. The Purpose of Sentencing

Pursuant to the sentencing statute, a defendant's sentence should be designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2)

To be clear, Mr. Manafort does not dispute his guilt, but these factors do not warrant a substantial period of imprisonment in this case. As noted above, the Special Counsel's investigation of Mr. Manafort's FARA violations—the specified unlawful activity underpinning the money laundering conspiracy charge and forfeiture penalties—are almost never criminally prosecuted and have historically resulted in civil penalties (or, more often, guidance regarding how to comply with the statute). Indeed, the 2016 OIG audit report noted that "historically there have been hardly any FARA prosecutions. Over the past 50 years, between 1966 and 2015, [DOJ] reported to us that it brought, in total, only seven criminal FARA cases," only three of which resulted in convictions for FARA-related conduct. OIG Report, *supra* at 8. The Inspector General further found that even civil actions for injunctive relief related to FARA violations have not been brought since 1991. *Id.* at 12.

It is also significant that the foreign bank accounts related to the tax and FBAR objects were established at the behest of the benefactors of Mr. Manafort's foreign clients, *not* because Mr. Manafort intended from the outset to use the accounts to evade income tax or foreign bank

account reporting obligations.  In fact, in 2014, Mr. Manafort *voluntarily disclosed* his interest in foreign accounts to the FBI, which was engaged at that time in an unrelated investigation of Ukraine-based assets.  The government's main cooperating witness confirmed this during his testimony during the EDVA trial.  *See, e.g.*, *United States v. Manafort*, 18-CR0083-TSE (E.D. Va. 2018), Trial Tr. 1453-57 (testimony from Rick Gates that in 2014 he and Mr. Manafort met with attorneys from DOJ and special agents from the FBI and disclosed DMI's work in Ukraine and foreign accounts).  Mr. Manafort acknowledges that he was wrong when he used funds held in these foreign accounts to pay vendors in the United States for personal goods and services, and to purchase and improve real estate, and that those decisions amounted to federal crimes.

With regard to the bank fraud conduct that Mr. Manafort acknowledged in this case, Mr. Manafort again admits that the loan applications contained false information.  Mr. Manafort's conduct in this regard stemmed from a desire to maintain his assets in the face of what he hoped and believed would be a temporary financial setback and, for that, he has accepted responsibility before this Court.

Lastly, with regard to Mr. Manafort's direct and indirect attempts to contact potential trial witnesses, Mr. Manafort again acknowledges that his conduct was wrong.  That said, the offense conduct related to these charges—a handful of short or ignored telephone calls and text messages—is distinguishable from the types of conduct common to most witness tampering cases, where potential witnesses are offered bribes or other financial incentives, or threatened with physical harm, to give false testimony.

The charges in this case (and in the EDVA matter), and the collateral consequences Mr. Manafort has already suffered as a result of his criminal conduct, including almost nine months of incarceration in protective solitary confinement, substantial negative media coverage that has

ruined his reputation, and the severe financial punishment experienced by Mr. Manafort and his family as a result of the forfeiture provisions of his plea agreement, have adequately conveyed the seriousness of Mr. Manafort's conduct.   He is deeply remorseful, has suffered almost unprecedented public shame, and he and his family will have to live with the collateral consequences of his conduct for the rest of their lives.

Despite the protestations of the Special Counsel, there is no risk of recidivism in light of the very harsh lesson that Mr. Manafort has already learned, especially considering the nature of these offenses, the damage done to his reputation, and his advanced age.   *See, e.g., United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (affirming 54 months downward variance in part because of low risk of recidivism).   Statistical data from a study commissioned by the United States Sentencing Commission show that "[r]ecidivism rates decline relatively consistently as age increases."   United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) at 12.[38]   That study indicates that a defendant over the age of 50 and in criminal history category I has a 6.2 percent likelihood of recidivating.   *Id.* at Ex. 9.[39]   It is plain that the likelihood of recidivism for a nearly 70-year-old man such as Mr. Manafort is far less than 6.2 percent.   Beyond his age, a number of other characteristics make recidivism highly unlikely, including Mr. Manafort's advanced level of education and lack of illicit drug use.   *See Measuring Recidivism*, at 12-13.   Indeed, elderly tax

---

[38] *Available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

[39] A related study of recidivism rates by "true" first offenders (*i.e.*, those with no prior involvement with the criminal justice system) showed that such first offenders had a "primary" recidivism rate (including supervised release/probation violations, re-arrest, and re-convicted) of 6.8 percent, and a re-conviction rate (involving an actual conviction for a subsequent offense) of only 2.5 percent.   U.S.S.C., *Recidivism and the "First Offender,"* at Ex. 6 (*available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf).

and white-collar offenders generally are considered low risk by the Bureau of Prisons and pose very little risk of reoffending.[40]

Mr. Manafort has been personally and financially devestated as a result of his conduct and the forfeiture he has agreed to.  There is no reason to believe that a sentence of years in prison is necessary to prevent him from committing further crimes.  He poses no risk to the public, which itself has certainly been generally deterred from engaging in similar conduct based on the widespread negative publicity this case has garnered, as well as his incarceration in solitary confinement.  Lastly, a term of imprisonment is not required in this case to provide Mr. Manafort with necessary educational or vocational training, medical care, or other correctional treatment.  Indeed, with regard to needed medical care, including the recently discovered potential thyroid issue, those needs could be better addressed by Mr. Manafort's own physicians outside of the federal prison system.

### 4.  The Kinds of Sentences Available

The Court has the authority and discretion to impose a wide range of alternatives to the lengthy term of incarceration contemplated by the Guidelines or the maximum penalty authorized under the relevant statutes.  *See* 18 U.S.C. §§ 3553(a)(3) and 3561(a)(1).  A sentence significantly below the statutory maximum is appropriate in this case in light of: Mr. Manafort's remorse for his conduct; his acceptance of responsibility as reflected in the plea agreement (where he also admitted his guilt as to the mistried counts in the EDVA case); the fact that he and the general public have been deterred from engaging in similar conduct in light of the punishment Mr. Manafort has already suffered and the widespread media attention this case has garnered; his age

---

[40] *See* Evan J. Davis, *Is the First Step Act Good New for Tax and Other White-Collar Defendants?* (Jan. 4, 2019) (*available at*: https://www.taxlitigator.com/is-the-first-step-act-good-news-for-tax-crime-and-other-white-collar-defendants-by-evan-j-davis/).

and deteriorating health; the financial devastation Mr. Manafort has experienced as a result of his prosecution and forfeiture agreement; the detrimental effect on his family; and, as explained below, the types of sentences imposed for similar conduct. Although there are many types of sentences available, the defense respectfully asks the Court to consider the time that Mr. Manafort has already served in solitary confinement and his agreement to forfeit substantial assets in fashioning its sentence.

### 5.   The Sentencing Guidelines and The Commission's Policy Statements

Mr. Manafort objects to the PSR[41] with regard to Probation's inclusion of an enhancement for role in the offense and Probation's determination that Mr. Manafort should get no credit for acceptance of responsibility. Furthermore, Mr. Manafort submits that the base offense level, while calculated accurately, overstates the seriousness of the offense.

### a.   Aggravating Role Enhancement

As a threshold matter, Probation erroneously asserts that the parties agreed in the plea agreement that an aggravating role enhancement pursuant to USSG § 3B1.1 is applicable in this case. *See* PSR ¶¶ 22, 163. This is incorrect—Mr. Manafort expressly reserved his right to object an enhancement for his role in the offense. *See* Doc. 422 (Plea Agreement dated Sept. 13, 2018) at 5 ("[Mr. Manafort] also reserves the right to disagree with the Estimated Guideline Range calculated by [the Special Counsel's] Office with respect to role in the offense.").

Probation has applied an aggravating role enhancement on the theory that Mr. Manafort was "an organizer or leader of a criminal activity that was otherwise extensive." *See* PSR ¶¶ 90, 112 (referencing USSG § 3B1.1(a)). A similar provision is found in USSG § 3B1.1(b) with regard

---

[41] To be clear, Mr. Manafort acknowledges the terms of his plea agreement, which states that "a sentence within the Estimated Guidelines Range (or below) would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a)[.]"  (Doc. 422.)

to a "manager or supervisor" of schemes that involved five or more participants or that was otherwise extensive.  USSG § 3B1.1(c) imposes a two-level enhancement for any "organizer, leader, manager, or supervisor" engaged in any criminal activity without regard for the number of participants or the extensiveness of the criminal conduct.

The comments to these Guideline provisions provide that they should be considered with respect to "criminal organization[s]."  *See* USSG § 3B1.1, Background Note ("This section provides a range of adjustments to increase the offense level based upon the *size of a criminal organization* (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense.") (emphasis added); *see also id.*, App. Note 2 ("An upward departure may be warranted . . .  in the case of a defendant . . . who . . . exercised management responsibility over the property, assets, or activities of *a criminal organization*.") (emphasis added); *id.*, App. Note 3 ("In assessing whether *an organization* is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.") (emphasis added).  The notion that an aggravating role enhancement is appropriate only in the context of a criminal organization or enterprise—that is, an organization with a primary objective of engaging in crime—is further bolstered by the background commentary to this Guideline provision, which states:

> In relatively small *criminal enterprises* that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger *enterprises* that tend to have clearly delineated divisions of responsibility.

USSG § 3B1.1 cmt. background (emphases added).  *See also United States v. Brodie*, 524 F.3d 259, 271 (D.C. Cir. 2008) ("Just as a party who knowingly assists a *criminal enterprise* is criminally responsible under principles of accessory liability, a party who gives knowing aid in

some part of the *criminal enterprise* is a criminally responsible party under the Guidelines." )

(quotation marks and citation omitted; emphases added); *United States v. Wilson*, 240 F.3d 39, 48

(D.C. Cir. 2001) ("[P]lanning and preparation actually define *an organization* as large or small[.]")

(emphasis added); *United States v. Slade*, F.3d 185, 190 n.1 (4th Cir. 2013) (to qualify for

aggravating role enhancement, the government must establish that defendant oversaw

"participants, as opposed to property, in the *criminal enterprise*.") (emphasis added).

The commentary from the Sentencing Commission and D.C. Circuit (and other) precedent

strongly suggest that these role enhancements are applicable to leaders or managers of

organizations that have a primary purpose of engaging in crime, such as foreign cartels that

smuggle narcotics into the United States, or motorcycle gangs that unlawfully transport and

distribute firearms.  But neither consulting company associated with Mr. Manafort, DMP and/or

DMI, operated as a criminal organization.  DMP was a company formed in 2005 to engage in

political consulting work, while DMI was a company formed in 2011 to engage in consulting,

lobbying, and public relations work for foreign clients.  *See* Doc. 419 (Superseding Information)

¶ 7.  They were not "criminal organizations" as that phrase is ordinarily understood and, therefore,

these enhancements are not applicable in this case.

Furthermore, Mr. Manafort cannot fairly be described as an organizer, leader, manager, or

supervisor under USSG § 3B1.1.  The government's star witness at Mr. Manafort's trial in the

EDVA, Rick Gates, testified that he was the only DMP or DMI employee that engaged in any

criminal activity with Mr. Manafort.  *See United States v. Manafort*, 19-CR-0083-TSE (E.D.Va.

2018), Trial Tr. at 1097.  In fact, the evidence at trial established that Mr. Gates often acted alone,

both when dealing with U.S. lenders in connection with the loan applications that underpin the

bank fraud conduct, and when handling transfers of funds earned from FARA-related activity and

held offshore, the conduct underpinning the tax and FBAR charges. Mr. Gates operated with little or no management supervision by Mr. Manafort; indeed, at trial Mr. Gates testified that this lack of oversight enabled him to embezzle hundreds of thousands of dollars from Mr. Manafort. *See id.* at 1419. This was not "extensive" criminal activity.

Accordingly, because Mr. Manafort's lobbying and consulting companies were not criminal organizations, and because Mr. Manafort cannot be described as an organizer, leader, manager, or supervisor, the enhancements under USSG § 3B1.1 are inapplicable.

### b.  Acceptance of Responsibility

Probation has declined to credit Mr. Manafort with accepting responsibility under USSG § 3E1.1. *See* PSR ¶¶ 94, 126. However, Probation's determination in this regard ignores the fact that Mr. Manafort pled guilty prior to trial in this case and accepted responsibility for offense conduct in both this District *and* the EDVA, including the Counts in the EDVA case for which a mistrial was declared. *See* PSR ¶ 22. In fact, Probation has included conduct that Mr. Manafort admitted with regard to the EDVA charges as other acts in this case. *See* PSR ¶¶ 76-83. It would be inconsistent and entirely inequitable to increase Mr. Manafort's Guidelines based on offense conduct he has admitted in connection with the EDVA case, on the one hand, and then, on the other hand, decline to give Mr. Manafort any consideration for accepting responsibility for that conduct.

At the time the PSR was completed, Probation relied on the Special Counsel's argument that, during his cooperative efforts, Mr. Manafort made false statements to the government and the grand jury to support its denial of acceptable of responsibility. *See* PSR ¶ 94. The Court has now ruled that the Special Counsel failed to prove that Mr. Manafort lied about the Mr. Kilimnik's participation in the obstruction of justice conspiracy. Importantly, the claim that Mr. Manafort

lied about the obstruction conspiracy was the only allegation that he had made a false statement relating to the offense conduct acknowledged in the plea.  In light of this finding, Mr. Manafort should receive credit for his acceptance of responsibility.

The Court determined that Mr. Manafort made false statements on a handful of topics to the government and the grand jury.  As the defense has consistently argued, Mr. Manafort did not intentionally lie to the government or before the grand jury—arguments that Probation, the Special Counsel and this Court have not credited with respect to those three topic areas.  Indisputably, however, whether Mr. Manafort was truthful or untruthful during his cooperation meetings regarding those three topics, it does nothing to offset the fact that Mr. Manafort fully accepted responsibility for his conduct when he acknowledged the Statement of the Offenses and Other Acts (Doc. 423) before this Court during his guilty plea hearing.  In short, even if Mr. Manafort did not satisfy the cooperation component of his plea agreement, he only hurt himself with respect to a potential 5K motion by the government under the Guidelines.  This, however, does not result in an *ipso facto* determination that Mr. Manafort did not accept responsibility for his conduct.  He has not backed away from his guilty plea in any way.  Accordingly, Mr. Manafort should receive credit pursuant to USSG § 3E1.1 for his acceptance of responsibility.

Finally, acknowledging, without agreeing with, the Court's determination that he made false statements relating to three topics during his cooperation, Mr. Manafort asks the Court to consider the narrow scope of those topics against more than 50 hours that he spent answering the government's questions.  Given the relatively small number of alleged false statements in the record in comparison to the defendant's lengthy cooperation sessions, the Special Counsel implicitly accepted the majority of Mr. Manafort's answers as truthful.  Thus, despite the Court's determination that the Special Counsel met its burden of proving by a preponderance of the

evidence that Mr. Manafort lied about three of the five topic areas, we ask that the Court weigh its findings in this regard against Mr. Manafort's truthful answers provided during the majority of his cooperation.

### c.   The Guidelines Overstate the Seriousness of the Offense

As noted above, the Guidelines in this case are largely driven by the "value of funds" provision of USSG § 2S1.3, which, in turn, references the fraud table found at USSG § 2B1.1, which provides for escalating offense categories based on the "loss" that resulted from a defendant's criminal conduct.   While the defendant agrees that Probation has calculated the Guidelines correctly in this regard, using the "value of funds" measure results in an advisory sentencing range that bears little relation to the offense conduct here.   In other words, neither the U.S. government nor any other victim "lost" an amount equal to the funds that were held by and flowed through the relevant foreign accounts associated with the FARA-related activities, which underpin the money laundering and FBAR conspiracy conduct.   Indeed, a substantial portion of the funds held in the relevant foreign accounts were ultimately paid out in fees to professionals that Mr. Manafort engaged, related to legitimate business expenses, or were reported as income on the book and records and tax returns of DMP and DMI.   Until recently, the DOJ itself advocated that sentencing courts use the less draconian tax Guidelines in FBAR-related cases, instead of using the value of funds to determine the appropriate offense level.[42]   Therefore, while the defense

---

[42] *See generally* Anton Janik, Jr. *DOJ Announces Major New Shift in Criminal Sentencing in Offshore Tax Matters*, Mitchell Williams (Dec. 8, 2017). (*Available at*: https://www.jdsupra.com/legalnews/doj-announces-major-new-shift-in-39945/.   Recently, a DOJ senior trial attorney floated the proposition that DOJ may now argue that USSG § 2S1.3 is the correct Guideline for criminal tax cases involving offshore accounts.   To date, however, DOJ has not promulgated any official guidance regarding this proposed change.   Indeed, in the very first criminal tax/FBAR case to be sentenced following the "reported" DOJ policy change, the government agreed that the *tax* Guidelines should be applied to the defendant to avoid disparate treatment considering that dozens of prior defendants in criminal tax/FBAR cases had been sentenced under the tax Guidelines.   *See United States v. Kim*, Docket No, 1:17-CR-00248-LMB (E.D. Va. 2018).

does not dispute the applicability of USSG §§ 2S1.3 and 2B1.1, the Court should consider under Section 3553(a) the fact that the "value of funds" analysis employed by the Guidelines results in an offense level that vastly overstates the seriousness of the offense in this case.

Lastly, there are no pertinent U.S. Sentencing Commission policy statements.

### 6.   The Need to Avoid Unwarranted Disparities

Among the most important sentencing factors in this case is the need to avoid disparity with the types of sentences imposed in similar cases.

#### a.   Sentences in FARA Cases

As noted above, there have been less than 10 defendants sentenced for violations of FARA over the last 50 years.  This is unsurprising, as the government itself has found that "the focus of the FARA Registration Unit's enforcement efforts is encouraging voluntary compliance, rather than pursuing criminal or civil charges."  OIG Report *supra* at 9.  Nevertheless, examples of sentences imposed in the *de minimis* number of criminal FARA prosecutions within the last decade are instructive and suggest that a sentence involving substantial prison time is not warranted in this case.  In *United States v. Siljander*, 07-CR-87-07-W-NKL (W.D. Mo. 2012), the defendant, a former Congressman, was sentenced to one year and one day after pleading guilty to FARA violations and obstruction of justice in connection with work the defendant performed for an Islamic charity with connections to terrorism.  In *United States v. Ben Israel*, 13-CR-572 (EEB) (N.D. Ill. 2014), the defendant was sentenced to 7 months' imprisonment for acting as an unregistered foreign agent in connection with work the defendant performed attempting to lift U.S. sanctions imposed on the Zimbabwean government.

### b.   Sentences in Offshore Tax and FBAR Cases

As reflected in the PSR, the Guidelines range in this case is largely driven by the fraud table found at USSG § 2B1.1 in connection with the FBAR charges.  *See* PSR ¶ 108 (determining a 22-level enhancement for at least $30 million "value of the funds").  In many similar cases, however, variances are frequent and substantial and have reflected the belief of many courts, academics, and commentators that in tax and fraud cases, a mechanical application of these provisions results in astronomically high advisory sentencing ranges that bear little relation to the nature of the offense or the history and characteristics of a defendant.

It has been rare that substantial sentences are imposed in cases related to the use of offshore bank accounts.  While offshore tax fraud and FBAR cases do not appear to be common in this District, defendants sentenced in nearby EDVA are instructive.  For example, in *United States v. Silva*, Case No. 10-CR-00044 (E.D. Va. 2010), U.S. District Judge Liam O'Grady sentenced the defendant to two years' probation with special conditions of four months' home detention and 100 hours of community service in a case where the defendant repatriated funds from his unreported offshore account into the United States by mailing himself 26 packages of currency and carrying another two packages into the United States, always structured in amounts under $10,000 to avoid detection.  In *United States v. Cambata*, Case No. 15-CR-362 (E.D. Va. 2014), U.S. District Judge Claude M. Hilton sentenced the defendant to one year of probation and a $15,000 fine where the defendant received $12 million from a Belizean company which was deposited into an undisclosed account at a Swiss bank in the name of a Hong Kong corporate entity.  Thereafter, the funds were later transferred to Singapore and Monaco bank accounts and the defendant failed to file FBARs even after he was advised to do so by counsel.  In *United States v. Horsky*, Case No. 16-CR-224 (E.D.Va. 2017), U.S. District Judge T.S. Ellis, III sentenced the defendant, a former business

professor at the University of Rochester, convicted of hiding over $200 million in offshore accounts resulting in an approximate tax loss of $18 million, to seven months' imprisonment followed by a period of supervised release with special conditions.  Even more recently, in *United States v. Kim*, Case No. 17-CR-248 (E.D.Va. 2018), U.S. District Judge Leonie M. Brinkema sentenced the defendant to six months' imprisonment for failing to report $28 million in income hidden in a Swiss bank account, using coded messages to communicate with Swiss bankers, and ultimately repatriating his funds by conspiring with a Swiss jeweler to ship jewelry to the United States in an effort to disguise the transfer.

Indeed, variances in tax fraud cases involving the use of foreign accounts have been typical around the country:

- Markus Hager, who maintained multiple offshore accounts in multiple countries held by a sham foreign entity, who used his own sister (a non-U.S. person) to open a secret bank account for him in Israel, and who established new offshore accounts even after he became aware that he was under federal investigation, was sentenced to 6 months' imprisonment.  (Case No. 16 Cr. 447 (PKC) (E.D.N.Y. May 31, 2017));

- Ty Warner, who was prosecuted for an undisclosed offshore bank account that held a high balance of over $100,000,000, which resulted in a tax loss of over $5.5 million, but was sentenced to 2 years' probation. (Case No. 13 Cr. 731 (CPK) (N.D. Il. Jan. 14, 2014));

- Mary Estelle Curran, who owned an undisclosed $47 million Swiss bank account which resulted in a $21 million FBAR penalty, was sentenced to *five (5) seconds* of probation. (Case No. 12 Cr. 80206 (KLR) (S.D. Fl. Apr. 25, 2013));

- Jacques Wajsfelner, who worked in real estate and advertising, held a Swiss bank account valued at over $5 million and owed more than $400,000 in back taxes, interest, and penalties, but was sentenced to three months home detention based in part on his PTSD stemming from his experiences during World War II (he fled the Nazis as a teenager). (Case No. 12 Cr. 641 (NRB) (S.D.N.Y. Mar. 8, 2013));

- Lothar Hoess, the owner of a company that sold office supplies and equipment, had a tax loss of between $400,000 and $1,000,000, and faced a Guidelines' range of 30 to 37 months, but was sentenced to three years' probation. (Case No. 11 Cr. 154 (SM) (D.N.H. Mar. 30, 2012));

- Arvind Ahuja, who was convicted in jury trial of willfully filing a false return and willfully failing to file an FBAR due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India.  At sentencing, the court varied from the Guidelines' range of 41-51 months to a sentence of 3 years' probation, 3 months home detention, a $350,000 fine, and 450 hours community service. (Case No. 11 Cr. 135 (CNC) (E.D. Wisc. Feb. 6, 2013));

- Kenneth Heller, a disbarred attorney who had a secret $25 million account in Switzerland, faced a Guidelines' range of 30-37 months, but was sentenced to 6 weeks' imprisonment.  (Case No. 10 Cr. 388 (PKC) (S.D.N.Y. Jan. 23, 2012));

- Michael Reiss, who moved his offshore account to various institutions and countries, failed to participate in the OVDP, and filed false FBARs, faced a Guidelines' range of 30 to 37 months, but was sentenced to 3 years' probation, the first 8 months to be served in a community confinement center, and 30 hours of community service a week for 3 years. (Case No. 11 Cr. 668 (RMB) (S.D.N.Y. Jan. 1, 2011));

- Josephine Bhasin, who had an account at HSBC in India that held a high balance of $8.3 million, and filed a false FBAR after being contacted by the DOJ, was sentenced to 2 years' probation, the first 3 months to be served in home confinement, and 150 hours of community service.  (Case No. 11 Cr. 268 (ADS) (E.D.N.Y. Mar. 8, 2013));

- Ernest Vogliano, who opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations, and actively used funds and transferred some after learning of the criminal investigation, was sentenced to 2 years' probation. (Case No. 10 Cr. 327 (TPG) (S.D.N.Y. Apr. 26, 2011));

- Jules Robbins, who created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts that held nearly $42 million.  The court took into consideration his "otherwise unblemished life" in imposing a sentence of 12 months' probation. (Case No. 10 Cr. 333 (RJH) (S.D.N.Y. Oct. 8, 2010)); and

- Igor Olenicoff, a businessman and investor, held more than $200 million in undisclosed offshore bank accounts and owed $52 million in back taxes, interest, and penalties, but was sentenced to two years' probation. (Case No. 07 Cr. 227 (CJC) (C.D. Cal. Apr. 16, 2008)).

Even if there were not numerous other factors warranting a sentence substantially below the statutorily-authorized maximum in this case, sentencing Mr. Manafort to prison for many years would create an undeniable and unwarranted disparity in the sentencing treatment of other defendants in offshore tax fraud and FBAR cases.  *See* 18 U.S.C. § 3553(a)(6).  This factor alone weighs heavily in favor of a sentence that does not include a substantial term of imprisonment,

particularly in light of the time that Mr. Manafort has already served and his agreement to forfeit a substantial portion of his assets.

### c.   Sentences in Other Cases Related to the Special Counsel's Investigation

Finally, the sentences imposed in the other cases prosecuted by the Special Counsel (or referred by that office to other prosecutors) are also instructive.  For example, in *United States v. Cohen*, 18-CR-602/18-CR-850 (WHP) (S.D.N.Y. 2018), defendant Michael Cohen was given a sentence of 36 months' imprisonment after pleading guilty to making false statements to Congress, five counts of tax evasion, one count of falsifying submissions to a bank, and two campaign finance violations.  The Special Counsel's prosecutions related to obstruction and false statements are even more instructive.  In *United States v. van der Zwann*, 18-CR-31-ABJ (D.D.C. 2018), this Court sentenced the defendant to 30 days' imprisonment for lying to the Special Counsel's attorneys and investigators.  In *United States v. Papadopoulos*, 17-CR-182-RDM (D.D.C. 2018), Judge Moss sentenced the defendant to 14 days' imprisonment for making false statements to the FBI.  The sentences already imposed in other cases that have been investigated and/or prosecuted by the Special Counsel's Office reflect the fact that courts recognize that these prosecutions bear little to no relation to the Special Counsel's core mandate of investigating allegations that the Trump campaign colluded with the Russian government to influence the 2016 election.

### 7.   The Need to Provide Restitution to Any Victims of the Offense

As noted in the PSR, restitution is not applicable in this case.  *See* PSR ¶ 22.

### 8.   A Concurrent Sentence is Appropriate

In its sentencing submission, the Special Counsel's Office states that the Court has discretion to run all or a portion of the sentence imposed in this case consecutively to the sentence imposed in the EDVA case.  *See* SCO Memo. at 24.  While the Court has substantial discretion,

that discretion is informed by the Sentencing Guidelines, which the Special Counsel ignores.  To the extent the Court in the EDVA imposes a term of imprisonment, Mr. Manafort will come before this Court serving an undischarged term of imprisonment and, therefore, the provisions of USSG § 5G1.3 (b) will apply.  This Guideline states, in pertinent part, that if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense" then the Court must "adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if [it determines that the Bureau of Prisons will not credit that time]" and "the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment."  USSG § 5G1.3(b)(1)-(2).

In situations involving an undischarged term of imprisonment, USSG § 5G1.3(b) instructs that "relevant conduct" be analyzed pursuant to the provisions of subsections (a)(1), (a)(2), or (a)(3) of USSG § 1B1.3.  Those provisions essentially provide that nearly *any* conduct related in *any way* to the charges for which a defendant will be sentenced qualifies as relevant conduct, and includes:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omission of others that were—
>
> > (i)     within the scope of the jointly undertaken criminal activity,
> >
> > (ii)    in furtherance of that criminal activity, and
> >
> > (iii)   reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; [or]
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; [or]

> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such act and omissions[.]

*See* USSG § 1B1.3(a)(1)-(3).

In light of the above provisions, the conduct for which Mr. Manafort will be sentenced in the EDVA case is relevant to the conduct for which he will be sentenced in this District.  The Special Counsel's theory from the outset has been that the various types of conduct that Mr. Manafort engaged in were *all* related to each other—that is, Mr. Manafort engaged in FARA activity that he did not properly disclose to the DOJ (*i.e.,* the FARA conduct); he deposited income from the FARA activity into foreign bank accounts that he did not disclose to the government (*i.e.,* the FBAR conduct (prosecuted here and in the EDVA)); he did not report all of the FARA income that he deposited into the foreign accounts (*i.e.,* the tax fraud conduct (prosecuted here and in the EDVA)); he laundered the proceeds of the FARA activity by using the funds from the foreign accounts to pay for goods, services, and real property in the United States (*i.e.,* the money laundering conduct, which is inextricably intertwined with the tax fraud conduct); he used real estate acquired with funds related to the foregoing schemes to commit bank fraud (*i.e.,* the bank fraud conduct, prosecuted in the EDVA and included in the Statement of Offense in this case, *see* Doc. 432); and, lastly, he attempted to contact potential trial witnesses to cover up his criminal conduct (*i.e.,* the obstruction conduct).

The Special Counsel's own sentencing submission makes this point.  For example, in discussing the EDVA indictment and trial, the Special Counsel notes that "[a]s with the facts supporting the tax conspiracy charge in the District of Columbia, the substantive tax and FBAR charges [in the EDVA] related to millions in income earned in Ukraine" and goes on to tie that income to the foreign account and bank fraud charges (*i.e.,* noting that relevant loan applications

were related to properties purchased or improved with funds that Mr. Manafort held in foreign accounts). SCO Memo. at 6. The Special Counsel also notes that in the Statement of Offense filed in this District (Doc. 432), Mr. Manafort allocated here to conduct that made up a substantial portion of the evidence against him at the EDVA trial. *See, e.g.*, SCO Memo at 7 (Mr. Manafort's admissions that he used income from FARA activities (and held in foreign accounts) to purchase goods, services, and real estate in the U.S.; Mr. Manafort's admissions that he falsely characterized income as loans; and Mr. Manafort's admissions that he lied to his bookkeepers and accountants as part of a scheme to underreport his income). Indeed, in its summary of the Count One tax and FBAR conspiracy objects, the Special Counsel's Office simply relies on the sentencing memorandum it has filed in the EDVA case, and "notes that the FBAR crimes" prosecuted in the EDVA "served to promote other crimes: the tax conspiracy herein as well as the FARA violations." SCO Memo. at 22.

In short: Mr. Manafort's conduct in this District and his conduct in the EDVA cannot be anything *other* than relevant conduct under USSG § 1B1.3(a)(1)-(3), which includes the Count Two obstruction conduct in this District, *see* USSG § 1B1.3(a)(1)(B) (relevant conduct includes conduct "that occurred during the commission of the offense of conviction, in preparation for that offense, *or in the course of attempting to avoid detection or responsibility for that offense[.]*") (emphasis added). Therefore, in the event that the Court in the EDVA sentences Mr. Manafort to a term of imprisonment, it is appropriate impose a concurrent sentence pursuant to USSG § 5G1.3(b). Lastly, the fact that Mr. Manafort exercised that constitutional right should not result in an overly punitive consecutive sentence.

For these reasons, the defendant requests that this Court should impose a sentence that will run concurrent to any undischarged term of imprisonment that results from the sentence imposed in the EDVA.

## CONCLUSION

For all of the foregoing reasons, we respectfully request that the Court impose a sentence significantly below the statutory maximum sentence in this case.

Respectfully submitted,

___/s/_____
Kevin M. Downing
(D.C. Bar No. 1013984)
Law Office of Kevin M. Downing
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 754-1992
kevindowning@kdowninglaw.com

___/s/_____
Thomas E. Zehnle
(D.C. Bar No. 415556)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001
(202) 368-4668
tezehnle@gmail.com

___/s/_____
Richard W. Westling
(D.C. Bar No. 990496)
Epstein Becker & Green, P.C.
1227 25th Street, N.W.
Washington, DC 20037
Tel: 202-861-1868
Fax: 202-296-2882
Email: rwestling@ebglaw.com

# Exhibit A

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
333 Constitution Avenue NW
Washington, D.C. 20001

Your Honor:

This letter is to tell you about Paul Manafort, my husband.  Paul is very different than the image painted in the media and the press.

Paul and I have been married for 40 years and I love him very much.   Paul has always made me feel valued, important and whole.  For our family, he always strived to give me, our daughters, and our extended family and friends a better life.  Paul and I have gone through a lot together, such as family crises, health issues, and the loss of loved ones.  We have shared a lot together, and we made constant sacrifices for each other.  Throughout our marriage Paul made sure that it was a partnership of equals.  In fact, Paul encouraged me to be my own person and follow my own interests and have my own career, something for which I have always been very grateful.

Paul worked countless hours at the White House, on political campaigns, and later at the consulting firm he co- founded and led for many years.  My husband travels often for his work, including many trips to foreign countries.  Despite what you may read in the press, his focus is to spread and foster American values through his work.

Despite his grueling work schedule, Paul is always first and foremost dedicated to his family.  Shortly after the birth of our first daughter, Jessica, Paul encouraged me to go to law school. I attended Georgetown Law School in the evenings and graduated with honors.

 Our second daughter, Andrea, was born while I was still in law school.  Paul provided me with unwavering support.  Even though he was incredibly busy, he made time for our daughters and made sure they were ready for bed when I returned home.   I could not have successfully survived those years and attained my degree without Paul's help.

Paul is an incredible father. Our daughters are Paul's number one priority and have never taken a back seat to his work.  No matter where he was in the world he traveled home to coach Jessica in basketball for five years and Andrea for three years in soccer.  There are so many examples, but there are a few particular memories I cherish.

Some may be surprised to hear that early in Paul's career, he declined an invitation from then Vice President Bush to have a private dinner at the Vice President's official residence.  He had a much more important obligation that night.  The dinner conflicted with our eldest daughter's graduation to Girl Scouts from Brownies and it didn't matter if it was Law School, college, or Brownies, graduations were always an exciting and important event in our family. I will never forget overhearing his response to a colleague that later asked him why he would miss such an

important event, "In 25 years no one will remember if I was at that dinner, but my daughter will remember that I was at her graduation." I can assure you that he wanted to be at that dinner very badly, but he didn't hesitant, he didn't complain, and most importantly, he was right.

Finishing law school and starting her career at a time where it was still very difficult for women, Paul was the type of man I hoped for when raising children. I can't begin to explain how much confidence and support Paul gave our daughters. He encouraged them to participate in sports, hobbies, their studies and careers. He did this so that they would be able to find what they were truly passionate about and pursue their dreams. He always told them they could be anything they wanted to be and there's no doubt Paul's empowered them to be strong women. Watching his daughters succeed has made Paul immensely proud, and I can see how happy he gets when they still come to him for advice as adults. Their bond to him is not just because of all the good things he's done for them, but also because of the rock he was for them during their most challenging period as children.

In 1997, I suffered a brain injury and was in a coma for six weeks. Paul was by my side every day, including the months of extended recovery. When I awoke, I had lost so much of my memory and had to re-learn the most basic life skills. I know now that each day Paul was with me, I would repeat the same story, ask the same questions, and we would do the same routine. Years later when I found this out, I would joke to friends about how annoying I must have been, but he always gave me a kiss and said that his one joke was always funny. We can laugh now, but I know extremely difficult it was for him during that time. He marshalled all of our family and friends to arrange hospital visits and aid in my recovery when I returned home. He would get our girls off to school, come to the hospital, go to work, come back to the hospital, come back to the hospital, and then work through the night to make sure he maintained his business commitments. He did this for months on end. Countless family and friends have told me that he never complained and he was always upbeat and excited about my progress, even on the bad days. He constantly made everyone feel like it was no question I would get better. It's sad to say that this was not the only time someone close to Paul would need his help to get through a tragedy.

Paul is compassionate and supportive of our extended family, our friends, and our neighbors. Paul is the oldest of three boys and he adores his little brothers. Unfortunately, the middle brother, Bob, passed away at age 37. He left behind a 7-year old daughter, Starr, and his young wife Linda, who we still love very much and will always be part of our family. As for Starr, Paul stepped right in and provided the emotional support she needed. He also made sure that Linda had everything she needed so she could continue being the wonderful mother she was before Bob's death. As the years went on, he became a father figure and he didn't just provide things, he was always available to Starr for advice, guidance, and love. When she was ready for college, Paul didn't think twice to pay for her education. When she fell in love, he made sure she got the wedding she deserved. Paul's selflessness is evident. When he did something nice or generous for Starr, he would pretend like he knew nothing about it and say she should thank her mother. When he walked her down the aisle, he made sure she knew how much his brother loved her. When she thanked him for paying for college, he thanked her for inviting

him to graduation.  That is my husband. It's not about credit with him, it's about making sure everyone has the resources they need.

That can be seen with my parents.  As they got older, Paul modernized their homes, made sure they had safe cars, and did whatever he could to make their later years comfortable.  It's the same story with my siblings. Over the years Paul helped many of our family members to purchase their homes.  My sister-in-law, Stacy, suffers from spina bifida.  It is very difficult for her to move around her home and Paul noticed this.  They didn't ask for help, Paul just wanted to alleviate Stacy's suffering, so he suggested her and my brother purchase a single-floor home. He offered them help to purchase it and took it upon himself to make sure everything was fully handicapped accessible before they moved in.

Paul also helped our nieces and nephews pursue their educations by covering tuition costs from pre-Kindergarten through college and post graduate work. In addition to financial assistance, Paul has always been our family and friends' resource for encouragement and academic advice. He is the rock the family has relied on for many years.  He also convinced a neighbor's daughter to stick it out through law school.  She credits him to this day for her law school success.

Paul always puts others, whether it be family, friends, or neighbors before himself.  Our summer home was a revolving door for family and friends.  Paul spent countless hours coordinating activities for the various groups that we hosted every summer.  His focus was on what would make each person happy all the way down to their food preferences.

No marriage is perfect, and Paul and I have had our ups and downs over the years, but we have always come back to each other and have helped each other overcome challenges, during tough periods of life.  We have been a great team together and have picked each other up when one of us was down.  Paul is also not perfect, and like everyone, he has his flaws.  Paul made mistakes that have led him to this sentencing before the court.  But, unlike the public perception of him, he is also a compassionate man who has always put me, the kids, and our family first.  When deciding his sentence, I ask you also to recognize the wonderful things Paul has done in the past and will continue to do when this chapter is behind him.

Sincerely,

*Kathleen B Manafort*

Kathleen Manafort

Exhibit B

Hon. Amy Berman Jackson
U.S. District Court of Columbia
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Hon. Judge Jackson,

My name is Andrea Manafort Shand, and I am writing this letter on behalf of my father, Paul
Manafort. It is my hope to share with you some of my experiences that I think provide helpful
insight about who my dad is as a person.

From when I was little, I always looked up to my dad. He instilled many values in me that I carry
with me to this day. If I were to list all of them, then I fear this letter would be entirely too long,
so instead I will share only a few. My dad showed me what it means to be a family – to always
love and support one another, unequivocally, especially when times are tough. He also made
clear to me from a young age that family, friends and community are more important than
everything else and to value them above all else. Lastly, but in my opinion most notably, he was
a living example of selflessness and generosity; he taught me how one person practicing these
values can make a huge difference to many.

Throughout my life, my dad has provided me with unconditional emotional support. Whenever
I approached my dad with thoughts or questions, he was always there to talk through it with
me – be it trivial or significant.  This may sound simple, but in reality it was anything but. For
example, I am somewhat of a night owl, which basically means that the deep thoughts or
feelings that I generally feel the need to talk through, quite frequently occur at very late night
hours. This is further complicated when adding in the fact that my dad has traveled worldwide
throughout his career, so quite often he would be in an entirely different time zone when I
desperately needed to chat about my deep musings. Whatever the case may be, my dad was
*always* available. If I needed immediate consultation on how do I pick what classes to enroll in,
or when did you know you wanted to marry mom, or why is junior high the worst thing ever –
he was unfailingly there to discuss.

Moreover, my dad has always made sure I felt I could do or be anything that I put my mind and
work into, and whatever that is, he is there to support me in executing it. This has certainly
been tested throughout the years as I have developed *many* interests and hobbies – some
fleeting, some long-lasting, and many in between. Yet my dad has never missed a beat. For
example, as a child my sister started to play basketball and after a couple of years my dad
volunteered to be the coach of her team. I saw this and also wanted to be on a team that my
dad coached, so naturally I decided I should try out basketball as well. Much to my dismay, I
was quite lacking in the hand-eye coordination department and basketball was not a good fit. I
decided that perhaps a sport utilizing my feet was more suited to my strengths, and the
following year I took up soccer, which thankfully I excelled at. The major downside was – would
my dad still be able to coach me? Basketball had always been a sport near and dear to him, and
I had definitely never seen him play or even watch soccer. His answer: of course he could coach

me, what was I crazy? And with that he promptly went to the bookstore and purchased a huge stack of books on soccer, soccer play strategies, and how to coach soccer.

This may seem like a small and silly story, but to me that moment really stuck with me. It meant so much that he not only agreed to coach me, but how seriously he took it. He did (and still does) whatever it takes to enable him to provide me with guidance and support, even when my interests and goals are in areas he is less familiar with. To really further illustrate this, fast forward to present day. I very recently expressed to my dad an interest to use the Montessori methods in raising my son. This took place during a telephone conversation while he has been incarcerated. My dad admitted he had little firsthand knowledge of this method but still expressed how he wanted to know more so he could fully understand and discuss it with me. So I donated some books about the Montessori methods to the facility where he is. He immediately read them all, and now he is the one consistently teaching me various techniques that could help support my son's growth and development. His support truly knows no bounds.

My dad is someone who never gives up on others. I can say this without hesitation after seeing the lengths he went through with my mother. When I was 12, my mom suffered a severe traumatic brain injury. We were told that with this type of injury that the most likely outcome for her was death or living in a permanent vegetative state. Despite this extremely bleak prognosis, my dad never gave up. He moved mountains it felt like to ensure that everything that could be done was being done to give my mom the best possible chance. After many excruciatingly long weeks, my mom awoke from her coma. While that was an amazing moment for all of us, it was nowhere close to the end of the battle, and in many ways it was just the beginning. The doctors could provide no insight on what type of recovery she would make or what our lives would look like from here on out. But my father was unwavering in his support. I admit that I never once felt like my mom would not make a full recovery and while this had to be at least in part due to my childish naiveté, I really believe it is also a testament to my father's determination and resolution. He patiently sat with her everyday while she learned to speak again, to walk again, to learn the most basic functions like feeding herself. All while raising and loving two scared daughters. If you were to meet my mom today, there is no way from talking with her that you could guess what we have all been through as a family. Her recovery has been a miracle, a gift from God to be sure, and we are so blessed to have her with us today. And I truly believe her presence now would not have been possible without my dad.

To be clear, while I am so thankful and blessed to have my dad's love and support, I have also personally witnessed how he provides this well beyond his nuclear family as well. To anyone who has needed someone, he has stepped up however he can. Depending on the person and the need, I have seen him take on the role of friend, mentor or fatherly figure to those in need. I have so many stories of how he has helped his parents, my mom's parents, my cousins, his cousins, my mom's cousins, my uncles and aunts, his friends, my friends, my sister's friends, and so on. He is a person who steps up when asked for help. But more than that, he is a person who seeks out who needs help and offers his assistance. Sometimes he is just a listener when someone needs to be heard, but many times, he is doing whatever he can to help ease their burden or assist their end goal. When I was young I was dating a boy for a short while, and a

family member of his got very sick while we were dating. He explained to me the situation and I shared it with my father. Despite that my father had only met my boyfriend maybe once or twice, and had never met this family member of my boyfriend's, who by the way lived in entirely different state – as soon as I told my dad what was going on, he asked how he could help. He immediately made calls to get some background on hospitals in the relevant area and what specialists came highly recommended. This is what my dad does – whatever he can do to help anyone in need.

It is no surprise to me that my dad has been asked and accepted the role of godfather for so many people's children that I have lost count at this point. This honor is a responsibility that he has always taken very seriously. To help people, whether in their spiritual upbringing or in any other way needed, seems to be a value that is innately part of who my father is. His acts of selflessness are many. It is for this reason, and so many more, that I chose to include my dad's name as part of my firstborn son's name. A choice I would make over and over again now that I have witnessed my dad firsthand as a grandfather.

The weeks leading up to my son's birth, my father came over nearly every day. It was the dead of summer, and I needed to take walks to promote labor. So of course my dad patiently accompanied me on these walks (which is probably not even the right term given that I was quite slow and hobbling about). During these walks, he would listen if I needed to talk or tell me stories if I needed to listen, but ultimately it was his calm and supportive presence that helped me feel better. And when I went into labor, which stretched over the course of two nights, he barely slept and made clear he was there for me and my growing family in any way he could be.

Once my son finally arrived, my dad was by his side as soon as he was allowed to be. He came every day I was in the hospital to visit us and to just gaze at our newest little family member. And when we were released and we all went home, my father came over every morning for several weeks to help make lunch and dinner and then to clean everything up afterwards. He was such a permanent fixture at my sink washing dishes that it became a family joke. This help that he provided in those early weeks cannot be understated.

And then several weeks later my father was indicted and our whole world got flipped upside down. Because of the high-profile nature of what was happening, suddenly our home no longer felt safe. Strangers felt they had the right to bang on our door and demand answers from me and my husband that we didn't have to give. With a newborn to protect, we felt like the safest option was to move into my parent's apartment which had more security than our home offered. And of course, right when this all happened, we were in the throes of a sleep regression with my newborn son. So my sleep deprived family set up shop in my parents' guest bedroom, and we took each day as it came. My dad, the ever giving and generous man that he is, took this opportunity to help US with OUR problem, despite his freedom being at stake.  In the very, very early morning hours of our first night there, I remember stumbling bleary eyed and exhausted into the living room with my son to find my dad sitting in his chair reading the indictment against him for the very first time. He took one look at me, put down the indictment, scooped up my son and told me to go back to bed. This to me says exactly who my

father is as a person. His selflessness is unshakably resolute. He gives whatever he can to those he sees in need, regardless of what is going on with him.

As a father, he has not just taught me the importance of being generous or selfless, but he has *shown* me what that really means and how to practice it. This is something that I hope to emulate with my own children. I love my dad more than words can describe. I am so blessed that he is my father and I wouldn't change that for anything in the world. While I know that he is not perfect, I love him just as much as if he was. Because he is a truly good man. Something I wish more people would have the opportunity to see - and not for his sake but for their own. Because knowing him and learning from him has given me faith in humanity and shown me the goodness that people are capable of. And I know that he is more than worthy of forgiveness just like every person under God is. Ever since he has been incarcerated, there has been a hole in our hearts. I did not get a chance to say goodbye, nor have I hugged him in over 8 months and I miss him in a way that I struggle to really capture with words. I pray every day for him and his health. I pray that my son will get to hug his grandfather again soon. I pray that my mother will get her devoted husband returned to her soon. I pray for patience and strength to endure these hard days so that one day soon my dad and I can go on another walk together and talk about the silly things a daughter needs to talk to her father about.

Thank you for your time in reading this letter.

Andrea Shand

Exhibit C



# Bennett Adjusting
C O M P A N Y

January 23, 2019
Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson:

It is my pleasure and honor to write this letter. I am doing so with a deep heartfelt conviction. I believe in families and the internal relations with and of a family member. I believe all of us should work hard at developing friendships and should enjoy these friendships fully. While we all do not think alike, we should maintain our friendships with tolerance, compassion, and a lack of bigotry of thought.

Paul Manafort is my friend. He has been my friend for over 30 years. This friendship has been steady and never in jeopardy. From both sides, I believe the friendship has been honest and forthright. I know that Paul shares in my convictions toward both family and friends.

We first met when our oldest daughters became friends in our neighborhood elementary school. Both were young ladies with athletic abilities and they played on the same Mt. Vernon Youth League basketball team. Paul and I co-coached their teams for three years. Both Paul and I had some background in basketball and our co-coaching worked very well. We had a tremendous amount of enjoyment teaching our daughters and their teammates. We took pleasure in bonding the team and their parents to provide a fun experience.

Co-coaching taught me a lot about my friend. Timely, hard working and very organized are some traits of Paul's that quickly come to mind. Paul was so into coaching that he made up a playbook for our team. I have saved a copy and it brings back wonderful memories.

Over the last 30 plus years, I have met most of Paul and Kathy's families and a number of their close friends. I now consider all as friends of mine as we all have great interest in family and friends. Without a doubt, Paul has in many ways come to the aid of almost every member of his and Kathy's families. He has assisted in finding housing, finding employment and educating nieces, nephews, and in-laws. All of Paul and Kathy's family and friends exude the love and affection for each other that you would expect.

I am an avid golfer. Through golf, I have met and become friends with many of Paul's former employees and partners who also play golf at the same club. Every one of these former employees and partners have prospered from their relationship and experiences with Paul I never hear a bad word. I only hear how he has helped them. All share wonderful stories of family,

**David Bennett**
General Adjuster

friends, and work. Without any question, Paul has a great amount of respect from all these people.

In 1996, Paul and I were standing in line at a Baskin Robbins getting ice cream for our families. He turned to me and asked me if I would like to go to the Republican Convention in San Diego. He was in charge of that Convention and I advised that I would like to if I could be of help and not be in the way. He said "I'll get you a good seat." I had no idea what I would be doing, so I got an airline ticket and a new suit and headed to San Diego. As it turns out, my seat was very good. It happened to be on the podium, a few seats down from George W. Bush and Christine Todd Whitman. It was at this time I did my first and only political work for free. I also learned for sure that Paul was my trusted friend.

I do know Paul Manafort. He is a natural leader. He is compassionate. He is loyal. He is a family man. He is my friend and he will always be my friend. It is my hope that my friend will no longer be confined in solitary or otherwise. I pray for fairness. I pray that you will recognize the very unusual punishment this man has endured. I also pray that you will see the cruelty of the imprisonment to date. I pray for a lot. I also expect a lot. Thank you .

Yours truly,

David Bennett

David Bennett
General Adjuster

Exhibit D

February 23 ,2019

Hon. Amy Berman Jackson
U.S. District Judge, District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W., Washington D.C. 20001

Dear Judge Jackson,

Judge, I am an old soldier - a Vietnam war vet who was drafted in New York and entered
the Army reluctantly in 1966. I tried to make the best of the situation, became a
rifleman, went to Engineer OCS and eventually became an Army Engineer Company
Commander in III Corps Vietnam. There, my commanding officer and mentor was
Medal of Honor recipient Lt. Col. Joe Rodriguez. He inspired me to remain in service to
our country for twenty more years. I have been all over the world and have seen and
evaluated many people - some great and some very bad. Please take into consideration
my background in conjunction with the following request:

Please be as lenient as possible when sentencing Paul Manafort. He is repentant for his
transgressions. I have known Paul and his family for over thirty years. They were across-
the-street neighbors in our suburban Virginia subdivision. We shared in all the typical
rhythms of family existence - weddings, funerals, graduations, holiday parties, coaching
kids sports teams, leaky plumbing, broken bones, flat tires and so on. I will never be able
to repay the generosity and loyalty Paul has extended to my family. I am always proud to
call him my friend. His work in politics was a source of comfort to me. I believe the
success of the great Americans Ronald Reagan, John McCain and Robert Dole was due
to his unsurpassed political acumen. In my estimation, he was always on the side of
justice, common sense and patriotism. Despite the demands of the business he was in, he
was there to be part of my family's ordinary but important occasions. He and his wife
Kathy even found time to travel to Montana for my son's wedding.

This year our country will observe the 50th anniversary of the Moon Landing and
Woodstock. I was on the ground in Vietnam in 1969 and missed both of those
milestones. My wish is that Paul and I and our families and friends could be together this
Summer to celebrate those events and the good fortune and good works accomplished
over the five decades since.

I remain, yours truly,

Wayne Holland, Lt. Col. (U.S. Army, Ret.)

# Exhibit E

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001


Dear Judge Jackson,

I have known Paul Manafort my entire life.  As children playing basketball at the Boys Club to spending our summers together at the beach.  Sharing joyous occasions of our weddings to the birth of our children and grandchildren. Through all the happy times and tragic events that have befallen on our families.

Throughout, Paul has been a wonderful husband to his wife Kathy, his two daughters and now the light of his life, his two young grandchildren.

Paul is extremely generous with his time to his immediate family as well as his extended family and friends. Whenever we are together he puts you at ease, always caring for your needs first. Often worrying about others to the point of making himself sick.  To him, there is no family member more important than the other, or a level of importance to one's problem.  It also not just with family, he goes above and beyond for anyone in his life.

Whenever I call Paul for help, whether for a charitable donation with a worthy cause, or just to talk about personal matters, he always there for you. Never dodging the tough issues but always finding a way to help you.  For as long as I've known him, he genuinely gets joy from helping others.  Which, to me, is clear because he never accepts credit and will almost always respond, "you did this all on your own…I knew you could do it".


I talk to Paul a few times a month, although it's now difficult to speak due to his current living accommodations.  Per usual, our conversations are about baseball, friends and family matters. With the difficult issues Paul is dealing with, he still remains positive about his situation.  In normal Paul fashion, he is the one encouraging us to do the same.

My wife struggles with Alzheimer's Disease.  Paul never lets our time pass without asking about her and how she is progressing.  Or if there is anything he can do, a doctor he can find. His thoughtfulness and kindness encourage me to persevere through the battle my wife endures everyday, and I don't know what I would do without his unwavering support.

Your honor, to err is human and Paul has clearly made mistakes.  I ask that you show mercy and leniency to him.  I know him to be a man of good character because of all the good things he has done for me and the many others, without ever asking for something in return.

Leniency to Paul will not only impact him and his family, but the many others that emotionally rely on him, as well as the impact he can have in the future if given a second chance.

I thank you for your kind consideration in this matter.


Sincerely,

David Cimadon

Exhibit F

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Your honor,

Paul J. Manafort Jr., who I have always called PJ, has been both a neighbor and friend going back to when we were both twelve years old. We met shortly after I moved to Corbin Avenue in New Britain just before entering sixth grade. I remember we met when I noticed some boys around my age playing basketball at a house across the street from where we rented. It wasn't long before his mom and dad welcomed me any time I came over. I was also invited to stay overnight on some occasions. They always treated me like a family member.

PJ was one of the best people among all the members of our small cadre of friends. He was generous to me in many ways, realizing that my family had limited resources. He was always quick to take money out of his pocket to pay for things like my movie ticket (when I couldn't pay), as well as buying my lunch whenever our group of friends stopped off at Friendly's Restaurant. He went about it quietly so as not to embarrass me. He was also a good son. Often, when I went over to his house to play he had a number of chores to perform before he could go outside. I recall on such instance, he had several pair of his father's shoes lined up to polish. Since his dad was the city's mayor, he realized how important it was that his shoes shined brightly.

PJ and I attended St. Maurice Catholic Church and Jr. High School, beginning with seventh grade. We both became Altar Boys and served many masses, weddings, funerals and special events together. We also played football on the same New Britain Midget Football League team, the Redskins. Paul was our quarterback because he was athletic and smart. He also starred on our school's basketball team. In our ninth grade year he was elected to be our class president. That was testimony to his likability and his leadership ability (that was so evident even back then). He was always a consummate gentleman, always a good sport and someone we all looked up to.

We went to different high schools but stayed in touch. After high school we both went away to college and lost touch. When PJ graduated from Georgetown I was invited to his party where we renewed our friendship and relationship. I was proud to call him "friend". Later in life I followed his career as he worked for President Ford and then President Reagan. Whenever I called him for advice he was always considerate, patient and helpful. We saw each other on only a few occasions after that, but we eventually got together in Alexandria, VA where his house was just down the street from Mt. Vernon. He was still the PJ I knew in our teens. Always kind, considerate and generous. He took us out to dinner and insisted on picking up the check! He also set up to tour of the White House with special access to the Oval Office! Unforgettable memories.

My wife and I stayed with Paul and Kathy Manafort at their home at Mt. Vernon Circle for a few nights one Fall about 12 years ago. During our stay PJ invited us to join him and Kathy at their Catholic church on a Sunday morning. This is where they regularly attended and to which they contributed. After services we went to breakfast where we prayed together. I felt that Paul was serious about his faith and it wasn't just for show.

They also took us into D.C. where we dined at The Palms Restaurant. PJ took me into a room where he showed me a caricature of him on the wall alongside other notable celebrities. I could tell he was proud to show his boyhood friend that painting.

On another occasion we were invited to their home in Bridgehampton for three nights. PJ was excited to spring a surprise on us, he imported everything from a locally famous hot dog place in our hometown so we could enjoy a nostalgic feast. It was a reminder of a simpler time in our lives. One morning when I awoke early, PJ was sitting in his office drinking coffee and conversing with his office in the Ukraine. Of course I asked him a lot of questions about what he did there and he answered me honestly and in terms I could understand. I knew that his firm, Davis-Manafort, was consulting the government of Ukraine and also running campaigns. This is something with which he was involved from the time he graduated college. He never bragged about his important work, nor did he waver in discussing with me what he and his staff were trying to achieve in Kiev. During our visit I asked about Paul's youngest brother, Dennis. Kathy Manafort told me that Paul frequently helped Dennis and other family members financially, since he was successful, and they were not. PJ even sent one or more of his younger relatives to college. PJ was always a regular guy, never acting like he is better than anybody else.

When our stay with Paul and Kathy was coming to the end we were invited to travel with them to NYC for dinner and to attend a Yankee game in what was then the new Yankee Stadium. Paul and I have been lifelong Yankee fans, and my friend of many years delighted in hosting my wife and me. Later, as we walked out of the stadium, I thanked him for the fantastic experience. Throughout our time together Paul was still the same guy I knew from the old days. He's always thoughtful, patient, kind and very caring. I don't ever remember him having any "honesty issues". He is a truth-teller, not a man with pretenses. I believe he is a man of integrity.

In closing I would like to tell you that the Paul Manafort Jr. I've read and heard so much about during the last couple of years is unrecognizable to me, and to everyone who knows him. I've spoken to a few of our long-time friends who all say the same thing. I'm angry that he's been placed in solitary confinement . It has me wondering what my country has come to. My hope is that my letter will be accepted by the court and will result in helping my friend receive mercy at the hand of the authorities who control his fate. I know that God is the ultimate judge. Thank you for allowing me to express myself on Paul's behalf.

Bart Mazzarella

Exhibit G

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson,


I am Kathy Manafort's first cousin (and a confirmed, lifelong Democrat.) We have been close since her teenage years. Kathy's parents were my favorite Aunt and Uncle. They were modern, smart, modest, open-minded, accepting, fun and funny, unpretentious, creative, confident people, without a trace of the provinciality, reserve and even stuffiness of many I knew on small town Long Island, where we grew up. Kathy was the logical product of this, one of the sweetest human beings I know, and I love her dearly.

I have lived in the Los Angeles area since 1969 but maintained a car and work equipment at my parents' house on Long Island, and visited when I found work to help fund it. After she and Paul were married and bought property—because of our relationship and the fact that I was in the trades with a creative bent—Paul always gave me the first opportunity to do any work in their homes that I might be able to do. The first was at the Bridgehampton house in the early nineties. I painted the entire house—and much more—over a number of years. The Manaforts entertained there a lot, mostly for family and friends, and sometimes his business associates. Everyone was welcome and Kathy's parents stayed there most summers.  This was important to Paul because he wanted to maintain the strong relationship they had, and to make sure the group's diverse thinking would leave an impression on his two daughters and the other children in the family. Paul would often talk about how much he loved summers because it was a two month long family reunion for the entire extended family.  Paul, along with Kathy, are responsible for keeping its many members in touch for several decades

I got to know Paul during all these extended visits, staying at their homes while working there. I also met many of his neighbors and friends, all wonderful people who would agree that Paul was warm and generous beyond belief. Paul's desire to bring people together was not just limited to Long Island. Every year he had a box at National Stadium, and always invited a full complement of guests. He would also love to take everyone to restaurants, no matter what city he and Kathy were in, and he always paid. I never had much money and it was a little embarrassing never to be able to reciprocate, even though I know he would never have accepted.  His gift was bringing everyone was together, something he often said. He clearly and thoroughly enjoyed being able to do such things because he loved family and friends. I used to marvel at that, well aware that the differences between people he worked with and for, and us regular folk, were enormous. He was always interested in our lives, our doings, and helping us when he could.

There were many times when he was asked for favors. Here's a good example. My youngest sister, studying in Italy, fell for a young Iraqi street painter who had run away after all three of his brothers had been killed in the Iran-Iraq war. Agents from Iraq found him, raided his

room in Italy and took all his papers. In desperation, my sister asked Paul to help, though she and Paul hardly knew each other. Paul helped him obtain a Green Card, got him out of that dangerous situation, and even helped him find work here. I can't imagine what that would have taken to accomplish.

When Kathy suffered severe brain damage after being thrown from her horse in the Hamptons it was Paul's personal connections and complete devotion to her that secured the best facilities, doctors. and rehab. care. That saved her life. Her recovery was truly a miracle.

Much has been made in the press of Paul's fondness for expensive clothing and other trappings of wealth, and I have seen how radically that has colored opinions of him by others that don't know him, but I would suggest that much of his income was spent for the benefit and enjoyment of others.

I write this letter because I know how easy it is to draw conclusions about someone we don't know from what we hear or read or see on TV. But I think it is important to know as much about a person, especially when it affects that person's fate. Paul was an international, big league player, by all accounts one of the best in the business. It was not surprising that he took work in the Ukraine, and it is certainly not surprising that he made a substantial income, but there's no mention of his endless generosity to people and institutions in need.  I think that Paul made some bad choices, but he is no demonic villain, certainly no traitor. A cover like the Atlantic Monthly's "Plot against America" is ridiculous.

During Paul's house arrest he, of all things, enthusiastically took up gourmet cooking, despite his confinement and two ankle bracelets. In months of solitary confinement, with almost nothing except his short visits from Kathy and his local family, and incarceration-related health issues, he did his best to retain a positive outlook. I was amazed to hear that in a phone call with him.

Paul is no violent criminal. He is changing, and he was doing it before this all happened.  He has surrendered his assets to the United States. It seems to me that that fact, his already lengthy confinement, and the stress felt by his family and friends might constitute a down payment on his debt to society.


Sincerely,


Jeff Richards

Exhibit H

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson,

I'm writing this letter about my brother Paul. My name is Dennis and I am the youngest brother and I would like to provide a little background on our upbringing.   My mother and father brought us up with old-fashioned Italian family values; we went to church every Sunday and holy days and were always taught to put our best foot forward. Your handshake was your word and you treat people the way you'd want to be treated.

My brother Paul was always there for us, especially when my middle brother Bobby died of cancer when he was 35. It was devastating. Even as Paul was extremely busy, he always reached out to him and did everything he could to help him. Unfortunately, God had other plans for Bobby. It was hard growing up after losing Bobby but Paul was always there to check on me, just like he did with Bobby. Paul has always been there for me, especially after I was divorced, he never gave up on me when I ended up being addicted to drugs myself. My brother was by my side at my darkest hour. It was because of his support and love that helped me pull my life back together. This was a very long battle, and he never gave up. I have been sober for many years now, I have a home and a steady job, and my brother never forgets to remind me how proud he is.

If it wasn't for Paul I'd be just another statistic. We are only on this earth for a short time, a blink of an eye. We will go to our maker and we will be judged on how we treated other people and I ask you to close your eyes and put all the politics aside and ask guidance from God.


Thank you

Dennis Manafort

Exhibit I

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

February 23, 2019

Dear Judge,

I have known Paul Manafort since the late Seventies when he married my sister, Kathy, and joined our family... most of our collective adult lives. Since the beginning, Paul has been an involved and supportive member of the family. These are some things I have seen.

Brother-in-Law

Since I met him, Paul has been supportive of my endeavors and always kept up with my health and my children's health, always helping where possible. A recent example - four years ago I was diagnosed with cancer. Paul connected me to a medical expert at Weil-Cornell, who arranged for my care. Today I am cancer free.

Son and Son-in-law

Paul was always aware and supportive of the previous generation. Whether it was getting my mother new teeth thirty years ago, getting both my parents quality hearing aids twenty years ago, or procuring adult housing for my father three years ago, time after time, Paul kept track of what our parents needed and, as far as I could tell, did everything he could to help.

Husband

In 1997 my sister Kathy was in a near-fatal accident. She was in a coma for weeks. During that time, Paul kept his daughters functioning - getting them back to school, giving them emotional support, all while personally checking on Kathy almost every day. Kathy had a 20% chance of living and less than a 5% chance of ever recovering. From what I witnessed, I believe it was Paul's relentless support that saved her life.

Father

I watched Paul raise his girls from day one. Whether it was flying home across the Atlantic from a project, to coach Jessica's basketball team or staying up until midnight, helping Andrea with her homework, it was impossible to spend time in the Manafort home, without seeing the love and attention he gave his girls.

- 1 -

Uncle

Paul always paid attention to the next generation. He was always aware and made their education, career, and health one of his top priorities. All of the "cousins" from that generation have been greatly impacted by Paul's unwavering love and support.

Employer

Spending time with the Manaforts over the years, I couldn't help but notice how Paul also took an interest in the well-being of the people that worked for him over the years (the housekeepers or nannies, yard workers, etc.) - and their families. He went out of his way to provide steady employment, health insurance, and a comfortable lifestyle for his people. I think he helped some become citizens as well, to legally join in the American Dream. One instance in particular was the son of a longtime employee. Recognizing his passion for cooking, Paul provided him the opportunity to shadow many reputable chefs and the courage to venture off on his own. I understand he now has a successful career and currently works at a highly acclaimed restaurant.

My hope as a Brother-in-law and American

I understand the gravity of this situation and the seriousness of the crimes he has been convicted of. I wrote this letter to perhaps add some human perspective.  To help you see that Paul is a real human with a real family that he loves and who love him.

I don't know all that you must consider in this situation - I don't have all the facts that you do. That said - and in recognition of how challenging your job is already, I respectfully ask that you consider a way to achieve a restorative outcome, or perhaps add a restorative option/aspect to your sentencing as opposed to purely traditional punishment.  I know Paul has been a part of our system for decades and has a valuable, unique perspective - and I imagine he knows very well how to improve it. If there is a way to use his skills to make the system better (which as far as I know serves everyone), it could prevent this from being a greater tragedy than it already is for all of us.

As I mentioned earlier, I can only imagine the weight of this decision - and I offer my words with nothing but respect, hope, and compassion for all of us who have been affected by this tragedy.

Sincerely,

Thomas M. Bond (Paul's Brother-in-law)

- 2 -

Exhibit J

January 22, 2019
Hon. Amy Berman Jackson
U.S. District Judge
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

To the Hon. Judge Jackson,

I have been asked to write to you on behalf of Paul Manafort, in the hope that you would consider leniency when sentencing. I had no hesitation in saying yes, when asked to do so. In the more than 13 years I have known Paul, he has been nothing other than a constant source of support for our family. Not just financially, but he has supported us in any way that he could whenever we faced challenges. He is a kind, caring, and compassionate man.

I admit that when I married his brother in law in 2006, I felt intimidated in his presence. Not by action, but by the way he presents himself. I quickly learned that there was no need to feel this way. He is a man with a big heart. This was especially evident when our daughter was born. They quickly developed a tight "Bond". Throughout her life, Paul has made sure that she had everything she needed. He made sure she had access to a good education, as education is very important to him.

When my husband and I were renting a house, and Paul found out that it wasn't the best situation to fit our needs, he and Kathy made sure we had a home that was handicap accessible, so that I would be able to raise her without facing any additional challenges. He also made sure that my daughter had fun summers, often times, showing his fun side, which he doesn't often show to many people.

I am aware of the seriousness of the crimes that Paul has been convicted, but I am asking that you consider leniency in sentencing, and let my daughter continue to have that special relationship with Paul that she has grown up with, as she constantly asks for Uncle Paul, and misses him.

I thank you for taking the time to read my letter.

Stacy Bond
Sister In Law

Exhibit K

**Rosann Garber Brodie**

January 26, 2019

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson:

On the first day of my first job ever, I met Kathy Bond. A few days later she came into my office to show me her new ring. She was engaged to Paul Manafort. From that day on, Paul has been part of my life in every way.

Over the past 41 years I have seen Paul at work, with his family, with friends and with strangers. I can honestly say he is one of the finest and most caring people I have ever known. So that's why these days when I hear or see stories in the news or online about Paul Manafort, I say *that's not the guy I know.*

Paul has been my friend, my brother, my father and my priest. He has been there for me in good times, and bad, never judging, always listening, encouraging and offering help.

I've been a witness to 41 years of Manafort family times. Paul puts his family first. On numerous occasions Paul cut business trips short or took overnight flights so that he could get home for Andrea's Girl Scout activity or Jessica's basketball game. After Kathy's accident, Paul dropped everything to take care of Andrea and Jessica while making Kathy's extraordinary recovery his priority. Until recently, Paul rose early each morning to get Kathy's special Starbuck's coffee so that it was waiting for her when she woke up.

Paul is the glue to a group of friends from a variety of backgrounds and professions including doctors, an electrician, a personal trainer, a receptionist, a UPS worker and housewives. He always plays a large role in planning our fun activities then sits back and makes sure others are in the spotlight. He is our organizer, our cheerleader. We are lost without him these days.

The thing about Paul is that when he's your friend, your family members get to come along. He takes an interest in them. He remembers their names, what they are doing, and he asks about them often. His wide arms that are open for his friends are also open to help our family members too. He is always generous with his time for everyone.

My Dad used to say that you can tell the character of a person by how well they treat the people who are not as fortunate as they are. I've seen how Paul treats waiters, and delivery people and the lady vacuuming the office. He always has a pleasant greeting, never ignoring anyone, often putting a smile on their faces. He treats everyone as his equal.

Your Honor, I ask you to please consider the *real* Paul Manafort, not the guy shown on television, when you determine his sentence. He is caring, thoughtful, loyal – a good man.

Sincerely,

Rosann Garber Brodie

# Exhibit L

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson,

The purpose of this letter is to provide a character reference for Paul Manafort Jr. in connection with his previously held trial and upcoming sentencing to take place February 8, 2019. My name is Starr Manafort, I am an active CPA who resides in Santa Monica, California. It must be noted that much of what I have learned over the course of my life and have applied to my current career stem directly from my relationship with Paul.

I am Paul's biological niece on my father's side. However, our relationship extends far beyond your typical uncle/niece connection. My father passed away of leukemia when I was seven years old after which my mother relied on the help of family members to support and raise me. At the time of my father's death my Uncle Paul did not hesitate to step up and provide both financial and emotional support to myself and my mother. He considered her part of the family and soon came to consider me one of his daughters. Every summer and most holidays from the time my father passed away to just last year I would travel back east as much time as I could with Paul and his family, at their expense. When I was younger he provided school clothes, supplies, sports and education coaches and anything else I required to live a happy and healthy lifestyle. As I grew older and my ambitions became bigger my Uncle Paul never hesitated to facilitate any dream I had for my future career. When I wanted to be a lawyer he was the person who helped get me into Pepperdine Law School and pay for all the expenses. After the first year when I decided law school was not for me and wanted to drop out he never once punished me or showed any signs of disappointment. It was quite the opposite, I received nothing but his love and support to find my true path. Years later when it would become evident that I wanted to be CPA but had neither the qualifications or schooling to sit for the exam, he sat down with me and mapped out a strategy of how to reach my goal. This was in 2008 and I am proud to say because of his unconditional love and support over the past 10 years I was able to go back to school, get a great job at a public accounting firm and receive my official CPA license as of August of last year.  It saddens me that the one person in my corner this entire time won't be there to celebrate with me and my husband.  I can only hope that someday my uncle will be able to see just how much his support has positively affected my life and future.

I recognize the fact that it is not easy to raise a family today, but Paul didn't just raise his daughters he also took on the responsibility of raising myself. No matter where life has taken me, whether it's been disappointments or achievements my Uncle supported me and cheered me on every step of the way. Over these past few months it has been difficult for me to watch the media villainize him. He has not only contributed to my success but to almost every other

member of our family's success. He's given countless hours of advice even when he is busy dealing with issues and problems far beyond our capacity. He is never too busy to respond to an email or return a phone call. He has provided financial and emotional support in times when I have felt so stuck in my life that it has seemed impossible to move forward. All it took is a phone call or email to my Uncle and my situation would be improved one way or another. He is the rock upon which our family supported and the ground from which our success grows. The hardest thing about these past two years has been not having him here to celebrate our joys, ease our sorrows and fix our problems.

Therefore, I ask you to take all of this into consideration when deciding on an appropriate sentencing for my Uncle. I ask you to look inside your own family and ask yourself how you would continue through life if your foundation and support system was taken away for any amount of time?

I sincerely thank you for your time and consideration in this matter as it is of utmost importance to myself and my family during this very difficult time.

Best,
Starr Manafort

# Exhibit M

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barret Pretty Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Jackson,

I have known Paul Manafort for forty-seven years. During that time, I was always amazed by the sense of support for his family. His parents were amazing people with strong community support while raising their three boys.

While I knew Paul as he became more involved in Connecticut politics, I really got to know him when we served in the Ford administration.

The amazing thing to me was his devotion to family. He was always available for his Mom and Dad. As the oldest brother, he looked out for his two younger siblings. Later when his brother Robert became addicted to drugs Paul worked hard to help him eliminate the habit, which unfortunately was not successful. In the midst of his sadness, he did not hesitate to look after Robert's only daughter, Starr. He recognized that his eight year old niece would still need a strong male figure in her life. He welcomed her into his family and treated her with the same love and devotion as his two biological daughters. Always with the blessing of his sister in law, he supported Starr in each developmental phase of her life with whatever resource was needed. He has continued this support up until the day of his incarceration.

He and Kathy were married, and I was proud of the fact that they asked me to become Godfather to their oldest child. Paul's attachment to Jessica was immediate and his being a father suited him well. The addition of Andrea completed the family. Then Paul went to work to support the family and his love of family was once again in the fore front. This is clear by how much he provided not just for his immediate family, but his entire extended family. It was not just financial, his love was sincere. Paul was the glue that kept everyone together, especially in times of crisis. Which is perhaps why his devoted family stands with him now.

I am writing this letter in the hope that the Court will realize there is a different side to Paul Manafort then the description one might read in the Newspaper or hear on Television. I recognize that Paul has been convicted of some serious crimes but his life over the past two years has been terrible.

I do hope that the justice system will take into consideration these factors and what Paul has been through during the last two years. Thank you for this consideration.

Sincerely,
Nicholas Panuzio

Exhibit N

February 22, 2019

Hon. Amy Berman Jackson
U.S. District Judge
District of Columbia
E. Barrett Prettyman Federal Courthouse
333 Constitution Avenue N.W.
Washington D.C. 20001

Dear Judge Berman Jackson,

My name is Doug Davenport and I am a long time colleague and friend of Paul Manafort.

I first met Paul in the Summer of 1984 when he was working on President Reagan's Re-Election Campaign. Although only 13 at the time, I had already developed a strong interest and passion for national politics and the federal government machinery. This first meeting, some 35 years ago, literally changed my life forever and helped lead to so many of the blessings I currently enjoy. You see, growing up like I did in rural Vermont, did not exactly provide a direct route to national presidential campaigns, nor many other exciting and fast-paced career opportunities beyond small town Riverton, VT.

It's no exaggeration to say that without Paul's help and guidance, I would never have had the professional opportunities beyond the rural corn fields and dilapidated businesses of Central Vermont in the late 1980's. At the time, Paul was a well-known national political power broker, but he never seemed to forget the importance of giving someone a "shot" or a chance to do better – regardless of where they came from. There are dozens of other college graduates from the late 80's and early 90's who also got their first "shot" in professional life as a result of Paul's goodwill and mentoring – an undeniable fact that has been totally lost in the current narrative of Paul's life and career.

It's been hard to watch what has happened to Paul over the past 3 years. Paul came to the Trump Presidential Campaign in early 2016 genuinely believing he could assist in helping elect an extremely unconventional GOP Candidate. From Day 1 on the job, Paul put in 18 hour days, 7 days a week, to help successfully wrap up the 2016 Trump delegate primary operation and develop a badly missing and long overdue plan for the 2016 RNC Convention in Cleveland, OH. He never deviated – day in/day out – from the sole mission he had been brought in to help achieve: a solid RNC Convention Delegate Operation and a secure GOP Presidential nomination for Donald Trump.

Never in the course of knowing and working with Paul did I ever witness any of the nefarious accusations or phony caricatures that have been so often portrayed, exaggerated and sensationalized by the main stream media outlets. We were told that an Independent Prosecutor was needed to look into whether there was some sort of collusion between the Trump Campaign and the Russian Government; but Paul's alleged issues go back far before the Trump Campaign and had already been investigated and passed over by the Obama DOJ.

But this was never about Paul's past dealings. Paul was simply an easy lightning rod to go after for detractors of Candidate - and now President - Trump. Unfortunately, a man's life hangs in peril just because he chose to come out of political retirement and try to help elect a non-establishment political candidate who just happened to become President of the United States.

On Paul's behalf, I ask you to take these thoughts into your consideration and also ask for your mercy and heartfelt compassion as you consider Paul's upcoming sentencing.

Sincerely,

Doug Davenport