UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. No.  17-201-1 (ABJ) |
| PAUL J. MANAFORT, JR., | **REDACTED** |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in connection with the sentencing of Paul J. Manafort, Jr., scheduled for March 13, 2019, in connection with his guilty plea to two counts of conspiracy in violation of 18 U.S.C. § 371.  Consistent with the practice the Special Counsel's Office has followed, the government does not take a position with respect to a particular sentence to be imposed.  Instead, the government sets forth its assessment of the nature of the offenses and offender and the applicable advisory sentencing guidelines and sentencing factors.[1]

Based on his relevant sentencing conduct, Manafort presents many aggravating sentencing factors and no warranted mitigating factors.  Manafort committed an array of felonies for over a decade, up through the fall of 2018.  Manafort chose repeatedly and knowingly to violate the law—whether the laws proscribed garden-variety crimes such as tax fraud, money laundering, obstruction of justice, and bank fraud, or more esoteric laws that he nevertheless was intimately familiar with, such as the Foreign Agents Registration Act (FARA).  His criminal actions were bold, some of which were committed while under a spotlight due to his work as the campaign chairman and, later, while he was on bail from this Court.  And the crimes he engaged in while on

---

[1] *See* 18 U.S.C. § 3553(a).

bail were not minor; they went to the heart of the criminal justice system, namely, tampering with witnesses so he would not be held accountable for his crimes.  Even after he purportedly agreed to cooperate with the government in September 2018, Manafort, as this court found, lied to the Federal Bureau of Investigation (FBI), this office, and the grand jury.  His deceit, which is a fundamental component of the crimes of conviction and relevant conduct, extended to tax preparers, bookkeepers, banks, the Treasury Department, the Department of Justice National Security Division, the FBI, the Special Counsel's Office, the grand jury, his own legal counsel, Members of Congress, and members of the executive branch of the United States government.  In sum, upon release from jail, Manafort presents a grave risk of recidivism.  Specific deterrence is thus at its height, as is general deterrence of those who would engage in comparable concerted criminal conduct.  *See United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017) (district court correctly considered pertinent sentencing factors when it, among other things, "explained that the sentence would deter Fry and others who may be inclined in doing similar kinds of things" (internal quotations omitted)); U*nited States v. Jackson*, 848 F.3d 460, 466-67 (D.C. Cir. 2017) (citing 18 U.S.C. § 3553(a)(2)(B) & (C), the question for the sentencing court is whether the sentence is "sufficiently stiff to deter [the defendant] and others from committing similar crimes in the future."); *United States v. Foy*, 617 F.3d 1029, 1037 (8th Cir. 2010) (general deterrence interest in deterring "similarly situated persons.")

Nothing about Manafort's upbringing, schooling, legal education, or family and financial circumstances mitigates his criminality.  Indeed, as part of his plea agreement, Manafort agreed that, although he could dispute for instance the guideline calculation as to role in the offense, a

downward departure from the government's estimated sentencing guideline range of 210 to 262 months is not warranted and he would not seek or suggest a departure or adjustment.[2]

The government has organized this submission as follows:

I.      Procedural History

II.     The Presentence Investigative Report ("PSR")

III.    Manafort's Relevant Criminal Conduct And The Statutory Sentencing Factors Under 18 U.S.C. § 3553(a):

      (A)    Count One Conduct

      (B)    Count Two Conduct

      (C)    Post-Plea Conduct

Attached to this filing are the following:

- Attachment A: A copy of the superseding criminal information to which Manafort pled guilty on September 14, 2018 (Doc. 419);

- Attachment B: A copy of Manafort's plea agreement (Doc. 422) and the Statement of the Offenses and Other Acts, dated September 14, 2018 (Doc. 423);

- Attachment C: A copy the superseding indictment charging Manafort in the Eastern District of Virginia (EDVA) on February 22, 2019, *United States v. Manafort*, 1:18-cr-83 (Doc. 9);

- Attachment D: A copy of the verdict form from Manafort's trial in the EDVA, *United States v. Manafort*, 1:18-cr-83 (Aug. 21, 2018) (Doc. 280);

- Attachment E: A copy of the government's sentencing submission in the EDVA, *United States v. Manafort*, 1:18-cr-83 (Feb. 15, 2019) (Doc. 314);

- Attachment F: A copy of the government's objections to the PSR (under seal); and

- Attachment G: A copy of additional documents cited herein, including the government's proposed trial exhibits, which were previously provided to the Court and defense. (An index of these exhibits is included in Attachment G, in the front of that attachment.)

---

[2] Attachment B, section 4D. Manafort further agreed that a sentence within the 210 to 262 month range "would constitute a reasonable sentence in light of all the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below." *Id.* at section 5.

I.      **Procedural History**

The government details below the charges filed against Manafort in this Court and the United States District Court for the EDVA, and his subsequent convictions, guilty pleas, and failed cooperation.

A. The District Of Columbia Indictment And Arrest

A grand jury sitting in the District of Columbia indicted Manafort and his employee Richard Gates on October 27, 2017, on eight counts.[3]  The charged conduct related to Manafort's work as an agent of the Government of Ukraine, the Party of Regions and Opposition Bloc, and Ukrainian President Victor Yanukovych (collectively, "Ukraine").  For years, Manafort failed to register under FARA and caused others to fail to register.  Manafort also conspired to fail to report both the income earned from his Ukraine engagement and the overseas accounts in which his funds were maintained.  He later concealed that work by making false statements to the United States Department of Justice, specifically the FARA Unit of the National Security Division.  Manafort also engaged from 2006 to 2016 in a money laundering conspiracy, with multiple objects.  Among other things, his money laundering promoted his FARA crimes.  The money laundering and tax conspiracies related to the tens of millions from Ukraine, maintained in myriad overseas accounts in Cyprus, St. Vincent and the Grenadines, and the United Kingdom, and transferred to the United States to pay fees to companies that engaged in the FARA scheme, as well as to purchase personal services, luxury items, real estate, and improvements to Manafort's homes in Bridgehampton, New York, and Palm Beach, Florida, among others.

---

[3] Indictment, Oct. 27, 2017 (Doc. 13).

Manafort was allowed to surrender to the FBI on these charges on Monday, October 30, 2017, and was released on bail subject to a series of conditions, including home confinement and GPS monitoring.[4]

### B. Superseding Indictments In The District Of Columbia And Manafort's Remand

On February 23, 2018, the grand jury charged Manafort in a superseding indictment that made several new allegations.[5] Of note, it included an additional component of the FARA scheme concerning the Hapsburg Group's lobbying in the United States. As the Court is aware, those new allegations led to Manafort and Konstantin Kilimnik promptly and repeatedly reaching out to two witnesses in order to coach them to lie about the work that the Hapsburg Group performed in the United States.[6] On June 8, 2018, Manafort was charged with two additional crimes, along with Kilimnik: attempt and conspiracy to obstruct justice based on their efforts to tamper with these witnesses with respect to the FARA scheme.[7] On June 15, 2018, after hearing from the parties, this Court remanded Manafort based on his criminal conduct while on pretrial release.[8] That decision was affirmed on appeal.[9]

### C. The EDVA Indictment And Trial

On February 22, 2018, a grand jury sitting in the EDVA returned a 32-count indictment against Manafort. Manafort was charged in connection with two types of schemes: one involved

---

[4] Order, Oct. 30, 2017 (Doc. 9).  Manafort was also subject to an Order with respect to certain pre-trial communications.  Order, November 8, 2017 (Doc. 38).

[5] The superseding indictment also narrowed the charges in one respect.  The initial District of Columbia indictment had charged Manafort with four enhanced foreign bank account reporting (FBAR) charges, as to which there was venue in this district.  (Indictment ¶¶ 42-43, Oct. 27, 2018 (Doc. 13)).  The EDVA indictment included non-enhanced FBAR charges (as to which there was no venue in the District of Columbia), and the enhanced FBAR charges in this district were dropped as a matter of prosecutorial discretion.  Attachment C (superseding indictment ¶¶ 55-56, *United States v. Manafort*, 1:18-cr-83 (E.D. Va. Feb. 22, 2018) (Doc. 9)).

[6] Superseding indictment ¶¶ 30-31, Feb. 23, 2018 (Doc. 202); Order of Detention, June 15, 2018 (Doc. 328); Opinion, United States v. Manafort, No. 1:18-3037, (D.C. Cir. July 31, 2018) (Doc. 1743190).

[7] Superseding indictment ¶¶ 48-51 (Doc. 318).

[8] Order, June 15, 2018 (Doc. 328).

[9] Opinion, United States v. Manafort, No. 18-3037 (D.C. Cir. July 31, 2018) (Doc. 1743190).

tax and FBAR violations; a second involved multiple bank fraud and bank fraud conspiracies. Specifically, Manafort was charged with: (a) filing false tax returns as to his income and the existence of overseas accounts from 2010 to 2014 (Counts One through Five); (b) failing to file FBARs in the years 2011 to 2014 (Counts Eleven through Fourteen); and (c) bank fraud and bank fraud conspiracy (Counts Twenty-Four to Thirty-Two).[10]

As with the facts supporting the tax conspiracy charge in the District of Columbia, the substantive tax and FBAR charges related to millions in income earned in Ukraine. Additionally, the indictment contained new allegations, charging Manafort in nine bank fraud and bank fraud conspiracies, involving five loan applications to three separate financial institutions, seeking more than $25 million. Four of these loan applications related to properties that Manafort purchased or improved with funds from his overseas accounts.[11]

Manafort elected to go to trial and on August 21, 2018, a jury convicted Manafort on eight counts: tax (5), FBAR (1), and bank fraud (2). The jury was hung on the remaining ten counts.[12]

## D. Manafort's Guilty Pleas In The District of Columbia

On September 14, 2018, on the eve of his second trial and after the jury selection process had commenced, Manafort pled guilty to a two-count superseding information pursuant to a plea agreement requiring his cooperation. Attachment A. The charges encompassed all of the factual allegations in the charges brought in this district. Count One charged Manafort with conspiracy

---

[10] Attachment C (superseding indictment, *United States v. Manafort*, 1:18-cr-83 (E.D. Va. Feb. 22, 2018) (Doc. 9)). As the Court is aware, prior to pursuing charges in the EDVA, the Special Counsel's Office asked counsel for Manafort and Gates whether they would waive venue and allow the new charges to be added to the existing District of Columbia indictment. Manafort, as was his right, declined to waive venue; Gates agreed to waive venue. In light of Manafort's decision, the government proceeded in the EDVA against both defendants. The crimes in the two districts are distinct; in particular, the substantive tax and FBAR charges have separate elements from the conspiracy charges in this district. *See Witte v. United States*, 515 U.S. 389 (1995).

[11] Attachment C (superseding indictment ¶¶ 28-44, *United States v. Manafort*, 1:18-cr-83 (E.D. Va. Feb. 22, 2018) (Doc. 9)).

[12] Attachment D (jury verdict form, *United States v. Manafort*, 18-cr-83, (E.D. Va. Aug. 21, 2018) (Doc. 280) (indicating on its verdict sheet that it voted eleven to one in favor of guilt on the remaining ten counts)).

against the United States, pursuant to 18 U.S.C. § 371.  The conspiracy has as its objects: tax fraud (in violation of 26 U.S.C. § 7206(1)), FBAR crimes (in violation of 31 U.S.C. §§ 5312 and 5322(b)), a substantive FARA violation and making false statements to the Justice Department (in violation of both FARA 22 U.S.C. §§ 612, 618(a)(1) and 618(a)(2) and 18 U.S.C. § 1001(a)), and money laundering (in violation of 18 U.S.C. § 1956).  Manafort's conduct underlying this charge was summarized in the Statement of the Offenses and Other Acts.  During Manafort's allocution, he admitted that: he was part of a conspiracy that involved money laundering involving millions of dollars of his income being wired from offshore accounts for goods, services, and real estate; he concealed that income and the related purchases, and the offshore accounts themselves; he hid millions of dollars of other income by falsely characterizing it as "loans"; he lied to his bookkeeper and tax preparers both about the payments from overseas and the existence of the bank accounts from which the money was transferred; he engaged in extensive lobbying activities in the United States on behalf of Ukraine without registering for this work as required; he funneled over $11 million from overseas accounts to pay for lobbyists working for Ukraine to engage in unregistered lobbying in the United States; and in submissions to the Department of Justice in November 2016 and February 2017, he caused false and misleading statements to be made relating to the lobbying work for Ukraine.[13]

Count Two charged a separate conspiracy to obstruct justice, concerning the tampering with two witnesses who had pertinent evidence about the work of the Hapsburg Group and its United States lobbying.  Manafort pleaded guilty to conspiring with Kilimnik between February

---

[13] The plea agreement also contained admissions to Manafort's criminal liability for the conduct at issue in the mistried counts in the EDVA.  Attachment B (Statement of the Offenses and Other Acts ¶¶ 47-54 (Doc. 423).

23, 2018 and April 2018 to obstruct justice by reaching out to two witnesses to have them conform their testimony to a false set of facts.[14]

## II.     The PSR

The government provided its objections to the PSR on February 14, 2018.  A copy of that submission is attached hereto in Attachment F, and is incorporated herein.  (Because it relates to the PSR, it is being filed under seal.)  Because the government has not had the opportunity to respond to Manafort's submission to Probation, we note the following with respect to Manafort's objection ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Manafort contends that ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[14] Attachment A (superseding information ¶¶ 64-67 (Doc. 419)); Attachment B (Statement of the Offenses and Other Acts ¶¶ 44-46 (Doc. 423)); Plea Hr'g Tr. 32:15 – 33:16, 34:17-20 (Doc. 424).



### III.   Manafort's Relevant Criminal Conduct And The Statutory Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing courts must consider the relevant section 3553(a) factors, which include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need to promote respect for the law, provide a just punishment for the offense, and afford adequate deterrence to criminal conduct; and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). Below, the government sets forth facts pertinent to these factors.

The government addresses each object of the Count One conspiracy and then addresses the Count Two conspiracy and Manafort's misconduct after his guilty pleas.

A.  Count One

1.  Count One: The FARA Object

This section first discusses Manafort's experience with the FARA statute. That history serves to distinguish Manafort from those who are unaware or unsure of FARA's parameters. It

also exemplifies Manafort's boldness in choosing to disobey the law, as he committed his FARA violations after being warned by the Department of Justice about the law's strictures and after resigning a Presidential appointment in connection with the Department of Justice review. Next, the three major prongs of Manafort's United States lobbying scheme for Ukraine are discussed. Finally, this section outlines Manafort's violations involving lying to the Justice Department in order to cover up his FARA crimes.

From 2006 until 2015, Manafort led a multi-million dollar lobbying campaign in the United States at the direction of Ukraine. Manafort did so without registering and providing the public disclosures required by law. Such disclosures would have revealed to the United States public, among other things, which United States government officials were being contacted by Ukraine, when such lobbying occurred, how much was being spent on the lobbying effort, and what public relations activities were undertaken by Ukraine (although appearing to emanate from independent sources). Secrecy was integral to the effectiveness of the foreign lobbying Manafort orchestrated for Ukraine to influence American leaders and the American public; compliance with FARA would have revealed the deceptive tactics Manafort and his Ukraine client were using to lobby in the United States. For instance, as set out in the Statement of the Offenses and Other Acts, Manafort orchestrated a scheme to smear surreptitiously a former senior Obama State Department official and then falsely blame the smear on an Obama rival, so that Ukraine could curry favor with the Obama Administration. Manafort also used secrecy to mislead Members of Congress, falsely using a Hapsburg member as a purported independent voice to advocate with Congress, while concealing that he was a paid Ukraine lobbyist.[15]

---

[15] Attachment B (Statement of the Offenses and Other Acts ¶¶ 6-8, 12-13, and 22 (Doc. 423)); Plea Hr'g Tr. 17:19 – 19:20; 32:25 – 34:20 (Doc. 424).

As part of the lobbying scheme, Manafort hired numerous firms and people to assist in his lobbying campaign in the United States. He hired ███████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ the Hapsburg Group members, and Skadden, Arps, Slate, Meagher & Flom ("Skadden"), among others, to participate in what he described to President Yanukovych in writing as a global "Engage Ukraine" lobbying campaign which he devised and led. Leaving aside the money Manafort himself earned, these companies and law firm were paid the equivalent of over $11 million for their Ukraine work over a two-year period.

a.   Manafort's History With The FARA Statute

Manafort had a lengthy history with the Department of Justice concerning the FARA statute. These interactions arose in connection with Manafort's lobbying in the mid-1980s when he was a principal at the firm Black, Manafort, Stone, and Kelly Public Affairs Company ("BMSK"). The Department of Justice inspected BMSK's files and provided BMSK its findings of deficiencies in both Manafort's and other BMSK FARA filings.[16]

In or about the summer and fall of 1986, the Department of Justice's Criminal Division (which then performed the functions now performed by the FARA Unit at the Department's National Security Division) conducted Section 5 inspections of Manafort and BMSK.

Manafort's position as both a lobbyist for foreign governments and a director of a federal agency—the Overseas Private Investment Corporation ("OPIC")—drew scrutiny from the Department of Justice, the White House, and the press. Both then and now, public officials cannot

---

[16] Pursuant to 22 U.S.C. § 615, an agent of a foreign principal is required to maintain books and records with respect to its activities, and to keep them "open at all reasonable times to the inspection of any official charged with the enforcement" of FARA. By regulation, the Attorney General has authorized officials of the National Security Division and the FBI to inspect those books and records. *See* 28 C.F.R. § 5.501. These inspections—named "Section 5" inspections in light of their place in the FARA statute—can involve a review of, among other things, all correspondence with foreign principals and those relating to a FARA registrant's political activities, contracts, financial records, and corporate documents.

be agents of foreign principals, *see* 18 U.S.C. § 219, and the White House had determined that it would not grant a certification under that statute to exempt Manafort from the law's requirements.

Manafort had registered as an agent of the Saudi Arabian government from in or about June 1984 through June 1986.[17] But Manafort did not register for other FARA work. Faced with the White House's decision not to grant him a waiver, Manafort contended to the Department of Justice that he did not run afoul of section 219 because he had not personally lobbied. He claimed that only his firm BMSK, and not he, had acted as a foreign agent. Manafort's argument was rejected by the Department of Justice. The language of section 219 mirrors FARA in applying to anyone who "is or acts as an agent of a foreign principal required to register under [FARA]," 18 U.S.C. § 219(a). Even if there might be a theoretical case of "political consulting" that did not involve any personal contacts or other public-relations and lobbying conduct covered by FARA, Manafort's public-relations and lobbying services were determined not to fall within that limited type of consulting.[18] Thus, Manafort had to either resign his political appointment, or would have

---

[17] *See* Attachment G (FARA Registration Statement, June 1, 1984, P. Manafort (exhibit 941); FARA Supplemental Statement, July 3, 1985, P. Manafort (exhibit 945); FARA Registration Amendment, June 26, 1986, P. Manafort (exhibit 949)).

[18] The Department's position was applied to the facts it found during its inspection. The inspection found, among other items, 18 lobbying and public-relations activities that were not reported by Manafort. These omissions included lobbying by Manafort of Congress and the White House regarding a "Jerusalem Bill" and a "Saudi Arms package", dissemination of press articles to Congress, lobbying of the National Security Council, and talking points "for telephone calls on Pending Saudi Munitions Sale." The inspection also revealed that Manafort's financial disclosure to the FARA Unit failed to reflect accurately Manafort's payments from the foreign principal. Attachment G (excerpt of DOJ Section 5 Inspection File, Registration No. 3594, Paul J. Manafort, May 27, 1987, p. 3-4, 5-9).

The Department's inspection of Manafort yielded a May 29, 1987 letter to Manafort's counsel cautioning that "[p]olitical activities undertaken as background or to prepare for a proposal or a piece of legislation must be fully disclosed even though the proposal may have been subsequently delayed, the legislation may not have been reported out of Committee, etc." Attachment G (May 29, 1987 letter to ███████████, p. 71 (exhibit 910)).

The Department's inspection of BMSK also revealed a number of deficiencies in BMSK's filings for its work on behalf of ten foreign principals. For example, the inspection report noted a November 1985 memorandum from Manafort describing a media plan for the dissemination of material to the United States media on behalf of the Bahamas. The inspection report found that BMSK's FARA filings must disclose the activity. Similarly, the inspection found a March 1986 memorandum from Manafort and others arranging for Bahamian officials to meet with United States press, another memorandum from Manafort summarizing information that had been sent to United States government officials "in both the Executive and Legislative branches", and a March 1986 memorandum committing to arrange meetings between Bahamian officials and congressional members during a visit to Washington D.C. The

to cease all his activities on behalf of foreign principals. Manafort resigned his position as a director of OPIC on May 16, 1986.[19]

In spite of these clear warnings and the personal ramifications to him for not adhering to the law, Manafort chose to violate the FARA statute and to get others to as well. For instance, in 2007 he retained a large American lobbying firm, ███████████████████████, to assist in lobbying in Europe and the United States in connection with the Ukraine parliamentary elections in the fall of 2007. When ██████ sought to register under FARA, Manafort urged ██████ not to do so.[20] After the Ukraine 2007 elections were over and ██████ was no longer working for Manafort and Ukraine, it belatedly registered in early 2008 under FARA.[21]

b. Ukraine's Lobbying Operation Through ██████████

As he admitted as part of his plea, Manafort in 2005 began a lengthy relationship with foreign government actors, particularly in Ukraine. In 2012, Manafort spearheaded a major international lobbying operation for Ukraine, with a large focus on lobbying in the United States. It had three main aspects, which are discussed in turn.

First, Manafort retained ██████████████████, two large Washington, D.C. lobbying firms, to engage from 2012 to 2014 in an extensive lobbying effort on behalf of Ukraine, without registering under FARA. Manafort arranged to pay the firms over $2.5 million from Ukraine funds funneled through his offshore accounts for the United States lobbying work for Ukraine. Those transfers also form the gravamen of one prong of the money laundering

---

inspection report explained that all this activity had to be disclosed under FARA. Attachment G (excerpt of DOJ Section 5 Inspection File, Registration No. 3600, BMSK, p. 3, 8, 14 (exhibit 910)).

[19] Attachment G (excerpt of DOJ Section 5 Inspection File, Registration No. 3600, BMSK, p. 81 (exhibit 910)).
[20] Attachment G (██████ 302, Aug. 10, 2018, at 1).
[21] Attachment G (Exhibits A and B to FARA Registration, ██████████ Jan. 23, 2008 (exhibit 1028)).

conspiracy.[22]  Among other things, Manafort had the firms lobby dozens of Members of Congress, their staff, and White House and State Department officials about Ukraine sanctions, the validity of Ukraine elections, and the propriety of imprisoning Yulia Tymoshenko.

One illustration of this aspect of the United States lobbying operation concerned its furtive activity in connection with the United States Senate's consideration of a resolution condemning Ukraine for President Yanukovych's locking up his political opponent Tymoshenko.   The resolution was referred to as the Durbin resolution, after its main proponent United States Senator Richard Durbin.[23]  The imprisonment of Tymoshenko was a major sticking point in United States-Ukraine relations, as many in the executive and legislative branches thought her treatment demonstrated a lack of commitment to the rule of law.   Manafort and President Yanukovych engaged in an all out effort to kill or at least delay the resolution.   Thus, Manafort had his lobbying firms contact numerous Members of Congress, engaging in backroom lobbying using personal contacts and confidential Congressional information obtained secretly by ▮▮▮▮▮▮▮▮ from Congressional staff.   A chart attached hereto in Attachment G, which was provided to the Court and defense counsel in August 2018 as part of the Court's pretrial Order regarding trial exhibits, details the major aspects of this effort.[24]  None of this lobbying was reported under FARA, as required, so the public would be aware of what efforts this foreign government was making with Members of Congress and the Executive branch.   The Durbin resolution is but one example of the lobbying campaign; the government has outlined in Attachment G, Exhibit 448, the principal

---

[22] *See* Attachment G (chart, "Foreign Transfers to United States Accounts of Entities Performing Work in the United States," (exhibit 434)).

[23] Attachment G (email, Nov. 19, 2013, ▮▮▮▮▮▮ to R. Gates, ▮▮▮▮▮, and ▮▮▮▮▮, Re Durbin Resolution, p. 14 (exhibit 1937)).   The resolution states, in part: "(4) expresses its concern and disappointment that the continued selective and politically motivated imprisonment of former Prime Minister Yulia Tymoshenko unnecessarily detracts from Ukraine's otherwise strong relationship with Europe, the United States, and the community of democracies."

[24] *See* Attachment G (chart, "Legislation: Durbin Resolution," (exhibit 449) (outlining principal lobbying activities regarding the Durbin resolution)).

legislative outreach efforts between 2012 to 2014 orchestrated by Manafort through 

████████████████ .[25]

   Manafort was integrally involved in these lobbying efforts. He repeatedly communicated

in person and in writing with President Yanukovych and his staff about the lobbying activities of

████████████████████ . He tasked the companies to prepare written reports on their

work so he, in turn, could brief President Yanukovych. For instance, Manafort wrote President

Yanukovych a memorandum dated April 8, 2012, in which he provided an update on the

lobbying firms' activities "since the inception of the project a few weeks ago. It is my intention

to provide you with a weekly update moving forward."[26] In November 2012, Gates wrote to the

firms that they needed to prepare an assessment of their past and prospective lobbying efforts so

the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do

better as we move into 2013." The resulting memorandum noted among other things that the

"client" had not been as successful as hoped given that it had an Embassy in Washington.[27]

   To appear to distance their United States lobbying work from Ukraine, and to avoid

having to register as agents of Ukraine under FARA, Manafort, with others, arranged for █

████████████████████ to be nominally engaged by a newly-formed Brussels entity called

the European Centre for a Modern Ukraine (the Centre), instead of directly by Ukraine.

Manafort privately described the Centre as "the Brussels NGO that we have formed" to

coordinate lobbying for Ukraine.[28] The Centre was founded by a Ukraine Party of Regions

---

[25] Attachment G (exhibit 441 is an even broader chart, outlining by proposed trial exhibit number all government relations activity orchestrated by Manafort reflected in proposed trial exhibits).
[26] Attachment G (memo, Apr. 8, 2012, PJM to VFY, "AC Project Update", p. 2 (exhibit 569)).
[27] Attachment G (email, Nov. 29, 2012, ████ to R. Gates, Re Assessment, p. 2-4 (exhibit 1763)).
[28] Attachment G (memo, July 3, 2012, P. Manafort to ████████ , et. al., "Program to Conduct Briefings of Embassies, Media and NGOs", p. 3 (exhibit 505)).

member and Ukraine First Vice-Prime Minister. The head of its Board was another member of the Party of Regions, who became the Ukraine Foreign Minister.[29] In spite of these ties to Ukraine, Manafort and others arranged for the Centre to represent falsely to FARA legal counsel that the Centre was not "directly or indirectly supervised, directed, [or] controlled" in whole or in major part by the Government of Ukraine or the Party of Regions (and thus did not need to register under FARA).[30]

Despite the Centre's being the ostensible client of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Manafort knew that the Centre did not direct or oversee their United States work. The firms received direction from Manafort and his subordinate Gates on behalf of Ukraine.

### c. Ukraine's Lobbying Operation Through The Skadden Report

As a second part of Ukraine's scheme to lobby in the United States illegally, in 2012 Manafort solicited Skadden, a prominent United States law firm, to write a report evaluating the trial of Tymoshenko. Manafort caused the Ukraine Ministry of Justice to hire the law firm. The goal was for the report to be used in the United States and elsewhere to defend the Tymoshenko criminal trial, specifically to argue that President Yanukovych and Ukraine had not engaged in selective prosecution. The selection of the lead attorney at Skadden was made with the United States lobbying effort in mind. Although using an accurate report to lobby in the United States on behalf of Ukraine, without reporting under FARA, is itself illegal, Manafort's conduct was compounded by the fact that he knew the report was misleading and used to justify the political prosecution and jailing of a political opponent.

Manafort also retained ▮ a public relations firm, to prepare a media roll-out plan for the Skadden report. Manafort worked closely with ▮ to develop a detailed written lobbying plan in

---

[29] Attachment G (letter, May 4, 2012 ▮▮▮▮, "ECFMU" (exhibit 1349); R. Gates 302, Feb. 1, 2018, at 2).
[30] Attachment G (email, May 4, 2012, ▮▮ to ▮▮, Re Send to Rick? (exhibit 1608)).

connection with what Manafort termed the selling of the report. This campaign included getting the Skadden report seeded to the press in the United States—that is, to leak the report ahead of its official release to a prominent United States newspaper and then use that initial article to influence reporting globally.[31]

A chart setting out a timeline of the major lobbying efforts orchestrated by Manafort to lobby in connection with the Skadden Report is attached hereto as Exhibit 444 of Attachment G. More than \$4.6 million was paid to Skadden for its work. Manafort used one of his offshore accounts to funnel \$4 million of that sum. Manafort used the same offshore accounts to pay █ the equivalent of more than \$1 million.[32]

Manafort was aware of various facts that were kept from the public Skadden report, because they would undermine the effectiveness of the report as a lobbying tool. For instance, Manafort knew that the actual cost of the report and the true scope of the law firm's work would undermine the report's being perceived as independent. Although FARA would have required disclosure of the amount paid for the report (more than \$4.6 million), Ukraine reported falsely that the report cost just \$12,000.[33] Further, Manafort knew that the report did not disclose facts that could be used to question Skadden's impartiality, namely that Skadden, in addition to being retained to write the report, was retained to represent Ukraine in connection with the Tymoshenko

---

[31] Attachment G (memo, Aug. 1, 2012, P. Manafort to █████, "SA Report – Media Plan" (exhibit 1307); email, May 18, 2012, █████ to █████, Re Ukraine – What we've been up to (exhibit 1351); Skadden Settlement Agreement, Appendix p. 15-16, *available at* https://www.justice.gov/opa/press-release/file/1124381/download). *See also* FARA Registration, Skadden, Arps, Slate, Meagher & Flom LLP, Jan. 18, 2019, *available at* https://efile.fara.gov/docs/6617-Registration-Statement-20190118-1.pdf

[32] Pursuant to 22 U.S.C. § 612(a)(5), an agent of a foreign principal is required to file a registration statement including the nature and amount of contributions, income, money, or thing of value, if any, that the registrant has received within the preceding sixty days from each such foreign principal, either as compensation or for disbursement or otherwise, and the form and time of each such payment and from whom received. Joint Pretrial Statement, (Doc. 389-393); *see* Attachment G (chart, "FARA Related Payments By Consultant," p. 3 (exhibit 436)).

[33] Attachment G (email, June 22, 2012, █████ to █████, Re FW: RAPSI.com: U.S. attorneys in ECHR under Tymoshenko case cost Ukraine \$12,5k (exhibit 1357)).

case itself and to provide training to the trial team prosecuting Tymoshenko in another criminal case.[34]

Substantively, Manafort also knew the report was misleading. Manafort directed lobbyists to tout the report as showing that President Yanukovych had not selectively prosecuted Tymoshenko. But in November 2012—prior to the issuance of the report on December 13, 2012—Manafort had been told privately in writing by Skadden's lead partner that the evidence of Tymoshenko's criminal intent "is virtually non-existent" and that it was unclear even among legal experts that Tymoshenko did not possess the power to engage in the conduct at issue in the Ukraine criminal case. These facts were not disclosed to the public.[35]

### d. Ukraine's Lobbying Operation Through The Hapsburg Group

Starting in 2011, Manafort secretly retained ▮▮▮▮▮ and a group of four former European heads of state and senior officials (including a former ▮▮▮ Chancellor, ▮▮ Prime Minister, and ▮ President) to lobby in the United States and Europe on behalf of Ukraine. The former politicians, called the Hapsburg Group, appeared to be solely providing their independent assessments of the Government of Ukraine's policies, when in fact they were paid by Ukraine. Manafort explained in an "EYES ONLY" memorandum in or about June 2012 that his purpose was to "assemble a small group of high-level European infuencial [sic] champions and politically credible friends who can act informally and without any visible relationship with the Government of Ukraine."[36]

---

[34] Attachment G (memo, Apr. 5, 2012, G. Craig to V. Pshonka, "Projects and Plans" (exhibit 2012); email, Apr. 11, 2012, ▮▮▮ to A. van der Zwaan, Re FW Tomorrow – Friday 4/6 (exhibit 2013); email, Aug. 9, 2012, ▮▮▮ to ▮▮▮, Re Kyiv Post Editorial: Skadden Stink (exhibit 2069); email, Aug. 30, 2012, A. van der Zwaan to ▮▮▮, ▮▮▮, et. al., Re Project 2 (exhibit 2078); email, Aug. 30, 2012, ▮▮▮ to ▮▮▮, Re Project 2 (exhibit 2079)).

[35] Attachment G (email, Nov. 28, 2012, ▮▮▮ to P. Manafort, Re ▮▮▮ Memo, p. 3 (exhibit 2106)).

[36] Attachment G (memo, June 27, 2012, "CREATION OF A SUPER VIP GROUP…" (exhibit 504)).

In or about 2012 through 2014, Manafort directed more than the equivalent of $2.8 million to be wired from at least four of his offshore accounts to secretly pay the Hapsburg Group.[37]  To avoid European taxation, the contract with the Hapsburg Group falsely stated that none of its work would take place in Europe.[38]  And, in or about 2012 through 2013, Manafort directed more than the equivalent of $950,000 to be wired from at least three of his offshore accounts to the benefit of       to secretly pay for its services, which entailed, among other things, interfacing with the Hapsburg Group for Manafort.[39]

All four Hapsburg Group members, at the direction and with the direct assistance of Manafort, advocated positions favorable to Ukraine in meetings with United States lawmakers, interviews with United States journalists, and ghostwritten op-eds in American publications.  A chart setting out the payments to the Hapsburg Group and a chart of the major lobbying efforts conducted by Manafort, including efforts conducted through the Hapsburg Group, are attached hereto as Exhibits 436 and 442, respectively.[40]

One of the Hapsburg Group members, a former    President, was also a representative of the European Parliament with oversight responsibility for Ukraine.  Manafort solicited that official to secretly provide Manafort inside information about the European Parliament's views and potential actions toward Ukraine and to take actions favorable to Ukraine.[41]  Manafort also used this Hapsburg Group member's current European Parliament position to Ukraine's advantage in his lobbying efforts in the United States.  As noted above, in the fall of 2012, the United States

---

[37] Attachment G (chart, "FARA Related Payments By Consultant," p. 6 (exhibit 436)).
[38] Attachment G (email, Nov. 14, 2012, R. Gates to      , Re Contract (exhibit 1237)).
[39] Attachment G (chart, "FARA Related Payments By Consultant," p. 5 (exhibit 436)).
[40] Attachment G (chart, "FARA Related Payments By Consultant," p. 6 (exhibit 436); Chart, "Public Relations Activity," p. 16, 21, 23, 24 , 27, 29, 31, 33, 35, and 36 (exhibit 442)).
[41] Attachment G (email, Sept. 28, 2012,    to    Re Fw: eyes only, p. 2-4 (exhibit 833))).

Senate was considering and ultimately passed the Durbin resolution, which was critical of President Yanukovych's treatment of former Prime Minister Tymoshenko.[42] As noted above, Manafort engaged in an all-out campaign to try to kill or delay the passage of this resolution. Manafort told his lobbyists to stress to the United States Senators that the former ▇▇▇ President who was advocating against the resolution was currently a designated representative of the President of the European Parliament in order to give extra clout to his supposedly independent judgment against the proposed Senate resolution.[43] Manafort never revealed to the American public, as required by FARA, that this representative (and his other lobbyists) were paid by Ukraine, thus violating a core purpose of the statute.

In another example, on May 16, 2013, a ▇▇▇ member of the Hapsburg Group lobbied in the United States for Ukraine. The Hapsburg Group member accompanied his country's prime minister to the Oval Office and met with the then-President and Vice President of the United States, as well as senior United States officials in the executive and legislative branches. In written communications sent to Manafort, the Hapsburg Group member reported that the Hapsburg Group member delivered the desired message.[44] FARA required Manafort to disclose such lobbying. Again, he did not.

In addition, with the assistance of ▇▇▇ Manafort personally lobbied in the United States. He drafted and edited numerous ghostwritten op-eds for publication in United States newspapers.[45] He also personally met with a Member of Congress who was on a subcommittee

---

[42] Attachment G (chart, "Legislation: Durbin Resolution" (exhibit 449)).
[43] Attachment G (email, Sept. 19, 2012, ▇▇▇ to R. Gates, P. Manafort, ▇▇▇ , Re an urgent request ON IT (exhibit 1308)).
[44] Attachment G (email, May 17, 2013, ▇▇▇ to P. Manafort, Re DC notes (exhibit 852)).
[45] Attachment G (chart, "Public Relations Activity" (exhibit 442)).

that had Ukraine within its purview in March 2013 in Washington, D.C.[46] After the meeting, Manafort prepared a report for President Yanukovych that the meeting "went well" and reported a series of positive developments for Ukraine from the meeting.[47]

### e.  Manafort's Belated 2017 FARA Registration Statement

In June 2017, Manafort filed a retroactive FARA registration statement for the period 2012 through 2014. That filing was plainly deficient. Manafort entirely omitted the United States lobbying contacts noted above and in the attached charts, all money (receipts and disbursements) related to the lobbying entities noted above, and a portion of the substantial compensation Manafort received from Ukraine.[48]

### f.  Manafort's False Statements To The Department of Justice

Manafort caused his attorney to submit two false and misleading letters to the Department of Justice when it inquired about Manafort's Ukraine work beginning in September 2016. The government has already briefed to this Court and to the Chief Judge the facts concerning Manafort's misconduct.[49] The government supplements the record with the chart attached as Exhibit 438, which lists significant documents that Manafort had in his possession at the time that he had his FARA attorney (unwittingly) falsely represent to the Department of Justice that he had no documents concerning his Ukraine work because of a purported document retention policy.[50]

---

[46] Attachment G (Calendar Record, Mar. 19, 2013, "Dinner/Manafort,      / reservation under      Capitol Hill Club (exhibit 1486)).

[47] Attachment G (chart, "Outreach to Congressman      (exhibit 443); Memo, Mar. 23, 2013, P. Manafort to      , "US Consultants Activity – Weekly Update," p. 2 (exhibit 695)).

[48] Attachment G (FARA Registration Statement, DMP International, LLC (Registration No. 6440), June 27, 2017 (exhibit 926)).

[49] Government's Tr. Br. Regarding Effect of Memorandum Op. in *In re Grand Jury Investigation*, Sept. 10, 2018 (Doc. 407); Memorandum Opinion, *In re Grand Jury Investigation*, No. 17-mc-2336, 2017 WL 4898143 (D.D.C. Oct. 2, 2017).

[50] Attachment G (chart, "False and Misleading Foreign Agents Registration Act Statements in Counts 4 and 5," (exhibit 438)).

### 2.      Count One: The Tax And FBAR Objects

The government has set forth the facts pertinent to this aspect of Manafort's crimes in a submission made in the EDVA, attached herein.[51] The government relies on and incorporates that submission. The government notes that the FBAR crimes served to promote other crimes: the tax conspiracy herein as well as the FARA violations.[52]

### 3.      Count One: The Money Laundering Object

Manafort participated in a money laundering scheme with multiple objects.[53] For purposes of the money laundering object of Count One, it suffices to note that the money Manafort transferred from outside the United States into the United States served to promote FARA crimes. For instance, as evidenced by Exhibits 434 (attached as part of Attachment G), Manafort caused millions of dollars to be spent to further the FARA scheme.

### B.  Count Two: The Witness Tampering Conspiracy

The government has set forth the facts pertinent to Count Two in its filing with respect to bail, filed in June 2018,[54] and more recently in the Statement of the Offenses and Other Acts.[55] The Court is well acquainted with these facts; they are not repeated herein.[56]

Manafort's witness tampering is notable because it occurred after he had already sought to obstruct the government's FARA investigation by causing his lawyer to submit false statements to the Department of Justice on a host of topics. Then, after indictment and while on pretrial release

---

[51] Attachment E (The Government's Sentencing Memorandum, *United States v. Manafort*, 1:18-cr-83 (E.D. Va. Feb. 15, 2019) (Doc. 314)).

[52] Attachment G (chart, "Payments from Foreign Entities to Entities Performing Work in the United States" (chart reflecting more that $11 million from undisclosed foreign bank accounts controlled by Manafort for payment to companies that participated in lobbying in the United States for Ukraine under Manafort's direction) (exhibit 437)).

[53] Memorandum Opinion and Order, June 22, 2018 (Doc. 333).

[54] Government's Mot. To Revoke or Revise Def. Paul J. Manafort, Jr.'s Current Order of Pretrial Release, June 4, 2018 (Doc. 315).

[55] Attachment B (Statement of the Offenses and Other Acts (Doc. 423)).

[56] Order of Detention, June 15, 2018 (Doc. 328).

from two courts, he again obstructed justice by repeatedly seeking to have witnesses lie for him, and getting another (Kilimnik) to participate in that obstruction.

### C. Post-Plea Misconduct

Manafort's conduct after he pleaded guilty is pertinent to sentencing. It reflects a hardened adherence to committing crimes and lack of remorse. As the Court is fully familiar with this proof, we do not repeat the evidence herein.[57]

Manafort voluntarily entered into a plea agreement that required that he cooperate "fully, truthfully, completely, and forthrightly" with the government.[58]  The plea agreement further provided that if the defendant failed "specifically to perform or to fulfill completely each and every one" of his obligations under the agreement, or "engages in any criminal activity prior to sentencing or during his cooperation," the defendant will be in breach of the agreement.[59]  The agreement further provided:

> [s]hould it be judged by the Government in its sole discretion that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from his pleas of guilty, but the Government will be released from its obligations under this agreement, including (a) not to oppose a downward adjustment of two levels for acceptance of responsibility described above... and (b) to file the motion for a downward departure for cooperation described above. [60]

A breach leaves intact all the obligations of the defendant as well as his guilty plea, but relieves the government of its promises under the agreement.[61]

The government relies on and incorporates herein its submissions on this issue.[62]

---

[57] Order, Feb. 13, 2019 (Doc. 509); Hr'g Tr., Feb. 13, 2019 (Doc. 514).
[58] Attachment B (Plea Agreement ¶ 8, Sept. 14, 2018 (Doc. 422)); Plea Hr'g Tr. at 39:10-17, 48:11-16, Sept. 14, 2018 (Doc. 424).
[59] Attachment B (Plea Agreement ¶ 13).
[60] *Id.* ¶ 13.
[61] *Id.* ¶¶ 4B, 8, & 13.
[62] Decl. in Support of the Government's Breach Determination and Sentencing, Jan. 15, 2019 (Doc. 474).

Based on the evidence provided to the Court, the government is not filing a motion for a reduction in sentence below the advisory Sentencing Guideline range or for a third point for acceptance of responsibility. Manafort is not entitled to such a motion under the terms of the plea agreement.[63]

## IV.   **Conclusion**

For over a decade, Manafort repeatedly and brazenly violated the law. His crimes continued up through the time he was first indicted in October 2017 and remarkably went unabated even after indictment. Manafort engaged in witness tampering while on bail and, even after he was caught for engaging in that scheme, Manafort committed the additional crimes of perjury and making false statements after he entered his guilty pleas herein. The sentence in this case must take into account the gravity of this conduct, and serve both to specifically deter Manafort and generally deter those who would commit a similar series of crimes.

The Court has the discretion to run all or a portion of the sentence herein consecutive to that imposed in the EDVA criminal prosecution. As it is unknown what that sentence will be, we do not now take a position on the issue, but reserve our right to do so at sentencing herein.[64]

---

[63] Hr'g Tr. at 13:13-16, Jan. 25, 2019 (Doc. 500). The superseding information to which Manafort pleaded guilty also included that he forfeit "any property, real or personal, involved in [Count One], and any property traceable to such property, and any property, real or personal, which constitutes or is derived from proceeds traceable to the offense..." (Doc. 409 ¶ 68). The forfeiture allegation explained that the government would seek a money judgment of forfeiture representing such property, to be offset by the forfeiture of specific property. *Id.* The United States intends to submit a separate motion for entry of such a money judgment in an amount to be determined by agreement with the Defendant or at a hearing to be conducted at the time of sentencing pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure. Further, as set forth in the plea agreement, the parties agreed that mandatory restitution pursuant to 18 U.S.C. § 3663A does not apply. However, the Court has discretion to order restitution pursuant to 18 U.S.C. § 3663. To implement an order of restitution this Court should require the Defendant to file corrected, accurate tax filings and pay all taxes, penalties and interest due and owing.

[64] Under the advisory Sentencing Guidelines, courts are to structure the sentences on multiple counts of conviction to reach the total punishment called for by the advisory guidelines. *See* U.S.S.G. § 5G1.2(d). The government submits that that mode of analysis is applicable to the issue of whether the sentence should run concurrently or consecutively, in whole or in part, to that imposed in the EDVA. *See also id.* § 5G1.3(d) and application note 4.

Respectfully submitted,

ROBERT S. MUELLER III
Special Counsel

Dated: February 22, 2019

By: _____

Andrew Weissmann
Jeannie S. Rhee (D.D.C. Bar No. 464127)
Greg D. Andres (D.D.C. Bar No. 459221)
U.S. Department of Justice
Special Counsel's Office
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-0800

*Attorneys for the United States of America*