# ATTACHMENT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 17-201-1 (ABJ)(S-5) |
| | * | |
| v. | * | Violations: 18 U.S.C. § 371 |
| | * | |
| PAUL J. MANAFORT, JR., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | ******* | |

## SUPERSEDING CRIMINAL INFORMATION

The Special Counsel informs the Court:

1.     PAUL J. MANAFORT, JR. (MANAFORT) served for years as a political consultant and lobbyist.  Between at least 2006 and 2015, MANAFORT conspired with Richard W. Gates (Gates), Konstantin Kilimnik (Kilimnik), and others to act, and acted, as unregistered agents of a foreign government and political party.  Specifically, MANAFORT conspired to act and acted as an agent of the Government of Ukraine, the Party of Regions (a Ukrainian political party whose leader Victor Yanukovych was President from 2010 to 2014), President Yanukovych, and the Opposition Bloc (a successor to the Party of Regions that formed in 2014 when Yanukovych fled to Russia).  MANAFORT generated more than 60 million dollars in income as a result of his Ukraine work.  In order to hide Ukraine payments from United States authorities, from approximately 2006 through at least 2016, MANAFORT, with the assistance of Gates and Kilimnik, laundered the money through scores of United States and foreign corporations, partnerships, and bank accounts.

2.     In furtherance of the scheme, MANAFORT funneled millions of dollars in payments into

1

foreign nominee companies and bank accounts, opened by him and his underlings in nominee names and in various foreign countries, including Cyprus, Saint Vincent & the Grenadines (Grenadines), and the United Kingdom. MANAFORT hid the existence of the foreign companies and bank accounts, falsely and repeatedly reporting to his tax preparers and to the United States that he had no foreign bank accounts.

3.      In furtherance of the scheme, MANAFORT concealed from the United States his work as an agent of, and millions of dollars in payments from, Ukraine and its political parties and leaders. Because MANAFORT directed a campaign to lobby United States officials and the United States media on behalf of the Government of Ukraine, the President of Ukraine, and Ukrainian political parties, he was required by law to report to the United States his work and fees. MANAFORT did not do so, either for himself or any of his companies. Instead, when the Department of Justice sent inquiries to MANAFORT in 2016 about his activities, MANAFORT responded with a series of false and misleading statements.

4.      In furtherance of the scheme, MANAFORT used his hidden overseas wealth to enjoy a lavish lifestyle in the United States, without paying taxes on that income. MANAFORT, without reporting the income to his bookkeeper or tax preparers or to the United States, spent millions of dollars on luxury goods and services for himself and his extended family through payments wired from offshore nominee accounts to United States vendors. MANAFORT also used these offshore accounts to purchase multi-million dollar properties in the United States. Manafort then borrowed millions of dollars in loans using these properties as collateral, thereby obtaining cash in the United States without reporting and paying taxes on the income. In order to increase the amount of money he could access in the United States, Manafort defrauded the institutions that loaned money on

2

these properties so that they would lend him more money at more favorable rates than he would otherwise be able to obtain.

5.    Manafort laundered more than $30 million to buy property, goods, and services in the United States, income that he concealed from the United States Treasury, the Department of Justice, and others.  MANAFORT cheated the United States out of over $15 million in taxes.

### Relevant Individuals And Entities

6.    MANAFORT was a United States citizen.  He resided in homes in Virginia, Florida, and Long Island, New York.

7.    In 2005, MANAFORT and another partner created Davis Manafort Partners, Inc. (DMP) to engage principally in political consulting.  DMP had staff in the United States, Ukraine, and Russia.  In 2011, MANAFORT created DMP International, LLC (DMI) to engage in work for foreign clients, in particular political consulting, lobbying, and public relations for the Government of Ukraine, the Party of Regions, and members of the Party of Regions.  DMI was a partnership solely owned by MANAFORT and his spouse.  Gates and Kilimnik worked for both DMP and DMI and served as close confidants of MANAFORT.

8.    The Party of Regions was a pro-Russia political party in Ukraine.  Beginning in approximately 2006, it retained MANAFORT, through DMP and then DMI, to advance its interests in Ukraine, including the election of its slate of candidates.  In 2010, its candidate for President, Yanukovych, was elected President of Ukraine.  In 2014, Yanukovych fled Ukraine for Russia in the wake of popular protests of widespread governmental corruption.  Yanukovych, the Party of Regions, and the Government of Ukraine were Manafort, DMP, and DMI clients.

9.    The European Centre for a Modern Ukraine (the Centre) was created in or about 2012 in

Belgium as a mouthpiece for Yanukovych and the Party of Regions. The Centre was used by MANAFORT and others in order to lobby and conduct a public relations campaign in the United States and Europe on behalf of the existing Ukraine regime. The Centre effectively ceased to operate upon the downfall of Yanukovych in 2014.

10.    MANAFORT owned or controlled the following entities, which were used in the scheme (the MANAFORT entities):

<div align="center">Domestic Entities</div>

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Daisy Manafort, LLC (PM) | August 2008 | Virginia |
| | March 2011 | Florida |
| Davis Manafort International LLC (PM) | March 2007 | Delaware |
| DMP (PM) | March 2005 | Virginia |
| | March 2011 | Florida |
| Davis Manafort, Inc. (PM) | October 1999 | Delaware |
| | November 1999 | Virginia |
| DMI  (PM) | June 2011 | Delaware |
| | March 2012 | Florida |
| Global Sites LLC (PM) | July 2008 | Delaware |
| Jesand Investment Corporation (PM) | April 2002 | Virginia |
| Jesand Investments Corporation (PM) | March 2011 | Florida |
| John Hannah, LLC (PM) | April 2006 | Virginia |
| | March 2011 | Florida |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Lilred, LLC (PM) | December 2011 | Florida |
| LOAV Ltd. (PM) | April 1992 | Delaware |
| MC Brooklyn Holdings, LLC (PM) | November 2012 | New York |
| MC Soho Holdings, LLC (PM) | January 2012 | Florida |
| | April 2012 | New York |
| Smythson LLC (also known as Symthson LLC) (PM) | July 2008 | Delaware |

## Cypriot Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Actinet Trading Limited | May 2009 | Cyprus |
| Black Sea View Limited | August 2007 | Cyprus |
| Bletilla Ventures Limited | October 2010 | Cyprus |
| Cavenari Investments Limited | December 2007 | Cyprus |
| Global Highway Limited | August 2007 | Cyprus |
| Leviathan Advisors Limited | August 2007 | Cyprus |
| LOAV Advisors Limited | August 2007 | Cyprus |
| Lucicle Consultants Limited | December 2008 | Cyprus |
| Marziola Holdings Limited | March 2012 | Cyprus |
| Olivenia Trading Limited | March 2012 | Cyprus |
| Peranova Holdings Limited | June 2007 | Cyprus |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Serangon Holdings Limited | January 2008 | Cyprus |
| Yiakora Ventures Limited | February 2008 | Cyprus |

Other Foreign Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Global Endeavour Inc. (also known as Global Endeavor Inc.) | October 2012 | Grenadines |
| Jeunet Ltd. | August 2011 | Grenadines |
| Pompolo Limited | April 2013 | United Kingdom |

11.    The Internal Revenue Service (IRS) was a bureau in the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the Treasury.

**The Scheme**

12.    Between in or around 2006 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, MANAFORT and others devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises from the United States, banks, and other financial institutions.  As part of the scheme, MANAFORT repeatedly provided false information to financial bookkeepers, tax accountants, and legal counsel, among others.

## MANAFORT's Wiring Of Money From Offshore Accounts Into The United States

13.   In order to use the money in the offshore nominee accounts of the MANAFORT entities
without paying taxes on it, MANAFORT caused millions of dollars in wire transfers from these
accounts to be made for goods, services, and real estate. He did not report these transfers as income
to DMP, DMI, or MANAFORT.

14.   From 2008 to 2014, MANAFORT caused the following wires, totaling over $12,000,000,
to be sent to the vendors listed below for personal items. MANAFORT did not pay taxes on this
income, which was used to make the purchases.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| S.P.&C. Home Improvement Inc. (Home Improvement Company in the Hamptons, New York) | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova Holdings Limited | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | Global Endeavour Inc. | Grenadines | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | **Total** | **$5,434,793** |
| **Big Picture Solutions** (Home Automation, Lighting and Home Entertainment Company in Florida) | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 8/28/2013 | Global Endeavour Inc. | Grenadines | $179,000 |
| | 10/31/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | 5/23/2014 | Global Endeavour Inc. | Grenadines | $99,960 |
| | 6/20/2014 | Global Endeavour Inc. | Grenadines | $62,960 |
| | | | **Total** | **$1,661,201** |
| **J&J Oriental Rug Gallery** | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Antique Rug Store in Alexandria, Virginia) | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | Total | $934,350 |
| Vendor D (Related to J&J Oriental Rug Gallery) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | Vendor D Total | $100,000 |
| Alan Couture (Men's Clothing Store in New York) | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |
| | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/25/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/17/2014 | Global Endeavour Inc. | Grenadines | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |
| | | | **Total** | **$849,215** |
| Scott L. Wilson Landscaping (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | **Total** | **$655,500** |
| Vendor G (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |

11

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | Vendor G Total | $623,910 |
| Fashion World, Inc. d/b/a/ Bijan (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | Total | $520,440 |
| Aegis Holdings, LLC (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | Total | $500,000 |
| Paul Sabatello Construction (Contractor in Florida) | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | Total | $432,487 |
| New Leaf Landscape Maintenance LLC | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Landscaper in the Hamptons, New York) | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/25/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | 4/15/2014 | Global Endeavour Inc. | Grenadines | $33,211 |
| | 5/13/2014 | Global Endeavour Inc. | Grenadines | $30,965 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $26,769 |
| | | | **Total** | **$255,685** |
| **Don Beyer Motors, Inc.** (Payments Relating to three Range Rovers) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | **Total** | **$163,705** |
| **Federal Stone and Brick LLC** (Contractor in Virginia) | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |
| | | | **Total** | **$125,650** |
| **Sensoryphile, Inc.** (Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, New York) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | **Total** | **$112,825** |

13

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **American Service Center Associates of Alexiandria** (Purchase of Mercedes Benz) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |
| | | | **Total** | **$62,750** |
| **Land Rover of Palm Beach** (Purchase of Range Rover) | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Total** | **$47,000** |
| **Vendor Q** (Property Management Company in South Carolina) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| **Vendor R** (Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| **Vendor S** (Housekeeping in New York) | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

15.     In 2012, MANAFORT caused the following wires to be sent to the entities listed below to purchase the real estate also listed below. MANAFORT did not report the money used to make these purchases on his 2012 tax return.

14

| Property Purchased | Payee | Date | Originating Account | Country of Origin | Amount |
|---|---|---|---|---|---|
| Howard Street Condominium (New York) | DMP International LLC | 2/1/2012 | Peranova Holdings Limited | Cyprus | $1,500,000 |
| Union Street Brownstone, (New York) | Attorney Account Of [Real Estate Attorney] | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $299,500 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,800,000 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,200,000 |
| Arlington House (Virginia) | Real Estate Trust | 8/31/2012 | Lucicle Consultants Limited | Cyprus | $1,900,000 |

16.     MANAFORT also disguised, as purported "loans," more than $13 million from Cypriot entities, including the overseas MANAFORT entities, to domestic entities owned by MANAFORT. For example, a $1.5 million wire from Peranova Holdings Limited (Peranova) to DMI that MANAFORT used to purchase real estate on Howard Street in Manhattan, New York, was recorded as a "loan" from Peranova to DMI, rather than as income. The following loans were shams designed to reduce fraudulently MANAFORT's reported taxable income.

| Year | Payor / Ostensible "Lender" | Payee / Ostensible "Borrower" | Country of Origination | Total Amount of "Loans" |
|---|---|---|---|---|
| 2008 | Yiakora Ventures Limited | Jesand Investment Corporation | Cyprus | $8,120,000 |
| 2008 | Yiakora Ventures Limited | DMP | Cyprus | $500,000 |
| 2009 | Yiakora Ventures Limited | DMP | Cyprus | $694,000 |
| 2009 | Yiakora Ventures Limited | Daisy Manafort, LLC | Cyprus | $500,000 |
| 2012 | Peranova | DMI | Cyprus | $1,500,000 |
| 2014 | Telmar Investments Ltd. | DMI | Cyprus | $900,000 |
| 2015 | Telmar Investments Ltd. | DMI | Cyprus | $1,000,000 |
| **Total** | | | | **$13,214,000** |

15

MANAFORT's Hiding Of Ukraine Lobbying And Public Relations Work

17.    MANAFORT knew it was illegal to lobby government officials and engage in public relations activities (hereinafter collectively referred to as lobbying) in the United States on behalf of a foreign government or political party, without registering with the United States Government under the Foreign Agents Registration Act.   MANAFORT knew he was lobbying in the United States for the Government of Ukraine, President Viktor F. Yanukovych,  the Party of Regions, and the Opposition Bloc (the latter two being political parties in Ukraine), and thus he was supposed to submit a written registration statement to the United States Department of Justice. MANAFORT knew that the filing was required to disclose the name of the foreign country, all the financial payments to the lobbyist, and the specific steps undertaken for the foreign country in the United States, among other information.

18.    MANAFORT knew that Ukraine had a strong interest in the United States' taking economic and policy positions favorable to Ukraine, including not imposing sanctions on Ukraine. MANAFORT also knew that the trial and treatment of President Yanukovych's political rival, former Prime Minister Yulia Tymoshenko, was strongly condemned by leading United States executive and legislative branch officials, and was a major hurdle to improving United States and Ukraine relations.

19.    From 2006 until 2015, MANAFORT led a multi-million dollar lobbying campaign in the United States at the direction of the Government of Ukraine, President Yanukovych, the Party of Regions, and the Opposition Bloc.  MANAFORT intentionally did so without registering and providing the disclosures required by law.

20.    As part of the lobbying scheme, MANAFORT hired numerous firms and people to assist in

his lobbying campaign in the United States.  He hired Companies A, B, C, D, and E, and Law Firm

A, among others, to participate in what he described to President Yanukovych in writing as a global

"Engage Ukraine" lobbying campaign that he devised and led.  These companies and law firm

were paid the equivalent of over $11 million for their Ukraine work.

21.    MANAFORT viewed secrecy for himself and for the actions of his lobbyists as integral to

the effectiveness of the lobbying offensive he orchestrated for Ukraine.  Filing under the Foreign

Agents Registration Act would have thwarted the secrecy MANAFORT sought in order to conduct

an effective campaign for Ukraine to influence both American leaders and the American public.

22.    MANAFORT took steps to avoid any of these firms and people disclosing their lobbying

efforts under the Foreign Agents Registration Act.  As one example, even though MANAFORT

engaged Company E in 2007 to lobby in the United States for the Government of Ukraine,

MANAFORT tried to dissuade Company E from filing under the Foreign Agents Registration Act.

Only after MANAFORT ceased to use Company E in the fall of 2007 did Company E disclose its

work for Ukraine, in a belated filing under the Act in 2008.

23.    MANAFORT took other measures to keep the Ukraine lobbying as secret as possible.  For

example, MANAFORT, in written communications on or about May 16, 2013, directed his

lobbyists (including Persons D1 and D2, who worked for Company D) to write and disseminate

within the United States news stories that alleged that Tymoshenko had paid for the murder of a

Ukrainian official.  MANAFORT stated that it should be "push[ed]" "[w]ith no fingerprints."  "It

is very important we have no connection."  MANAFORT stated that "[m]y goal is to plant some

stink on Tymo."  Person D1 objected to the plan, but ultimately Persons D1 and D2 complied with

MANAFORT's direction.  The Foreign Agents Registration Act required MANAFORT to disclose

such lobbying, as MANAFORT knew.  He did not.

The Hapsburg Group and Company D

24.     As part of the lobbying scheme, starting in 2011, MANAFORT secretly retained Company

D and a group of four former European heads of state and senior officials (including a former

Austrian Chancellor, Italian Prime Minister, and Polish President) to lobby in the United States

and Europe on behalf of Ukraine. The former politicians, called the Hapsburg Group by

MANAFORT, appeared to be providing solely their independent assessments of Government of

Ukraine policies, when in fact they were paid by Ukraine.  MANAFORT explained in an "EYES

ONLY" memorandum in or about June 2012 that his purpose was to "assemble a small group of

high-level European infuencial [sic] champions and politically credible friends who can act

informally and without any visible relationship with the Government of Ukraine."

25.     Through MANAFORT, the Government of Ukraine retained an additional group of

lobbyists (Company D and Persons D1 and D2).  In addition to lobbying itself, Company D secretly

served as intermediaries between the Hapsburg Group and MANAFORT and the Government of

Ukraine.  In or about 2012 through 2013, MANAFORT directed more than the equivalent of

700,000 euros to be wired from at least three of his offshore accounts to the benefit of Company

D to pay secretly for its services.

26.     All four Hapsburg Group members, at the direction, and with the direct assistance, of

MANAFORT, advocated positions favorable to Ukraine in meetings with United States

lawmakers, interviews with United States journalists, and ghost written op-eds in American

publications.  In or about 2012 through 2014, MANAFORT directed more than 2 million euros to

be wired from at least four of his offshore accounts to pay secretly the Hapsburg Group.  To avoid

European taxation, the contract with the Hapsburg Group falsely stated that none of its work would take place in Europe.

27.     One of the Hapsburg Group members, a former Polish President, was also a representative of the European Parliament with oversight responsibility for Ukraine.  MANAFORT solicited that official to provide MANAFORT inside information about the European Parliament's views and actions toward Ukraine and to take actions favorable to Ukraine.  MANAFORT also used this Hapsburg Group member's current European Parliament position to Ukraine's advantage in his lobbying efforts in the United States.  In the fall of 2012, the United States Senate was considering and ultimately passed a resolution critical of President Yanukovych's treatment of former Prime Minister Tymoshenko.  MANAFORT engaged in an all-out campaign to try to kill or delay the passage of this resolution.  Among the steps he took was having the Hapsburg Group members reach out to United States Senators, as well as directing Companies A and B to have private conversations with Senators to lobby them to place a "hold" on the resolution.  MANAFORT told his lobbyists to stress to the Senators that the former Polish President who was advocating against the resolution was currently a designated representative of the President of the European Parliament, to give extra clout to his supposedly independent judgment against the Senate resolution.  MANAFORT never revealed to the Senators or to the American public that any of these lobbyists or Hapsburg Group members were paid by Ukraine.

28.     In another example, on May 16, 2013, another member of the Hapsburg Group lobbied in the United States for Ukraine.  The Hapsburg Group member accompanied his country's prime minister to the Oval Office and met with the President and Vice President of the United States, as well as senior United States officials in the executive and legislative branches.  In written

communications sent to MANAFORT, Person D1 reported that the Hapsburg Group member delivered the message of not letting "Russians Steal Ukraine from the West." The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew. He did not.

Law Firm Report and Tymoshenko

29.     As another part of the lobbying scheme, in 2012, on behalf of President Yanukovych and the Government of Ukraine's Ministry of Justice, MANAFORT solicited a United States law firm to write a report evaluating the trial of Yanukovych's political opponent Yulia Tymoshenko. MANAFORT caused Ukraine to hire the law firm so that its report could be used in the United States and elsewhere to defend the Tymoshenko criminal trial and argue that President Yanukovych and Ukraine had not engaged in selective prosecution.

30.     MANAFORT retained a public relations firm (Company C) to prepare a media roll-out plan for the law firm report. MANAFORT used one of his offshore accounts to pay Company C the equivalent of more than $1 million for its services.

31.     MANAFORT worked closely with Company C to develop a detailed written lobbying plan in connection with what MANAFORT termed the "selling" of the report. This campaign included getting the law firm's report "seeded" to the press in the United States—that is, to leak the report ahead of its official release to a prominent United States newspaper and then use that initial article to influence reporting globally. As part of the roll-out plan, on the report's issuance on December 13, 2012, MANAFORT arranged to have the law firm disseminate hard copies of the report to numerous government officials, including senior United States executive and legislative branch officials.

20

32.     MANAFORT reported on the law firm's work on the report and Company C's lobbying plan to President Yanukovych and other representatives of the Government of Ukraine.  For example, in a July 27, 2012 memorandum to President Yanukovych's Chief of Staff, MANAFORT reported on "the global rollout strategy for the [law firm's] legal report, and provide[d] a detailed plan of action[]" which included step-by-step lobbying outreach in the United States.

33.     MANAFORT directed lobbyists to tout the report as showing that President Yanukovych had not selectively prosecuted Tymoshenko.  But in November 2012 MANAFORT had been told privately in writing by the law firm that the evidence of Tymoshenko's criminal intent "is virtually non-existent" and that it was unclear even among legal experts that Tymoshenko lacked power to engage in the conduct central to the Ukraine criminal case.  These facts, known by MANAFORT, were not disclosed to the public.

34.     Manafort knew that the report also did not disclose that the law firm, in addition to being retained to write the report, was retained to represent Ukraine itself, including in connection with the Tymoshenko case and to provide training to the trial team prosecuting Tymoshenko.

35.     MANAFORT also knew that the Government of Ukraine did not want to disclose how much the report cost.  More than $4.6 million was paid to the law firm for its work.  MANAFORT used one of his offshore accounts to funnel $4 million to pay the law firm, a fact that MANAFORT did not disclose to the public.  Instead, the Government of Ukraine reported falsely that the report cost just $12,000.

36.     MANAFORT and others knew that the actual cost of the report and the scope of the law firm's work would undermine the report's being perceived as an independent assessment and thus being an effective lobbying tool for MANAFORT to use to support the incarceration of President

Yanukovych's political opponent.

37.    In addition to the law firm report, MANAFORT took other steps on behalf of the Government of Ukraine to tarnish Tymoshenko in the United States.  In addition to disseminating stories about her soliciting murder, noted above, in October 2012, MANAFORT orchestrated a scheme to have, as he wrote in a contemporaneous communication, "[O]bama jews" put pressure on the Administration to disavow Tymoshenko and support Yanukovych.  MANAFORT sought to undermine United States support for Tymoshenko by spreading stories in the United States that a senior Cabinet official (who had been a prominent critic of Yanukovych's treatment of Tymoshenko) was supporting anti-Semitism because the official supported Tymoshenko, who in turn had formed a political alliance with a Ukraine party that espoused anti-Semitic views.  MANAFORT coordinated privately with a senior Israeli government official to issue a written statement publicizing this story.  MANAFORT then, with secret advance knowledge of that Israeli statement, worked to disseminate this story in the United States, writing to Person D1 "I have someone pushing it on the NY Post.  Bada bing bada boom."  MANAFORT sought to have the Administration understand that "the Jewish community will take this out on Obama on election day if he does nothing."  MANAFORT then told his United States lobbyist to inform the Administration that Ukraine had worked to prevent the Administration's presidential opponent from including damaging language in the Israeli statement, so as not to harm the Administration, and thus further ingratiate Yanukovych with the Administration.

Company A and Company B

38.    As a third part of the lobbying scheme, in February 2012, MANAFORT solicited two Washington, D.C. lobbying firms (Company A and Company B) to lobby in the United States on

22

behalf of President Yanukovych, the Party of Regions and the Government of Ukraine.   For

instance, in early 2012 at the inception of the relationship, Company B wrote in an email to its

team about a "potential representation for the Ukraine," having been contacted "at the suggestion

of Paul Manafort who has been working on the current PM elections."

39.     MANAFORT arranged to pay Companies A and B over $2 million from his offshore

accounts for their United States lobbying work for Ukraine.

40.     MANAFORT provided direction to Companies A and B in their lobbying efforts, including

providing support for numerous United States visits by numerous senior Ukrainian officials.

Companies A and B, at MANAFORT's direction, engaged in extensive United States lobbying.

Among other things, they lobbied dozens of Members of Congress, their staff, and White House

and State Department officials about Ukraine sanctions, the validity of Ukraine elections, and the

propriety of President Yanukovych's imprisoning Tymoshenko, his presidential rival.

41.     In addition, with the assistance of Company A, MANAFORT also personally lobbied in the

United States.   He drafted and edited numerous ghost-written op-eds for publication in United

States newspapers.   He also personally met in March 2013 in Washington, D.C., with a Member

of Congress who was on a subcommittee that had Ukraine within its purview.   After the meeting,

MANAFORT prepared a report for President Yanukovych that the meeting "went well" and

reported a series of positive developments for Ukraine from the meeting.

42.     Indeed, MANAFORT repeatedly communicated in person and in writing with President

Yanukovych and his staff about the lobbying activities of Companies A and B and he tasked the

companies to prepare assessments of their work so he, in turn, could brief President Yanukovych.

For instance, MANAFORT wrote President Yanukovych a memorandum dated April 8, 2012, in

which he provided an update on the lobbying firms' activities "since the inception of the project a few weeks ago.  It is my intention to provide you with a weekly update moving forward."  In November 2012, Gates wrote to Companies A and B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013." The resulting memorandum from Companies A and B, with input from Gates, noted among other things that the "client" had not been as successful as hoped given that it had an Embassy in Washington.

43.     To distance their United States lobbying work from the Government of Ukraine, and to avoid having to register as agents of Ukraine under the Foreign Agents Registration Act, MANAFORT with others arranged for Companies A and B to be engaged by a newly-formed Brussels entity called the European Centre for the Modern Ukraine (the Centre), instead of directly by the Government of Ukraine.

44.     MANAFORT described the Centre as "the Brussels NGO that we have formed" to coordinate lobbying for Ukraine.  The Centre was founded by a Ukraine Party of Regions member and Ukraine First Vice-Prime Minister.  The head of its Board was another member of the Party of Regions, who became the Ukraine Foreign Minister.

45.     In spite of these ties to Ukraine, MANAFORT and others arranged for the Centre to represent falsely that it was not "directly or indirectly supervised, directed, [or] controlled" in whole or in major part by the Government of Ukraine or the Party of Regions.  MANAFORT knew that the false and misleading representations would lead Companies A and B not to register their activities pursuant to the Foreign Agents Registration Act.

46.     Despite the Centre being the ostensible client of Companies A and B, MANAFORT knew

that the Centre did not direct or oversee their work.   The firms received direction from MANAFORT and his subordinate Gates, on behalf of the Government of Ukraine.

47.     Various employees of Companies A and B understood that they were receiving direction from MANAFORT and President Yanukovych, not the Centre, which was not even operational when Companies A and B began lobbying for Ukraine.   MANAFORT, Gates, and employees of both Companies A and B referred to the client in ways that made clear they knew it was Ukraine, for instance noting that the "client" had an Embassy in Washington D.C.   The head of Company B told his team to think the President of Ukraine "is the client."   As a Company A employee noted to another company employee: the lobbying for the Centre was "in name only.   [Y]ou've gotta see through the nonsense of that[.]"   "It's like Alice in Wonderland."   An employee of Company B described the Centre as a fig leaf, and the Centre's written certification that it was not related to the Party of Regions as "a fig leaf on a fig leaf," referring to the Centre in an email as the "European hot dog stand for a Modern Ukraine."

Conspiring to Obstruct Justice: False and Misleading Submissions to the Department of Justice

48.     In September 2016, after numerous press reports concerning MANAFORT had appeared in August, the Department of Justice National Security Division informed MANAFORT, Gates, and DMI in writing that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act, without registering.   In November 2016 and February 2017, MANAFORT and Gates conspired to knowingly and intentionally cause false and misleading letters to be submitted to the Department of Justice, through his unwitting legal counsel.   The letters, both of which were approved by MANAFORT before they were submitted by his counsel, represented falsely, among other things, that:

a.     DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

b.     MANAFORT did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications.  Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

c.     MANAFORT had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration"; and

d.     DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents."  The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

49.   In fact, MANAFORT had: selected Companies A and B; engaged in weekly scheduled calls and frequent emails with Companies A and B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Companies A and B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the

26

lobbying firms over $2.5 million from offshore accounts he controlled, among other things.

50.    Although MANAFORT had represented to the Department of Justice in November 2016 and February 2017 that he had no relevant documents, in fact MANAFORT had numerous incriminating documents in his possession, as he knew at the time.   The Federal Bureau of Investigation conducted a court-authorized search of MANAFORT'S home in Virginia in the summer of 2017.   The documents attached hereto as Government Exhibits 503, 504, 517, 532, 594, 604, 606, 616, 691, 692, 697, 706 and 708, among numerous others, were all documents that MANAFORT had in his possession, custody or control (and were found in the search) and all pre-dated the November 2016 letter.

Money Laundering Conspiracy

51.    In or around and between 2006 and 2016, MANAFORT, together with others,   did knowingly and intentionally conspire (a) to conduct financial transactions, affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, to wit, felony violations of FARA in violation of Title 22, United States Code, Sections 612 and 618, knowing that the property involved in the financial transactions represented proceeds of some form of unlawful activity, with intent to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986; and (b) to transport, transmit, and transfer monetary instruments and funds from places outside the United States to and through places in the United States and from places in the United States to and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: a felony violation of FARA, in violation of Title 22, United States Code, Sections 612 and 618, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(ii) and (a)(2)(A).

52.     MANAFORT caused the following transfers to be made, knowing that they were being made to entities to carry on activities that were required to be timely reported under the Foreign Agents Registration Act, but were not:

| Payee | Date | Payer | Originating Bank Account | Country of... Origin | Country of... Destination | Amount (USD) |
|-------|------|-------|-------------------------|--------|-------------|--------|
| Company A | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $270,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $90,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $120,000.00 |
| | 11/20/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $182,968.07 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $25,000.00 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $90,000.00 |
| | 9/18/2013 | Global Endeavour Inc. | Loyal Bank Limited Account -1840 | SVG* | US | $135,937.37 |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $167,689.40 |
| | 3/28/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $135,639.65 |
| | 4/3/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $82,979.93 |
| **Total Company A Transfers** | | | | | | **$1,300,214.42** |
| Company B | 5/30/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $195,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $50,000.00 |

28

| Payee | Date | Payer | Originating Bank Account | Country of... | | Amount (USD) |
|---|---|---|---|---|---|---|
| | | | | Origin | Destination | |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $54,649.51 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $150,000.00 |
| | 9/3/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $175,857.51 |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $195,857.51 |
| | 3/12/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $26,891.78 |
| | 3/21/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $138,026.00 |
| | 4/15/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,728.81 |
| | 4/25/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,739.23 |
| **Total Company B Transfers** | | | | | | **$1,255,750.35** |
| Law Firm A | 4/19/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $2,000,000.00 |
| | 5/30/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| | 7/13/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| **Total Law Firm A Transfers** | | | | | | **$4,000,000.00** |
| **TOTAL TRANSFERS** | | | | | | **$6,555,964.77** |

\* SVG refers to St. Vincent and the Grenadines.

MANAFORT's Hiding Of Foreign Bank Accounts And False Tax Filings

53.    United States citizens who have authority over certain foreign bank accounts—whether or

not the accounts are set up in the names of nominees who act for their principals—have reporting

29

obligations to the United States.

54.     First, the Bank Secrecy Act and its implementing regulations require United States citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeds $10,000 at any point during the year. This is commonly known as a foreign bank account report or "FBAR."  The Bank Secrecy Act requires these reports because they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.   The United States Treasury's Financial Crimes Enforcement Network (FinCEN) is the custodian for FBAR filings, and FinCEN provides access to its FBAR database to law enforcement entities, including the Federal Bureau of Investigation.  The reports filed by individuals and businesses are used by law enforcement to identify, detect, and deter money laundering that furthers criminal enterprise activity, tax evasion, and other unlawful activities.

55.     Second, United States citizens also are obligated to report information to the IRS regarding foreign bank accounts.  For instance, in 2010 Form 1040, Schedule B had a "Yes" or "No" box to record an answer to the question: "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?"  If the answer was "Yes," then the form required the taxpayer to enter the name of the foreign country in which the financial account was located.

56.     For each year in or about and between 2007 through at least 2014, MANAFORT had authority over foreign accounts that required an FBAR report.  Specifically, MANAFORT was

30

required to report to the United States Treasury each foreign bank account held by the foreign MANAFORT entities noted above in paragraph 10.   No FBAR reports were made by MANAFORT for these accounts.

57.   Furthermore, in each of MANAFORT's tax filings for 2007 through 2014, Manafort represented falsely that he did not have authority over any foreign bank accounts.  MANAFORT had repeatedly and falsely represented in writing to MANAFORT's tax preparer that MANAFORT had no authority over foreign bank accounts, knowing that such false representations would result in false MANAFORT tax filings.  For instance, on October 4, 2011, MANAFORT's tax preparer asked MANAFORT in writing: "At any time during 2010, did you [or your wife or children] have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?"  On the same day, MANAFORT falsely responded "NO."  MANAFORT responded the same way as recently as October 3, 2016, when MANAFORT's tax preparer again emailed the question in connection with the preparation of MANAFORT's tax returns: "Foreign bank accounts etc.?"  MANAFORT responded on or about the same day: "NONE."

MANAFORT's Fraud To Increase Access To Offshore Money

58.   After MANAFORT used his offshore accounts to purchase real estate in the United States, he took out mortgages on the properties thereby allowing MANAFORT to have the benefits of liquid income without paying taxes on it.  Further, MANAFORT defrauded the banks that loaned him the money so that he could withdraw more money at a cheaper rate than he otherwise would have been permitted.

59.    In 2012, MANAFORT, through a corporate vehicle called "MC Soho Holdings, LLC"

owned by him and his family, bought a condominium on Howard Street in the Soho neighborhood in Manhattan, New York. He paid approximately $2,850,000. All the money used to purchase the condominium came from MANAFORT entities in Cyprus. MANAFORT used the property from at least January 2015 through 2016 as an income-generating rental property, charging thousands of dollars a week on Airbnb, among other places. In his tax returns, MANAFORT took advantage of the beneficial tax consequences of owning this rental property.

60. Also in 2012, MANAFORT -- through a corporate vehicle called "MC Brooklyn Holdings, LLC" similarly owned by him and his family -- bought a brownstone on Union Street in the Carroll Gardens section of Brooklyn, New York. He paid approximately $3,000,000 in cash for the property. All of that money came from a MANAFORT entity in Cyprus.

## COUNT ONE

### Conspiracy Against The United States

61. Paragraphs 1 through 60 are incorporated here.

62. From in or about and between 2006 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., together with others, including Gates and Kilimnik, knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of a government agency, namely the Department of Justice and the Department of the Treasury, and to commit offenses against the United States, to wit, (a) money laundering (in violation of 18 U.S.C. § 1956); (b) tax fraud (in violation of 26 U.S.C. § 7206(1)); (c) failing to file Foreign Bank Account Reports (in violation of 31 U.S.C. §§ 5312 and 5322(b)); (d) violating the Foreign Agents Registration Act (in violation of 22 U.S.C. §§ 612, 618(a)(1), and 618(a)(2));

and (e) lying and misrepresenting to the Department of Justice (in violation of 18 U.S.C. § 1001(a) and 22 U.S.C. §§ 612 and 618(a)(2)).

63.     In furtherance of the conspiracy and to effect its illegal object, MANAFORT, together with others, committed the overt acts, in the District of Columbia and elsewhere, as set forth in the paragraphs above, which are incorporated herein.

(18 U.S.C. §§ 371 and 3551 et seq.)

## COUNT TWO

### Conspiracy to Obstruct Justice (Witness Tampering)

64.     Paragraphs 1 through 60 are incorporated here.

65.     From in or about and between February 23, 2018 and April 2018, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., together with others, including Konstantin Kilimnik, knowingly and intentionally conspired to corruptly persuade another person, to wit: Persons D1 and D2, with intent to influence, delay and prevent the testimony of any person in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1).

66.     On February 22, 2018, MANAFORT was charged in the District of Columbia in a Superseding Indictment that for the first time included allegations about the Hapsburg Group and MANAFORT's use of that group to lobby illegally in the United States in violation of the Foreign Agent Registration Act. MANAFORT knew that the Act prescribed only United States lobbying. Immediately after February 22, 2018, MANAFORT began reaching out directly and indirectly to Persons D1 and D2 to induce them to say falsely that they did not work in the United States as part

of the lobbying campaign, even though MANAFORT then and there well knew that they did lobby in the United States.

67.     MANAFORT committed the following overt acts directly and through his conspirators.

| Date/Time* | Sender | Receiver | Event |
| --- | --- | --- | --- |
| *MANAFORT contacted Person D1 by phone and a messaging application:* | | | |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call: 1 min, 24 second call. |
| 2/24/2018; 15:53 (UTC) | MANAFORT | Person D1 | Text: "This is paul" |
| 2/25/2018; 18:41 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/26/2018; 23:56 (UTC) | MANAFORT | Person D1 | Text: "http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T" |
| 2/26/2018; 23:57 (UTC) | MANAFORT | Person D1 | Text: "We should talk. I have made clear that they worked in Europe." |
| 2/27/2018; 11:03 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/27/2018; 11:31 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| *Kilimnik contacted Person D2 a messaging application, sending four messages:* | | | |
| 2/28/2018; 01:49 (CEST) | Kilimnik | Person D2 | "[Person D2], hi! How are you? Hope you are doing fine. ;))" |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on." |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [Person D1] - would be great" |

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/28/2018; 01:53 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |
| *Kilimnik contacted Person D2 using a different messaging application, sending five messages:* | | | |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "Hey, how are you? This is K." |
| 2/28/2018; 06:01(CEST) | Kilimnik | Person D2 | "Hope you are doing fine." |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on" |
| 2/28/2018; 06:02 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |
| 2/28/2018; 06:03 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [First Initial of Person D1's Name]. - it would be great. It would be good to get them connected to discuss in person. P is his friend." |
| *Kilimnik contacted Person D2 using two different applications, sending three messages:* | | | |
| 4/4/2018; 08:53 (CEST) | Kilimnik | Person D2 | "Hey. This is Konstantin. My friend P asked me again to help connect him with [Person D1]. Can you help?" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "Hey. My friend P has asked me again if there is any way to help connect him through [Person D1]" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "I tried him on all numbers." |
| *Kilimnik contacted Person D1 using a messaging application:* | | | |
| 4/4/2018; 13:00 (UTC) | Kilimnik | Person D1 | "Hi. This is K. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." |

\*UTC and CEST refer to Coordinated Universal Time and Central European Summer Time, respectively.

35

(18 U.S.C. §§ 371 and 3551 et seq.)

## FORFEITURE ALLEGATIONS

68. Upon conviction of the offense charged in Count One, the defendant PAUL J. MANAFORT, JR., shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, and any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1), and Title 28, United States Code, Section 2461(c). The United States will also seek a judgment against the defendant for a sum of money representing the property described in this paragraph (to be offset by the forfeiture of any specific property).

69. The property subject to forfeiture by PAUL J. MANAFORT, JR., includes, but is not limited to, the following listed assets:

    a. The real property and premises commonly known as 377 Union Street, Brooklyn, New York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

    b. The real property and premises commonly known as 29 Howard Street, #4D, New York, New York 10013 (Block 209, Lot 1104), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

    c. The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

36

d.      All funds held in account number XXXXXX0969 at The Federal Savings Bank, and any property traceable thereto;

e.      All funds seized from account number XXXXXX1388 at Capital One N.A., and any property traceable thereto; and

f.      All funds seized from account number XXXXXX9952 at The Federal Savings Bank, and any property traceable thereto;

g.      Northwestern Mutual Universal Life Insurance Policy 18268327, and any property traceable thereto;

h.      All funds held in account number XXXX7988 at Charles A. Schwab & Co. Inc., and any property traceable thereto; and

i.      The real property and premises commonly known as 1046 N. Edgewood Street, Arlington, Virginia 22201, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto.

## **Substitute Assets**

70.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be subdivided without difficulty;

37

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section

982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853, to seek forfeiture of any other property of said defendant.

By:

Robert S. Mueller, III
Special Counsel
Department of Justice

38

# ATTACHMENT B



**U.S. Department of Justice**
*The Special Counsel's Office*

*Washington, D.C. 20530*
September 13, 2018

Kevin M. Downing, Esq.
Law Office of Kevin M. Downing
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001

**FILED**

**SEP 1 4 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Thomas E. Zehnle, Esq.
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001

Richard W. Westling, Esq
Epstein Becker Green
1227 25th Street NW
Suite 700
Washington, DC 20037

Re: United States v. Paul J. Manafort, Jr., Crim. No. 17-201-2 (ABJ)

Dear Counsel:

This letter sets forth the full and complete plea offer to your client Paul J. Manafort, Jr. (hereinafter referred to as "your client" or "defendant") from the Special Counsel's Office (hereinafter also referred to as "the Government" or "this Office"). If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as the "Agreement"). The terms of the offer are as follows.

## 1. Charges and Statutory Penalties

Your client agrees to plead guilty in the above-captioned case to all elements of all objects of all the charges in a Superseding Criminal Information, which will encompass the charges in Counts One and Two of a Superseding Criminal Information, charging your client with:

A. conspiracy against the United States, in violation of 18 U.S.C. § 371 (which includes a conspiracy to: (a) money launder (in violation of 18 U.S.C. § 1956); (b) commit tax fraud

Page **1** of **17**

(in violation of 26 U.S.C. § 7206(1)); (c) fail to file Foreign Bank Account Reports (in violation of 31 U.S.C. §§ 5314 and 5322(b)); (d) violate the Foreign Agents Registration Act (in violation of 22 U.S.C. §§ 612, 618(a)(1), and 618(a)(2)); and (e) to lie to the Department of Justice (in violation of 18 U.S.C. § 1001(a) and 22 U.S.C. §§ 612 and 618(a)(2)); and

B. conspiracy against the United States, in violation of 18 U.S.C. § 371, to wit: conspiracy to obstruct justice by tampering with witnesses while on pre-trial release (in violation of 18 U.S.C. § 1512).

The defendant also agrees not to appeal any trial or pre-trial issue in the Eastern District of Virginia, or to challenge in the district court any such issue, and admits in the attached "Statement of the Offense" his guilt of the remaining counts against him in United States v. Paul J. Manafort, Jr., Crim. No. 1:18-cr-83 (TSE) (hereafter "Eastern District of Virginia.") A copy of the Superseding Criminal Information and Statement of the Offense are attached.

Your client understands that each violation of 18 U.S.C. § 371 carries a maximum sentence of 5 years' imprisonment; a fine of not more than $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made, and forfeiture.

In addition, your client agrees to pay a mandatory special assessment of $200 to the Clerk of the United States District Court for the District of Columbia. Your client also understands that, pursuant to 18 U.S.C. § 3572 and § 5E1.2 of the United States Sentencing Guidelines, *Guidelines Manual* (2016) (hereinafter "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.

## 2.    **Factual Stipulations**

Your client agrees that the attached Statement of the Offense fairly and accurately describes and summarizes your client's actions and involvement in the offenses to which your client is pleading guilty, as well as crimes charged in the Eastern District of Virginia that remain outstanding, as well as additional acts taken by him. Please have your client sign and return the Statement of the Offense, along with this Agreement.

## 3.    **Additional Charges**

In consideration of your client's guilty plea to the above offenses, and upon the completion of full cooperation as described herein and fulfillment of all the other obligations herein, no additional criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity, including money laundering, false statements, personal and corporate tax and FBAR offenses, bank fraud, Foreign Agents Registration Act violations for his work in Ukraine, and obstruction of justice. In addition, subject to the terms of this Agreement, at the time of sentence or at the completion of his successful cooperation, whichever is later, the Government will move to dismiss the remaining counts of the Indictment

in this matter and in the Eastern District of Virginia and your client waives venue as to such charges in the event he breaches this Agreement. Your client also waives all rights under the Speedy Trial act as to any outstanding charges.

4. **Sentencing Guidelines Analysis**

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the applicable guidelines and policies set forth in the Sentencing Guidelines. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the Office estimates the Guidelines as follows:

A. **Estimated Offense Level Under the Guidelines**

| Base offense level | +8 | 2S1.1(a) Base Offense Level: (1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or (2) 8 plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise. |
|---|---|---|
| | +22 | Using more than $25 million threshold under 2B1.1 |
| Enhancement | +2 | 2S1.1(b)(2)(B) permits enhancement for 2 points if the conviction is pursuant to §1956. |
| Enhancement | +2 | 2S1.1(b)(3) adds two points for sophisticated laundering (which the guidelines lists as involving shell corporations and offshore financial accounts. |
| Enhancement: | +4 | 3B1.1(a) aggravating role – 5 or more participants or otherwise extensive |
| Enhancement: | +2 | 3C1.1 obstruction |
| Combined Offense level | +0 | 3D1.4 |
| Acceptance: | -3 | 3E1.1(b) acceptance of responsibility |
| Total for Counts One and Two: | 37 | **Advisory guidelines range of 210-262** |

The defendant agrees that all of the Sentencing Guidelines for money laundering applicable to charges brought under 18 U.S.C. § 1956 apply to Count One of the Superseding Criminal Information brought under 18 U.S.C. § 371.

For the purposes of the Sentencing Guidelines analysis, the government calculates the highest guideline range among the offenses, namely the object of the conspiracy to violate Title 18 U.S.C. § 1956. The defendant's estimated guideline range for Count Two, the conspiracy to obstruct justice, is 30 (before any reduction for acceptance of responsibility), and would be grouped with Count One pursuant to §3D1.2(c).

## B.  Acceptance of Responsibility

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence. If the defendant has accepted responsibility as described above, and if the defendant pleads guilty on or before September 14, 2018, subject to the availability of the Court, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b).

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth herein, should your client move to withdraw his guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

In accordance with the above, the applicable Guidelines Offense Level will be at least 37.

## C.  Estimated Criminal History Category

Based upon the information now available to this Office, your client has no criminal convictions, other than in the Eastern District of Virginia. Your client acknowledges that depending on when he is sentenced here and how the Guidelines are interpreted, he may have a criminal history. If additional convictions are discovered during the pre-sentence investigation by the United States Probation Office, your client's criminal history points may increase.

## D.  Estimated Applicable Guidelines Range

Based upon the total offense level and the estimated criminal history category set forth above, the Office calculates your client's estimated Sentencing Guidelines range is 210 months to 262 months' imprisonment (the "Estimated Guidelines Range"). In addition, the Office calculates that, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level

37, the estimated applicable fine range is $40,000 to $400,000. Your client reserves the right to ask the Court not to impose any applicable fine.

Your client agrees that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, a downward departure from the Estimated Guidelines Range set forth above is not warranted, subject to the paragraphs regarding cooperation below. Accordingly, you will not seek any departure or adjustment to the Estimated Guidelines Range set forth above, nor suggest that the Court consider such a departure or adjustment for any other reason other than those specified above. Your client also reserves the right to disagree with the Estimated Guideline Range calculated by the Office with respect to role in the offense. However, your client understands and acknowledges that the Estimated Guidelines Range agreed to by the Office is not binding on the Probation Office or the Court. Should the Court or Probation Office determine that a different guidelines range is applicable, your client will not be permitted to withdraw his guilty plea on that basis, and the Government and your client will still be bound by this Agreement.

Your client understands and acknowledges that the terms of this section apply only to conduct that occurred before the execution of this Agreement. Should your client engage in any conduct after the execution of this Agreement that would form the basis for an increase in your client's base offense level or justify an upward departure (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or the Court), the Government is free under this Agreement to seek an increase in the base offense level based on that post-agreement conduct.

## 5.    Agreement as to Sentencing Allocution

Based upon the information known to the Government at the time of the signing of this Agreement, the parties further agree that a sentence within the Estimated Guidelines Range (or below) would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below.

## 6.    Reservation of Allocution

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charge to which your client is pleading guilty.

The parties also reserve the right to inform the presentence report writer and the Courts of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement. In the event that the Courts considers any Sentencing Guidelines adjustments, departures, or calculations different from any agreements contained in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Courts. In addition, your client acknowledges that the

Government is not obligated to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

### 7. **Court Not Bound by this Agreement or the Sentencing Guidelines**

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a), upon consideration of the Sentencing Guidelines. Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Courts. Your client acknowledges that the Courts are not obligated to follow any recommendation of the Government at the time of sentencing or to grant a downward departure based on your client's substantial assistance to the Government, even if the Government files a motion pursuant to Section 5K1.1 of the Sentencing Guidelines. Your client understands that neither the Government's recommendation nor the Sentencing Guidelines are binding on the Courts.

Your client acknowledges that your client's entry of a guilty plea to the charged offenses authorizes the Court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range determined by the Court. Although the parties agree that the sentences here and in the Eastern District of Virginia should run concurrently to the extent there is factual overlap (i.e. the tax and foreign bank account charges), that recommendation is not binding on either Court. The Government cannot, and does not, make any promise or representation as to what sentences your client will receive. Moreover, your client acknowledges that your client will have no right to withdraw your client's plea of guilty should the Courts impose sentences that are outside the Guidelines range or if the Courts do not follow the Government's sentencing recommendation. The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Courts. Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

### 8. **Cooperation**

Your client shall cooperate fully, truthfully, completely, and forthrightly with the Government and other law enforcement authorities identified by the Government in any and all matters as to which the Government deems the cooperation relevant. This cooperation will include, but is not limited to, the following:

(a) The defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities.

(b) The defendant agrees to furnish to the Government all documents and other material that may be relevant to the investigation and that are in the defendant's possession or control and to participate in undercover activities pursuant to the specific instructions of law enforcement agents or the Government.

(c) The defendant agrees to testify at any proceeding in the District of Colombia or elsewhere as requested by the Government.

(d) The defendant consents to adjournments of his sentences as requested by the Government.

(e) The defendant agrees that all of the defendant's obligations under this agreement continue after the defendant is sentenced here and in the Eastern District of Virginia; and

(f) The defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes.

Your client acknowledges and understands that, during the course of the cooperation outlined in this Agreement, your client will be interviewed by law enforcement agents and/or Government attorneys. Your client waives any right to have counsel present during these interviews and agrees to meet with law enforcement agents and Government attorneys outside of the presence of counsel. If, at some future point, you or your client desire to have counsel present during interviews by law enforcement agents and/or Government attorneys, and you communicate this decision in writing to this Office, this Office will honor this request, and this change will have no effect on any other terms and conditions of this Agreement.

Your client shall testify fully, completely and truthfully before any and all Grand Juries in the District of Columbia and elsewhere, and at any and all trials of cases or other court proceedings in the District of Columbia and elsewhere, at which your client's testimony may be deemed relevant by the Government.

Your client understands and acknowledges that nothing in this Agreement allows your client to commit any criminal violation of local, state or federal law during the period of your client's cooperation with law enforcement authorities or at any time prior to the sentencing in this case. The commission of a criminal offense during the period of your client's cooperation or at any time prior to sentencing will constitute a breach of this Agreement and will relieve the Government of all of its obligations under this Agreement, including, but not limited to, its obligation to inform this Court of any assistance your client has provided. However, your client acknowledges and agrees that such a breach of this Agreement will not entitle your client to withdraw your client's plea of guilty or relieve your client of the obligations under this Agreement.

Your client agrees that the sentencing in this case and in the Eastern District of Virginia may be delayed until your client's efforts to cooperate have been completed, as determined by the Government, so that the Courts will have the benefit of all relevant information before a sentence is imposed.

## 9.     **Government's Obligations**

The Government will bring to the Courts' attention at the time of sentencing the nature and extent of your client's cooperation or lack of cooperation. The Government will evaluate the full nature and extent of your client's cooperation to determine whether your client has provided substantial assistance in the investigation or prosecution of another person who has committed an offense. If this Office determines that the defendant has provided substantial assistance in the form of truthful information and, where applicable, testimony, the Office will file motions pursuant to Section 5K1.1 of the United States Sentencing Guidelines. Defendant will then be free to argue for any sentence below the advisory Sentencing Guidelines range calculated by the Probation Office, including probation.

10.  **Waivers**

A.  **Venue**

Your client waives any challenge to venue in the District of Columbia.

B.  **Statute of Limitations**

Your client agrees that, should any plea or conviction following your client's pleas of guilty pursuant to this Agreement, or the guilty verdicts in the Eastern District of Virginia, be vacated, set aside, or dismissed for any reason (other than by government motion as set forth herein), any prosecution based on the conduct set forth in the attached Statement of the Offense, as well as any crimes that the Government has agreed not to prosecute or to dismiss pursuant to this Agreement, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement, may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution of conduct set forth in the attached Statement of the Offense, or any other crimes that the Government has agreed not to prosecute, that are not time-barred on the date that this Agreement is signed. The Office and any other party will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client, including the Statement of the Offense, and any of the information or materials provided by your client, including such statements, information, and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously a part of proffer-protected debriefings, and your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

C.  **Trial and Other Rights**

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule. Your client agrees to forgo the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea. Your client also agrees to waive,

among other rights, the right to be indicted by a Grand Jury, the right to plead not guilty, and the right to a jury trial. If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify. If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal your client's conviction. Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of compelled self-incriminating statements in a criminal prosecution. By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against compelled self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily hereby waives the rights that arise under these rules to object to the use of all such statements by him on and after September 10, 2018, in the event your client breaches this agreement, withdraws his guilty plea, or seeks to withdraw from this Agreement after signing it. This Agreement supersedes the proffer agreement between the Government and the client.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the pleas of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court. Your client understands that the date for sentencing will be set by the Courts.

Your client agrees not to accept remuneration or compensation of any sort, directly or indirectly, for the dissemination through any means, including but not limited to books, articles, speeches, blogs, podcasts, and interviews, however disseminated, regarding the conduct encompassed by the Statement of the Offense, or the investigation by the Office or prosecution of any criminal or civil cases against him.

## D. Appeal Rights

Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client agrees to waive the right to appeal the sentences in this case and the Eastern District of Virginia, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Courts to set conditions of release, and the manner in which the sentences were determined, except to the extent the Courts sentence your client above the statutory maximum or guidelines range determined by the Courts or your client claims that your client received ineffective assistance of counsel, in which case your client would

have the right to appeal the illegal sentence or above-guidelines sentence or raise on appeal a claim of ineffective assistance of counsel, but not to raise on appeal other issues regarding the sentencings. In agreeing to this waiver, your client is aware that your client's sentences have yet to be determined by the Courts. Realizing the uncertainty in estimating what sentences the Courts ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement.

### E.     Collateral Attack

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or in the Eastern District of Virginia or otherwise attempt to modify or change the sentences or the manner in which they were determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on a claim that your client received ineffective assistance of counsel.

Your client agrees that with respect to all charges referred to herein he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law.

### F.     Privacy Act and FOIA Rights

Your client also agrees to waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including and without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a, for the duration of the Special Counsel's investigation.

### 11.     Restitution

Your client understands that the Court has an obligation to determine whether, and in what amount, mandatory restitution applies in this case under 18 U.S.C. § 3663A. The Government and your client agree that mandatory restitution does not apply in this case.

### 12.     Forfeiture

a)     Your client agrees to the forfeiture set forth in the Forfeiture Allegations in the Superseding Criminal Information to which your client is pleading guilty. Your client further agrees to forfeit criminally and civilly the following properties (collectively, the "Forfeited Assets") to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), 982(a)(1), 982(a)(2); Title 21, United States Code, Section 853(p), and Title 28 U.S.C. § 2461(c), and further agrees to waive all interest in such assets in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal:

1) The real property and premises commonly known as 377 Union Street, Brooklyn, New

York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

2) The real property and premises commonly known as 29 Howard Street, #4D, New York, New York 10013 (Block 209, Lot 1104), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

3) The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

4) All funds held in account number          0969 at The Federal Savings Bank, and any property traceable thereto;

5) All funds seized from account number          1388 at Capital One N.A., and any property traceable thereto;

6) All funds seized from account number          9952 at The Federal Savings Bank, and any property traceable thereto;

7) Northwestern Mutual Universal Life Insurance Policy          and any property traceable thereto;

8) The real property and premises commonly known as 123 Baxter Street, #5D, New York, New York 10016 in lieu of 1046 N. Edgewood Street; and

9) The real property and premises commonly known as 721 Fifth Avenue, #43G, New York, New York 10022 in lieu of all funds from account number          ˆ at Charles Schwab & Co. Inc., and any property traceable thereto.

Your client agrees that his consent to forfeiture is final and irrevocable as to his interests in the Forfeited Assets.

b)      Your client agrees that the facts set forth in the Statement of Facts and admitted to by your client establish that the Forfeited Assets are forfeitable to the United States pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461. Your client admits that the Forfeited Assets numbered 1 through 7, above, represent property that constitutes or is derived from proceeds of, and property involved in, the criminal offenses in the Superseding Criminal Information to which your client is pleading guilty. Your client further agrees that all the Forfeited Assets (numbered 1 through 9) can additionally be considered substitute assets for the purpose of forfeiture to the United States pursuant to Title 18, United States Code, Section 982(b); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).

c)       Your client agrees that the Court may enter a preliminary order of forfeiture for the Forfeited Assets at the time of your client's guilty plea or at any time before sentencing, and consents thereto. Your client agrees that the Court can enter a Final Order of Forfeiture for the Forfeited Assets, and could do so as part of his sentence.

d)       Your client further agrees that the government may choose in its sole discretion how it wishes to accomplish forfeiture of the property whose forfeiture your client has consented to in this plea agreement, whether by criminal or civil forfeiture, using judicial or non-judicial forfeiture processes. If the government chooses to effect the forfeiture provisions of this plea agreement through the criminal forfeiture process, your client agrees to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J) and 32.2 regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

e)       Your client understands that the United States may institute civil or administrative forfeiture proceedings against all forfeitable property in which your client has an interest, including the Forfeited Assets, without regard to the status of his criminal conviction. Your client further consents to the civil forfeiture of the Forfeited Assets to the United States, without regard to the status of his criminal conviction. In connection therewith, your client specifically agrees to waive all right, title, and interest in the Forfeited Assets, both individually and on behalf of DMP International, Summerbreeze LLC, or any other entity of which he is an officer, member, or has any ownership interest. Your client waives all defenses based on statute of limitations and venue with respect to any administrative or civil forfeiture proceeding related to the Forfeited Assets.

f)       Your client represents that with respect to each of the Forfeited Assets, he is either the sole and rightful owner and that no other person or entity has any claim or interest, or that he has secured the consent from any other individuals or entities having an interest in the Forfeited Assets to convey their interests in the Forfeited Assets to him prior to entry of the Order of Forfeiture (with the exception of previously disclosed mortgage holders). Your client warrants that he has accurately represented to the Government all those individuals and entities having an interest in the Forfeited Assets and the nature and extent of those interests, including any mortgages or liens on the Forfeited Assets. Your client agrees to take all steps to pass clear title to the Forfeited Assets to the United States (with the exception of previously disclosed mortgage liens). Your client further agrees to testify truthfully in any judicial forfeiture proceeding, and to take all steps to effectuate the same as requested by the Government. Your client agrees to take all steps requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by your client, including but not limited to the Forfeited Assets, and to otherwise facilitate the effectuation of forfeiture and the maximization of the value of Forfeited Assets for the United States.

g)       Your client agrees that, to the extent that he does not convey to the United States

clear title to each of the Forfeited Assets, the United States is entitled, in its sole discretion, either to vacatur of the plea agreement or to forfeiture to the United States of a sum of money equal to the value of that asset at the time this agreement was executed. Your client consents to modification of any Order of Forfeiture at any point to add such sum of money as a forfeiture judgment in substitution for Forfeited Assets.

h)     Your client hereby abandons any interest he has in all forfeitable property and consents to any disposition of the property by the government without further notice or obligation whatsoever owning to your client.

i)     Your client agrees not to interpose any claim, or to assist others to file or interpose any claim, to the Forfeited Assets in any proceeding, including but not limited to any civil or administrative forfeiture proceedings and any ancillary proceedings related to criminal forfeiture. Your client agrees that he shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeited Assets, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeited Assets, nor shall your client assist any other in filing any such claims, petitions, actions, or motion. Contesting or assisting others in contesting forfeiture shall constitute a material breach of the Agreement, relieving the United States of all its obligations under the Agreement. Your client agrees not to seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the assets forfeited pursuant to this Agreement.

j)     In the event your client fails to deliver the assets forfeited pursuant to this agreement, or in any way fails to adhere to the forfeiture provisions of this agreement, the United States reserves all remedies available to it, including but not limited to vacating the Agreement based on a breach of the Agreement by your client.

k)     Your client agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him notwithstanding the abatement of any underlying criminal conviction after the execution of this Agreement.

l)     Your client agrees that he will not claim, assert, or apply for, directly or indirectly, any tax deduction, tax credit, or any other taxable offset with regard to any federal, state, or local tax or taxable income for payments of any assets forfeited pursuant to this Agreement.

m)     Your client agrees to waive all constitutional and statutory challenges in any manner (including, but not limited to, direct appeal) to any forfeiture carried out in accordance with this Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

### 13. **Breach of Agreement**

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing or during his cooperation (whichever is later), your client will have breached this Agreement. Should it be judged by the Government in its sole discretion that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from his pleas of guilty but the Government will be released from its obligations under this agreement, including (a) not to oppose a downward adjustment of two levels for acceptance of responsibility described above, and to make the motion for an additional one-level reduction described above and (b) to file the motion for a downward departure for cooperation described above. Moreover, the Government may withdraw the motion described above, if such motion has been filed prior to sentencing. In the event that it is judged by the Government that there has been a breach: (a) your client will be fully subject to criminal prosecution, in addition to the charges contained in the Superseding Criminal Information, for any crimes to which he has not pled guilty, including perjury and obstruction of justice; and (b) the Government and any other party will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client, including the Statement of the Offense, and any of the information or materials provided by your client, including such statements, information, and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously a part of proffer-protected debriefings, and your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by good faith.

Nothing in this Agreement shall be construed to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

### 14. **Complete Agreement**

Apart from the written proffer agreement initially dated September 11, 2018, which this Agreement supersedes, no agreements, promises, understandings, or representations have been

made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and the Office.

Your client further understands that this Agreement is binding only upon the Office. This Agreement does not bind any United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

If the foregoing terms and conditions are satisfactory, your client may so indicate by

signing this Agreement and the Statement of the Offense, and returning both to the Office no later than September 14, 2018.

Sincerely yours,

ROBERT S. MUELLER, III
Special Counsel

By:

Andrew Weissmann
Jeannie S. Rhee
Greg D. Andres
Kyle R. Freeny
Senior/Assistant Special Counsels

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorneys Kevin Downing, Thomas Zehnle, and Richard Westling. I am fully satisfied with the legal representation by them, who I have chosen to represent me herein. Nothing about the quality of the representation of other counsel is affecting my decision herein to plead guilty. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorneys in connection with this Agreement and matters related to it.

Date:  _9 - 13-18_                        _____

Paul J. Manafort, Jr.
Defendant

## ATTORNEYS' ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, Paul J. Manafort, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date:  _9 - 13 - 2018_                    _____

Kevin M. Downing
Richard W. Westling
Thomas E. Zehnle
Attorneys for Defendant



**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**SEP 1 4 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. 17-201-1 (ABJ) |
| | * | |
| v. | * | Violations: 18 U.S.C. § 371 |
| | * | (Conspiracy Against the United States |
| | * | and Conspiracy to Obstruct Justice) |
| PAUL J. MANAFORT, JR., | * | |
| | * | |
| Defendant. | * | |
| | ******* | |

## STATEMENT OF THE OFFENSES AND OTHER ACTS

Pursuant to the Federal Rules of Criminal Procedure 11, the United States and the

defendant PAUL J. MANAFORT, JR. (MANAFORT) stipulate and agree that the following

facts are true and accurate. These facts do not constitute all of the facts known to the parties

concerning the charged offense and covered conduct. This statement is being submitted by the

parties to demonstrate that sufficient facts exist to establish that the defendant committed the

offenses to which he is pleading guilty.

### Count 1: Conspiracy Against the United States (18 U.S.C. § 371)

1. At all relevant times herein, MANAFORT was an owner of Davis Manafort Partners, Inc.

(DMP) or DMP International, LLC (DMI) or both. MANAFORT engaged in a variety of criminal

schemes, and knowingly, intentionally, and willfully conspired with Richard W. Gates, Konstantin

Kilimnik, and others to carry out the criminal schemes that make up Counts One and Two of the

Information, as more fully set forth below.

#### A. FARA Conspiracy
#### 22 U.S.C. §§ 612 and 618(a)(1)

**MANAFORT's Lobbying in the United States on Behalf of the Government of Ukraine**

Page **1** of **24**

2.     MANAFORT knew it was illegal to lobby government officials and engage in public relations activities (hereinafter collectively referred to as lobbying) in the United States on behalf of a foreign government or political party, without registering with the United States Government under the Foreign Agents Registration Act. MANAFORT knew he was lobbying in the United States for the Government of Ukraine, President Viktor F. Yanukovych, the Party of Regions, and the Opposition Bloc (the latter two being political parties in Ukraine), and thus he was supposed to submit a written registration statement to the United States Department of Justice. MANAFORT knew that the filing was required to disclose the name of the foreign country, all the financial payments to the lobbyist, and the specific steps undertaken for the foreign country in the United States, among other information.

3.     MANAFORT knew that Ukraine had a strong interest in the United States' taking economic and policy positions favorable to Ukraine, including not imposing sanctions on Ukraine. MANAFORT also knew that the trial and treatment of President Yanukovych's political rival, former Prime Minister Yulia Tymoshenko, was strongly condemned by leading United States executive and legislative branch officials, and was a major hurdle to improving United States and Ukraine relations.

4.     From 2006 until 2015, MANAFORT led a multi-million dollar lobbying campaign in the United States at the direction of the Government of Ukraine, President Yanukovych, the Party of Regions, and the Opposition Bloc. MANAFORT intentionally did so without registering and providing the disclosures required by law.

5.     As part of the lobbying scheme, MANAFORT hired numerous firms and people to assist in his lobbying campaign in the United States. He hired Companies A, B, C, D, and E, and Law Firm A, among others, to participate in what he described to President Yanukovych in writing as a global



"Engage Ukraine" lobbying campaign that he devised and led. These companies and law firm were paid the equivalent of over $11 million for their Ukraine work.

6. MANAFORT viewed secrecy for himself and for the actions of his lobbyists as integral to the effectiveness of the lobbying offensive he orchestrated for Ukraine. Filing under the Foreign Agents Registration Act would have thwarted the secrecy MANAFORT sought in order to conduct an effective campaign for Ukraine to influence both American leaders and the American public.

7. MANAFORT took steps to avoid any of these firms and people disclosing their lobbying efforts under the Foreign Agents Registration Act. As one example, even though MANAFORT engaged Company E in 2007 to lobby in the United States for the Government of Ukraine, MANAFORT tried to dissuade Company E from filing under the Foreign Agents Registration Act. Only after MANAFORT ceased to use Company E in the fall of 2007 did Company E disclose its work for Ukraine, in a belated filing under the Act in 2008.

8. MANAFORT took other measures to keep the Ukraine lobbying as secret as possible. For example, MANAFORT, in written communications on or about May 16, 2013, directed his lobbyists (including Persons D1 and D2, who worked for Company D) to write and disseminate within the United States news stories that alleged that Tymoshenko had paid for the murder of a Ukrainian official. MANAFORT stated that it should be "push[ed]" "[w]ith no fingerprints." "It is very important we have no connection." MANAFORT stated that "[m]y goal is to plant some stink on Tymo." Person D1 objected to the plan, but ultimately Persons D1 and D2 complied with MANAFORT's direction. The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew. He did not.

The Hapsburg Group and Company D

9. As part of the lobbying scheme, starting in 2011, MANAFORT secretly retained Company

Page **3** of **24**

D and a group of four former European heads of state and senior officials (including a former Austrian Chancellor, Italian Prime Minister, and Polish President) to lobby in the United States and Europe on behalf of Ukraine. The former politicians, called the Hapsburg Group by MANAFORT, appeared to be providing solely their independent assessments of Government of Ukraine policies, when in fact they were paid by Ukraine. MANAFORT explained in an "EYES ONLY" memorandum in or about June 2012 that his purpose was to "assemble a small group of high-level European infuencial [sic] champions and politically credible friends who can act informally and without any visible relationship with the Government of Ukraine."

10. Through MANAFORT, the Government of Ukraine retained an additional group of lobbyists (Company D and Persons D1 and D2). In addition to lobbying itself, Company D secretly served as intermediaries between the Hapsburg Group and MANAFORT and the Government of Ukraine. In or about 2012 through 2013, MANAFORT directed more than the equivalent of 700,000 euros to be wired from at least three of his offshore accounts to the benefit of Company D to pay secretly for its services.

11. All four Hapsburg Group members, at the direction, and with the direct assistance, of MANAFORT, advocated positions favorable to Ukraine in meetings with United States lawmakers, interviews with United States journalists, and ghost written op-eds in American publications. In or about 2012 through 2014, MANAFORT directed more than 2 million euros to be wired from at least four of his offshore accounts to pay secretly the Hapsburg Group. To avoid European taxation, the contract with the Hapsburg Group falsely stated that none of its work would take place in Europe.

12. One of the Hapsburg Group members, a former Polish President, was also a representative of the European Parliament with oversight responsibility for Ukraine. MANAFORT solicited that

official to provide MANAFORT inside information about the European Parliament's views and actions toward Ukraine and to take actions favorable to Ukraine. MANAFORT also used this Hapsburg Group member's current European Parliament position to Ukraine's advantage in his lobbying efforts in the United States. In the fall of 2012, the United States Senate was considering and ultimately passed a resolution critical of President Yanukovych's treatment of former Prime Minister Tymoshenko. MANAFORT engaged in an all-out campaign to try to kill or delay the passage of this resolution. Among the steps he took was having the Hapsburg Group members reach out to United States Senators, as well as directing Companies A and B to have private conversations with Senators to lobby them to place a "hold" on the resolution. MANAFORT told his lobbyists to stress to the Senators that the former Polish President who was advocating against the resolution was currently a designated representative of the President of the European Parliament, to give extra clout to his supposedly independent judgment against the Senate resolution. MANAFORT never revealed to the Senators or to the American public that any of these lobbyists or Hapsburg Group members were paid by Ukraine.

13.     In another example, on May 16, 2013, another member of the Hapsburg Group lobbied in the United States for Ukraine. The Hapsburg Group member accompanied his country's prime minister to the Oval Office and met with the President and Vice President of the United States, as well as senior United States officials in the executive and legislative branches. In written communications sent to MANAFORT, Person D1 reported that the Hapsburg Group member delivered the message of not letting "Russians Steal Ukraine from the West." The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew. He did not.

Law Firm Report and Tymoshenko

14.     As another part of the lobbying scheme, in 2012, on behalf of President Yanukovych and the Government of Ukraine's Ministry of Justice, MANAFORT solicited a United States law firm to write a report evaluating the trial of Yanukovych's political opponent Yulia Tymoshenko. MANAFORT caused Ukraine to hire the law firm so that its report could be used in the United States and elsewhere to defend the Tymoshenko criminal trial and argue that President Yanukovych and Ukraine had not engaged in selective prosecution.

15.     MANAFORT retained a public relations firm (Company C) to prepare a media roll-out plan for the law firm report. MANAFORT used one of his offshore accounts to pay Company C the equivalent of more than $1 million for its services.

16.     MANAFORT worked closely with Company C to develop a detailed written lobbying plan in connection with what MANAFORT termed the "selling" of the report. This campaign included getting the law firm's report "seeded" to the press in the United States—that is, to leak the report ahead of its official release to a prominent United States newspaper and then use that initial article to influence reporting globally. As part of the roll-out plan, on the report's issuance on December 13, 2012, MANAFORT arranged to have the law firm disseminate hard copies of the report to numerous government officials, including senior United States executive and legislative branch officials.

17.     MANAFORT reported on the law firm's work on the report and Company C's lobbying plan to President Yanukovych and other representatives of the Government of Ukraine. For example, in a July 27, 2012 memorandum to President Yanukovych's Chief of Staff, MANAFORT reported on "the global rollout strategy for the [law firm's] legal report, and provide[d] a detailed plan of action[]" which included step-by-step lobbying outreach in the United States.

18.     MANAFORT directed lobbyists to tout the report as showing that President Yanukovych

had not selectively prosecuted Tymoshenko. But in November 2012 MANAFORT had been told privately in writing by the law firm that the evidence of Tymoshenko's criminal intent "is virtually non-existent" and that it was unclear even among legal experts that Tymoshenko lacked power to engage in the conduct central to the Ukraine criminal case. These facts, known by MANAFORT, were not disclosed to the public.

19.     MANAFORT knew that the report also did not disclose that the law firm, in addition to being retained to write the report, was retained to represent Ukraine itself, including in connection with the Tymoshenko case and to provide training to the trial team prosecuting Tymoshenko.

20.     MANAFORT also knew that the Government of Ukraine did not want to disclose how much the report cost. More than $4.6 million was paid to the law firm for its work. MANAFORT used one of his offshore accounts to funnel $4 million to pay the law firm, a fact that MANAFORT did not disclose to the public. Instead, the Government of Ukraine reported falsely that the report cost just $12,000.

21.     MANAFORT and others knew that the actual cost of the report and the scope of the law firm's work would undermine the report's being perceived as an independent assessment and thus being an effective lobbying tool for MANAFORT to use to support the incarceration of President Yanukovych's political opponent.

22.     In addition to the law firm report, MANAFORT took other steps on behalf of the Government of Ukraine to tarnish Tymoshenko in the United States. In addition to disseminating stories about her soliciting murder, noted above, in October 2012, MANAFORT orchestrated a scheme to have, as he wrote in a contemporaneous communication, "[O]bama jews" put pressure on the Administration to disavow Tymoshenko and support Yanukovych. MANAFORT sought to undermine United States support for Tymoshenko by spreading stories in the United States that

a senior Cabinet official (who had been a prominent critic of Yanukovych's treatment of Tymoshenko) was supporting anti-Semitism because the official supported Tymoshenko, who in turn had formed a political alliance with a Ukraine party that espoused anti-Semitic views. MANAFORT coordinated privately with a senior Israeli government official to issue a written statement publicizing this story. MANAFORT then, with secret advance knowledge of that Israeli statement, worked to disseminate this story in the United States, writing to Person D1 "I have someone pushing it on the NY Post. Bada bing bada boom." MANAFORT sought to have the Administration understand that "the Jewish community will take this out on Obama on election day if he does nothing." MANAFORT then told his United States lobbyist to inform the Administration that Ukraine had worked to prevent the Administration's presidential opponent from including damaging language in the Israeli statement, so as not to harm the Administration, and thus further ingratiate Yanukovych with the Administration.

Company A and Company B

23.     As a third part of the lobbying scheme, in February 2012, MANAFORT solicited two Washington, D.C. lobbying firms (Company A and Company B) to lobby in the United States on behalf of President Yanukovych, the Party of Regions and the Government of Ukraine.   For instance, in early 2012 at the inception of the relationship, Company B wrote in an email to its team about a "potential representation for the Ukraine," having been contacted "at the suggestion of Paul Manafort who has been working on the current PM elections."

24.     MANAFORT arranged to pay Companies A and B over \$2 million from his offshore accounts for their United States lobbying work for Ukraine.

25.     MANAFORT provided direction to Companies A and B in their lobbying efforts, including providing support for numerous United States visits by numerous senior Ukrainian officials.

Page **8** of **24**



Companies A and B, at MANAFORT's direction, engaged in extensive United States lobbying. Among other things, they lobbied dozens of Members of Congress, their staff, and White House and State Department officials about Ukraine sanctions, the validity of Ukraine elections, and the propriety of President Yanukovych's imprisoning Tymoshenko, his presidential rival.

26.     In addition, with the assistance of Company A, MANAFORT also personally lobbied in the United States. He drafted and edited numerous ghost-written op-eds for publication in United States newspapers. He also personally met in March 2013 in Washington, D.C., with a Member of Congress who was on a subcommittee that had Ukraine within its purview. After the meeting, MANAFORT prepared a report for President Yanukovych that the meeting "went well" and reported a series of positive developments for Ukraine from the meeting.

27.     Indeed, MANAFORT repeatedly communicated in person and in writing with President Yanukovych and his staff about the lobbying activities of Companies A and B and he tasked the companies to prepare assessments of their work so he, in turn, could brief President Yanukovych. For instance, MANAFORT wrote President Yanukovych a memorandum dated April 8, 2012, in which he provided an update on the lobbying firms' activities "since the inception of the project a few weeks ago. It is my intention to provide you with a weekly update moving forward." In November 2012, Gates wrote to Companies A and B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013." The resulting memorandum from Companies A and B, with input from Gates, noted among other things that the "client" had not been as successful as hoped given that it had an Embassy in Washington.

28.     To distance their United States lobbying work from the Government of Ukraine, and to avoid having to register as agents of Ukraine under the Foreign Agents Registration Act,



MANAFORT with others arranged for Companies A and B to be engaged by a newly-formed Brussels entity called the European Centre for the Modern Ukraine (the Centre), instead of directly by the Government of Ukraine.

29. MANAFORT described the Centre as "the Brussels NGO that we have formed" to coordinate lobbying for Ukraine. The Centre was founded by a Ukraine Party of Regions member and Ukraine First Vice-Prime Minister. The head of its Board was another member of the Party of Regions, who became the Ukraine Foreign Minister.

30. In spite of these ties to Ukraine, MANAFORT and others arranged for the Centre to represent falsely that it was not "directly or indirectly supervised, directed, [or] controlled" in whole or in major part by the Government of Ukraine or the Party of Regions. MANAFORT knew that the false and misleading representations would lead Companies A and B not to register their activities pursuant to the Foreign Agents Registration Act.

31. Despite the Centre being the ostensible client of Companies A and B, MANAFORT knew that the Centre did not direct or oversee their work. The firms received direction from MANAFORT and his subordinate Gates, on behalf of the Government of Ukraine.

32. As MANAFORT knows from giving directions to Companies A and B, and from the discovery material provided herein, various employees of Companies A and B understood that they were receiving direction from MANAFORT and President Yanukovych, not the Centre, which was not even operational when Companies A and B began lobbying for Ukraine. MANAFORT, Gates, and employees of both Companies A and B referred to the client in ways that made clear they knew it was Ukraine, for instance noting that the "client" had an Embassy in Washington D.C. The head of Company B told his team to think the President of Ukraine "is the client." As a Company A employee noted to another company employee: the lobbying for the

Page **10** of **24**



Centre was "in name only. [Y]ou've gotta see through the nonsense of that[.]" "It's like Alice in Wonderland." An employee of Company B described the Centre as a fig leaf, and the Centre's written certification that it was not related to the Party of Regions as "a fig leaf on a fig leaf," referring to the Centre in an email as the "European hot dog stand for a Modern Ukraine."

Conspiring to Obstruct Justice: False and Misleading Submissions to the Department of Justice

33.   In September 2016, after numerous press reports concerning MANAFORT had appeared in August, the Department of Justice National Security Division informed MANAFORT, Gates, and DMI in writing that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act, without registering. In November 2016 and February 2017, MANAFORT and Gates conspired to knowingly and intentionally cause false and misleading letters to be submitted to the Department of Justice, through his unwitting legal counsel. The letters, both of which were approved by MANAFORT before they were submitted by his counsel, represented falsely, among other things, that:

a.   DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

b.   MANAFORT did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications. Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

c.   MANAFORT had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based

Page **11** of **24**

consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

d.     DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents." The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

34.     In fact, MANAFORT had: selected Companies A and B; engaged in weekly scheduled calls and frequent emails with Companies A and B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Companies A and B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the lobbying firms over \$2.5 million from offshore accounts he controlled, among other things.

35.     Although MANAFORT had represented to the Department of Justice in November 2016 and February 2017 that he had no relevant documents, in fact MANAFORT had numerous incriminating documents in his possession, as he knew at the time. The Federal Bureau of Investigation conducted a court-authorized search of MANAFORT'S home in Virginia in the summer of 2017. The documents attached hereto as Government Exhibits 503, 504, 517, 532, 594, 604, 606, 616, 691, 692, 697, 706 and 708, among numerous others, were all documents that MANAFORT had in his possession (and were found in the search) and all pre-dated the November 2016 letter.

### B. Money Laundering Conspiracy

36.     In or around and between 2006 and 2016, MANAFORT, together with others, did

knowingly and intentionally conspire (a) to conduct financial transactions, affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, to wit, felony violations of FARA in violation of Title 22, United States Code, Sections 612 and 618, knowing that the property involved in the financial transactions represented proceeds of some form of unlawful activity, with intent to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986; and (b) to transport, transmit, and transfer monetary instruments and funds from places outside the United States to and through places in the United States and from places in the United States to and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: a felony violation of FARA, in violation of Title 22, United States Code, Sections 612 and 618, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(ii) and (a)(2)(A).

37. MANAFORT caused the following transfers to be made, knowing that they were being made to entities to carry on activities that were required to be timely reported under the Foreign Agents Registration Act, but were not:

| Payee | Date | Payer | Originating Bank Account | Country of... Origin | Country of... Destination | Amount (USD) |
|---|---|---|---|---|---|---|
| Company A | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $270,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $90,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $120,000.00 |
| | 11/20/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $182,968.07 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $25,000.00 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $90,000.00 |
| | 9/18/2013 | Global Endeavour Inc. | Loyal Bank Limited Account -1840 | SVG* | US | $135,937.37 |

| Payee | Date | Payer | Originating Bank Account | Country of... | | Amount (USD) |
|---|---|---|---|---|---|---|
| | | | | Origin | Destination | |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $167,689.40 |
| | 3/28/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $135,639.65 |
| | 4/3/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $82,979.93 |
| **Total Company A Transfers** | | | | | | **$1,300,214.42** |
| Company B | 5/30/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $195,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $50,000.00 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $54,649.51 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $150,000.00 |
| | 9/3/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $175,857.51 |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $195,857.51 |
| | 3/12/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $26,891.78 |
| | 3/21/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $138,026.00 |
| | 4/15/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,728.81 |
| | 4/25/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,739.23 |
| **Total Company B Transfers** | | | | | | **$1,255,750.35** |



| Payee | Date | Payer | Originating Bank Account | Country of... | | Amount (USD) |
|-------|------|-------|--------------------------|--------|-------------|--------|
| | | | | Origin | Destination | |
| Law Firm A | 4/19/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $2,000,000.00 |
| | 5/30/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| | 7/13/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| **Total Law Firm A Transfers** | | | | | | **$4,000,000.00** |
| **TOTAL TRANSFERS** | | | | | | **$6,555,964.77** |

\* SVG refers to St. Vincent and the Grenadines.

### C. Tax and Foreign Bank Account Conspiracy
### 26 U.S.C. § 7206(1)
### 31 U.S.C. §§ 5314 and 5322(a)

38.     From 2008 through 2014, MANAFORT caused millions of dollars of wire transfers to be made from offshore nominee accounts, without paying taxes on that income. The payments were made for goods, services, and real estate. MANAFORT also hid income by denominating various overseas payments as "loans," thereby evading payment of any taxes on that income by MANAFORT.

39.     MANAFORT directly and through Gates repeatedly misled his bookkeeper and tax accountants, including by not disclosing Manafort's overseas accounts and income. Further, MANAFORT and Gates, acting at Manafort's instruction, classified overseas payments made to MANAFORT falsely as "loans" to avoid incurring additional taxes on the income.

40.     MANAFORT owned and controlled a range of foreign bank accounts in Cyprus, the Grenadines, and the United Kingdom. MANAFORT directly and through Gates maintained these accounts, including by managing them and by making substantial transfers from the accounts to both himself and vendors for personal items for him and his family. MANAFORT was aware that many of these accounts held well in excess of $10,000 in the aggregate at some point during each year in which they existed. MANAFORT did not report the accounts' existence to his bookkeeper

and his tax preparers in an effort to hide them, and to allow him to avoid disclosing their existence on an FBAR filing.

41.    MANAFORT was aware at the time that it was illegal to hide income from the Internal Revenue Service (IRS) by failing to account for reportable income on his income tax returns. MANAFORT was also aware that it was illegal to fail to report information to the IRS regarding the existence of foreign bank accounts, as required by Schedule B of the IRS Form 1040. MANAFORT also understood at the time that a U.S. person who had a financial interest in, or signature or other authority over, a bank account or other financial account in a foreign country, which exceeded $10,000 in any one year (at any time during that year), was required to report the account to the Department of the Treasury. MANAFORT also understood, after 2010, that the failure to make such a report constituted a crime.

42.    Knowing the existence of his reportable foreign accounts and hidden income, MANAFORT knowingly, intentionally, and willfully filed and conspired to file false tax returns from 2006-2015 in that he said he did not have reportable foreign bank accounts when he knew that he did, he did not report income that he knew he in fact had earned, and he did not file Foreign Bank Account Reports. MANAFORT failed to report over $15 million in income during the period 2010-2014.

## FORFEITURE

43.    The following assets constitute or were derived from proceeds of MANAFORT's conspiracy to violate the Foreign Agents Registration Act and/or they constitute property involved in MANAFORT's conspiracy to launder money in violation of 18 U.S.C. § 1956 or are traceable thereto and/or they represent substitute assets for such property which has been made unavailable for forfeiture by the acts or omissions of MANAFORT:

a) The real property and premises commonly known as 377 Union Street, Brooklyn, New

York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

b) The real property and premises commonly known as 29 Howard Street, #4D, New York, New York 10013 (Block 209, Lot 1104), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

c) The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

d) All funds held in account number XXXXXX0969 at The Federal Savings Bank, and any property traceable thereto;

e) All funds seized from account number XXXXXX1388 at Capital One N.A. and any property traceable thereto;

f) All funds seized from account number XXXXXX9952 at The Federal Savings Bank and any property traceable thereto;

g) Northwestern Mutual Universal Life Insurance Policy          and any property traceable thereto;

h) The real property and premises commonly known as 123 Baxter Street, #5D, New York, New York 10016 in lieu of 1046 N. Edgewood Street; and

i) The real property and premises commonly known as 721 Fifth Avenue, #43G, New York, New York 10022 in lieu of all funds from account number          at Charles Schwab & Co. Inc., and any property traceable thereto.

## Count Two: Witness Tampering Conspiracy (18 U.S.C. § 371)

44.     From in or about and between February 23, 2018, and April 2018, both dates being approximate and inclusive, within the District of Columbia and elsewhere, the defendant PAUL J.

Page **17** of **24**

MANAFORT, JR., together with others, including Konstantin Kilimnik, knowingly and intentionally conspired to corruptly persuade another person, to wit: Persons D1 and D2, with intent to influence, delay and prevent the testimony of any person in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1). The facts set forth with respect to Count One are incorporated herein.

45. On February 22, 2018, MANAFORT was charged in the District of Columbia in a Superseding Indictment that for the first time included allegations about the Hapsburg Group and MANAFORT's use of that group to lobby illegally in the United States in violation of the Foreign Agent Registration Act. MANAFORT knew that the Act prescribed only United States lobbying. Immediately after February 22, 2018, MANAFORT began reaching out directly and indirectly to Persons D1 and D2 to induce them to say falsely that they did not work in the United States as part of the lobbying campaign, even though MANAFORT then and there well knew that they did lobby in the United States.

46. MANAFORT committed the following overt acts directly and through his conspirators.

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| MANAFORT contacted Person D1 by phone and a messaging application: | | | |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call: 1 min, 24 second call. |
| 2/24/2018; 15:53 (UTC) | MANAFORT | Person D1 | Text: "This is paul" |
| 2/25/2018; 18:41 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/26/2018; 23:56 (UTC) | MANAFORT | Person D1 | Text: "http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T" |

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/26/2018; 23:57 (UTC) | MANAFORT | Person D1 | Text: "We should talk. I have made clear that they worked in Europe." |
| 2/27/2018; 11:03 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/27/2018; 11:31 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| *Kilimnik contacted Person D2 a messaging application, sending four messages:* | | | |
| 2/28/2018; 01:49 (CEST) | Kilimnik | Person D2 | "[Person D2], hi! How are you? Hope you are doing fine. ;))" |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on." |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [Person D1] - would be great" |
| 2/28/2018; 01:53 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |
| *Kilimnik contacted Person D2 using a different messaging application, sending five messages:* | | | |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "Hey, how are you? This is K." |
| 2/28/2018; 06:01(CEST) | Kilimnik | Person D2 | "Hope you are doing fine." |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on" |
| 2/28/2018; 06:02 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |



| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/28/2018; 06:03 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [First Initial of Person D1's Name]. - it would be great. It would be good to get them connected to discuss in person. P is his friend." |

*Kilimnik contacted Person D2 using two different applications, sending three messages:*

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 4/4/2018; 08:53 (CEST) | Kilimnik | Person D2 | "Hey. This is Konstantin. My friend P asked me again to help connect him with [Person D1]. Can you help?" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "Hey. My friend P has asked me again if there is any way to help connect him through [Person D1] |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "I tried him on all numbers." |

*Kilimnik contacted Person D1 using a messaging application:*

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 4/4/2018; 13:00 (UTC) | Kilimnik | Person D1 | "Hi. This is K. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." |

*UTC and CEST refer to Coordinated Universal Time and Central European Summer Time, respectively.

## Other Acts

### I.    Bank/Bank Fraud Conspiracy
### 18 U.S.C. §§ 1344 and 1349

### Bank Fraud Conspiracy / Citizens Bank / $3.4 million loan
### (Charged as Count 24 in the Eastern District of Virginia Superseding Indictment)

47.    Between December 2015 and March 2016, MANAFORT conspired to intentionally defraud

Citizens Bank in connection with his application for a mortgage for approximately $3.4 million.

The mortgage related to a condominium on Howard Street in the Soho neighborhood of Manhattan,

New York. During the course of the conspiracy, MANAFORT made and caused to be made, a

series of false and fraudulent representations to the bank in order to secure the loan, including the

Page **20** of **24**



following: (a) MANAFORT falsely represented the amount of debt he had by failing to disclose on his loan application the existence of a mortgage on his Union Street property (from Genesis Capital); (b) MANAFORT caused an insurance broker to provide Citizens Bank false information, namely, an outdated insurance report that did not list the Union Street loan (from Genesis Capital); (c) MANAFORT falsely stated that a $1.5 million Peranova loan had been forgiven in 2015; and (d) MANAFORT falsely represented to the lender and its agents that the Howard Street property was a secondary home used as such by his daughter and son-in-law and was not held as a rental property. These statements were material to Citizens Bank.

48.    Citizens Bank was a financial institution chartered by the United States.

### Bank Fraud Conspiracy / Banc of California / $1 million loan
### (Charged as Count 26 in the Eastern District of Virginia Superseding Indictment)

49.    In approximately February 2016, MANAFORT conspired to intentionally defraud Banc of California in connection with his application for a business loan. During the course of the conspiracy, MANAFORT made and caused to be made a series of false and fraudulent representations to the bank, including the following: (a) the submission of a false statement of assets and liabilities that failed to disclose a loan on the Union Street property (from Genesis Capital) and misrepresented, among other things, the amount of the mortgage on the Howard Street property; and (b) the submission of a doctored 2015 DMI profit and loss statement (P&L) that overstated DMI's 2015 income by more than $4 million. These statements were material to Banc of California.

50.    Banc of California was a financial institution chartered by the United States.

**Bank Fraud Conspiracy / Citizens Bank / $5.5 million loan**
**(Charged as Count 28 in the Eastern District of Virginia Superseding Indictment)**

51.    Between December 2015 and March 2016, MANAFORT conspired to intentionally

defraud Citizens Bank in connection with his application for a mortgage for approximately $5.5

million on a property at Union Street in Brooklyn, New York. During the course of the

conspiracy, MANAFORT made or caused to be made a series of false and fraudulent material

representations to the bank in order to secure the loan, including the following: (a) the

submission of a false statement of assets and liabilities that hid a prior loan on the Union Street

property (from Genesis Capital), among other liabilities; and (b) the submission of a falsified

2016 DMI P&L that overstated DMI's income by more than $2 million.

**Bank Fraud/Bank Fraud Conspiracy / The Federal Savings Bank / $9.5 million loan & $6.5**
**million loan**
**(Charged in Counts 29, 30, 31 & 32 in the Eastern District of Virginia Superseding Indictment)**

52.    Between April 2016 and January 2017, MANAFORT conspired to intentionally defraud,

and did defraud, The Federal Savings Bank in connection with his applications for the following

two loans: (a) a loan for approximately $9.5 million related to various properties, including a

house in Bridgehampton, New York, and (b) a loan for approximately $6.5 million related to his

Union Street property. During the course of the fraudulent scheme, MANAFORT made and

caused to be made a series of false and fraudulent material representations to the bank in order to

secure both loans, including the following: (a) MANAFORT provided the bank with doctored

P&Ls for DMI for both 2015 and 2016, overstating its income by millions of dollars; and (b)

MANAFORT falsely represented to The Federal Savings Bank that he had lent his credit card to

a friend who had incurred more than $200,000 in charges relating to the purchase of Yankee

tickets.

53.    Both loans were extended by The Federal Savings Bank.



54.    The Federal Savings Bank was a financial institution chartered by the United States.


ROBERT S. MUELLER, III
Special Counsel

By:

Andrew Weissmann
Jeannie S. Rhee
Greg D. Andres
Kyle R. Freeny
Senior/Assistant Special Counsels

Page **23** of **24**

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorneys Kevin Downing, Thomas Zehnle, and Richard Westling. I am fully satisfied with the legal representation by them, who I have chosen to represent me herein. Nothing about the quality of the representation of other counsel is affecting my decision herein to plead guilty. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorneys in connection with this Agreement and matters related to it.

Date: ___9-14-18___

_____
Paul J. Manafort, Jr.
Defendant

## ATTORNEYS' ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, Paul J. Manafort, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: ___9-14-18___

_____
Kevin M. Downing
Richard W. Westling
Thomas E. Zehnle
Attorneys for Defendant

Page **24** of **24**

# ATTACHMENT C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



FILED
IN OPEN COURT

FEB 2 2 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO.  1:18 Cr. 83 (TSE)(S-1) |
| | * | |
| v. | * | COUNTS 1–5: 26 U.S.C. § 7206(1); 18 |
| | * | U.S.C. §§ 2 and 3551 et seq. |
| | * | Subscribing to False United States |
| | * | Individual Income Tax Returns |
| PAUL J. MANAFORT, JR., | * | |
| (Counts 1 through 5, 11 through 14, and | * | COUNTS 6–10: 26 U.S.C. § 7206(2); 18 |
| 24 through 32) | * | U.S.C. § 3551 et seq. |
| | * | Assisting in the Preparation of False |
| and | * | United States Individual Income |
| | * | |
| RICHARD W. GATES III, | * | |
| (Counts 6 through 10 and 15 through 32) | * | COUNTS 11–14:  31 U.S.C. §§ 5314 and |
| | * | 5322(a); 18 U.S.C. §§ 2 and 3551 et seq. |
| Defendants. | * | Failure To File Reports Of Foreign Bank |
| | * | And Financial Accounts |
| | * | |
| | * | COUNTS 15–19:  26 U.S.C. § 7206(1); |
| | * | 18 U.S.C. §§ 2 and 3551 et seq. |
| | * | Subscribing to False United States |
| | * | Individual Income Tax Returns |
| | * | |
| | * | COUNT 20: 26 U.S.C. § 7206(1); 18 |
| | * | U.S.C. §§ 2 and 3551 et seq. |
| | * | Subscribing to a False Amended United |
| | * | States Individual Income Tax Return |
| | * | |
| | * | COUNTS 21–23: 31 U.S.C. §§ 5314 and |
| | * | 5322(a); 18 U.S.C. §§ 2 and 3551 et seq. |
| | * | Failure To File Reports Of Foreign Bank |
| | * | And Financial Accounts |
| | * | |
| | * | COUNT 24: 18 U.S.C. §§ 1349 and 3551 |
| | * | et seq. |
| | * | Bank Fraud Conspiracy |
| | * | |
| | * | COUNT 25: 18 U.S.C. §§ 1344, 2, and |
| | * | 3551 et seq. |
| | * | Bank Fraud |

| | |
|---|---|
| * | COUNT 26: 18 U.S.C. §§ 1349 and 3551 |
| * | et seq. |
| * | Bank Fraud Conspiracy |
| * | |
| * | COUNTS 27: 18 U.S.C. §§ 1344, 2, and |
| * | 3551 et seq. |
| * | Bank Fraud |
| * | |
| * | COUNT 28–29: 18 U.S.C. §§ 1349 and |
| * | 3551 et seq. |
| * | Bank Fraud Conspiracy |
| * | |
| * | COUNT 30: 18 U.S.C. §§ 1344, 2, and |
| * | 3551 et seq. |
| * | Bank Fraud |
| * | |
| * | COUNT 31: 18 U.S.C. §§ 1349 and 3551 |
| * | et seq. |
| * | Bank Fraud Conspiracy |
| * | |
| * | COUNT 32: 18 U.S.C. §§ 1344, 2, and |
| * | 3551 et seq. |
| * | Bank Fraud |
| * | |
| * | FORFEITURE NOTICE |
| * | |
| * | |

*******

## SUPERSEDING INDICTMENT

February 2018 Term – At Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

## Introduction

At all times relevant to this Superseding Indictment:

1. Defendants PAUL J. MANAFORT, JR. (MANAFORT) and RICHARD W. GATES III (GATES) served for years as political consultants and lobbyists. Between at least 2006 and 2015,

MANAFORT and GATES acted as unregistered agents of a foreign government and foreign political parties. Specifically, they represented the Government of Ukraine, the President of Ukraine (Victor Yanukovych, who was President from 2010 to 2014), the Party of Regions (a Ukrainian political party led by Yanukovych), and the Opposition Bloc (a successor to the Party of Regions after Yanukovych fled to Russia).

2.      MANAFORT and GATES generated tens of millions of dollars in income as a result of their Ukraine work. From approximately 2006 through the present, MANAFORT and GATES engaged in a scheme to hide income from United States authorities, while enjoying the use of the money. During the first part of the scheme between approximately 2006 and 2015, MANAFORT, with GATES' assistance, failed to pay taxes on this income by disguising it as alleged "loans" from nominee offshore corporate entities and by making millions of dollars in unreported payments from foreign accounts to bank accounts they controlled and United States vendors. MANAFORT also used the offshore accounts to purchase United States real estate, and MANAFORT and GATES used the undisclosed income to make improvements to and refinance their United States properties.

3.      In the second part of the scheme, between approximately 2015 and at least January 2017, when the Ukraine income dwindled after Yanukovych fled to Russia, MANAFORT, with the assistance of GATES, extracted money from MANAFORT's United States real estate by, among other things, using those properties as collateral to obtain loans from multiple financial institutions. MANAFORT and GATES fraudulently secured more than twenty million dollars in loans by falsely inflating MANAFORT's and his company's income and by failing to disclose existing debt in order to qualify for the loans.

4.      In furtherance of the scheme, MANAFORT and GATES funneled millions of dollars in

3

payments into numerous foreign nominee companies and bank accounts, opened by them and their accomplices in nominee names and in various foreign countries, including Cyprus, Saint Vincent & the Grenadines (Grenadines), and the Seychelles. MANAFORT and GATES hid the existence and ownership of the foreign companies and bank accounts, falsely and repeatedly reporting to their tax preparers and to the United States that they had no foreign bank accounts.

5.      In furtherance of the scheme, MANAFORT used his hidden overseas wealth to enjoy a lavish lifestyle in the United States, without paying taxes on that income. MANAFORT, without reporting the income to his tax preparer or the United States, spent millions of dollars on luxury goods and services for himself and his extended family through payments wired from offshore nominee accounts to United States vendors. MANAFORT also used these offshore accounts to purchase multi-million dollar properties in the United States and to improve substantially another property owned by his family.

6.      In furtherance of the scheme, GATES used millions of dollars from these offshore accounts to pay for his personal expenses, including his mortgage, children's tuition, and interior decorating and refinancing of his Virginia residence.

7.      In total, more than $75,000,000 flowed through the offshore accounts. MANAFORT, with the assistance of GATES, laundered more than $30,000,000, income that he concealed from the United States Department of the Treasury (Treasury), the Department of Justice, and others. GATES obtained more than $3,000,000 from the offshore accounts, income that he too concealed from the Treasury, the Department of Justice, and others.

4

## Relevant Individuals And Entities

8.    MANAFORT was a United States citizen.  He resided in homes in Virginia, Florida, and Long Island, New York.

9.    GATES was a United States citizen.  He resided in Virginia.

10.    In 2005, MANAFORT and another partner created Davis Manafort Partners, Inc. (DMP) to engage principally in political consulting.  DMP had staff in the United States, Ukraine, and Russia.  In 2011, MANAFORT created DMP International, LLC (DMI) to engage in work for foreign clients, in particular political consulting, lobbying, and public relations for the Government of Ukraine, the Party of Regions, and members of the Party of Regions.  DMI was a partnership solely owned by MANAFORT and his spouse.  GATES worked for both DMP and DMI and served as MANAFORT's right-hand man.

11.    The Party of Regions was a pro-Russia political party in Ukraine.  Beginning in approximately 2006, it retained MANAFORT, through DMP and then DMI, to advance its interests in Ukraine, the United States, and elsewhere, including the election of its slate of candidates.  In 2010, its candidate for President, Yanukovych, was elected President of Ukraine.  In 2014, Yanukovych fled Ukraine for Russia in the wake of popular protests of widespread governmental corruption.  Yanukovych, the Party of Regions, and the Government of Ukraine were MANAFORT, DMP, and DMI clients.

12.    MANAFORT and GATES owned or controlled the following entities, which were used in the scheme (the MANAFORT–GATES entities):

### Domestic Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Bade LLC (RG) | January 2012 | Delaware |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Daisy Manafort, LLC (PM) | August 2008 | Virginia |
| | March 2011 | Florida |
| Davis Manafort International LLC (PM) | March 2007 | Delaware |
| DMP (PM) | March 2005 | Virginia |
| | March 2011 | Florida |
| Davis Manafort, Inc. (PM) | October 1999 | Delaware |
| | November 1999 | Virginia |
| DMI (PM) | June 2011 | Delaware |
| | March 2012 | Florida |
| Global Sites LLC (PM, RG) | July 2008 | Delaware |
| Jemina LLC (RG) | July 2008 | Delaware |
| Jesand Investment Corporation (PM) | April 2002 | Virginia |
| Jesand Investments Corporation (PM) | March 2011 | Florida |
| John Hannah, LLC (PM) | April 2006 | Virginia |
| | March 2011 | Florida |
| Jupiter Holdings Management, LLC (RG) | January 2011 | Delaware |
| Lilred, LLC (PM) | December 2011 | Florida |
| LOAV Ltd. (PM) | April 1992 | Delaware |
| MC Brooklyn Holdings, LLC (PM) | November 2012 | New York |
| MC Soho Holdings, LLC (PM) | January 2012 | Florida |
| | April 2012 | New York |
| Smythson LLC (also known as Symthson LLC) (PM, RG) | July 2008 | Delaware |

Cypriot Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Actinet Trading Limited (PM, RG) | May 2009 | Cyprus |
| Black Sea View Limited (PM, RG) | August 2007 | Cyprus |
| Bletilla Ventures Limited (PM, RG) | October 2010 | Cyprus |
| Cavenari Investments Limited (RG) | December 2007 | Cyprus |
| Global Highway Limited (PM, RG) | August 2007 | Cyprus |
| Leviathan Advisors Limited (PM, RG) | August 2007 | Cyprus |
| LOAV Advisors Limited (PM, RG) | August 2007 | Cyprus |
| Lucicle Consultants Limited (PM, RG) | December 2008 | Cyprus |
| Marziola Holdings Limited (PM) | March 2012 | Cyprus |
| Olivenia Trading Limited (PM, RG) | March 2012 | Cyprus |
| Peranova Holdings Limited (Peranova) (PM, RG) | June 2007 | Cyprus |
| Serangon Holdings Limited (PM, RG) | January 2008 | Cyprus |
| Yiakora Ventures Limited (PM) | February 2008 | Cyprus |

Other Foreign Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Global Endeavour Inc. (also known as Global Endeavor Inc.) (PM) | *Unknown* | Grenadines |
| Jeunet Ltd. (PM) | August 2011 | Grenadines |
| Pompolo Limited (PM, RG) | April 2013 | United Kingdom |

7

13.   The Internal Revenue Service (IRS) was a bureau in the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the Treasury.

### The Tax Scheme

MANAFORT And GATES' Wiring Money From Offshore Accounts Into The United States

14.   In order to use the money in the offshore nominee accounts of the MANAFORT–GATES entities without paying taxes on it, MANAFORT and GATES caused millions of dollars in wire transfers from these accounts to be made for goods, services, and real estate. They did not report these transfers as income.

15.   From 2008 to 2014, MANAFORT caused the following wires, totaling over $12,000,000, to be sent to the vendors listed below for personal items. MANAFORT did not pay taxes on this income, which was used to make the purchases.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| Vendor A (Home Improvement Company in the Hamptons, New York) | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |

8

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |

9

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | Global Endeavour Inc. | Grenadines | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | **Vendor A Total** | **$5,434,793** |
| **Vendor B** (Home Automation, Lighting and Home Entertainment Company in Florida) | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 11/5/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | | | **Vendor B Total** | **$1,319,281** |
| **Vendor C** (Antique Rug Store in Alexandria, Virginia) | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |

10

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | **Vendor C Total** | **$934,350** |
| **Vendor D** (Related to Vendor C) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | **Vendor D Total** | **$100,000** |
| **Vendor E** (Men's Clothing Store in New York) | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |
| | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 10/15/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/24/2014 | Global Endeavour Inc. | Grenadines | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |
| | | | **Vendor E Total** | **$849,215** |
| **Vendor F** (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | **Vendor F Total** | **$655,500** |
| **Vendor G** (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | **Vendor G Total** | **$623,910** |
| **Vendor H** (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | **Vendor H Total** | **$520,440** |
| **Vendor I** (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | **Vendor I Total** | **$500,000** |
| **Vendor J** (Contractor in Florida) | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | **Vendor J Total** | **$432,487** |
| **Vendor K** (Landscaper in the Hamptons, New York) | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | | | **Vendor K Total** | **$164,740** |
| **Vendor L** (Payments Relating to Three Range Rovers) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | **Vendor L Total** | **$163,705** |
| **Vendor M** | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Contractor in Virginia) | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |
| | | | **Vendor M Total** | **$125,650** |
| **Vendor N** (Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, New York) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | **Vendor N Total** | **$112,825** |
| **Vendor O** (Purchase of Mercedes Benz) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |
| | | | **Vendor O Total** | **$62,750** |
| **Vendor P** (Purchase of Range Rover) | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Vendor P Total** | **$47,000** |
| **Vendor Q** (Property Management Company in South Carolina) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| **Vendor R** (Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| **Vendor S** | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |

14

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|-------|------------------|----------------------------|------------------------|------------------------|
| (Housekeeping in New York) | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

16.    In 2012, MANAFORT caused the following wires to be sent to the entities listed below to purchase the real estate also listed below. MANAFORT did not report the money used to make these purchases on his 2012 tax return.

| Property Purchased | Payee | Date | Originating Account | Country of Origin | Amount |
|--------------------|-------|------|---------------------|-------------------|--------|
| Howard Street Condominium (New York) | DMP International LLC | 2/1/2012 | Peranova | Cyprus | $1,500,000 |
| Union Street Brownstone, (New York) | Attorney Account Of [Real Estate Attorney] | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,800,000 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,200,000 |
| Arlington House (Virginia) | Real Estate Trust | 8/31/2012 | Lucicle Consultants Limited | Cyprus | $1,900,000 |
| | | | | **Total** | **$6,400,000** |

17.    MANAFORT and GATES also disguised, as purported "loans," more than $10 million transferred from Cypriot entities, including the overseas MANAFORT–GATES entities, to domestic entities owned by MANAFORT. For example, a $1.5 million wire from Peranova to DMI that MANAFORT used to purchase real estate on Howard Street in Manhattan, New York, was recorded as a "loan" from Peranova to DMI, rather than as income. The following loans were shams designed to reduce fraudulently MANAFORT's reported taxable income.

| Year | Payor / Ostensible "Lender" | Payee / Ostensible "Borrower" | Country of Origin | Total Amount of "Loans" |
|------|------------------------------|-------------------------------|-------------------|-------------------------|
| 2008 | Yiakora Ventures Limited | Jesand Investment Corporation | Cyprus | $8,120,000 |
| 2008 | Yiakora Ventures Limited | DMP | Cyprus | $500,000 |
| 2009 | Yiakora Ventures Limited | DMP | Cyprus | $694,000 |
| 2009 | Yiakora Ventures Limited | Daisy Manafort, LLC | Cyprus | $500,000 |
| 2012 | Peranova | DMI | Cyprus | $1,500,000 |
| 2014 | Telmar Investments Ltd. | DMI | Cyprus | $900,000 |
| 2015 | Telmar Investments Ltd. | DMI | Cyprus | $1,000,000 |
| | | | Total | $13,214,000 |

18.    From 2010 to 2014, GATES caused the following wires, totaling more than $3,000,000, to be sent to entities and bank accounts of which he was a beneficial owner or he otherwise controlled. GATES did not report this income on his tax returns.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|-------|------------------|----------------------------|------------------------|-----------------------|
| Richard Gates United Kingdom Bank Account A | 3/26/2010 | Serangon Holdings Limited | Cyprus | $85,000 |
| | 4/20/2010 | Serangon Holdings Limited | Cyprus | $50,000 |
| | 5/6/2010 | Serangon Holdings Limited | Cyprus | $150,000 |
| Richard Gates United Kingdom Bank Account B | 9/7/2010 | Serangon Holdings Limited | Cyprus | $160,000 |
| | 10/13/2010 | Serangon Holdings Limited | Cyprus | $15,000 |
| Richard Gates United States Bank Account C | 9/27/2010 | Global Highway Limited | Cyprus | $50,000 |
| | | **2010 Tax Year Total** | | **$510,000** |
| Jemina LLC United States Bank Account D | 9/9/2011 | Peranova | Cyprus | $48,500 |
| Richard Gates United Kingdom Bank Account B | 12/16/2011 | Peranova | Cyprus | $100,435 |
| | | **2011 Tax Year Total** | | **$148,935** |
| Richard Gates United Kingdom Bank Account B | 1/9/2012 | Global Highway Limited | Cyprus | $100,000 |
| | 1/13/2012 | Peranova | Cyprus | $100,435 |
| | 2/29/2012 | Global Highway Limited | Cyprus | $28,500 |
| | 3/27/2012 | Bletilla Ventures Limited | Cyprus | $18,745 |

16

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 4/26/2012 | Bletilla Ventures Limited | Cyprus | $26,455 |
| | 5/30/2012 | Bletilla Ventures Limited | Cyprus | $15,000 |
| | 5/30/2012 | Lucicle Consultants Limited | Cyprus | $14,650 |
| | 6/27/2012 | Bletilla Ventures Limited | Cyprus | $18,745 |
| | 8/2/2012 | Bletilla Ventures Limited | Cyprus | $28,745 |
| | 8/30/2012 | Bletilla Ventures Limited | Cyprus | $38,745 |
| | 9/27/2012 | Bletilla Ventures Limited | Cyprus | $32,345 |
| | 10/31/2012 | Bletilla Ventures Limited | Cyprus | $46,332 |
| | 11/20/2012 | Bletilla Ventures Limited | Cyprus | $48,547 |
| | 11/30/2012 | Bletilla Ventures Limited | Cyprus | $38,532 |
| | 12/21/2012 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | 12/28/2012 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | | | **2012 Tax Year Total** | **$651,448** |
| Richard Gates United Kingdom Bank Account B | 1/11/2013 | Bletilla Ventures Limited | Cyprus | $47,836 |
| | 1/22/2013 | Bletilla Ventures Limited | Cyprus | $34,783 |
| | 1/30/2013 | Bletilla Ventures Limited | Cyprus | $46,583 |
| | 2/22/2013 | Bletilla Ventures Limited | Cyprus | $46,233 |
| | 2/28/2013 | Bletilla Ventures Limited | Cyprus | $46,583 |
| | 3/1/2013 | Bletilla Ventures Limited | Cyprus | $42,433 |
| | 3/15/2013 | Bletilla Ventures Limited | Cyprus | $37,834 |
| | 4/15/2013 | Bletilla Ventures Limited | Cyprus | $59,735 |
| | 4/26/2013 | Bletilla Ventures Limited | Cyprus | $48,802 |
| | 5/17/2013 | Olivenia Trading Limited | Cyprus | $57,798 |
| | 5/30/2013 | Actinet Trading Limited | Cyprus | $45,622 |
| | 6/13/2013 | Lucicle Consultants Limited | Cyprus | $76,343 |
| | 8/7/2013 | Pompolo Limited | United Kingdom | $250,784 |
| | 9/6/2013 | Lucicle Consultants Limited | Cyprus | $68,500 |
| | 9/13/2013 | Cypriot Agent | Cyprus | $179,216 |
| Jemina LLC United States Bank Account D | 7/8/2013 | Marziola Holdings Limited | Cyprus | $72,500 |
| | 9/4/2013 | Marziola Holdings Limited | Cyprus | $89,807 |
| | 10/22/2013 | Cypriot Agent | Cyprus | $119,844 |
| | 11/12/2013 | Cypriot Agent | Cyprus | $80,000 |
| | 12/20/2013 | Cypriot Agent | Cyprus | $90,000 |
| | | | **2013 Tax Year Total** | **$1,541,237** |
| Jemina LLC United States Bank Account D | 2/10/2014 | Cypriot Agent | Cyprus | $60,044 |
| | 4/29/2014 | Cypriot Agent | Cyprus | $44,068 |
| | 10/6/2014 | Global Endeavour Inc. | Grenadines | $65,000 |

17

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| Bade LLC United States Bank Account E | 11/25/2014 | Global Endeavour Inc. | Grenadines | $120,000 |
| | | | 2014 Tax Year Total | $289,112 |

## MANAFORT And GATES' Hiding Foreign Bank Accounts And False Filings

19.     United States citizens who have authority over certain foreign bank accounts—whether or not the accounts are set up in the names of nominees who act for their principals—have reporting obligations to the United States.

20.     First, the Bank Secrecy Act and its implementing regulations require United States citizens to report to the Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeds $10,000 at any point during the year.  This is commonly known as a foreign bank account report or "FBAR."  The Bank Secrecy Act requires these reports because they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.  The Treasury's Financial Crimes Enforcement Network (FinCEN) is the custodian for FBAR filings, and FinCEN provides access to its FBAR database to law enforcement entities, including the Federal Bureau of Investigation.  The reports filed by individuals and businesses are used by law enforcement to identify, detect, and deter money laundering that furthers criminal enterprise activity, tax evasion, and other unlawful activities.

21.     Second, United States citizens also are obligated to report information to the IRS regarding foreign bank accounts.  For instance, in 2010, Schedule B of IRS Form 1040 had a "Yes" or "No" box to record an answer to the question: "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a

18

bank account, securities account, or other financial account?" If the answer was "Yes," then the form required the taxpayer to enter the name of the foreign country in which the financial account was located.

22.     For each year in or about and between 2008 through at least 2014, MANAFORT had authority over foreign accounts that required an FBAR filing. Specifically, MANAFORT was required to report to the Treasury each foreign bank account held by the foreign MANAFORT–GATES entities noted above in paragraph 12 that bears the initials PM. No FBAR filings were made by MANAFORT for these accounts.

23.     For each year in or about and between 2010 through at least 2013, GATES had authority over foreign accounts that required an FBAR filing. Specifically, GATES was required to report to the United States Treasury each foreign bank account held by the foreign MANAFORT–GATES entities noted above in paragraph 12 that bears the initials RG, as well as United Kingdom Bank Accounts A and B noted in paragraph 18. No FBAR filings were made by GATES for these accounts.

24.     Furthermore, in each of MANAFORT's tax filings for 2008 through 2014, MANAFORT, with the assistance of GATES, represented falsely that he did not have authority over any foreign bank accounts. MANAFORT and GATES had repeatedly and falsely represented in writing to MANAFORT's tax preparer that MANAFORT had no authority over foreign bank accounts, knowing that such false representations would result in false tax filings in MANAFORT's name. For instance, on October 4, 2011, MANAFORT's tax preparer asked MANAFORT in writing: "At any time during 2010, did you [or your wife or children] have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?" On the same day, MANAFORT falsely responded "NO."

MANAFORT responded the same way as recently as October 3, 2016, when MANAFORT's tax preparer again emailed the question in connection with the preparation of MANAFORT's tax returns: "Foreign bank accounts etc.?" MANAFORT responded on or about the same day: "NONE."

25. In each of GATES' tax filings for 2010 through 2013, GATES represented falsely that he did not have authority over any foreign bank accounts. GATES had repeatedly and falsely represented to his tax preparers that he had no authority over foreign bank accounts, knowing that such false representations would result in false tax filings. As recently as October 2017, in preparation for his amended 2013 tax filing, GATES was asked by his tax preparer: "Did you have any foreign assets/bank accounts during 2013 or 2014?" to which he responded "no."

## The Financial Institution Scheme

26. Between in or around 2015 and the present, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, MANAFORT, GATES, and others devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud, and to obtain money and property, by means of false and fraudulent pretenses, representations, and promises, from banks and other financial institutions. As part of the scheme, MANAFORT and GATES repeatedly provided and caused to be provided false information to banks and other lenders, among others.

MANAFORT And GATES' Fraud To Access Offshore Money

27. When they were flush with Ukraine funds, MANAFORT, with the assistance of GATES, used their offshore accounts to purchase and improve real estate in the United States. When the income from Ukraine dwindled in 2014 and 2015, MANAFORT, with the assistance of GATES, obtained millions of dollars in mortgages on the United States properties, thereby allowing

MANAFORT to have the benefits of liquid income without paying taxes on it. MANAFORT and GATES defrauded the lenders in various ways, including by lying about MANAFORT's and DMI's income, lying about their debt, and lying about MANAFORT's use of the property and the loan proceeds. For example, MANAFORT and GATES submitted fabricated profit and loss statements (P&Ls) that inflated income, and they caused others to provide doctored financial documents.

### A. The Loan From Lender A On The Union Street Property

28.     In 2012, MANAFORT, through a corporate vehicle called "MC Brooklyn Holdings, LLC" owned by him and his family, bought a brownstone on Union Street in the Carroll Gardens section of Brooklyn, New York. He paid approximately $3,000,000 in cash for the property. All of that money came from a MANAFORT–GATES entity in Cyprus. After purchase of the property, MANAFORT began renovations to transform it from a multi-family dwelling into a single-family home. MANAFORT used proceeds of a 2015 loan obtained from a financial institution to make the renovations. In order to obtain that loan, MANAFORT falsely represented to the bank that he did not derive more than 50% of his income/wealth from a country outside the United States.

29.     In late 2015 through early 2016, MANAFORT sought to borrow cash against the Union Street property from Lender A. Lender A provided greater loan amounts for "construction loans"—that is, loans that required the loan funds to be used to pay solely for construction on the property and thus increase the value of the property serving as the loan's collateral. The institution would thus loan money against the expected completed value of the property, which in the case of the Union Street property was estimated to be $8,000,000. In early 2016, MANAFORT was able to obtain a loan of approximately $5,000,000, after promising Lender A that approximately $1,400,000 of the loan would be used solely for construction on the Union Street property.

MANAFORT never intended to limit use of the proceeds to construction as required by the loan contracts and never did. In December 2015, before the loan was made, MANAFORT wrote his tax preparer, among others, that the "construction mortgage will allow me to pay back [another Manafort apartment] mortgage in full. . . ." Further, when the construction loan closed, MANAFORT used hundreds of thousands of dollars for purposes unrelated to the construction of the property.

### B. The Loan From Lender B On The Howard Street Property

30.    In 2012, MANAFORT, through a corporate vehicle called "MC Soho Holdings, LLC" owned by him and his family, bought a condominium on Howard Street in the Soho neighborhood of Manhattan, New York. He paid approximately $2,850,000. All the money used to purchase the condominium came from MANAFORT–GATES entities in Cyprus. MANAFORT used the property from at least January 2015 through at least August 2017 as an income-generating rental property, charging thousands of dollars a week on Airbnb, among other places. On his tax returns, MANAFORT took advantage of the beneficial tax consequences of owning this rental property.

31.    In late 2015 through early 2016, MANAFORT applied for a mortgage on the Howard Street condominium from Lender B for approximately $3.4 million. Because the bank would permit a greater loan amount if the property were owner-occupied, MANAFORT falsely represented to the lender and its agents that it was a secondary home used as such by his daughter and son-in-law and was not held as a rental property. In an email on January 6, 2016, MANAFORT noted: "[i]n order to have the maximum benefit, I am claiming Howard St. as a second home. Not an investment property." Later, on January 26, 2016, MANAFORT wrote to his son-in-law to advise him that when the bank appraiser came to assess the condominium, his son-in-law should "[r]emember, he believes that you and [MANAFORT's daughter] are living there."

22

32. MANAFORT, with GATES' assistance, also made a series of false and fraudulent representations to the bank in order to secure the millions of dollars in financing. For example, MANAFORT falsely represented the amount of debt he had by failing to disclose on his loan application the existence of the Lender A mortgage on his Union Street property. That liability would have risked his qualifying for the loan. Through its own due diligence, Lender B found evidence of the existing mortgage on the Union Street property. As a result, Lender B wrote to MANAFORT and GATES that the "application has the following properties as being owned free & clear . . . Union Street," but "[b]ased on the insurance binders that we received last night, we are showing that there are mortgages listed on these properties, can you please clarify[?]"

33. To cover up the falsity of the loan application, GATES, on MANAFORT's behalf, caused an insurance broker to provide Lender B false information, namely, an outdated insurance report that did not list the Union Street loan. MANAFORT and GATES knew such a representation was fraudulent. After GATES contacted the insurance broker and asked her to provide Lender B with false information, he updated MANAFORT by email on February 24, 2016. MANAFORT replied to GATES, on the same day: "good job on the insurance issues."

34. MANAFORT and GATES submitted additional false and fraudulent statements to Lender B. For example, MANAFORT submitted 2014 DMI tax returns to support his 2016 loan application to Lender B. Those tax returns included as a purported liability a $1.5 million loan from Peranova. Peranova was a Cypriot entity controlled by MANAFORT and GATES. On or about February 1, 2012, Peranova transferred $1.5 million to a DMI account in the United States, denominating the transfer as a loan so that MANAFORT would not have to declare the money as income. MANAFORT used the "loan" to acquire the Howard Street property.

35. When MANAFORT needed to obtain a loan from Lender B, the existence of the Peranova

23

"loan" undermined his creditworthiness. As a result of the listed Peranova liability, Lender B was not willing to make the loan to MANAFORT. To circumvent this issue, MANAFORT and GATES caused MANAFORT's tax accountant to send to Lender B back-dated documentation that falsely stated that the $1.5 million Peranova loan had been forgiven in 2015, and falsely inflated income for 2015 to mask MANAFORT's 2015 drop in income.

36.    In March 2016, Lender B approved the loan in the amount of approximately $3.4 million (the $3.4 million loan).

C.    The Loan From Lender C

37.    In approximately February 2016, MANAFORT applied for a business loan from Lender C. MANAFORT made a series of false statements to Lender C. For example, MANAFORT submitted a false statement of assets and liabilities that failed to disclosed the Lender A loan on the Union Street property and misrepresented, among other things, the amount of the mortgage on the Howard Street property.

38.    Further, in approximately March 2016, MANAFORT and GATES submitted a doctored 2015 DMI P&L that overstated DMI's 2015 income by more than $4 million. GATES asked DMI's bookkeeper to send him a "Word Document version of the 2015 P&L for [DMI]" because MANAFORT wanted GATES "to add the accrual revenue which we have not received in order to send to [Lender C]." The bookkeeper said she could send a .pdf version of the P&L. GATES then asked the bookkeeper to increase the DMI revenue, falsely claiming that: "[w]e have $2.4m in accrued revenue that [MANAFORT] wants added to the [DMI] 2015 income. Can you make adjustments on your end and then just send me a new scanned version[?]" The bookkeeper refused since the accounting method DMI used did not permit recording income before it was actually received.

24

39.     Having failed to secure a falsified P&L from the bookkeeper, GATES falsified the P&L. GATES wrote to MANAFORT and another conspirator, "I am editing Paul's 2015 P&L statement." GATES then sent the altered P&L to Lender C, which claimed approximately $4.45 million in net income, whereas the true P&L had less than $400,000 in net income.

D.     The Loan From Lender B On The Union Street Property

40.     In March 2016, MANAFORT, with the assistance of GATES and others, applied for a $5.5 million loan from Lender B on the Union Street property.    As part of the loan process, MANAFORT submitted a false statement of assets and liabilities that hid his prior loan from Lender A on the Union Street property, among other liabilities.    In addition, another conspirator on MANAFORT's behalf submitted a falsified 2016 DMI P&L. The falsified 2016 DMI P&L overstated DMI's income by more than $2 million, which was the amount that Lender B told MANAFORT he needed to qualify for the loan.    When the document was first submitted to Lender B, a conspirator working at Lender B replied: "Looks Dr'd. Can't someone just do a clean excel doc and pdf to me??" A subsequent version was submitted to the bank.

E.     The Loans From Lender D On The Bridgehampton And Union Street Properties

41.     In 2016, MANAFORT sought a mortgage on property in Bridgehampton, New York from a financial institution. In connection with his application, MANAFORT falsely represented to the bank that DMI would be receiving $2.4 million in income later in the year for work on a "democratic development consulting project."    To support this representation, GATES, on MANAFORT's behalf, provided the bank with a fake invoice for $2.4 million, directed "To Whom It May Concern," for "[s]ervices rendered per the consultancy agreement pertaining to the parliamentary elections."    The bank, unwilling to rely on the invoice to support MANAFORT's stated 2016 income, requested additional information. The bank was unable to obtain satisfactory

25

support for the stated income, and the loan application was denied.

42.     MANAFORT applied to a second bank, Lender D. Between approximately July 2016 and January 2017, MANAFORT, with the assistance of GATES, sought and secured approximately $16,000,000 in two loans from Lender D. MANAFORT used the Bridgehampton property as collateral for one loan, and the Union Street property for the other.

43.     MANAFORT and GATES made numerous false and fraudulent representations to secure the loans. For example, MANAFORT provided the bank with doctored P&Ls for DMI for both 2015 and 2016, overstating its income by millions of dollars. The doctored 2015 DMI P&L submitted to Lender D was the same false statement previously submitted to Lender C, which overstated DMI's income by more than $4 million. The doctored 2016 DMI P&L was inflated by MANAFORT by more than $3.5 million. To create the false 2016 P&L, on or about October 21, 2016, MANAFORT emailed GATES a .pdf version of the real 2016 DMI P&L, which showed a loss of more than $600,000. GATES converted that .pdf into a "Word" document so that it could be edited, which GATES sent back to MANAFORT. MANAFORT altered that "Word" document by adding more than $3.5 million in income. He then sent this falsified P&L to GATES and asked that the "Word" document be converted back to a .pdf, which GATES did and returned to MANAFORT. MANAFORT then sent the falsified 2016 DMI P&L .pdf to Lender D.

44.     In addition, Lender D questioned MANAFORT about a $300,000 delinquency on his American Express card, which was more than 90 days past due. The delinquency significantly affected MANAFORT's credit rating score. MANAFORT falsely represented to Lender D that he had lent his credit card to a friend, GATES, who had incurred the charges and had not reimbursed him. MANAFORT supplied Lender D a letter from GATES that falsely stated that

GATES had borrowed MANAFORT's credit card to make the purchases at issue and would pay him back by a date certain.

### Statutory Allegations

COUNTS ONE THROUGH FIVE
(Subscribing to False United States Individual Income
Tax Returns For 2010–2014 Tax Years)

45.     Paragraphs 1 through 44 are incorporated here.

46.     On or about the dates specified below, in the Eastern District of Virginia and elsewhere, defendant PAUL J. MANAFORT, JR., willfully and knowingly did make and subscribe, and aid and abet and cause to be made and subscribed, United States Individual Income Tax Returns, Forms 1040 and Schedule B, for the tax years set forth below, which returns contained and were verified by the written declaration of MANAFORT that they were made under penalties of perjury, and which returns MANAFORT did not believe to be true and correct as to every material matter, in that the returns (a) claimed that MANAFORT did not have a financial interest in and signature and other authority over a financial account in a foreign country and (b) failed to report income, whereas MANAFORT then and there well knew and believed that he had a financial interest in, and signature and other authority over, bank accounts in a foreign country and had earned total income in excess of the reported amounts noted below:

| COUNT | TAX YEAR | APPROX. FILING DATE | FOREIGN ACCOUNT REPORTED (Sch. B, Line 7a) | TOTAL INCOME REPORTED (Line 22) |
|---|---|---|---|---|
| 1 | 2010 | October 14, 2011 | None | $504,744 |
| 2 | 2011 | October 15, 2012 | None | $3,071,409 |
| 3 | 2012 | October 7, 2013 | None | $5,361,007 |
| 4 | 2013 | October 6, 2014 | None | $1,910,928 |
| 5 | 2014 | October 14, 2015 | None | $2,984,210 |

(26 U.S.C. § 7206(l); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNTS SIX THROUGH TEN
(Assisting in the Preparation of
False United States Individual Income
Tax Returns For 2010–2014 Tax Years)

47.    Paragraphs 1 through 44 are incorporated here.

48.    On or about the dates specified below, in the Eastern District of Virginia and elsewhere,

defendant RICHARD W. GATES III willfully and knowingly did aid and assist in, and procure,

counsel, and advise the preparation and presentation to the Internal Revenue Service, of a United

States Individual Income Tax Return, Form 1040 and Schedule B, of PAUL J. MANAFORT, JR.,

for the tax years set forth below, which returns were false and fraudulent as to a material matter,

in that the returns (a) claimed that MANAFORT did not have a financial interest in, and signature

and other authority over, a financial account in a foreign country and (b) failed to report income,

whereas GATES then and there well knew and believed that MANAFORT had a financial interest

in, and signature and other authority over, bank accounts in a foreign country and had earned total

income in excess of the reported amounts noted below:

| COUNT | TAX YEAR | APPROX. FILING DATE | FOREIGN ACCOUNT REPORTED (Sch. B, Line 7a) | TOTAL INCOME REPORTED (Line 22) |
|-------|----------|---------------------|---------------------------------------------|----------------------------------|
| 6 | 2010 | October 14, 2011 | None | $504,744 |
| 7 | 2011 | October 15, 2012 | None | $3,071,409 |
| 8 | 2012 | October 7, 2013 | None | $5,361,007 |
| 9 | 2013 | October 6, 2014 | None | $1,910,928 |
| 10 | 2014 | October 14, 2015 | None | $2,984,210 |

(26 U.S.C. § 7206(2); 18 U.S.C. § 3551 et seq.)

## COUNTS ELEVEN THROUGH FOURTEEN
(Failure To File Reports Of Foreign Bank And Financial
Accounts For Calendar Years 2011–2014)

49.    Paragraphs 1 through 44 are incorporated here.

50.    On the filing due dates listed below, in the Eastern District of Virginia and elsewhere,

defendant PAUL J. MANAFORT, JR., unlawfully, willfully, and knowingly did fail to file with the Treasury an FBAR disclosing that he had a financial interest in, and signature and other authority over, a bank, securities, and other financial account in a foreign country, which had an aggregate value of more than $10,000 in a 12-month period, during the years listed below:

| COUNT | YEAR | DUE DATE TO FILE FBAR |
|-------|------|------------------------|
| 11 | 2011 | June 29, 2012 |
| 12 | 2012 | June 30, 2013 |
| 13 | 2013 | June 30, 2014 |
| 14 | 2014 | June 30, 2015 |

(31 U.S.C. §§ 5314 and 5322(a); 18 U.S.C. §§ 2 and 3551 et seq.)

### COUNTS FIFTEEN THROUGH NINETEEN
(Subscribing to False United States Individual Income
Tax Returns For 2010–2014 Tax Years)

51.     Paragraphs 1 through 44 are incorporated here.

52.     On or about the dates specified below, in the Eastern District of Virginia and elsewhere, defendant RICHARD W. GATES III willfully and knowingly did make and subscribe, and aid and abet and cause to be made and subscribed, United States Individual Income Tax Returns, Forms 1040 and Schedule B, for the tax years set forth below, which returns contained and were verified by the written declaration of defendant GATES that they were made under penalties of perjury, and which returns defendant GATES did not believe to be true and correct as to every material matter, in that the returns (a) claimed that GATES did not have a financial interest in, and signature and other authority over, a financial account in a foreign country and (b) failed to report income, whereas GATES then and there well knew and believed that he had a financial interest in, and signature and other authority over, a financial account in a foreign country and had earned total income in excess of the reported amounts noted below:

| COUNT | TAX YEAR | APPROX. FILING DATE | FOREIGN ACCOUNT REPORTED (Sch. B, Line 7a) | TOTAL INCOME REPORTED (Line 22) |
|-------|----------|---------------------|---------------------------------------------|----------------------------------|
| 15 | 2010 | July 26, 2011 | None | $194,257 |
| 16 | 2011 | October 11, 2012 | None | $250,307 |
| 17 | 2012 | October 15, 2013 | None | $365,646 |
| 18 | 2013 | October 15, 2014 | None | $307,363 |
| 19 | 2014 | October 14, 2015 | None | $292,892 |

(26 U.S.C. § 7206(l); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNT TWENTY
(Subscribing to a False Amended United States Individual Income
Tax Return For 2013 Tax Year)

53.    Paragraphs 1 through 44 are incorporated here.

54.    On or about October 25, 2017, in the Eastern District of Virginia and elsewhere, defendant

RICHARD W. GATES III willfully and knowingly did make and subscribe, and aid and abet and

cause another to make and subscribe, a United States Individual Income Tax Return, Form 1040X,

for the 2013 tax year, which return contained and was verified by the written declaration of

defendant GATES that it was made under penalties of perjury, and which return defendant GATES

did not believe to be true and correct as to every material matter, in that the return failed to report

income, whereas GATES then and there well knew and believed that he had earned adjusted gross

income in excess of the reported amount on Line 1C, to wit: $292,055.

(26 U.S.C. § 7206(l); 18 U.S.C. §§ 2 and 3551 et seq.)

## COUNTS TWENTY-ONE THROUGH TWENTY-THREE
(Failure To File Reports Of Foreign Bank And Financial
Accounts For Calendar Years 2011–2013)

55.    Paragraphs 1 through 44 are incorporated here.

56.    On the filing due dates listed below, in the Eastern District of Virginia and elsewhere,

defendant RICHARD W. GATES III unlawfully, willfully, and knowingly did fail to file with the

Treasury an FBAR disclosing that he had a financial interest in, and signature authority over, a bank, securities, and other financial account in a foreign country, which had an aggregate value of more than $10,000 in a 12-month period, during the years listed below:

| COUNT | YEAR | DUE DATE TO FILE FBAR |
|-------|------|------------------------|
| 21 | 2011 | June 29, 2012 |
| 22 | 2012 | June 30, 2013 |
| 23 | 2013 | June 30, 2014 |

(31 U.S.C. §§ 5314 and 5322(a); 18 U.S.C. §§ 2 and 3551 et seq.)

### COUNT TWENTY-FOUR
(Bank Fraud Conspiracy / Lender B / $3.4 million loan)

57. Paragraphs 1 through 44 are incorporated here.

58. On or about and between December 2015 and March 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender B, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

### COUNT TWENTY-FIVE
(Bank Fraud / Lender B / $3.4 million loan)

59. Paragraphs 1 through 44 are incorporated here.

60. On or about and between December 2015 and March 2016, both dates being approximate

and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender B, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

(18 U.S.C. §§ 1344, 2, and 3551 et seq.)

## COUNT TWENTY-SIX
(Bank Fraud Conspiracy / Lender C / $1 million loan)

61.    Paragraphs 1 through 44 are incorporated here.

62.    On or about and between March 2016 and May 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender C, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

## COUNT TWENTY-SEVEN
(Bank Fraud / Lender C / $1 million loan)

63.    Paragraphs 1 through 44 are incorporated here.

64.    On or about and between December 2015 and March 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J.

MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender C, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

<div align="center">(18 U.S.C. §§ 1344, 2, and 3551 <u>et seq</u>.)</div>

<div align="center">

COUNT TWENTY-EIGHT
(Bank Fraud Conspiracy / Lender B / $5.5 million loan)

</div>

65. Paragraphs 1 through 44 are incorporated here.

66. On or about and between March 2016 and August 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender B, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

<div align="center">(18 U.S.C. §§ 1349 and 3551 <u>et seq</u>.)</div>

<div align="center">

COUNT TWENTY-NINE
(Bank Fraud Conspiracy / Lender D / $9.5 million loan)

</div>

67. Paragraphs 1 through 44 are incorporated here.

68. On or about and between April 2016 and November 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to

<div align="center">33</div>

execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

## COUNT THIRTY
(Bank Fraud / Lender D / $9.5 million loan)

69.    Paragraphs 1 through 44 are incorporated here.

70.    On or about and between April 2016 and November 2016, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

(18 U.S.C. § 1344, 2, and 3551 et seq.)

## COUNT THIRTY-ONE
(Bank Fraud Conspiracy / Lender D / $6.5 million loan)

71.    Paragraphs 1 through 44 are incorporated here.

72.    On or about and between April 2016 and January 2017, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally conspire to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which

34

were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

(18 U.S.C. §§ 1349 and 3551 et seq.)

## COUNT THIRTY-TWO
(Bank Fraud / Lender D / $6.5 million loan)

73.    Paragraphs 1 through 44 are incorporated here.

74.    On or about and between April 2016 and January 2017, both dates being approximate and inclusive, in the Eastern District of Virginia and elsewhere, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud one or more financial institutions, to wit: Lender D, the deposits of which were insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, and credits owned by and under the custody and control of such financial institution by means of materially false and fraudulent pretenses, representations, and promises.

(18 U.S.C. §§ 1344, 2, and 3551 et seq.)

## FORFEITURE NOTICE

75.    Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(2), in the event of the defendants' convictions under Counts Twenty-Four through Thirty-Two of this Superseding Indictment. Upon conviction of the offenses charged in Counts Twenty-Four through Thirty-Two, defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III shall forfeit to the United States any property constituting, or derived from, proceeds

35

obtained, directly or indirectly, as a result of such violation(s). Notice is further given that, upon conviction, the United States intends to seek a judgment against each defendant for a sum of money representing the property described in this paragraph, as applicable to each defendant (to be offset by the forfeiture of any specific property).

76.     The grand jury finds probable cause to believe that the property subject to forfeiture by PAUL J. MANAFORT, JR., includes, but is not limited to, the following listed assets:

> a.  All funds held in account number XXXXXX0969 at Lender D, and any property traceable thereto.

<div align="center">Substitute Assets</div>

77.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of any defendant

> a.     cannot be located upon the exercise of due diligence;
>
> b.     has been transferred or sold to, or deposited with, a third party;
>
> c.     has been placed beyond the jurisdiction of the court;
>
> d.     has been substantially diminished in value; or
>
> e.     has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853, to seek forfeiture of any other property of said defendant.

<div align="center">(18 U.S.C. § 982)</div>

<div align="center">36</div>

Robert S. Mueller, III
Special Counsel
Department of Justice

A TRUE BILL:
Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____

Foreperson

Date:  February 22, 2018

37

# ATTACHMENT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



FILED
IN OPEN COURT

AUG 2 1 2018

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA,          )
                                   )
        v.                         )
                                   )       **Criminal No. 1:18-CR-83**
PAUL J. MANAFORT, JR.,             )
        Defendant.                 )

## JURY VERDICT FORM

We the jury find as follows:

**COUNT 1:** Subscribing to False United States Individual Income Tax Return for 2010

_____ Not Guilty          ✓ Guilty


**COUNT 2:** Subscribing to False United States Individual Income Tax Return for 2011

_____ Not Guilty          ✓ Guilty


**COUNT 3:** Subscribing to False United States Individual Income Tax Return for 2012

_____ Not Guilty          ✓ Guilty


**COUNT 4:** Subscribing to False United States Individual Income Tax Return for 2013

_____ Not Guilty          ✓ Guilty


**COUNT 5:** Subscribing to False United States Individual Income Tax Return for 2014

_____ Not Guilty          ✓ Guilty

**COUNT 11:** Failure to File Reports of Foreign Bank and Financial Accounts 2011

___ Not Guilty      ___ Guilty      NO CONSENSUS    $\frac{G}{11}$ to $\frac{N}{1}$


**COUNT 12:** Failure to File Reports of Foreign Bank and Financial Accounts 2012

___ Not Guilty      ✓ Guilty


**COUNT 13:** Failure to File Reports of Foreign Bank and Financial Accounts 2013

___ Not Guilty      ✗ Guilty      NO CONSENSUS    $\frac{G}{11}$ to $\frac{N}{1}$


**COUNT 14:** Failure to File Reports of Foreign Bank and Financial Accounts 2014

___ Not Guilty      ✗ Guilty      NO CONSENSUS    $\frac{G}{11}$ to $\frac{N}{1}$


**COUNT 24:** Bank Fraud Conspiracy on or about December 2015 to March 2016

___ Not Guilty      ___ Guilty      NO CONSENSUS    $\frac{G}{11}$ to $\frac{N}{1}$


**COUNT 25:** Bank Fraud on or about December 2015 to March 2016

___ Not Guilty      ✓ Guilty


**COUNT 26:** Bank Fraud Conspiracy on or about March 2016 to May 2016

___ Not Guilty      ___ Guilty      NO CONSENSUS    $\frac{G}{11}$ to $\frac{N}{1}$

**COUNT 27:** Bank Fraud on or about December 2015 to March 2016

___ Not Guilty          ✓ Guilty


**COUNT 28:** Bank Fraud Conspiracy on or about March 2016 to August 2016

___ Not Guilty          ___ Guilty          NO CONSENSUS    G   N
                                                            11 to 1


**COUNT 29:** Bank Fraud Conspiracy on or about April 2016 to November 2016

___ Not Guilty          ___ Guilty
                                            G   N
                        NO CONSENSUS    11 to 1

**COUNT 30:** Bank Fraud on or about April 2016 to November 2016

___ Not Guilty          ___ Guilty
                                        G    N
                        NO CONSENSUS    11 to 1


**COUNT 31:** Bank Fraud Conspiracy on or about April 2016 to January 2017

                                            G   N
___ Not Guilty          ___ Guilty    NO CONSENSUS    11 to 1


**COUNT 32:** Bank Fraud on or about April 2016 to January 2017

                                                G   N
___ Not Guilty          ___ Guilty    NO CONSENSUS    11 to 1


**SO SAY WE ALL.**


08.21.18
Date

REDACTED

# ATTACHMENT E

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| PAUL J. MANAFORT, JR., | Crim. No. 1:18-cr-83 (TSE) |
| Defendant. | |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Special Counsel Robert S. Mueller, III, files this submission to address the sentencing of defendant Paul J. Manafort, Jr.

As an initial matter, the government agrees with the guidelines analysis in the Presentence Investigation Report (PSR) and its calculation of the defendant's Total Offense Level as 38 with a corresponding range of imprisonment of 235 to 293 months, a fine range of $50,000 to $24,371,497.74, a term of supervised release of up to five years, restitution in the amount of $24,815,108.74, and forfeiture in the amount of $4,412,500.

Second, while the government does not take a position as to the specific sentence to be imposed here, the government sets forth below its assessment of the nature of the offenses and the characteristics of the defendant under Title 18, United States Code, Section 3553(a). The defendant stands convicted of the serious crimes of tax fraud, bank fraud, and failing to file a foreign bank account report. Manafort was the lead perpetrator and a direct beneficiary of each offense. And while some of these offenses are commonly prosecuted, there was nothing ordinary about the millions of dollars involved in the defendant's crimes, the duration of his

criminal conduct, or the sophistication of his schemes.[1]  Together with the relevant criminal

conduct, Manafort's misconduct involved more than $16 million in unreported income resulting

in more than $6 million in federal taxes owed, more than $55 million hidden in foreign bank

accounts, and more than $25 million secured from financial institutions through lies resulting in

a fraud loss of more than $6 million.  Manafort committed these crimes over an extended period

of time, from at least 2010 to 2016.  His criminal decisions were not momentary or limited in

time; they were routine.  And Manafort's repeated misrepresentations to financial institutions

were brazen, at least some of which were made at a time when he was the subject of significant

national attention.

     Neither the Probation Department nor the government is aware of any mitigating factors.

Manafort did not commit these crimes out of necessity or hardship.  He was well educated,

professionally successful, and financially well off.  He nonetheless cheated the United States

Treasury and the public out of more than $6 million in taxes at a time when he had substantial

resources.  Manafort committed bank fraud to supplement his liquidity because his lavish

spending exhausted his substantial cash resources when his overseas income dwindled.

     Finally, Manafort pled guilty in September 2018 in the United States District Court for

the District of Columbia to others crimes committed over an even longer period.   The

government references those crimes below principally as they pertain to the Section 3553(a)

factors and, in particular, because they demonstrate the defendant's concerted criminality,

including the conduct to which he pled guilty, from as early as 2005 and continuing up until the

---

[1] Manafort was being investigated prior to the May 2017 appointment of the Special Counsel by
prosecutors in this district and the Criminal Division of the Department of Justice.  See Motion Hearing
Tr., May 4, 2018, at 4.

defendant's involvement in an obstruction of justice conspiracy between February 23, 2018 and April 2018—a crime Manafort committed while under indictment in two jurisdictions and subject to court-ordered bail conditions in each. The District of Columbia offenses are also relevant to the application of § 2S1.3(b)(2) of the Sentencing Guidelines to the FBAR offenses and to the issue of acceptance of responsibility, as discussed below.

In the end, Manafort acted for more than a decade as if he were above the law, and deprived the federal government and various financial institutions of millions of dollars. The sentence here should reflect the seriousness of these crimes, and serve to both deter Manafort and others from engaging in such conduct.

I.     **Procedural History**

On February 22, 2018, a grand jury sitting in the Eastern District of Virginia returned a 32-count Superseding Indictment charging Manafort and co-defendant Richard Gates with a series of crimes involving tax fraud, failure to file foreign bank account reports, and bank fraud. Superseding Indictment, Feb. 2, 2019, Doc. 9.

The defendant proceeded to trial on July 31, 2018 and, on August 21, the jury convicted the defendant on eight counts: Counts 1 through 5 (filing false income tax returns for the years 2010 to 2014); Count 12 (failing to file a report of foreign bank and financial accounts (FBAR) in 2012), and Counts 25 and 27 (bank fraud relating to a Citizens Bank loan for the Howard Street property in New York, and a Banc of California commercial loan, respectively). The jury did not reach a verdict on the remaining ten counts.[2]

---

[2] The Jury Verdict Form indicated that the jury voted eleven to one in favor of guilt on all ten counts for which it did not reach a verdict. See Jury Verdict Form, Aug. 21, 2018, Doc. 280.

## II.   Trial Evidence

Given the Court's familiarity with the trial evidence, the government only briefly outlines

it below.

### A.   Tax Charges

Manafort's tax returns were false as to the stated income and the fact that in each year

Manafort failed to report the existence of his overseas bank accounts.  The government proved

Manafort's unreported income through a series of payments from his overseas accounts to

vendors for various goods and services and for the purchase and improvement of real estate in

New York and Virginia.[3]  FBI Forensic Accountant Morgan Magionos traced each wire transfer,

detailing the banks and accounts over the period from 2010 to 2014, and calculated the total

---

[3]The evidence supporting the false returns included both testimony and documentary evidence.  Eight vendors testified about receiving payments from overseas accounts for goods, services, or real estate purchased by the defendant in the United States.  See Trial Tr. at 285-312 (Testimony of Maximillian Katzman from Alan Couture); id. at 312-29 (Testimony of Ronald Wall from House of Bijan); id. at 339-49 (Testimony of Daniel Opsut from American Service Center/Mercedes-Benz of Alexandria); id. at 349-59 (Testimony of Wayne Holland from McEnearney Associates); id. at 361-91 (Testimony of Stephen Jacobson from SP&C Home Improvement); id. at 393-410 (Testimony of Doug DeLuca from Federal Stone and Brick); id. at 435-461 (Testimony of Joel Maxwell from Big Picture Solutions); id. at 469-91 (Testimony of  Michael Regolizio from New Leaf Landscape).  This testimony was corroborated by invoices, banks statements, emails, and other documentary evidence.  See, e.g., Government Exhibit 94A (SP&C Home Improvement Invoices 2010-2014); Government Exhibit 95A (SP&C Home Improvement Bank Records); Government Exhibit 97A (Alan Couture Invoices 2010-2014); Government Exhibit 98 (Alan Couture Bank Records); Government Exhibit 99 (March 21, 2011 Email from Manafort to M. Katzman).  Evidence with respect to six additional vendors and three real estate purchases, and supporting documentation, was admitted by stipulation.  See e.g., Government Exhibit 327 (Stipulation Regarding Aegis Holdings, LLC); Government Exhibit 329 (Stipulation Regarding J&J Oriental Rug Gallery); Government Exhibit 332 (Stipulation Regarding Don Beyer Motors, Inc.); Government Exhibit 334 (Stipulation Regarding Sabatello Construction of Florida, Inc.); Government Exhibit 335 (Stipulation Regarding Scott L. Wilson Landscaping & Tree Specialists, Inc.); Government Exhibit 336 (Stipulation Regarding Sensoryphile, Inc.); Government Exhibit 328 (Stipulation Relating to the Purchase of 377 Union Street, Brooklyn, New York); Government Exhibit 330 (Stipulation Relating to the Purchase of 29 Howard Street #4, New York, New York); Government Exhibit 331 (Stipulation Relating to the Purchase of 1046 N. Edgewood Street, Arlington, Virginia).

4

amount to be \$15,571,046, as reflected on Government Exhibit 72 (attached as Exhibit A).[4]

Additionally, the government proved that Manafort further misrepresented his income by falsely

characterizing certain income as loans.[5]

IRS Revenue Agent Michael Welch testified that Manafort failed to report more than \$16

million in income on line 22 of his tax returns during tax years 2010 through 2014, as

documented in Government Exhibit 77 (attached as Exhibit B).[6]  Welch also testified that

Manafort failed to identify any of his foreign bank accounts on Schedule B, Line 7A for the

years from 2010 to 2014.[7]  The IRS has determined that Manafort owed \$6,164,032 in taxes for

his unreported income.  See PSR, ¶ 36.

**B.  FBAR Charges**

Manafort was found guilty of the Count 12 FBAR charge relating to 2012.  Under the

Sentencing Guidelines the FBAR charges in Counts 11, 13 and 14, for the years 2011, 2013, and

2014, respectively, constitute relevant conduct.  See PSR, ¶ 75.  FBI Forensic Accountant

Magionos, using a series of charts, testified that Manafort maintained 31 overseas accounts in

three countries and listed the aggregate maximum value in those accounts in each year from

2011 to 2014 as reflected on the following exhibits:[8]

- Government Exhibit 73B documented the aggregate maximum value of foreign bank
  accounts controlled by Manafort in 2011 that totaled approximately \$8.3 million;

---

[4] See Trial Tr. at 1617-20 (Testimony of Morgan Magionos).

[5] See Trial Tr. at 903-06 (Cindy LaPorta testified that Gates proposed changing the amount of Manafort's alleged loans to reduce his total taxable income); see id. at 1107-09 (Gates testified that at Manafort's direction he instructed Manafort's bookkeeper and tax preparers to treat certain income as loans to avoid paying taxes on the income).

[6] See Trial Tr. at 1679-82 (Testimony of Michael Welch).

[7] Id. at 1695-97.

[8] See Trial Tr. at 1620-24 (Testimony of Morgan Magionos).

- Government Exhibit 73C documented the aggregate maximum value of foreign bank accounts controlled by Manafort in 2012 that totaled approximately $25.7 million;

- Government Exhibit 73D documented the aggregate maximum value of foreign bank accounts controlled by Manafort in 2013 that totaled approximately $18.7 million;

- Government Exhibit 73E documented the aggregate maximum value of foreign bank accounts in 2014 that totaled approximately $2.7 million.[9]

Copies of Government Exhibits 73B, 73C, 73D and 73E are attached as Exhibit C.

## C. __Bank Frauds__

The jury convicted Manafort of the two bank fraud schemes charged in Counts 25 and 27.

Manafort sought both loans at a time when he was no longer receiving income from Ukraine.

Count 25 charged Manafort with defrauding Citizens Bank of $3.4 million relating to a

loan for property on Howard Street in New York, New York. As part of that fraud, the

government proved at trial that the defendant made, or caused to be made, the following three

material false statements between December 2015 and March 2016: (1) that the Howard Street

residence was his second home; (2) that a $1.5 million dollar loan from a Cyprus entity named

Peranova had been forgiven in the prior year; and (3) that there was no mortgage on Manafort's

Union Street property in Brooklyn, New York.[10] Two bank witnesses, Manafort's tax preparer

and bookkeeper, and Rick Gates testified to the details of the charged scheme. Their testimony

---

[9]Special Agent Paula Liss from the Financial Crimes Enforcement Network testified that no FBAR reports were filed by Manafort or his related entities in the relevant time period. _See_ Trial Tr. at 1080-81; 2293-94.

[10]_See_ Trial Tr. at 2409 (government summation identifying false statements relating to the Counts 24 and 25 Citizens Bank fraud/conspiracy charges involving the Howard Street property).

was corroborated by a series of emails, tax returns, and insurance documents, among other documentary evidence.[11]

Manafort was also convicted, in Count 27, of defrauding the Banc of California with respect to a $1 million dollar commercial loan. The government proved at trial that the defendant made, or caused to be made, the following material false statements: (1) omitting to report his Howard Street mortgage on his loan application; and (2) submitting a materially false 2015 DMP Profit and Loss Statement.[12] Among other evidence, Washkuhn and Gates testified about the false DMP Profit and Loss Statements submitted to the bank, with Gates explaining the various emails in which Manafort directed him to manipulate the relevant financial statement.[13]

---

[11]Melinda James (née Francis) from Citizens Bank testified that Manafort represented the Howard Street property to be a second home and that Manafort represented that there was no mortgage on the Union Street property. See Trial Tr. at 1747, 1755. Tax preparer Cindy LaPorta testified about her representations relating to the Peranova loan to Citizens Bank, nothwithstanding the fact that she had concerns it was never a loan at all, see Trial Tr. at 944-59, as did Gates, who also noted that money from Peranova was income and was never a loan, see Trial Tr. at 1297-1308. Bookkeeper Heather Washkuhn testified that at the time of the Howard Street loan, there was a mortgage on the Union Street property. See Trial Tr. at 596-601. The supporting documentary evidence included the following: Government Exhibit 227 (Manafort's bank application identifying the Howard Street property as a second residence); Government Exhibit 337L (2015 MC Soho Tax Return reporting $115,987 in rental income for Howard Street apartment); Government Exhibit 337M (2016 MC Soho Tax Return reporting $108,000 in rental income for Howard Street apartment); Government Exhibit 127 (February 5, 2015 email relating to rental income from the Howard Street apartment); Government Exhibit 503 (March 12, 2016 email relating to rental earnings generated from the Howard Street property); Government Exhibit 422 (January 26, 2016 email from Manafort to his son-in-law reminding him that the appraiser is coming to the Howard Street apartment, who believes that the son-in-law and his wife live in the apartment); Government Exhibit 118 (Airbnb records relating to the rental of the Howard Street apartment); Government Exhibit 500 (Stipulation regarding Genesis Capital mortgage on Union Street Property).

[12]See Trial Tr. at 2418-21 (government summation identifying false statements relating to the Counts 26 and 27 Banc of California commercial loan fraud/conspiracy).

[13]Gates testified that at Manafort's direction he altered the 2015 DMP Profit and Loss Statement that was ultimately sent to the Banc of California. See Trial Tr. at 1317-26. Washkuhn testified to the falsity of the submitted 2015 DMP Profit and Loss Statement. See Trial Tr. at 601-19. The supporting documentary evidence included among other evidence: Government Exhibit 140 (March 16, 2016 emails between Gates and Washkuhn involving the 2015 DMP Profit and Loss Statement); Government Exhibit 392 (March 16, 2016 email between Manafort and Gates involving the 2015 DMP Profit and Loss Statement); and Government Exhibit 298 (March 16, 2016 email from Manafort to Perris Kaufman

7

With respect to the three other bank frauds for which the jury failed to reach a verdict, one involving a $5.5 million loan from Citizens Bank (charged only as a conspiracy) and two involving loans from The Federal Savings Bank, one for $9.5 million and the other for $6.5 million, respectively, the defendant admitted to his involvement in each of these bank frauds as part of his guilty plea in the District of Columbia.[14]   The evidence at trial established those same facts through witness testimony and documentary evidence.[15]

With respect to the Union Street loan conspiracy involving Citizens Bank, charged in Count 28, Manafort pledged his property at 377 Union Street in Brooklyn, New York.  At the

attaching false 2015 DMP Profit and Loss Statement).  Gary Seferian, Senior Vice President of the Managed Assets Group at the Banc of California, testified about the loan process and the materiality of Manafort's false statements.  See Trial Tr. at 1958-88.

[14]Plea Agreement, United States v. Manafort, 1:17-cr-201 (ABJ) (D.D.C. Sept.14, 2018), Doc 422 ("D.C. Plea Agreement"); Statement of the Offenses and Other Acts, United States v. Manafort, 1:17-cr-201 (ABJ) (D.D.C. Sept.14, 2018), Doc 423 ("D.C. Statement of the Offense") (collectively attached as Exhibit D).

[15]With respect to the Citizens Bank Union Street loan, Manafort made, or caused to be made, the following misrepresentations: (a) he caused to be submitted a false 2016 DMP Profit and Loss Statement; and (b) he falsely claimed the Peranova loan was forgiven and made false statements about his income. See Trial Tr. at 2418-21 (government summation identifying false statements relating to Counts 28 Citizens Bank Union Street loan conspiracy).  Taryn Rodriguez from Citizens Bank testified about the loans process, see Trial Tr. at 1906-37, LaPorta testified about the Peranova loan issues, see id., at 947-59, as did Gates, see id. at 1326-30, and Washkuhn testified about the false DMP Profit and Loss Statement comparing it to the original she prepared, see id. at 631-32.  With respect to The Federal Savings Bank loans, Manafort made, or caused to be made, the following misrepresentations as to both loans: (a) he caused to be submitted a false 2015 DMP Profit and Loss Statement; (b) he caused to be submitted a false 2016 DMP Profit and Loss Statement; (c) he falsely claimed that the $300,000 delinquency on his American Express Card resulted from lending that credit card to Rick Gates to buy New York Yankees tickets; and (d) he made false statements about his mortgage on the Howard Street property.  See Trial Tr. at 2423-24 (government summation identifying false statements relating to the Counts 29, 30, 31 and 32 bank fraud/conspiracies relating to two loans from The Federal Savings Bank). Three bank witnesses testified about The Federal Savings Bank Loans: Dennis Raico, see Trial Tr. at 2008-77; James Brennan, id. at 2164-2199; and Andrew Chojnowski, see id. at 2129-43. Among other testimony, Washkuhn identified the various submitted DMP Profit and Loss Statements as false.  See Trial Tr. at 620-32.  Gates testified that he never sought to borrow Manafort's American Express card and that he did not incur the $300,000 delinquency for Yankees tickets, but rather that those tickets were for Manafort.  See Trial Tr. at 1352-54.

8

time of his application, the Union Street property was encumbered by a $5.3 million dollar loan

from Genesis Capital.  Manafort failed to disclose this mortgage to Citizens Bank at the time of

the Count 28 conspiracy, nor previously as part of the $3.4 million Citizens Howard Street loan

application (charged in Counts 24 and 25).  Taryn Rodriguez from Citizens Bank testified to this

fact, noting that she later found the loan on her own.[16]  At trial, Manafort never disputed the

existence of the Genesis Capital loan and in fact agreed to the underlying details in Government

Exhibit 500, a stipulation between the parties relating to the Genesis Capital loan on Union Street

property.

### III.     <u>Standards Governing Sentencing</u>

The Fourth Circuit has held that a sentencing court must: "(1) properly calculate the

[Sentencing] Guidelines range; (2) allow the parties to argue for the sentence they deem

appropriate and determine whether the § 3553(a) factors support the sentence[s] requested by the

parties; and (3) explain its reasons for selecting a sentence."  <u>United States v. Simmons</u>, 269 Fed.

Appx. 272, 273 (4th Cir. 2008) (citing <u>United States v. Pauley</u>, 511 F.3d 468, 473 (4th Cir.

2007)).  Although the Sentencing Guidelines are advisory, <u>United States v. Booker</u>, 543 U.S.

220, 246 (2005), "district courts must begin their analysis with the Guidelines and remain

cognizant of them throughout the sentencing process."  <u>Gall v. United States</u>, 552 U.S. 38, 50 n.

6 (2007); <u>see</u> <u>Rosales-Mireles v. United States</u>, 138 S. Ct. 1897, 1904 (2018) ("[E]ven in an

advisory capacity the Guidelines serve as 'a meaningful benchmark' in the initial determination

of a sentence and 'through the process of appellate review.'") (citation omitted).

---

[16] <u>See</u> Trial Tr. at 1911-1917.

## IV.     The Advisory Guidelines Range

The government agrees with the Probation Department's guidelines calculations in the PSR and addresses that analysis below together with the defendant's challenges.  See Defense Objections to the PSR (dated January 21, 2019).

### A.   Tax and FBAR Guidelines (Group 1)

#### 1.   Section 2S1.3 is the Relevant Guideline Provision

As noted in the PSR, the base offense level for the Group 1 tax and FBAR counts is level 6, pursuant to § 2S1.3(b)(2), with 22 levels added based on the value of the funds held—here, more than $55 million, pursuant to § 2B1.1(b)(1)(L).  See PSR ¶¶ 73-74.[17]

The defendant argues that the tax guidelines, and not § 2S1.3, is the appropriate starting point for the Group 1 FBAR and tax offenses, citing United States v. Kim, 1:17-cr-00248 (TSE/LMB) (E.D. Va. 2018).  See Defense Objections to the PSR, at 1-2.  As detailed in the PSR Addendum, the defendant's arguments lack merit.  See PSR Addendum, 52-53.

First, the Guidelines explicitly distinguish between the various reporting crimes at issue here (covered by § 2S1.3) and tax offenses (covered by Part T).  For example, the commentary to § 2S1.3, under the title "Statutory Provisions," explicitly lists 31 U.S.C. § 5313—the statute of which Manafort was convicted in Count 12.  Further, § 2S1.3(c)(1) addresses a reporting violation committed for the purposes of evading taxes, and specifically calls for use of the tax guidelines only if the resulting offense level is greater than the one determined under § 2S1.3.[18]

---

[17]The base offense level is 6 pursuant to § 2S1.3(b)(2) because the offense at issue is not enumerated in § 2S1.3(b)(1).

[18]Section 2S1.3(c)(1), entitled "Cross Reference," reading as follows: "If the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter

10

That criterion is not satisfied here: "the resulting offense level" under Chapter 2T of the

guidelines is less than the Chapter 2S calculation. See United States v. Hill, 171 Fed. Appx. 815,

821-22 (11th Cir. 2006) ("§ 2S1.3(c)(1) was not applicable because the offense level of 16 that

would have resulted from the court's application of U.S.S.G. § 2T1.1(a)(1), would have been less

than 17—the offense level that resulted from the court's application of § 2S1.3(a) & (b)(1)")

(footnote omitted).

   Moreover, Manafort's FBAR offense was not committed solely for allowing him to

violate the tax laws.  Rather, his use of and access to unreported overseas accounts also

facilitated the money laundering and unregistered-foreign-agent (FARA) schemes to which he

pled guilty in Count One of a superseding information in the District of Columbia.[19]

Accordingly, the tax guidelines are not appropriate here, both because the tax guidelines are not

higher, as required by § 2S1.3(c)(1),  and because the gravamen of the crime here was not solely

tax avoidance.

   As part of his plea in the District of Columbia, Manafort pleaded guilty to a conspiracy to

transfer funds from outside the United States to the United States with the intent to promote the

felony FARA violations.[20]  Manafort's scheme involved more than $6.5 million dollars in

transfers from the very overseas accounts that Manafort failed to report on his tax returns and

under the FBAR process.[21]

---

Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above."

[19]See D.C. Plea Agreement; D.C. Statement of the Offense ¶ 36-37.

[20]Id.

[21]Notably, in his objections to the PSR, the defendant falsely characterized his guilty plea in the District of Columbia as involving only a "general conspiracy to violate the Foreign Agents Registration Act,"

Finally, Manafort argues that the Part T guidelines are appropriate because they were used in older cases, such as United States v. Kim, supra, and thus should continue to be used to avoid unwarranted sentencing disparities for similar defendants. The government disagrees for two reasons. First, in late 2017, the Department of Justice's Tax Division clarified its interpretation as to the appropriate guidelines applicable to FBAR violations, and its current position is consistent with that of the Probation Office in this matter; and second, the facts at issue here differ from those of the Kim prosecution.

The Tax Division changed its position on the appropriate guideline provision in FBAR cases sometime in late 2017. Manafort was aware of the government's position prior to this trial, at the very least because the Special Counsel's Office made clear its view that the relevant guideline is § 2S1.3. Further, in Kim itself, the Tax Division and Probation Office took the position that the appropriate guideline was § 2S1.3. See Kim Plea Agreement, at 3-4 (attached as Government Exhibit E) ("The Government contends that the applicable Guideline in this matter should be U.S.S.G § 2S1.3(a)(2), § 2B1.1 and § 2S1.3(b)(2) because the defendant filed two false FBARs and a false U.S. Individual Income Tax Return, Form 1020, within a 12-month period. However, at the time that the defendant agreed to plead guilty, the Government consistently took the position with similarly situated defendants that the applicable Guideline was U.S.S.G. § 2T1.1 and § 2T1.4 due to the cross reference in § 2S1.3(c)(1). Therefore, in order to ensure that the defendant receives equitable treatment, and in accordance with Federal Rule of Criminal Procedure 11(c)(1)(B), the United States and the defendant will recommend to

---

Def. Obj. to PSR, at 3, without any mention to the fact that his plea also included a money laundering conspiracy, among other offenses. See D.C. Plea Agreement; D.C. Statement of the Offense ¶ 36-37.

the Court that the following provisions of the Sentencing Guidelines apply: [the Tax

Guidelines].”); Government Sentencing Brief, at 6 (attached as Government Exhibit F) (“The

defendant pled guilty to the willful failure to file an FBAR, in violation of 31 U.S.C. Sections

5314 and 5322.  The offense of conviction in this case falls under U.S.S.G. § 2S1.3.  The

Probation Office calculated the Guidelines range under U.S.S.G. § 2S1.3(a)(2)”).

Further, as noted, the circumstances of the Kim and Manafort prosecutions and the

conduct at issue are easily distinguished.  In Kim, the defendant entered into a negotiated plea

agreement which involved his cooperation, and the plea was entered into pursuant to Rule

11(c)(1)(B).  Manafort’s FBAR offenses, in contrast, served to facilitate his tax offenses and his

FARA and money laundering offenses.  Further, the Kim prosecution was part of a series of

prosecutions involving the use of overseas accounts to hide tax offenses, and thus the concern

over parity with similarly situated defendants prosecuted at the same time was at its height.

Calculating Manafort’s advisory Guidelines range under § 2S1.3 for an FBAR offense, even if he

is one of the first defendants to be sentenced in that manner, would not constitute disparate

treatment because his conduct, and the circumstances at issue, were different than in Kim.

## 2.  A Role Enhancement is Appropriate

The PSR concluded that Manafort should receive a four-level role enhancement for the

Group 1 offenses, pursuant § 3B1.1(a), on the basis that “the defendant was an organizer or

leader of a criminal activity that was otherwise extensive.”  PSR, ¶ 78.  The relevant test is the

number of persons involved in the offenses, whether they were witting or unwitting.  See United

States v. Harvey, 532 F.3d 326, 338 (4th Cir. 2008) (“The Application Note to U.S.S.G. § 3B1.1

explains that, in determining if a criminal activity is ‘otherwise extensive,’ all persons involved

during the course of the entire offense are to be considered, including outsiders who provided unwitting services and thus do not qualify as 'participants.'"); United States v. Ellis, 951 F.2d 580, 585 (4th Cir. 1991) (role enhancement based on "otherwise extensive" prong based on "'all persons involved during the course of the entire offense,' even the 'unknowing services of many outsiders'").

Manafort's criminal conduct meets this standard. Manafort controlled the money at issue, he recruited others to facilitate these crimes, and he claimed a larger share of the proceeds. Further, Manafort was plainly the leader. He involved numerous individuals who were both knowing and unknowing participants in the criminal scheme. These included Gates and Konstantin Kilimnik, Manafort's tax preparers (Ayliff, LaPorta, Naji Lakkis, Dan Walters, and Conor O'Brien) and bookkeepers (Hesham Ali and Washkuhn), and others in Cyprus who were involved in originating and maintaining the defendant's overseas accounts.[22] Under the factors set forth in the Guidelines application notes and applied by the Fourth Circuit, application of the leadership enhancement is warranted. See United States v. Jones, 495 F. App'x 371, 373 (4th Cir. 2012) ("In determining a defendant's leadership and organizational role, sentencing courts must consider seven factors: [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority

---

[22]The corporate entity and bank account documents relating to the overseas accounts listed a variety of individuals associated with Dr. Kypros Chrysostomides firm's, including Eleni Chrysostomides, Chrystalla Pitsilli Dekatris, Myrianthi Christou, Evelina Georgiades, and Georgoula Mavrides. See e.g., Government Exhibit 63 (chart of foreign entities); Government Exhibit 73B (chart listing bank accounts).

exercised over others. U.S.S.G. § 3B1.1, cmt. n.4.").[23]  Further, even to the extent that Gates profited from this scheme, including by stealing from Manafort, his profits from these crimes paled in comparison to Manafort's gain.

## B.  Bank Fraud Guidelines (Group 2)

### 1.  The PSR Correctly Calculated the Fraud Loss

The Probation Department assessed the fraud loss to be approximately $6 million for the counts of conviction for bank fraud together with the relevant conduct.  See PSR, at ¶ 87. Manafort contends that the assessed fraud loss is overstated because the Citizens Bank loan conspiracy relating to Union Street property charged in Count 28 never closed and, had it closed, Manafort speculates that he would have fully collateralized the loan, resulting in no loss.  See Defense Objections to PSR, at 4.  That argument ignores the trial evidence that the defendant did not intend the property he pledged as collateral to be used as such since he lied to the bank about the collateral, hiding the fact that the Union Street property had a mortgage.  At trial, the government proved that the Union Street property Manafort now claims he would have pledged as part of the loan charged in Count 28 was encumbered by a $5.3 million loan from Genesis

---

[23]In arguing against the application of a role enhancement, Manafort relies principally on the Guidelines' use of the phrase "criminal organization" and contends that role enhancements in § 3B1.1 are meant to be applied only "to leaders or managers of organizations that have a primary purpose of engaging in crime, such as foreign cartels that smuggle narcotics into the United States, or motorcycle gangs that unlawfully transport and distribute firearms."  Def. Obj. to PSR, at 5.  Manafort cites no case law endorsing his "not-in-white-collar-cases" reading of § 3B1.1, which cannot be reconciled with Fourth Circuit decisions such as Ellis and Harvey, supra.  The dog-track owner who bribed state legislators in Ellis, for example, may have done it for "the primary purpose of" helping his business, not "engaging in crime," see Def. Obj. to PSR, at 5, yet the Fourth Circuit affirmed application of the leadership enhancement to his scheme.  Ellis, 951 F.2d at 585; accord Harvey, 532 F.3d at 338 (defendant sentenced for honest-services fraud involving bribery in awarding Army contracts was assessed a role enhancement).  The defendant's argument, in short, lacks merit.

Capital at the time.[24]  Previously, the defendant applied for a loan from Citizens Bank on the Howard Street property (Counts 24 & 25), and also failed to disclose the Genesis loan on the Union Street property, which was one of several misrepresentations charged in the indictment and proven at trial.[25]

Because Manafort concealed the Genesis loan and intended to continue to do so, he is not entitled to credit based on the happenstance that the bank, through its own due diligence, eventually discovered the Genesis loan.  See United States v. Staples, 410 F.3d 484, 490-91 (8th Cir. 2005) ("We do not mean that the value of the collateral necessarily must be deducted from the intended loss; the defendant's intent is the touchstone. For example, if a car were collateral in a fraudulent loan procurement case, and the defendant were to hide the car, then the court should not deduct the value of the collateral from the *intended loss* because under those circumstances the defendant intended the loss to encompass the value of the collateral.") (emphasis added).

## 2.  **The Sophisticated Means Enhancement Is Appropriate**

The Probation Department assessed a two-level enhancement on the Group 2 offenses for the use of sophisticated means pursuant to USSG § 2B1.1(b)(10)(c).  PSR ¶ 88.  The defendant

---

[24]See Government Exhibit 500 (Stipulation relating to Genesis Capital); Trial Tr, at 1911-17 (Taryn Rodriguez from Citizens Bank testified that Manafort did not list the mortgage from Genesis Capital for 377 Union Street, Brooklyn, New York on his application for the Union Street loan and that she later identified the mortgage during a records check); Government Exhibit 255 (377 Union Street Uniform Residential Loan Application).

[25]See Trial Tr. at 1743-44 (Melinda James (née Francis) from Citizens Bank testified that on Manafort's Howard Street loan application, it indicated that there was no mortgage on the property at 377 Union Street, Brooklyn, New York); Government Exhibit 224 (email attaching schedule of Manafort's real estate owned and reflecting there is no mortgage on Union Street property); Trial Tr. at 1284-85 (Rick Gates testified that he understood that Manafort had a mortgage on the property at 377 Union Street, Brooklyn, New York during the time of the loan application at Citizens Bank for the Howard Street property).

objects on the grounds that "there was nothing complex about simply lying to the banks," and
that the falsified documents were "simple or ham-handed."  See Defense Objections to PSR, at 4.
Manafort is wrong; even if some of Manafort's conduct may have been ham-handed not all of it
was.

The Guidelines affords an enhancement when "the offense otherwise involved
sophisticated means and the defendant intentionally engaged in or caused the conduct
constituting sophisticated means," U.S.S.G. § 2B1.1(b)(10)(c).  Application Note 9 defines
"sophisticated means" as:

> especially complex or especially intricate offense conduct pertaining to the
> execution or concealment of an offense.  For example, in a telemarketing
> scheme, locating the main office of the scheme in one jurisdiction but
> locating soliciting operations in another jurisdiction ordinarily indicates
> sophisticated means.  Conduct such as hiding assets or transactions, or
> both, through the use of fictitious entities, corporate shells, or offshore
> financial accounts also ordinarily indicates sophisticated means.

Id. § 2B1.1 cmt. n. 9.

Here, the defendant's conduct qualifies for the enhancement, as he routinely hid relevant
transactions, falsified documentation, and made misrepresentations relating to an offshore
transaction (and the existence of those assets).  For example, for the two Citizens Bank loans,
Manafort hid the true nature of his foreign Peranova "loan".  Manafort had first claimed the $1.5
million from Peranova, an offshore entity that he controlled, as a "loan" on his tax returns (to
avoid paying taxes on the money), and when the bank needed to see less debt and more income
for 2015, Manafort claimed the loan was forgiven, created a back-dated letter purporting to
document the forgiveness, and instructed his tax preparer to forward that letter to the bank.[26]

---

[26]See Trial Tr. at 944-69 (Testimony of Cindy LaPorta).

Further, for four of the five loans, Manafort materially misstated the Profit and Loss Statement from his business for the years 2015 and 2016, hiding his true income, requested those documents from his bookkeeper, altered them, and then submitted them to the bank.[27]

   With respect to the Citizens Bank loan charged in Count 24, Manafort hid the mortgage on the Union Street property, and went to great lengths to do so including having Gates contact the mortgage broker (Donna Duggan) and having her forward an older version of the mortgage binder for the property.[28]  On the Banc of California fraud charged in Counts 27 and 28, Manafort hid the Howard Street mortgage.  For The Federal Savings Bank loans charged in Counts 29 through 32, Manafort hid outstanding American Express debt and delinquency, falsely claiming that debt to be a loan to Gates and sending a letter to that effect to the bank.  See United States v. Davis, No. 18-4080, 2018 WL 5096070, at *1 (4th Cir. Oct. 18, 2018) (unpublished) (affirming application of the sophisticated means enhancement applies where the defendant created a "multilayered scheme" and "used numerous means to conceal the fraud, including forgery, altering documentation, transferring money between accounts, and omitting property from certain accountings").

---

[27]See Trial Tr. at 601-30 (Testimony of Heather Washkuhn).

[28]See Trial Tr. at 1284-86 (Gates testified that at Manafort's direction he contacted Manafort's insurance broker and requested an old copy of the insurance binder with respect to the Union Street property, which did not reflect the current mortgage, and that he was aware that the older version was then sent to the bank to hide the fact that there was currently a mortgage on the Union Street property).

### 3.   A Role Enhancement is Appropriate For the Group 2 Crimes

The Group 2 criminal conduct involved multiple parties, individuals who were both

knowing and unknowing with respect to the scheme, including co-conspirators Gates and Jeffrey

Yohai, and more than a dozen bankers, accountants, and Manafort's bookkeepers and tax

preparers.[29]   Manafort, moreover, was the primary beneficiary of the frauds.   Based on the

criteria in the application note and the case law cited above, the role enhancement is equally

appropriate for the Group 2 bank fraud offenses.

### C.   The Defendant Did Not Accept Responsibility

Finally, the PSR properly denied Manafort any reduction for acceptance of responsibility

pursuant to § 3E1.1.   PSR ¶ 96.   Manafort proceeded to trial and vigorously denied his guilt.

Although a trial alone does not necessarily preclude an acceptance reduction, it almost always

does in circumstances like those here.   Application Note 2 to § 3E1.1 suggests that the situations

where a defendant proceeds to trial and qualifies for an acceptance reduction are rare, and are

often limited to circumstances where the defendant proceeds to trial to challenge the

constitutionality of a statute, or some other legal issue, and not the facts.   See § 3E1.1,

Application Note 2.   That was not the case here.   See e.g., United States v. Redding, 422 F.

App'x 192, 195 (4th Cir. 2011) (unpublished) ("Because Redding put the government to its

burden of proof and went to trial challenging his factual guilt, the district court was correct in

finding the two-level reduction was inappropriate.").   Manafort cites no authority for the

---

[29]For example, from Citizens Bank at least the following individuals were involved: David Fallarino, Melinda James (née Francis), Taryn Rodriguez, and Peggy Miceli; from the Banc of California, Perris Kaufman and Gary Seferian; and from The Federal Savings Bank: Anna Ivakhnik, Dennis Raico, Thomas Horn, James Brennan, and Steve Calk; from Nigro Karlin (the bookkeeper): Heather Washkuhn; and from KWC: Cindy LaPorta and Philip Ayliff.

proposition that a later plea in another prosecution—even one involving some of the same

facts—negates the fact that he put the government to its proof in the Eastern District of Virginia.

Further, the defendant has now conceded that he breached his plea agreement in the

District of Columbia, and on February 13, 2019, in a ruling from the bench, Judge Jackson found

by a preponderance of the evidence that Manafort intentionally lied to the government as to three

subject areas, and had not with respect to two others.  The DC Court also issued an order

documenting those findings.  United States v. Manafort, 1:17-cr-201 (ABJ) (D.D.C. February 13,

2019), Doc 509 (attached as Exhibit G).

Finally, the defendant's failure to file the required financial information with the

Probation Department, in either district, is further evidence of his failure to accept responsibility,

particularly here, where the defendant was convicted of financial crimes, including hiding his

income and assets.

## V.     Statutory Sentencing Factors Pursuant To Title 18, United States Code, Section 3553(a)

The government addresses the Section 3553(a) factors below.

### A.    The Nature and Circumstances of the Offense

Manafort's criminal conduct was serious, longstanding, and bold.  He failed to pay taxes

in five successive years involving more than $16 million in unreported income—and failed to

identify his overseas accounts in those same returns—resulting in more than $6 million in unpaid

taxes.  In four successive years from 2011 to 2014, Manafort failed to report his overseas

accounts to the Treasury Department, and over that period he maintained 31 accounts in three

foreign countries collectively holding more than $55 million in multiple currencies.[30]  As for his

bank fraud offenses, Manafort defrauded not one financial institution but three, and sought five

loans from those banks, seeking more than $25 million.

      Tax fraud is a serious crime and violates the most basic covenant between citizens and

the government.  See United States v. Zukerman, 897 F.3d 423, 428 (2d Cir. 2018) ("[t]ax crimes

represent an especially damaging category of criminal offense" which "strike[] at the foundation

of a functioning government'") (citation omitted), pet. for cert. filed, No. 18-642 (Nov. 19,

2018).  The defendant benefited from the protections and privileges of the law and the services

of his government, while cheating it and his fellow citizens.  See United State v. Trupin, 475

F.3d 71, 76 (2d Cir. 2007) (tax evader effectively "[steals] from his fellow taxpayers through his

deceptions.").

      The defendant's failure to file foreign bank account reports is also significant.  FBAR

regulations facilitate the identification of "persons who may be using foreign financial accounts

to circumvent United States law," whether those funds are used for "illicit purposes or to identify

income maintained or generated abroad."  See IRS FBAR Reference Guide, at 2

(https://www.irs.gov/pub/irs-utl/irsfbarreferenceguide.pdf).  Here, Manafort's FBAR offenses

were more serious than that of a defendant who simply hides his income, like the defendant in

Kim.  Manafort used his foreign accounts not only to hide his income, but to launder funds,

including by engaging in transactions that promoted his FARA scheme.

---

[30]See Government Exhibit 73B (FBAR Chart for 2011), Government Exhibit 73C (FBAR Chart for 2012), Government Exhibit 73D (FBAR Chart for 2013), Government Exhibit 73E (FBAR Chart for 2014); Government Exhibit 74 ("Deposit Analysis – Foreign Source of Funds Received by Foreign Accounts," listing total as $65,860,502.50).

Finally, the defendant's bank fraud offenses are also serious, both for the number and amount of the loans and the conduct involved. Bank fraud undermines the stability of our financial system and the federally insured financial institutions that citizens rely upon that those statutes seek to protect. See United States v. Koh, 199 F.3d 632, 638 (2d Cir. 1999) (recognizing that Congress, in part through passage of the bank fraud statute, "clearly intended to protect 'the financial integrity' of institutions in which it had a strong federal interest, including those that are 'federally created, controlled or insured'") (quoting S. Rep. No. 98–225, at 377 (1983)). Manafort sought five loans totaling more than $25 million and secured funding in the amount of more than $19 million. Those facts set him far afield from the ordinary bank fraud defendant.

As noted, these were not short-lived schemes. Manafort's crimes were the product of his planning and premeditation over many years, and a result of his direct and willful conduct. Manafort's tax crimes by any account were serious, and more serious than most given the amount of money at issue and the fact that his failure to pay the taxes owed was not caused by any necessity but simple greed. Manafort had ample funds to cover these tax payments. He simply chose not to comply with laws that would reduce his wealth. And along the way, each year, in order to successfully implement the tax scheme the defendant involved numerous other people, including both witting and unwitting participants. In every scheme, Manafort was always the principal, and almost always the exclusive beneficiary.

**B.   History and Characteristics of the Defendant**

Manafort's history and characteristics are aggravating factors. Manafort has had every opportunity to succeed. He is well educated and a member of the legal profession, attending

22

Georgetown University for college and law school.  He was a successful political consultant both in the United States and abroad.[31]

Further, while the defendant is 69 years old and has suffered reputational harm as a result of his conviction, neither is a mitigating factor.   Part H of Chapter 5 of the Sentencing Guidelines addresses age, and in effect provides that age can be considered "individually or in combination with other offender characteristics," when "present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  U.S.S.G. § 5H1.1.  Nothing about the defendant's age is unusual.  Tax offenders are often older and often, like the defendant, wealthy, but they nonetheless receive substantial terms of incarceration notwithstanding age and health issues.  See, e.g., United States v. Dibbi, 413 Fed. Appx 618, 620 (4th Cir. 2011) (affirming sentence of 30 months for tax fraud and decision not to grant a downward variance based on the defendant's health and age); United States v. Gilmartin, 12-cr-287 (MGC) (SDNY) (defendant, age 70, sentenced to 48 months imprisonment for evading taxes and failing to file federal and state tax returns for over 20 years, where the tax loss was approximately $1.7 million).[32]

---

[31] See Trial Tr. at 2436 (defense closing argument citing witness testimony of Tad Devine and Dan Rabin describing Manafort as a talented political consultant and citing documents detailing Manafort's work for the presidential campaigns of Gerald Ford, Ronald Reagan, George H. W. Bush, Bob Dole, and Donald Trump); see Trial Tr. at 1133-34 (Rick Gates testified that Manafort was "probably one of the most, you know, politically brilliant strategists I've ever worked with.").

[32] See also United States v. Jackson, 10-cr-298 (CM) (SDNY) (defendant, age 57, sentenced to 63 months imprisonment for his work as a tax preparer who used a variety of deceptive practices—including claiming deceased children as dependents—as part of a scheme to prepare false tax returns and where the tax loss was approximately $1 million); United States v. Catlett, 10-CR-101 (D. Md) (defendant, age 64, sentenced to 210 months imprisonment, related to filing 275 fraudulent tax returns reporting over $22 million in false Schedule E losses, resulting in a federal tax loss of $3.8 million).

Manafort's age does not eliminate the risk of recidivism he poses—particularly given that his pattern of criminal activity has occurred over more than a decade and that the most recent crimes he pled guilty to occurred from February to April 2018, when he conspired to tamper with witnesses at a time when he was under indictment in two separate districts.   Further as Judge Jackson found, Manafort's misconduct continued as recently as October 2018 when he repeatedly and intentionally lied to the government during proffer sessions and the grand jury.

Courts also have rejected the premise that the reputational harm incident to every criminal conviction is a valid basis for reducing the term of imprisonment imposed on a white-collar offender such as Manafort.  Nothing about that harm, or the collateral consequences that Manafort faces, was unforeseeable at the time that he chose to engage in the charged conduct. Manafort chose to commit multiple bank frauds, even when the subject of national attention in 2016.  See, e.g., United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible for a court to impose a lighter sentence on a white-collar defendant than on blue-collar defendants because it reasons that white-collar defendants suffer greater reputational harm or have more to lose by conviction.").

### C.  The Need to Promote Respect for the Law and to Afford Adequate Deterrence to Criminal Conduct

The sentence should serve to promote respect for the law and to afford both adequate specific and general deterrence as intended by Congress.  With respect to general deterrence, the sentence should send a clear message that repeated choices to commit serious economic crimes have serious consequences, particularly in a matter that received national attention.

The Fourth Circuit has stressed the heightened importance of general deterrence in tax cases, and in particular the need for incarceration, given the prevalence of tax offenses and the

24

comparatively few prosecutions. See United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010)
("Given the nature and number of tax evasion offenses as compared to the relatively infrequent
prosecution of those offenses, we believe that the [Sentencing] Commission's focus on
incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go
unpunished, if not undetected. Without a real possibility of imprisonment, there would be little
incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward
path."). Courts have recognized that tax prosecutions are difficult and time consuming to
investigate and prosecute, and require substantial resources. See Zukerman, 897 F.3d at 429
(general deterrence has an important role in tax cases "due to the significant resources required
to monitor and prosecute tax cases," which cost the government hundreds of billions of dollars
annually) (internal quotation marks omitted); see also U.S.S.G Ch. 2, Part T, intro. cmt.
(explaining that, in light of "the limited number of criminal tax prosecutions relative to the
estimated incidence of such violations, deterring others from violating the tax laws is a primary
consideration underlying these guidelines," and that "[r]ecognition that the sentence for a
criminal tax case will be commensurate with the gravity of the offense should act as a deterrent
to would-be violators").

Tax evasion through the use of offshore entities and bank accounts is among the most
lucrative offenses and often the most difficult to investigate, which increases the need for strong
deterrence and a meaningful sentence. See United States v. Hefferman, 43 F.3d 1144, 1149 (7th
Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those
offenses that either are lucrative or are difficult to detect and punish, since both attributes go to
increase the expected benefits of a crime and hence the punishment required to deter it."). Bank

25

fraud, while more common, is equally serious and the need for deterrence is also strong in light of the need to protect the integrity of the nation's banking system.

### D.   The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a) also requires a sentence that is generally consistent with others imposed on similar offenders for similar offenses; courts are instructed "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). First, in this case, there are no similarly situated charged defendants, as Manafort's co-defendant, Gates, was subservient to Manafort, and he accepted responsibility, pled guilty, and cooperated early in this investigation. The crimes at issue involved Manafort's taxes and overseas accounts, not Gates'. With respect to the bank loans, Manafort, not Gates, principally received the proceeds. Second, given the breadth of Manafort's criminal activity, the government has not located a comparable case with the unique array of crimes and aggravating factors.

## VI.   Conclusion

For a decade, Manafort repeatedly violated the law. Considering only the crimes charged in this district, they make plain that Manafort chose to engage in a sophisticated scheme to hide millions of dollars from United States authorities. And when his foreign income stream dissipated in 2015, he chose to engage in a series of bank frauds in the United States to maintain his extravagant lifestyle, at the expense of various financial institutions. Manafort chose to do this for no other reason than greed, evidencing his belief that the law does not apply to him. Manafort solicited numerous professionals and others to reap his ill-gotten gains. The sentence

in this case must take into account the gravity of this conduct, and serve to both specifically deter

Manafort and those who would commit a similar series of crimes.


Dated: February 15, 2018

Uzo Asonye
Assistant United States Attorney
Eastern District of Virginia

/s/_____
Andrew Weissmann
Greg D. Andres
Brandon L. Van Grack
Senior Assistant Special Counsels
Special Counsel's Office
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: (202) 616-0800

*Attorneys for United States of America*

# <u>EXHIBIT A</u>

**VENDOR AND PROPERTY PAYMENTS FROM FOREIGN BANK ACCOUNTS**

| Vendor Name | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|
| SP&C Home Improvement Inc. | $ 626,760 | $ 716,200 | $ 1,015,960 | $ 1,099,000 | $ 90,953 | $ 3,548,873 |
| Big Picture Solutions, Inc. | | $ 102,006 | $ 456,800 | $ 939,475 | $ 162,920 | $ 1,661,201 |
| Alan Couture | $ 103,000 | $ 191,800 | $ 137,850 | $ 230,700 | $ 85,115 | $ 748,465 |
| Scott L. Wilson Landscape & Tree Specialists, Inc. | $ 237,700 | $ 265,800 | | | | $ 503,500 |
| Aegis Holdings LLC | | | | $ 500,000 | | $ 500,000 |
| J&J Oriental Rug Gallery | $ 390,000 | | $ 100,000 | | | $ 490,000 |
| Sabatello Construction of Florida, Inc. | | $ 39,237 | $ 362,950 | $ 30,300 | | $ 432,487 |
| House of Bijan | $ 213,280 | $ 112,000 | $ 7,500 | | | $ 332,780 |
| New Leaf Landscape Maintenance LLC | | $ 4,115 | $ 134,600 | $ 26,025 | $ 90,945 | $ 255,685 |
| Don Beyer Motors, Inc. aka Land Rover of Alexandria | | | $ 163,705 | | | $ 163,705 |
| Federal Stone and Brick LLC | | | $ 87,000 | $ 38,650 | | $ 125,650 |
| American Service Center Associates of Alexandria, LLC aka Mercedes-Benz of Alexandria | | | $ 62,750 | | | $ 62,750 |
| Sensoryphile, Inc. | $ 46,450 | | | | | $ 46,450 |
| **Total** | **$ 1,617,190** | **$ 1,431,158** | **$ 2,529,115** | **$ 2,864,150** | **$ 429,933** | **$ 8,871,546** |

| Purchase of Property | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|
| Howard Street Condominium | | | $ 1,500,000 | | | |
| Arlington House | | | $ 1,900,000 | | | |
| Union Street Brownstone | | | $ 3,299,500 | | | |
| **Total** | **$ -** | **$ -** | **$ 6,699,500** | **$ -** | **$ -** | **$ 6,699,500** |

| **Grand Total** | **$ 1,617,190** | **$ 1,431,158** | **$ 9,228,615** | **$ 2,864,150** | **$ 429,933** | **$ 15,571,046** |

# EXHIBIT B

**Paul Manafort**

## Summary of Personal Tax Return Items and Unreported Income

### Tax Years 2010 to 2014

| Tax Year | Approx. Filing Date | Foreign Account Reported (Sch. B, Line 7a) | Total Income Reported (Line 22) | Total Unreported Income |
|---|---|---|---|---|
| 2010 | October 14, 2011 | None | $504,744 | $1,617,190 |
| 2011 | October 15, 2012 | None | $3,071,409 | $1,431,158 |
| 2012 | October 7, 2013 | None | $5,361,007 | $9,228,615 |
| 2013 | October 6, 2014 | None | $1,910,928 | $2,864,150 |
| 2014 | October 14, 2015 | None | $2,984,210 | $1,329,933 |

EXHIBIT

77

# <u>EXHIBIT C</u>

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2011

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 1 | **Black Sea View Limited** Bank of Cyprus ▮▮▮▮ | $ 1,025,100.00 | Richard Gates Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Georgoula Mavrides Myrianthi Christou |
| 2 | **Black Sea View Limited*** Bank of Cyprus ▮▮▮▮ | $ 133.81 | Richard Gates Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Georgoula Mavrides Myrianthi Christou |
| 3 | **Global Highway Limited** Bank of Cyprus ▮▮▮▮ | $ 684,568.70 | Richard Gates Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Georgoula Mavrides Myrianthi Christou |
| 4 | **Leviathan Advisors Limited** Bank of Cyprus ▮▮▮▮ | $ 124,516.30 | Richard Gates Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Georgoula Mavrides Myrianthi Christou |
| 5 | **Leviathan Advisors Limited*** Bank of Cyprus ▮▮▮▮ | $ 1,582,790.00 | Richard Gates Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Georgoula Mavrides Myrianthi Christou |
| 6 | **LOAV Advisors Limited** Bank of Cyprus ▮▮▮▮ | $ 20,346.93 | Richard Gates Paul Manafort Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Georgoula Mavrides Myrianthi Christou |

GOVERNMENT EXHIBIT
U.S. v. MANAFORT, 1:18-cr-83 (T.S.E.)
73B

*The maximum account value was converted from Euro to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2011

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 7 | **Peranova Holdings Limited**<br>Bank of Cyprus ███████ | $ 4,436,680.04 | Richard Gates<br>Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| 8 | **Peranova Holdings Limited***<br>Bank of Cyprus ███████ | $ 23.84 | Richard Gates<br>Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| 9 | **Serangon Holdings Limited**<br>Bank of Cyprus ███████ | $ 2,831.57 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| 10 | **Yiakora Ventures Limited**<br>Bank of Cyprus ███████ | $ 504,807.56 | Paul Manafort<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| | **AGGREGATE MAXIMUM VALUE:** | $ 8,381,798.75 | | |

*The maximum account value was converted from Euro to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2012

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 1 | **Actinet Trading Limited**<br>Bank of Cyprus ▮ | $ 999,987.00 | Paul Manafort<br>Konstantin Kilimnik (As of 1/21/13) | Paul Manafort<br>Richard Gates<br><br>Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 2 | **Actinet Trading Limited\***<br>Bank of Cyprus ▮ | $ 3,416,880.00 | Paul Manafort<br>Konstantin Kilimnik (As of 1/21/13) | Paul Manafort<br>Richard Gates<br><br>Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 3 | **Black Sea View Limited**<br>Bank of Cyprus ▮ | $ 2,519,316.94 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| 4 | **Black Sea View Limited\***<br>Bank of Cyprus ▮ | $ 1,927,720.00 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |

\*The maximum account value was converted from Euro to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2012

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|------|---|---|---|---|
| 5 | **Bletilla Ventures Limited** <br> Bank of Cyprus ████ | $ 5,000,000.00 | Paul Manafort <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 6 | **Bletilla Ventures Limited\*** <br> Bank of Cyprus ████ | $ 1,849,860.00 | Paul Manafort <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 7 | **Global Highway Limited** <br> Bank of Cyprus ████ | $ 531,852.76 | Richard Gates <br> Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Georgoula Mavrides <br> Myrianthi Christou |
| 8 | **Leviathan Advisors Limited** <br> Bank of Cyprus ████ | $ 738.45 | Richard Gates <br> Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Georgoula Mavrides <br> Myrianthi Christou |
| 9 | **Leviathan Advisors Limited\*** <br> Bank of Cyprus ████ | $ 66,053.30 | Richard Gates <br> Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Georgoula Mavrides <br> Myrianthi Christou |
| 10 | **LOAV Advisors Limited** <br> Bank of Cyprus ████ | $ 5,679.02 | Richard Gates <br> Paul Manafort <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Georgoula Mavrides <br> Myrianthi Christou |

\*The maximum account value was converted from Euro to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2012

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 11 | **Lucicle Consultants Limited**<br>Bank of Cyprus | $ 1,530,903.16 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Paul Manafort<br>Richard Gates<br><br>Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 12 | **Lucicle Consultants Limited***<br>Bank of Cyprus | $ 4,183,590.00 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Paul Manafort<br>Richard Gates<br><br>Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 13 | **Olivenia Trading Limited***<br>Bank of Cyprus | $ 3.28 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 14 | **Olivenia Trading Limited**<br>Bank of Cyprus | $ 740,362.98 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |

*The maximum account value was converted from Euro to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2012

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 15 | **Peranova Holdings Limited**<br>Bank of Cyprus | $ 2,926,680.04 | Richard Gates<br>Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| 16 | **Peranova Holdings Limited***<br>Bank of Cyprus | $ 13.08 | Richard Gates<br>Konstantin Kilimnik (As of 1/15/08) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| 17 | **Serangon Holdings Limited**<br>Bank of Cyprus | $ 2,379.44 | Richard Gates<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| 18 | **Yiakora Ventures Limited**<br>Bank of Cyprus | $ 2,650.27 | Paul Manafort<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |
| | **AGGREGATE MAXIMUM VALUE:** | $ 25,704,669.72 | | |

*The maximum account value was converted from Euro to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2013

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 1 | **Actinet Trading Limited** <br> Bank of Cyprus ████ | $ 87,728.03 | Paul Manafort <br> Konstantin Kilimnik (As of 1/21/13) | Paul Manafort <br> Richard Gates <br><br> Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 2 | **Actinet Trading Limited*** <br> Bank of Cyprus ████ | $ 196,511.00 | Paul Manafort <br> Konstantin Kilimnik (As of 1/21/13) | Paul Manafort <br> Richard Gates <br><br> Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 3 | **Actinet Trading Limited** <br> Hellenic Bank ████ | $ 87,458.48 | Richard Gates <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 4 | **Actinet Trading Limited*** <br> Hellenic Bank ████ | $ 202,277.00 | Richard Gates <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |

*The maximum account value was converted from Euro and GBP to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2013

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 5 | **Bletilla Ventures Limited**<br>Bank of Cyprus ■■■■ | $ 1,568,530.54 | Paul Manafort<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 6 | **Bletilla Ventures Limited***<br>Bank of Cyprus ■■■■ | $ 276,703.00 | Paul Manafort<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 7 | **Bletilla Ventures Limited**<br>Hellenic Bank ■■■■ | $ 833,349.39 | Richard Gates<br>Konstantin Kilimnik | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 8 | **Bletilla Ventures Limited***<br>Hellenic Bank ■■■■ | $ 278,614.00 | Richard Gates<br>Konstantin Kilimnik | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Myrianthi Christou<br>Evelina Georgiades<br>Georgoula Mavrides |
| 9 | **LOAV Advisors Limited**<br>Bank of Cyprus ■■■■ | $ 5,292.42 | Richard Gates<br>Paul Manafort<br>Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides<br>Chrystalla Pitsilli Dekatris<br>Georgoula Mavrides<br>Myrianthi Christou |

*The maximum account value was converted from Euro and GBP to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2013

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 10 | **Lucicle Consultants Limited** Bank of Cyprus ▬▬▬ | $ 167,664.80 | Richard Gates Konstantin Kilimnik (As of 1/21/13) | Paul Manafort Richard Gates<br><br>Eleni Chrysostomides Chrystalla Pitsilli Dekatris Myrianthi Christou Evelina Georgiades Georgoula Mavrides |
| 11 | **Lucicle Consultants Limited\*** Bank of Cyprus ▬▬▬ | $ 288,410.00 | Richard Gates Konstantin Kilimnik (As of 1/21/13) | Paul Manafort Richard Gates<br><br>Eleni Chrysostomides Chrystalla Pitsilli Dekatris Myrianthi Christou Evelina Georgiades Georgoula Mavrides |
| 12 | **Lucicle Consultants Limited** Hellenic Bank ▬▬▬ | $ 603,131.79 | Richard Gates | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Myrianthi Christou Evelina Georgiades Georgoula Mavrides |
| 13 | **Lucicle Consultants Limited\*** Hellenic Bank ▬▬▬ | $ 1,427,810.00 | Richard Gates | Eleni Chrysostomides Chrystalla Pitsilli Dekatris Myrianthi Christou Evelina Georgiades Georgoula Mavrides |

\*The maximum account value was converted from Euro and GBP to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2013

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 14 | **Marziola Holdings Limited** <br> Hellenic Bank ▬ | $ 2,000,000.00 | Konstantin Kilimnik | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 15 | **Olivenia Trading Limited\*** <br> Bank of Cyprus ▬ | $ 0.64 | Richard Gates <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 16 | **Olivenia Trading Limited** <br> Bank of Cyprus ▬ | $ 601,794.98 | Richard Gates <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 17 | **Olivenia Trading Limited** <br> Hellenic Bank ▬ | $ 601,079.22 | Richard Gates <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Myrianthi Christou <br> Evelina Georgiades <br> Georgoula Mavrides |
| 18 | **Yiakora Ventures Limited** <br> Bank of Cyprus ▬ | $ 11,943.28 | Paul Manafort <br> Konstantin Kilimnik (As of 1/21/13) | Eleni Chrysostomides <br> Chrystalla Pitsilli Dekatris <br> Georgoula Mavrides <br> Myrianthi Christou |

\*The maximum account value was converted from Euro and GBP to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2013

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 19 | **Pompolo Limited\*** <br> HSBC UK ▮▮▮▮▮ | $ 1,838,260.00 | | Richard Gates |
| 20 | **Global Endeavour Inc.** <br> Loyal Bank Ltd. ▮▮▮▮▮ | $ 2,999,950.00 | Konstantin Kilimnik | Myrianthi Christou <br> Chrystalla Dekatris <br> Eleni Chrysostomides <br> Georgoula Mavrides <br> Evelina Georgiades |
| 21 | **Global Endeavour Inc.\*** <br> Loyal Bank Ltd. ▮▮▮▮▮ | $ 2,036,960.00 | Konstantin Kilimnik | Myrianthi Christou <br> Chrystalla Dekatris <br> Eleni Chrysostomides <br> Georgoula Mavrides <br> Evelina Georgiades |
| 22 | **Jeunet Ltd.\*** <br> Loyal Bank Ltd ▮▮▮▮▮ | $ 2,675,340.00 | Konstantin Kilimnik | Myrianthi Christou <br> Chrystalla Dekatris <br> Eleni Chrysostomides <br> Georgoula Mavrides <br> Evelina Georgiades |
| | **AGGREGATE MAXIMUM VALUE:** | **$ 18,788,808.57** | | |

\*The maximum account value was converted from Euro and GBP to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# AGGREGATE MAXIMUM VALUE OF FOREIGN BANK ACCOUNTS IN 2014

| Item | Account Name, Financial Institution and Account Number | Maximum Account Value | Beneficial Owner Listed on Bank Account Application | Authorized Signers Listed on Bank Account Application |
|---|---|---|---|---|
| 1 | **Global Endeavour Inc.**<br>Loyal Bank Ltd. ▮▮▮▮▮ | $ 259,797.56 | Konstantin Kilimnik | Myrianthi Christou<br>Chrystalla Dekatris<br>Eleni Chrysostomides<br>Georgoula Mavrides<br>Evelina Georgiades |
| 2 | **Global Endeavour Inc.***<br>Loyal Bank Ltd. ▮▮▮▮▮ | $ 1,622,660.00 | Konstantin Kilimnik | Myrianthi Christou<br>Chrystalla Dekatris<br>Eleni Chrysostomides<br>Georgoula Mavrides<br>Evelina Georgiades |
| 3 | **Jeunet Ltd.***<br>Loyal Bank Ltd. ▮▮▮▮▮ | $ 860,846.00 | Konstantin Kilimnik | Myrianthi Christou<br>Chrystalla Dekatris<br>Eleni Chrysostomides<br>Georgoula Mavrides<br>Evelina Georgiades |
| | **AGGREGATE MAXIMUM VALUE:** | **$ 2,743,303.56** | | |

*The maximum account value was converted from Euro to USD on the date of occurrence per the bank statement using the website https://www.oanda.com/currency/converter/.

# <u>EXHIBIT D</u>



**U.S. Department of Justice**
*The Special Counsel's Office*

*Washington, D.C. 20530*
September 13, 2018

Kevin M. Downing, Esq.
Law Office of Kevin M. Downing
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001

**FILED**

**SEP 1 4 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Thomas E. Zehnle, Esq.
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW
Suite 620
Washington, DC 20001

Richard W. Westling, Esq
Epstein Becker Green
1227 25ᵗʰ Street NW
Suite 700
Washington, DC 20037

Re:    United States v.  Paul J. Manafort, Jr., Crim. No. 17-201-*J* (ABJ)

Dear Counsel:

This letter sets forth the full and complete plea offer to your client Paul J. Manafort, Jr. (hereinafter referred to as "your client" or "defendant") from the Special Counsel's Office (hereinafter also referred to as "the Government" or "this Office"). If your client accepts the terms and conditions of this offer, please have your client execute this document in the space provided below. Upon receipt of the executed document, this letter will become the Plea Agreement (hereinafter referred to as the "Agreement"). The terms of the offer are as follows.

### 1.    **Charges and Statutory Penalties**

Your client agrees to plead guilty in the above-captioned case to all elements of all objects of all the charges in a Superseding Criminal Information, which will encompass the charges in Counts One and Two of a Superseding Criminal Information, charging your client with:

A. conspiracy against the United States, in violation of 18 U.S.C. § 371 (which includes a conspiracy to: (a) money launder (in violation of 18 U.S.C. § 1956); (b) commit tax fraud

Page **1** of **17**

(in violation of 26 U.S.C. § 7206(1)); (c) fail to file Foreign Bank Account Reports (in violation of 31 U.S.C. §§ 5314 and 5322(b)); (d) violate the Foreign Agents Registration Act (in violation of 22 U.S.C. §§ 612, 618(a)(1), and 618(a)(2)); and (e) to lie to the Department of Justice (in violation of 18 U.S.C. § 1001(a) and 22 U.S.C. §§ 612 and 618(a)(2)); and

B. conspiracy against the United States, in violation of 18 U.S.C. § 371, to wit: conspiracy to obstruct justice by tampering with witnesses while on pre-trial release (in violation of 18 U.S.C. § 1512).

The defendant also agrees not to appeal any trial or pre-trial issue in the Eastern District of Virginia, or to challenge in the district court any such issue, and admits in the attached "Statement of the Offense" his guilt of the remaining counts against him in United States v. Paul J. Manafort, Jr., Crim. No. 1:18-cr-83 (TSE) (hereafter "Eastern District of Virginia.") A copy of the Superseding Criminal Information and Statement of the Offense are attached.

Your client understands that each violation of 18 U.S.C. § 371 carries a maximum sentence of 5 years' imprisonment; a fine of not more than $250,000, pursuant to 18 U.S.C. § 3571(b)(3); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made, and forfeiture.

In addition, your client agrees to pay a mandatory special assessment of $200 to the Clerk of the United States District Court for the District of Columbia. Your client also understands that, pursuant to 18 U.S.C. § 3572 and § 5E1.2 of the United States Sentencing Guidelines, *Guidelines Manual* (2016) (hereinafter "Sentencing Guidelines," "Guidelines," or "U.S.S.G."), the Court may also impose a fine that is sufficient to pay the federal government the costs of any imprisonment, term of supervised release, and period of probation.

## 2. **Factual Stipulations**

Your client agrees that the attached Statement of the Offense fairly and accurately describes and summarizes your client's actions and involvement in the offenses to which your client is pleading guilty, as well as crimes charged in the Eastern District of Virginia that remain outstanding, as well as additional acts taken by him. Please have your client sign and return the Statement of the Offense, along with this Agreement.

## 3. **Additional Charges**

In consideration of your client's guilty plea to the above offenses, and upon the completion of full cooperation as described herein and fulfillment of all the other obligations herein, no additional criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity, including money laundering, false statements, personal and corporate tax and FBAR offenses, bank fraud, Foreign Agents Registration Act violations for his work in Ukraine, and obstruction of justice. In addition, subject to the terms of this Agreement, at the time of sentence or at the completion of his successful cooperation, whichever is later, the Government will move to dismiss the remaining counts of the Indictment

in this matter and in the Eastern District of Virginia and your client waives venue as to such charges in the event he breaches this Agreement. Your client also waives all rights under the Speedy Trial act as to any outstanding charges.

### 4. Sentencing Guidelines Analysis

Your client understands that the sentence in this case will be determined by the Court, pursuant to the factors set forth in 18 U.S.C. § 3553(a), including a consideration of the applicable guidelines and policies set forth in the Sentencing Guidelines. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and to assist the Court in determining the appropriate sentence, the Office estimates the Guidelines as follows:

### A. Estimated Offense Level Under the Guidelines

| Base offense level | +8 | 2S1.1(a) Base Offense Level: (1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or (2) 8 plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise. |
|---|---|---|
| | +22 | Using more than $25 million threshold under 2B1.1 |
| Enhancement | +2 | 2S1.1(b)(2)(B) permits enhancement for 2 points if the conviction is pursuant to §1956. |
| Enhancement | +2 | 2S1.1(b)(3) adds two points for sophisticated laundering (which the guidelines lists as involving shell corporations and offshore financial accounts. |
| Enhancement: | +4 | 3B1.1(a) aggravating role – 5 or more participants or otherwise extensive |
| Enhancement: | +2 | 3C1.1 obstruction |
| Combined Offense level | +0 | 3D1.4 |
| Acceptance: | -3 | 3E1.1(b) acceptance of responsibility |
| Total for Counts One and Two: | 37 | **Advisory guidelines range of 210-262** |

The defendant agrees that all of the Sentencing Guidelines for money laundering applicable to charges brought under 18 U.S.C. § 1956 apply to Count One of the Superseding Criminal Information brought under 18 U.S.C. § 371.

For the purposes of the Sentencing Guidelines analysis, the government calculates the highest guideline range among the offenses, namely the object of the conspiracy to violate Title 18 U.S.C. § 1956. The defendant's estimated guideline range for Count Two, the conspiracy to obstruct justice, is 30 (before any reduction for acceptance of responsibility), and would be grouped with Count One pursuant to §3D1.2(c).

### B.    Acceptance of Responsibility

The Government agrees that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that your client clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through your client's allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence. If the defendant has accepted responsibility as described above, and if the defendant pleads guilty on or before September 14, 2018, subject to the availability of the Court, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b).

Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, and/or imposition of an adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, regardless of any agreement set forth herein, should your client move to withdraw his guilty plea after it is entered, or should it be determined by the Government that your client has either (a) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice, or (b) engaged in additional criminal conduct after signing this Agreement.

In accordance with the above, the applicable Guidelines Offense Level will be at least 37.

### C.    Estimated Criminal History Category

Based upon the information now available to this Office, your client has no criminal convictions, other than in the Eastern District of Virginia. Your client acknowledges that depending on when he is sentenced here and how the Guidelines are interpreted, he may have a criminal history. If additional convictions are discovered during the pre-sentence investigation by the United States Probation Office, your client's criminal history points may increase.

### D.    Estimated Applicable Guidelines Range

Based upon the total offense level and the estimated criminal history category set forth above, the Office calculates your client's estimated Sentencing Guidelines range is 210 months to 262 months' imprisonment (the "Estimated Guidelines Range"). In addition, the Office calculates that, pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level

37, the estimated applicable fine range is $40,000 to $400,000. Your client reserves the right to ask the Court not to impose any applicable fine.

Your client agrees that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, a downward departure from the Estimated Guidelines Range set forth above is not warranted, subject to the paragraphs regarding cooperation below. Accordingly, you will not seek any departure or adjustment to the Estimated Guidelines Range set forth above, nor suggest that the Court consider such a departure or adjustment for any other reason other than those specified above. Your client also reserves the right to disagree with the Estimated Guideline Range calculated by the Office with respect to role in the offense. However, your client understands and acknowledges that the Estimated Guidelines Range agreed to by the Office is not binding on the Probation Office or the Court. Should the Court or Probation Office determine that a different guidelines range is applicable, your client will not be permitted to withdraw his guilty plea on that basis, and the Government and your client will still be bound by this Agreement.

Your client understands and acknowledges that the terms of this section apply only to conduct that occurred before the execution of this Agreement. Should your client engage in any conduct after the execution of this Agreement that would form the basis for an increase in your client's base offense level or justify an upward departure (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the probation officer, or the Court), the Government is free under this Agreement to seek an increase in the base offense level based on that post-agreement conduct.

## 5. Agreement as to Sentencing Allocution

Based upon the information known to the Government at the time of the signing of this Agreement, the parties further agree that a sentence within the Estimated Guidelines Range (or below) would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a), should such a sentence be subject to appellate review notwithstanding the appeal waiver provided below.

## 6. Reservation of Allocution

The Government and your client reserve the right to describe fully, both orally and in writing, to the sentencing judge, the nature and seriousness of your client's misconduct, including any misconduct not described in the charge to which your client is pleading guilty.

The parties also reserve the right to inform the presentence report writer and the Courts of any relevant facts, to dispute any factual inaccuracies in the presentence report, and to contest any matters not provided for in this Agreement. In the event that the Courts considers any Sentencing Guidelines adjustments, departures, or calculations different from any agreements contained in this Agreement, or contemplates a sentence outside the Guidelines range based upon the general sentencing factors listed in 18 U.S.C. § 3553(a), the parties reserve the right to answer any related inquiries from the Courts. In addition, your client acknowledges that the

Government is not obligated to file any post-sentence downward departure motion in this case pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure.

### 7. **Court Not Bound by this Agreement or the Sentencing Guidelines**

Your client understands that the sentence in this case will be imposed in accordance with 18 U.S.C. § 3553(a), upon consideration of the Sentencing Guidelines. Your client further understands that the sentence to be imposed is a matter solely within the discretion of the Courts. Your client acknowledges that the Courts are not obligated to follow any recommendation of the Government at the time of sentencing or to grant a downward departure based on your client's substantial assistance to the Government, even if the Government files a motion pursuant to Section 5K1.1 of the Sentencing Guidelines. Your client understands that neither the Government's recommendation nor the Sentencing Guidelines are binding on the Courts.

Your client acknowledges that your client's entry of a guilty plea to the charged offenses authorizes the Court to impose any sentence, up to and including the statutory maximum sentence, which may be greater than the applicable Guidelines range determined by the Court. Although the parties agree that the sentences here and in the Eastern District of Virginia should run concurrently to the extent there is factual overlap (i.e. the tax and foreign bank account charges), that recommendation is not binding on either Court. The Government cannot, and does not, make any promise or representation as to what sentences your client will receive. Moreover, your client acknowledges that your client will have no right to withdraw your client's plea of guilty should the Courts impose sentences that are outside the Guidelines range or if the Courts do not follow the Government's sentencing recommendation. The Government and your client will be bound by this Agreement, regardless of the sentence imposed by the Courts. Any effort by your client to withdraw the guilty plea because of the length of the sentence shall constitute a breach of this Agreement.

### 8. **Cooperation**

Your client shall cooperate fully, truthfully, completely, and forthrightly with the Government and other law enforcement authorities identified by the Government in any and all matters as to which the Government deems the cooperation relevant. This cooperation will include, but is not limited to, the following:

(a) The defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities.

(b) The defendant agrees to furnish to the Government all documents and other material that may be relevant to the investigation and that are in the defendant's possession or control and to participate in undercover activities pursuant to the specific instructions of law enforcement agents or the Government.

(c) The defendant agrees to testify at any proceeding in the District of Colombia or elsewhere as requested by the Government.

(d) The defendant consents to adjournments of his sentences as requested by the Government.

(e) The defendant agrees that all of the defendant's obligations under this agreement continue after the defendant is sentenced here and in the Eastern District of Virginia; and

(f) The defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes.

Your client acknowledges and understands that, during the course of the cooperation outlined in this Agreement, your client will be interviewed by law enforcement agents and/or Government attorneys. Your client waives any right to have counsel present during these interviews and agrees to meet with law enforcement agents and Government attorneys outside of the presence of counsel. If, at some future point, you or your client desire to have counsel present during interviews by law enforcement agents and/or Government attorneys, and you communicate this decision in writing to this Office, this Office will honor this request, and this change will have no effect on any other terms and conditions of this Agreement.

Your client shall testify fully, completely and truthfully before any and all Grand Juries in the District of Columbia and elsewhere, and at any and all trials of cases or other court proceedings in the District of Columbia and elsewhere, at which your client's testimony may be deemed relevant by the Government.

Your client understands and acknowledges that nothing in this Agreement allows your client to commit any criminal violation of local, state or federal law during the period of your client's cooperation with law enforcement authorities or at any time prior to the sentencing in this case. The commission of a criminal offense during the period of your client's cooperation or at any time prior to sentencing will constitute a breach of this Agreement and will relieve the Government of all of its obligations under this Agreement, including, but not limited to, its obligation to inform this Court of any assistance your client has provided. However, your client acknowledges and agrees that such a breach of this Agreement will not entitle your client to withdraw your client's plea of guilty or relieve your client of the obligations under this Agreement.

Your client agrees that the sentencing in this case and in the Eastern District of Virginia may be delayed until your client's efforts to cooperate have been completed, as determined by the Government, so that the Courts will have the benefit of all relevant information before a sentence is imposed.

## 9. **Government's Obligations**

The Government will bring to the Courts' attention at the time of sentencing the nature and extent of your client's cooperation or lack of cooperation. The Government will evaluate the full nature and extent of your client's cooperation to determine whether your client has provided substantial assistance in the investigation or prosecution of another person who has committed an offense. If this Office determines that the defendant has provided substantial assistance in the form of truthful information and, where applicable, testimony, the Office will file motions pursuant to Section 5K1.1 of the United States Sentencing Guidelines. Defendant will then be free to argue for any sentence below the advisory Sentencing Guidelines range calculated by the Probation Office, including probation.

10. **Waivers**

    **A.**    **Venue**

Your client waives any challenge to venue in the District of Columbia.

    **B.**    **Statute of Limitations**

Your client agrees that, should any plea or conviction following your client's pleas of guilty pursuant to this Agreement, or the guilty verdicts in the Eastern District of Virginia, be vacated, set aside, or dismissed for any reason (other than by government motion as set forth herein), any prosecution based on the conduct set forth in the attached Statement of the Offense, as well as any crimes that the Government has agreed not to prosecute or to dismiss pursuant to this Agreement, that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement, may be commenced or reinstated against your client, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution of conduct set forth in the attached Statement of the Offense, or any other crimes that the Government has agreed not to prosecute, that are not time-barred on the date that this Agreement is signed. The Office and any other party will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client, including the Statement of the Offense, and any of the information or materials provided by your client, including such statements, information, and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously a part of proffer-protected debriefings, and your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

    **C.**    **Trial and Other Rights**

Your client understands that by pleading guilty in this case your client agrees to waive certain rights afforded by the Constitution of the United States and/or by statute or rule. Your client agrees to forgo the right to any further discovery or disclosures of information not already provided at the time of the entry of your client's guilty plea. Your client also agrees to waive,

among other rights, the right to be indicted by a Grand Jury, the right to plead not guilty, and the right to a jury trial. If there were a jury trial, your client would have the right to be represented by counsel, to confront and cross-examine witnesses against your client, to challenge the admissibility of evidence offered against your client, to compel witnesses to appear for the purpose of testifying and presenting other evidence on your client's behalf, and to choose whether to testify. If there were a jury trial and your client chose not to testify at that trial, your client would have the right to have the jury instructed that your client's failure to testify could not be held against your client. Your client would further have the right to have the jury instructed that your client is presumed innocent until proven guilty, and that the burden would be on the United States to prove your client's guilt beyond a reasonable doubt. If your client were found guilty after a trial, your client would have the right to appeal your client's conviction. Your client understands that the Fifth Amendment to the Constitution of the United States protects your client from the use of compelled self-incriminating statements in a criminal prosecution. By entering a plea of guilty, your client knowingly and voluntarily waives or gives up your client's right against compelled self-incrimination.

Your client acknowledges discussing with you Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. Your client knowingly and voluntarily hereby waives the rights that arise under these rules to object to the use of all such statements by him on and after September 10, 2018, in the event your client breaches this agreement, withdraws his guilty plea, or seeks to withdraw from this Agreement after signing it. This Agreement supersedes the proffer agreement between the Government and the client.

Your client also agrees to waive all constitutional and statutory rights to a speedy sentence and agrees that the pleas of guilty pursuant to this Agreement will be entered at a time decided upon by the parties with the concurrence of the Court. Your client understands that the date for sentencing will be set by the Courts.

Your client agrees not to accept remuneration or compensation of any sort, directly or indirectly, for the dissemination through any means, including but not limited to books, articles, speeches, blogs, podcasts, and interviews, however disseminated, regarding the conduct encompassed by the Statement of the Offense, or the investigation by the Office or prosecution of any criminal or civil cases against him.

## D. Appeal Rights

Your client understands that federal law, specifically 18 U.S.C. § 3742, affords defendants the right to appeal their sentences in certain circumstances. Your client agrees to waive the right to appeal the sentences in this case and the Eastern District of Virginia, including but not limited to any term of imprisonment, fine, forfeiture, award of restitution, term or condition of supervised release, authority of the Courts to set conditions of release, and the manner in which the sentences were determined, except to the extent the Courts sentence your client above the statutory maximum or guidelines range determined by the Courts or your client claims that your client received ineffective assistance of counsel, in which case your client would

have the right to appeal the illegal sentence or above-guidelines sentence or raise on appeal a claim of ineffective assistance of counsel, but not to raise on appeal other issues regarding the sentencings. In agreeing to this waiver, your client is aware that your client's sentences have yet to be determined by the Courts. Realizing the uncertainty in estimating what sentences the Courts ultimately will impose, your client knowingly and willingly waives your client's right to appeal the sentence, to the extent noted above, in exchange for the concessions made by the Government in this Agreement.

## E. Collateral Attack

Your client also waives any right to challenge the conviction entered or sentence imposed under this Agreement or in the Eastern District of Virginia or otherwise attempt to modify or change the sentences or the manner in which they were determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on a claim that your client received ineffective assistance of counsel.

Your client agrees that with respect to all charges referred to herein he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law.

## F. Privacy Act and FOIA Rights

Your client also agrees to waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including and without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a, for the duration of the Special Counsel's investigation.

## 11. Restitution

Your client understands that the Court has an obligation to determine whether, and in what amount, mandatory restitution applies in this case under 18 U.S.C. § 3663A. The Government and your client agree that mandatory restitution does not apply in this case.

## 12. Forfeiture

a) Your client agrees to the forfeiture set forth in the Forfeiture Allegations in the Superseding Criminal Information to which your client is pleading guilty. Your client further agrees to forfeit criminally and civilly the following properties (collectively, the "Forfeited Assets") to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), 982(a)(1), 982(a)(2); Title 21, United States Code, Section 853(p), and Title 28 U.S.C. § 2461(c), and further agrees to waive all interest in such assets in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal:

1) The real property and premises commonly known as 377 Union Street, Brooklyn, New

Page **10** of **17**

York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

2) The real property and premises commonly known as 29 Howard Street, #4D, New York, New York 10013 (Block 209, Lot 1104), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

3) The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

4) All funds held in account number         0969 at The Federal Savings Bank, and any property traceable thereto;

5) All funds seized from account number         1388 at Capital One N.A., and any property traceable thereto;

6) All funds seized from account number         9952 at The Federal Savings Bank, and any property traceable thereto;

7) Northwestern Mutual Universal Life Insurance Policy         and any property traceable thereto;

8) The real property and premises commonly known as 123 Baxter Street, #5D, New York, New York 10016 in lieu of 1046 N. Edgewood Street; and

9) The real property and premises commonly known as 721 Fifth Avenue, #43G, New York, New York 10022 in lieu of all funds from account number         ^ at Charles Schwab & Co. Inc., and any property traceable thereto.

Your client agrees that his consent to forfeiture is final and irrevocable as to his interests in the Forfeited Assets.

b)     Your client agrees that the facts set forth in the Statement of Facts and admitted to by your client establish that the Forfeited Assets are forfeitable to the United States pursuant to Title 18, United States Code, Sections 981 and 982, Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461. Your client admits that the Forfeited Assets numbered 1 through 7, above, represent property that constitutes or is derived from proceeds of, and property involved in, the criminal offenses in the Superseding Criminal Information to which your client is pleading guilty. Your client further agrees that all the Forfeited Assets (numbered 1 through 9) can additionally be considered substitute assets for the purpose of forfeiture to the United States pursuant to Title 18, United States Code, Section 982(b); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).

c)       Your client agrees that the Court may enter a preliminary order of forfeiture for the Forfeited Assets at the time of your client's guilty plea or at any time before sentencing, and consents thereto. Your client agrees that the Court can enter a Final Order of Forfeiture for the Forfeited Assets, and could do so as part of his sentence.

d)       Your client further agrees that the government may choose in its sole discretion how it wishes to accomplish forfeiture of the property whose forfeiture your client has consented to in this plea agreement, whether by criminal or civil forfeiture, using judicial or non-judicial forfeiture processes. If the government chooses to effect the forfeiture provisions of this plea agreement through the criminal forfeiture process, your client agrees to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J) and 32.2 regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

e)       Your client understands that the United States may institute civil or administrative forfeiture proceedings against all forfeitable property in which your client has an interest, including the Forfeited Assets, without regard to the status of his criminal conviction. Your client further consents to the civil forfeiture of the Forfeited Assets to the United States, without regard to the status of his criminal conviction. In connection therewith, your client specifically agrees to waive all right, title, and interest in the Forfeited Assets, both individually and on behalf of DMP International, Summerbreeze LLC, or any other entity of which he is an officer, member, or has any ownership interest. Your client waives all defenses based on statute of limitations and venue with respect to any administrative or civil forfeiture proceeding related to the Forfeited Assets.

f)       Your client represents that with respect to each of the Forfeited Assets, he is either the sole and rightful owner and that no other person or entity has any claim or interest, or that he has secured the consent from any other individuals or entities having an interest in the Forfeited Assets to convey their interests in the Forfeited Assets to him prior to entry of the Order of Forfeiture (with the exception of previously disclosed mortgage holders). Your client warrants that he has accurately represented to the Government all those individuals and entities having an interest in the Forfeited Assets and the nature and extent of those interests, including any mortgages or liens on the Forfeited Assets. Your client agrees to take all steps to pass clear title to the Forfeited Assets to the United States (with the exception of previously disclosed mortgage liens). Your client further agrees to testify truthfully in any judicial forfeiture proceeding, and to take all steps to effectuate the same as requested by the Government. Your client agrees to take all steps requested by the Government to obtain from any other parties by any lawful means any records of assets owned at any time by your client, including but not limited to the Forfeited Assets, and to otherwise facilitate the effectuation of forfeiture and the maximization of the value of Forfeited Assets for the United States.

g)       Your client agrees that, to the extent that he does not convey to the United States

clear title to each of the Forfeited Assets, the United States is entitled, in its sole discretion, either to vacatur of the plea agreement or to forfeiture to the United States of a sum of money equal to the value of that asset at the time this agreement was executed. Your client consents to modification of any Order of Forfeiture at any point to add such sum of money as a forfeiture judgment in substitution for Forfeited Assets.

h)     Your client hereby abandons any interest he has in all forfeitable property and consents to any disposition of the property by the government without further notice or obligation whatsoever owning to your client.

i)     Your client agrees not to interpose any claim, or to assist others to file or interpose any claim, to the Forfeited Assets in any proceeding, including but not limited to any civil or administrative forfeiture proceedings and any ancillary proceedings related to criminal forfeiture. Your client agrees that he shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeited Assets, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeited Assets, nor shall your client assist any other in filing any such claims, petitions, actions, or motion. Contesting or assisting others in contesting forfeiture shall constitute a material breach of the Agreement, relieving the United States of all its obligations under the Agreement. Your client agrees not to seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the assets forfeited pursuant to this Agreement.

j)     In the event your client fails to deliver the assets forfeited pursuant to this agreement, or in any way fails to adhere to the forfeiture provisions of this agreement, the United States reserves all remedies available to it, including but not limited to vacating the Agreement based on a breach of the Agreement by your client.

k)     Your client agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him notwithstanding the abatement of any underlying criminal conviction after the execution of this Agreement.

l)     Your client agrees that he will not claim, assert, or apply for, directly or indirectly, any tax deduction, tax credit, or any other taxable offset with regard to any federal, state, or local tax or taxable income for payments of any assets forfeited pursuant to this Agreement.

m)     Your client agrees to waive all constitutional and statutory challenges in any manner (including, but not limited to, direct appeal) to any forfeiture carried out in accordance with this Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

### 13.    **Breach of Agreement**

Your client understands and agrees that, if after entering this Agreement, your client fails specifically to perform or to fulfill completely each and every one of your client's obligations under this Agreement, or engages in any criminal activity prior to sentencing or during his cooperation (whichever is later), your client will have breached this Agreement. Should it be judged by the Government in its sole discretion that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from his pleas of guilty but the Government will be released from its obligations under this agreement, including (a) not to oppose a downward adjustment of two levels for acceptance of responsibility described above, and to make the motion for an additional one-level reduction described above and (b) to file the motion for a downward departure for cooperation described above. Moreover, the Government may withdraw the motion described above, if such motion has been filed prior to sentencing. In the event that it is judged by the Government that there has been a breach: (a) your client will be fully subject to criminal prosecution, in addition to the charges contained in the Superseding Criminal Information, for any crimes to which he has not pled guilty, including perjury and obstruction of justice; and (b) the Government and any other party will be free to use against your client, directly and indirectly, in any criminal or civil proceeding, all statements made by your client, including the Statement of the Offense, and any of the information or materials provided by your client, including such statements, information, and materials provided pursuant to this Agreement or during the course of any debriefings conducted in anticipation of, or after entry of, this Agreement, whether or not the debriefings were previously a part of proffer-protected debriefings, and your client's statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

Your client understands and agrees that the Government shall be required to prove a breach of this Agreement only by good faith.

Nothing in this Agreement shall be construed to protect your client from prosecution for any crimes not included within this Agreement or committed by your client after the execution of this Agreement. Your client understands and agrees that the Government reserves the right to prosecute your client for any such offenses. Your client further understands that any perjury, false statements or declarations, or obstruction of justice relating to your client's obligations under this Agreement shall constitute a breach of this Agreement. In the event of such a breach, your client will not be allowed to withdraw your client's guilty plea.

### 14.    **Complete Agreement**

Apart from the written proffer agreement initially dated September 11, 2018, which this Agreement supersedes, no agreements, promises, understandings, or representations have been

made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by your client, defense counsel, and the Office.

Your client further understands that this Agreement is binding only upon the Office. This Agreement does not bind any United States Attorney's Office, nor does it bind any other state, local, or federal prosecutor. It also does not bar or compromise any civil, tax, or administrative claim pending or that may be made against your client.

If the foregoing terms and conditions are satisfactory, your client may so indicate by

signing this Agreement and the Statement of the Offense, and returning both to the Office no later than September 14, 2018.

Sincerely yours,

ROBERT S. MUELLER, III
Special Counsel

By:

Andrew Weissmann
Jeannie S. Rhee
Greg D. Andres
Kyle R. Freeny
Senior/Assistant Special Counsels

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorneys Kevin Downing, Thomas Zehnle, and Richard Westling. I am fully satisfied with the legal representation by them, who I have chosen to represent me herein. Nothing about the quality of the representation of other counsel is affecting my decision herein to plead guilty. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorneys in connection with this Agreement and matters related to it.

Date: 9-13-18

Paul J. Manafort, Jr.
Defendant

## ATTORNEYS' ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, Paul J. Manafort, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: 9-13-2018

Kevin M. Downing
Richard W. Westling
Thomas E. Zehnle
Attorneys for Defendant



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**SEP 14 2018**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES OF AMERICA          *
                                  *    CRIMINAL NO. 17-201-1 (ABJ)
                                  *
v.                                *    Violations: 18 U.S.C. § 371
                                  *    (Conspiracy Against the United States
                                  *    and Conspiracy to Obstruct Justice)
PAUL J. MANAFORT, JR.,            *
                                  *
         Defendant.               *
                              *******

## STATEMENT OF THE OFFENSES AND OTHER ACTS

Pursuant to the Federal Rules of Criminal Procedure 11, the United States and the
defendant PAUL J. MANAFORT, JR. (MANAFORT) stipulate and agree that the following
facts are true and accurate. These facts do not constitute all of the facts known to the parties
concerning the charged offense and covered conduct. This statement is being submitted by the
parties to demonstrate that sufficient facts exist to establish that the defendant committed the
offenses to which he is pleading guilty.

### Count 1: Conspiracy Against the United States (18 U.S.C. § 371)

1.      At all relevant times herein, MANAFORT was an owner of Davis Manafort Partners, Inc.
(DMP) or DMP International, LLC (DMI) or both. MANAFORT engaged in a variety of criminal
schemes, and knowingly, intentionally, and willfully conspired with Richard W. Gates, Konstantin
Kilimnik, and others to carry out the criminal schemes that make up Counts One and Two of the
Information, as more fully set forth below.

### A. FARA Conspiracy
### 22 U.S.C. §§ 612 and 618(a)(1)

**MANAFORT's Lobbying in the United States on Behalf of the Government of Ukraine**

Page **1** of **24**

2.      MANAFORT knew it was illegal to lobby government officials and engage in public relations activities (hereinafter collectively referred to as lobbying) in the United States on behalf of a foreign government or political party, without registering with the United States Government under the Foreign Agents Registration Act.  MANAFORT knew he was lobbying in the United States for the Government of Ukraine, President Viktor F. Yanukovych, the Party of Regions, and the Opposition Bloc (the latter two being political parties in Ukraine), and thus he was supposed to submit a written registration statement to the United States Department of Justice. MANAFORT knew that the filing was required to disclose the name of the foreign country, all the financial payments to the lobbyist, and the specific steps undertaken for the foreign country in the United States, among other information.

3.      MANAFORT knew that Ukraine had a strong interest in the United States' taking economic and policy positions favorable to Ukraine, including not imposing sanctions on Ukraine. MANAFORT also knew that the trial and treatment of President Yanukovych's political rival, former Prime Minister Yulia Tymoshenko, was strongly condemned by leading United States executive and legislative branch officials, and was a major hurdle to improving United States and Ukraine relations.

4.      From 2006 until 2015, MANAFORT led a multi-million dollar lobbying campaign in the United States at the direction of the Government of Ukraine, President Yanukovych, the Party of Regions, and the Opposition Bloc.  MANAFORT intentionally did so without registering and providing the disclosures required by law.

5.      As part of the lobbying scheme, MANAFORT hired numerous firms and people to assist in his lobbying campaign in the United States.  He hired Companies A, B, C, D, and E, and Law Firm A, among others, to participate in what he described to President Yanukovych in writing as a global

"Engage Ukraine" lobbying campaign that he devised and led. These companies and law firm were paid the equivalent of over $11 million for their Ukraine work.

6.  MANAFORT viewed secrecy for himself and for the actions of his lobbyists as integral to the effectiveness of the lobbying offensive he orchestrated for Ukraine. Filing under the Foreign Agents Registration Act would have thwarted the secrecy MANAFORT sought in order to conduct an effective campaign for Ukraine to influence both American leaders and the American public.

7.  MANAFORT took steps to avoid any of these firms and people disclosing their lobbying efforts under the Foreign Agents Registration Act. As one example, even though MANAFORT engaged Company E in 2007 to lobby in the United States for the Government of Ukraine, MANAFORT tried to dissuade Company E from filing under the Foreign Agents Registration Act. Only after MANAFORT ceased to use Company E in the fall of 2007 did Company E disclose its work for Ukraine, in a belated filing under the Act in 2008.

8.  MANAFORT took other measures to keep the Ukraine lobbying as secret as possible. For example, MANAFORT, in written communications on or about May 16, 2013, directed his lobbyists (including Persons D1 and D2, who worked for Company D) to write and disseminate within the United States news stories that alleged that Tymoshenko had paid for the murder of a Ukrainian official. MANAFORT stated that it should be "push[ed]" "[w]ith no fingerprints." "It is very important we have no connection." MANAFORT stated that "[m]y goal is to plant some stink on Tymo." Person D1 objected to the plan, but ultimately Persons D1 and D2 complied with MANAFORT's direction. The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew. He did not.

The Hapsburg Group and Company D

9.  As part of the lobbying scheme, starting in 2011, MANAFORT secretly retained Company

Page **3** of **24**

D and a group of four former European heads of state and senior officials (including a former Austrian Chancellor, Italian Prime Minister, and Polish President) to lobby in the United States and Europe on behalf of Ukraine. The former politicians, called the Hapsburg Group by MANAFORT, appeared to be providing solely their independent assessments of Government of Ukraine policies, when in fact they were paid by Ukraine. MANAFORT explained in an "EYES ONLY" memorandum in or about June 2012 that his purpose was to "assemble a small group of high-level European infuencial [sic] champions and politically credible friends who can act informally and without any visible relationship with the Government of Ukraine."

10. Through MANAFORT, the Government of Ukraine retained an additional group of lobbyists (Company D and Persons D1 and D2). In addition to lobbying itself, Company D secretly served as intermediaries between the Hapsburg Group and MANAFORT and the Government of Ukraine. In or about 2012 through 2013, MANAFORT directed more than the equivalent of 700,000 euros to be wired from at least three of his offshore accounts to the benefit of Company D to pay secretly for its services.

11. All four Hapsburg Group members, at the direction, and with the direct assistance, of MANAFORT, advocated positions favorable to Ukraine in meetings with United States lawmakers, interviews with United States journalists, and ghost written op-eds in American publications. In or about 2012 through 2014, MANAFORT directed more than 2 million euros to be wired from at least four of his offshore accounts to pay secretly the Hapsburg Group. To avoid European taxation, the contract with the Hapsburg Group falsely stated that none of its work would take place in Europe.

12. One of the Hapsburg Group members, a former Polish President, was also a representative of the European Parliament with oversight responsibility for Ukraine. MANAFORT solicited that

official to provide MANAFORT inside information about the European Parliament's views and actions toward Ukraine and to take actions favorable to Ukraine. MANAFORT also used this Hapsburg Group member's current European Parliament position to Ukraine's advantage in his lobbying efforts in the United States. In the fall of 2012, the United States Senate was considering and ultimately passed a resolution critical of President Yanukovych's treatment of former Prime Minister Tymoshenko. MANAFORT engaged in an all-out campaign to try to kill or delay the passage of this resolution. Among the steps he took was having the Hapsburg Group members reach out to United States Senators, as well as directing Companies A and B to have private conversations with Senators to lobby them to place a "hold" on the resolution. MANAFORT told his lobbyists to stress to the Senators that the former Polish President who was advocating against the resolution was currently a designated representative of the President of the European Parliament, to give extra clout to his supposedly independent judgment against the Senate resolution. MANAFORT never revealed to the Senators or to the American public that any of these lobbyists or Hapsburg Group members were paid by Ukraine.

13. In another example, on May 16, 2013, another member of the Hapsburg Group lobbied in the United States for Ukraine. The Hapsburg Group member accompanied his country's prime minister to the Oval Office and met with the President and Vice President of the United States, as well as senior United States officials in the executive and legislative branches. In written communications sent to MANAFORT, Person D1 reported that the Hapsburg Group member delivered the message of not letting "Russians Steal Ukraine from the West." The Foreign Agents Registration Act required MANAFORT to disclose such lobbying, as MANAFORT knew. He did not.

Law Firm Report and Tymoshenko

Case 1:18-cr-00083-TSE Document 523-3 Filed 08/24/18 Page 2 of 19 PageID# 6923

14. As another part of the lobbying scheme, in 2012, on behalf of President Yanukovych and the Government of Ukraine's Ministry of Justice, MANAFORT solicited a United States law firm to write a report evaluating the trial of Yanukovych's political opponent Yulia Tymoshenko. MANAFORT caused Ukraine to hire the law firm so that its report could be used in the United States and elsewhere to defend the Tymoshenko criminal trial and argue that President Yanukovych and Ukraine had not engaged in selective prosecution.

15. MANAFORT retained a public relations firm (Company C) to prepare a media roll-out plan for the law firm report. MANAFORT used one of his offshore accounts to pay Company C the equivalent of more than $1 million for its services.

16. MANAFORT worked closely with Company C to develop a detailed written lobbying plan in connection with what MANAFORT termed the "selling" of the report. This campaign included getting the law firm's report "seeded" to the press in the United States—that is, to leak the report ahead of its official release to a prominent United States newspaper and then use that initial article to influence reporting globally. As part of the roll-out plan, on the report's issuance on December 13, 2012, MANAFORT arranged to have the law firm disseminate hard copies of the report to numerous government officials, including senior United States executive and legislative branch officials.

17. MANAFORT reported on the law firm's work on the report and Company C's lobbying plan to President Yanukovych and other representatives of the Government of Ukraine. For example, in a July 27, 2012 memorandum to President Yanukovych's Chief of Staff, MANAFORT reported on "the global rollout strategy for the [law firm's] legal report, and provide[d] a detailed plan of action[]" which included step-by-step lobbying outreach in the United States.

18. MANAFORT directed lobbyists to tout the report as showing that President Yanukovych

Page **6** of **24**

had not selectively prosecuted Tymoshenko. But in November 2012 MANAFORT had been told privately in writing by the law firm that the evidence of Tymoshenko's criminal intent "is virtually non-existent" and that it was unclear even among legal experts that Tymoshenko lacked power to engage in the conduct central to the Ukraine criminal case. These facts, known by MANAFORT, were not disclosed to the public.

19.    MANAFORT knew that the report also did not disclose that the law firm, in addition to being retained to write the report, was retained to represent Ukraine itself, including in connection with the Tymoshenko case and to provide training to the trial team prosecuting Tymoshenko.

20.    MANAFORT also knew that the Government of Ukraine did not want to disclose how much the report cost. More than \$4.6 million was paid to the law firm for its work. MANAFORT used one of his offshore accounts to funnel \$4 million to pay the law firm, a fact that MANAFORT did not disclose to the public. Instead, the Government of Ukraine reported falsely that the report cost just \$12,000.

21.    MANAFORT and others knew that the actual cost of the report and the scope of the law firm's work would undermine the report's being perceived as an independent assessment and thus being an effective lobbying tool for MANAFORT to use to support the incarceration of President Yanukovych's political opponent.

22.    In addition to the law firm report, MANAFORT took other steps on behalf of the Government of Ukraine to tarnish Tymoshenko in the United States. In addition to disseminating stories about her soliciting murder, noted above, in October 2012, MANAFORT orchestrated a scheme to have, as he wrote in a contemporaneous communication, "[O]bama jews" put pressure on the Administration to disavow Tymoshenko and support Yanukovych. MANAFORT sought to undermine United States support for Tymoshenko by spreading stories in the United States that

a senior Cabinet official (who had been a prominent critic of Yanukovych's treatment of Tymoshenko) was supporting anti-Semitism because the official supported Tymoshenko, who in turn had formed a political alliance with a Ukraine party that espoused anti-Semitic views. MANAFORT coordinated privately with a senior Israeli government official to issue a written statement publicizing this story. MANAFORT then, with secret advance knowledge of that Israeli statement, worked to disseminate this story in the United States, writing to Person D1 "I have someone pushing it on the NY Post. Bada bing bada boom." MANAFORT sought to have the Administration understand that "the Jewish community will take this out on Obama on election day if he does nothing." MANAFORT then told his United States lobbyist to inform the Administration that Ukraine had worked to prevent the Administration's presidential opponent from including damaging language in the Israeli statement, so as not to harm the Administration, and thus further ingratiate Yanukovych with the Administration.

### Company A and Company B

23. As a third part of the lobbying scheme, in February 2012, MANAFORT solicited two Washington, D.C. lobbying firms (Company A and Company B) to lobby in the United States on behalf of President Yanukovych, the Party of Regions and the Government of Ukraine. For instance, in early 2012 at the inception of the relationship, Company B wrote in an email to its team about a "potential representation for the Ukraine," having been contacted "at the suggestion of Paul Manafort who has been working on the current PM elections."

24. MANAFORT arranged to pay Companies A and B over \$2 million from his offshore accounts for their United States lobbying work for Ukraine.

25. MANAFORT provided direction to Companies A and B in their lobbying efforts, including providing support for numerous United States visits by numerous senior Ukrainian officials.



Companies A and B, at MANAFORT's direction, engaged in extensive United States lobbying. Among other things, they lobbied dozens of Members of Congress, their staff, and White House and State Department officials about Ukraine sanctions, the validity of Ukraine elections, and the propriety of President Yanukovych's imprisoning Tymoshenko, his presidential rival.

26.     In addition, with the assistance of Company A, MANAFORT also personally lobbied in the United States. He drafted and edited numerous ghost-written op-eds for publication in United States newspapers. He also personally met in March 2013 in Washington, D.C., with a Member of Congress who was on a subcommittee that had Ukraine within its purview. After the meeting, MANAFORT prepared a report for President Yanukovych that the meeting "went well" and reported a series of positive developments for Ukraine from the meeting.

27.     Indeed, MANAFORT repeatedly communicated in person and in writing with President Yanukovych and his staff about the lobbying activities of Companies A and B and he tasked the companies to prepare assessments of their work so he, in turn, could brief President Yanukovych. For instance, MANAFORT wrote President Yanukovych a memorandum dated April 8, 2012, in which he provided an update on the lobbying firms' activities "since the inception of the project a few weeks ago. It is my intention to provide you with a weekly update moving forward." In November 2012, Gates wrote to Companies A and B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013." The resulting memorandum from Companies A and B, with input from Gates, noted among other things that the "client" had not been as successful as hoped given that it had an Embassy in Washington.

28.     To distance their United States lobbying work from the Government of Ukraine, and to avoid having to register as agents of Ukraine under the Foreign Agents Registration Act,



MANAFORT with others arranged for Companies A and B to be engaged by a newly-formed Brussels entity called the European Centre for the Modern Ukraine (the Centre), instead of directly by the Government of Ukraine.

29.    MANAFORT described the Centre as "the Brussels NGO that we have formed" to coordinate lobbying for Ukraine. The Centre was founded by a Ukraine Party of Regions member and Ukraine First Vice-Prime Minister. The head of its Board was another member of the Party of Regions, who became the Ukraine Foreign Minister.

30.    In spite of these ties to Ukraine, MANAFORT and others arranged for the Centre to represent falsely that it was not "directly or indirectly supervised, directed, [or] controlled" in whole or in major part by the Government of Ukraine or the Party of Regions. MANAFORT knew that the false and misleading representations would lead Companies A and B not to register their activities pursuant to the Foreign Agents Registration Act.

31.    Despite the Centre being the ostensible client of Companies A and B, MANAFORT knew that the Centre did not direct or oversee their work. The firms received direction from MANAFORT and his subordinate Gates, on behalf of the Government of Ukraine.

32.    As MANAFORT knows from giving directions to Companies A and B, and from the discovery material provided herein, various employees of Companies A and B understood that they were receiving direction from MANAFORT and President Yanukovych, not the Centre, which was not even operational when Companies A and B began lobbying for Ukraine. MANAFORT, Gates, and employees of both Companies A and B referred to the client in ways that made clear they knew it was Ukraine, for instance noting that the "client" had an Embassy in Washington D.C. The head of Company B told his team to think the President of Ukraine "is the client." As a Company A employee noted to another company employee: the lobbying for the



Centre was "in name only. [Y]ou've gotta see through the nonsense of that[.]" "It's like Alice in Wonderland." An employee of Company B described the Centre as a fig leaf, and the Centre's written certification that it was not related to the Party of Regions as "a fig leaf on a fig leaf," referring to the Centre in an email as the "European hot dog stand for a Modern Ukraine."

Conspiring to Obstruct Justice: False and Misleading Submissions to the Department of Justice

33. In September 2016, after numerous press reports concerning MANAFORT had appeared in August, the Department of Justice National Security Division informed MANAFORT, Gates, and DMI in writing that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act, without registering. In November 2016 and February 2017, MANAFORT and Gates conspired to knowingly and intentionally cause false and misleading letters to be submitted to the Department of Justice, through his unwitting legal counsel. The letters, both of which were approved by MANAFORT before they were submitted by his counsel, represented falsely, among other things, that:

a. DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

b. MANAFORT did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications. Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

c. MANAFORT had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based

Page **11** of **24**

consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

d.   DMI "does not retain communications beyond thirty days" and as a result of this policy, a "search has returned no responsive documents." The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

34.   In fact, MANAFORT had: selected Companies A and B; engaged in weekly scheduled calls and frequent emails with Companies A and B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Companies A and B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the lobbying firms over $2.5 million from offshore accounts he controlled, among other things.

35.   Although MANAFORT had represented to the Department of Justice in November 2016 and February 2017 that he had no relevant documents, in fact MANAFORT had numerous incriminating documents in his possession, as he knew at the time. The Federal Bureau of Investigation conducted a court-authorized search of MANAFORT'S home in Virginia in the summer of 2017. The documents attached hereto as Government Exhibits 503, 504, 517, 532, 594, 604, 606, 616, 691, 692, 697, 706 and 708, among numerous others, were all documents that MANAFORT had in his possession (and were found in the search) and all pre-dated the November 2016 letter.

### B. Money Laundering Conspiracy

36.   In or around and between 2006 and 2016, MANAFORT, together with others, did

knowingly and intentionally conspire (a) to conduct financial transactions, affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, to wit, felony violations of FARA in violation of Title 22, United States Code, Sections 612 and 618, knowing that the property involved in the financial transactions represented proceeds of some form of unlawful activity, with intent to engage in conduct constituting a violation of sections 7201 and 7206 of the Internal Revenue Code of 1986; and (b) to transport, transmit, and transfer monetary instruments and funds from places outside the United States to and through places in the United States and from places in the United States to and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: a felony violation of FARA, in violation of Title 22, United States Code, Sections 612 and 618, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(ii) and (a)(2)(A).

37. MANAFORT caused the following transfers to be made, knowing that they were being made to entities to carry on activities that were required to be timely reported under the Foreign Agents Registration Act, but were not:

| Payee | Date | Payer | Originating Bank Account | Country of... | | Amount (USD) |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Origin | Destination | |
| Company A | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $270,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $90,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $120,000.00 |
| | 11/20/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $182,968.07 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $25,000.00 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $90,000.00 |
| | 9/18/2013 | Global Endeavour Inc. | Loyal Bank Limited Account -1840 | SVG* | US | $135,937.37 |

| Payee | Date | Payer | Originating Bank Account | Country of Origin | Destination | Amount (USD) |
|---|---|---|---|---|---|---|
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $167,689.40 |
| | 3/28/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $135,639.65 |
| | 4/3/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $82,979.93 |
| **Total Company A Transfers** | | | | | | **$1,300,214.42** |
| Company B | 5/30/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 8/2/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $195,000.00 |
| | 10/10/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $130,000.00 |
| | 11/16/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $50,000.00 |
| | 12/21/2012 | Bletilla Ventures Ltd. | Bank of Cyprus Account -0480 | Cyprus | US | $54,649.51 |
| | 3/15/2013 | Bletilla Ventures Ltd. | Hellenic Bank Account -2501 | Cyprus | US | $150,000.00 |
| | 9/3/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $175,857.51 |
| | 10/31/2013 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $195,857.51 |
| | 3/12/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $26,891.78 |
| | 3/21/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $138,026.00 |
| | 4/15/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,728.81 |
| | 4/25/2014 | Jeunet Ltd. | Loyal Bank Limited Account -4978 | SVG* | US | $4,739.23 |
| **Total Company B Transfers** | | | | | | **$1,255,750.35** |

| Payee | Date | Payer | Originating Bank Account | Country of<br>Origin | Destination (USD) | Amount |
|---|---|---|---|---|---|---|
| Law Firm A | 4/19/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $2,000,000.00 |
| | 5/30/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| | 7/13/2012 | Black Sea View Limited | Bank of Cyprus Account -7412 | Cyprus | US | $1,000,000.00 |
| **Total Law Firm A Transfers** | | | | | | **$4,000,000.00** |
| **TOTAL TRANSFERS** | | | | | | **$6,555,964.77** |

\* SVG refers to St. Vincent and the Grenadines.

### C. Tax and Foreign Bank Account Conspiracy
### 26 U.S.C. § 7206(1)
### 31 U.S.C. §§ 5314 and 5322(a)

38. From 2008 through 2014, MANAFORT caused millions of dollars of wire transfers to be made from offshore nominee accounts, without paying taxes on that income. The payments were made for goods, services, and real estate. MANAFORT also hid income by denominating various overseas payments as "loans," thereby evading payment of any taxes on that income by MANAFORT.

39. MANAFORT directly and through Gates repeatedly misled his bookkeeper and tax accountants, including by not disclosing Manafort's overseas accounts and income. Further, MANAFORT and Gates, acting at Manafort's instruction, classified overseas payments made to MANAFORT falsely as "loans" to avoid incurring additional taxes on the income.

40. MANAFORT owned and controlled a range of foreign bank accounts in Cyprus, the Grenadines, and the United Kingdom. MANAFORT directly and through Gates maintained these accounts, including by managing them and by making substantial transfers from the accounts to both himself and vendors for personal items for him and his family. MANAFORT was aware that many of these accounts held well in excess of $10,000 in the aggregate at some point during each year in which they existed. MANAFORT did not report the accounts' existence to his bookkeeper

Page **15** of **24**

and his tax preparers in an effort to hide them, and to allow him to avoid disclosing their existence on an FBAR filing.

41.     MANAFORT was aware at the time that it was illegal to hide income from the Internal Revenue Service (IRS) by failing to account for reportable income on his income tax returns. MANAFORT was also aware that it was illegal to fail to report information to the IRS regarding the existence of foreign bank accounts, as required by Schedule B of the IRS Form 1040. MANAFORT also understood at the time that a U.S. person who had a financial interest in, or signature or other authority over, a bank account or other financial account in a foreign country, which exceeded $10,000 in any one year (at any time during that year), was required to report the account to the Department of the Treasury. MANAFORT also understood, after 2010, that the failure to make such a report constituted a crime.

42.     Knowing the existence of his reportable foreign accounts and hidden income, MANAFORT knowingly, intentionally, and willfully filed and conspired to file false tax returns from 2006-2015 in that he said he did not have reportable foreign bank accounts when he knew that he did, he did not report income that he knew he in fact had earned, and he did not file Foreign Bank Account Reports. MANAFORT failed to report over $15 million in income during the period 2010-2014.

## FORFEITURE

43.     The following assets constitute or were derived from proceeds of MANAFORT's conspiracy to violate the Foreign Agents Registration Act and/or they constitute property involved in MANAFORT's conspiracy to launder money in violation of 18 U.S.C. § 1956 or are traceable thereto and/or they represent substitute assets for such property which has been made unavailable for forfeiture by the acts or omissions of MANAFORT:

     a) The real property and premises commonly known as 377 Union Street, Brooklyn, New

Page **16** of **24**

York 11231 (Block 429, Lot 65), including all appurtenances, improvements, and
attachments thereon, and any property traceable thereto;

b) The real property and premises commonly known as 29 Howard Street, #4D, New
York, New York 10013 (Block 209, Lot 1104), including all appurtenances,
improvements, and attachments thereon, and any property traceable thereto;

c) The real property and premises commonly known as 174 Jobs Lane, Water Mill, New
York 11976, including all appurtenances, improvements, and attachments thereon, and
any property traceable thereto;

d) All funds held in account number XXXXXX0969 at The Federal Savings Bank, and
any property traceable thereto;

e) All funds seized from account number XXXXXX1388 at Capital One N.A. and any
property traceable thereto;

f) All funds seized from account number XXXXXX9952 at The Federal Savings Bank
and any property traceable thereto;

g) Northwestern Mutual Universal Life Insurance Policy         and any property
traceable thereto;

h) The real property and premises commonly known as 123 Baxter Street, #5D, New
York, New York 10016 in lieu of 1046 N. Edgewood Street; and

i) The real property and premises commonly known as 721 Fifth Avenue, #43G, New
York, New York 10022 in lieu of all funds from account number        at Charles
Schwab & Co. Inc., and any property traceable thereto.

### Count Two: Witness Tampering Conspiracy (18 U.S.C. § 371)

44.     From in or about and between February 23, 2018, and April 2018, both dates being
approximate and inclusive, within the District of Columbia and elsewhere, the defendant PAUL J.

MANAFORT, JR., together with others, including Konstantin Kilimnik, knowingly and intentionally conspired to corruptly persuade another person, to wit: Persons D1 and D2, with intent to influence, delay and prevent the testimony of any person in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1). The facts set forth with respect to Count One are incorporated herein.

45. On February 22, 2018, MANAFORT was charged in the District of Columbia in a Superseding Indictment that for the first time included allegations about the Hapsburg Group and MANAFORT's use of that group to lobby illegally in the United States in violation of the Foreign Agent Registration Act. MANAFORT knew that the Act prescribed only United States lobbying. Immediately after February 22, 2018, MANAFORT began reaching out directly and indirectly to Persons D1 and D2 to induce them to say falsely that they did not work in the United States as part of the lobbying campaign, even though MANAFORT then and there well knew that they did lobby in the United States.

46. MANAFORT committed the following overt acts directly and through his conspirators.

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| MANAFORT contacted Person D1 by phone and a messaging application: | | | |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/24/2018; 15:51 (UTC) | MANAFORT | Person D1 | Phone call: 1 min, 24 second call. |
| 2/24/2018; 15:53 (UTC) | MANAFORT | Person D1 | Text: "This is paul" |
| 2/25/2018; 18:41 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/26/2018; 23:56 (UTC) | MANAFORT | Person D1 | Text: "http://www.businessinsider.com/former-european-leaders-manafort-hapsburg-group-2018-2?r=UK&IR=T" |

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/26/2018; 23:57 (UTC) | MANAFORT | Person D1 | Text: "We should talk. I have made clear that they worked in Europe." |
| 2/27/2018; 11:03 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |
| 2/27/2018; 11:31 (UTC) | MANAFORT | Person D1 | Phone call (attempted): No duration. |

*Kilimnik contacted Person D2 a messaging application, sending four messages:*

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/28/2018; 01:49 (CEST) | Kilimnik | Person D2 | "[Person D2], hi! How are you? Hope you are doing fine. ;))" |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on." |
| 2/28/2018; 01:51 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [Person D1] - would be great" |
| 2/28/2018; 01:53 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |

*Kilimnik contacted Person D2 using a different messaging application, sending five messages:*

| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "Hey, how are you? This is K." |
| 2/28/2018; 06:01(CEST) | Kilimnik | Person D2 | "Hope you are doing fine." |
| 2/28/2018; 06:01 (CEST) | Kilimnik | Person D2 | "My friend P is trying to reach [Person D1] to brief him on what's going on" |
| 2/28/2018; 06:02 (CEST) | Kilimnik | Person D2 | "Basically P wants to give him a quick summary that he says to everybody (which is true) that our friends never lobbied in the US, and the purpose of the program was EU" |



| Date/Time* | Sender | Receiver | Event |
|---|---|---|---|
| 2/28/2018; 06:03 (CEST) | Kilimnik | Person D2 | "If you have a chance to mention this to [First Initial of Person D1's Name]. - it would be great. It would be good to get them connected to discuss in person. P is his friend." |
| *Kilimnik contacted Person D2 using two different applications, sending three messages:* | | | |
| 4/4/2018; 08:53 (CEST) | Kilimnik | Person D2 | "Hey. This is Konstantin. My friend P asked me again to help connect him with [Person D1]. Can you help?" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "Hey. My friend P has asked me again if there is any way to help connect him through [Person D1]" |
| 4/4/2018; 08:54 (CEST) | Kilimnik | Person D2 | "I tried him on all numbers." |
| *Kilimnik contacted Person D1 using a messaging application:* | | | |
| 4/4/2018; 13:00 (UTC) | Kilimnik | Person D1 | "Hi. This is K. My friend P is looking for ways to connect to you to pass you several messages. Can we arrange that." |

*UTC and CEST refer to Coordinated Universal Time and Central European Summer Time, respectively.

## Other Acts

### I. Bank/Bank Fraud Conspiracy
### 18 U.S.C. §§ 1344 and 1349

**Bank Fraud Conspiracy / Citizens Bank / $3.4 million loan**
**(Charged as Count 24 in the Eastern District of Virginia Superseding Indictment)**

47. Between December 2015 and March 2016, MANAFORT conspired to intentionally defraud

Citizens Bank in connection with his application for a mortgage for approximately $3.4 million.

The mortgage related to a condominium on Howard Street in the Soho neighborhood of Manhattan,

New York. During the course of the conspiracy, MANAFORT made and caused to be made, a

series of false and fraudulent representations to the bank in order to secure the loan, including the

Page **20** of **24**



following: (a) MANAFORT falsely represented the amount of debt he had by failing to disclose on his loan application the existence of a mortgage on his Union Street property (from Genesis Capital); (b) MANAFORT caused an insurance broker to provide Citizens Bank false information, namely, an outdated insurance report that did not list the Union Street loan (from Genesis Capital); (c) MANAFORT falsely stated that a $1.5 million Peranova loan had been forgiven in 2015; and (d) MANAFORT falsely represented to the lender and its agents that the Howard Street property was a secondary home used as such by his daughter and son-in-law and was not held as a rental property. These statements were material to Citizens Bank.

48.    Citizens Bank was a financial institution chartered by the United States.

## Bank Fraud Conspiracy / Banc of California / $1 million loan
### (Charged as Count 26 in the Eastern District of Virginia Superseding Indictment)

49.    In approximately February 2016, MANAFORT conspired to intentionally defraud Banc of California in connection with his application for a business loan. During the course of the conspiracy, MANAFORT made and caused to be made a series of false and fraudulent representations to the bank, including the following: (a) the submission of a false statement of assets and liabilities that failed to disclose a loan on the Union Street property (from Genesis Capital) and misrepresented, among other things, the amount of the mortgage on the Howard Street property; and (b) the submission of a doctored 2015 DMI profit and loss statement (P&L) that overstated DMI's 2015 income by more than $4 million. These statements were material to Banc of California.

50.    Banc of California was a financial institution chartered by the United States.

**Bank Fraud Conspiracy / Citizens Bank / $5.5 million loan**
**(Charged as Count 28 in the Eastern District of Virginia Superseding Indictment)**

51. Between December 2015 and March 2016, MANAFORT conspired to intentionally

defraud Citizens Bank in connection with his application for a mortgage for approximately $5.5

million on a property at Union Street in Brooklyn, New York. During the course of the

conspiracy, MANAFORT made or caused to be made a series of false and fraudulent material

representations to the bank in order to secure the loan, including the following: (a) the

submission of a false statement of assets and liabilities that hid a prior loan on the Union Street

property (from Genesis Capital), among other liabilities; and (b) the submission of a falsified

2016 DMI P&L that overstated DMI's income by more than $2 million.

**Bank Fraud/Bank Fraud Conspiracy / The Federal Savings Bank / $9.5 million loan & $6.5**
**million loan**
**(Charged in Counts 29. 30, 31 & 32 in the Eastern District of Virginia Superseding Indictment)**

52. Between April 2016 and January 2017, MANAFORT conspired to intentionally defraud,

and did defraud, The Federal Savings Bank in connection with his applications for the following

two loans: (a) a loan for approximately $9.5 million related to various properties, including a

house in Bridgehampton, New York, and (b) a loan for approximately $6.5 million related to his

Union Street property. During the course of the fraudulent scheme, MANAFORT made and

caused to be made a series of false and fraudulent material representations to the bank in order to

secure both loans, including the following: (a) MANAFORT provided the bank with doctored

P&Ls for DMI for both 2015 and 2016, overstating its income by millions of dollars; and (b)

MANAFORT falsely represented to The Federal Savings Bank that he had lent his credit card to

a friend who had incurred more than $200,000 in charges relating to the purchase of Yankee

tickets.

53. Both loans were extended by The Federal Savings Bank.



54. The Federal Savings Bank was a financial institution chartered by the United States.

ROBERT S. MUELLER, III
Special Counsel

By:

Andrew Weissmann
Jeannie S. Rhee
Greg D. Andres
Kyle R. Freeny
Senior/Assistant Special Counsels

## DEFENDANT'S ACCEPTANCE

I have read every page of this Agreement and have discussed it with my attorneys Kevin Downing, Thomas Zehnle, and Richard Westling. I am fully satisfied with the legal representation by them, who I have chosen to represent me herein. Nothing about the quality of the representation of other counsel is affecting my decision herein to plead guilty. I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Agreement fully. I am pleading guilty because I am in fact guilty of the offense identified in this Agreement.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this Agreement. I am satisfied with the legal services provided by my attorneys in connection with this Agreement and matters related to it.

Date: _9-14-18_

Paul J. Manafort, Jr.
Defendant

## ATTORNEYS' ACKNOWLEDGMENT

I have read every page of this Agreement, reviewed this Agreement with my client, Paul J. Manafort, and fully discussed the provisions of this Agreement with my client. These pages accurately and completely set forth the entire Agreement. I concur in my client's desire to plead guilty as set forth in this Agreement.

Date: _9-14-18_

Kevin M. Downing
Richard W. Westling
Thomas E. Zehnle
Attorneys for Defendant

Page **24** of **24**

Case 1:17-cv-00201-AB-1 Document 528-1 Filed 02/26/19 Page 211 of 246

# EXHIBIT E

FILED
IN OPEN COURT

OCT 2 6 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 1:17-CR-248 |
| | ) |
| | ) Hon. T. S. Ellis, III |
| HYUNG KWON KIM, | ) |
| | ) |
| Defendant. | ) |

## PLEA AGREEMENT

Dana J. Boente, United States Attorney for the Eastern District of Virginia; Mark D.
Lytle, Assistant United States Attorney; Stuart M. Goldberg, Acting Deputy Assistant Attorney
General for the Tax Division, U.S. Department of Justice; Mark F. Daly, Senior Litigation
Counsel and Robert J. Boudreau, Trial Attorney; the defendant, Hyung Kwon Kim; and the
defendant's counsel have entered into an agreement pursuant to Rule 11 of the Federal Rules of
Criminal Procedure. The terms of the agreement are as follows:

### 1. Offense and Maximum Penalties

The defendant agrees to waive indictment and plead guilty to a single count criminal
information charging the defendant with willful failure to file a Report of Foreign Bank and
Financial Accounts, FinCEN Report 114 (formerly TD F 90.22-1) (as applicable, "FBAR") with
the Department of the Treasury, in violation of Title 31, United States Code, Sections 5314 and
5322(a), and Title 31, Code of Federal Regulations, Section 1010.350.

The maximum penalties for this offense are: a maximum term of imprisonment of five
years of imprisonment; a maximum fine of the greater of $250,000 or twice the gross gain or
loss; a special assessment, pursuant to 18 U.S.C. §§ 3013 and 3014; and three years of

supervised release. The defendant understands that this supervised release term is in addition to any prison term the defendant may receive, and that a violation of a term of supervised release could result in the defendant being returned to prison for the full term of supervised release.

### 2. Factual Basis for the Plea

The defendant will plead guilty because the defendant is in fact guilty of the charged offense. The defendant admits the facts set forth in the Statement of Facts filed with this plea agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable doubt. The Statement of Facts, which is hereby incorporated into this plea agreement, constitutes a stipulation of facts for purposes of Section 1B1.2(a) of the U.S. Sentencing Commission's Sentencing Guidelines Manual ("Sentencing Guidelines").

### 3. Assistance and Advice of Counsel

The defendant is satisfied that his attorneys have rendered effective assistance. The defendant understands that by entering into this plea agreement, he surrenders certain rights as provided in this plea agreement. The defendant understands that the rights of criminal defendants include the following:

      a.    the right to plead not guilty and to persist in that plea;

      b.    the right to a jury trial;

      c.    the right to be represented by counsel – and, if necessary, have the Court appoint counsel – at trial and at every other stage of the proceedings; and

      d.    the right at trial to confront and to cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

### 4.    Role of the Court and the Probation Office

The defendant understands that the Court has jurisdiction and authority to impose any sentence within the statutory maximum described above but that the Court will determine his actual sentence in accordance with 18 U.S.C. § 3553(a).  The defendant understands that the Court has not yet determined a sentence and that any estimate of the advisory sentencing range under the Sentencing Guidelines he may have received from his counsel, the United States, or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court.  Additionally, pursuant to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), may impose a sentence above or below the Sentencing Guidelines' advisory sentencing range, subject only to review by higher courts for reasonableness.  The United States makes no promise or representation concerning what sentence the defendant will receive, and he cannot withdraw a guilty plea based upon the actual sentence.

### 5.    Sentencing Guidelines

The Government contends that the applicable Guideline in this matter should be U.S.S.G. § 2S1.3(a)(2), § 2B1.1, and § 2S1.3(b)(2) because the defendant filed two false FBARs and a false U.S. Individual Income Tax Return, Form 1040, within a 12-month period.  However, at the time that the defendant agreed to plead guilty, the Government consistently took the position with similarly situated defendants that the applicable Guideline was U.S.S.G. § 2T1.1 and § 2T1.4 due to the cross reference in 2S1.3(c)(1).

Therefore, in order to ensure that the defendant receives equitable treatment, and in accordance with Federal Rule of Criminal Procedure 11(c)(1)(B), the United States and the

defendant will recommend to the Court that the following provisions of the Sentencing Guidelines apply:

      a.     The base offense level for this offense is 16 pursuant to U.S.S.G. § 2T1.1(a)(1) and § 2T4.1(F), because the tax loss exceeded $100,000;

      b.     The base offense level is increased by 2 levels pursuant to U.S.S.G. § 2T1.1(b)(2) because the offense involved sophisticated means; and

      c.     the parties agree that they are free to argue other provisions of the Sentencing Guidelines not referenced herein or the sentencing factors under 18 U.S.C. § 3553(a).

The United States and the defendant also agree that he has assisted the government in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. If the defendant qualifies for a two-level decrease in offense level pursuant to Sentencing Guidelines § 3E1.1(a) and the offense level prior to the operation of that section is 16 or greater, the government agrees to file, pursuant to Sentencing Guidelines § 3E1.1(b), a motion prior to, or at the time of, sentencing for an additional one-level decrease in the defendant's offense level.

**6.     Waiver of Appeal, FOIA, Privacy Act Rights, Venue and Statute of Limitations**

The defendant also understands that 18 U.S.C. § 3742 affords him the right to appeal the sentence imposed. Nonetheless, the defendant knowingly waives the right to appeal the conviction and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatsoever other than an ineffective assistance of counsel claim that is cognizable on

direct appeal, in exchange for the concessions made by the United States in this plea agreement. This plea agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b).

The defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

The defendant knowingly waives all rights to the venue requirement for Count One of the Information due to the fact that venue for the crimes committed lies in any other Federal judicial district, and the defendant further agrees to be prosecuted for this charge in the Eastern District of Virginia.

The defendant knowingly waives all rights to raise any defense based on the failure of a federal grand jury or the United States to charge him with the offense described in paragraph 1 of this agreement within any applicable statute of limitations.

### 7.    Special Assessment

Before sentencing in this case, the defendant agrees to pay a mandatory special assessment of one hundred dollars ($100.00).

### 8.    Payment of Monetary Penalties

The defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due immediately and subject to immediate enforcement by the United States as provided for in Section 3613. Furthermore, within 14 days of a request, the defendant agrees to provide all of the defendant's financial information to the

United States and the Probation Office and, if requested, to participate in a pre-sentencing debtor's examination and/or complete a financial statement under penalty of perjury. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. If the defendant is incarcerated, he agrees voluntarily to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

9.    **Restitution**

The defendant agrees to the entry of a Restitution Order for the full amount of the victim's losses pursuant to 18 U.S.C. § 3663(a)(3). Victims of the conduct, as defined by 18 U.S.C. § 3663(a)(2) and described in the charging instrument or Statement of Facts or any other document describing the defendant's conduct, shall be entitled to restitution. Without limiting the amount of restitution that the Court must impose, the parties agree that, at a minimum, the following victims have suffered the following losses:

| Victim Name/ Address | Amount of Restitution |
| --- | --- |
| IRS- RACS | TBD |
| Attn.: Mail Stop 6261, Restitution | |
| 333 West Pershing Avenue | |
| Kansas City, MO 64108 | |

The parties acknowledge that determination of the loss amounts for all victims in this matter is a complicated and time consuming process. To that end, the defendant agrees, pursuant to 18 U.S.C. § 3664(d)(5), that the Court may defer the imposition of restitution until after the sentencing; however, the defendant specifically waives the 90 day provision found at 18 U.S.C.

§ 3664(d)(5) and consents to the entry of any orders pertaining to restitution after sentencing without limitation.

If the Court orders the defendant to pay restitution to the IRS for the failure to pay tax, either directly as part of the sentence or as a condition of supervised release, the IRS will use the restitution order as the basis for a civil assessment. See 26 U.S.C. § 6201(a)(4). The defendant does not have the right to challenge the amount of this assessment. See 26 U.S.C. § 6201(a)(4)(C). Neither the existence of a restitution payment schedule nor the defendant's timely payment of restitution according to that schedule will preclude the IRS from administrative collection of the restitution-based assessment, including levy and distraint under 26 U.S.C. § 6331.

### 10. Immunity from Further Prosecution in this District

The United States will not further criminally prosecute the defendant in the Eastern District of Virginia for the specific conduct described in the information or Statement of Facts.

### 11. Waiver of Protections of Proffer Agreement

The defendant agrees that all protections set forth in any proffer letter executed in relation to this case are hereby waived. The defendant further agrees that the government may use all statements provided by him, without limitation, in any proceeding brought by the government, including the Internal Revenue Service, against the defendant.

### 12. Defendant's Cooperation

The defendant agrees to cooperate fully and truthfully with the United States, and provide all information known to him regarding any criminal activity as requested by the government. In that regard:

a. The defendant agrees to appear for and testify truthfully and completely at any grand juries, trials or other proceedings.

b. The defendant agrees to be reasonably available for debriefings, meetings, and pre-trial conferences as the United States may require.

c. The defendant agrees to provide all documents, records, writings, or materials of any kind in the defendant's possession or under his care, custody, or control relating directly or indirectly to all areas of inquiry and investigation. Nothing in this plea agreement requires the defendant to waive any valid assertion of the attorney client privilege as to counsel advising him in connection with this investigation or any related proceeding.

d. The defendant agrees that, at the request of the United States, he will voluntarily submit to polygraph examinations, and that the United States will choose the polygraph examiner and specify the procedures for the examinations.

e. The defendant agrees that the Statement of Facts is limited to information necessary to support the plea. The defendant will provide more detailed facts relating to this case during ensuing debriefings.

f. The defendant agrees to execute any and all instructions and authorizations to direct individuals, entities, or financial institutions to provide account documents and information as well as to repatriate funds held by foreign financial institutions in order to accomplish the terms and conditions of this plea agreement.

g. The defendant acknowledges that he is hereby on notice that he may not violate any federal, state, or local criminal law while cooperating with the government, and that the government will, in its discretion, consider any such violation in evaluating whether to file a motion for a downward departure or reduction of sentence.

h.      Nothing in this plea agreement places any obligation on the government to seek the defendant's cooperation or assistance.

**13.    Use of Information Provided by the Defendant under this Plea Agreement.**

The United States will not use any truthful information provided pursuant to this plea agreement in any criminal prosecution against the defendant in the Eastern District of Virginia, except in any prosecution for a crime of violence or conspiracy to commit, or aiding and abetting, a crime of violence (as defined in 18 U.S.C. § 16). Pursuant to Sentencing Guidelines §1B1.8, no truthful information that the defendant provides under this plea agreement will be used in determining the applicable Sentencing Guidelines advisory sentencing range, except as provided in §1B1.8(b). Nothing in this plea agreement, however, restricts the Court's or Probation Officer's access to information and records in the possession of the United States. Furthermore, nothing in this plea agreement prevents the government in any way from prosecuting the defendant should he knowingly provide false, untruthful, or perjurious information or testimony, or from using information provided by the defendant in furtherance of any forfeiture action, whether criminal or civil, administrative or judicial. The United States will bring this plea agreement and the full extent of the defendant's cooperation to the attention of other prosecuting offices if requested.

**14.    Defendant Must Provide Full, Complete and Truthful Cooperation**

This plea agreement is not conditioned upon charges being brought against any other individual. This plea agreement is not conditioned upon any outcome in any pending investigation. This plea agreement is not conditioned upon any result in any future prosecution which may occur because of the defendant's cooperation. This plea agreement is not conditioned upon any result in any future grand jury presentation or trial involving charges

resulting from this investigation. This plea agreement is conditioned upon the defendant providing full, complete and truthful cooperation.

### 15. Motion for a Downward Departure

The parties agree that the United States reserves the right to seek any departure from the applicable Sentencing Guidelines advisory sentencing range, pursuant to § 5K1.1 of the Sentencing Guidelines and Policy Statements, or any reduction of sentence pursuant to Federal Rule of Criminal Procedure 35(b), if, in its sole discretion, the United States determines that such a departure or reduction of sentence is appropriate.

### 16. Payment of Taxes and Filing of Tax Returns

The defendant consents to any motion by the United States, under Federal Rule of Criminal Procedure 6(e)(3)(E), to disclose grand jury material to the Internal Revenue Service ("IRS") for use in computing and collecting his taxes, interest and penalties, and to the civil and forfeiture sections of the United States Attorney's Office for use in identifying assets and collecting fines and restitution. The defendant also agrees to file true and correct Amended U.S. Individual Income Tax Returns, Forms 1040X, for the years 2003 through 2010 and to pay all taxes, interest and penalties for the years 2003 through 2010, prior to sentencing, as will be agreed upon between him and the IRS, or as otherwise imposed or assessed by the IRS. The defendant also admits that he willfully failed to file a true and accurate FBAR for each required year 2003 through 2010, and agrees not to object to the assessment of fraud penalties pursuant to 26 U.S.C. § 6663. The defendant further agrees to make all books, records and documents available to the IRS for use in computing his taxes, interest and penalties for the years 1999 through 2010.

### 17.    Penalty Related to filing False and Fraudulent FBARs

The defendant agrees that in order to resolve his civil liability for both willfully failing to

file FBARs and for willfully filing false and fraudulent FBARs for years 1999 through 2010, he

will pay a civil penalty in the amount of $14,075,862 (fourteen million, seventy-five thousand,

eight hundred and sixty-two dollars), equaling 50% of the total assets that the Defendant held in

his undeclared accounts in Switzerland on December 31, 2004, no later than ten (10) days after

the entry of Judgment in this case. The defendant further agrees to cause the transfer of the

funds by electronic funds transfer pursuant to written instructions to be provided by the Financial

Litigation Unit of the United States Attorney's Office for the Eastern District of Virginia. The

defendant further agrees to cooperate with the United States, and make best efforts to transfer

and remit the funds, including taking all steps requested by any financial institution or the United

States, including the execution of all documents, orders, and/or instructions directing persons or

entities acting on his behalf or in the name of nominee holders of accounts on his behalf,

providing any information requested to facilitate the transfer, and granting access to information

to facilitate the transfer. The defendant understands and agrees that nothing in paragraphs 15 and

16 of, or otherwise in, this plea agreement shall preclude or limit the IRS in its civil

determination, assessment, or collection of any taxes, interest and/or penalties that he may owe.

The defendant agrees to file with the Financial Crimes Enforcement Network of the

Department of the Treasury true and correct FBARs, including amended FBARs as needed, for

1999 through 2010.

### 18.    Breach of this Plea Agreement and Remedies

This plea agreement is effective when signed by the defendant, his attorney, and an

attorney for the United States. The defendant agrees to entry of this plea agreement at the date

and time scheduled with the Court by the United States (in consultation with his attorney). If the defendant withdraws from this plea agreement, or commits or attempts to commit any additional federal, state or local crimes, or intentionally gives materially false, incomplete, or misleading testimony or information, or otherwise violates any provision of this plea agreement, then:

      a.     The United States will be released from its obligations under this plea agreement, including any obligation to seek a downward departure or a reduction in sentence. The defendant, however, may not withdraw the guilty plea entered pursuant to this plea agreement.

      b.     The defendant will be subject to prosecution for any federal criminal violation, including, but not limited to, perjury and obstruction of justice, that is not time-barred by the applicable statute of limitations on the date this plea agreement is signed. Notwithstanding the subsequent expiration of the statute of limitations, in any such prosecution, the defendant agrees to waive any statute-of-limitations defense.

      c.     Any prosecution, including the prosecution that is the subject of this plea agreement, may be premised upon any information provided, or statements made, by the defendant, and all such information, statements, and leads derived therefrom may be used against the defendant. The defendant waives any right to claim that statements made before or after the date of this plea agreement, including the statement of facts accompanying this plea agreement or adopted by the defendant and any other statements made pursuant to this or any other agreement with the United States, should be excluded or suppressed under Federal Rule of Evidence 410, Federal Rule of Criminal Procedure 11(f), the Sentencing Guidelines or any other provision of the Constitution or federal law.

Any alleged breach of this plea agreement by either party shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall be admissible and at which the moving party shall be required to establish a breach of the plea agreement by a preponderance of the evidence. The proceeding established by this paragraph does not apply, however, to the decision of the United States whether to file a motion based on "substantial assistance" as that phrase is used in Federal Rule of Criminal Procedure 35(b) and Section 5K1.1 of the Sentencing Guidelines and Policy Statements. The defendant agrees that the decision whether to file such a motion rests in the sole discretion of the United States.

## 19.    Nature of this Plea Agreement and Modifications

This written plea agreement constitutes the complete plea agreement between the United States, the defendant, and his counsel. The defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in writing in this plea agreement, to cause him to plead guilty. Any modifications of this plea agreement shall be valid only as set forth in writing in a supplemental or revised plea agreement signed by all parties.

Dana J. Boente
United States Attorney
Eastern District of Virginia

By: _____
Mark D. Lytle
Assistant United States Attorney

Date: 10/26/2017

Stuart M. Goldberg
Acting Deputy Assistant Attorney General
Department of Justice, Tax Division

By: _____
Mark F. Daly
Senior Litigation Counsel
Robert J. Boudreau
Trial Attorney

Date: 10/24/2017

Defendants Signature: I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending criminal information. Further, I fully understand all rights with respect to Title 18, United States Code, Section 3553 and the provisions of the Sentencing Guidelines that may apply in my case. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and voluntarily agree to it.

Date: October 26 2017

Hyung Kwon Kim
Defendant

Defense Counsel Signature: I am counsel for the defendant in this case. I have fully explained the defendant's rights to him with respect to the pending information. Further, I have reviewed Title 18, United States Code, Section 3553 and the Sentencing Guidelines, and I have fully explained to the defendant the provisions that may apply in this case. I have carefully reviewed every part of this plea agreement with the defendant. To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one.

Date: October 26, 2017

Mark E. Matthews
Charles Myungsik Yoon
Counsel for the Defendant

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:17-CR-00248 |
| | ) | |
| HYUNG KWON KIM, | ) | Honorable T. S. Ellis III |
| | ) | |
| Defendant. | ) | Sentencing:  January 25, 2018 |
| | ) | 4:00 p.m. |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States hereby submits its position on the sentencing of the defendant

Hyung Kwon Kim ("defendant" or "Kim") in accordance with U.S.S.G. §6A1.2 and the policy

of this Court.  As explained below, while the government agrees with the Probation Office's

calculation of the sentencing range the advisory Sentencing Guidelines, the government

nevertheless believes that the appropriate Guidelines range that should be applied in this case is

that agreed upon by the parties, as set forth in the plea agreement.  Taking into account the

factors set forth in 18 U.S.C. § 3553(a) and the government's filing under seal, the government

makes a final sentencing recommendation of nine (9) months of imprisonment, three (3) years of

supervised release, an appropriate fine, and a $100 special assessment.

I.      **Background**

A.      **Offense Conduct**

Hyung Kim is a highly educated and sophisticated executive.  Born into affluence, he had

the good fortune to inherit staggering sums.  The vast sums Kim secreted in a series of secret

Swiss accounts are of import here.  At one point, in 2004, the windfall stashed in Switzerland

swelled to over $28 million.  Kim engaged in a series of schemes and ruses to conceal the funds from the IRS, violate reporting requirements, and evade taxes.

Kim first opened an account in his own name at Credit Suisse AG in Switzerland in October 1998.  He funded that account, as well as other additional accounts that he opened at Credit Suisse, its wholly owned subsidiaries (including Bank Leu, Bank Hofmann, and Clariden Leu), and UBS AG, with funds inherited from a foreign relative.

In November 2000, Kim took the first of many steps to mask his ownership and control of the offshore funds.  At the advice and with the assistance of his co-conspirator Edgar Paltzer, an attorney practicing in Switzerland, Kim opened an account at Bank Leu in the name of a sham entity called Daroka Overseas.  In February 2002, he opened a second account, at Bank Hofmann, in the name of the same entity.   By placing his assets in accounts held in the name of a nominee, Kim made it appear that the offshore funds belonged to a corporate entity, not him.

Kim controlled the assets in the account by meeting with the bankers and his attorney in in Switzerland and the United States as well as communicating with them via email, fax, and phone.  Further, he hosted one of his Swiss bankers at his homes in the U.S. where the banker vacationed with his family and used Kim's residence as a base to travel to meet with his other clients.

Wires from afar flowed into these accounts.  By the close of 2004, the balance of his accounts exceeded $28 million.  Kim did not expend these funds on necessities.  Instead, Kim used assets in the accounts to fund a lavish lifestyle. The Statement of Facts and PSR discuss Kim's expenditures in detail.  However, a summary of the spending is helpful to understand the magnitude of the wealth that Kim concealed:

16184362 2

- Between 2003 and 2007, Kim spent over $3 million from his Swiss accounts to purchase his residence in Greenwich, Connecticut. Kim and Paltzer took efforts to conceal that Kim controlled the funds in the Swiss accounts. When Kim communicated with Paltzer, he used coded language. In turn, Paltzer directed Credit Suisse to issue a check for $1.76 million from Credit Suisse First Boston, its U.S. bank, so that it appeared that Kim tapped a domestic source of funds.

- In 2005, Kim spent almost $5 million from his Swiss accounts to purchase a summer home on Cape Cod. While the price was significant, what is most relevant are the machinations undertaken by Kim and Paltzer to conceal Kim's ownership of the Swiss accounts and the summer home itself. Paltzer formed a new sham entity, Edraith Invest & Finance, to hold title to the home as well as a Swiss account. Paltzer and Kim pretended that Kim merely leased the home in an arms-length transaction from a third party. They drafted and executed fake leases. They exchanged emails in which they discussed the wishes of the "owners."

- Between 2003 and 2008, Kim used over $5 million from his Swiss accounts to purchase jewels and jewelry, including the following items:  a 11.6 carat diamond ring; a 10.5 carat yellow diamond ring and jewelry setting; a 8.6 carat ruby ring; a 8.4 carat emerald ring; a 7.15 carat diamond ring; and pearls.

- Between 2000 and 2008, Kim withdrew over $500,000 when traveling in Switzerland to fund his personal expenses.

Kim had the opportunity to bring his remaining assets to the United States in 2008, in the midst of the Department of Justice's investigation of UBS AG for aiding and assisting U.S. taxpayers to evade their taxes. At that time, Credit Suisse had advised Paltzer and Kim that it

16184362 2

intended to close the Daroka Overseas and Edraith accounts as part of its initiative to minimize

the bank's exposure by closing accounts held by U.S. residents in the names of nominee entities.

Fully aware that Kim's undeclared assets could not stay at Credit Suisse, Paltzer and Kim

reviewed Kim's options:  to report his previously undeclared assets and income to the IRS; to

end his crimes by spending the assets; or to continue the concealment by transferring his assets to

another bank.  Kim chose to keep the money offshore, albeit at Bank Frey, a smaller Swiss bank

that considered itself immune from U.S. law enforcement as it deliberately maintained no

physical presence in the United States.[1]

　　　With the assistance of Paltzer, Kim opened accounts at Bank Frey in the names of

Daroka Overseas and Edraith in December 2008.  He deposited into those accounts the

remaining assets from his accounts at Credit Suisse's subsidiaries.  Paltzer advised Kim to take

further precautions to prevent detection, by limiting emails and phone communications from the

U.S. and meeting in third countries, such as France or Italy.

　　　Kim maintained the accounts at Bank Frey until 2011.  At that time, he elected not to

report the funds, but to bring the assets to the United States in a covert manner by paying a

---

[1] In September 2008, as corroborated by the Internet Wayback Machine, Bank Frey's web site contained the following statements:

　　　"An important reason for founding Bank Frey was to provide our clients with the services of a Bank that is - and always will remain - truly Swiss," Dr. Markus A. Frey says.

　　　As a result, Bank Frey follows a strict policy to never open any branch or other representation outside the reach of the Swiss laws and jurisdiction. We strongly believe that only by remaining a true Swiss banking institution, we can guarantee to act in accordance with the Swiss standards of political stability, acting in good faith and an unbroken sense for independent neutrality.

　　　Dr. Markus A. Frey continues, "Bank Frey is and will remain truly Swiss. Only that way can we be certain to maintain our values - and assure that no foreign authority will ever 'bully' us into giving them up".

See "A True Swiss Bank", available at https://web.archive.org/web/20080915012232/http://www.bank-frey.com:80/index.php?option=com_content&task=view&id=27&Itemid=55.  Bank Frey announced that it would cease operations in October 2013.

jeweler in Switzerland for jewels and jewelry purchased in the United States. Kim arranged the sales by mailing packages of gifts to the children of his former banker. Kim hid handwritten transfer instructions within those packages. Between March and August 2011, Kim spent a total of $3.6 million in two separate transactions to purchase a ring with a sapphire weighing 13.9 carats and three loose diamonds weighing 5.02, 4.03 and 4.17 carats.

Kim concealed his offshore assets from his accountants. Indeed, although the defendant filed FBARs in 2005, 2006, 2007, and 2008 (for calendar years 2004 through 2007) on which he reported accounts that he owned in South Korea, he never once reported his Swiss accounts. Further, Kim also filed false income tax returns on which he underreported his income and failed to report his ownership of the Swiss accounts.

Kim did not earn substantial amounts of taxable income from the assets in the Swiss accounts. From 2001 through 2010, the combined federal and state income tax loss amounted to $243,542. Indeed, the millions of dollars in capital losses that Kim incurred as a product of his ill-advised investing swamped his investment gains.

## II.  Sentencing Argument

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). The sentencing court, however, "may not presume that the Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The "Guidelines should be the starting point and the initial

benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.*; *see also Clark*, 434 F.3d at 685. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

### A. Guidelines Range

#### 1. The Applicable Guidelines Provisions

The defendant pled guilty to the willful failure to file an FBAR, in violation of 31 U.S.C. Sections 5314 and 5322. The offense of conviction in this case falls under U.S.S.G. § 2S1.3. The Probation Office calculated the Guidelines range under U.S.S.G. § 2S1.3(a)(2) (the "Part-S Guidelines"). See Presentence Investigation Report, ¶¶ 76-85. That provision includes a cross-reference to the theft and fraud Guidelines, and sets the base offense level as follows:

> 6 plus the number of offense levels from the table in § 2B1.1
> (Theft, Property Destruction, and Fraud) corresponding to the
> value of the funds, if subsection (a)(1) does not apply.

Probation calculated the base offense level as 28. Probation added 22 levels as it placed the "value of funds" at $28,151,724, the year-end value of the assets in the unreported accounts in 2004 (the highest year-end balance). *See* PSR, ¶¶ 65(j), 76; U.S.S.G. § 2B1.1(b)(1)(L) (more than $25 million).

The government contends, as does Probation, that two levels should be added as the defendant "committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period." See U.S.S.G. § 2S1.3(b)(2). The Application Note to § 2S1.3 defines a pattern of illegal activity as "at least two separate occasions of unlawful activity involving a total amount of more than $100,000 in a 12-month period, without regard to whether any such occasion occurred during the course of the offense or resulted in a conviction for the conduct that occurred on that occasion." Kim filed false FBARs on October 14, 2007 (for 2006) and again on March 27, 2008 (for 2008). On each FBAR, Kim failed to report that he owned and

controlled any of the financial accounts in Switzerland. Kim also filed a false 2007 Individual Income Tax Return, Form 1040, on March 3, 2008, which omitted any income that Kim earned from the assets in his undeclared accounts in Switzerland. Kim's attorneys calculated that Kim omitted $104,699 in ordinary income on the 2007 return. The filing of two false FBARs and a false return within a 12-month period qualifies as a "pattern of unlawful activity" sufficient to trigger the two-level enhancement.

While 2S1.3 may be the proper Guideline, the government respectfully requests that the Court sentence the defendant under U.S.S.G. § 2T, the Tax Guidelines. As stated in the Plea Agreement, "at the time that the defendant agreed to plead guilty, the Government consistently took the position with similarly situated defendants that the applicable Guideline was U.S.S.G. § 2T1.1 and § 2T1.4 due to the cross reference in § 2S1.3(c)(1)."[2] Plea Agreement, Dkt. # 10, pp. 3-4.

In 2012, Kim and the government commenced plea negotiations with the defendant's counsel. At that time, the government had entered into plea agreements with a number of several other legal permanent residents that required those individuals to plead guilty to FBAR charges, and not tax charges. In each of those cases, the plea agreements specifically set forth a Guidelines calculation using the Tax Guidelines and not § 2S1.3. After Kim and the government had reached an agreement in principle, the government continued to employ the Tax Guidelines in virtually every other FBAR case. In order to ensure that this defendant receives equitable treatment, the government believes that the appropriate Guidelines which should be applied *in this case* are the alternative calculation under § 2S1.3(c)(1).

---

[2] U.S.S.G. § 2S1.3 states as follows: "If the offense was committed for the purposes of violating the Internal Revenue laws, apply the most appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation) if the resulting offense level is greater than that determined above."

The base offense level for this offense is 16 pursuant to U.S.S.G. § 2T1.l(a)(1) and § 2T4.1(F), because the tax loss exceeded $100,000.  The base offense level is increased by 2 levels, pursuant to U.S.S.G. § 2T1.1(b)(2), because the offense involved sophisticated means. The defendant should receive a 3-level reduction for acceptance of responsibility resulting in a total offense level of 15.  The advisory range is 18 to 24 months of imprisonment and the fine range is $4,000 to $40,000.

### B.  Section 3553(a) Factors

#### 1.  Nature and Circumstances of the Offense, History and Characteristics of the Defendant, and the Need for Just Punishment

Tax evasion is a serious crime, and the use of offshore accounts by U.S. taxpayers to evade their income tax obligations directly affects the ability of the Treasury to raise funds for government expenditures.  In April 2016, the IRS estimated that for the years 2008-2010, the U.S. tax gap, which represented the total amount of U.S. taxes owed but not paid on time, was $458 billion, despite an overall tax compliance rate among American taxpayers of 81.7%.  *See* "Tax Gap Estimates for Tax Years 2008–2010," report by the IRS, *available at*: https://www.irs.gov/PUP/newsroom/tax%20gap%20estimates%20for%202008%20through%202010.pdf.  The IRS found that these updated "estimates suggest that compliance is substantially unchanged since last estimated for [tax year] 2006."  *Id*. at 2.

What sets Hyung Kim apart from many other seemingly similarly situated defendants, is the level and duration of the deception he employed to hide his assets from the IRS.  For over a dozen years, the defendant employed a series of ever more aggressive schemes to conceal the windfall that he inherited.  Kim utilized nine different accounts at five Swiss banks to hide his assets.  For four of those accounts, the defendant used nominee entities, formed in Caribbean tax-haven countries, to add a further layer of protection.  The defendant and his co-conspirator,

16184362 2

Paltzer, used one of those entities, Edraith Invest & Finance, to deceive a realtor and other third parties involved in the purchase of his home on Cape Cod.  They went so far as to concoct a ruse whereby Kim and Paltzer exchanged emails wherein they pretended that Kim was renting the home from another family.

Kim had numerous opportunities to report his accounts and come into compliance.  Each time, he chose to continue his criminal conduct.  From 2004 through 2008, Kim filed FBARs on which he reported his ownership of certain accounts in South Korea.  In each of those years, he had the opportunity to come clean about his Swiss accounts.  He could have informed his U.S. return preparers about the Swiss accounts and sought their advice for properly reporting the ownership of the accounts and the income that he received, and pay the tax due and owing.  Kim stayed silent.

In the same year that he filed his last, false FBAR, Paltzer, Kim's Swiss attorney, presented to him the option to close the accounts and bring the money to the United States.  Instead, Kim chose to burrow deeper into the darkness of offshore evasion.  He moved his assets to a bank that touted itself as refusing to be "bullied" by a "foreign authority," such as U.S. law enforcement.

Kim kept the funds in Switzerland for almost three more years.  He continued to conceal his accounts from his return preparer and never filed FBARs during those years. In 2011, Kim again had the option to come clean and report his offshore assets.  Instead, he elected to spend down the assets.  Through a series of messages hidden in packages mailed from the U.S. to his former banker in Switzerland, Kim arranged to close his account by using the remaining fund to buy yet more high-end jewelry.

16184362 2

Given the duration of the offense, the amounts involved, the defendant's knowledge of his duty to report his foreign financial accounts, and the myriad of schemes and lies that the defendant perpetrated, a sentence of incarceration is required in order to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

2.      **The Need for Deterrence**

Over the past decade, the government endeavored to crack down on the use of foreign financial accounts by U.S. citizens seeking to evade the payment of their taxes. The foreign banks and institutions are more likely to aid and assist the ultra-high net worth individuals, like the defendant, to evade their taxes. Such foreign institutional assistance makes these crimes more difficult to detect, investigate and prosecute. Further, prosecutions involving offshore accounts such as this one require the government to commit significant investigative and prosecutorial resources, and the IRS typically detects the criminal conduct well after the offenses have been committed. A sentence of incarceration and a strong message of general deterrence in this case is necessary to ensure that U.S. taxpayers do not use foreign financial accounts to evade their taxes.

The government concedes that the defendant will pay a great financial price for his crimes. He has already remitted over $14 million to the government as a civil penalty for his willful failure to report his foreign banks accounts. Nevertheless, the defendant should receive no mercy for paying over what amounts to slightly more than 7% of his current net worth. He had numerous opportunities to report his accounts, had access to seasoned professionals who knew how to do such reporting, and chose not do so. He has no one to blame but himself. Further, Kim would have owed the same civil penalty had he been audited, not prosecuted.

## C.     Fine

The Guidelines instruct that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a).  The Presentence Report states that Kim's assets exceed $200 million and he receives monthly cash flow of more than $450,000.  As such, the government recommends that the Court impose a substantial fine.

## III.    Restitution

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case, and the parties have agreed that the defendant should pay full restitution to the IRS.  The government expects that by the time of sentencing the defendant will have filed amended federal and state income tax returns and directly paid over the tax due and owing as well as interest.

Nonetheless, the government respectfully requests that the Court order restitution to the IRS for the following years in the following amounts:  2003 – $93,223; and 2009 – $63,828.

## IV.     Conclusion

Based on the foregoing, and for the reasons stated in the United States' sealed filing, the

United States submits that a final sentence should be imposed of nine (9) months of

imprisonment, three (3) years of supervised release, an appropriate fine, and a $100.00 special

assessment.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:     _____/s/_____

Mark D. Lytle
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (703) 299-3700
Fax:  (703) 299-3981
Email:  Mark.Lytle@usdoj.gov


By:     _____/s/_____

Mark F. Daly
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (202) 616-2245 (phone)
Fax:  (202) 616-1786 (fax)
E-mail:  Mark.F.Daly@usdoj.gov

Robert J. Boudreau
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (202) 616-3336 (phone)
Fax:  (202) 514-0962 (fax)
E-mail:  Robert.J.Boudreau@usdoj.gov

16184362 2

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of January, 2018, I electronically filed the foregoing

Position of the United States With Respect to Sentencing with the Clerk of Court using the

CM/ECF system which will send notification of such filing to all attorneys of record.

A copy has also been sent via email to:

<div style="margin-left:2em">

Karen Riffle
Supervising United States Probation Officer
Karen_Riffle@vaep.uscourts.gov

</div>

<div style="margin-left:2em">

_____/s/_____

Mark F. Daly
Special Assistant United States Attorney

</div>

# EXHIBIT G

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   Crim. Action No. 17-0201-01 (ABJ) |
| | ) |
| PAUL J. MANAFORT, JR., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## ORDER

Defendant Paul J. Manafort, Jr. entered a plea of guilty in this case on September 14, 2018. The plea agreement [Dkt. # 422] provides:

> Your client shall cooperate fully, truthfully, completely, and forthrightly with the Government . . . .

Plea Agreement ¶ 8.

Defendant agreed in paragraph 8(a) of the agreement to be debriefed; in paragraph 8(c) to testify at any proceedings, and in paragraph 8(f) that he "must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes." Paragraph 8 goes on to provide that defendant "shall testify fully, completely and truthfully before any and all Grand Juries" in the District of Columbia or elsewhere.

Paragraph 13 – "Breach of Agreement" provides:

> Your client understands and agrees that, if after entering this Agreement, [he] fails specifically to perform or to fulfill completely each and every one of [his] obligations under this Agreement, or engages in any criminal activity prior to sentencing or during his cooperation . . . , [he] will have breached this Agreement.

> Should it be judged by the Government in its sole discretion that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from his pleas of guilty but the Government will be released from its obligations under the agreement, including (a) not to oppose

1

the downward adjustment [to the U.S. Sentencing Guidelines calculation] for acceptance of responsibility . . . .

Your client understands that the Government shall be required to prove a breach of this Agreement only by good faith.

The defendant accepted the plea agreement; the signed acceptance on last page states, "I fully understand this Agreement and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound." After the plea was entered, sentencing was deferred while the defendant's cooperation was ongoing.

On November 26, 2018, the parties informed the Court in a joint status report [Dkt. # 455] that it was the government's position that the defendant had breached the plea agreement by making false statements to the FBI and Office of Special Counsel ("OSC") and that it was time to set a sentencing date. The defendant disputed the government's characterization of the information he had provided and denied that he had breached the agreement, but he agreed that in light of the dispute, it was time to proceed to sentencing. Thereafter, the government was ordered to provide the Court with information concerning the alleged breach, a schedule was established for the defense to respond, and the following submissions were made a part of the record in the case:

| | |
|---|---|
| December 7, 2018 | Government's Submission in Support of its Breach Determination [Dkt. # 461] (Sealed); [Dkt. # 460] (Public) |
| January 8, 2019 | Defendant's Response to the Government's Submission in Support of its Breach Determination [Dkt. # 470] (Sealed); [Dkt. # 472] (Public) |
| January 15, 2019 | FBI Declaration in Support of the Government's Breach Determination with accompanying exhibits [Dkt # 477] (Sealed); [Dkt. # 476] (Public) |
| January 23, 2019 | Defendant's Reply to the Declaration [Dkt. # 481] (Sealed); [Dkt. # 482] (Public) |

The Court held a sealed hearing on February 4, 2019, and the parties each filed post-hearing submissions. *See* Def.'s Post-Hearing Mem. [Dkt. # 502] (Sealed), [Dkt. # 505] (Public); Government's Suppl. [Dkt. # 507] (Sealed).

It is a matter of public record that the Office of Special Counsel has alleged that the defendant made intentionally false statements to the FBI, the OSC, and/or the grand jury in connection with five matters: a payment made by Firm A to a law firm to pay a debt owed to the law firm by defendant Manafort; co-defendant Konstantin Kilimnik's role in the obstruction of justice conspiracy; the defendant's interactions and communications with Kilimnik; another Department of Justice investigation; and the defendant's contacts with the current administration after the election. The parties are agreed that it is the government's burden to show that there has been a breach of the plea agreement, but to be relieved of its obligations under the agreement, it must simply demonstrate that its determination was made in good faith. Plea Agreement ¶ 13.

In its January 8, 2019 response to the breach allegations, the defense stated that "given the highly deferential standard that applies to the Government's determination," Def.'s Resp. [Dkt. # 472] at 2, it was not challenging the assertion that the determination was made in good faith. And, in response to a question posed by the Court at a status hearing held on January 25, 2019, the defendant conceded that that the determination was made in good faith. Tr. of Hearing (Jan. 25, 2019) [Dkt. # 500] at 13.

In light of the defendant's concession, and based upon the Court's independent review of entire record, including: all of the pleadings listed above and the supporting exhibits; the facts and arguments placed on the record at the hearing held on February 4, 2019; and the post-hearing submissions, the Court ruled at the hearing held on February 13, 2019 that the Office of Special Counsel made its determination that the defendant made false statements and thereby breached the plea agreement in good faith. Therefore, the Office of Special Counsel is no longer bound by its obligations under the plea agreement, including its promise to support a reduction of the offense level in the calculation of the U.S. Sentencing Guidelines for acceptance of responsibility.

But that is not the only question before the Court to decide. The question remains whether the defendant intentionally made false statements in connection with the five matters that have been identified by the Office of Special Counsel. The answer bears upon the applicability of certain provisions of the Sentencing Guidelines, in particular, the adjustment for acceptance of responsibility, and it bears more generally on the Court's assessment of the factors set forth in the sentencing statute, 18 U.S.C. § 3553(a). The parties are agreed that the government is bound to prove facts that bear on the application of the Guidelines by a preponderance of the evidence.

Based upon its consideration of the entire record and the arguments of counsel at the hearing of February 4, 2019, for the reasons stated on the record at the continuation of the sealed hearing on February 13, 2019, the Court made the following additional findings:

I.     OSC has established by a preponderance of the evidence that defendant intentionally made false statements to the FBI, the OSC, and the grand jury concerning the payment by Firm A to the law firm, a matter that was material to the investigation. *See United States v. Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010).

II.    OSC has failed to establish by a preponderance of the evidence that on October 16, 2018, defendant intentionally made false statements concerning Kilimnik's role in the obstruction of justice conspiracy.

III.   OSC has established by a preponderance of the evidence that the defendant intentionally made multiple false statements to the FBI, the OSC, and the grand jury concerning matters that were material to the investigation: his interactions and communications with Kilimnik.

IV.    OSC has established by a preponderance of the evidence that on October 5, 2018, the defendant intentionally made false statements that were material to another DOJ investigation.

V.    OSC has failed to establish by a preponderance of the evidence that on October 16, 2018, defendant intentionally made a false statement concerning his contacts with the administration.

This order does not address the question of whether the defendant will receive credit for his acceptance of responsibility in connection with the calculation of the Sentencing Guidelines or how any other Guideline provision will apply to this case. Those issues, which depend on the consideration of a number of additional factors, will be determined at sentencing, after the Presentence Investigation Report has been completed, the parties have filed their memoranda in aid of sentencing, and the Court has heard argument.

The Court reporter is hereby ORDERED to provide a copy of the sealed transcript of today's hearing to the parties by 12:00 noon on February 14, 2019, and the parties must inform the Court of any redactions that must to be made before the transcript can be released no later than 11:00 a.m. on February 15, 2019.

SO ORDERED.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 13, 2019

# ATTACHMENT F

**REDACTED**