## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**PAUL J. MANAFORT, JR.,**<br><br>**Defendant.** | **Crim. No.  17-201-1 (ABJ)** |

## STATUS REPORT

The United States of America, by and through Special Counsel Robert S. Mueller, III, files this status report to apprise the Court of a recent development in *United States v. Paul J. Manafort, Jr.*, No. 1:18-cr-83 (E.D. Va.) that is pertinent to this Court's upcoming sentencing decision. Attached to this status report as Exhibit A is the transcript from the sentencing hearing on March 7, 2019.

Respectfully submitted,

ROBERT S. MUELLER III
Special Counsel

Dated: March 11, 2019

By:__ /s/ _____ _____
　　Andrew Weissmann
　　Jeannie S. Rhee (D.D.C. Bar No. 464127)
　　Greg D. Andres (D.D.C. Bar No. 459221)
　　U.S. Department of Justice
　　Special Counsel's Office
　　950 Pennsylvania Avenue NW
　　Washington, D.C. 20530
　　Telephone: (202) 616-0800

　　*Attorneys for the United States of America*

# EXHIBIT A

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

```
1

2

3     ------------------------------x
                                    :
4     UNITED STATES OF AMERICA,     : Criminal Action No.
                                    : 1:18-CR-83
5               versus              :
                                    :
6     PAUL J. MANAFORT, JR.,        :
                                    : March 7, 2019
7                    Defendant. :
      ------------------------------x
8

9                  TRANSCRIPT OF SENTENCING
           BEFORE THE HONORABLE T.S. ELLIS, III
                UNITED STATES DISTRICT JUDGE
10

11    APPEARANCES:

12    FOR THE GOVERNMENT:          UZO ASONYE, AUSA
                                   United States Attorney's Office
13                                 2100 Jamieson Avenue
                                   Alexandria, VA 22314
14                                      and
                                   ANDREW WEISMANN, SAUSA
15                                 GREG D. ANDRES, SAUSA
                                   BRANDON L. VAN GRACK, SAUSA
16                                 Special Counsel's Office
                                   U.S. Department of Justice
17                                 950 Pennsylvania Avenue NW
                                   Washington, D.C. 20530

18    FOR THE DEFENDANT:           BRIAN KETCHAM, ESQ.
                                   Kostelanetz & Fink LLP
19                                 601 New Jersey Avenue NW
                                   Suite 620
20                                 Washington, DC 20001
                                        and
21                                 THOMAS E. ZEHNLE, ESQ.
                                   Law Office of Thomas E. Zehnle
22                                 601 New Jersey Avenue NW
                                   Suite 620
23                                 Washington, DC 20001
                                        and
24

25
```

```
                                                                    2
 1   Appearances continued:
                              KEVIN DOWNING, ESQ.
 2                            Law Office of Kevin Downing
                              601 New Jersey Avenue NW
 3                            Suite 620
                              Washington, DC 20001
 4                                and
                              RICHARD WILLIAM WESTLING, ESQ.
 5                            Epstein, Becker, & Green, PC
                              1227 25th Street NW
 6                            Washington, DC 20037

 7   OFFICIAL COURT REPORTER:   TONIA M. HARRIS, RPR
                              U.S. District Court, Ninth Floor
 8                            401 Courthouse Square
                              Alexandria, VA
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. v. Manafort

3

**P R O C E E D I N G S**

1

(Court proceedings commenced at 4:00 p.m.)

2

3          THE COURT:  All right.  Good afternoon.  I apologize

4  to some of you as we're a little late starting.  I had a

5  naturalization ceremony from 2:00 to 3:30 that took a little

6  longer than I expected.

7          All right.  You may call this next matter, please.

8          THE DEPUTY CLERK:  Court calls Criminal Case, United

9  States of America versus Paul J. Manafort, Jr.  Case

10  No. 2018-CR-83.

11          May I have appearances, please.  First for the

12  Government.

13          MR. ANDRES:  Good afternoon, Your Honor.  Greg

14  Andres, Uzo Asonye, Brandon Van Grack, Andrew Weissmann and

15  Special Agent Sherine Ebadi for the Government.

16          THE COURT:  All right.  Good afternoon to you.

17          MR. DOWNING:  Good afternoon, Your Honor.  For

18  Mr. Manafort, Kevin Downing, Thomas Zehnle, Rich Westling and

19  Brian Ketcham.  Good afternoon.

20          THE COURT:  Good afternoon to all of you, and good

21  afternoon, Mr. Manafort.

22          (Defendant nods.)

23          Typically, I will begin with asking counsel whether

24  they had an adequate opportunity to review the presentence

25  investigation report and to review it with their client, in

─U.S. v. Manafort─

4

1    this case, Mr. Manafort, but it's apparent to me that from the

2    mountain of briefs that have been filed, that you've had an

3    adequate opportunity and that you have expressed fully the

4    views of each side on this.

5          But I will confirm, Mr. Manafort, have you had an

6    adequate opportunity to review the presentence report and to

7    review it with your counsel?

8          THE DEFENDANT:  I have, Your Honor.

9          THE COURT:  And are you fully satisfied with -- you

10   don't have to get up.  I understand there's discomfort in

11   that.  You don't have to get up.

12         Are you fully satisfied with the advice and counsel

13   that has been provided to you by your counsel in this case?

14         THE DEFENDANT:  I am, Your Honor.

15         THE COURT:  All right.  And as I said, it's apparent

16   to me that, Mr. Downing, you and your colleagues have had an

17   adequate opportunity to review it.

18         MR. DOWNING:  We have, Your Honor.

19         THE COURT:  And, Mr. Andres, you and your colleagues

20   have had an adequate opportunity to review it?

21         MR. ANDRES:  Yes, Your Honor.

22         THE COURT:  All right.  So the way in which we will

23   proceed now, which is typical, is that we will take up first

24   the various objections that have been asserted to the facts,

25   conclusions and calculations contained in the presentence

U.S. v. Manafort

5

1  report, so that I can fulfill the first duty, which is to

2  ensure that the sentencing guidelines are accurately and

3  appropriately calculated.

4       As I'm sure most of you, if not every one of you,

5  knows, the sentencing guidelines are advisory.  They are not

6  mandatory as they once were.  They're one factor for the Court

7  to take into account in imposing an appropriate sentence.  And

8  there is a statute that itemizes the factors the Court is

9  required to consider in imposing an appropriate sentence, and

10  the guidelines is merely one of those factors.

11       Now, let me begin by being clear that what

12  Mr. Manafort is before the Court for sentencing on today.

13  Mr. Manafort is before the Court for sentencing, having been

14  found guilty by a jury of eight counts:  five counts of

15  failure to file tax returns, accurate tax returns; one count

16  of failure to file report of a foreign bank account; and two

17  counts of bank fraud.

18       So he was found guilty of eight counts.  The jury

19  could not reach a unanimous decision as to ten counts.  I

20  dismissed those without prejudice.  They were hung counts.  In

21  the end, Mr. Manafort has admitted to the conduct constituting

22  those other counts.  So they are part of the related conduct

23  that is considered by the Court in sentencing in this case.

24  He admitted to those facts in the District of Columbia's

25  Statement of Facts.  I think I have that right, do I not?

6

1          MR. ANDRES:  Yes, Your Honor.

2          THE COURT:  All right.  Do I have it right,

3    Mr. Downing?

4          MR. DOWNING:  Yes, Your Honor.

5          THE COURT:  All right.  Now, so the next -- he is

6    not before the Court -- let me underscore, he's before the

7    Court for those counts on which he's been found guilty and the

8    related conduct.  And the counts that were hung, the facts of

9    those are also to be part of the sentencing consideration.  He

10   is not before the Court for any allegation that he or anybody

11   at his direction colluded with the Russian government to

12   influence the 2016 presidential election.

13          And there is much discussion about why the special

14   prosecutor has it.  I would remind those of you that I faced

15   that issue at the beginning of this case.  There was a motion

16   brought by the defendant, arguing that the indictment being

17   pursued by the special prosecutor was illegitimate.  I heard

18   that case, and I issued an opinion, and I concluded that it

19   was legitimate.  The grant of power to the special prosecutor

20   was broad enough to cover this.

21          That's in the record of this case for those who are

22   interested.  That doesn't mean that I decided the wisdom or

23   appropriateness of delegating to special prosecutors broad

24   powers that are not at times -- or a subject matter.  But I

25   didn't have to decide that.  It's not before me.  What was

1    before me is was this prosecution authorized from -- or

2    legitimately, and I concluded that it was, and so we went

3    ahead and had the trial.  Now -- so he's not before the Court

4    for anything having to do with colluding with the Russian

5    government to influence this election.

6              Now, the first issue, the first objection, it seems

7    to me, to take up is the defendant's objection to the

8    presentence investigation report on the ground that the

9    presentence report proceeded on the basis of Section 2S1.3

10   rather than 2T1.3.  In other words, the defendant argues that

11   the tax guidelines, not the FBAR, or failure to report a

12   foreign bank account guideline, applies in this case.

13             That's still a disagreement, Mr. Downing?

14             MR. DOWNING:  It is, Your Honor.

15             THE COURT:  And as a concession to this -- to the

16   shortness of life, would I be fair in concluding that you've

17   said everything you need to say in your briefs?

18             MR. DOWNING:  We have, Your Honor.

19             THE COURT:  Mr. -- all right.  Mr. Andres, have

20   you-all said everything you have to say on that issue in your

21   briefs?

22             MR. ANDRES:  Yes, Your Honor.

23             THE COURT:  All right.  The objection is overruled.

24   However, having said it's overruled, let me explain what

25   happened because history is important.  What has happened in

1    this country on this is important.

2           But at the bottom line, it is my conclusion that the

3    sentencing guideline of 2S1.3 was appropriately applied by the

4    probation officer, and the reason for that is quite clear in

5    the language of the guidelines.  It really emits of no other

6    conclusion.  The problem arises, as the defense counsel had

7    pointed out in their brief thoroughly, for years the

8    Department of Justice didn't do that.  For years, the

9    Department of Justice calculated the guidelines and went

10   forward.

11          They did it, I think -- I don't know this, I'm

12   speculating here, but I think it was done because it led to

13   pleas using lower guidelines under 2T rather than 2S, because

14   the conduct of failing to report a foreign bank account and

15   failing to file a tax return that reflected the income that

16   you earned in a foreign bank really was the same conduct

17   essentially.  It hid income earned or placed overseas.

18          So in December of 2017, the Justice Department did

19   a -- not an about-face, but it changed from imposing or

20   insisting on the use of Section 2S1.3 rather than the 2T, and

21   that resulted in guidelines that were higher rather than

22   lower.

23          And the defendant argues that the government

24   should -- that should be what the government continues to do.

25   What, in fact, must be done is that the guidelines must be --

9

1   the offenses must be grouped, and I find that the probation

2   officer -- the probation officer correctly grouped the

3   guidelines.

4           The first five counts, failure to report tax, is

5   grouped with the FBAR account, the failure to report the

6   foreign bank account.  So those six counts are grouped

7   together and treated as a group for the guideline purposes.

8   And even though five of those, if they were alone, would be

9   treated under 2T, when they are grouped with the FBAR -- or

10  the foreign bank account report -- count, that leads to a

11  higher guideline.  The guideline manual makes clear that the

12  Court must go to the higher guideline, which is what was done

13  here, and I am in agreement with that.  So that objection is

14  overruled.

15          Now, the next objection that was asserted -- if I

16  miss one, Mr. Downing, you correct me -- but I think the

17  second one is the organizer or leader under 3B1.1(a); is that

18  correct?

19          MR. DOWNING:  A moment, Your Honor.

20          THE COURT:  Yes.

21          (A pause in the proceedings.)

22          MR. DOWNING:  Your Honor, the order may not be

23  important, but I think the intended loss, the specific intent

24  loss.

25          THE COURT:  All right.  Under what provision?

U.S. v. Manafort

10

1          MR. DOWNING:  It would be 1.1 --

2          THE COURT:  Are you talking about the -- this

3   is the -- under the bank accounts, the bank fraud?

4          MR. DOWNING:  Correct.

5          THE COURT:  No, let's deal with the -- any

6   objections to the failure to report and FBAR counts.

7          MR. DOWNING:  Okay.

8          THE COURT:  Those are grouped together.  And as to

9   those, I think the next one is the organizer or leader.  The

10  probation officer imposed a four-level enhancement on the

11  ground that Mr. Manafort directed Gates and others to do

12  various things which were illegal, and that that warrants the

13  four-level enhancement.  She also concluded that it was

14  otherwise extensive.

15         Now, Mr. Downing, I've read your brief on that, but

16  you may want to emphasize what you think merits or warrants

17  emphasis in that regard.

18         MR. DOWNING:  Your Honor, Mr. --

19         THE COURT:  Paragraph 32 of the PSR.

20         MR. DOWNING:  Yes, Mr. Westling is going to handle

21  this if it pleases the Court.

22         THE COURT:  All right.  Mr. Westling.

23         MR. WESTLING:  Thank you, Your Honor.  Yeah, very

24  briefly, we did, I think, fully brief this, but I think we

25  feel strongly that there wasn't a showing here of leadership

———U.S. v. Manafort———

11

1    in the classic sense under that enhancement.

2            Obviously, Mr. Gates testified they were doing this

3    together, but it didn't seem like it was either the

4    appropriate degree of leadership or that it was sufficiently

5    extensive to warrant that four-level enhancement, and that's

6    the reason for the objection.

7            THE COURT:  Well, you're right that it's been fully

8    briefed, and let me say for both sides that your briefs were

9    quite thorough and clear and appreciated.

10           The commentary to 3B1.1 includes people like

11   bookkeepers, tax preparers, people in Cyprus, all the people

12   involved.  They don't have to be violators themselves.  They

13   can be unknowing service providers.  But they have to be under

14   the direction and they were under the direction of Manafort

15   and Gates, and I find that 3B1.1(a) applies and that the

16   four-level enhancement is appropriate.  So that is overruled.

17   That objection is overruled.

18           Next, we go to the next objection, which is the loss

19   attributed to the bank fraud charges.  Now, here, we might --

20   I might need a little more argument, Mr. Downing or

21   Mr. Westling.  Let me go down this list so that we're talking

22   about the same thing.

23           I think it's useful in this regard to look at the

24   chart in the presentence report that appears in -- the chart

25   that appears at paragraph 64.  Who will argue this,

1  Mr. Downing?

2          MR. DOWNING:  Mr. Westling.

3          MR. WESTLING:  I will, Your Honor.

4          THE COURT:  All right.  Mr. Westling, do you have

5  that chart in front of you?

6          MR. WESTLING:  I do, Your Honor.  Thank you.

7          THE COURT:  Now, the first one, the victim of

8  Citizens Bank loan, and that was a loan for $2.7-plus million

9  and a $682,000 line of credit.  And I think the probation

10  officer concluded that there was no loss from that one.  Do

11  you agree with that?

12          MR. WESTLING:  That's correct, Your Honor.

13          THE COURT:  All right.  Now, we come to the next

14  one.

15          And you don't disagree with that either, do you,

16  Mr. Andres?

17          MR. ANDRES:  No, Your Honor.

18          THE COURT:  All right.  But the next one, I think,

19  does have a disagreement.  That's the Banc of California loan

20  for a million dollars, and I think the original presentence

21  report transposed some figures, which we found out.  The loss

22  in that was 684,448 is the loss that the probation officer

23  ultimately found.

24          Now, Mr. Westling, do you dispute that loss?

25          MR. WESTLING:  Your Honor, we don't.

U.S. v. Manafort

13

1          THE COURT:  All right.  So then we come to the

2   Citizens Bank loan, which is the loan for 377 Union Street.

3   Now, this is sort of an interesting one.  It's an interesting

4   one because this was a million-dollar loan -- I'm sorry, a

5   $5.5 million loan that never closed; is that right?

6          MR. WESTLING:  That's correct, Your Honor.

7          THE COURT:  And so it never closed.  Nonetheless,

8   there is convicted conduct or maybe it's admitted conduct, I

9   don't remember which, but it's conduct where there is fraud

10  against -- or the Citizens Bank in New York because a 3 -- or

11  a $5.3 million loan that was already encumbering the property

12  was not disclosed in the loan application.  Do I have that

13  right?

14         MR. WESTLING:  That's the allegation, Your Honor,

15  yes.

16         THE COURT:  All right.  Now, as I understand, your

17  argument is, distilled to its essence, no harm, no foul.  The

18  loan was never made, and therefore, there was no loss to which

19  the Government answers that you still must take advantage --

20  or take advantage -- take account of the intended loss.  And

21  there the intended loss is the full amount of the loan, 5.5

22  million.

23         I think I know your argument there, but let's state

24  it so Mr. Andres can have a target to shoot at.

25         MR. WESTLING:  Well, Your Honor, I think we were

─────U.S. v. Manafort─────

14

1   looking at the provision of the guidelines that deals with the

2   specific intent of the defendant at the time of the loan.  And

3   this was, you may recall from the testimony at trial, a

4   situation where Mr. Manafort had actually disclosed this loan,

5   that the collateral's encumbrance, by the time this later loan

6   occurred.  There were two loans at Citizens --

7          THE COURT:  Yes, but this loan never closed.

8          MR. WESTLING:  That's correct, and it was second in

9   time.  So by the time the bank did the application in July,

10  they had an e-mail from Mr. Manafort back in April saying

11  there was a new mortgage on the property.  And so we take the

12  position that contrary to what the Government has argued,

13  which is that they had -- the bank discovered it on its own,

14  and that was true for the first loan.

15         When it came to the second loan, Mr. Manafort had

16  given them that information and, therefore, was trying to be

17  clear.  In fact, the bank restructured the loan in order to

18  deal with that encumbrance, and it eventually didn't get made.

19  But this isn't -- I think the argument was that because he

20  didn't disclose that, it somehow meant he was trying to get

21  one over on the bank.

22         There was admittedly false statements submitted in

23  connection with the loan, so we're not bickering with that

24  issue.  It's simply a matter of when he submitted those with

25  the intent to pay the loan and prevent there from being a

1  loss.  And in our view the facts developed at trial suggest

2  that's exactly what happened.

3        THE COURT:  All right.  Mr. Andres?

4        MR. ANDRES:  Your Honor, we have a dispute about the

5  facts and the trial evidence.  Mr. Manafort specifically did

6  not disclose the Genesis Capital loan as part of that loan

7  application to Citizens Bank, nor did he ever disclose it

8  before the bank found out about it.  So there's no evidence

9  that he ever -- when you review both the loan application and

10 the testimony of Taryn Rodriguez, which was on pages 1911 to

11 1917, he specifically did not disclose it.

12        Now, there's history to the reason why he did not

13 disclose it.  Mr. Manafort had a prior loan from Citizens Bank

14 for Howard Street, the first loan that you went over in that

15 chart.  In that loan -- in that application, he also

16 specifically failed to disclose that, and he sought to secure

17 false documents to submit to the bank to show there wasn't a

18 loan on that property.

19        So you may remember the testimony of Rick Gates, who

20 testified that at Mr. Manafort's direction, he contacted the

21 insurance broker and the insurance broker provided a

22 fraudulent document that didn't include that loan so it could

23 be submitted to the bank.

24        So in the first instance, he didn't disclose it in

25 the first application, and then obviously making a loan to the

16

1   same bank, he could not have disclosed it a second time

2   because they would have found out about the first loan.  But

3   he specifically intended to not disclose that.

4          So at the time, he intended the bank to lose

5   $5.5 million because he hid what, in effect, was the

6   collateral or the collateral had a lien consistent with the

7   case law that we cited.

8          THE COURT:  Was the 5.3 loan docketed or recorded?

9          MR. ANDRES:  At the -- yes, it was recorded,

10  Your Honor, and the bank --

11         THE COURT:  So how in the world could anybody who's

12  a lawyer think that anybody is going to be fooled about

13  whether there was a loan on there before closing, because

14  clearly that would have been discovered.  And why wouldn't it

15  be reasonable to conclude that the failure to disclose the 5.3

16  loan was a -- an error, a mistake, they would argue, by a busy

17  man rather than fraud, a deliberate intent to deceive?

18         MR. ANDRES:  For two reasons, Judge.  First, he got

19  away with it once before.  That is in the prior loan -- in the

20  prior application to the same bank.  He failed to disclose it

21  and secured the loan, not having disclosed it, although as you

22  say, the bank found out about it.  Secondly --

23         THE COURT:  And it never closed.

24         MR. ANDRES:  No, the first loan did close.  The

25  first Citizens -- this is the second loan to the same bank.

U.S. v. Manafort

17

1          THE COURT:  Oh, yes, go ahead.

2          MR. ANDRES:  And the second reason is that

3   Mr. Manafort has agreed in his D.C. plea that he hid a loan on

4   the Union Street property.  So I'm reading from Paragraph 51

5   in the Statement of Offense in the Washington, D.C. plea,

6   where as Your Honor noted, Mr. Manafort admitted to the

7   equated conduct here in the Eastern District of Virginia.

8          So there's really no dispute about the fact that

9   Mr. Manafort has admitted to hiding the loan in question.

10          THE COURT:  What's the standard of Scienter that's

11   required for this?  In other words, suppose someone does it,

12   fails to disclose a loan carelessly, inadvertently.  Is that

13   sufficient?

14          MR. ANDRES:  So let me just -- for the purposes of

15   the conviction at trial, obviously we had to prove that beyond

16   a reasonable doubt that it was intentional, right?  So the

17   Government proved and Mr. Manafort has acknowledged his guilt

18   that he intentionally hid these loans as part of his

19   admissions --

20          THE COURT:  Because that was Count 28, right?

21          MR. ANDRES:  Correct.

22          THE COURT:  All right.  Go on.

23          MR. ANDRES:  I -- if we're talking about it as a

24   matter of sentencing, generally, as Your Honor knows, there's

25   a different standard of proof, but --

1          THE COURT:  But as you point out, the jury has

2     already foreclosed that.

3          MR. ANDRES:  Well, the jury didn't -- the jury

4     didn't convict Mr. Manafort on this count.

5          THE COURT:  On 20 -- that's right, 26 and -- just a

6     moment.

7          (A pause in the proceedings.)

8          THE COURT:  All right.  25 and 27 is what he was

9     convicted of, correct?

10          MR. ANDRES:  Correct.

11          THE COURT:  And --

12          MR. ANDRES:  This is loan -- this is Count 28.

13          THE COURT:  28.  So the jury made no determination

14     on this count.

15          MR. ANDRES:  Correct.  And as part of his plea in

16     Washington, D.C., in the district court, Mr. Manafort admitted

17     the conduct that was acquitted here and in -- specifically in

18     paragraph 51 --

19          THE COURT:  I don't have any doubt that he admitted

20     that conduct.  The thing that I'm having difficulty with, and

21     I think you may explain it in the same way, which might repeat

22     it, I should find that he intended Citizens Bank to lose

23     $5.5 million, right?

24          MR. ANDRES:  Correct.

25          THE COURT:  Now -- and that loan never closed, but

U.S. v. Manafort

1    nonetheless, if he intended a loss of 5.5 million, then under

2    the sentencing guidelines, he should be charged with that.

3    I'm still quizzical about why anybody who's a lawyer would

4    think that a recorded loan could be kept secret from a bank.

5         MR. ANDRES:  Your Honor, putting aside whether or

6    not it was wise or whether or not it would succeed.  Mr.

7    Manafort has said that he specifically sought to hide that

8    loan.

9         THE COURT:  Yes.  All right.

10         MR. ANDRES:  So that's what the evidence is.  And,

11    again, putting aside that it didn't succeed because the bank

12    found it out --

13         THE COURT:  It couldn't succeed.  I don't know of

14    any bank that doesn't do a record search on a title.  But your

15    point is he admitted it.

16         MR. ANDRES:  And in the first loan, it did succeed.

17         THE COURT:  The first loan, which one is that on our

18    chart?

19         MR. ANDRES:  So that would be the first loan in the

20    chart, the Citizens Howard.

21         THE COURT:  As to which there was no loss.

22         MR. ANDRES:  As which -- as to which there was no

23    loss, but there was a -- it was a loan application, and on

24    that loan application, Mr. Manafort was required to disclose

25    the prior liabilities, including this loan that we're

U.S. v. Manafort

20

1   discussing.

2          THE COURT:  Right.  And it succeeded there because

3   the loan issued, but we now know that the bank suffered no

4   loss as a result of that.

5          MR. ANDRES:  Correct.  And when I say "succeed,"

6   what I mean, obviously, is that the loan was approved by the

7   bank.

8          THE COURT:  Interesting.  Stunning, isn't it, that a

9   bank would miss a recorded loan on a piece of property?

10          MR. ANDRES:  No comment.

11          THE COURT:  All right.

12          MR. ANDRES:  Thank you, Your Honor.

13          THE COURT:  Is there anything you want to add,

14   Mr. Westling?

15          MR. WESTLING:  Just briefly, Your Honor.  We

16   understand there are admissions in the D.C. case, and I think

17   what we focused here is on the requirement that obviously he

18   purposely sought to inflict harm on the bank, and we simply

19   don't believe that standard is met by what's before the Court.

20          THE COURT:  And that, you say, as well is in the

21   admissions; is that right, Mr. Andres?

22          MR. ANDRES:  Well, Mr. Manafort pled guilty to bank

23   fraud, and so he was intentionally trying to defraud the bank,

24   which would necessarily --

25          THE COURT:  Yes, but what in D.C. did he say in --

U.S. v. Manafort

21

1  with respect to intending this loss?

2        Let's come back to this, Mr. Andres.  I'll give you

3  an opportunity to look at it, but you see the point I'm

4  curious about.

5        The point I'm curious about is what precise standard

6  must I apply, under the guidelines, to finding that there was

7  this intended loss?  Mr. Westling has told me what he thinks

8  the standard is.  Tell me again, Mr. Westling.

9        MR. WESTLING:  That he purposely sought to inflict

10  harm on the bank, Your Honor.

11        THE COURT:  Well, that doesn't tell me a lot.

12  Purposely sought to inflict harm on the bank, that's what he

13  says.  But, you think about it.  This isn't -- I'm not going

14  through this whole thing without one recess.

15        MR. ANDRES:  Yeah, just -- Judge, just so I don't

16  lose the thread.  The standard is that the Government has to

17  prove by a preponderance, for the guidelines purposes, that he

18  intended --

19        THE COURT:  Intended the loss.

20        MR. ANDRES:  Intended the loss to be five point --

21        THE COURT:  And you see, that's where I stumble.

22  That's where I stumble because I find it hard to find by a

23  preponderance of the evidence.  But, I'm going to look again

24  at what you cited me to -- I don't want to do it here -- at

25  the D.C. stuff.  But it seems to me that it's hard to believe

—————U.S. v. Manafort—————

22

1  that a lawyer would believe that he could get -- he could fool

2  a bank into not finding a $5.3 million loan that's recorded.

3  It seems to me that that might have been inadvertence or

4  something else; I don't know.  But let's pass it for a while

5  --

6  MR. ANDRES:  Okay.

7  THE COURT:  -- and come back to it.

8  I think I understand your position, but I want to

9  give you one more opportunity, and you as well, Mr. Westling,

10  to address the $5.5 million intended loss with respect to the

11  377 Union Street loan by Citizens Bank.

12  Now, let's turn to the next one, which is a loss of

13  207,000 on the Federal Savings Bank.  Is there any dispute

14  about that, Mr. Westling?

15  MR. WESTLING:  No, Your Honor.

16  THE COURT:  All right.  And you don't have a

17  dispute?

18  MR. ANDRES:  No, Your Honor.

19  THE COURT:  All right.  So then we go to the Federal

20  Savings Bank loan for the 377 Union Street.  This is the

21  second one, a $6.5 million loan, and that, the probation

22  officer concluded no loss.  You don't have a problem with

23  that, Mr. Westling?

24  MR. WESTLING:  No, Your Honor.

25  THE COURT:  And Mr. Andres?

1       MR. ANDRES:  No, Your Honor.

2       THE COURT:  So really the only dispute -- guidelines

3   dispute we have is whether or not there should be a

4   $5.5 million intended loss with respect to 377 Union Street,

5   and I'll come back to that.

6       MR. ANDRES:  Thank you.

7       THE COURT:  And in that regard, Mr. Andres, I

8   will -- I'm going to take what you say and look at the D.C.

9   material.  You're telling me that, first of all, they pled

10  guilty to bank fraud.  So this -- that should, in you view,

11  end the matter.  But I will look at that once more carefully.

12      MR. WESTLING:  Your Honor --

13      MR. ANDRES:  Thank you, Judge.  It's specifically

14  paragraph 51 on page 22, and I'm happy to hand up a copy.

15  We've submitted it separately, but I'm happy to hand it up if

16  that's easier.

17      THE COURT:  No, I don't need it.

18      MR. ANDRES:  Okay.

19      MR. WESTLING:  Just a fine point, Your Honor.  I

20  apologize for interrupting.  But he didn't plead guilty to

21  bank fraud in D.C., he admitted the conduct.

22      THE COURT:  That's right.  He didn't --

23      MR. WESTLING:  I just want to make sure we're clear.

24      THE COURT:  You're exactly right.  He didn't plead

25  guilty to bank fraud there, but he -- in the course of that

24

1   plea in D.C., he admitted the conduct.

2          MR. WESTLING:  That's correct, Your Honor.

3          THE COURT:  Now, why don't you tell me very

4   succinctly why you don't think that ends the matter?

5          MR. WESTLING:  Because I think admitting the

6   elements of bank fraud does not cover the issue of whether one

7   intended a loss.  There's all kinds of methods of defrauding a

8   bank that don't necessarily mean you don't plan to pay the

9   loan, and I think the guideline's key to that issue.

10          THE COURT:  And, Mr. Andres, I'll give you the last

11   opportunity.

12          MR. ANDRES:  Yeah.  Again, I would just refer to the

13   Statement of Facts in D.C., where he specifically says that he

14   didn't -- that he basically conspired to defraud the bank of

15   $5.5 million.  I don't know that there's any other way to

16   defraud a bank and not intend it to lose the money that you're

17   securing from the loan.

18          THE COURT:  Yes.  It's not a momentous issue in the

19   overall sentencing calculus.  It's sort of interesting because

20   there is an interplay here of plea negotiations in another

21   jurisdiction affecting this case, and that's unusual.

22          All right.  I think we have dealt with all of the

23   loan .  Now, let me deal with one other subject with respect

24   to the bank loan.  I think there is a current dispute between

25   the parties on restitution.  I think the defendant says wait

25

1   on restitution until these properties are resolved, sold or

2   something else; is that right, Mr. Westling?  Mr. Downing?

3   Either one of you.

4            MR. WESTLING:  Your Honor, I think to be clear,

5   we're -- we were just wanting to ensure that there would be an

6   appropriate offset for anything that came from that process so

7   that --

8            THE COURT:  Yes.  I think Mr. Andres would be

9   willing to agree with that or Mr. Asonye.  A cameo or more?

10           MR. ASONYE:  We'll see, Your Honor.  We do agree,

11   and it is in paragraph 3 of the restitution order, the offset

12   language.

13           THE COURT:  All right.  The restitution order has

14   now been handed to me.  It was given to the clerk today,

15   right?

16           MR. ASONYE:  Yes, Your Honor.

17           THE COURT:  I'm not an instant reader, so that'll be

18   something I will do at the first recess.

19           All right.  So I have that one issue that I'm going

20   to consider.  Are there any other objections -- there are, I

21   believe -- to the presentence report that I should consider at

22   this time?

23           For those of you in the courtroom, once I resolve

24   all of the objections to the presentence report, then I will

25   have a final offense level and criminal history.  He's a

U.S. v. Manafort

26

1  Criminal History Category I; that is, he has no criminal

2  history.  That will have the guideline calculation and that

3  will be one factor for the Court to take into account, and we

4  will then go to argument and allocution, which is where the

5  government and the defendant get to tell me what they think

6  should be the disposition of this sentencing.

7           And Mr. Manafort will have the opportunity, if he

8  wishes, to address the Court and to say anything at all he

9  wishes to this Court by way of extenuation or mitigation or

10 not at all if he wishes.  It's entirely up to him.  So that's

11 what we have left.

12          Now, just a minute.  Let me see if I see -- we

13 haven't done the role in the offense yet, have we,

14 Mr. Westling?

15          MR. WESTLING:  We have, Your Honor.

16          THE COURT:  We have.  That's right; I did conclude

17 that.  I don't think there is anything left.  There is no

18 adjustment for obstruction of justice, and there is no

19 adjustment for -- oh, acceptance of responsibility.

20          All right.  I do want to hear from you a bit on

21 this.  The guidelines --

22          (A pause in the proceedings.)

23          THE COURT:  The guidelines provide for a credit,

24 under the guidelines calculation, for a defendant's acceptance

25 of responsibility.  And the probation officer did not give

—U.S. v. Manafort—

27

1   Mr. Manafort a credit for acceptance of responsibility, and

2   the reason for which is that he exercised his constitutional

3   right to go to trial.  He denied the -- his guilt under those

4   counts and went ahead with trial.

5          Now, that doesn't foreclose acceptance of

6   responsibility.  You can still get acceptance of

7   responsibility even if you go to trial, and the guidelines

8   make that clear, but they do so in a provision that states

9   that -- well, let's get it in argument.

10          But I think it's very clear under the law that a

11   defendant who exercises his right to go to trial can

12   nonetheless receive credit for acceptance of responsibility,

13   but it's fairly limited, the circumstances under which a

14   defendant can receive that.  I think if defendant had gone

15   ahead in the District of Columbia and his cooperation

16   agreement had not been terminated, was it, Mr. Andres or

17   Mr. --

18          MR. ANDRES:  Breached, Your Honor.

19          THE COURT:  Yes, but what -- was it terminated?

20          MR. ANDRES:  The -- what happens with the breach is,

21   effectively, the defendant loses his rights under the

22   contract, but the government doesn't.  So it's not that -- the

23   contract doesn't get ripped up.

24          THE COURT:  So from his point of view, it was

25   terminated.

—— U.S. v. Manafort ——

1      MR. ANDRES:  Yes, breached.  But yes, that's the

2  effect.

3      THE COURT:  All right.  And so in that circumstance,

4  you get to use his Statement of Facts, but he does not get

5  acceptance of responsibility.

6      MR. ANDRES:  He doesn't allow -- he's not allowed to

7  withdraw his plea, which is the same thing that the Statement

8  of Facts stands, his plea stands.

9      THE COURT:  Now, the argument I'm going to hear --

10  and I want you to put some flesh on it, Mr. Downing -- he

11  spent 50 hours with the special prosecutor.  You would say,

12  your words, not mine, spilling his guts, and I gave you those

13  words.  They weren't yours.  But it would be what I'd be

14  arguing.

15      In any event, he didn't get it because they didn't

16  believe he was truthful.  But why do you think he gets under

17  the circumstances?  And you don't need to argue about

18  obstruction, because the obstruction is not an impediment to

19  acceptance of responsibility in this case.

20      MR. DOWNING:  Sure.  Thank you, Your Honor.  Just a

21  couple of things.  One, to start out with the fairly obvious,

22  this is a very unusual case.  So we're --

23      THE COURT:  I think it's worth -- nobody here denies

24  that.

25      MR. DOWNING:  Right.  And I think because of the

1   process that was -- surrounds this case, the Office of Special

2   Counsel, the way in which the case was handled, I think we

3   ended up at trial for that very reason.  I think if we would

4   have been faced with this same case by the local U.S.

5   Attorney's Office, we may never have had a trial.

6           So I'd like the Court to consider the fact that when

7   we went into this case, the Court even observed that this case

8   was overcharged, and at the end of the day, 10 of the 18 did

9   hang.  But there was not a process in place from our

10  standpoint to avoid having gone to trial.

11          Now, at trial, I think, we did not step into any of

12  the areas where the sentencing guidelines say if you do the

13  following at trial, you cannot get acceptance.  After the

14  trial was over, and I know this Court doesn't get into pleas

15  and plea negotiations, we were able to have much more

16  productive discussions and reach a plea agreement shortly

17  after the end of this trial.

18          THE COURT:  In D.C.

19          MR. DOWNING:  In D.C., correct.  Again, Your Honor,

20  a bifurcated trial I don't think would have existed if the

21  U.S. Attorney's Office had brought the case.

22          So I think these are a lot of extenuating

23  circumstances around the consideration that after this trial,

24  shortly thereafter, once we were able to get into productive

25  discussions with the Office of Special Counsel, there was a

30

1   resolution and there was immediate acceptance of

2   responsibility for Mr. Manafort's conduct with respect to the

3   hung counts.  And we think all of that should be considered by

4   the Court, the unusual circumstances and what followed.

5           THE COURT:  Well, yes, I don't question that, and I

6   don't think Mr. Andres does, that I can take that into account

7   under 3553.  But his argument is you don't get the three-level

8   reduction; am I right, Mr. Andres?

9           MR. ANDRES:  Correct, Your Honor.  Two-level

10  reduction.

11          THE COURT:  I beg your pardon?

12          MR. ANDRES:  It would really just be a two-level

13  reduction.

14          THE COURT:  It would be.  You're correct.

15          MR. ANDRES:  I don't think the third point is really

16  an issue because the Government hasn't made a motion.

17          THE COURT:  You're quite right.  Go on.

18          MR. DOWNING:  Well, again, I think all these

19  attenuating circumstances around this particular trial, it's

20  very odd because ordinarily all of the counts would be in one

21  case and you wouldn't have a conviction and a plea.  But

22  because of the odd nature of what happened here -- and

23  obviously we exercised Mr. Manafort's constitutional rights to

24  be tried in the appropriate venue.

25          Certainly, the outcome of him getting acceptance

1   shouldn't change because he exercised his constitutional

2   rights, and that's really what we would like the Court to

3   consider.

4            THE COURT:  All right.  Mr. Andres.

5            MR. ANDRES:  Your Honor, it certainly is true that

6   all these -- the Government offered to indict Mr. Manafort in

7   Washington, D.C., as to all the counts that he wanted to be

8   tried in the appropriate venue, and there's certainly nothing

9   wrong with that.

10           I would say the following:  There's nothing unusual

11  about the fact that evidence is submitted to a grand jury,

12  that that grand jury returns an indictment, that before this

13  Court, Your Honor heard argument on all of the relevant

14  motions, including the motion to dismiss.  The case -- the

15  jury was picked by both sides under Your Honor's supervision,

16  and that jury convicted Mr. Manafort.  And for that case, he

17  is not entitled to acceptance of responsibility.

18           What the guidelines says is if you go to trial to

19  preserve a legal issue, if there's a novel legal issue that

20  you want to appeal or something along those lines, then you

21  could get -- still get acceptance of responsibility because

22  you've accepted your guilt as to those facts or to those

23  crimes, but you want to preserve your legal appeal.

24           That's not what happened here.  What happened here

25  is Mr. Manafort vigorously defended himself on the facts and

32

1    his guilt, and he did not accept responsibility in this

2    courthouse with respect to those crimes, notwithstanding what

3    happened in D.C., and I --

4              THE COURT:  But let me ask you this:  Suppose that

5    the facts that arose that caused the Government to seek

6    Mr. Manafort's ending of his bond and his failure to be

7    truthful, suppose none of that had occurred.  You would be

8    here today saying he does get acceptance of responsibility.

9              MR. ANDRES:  I don't want to hypothesize about what

10   happened, Your Honor, but I will say this:  The fact that

11   he --

12             THE COURT:  I'm asking you to hypothesize.  If that

13   had happened, wouldn't he get acceptance?

14             MR. ANDRES:  Well, there's nothing in the plea

15   agreement, and remember that the plea agreement is supposed to

16   contain all of the agreements between the parties, that there

17   are no agreements beyond that.

18             It certainly doesn't say in the plea agreement that

19   the Government would be asking for a reduction or not to be

20   imposing an acceptance of responsibility addition to the

21   guidelines here.

22             It's certainly possible that the Government would

23   have brought Mr. Manafort's cooperation, had he cooperated, to

24   the Court's attention.  But there's certainly nothing to

25   indicate that we would have -- that we would have accepted a

U.S. v. Manafort

33

1    reduction for acceptance of responsibility.

2            Moreover, what I would say to Your Honor, and again,

3    I don't want to mix the D.C. and Eastern District of Virginia

4    cases, but there's a pertinent fact, which is the Fourth

5    Circuit has said that post-plea -- post-arrest and post-plea

6    conduct is relevant to acceptance of responsibility.  And a

7    judge -- the judge in Washington, D.C., Judge Jackson, has

8    found that Mr. Manafort has both lied to the Government and

9    lied to the grand jury.

10           And so that's also relevant to Your Honor's

11   determination about whether or not he's accepted

12   responsibility.

13           THE COURT:  All right.  Thank you.

14           Mr. Downing.

15           MR. DOWNING:  Your Honor, one of the difficulties

16   here is -- and we pointed this out in our briefing.  The

17   Office of Special Counsel is presenting this Court with fact

18   finding by another court that is still open to reconsideration

19   because of subsequent evidence that was presented by the

20   Office of Special Counsel.

21           So I have not been -- I've been doing this for a

22   long time.  I've never been in the situation where open fact

23   finding in another case is affecting the Court's decision on

24   sentencing in this case.

25           THE COURT:  Yes, I take your point, and I'm also

U.S. v. Manafort

34

1   sensitive to the fact that this isn't your first rodeo nor is

2   it anybody's here first rodeo, except Mr. Manafort's.

3        I just had occasion to recognize that I've been here

4   32 years and I have seen a great deal.  And the one thing I

5   think everyone here would have to agree with is this is

6   unusual.  It's unusual because of the attention this case

7   gets.  Look at the courtroom.  It's filled.

8        I sentence people -- and there's an overflow

9   courtroom.  I sentence people every week.  I have sentenced

10  large numbers of people in the past 32 years for a lot of

11  conduct, some of it far more egregious than this and some of

12  it less, rarely have a courtroom even close to this filled,

13  which is unfortunate.  It's unfortunate because a lot of the

14  sentences I impose need to have publicity so that they have

15  general deterrent effect.

16       I don't know, as an empirical matter, whether there

17  is any deterrent effect to sentences.  I hope so.  But that, I

18  think, remains to be empirically tested.  I know years ago I

19  had to sentence young people who were mules, drug mules from

20  Colombia, the country of my birth.  They came up here with

21  drugs and I sentenced them to a mandatory minimum of ten years

22  in prison.

23       And, of course, these were young kids essentially,

24  teenagers and 20's, who were told, here, take these drugs.

25  They'll -- if they find them, they'll just deport you.  Well,

1  that's true, but only after ten years in Uncle Sam's custody.

2  And I thought that failing to give people notice of that in

3  Colombia, Madine, and other places, was wrong, immoral.

4         So I ordered the government to put signs up in these

5  airports and I smugly told myself that that would make some

6  difference.  Not in the slightest.  So I don't know about

7  general deterrence, but it is still a congressionally mandated

8  consideration under 3553, and I hope it has some effect.

9         And, of course, I also am fully aware of the fact

10  that they hung pickpockets in 18th and 17th Century England.

11  But every time they had a hanging, pickpockets showed up.  So

12  that gives you a sense of the deterrent effect.  We'll come to

13  that later.  But let's get back to this now.

14         Did you finish what you wanted to say, Mr. Downing,

15  about --

16         MR. DOWNING:  The only other issue that I wanted to

17  bring up is that even in the D.C. case, that the Office of

18  Special Counsel has conceded that the issue of the breach in

19  the agreement might only go to one of the pled counts.

20         So I feel like we are a lot further away from one of

21  the two counts in D.C. and in a position where I think that

22  issue should be of --

23         THE COURT:  Well --

24         MR. DOWNING:  -- little relevance to this Court.

25         THE COURT:  All right.  But I take it you would urge

36

1    me -- you would agree that if I agree with Mr. Andres that he

2    should not receive acceptance of responsibility, you would

3    still urge me to take into account and to consider the fact

4    that he spent 50 hours with the special prosecutor and

5    cooperated there, and that isn't where he lied apparently --

6    or is it, Mr. Andres?

7            MR. ANDRES:  It's one of the places where he lied.

8            THE COURT:  All right.

9            MR. ANDRES:  He lied both in the proffers and before

10   the grand jury.

11           THE COURT:  All right.  So he lied in other places.

12           MR. DOWNING:  However, I do think it stands to be

13   emphasized that there were two limited issues for which at the

14   end of the day, the judge found that Mr. Manafort lied.

15   There's one issue that's open to a motion to reconsider now.

16           THE COURT:  Is that -- and this is under seal?

17           MR. DOWNING:  Yes.  It seems like everything is

18   under seal.

19           THE COURT:  Why is it under seal?  The public ought

20   to know about these things.

21           MR. ANDRES:  Your Honor, it's not all under seal.

22   There is a public order which Judge Jackson issued and --

23           THE COURT:  Well, that's her decision.  I'm not

24   second-guessing that.  She should do whatever she thinks is

25   right, and I'm sure she will.  But I hope, at the end of the

U.S. v. Manafort

37

1    day, all this will be unsealed.

2           MR. ANDRES:  Understood, Judge.  It's part under

3    seal because there's a continuing investigation.

4           If I could just briefly address several points?

5           One, even if Your Honor put aside the fact that a

6    federal judge in Washington has found that Mr. Manafort lied

7    to the government and the grand jury for the purposes of

8    acceptance of responsibility, there's no Fourth Circuit law,

9    at least none that the defense has cited and none that we've

10   found, where defendant vigorously contests his guilt and the

11   facts at trial and gets acceptance.

12          Second of all, the government is not -- is opposing

13   the imposition of acceptance of responsibility in Washington,

14   D.C., as well.  So the notion that Mr. Manafort's argument is:

15   I accepted responsibility and I should be getting acceptance

16   of responsibility for my plea, it's not going to happen with

17   respect to his plea in Washington, D.C. -- or I shouldn't

18   predict what the judge is going to do; I'm not suggesting

19   that.  But the government opposes acceptance there as well as

20   the acceptance here.

21          THE COURT:  All right.  Your arguments, as usual,

22   have been helpful, and it illuminates a number of facts.  But

23   it's the guidelines terms that govern this decision.

24          As I said and as the guidelines reflect, conviction

25   by trial does not automatically preclude a defendant from

1   consideration for such a reduction.  In rare situations,

2   according to the guidelines, a defendant may clearly

3   demonstrate an acceptance of responsibility for criminal

4   conduct even though he exercises his constitutional right to

5   trial.  This may occur, for example, where a defendant goes to

6   trial to assert and preserve issues that do not relate to

7   factual guilt, for example, making a constitutional challenge

8   to the applicability of a statute to his conduct.

9          But in each such instance, the guidelines note that

10  a determination that the defendant has accepted responsibility

11  would be based primarily upon pretrial statements and conduct.

12         In the end, I think that it is important for me to

13  recognize what he has done, the 50 hours of cooperation.  But

14  in the end, he doesn't get acceptance under the strict terms

15  of the guidelines.

16         So the objection is overruled, but it doesn't mean

17  that I don't take into account under 3553, and in the overall

18  consideration of an appropriate sentence, those facts.  And I

19  don't know all of the facts relating to his -- the allegations

20  that he lied on two issues in the District of Columbia.

21         I think , Mr. Downing, you invited the Court to go

22  look at that.  I declined that invitation.  I am not -- I do

23  not sit to second-guess Judge Jackson, and I'm not going to.

24  She will do whatever she thinks is right, and I will accept

25  that.  I don't go behind it, and I don't need to know all of

1  that.

2          Now, I think I now have dealt with all of the

3  objections, Mr. Andres, Mr. Downing, Mr. Westling.

4          MR. WESTLING:  I think there is one additional

5  objection, Your Honor.

6          THE COURT:  What's the additional one?

7          MR. WESTLING:  Which related to the sophisticated

8  means enhancement for the bank fraud.

9          THE COURT:  Yes, yes.

10          MR. WESTLING:  We're happy to stand on our briefs,

11  but I just wanted to make --

12          THE COURT:  All right.  Well, I'm happy to rule on

13  the basis of the briefs that have been filed.  I don't have

14  any doubt that this involves sophisticated means under the

15  guidelines, and so that enhancement is appropriate.

16          Now, I'm going to take a brief recess, and at the

17  end of that recess, I will either rule on this intended loss

18  issue or ask for more information, and then I will expect the

19  parties to be prepared to go on and make their arguments under

20  the sentencing arguments, with, Mr. Andres, you going first,

21  unless you're going to give Mr. Asonye an opportunity to

22  dazzle us with his verbal atomic footwork, and then you, Mr.

23  Westling.  That's not meaningful to other people.

24          Mr. Asonye is an assistant U.S. attorney in the

25  Eastern District, not a member of the Special Prosecutor's

1   office, and I see Mr. Asonye on a routine basis here on

2   Fridays and for trials.  So I have some knowledge of his

3   verbal atomic footwork.

4           All right.  We'll take a 15-minute recess and also

5   take a -- we will then hear at -- once I hear argument from

6   Mr. Manafort.  I have the restitution order up here now?  Yes.

7           All right.  Court stands in recess.

8           (Recess.)

9           (Court proceedings resumed at 5:15 p.m.)

10          (Defendant present.)

11          THE COURT:  You-all can see why Mr. Flood got his

12   job.  He can get your attention.

13          All right.  I -- two things before we get to

14   argument.  First of all, there is this issue of the intended

15   loss on the Union Street property.  The second -- or the first

16   loan didn't -- the first loan did not go through, but there's

17   still a $5.5 million loss on that one and that's what's at

18   issue, right?

19          MR. ANDRES:  His second loan.  So the first loan

20   went through, in which Mr. Manafort hid the loan, the Genesis

21   Capital loan.  The -- when I say the first loan, I'm talking

22   about the Count 24 and 25.

23          THE COURT:  Just a moment.

24          (A pause in the proceedings.)

25          THE COURT:  I'm sorry, Mr. Andres.  Would you repeat

1  that, please?

2      MR. ANDRES:  Yes.  There were two loans with

3  Citizens Bank.  The first loan, which was charged in Count 24

4  and 25, was a loan for the Howard Street property, and on that

5  property, Mr. Manafort hid his loan on the Union Street

6  property.

7      The second loan was a loan that's charged in

8  Count 28, is a loan for the Union Street property itself, and

9  again, in that loan, Mr. Manafort hid the prior lien on that

10  loan as well.

11      THE COURT:  All right.  And the issue that I raised

12  was in the Union Street bank loan for 5.5 million, which never

13  closed.  Why should he be charged with $5.5 million loss when

14  it's difficult to understand that he intended a $5.5 million

15  loss?  Now, usually the only loss that would occur on a loan

16  that didn't close is -- well, no loss, but what he intended.

17      And I went and read, as you invited me to do, Mr.

18  Andres, paragraph 51 of the Statement of Offenses and other

19  acts in the District of Columbia, and it says that he made or

20  caused to be made a series of false and fraudulent material

21  representations to the bank in order to secure the loan,

22  including the submission of false statement of assets that hid

23  a prior loan on the Union Street property, that's the Genesis

24  loan, among other liabilities and the submission of falsified

25  2016 DMI, P&L that overstated DMI's income.

U.S. v. Manafort

42

1          Do you have anything further you want to say on

2    this, Mr. Westling?  I think I understand it.

3          MR. WESTLING:  No, Your Honor.

4          THE COURT:  I'm going to overrule the objection, but

5    I'm going to state what I think is a real problem with it.

6          I find it difficult to see that as an intended loss

7    in that one.  Sometimes there -- you could argue an

8    intended -- what they really wanted to do was get the interest

9    rate down.  That's why they left that -- whoever submitted it

10   left that loan out.  But in any event, it isn't something that

11   is very material at all to my sentencing decision.

12         But I'm going to overrule the objection and I do

13   rely to some extent in that regard, Mr. Andres, on the

14   paragraph that you cited to me, paragraph 51 from the D.C.

15   submission.  So now -- one other thing I wanted -- two things

16   I wanted to mention.

17         First of all is the restitution order.  Mr. Asonye,

18   I don't think I agree with your construction of paragraph 3.

19   Paragraph 3 reads -- well, let me set the stage for people.

20   This is a restitution order, and the basic objection to the

21   restitution order is, to distill it to its essence, is the

22   defendant says, look, wait until these properties are all sold

23   and everything is all resolved, and then I'll know exactly

24   what I have to do in restitution.

25         That's a fairly appealing position to take.

1  Mr. Asonye says, well, we've taken care of that in paragraph 3

2  of the restitution order, and I don't think so, Mr. Asonye.

3        Let me tell you why.  The amount of restitution paid

4  to any entity, I'm reading now from the restitution order,

5  shall not exceed the entities in total loss from the offenses

6  of conviction pursuant to such-and-such statute.  Any amount

7  paid to an entity under an order of restitution shall be

8  reduced by an amount later recovered as compensatory damages

9  for the same loss by the victim in any federal or state civil

10  proceeding.

11        Well, that's what you were referring to by saying

12  that it's -- that the order accommodates the defense's

13  argument that he shouldn't have to pay any more than an actual

14  loss, right?

15        MR. ASONYE:  Both provisions, Your Honor.  Both the

16  first sentence, which permits that no --

17        THE COURT:  First sentence of paragraph 3.

18        MR. ASONYE:  Correct, which --

19        THE COURT:  Look, just change -- why didn't you

20  change the language to say by an amount later recovered in any

21  way in the disposition of the property?  Don't limit it to

22  compensatory damages for the same loss by the victim, but --

23        MR. ASONYE:  We have no objection to doing that,

24  Your Honor.  That language comes straight from the statute.

25        THE COURT:  I wouldn't think that -- well, just

U.S. v. Manafort

44

1  because it comes straight from the statute doesn't mean it's

2  appropriate to accommodate the parties' intention on this --

3  or the Court's intention on the restitution order.

4        I don't want to order restitution in any amount

5  greater than what the disposition of this property gives to

6  these banks or other victims.

7        MR. ASONYE:  So --

8        THE COURT:  Now, does that -- why don't you huddle

9  there with Mr. Westling and Mr. Downing, and let's see if we

10  can get language, because right now, I don't have a

11  restitution order signed by all parties, and that is something

12  I'd like to have before I proceed.

13        Now, while they're doing that, let me say this to

14  the others.  And, counsel, you don't need to listen to this,

15  so don't worry about it.

16        In a few minutes, I will be pronouncing sentence.

17  And although 99 percent of the cases I have in which I

18  announce sentences don't involve this kind of interest and

19  notoriety, the very few that I have had, minuscule number, as

20  soon as I say something, reporters run out.  That's very

21  disruptive and not appropriate.  I've never had it in a

22  sentencing.  I've had it with jury verdicts and so forth, and

23  we don't want that to happen.  If you want to do that, I would

24  ask that you retire to --

25        Mr. Flood, seven.

1           THE CSO:  Seven.

2           THE COURT:  The seventh floor courtroom.  Everything

3   is piped into there, and if you want to make immediate contact

4   with your publication, whatever it may be, when you hear

5   something, please use that.  Let's not run out of here like

6   the beginning of a marathon or something because it's

7   disruptive and inappropriate.  Thank you.

8           All right.  Is that agreeable to you, Mr. Westling?

9           MR. WESTLING:  Yes, Your Honor, that language in

10  that provision is agreeable.

11          THE COURT:  All right.  Well --

12          MR. WESTLING:  Let me just make a point on what

13  you're going to ask me next, Judge, is why haven't we signed

14  it.  And I think just in terms of not waiving any possible

15  appellate right, I would prefer not to have the defendant sign

16  it but have the Court impose the order, because I don't want

17  to have been viewed as waiving any issue that I can't see down

18  the road.  And so I recognize that may not be the local

19  practice, so I'll defer to the judge.  But I just wanted to

20  make --

21          THE COURT:  All right.  I don't know what you mean

22  by local practice.  It's not what I typically do, but I will

23  do this because I think it's a fair restitution order and I

24  didn't like paragraph 3 the way it was.  This one, I think, is

25  fine, Mr. Asonye.

46

1          All right.  Now, Mr. -- well, who will argue for the

2   Government to begin with?

3          MR. ANDRES:  Your Honor, I'm just going to cover the

4   3553 factors.

5          THE COURT:  Yes.

6          MR. ANDRES:  And Mr. Asonye has an outstanding issue

7   with respect to the forfeiture and with respect to fines.  So

8   we'll split the argument up that way, and we're not going to

9   be long.

10          THE COURT:  All right.  Well, maybe I should hear

11   from him first though.  What is it, forfeiture and what?

12          MR. ANDRES:  And the fine.

13          MR. ASONYE:  I think we'll start where we have the

14   most agreement, Your Honor, and on forfeiture.

15          In light of the forfeiture proceedings that are

16   taking place in the District of Columbia, and for ease of

17   administration and clarity, the parties have agreed that -- to

18   attempt to resolve the forfeiture issues pertaining to

19   Mr. Manafort in the District of Columbia; therefore, the

20   Government will not seek a forfeiture order in this district.

21          THE COURT:  All right.  Well, that's fine.  Let

22   Judge Jackson deal with it.  Next.

23          MR. ASONYE:  The fine, Your Honor.

24          Now, the guidelines state that the Court shall

25   impose a fine in all cases except where the defendant

─────U.S. v. Manafort─────
47

1    establishes he's unable to pay.  And, Your Honor, the

2    defendant has not met his burden that he's unable to pay a

3    substantial fine in this case, particularly since he has not

4    submitted the financial information requested by the probation

5    officer.

6          We will note, however, that in paragraph 135 of the

7    PSR, it notes that based on the available financial

8    information to the probation officer, it appears he does have

9    significant assets and that he does have the means to pay a

10   fine.  And we'll note that Mr. Manafort -- the Government is

11   aware that Mr. Manafort owns two homes that are not included

12   in any forfeiture proceedings in D.C.  He has a home in

13   Alexandria, Virginia, and he also has a home in Palm Beach

14   Gardens, Florida.

15         And the PSR notes that the equity in those homes is

16   approximately $4 million.  So the Government certainly

17   believes that he has at least $4 million to pay towards a fine

18   in this case, potentially more since he has not even submitted

19   a financial information form, which is particularly troubling

20   in light of the fact that this prosecution is based on

21   Mr. Manafort hiding income and providing false statements to

22   financial institutions.

23         THE COURT:  The restitution order says $24 million.

24         MR. ASONYE:  Yes, Your Honor.

25         THE COURT:  That includes the 6 million in unpaid

48

1    taxes?

2              MR. ASONYE:  It does, Your Honor.

3              THE COURT:  All right.  Go on.

4              MR. ASONYE:  That's it, Your Honor.

5              THE COURT:  All right.  Mr. Westling or Mr. Downing.

6              MR. WESTLING:  Your Honor, I think that from our

7    perspective, obviously it's in the Court's discretion to order

8    a fine.  One of the factors you consider is whether he can pay

9    one.  Clearly, even if you take the information from present

10   --

11             THE COURT:  Why don't we have financial information?

12             MR. WESTLING:  I can only say, Your Honor, that it

13   was a very difficult process given his incarceration.  There's

14   a lot of complexity to it, and we just had difficulty getting

15   it together, and I apologize to the Court for that.  I know it

16   makes the job more difficult.

17             But I will note that even based on this information,

18   which we know includes the assets that are being forfeited in

19   D.C., he has a net worth of 13 million.  And the Court is

20   going to enter an order of 24 million of restitution, and it

21   seems to me it's clearly a situation where he's illiquid, and

22   again, that includes assets that we know are being forfeited.

23             THE COURT:  Tell me this.  This really should be

24   directed to Mr. Asonye.

25             Tell me this, Mr. Asonye:  Will Judge Jackson also

49

1  have the opportunity to impose a fine on the basis of

2  convictions or admitted conduct there?

3          MR. ASONYE:  She would, Your Honor, but not on the

4  admitted conduct here.

5          THE COURT:  Why?  He's admitted all the conduct over

6  there.

7          MR. ASONYE:  Yeah, but it's not relevant conduct for

8  purposes of calculating the guidelines in the District of

9  Columbia.  It's just essentially relevant conduct for purposes

10  of considering the 3553 --

11          THE COURT:  Can you tell me what defined guidelines

12  are in the District of Columbia?

13          MR. ASONYE:  One -- Court's indulgence?

14          THE COURT:  Yes, of course.

15          (A pause in the proceedings.)

16          MR. ASONYE:  Your Honor, there is a -- there is a

17  PSR in the District of Columbia.  It does note a fine range,

18  but the Government will object because we don't believe it was

19  calculated correctly.  So in our view, we do not currently

20  know an accurate fine range for the District of Columbia.  But

21  I will note it does not include --

22          THE COURT:  What's your view of the correct fine

23  guideline range in the District of Columbia?  That is, what's

24  the Government's view?  You may confer with your co-counsel.

25          (A pause in the proceedings.)

50

1        MR. ASONYE:  Your Honor, the PSR in the District of

2   Columbia says that the maximum fine range is $250,000 times

3   two for the two counts, so --

4        THE COURT:  Yes, but I -- that's the PSR.

5        MR. ASONYE:  Right.

6        THE COURT:  You said you differ.

7        MR. ASONYE:  Correct.

8        THE COURT:  I want to know what you think.

9        MR. ASONYE:  And our view is that the maximum fine

10  range in D.C. should be approximately $12 million.

11        THE COURT:  Well, tell me again, Mr. Asonye, what we

12  know or what the Government knows right now of his financial

13  situation.

14        MR. ASONYE:  We know that he owns two homes with net

15  equity of approximately $4 million.  That's in paragraph, I

16  believe, 135 of the PSR.  132, Your Honor.

17        The Palm Beach, Florida, home has an equity,

18  according to the PSR, of $1.25 million, and the Alexandria

19  home has equity of approximately $3 million.

20        THE COURT:  The reason --

21        MR. ASONYE:  And, Your Honor, if -- I will also

22  add --

23        THE COURT:  Just a moment.  The reason that I want

24  to know that is the primary financial burden on the defendant

25  should be restitution, not a fine.  And it makes no sense to

1    impose an onerous fine when restitution is already

2    significant.  The purpose of a fine is chiefly punitive and I

3    don't know that we need that if we're going to have a

4    restitution of $24 million.

5         MR. ASONYE:  And, Your Honor, to that point --

6         THE COURT:  Because I think the Government would

7    agree that victims should be paid before the Government gets

8    its fine money, right?

9         MR. ASONYE:  We do agree with that, Your Honor.  I

10   would note that although the forfeiture proceedings are

11   ongoing in the District of Columbia, and I hesitate to say how

12   things will turn out, because we still are negotiating with

13   Mr. Manafort and the various banks.

14        If things go according to plan, we have some sense,

15   if you look at paragraph 64 of the PSR, of where -- how much

16   the banks will receive based on estimates of the value.  And

17   so if you look at the Citizens Bank loan, the $3.2 million,

18   the estimate fair market value of that property, as estimated

19   in the PSR, is $3.8 million.  So if things go according to

20   plan, Citizens Bank may be made whole.

21        Banc of California, there was no collateral, so we

22   are looking at a $685,000 loss at least there.  And then with

23   respect to the Federal Savings Bank, again, the PSR has

24   calculated at approximately, after the collateral, if it's

25   disposed appropriately in the District of Columbia,

52

1    approximately $200,000 loss.

2          So in truth, if the -- if things go as we project,

3    then actually the banks will be out -- Mr. Manafort will still

4    owe $1 million on a restitution order after the properties are

5    forfeited and paid.  So he still would have -- that's actually

6    a restitution amount that he should be able to pay,

7    particularly in light of the fact that he has $4 million in

8    equity in his homes.  That doesn't include the additional

9    securities that are listed in the PSR of approximately

10   $5.6 million, which is listed in paragraph 131.

11         THE COURT:  But he also has a $6 million bill to pay

12   to the IRS.

13         MR. ASONYE:  That's true.  The fine, though -- and,

14   Your Honor, the fine and the tax obligation as such, they're

15   all to Uncle Sam.

16         THE COURT:  Oh, no.  The fine is.  The tax is paying

17   back you, me, and the rest of the folks here who paid their

18   taxes.

19         MR. ASONYE:  That's true, Your Honor.

20         THE COURT:  As I will tell Mr. Manafort, the real

21   essence of his violation is he stole from us, from people who

22   paid their taxes, not the fine.  The fine is punitive, pure

23   and simple.

24         MR. ASONYE:  Your Honor, I agree.  And at bottom,

25   the guidelines instruct that if Mr. Manafort has an ability to

1  pay a fine, the Court shall impose one.  And clearly if --

2           THE COURT:  Well, that's -- is that the guideline or

3  the statute?

4           MR. ASONYE:  Well, that's -- I'm reading from the

5  guidelines.  But the statute --

6           THE COURT:  All right.  It's what it says, "shall."

7  It's not a command that I have to follow.  The guidelines are

8  not mandatory.

9           MR. ASONYE:  It's 3572, Your Honor, 18 U.S.C. 3572.

10          THE COURT:  All right.  It's a statute, not the

11 guidelines.

12          MR. ASONYE:  Correct.  And the Court should impose a

13 fine if Mr. Manafort has ability to pay one.  The Government's

14 argument is that he certainly has multiple millions of dollars

15 after the restitution order to pay a fine.

16          THE COURT:  All right.  Mr. Westling.

17          MR. WESTLING:  Well, I think, Your Honor, that we

18 would contend that even with Mr. --

19          THE COURT:  A little louder, please, sir.

20          MR. WESTLING:  I'm sorry?

21          THE COURT:  A little louder.

22          MR. WESTLING:  I've actually been reminded by

23 Ms. Harris a couple of times, Judge.

24          THE COURT:  Well, I know, but I -- we always require

25 lawyers to come to the podium, but it's a big -- it's a lot of

54

1    lawyers today, and I want to get things done.

2         MR. WESTLING:  Understood, Your Honor.  What we

3    would simply note, Your Honor, is that even assuming that

4    Mr. Asonye's math about the repayment to the various lenders

5    is correct, which we would probably bicker with, you still

6    have a $7 million restitution order against assets, which the

7    Government says amount to two homes worth about $4 million.

8         So I recognize that, you know, we're dealing with a

9    lot of issues here, but I think there's still a big "if" about

10   what will be collected from the sale of those properties.  And

11   it -- in any case, he faces a restitution order of $20

12   million -- $24 million on its face.  So we can't really know

13   whether that is what he'll have to pay or not until the sales

14   take place.  I think based on all of that, we would simply say

15   there's not evidence he has the ability to pay.

16        THE COURT:  I wonder if the restitution order

17   shouldn't say that the defendant is ordered to pay restitution

18   in an amount of at least -- no, not at least -- in an amount

19   of up to $24 million.  It may be less; am I right?

20        MR. ASONYE:  That's -- the Government has no

21   objection to that.  You are correct, Your Honor.

22        THE COURT:  Well, let's change the language there.

23   I'm still -- Mr. Asonye, I'm still puzzled a bit by imposing a

24   fine when I don't know what the total amount of restitution is

25   going to be in the end and how that will affect his ability to

55

1    pay.  I think your -- the argument you've made is that the

2    predictions on the dispositions of the property and the

3    restitution to the other victims is such that even after all

4    that's paid, plus the $6 million in tax liability, would leave

5    him with two homes.  Is that your view?

6                MR. ASONYE:  Two homes and millions of dollars in

7    securities, Your Honor.

8                THE COURT:  And they're in what paragraph?

9                MR. ASONYE:  131 of the PSR.  And again, Your Honor,

10   that's based on information that the probation officer was

11   able to locate.  The securities are listed at the bottom of

12   page 44 of the PSR:  a $4.2 million in securities, a life

13   insurance policy of $1.496 million and another $2.5 million in

14   investments in a --

15               THE COURT:  He has to die to get that 1.496.

16               MR. ASONYE:  Your Honor, I believe there are ways to

17   cash out and to sell your life insurance policies.

18               THE COURT:  There are, indeed, but -- there are,

19   indeed, but certainly not for $1.496 million.

20               MR. ASONYE:  But, Your Honor --

21               THE COURT:  Have you ever tried to sell an insurance

22   policy that you have?

23               MR. ASONYE:  I have not.

24               THE COURT:  Don't do it.  You will be dismayed.

25               MR. ASONYE:  The point is, Your Honor, it's the

56

1    defendant's burden to prove he doesn't have the ability to pay

2    a fine, and he hasn't --

3              THE COURT:  Right.  I understand that.  But I am not

4    going to impose a fine that is unfair.

5              MR. ASONYE:  And --

6              THE COURT:  If I don't -- let me ask you this:  If I

7    don't have enough information, can I -- I know I can delay

8    restitution, but I don't need to because of some changes have

9    been made.  But can I also delay the imposition of fine?  I

10   don't think the law permits that.

11             MR. ASONYE:  And we don't believe it does,

12   Your Honor.  And what we would submit is, you do have -- you

13   do have before you in the PSR information of -- about the

14   equity and properties that he owns and securities of at least

15   $4 million.

16             THE COURT:  What do you think a fine should be?

17             MR. ASONYE:  Well, Your Honor, what we've -- the

18   position of the Special Counsel is that we do not make --

19             THE COURT:  That's the Government's position.  I

20   don't want to hear Special Counsel, the Government.

21             MR. ASONYE:  The Government's position is that we

22   out -- lay out the fine range, which is laid here.  But we're

23   not taking a specific position on the exact fine that the

24   Court should.

25             THE COURT:  So what's the fine range again?

1    MR. ASONYE:  Your Honor, the fine range in this case

2  is on page 49 of the PSR, $50,000 to 25 -- essentially just

3  over $25 million, Your Honor.

4    THE COURT:  So that's a pretty good range and you

5  don't take a position.  Stand by.

6    All right.  Thank you.

7    Do you have anything else, Mr. Westling?

8    MR. WESTLING:  No, Your Honor.

9    THE COURT:  All right.  Now, we've come to the

10  sentence, itself.

11    Mr. Andres.

12    MR. ANDRES:  Thank you, Your Honor.  I'll be brief.

13    Your Honor, I'm going to focus my comments obviously

14  on the 3553 factors.  I wanted to start, though, with the

15  cooperation.  The Special Counsel's office takes the position

16  that Mr. Manafort did not provide sufficient cooperation to

17  allow for any mitigation by this Court.  I know that the

18  counsel has noted that there were 50 hours of cooperation, but

19  the --

20    THE COURT:  Is that inaccurate?

21    MR. ANDRES:  It was long.  I would say -- I don't

22  know.

23    MR. DOWNING:  It was.

24    MR. ANDRES:  If it was 50 hours, but we met on

25  multiple occasions, I think on at least ten occasions.  So the

1  number of hours is probably in the ballpark, but it's not

2  reflective, Your Honor, of the value of the information that

3  Mr. --

4  THE COURT:  Well, of course not.  You haven't filed

5  a 5K1.1.  So in your view, I knew that the Government didn't

6  consider his cooperation to be substantial, but that doesn't

7  mean that he didn't cooperate.  That doesn't mean that he

8  didn't give you a lot of information.  It just means he didn't

9  give you information you thought was particularly valuable.

10  MR. ANDRES:  I disagree, Your Honor.  Defense

11  counsel who bears the burden here hasn't provided, Your Honor,

12  with a single --

13  THE COURT:  Bears the burden of what?

14  MR. ANDRES:  To establish what the cooperation was,

15  and they haven't provided --

16  THE COURT:  I haven't given them a 5K1.1.  They

17  aren't going to get one and they aren't going to get

18  acceptance of responsibility.  And you've admitted he spent

19  about 50 hours.  Now, you say under 3553, I shouldn't take

20  that into account in imposing a sentence because you don't

21  think -- well, two things.  You say, one, he lied, and two,

22  the information he provided, you didn't like it.  It wasn't of

23  substantial assistance.  I understand that.

24  MR. ANDRES:  And three -- and three or four, even

25  Mr. Manafort hasn't provided the Court with any information

59

1   that he provided to the Special Counsel that was of any value.

2           So what Your Honor is evaluating is simply the fact

3   that he met for 50 hours.  And the reason that he met for

4   50 hours was because he lied.  Because he lied, it took longer

5   to try to show Mr. Manafort what the evidence was to allow him

6   to provide truthful proffers.  It certainly was the -- was in

7   the interest of the Special Counsel's office to have

8   Mr. Manafort provide helpful and meaningful cooperation and he

9   didn't.

10          There were a wide range of issues that he was asked

11  about and he did not provide valuable cooperation.  And

12  there's nothing in the record, Your Honor, to suggest that he

13  did.  Mr. Downing has simply cited the number of hours, but

14  not anything specific about any individual, about any area of

15  cooperation or anything that merits Your Honor --

16          THE COURT:  So I'm to assume that he spent 50 hours

17  telling you things you didn't want to hear.

18          MR. ANDRES:  He told us 50 hours, a large part of

19  things we already knew or was included in documents.

20          THE COURT:  All right.

21          MR. ANDRES:  So he didn't provide additional

22  information.  It wasn't 50 hours of information that we didn't

23  know and it certainly wasn't 50 hours of information that was

24  useful.

25          THE COURT:  All right.  Go on.

60

1          MR. ANDRES:  Your Honor, the 3553 factors obviously

2    first begin with the nature and circumstances of the offenses.

3    The jury in this courtroom convicted Mr. Manafort of serious

4    crimes, crimes that were serious because of their frequency,

5    crimes that were serious because of the amount of money

6    involved.  Millions of dollars in unpaid taxes and millions of

7    dollars secured by fraud from financial institutions.  They

8    were serious crimes because they were sophisticated schemes,

9    because they involved a number of individuals.

10         Mr. Manafort's crimes did not occur decades ago, not

11   even a decade ago.  He made criminal choices as recently as

12   2016 and 2017.  No one made up those crimes.  Nobody conjured

13   them up.  Mr. Manafort, himself, made criminal choices and

14   those choices have consequences.  The crimes were borne out in

15   the dozens and hundreds of documents admitted as evidence in

16   this trial -- at the trial, in bank account records, corporate

17   documents, loan files, tax returns and the more than dozen

18   witnesses.

19         Mr. Manafort made criminal choices and the jury of

20   his peers found him guilty.  Bank records established that

21   Mr. Manafort had more than 30 foreign overseas bank accounts

22   in three different countries.  They involved a dozen different

23   shelf companies, which existed only to receive and hide those

24   funds.  Those accounts held more than $55 million.

25   Mr. Manafort failed to pay more than $6 million in taxes and

1  he broke the basic civil covenant of citizens in this

2  democracy, the agreement to pay taxes.  And again, that was

3  his choice and those choices have consequences.

4          And today, we know that Mr. Manafort remains --

5  fails to accept responsibility and is not remorseful.  We hear

6  that he's failed to file a financial statement.  As of today,

7  we really have no idea of what his financials are, financial

8  assets are, particularly in a case where he was convicted of

9  hiding his assets and in a case where he's doctored financial

10  statements and submitted them to the bank.  The Government

11  submits that that suggests a lack of remorse for his crimes.

12          As I mentioned, he secured more than $25 million in

13  bank loans.  Mr. Manafort has cited to a series of different

14  offshore tax cases and those cases are nothing like the case

15  before Your Honor.  This is a case about tax fraud, FBAR fraud

16  and bank fraud cases.  Mr. Manafort didn't simply --

17          THE COURT:  Actually I resided over some of those

18  and they are like this.  Every FBAR case involves trying to

19  hide money and usually the government gets a plea and they

20  don't go through all the tax returns and everything else.  So

21  I don't think it's accurate to say that those cases are

22  nothing like this case.  There are always differences, case to

23  case.  But there is a lot of similarity between those cases

24  and this.

25          MR. ANDRES:  Your Honor, if I may, the *Horsky* case,

U.S. v. Manafort

62

1  which Your Honor presided over --

2            THE COURT:  Yes.

3            MR. ANDRES:  -- was significantly different.  In

4  that case, the defendant had an investment scheme and he hid

5  the money from that investment.  He didn't use the account --

6            THE COURT:  Now, how many -- how much taxes did he

7  avoid paying?

8            MR. ANDRES:  I believe that his --

9            THE COURT:  It was three times what he avoided

10  paying, three times.

11            MR. ANDRES:  Right.  And how --

12            THE COURT:  And -- but a big difference that you

13  ought to point out Mr. Horsky -- refresh my recollection here,

14  those who might have been here -- he showed up at sentencing

15  with a check.  He paid everything.

16            MR. ANDRES:  $100 million, Your Honor.

17            THE COURT:  Well, he owed a lot.

18            MR. ANDRES:  He did, he did.  But before his

19  sentencing, Your --

20            THE COURT:  But he was able to pay everything.

21            MR. ANDRES:  I understand.

22            THE COURT:  So that is a difference between that

23  case and this case.  But basically any FBAR case is a case of

24  stealing money from the U.S.  It's the same as any tax fraud

25  case.  That's why people don't report foreign bank accounts.

U.S. v. Manafort

63

1   They want to hide income.  So they are similar cases.  But I

2   take your point and it's a valid point that there are

3   differences between Horsky and Manafort.  Whether they're as

4   large as you think they are, is a matter I have to consider.

5   MR. ANDRES:  Understood.  And I haven't said exactly

6   how large those differences are.  But consider this,

7   Your Honor.  There are other cases where the -- there are

8   other defendants where the cases that are cited by

9   Mr. Manafort, defendants self disclosed their activity.

10  People got downward departures for cooperation.  People got

11  reductions for acceptance of responsibility.  One defendant

12  was an 80-year-old woman in Florida who inherited money when

13  her husband died who he -- and he, himself, had inherited that

14  money in an overseas foreign account.  They didn't use the

15  accounts in the way that Mr. Manafort did and they didn't have

16  the knowledge Mr. Manafort did.

17  One other important distinction, Your Honor.

18  Mr. Manafort didn't only use his overseas accounts for the

19  purposes of hiding taxes.  He also used it for the promotion

20  of his FERA violation and his FERA crimes in the District of

21  Columbia, and that was part of his plea in the District of

22  Columbia that the -- some of the --

23  THE COURT:  For which he will be punished there.

24  MR. ANDRES:  Understood.  But it's also a point of

25  distinction with respect to the FERA crimes -- the FBAR crimes

64

1    here.  I'm not suggesting -- I'm just suggesting that not all

2    FBAR cases are the same.  Certainly the list --

3              THE COURT:  Most of them are pretty close.

4              MR. ANDRES:  Well, again, I would disagree,

5    Your Honor, but --

6              THE COURT:  Well, let me put it to you this way.

7    Most of the ones I've presided over and studied are pretty

8    much the same.  They're hiding money from the U.S. government

9    so they don't have to pay taxes on it.

10             MR. ANDRES:  Understood.  And obviously there are

11   disparities with all of them as to the amount, as to whether

12   they got downward departures, as to whether --

13             THE COURT:  Some made contributions to charitable

14   institutions, some did all kinds of good things.  Well,

15   Mr. Manafort has done some, as the defense has pointed out in

16   their brief.  Some people were just, otherwise, pretty bad.

17   Others did lots of redemptive things that redeemed them.

18             All -- every case is different, every defendant is

19   different.  But the fundamental conduct of FBAR violations and

20   tax evasion is all the same.  Hide money from the government

21   so you don't have to pay taxes on it.

22             MR. ANDRES:  Your Honor, I'd also like to address

23   the issue of deterrence here as required by 3553, both general

24   deterrence and specific deterrence are important.  The law

25   requires the Court to impose a sentence that shows others that

1   this conduct has consequences, that Mr. Manafort's criminal

2   choices have consequences.  And obviously the sentence must

3   stand as a beacon to others that this conduct can't be

4   accepted.  In this case, there's --

5           THE COURT:  I think you've heard me before.

6           MR. ANDRES:  I've read you, Judge.

7           The -- there's also a need for specific deterrence

8   with respect to Mr. Manafort.  He committed crimes over an

9   extended period of time.  In the Government's view, he has not

10  accepted responsibility.  His sentencing submissions are

11  replete with blaming others for his consequences and not

12  taking responsibility, and Mr. Manafort is here today because

13  of the criminal decisions he made himself.

14          With that, Your Honor, the Government asks that the

15  Court impose a substantial sentence consistent with those 3553

16  factors and those we've discussed in our submission.  Thank

17  you.

18          THE COURT:  All right.  Mr. Downing or Mr. Westling.

19          MR. DOWNING:  We're going to have Mr. Zehnle now.

20          THE COURT:  All right.

21          MR. DOWNING:  Thank you, Your Honor.

22          MR. ZEHNLE:  Good afternoon, Your Honor.

23          THE COURT:  Good afternoon, Mr. Zehnle.

24          MR. ZEHNLE:  Your Honor, in terms of the focus of

25  the 3553 factors, I want to devote primarily the time to the

1   sentencing disparity issue that Mr. Andres was just hitting on

2   last.  Essentially, the cases that the defense has cited in

3   its filings versus what the Government has done with respect

4   to that, I think it's telling because if you look at the

5   numerous cases, not only with Your Honor, not only with other

6   judges in this district court, but judges across the country,

7   we've cited more than 20 different cases.

8           THE COURT:  Excuse me a minute.

9           (A pause in the proceedings.)

10           THE COURT:  Go ahead, Mr. Zehnle.

11           MR. ZEHNLE:  Yes, Your Honor.  What I was saying was

12   that we have cited more than 20 different cases in our

13   pleadings as the Court is aware.  And as the Court just

14   recognized, these are cases that involve both tax and FBAR

15   charges.

16           Now, the Government seeks to distinguish this

17   particular case from all those other cases involving tax

18   charges and FBAR charges when this Court sat and heard the

19   same evidence that everyone else did, that the FBAR charge,

20   the one that he was convicted on in this court, was covered by

21   the tax charge in Count 3.

22           The false tax return was not only unreported income,

23   but also the failure to report the tax -- the foreign bank

24   accounts.  All that evidence, all that -- all those charges

25   are relevant, Your Honor.  They're all tax and tax related.

1    And the Government seeks to then say, well, there's also this

2    bank fraud stuff out there, and that's what makes this

3    different.

4            But I would point the Court to something that the

5    Government said in its opening statement in this case that

6    ties this entire matter together as a tax and tax related

7    case.  Mr. Asonye was stating, and I quote, this is on page 24

8    of the transcript, "In 2015, the defendant's work in Ukraine

9    had dried up.  He was no longer making millions and couldn't

10   support his lifestyle.  Mr. Manafort was running out of cash

11   and to maintain that life he had become accustomed to, he

12   needed more of it.  So he approached multiple banks for loans,

13   loans on homes that he purchased and improved with the untaxed

14   income from his foreign banks."

15           Your Honor, that's their words, not mine.  They're

16   the ones who have tied this all into one theme of Mr. Manafort

17   has made a lot of money being an advisor overseas.  He did not

18   report that money.  That money was kept in foreign bank

19   accounts and that is the crux of this case.  And as this Court

20   just pointed out, the -- all of those cases that we cited in

21   this district, California, Illinois, Wisconsin, New York, New

22   Jersey, all those cases all involve similar circumstances of

23   tax avoidance, tax evasion, failing to file tax returns and

24   FBARs.  And the two charges related to the bank fraud

25   specifically tie into that because, in closing, the Government

68

1   also refers back to, well, gee, when things got tight, he

2   basically tapped into money by getting mortgages on assets

3   that he had used untaxed proceeds to purchase.  So it all ties

4   together, Your Honor.

5           And it wasn't a smattering.  I mean, if you look at

6   the Government's filing, they basically put one paragraph on

7   it, which is telling in and of itself on that particular

8   sentencing factor.  And then, you know, they actually filed a

9   reply and they still didn't really deal with it.

10          So I also wanted to make note of one other point

11  just with respect to the sentencing disparity issues.  I think

12  Mr. Andres was talking about, well, some of these dealt with

13  pleas.  Well, yes, Your Honor, some of them did deal with

14  pleas.  The majority deal with pleas.  This Court's well aware

15  that most cases plead.  It's rare that cases go to trial

16  anymore.  But we did find and present to this Court cases

17  where the defendant had actually gone to trial, and that

18  person, for example, in one of the cases we cite, *Ashvin Desai*

19  was convicted of hiding over 8 million.  And the guidelines

20  range for him was 78 to 96 months and he was sentenced to

21  six months in prison and six months of home detention.

22          There's another one, *Arvind Ahuja*.  That was more

23  than 8.5 million, Your Honor.  The sentencing guidelines in

24  that case were 41 to 51.  He was sentenced to three years of

25  probation and three months in home confinement.  For the ones

1   for which there were pleas or there were pleas and

2   cooperation, the majority of them are probation.

3           So I don't think it's fair for the Government to sit

4   there and try to distinguish away cases that involve taxes and

5   FBAR combined by saying, oh, gee, this is so different from

6   those.  It's not, Your Honor, as the Court correctly noted.

7           Now, turning briefly to some of the other points

8   that Mr. Andres made, serious crimes.  Of course, this --

9   you're -- you know, Mr. Manafort is going to speak to you in a

10  moment.  These are serious crimes.  We understand that.  No

11  one is disputing that.  Your Honor, for 14 years, I was

12  sitting at that table as a federal prosecutor and as a chief

13  of one of the criminal sections.

14          THE COURT:  And you're trying to redeem yourself

15  now.

16          MR. ZEHNLE:  But I do -- Your Honor, I do have, I

17  think, a good deal of familiarity with tax cases and FBAR

18  cases and those kinds of things.  And these charges that were

19  brought in this case that were tried before Your Honor are

20  quite similar, and they're serious, but they're very similar

21  to these other cases that we've actually directed you to.

22          In terms of -- it was interesting that the

23  Government did point out the Professor Horsky case that I know

24  this Court handled.  Yes, he did show up with a check and he

25  did -- it was $100 million, Your Honor.

70

1          One point I would like to make for the Court's

2   consideration, though, is Mr. Manafort and his team have been

3   working through forfeiture issues for many months now as part

4   of our negotiated plea with them.  And it's difficult to sit

5   there and say, well, gee, you haven't paid back the IRS yet

6   when you're still trying to sit there and give the Government,

7   you know, the property that you've agreed to forfeit.

8          It's not like the IRS is going to go away.  I mean,

9   a lot of people would probably like that to happen, but it's

10  not going to happen.  And so I just wanted to make that point,

11  that that's a little unfair to basically say, well, gee, you

12  know, you didn't show up, you know, you haven't made any

13  payments, et cetera, because he is working through his

14  agreement despite the Government's breach determination that

15  they've made based -- unilaterally on their good faith,

16  they've made that determination, we still continue to do that.

17          (A pause in the proceedings.)

18          MR. ZEHNLE:  Oh, yeah.  Your Honor, yeah, and as I

19  was talking to Mr. Downing, in terms of the deterrence issue,

20  this case, as you've pointed out, has probably gotten more

21  scrutiny than any other tax FBAR violation case I've ever

22  seen.  And whether it's because of the nature of how the

23  charges were --

24          THE COURT:  Well, we know why.  Come on.  It's not

25  relevant to my determination of an appropriate sentence.  But

1   we all know why there's this much interest.

2        MR. ZEHNLE:  So let -- so if I may be just a little

3   more clear.  I understand, Your Honor.  I'm just saying that

4   in terms of general deterrence, one of the things you always

5   focus on, if you're the Government or prosecutor, is getting

6   the word out and letting people know, look, this is a serious

7   crime.

8        THE COURT:  You're quite right.  We don't have to

9   worry about that in this case.  That's why I told that story

10  about -- even then, though, this -- it's not clear because

11  when I put -- had them -- the Government put up all those

12  signs, it didn't make any difference.  Mules continued to

13  come.  Maybe they didn't read the signs.

14       Deterrence is endlessly to debated by academics

15  based on empirical studies.  It's a hard, hard issue.  But

16  Congress has decided that I have to take it into account and I

17  do.  Mr. Andres has appropriately argued about special or

18  specific deterrence and general deterrence.  Both are

19  important factors for the Court to consider.  And you're

20  pointing out that there will be general deterrence here

21  because of the notoriety provided to this case.

22       MR. ZEHNLE:  Correct, Your Honor.

23       THE COURT:  All right.  Go on.  I don't know how

24  that counts for you.  Mr. Evans, I think, would point out the

25  same thing.  He would say, you know, give him a life sentence

─────U.S. v. Manafort─────

72

1   so -- and we'll publish that.  Actually the guidelines are

2   pretty high.

3          MR. ZEHNLE:  Yes, Your Honor.  The guidelines are

4   extraordinarily high.

5          THE COURT:  19 to 24 years.  I believe that's right,

6   19 to 24.  It's about right, isn't it?

7          MR. ZEHNLE:  It was 19 and a half to 24 years,

8   Your Honor.

9          THE COURT:  Yes, go on.

10          MR. ZEHNLE:  Okay.  If -- and since I did reference

11   it a moment ago, Your Honor, as I did sit at that table for

12   many years, I can tell you because -- I don't want to repeat

13   myself from what we've put in the papers, but I can tell you

14   that when I was a chief, I would tell my younger prosecutors

15   in tax cases in particular, you know, if you received a

16   sentence of 18 months to 24 months of imprisonment in a tax

17   case, that's pretty good, because in terms of the gradation of

18   all the federal offenses, you know, under Title 26, under

19   Title 18, it's just an understanding that courts every day --

20   you know, tax evasion is by no means jaywalking.  But it is

21   also not, you know, narcotics trafficking where people, you

22   know, have their lives ruined and people get killed in the

23   trade.

24          And so you have to understand the courts are taking

25   all these things into account, and that's why I make that

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

73

1   statement when I was a chief of those sections.  Here, instead

2   of 18 to 24 months, the guidelines are showing 18 to 24 years.

3   It's just so disproportionate.

4          THE COURT:  19 to 24.

5          MR. ZEHNLE:  19.5 to be actual -- to be correct,

6   19.5 to 24 years, Your Honor.

7          And so the only other two things I want to make a

8   point of, because I do think the Court should be aware of it,

9   the 50 hours plus that my client spent with the Government, we

10  would have no problem -- and the Government, you know, if they

11  want to provide you all the 302's to see the cooperation that

12  he provided, we don't have the 302's --

13         THE COURT:  I'm not interested in reading that.

14         MR. ZEHNLE:  I understand, Your Honor.  But I'm just

15  saying it's like, oh, well, they haven't proven it --

16         THE COURT:  Now, there are people here who would be

17  interested.  But I'm not one of them.

18         MR. ZEHNLE:  And the last thing I do want to point

19  out, Your Honor, because it did come out at trial and it came

20  up through their main cooperating witness, is that back in

21  2014, and the Court may recall that there was a meeting

22  between FBI agents and Mr. Manafort and Mr. Gates, and a

23  number of these entities and accounts were disclosed at that

24  time.  And so I just think that these are important facts as

25  the Court considers, you know, all the 3553 factors, that it

74

1   also pay specific attention to those.

2          THE COURT:  All right.  Mr. Manafort, this is now

3   your opportunity to address the Court and to say anything --

4   and you may remain seated.

5          MR. MANAFORT:  Thank you, Your Honor.

6          THE COURT:  But speak up, please.  And the reason

7   you may remain seated is because I understand that you have a

8   physical impairment at the moment that makes that very

9   painful.  This is your opportunity to address the Court and to

10  say anything at all you wish to the Court by way of

11  extenuation, mitigation or, indeed, anything you think I

12  should know before sentence is imposed.  You're not required

13  to say anything, but you have the opportunity to do so if you

14  wish to.  Do you wish to say anything?

15         THE DEFENDANT:  Thank you, Your Honor.  Yes, I

16  would.

17         THE COURT:  All right.  Please keep your voice up,

18  sir.

19         THE DEFENDANT:  The last two years, Your Honor, have

20  been the most difficult years for my family and I that we've

21  ever experienced.

22         THE COURT:  I'm sorry.  I'm an old man with bad

23  ears, so you're going to have to speak up a little louder than

24  that.

25         Do you have a microphone there for Mr. Manafort?

U.S. v. Manafort

1          THE DEFENDANT:  I'll speak more loudly.

2          THE COURT:  All right.  Go ahead, sir.

3          THE DEFENDANT:  The last two years have been the

4  most difficult that my family and I have ever experienced.

5  The person that I am or that I have been described as in

6  public is not someone I recognize.  To say that I feel

7  humiliated and ashamed would be a gross understatement of this

8  characterization.

9          But the worse pain that I feel is the pain that I

10  know my family is feeling.  My whole life I have been proud --

11  I've been most proud of being the protector and their role

12  model, and it pains me deeply that I have caused them this

13  suffering by the actions that have happened confront me here

14  today.

15          What has been uplifting to me, I should say,

16  however, is the outpouring of support and affection that I

17  have received not just from my family and friends but from

18  total strangers.  The support and the incredible power of

19  their prayers is what has sustained me through these terrible

20  times.

21          Having been separated from my family over the last

22  nine years -- nine months has been very hard.  At a time when

23  I planned to be spending quality time giving back to my

24  family, I've had to rely upon them as my -- for support to get

25  me through this situation.  I truly feel the bonds of their

1    love and have been strengthened by it.

2         In the midst of this pain, I must tell you, Your

3    Honor, that I appreciate the fairness of the trial that you

4    have conducted.  I know this has not been easy given the media

5    frenzy atmosphere surrounding the trial.  I know how it

6    affects me, and I know the kind of pressures it put on the

7    Court, and I truly do appreciate the fact that at least from

8    my perspective, I feel that you've bent over backwards to make

9    this to be a fair proceeding.

10        I could tell you that I feel the punishment from

11   these proceedings already and know that it was my conduct that

12   brought me here.  Nine months of solitary confinement after

13   seven months of home arrest have given me -- has affected my

14   physical and mental health.  My life professionally and

15   financially is in shambles, and I feel the pain and shame of

16   these factors.

17        I say all of this to let the Court know that I will

18   never put myself in questionable circumstances in the future.

19   Sitting in solitary confinement, I've had much time to reflect

20   upon my life and my choices and the importance of family and

21   friends.  This reflection has created my intent to turn my

22   notoriety into a positive and show the world who I know I

23   really am and who is not who I've been depicted to be.

24        With the power of prayer and God's guiding hand, I

25   know that my family and I will grow stronger from this ordeal,

1  and I recognize and acknowledge that it is an ordeal that I am

2  responsible for.

3           Again, I want to thank you for the fair trial.  Your

4  wisdom and management of this courtroom has given me hope for

5  the judicial system, and I am ready for your decision, and I

6  ask your compassion.

7           THE COURT:  All right.  Anything further?

8           (No response.)

9           THE COURT:  All right.  I'll take a brief recess and

10  then pronounce sentence.  Court stands in recess.  It will be

11  ten minutes.

12           (Recess.)

13           (Court proceedings resumed at 6:32 p.m.)

14           THE COURT:  All right.  Any reason why the Court

15  should not now pronounce sentence, Mr. Andres?

16           MR. ANDRES:  No, Your Honor.

17           THE COURT:  Mr. Downing?

18           MR. DOWNING:  No, Your Honor.

19           THE COURT:  Mr. Manafort, you may remain seated.

20           Mr. Manafort, you stand convicted of the serious

21  crimes -- very serious crimes by a jury.  You stand convicted

22  of five counts of failing to report.  Each of those counts

23  carries a maximum term of imprisonment of three years.

24           You stand convicted of one count of failing to file

25  a report of a foreign bank account that has a ten-year

─────U.S. v. Manafort─────

78

1    maximum, I believe -- five-year maximum, and then you stand

2    convicted of two bank fraud -- excuse me -- two bank fraud

3    counts, and each of those carries a maximum term of

4    imprisonment of 30 years.

5           The law requires that I consider a variety of

6    factors in imposing an appropriate sentence.  First, the

7    nature and circumstances of the offense.  And as the

8    government has argued and, I think, the defendant accepts or

9    concedes, they are serious crimes.  They are very serious

10   crimes.

11          The essence of the tax fraud or failure to report

12   counts and FBAR counts is hiding money from the government so

13   that you don't have to pay taxes on it.  And in this case, the

14   amount of money hidden resulted in a tax loss to the

15   government of 6 plus -- 6 and -- I've forgotten what the exact

16   figure was, 6.3 -- or something of that sort -- million

17   dollars.  And as I said earlier, in essence, that's a theft of

18   money, a theft of money from everyone who pays their taxes.

19   If you don't pay your fair share, you're taking away from the

20   common pool of money that the government uses.  So those

21   counts were appropriately grouped for tax -- or for guidelines

22   calculations.

23          So the nature and circumstances of the offense, I

24   think, are clear, and they're undeniably serious, as

25   Mr. Andres argued.  They are serious offenses, and I don't

1   think that the defense argues otherwise.

2          Next, the Court must take into account the history

3   and characteristics of the defendant.  The defendant is a

4   Category I in criminal history; that is, he has no criminal

5   history.  He is a graduate of a university and law school

6   here, Georgetown for both, and he's lived an otherwise

7   blameless life.  And he's also earned the admiration of a

8   number of people, all of whom have written the Court about

9   him.

10         And you've received those letters as well,

11  Mr. Andres, I'm sure.

12         MR. ANDRES:  Yes, Your Honor.

13         THE COURT:  And I have reviewed those, and I have

14  taken those into account.  And the law is very clear that in

15  sentencing, a court must consider the entire individual, not

16  just the individual and his crime-committing activities.

17         Mr. Manafort has engaged in lots of good things.

18  He's been a good father and husband, and he has been a good

19  friend to others and a generous person.  Of course, that can't

20  erase his criminal activity, but it is -- they are factors

21  that the Court must take into account.

22         Next, the Court has to impose a sentence that

23  reflects the seriousness of these offenses and a sentence that

24  promotes respect for the law and that provides just punishment

25  for the offenses.

1           And the Court must impose a sentence that

2    promotes -- or that provides adequate deterrence for the

3    defendant specifically and general deterrence as well.  And

4    I'll discuss that in a little greater detail.

5           The Court also has to take account of the

6    guidelines.  They're not mandatory, but they're advisory.

7    These guidelines are quite high.  They provide for a sentence

8    that is from 19 to 24 years, roughly.

9           I think that sentencing range is excessive.  I don't

10   think that's warranted in this case.  It raises questions.

11          The guidelines are important because they -- I began

12   sentencing people before there were guidelines, and the

13   variety of sentences that could be imposed was staggering.  It

14   mattered a lot whether you got Judge A or Judge B.  You could

15   go home to probation or to jail for ten years depending on

16   whether it was Judge A or Judge B, and that was really not

17   right, and I think we all knew it wasn't right, and I

18   personally was glad when the guidelines came into effect.

19          But as I lived under the guidelines initially and

20   they were mandatory, I came to conclude that they were not a

21   good idea as they stood, and ultimately, that changed.

22          And we should all remember who brought that about.

23   It was Justice Scalia in his opinions, which was a surprise to

24   some, I suppose.  Anyway, they're now not mandatory; they're

25   advisory.

1          The next factor is related to the guidelines.  It's

2     a factor that says that the Court should impose a sentence

3     that does not involve an unwarranted disparity between the

4     sentence imposed on Mr. Manafort and the sentence imposed on

5     others convicted of essentially similar conduct.  Guidelines

6     help to avoid that.

7          Well, here we have a very curious situation.  We

8     have a violation that for years the Department of Justice, I

9     think for sensible reasons, argued that the guidelines should

10    be 2T rather than 2S, which was a higher guideline for FBAR

11    and tax violations.

12         Then in December of 2017, the government changed its

13    view, I think, again, for understandable reasons and for

14    reasons that were grounded in the language of the guidelines,

15    to say 2T -- I beg your pardon -- 2S for FBAR violations.

16         But over the years, there has been a remarkable

17    trend in sentences imposed for this kind of conduct.  The

18    sentences have been remarkably light, and I need to take that

19    into account.  It is important that the --

20         (A pause in the proceedings.)

21         THE COURT:  There's been a steady history of the

22    imposition of sentences under FBAR and tax violations, and I

23    want to review that because it furnished the context in which

24    I made my ultimate decision.  And let me be clear about that.

25    The guidelines, to most people, would suggest that a sentence

1  is somehow an arithmetic calculation, it is not.  It is a

2  judgment, and that's an important factor to keep in mind.  The

3  guidelines are judgments.

4       Now, when the guidelines were originally done, what

5  they did is collect historical evidence of sentences and take

6  two standard deviations from the mean of those sentences as

7  the guideline range.  Well, they soon ran out of historical

8  information about certain kinds of offenses, so they couldn't

9  do that anymore.

10      And indeed, for many offenses today for which we

11 have guidelines, there isn't any empirical or historical data.

12 They are judgments by the Sentencing Commission.  And in the

13 end, it's a district judge who has to make a sentence -- has

14 to make a judgment about an appropriate sentence.

15      But it is important to avoid unwarranted

16 disparities.  Why?  Because it's a fundamental principle of

17 justice that like cases should be treated alike, and if

18 they're treated differently, there ought to be a good reason

19 for it.

20      Well, there are a number of cases of offshore hiding

21 of money, and some of them are summarized by the defendant in

22 its brief.  Some of them I remember because I presided over

23 them.  *Horsky* was the most prominent one.  That was a

24 defendant who hid more than $200 million in offshore accounts,

25 and there was about an $18 million loss to the government in

U.S. v. Manafort

1    tax revenues.  Now, that's roughly three times the amount the

2    loss in this case.

3           But, Mr. Horsky received from me a sentence of seven

4    months followed by a period of supervised release.  Whether

5    that was the right sentence or not is subject to reasonable

6    people differ, as is true with any sentence that I impose.  I

7    don't expect the sentence I'm about to announce to meet with

8    everyone's approval.  I don't sit to do it that way.  I sit to

9    impose a just sentence, and I have to satisfy myself about it.

10          Now, there's another case, *United States against*

11   *Kim*.  That was my case, but ultimately, Judge Brinkema did the

12   sentencing because I recused myself.  I recused myself

13   because -- I don't know if this is in the record, and you-all

14   didn't know it -- but I recused myself because Mr. Kim made a

15   very substantial contribution to a university department in

16   which I served as the -- as a -- on the advisory committee,

17   and so I didn't think it was proper for me to sit in that

18   case, and Judge Brinkema didn't know that either.

19          But that was a case in which he failed to report

20   $28 million in income hidden in a Swiss bank account.

21          Now, Mr. Andres correctly points out that all these

22   cases have little differences to them.  For example, you would

23   say, well, in the *Kim* case, there weren't any bank fraud.

24   That's true.  And in the *Kim* case, there were other

25   differences between Kim and Manafort, all of which I have to

1 take into account, but I still have to consider overall

2 whether there are disparities.

3        Now, there were others, other cases. I think *Horsky*

4 was Mr. -- I think it was Mr. Westling who argued. He raised

5 the *Desai* case and the *Ahuja* case. There are many others

6 listed in his brief, and he's correct. Some of them, I think,

7 were rather strange.

8        I think Ms. Curran (ph) was the elderly woman. She

9 was the elderly woman, and she didn't disclose $47 million in

10 a Swiss bank account, so there was a $21 million FBAR penalty,

11 and she was sentenced to five seconds of probation,

12 astonishingly. I think that may be a record.

13        And there are many others in here, and the sentences

14 range from a few months to probation and other things.

15        All of these cases suggest to me that to impose a

16 sentence of 19 to 24 years on Mr. Manafort would be clearly an

17 unwarranted disparity. The conduct is slightly different, as

18 Mr. Andres points out. There are bank fraud counts here, as

19 there weren't in most of these other cases.

20        But in the end, I don't think the guidelines range

21 is at all appropriate given the provisions of 3553 and

22 especially the history. There's no doubt that for a long

23 time, the Department of Justice used a different guideline

24 from the one it seeks to enforce today, but I think the

25 Department of Justice, the Government is correct in its

1    argument here that 2S not 2T applies, and I've so ruled.

2            So, deterrence.  Mr. Andres argues that he needs to

3    be deterred.  I'm not so sure I agree with that, but in any

4    event, I think what I intend to do will deter him.  It's far

5    more important, in my view, that this case serve as a beacon

6    to warn others not to engage in hiding income overseas to

7    avoid paying taxes here, because there are serious

8    consequences.

9            As Mr. Andres and Mr. Downing both know since

10   they've read all my sentencing proceedings, I tell all

11   defendants life is making choices, Mr. Manafort, and then

12   living with the choices you make.  You don't determine where

13   you live or to whom you're born or anything of that sort or

14   whether you're born with handicaps or talents, but you do

15   determine how you respond to all of that, and you made choices

16   to engage in criminal conduct, and there will be consequences

17   for those decisions.

18           I listened carefully to your allocution, and I don't

19   have any doubt that what you said was genuine, but I was

20   surprised that I did not hear you express regret for engaging

21   in wrongful conduct.  In other words, you didn't say, I

22   really, really regret not doing what I knew the law required.

23           Now, that doesn't make any difference to the

24   judgment that I'm about to make, Mr. Manafort, that you didn't

25   say that, but I hope you will reflect on that and that your

1  regret will be that you didn't comply with the law.  That

2  should be your true regret, and you should have remorse for

3  that, and I certainly recommend that you do it in the District

4  of Columbia, because you'll have that opportunity.

5          So the main factor that I think is operative here on

6  3553 is I need to impose a sentence that reflects the

7  seriousness of the offense, promotes respect for the law,

8  provides just punishment, and does not involve -- the other

9  important thing, it does not involve unwarranted disparities.

10          The government cannot sweep away the history of all

11  these previous sentences.  It cannot sweep away the history of

12  having advocated the application of 2T rather than 2S to these

13  types of offenses.

14          Now, so we are now at the end where I have to

15  exercise this judgment.  And I repeat, it's not a mathematical

16  calculation.  It is a judgment, but it is a judgment guided by

17  all the factors that you have raised in your counsel's briefs

18  and the government has raised in its briefs.

19          Now, let me mention one other thing.  I was curious

20  about the Sentencing Commission's experience or statistics on

21  2S1.3.  Very, very few cases from 19- -- or from 2008 to 2017.

22  Very few cases, but of those cases, the substantial majority

23  all ended up with sentences below the guideline range.  And I

24  exclude from that the substantial assistance ones.  Still a

25  majority of all the rest of them, which doesn't surprise me.

87

1          Now, to pronounce sentence.  It is the judgment of

2   this Court, Mr. Manafort, that you be sentenced, that you be

3   committed to the custody of Bureau of Prisons for the

4   following terms:

5          With respect to Counts 1, 2, 3, 4, and 5, those

6   counts are counts of subscribing to false United States

7   individual income tax returns for -- those are counts which

8   involve a maximum term of three years.  For those counts, I

9   impose a sentence, that is, I commit you to the custody of

10  Bureau of Prisons for a period of 24 months for Count 1, 24

11  months for Count 2, 24 months for Count 3, 24 months for Count

12  4, and 24 months for Count 5, all of which is to be served

13  concurrently.

14         Now, with respect to Count 11 or 12 -- which one is

15  it?  I've forgotten the number.

16         MR. ANDRES:  12, Your Honor.

17         THE COURT:  12.  That's the failure to file reports

18  of foreign income -- foreign bank and financial accounts.

19         The maximum penalty for that is, Mr. Asonye,

20  Mr. Andres, I think it's ten years?

21         MR. ANDRES:  Five years, Your Honor.

22         THE COURT:  Five years.  All right.  For that, it is

23  the judgment of this Court -- it's really the same offense as

24  the others, so I'm going to impose a sentence of 30 months on

25  that, to run concurrently to the 24-month sentences imposed on

88

 1   Counts 1 through 5.

 2           Then we come to Counts 27 and 28, the bank fraud.

 3           MR. ANDRES:  25 and 27, Your Honor.

 4           THE COURT:  25 and --

 5           MR. ANDRES:  27.

 6           THE COURT:  And 27.  Now, those counts for bank

 7   fraud have a maximum of 30 years, as I recall; is that

 8   correct?

 9           MR. ANDRES:  Correct.  Yes, Your Honor.

10           THE COURT:  All right.  And I take into account a

11   number of factors there, but it is the judgment of this Court

12   that you be committed to the custody of the Bureau of Prisons

13   for a period of 47 months.  That term is to be served

14   concurrently with the other terms.  So you have a total

15   sentence of 47 months.

16           I took into account, Mr. Manafort, your personal

17   history and characteristics.  I think I might have been a

18   little more impressed if you'd been able to resolve your IRS

19   and other problems, but I hope you will still do that.

20           So I have imposed a sentence -- did I say 47?

21           MR. ANDRES:  Yes, Your Honor.

22           THE COURT:  Yes, 47 months, and that's total; in

23   other words, that's concurrent.

24           It's more severe than most of the cases cited by the

25   defendant, significantly more.  I've taken into account all of

1  the criminal conduct that's been found by the jury and

2  admitted by you, Mr. Manafort, and I'm convinced that's a just

3  sentence for that conduct.

4        The government didn't argue for a guideline

5  sentence, which I thought was a good thing.  Then I would have

6  concluded that it was vindictive, because clearly the

7  guidelines were way out of whack on this, as the history of

8  the sentences in this area show.

9        I'm going to require that he pay a $100 special

10  assessment for each count, and that total can easily be added

11  up.

12        I'm going to require that he serve -- I think the

13  supervised release period for the tax counts is one year; is

14  that correct?

15        THE PROBATION:  Yes, Your Honor.

16        THE COURT:  So he'll get one year of supervised

17  release for each of the first five counts, and that term is to

18  run concurrently.  He will get a period of supervised release

19  to follow any period of incarceration of three years with

20  respect to the FBAR count.  That provides for at least three

21  years.  And three years for the two bank fraud counts.  All of

22  those terms are to run concurrently.

23        Now, as a special condition of his supervised

24  release, he is to comply with the terms of this restitution

25  order.  Now, the restitution order isn't in a final form.  I'm

U.S. v. Manafort

90

1    going to waive interest, and the amount of $25,000,815 is due

2    and payable immediately.

3              The paragraph 3 that troubled me, can you read to me

4    now how it reads?

5              MR. ASONYE:  It reads:  "The amount of restitution

6    paid to any entity shall not exceed the entity's total loss

7    from the offenses of conviction.  Any amount paid to an entity

8    under an order of restitution shall be reduced by an amount

9    later recovered for the same loss by the victim in any federal

10   or state civil proceeding."

11             THE COURT:  All right.  You'll have to submit a new

12   restitution order with that language in it.

13             I think that language is appropriate, Mr. Westling.

14             MR. WESTLING:  That's correct, Your Honor.

15             THE COURT:  Now, I take your point you don't want to

16   sign it, and that's perfectly appropriate.  You don't need to

17   do it, but I want you to be able to say to me why you don't

18   think that -- I thought the language I was originally

19   presented with was clearly not appropriate, but this one does

20   sound appropriate.

21             In other words, I don't want your client paying in

22   restitution more than these people really lose.

23             MR. WESTLING:  Correct, Your Honor.

24             THE COURT:  And the restitution order also doesn't

25   show what I want it to show, Mr. Asonye, and that is that

1  first I want him to pay restitution to the United States, not

2  to these banks.

3          MR. ASONYE:  Your Honor, I believe by law that the

4  banks are due, I think it's under 3664(i), the banks must be

5  paid first before the United States.

6          THE COURT:  That's a mistake because that cheats the

7  rest of us.  All right.

8          But I wanted to -- well, I'm not going to impose

9  interest.  And I'm going to say that he's to pay it in $100 a

10  month or 25 percent of his net income 60 days after release

11  from any period of confinement.

12          Now, we come to the issue of a fine.

13          Is there a request -- first of all, Mr. Downing, is

14  there a request for a designation?

15          MR. DOWNING:  Yes, Your Honor.

16          THE COURT:  In this area so that he may be near his

17  family?

18          MR. DOWNING:  We would request a designation to the

19  federal prison camp at Cumberland, Maryland.

20          THE COURT:  All right.  I will make that

21  recommendation.  It's consistent with his security needs.

22          Can you-all wait until I've recessed?  In the

23  future, please do so.

24          All right.  Go on.

25          MR. DOWNING:  Your Honor, one other issue we'd like

92

1   to raise, and I don't know that we need to raise it right now,

2   but it has to do with whether or not you can order this

3   sentence to be concurrently served with --

4           THE COURT:  I can't, but she can.

5           MR. DOWNING:  Thank you, Your Honor.

6           THE COURT:  I don't believe I can.  If you find in

7   the law that I'm incorrect, you can bring that to my

8   attention.

9           MR. DOWNING:  Thank you, Your Honor.

10          THE COURT:  But I think it is entirely up to her

11  whether any sentence she imposes is to run concurrent to this

12  sentence.  It's up to her.  But if you find that I'm

13  incorrect, that I have that discretion or that power, you

14  may -- and that will be after she completes her sentencing --

15  then you can return.

16          Anything else, Mr. Downing?

17          MR. DOWNING:  No, Your Honor.

18          THE COURT:  Mr. Andres?

19          MR. ANDRES:  Mr. Asonye just has some minor

20  housekeeping issues, Your Honor.

21          MR. ASONYE:  Your Honor, two issues:  the issue of

22  the fine -- of the amount of the fine.

23          THE COURT:  All right.

24          MR. ASONYE:  And also the government would request

25  three additional conditions of supervised release when it's

93

1   appropriate, Your Honor.

2           THE COURT:  Well, go ahead and tell me what they

3   are.

4           MR. ASONYE:  Sure.  Well, actually, I believe the

5   Court covered the first one, but explicitly to pay restitution

6   of $6,164,032 to the IRS in the supervised release.

7           THE COURT:  That's in the 28 million.

8           MR. ASONYE:  Yes, it is, but, Your Honor, we always

9   ask for it when it's paid to the IRS as a condition of

10  supervised release.

11          THE COURT:  Well, I should do it because you always

12  ask for it?  I'm not persuaded.

13          What's your next one?

14          MR. ASONYE:  Again, in white collar cases, Your

15  Honor, the government typically asks that a condition of

16  supervised release, that the defendant not open any new credit

17  lines without the approval of the Court or probation.

18          THE COURT:  Yes, I typically do that.  I'll add that

19  condition.

20          What else.

21          MR. ASONYE:  And finally, that the defendant not

22  engage in any transactions above $10,000 without the approval

23  of the Court or probation.

24          THE COURT:  Any objection to that, Mr. Downing?

25          MR. WESTLING:  We do object to that, Your Honor.  I

1   don't see there's a basis here if a credit condition is

2   sufficient.  He'll have to report his financials on a regular

3   basis to the probation officer as part of any supervised

4   release term.  I think it's excessive.

5            THE COURT:  I will require that he comply with any

6   request by the probation officer for financial information.

7   That's what I will require.

8            MR. ASONYE:  Thank you, Your Honor.

9            THE COURT:  All right.  Anything else, Mr. Downing?

10  So we have only the issue of a fine.

11           MR. DOWNING:  Nothing else, Your Honor.

12           THE COURT:  I would impose a significant fine in

13  this case if it were not for the fact that there is a

14  $24 million restitution.

15           Now, as Mr. Andres pointed out, it may not come to

16  24 million.  It may be -- or Mr. Asonye, I don't remember

17  which, but one of you pointed out, correctly, I think, that

18  ultimately his restitution may not be 24 million.  It may be

19  less.  It's never going to be less than 6 million, but it may

20  be less.

21           Is that right, Mr. Asonye?

22           MR. ASONYE:  That's correct, Your Honor.

23           THE COURT:  But 6 million is still a pretty

24  significant amount of restitution, and I often do not impose a

25  punitive fine where there is restitution in that amount.  But

U.S. v. Manafort

95

1  you also point out that he has two very substantial assets,

2  two homes.

3         What I'm going to do in this case -- what is the

4  guideline range on fines?

5         THE PROBATION:  Your Honor, the low end is $50,000.

6         THE COURT:  What's the upper range?

7         THE PROBATION:  25 million.

8         THE COURT:  $50,000 fine.  If I had more

9  information, it might be more, but it's punitive, and I think

10  what I've done is sufficiently punitive.

11         If anybody in this courtroom doesn't think so, go

12  and spend a day in the jail or penitentiary of the federal

13  government.  Spend a week there.  He has to spend 47 months,

14  but he will receive credit for time already served.

15         Now, I want to remove any doubt about that.  So what

16  I'm going to do is enter an order nunc pro tunc that -- that

17  his bond violation occurred, because there was an adjudication

18  of that in another forum, but I'm going to make that nunc pro

19  tunc so he should receive credit for that.  And the reason for

20  that is that if he had been incarcerated by both Judge Jackson

21  and by this Court, he would still receive credit for both, and

22  I want him to receive credit for the nine months.

23         It may be a matter of some interest, Mr. Downing,

24  for you to tell everybody here, I know I've received

25  information about it, why has Mr. Manafort been in isolation?

U.S. v. Manafort

1          MR. DOWNING:  Your Honor, with respect to the

2   Marshals Service and the local sheriff's office that are

3   maintaining Mr. Manafort --

4          THE COURT:  So they do it because they want to

5   protect his personal safety?

6          MR. DOWNING:  Correct, from the general population.

7   It's purely a safety issue because the thought is that if

8   Mr. Manafort would be in the general population, that there

9   are many folks out there that would want to do harm or

10  violence to him.

11         THE COURT:  Yes.  And I will point out that I

12  received a lot of nutty communications which I have neither

13  read nor kept.  That won't surprise anybody in the courtroom.

14  Maybe they're the authors.  I don't know.  I don't care.

15         Anything further today, Mr. Andres?

16         MR. ANDRES:  No, Your Honor.  Thank you very much.

17         THE COURT:  Mr. Downing?

18         MR. DOWNING:  Nothing further, Your Honor.

19         THE COURT:  All right.  I thank counsel for your

20  cooperation.  Court stands in recess.

21

22         **(Proceedings adjourned at 7:08 p.m.)**

23

24

25

<u>CERTIFICATE OF REPORTER</u>

I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Sentencing hearing in the case of the **UNITED STATES OF AMERICA versus PAUL J. MANAFORT, JR.**, Criminal Action No. 1:18-CR-83, in said court on the 7th day of March, 2019.

I further certify that the foregoing 97 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my name, this March 7, 2019.



Tonia M. Harris, RPR
Official Court Reporter

97