```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,     ) Criminal Action
                                     ) No. 17-CR-201
 4                    Plaintiff,     )
                                     ) SENTENCING
 5     vs.                           )
                                     ) Washington, DC
 6     Paul Manafort, Jr.,           ) Date:  March 13, 2019
                                     ) Time:  9:30 a.m.
 7                    Defendant.     )
                                     )
 8     _____

 9                    TRANSCRIPT OF SENTENCING
                           HELD BEFORE
10          THE HONORABLE JUDGE AMY BERMAN JACKSON
                   UNITED STATES DISTRICT JUDGE
11     _____

12                   A P P E A R A N C E S

13     For Plaintiff:    ANDREW WEISSMANN
                         GREG D. ANDRES
14                       JEANNIE SCLAFANI RHEE
                         U.S. Department of Justice
15                       Special Counsel's office
                         950 Pennsylvania Avenue NW
16                       Washington, D.C.  20530
                         202-514-1746
17                       Email:  Aaw@usdoj.gov
                         Email:  Gda@usdoj.gov
18                       Email:  Jsr@usdoj.gov

19     For Defendant:    KEVIN M. DOWNING
                         815 Connecticut Avenue, N.W.
20                       Suite 730
                         Washington, D.C. 20006
21                       (202) 754-1992
                         Email:  Kevindowning@kdowninglaw.com
22
                         THOMAS EDWARD ZEHNLE
23                       Law Office of Thomas E. Zehnle
                         601 New Jersey Avenue, NW
24                       Suite 620
                         Washington, DC 20001
25                       (202) 368-4668
                         Email:  Tzehnle@milchev.com
```

1                              RICHARD WILLIAM WESTLING
                               Epstein Becker & Green, P.C.
2                              1227 25th Street, NW
                               Suite 700
3                              Washington, DC 20037
                               (202) 861-1868
4                              Email:  Rwestling@ebglaw.com

5
        Also Present:       Michael Ficht
6                            Renee Michael

7
        Court Reporter:     Janice E. Dickman, RMR, CRR
8                            Official Court Reporter
                             United States Courthouse, Room 6523
9                            333 Constitution Avenue, NW
                             Washington, DC  20001
10                           202-354-3267

11                               *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1            THE COURTROOM DEPUTY:  Your Honor, good morning.

2            This morning we have case No. 17-201-1, the United

3    States of America v. Paul J. Manafort, Jr.   Mr. Manafort is

4    present in the courtroom, Your Honor.   Probation officers

5    present for these proceedings are Miss Kramer-Soares and Miss

6    Moses-Gregory.

7            Will counsel for the parties please approach the

8    lectern, identify yourself for the record.

9            MR. WEISSMANN:  Good morning, Your Honor.  Andrew

10   Weissmann for the government.  And at the government's table

11   is, for the government, Counsel Jeannie Rhee and Greg Andres.

12   And in addition, Evan Binder, a paralegal with our office.  And

13   with the FBI, Renee Michael and Mike Ficht.

14           THE COURT:  All right.  Good morning.

15           MR. DOWNING:  Good morning, Your Honor.  Kevin

16   Downing, Richard Westling, Thomas Zehnle, the defendant, Paul

17   Manafort.  And with us is our paralegal Tim Wang.

18           THE COURT:  All right.  Good morning.

19           I have a question or two for you, Mr. Downing.  We're

20   here this morning, obviously, for Mr. Manafort's sentencing.

21   The final presentence report in this case was filed on March

22   6th.  Have both you and your client had an opportunity to read

23   it?

24           MR. DOWNING:  We have, Your Honor.

25           THE COURT:  And I think I understand, from reading
```

1     the objections and all the back-and-forth, that there aren't

2     any factual disputes that I need to resolve right now, is that

3     correct?

4              MR. DOWNING:  That's correct, Your Honor.

5              THE COURT:  And with respect to the legal issues, we

6     have to determine whether I'm going to apply the adjustment for

7     acceptance of responsibility and the enhancement for a

8     leadership role in the offense.  But other than that, there

9     aren't any other legal issues to be resolved, is that correct?

10             MR. DOWNING:  I believe that's correct.  And, Your

11    Honor, with the respect to the defense, we rest on our papers

12    that we filed with respect to the guideline determinations.

13             THE COURT:  Okay.  All right.  So I won't ask for

14    argument on that then.  Okay.  You can be seated.  Thank you.

15             I've received additional materials, in addition to

16    the presentence report, concerning the defendant, including the

17    government's memorandum in aid of sentencing and its exhibits;

18    also, the defendant's memorandum in aid of sentencing and a

19    number of letters.  I received a letter from his wife; one of

20    his two daughters; Mr. Bennett, a friend for more than 30

21    years; Lieutenant Colonel Holland, a friend for over 30 years;

22    other lifelong friends, Mr. Cimadon and Mr. Mazzarella; the

23    first cousin of his wife; the defendant's brother and

24    brother-in-law; his brother-in-law's wife; one of his wife's

25    friends; a niece; a Mr. Panuzio, who was a friend and a

1    colleague in the Ford administration; and a Mr. Davenport,

2    another colleague and friend.

3            I want you to know that I appreciate all the letters

4    and I've read them all.

5            In a criminal case there's a statute that tells me

6    how I'm supposed to go about sentencing someone and it's 18

7    U.S. Code §3553.  It lists a number of important factors the

8    Court's supposed to consider, and the advisory sentencing

9    guidelines are one of the factors I must consider in

10   determining the appropriate sentence.

11           Congress has created a commission that assigned

12   recommended sentencing ranges to each offense and they can go

13   up or down based on various factors set out in the guidelines.

14   The guidelines are advisory, but the Court is required to

15   calculate what they would recommend in every case.  So, that's

16   where I'm going to start.  And it may take some time, but I

17   want to emphasize that that's only a very small part of the

18   analysis.

19           Before I get to what the guidelines would recommend,

20   I think it's important to make clear at the outset that there

21   are boundaries to what sentence can be imposed that are

22   established by laws and cannot be changed.  And there are laws

23   that are before me and there are laws that aren't.

24           Defendant's conviction for the crime of filing false

25   tax returns was not in this court.  His conviction for failure

1    to file a foreign bank account report in 2012 was also not in

2    this court.  The bank fraud charges were not brought or tried

3    in this court and he wasn't convicted of those here.  He's been

4    sentenced for each of the individual offenses for which he was

5    convicted in the Eastern District of Virginia and the Court

6    decided there that all of those sentences would be served

7    concurrently to one another.  What's happening today is not and

8    cannot be a review or a revision of a sentence that was imposed

9    by another court.

10          Here, the defendant pled guilty to two counts of

11   violating 18 U.S. Code §371.  That section prohibits

12   conspiracy, either to commit any offense against the United

13   States or to defraud the United States.  Conspiracy carries a

14   maximum penalty of 60 months, or five years, imprisonment.  No

15   charge here carries the sort of potential maximum sentence that

16   the defendant was facing for bank fraud in the other case.

17          In Count 1 he pled guilty to conspiracy with multiple

18   objects; to commit the offenses of money laundering, tax fraud,

19   failure to file foreign bank account reports, violating the

20   Foreign Agent Registration Act and making false statements;

21   that is, lying to the United States Department of Justice.

22   This list of the objects of the conspiracy -- and by that I

23   mean the crimes the coconspirators agreed to commit -- include

24   some of the same violations of tax laws and the laws regarding

25   foreign bank accounts reports for which he was convicted in the

1    Virginia case, as well as crimes that were not part of the

2    Virginia case.

3           In Count 2 he pled guilty to conspiracy in 2018 to

4    obstruct justice and tamper with witnesses in this case while

5    the charges were pending in this court.  The maximum sentence,

6    again, for Count 2 is 60 months, or five years.  Thus, even if

7    he was sentenced to serve the maximum sentence on the two

8    counts consecutively, the maximum sentence that may be imposed

9    by this Court is ten years.

10          There's no provision that permits exceeding the

11   statutory maximum due to violations of the plea agreement.  The

12   sentencing guidelines, as you'll learn, would recommend more

13   than ten years because there's so much money involved.  But

14   there is no provision that permits sentencing in accordance

15   with the guidelines if the applicable guideline is greater than

16   statutory maximum.

17          No charge here carries the sort of potential sentence

18   the defendant was facing for bank fraud in the other case.  And

19   there is one more restriction on this court, §5G1.3(b) of the

20   guidelines says:  If a term of imprisonment resulted from

21   another offense that is relevant conduct to the instant offense

22   of conviction -- which means the offense before the Court at

23   this instant -- the sentence for the instant offense shall be

24   concurrent.

25          What does that mean?  That means that while the bank

1    fraud counts in the Eastern District of Virginia were not based

2    on conduct relevant to Count 1 in this court, the counts for

3    filing false tax returns and failure to file a foreign bank

4    account report were.  And, therefore, the guidelines require

5    overlapping sentences for overlapping counts.

6          What do the guidelines provide in this case?  The

7    offense level is complicated by the fact that there are two

8    charges and by the fact that the first conspiracy charge is a

9    conspiracy to commit a number of other charges, which have

10   different individual guideline calculations.  And the short

11   answer is, the highest applicable guideline controls.

12          So, Mr. Downing, I guess I have a question for you.

13   Are you handling the sentencing portion here?

14          MR. DOWNING:  I think we're going to break it up a

15   little bit, depending upon the subject matter, Your Honor.

16          THE COURT:  Okay.  Well, I just want to ask about the

17   general guideline calculation.  Is that you?

18          MR. DOWNING:  That would be Mr. Westling.

19          THE COURT:  All right.  Mr. Westling.

20          At the time of the plea, the anticipated guideline

21   calculation was different than what's in the presentence

22   report, which rolled the two counts together.  I take it,

23   though, that your only objection to the calculation in the

24   presentence report now is the application of the enhancement

25   for leadership role under §3B1.1 and acceptance of

1      responsibility?

2                    MR. WESTLING:  That's correct, Your Honor.

3                    THE COURT:  I know you have a policy disagreement,

4      but you don't challenge the technical application of the 22-

5      level increase for the amount of the fraud?

6                    MR. WESTLING:  That's correct.

7                    THE COURT:  Okay.  And that is what leads us to

8      starting at a base offense level of 30 for the money laundering

9      and foreign bank account object of the conspiracy.

10                   MR. WESTLING:  Correct.

11                   THE COURT:  And you're also not objecting to the

12     enhancements under the money laundering guideline, the two

13     two-level enhancements --

14                   MR. WESTLING:  That's also correct, Your Honor.

15                   THE COURT:  -- under section 2S1.1(b)(2)(B) and

16     (b)(3).  And you're also not objecting to the two-level

17     enhancement for the obstruction of justice regarding the false

18     statements to the Department of Justice.

19                   MR. WESTLING:  Correct.

20                   THE COURT:  So I will address the two objections, but

21     we agree that the Court can otherwise follow the calculations

22     set out in the presentence report on pages 30 to 33 and I don't

23     have to go through it all in great detail?

24                   MR. WESTLING:  That's correct, Your Honor.

25                   THE COURT:  Okay.  According to the presentence

1    report, the base offense level for the money laundering object,

2    which is what drove the sentence for the conspiracy as a whole,

3    was 30.  If you add the enhancements to which you don't object,

4    and the four-level enhancement to which you do object, you get

5    to Level 40.  The presentence report writer did not subtract

6    two levels for acceptance of responsibility.  And that's how

7    they reached 38.

8              Your position is that it should have been Level 36 to

9    start with, minus the four-level enhancement, and then a

10   reduction of two levels that would take it to Level 34, is that

11   correct?

12             MR. WESTLING:  That's correct, Your Honor.

13             THE COURT:  But also at the time of the plea you did

14   agree that a sentence at Level 37 would be a reasonable

15   sentence, is that right?

16             MR. WESTLING:  That's correct.

17             THE COURT:  Okay.  You can be seated.  Thank you.

18             MR. WESTLING:  Thank you, Your Honor.

19             THE COURT:  So I think I need to address the disputed

20   enhancements.  And all of this, when you talk about the

21   guidelines, is when the people who didn't realize math was

22   going to be involved need to understand that there's a

23   considerable amount of algebra that goes into the application

24   of the sentencing guidelines.

25             §3B1.1 of the guidelines talks about the defendant's

1    role in the offense.  If he was an organizer or leader of a

2    criminal activity that involved five or more participants or

3    was otherwise extensive, you can increase the offense level by

4    four levels.  It can be increased by three levels if he was a

5    manager or supervisor but not an organizer or leader of the

6    criminal activity, or two levels if he was a leader, manager or

7    supervisor in any criminal activity that isn't described in the

8    first two paragraphs.

9          The presentence report writer recommended a

10   four-level increase because he was an organizer or leader of a

11   criminal activity that involved five or more participants.

12         The defense has argued in its sentencing memo that an

13   aggravating role enhancement is appropriate only in the context

14   of a criminal organization or enterprise; that is, according to

15   the defendant, an organization with a primary objective of

16   engaging in crime.  Both sides have briefed this issue

17   thoroughly and the defense is resting on its papers.

18         I take it the government is happy to rest on its

19   papers as well?

20         MR. WEISMANN:  Yes, Your Honor.

21         THE COURT:  Basically nothing in the plain text of

22   the guidelines or the application notes or any case law

23   suggests that there is such a limitation on this enhancement.

24   §3B1.1 talks about organizers and leaders of, quote, criminal

25   activity, close quote.  There's no requirement that the group

1    of individuals that the defendant led, managed or supervised be

2    involved in what is solely or primarily a criminal enterprise.

3         The second application note to the guideline defines

4    an activity in terms of the number of people involved only.  It

5    says to qualify for an adjustment under this section, the

6    defendant must have been the organizer, leader, manager or

7    supervisor of one or more other participants.  It's silent

8    about the objective or any primary objective.

9         Note three says in assessing whether an organization

10   is otherwise extensive, all persons involved are to be

11   considered.  Doesn't mention what they were doing.

12        Application note number four, in distinguishing a

13   leadership and organizational role from one of mere management

14   or supervision, titles such as "kingpin" or "boss" are not

15   controlling, which is sort of inconsistent with the defense

16   theory.  It also says the factors the Court should consider

17   include the exercise of decision-making authority, the nature

18   of participation in the commission of the offense, the

19   recruitment of accomplices, the claimed right to a larger share

20   of the fruits of the crime, the degree of planning --

21   participation in the planning or organizing the offense, the

22   nature and scope of the illegal activity and the degree of

23   control exercised over others.  There can, of course, be more

24   than one person who qualifies as a leader of a criminal

25   association or conspiracy.

1          So the nature and scope of the illegal activity is

2     only one factor, and this section isn't limited by the need to

3     show a primary purpose either.

4          The defense says, look at the section called

5     background.  It talks about the size of a criminal

6     organization.  But the defendant admits the fact that

7     immediately after the term "organization," the background

8     section says, in a parenthetical, i.e., that is, the number of

9     participants in the offense.

10          So this enhancement is all about an activity

11     committed by a group and who was in charge of the group, and no

12     other element is stated or implied.  Every case that is cited

13     in the defendant's memorandum simply uses the word

14     "organization" or "enterprise."  He hasn't pointed to any

15     authority that adopts the gloss that he has added and holds

16     that those words necessarily mean an enterprise with a primary

17     criminal purpose.  Meanwhile, on pages 8 to 9 of its

18     memorandum, the government cites many cases that specifically

19     reject this argument.

20          So, I believe it's not a valid argument.  Here, the

21     number of people involved far exceeds five.  We have Mr. Gates

22     and Mr. Kilimnik, the people at each of the media lobbying

23     outfits; Companies A and B and Law Firm A.  They're listed in

24     the presentence report on pages -- paragraph 61 and 88 to 91,

25     and in the superseding indictment.  And, therefore, I find that

1    the enhancement applies and we start at a Level 40 for

2    calculating the guideline that goes with this offense.

3            The other dispute concerns Mr. Manafort's acceptance

4    of responsibility.  §3E1.1(a) says it applies if the defendant

5    clearly demonstrates acceptance of responsibility for his

6    offense, he gets a two-level reduction.  So there's an

7    additional one-level reduction upon motion of the government.

8    The government has not filed such a motion; it's been freed

9    from its promise to do so by my findings concerning the

10   potential breach of the plea agreement and by defendant's

11   concession that the government's argument that he breached the

12   plea agreement was in good faith.

13           And, so, all that is at issue right now is the

14   two-level reduction.  The application note to this guideline

15   lists appropriate considerations, and they include, but they

16   are not limited to, whether he truthfully admitted the conduct

17   comprising the offense, and admitted or didn't falsely deny

18   relevant conduct, his voluntary termination or withdrawal from

19   the criminal conduct or association, his voluntary assistance

20   to authorities to the recovery of the fruits of the offense,

21   and the timeliness of the defendant's conduct in manifesting

22   his acceptance of responsibility.  Some of these are stronger

23   and some of these are weaker, but many of these apply.

24           Note three says entry of a guilty plea prior to the

25   commencement of trial, combined with truthfully admitting the

1    conduct comprising the offense of conviction, and truthfully

2    admitting or not falsely denying any relevant conduct for which

3    he's accountable will constitute significant evidence of

4    acceptance of responsibility for the purposes of subsection

5    (a).  However, this evidence may be outweighed by the conduct

6    of the defendant that's inconsistent with such acceptance of

7    responsibility.

8              In connection with that, my ruling on whether he lied

9    during his cooperation sessions and breached the plea agreement

10   has some relevance and, therefore, I think it's important to

11   take a little detour for a moment and rule on docket 540, which

12   is the defendant's motion for reconsideration of my finding

13   that he breached the plea agreement in certain respects.

14             One issue that I was asked to discuss at that time

15   was information where the testimony regarding -- testimony of

16   Richard Gates regarding what transpired at a meeting on August

17   2nd varied from the defendant's description of that meeting.  I

18   agree with the defense that the exhibit that I found at the

19   time to be corroborative of Gates's testimony, but not

20   dispositive, was actually irrelevant to that subject matter

21   and, therefore, it was necessary to look back at my conclusion

22   that he lied about that particular matter without reliance on

23   that exhibit.

24             And so I have reviewed the transcript of the hearing,

25   the supporting exhibits, and the new information provided by

1    the government, and I still find that the Office of Special

2    Counsel proved by a preponderance of the evidence that Manafort

3    intentionally gave false testimony with respect to that matter,

4    which was just one of several matters that fell within the

5    category of false statements regarding his interactions with

6    Mr. Kilimnik.

7              I note that the fact that the witness, Mr. Gates,

8    corrected the record and the inaccurate impression left by the

9    exhibit, lends credence to his testimony.  And, therefore, the

10   motion to reconsider my finding that the defendant gave false

11   statements regarding his interactions with Mr. Kilimnik is

12   denied.

13             With respect to whether I should give him credit for

14   acceptance of responsibility now, does either side want to

15   argue that point?

16             MR. ZEHNLE:  Yes, Your Honor.

17             THE COURT:  All right.  Mr. Zehnle.

18             MR. ZEHNLE:  Your Honor summarized essentially what

19   3E1.1 says in her lead-up to this argument.  The defense

20   position is that 3E1.1(a) -- and we're only dealing with (a)

21   because we do understand that (b) is made only upon motion by

22   the government.  We're only dealing with 3E1.1(a) here.

23             The commentary talks about whether the defendant

24   truthfully admitted the conduct comprising the offense of

25   conviction, as the Court pointed out, and truthfully admitted,

1    or not falsely denied, any relevant conduct for which he is

2    accountable under 1B1.3, which is the relevant conduct

3    provisions that the Court spoke of earlier today, or at least

4    in terms of addressing the EDVA charges.

5            Your Honor, our position is that Mr. Manafort did

6    accept responsibility under 3E1.1(a).  The misrepresentations

7    that the Court just referenced -- and there were five, five

8    areas, five topic areas, as the Court recalls.  The three where

9    the Court found that the government had met its burden of

10   establishing an intentional misrepresentation were related to

11   other areas of the government's broad investigation.  The one

12   area that actually touched upon the offense conduct in this

13   case was the one dealing with Mr. Manafort and Mr. Kilimnik and

14   the issue dealing with the witness tampering.  In that specific

15   instance the Court found that the government had not met its

16   burden of establishing that, even under the preponderance

17   standard.

18           So, Your Honor, our position is that when you look at

19   3E1.1, the words of it, it basically says did he truthfully

20   admit the conduct comprising the offense of conviction?  Yes,

21   he did.  In the February 4th meeting, which -- and I'll only

22   discuss the part that's been properly redacted.  The Court

23   might recall that I actually stood up and talked about that

24   particular issue.

25           THE COURT:  I do.

1    MR. ZEHNLE:  And so, our view is that he did not back

2    away.  And I remember the Court saying that's not the issue,

3    they're not arguing about whether or not he's trying to

4    sugarcoat his own acceptance of responsibility for that

5    conduct.  The Court pointed out, the government's issue was,

6    was he trying to essentially diminish Mr. Kilimnik's conduct

7    with respect to that conspiracy.  And the Court has now since

8    found that the government did not meet its burden in that

9    particular respect.

10    So my point is that Mr. Manafort has come forward,

11    he's accepted responsibility by pleading guilty to both the

12    multi-object conspiracy in Count 1 and, in Count 2, the

13    conspiracy for witness tampering through the sending of the

14    text directly and indirectly to the people over there.

15    THE COURT:  Yes.  I don't want to cut you off.

16    MR. ZEHNLE:  No, that's okay.

17    THE COURT:  Okay.  Thank you.

18    Does the government want to address this issue?

19    MR. WEISSMANN:  Briefly.

20    THE COURT:  Okay.

21    MR. WEISSMANN:  Your Honor, we have a couple law

22    points and a couple factual points.

23    THE COURT:  All right.

24    MR. WEISSMANN:  First, with respect to the law

25    points, we understand this is a matter that is very much within

1    the discretion of the Court in deciding what to do.  I would

2    call Your Honor's attention to a recent case in the D.C.

3    Circuit, *United States versus Leyva*, which was decided on

4    February 26.  In that case the Court repeated that it is the

5    defendant's burden to show that he is entitled to the

6    acceptance of responsibility.

7              Further, that case was interesting because there the

8    Court was dealing with a defendant who had challenged his

9    leadership role enhancement under the guidelines.  And the

10   Court noted that Leyva would confess and avoid on the ground

11   that he merely sought to require the government to justify

12   enhancements through reliable information.  But the Court

13   rejected that and said he cannot accept responsibility for his

14   conduct and simultaneously contest the sufficiency of the

15   evidence that he engaged in that conduct.  And the Court --

16             THE COURT:  I don't think in challenging the

17   leadership role here they were challenging the underlying

18   evidence, they were challenging the applicability.

19             MR. WEISSMANN:  I wanted to address that.  So there

20   were two factual issues.  I would completely agree with what

21   the Court said with respect to the legal argument.  I think

22   there's absolutely no basis, and the government is not saying

23   that because the defense is raising a legal argument that that

24   in any way relates to acceptance of responsibility.  That's

25   something that lawyers are entitled to do, and if the law

1      supported their position, that would be fine.

2              My point goes to not the legal challenge, but there

3      is a factual challenge that the defendant did make.  So I think

4      there are two bases here factually with respect to acceptance

5      of responsibility.  One is the defendant said, on page 35 of

6      the defense sentencing submission, that he in fact was not a

7      leader.  He cited to the testimony of Richard Gates, saying

8      that the only two people involved in the conspiracy were

9      Richard Gates and he.  And he cites a page of a trial

10     transcript that in fact does not support that.  That is not

11     what Mr. Gates said.  And, of course, Mr. Manafort, being the

12     leader of this organization, knowing that it was more than he

13     and Mr. Gates, should not have been putting forth that factual

14     contention.

15             Again, I'm bringing that to the Court's attention.

16     I'm not saying it's dispositive or not well within the

17     discretion of the Court, but there is a factual representation

18     that was made in the defense brief.

19             More to the point is the issue of the defendant's

20     conduct after he entered the plea agreement in this case where

21     the Court has found by a preponderance of the evidence that the

22     defendant made false statements to the FBI and made false

23     statements under oath to the grand jury.  Repeatedly.  And the

24     acceptance of responsibility guideline is not one that is

25     trying to just encourage pleas.  If it were just about taking a

1    plea, the guideline would read very differently; it would be if

2    you plead, you get acceptance, if you don't plead, you don't.

3    And in fact, it works quite the opposite way.  In fact, you can

4    plead and not get acceptance, and you can not plead and get

5    acceptance.

6              THE COURT:  That's rare.

7              MR. WEISSMANN:  It is rare, but the guidelines

8    actually note that if, for instance, you're preserving a legal

9    issue, you could be in that position where you're factually

10   accepting, and it's like the issue we just talked about in

11   terms of preserving a legal challenge.

12             Here, although we haven't found a D.C. Circuit case

13   that says you can consider conduct that is outside of the crime

14   of conviction or relevant conduct, we have cited a series of

15   circuit cases outside of the D.C. Circuit that say that the

16   Court can consider that.  And we think that is the correct

17   reading because the acceptance of responsibility is -- again,

18   it's not about accepting pleas, it's a proxy for what the Court

19   is thinking about this defendant in terms of recidivism.  It's

20   a way of saying the defendant, who truly has accepted

21   responsibility, poses a lesser risk and is deserving of a

22   lesser sentence.

23             So, here, I think that the -- what we would ask the

24   Court to consider is whether that really is true for somebody

25   who, in this circumstance, has repeatedly, as the Court found,

1    engaged in deceitful conduct, both with the FBI and under oath.

2    Thank you.

3              THE COURT:  Okay.  Thank you.

4              I agree that I can consider conduct related to issues

5    other than the conduct involved in the offense, but I think if

6    you read the guideline itself and you read the application

7    notes, that the offense conduct is really the driving factor

8    with respect to the application of this particular enhancement.

9    And, therefore, given his plea and given his sworn admissions

10   in court, that he committed the offense for which he was

11   charged, I believe the defendant has met his burden and I will

12   give him credit for the two-level reduction, which means that

13   the total offense level for guideline purposes is Level 38.

14             I note, given his criminal history category, which is

15   that he has no prior criminal convictions and he's in Category

16   I, that even with that reduction the advisory sentencing

17   guideline range far exceeds the maximum sentence available

18   under the statutes in this case for either count individually,

19   and even for both combined.  At Level 38 the recommended

20   guideline range is 235 to 293 months, which is 19.4 to 24.4

21   years, and Level 40 would have started at 292 months and gone

22   up to 365 months.

23             I do want to say that acceptance of responsibility

24   for purposes of the guidelines is not the same thing as

25   acceptance of responsibility in a more existential and personal

1    sense.  And how that might bear on the consideration of the

2    statutory factors here, such as the history and characteristics

3    of the defendant and what is sufficient but not greater than

4    necessary to fulfill all the goals of a sentence under the

5    statute, I'm going to address all of that later.

6              I do note that in its memorandum, the defense pointed

7    to guideline §5H1.4, which says that an extraordinary physical

8    impairment may be a reason to depart downward.  But I just want

9    to make clear that there's no formal motion for a downward

10   departure under that section.  Am I correct that you're simply

11   asking me to take all those factors into consideration in

12   connection with a possible variance or what to impose under the

13   statute?

14             MR. WESTLING:  That's correct, Your Honor.

15             THE COURT:  Okay.  All right.  So I think --

16             Yes?

17             MR. DOWNING:  Your Honor, just a matter of

18   administrative convenience, you said earlier when you were

19   talking --

20             THE COURT:  Can you come to the lectern so we can get

21   you on the record?

22             MR. DOWNING:  A little bit earlier you were talking

23   about the issue of concurrent sentencing under the guidelines.

24   I just wanted to point out, I believe I heard you say that the

25   loan fraud is not implicated in this case.  In the superseding

1    information, in paragraph 58, there is a reference to:

2    Further, Manafort defrauded the banks that loaned him the money

3    so that he could withdraw more money at cheaper rates than

4    otherwise would have been permitted.  We believe that the loan

5    fraud issue in EDVA is in fact implicated here.

6            THE COURT:  I don't think bank fraud is one of the

7    offenses for which he was convicted and for which he pled.  The

8    offense was conspiracy to -- the tax counts are the same,

9    conspiracy to not file the foreign bank account reports.  But

10   he was not charged in this case with conspiring to defraud the

11   banks that made loans to him.

12           MR. DOWNING:  In the superseding indictment, no.  In

13   the superseding information, paragraph 58 refers to loan fraud,

14   Your Honor.  It's in here.  I'm just letting you know.

15           THE COURT:  It's not an object of the conspiracy,

16   it's just a fact that's set out in the information.  I do think

17   it's important.

18           MR. DOWNING:  Okay.  I'm just making the point, the

19   initial indictments that came out in this case referenced --

20           THE COURT:  I'm not talking about that.  I'm talking

21   about the offense conduct here is what he pled guilty to.  And

22   Count 1 had multiple objects, and one of those objects was not

23   bank fraud; am I correct?

24           MR. DOWNING:  Well, what I'm saying to you is that in

25   their conspiracy allegation they are spelling out loan fraud.

1    It's in the superseding information.  That's the only point I

2    wanted to make.  I don't think that means it's not related to

3    what he pled to here because it's directly in that superseding

4    information.  And I don't think the government put it in there

5    because they thought it was extraneous.  They're saying this is

6    sum and substance of the overall conspiracy, and that's how we

7    read 58.  So I just want to point that out for the Court.

8              THE COURT:  All right.  Mr. Weissmann, can you tell

9    me off the top of your head whether the statement of offense to

10   which he pled guilty -- I know it talks about disguising income

11   as loans as part of the tax fraud object of the conspiracy, but

12   under -- in the statement of offense does he admit to

13   defrauding the banks in connection with the loans that he was

14   either convicted of or were presented to the jury in the

15   Eastern District of Virginia?

16             MR. WEISSMANN:  Your Honor, the statement of offense

17   only addresses the bank fraud issues in the other-acts portion

18   of the statement of offense.  So, if the Court looks at pages

19   20, 21, 22, and 23, at the -- which is paragraphs 47 to 54,

20   Your Honor may recall that the defendant, in the statement of

21   offense, admitted the bank frauds as to which there were hung

22   counts in the Eastern District of Virginia.

23             THE COURT:  Yes.

24             MR. WEISSMANN:  Yes.  But then in the case here, as

25   Your Honor can see from the presentence report, none of the

1    bank fraud conduct is -- it is noted that the defendant was

2    convicted and has admitted the bank fraud conduct, but that is

3    all dealt with as a matter of description; it doesn't in any

4    way govern the guidelines or is calculated in any way in terms

5    of either Count 1 or Count 2.

6         THE COURT:  All right.  We're now at the point where

7    I'm going to invite each side to speak regarding the

8    appropriate sentence in this case.  So, who from the government

9    is going to handle that?

10        MR. WEISSMANN:  I am.

11        THE COURT:  All right.  You can come back.

12        MR. WEISSMANN:  Your Honor, there is also -- I have a

13   question for Your Honor as to how you would like to proceed

14   with respect to the, sort of, financial aspect of the case?

15        THE COURT:  I've been presented with an agreed order

16   of forfeiture and I've signed it.

17        MR. WEISSMANN:  Okay.

18        THE COURT:  Is there something else?

19        MR. WEISSMANN:  The other issue that I wanted to

20   raise really had to do with paragraph 152 in the presentence

21   report, which is where the probation department calculates the

22   defendant's liabilities and assets to -- I wanted the Court to

23   note that the liabilities essentially are counted twice.  So in

24   counting the defendant's assets, they have deducted already the

25   mortgages on the properties.  In other words, they have not

1    counted the full market value.  But in the liabilities they've

2    counted already the mortgages.  So, there actually is double

3    counting of those liabilities.

4          THE COURT:  All right.  Are you asking that in

5    addition to all the forfeiture, that I sentence him to pay a

6    fine?

7          MR. WEISSMANN:  I think that it's within the Court's

8    discretion.  We understand the guideline range, but I do think

9    that if the Court notes the double counting, it ultimately

10   results in over a $20 million spread.  So, we totally

11   understand that if you consider the $6 million restitution

12   order to the IRS, which we're asking for, as well as the

13   forfeiture order that is proposed, that a fine here is well

14   within the discretion of the Court.  But there would be -- if

15   you look at the paragraph 152, there would be assets to pay

16   that.

17         We, obviously, leave to the Court whether that's

18   something that is necessary, given the other financial

19   components.  But I wanted to make sure the Court is aware of

20   it.

21         THE COURT:  Are you arguing that it's necessary,

22   given the other financial components?

23         MR. WEISSMANN:  We're not arguing that it's

24   necessary, but we wanted to make sure the Court had the correct

25   factual information about the financial wherewithal of the

1   defendant, given what seemed like a considerable double

2   counting.

3               THE COURT:  Okay.

4               MR. WEISSMANN:  So, addressing the facts here --

5               MR. WESTLING:  Your Honor, I hate to interrupt.  I

6   know you've just been talking about the forfeiture.  There is

7   one issue I want to put on the record, if that's okay.  I'll do

8   it whenever it's convenient for the Court.

9               THE COURT:  Why don't we do it right now.

10              So don't go far.

11              MR. WESTLING:  I apologize.  So I just wanted to

12  clarify, the government submitted an order of forfeiture and

13  was correct in saying that we had approved the order as to

14  form.  We also understand our obligation under the plea

15  agreement with regard to the specific assets, which are

16  specifically identified and have been agreed to be forfeited by

17  the plea agreement.

18              The issue we did want to put an objection on the

19  record to is the government's request for an $11 million money

20  judgment.  That is not something that was in the plea agreement

21  originally and I understand that the Court has made a ruling on

22  the breach issue, which frees the government to seek additional

23  remedies.

24              But we did want to make clear, obviously we've

25  objected to the breach, we don't think that occurred, the Court

 1   has differed with us.  But it's important for the record that I

 2   am clear that we do not think the $11 million money judgment is

 3   appropriate.

 4          THE COURT:  All right.  I thought this order was

 5   being presented to me as an agreed order.

 6          MR. WESTLING:  I understand.

 7          THE COURT:  All right.  Well, when it's time for you

 8   to allocute, or whoever is going to allocute, you can let me

 9   know why you believe that shouldn't be in the order that was

10   presented to me --

11          MR. WESTLING:  Understood.

12          THE COURT:  -- by both parties for my signature.

13          MR. WESTLING:  Understood.  Thank you, Your Honor.

14          THE COURT:  And, Mr. Weissmann, you can touch on this

15   in your remarks as well.

16          MR. WEISSMANN:  Starting just with that issue, we

17   submitted that because we'd given the draft, as revised by

18   defense counsel, who said that it was fine to submit and they

19   don't object to it, and that's why we made the representation

20   that we did in the submission to Your Honor.  My understanding,

21   from speaking to defense counsel this morning, is that they

22   were going to note an objection for the record, given that they

23   wanted to preserve an issue of breach, but they weren't

24   actually interposing a substantive objection to the order.

25          THE COURT:  All right.

1          MR. WEISSMANN:  We do think that simply looking at

2     Government Exhibit 437, which is a chart of -- just one of the

3     charts related to monies that were earned and proceeds of the

4     FARA violation would support the order that was submitted.

5          Your Honor, we're here today because of crimes Paul

6     Manafort committed for over a decade, beginning in 2006 and

7     going up through 2018.  Paul Manafort claims, in mitigation, to

8     have learned -- and I'm going to use a quote -- a harsh lesson,

9     unquote, from his being brought to justice for his crimes.  And

10    says further that he has lived to seek -- to promote American

11    ideals and principles.  Again, that's a quote.  But the

12    government submits that his conduct belies both of those

13    things.

14         Let me first address the tax and foreign bank account

15    crimes.  Some of those crimes involved a sophisticated scheme

16    to avoid a duty all Americans have, which is to pay taxes.  He

17    hid his wealth in over 30 offshore accounts, in three foreign

18    countries, holding over $50 million in money from his work for

19    a foreign government, Ukraine, as well as a Russian oligarch,

20    Oleg Deripaska.  He used these hidden, offshore accounts,

21    falsified tax returns, and fake loans to disguise his income

22    and thereby avoid paying over $6 million in taxes, money he

23    used to fuel an extravagant lifestyle.

24         Manafort makes much in his sentencing submission that

25    he also supported his family and friends financially.  He makes

1    other mitigating arguments.  I'm not trying to say that this is

2    the exclusive argument, but he makes much of having financially

3    supported people.  That, in other circumstances, would be truly

4    admirable.  It is less so when it is done with other people's

5    money.  We ask that the Court, as part of the sentence here,

6    impose an order of restitution to the IRS in the amount of

7    $6,164,032.

8         There are more crimes to cover.  Let me turn to the

9    Foreign Agent Registration Act and money laundering crimes.

10   Mr. Manafort committed crimes that undermine our political

11   process and subverted the due process of law.  Mr. Manafort was

12   well aware of the Foreign Agents Registration Act through his

13   work for decades representing foreign governments and

14   individuals.  His brief lists some of them, but not all.  He

15   omits Angola, Saudi Arabia, Mr. Deripaska, who I referenced

16   earlier.

17        As we noted to the Court in our sentencing

18   submission, Mr. Manafort was audited by the Department of

19   Justice.  He knew from -- at the very least, from that audit he

20   knew what he could and could not do under the Foreign Agents

21   Registration Act.  Indeed, he had to give up a presidential

22   appointment in light of that audit.  The law, as we explained

23   in our submission, does not allow someone to be both a

24   government official and an agent of a foreign government.  Mr.

25   Manafort sought a waiver from the Reagan White House, they said

1   no, and he had to make a choice, was he going to represent

2   foreign governments or was he going to represent the United

3   States.  And he decided to represent foreign governments.

4        Now, the Foreign Agents Registration Act lets the

5   American public, as well as public officials who are being

6   lobbied, know what foreign governments are lobbying our

7   government to do.  It all has to be reported.  What press

8   articles are being written on behalf of the foreign government,

9   what senators are being contacted, what people in the executive

10   branch are being importuned to do; when, where, what and how

11   much money is being spent.  That law got in the way of

12   Mr. Manafort.  Secrecy was integral to what Mr. Manafort wanted

13   to do for Ukraine.

14        On behalf of Ukraine, Mr. Manafort engaged for years

15   in illegal lobbying in the United States, secretly contacting

16   members of Congress and members of the executive branch to

17   promote the corrupt Yanukovych regime.  His operation placed

18   ghost-written opinion pieces in newspapers; paid, ostensibly,

19   independent bloggers to write favorable Ukraine stories.  He

20   passed off former senior European leaders as independent

21   dignitaries supporting Yanukovych, when in truth and in fact,

22   these senior former European leaders were handsomely paid

23   lobbyists for Ukraine.

24        He created fake scandalous stories about Yanukovych's

25   political rival, Yulia Tymoshenko, going so far as to say that

1    she engaged in murder for hire.  Manafort promulgated a

2    supposedly independent report justifying the imprisonment of

3    Tymoshenko, even though Manafort knew a series of undisclosed

4    facts that would have cast the report in a very different

5    light.

6          For instance, Mr. Manafort knew that the law firm

7    that wrote the report was tasked with also representing Ukraine

8    in the Tymoshenko case and in training the prosecution team.

9    None of that was disclosed.  Mr. Manafort, in essence,

10   undermined the very ideal of due process.  Keeping a woman in

11   jail because it would serve to prop up the Yanukovych regime

12   and thwart calls in the United States -- in the United States'

13   political leadership for Ukraine sanctions in condemnation.

14   His work, in sum, was corrosive to faith in a political process

15   in the United States and abroad.

16          Now, Mr. Manafort's crimes did not stop there in

17   terms of undermining the rule of law.  When the Department of

18   Justice started investigating, in the fall of 2016, his

19   compliance with the Foreign Agents Registration Act,

20   Mr. Manafort lied to his legal counsel and had her submit

21   unknowingly and unwittingly on her part a series of false

22   statements to the Department of Justice to throw them off the

23   track.  These were independent crimes under the Foreign Agents

24   Registration Act, in addition to the underlying violation of

25   the Act.

1        I'll turn later to the Hapsburg Group obstruction in

2    a separate piece, although it does relate to the Foreign Agents

3    Registration Act and money laundering.

4        I want to call the Court's attention to a number of

5    ways in which the Foreign Agents Registration Act violation

6    here is egregious.  It is hard to imagine a more righteous

7    prosecution of this Act.

8        Mr. Manafort violated the Act in three separate ways.

9    He violated the money laundering statute to promote the

10   violation of the Act, and he obstructed justice twice to thwart

11   getting caught for this crime.  And he -- when he violated the

12   act himself, he did so in a particularly corrosive manner.  I'm

13   just going to tick off the way I get to those -- that analysis.

14       As mentioned, he was explicitly warned about its

15   requirements.  Nevertheless, he chose to violate it for years.

16       Second, he violated the act himself over and over

17   again.

18       Third, he got many, many other people and entities to

19   violate the Act.  Your Honor has noted three of them with

20   respect to Companies A and B and Law Firm A, who have all filed

21   corrective filings with the Department of Justice.  There are

22   many other entities and people that are named in the

23   presentence report.

24       In addition, I would note to the Court that

25   Mr. Manafort importuned one company not to file, and then only

1     after that company stopped working with Mr. Manafort did they

2     go ahead and file belatedly.

3            Fourth, Mr. Manafort laundered $11 million to promote

4     those FARA violations.  So it simply isn't true, as the defense

5     claims, that he cannot be guilty of FARA and also -- not also

6     have violated the money laundering statute.  One could commit a

7     crime of violating the Foreign Agents Registration Act, but not

8     also be the person who's financing other people to violate the

9     Act.  Those are very separate pieces of behavior.

10           Fifth, when investigators were on to Mr. Manafort, he

11    lied repeatedly to the Department of Justice, yet another

12    violation of the Act.

13           Six, which I'll discuss in a moment, he then tampered

14    with two witnesses to avoid getting caught for the Foreign

15    Agent Registration Act crime and the money laundering with

16    respect to that crime.

17           Seventh, in violating that Act he not only kept what

18    he was doing from the American public, he also kept what he was

19    doing from the people he was lobbying.  In other words, when he

20    was using, for instance, the Hapsburg Group to lobby in the

21    Oval Office, in the Senate, none of those people were told that

22    those former European leaders were in fact paid lobbyists for

23    Ukraine.

24           So, there's sort of -- this isn't a simple situation

25    where you have a lobbyist who's otherwise being transparent in

1    terms of what they are doing and who they're acting for.  As

2    the Court knows, Mr. Manafort went about creating a sham

3    entity.  You have the European Center for a Modern Ukraine that

4    was set up precisely so that there wouldn't have to be a filing

5    under the Foreign Agents Registration Act and that could be

6    used, as one of the witnesses said, as a fig leaf, to avoid

7    having to make these disclosures.

8         And finally, in the belated FARA filing that

9    Mr. Manafort filed in June of 2017, the one that he touts so in

10   his brief as saying this all could have gone away as a simple

11   civil regulatory matter, I would invite the Court to look at

12   that filing.  It is woefully false and incomplete.

13        What kinds of things does it leave out?  Well, let's

14   see.  It leaves out that he did work for Ukraine.  It leaves

15   out that he did work for President Yanukovych.  It leaves out

16   all of the United States lobbying that was directed by him by

17   Law Firm A, by Company A, by Company B, by the Hapsburg Group.

18   The very, very lengthy charts that we have submitted to the

19   Court documenting all of the steps that Mr. Manafort directed,

20   all of that is left out except for one day.

21        There is one day that is listed, and the only reason,

22   I would submit, that that day is listed, which is March 13 of

23   2013, is because Company A had already filed its corrective

24   filing and it listed exactly what happened on those days -- on

25   that date.  Sorry.  So that is the one day, if you look at

1    Mr. Manafort's filing, where he says he did anything in the

2    United States.

3            So it simply isn't the case that a false and

4    incomplete filing was going to be the end of the day.  It

5    neither would, could, nor should be absolution for a criminal

6    prosecution.

7            I would note that Mr. Manafort is also not the first

8    person who has been charged with the Foreign Agents

9    Registration Act.  He is also not the first person who's been

10   charged with money laundering to promote a violation of the

11   Foreign Agents Registration Act.  I would call Your Honor's

12   attention to the case of *Tongsun Park* in the Southern District

13   of New York.  He was prosecuted in 2007 in connection with the

14   oil-for-food case.  And there, Mr. Park was charged with a

15   crime remarkably similar, a 371 conspiracy that involved a

16   conspiracy to violate the Foreign Agents Registration Act and

17   money laundering, with the SUA -- the specified unlawful

18   activity -- being the promotion of the Foreign Agent

19   Registration Act crime.  Exactly as was done here.

20           For that single crime of conviction, because of the

21   level of more than and the limited role of the offense,

22   Mr. Park had a guideline range of 57 to 71 months, a Level 25.

23   Because it's a five-year count, the Court could not sentence

24   more than 60 months.  And Mr. Park was sentenced to 60 months

25   and then he cooperated with the government and his sentence

1    eventually was lowered.

2            If the Court would like, there are two published

3    decisions on that case where the Court notes what it did in

4    terms of sentencing, so it can verify what I'm saying about the

5    case.  One of the cites is 533 F.Supp.2d 474.

6            Let me go on to other crimes, because Mr. Manafort's

7    crimes did not stop with his indictment of the tax offenses,

8    the Foreign Agents Registration Act offenses, the foreign bank

9    account offenses, the money laundering offenses, or even the

10   bank fraud charges in Virginia, which involved crimes up

11   through 2017.  In a further subversion of the rule of law,

12   after being indicted, while on bail from two federal courts, in

13   a high profile matter, Mr. Manafort engaged in crimes that go

14   to the heart of the American criminal justice system; tampering

15   with witnesses.

16           As the Court knows, that criminal conduct, trying to

17   induce two witnesses to lie for him to avoid criminal

18   accountability, resulted in his bail being revoked.  As the

19   Court noted at the time, in something that I think is relevant

20   to sentencing, it could not conclude that Mr. Manafort would

21   abide by the Court's directions and directives.

22           The court (sic) submits that it is useful to stop for

23   a moment to think about that conduct, about the fact that you

24   have somebody who is the former campaign chairman for a major

25   political party under indictment in two cases, with a national

1   spotlight on him, with two Court orders releasing him on bail

2   but directing that he cannot commit further crime, something

3   that ordinary citizens do not need to be told with a Court

4   order; everyone knows you can't do that.  And he then chose,

5   while under house arrest, to commit the crime of obstruction of

6   justice by tampering with witnesses.

7          I believe that that is not reflective of somebody

8   who's learned a harsh lesson.  It is not a reflection of

9   remorse.  It is evidence that something is wrong with, sort of,

10  a moral compass, that somebody in that position would choose to

11  make that decision at that moment.

12         But as the Court knows, that doesn't even end the

13  story.  Mr. Manafort finally, after going to trial, after being

14  found guilty, after pleading guilty before Your Honor, and even

15  after being afforded the unusual opportunity after trial to

16  cooperate with the government, Mr. Manafort engaged in further

17  misconduct.  The Court found that he lied to the FBI and under

18  oath to the grand jury.  He did so repeatedly, sitting in a

19  room face-to-face with FBI agents; under oath, face-to-face

20  with at least 16 grand jurors.  He chose to lie over and over

21  again to them.

22         The Court is aware of the nature of those lies, the

23  particular subject matters and the fact that they are material

24  to the government's investigation here and in another District.

25         To conclude, Paul Manafort's upbringing, his

1     education, his means, his opportunities could have led him to

2     lead a life to be a leading example for this country.  At each

3     juncture, though, Mr. Manafort chose to take a different path.

4     He engaged in crime again and again.  He has not learned a

5     harsh lesson.  He served to undermine, not promote American

6     ideals of honesty, transparency, and playing by the rules.  We

7     leave to the Court to fashion a punishment that reflects the

8     seriousness of this conduct.  Thank you.

9                 THE COURT:  Thank you.

10                Would defense counsel like to speak on defendant's

11    behalf?

12                MR. DOWNING:  Thank you, Your Honor.  Your Honor, I'm

13    going speak for a short period of time on a discrete issue and

14    then Mr. Westling is going to deal with a separate discrete

15    issue, and then Mr. Zehnle, if that's okay with the Court.  We

16    just kind of broke it up subject matter-wise.

17                THE COURT:  That's fine.

18                MR. DOWNING:  To start with, Mr. Manafort recognizes

19    these are serious crimes that he's pled to and being convicted

20    of.  And he will address the Court at the time you allow him to

21    and to show that he truly is sorry for violating the law.

22                The FARA violation itself I would like to address off

23    the bat.  Obviously it's a felony not to file a Foreign Agent

24    Registration form, and that is definitely serious.  But I would

25    like to a make a distinction about this case as to some of the

1    other cases that have been prosecuted in the past.  And, Your

2    Honor, there's only been about six cases since 1966.

3            The *Park* case which Mr. Weissmann was talking about

4    before, the underlying crime there was bribing members of

5    Congress.  It wasn't just not filing a form.  It was a very

6    serious issue in *Park*.  The money laundering stemmed from the

7    bribing of congressmen and providing them with illegal campaign

8    contributions.  So we think the nature of that offense is quite

9    different than what we have here.

10           But what I would like to concentrate on is the

11   important issue behind FARA.  FARA's two-pronged approach is

12   that both the citizens of the United States and the government

13   should know about foreign agents' activity; it should be known

14   to both.  In this particular case, Mr. Manafort's activities

15   with respect to the Ukraine were well publicized in newspapers

16   throughout the country.  But more importantly, you heard

17   evidence before -- and this is the sealed part of the case, so

18   I can't get in to the detail.  Someday it will be unsealed.

19           But Mr. Manafort and Mr. Kilimnik, on a regular

20   basis, were dealing with State Department officials in the U.S.

21   embassy in Kyiv.  And the information that was being conveyed

22   about his activities in the Ukraine, and shared information,

23   was shared at the highest levels of the State Department.

24           So, while, yes, he did not file the form, I do think

25   the requisite notice about his activities was out there.

1    Not -- he did not comply with the FARA requirement, but I think

2    the Court should take that into consideration.  I also think

3    the fact that Mr. Manafort --

4            THE COURT:  Where is it in the record that

5    Mr. Manafort was communicating with the State Department in

6    Kyiv?

7            MR. DOWNING:  In the 302s that were part of the --

8            THE COURT:  That Mr. Kilimnik was.

9            MR. DOWNING:  No, it also referenced Mr. Manafort.

10   And the United States government has --

11           THE COURT:  And in that he was talking about the

12   lobbying that he was doing in the United States?  Is that in

13   there?

14           MR. DOWNING:  No, we're talking about the activities

15   in the Ukraine.

16           THE COURT:  Go ahead.

17           MR. DOWNING:  The government has conceded this issue

18   also, Your Honor, that Mr. Manafort was in regular contact with

19   officials at the embassy, that's part of one of our hearings.

20   So that's really not in dispute.

21           THE COURT:  What does that have to do with the

22   Foreign Agents Registration Act?

23           MR. DOWNING:  I'm saying it has to do with notice to

24   the U.S. government.  I mean, the highest level State

25   Department officials knew of Mr. Manafort's activities.  That

1    matters.  It's not that he was hiding his activities from the

2    very State Department people that were most interested in what

3    he was doing.  So I'm just making the point that the FARA

4    registration --

5              THE COURT:  The State Department in Kyiv.

6              MR. DOWNING:  Well, the State Department in Kyiv

7    communicated --

8              THE COURT:  I want to make sure that's the one we're

9    talking about.

10             MR. DOWNING:  We are.  But also, it's not just there,

11   Your Honor.  The 302s that are sealed also refer to

12   communicating that information to the highest levels of the

13   State Department here in the United States.  So if you want to

14   go back and take a look at those, I think that's very

15   important.

16             So, the officials who really wanted to know what

17   Manafort -- some of those officials knew because they were

18   communicating with him.  And I think that an important

19   distinction from some of these other cases, where the activity

20   itself was not known to anyone in the U.S. government.  And I

21   think that should be considered by the Court in terms of the

22   non-file.  Because the two goals, one is the *New York Times* and

23   other publications were reporting on what Mr. Manafort was

24   doing in the Ukraine, which goes to public knowledge.  And the

25   other one has to do with the knowledge of the U.S. government,

1        the State Department officials, who both he and Mr. Kilimnik

2        were communicating with.  So I think that's an important issue.

3               I also think it's important for the Court -- and it's

4        in detail in our brief, that this office itself was working

5        with Mr. Manafort and decided on their part, from the

6        information they had, that Mr. Manafort had to file a FARA

7        registration.  And he was in the process of doing that when it

8        was stopped and the case was taken over by the Office of

9        Special Counsel.  So, there was a determination on their part

10       that --

11              THE COURT:  You talked about this determination, many

12       times.

13              MR. DOWNING:  Yes.

14              THE COURT:  And I understand that they -- nothing

15       came of what they were doing.  But what is the basis for your

16       claim that they made a decision?

17              MR. DOWNING:  There is a letter from the office

18       stating that despite not getting information from Mr. Manafort,

19       they have sufficient evidence that he needs to file a FARA

20       registration with respect to his representation of the

21       Ukrainian government, the Party of Regions, and Mr. Yanukovych.

22       That came from --

23              THE COURT:  And does it say:  And, therefore, we will

24       take no further action with respect to his prior failure, that

25       will end the matter, that they made a determination that that

1    was the end of it?  And what was the date of that letter?

2            MR. DOWNING:  I don't have the letter on me.  But I

3    believe it was June.  One moment, please.

4            THE COURT:  All right.

5            MR. DOWNING:  Your Honor, it was in the March, April

6    timeframe.

7            THE COURT:  March, April 2017?

8            MR. DOWNING:  '17.  And we can get copies of those

9    letters to the Court.  I apologize for not having it on me

10   right now.

11           But -- and the determination was that the filing was

12   required.  And Mr. Manafort was in the process of getting that

13   filing done with the FARA office.  The only reason I'm raising

14   this, and it doesn't -- it's, obviously, no legal impediment to

15   the Department of Justice or the Office of Special Counsel

16   bringing the charge, I'm not raising it for that issue.  But

17   the office itself had told the Inspector General that what its

18   mission is, is to get more folks in and get them filed; not to

19   bring criminal prosecutions.  That they were trying to have

20   this, kind of, more communicative style of dealing with folks

21   that are out there to get more information in.

22           As a result of this prosecution -- we put in the

23   sentencing memo -- that the FARA filings have more than

24   doubled.  And that the amendments to FARA filings have grown

25   exponentially.  So I think it's important that the Court also

1   know that as a result of this, that there has been a general

2   increase in compliance on FARA and, also, the deterrent effect

3   has been made known.

4          With respect to other individuals or entities that

5   were involved with Mr. Manafort, including a major law firm,

6   those matters are being resolved civilly, as we understand.

7   One, in fact, recently has occurred, with respect to the law

8   firm, for about $4.7 million.  It's been resolved civilly.  And

9   that's just how that office generally operates.  It's not to

10  say it can't be a criminal prosecution, but I think it's

11  important for the Court to consider that process was ongoing at

12  the time and there was that determination by that FARA office,

13  with Mr. Manafort working through a lawyer to get that

14  compliance done.

15         I also would like to point out --

16         THE COURT:  The same lawyer that he directed to lie

17  to the Department of Justice?

18         MR. DOWNING:  The very same, Your Honor.

19         THE COURT:  All right.

20         MR. DOWNING:  I would also like to point out, in

21  terms of knowledge of the United States as to activities, FBI

22  agents did go and talk to Mr. Manafort in 2014, and Mr. Gates,

23  regarding an offshore investigation of Mr. Yanukovych and

24  monies he allegedly took from the Ukraine.  During that

25  interview, both Mr. Manafort himself, and he directed

1    Mr. Gates, to cooperate and provide information to help the FBI

2    with respect to that investigation, which they did.  And what

3    they did was they identified some of these offshore accounts

4    and the location of them in Cyprus for the FBI.

5         So, again, this is a couple of years before -- or,

6    three years before the existence of the special counsel.  But

7    it should indicate to the Court, when law enforcement showed

8    up, that Mr. Manafort was in a position and did in fact

9    cooperate and provide information.  So, I think overall in

10   terms of --

11        THE COURT:  When you say he identified some?

12        MR. DOWNING:  They identified entity accounts that

13   were in Cyprus.  There's a list of them that were identified at

14   the time and the bank where they were located.

15        THE COURT:  So how many weren't identified?

16        MR. DOWNING:  I don't know the answer to that, Your

17   Honor.  But several of the accounts were identified and the

18   location of the accounts.

19        THE COURT:  Okay.

20        MR. DOWNING:  So I think these are all important

21   issues.  I think that -- one other issue that, you know, the

22   case itself, the Office of Special Counsel situation, just as a

23   general matter, not in particular to this one, is a very -- it

24   can be very harsh.  The media attention that comes along with

25   it, the political motivation and disagreement is so unreal in

1    this particular instance, and so out of whack with what another

2    case would look like if we didn't have a special counsel, if

3    this was just the run-of-the-mill DOJ --

4              THE COURT:  Whose political motivation?

5              MR. DOWNING:  Everybody out there.  They're all --

6    everybody is going nuts over this.  Last week it was

7    unbelievable, the press coverage and what have you.  Not here.

8              THE COURT:  The press and the commentators?

9              MR. DOWNING:  Not here.

10             THE COURT:  I want to know if you're saying -- you're

11   talking about the prosecutor's political motivation --

12             MR. DOWNING:  No.  No.

13             THE COURT:  -- or the political motivation of those

14   who are assessing what they think of what the --

15             MR. DOWNING:  Correct, Your Honor.  I'm not directing

16   this at the Office of Special Counsel.  But the media

17   attention, the media frenzy around this.  And it's well

18   understood; it's a case of national interest.  But that results

19   in a very harsh process for the defendant.  And I hope the

20   Court can consider, unlike other cases which this Court has

21   sentenced people in, where there is nobody in the gallery,

22   there is not going to be this torrent of press that comes out

23   of it and focus on Mr. Manafort and his family, that that

24   harshness, we would appreciate it if the Court could consider

25   in sentencing because it has been real.  And but for a short

1    stint as a campaign manager and in a presidential election, I

2    don't think we would be here today.  And I think the Court

3    should consider that, too.

4           I'll leave it to my colleagues to address the other

5    issue, Your Honor.

6           THE COURT:  All right.  Thank you.

7           MR. WESTLING:  Your Honor, I have a fairly focused

8    argument related to the money laundering issue in the case.

9           THE COURT:  All right.

10          MR. WESTLING:  Mr. Weissmann is correct, there is one

11   prior case, the *Park* case.  I think that just for background,

12   obviously this fits into sort of the nature of why the

13   guidelines are where they are; again, not -- I think they're

14   correctly computed -- but where they might be if we were in a

15   slightly different situation.  And so as the Court probably is

16   aware, if you go back to the late '90s, early 2000s, there were

17   substantial amendments to the money laundering guidelines.

18          For many years it was you committed an underlying

19   offense and then money laundering was sort of tacked on and it

20   added a whole lot of exposure in that process.  What the

21   sentencing commission did was to look to the need to better tie

22   the sentences to the underlying offense, with the idea that

23   money laundering would be a sort of enhancement to that.  And

24   so what they did was they readjusted the guideline and they

25   said where there is a base offense, you use the base offense

1    level and you add two for the money laundering, and whatever

2    the additional enhancements are.

3            We're in a situation here that is somewhat the result

4    of FARA not being all that frequently prosecuted, because there

5    is no FARA guideline to look at.  And so, if the commission had

6    seen a lot of FARA cases, I suspect they would have promulgated

7    a FARA guideline.  I can't guess for the Court what that level

8    would be, but based on things like obstruction and other types

9    of what I would call similar offenses, you might have a base

10   offense level somewhere in the neighborhood of 14, then add a

11   couple of levels for money laundering.  That would create a

12   very different scenario for the Court.

13           Again, I'm not bickering with the computation of the

14   guidelines, simply this unique situation of FARA being the

15   underlying offense and the impact that no guideline being there

16   causes you to default to the 2B1.1 schedule.

17           THE COURT:  Isn't it the loss amount, not necessarily

18   whether it's -- I know money laundering had two points that

19   wouldn't have been there otherwise.  But if you've got a

20   conspiracy to fail to identify foreign bank accounts and to

21   fail to pay income taxes and you have the dollars that we're

22   talking about here, wouldn't the loss amount have hiked up the

23   guidelines no matter what?

24           MR. WESTLING:  To some degree.

25           THE COURT:  I mean, they did in your calculation,

1    which was different than the one that the presentence report

2    writer came up with.

3              MR. WESTLING:  Understood.  But the point I'm making

4    really is if you look at 2S1.1(a)(1), it says look to the

5    underlying offense and don't use the loss table unless you

6    can't find the underlying offense.  So there's a default that

7    you'll go first to whatever the guideline is; what, I can't

8    say, because there isn't one.  So I understand that makes this

9    difficult, what the FARA guideline would look like.  Would it

10   include a loss table or not?  Many offenses of that type do

11   not.

12             THE COURT:  But the conspiracy had other underlying

13   offenses which do have loss tables.

14             MR. WESTLING:  It did.  And in that case what we

15   would be looking at is tax or something else, which would

16   clearly drop the level below what it is here.  So it's really

17   just an observation about the structure of the guidelines that

18   create a degree of difficult for the Court, obviously, whenever

19   there is not one that is exactly on point.

20             In this case, where FARA is the, you know, primary

21   underlying offense, I think it results in what I believe are

22   guidelines that are higher than what we would expect if the

23   money laundering statute was able to apply in a traditional

24   sense.

25             In addition to that, Your Honor, we would point out

1    that this is a rare case.  And we know there's one other case

2    where money laundering was involved, the *Park* case, yet it had

3    other conduct involved that is distinct from FARA by the nature

4    of bribery and other things.  Here the money laundering really

5    does have a substantial impact on escalating where the

6    guidelines end up, and we would simply like the Court to

7    consider that as it fashions its sentence under 3553.

8            THE COURT:  All right.  Didn't the guidelines come

9    out virtually the same place in the Eastern District, even

10   without money laundering, based on the amount of money involved

11   in all these bank accounts and tax accounts?

12           MR. WESTLING:  They were very high there, too.

13   Again, based on the foreign bank account issue, yes.

14           THE COURT:  Thank you.

15           Mr. Zehnle?

16           MR. ZEHNLE:  Good morning again, Your Honor.  I

17   wanted to address in a very focused way the issue of the

18   witness tampering that Mr. Weissmann raised.

19           THE COURT:  Can you just scooch up a little bit.

20           MR. ZEHNLE:  Of course.  Of course.

21           THE COURT:  Thank you.

22           MR. ZEHNLE:  I wanted to address the witness

23   tampering issue that Mr. Weissmann raised.

24           At the end of the day, Your Honor, this Court is

25   quite familiar with that particular statute.  And the point

1    that the defense would like to make is that with respect to the

2    cases that deal with witness tampering, whether they're trial

3    convictions or whether they're guilty pleas, in most of those

4    cases what you have is either bribery of witnesses in order to

5    get them to say things or not say things, or potential

6    intimidating or threatening conduct.

7          Now, of course, the statute is broad enough and it

8    does cover the conduct that Mr. Manafort pled to.  And I think

9    it's important for the Court to at least consider, in the cases

10   that are similar under that particular statute, the more

11   significant sentences, which are usually -- and I can give the

12   Court a couple cites in a moment -- you know, usually

13   relatively low, are based upon conduct that I think most people

14   would agree is more egregious; that is, actually paying

15   somebody to lie, or actually threatening them to do that.

16         And as the Court knows, based on the superseding

17   information, based on the information that the government has

18   provided, that's all spelled out in terms of exactly what was

19   done, the texts to the individuals in the -- I can't remember

20   whether they were Individual 1 or Individual 2, but the Court

21   knows who we're talking about.

22         So, in terms of that, we went back and took a quick

23   look at some more recent cases dealing with witness tampering

24   under that particular statute.  And just for the Court's

25   consideration, *United States v. Maldonado*, which is 17-CR-620,

1    and that was in the District of Hawaii.  That was just in

2    September of last year.  That dealt with a defendant who was a

3    police officer who stole $1800 from somebody during a traffic

4    stop.  And after the driver filed a complaint, the defendant

5    and his cousin tried to bribe that driver in order to influence

6    him to withdraw the complaint.  Now, he was sentenced to 24

7    months imprisonment in that case.

8           In another case that we found, from December of 2015,

9    *United States v. Konopski*, K-O-N-O-P-S-K-I, that's 14-CR-6043

10   in the Western District of New York.  That case also dealt with

11   witness tampering, where the defendant was ultimately sentenced

12   to six months imprisonment and six months of home detention.

13   And in that case the defendant confronted an individual that

14   they believed was cooperating against the defendant's brother,

15   and they did so in a threatening and intimidating matter --

16   manner, excuse me, and obtained a false statement.

17          So those were just some of the cases, just to kind of

18   direct the Court's attention to, when you're dealing with

19   witness tampering and the various gradations, if you will, of

20   how did the person actually tamper with the witness?

21          Here Mr. Manafort has admitted to this Court,

22   September 14th, I believe, the conduct involved with sending

23   those texts to those individuals.  And it dealt with primarily,

24   as this Court is well aware, the Hapsburg Group.  That is the

25   group that was essentially engaged to seek Ukraine's admittance

1        into the European Union.  That's what that dealt with.  The

2        majority of that focus, of that group, was to get Ukraine into

3        the European Union.  Mr. Manafort's admitted, he doesn't deny,

4        and he's never backed away from the fact that contact and

5        outreach occurred in the United States and that was a

6        violation.

7                But it is important to note the factual contact in

8        which this particular charge came about.

9                THE COURT:  All right.  Thank you.

10               Mr. Manafort, is there anything you would like to

11       say, that you want me to consider before I impose sentence in

12       this case?  And you're welcome to use -- there's a live

13       microphone at your table there.

14               THE DEFENDANT:  Thank you, Your Honor.  In my

15       previous allocution, I told Judge Ellis that I was ashamed at

16       my conduct that brought me into his court, and to this day of

17       judgment as well.  For that I said I took full responsibility.

18       Apparently at that time I was not as clear in saying what was

19       in my heart, so I want to say to you now that I am sorry for

20       what I've done and for all the activities that have gotten us

21       here today.

22               The last two years have been the most difficult years

23       that my family and I have ever experienced.  The person who I

24       have been described as in public and in this courtroom is not

25       somebody who I recognize.  While I know that I am not that

1    person, I still feets ashamed and embarrassment for the

2    suffering that I have caused to my family, to my friends, and

3    to all that have been affected by my behavior.

4         Let me be very clear, I accept the responsibility for

5    the acts that have caused me to be here today.  Further, I want

6    to apologize for all that I did that contributed to these

7    actions and to the effects that have been brought to both

8    people and institutions.

9         While I cannot undo the past, I can ensure that the

10   future will be very different.  And I stand here today

11   committing to you this:  I am especially upset at the pain that

12   I have caused my family.  If nothing else, the suffering will

13   be a major deterrent to me in any future behavior of mine.

14        As I have sat in solitary confinement for the past

15   nine months, I have reflected on the life -- on my life and

16   what is important to me.  And I can see that I have behaved in

17   ways that did not always support my personal code of values.

18   I'm upset with myself for these failures and understand that

19   many of these mistakes are what have gotten me here today.

20        Because of this new self awareness, I can say to you

21   with conviction that my behavior in the future will be very

22   different.  I have already begun to change, and I'm confident

23   that the lessons of the past two years, and specifically of the

24   last nine months, will be a guide for my future.

25        What has been uplifting to me during this crisis is

1    the incredible support I've received, not just from family and

2    friends, but also from many strangers.  I've been strengthened

3    by their letters that I've received from them and they have

4    affected me in a very positive way, especially their prayers

5    and encouragement.  This exposure to the goodness of people has

6    had an energizing impact on my life already and has given me

7    the ability to cope with the difficulties that I've had to deal

8    with in solitary confinement.  Their encouragement has focused

9    me on how I want to conduct my life when this ordeal is over.

10          I stand here today to assure the Court that I'm a

11   different person than the one who came before you in October of

12   2017.  I have had the time to reflect on my life and my choices

13   and the importance of family and friends.  My reflections have

14   instilled in me a commitment to turn the notoriety of the past

15   two years into a positive and to show the world who I really

16   am.  I see more clearly now both myself and my life, both my

17   past and my future.  I can assure you that I feel the pain from

18   these reflections and I know that it was my conduct that

19   brought me here today.  For these mistakes I am remorseful.

20   With the power of prayer that God's guiding -- and God's

21   guiding hands, I know that my family and I will emerge stronger

22   from the suffering, and I look forward to setting forth on that

23   journey.

24          Again, I apologize to all who have been negatively

25   affected from my behavior.  I take responsibility for the

1    consequences of these actions, and I pledge to do all I can to

2    accelerate the healing process.  Your Honor, I will be 70 years

3    old in a few weeks.  My wife is 66 years old.  I am her primary

4    caregiver.  She needs me and I need her.  I ask you to think of

5    this and our need for each other as you deliberate today.

6         This case has taken everything from me already; my

7    properties, my cash, my life insurance, my trust account for my

8    children and my grandchildren, and even more.  Please let my

9    wife and I be together.  Please do not take away from -- us

10   from each other any longer than the 47 months imposed last

11   week.

12        I appreciate the time that you have committed to this

13   case and ask that you find compassion in your sentencing, if

14   not for me, then for my family.  I promise you that if you do,

15   you will not regret it.  Thank you.

16        THE COURT:  Thank you.  At this point I'm going to

17   take a brief break so that I can absorb everything that I've

18   heard, some things that I've heard today for the first time.

19   You can all remain seated.  I expect that we'll resume at about

20   10 after, maybe quarter after 11.  So I'll be back at that

21   time.  Thank you.

22        (Recess.)

23        THE COURTROOM DEPUTY:  Your Honor, recalling criminal

24   case number 17-201-1, the United States of America v. Paul J.

25   Manafort, Jr.

1          THE COURT:  The briefing, and to a lesser extent the

2     argument this morning in this case, has been marked by a great

3     deal of passion and a fair amount of hyperbole and

4     overstatement on both sides.  This defendant is not public

5     enemy number one, but he is not a victim either.

6          I also want to make clear from the start that the

7     conclusion of this particular prosecution with the imposition

8     of sentence today will not be a vindication of and will not

9     incriminate anyone who is involved in or the subject of the

10    ongoing investigation by the Office of Special Counsel.

11         Notwithstanding the many references that pepper the

12    sentencing memo, the question of whether there was or was not

13    any coordination or conspiracy or any collusion between anyone

14    associated with the presidential campaign and anyone in Russia

15    was not presented in this case.  Period.  Therefore, it was not

16    resolved one way or the other by this case.

17         Also, this sentence will not be an endorsement or an

18    indictment of the mission or the tactics of the Office of

19    Special Counsel.  That question is not before the Court either.

20    Nor does it fall to me today to pass judgment on Paul Manafort

21    as a human being, or to decide, as his daughter asked me to, if

22    he is worthy of forgiveness under God.  His life is not over

23    and he's going to have the opportunity to make something

24    positive out of this, as he's suggested he's going to do, and

25    that's a question left for a higher authority at another time.

1          The issue today is what is the appropriate sanction

2    in this world for certain things he did, deliberately, over a

3    considerable period of time and in violation of a number of

4    federal laws.

5          As I stated earlier, Congress passed a statute that

6    tells judges what they're supposed to think about when they

7    sentence someone.  And as my court reporter and anyone who's

8    been here before can tell you I do in every case, I'm going to

9    go through each of those sentencing factors.

10         The first factor set out in the statute is the nature

11   and circumstances of the offense.  And I think the government's

12   sentencing memorandum summed it up well when it said it is

13   undisputed that he was part of a conspiracy that involved money

14   laundering involving millions of dollars of his income being

15   wired from offshore accounts for goods, services, and real

16   estate.  He concealed that income and the related purchases and

17   the offshore accounts themselves.

18         He hid millions of dollars of other income by falsely

19   characterizing it as loans.  He lied to his bookkeeper and tax

20   preparers, both about the payments from overseas and the

21   existence of the bank accounts from which the money was

22   transferred.  He engaged in extensive lobbying activities in

23   the United States on behalf of Ukraine without registering for

24   this work as required.  He funneled over $11 million from the

25   overseas accounts to pay for other lobbyists working for

1    Ukraine to engage in unregistered lobbying in the United

2    States.  And in submissions to the Department of Justice in

3    November 2016 and February 2017, he caused false and misleading

4    statements to be made relating to the lobbying work for the

5    Ukraine.

6         It is hard to overstate the number of lies and the

7    amount of fraud and the extraordinary amount of money involved.

8    As the prosecutor said, 30 offshore accounts, three foreign

9    countries.  And there is no good explanation that would warrant

10   the leniency requested.  This is not just a failure to comport

11   with some pesky regulations, as the defense would make it out

12   to be.  The defendant hid the proceeds of his international

13   lobbying work from the United States, from the American people

14   who pay their share of taxes so that the government, the

15   military, the national security apparatus, the veterans

16   hospitals and all of the other functions that ordinary people

17   rely on, can operate.  And he thereby cheated the U.S. treasury

18   out of over $6 million in tax revenue.  Why?  Not to support a

19   family, but to sustain a lifestyle at the most opulent and

20   extravagant level possible.  More houses than a family can

21   enjoy, more suits than one man can wear.

22        It is important to note, in case there's any

23   confusion, notwithstanding the use of the word "agent," an

24   unregistered foreign agent is not a spy.  He is a lobbyist.

25   Lobbying is not illegal.  Being paid to do it, even on behalf

1    of clients who others might view as unseemly or odious or even

2    tyrannical is not illegal, if you follow the laws that govern

3    foreign financial transactions and pay your taxes.  But this

4    defendant kept his money offshore and under wraps so he

5    wouldn't have to pay.

6         And the government memorandum makes clear that the

7    tax conspiracy and the failure to file foreign bank account

8    reports is the very conduct underlying some of the convictions

9    in the Virginia case.  The government used the same charts and

10   the same exhibits to tell the story.  And I agree with the

11   defense that he cannot be sentenced for those components twice.

12   He's already been sentenced for that.  And there's going to be

13   a significant forfeiture for that as well; not just to punish

14   him, but restitution because money is owed.

15        So what remains to be considered here?  According to

16   the defendant, it's just an administrative matter, a regulatory

17   crime, a violation of the Foreign Agent Registration Act.  And

18   that's not a fair description.  He was hiding the truth of who

19   he represented from policymakers and the public, and that's

20   antithetical to the very American values that he told me he

21   championed.  And this was after he knew and already had been

22   warned not to do it.

23        What becomes clear from this record is that

24   defendant's approach in his career, and what he didn't abandon

25   even after he was indicted, was that it's all about strategy,

1    positioning, public relations, spin.  And you could say, well,

2    there's nothing wrong with that, at least if you're not a

3    journalist.  But there is something wrong with it if you're not

4    simply advancing a position as part of a PR campaign.

5            It's okay to say:  Members of Congress, the

6    government of the Ukraine, President Victor Yanukovych, would

7    like you to consider the following when you consider how to

8    respond to his actions, when you determine what the foreign

9    policy of the United States should be.  But what you were doing

10   was lying to members of Congress and the American public,

11   saying, look at this nice American PR firm, look at this nice

12   U.S.-based law firm, look at this nice group of prominent

13   former European officials, isn't it great how they've all

14   voluntarily stepped forward to stand up for Yanukovych and the

15   new administration, when all along you were hiding that you and

16   the Ukrainians actually had them on the payroll.

17           This deliberate effort to obscure the facts, this

18   disregard for truth undermines our political discourse and it

19   infects our policymaking.  If the people don't have the facts,

20   democracy can't work.

21           Furthermore, this conduct is not, as the defendant

22   would have me conclude, old news.  It's not just some ancient

23   failure to comply with a couple of regulations, something that

24   took place so long before the campaign it's just unfair and

25   inappropriate to charge him for it in 2017.

1          He pled guilty to laundering of funds through 2016.

2     He pled guilty to a lobbying campaign in the United States for

3     the government of Ukraine, Victor Yanukovych, and when he was

4     out of office, his Party of Regions and the Opposition Bloc

5     from 2005 to 2015.  And the defense says, well, yes, but the

6     government investigated and wrapped it all up and there

7     wouldn't have been a prosecution but for the appointment of the

8     special counsel.

9          I'm not exactly sure what that prediction -- which

10    they've made to me repeatedly -- is actually based on.  I don't

11    believe there is evidence that a formal final determination was

12    made.  Prior to the time when anybody was even thinking about a

13    special counsel, the Department of Justice was already looking

14    into this matter.  And when the Department of Justice -- not

15    the Office of Special Counsel -- was looking into the matter,

16    it asked Mr. Manafort questions.  He lied to his own lawyers

17    and he lied to the Department of Justice.  He had them submit

18    not one, but two letters, falsely stating that he had not

19    performed lobbying activities in the United States on the part

20    of the Ukraine.

21         That first lie was in November of 2016, after he

22    resigned as campaign chair but well before the appointment of

23    the special counsel.  The second, in February, was after the

24    special counsel investigation was underway.  So it's not

25    entirely clear that a civil resolution would still have been

1    possible at that point.

2            And this disregard for facts, this "I'm just going to

3    manage this, I'm just going to spin this" attitude has

4    continued throughout the pendency of this case and it prompted

5    Count 2, the witness tampering conspiracy, which is also part

6    of the nature and circumstances of this offense.

7            Immediately after the superseding indictment was

8    returned and it became clear that the effort by the Hapsburg

9    Group was going to be involved, the defendant immediately began

10   reaching out to witnesses involved with the lobbying effort by

11   the Hapsburg Group to remind them that all the work was done in

12   Europe.  And he pled guilty, for which he deserves credit, but

13   he isn't being straight with me about it now.

14           In the sentencing memorandum the defendant

15   acknowledges and repeats several times that he, quote,

16   contacted, close quote, witnesses.  He was not stepped back for

17   contacting witnesses, that's not a crime.  He didn't plead

18   guilty to contacting witnesses.  He pled guilty to the crime of

19   conspiracy, which means agreeing with someone else, in this

20   case Konstantin Kilimnik, to violate the law.  He pled guilty

21   to conspiring to corruptly persuade another person, two people,

22   with the intent to influence their testimony in an official

23   proceeding.  And which official proceeding?  This one.  The

24   case against Mr. Manafort himself.

25           I do want to say and point out again that no other

1    interactions involving Mr. Kilimnik are before the Court today

2    for sentencing or bear on his sentencing.  The message that

3    Mr. Manafort himself sent to a critical witness regarding the

4    role of the Hapsburg Group was, We should talk.  I've made it

5    clear, they worked in Europe.  The same message was echoed by

6    his co-conspirator, Mr. Kilimnik; Paul is trying to reach that

7    same witness.  Basically, Paul wants to give him a quick

8    summary, that he says to everybody, which is true, that our

9    friends never lobbied in the U.S. and the purpose of the

10   program was the EU.  That, of course, was not true.  And no,

11   the problem was not contacting witnesses.

12          So the sentencing memorandum gave me concern that he

13   really hasn't accepted responsibility for that offense.  And

14   this came up recently during the hearing regarding the breach

15   of the plea agreement.  I did say, as Mr. Zehnle has correctly

16   pointed out, that I could not find that the Office of Special

17   Counsel had proved that his similarly whitewashed or

18   sugarcoated recitation of what Mr. Kilimnik did during his

19   debriefings was a deliberate falsehood because all I have is

20   the FBI 302.  I couldn't tell what the question was you had

21   asked and that he was answering.  So I couldn't tell from that

22   piece of paper alone whether he was asserting false facts or

23   merely parroting false facts that Mr. Kilimnik was saying now.

24   But the fact that then he turned around and advanced a similar

25   version in the sentencing memo now suggests that it was all of

1    a piece.  While he agreed to plead guilty to this count, he's

2    backed away from the facts.

3         And he didn't only try to influence witnesses.  The

4    dissembling in this courtroom began with the bond proceedings

5    and it never abated.  Mr. Manafort had significant assets and

6    we tried mightily to secure his bond before this Court so he

7    could be released from home detention.  I issued several orders

8    actually trying to do that.

9         In the first presentation he said, we have these

10   funds in an account, my wife will be the surety, the money will

11   be safe.  And then I said, okay, fine, then let's put it in an

12   account where only she has access, you don't have access to it.

13   And then it was, oh, never mind, I don't want to do that.  Then

14   it was, okay, well, you can have this property, this property

15   will be great security for my bond.  And then it turned out

16   that property had already been promised to a bank as security

17   for a loan to the bank.  And he said to me, and had a lawyer

18   write to me that, no, the bank had agreed that it would take it

19   last, it wasn't really going to take that house if it needed to

20   to secure its own loan.  And they provided me with all the loan

21   documents and it wasn't in there.  It wasn't true.

22        All this appeared to reflect as ongoing contempt for

23   and his belief that he had the right to manipulate these

24   proceedings, and the Court orders and the rules didn't apply to

25   him.

1          He has now admitted that he engaged in attempts to

2     influence the depiction of this case in the media, himself and

3     through his representatives, in direct contravention of a court

4     order.  That was not why he got stepped back.  I didn't know it

5     then, but it's certainly worthy of consideration now.

6          And he's been less than candid about the conditions

7     of his confinement and made overblown statements about where he

8     was housed when he thought it was to his advantage to do so.

9          The hearing on the alleged breach of the plea

10    agreement suggested that he was trying to get the benefit of

11    the plea without the obligation, to get the government

12    interested in a cooperation deal before the plea with a

13    proffer, and avoid the costs and the risks of a trial and cap

14    his exposure.  But then he began to minimize his conduct and to

15    shield others in ways that I have found were intentionally

16    false.  And it's all very problematic to me because court is

17    one of those places where facts still matter.

18          The second thing that the sentencing statute tells me

19    I'm supposed to consider is the history and characteristics of

20    the defendant.  Paul Manafort is an educated, accomplished man

21    with a loving family.  He has no prior convictions.  And that

22    is a factor to be considered.  I have to balance that against

23    the fact that the criminal conduct involved in this case was

24    not an isolated, single incident.  It went on for a

25    considerable period of time.  It involved many years' worth of

1   false tax returns and filings that weren't filed, and there

2   were many crimes involved.

3           He was convicted in Virginia of five counts of making

4   false statements on his tax returns in five different years;

5   2010, 2011, 2012, 2013, 2014.  He was convicted in Virginia of

6   failing to file the foreign bank account report in 2012, but he

7   admitted under oath to me that he also failed to do it in 2011,

8   2013, 2014.  He's convicted of two counts of bank fraud and

9   admitted the others.  All in all, he defrauded four different

10  lenders in five separate loan transactions, and there was

11  evidence that he was discussing helping a bank officer secure a

12  job in the administration in return for averting his eyes from

13  the known false representations.

14          So this supports the notion that a significant

15  portion of his career has been spent gaming the system.  It is

16  true and it is important that these offenses don't involve

17  violence.  And, yes, while the government wasn't bound by his

18  promise to ask for this, he does get some credit for

19  cooperation.  He did plead guilty.  He did sit for many

20  sessions and answer many questions.  There's no claim that he

21  lied about everything important, and some of the information he

22  provided the government is relying on in its sentencing came

23  from him.

24          But the problem is that the defendant's own conduct

25  makes it impossible to assess the value of the information he

1   did provide because his lies about material matters undermine

2   his reliability as a source of information about anything else.

3   The prosecutors may not have documents about everything, so how

4   can they know now if Mr. Manafort, who they were relying upon

5   to fill the gaps, was being truthful when they talked to him or

6   he wasn't?  It's also problematical that what he had to say

7   about others became less incriminating after the proffers and

8   after the plea.  So, was he spinning the facts beforehand to

9   get a good deal?  Or was he spinning them after to protect

10  other people?  I don't know.

11       I read the letters from his friends and family.  I

12  want to say that I don't discount them just because he came --

13  they came from his friends and family.  It's not true that

14  everyone has people standing so firmly in their corner.  And

15  the letters are detailed and they're heartfelt and they provide

16  specific examples that ring true.

17       I don't doubt their sincerity and I don't doubt the

18  fact that I haven't seen everything there is or can be to Paul

19  Manafort.  I believe he was sincere when he told me today how

20  important they are to him, and the fact that it pains him to

21  cause them to suffer.

22       He's been a significant course of support within his

23  family.  He was stalwart and unfailingly reliable and

24  supportive when his wife suffered a serious injury, and even

25  earlier he supported her determination to get a law degree and

1    a career.  He stepped up in extraordinary ways to serve as a

2    surrogate father for a niece who lost her own father, and there

3    were testaments to his generosity in other situations, his

4    efforts to assist his brother to make the difficult return to

5    sobriety.  All of this, and other charitable and philanthropic

6    activities that were brought to my attention, are a part of his

7    character and they are commendable.

8            And it is unfortunate, as he's pointed out, that

9    incarceration can tear apart a family and separate him from

10   people who need him.  But that is true in every case where

11   someone is incarcerated.  And at least in this case it is a

12   family that has the means to sustain itself in the interim.

13           The sentencing memorandum also states:  Mr. Manafort

14   has spent his life advancing American ideals and principles.

15   It starts with his work on numerous political campaigns and

16   positions within some of the administrations, and it goes on to

17   say during his years outside of government service,

18   Mr. Manafort also worked with world leaders.  He has spent a

19   lifetime promoting American democratic values and assisting

20   emerging democracies to adopt reforms necessary to become a

21   part of Western society.

22           At times he interacted with politicians and business

23   people in emerging countries to assist in the development of

24   American beliefs of equal justice, human rights, and free

25   markets.  There aren't really any exhibits or letters that go

1    along with that, so I don't have the facts or the record before

2    me that would permit me to either accept or question what is a

3    very general description.  It will fall to others in other

4    settings to assess whether the way the defendant chose to

5    market the access he gained during political campaigns and the

6    work he did for the clients he represented has been

7    characterized accurately.  So it doesn't factor into my

8    consideration of the history and characteristics of the

9    defendant.

10        He does, though, appear to have brought intelligence,

11   real skill, organization, and structure to the latest U.S.

12   campaign he was asked to step in and run, and to others.  And

13   those talents are valued in our political system.  But the fact

14   that he has enormous experience and talent and the capacity to

15   uses it in so many constructive ways makes his dissembling at

16   every turn to serve the purposes of enriching himself and

17   frustrating both the investigation and prosecution all the more

18   troubling.

19        It may have been that in addition to thinking of his

20   own finances, he had his clients' ability to win in mind.  He

21   knew that revealing the true source behind the lobbying

22   activities would have made those activities ineffective and

23   unsuccessful, as the prosecutor said.  Secrecy was integral.

24   But that willingness to win at all costs was contrary to laws

25   designed to ensure transparency in the political process and

1    the legislative process.  So it cannot possibly justify the

2    behavior, particularly when there's no question that this

3    defendant knew better and he knew exactly what he was doing.

4              I do appreciate the comments that were made this

5    morning.  But I have to say, it was very striking to me that he

6    had his friends and family write -- or maybe he didn't ask

7    them, maybe they wrote on their own accord, but they wrote --

8    and this person who made his living with words and whose

9    multiple advanced degrees have been detailed in his submission,

10   was strangely silent.

11             I've had defendants who didn't finish high school,

12   whom English was a second language, who managed to write me a

13   letter and express remorse about something.  The comments

14   today, at least in part, seem to have been prompted by comments

15   made after the last sentencing hearing.  And prior to this

16   morning, the upshot of this defendant's entire sentencing

17   presentation was, Look what they've done to me.  The element of

18   remorse and personal responsibility were completely absent.

19             Not once in his submission did he even admit to the

20   possibility that he brought any of this upon himself, when in

21   fact he has no one else to blame.  He even had a plea agreement

22   in which the special counsel agreed to bring his cooperation to

23   my attention and to ask for a lesser sentence, and he

24   squandered it.

25             What the defense tells me is that because the special

1    counsel got involved, what was a mere administrative inquiry

2    about missing paperwork was quote, transmogrified, close quote,

3    into a multiple-count, excessive indictment.  To the extent

4    that is the appropriate verb, if one were to insist on its

5    having a subject in that sentence, it would have to be the

6    defendant who was the transmogrifier.

7            I don't mean to suggest for a second that sentencing

8    was not the time to mount a vigorous defense.  That was your

9    job and your lawyer's job.  There was a lot that this defendant

10   mentioned that was properly included in his sentencing

11   submission.  Sentencing is an individual exercise.  And his age

12   and medical condition were important and needed to be brought

13   to my attention.  And there's a lot that can be said about the

14   guidelines and the draconian multiplying effect of the loss

15   table.

16           But this defendant chose to place his emphasis

17   elsewhere.  And his core argument, echoed by Mr. Downing this

18   morning, was that, quote, but-for, close quote, the special

19   counsel investigation he wouldn't have been charged in the

20   first place.  And that argument falls flat.

21           It is certainly not unusual that investigators

22   uncover crime X when they're looking into crime Y.  And the

23   perpetrators who get uncovered that way do not get a pass.

24   Saying I'm sorry I got caught is not an inspiring plea for

25   leniency.

1          First of all, it's entirely irrelevant to the

2     question before the Court, which is what sanction is

3     appropriate for the conduct he knowingly and willfully and

4     repeatedly engaged in, in violation of many criminal statutes.

5     And the number of times the argument was repeated,

6     notwithstanding the fact that it didn't have any bearing on the

7     question at hand, suggests that it wasn't being repeated for

8     the benefit of the person you were trying to persuade he had

9     accepted responsibility, but it was being repeated for some

10    other audience.

11         So I probably don't need to say too much about it,

12    but I do want to add that the second problem with the argument

13    is that it's not supported by the record.  The DOJ

14    investigation into Ukrainian lobbying was well under way before

15    the special counsel was appointed.  I dealt with this in detail

16    in the order denying the motion to dismiss.  And it wasn't the

17    special counsel's fault that the defendant chose to lie to the

18    Department of Justice again, even after the special counsel had

19    been appointed.

20         The sentencing memo also includes a dramatic

21    paragraph about the execution of the search warrant, armed

22    agents who arrived at the house in the early morning hours and,

23    quote, searched high and low, close quote.  It echoes public

24    statements made at the time about agents breaking into the

25    home.  But when I asked you specifically in court if you had

1   any legal challenge to the manner in which the search was

2   conducted, the defense said no.

3          Also, the entire defense team knows perfectly well

4   that the tactic of using search warrants in white collar

5   criminal cases, certainly in the Eastern District of Virginia,

6   but also at other offices and at Main Justice, while it could

7   be the legitimate subject of a very fruitful policy discussion,

8   absolutely do not start with the special counsel or with Paul

9   Manafort, but has been an arrow in the government's quiver for

10  quite some time.

11         Finally, the no-collusion refrain that runs through

12  the entire defense memorandum is, similarly, unrelated to the

13  matters at hand.  The defense told me over and over, quote,

14  importantly, close quote, or, quote, it is notable that, close

15  quote, the defendant has not been charged with any crimes

16  related to the primary focus of the special counsel's

17  investigation.  At one point he added an entirely

18  unsubstantiated causal link to the theme.  Quote, in October

19  2017, unable to establish that Mr. Manafort engaged in any

20  Russia collusion, the special counsel's office charged

21  Mr. Manafort with crimes that did not relate to his work on the

22  2016 presidential campaign, close quote.  And the memorandum

23  suggests, without foundation, that the individuals who received

24  relatively short sentences for lying during the investigation,

25  individuals who admitted it quite early, pled guilty, and lied

1      about a narrowly circumscribed set of facts, received those

2      sentences because, as the defense put it, quote, Courts

3      recognize that these prosecutions bear little or no relation to

4      the special counsel's core mandate of the investigation

5      allegations that the Trump campaign colluded with the Russian

6      government to influence the 2016 election, close quote.  It's

7      hard to understand why an attorney would write that.

8              That sentence, like the others, has no citation

9      following it because not one of the judges involved stated at

10     the time they imposed sentence that they considered that to be

11     a factor in their sentencing decisions.  The no-collusion

12     mantra is simply a non sequitur that doesn't bear on the

13     question of the appropriate sentence.  And it's not clear

14     whether it's even accurate, since the investigation is as yet

15     unfinished and no report has been issued.  It's also not

16     particularly persuasive to argue that an investigation hasn't

17     found anything when you lied to the investigators.

18             It is true to say this much:  This defendant has not

19     been charged with any offense related to the election and he is

20     not being sentenced for any offense related to the election.

21     And, therefore, defendant's argument about the Russian

22     investigation is not going to affect my sentence, except in one

23     respect:  The defendant's insistence that none of this should

24     be happening to him, that the government had no right to

25     investigate him or charge him, and that the prosecution is

1    misguided and excessive and invalid, after this Court and the

2    Court in the Eastern District of Virginia both found that he

3    fell squarely within the special counsel's mandate, is just one

4    more thing that's inconsistent with the notion of any genuine

5    acceptance of responsibility.

6            The sentencing statute tells me that the Court is

7    required to impose a sentence that's sufficient but not greater

8    than necessary to accomplish the purposes set out in the

9    statute.  And it lists a number of purposes.  I have to reflect

10   the seriousness of the offense, to promote respect for the law,

11   to provide just punishment for the offense.  I have to afford

12   adequate deterrence to criminal conduct by this defendant and

13   other people.  I'm supposed to protect the public from further

14   crimes by this defendant, and provide the defendant with

15   education or vocational training or medical care or other

16   correctional treatment in the most effective means possible.

17           I'm not sure we've fully reflected the seriousness of

18   the offense, imposed punishment for all the wrongdoing

19   involved, and we still have a way to go to see something that

20   looks like respect for the law.

21           With respect to protecting the public from the

22   defendant and the government argument that I need to be

23   concerned about deterring him and recidivism, I agree with the

24   defense that that goes a bit too far.  The defendant's

25   reputation and his business and financial wherewithal are in

1      tatters.  It's not through anyone's fault but his own.  But

2      here, his age and the forfeiture and the punishment that have

3      been exacted combine to make future illegalities seem

4      relatively unlikely.

5              With respect to just punishment, the defense has

6      urged me to conclude that he's been punished enough.  And it is

7      true that he's been confined since June of 2018.  And he

8      definitely should, and the Eastern District of Virginia

9      sentence has already ensured that he will receive credit for

10     the time he's already served.  But the other recurring theme

11     about his punishment, the solitary confinement, requires

12     context and clarification because it's not the first time that

13     that note has been struck in this case.

14             He is at the Alexandria Detention Center now, but how

15     did he get there?  This Court revoked his bond in June based on

16     a finding that there was probable cause to believe that while

17     he was on court supervision he attempted to obstruct justice

18     and interfere with witnesses.  The D.C. Circuit upheld that

19     finding.  And he's since specifically admitted to doing that

20     under oath when he pled guilty.  He was not locked up for

21     violating the media contact order.  He was unquestionably

22     lawfully detained.  And then a U.S. marshal, and not the Court,

23     made the decision about where he should be placed.

24             He was awaiting trial in the Eastern District of

25     Virginia at that time.  The marshal there selected Northern

1    Neck Regional Jail.  That would have been one of the options

2    for our marshal also.  The other would have been D.C. jail.

3          Northern Neck, in my view, presented real concerns

4    about the ability to confer with counsel and get ready for what

5    were then two upcoming trials.  But before anybody presented

6    that issue to me for action, the defendant presented it to the

7    Court in the Eastern District of Virginia in early July.  He

8    complained that given the distance from the District,

9    restrictions on electronic and phone communications, there was

10   a severe impact on his ability to prepare for trial and review

11   documents.

12         He also attached a brief in which he told the D.C.

13   Circuit, when he challenged my order, that he was in solitary

14   confinement, locked in his cell 23 hours a day.  The Court in

15   the Eastern District of Virginia made the decision to promptly

16   alleviate those concerns by ordering -- not just

17   recommending -- that he be housed in the Alexandria jail.

18         Defendant realized that the tactic had backfired

19   immediately and turned around the same day and said never mind,

20   we respectfully ask the Court to permit me to remain at the

21   Northern Neck Regional Jail.  It became clear why, when the

22   government filed its pleading that said, yes, he was housed by

23   himself, but he was housed in a private, self-contained living

24   unit in Northern Neck that included its own bathroom, shower,

25   phone, laptop, and access to a separate work room for review of

1    material.  And the defense, in its reply, conceded that the

2    government had not misrepresented the conditions, other than

3    disputing whether he was able to send email.

4         I'm not going to split hairs over whether the word

5    "solitary" was technically accurate because he had a room of

6    his own.  But the facts about what the true nature of the

7    detention was are not in dispute.  And it was this

8    disingenuousness on the part of the defense and the attempt to

9    garner public sympathy by repeating the term over and over

10   again that played a key role in how he got to Alexandria.  And

11   I think it's more spin and more lack of candor that has

12   characterized the relationship with the Court since day one.

13        Once he got to Alexandria there have been no

14   complaints lodged with me regarding his confinement or his

15   access to or the quality of his medical care.  No official

16   information had been provided to me by the defendant concerning

17   his classification, but he noted frequently in his submission

18   that he was in solitary confinement, solitary confinement.  So

19   I asked the presentence report writer to find out what the

20   situation was so I would have a complete and fair understanding

21   of it.  And at bottom, the defendant was not in the SHU.

22        I understand now that he is in protective

23   confinement.  It is true that his cell is not shared, it has a

24   single bunk, it has a window, radio, newspapers, and view of

25   the television.  It is true that he's released for only a few

1      of his waking hours every day out of that confinement to walk

2      around and be with other people.  But the reason he's not being

3      released to mingle with the other 50 people in the general

4      population of a general local pretrial detention facility, a

5      jail, is so that he will only be with a smaller, more

6      restricted group of people for his own safety.  So I'm not sure

7      what all that was about.

8              Mr. Manafort, I don't want to belittle or minimize

9      the discomforts of prison for you.  It is hard on everyone;

10     young and old, rich and poor.  I also don't question the

11     representation that you've experienced flare-ups of the gout

12     that you were diagnosed as having before and that the symptoms

13     have worsened during your incarceration.  But not one doctor's

14     letter or medical record has been given to me so I don't know

15     what to make of it.  I don't know how to understand what the

16     connection might be between the confinement and the

17     exacerbation of your symptoms, but I hope that you've

18     researched the quality of care before making a recommendation

19     about where you should be designated, which I expect the

20     defense will make at some point.

21             The other thing the sentencing statute tells me I'm

22     supposed to do is I'm supposed to avoid unwarranted sentencing

23     disparities among defendants with similar records who have been

24     found guilty of similar conduct.  With respect to sentencing

25     disparities, the defense points primarily to other regulatory

1    cases.  But those involve, ordinarily, just a plain failure to

2    register, or a plain failure to reveal a foreign bank account.

3    They're not analogous.  They don't involve, as here, a failure

4    to register -- to hide the existence of -- multiple foreign

5    bank accounts for the purpose of laundering millions of

6    dollars, shielding millions of dollars from the IRS.

7            But I do agree with the defendant that a guideline of

8    19 to 24 years, which -- I'm sorry, I do agree with the

9    defendant that the recommended guideline range of 19 to 24

10   years that he was facing in Virginia and he would have faced

11   here if the sentence hadn't been capped at five years on each

12   count overstates the seriousness of this offense.

13           The U.S. sentencing guidelines go up dramatically

14   with the amount of money involved.  I don't have to vary from

15   the guidelines here because the guidelines exceed the maximum

16   that I can impose anyway.  But there is authority in *Kimbrough*

17   *versus United States*, 522 U.S. 85, and other cases that would

18   even permit me to depart based on a policy disagreement with

19   the Commission alone.

20           It's also true that the tax counts and the foreign

21   bank account report aspects of this case have already been

22   sentenced.  And I can't and won't sentence him twice for that.

23           So what sentence did he receive there for conduct

24   that is also embraced in the charges here?  Counts 1 through 5

25   in the Eastern District of Virginia, filing false tax returns

1   in connection with money earned for his work as an agent for

2   the Ukraine, he was sentenced to 24 months each.

3           Count 12, failure to file foreign bank account report

4   in connection with money earned for his work as an agent in

5   Ukraine, he was sentenced to 30 months.  So that's up to 30

6   months' worth of his sentence has been based on overlapping

7   conduct.

8           Counts 25 and 27 were the bank fraud convictions,

9   involving loans from banks that are not relevant conduct to the

10  offense of conviction here.  That was where he got the 47

11  months, and then the Court ran them all concurrent to one

12  another for 47 months.

13          Since the bank fraud, even if it is mentioned in the

14  pleadings in this case, is not an overlapping count, I do not

15  need to make my sentence concurrent to the entire 47 months

16  sentence from Virginia.  But I believe I am bound to do so with

17  30 months.

18          Pursuant 5G1.3(b), I find that any sentence I impose

19  for Count 1 must be concurrent with 30 months of the Virginia

20  sentence because that's the extent of the overlap.

21          So what's left to me?  I've got the regulatory FARA

22  piece of Count 1 and the money laundering.  And I don't believe

23  that's covered by the Eastern District sentence and I think it

24  has to be addressed.  As I noted earlier, it's not a mere

25  oversight, it's not a missing piece of paper.  To the extent it

1   could or should have been treated as a mere administrative

2   matter, I think the defendant forfeited being able to rely on

3   that sort of discretion on the part of law enforcement by

4   having his lawyer lie to the Department of Justice twice on his

5   behalf.

6        I do note that the Eastern District of Virginia found

7   30 months to be an appropriate sentence for the other single

8   regulatory disclosure violation.  And here, it wasn't just a

9   single failure to register; the defendant prevailed upon others

10   in the scheme not to register either, and he admitted under

11   oath at the plea that he caused them not to register.

12        Plus, we have the money laundering, which is a

13   separate offense, which hasn't been covered yet.  And there's

14   Count 2, obstruction of justice, which hasn't received any

15   consideration yet at all.

16        It is an entirely separate offense.  It's an attempt

17   to undermine the integrity of these proceedings and it warrants

18   a separate consecutive sentence.  That being said, I do have to

19   think about what sentence would be appropriate in a situation

20   where, yes, there was a corrupt attempt to persuade, but there

21   were no threats, there were no payments, there was no harm to

22   witnesses.

23        The effort was largely nipped in the bud by the

24   witnesses themselves, who recognized the outreach for exactly

25   what it was, and it ended there.  So there is some time due for

1    that offense, but I believe the full five years on that count,

2    which doesn't include any other conduct, would be greater than

3    necessary to serve the purposes of a criminal sentence.

4          Finally, I'm supposed to determine whether

5    restitution is warranted in this case.  There is a restitution

6    order in this case already imposed by the Eastern District of

7    Virginia for $6,164,032, which represents the missing tax

8    revenue.

9          Do I need to impose that restitution order again in

10   this case, or should I simply say that paying it is a condition

11   of his supervised release?  Does the government think I need a

12   separate order, in this case, of restitution?

13         MR. WEISSMANN:  Your Honor, we would ask for a

14   separate order, but we would propose that the Court indicate

15   that, of course, it only needs to be paid once.  In other

16   words, once the victim, in this case the IRS, is paid the full

17   amount, if it's over, it's double counting.

18         THE COURT:  Okay.  All right.  For all of the reasons

19   that I've just set out, in an exercise of my discretion, after

20   consideration of all the statutory factors, I find that the

21   following sentence is to be imposed:

22         It is the judgment of the Court that you, Paul

23   Manafort, are hereby committed to the custody of the Bureau of

24   Prisons for a term of 60 months on Count 1.  This sentence is

25   to run concurrent to 30 months of the sentence previously

1    imposed by the United States District Court for the Eastern

2    District of Virginia, which has already accounted for the

3    credit you are due for the time served.

4          It is further ordered that you are committed to the

5    custody of the Bureau of Prisons for a term of 13 months on

6    Count 2, to be served consecutively to the sentence on Count 1

7    and the sentence imposed by the Eastern District of Virginia.

8          Mr. Downing, are you asking that I make a specific

9    recommendation as to where he be designated?

10         MR. DOWNING:  Yes, Your Honor.  We made the request

11   in EDVA also, which was granted, to the federal prison camp in

12   Cumberland, Maryland.

13         THE COURT:  All right.  I will recommend in my order

14   that the Bureau of Prisons designate him to serve his sentence,

15   consistent with the recommendation of the Eastern District of

16   Virginia, at the federal prison camp in Cumberland.

17         You are further sentenced to serve a 36-month term of

18   supervised release on both counts, to run concurrently to each

19   other and concurrently to the term of supervised release

20   imposed in the Virginia case.

21         You are further ordered to pay restitution to the

22   Internal Revenue Service of the United States in the amount of

23   $6,164,032, but that amount only needs to be paid once to

24   satisfy the two restitution orders.

25         I'm going to decline to impose a fine, given the

1   significant sums in the order of forfeiture and the order of

2   restitution.  You are, however, required to pay a $200 special

3   assessment to the court.  It's immediately payable to the Clerk

4   of the Court for the U.S. District Court for the District of

5   Columbia.  While you are incarcerated you can make payments on

6   the special assessment through your participation in the Bureau

7   of Prisons' Inmate Financial Responsibility Program.

8           Within 72 hours of your release from custody you

9   shall report in person to the probation office in the district

10  to which you are released.  While on supervision you shall not

11  possess a firearm or other dangerous weapon.  You shall not use

12  or possess an illegal controlled substance, and you shall not

13  commit another federal, state, or local crime.

14          You shall also abide by the general conditions of

15  supervision adopted by the U.S. probation office, as well as

16  the following special conditions:  Pursuant to 42 U.S. Code

17  §14135a, as for all felony offenses, you must submit to the

18  collection and use of DNA identification information while

19  incarcerated or at the direction of the U.S. probation office.

20          You shall participate in a mental health assessment

21  and, if recommended, a treatment program, which may include

22  outpatient counseling as approved and directed by the probation

23  office.

24          It will be a condition of your supervised release

25  that you pay the restitution order in full, once, until the

1    $6 million sum has been satisfied.

2         You shall provide the probation office with your

3    income tax returns, authorization for release of credit

4    information, and information about any business or finances in

5    which you have a control or interest until all the restitution

6    has been satisfied.

7         Mr. Manafort, you have a right to appeal the sentence

8    imposed by this Court if the period of imprisonment is longer

9    than the statutory maximum or the sentence departed upward from

10   the applicable sentencing guideline range.  If you choose to

11   appeal, you must file any appeal within 14 days after the Court

12   enters judgment.  If you're unable to afford the cost of

13   appeal, you may request permission from the Court to file an

14   appeal without cost to you.

15        As I understand, I believe at this point the

16   government needs to make a motion to dismiss the indictment.

17        MR. WEISSMANN:  Yes.  There are three underlying

18   indictments and we would move it dismiss, without prejudice,

19   the counts.  I can name all the counts, if you want.  But it's

20   all of the underlying counts in the three indictments.

21        THE COURT:  All right.  The motion will be granted.

22        So anything further I need to take up on behalf of

23   the United States at this time?

24        The order of forfeiture has been signed.

25        MR. WEISSMANN:  And that is part of the sentence,

1    Your Honor?

2         THE COURT:  Yes.  It is now.  It will be incorporated

3    in the judgment and commitment order as part of the sentence in

4    this case.

5         MR. WEISSMANN:  Thank you, Your Honor.

6         THE COURT:  All right.  Is there anything further I

7    need to take up right now on behalf of the defense?

8         MR. WESTLING:  No, Your Honor.

9         THE COURT:  All right.  Thank you.

10                            *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 13th day of March 2019.

/s/_____

Janice E. Dickman, CRR, RMR, CRC
Official Court Reporter
Room 6523
333 Constitution Avenue NW
Washington, D.C. 20001