```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,      ) Criminal Action
                                      ) No. 17-CR-201
 4                      Plaintiff,    )
                                      )
 5     vs.                            ) Public Transcript
                                      ) Of Sealed Hearing
 6     Paul Manafort, Jr.,            )
                                      ) Washington, DC
 7                      Defendant.    ) Date:  February 4, 2019
                                      ) Time:  10:38 a.m.
 8     _____

 9                  TRANSCRIPT OF SEALED HEARING
                          HELD BEFORE
10          THE HONORABLE JUDGE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
11     _____

12                      A P P E A R A N C E S

13     For Plaintiff:    ANDREW WEISSMANN
                         GREG D. ANDRES
14                       JEANNIE SCLAFANI RHEE
                         U.S. Department of Justice
15                       Special Counsel's office
                         950 Pennsylvania Avenue NW
16                       Washington, D.C.  20530
                         202-514-1746
17                       E-mail:  Aaw@usdoj.gov
                         E-mail:  Gda@usdoj.gov
18                       E-mail:  Jsr@usdoj.gov

19     For Defendant:    KEVIN M. DOWNING
                         815 Connecticut Avenue, N.W.
20                       Suite 730
                         Washington, D.C. 20006
21                       (202) 754-1992
                         E-mail:  Kevindowning@kdowninglaw.com
22
                         THOMAS EDWARD ZEHNLE
23                       Law Office of Thomas E. Zehnle
                         601 New Jersey Avenue, NW
24                       Suite 620
                         Washington, DC 20001
25                       (202) 368-4668
                         E-mail:  Tzehnle@milchev.com
```

```
 1                          RICHARD WILLIAM WESTLING
                            Epstein Becker & Green, P.C.
 2                          1227 25th Street, NW
                            Suite 700
 3                          Washington, DC 20037
                            (202) 861-1868
 4                          e-mail:  Rwestling@ebglaw.com

 5

         Also Present:     Michael Ficht
 6                          Renee Michael

 7

         Court Reporter:   Janice E. Dickman, RMR, CRR
 8                          Official Court Reporter
                            United States Courthouse, Room 6523
 9                          333 Constitution Avenue, NW
                            Washington, DC  20001
10                          202-354-3267

11                                    *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE COURTROOM DEPUTY:  Good morning, Your Honor.

2      This is a sealed proceeding, and the courtroom has been locked.

3              We have Case Number 17-201-1, the United States of

4      America v. Paul J. Manafort, Jr.  Mr. Manafort is present in

5      the courtroom, Your Honor.

6              Will counsel for the parties please approach the

7      lectern, identify yourself for the record.

8              MR. WEISSMANN:  Good morning, Your Honor.

9              For the Government, Andrew Weissmann, Greg Andres,

10     Mike Ficht, Renee Michael, Jeannie Rhee, and Jeff Weiland.

11             THE COURT:  All right.  Good morning.

12             And I take it the other gentlemen in the first row

13     are part of your team?

14             MR. WEISSMANN:  Yes, they are.

15             THE COURT:  Okay.  Thank you.

16             MR. WESTLING:  Good morning, Your Honor.

17             Richard Westling, Thomas Zehnle, Kevin Downing for

18     Mr. Manafort.  And Tim Wang is with us as our paralegal.

19             THE COURT:  Okay.  And who is the person seated in

20     the front row?

21             THE COURTROOM DEPUTY:  U.S. marshal.

22             THE COURT:  Okay.  All right.  Welcome.  Just wanted

23     to make sure everybody who is here is supposed to be here.

24             Before we get started, I wanted to take up a

25     preliminary matter that I meant to take up last time and forgot

1    because we had so much else on our plate.

2              Right now, we have the sentencing memoranda scheduled

3    to be filed on February 22nd, and the sentencing on March 5th.

4    And I've looked at my calendar, and the week before those two

5    events is filled with a trial.  And I'm not comfortable that

6    that's going to give me an adequate amount of time to review

7    what I expect is going to be a lengthy submission on at least

8    one side, and maybe both.  And so, therefore, I would propose

9    to move the sentencing until March -- I think I was looking at

10   the 12th or 13th.

11             Does anybody have a problem with that?

12             MR. WEISSMANN:  No, Your Honor.

13             THE COURT:  All right.  That's the Tuesday and

14   Wednesday of that week, right?

15             THE COURTROOM DEPUTY:  Correct, Your Honor.

16             THE COURT:  Do you have --

17             MR. WESTLING:  I'm not sure we know, Your Honor.

18             THE COURT:  You don't know whether you have a --

19             MR. WESTLING:  Well, meaning, we would have to get

20   electronic devices out and check.

21             THE COURT:  Oh.

22             MR. WESTLING:  Which we're welcome to do, but --

23             THE COURT:  Okay.  Well, if you can, get back to

24   Mr. Haley after you get back to chambers -- or, chambers --

25   wherever you're going.  Guess you're not coming to chambers.  I

1      don't have room for all of you.

2              But if you could communicate if you have problems

3      with any of the dates at the -- I think the Monday, Tuesday,

4      Wednesday of that week, that would be helpful, and then I'll

5      issue an order.  But I'm going to reschedule it.

6              All right.  This morning I'm going to organize myself

7      by the issues the way they were numbered in the initial

8      declaration.  It was great because in every pleading, you all

9      numbered the five issues into different orders.  So I can't

10     really call them Issue No. 1 and Issue No. 2, but that's the

11     template I'm going to use.  And what I'm going to do is, I'm

12     going to hear from both sides on each issue before I move on to

13     the next issue.

14             I think we've arranged to have people wired for

15     sound, or at least seated in front of a working microphone so

16     that you don't have to parade back and forth to the lectern.

17     And I think it will just be more efficient that way.

18             Before I get into the issues, I just want to make

19     sure that we're all agreed about certain things.  I believe

20     that we're all agreed that the burden of proving any facts

21     which are going to be relied upon as part of the sentencing

22     guidelines determination, it's the Government's burden to prove

23     them by a preponderance of the evidence.

24             Is that everybody's understanding?

25             MR. WESTLING:  Yes, Your Honor.

```
 1                    MR. WEISSMANN:  Yes.

 2                    THE COURT:  Okay.  And I don't think that it has to

 3          be an actionable false statement under § 1001, or a violation

 4          of the perjury statute to fall within the broad scope of what

 5          could violate the agreement.

 6                    But, what is your position about whether the Office

 7          of Special Counsel has to prove the elements of one of those

 8          offenses, albeit by a preponderance, for me to deem his

 9          response on one of these issues to be an intentional lie with

10          whatever sentencing consequences that could ensue?

11                    You can't do it sitting down?

12                    MR. WEISSMANN:  Am I permitted to sit?

13                    THE COURT:  You're permitted to sit and use those --

14                    MR. WEISSMANN:  That's fine.

15                    THE COURT:  -- just because we're going to be going

16          back and forth.

17                    MR. WEISSMANN:  That's fine.  I'm just used to --

18                    THE COURT:  Yeah.  Me, too.

19                    MR. ANDRES:  Next time we don't stand, we're going to

20          get in trouble.

21                    THE COURT:  Well, you know, it just seemed like there

22          would be a lot of popping up and down.  So for this, for

23          purposes of today, I'm happy to have you seated.

24                    MR. WEISSMANN:  So the Government's view is that it

25          is not necessary for us to prove all of the elements of 1001 --
```

```
 1                THE COURT:  I don't think you're actually using the

 2      microphone.

 3                MR. WEISSMANN:  Okay.  Is that --

 4                THE COURT:  Much better.

 5                MR. WEISSMANN:  So I don't think we need to prove the

 6      elements.  I think we have, but I don't think it's necessary.

 7      From our perspective, what's before the Court today is, really,

 8      what would the Court find of use at sentencing?  Whether it

 9      would be relevant to the Court if the defendant made false

10      statements either to the government or to the grand jury,

11      whether it was something --

12                THE COURT:  All right.  We're going to have you

13      coming back and forth.  The whole point of putting the body

14      mics on your table, or the other mics, was so that --

15                THE COURTROOM DEPUTY:  It's got to be closer to your

16      mouth.

17                THE COURT:  -- you got to use them.

18                Are you going to be arguing all of these?

19                MR. WEISSMANN:  Four of the five.

20                THE COURT:  All right.  Well, why don't you clip that

21      right there.

22                MR. WEISSMANN:  Okay.

23                THE COURT:  All right.

24                THE COURTROOM DEPUTY:  Near the knot.  Thank you.

25                MR. WEISSMANN:  Okay.  How's that?
```

```
1              THE COURT:  It's great.

2              MR. WEISSMANN:  Okay.

3              THE COURT:  If you have a trial in this courtroom,

4    you get to do that for your opening and closing.  So you might

5    want to get used to it.

6              MR. WEISSMANN:  Okay.

7              THE COURT:  All right?

8              MR. WEISSMANN:  Okay.  So, as the Court heard, I

9    don't think we need to prove all the technical elements,

10   although I don't think, as a practical matter, that should be

11   an issue here.  I think we have proved that, but I don't think

12   it's required.

13             I think that the Court, in terms of sentencing, could

14   find it relevant to a variety of issues, if the Court concluded

15   that the defendant, after signing an agreement, made a false

16   statement either to -- just one, to the government or to the

17   grand jury.  The Court could also find that there were more

18   than one that would be relevant or not so relevant.  But I

19   don't think it's necessary for us to prove perjury by a

20   preponderance, or a 1001 violation by a preponderance.

21             THE COURT:  Well, does materiality matter?

22             MR. WEISSMANN:  I don't think it does.  Because I

23   think from the Court's perspective, you could find -- I think

24   that could be a factor that the Court could consider, but I

25   don't think it's necessary in the way it would be for a
```

1    criminal violation.

2              It could be relevant in this way:  If you thought

3    that, at the end of the day, he made a false statement

4    intentionally, but it was about, you know, his favorite color,

5    or something that's just not that important, you may find that,

6    yes, that happened, but it's not going to really affect the

7    sentence that I think is appropriate.

8              So I think it is a factor for the Court, but I don't

9    think it's necessary in the way it would be for an element of a

10   crime.

11             THE COURT:  All right.  What do you think about that?

12             MR. WESTLING:  Well, Your Honor, I guess, first, I

13   would start by saying that I think, you know, this issue was

14   really brought up by the special counsel at the outset,

15   claiming that crimes had been committed.

16             THE COURT:  Correct.

17             MR. WESTLING:  And so I'm surprised that there

18   wouldn't be a sense that they had established the elements of

19   the crimes they allegedly say were committed.

20             I think the another point, to the Court's comment

21   just a second ago, was that we obviously do think materiality

22   is pretty relevant here.  I mean, given the nature of what

23   happened, the nature of cooperation sessions, sort of the ebb

24   and flow of those sessions in general, it seems to me the

25   question really has to be, was there an intent to deceive in

1    some way?  Was that the goal of what was happening, or was this

2    simply a mistake?

3            And so we believe the standard should be the one that

4    comes from those statutes.

5            THE COURT:  Well, I think they certainly have taken

6    on the mantle of establishing that these were intentionalized.

7    And I think if they aren't intentional, then they wouldn't bear

8    on acceptance of responsibility.

9            I think the government agrees with that.

10           MR. WEISSMANN:  Absolutely.

11           THE COURT:  Okay.  Well, let's get into the

12   individual -- do you want to say something else about what we

13   just talked about?

14           MR. WEISSMANN:  No.  It was on something else.

15           I know that the Court's normal practice is to ask a

16   lot of questions and give us an opportunity at the end, if

17   there's something we wanted to say.

18           In this situation, there were two preliminary matters

19   that I thought would be useful, but I don't know if the Court

20   would vary from its normal practice.

21           THE COURT:  Well, the practice is kind of a mix.  For

22   some of them, I'm just going to start by asking you, and then

23   ask specific questions; then others, I only have narrow

24   questions.  But, if there's something you want to say before we

25   get started, you're welcome to say it.

1          MR. WEISSMANN:  Great.  There were two points that I

2     wanted to make to the Court.  There are a number of subparts to

3     them.

4          But, the first point has to do with sort of the

5     context in which we operated at the time that we entered into

6     the agreement.  As the Court will recall, the agreement was

7     entered into just shortly before the trial was to commence

8     before this Court, and it was after three proffer sessions.

9     And then, of course, there were many debriefings after that.

10    And a couple things about that timing that are relevant.

11         One, at the end of the third proffer session, before

12    entering into the agreement, we had made clear to the defense

13    that we were willing to go forward.  But, that given the

14    limited opportunity, and yet the need to make a decision

15    because of the eminent trial, we wanted to make clear to the

16    defense that, of course, we were going in with good faith.

17         But we could not say at that point that we either

18    could say the defendant was being truthful or that the

19    defendant was going to be able to meet the substantial

20    assistance prong.  In other words, two parts of the agreement.

21         Of course, I think everyone was hopeful that all of

22    that would be met.  But we wanted to make it clear to the

23    defense that they weren't being misled in any way as to what we

24    were thinking.

25         And the second component of that is, I think,

1    something unusual -- there were two factors that were unusual

2    in this case compared to, I think, the cases that all of us at

3    this table have had in the past.

4          One was, there's enormous interest in what I will

5    call -- for lack of a better term -- the intelligence that

6    could be gathered from having a cooperating witness in this

7    particular investigation.  And that would account for the

8    Government agreeing to have Mr. Manafort cooperate, even though

9    it was after a trial.  Because that's certainly an -- not --

10   not -- it's not that that never happens, but it's more

11   atypical.

12         By the same token, there was an unusual factor -- the

13   second unusual factor, which was ███████████████████████████

14   ███████████████████████████████████████████████████████████

15   ███████████████████   the normal motives and incentives that are built

16   into a cooperation agreement.

17         So those were -- to give the Court sort of the lay of

18   the land at the time that the -- at least from the Government's

19   perspective -- when we were entering into an agreement.  The

20   decision, at the end of the day, that the Government made to --

21   that we believe that the defendant was lying to us had a number

22   of different components.

23         As the Court is aware from the Gates resolution, the

24   Government is aware that many cooperators have a rocky start,

25   and that part of our job and part of defense counsel's job --

1    many of us at this table have been defense counsel --

2    understand that this can be an ongoing process, and we worked

3    with defense counsel.

4         And, by the way, nothing that is happening here today

5    has anything to do with our understanding and belief that

6    defense counsel has operated completely in trying to make sure

7    that this would work.

8         And with Mr. Gates, we also wanted to make sure that

9    we could get information, and we thought that there was -- I

10   think there was certainly a significant issue.  And we dealt

11   with it by having the defendant plead to something in addition

12   to take -- to have the ramification for it.  But that is to

13   show, I think, an example of wanting the intelligence, but

14   dealing with what we considered to be, you know, unacceptable

15   behavior from the Government, particularly from somebody whose

16   information we would rely on, and potentially ask the jury to

17   rely on.

18        Here, a number of factors went into the decision to

19   file the joint status report in November, with our view that

20   the defendant has lied.  I'm going to separate out demeanor

21   evidence because, obviously, that's something that it would be

22   relevant to the issue that's now moot, about whether we

23   breached in good faith.  But, it's obviously very hard for the

24   Court to just take that on faith, that we reevaluated demeanor.

25   But, that obviously was a factor.  But, I'm going to try and

1   focus on things that are in the record before you, in addition

2   to that.

3        One is the importance of the matters that, if you

4   look at the totality, the examples that were given to you are

5   ones where we think that the subject matter is something that

6   is -- that is not likely to have been forgotten, where somebody

7   would just misremember.  Obviously, that's the issue, is, is it

8   possible for -- if the person forgot, and that their recollect

9   was refreshed?

10        Another factor is the recency of events; is it

11   something that happened long ago versus recently?  So the --

12   what I'll call the second issue, which is the Mr. Kilimnik --

13   I'm not going to argue each one, I'm just giving it as an

14   example -- Mr. Kilimnik, and whether he conspired with

15   Mr. Manafort.  That is something where the plea was only, I

16   think, 30 days -- 32 days before the interview.

17        So, again, we're not talking about something long in

18   the past, or, to take the defendant's position, something that

19   happened in the heat of a campaign, where there was so many

20   other things going on.

21        There's the issue that we evaluated in terms of the

22   changing stories, that things -- that the story kept on

23   evolving in a way that did not seem consistent to us with just

24   a better recollection, more details being filled in, as opposed

25   to fundamental changes.  There was inconsistency with other

1    evidence.  The $125,000 payment is just one example of that.

2           There was evaluating the denial of what the defendant

3    had said to us.  So one thing that the Court may have noted is

4    in, again, going back to the -- whether Mr. Kilimnik conspired

5    with Mr. Manafort, when Mr. Manafort ultimately recanted and

6    said:  Yes, I did, he also said:  You were just confused.  I

7    never said what you said I said.

8           And to us, that was just so emblematic because, of

9    course, everyone in the room -- defense counsel taking notes,

10   and the Government taking notes -- was there.  So, we knew for

11   a fact that was not the case.  And I should point out, that's

12   the only evidence in the record.  There's not contrary evidence

13   to that fact.

14          There was the level of detail that was given.  So

15   that in recounting a story to us that we concluded was false,

16   we looked at the amount of detail that was given by

17   Mr. Manafort in recounting that story.

18          There was the fact that Mr. Manafort would at times,

19   in other situations, say when he was unsure, and say:  I'm not

20   sure.  I need to refresh my recollection, or, I don't recall.

21   Whereas the example that we gave to the Court were ones where

22   that didn't happen -- almost invariably, not exclusively.

23          There also is, of course, the defendant's history

24   that -- that we considered, although I don't think -- for some

25   of us, it wasn't even necessary to get to that, but it was

1      something that was also a factor.

2                  THE COURT:  What do you mean by that?

3                  MR. WEISSMANN:  In other words, that the defendant

4      coming into this had lied to the Department of Justice, had

5      lied to banks, had lied to his own defense counsel, had

6      violated court orders, had lied to his tax preparers, had lied

7      to his bookkeepers.  In other words, there were so many lies.

8                  Now, that doesn't -- just to make sure the Court

9      understands, that does not mean that a cooperator can't

10     understand and cooperate fully and be a successful cooperator

11     and the incentives of the cooperation agreement can still work.

12     But, it does mean that the Government should be, I think, extra

13     vigilant to make sure and to test what it is that the defendant

14     is saying.

15                 Because there you could imagine having not a

16     different standard, but sort of more scrutiny in this situation

17     than you would where somebody had one aberrant-type of behavior

18     and got themselves in criminal trouble, versus somebody who had

19     an habitual problem, particularly when it comes to truth-

20     telling.

21                 And then, I think, finally, and probably most

22     important, was the number of instances.  The fact that, sort

23     of, what are the odds that all of this was a mistake, that it

24     just happened over and over and over again?

25                 And to take -- to go back to the example of

1    Mr. Manafort's saying to us:  Well, that's not what I said

2    previously.  What that showed is that the incentives of the

3    agreement, where there are benefits to be had by cooperating,

4    there are disincentives; because if you're caught lying, that

5    you can have serious consequences.  It told us that those

6    incentives were not working -- were not working adequately.

7    So, all of that factored into why we were making this decision.

8          At the end of the day, we also, having then talked to

9    defense counsel, and also still, to today, there is no contrary

10   evidence.  In other words, having talked to defense counsel,

11   and asked:  Is there something we are missing?  Is there some

12   other evidence?

13         I think the Court and we are in the same position,

14   where there is argument that has been made by defense counsel.

15   And we're not in any way saying that that shouldn't be

16   considered, but there isn't evidence that's been submitted.  Of

17   course, we still have the burden.  I'm not saying that just

18   because there's no contrary evidence means that we met our

19   burden, but there is nothing on the other side weighing against

20   what it is that's in the record.

21         And then I just wanted to briefly -- my second --

22   this is all in the context of sort of one point.  I have one

23   other point, which is I'd wanted to address something that was

24   in the defense submission about -- this is going to be my

25   phrasing, it's not the defense phrasing; they were more

1    polite -- but that we proceeded in a sort of "gotcha" mode.   In

2    other words, that we didn't give the defendant the evidence to

3    look at first, and then talk about it.

4         And the idea being, is it possible that this was just

5    some information that when the defendant saw it, it refreshed

6    his recollection?  And until he saw it, he just didn't

7    remember?  And we're very cognizant that happens all the time.

8    It happened with Mr. Manafort.  Like everyone else, there were

9    instances where he would look at things and it did refresh

10   recollection.

11        That's particularly true when it comes to time,

12   place, names, things like that.  That is very, very common.

13   And it certainly happened here.  But, I wanted to address that

14   that's not -- this is an unusual case.  This is an unusual

15   case.  Not because we did that, it's an unusual case because of

16   the volume of evidence that the defendant had.

17        As the Court knows, there was a trial in the Eastern

18   District of Virginia.  And as the Court knows, there was a

19   discovery order in this case.  There, the vast, vast majority

20   of information was available to the defendant.  And as one of

21   the submissions having to do with bail conditions and -- or,

22   prison location, what's in the record is that the defendant, on

23   tape, in prison, says yes, he has been through all of that

24   discovery.

25        So, for one example of that, all of the Gates 302s

1    that were extant in September of last year were something that

2    had been disclosed to the defendant.  So, the defendant was

3    very well aware of what Mr. Gates had said about sharing of

4    polling data, and that it was something that was not -- not

5    simply a matter of keeping somebody up to date.  And it sort

6    of -- that Mr. Gates made the decision as to what was chosen,

7    that he knew that Mr. Gates had said in these 302s it was very

8    different, that he was being instructed to.

9         So what's unusual in this case is how much

10   information the defendant had.  It is entirely appropriate for

11   the Government to not provide all information to the defense,

12   because one of our jobs is to make sure the defendant is

13   telling us the truth, to the best we can.  We're obviously not

14   lie detectors, but it is appropriate to not share everything.

15        Here, there is a very, very small category of things

16   that as we go through the different five areas, and the

17   Judge -- the Court asks questions to us, I will try and point

18   out where those instances are, because most of it is something

19   where the defendants had it.  And the issue is more the

20   defendant -- even in the instances where we didn't share

21   something, the defendant had it.  He just didn't know whether

22   we had it.

23        So an example of that would be, the Ukraine polling

24   questions in 2018 is something where we got the information, of

25   course the defendant had it.  And that is information that we

1     had not -- that's an instance where information had not been

2     provided to the defense.  And, in fact, I'm not sure we had it

3     at the time of the Eastern District of Virginia trial.

4            I also wanted to point out that with respect to

5     information that had -- whether information had been shared or

6     not is entirely irrelevant to some of these areas.  So, for

7     instance, whether Mr. Manafort conspired with Mr. Kilimnik,

8     there is no -- that was not an example, like, the defense could

9     say:  Well, why weren't we given information?

10           They had the information about the underlying crime.

11    They had the information about what Mr. Manafort had said

12    previously.  That was done just a month before.  So, that's not

13    an instance where the Government could in any way be faulted

14    for what we shared and didn't share.

15           Another instance would be where -- this wasn't an

16    example of we had information and didn't share it, but, rather,

17    having heard the defendant's explanation, we then went out to

18    check it.  So, the $125,000 payment to WilmerHale is a good

19    example of that, where in light of what the defendant said, we

20    went out and checked.

21           And that information, actually, you can see in the

22    record.  Because if the Court looks at the dates of the

23    interviews of Mr. ███████ and Mr. ███████, you will see that

24    they're happening contemporaneously.  Because we are trying

25    to -- we actually had fronted to the defense the issue of that

1    this doesn't make sense, that this is what the records are

2    showing, and then we got another version.  And we were, like,

3    that still doesn't make sense.  And so we decided to do more

4    digging.

5            So this wasn't an example of we, somehow, had all the

6    information and we were trying to play a game of, like,

7    "gotcha," why can't you tell us what -- we know something you

8    don't, and we want to rip up the agreement.  We were actually

9    trying to figure out what was going on there.  And you can see

10   that by following the time period.

11           And that's it.

12           THE COURT:  Okay.

13           MR. WEISSMANN:  Thank you very much.

14           THE COURT:  All right.  Now, I think in some ways

15   that was more of the summing-up that I might have anticipated

16   hearing at the end; therefore, if I ask you at the end if you

17   have anything else to say, it will be -- "else" will be the

18   operative word in that sentence.

19           But I don't think it's fair to the defense, who may

20   or may not have been prepared to orient me at the start, to not

21   give you the opportunity now that they've had the opportunity.

22           So if there's some basic principles you would like me

23   to keep in mind while we talk about each of these individual

24   instances, I'm happy to hear them.  I mean, I know he's touched

25   on what some of your themes are, and I'm familiar with what

1    some of your themes are.  But, you know, if you would like to

2    give me some guideposts to keep in mind, as he just did, I'm

3    happy to hear them.

4            MR. WESTLING:  Well, I think, briefly, Your Honor, a

5    couple of things.  I mean -- and I don't mean to repeat what's

6    already in some of the pleadings.  I may touch on some of that.

7            But, I mean, obviously, Mr. Weissmann describes, I

8    think somewhat accurately, the process leading up to the plea,

9    the pressure that everyone was under.  Pressure that, frankly,

10   didn't relieve any time after the plea.  That there was a lot

11   of pressure from the Government to:  Let's get these

12   cooperation sessions going.

13           We understood that.  But everybody was working, I

14   think, with a limited amount of time to be as prepared as we

15   all would have liked to be each day before we headed in.  The

16   Government did its best to try to say:  This will be the topic.

17   But, you know, for us to really be in any way useful, it often

18   required trips to the jail that night to try to get

19   Mr. Manafort oriented so we could come back the next morning.

20           I think the situation that we want to be sure the

21   Court is aware of -- we know that it is -- is just the

22   challenges of anyone who is, you know, facing some of the

23   physical and emotional challenges Mr. Manafort was; the

24   situation of his confinement, the focus, really for the last

25   months before this, really on just the trial issues on the

 1    case, and then shifting, almost immediately, to:  Let's open

 2    the world to everything you remember over the last several

 3    years, and well before that.

 4            I think we just want to be clear -- I know we have in

 5    our pleadings emphatically -- Mr. Manafort, you know, did his

 6    best to answer the questions.  He did not lie in any way.

 7            We do think there's a number of areas where there is

 8    still confusion between the parties about what was said, what

 9    it meant.  We hope we'll have an opportunity to talk about that

10    as we go through these issues today.

11            But, I think that -- you know, I'm struck, in

12    particular, by understanding we've always acknowledged the

13    Government's, you know, approach was not to play a game of

14    "gotcha," but there was a choice made in a number of cases to

15    ask about topics before documents were shared.  And then, when

16    something went awry, there was a document to show why it was

17    untrue.

18            And I think there are different ways we all could

19    have done this.  It's totally the prerogative of the

20    Government, and we've acknowledged, you know, what we've seen

21    as their good faith in being here.

22            But, clearly, you know, it was a challenging

23    situation for everyone.  And I think the amount of the issues

24    we're left with today where there are supposed lies, compared

25    to, really, 12 days of interviews, more than 50 hours, plus 2

1    days in the grand jury, and in many cases, not core issues to

2    the things we spent most of our time talking about, simply, we

3    believe, is an important backdrop in determining whether

4    Mr. Manafort was in any way doing anything other than doing his

5    best to tell the truth.

6         And I think, you know, the last point that I would

7    make is that given that relatively small set of areas where

8    this occurred, whether even the allegations are being made, you

9    know, we note that there's not really a lot to explain.

10   There's no pattern, there's no clear motive that would suggest

11   someone who was trying to intentionally not share information.

12        And many of the more sensitive topics that we're

13   aware of from a -- all of us paying attention to what's gone in

14   the news cycle over the last many months, you know, are things

15   where these issues didn't come up, where there wasn't a

16   complaint about the information Mr. Manafort provided.  And so

17   we think that's important context as we get started here today.

18        THE COURT:  Do I have -- and I don't think I need

19   them for today, but I'm certain that what you just said is also

20   going to be a part of your acceptance of responsibility

21   argument and argument at sentencing.

22        Do I have the 302s from 12 days of interviews?  Do I

23   have everything, or do I only have what was given to me because

24   it bore on the particular issues that I'm being asked to rule

25   on today?

```
 1              MR. WEISSMANN:  Judge, you do not have everything.

 2    We are happy to give you the -- all of the 302s.  We just gave

 3    you -- you have, I think, the majority of them, but not all of

 4    them.

 5              THE COURT:  Okay.  And I don't know that -- if I need

 6    them.  But, it's hard to assess -- and I certainly don't think

 7    they should be a public part of any sentencing submission.

 8    But, if you want me to put this in context of more that was

 9    said, it helps to have it.

10              MR. WESTLING*:  And, of course, we don't have anything

11    more than what you have, Your Honor.  So --

12              THE COURT:  Okay.  Okay.  I didn't know.

13              MR. WESTLING*:  I'm just letting the Court know.

14              THE COURT:  All right.  Is there anything anybody

15    else wants to say before we get started?

16              MR. WEISSMANN:  No, Your Honor.  And thank you.

17              THE COURT:  All right.

18              With respect to the $125,000 payment by ████████████

19    ████████████████████████████, and called Firm A in the

20    pleadings, at the direction of Entity B, the ███████████

21    ████████████████████, towards an unrelated debt owed by the

22    defendant to a law firm, you've already mentioned the name of

23    the law firm this morning.  But, I think the name of the law

24    firm is irrelevant to the rest of the conversation.

25              So -- and as background, the Government has explained
```

1    to me that Mr. Manafort was involved in the establishment of

2    ▉▉▉▉▉, getting the ▉▉▉ to hire ▉▉▉, and he knew both

3    principals.  Initially, I found the description in the

4    declaration and the 302s to be somewhat confusing, but I think

5    I do understand it now.  But, I would be happy to have you

6    briefly start by summarizing what the specific allegations of

7    the falsehood are with respect to this one.

8          MR. WEISSMANN:  Okay.  So, I can go through what I

9    think are key false statements.

10         One false statement is that the payment -- the

11   $125,000 payment that was made to the law firm was

12   reimbursement of a loan from Mr. Manafort to ▉▉▉▉▉  And

13   their -- I can --

14         THE COURT:  The first version?

15         MR. WEISSMANN:  That's the first version.  And

16   Exhibit 9, which is a 302 on September 20th of 2018, on page 6,

17   paragraph 2 has information where Mr. Manafort is conveying

18   that.

19         And what may help the Court is that what I think

20   Mr. Manafort was doing was lying about, essentially, where --

21   what was the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  Because -- and

22   then this is definitely an educated guess:  But what we think

23   the actual -- what was really going on was that Mr. Manafort

24   was aware that there was a -- to put it charitably, a

25   ▉▉▉▉▉▉▉▉ scheme where Mr. ▉▉▉▉▉▉ was paying money back,

1    not to the ███, but to the head of the ██████████, and that

2    Mr. ██████ was holding the money for Mr. ██.

3         Mr. ███ may -- may have, in turn, had that same

4    relationship, or similar relationship, with Mr. Manafort,

5    although that's not necessary to our argument.

6         And so in the first version, what it is, what I would

7    say is close to the truth, in the sense that there is -- there,

8    in fact -- if, in fact, Mr. ███ and Mr. Manafort had a similar

9    ██████████ arrangement, the -- that part was hidden from us,

10   and that was a lie, that this didn't come from that.  That was

11   the reason for the payment.

12        But, it would be the case that Mr. ███ owed

13   Mr. Manafort money; it's just that it was not a loan.  Meaning,

14   what was lied to about was hiding that ██████████ -- knowledge

15   of that ████████ scheme.

16        Version two, the false statement is that this is now

17   Mr. ██████ saying that he -- this is according to

18   Mr. Manafort -- paid money for past work he got for

19   Mr. Manafort, and that he was -- Mr. ████████ was justifying

20   this as money that he was paying because of work that he -- had

21   been obtained for him by Mr. Manafort.

22        And their subsidiary false statements, Mr. Manafort

23   said that Mr. ████████ told Mr. ███ that he had a relationship

24   with Mr. Manafort and would deal with Mr. Manafort directly.

25   In other words, the issue now was when, after the first

1    version, we went to counsel and said:  This doesn't make any

2    sense.  We've got payment records, and the payment records are

3    coming from Mr. ███████.  So how does Mr. ███████ get

4    involved?

5              And that's when we got version two.  And so the issue

6    for Mr. Manafort is, how does he now justify Mr. ███████ being

7    anywhere near this scheme?  And then, once he switches to

8    Mr. ███████, the issue is, why did he first go to Mr. ███?

9    And so -- and we know the answer through Mr. ███████'s

10   interview, where he tells us how that happened.

11             But, this was not Mr. ███████ paying money simply as

12   a way of -- as a gesture in light of work that he had obtained

13   from Mr. Manafort.  Rather, this was just money that he was

14   holding for Mr. ███, and he just gave it because he was

15   directed to do it by Mr. ███, and that's why he did it.  Again,

16   that was not told to us by Mr. Manafort.

17             If you look at Exhibit 3, page 1, that supports the

18   statements made by Mr. Manafort.  In the grand jury, Exhibit 4,

19   at pages 254 and 255, Mr. Manafort said that ███████

20   ████████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ████████████████████████.  Our view is that all of that is

23   not true.

24             And also, if you look on pages 248 and 249 and 257,

25   all in Exhibit 4, which is the grand jury testimony --

1          THE COURT:  Tell me the pages of the grand jury

2    testimony again.

3          MR. WEISSMANN:  254 and 255, 248 and 249, and 257.

4    257, Mr. Manafort is explicitly asked, and says that the █████

5    ███████████████████████████████████████.

6          And then version three is that -- is when

7    Mr. Manafort said that this was a loan that was being given

8    from Mr. ████████ to Mr. Manafort, which Mr. Manafort had

9    requested from Mr. █████████.

10          And if you look at Exhibit 10, at page 3,

11    Mr. Manafort says that originally they planned this to be a

12    loan.  And there's -- there's no evidence of that, other than

13    Mr. Manafort's statements.  It's not what Mr. █████████ said.

14    It's not what Mr. █████████ said.  It's not what Mr. Manafort

15    said in an email to Mr. █████████ about this being income, if

16    you'll note that.

17          If this was so legitimate and there was no issue, if

18    you look at the email that Mr. Manafort wrote to Mr. █████████,

19    he said:  This is a payment from a vendor, and it's being paid

20    directly to the law firm because I have trouble with my banks.

21          Again, that would all suggest that there's something

22    nefarious going on, because that's clearly not the case,

23    Mr. █████████ is not a vendor of Mr. Manafort.

24          So those are the lies that we think were told in

25    connection with the $125,000 scheme.

1    THE COURT:  All right.  The 302s, of course, reflect

2    what was said as opposed to a Q&A.

3    What's your response to what the defense has said,

4    that the initial questions had the wrong amount and they were

5    confusing and that's why his answers weren't what you were

6    expecting?

7    MR. WEISSMANN:  So I think one piece of that we agree

8    with, which is that the initial amount -- if you give me one

9    second.

10    (Pause.)

11    MR. WEISSMANN:  So the initial amount that we had

12    thought was paid to the law firm, we thought was higher, and

13    then we went and looked at the records and realized it was

14    lower.

15    So they're correct, that we initially had the number

16    wrong.  And, by the way, that, I think, should be taken as we

17    went in to this just wanting to know what's this payment, and

18    where did it come -- I mean, this was not -- we in no way were

19    thinking this was going to be where we ended up.  And you can

20    tell from the fact that we then interviewed all these people to

21    try and dig through this.

22    The issue of whether the amount that was paid to the

23    law firm was 500,000 or 125,000 has nothing to do with hiding a

24    ███████████  scheme, and it's nothing to do with coming up with

25    three separate versions.  I just -- I think it's -- I think

1    there is -- like many very good defense arguments, you know,

2    that you make to a jury, there's a kernel that's true.  But, I

3    don't think you get from that to where you need to be.

4          THE COURT:  What about the defense suggestion that

5    there was confusion at the time the payment was made as to

6    whether it was going to be a loan or a gift?

7          MR. WEISSMANN:  So, we have -- we have --

8          THE COURT:  We have the email he wrote in real time

9    to his accountant and how he treated it at tax time.

10         MR. WEISSMANN:  Yes.  And so we have that, and we

11   have Mr. ████████ and Mr. ████████.  And it's very hard to see

12   why Mr. ████████ -- again, we could rely on his credibility and

13   his demeanor.  But, it is hard to see why what he said to us

14   would not be where -- one could view that as not particularly

15   being in his interest.  And telling us the circumstances of the

16   payment seemed very credible to us, in that I don't see how

17   there's confusion.

18         And also, it's important to note that that's not how

19   it was presented to us.  It was not presented as:  Let me talk

20   to you about the 125,000.  There was a ████████ scheme.  I

21   don't know, in terms of how it's going to be documented,

22   what -- that was not the way it was presented.  It was

23   presented as:  It happened this way.  No.  Then, it happened

24   this way.  Then, it happened this way.

25         And when we said:  Well, then, why did you even

1   mention Mr. █████?

2         And it was, like:  Well, Mr. █████ just introduced me

3   to Mr. ███████ in terms of he could pay the money.

4         I mean, the story really does not make sense, unless

5   you really -- the way, I think, to understand it, and the way

6   we got into this was, at the very least, Mr. Manafort was aware

7   of the ██████████ scheme.

8         THE COURT:  All right.  Well, you've kind of headed

9   it right into something that I had wanted to ask, which is,

10  putting aside whether it has to be established and whether we

11  have to establish all the elements of 1001, why is this

12  important?  I mean, basically, what you're saying is, you were

13  just asking about something and it turned -- it snowballed into

14  a series of false statements.

15        But, was there something about his -- if I agree with

16  you that he was lying about that, that was material to what you

17  were doing?  What was the importance of asking him about the

18  payment in the first place?

19        MR. WEISSMANN:  So, there were a number of things

20  that we were interested in knowing about the source of funds

21  and where money was coming from.  And there was a lot of

22  tracing of assets that was being done.  Actually, our forensic

23  accountant is here.  That is something that was relevant to the

24  Eastern District of Virginia case, and to the case here.

25        So, we were trying to determine location of money,

1   and whether there were other -- other accounts that we were not

2   aware of, or people holding money for Mr. Manafort that we were

3   unaware of.  So that was the initial impetus for why we were

4   looking at this.

5          It obviously, subsequently, is of significance, in

6   that the reason for sealing this is -- has to do with the

7   ███████████████████████.  So, it -- the initial reasons are not,

8   now, the current reasons.

9          THE COURT:  All right.  You touched on this:  It's

10  noted in the declaration that ████████, when he explained the

11  deal that he had, essentially, to █████████████████████████████

12  ████████████████████████████████, that he said he

13  was unaware of whether there was a ███████████████████████

14  Manafort.  And you've kind of hinted to that here today, that

15  that might be a motive for his being not straightforward, as

16  you believe he wasn't.

17         Is it something that we know the answer to?  And

18  whether he did or he didn't, is it something that matters?

19         MR. WEISSMANN:  So, the answer to the first question,

20  about whether we know the answer to whether Mr. Manafort was

21  receiving ████████████████████████████████████████████████

22  ████████████████████████████████████████

23         In terms of whether it matters, I don't think it

24  matters because it's sufficient that the -- defendant, A,

25  whether he lied and he would -- it would be sufficient if he

1    was aware of the -- of the scheme.  I think you can infer that

2    from all of the circumstances here.

3              I do want to address one of the things that the Court

4    said about motive.

5              The -- from our perspective, the motive here is, if

6    you remember Mr. Manafort, at the -- when he was working for

7    the Trump campaign, was unpaid.

8              Second, as there's been a lot of evidence in the

9    Eastern District of Virginia case, that during that time period

10   Mr. Manafort had a liquidity issue; not that he didn't have

11   assets.  But Mr. Yanukovych had fled in 2014 from the Ukraine,

12   and there was a dramatic drop in income that was coming in to

13   Mr. Manafort.

14             And one of the -- and so the -- one of the motives

15   for the serial bank frauds that were charged, and now admitted

16   by Mr. Manafort, was to, basically, increase his liquidity.

17             Here, this was a way of getting cash.  And it's not

18   something that would be, I think, well received, that the

19   unpaid campaign manager was getting ████████████████████████

20   ██████████████████████████████████████████████████████████████

21   ███████████████████████████████.  And, instead, was being used to

22   pay ███████████████████████████████████████ in ways that

23   were not reported in the contract -- the written contract so

24   that there would be a motive to conceal this.

25             THE COURT:  Okay.  All right.

1          Mr. Westling, is there something, first, you want to

2     start with to add to what you put in your pleadings about this

3     issue?

4          MR. WESTLING:  Well, I think, Your Honor, as you

5     pointed out and the Government responded to, there was this

6     initial amount confusion.  It sort of came up as kind of a --

7     less than a primary area of discussion.

8          You'll note that in the first 302, there really is a

9     fairly complete accounting of the relationship of Mr. ███, and

10    the fact that ███████ paid the money.  And so, you know, I

11    think that as a practical matter, this issue took on a life of

12    its own through these meetings.  I mean, we seem to keep going

13    back, and the Government continued to show its dissatisfaction,

14    and yet the story didn't change all that much.

15         And I think that at the end of the day, you know,

16    Mr. Weissmann has been very up front in saying that, you know,

17    he has a suspicion about what was going on here, for which

18    there is not yet proof.  I don't think there is proof because I

19    don't think it occurred.

20         And one of the things the Court should be mindful of

21    is that the amount of money that was paid here, if there had

22    been such an arrangement, would have been a small fraction of

23    what he could have used to pay lawyers he owed a lot more money

24    to.  So, I mean, there's something about it that just doesn't

25    really make sense in the way the Government wants to describe

1    it.

2            But, I think that's probably all I have as an

3    introduction, Your Honor.  And I would be happy to answer

4    specific questions, if that's helpful.

5            THE COURT:  All right.  Well, it struck me, when I

6    read your pleadings, that you had a number of theories about

7    why each individual statement wasn't necessarily false.  For

8    instance, you start by saying that he could have fairly thought

9    that the payment was a repayment of a loan to ███ because ███

10   owed him money.  But, the payment wasn't made by ███.  It was

11   made by ███████.

12           And I'm not sure how that explains the evolving

13   succession of inconsistent explanations.  I'm not at all sure I

14   agree with what you just said, that the story didn't change.

15           MR. WESTLING:  Well, I think, if you look at the 302

16   from -- let me give you an exhibit number.  It's Exhibit 9, and

17   it's page 6.  It was the same paragraph that Mr. Weissmann

18   referred to you previously.  And he talks about -- and this

19   sort of came up, with the understanding that he went to Mr. ███

20   because Mr. ███ owed him money.  And so that was -- gave him a

21   reason he could go and ask for this money, for help, which was

22   really what he was looking for.

23           And then, in essence, what happens is that he

24   recognizes, as this comes out in his first interview, that

25   Mr. ███████ is the one that's paying the money, and that the

1     money, the amount is actually the 125, not the higher number

2     the Government had said, or the lower one he was thinking.  And

3     as a practical matter, that's sort of where it's left at that

4     point.

5              But, what's clear from the very first is that Mr. ██████

6     is involved and Mr. ████████ is involved.  And then we come

7     back and revisit it.  And it's very clear, from our

8     perspective, that all along what was being said was:  I went to

9     ████████ talked to ████████, and I talked to ████████, and I

10    got this money.

11             And I don't know, at the end of the day, that it

12    really changes.  I mean, those elements are there throughout.

13    The point, you know, that's made later on about the e-mail to

14    ████████ in referencing a vendor, well, that's actually an

15    accurate description of his relationship with Mr. ████████,

16    who's been a vendor on all these campaigns he's used in the

17    past.  So, I don't think that was designed to hide anything.

18    It's explaining who's the source of the funds.

19             And I think throughout, there was just an

20    unwillingness on the Government's part to sort of accept what

21    was being said.  So their point, I guess, they did more

22    investigation, found out more details.

23             But, I don't think there's any question when we sit

24    here today, that what Mr. Manafort was saying is:  I reached

25    out to ████████████████, basically, talked to

1   ████████████, I talked to █████████████, and ████████ made a

2   payment on my behalf.

3          And that sort of runs through all of these sessions.

4          THE COURT:  All right.  Well, one of the things you

5   say is, there was confusion at the time of the transaction

6   about whether it was a loan or a gift, and so you declared --

7   he declared it income in an abundance of caution.

8          Where is the confusion that it might have been a loan

9   at the outset?

10          MR. WESTLING:  Well, there is -- give you an exhibit

11   site here.

12          Exhibit 8, which is 11/6/2018, 302 of ████████████,

13   on page 2, paragraph -- the fourth full paragraph, there's a

14   recounting by Mr. ████████ of a dinner he had with Mr. Manafort

15   where they discuss the payment, and ████████ tells Manafort

16   that he needs to issue a 1099.  And Manafort sort of says:  Do

17   what you need to do.

18          And so Manafort is expecting a 1099 from

19   Mr. ████████, which never arrives.  So, at the end of the day,

20   what happens is Mr. ████████'s accountant sends the 1099 to the

21   law firm, not to Mr. Manafort.  And so he's sitting in a

22   situation where he doesn't really have control of his finances,

23   trying to help his accountant.

24          On one hand, he knows he was promised a 1099 that

25   never appeared, because the accountant doesn't have it.  And

1      the question is:  What do we do with this?

2              And so it's either got to be a loan or income,

3      because everybody was clear it wasn't a gift.  And so, in the

4      end, Mr. Manafort declares it, although there's also some

5      effort to put together a loan document in the event that's the

6      way it's going to be treated.

7              But, you know, again, it was not clear at the time,

8      between the two people talking, what was happening, other than

9      the money had been paid and that a 1099 would be coming.  So

10     that appears to be income, and that's the way Mr. Manafort

11     treated it.

12             Later, when it doesn't arrive, he doesn't know what's

13     going on and he's not able to reach out to Mr. █████████ to

14     clarify it directly, which is one of the things he points out

15     in the grand jury.

16             THE COURT:  All right.  Well, you also said in your

17     reply that the Office of Special Counsel was claiming that

18     Manafort lied when he discussed the fact that the payment might

19     be a loan.

20             That's your words.

21             MR. WESTLING:  Mm-hmm.

22             THE COURT:  And then you tell me:  Well, it's all,

23     you know, really of little moment because he paid taxes on it

24     anyway.

25             I'm not sure that really addresses the seriousness of

1    the allegation, because he didn't just say the payment might be

2    a loan.  The Office of Special Counsel is claiming that he lied

3    when he advanced the narrative that it was a loan, and he came

4    up with a reported unsigned copy of a note to support it and

5    then passed the same false story on to his accountant years

6    later in an effort to have him revisit the original tax

7    treatment.

8              So, I feel like that not only is it possible that he

9    wasn't being truthful with the Office of Special Counsel, but

10   you were kind of really downplaying it in your description to

11   me.

12             So, what do you want to tell me about this promissory

13   note that makes its first appearance during the debriefing

14   session?

15             MR. WESTLING:  Well, I mean, again, I think it's

16   important, Your Honor, going back to Exhibit 8, Mr. ███████

17   acknowledges having seen a promissory note in the past.  He

18   doesn't remember signing it or anything else.  So at some point

19   that was presented to him.

20             We also know that Mr. Manafort told the special

21   counsel and the grand jury that he, basically, told his

22   accountant to reach out to Mr. ██████ and get this figured

23   out, because he was not in a position to do it.

24             And so I think the point is that there -- it was not

25   clear, and there's these things floating around.  In the end,

1     it gets reported, because that's what you do if you don't have

2     a basis not to report it.

3                 But I think, you know, because there was not a

4     discussion --

5                 THE COURT:  Well, why are we suddenly sending to the

6     accountant, in October of 2018 -- and, interestingly, it comes

7     from the same lawyer who tried to sell me a little bit of a

8     bill of goods in connection with the loan documents during the

9     bond hearing?  Like, how is he suddenly sending this supposed

10    promissory note that existed way back when?

11                MR. WESTLING:  Well, I don't know when the note was

12    sent to Mr. ███████.  It's not clear from the 302.  What's

13    clear is, he acknowledges seeing it and --

14                THE COURT:  So you're not telling me that that's

15    evidence that it was generated in real time?  I'm just trying

16    to figure out, do I have any reason to believe that this thing

17    existed at the time of the transaction, as opposed to

18    conveniently appearing in time for the debriefing session --

19    after he'd been through several debriefing sessions.

20                MR. WESTLING:  But, I guess the premise that that

21    starts from is that Mr. Manafort, from the beginning,

22    acknowledged that he was expecting a 1099.  So he believed it

23    to be income.

24                THE COURT:  Right.

25                MR. WESTLING:  And then there was this confusion that

1    came up.  And so in the end, when there was no loan that was

2    confected, it was reported as income.  But, I don't think there

3    was ever any indication that the loan was in any way an effort

4    to avoid paying tax, if tax was, in fact, due.  It depended on

5    what the intent of the gift -- the person who provided the

6    money was as to whether it was going to be repaid or not.

7              THE COURT:  No.  I'm trying to figure out if the

8    promissory note was something created to support the

9    version three.

10             MR. WESTLING:  No, I don't think it was, Your Honor.

11   I think version three was a response to being shown the

12   promissory note.  In other words --

13             THE COURT:  By whom?

14             MR. WESTLING:  By the special counsel.

15             THE COURT:  No.  They say he showed it to them.

16             MR. WESTLING:  I wasn't at that meeting.  So I

17   apologize.

18             MR. DOWNING:  Just to clarify, we got that document

19   from Mr. ███████ and then provided the document to the Office

20   of Special Counsel.  That promissory note predated any

21   interviews with the Office of Special Counsel, Your Honor.

22             THE COURT:  What prompted him to suddenly send it to

23   the accountant right around the time that you were showing it

24   to the Office of Special Counsel for the first time?

25             MR. DOWNING:  The reporting of the amount as income

1    had to do with the tax deadline for that year it was showing

2    up.  So, Your Honor, I think, before, you were saying to clean

3    up a prior year.  That's not what happened.  The returns were

4    being filed, and that amount of income was being timely picked

5    up on a return that was being filed on an extension.  So that

6    was the email communication with the accountant.

7           And, quite frankly, it wasn't really an issue here,

8    in court.  But, there was an issue in the Eastern District of

9    Virginia about whether or not recording certain transactions as

10   loans was legitimate.  And there was a big issue to just say:

11   Pick it up on the return and let's figure it out later.

12          That's what was determined to be done.  And as you

13   know, at that point in time, we were not about to reach out to

14   other individuals that could potentially be witnesses.  So, we

15   were kind of in a box, in terms of trying to get a resolution

16   of the matter satisfactorily during this process.  We just

17   couldn't do it.

18          THE COURT:  All right.

19          Mr. Weissmann, I certainly got the impression from

20   the declaration and your pleadings that you were suggesting to

21   me that this promissory note was a recent concoction.

22          What's your response to what they're saying?

23          MR. WEISSMANN:  There's no evidence in the record

24   that the promissory -- the unsigned promissory note existed

25   prior to the proffers in debriefings here.  But, we know what

1    is in the record, which is the contemporaneous email from

2    Mr. Manafort to his tax advisor, and the tax advisor's

3    statements to us about this being income.

4              It's the email where I told you Mr. Manafort is

5    coming up with, itself, a false statement to his tax advisor,

6    saying that this is money from a vendor.  Again, no reason to

7    be lying to your tax advisor.  Ironically, for somebody who's

8    charged in two cases with tax offenses, still making a false

9    statement to Mr. ████████ about this.

10             Why I think the -- this is now being recast as a loan

11   as opposed to income is because as we started asking questions

12   about it, and it -- again, not in any way thinking this was a

13   ████████ scheme.  But, then, falling into that, is that I

14   think that Mr. Manafort did correctly decide to record this as

15   income because, although it is a -- a ████████ scheme, it --

16   one way of avoiding at least one criminal problem is to report

17   it as income because it is income, if it is money from a

18   ████████ scheme.

19             But, if you were hiding that from the Government, you

20   need to come up with a different way of explaining this than

21   income.  Which is why I think it was then, later, determined,

22   okay.  Let's call it a loan.

23             As you know, Mr. ████████ didn't know it was a loan.

24   Mr. ████████ didn't know it was a loan.  So you have two

25   witnesses saying that, and it's uncontroverted.  There is no

1    evidence in the record otherwise.

2         And I would just -- although it's in the declaration,

3    I would point out Exhibit 12 to the Court, which is -- it is

4    the text exchange between Mr. Manafort and Mr. ████.

5         If this is money that is being paid by Mr. ███████

6    as a loan, or as money for past work, Mr. Manafort is sending

7    the banking information as to where the money should go to

8    Mr. ████.  That all makes sense, if it's Mr. ████'s money, and

9    Mr. ████ is directing where this is going to go.  And that's

10   exactly what Mr. ██████ said.

11        So the contemporaneous documentation is entirely

12   consistent with what Mr. ██████ was telling the Government.

13        THE COURT:  All right.  I think I've heard everything

14   I need to hear on this issue, unless there's something you

15   think I haven't heard yet that you want to tell me.

16        MR. WESTLING:  One second.

17        (Pause.)

18        MR. WEISSMANN:  Judge, while they're waiting, I just

19   want to repeat that nothing that the Government is contending

20   here is in any way intended to reflect on defense counsel.

21        THE COURT:  I understand that as something you've

22   made quite clear, and I appreciate that.

23        MR. WEISMANN:  Okay.  Okay.

24        MR. WESTLING:  Your Honor, a couple points.

25        One, if the Court would be willing, we're able, we

1    believe, to get the metadata beyond that relates to that loan

2    document.  We're pretty confident it existed some time in the

3    past and was not created.  But, we obviously know that you

4    would have to have proof of that to be able to rely on it.  I

5    don't know if that's something that we could provide to you

6    after the hearing, but it's something we're willing to provide.

7            THE COURT:  That would be fine.

8            MR. WESTLING:  Okay.  And I think the other thing,

9    Your Honor, just sort of going back, a great deal of --

10           THE COURT:  You need to put it some format that I

11    actually understand what I'm looking at.

12           MR. WESTLING:  Understood.

13           THE COURT:  All right.

14           MR. WESTLING:  It will have to be that way for me,

15    too.

16           THE COURT:  All right.

17           MR. WESTLING:  Just the other thing is that I think a

18    lot of what the Government reads into what happened here

19    relates to this theory of what's going on.  I think what's

20    important to note is that they describe, for example, the

21    payments to Mr. ████ as ██████████, when, in fact, you know,

22    Mr. ██████ acknowledges this is commonplace, based on his

23    understanding.  There's nothing unusual about what's going on

24    as far as what Mr. ████ is getting.

25           And I think, you know, it's important because there's

1    a sense of coming up with reasons why it would have made sense

2    to hide what was going on, rather than accepting the fact that

3    the three players in this were there from the beginning, and

4    there was just a lot of uncertainty about what exactly happened

5    in terms of getting the money paid.

6          THE COURT:  All right.  I think you made that clear.

7    And I think I understand everybody's point of view about this,

8    and what the evidence is.  But, there's some aspects of the

9    evidence I'm going to need to re-review.

10         All right.  So let's go on to what is II, or the

11   second subject touched upon in the declaration, which is

12   Mr. Kilimnik's role in the obstruction conspiracy.

13         So, Mr. Weissmann, the concern here, laid out in

14   paragraph 15 of the declaration, is that in an interview, after

15   Mr. Manafort had pled guilty to conspiring with Kilimnik, he

16   offered up an exculpatory version of Kilimnik's state of mind.

17   And I certainly don't quarrel with your conclusion, that this

18   isn't necessarily consistent with what one would call full and

19   forthright cooperation.

20         But, given his correction after consultation with

21   counsel, why would this be something that we would characterize

22   as the crime of making an intentionally false statement to the

23   FBI, or even just a law of significance for acceptance of

24   responsibility in sentencing purposes?

25         MR. WEISSMANN:  So, let me just first address the

1    acceptance of responsibility.

2              This could be relevant to acceptance of

3    responsibility, but it could also be relevant to a number of

4    other issues.  In other words, there are a number of legal

5    issues that we're now very much involved in, in terms of

6    whether this should or should not form a basis for discounting

7    acceptance of responsibility.

8              Even putting that aside, if the Court were to

9    conclude that this is an intentional lie, that it would be

10   relevant to issues such as a variance, or where within the

11   guidelines the Court would sentence the defendant.  So, that's

12   our position with respect to how it could be relevant.

13             In terms of --

14             THE COURT:  Well, and I think I detailed, at one

15   hearing or another, all the various ways, if he made false

16   statements, it could bear on sentencing.

17             MR. WESTLING:  Yep.

18             THE COURT:  I'm just trying to figure out why this

19   one, corrected within the same session, albeit after his

20   counsel took him aside and whispered in his ear, makes you

21   think that I should consider this one in that group of things

22   that bear on these issues.

23             MR. WEISSMANN:  So, this is why:  First, in terms of

24   what happened, I would like to direct your attention to

25   Exhibit 10, page 6, which is the 302 of that session.

```
 1              And it's not correct that the defendant said
 2    something, and then defense counsel sort of said:  Let me have
 3    a moment, and it got fixed.
 4              THE COURT:  Okay.  Let me stop you for one second.
 5              Are the mics on the tables live?
 6              THE COURTROOM DEPUTY:  Yes.
 7              THE COURT:  Can we let him have that?  For some
 8    reason -- you obviously haven't done a lot of TV or theater,
 9    Mr. Weissmann.
10              MR. WEISSMANN:  Yeah.  Exactly.
11              THE COURT:  Or maybe you just got a bum microphone,
12    and it's not your fault at all.
13              MR. WEISSMANN:  So --
14              THE COURT:  That's much better.
15              MR. WEISSMANN:  What I was saying is that it wasn't a
16    situation where this came up, defense counsel said:  Can I have
17    a moment?  And then it all got corrected.
18              There -- if you look at page 6, Mr. Manafort gave a
19    detailed explanation.  And I'll get to that in a moment.  And
20    after that detailed explanation, the Government pointed out to
21    Mr. Manafort and to defense counsel who was present the
22    inconsistency and -- with respect to the statement of offense
23    and guilty plea.  There then was a substantial period of time
24    where Mr. Manafort and defense counsel were alone, and then we
25    resumed.
```

1           So, one of the things I would -- so, one, I think

2      that is -- bears on -- it's a factor for the Court.

3           The other is that if you look at what the defendant

4      said, this is not the defendant saying -- you know, I have to

5      just intuit what is in his head, and, you know, he got it

6      wrong.  In one instance, he was, like:  Okay, yes.  And now I

7      remember, having gone through it with counsel, why it is that I

8      believed he knew.

9           That's not the way it was presented in either the

10     first or corrected version.

11          If you look at the 302 -- and I'd just like to quote

12     some of it to you, because some of it is factual about what the

13     facts were, not just intuiting what was in someone's head.

14          So, the part that would be what Mr. Kilimnik

15     believed -- and this, by the way, is Mr. Manafort having no

16     problem saying what it is that Mr. Kilimnik believed.  So, it's

17     not a situation where he is, like:  I can't really tell you

18     what was in his head because version one included what he

19     thought was in his head.

20          Mr. Kilimnik believed that the Hapsburg Group was a

21     European project.  Mr. Kilimnik did not work on the Hapsburg

22     group's project in the United States.

23          Now, let me go to the corrected version after the

24     substantial break.

25          Kilimnik knew that the Hapsburg Group performed work

1    in the United States.  So you have he didn't know, and he did

2    know.

3             Now, the actual facts are ones that the Court is

4    familiar with.  There, obviously, is an indictment, which -- of

5    Mr. Kilimnik, as well as Mr. Manafort, which the grand jury

6    found at least probable cause.  There are ample records of

7    Mr. Kilimnik being involved in setting up Hapsburg Group

8    events, and being on e-mails where the Hapsburg Group is

9    working in the United States.  So it's not a case where

10   Mr. Kilimnik and Mr. Manafort didn't both know and knew that

11   the others knew.

12            And then, finally, Mr. Manafort, in the second

13   version, says Mr. Kilimnik was aware of the facts and agreed to

14   violate the law.

15            So, to us, within 32 days, we have an instance of

16   Mr. Manafort completely changing his story.  And one of the

17   issues, I think, for the Court, as it was for us, is, what's

18   the motive?

19            THE COURT:  Well, that's what I was going to ask you.

20   What are you thinking that was?

21            MR. WEISSMANN:  Because we had the same question,

22   which is, why would somebody do this?  And to us, the issue is

23   that I think Mr. Manafort went out of his way in this instance,

24   and I think in the next one, to not want to provide any

25   evidence that could be used with respect to Mr. Kilimnik.

1           And I do think there is an aspect which is something

2      he did forget, which is, I think he clearly forgot that when he

3      pled guilty, it was a conspiracy where he was necessarily

4      conspiring with Mr. Kilimnik.  I mean, that's plain.  But that

5      does not in any way mean that he did not lie.

6           We have him saying that Mr. Kilimnik did not work on

7      the Hapsburg project in the United States, and we know that's

8      not true.  That he, in fact, knew that at the time, and he

9      admitted that just 32 days earlier; if he even needed to

10     remember it from that, as opposed to having lived the

11     experience with Mr. Kilimnik.

12               THE COURT:  Okay.  Mr. -- oh, my God -- Westling --

13               MR. WESTLING:  Westling, Your Honor.

14               THE COURT:  -- again, I think the characterization of

15     the issue in the reply is a little off.  In your initial

16     response you say:  Well, he didn't deny his involvement.  He

17     just wouldn't agree to his intent.  He couldn't speak to his

18     state of mind, of course.  But the 302, I don't need it to be

19     read to me right now to notice that he volunteers affirmative

20     statements about the nature of Mr. Kilimnik's state of mind.

21           And so I take it you would agree that certainly that

22     was not consistent with his plea and his obligations under the

23     plea agreement?

24               MR. WESTLING:  Well, I think that there's some

25     context, Your Honor, for what's happening here.  I mean, he

1    does indicate about Mr. Kilimnik's mind.  What's not clear,

2    from the way I sort of read all this, is when it's read with

3    the paragraph that follows, and even the one right before it,

4    where there's some reference to the communication he's had with

5    Mr. Kilimnik after the indictment.

6          And so, the -- for example, comments about this being

7    outrageous, I mean, I sort of view this, at least in part, as

8    what Kilimnik is saying or feeling about his role, not what

9    Mr. Manafort believed about it.

10          But, you know, it still sort of comes down to this

11    whole idea of, you know, what was in someone's mind.  I think

12    when reminded about the conspiracy to the point that the

13    Government made, where there was some lack of recognition of

14    perhaps what that meant in the moment, you know, Mr. Manafort

15    returned to what he had said before you, under oath, and has

16    consistently said since.

17          I mean, I think this was just a moment where there

18    was some, you know, lack of clarity in the questioning.  When

19    you look at the paragraph right before it, you know, it's sort

20    of talking about where Mr. Kilimnik is living at the time,

21    etcetera.  And sort of Kilimnik told Manafort that he was

22    afraid for his family after moving back to Moscow, and that he

23    did not believe he was suborning perjury.

24          To me, that seems to be -- it's suggesting what's

25    happened after the indictment and not in the moment.  And,

1     again, I'm not saying that's what it is; I'm just saying

2     there's confusion around that in the way this is written.  And

3     it's -- this paragraph is sandwiched between two that clearly

4     reference an after-indictment conversation with Mr. Kilimnik.

5              And so from the point of view of Mr. Manafort, you

6     know, clearly, he wasn't --

7              THE COURT:  Well, then, why would that have needed a

8     session and a review of notes and getting him to say something

9     different, if what he said at the beginning, there was nothing

10    wrong with it?

11             MR. WESTLING:  Because throughout these sessions,

12    there were moments where -- I mean, I don't need to tell the

13    Court.  I know you've been there.  But, you know, there's the

14    nature of defense lawyers sitting in any proffer session, any

15    cooperation session, that is all about what I've always

16    described as being the air traffic controller, making sure the

17    question that is coming is the one that's getting answered, and

18    that everybody stays on the same.

19             Clearly, things got awry here.  And when that

20    happened throughout, where there was a sense that either

21    Mr. Manafort was saying something the Government doesn't

22    understand or vice versa, defense counsel intervened

23    repeatedly.  I mean, this was not an unusual thing that

24    happened during the course of these many sessions.

25             And I think in this case, it was important to make

     1    clear.  Because the way the Government was:  You're backing

     2    away from your plea.  And that was not what Mr. Manafort

     3    intended.  And so we met with him and corrected the record.

     4              THE COURT:  I think Mr. Zehnle wants to say

     5    something.

     6              MR. ZEHNLE:  Good morning, Your Honor.

     7              I just wanted to clarify a little bit, based on this

     8    302, since I was counsel present at this time.

     9              And I think what Mr. Westling said is absolutely

    10    correct.  Because when I was looking at the 302 and remembering

    11    and looking at our notes of this meeting, the issue came up in

    12    terms of:  Did you discuss this with Mr. Kilimnik?

    13              And there was a series of questions following -- as

    14    you can see in the paragraph identified in the 302 that

    15    Mr. Weissmann went over -- where my understanding and my

    16    client's understanding, as he has stated, was that this is what

    17    Kilimnik was saying in terms of this.  But it all flowed.  And

    18    you can see it from the previous page, he's talking about

    19    Kilimnik told Manafort.

    20              So it's:  Well, okay.  After the indictment, did you

    21    guys talk?  What did you talk about?

    22              Okay.  Well, Kilimnik said, you know, I didn't

    23    believe I'm suborning perjury, or anything like that.

    24              And this discussion went on for, you know, a decent

    25    amount of time, as I believe Mr. Weissmann was the one asking

1    the questions at that point in time.  And Mr. Manafort was

2    answering based on the stated comments that, apparently, he had

3    with Mr. Kilimnik during this conversation.

4            When it seemed to start going awry -- and I do recall

5    this specifically.  It's not evidence, but I can tell the

6    Court, as an officer of this Court, there was an issue raised:

7    Well, do you understand the difference between an explicit

8    agreement and an implicit agreement?

9            And it was at that point that we took a break to --

10   and I'm not going to go over, obviously, attorney-client

11   privileged information, Your Honor, but that's what came up in

12   terms of what was explicitly being said versus what was

13   implicit.  And there was never any backing away from the fact

14   that Mr. Manafort said:  I've pled guilty to this crime and

15   this is what's happened.

16           So, the way this comes out, when I read --

17           THE COURT:  I don't think they're suggesting that he

18   ever tried to sugarcoat his involvement in the witness

19   tampering.  I think they're saying that he started trying to

20   cut Kilimnik out of it.  And the question is, was he simply

21   saying:  Kilimnik says X.  This is his version.  I'm just

22   telling you what he's thinking.

23           That's not the way the 302 read to me when I read it.

24   I understand you want me to look at the first paragraph.

25   But -- and this is the problem with not having grand jury

1    testimony, but having to look at a 302.

2              And I'm going to ask if the agent or anybody in the

3    Office of Special Counsel wants to weigh in on this issue.  But

4    I think it went on to be more of an affirmative statement of

5    not only what Kilimnik's position was, but what he did or

6    didn't think at the time.  And I may not be able to resolve it

7    on the face of the 302.  But I'm not -- I think that it's a

8    little bit of a strained reading that you're giving it,

9    although I will read it again.

10             Is there anything else you want to tell me about what

11   happened during it?

12             MR. DOWNING:  Just -- can I have a moment?

13             THE COURT:  Yes.

14             (Pause.)

15             MR. ZEHNLE:  Well, Your Honor, as I said to you a

16   moment ago, I mean, this was my recollection of what occurred

17   there --

18             THE COURT:  Okay.  No, I appreciate it.

19             MR. ZEHNLE:  -- as opposed to the 302.

20             THE COURT:  Okay.

21             MR. ZEHNLE:  And so the reason I raised the --

22             THE COURT:  I mean, I think it was -- I mean, I think

23   what they're saying is, you acted all responsibly at every

24   point.  It was troubling enough to you all to get it re -- back

25   on course; so, it had gotten off course somehow.  And I have to

1     try to figure out if it's because he was intentionally trying

2     to soften the blow for Kilimnik, or he was just saying:  You

3     want to know what he thinks?  I'll tell you what he thinks.

4              And so I appreciate your gloss on it and your

5     recollection.  And I don't doubt that you're telling me that in

6     good faith, but I want to hear what their recollection is, too.

7              MR. ZEHNLE:  Okay.

8              THE COURT:  Do you have anything you want to add,

9     understanding that that's where the rub seems to be right now?

10             MR. WEISSMANN:  I think I have a couple things.

11             One is, I think that it's important to have a clear

12    factual record and -- so that we have no objection to the

13    defense submitting additional evidence, but the evidence in the

14    record does not support that.  And it also would not support --

15    I was just checking with Mr. Andres -- that there was a

16    discussion of implicit and explicit agreements.  That wasn't

17    the context that we recall, and it -- that's not in the record.

18             And, again, that's -- I'm just -- I guess I'm being a

19    lawyer, which is, there's evidence that's been submitted to

20    you.  We're not against the record being amplified, but we

21    don't think that the record supports that.

22             Again, I think if you look at the text of the 302,

23    and what it is that Agent Weiland put into the record, it does

24    not support the view.  And we would not be here if this was

25    simply a miscommunication.  We have a -- I think, a good

1    professional working relationship with defense counsel, and in

2    instances where there was -- people were just not on the same

3    page, we worked through that issue.

4           This was not that.  This was one where a significant

5    issue came up because 30 days after pleading guilty, we had a

6    defendant before us saying, in fact, he is not guilty of the

7    conspiracy.  Again, the Court has it completely correct.  We

8    are not in any way saying that Mr. Manafort was saying that he,

9    himself, did not engage in what I think would be one of the

10   counts that was charged, but he was saying it was not a

11   conspiracy.  He was not doing it with Mr. Kilimnik.  And that

12   is clear from the factual statements that diverge in the 302.

13          And I think the final piece is that Mr. Manafort,

14   afterwards, basically told us when -- after this long break and

15   he came back and said the exact opposite of what he had just

16   said, Mr. Kilimnik knew that the Hapsburg Group performed work

17   in the United States, something that he had previously said he

18   did not say.  He said:  You just didn't understand what I had

19   said.

20          And we all knew, and the record reflects that, in

21   fact, is another false statement.  That is not what happened.

22   And the only evidence in the record is that that statement is

23   not true.  And that has to be intentional, in our view.  We

24   were all present for the prior version.

25          THE COURT:  So, this is an example where you're

1    saying he didn't just correct or revise the information, but he

2    denied having said the thing earlier?

3                MR. WEISSMANN:  Yes.

4                THE COURT:  Okay.

5                MR. WEISSMANN:  And that is on Paragraph 17 of

6    Agent Weiland's declaration.  It's in the very end of the

7    Paragraph 17.

8                THE COURT:  But it would be reflected in the 302,

9    also?

10               MR. WEISSMANN:  I don't think it is.  I think it's

11   only in the declaration.

12               THE COURT:  Okay.  All right.  Is there anything more

13   that we need to discuss about that one?

14               MR. ZEHNLE:  Your Honor, I mean, just to the extent

15   that we're talking about the factual record, which is really

16   the 302 that the agent prepared which, as the Court recognized

17   at the beginning of the hearing, is simply a summary of what

18   happened.  It's not a question and answer, and it's certainly

19   not grand jury.

20               I mean, Mr. Weissmann's made some comments, and I

21   think -- you know, obviously, I'm not suggesting anything in

22   bad faith, but I don't view this as some kind of substantial

23   break.  There's nothing in here that talks about some kind of

24   substantial break in time.  It says:  During a break, he spoke

25   to his attorney.

1          THE COURT:  I'm not putting any emphasis, one way or

2     the other, on how long it took to confer with counsel.

3          MR. ZEHNLE:  Thank you, Your Honor.

4          In terms of any of the other things, I don't believe

5     that these are necessarily inconsistent when you look at what

6     the 302 itself actually says, which is, Mr. Manafort reporting

7     after -- you know, based on his conversation, that is the

8     stated views of Mr. Kilimnik, that he believed the Hapsburg

9     Group was a European project, and that Europe was the fulcrum

10    of the project.

11         Your Honor, that position hasn't changed from the

12    defense at any time.  Europe was the fulcrum of that project.

13    It was the focus.  There was a component where outreach was

14    made to the U.S., and Mr. Manafort has accepted responsibility

15    for that.  He's pled guilty to that before this very Court.

16         But, to sit there and say:  Oh, well, saying that he

17    believed it was a European project and Europe was the fulcrum

18    is not necessarily a lie.  I mean, you could sit there and

19    argue and take it in the most nefarious context and say:  Oh,

20    see, that is a lie, because then he comes back and says he was

21    aware that there was work performed in the U.S., which is the

22    paragraph that follows immediately after the break.

23         I'm just saying that -- when you're sitting there and

24    you're allowing, in a cooperation or a debriefing, government

25    counsel to ask the questions that they want to ask of your

1    client, without interrupting every two minutes, and then you

2    see something going astray because it seems like they're

3    viewing it one way and he's viewing it another way, it's

4    perfectly understandable, and it happens all the time that

5    counsel take breaks.

6           And then, when you look back, he comes back -- you

7    can read the paragraph for yourself, Your Honor.  I don't need

8    to read it again.

9           But my view is that this is not in any way a false

10   statement by Mr. Manafort.  I was sitting there.  I saw what

11   was happening.  And at the end, he came back.  He makes the

12   statement after we talk about -- and by the way, I do stand by

13   my earlier point of there's no evidence -- record about the

14   implicit versus explicit issue, because that question came up.

15          You understand that because you and I know, and

16   everyone else here pretty much knows, in terms of the

17   conspiracy law, there can be implicit agreements or explicit

18   agreements.  And when the whole discussion is based on:  Well,

19   what did you guys talk about?  And he's, like:  Well, based on

20   what he's talking about, here's what he said.  You know, and

21   here's what I believed him to mean, based on what he was

22   saying.

23          But, then you come back and say:  Well, at the end of

24   the day, he did understand that there was U.S. outreach in this

25   program, and that he stood by it.

1          And by the way, you can see immediately -- this moves

2    on to another topic.

3          THE COURT:  All right.  Well, I don't think I need

4    any more of your telling me what it says because I'm going to

5    read it again.  So let's go on to III, the interactions with

6    Kilimnik, which I think I'm going to break up a little bit into

7    the Ukraine stuff and the sharing U.S. election polling data

8    stuff.

9          With respect to the first, sort of, subtopic here,

10   the discussions concerning the peace plan for the Ukraine, we

11   were talking about a proposal that was being floated by the

12   ███████████████████████████████████████████████████████████

13   ███████████████████████████, that would involve ███████████to

14   control what would be an autonomous region of the eastern

15   Ukraine; plainly, something favorable to the Russians.

16         The Office of Special Counsel contends that

17   Mr. Manafort lied about the number of times they discussed it,

18   that he and Mr. Kilimnik had not just discussed it once on

19   August 2nd, 2016, but also in December of 2016; in January

20   2017, in person, in Washington, D.C., when Kilimnik was here

21   for the inauguration; in February of 2017, including in person

22   on February 26th; and even in the winter of 2018.

23         In the declaration, paragraph 29, and the 302, which

24   is Exhibit 101 from 9-21-18, the defendant was pretty

25   definitive that he did not continue to discuss it with Kilimnik

1   after the initial August discussion.  But, there is evidence of

2   meetings and conversations later, and he ultimately did confirm

3   them in later sessions, and in the grand jury.

4         As part of this issue, there's also testimony

5   concerning the February 2017 meeting with Mr. Kilimnik in

6   Madrid.  On September 11 of 2018 Mr. Manafort said:  I traveled

7   to Madrid for other business.  Didn't meet with Kilimnik.

8         September 12th, he's told:  Well, Kilimnik was there.

9   And he says:  Well, I don't recall meeting with him.  But, if

10  he was there, he would have been there to meet with me.

11        And then, either on the 13th or 14th, he did say that

12  that meeting touched on a number of issues involving the

13  Ukraine, and that Kilimnik would have raised the peace plan.

14        And then in the grand jury, he testified that he told

15  ████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████.

17        And this issue about Kilimnik and Ukrainian politics

18  also involves Manafort's own work in 2017, as a consultant for

19  a potential candidate in the Ukraine.  And in particular, polls

20  he arranged for there related to what the Ukrainians thought

21  about the peace plan.

22        So I want to put aside U.S. presidential campaign

23  polling data for a minute so when we talk about polls, we all

24  know what polls we're talking about.  And I want to talk about

25  whether his testimony about those efforts, including whether

1   Kilimnik knew about those efforts, was accurate.

2           So, again, starting with you, Mr. Weissmann, I want

3   to know what the particular intentional falsehoods are that you

4   want me to focus on here and why.  And in particular, whether

5   there were any before the grand jury, in your view.  And then

6   we'll talk about the larger question, about whether even if he

7   kept it under wraps initially, if he began to respond to it

8   truthfully later, what significance I should draw from all of

9   that.

10          But, let's start with the -- the ones in particular

11  that you want me to focus on as lies of consequence.

12          MR. WEISSMANN:  So I do think that the Court outlined

13  the principal ones.  There is the -- the statement from

14  Mr. Manafort that this was a topic that was raised by

15  Mr. Kilimnik on August 2nd, 2016, in person, in New York, and

16  that the topic ended.

17          There's -- there's also the substance of

18  Mr. Manafort's reaction that we would like the Court to focus

19  on, because Mr. Manafort gives an explanation for why it is

20  that it ended.  Which is that, to use his phrase, it was a

21  backdoor ███████████████████████████████████████████

22  █████████████████████████████████████.  And because of

23  that, he was not going to countenance it.

24          Of note for us was that has nothing to do with

25  whether Mr. ██████████ would lead the plan or whether someone

1    else would.  The idea was that the plan itself, which was a

2    backdoor ██████████████████████████████████████████████

3    ████████, was a nonstarter for Mr. Manafort, according to him.

4           Those came up in his view of that came up in

5    sessions, interview sessions, but it also came up in the grand

6    jury, where he gave that view inconsistently.  But, there were

7    times when he talked about he was against ██████████ because it

8    was a ████████████████████████████████████████

9           The issue of the timing, the denial of it coming up

10   after August 2nd did not come up in the grand jury.  Because by

11   that point we had been through the evidence with Mr. Manafort

12   to explain how it had come up in the past, with one exception.

13   We had not discussed with Mr. Manafort the evidence regarding

14   the 2018 work that he did with respect to polling in Ukraine.

15   That is information that we had and obtained, I think, after

16   the Eastern District of Virginia trial, that was not shared

17   with Mr. Manafort.  Of course, it's something, as I noted at

18   the outside, that Mr. Manafort was aware of; he just didn't

19   know that we knew that information.

20          Second, we would like the Court to focus on the

21   Madrid meeting, and the denial of Mr. Kilimnik having met with

22   Mr. Kilimnik [sic].  This is a good example:  If that was the

23   only instance where if this wasn't in the context of denying

24   the -- a series of things about the peace plan, and it was just

25   having forgotten about one meeting, that we could have taken a

 1     very different view.

 2              It's hard to sort of put yourself into what you would

 3     have done.  But this, to us, took on extra weight because of

 4     the context in which it was in, and the importance of what was

 5     being discussed.  And even after Mr. Manafort had to concede

 6     that there was this meeting, if you note what he says happened,

 7     Mr. Manafort says:  Well, I had things to discuss, but

 8     Mr. Kilimnik was the one who wanted to discuss the peace plan;

 9     I didn't.

10              So, again, diminishing, sort of, his interest in

11     this, even though he is the one you see a year later who is

12     very much focused on the peace plan.

13              The polling questions.  There are a series of lies

14     about the polling questions.  I think --

15              THE COURT:  Can you tell me why that was -- I guess

16     where I got the most confused, what the importance is of any

17     dissembling about whether Kilimnik knew who he was working for

18     or not, and what his role was in creating the polling

19     questions, or advancing them?  Why is that important?

20              MR. WEISSMANN:  Okay.  So, I mean, this goes to the

21     larger view of what we think is going on, and what we think the

22     motive here is.

23              This goes, I think, very much to the heart of what

24     the Special Counsel's Office is investigating.  And in 2016

25     there is an in-person meeting with someone who the Government

1    has certainly proffered to this Court in the past, is

2    understood by the FBI, assessed to be -- have a relationship

3    with Russian intelligence, that there is American polling data

4    being shared.  And there is an in-person meeting at an unusual

5    time for somebody who is the campaign chairman to be spending

6    time, and to be doing it in person.

7              That meeting and what happened at that meeting is of

8    significance to the special counsel.  The -- in looking at the

9    issue of what Russia could be -- what interests it would have,

10   and what it could be viewing as a beneficial interest to that

11   country of having a certain candidate win, and whether there

12   was knowing or unknowing coordination by the then Trump

13   campaign manager, all are the focus of -- and are raised by the

14   issue of the August 2nd meeting.

15             THE COURT:  Well, I understand the August 2nd meeting

16   and the Madrid meeting -- well, not so much the Madrid.  My

17   question is more the peace plan polling effort was in 2018; is

18   that correct?

19             MR. WEISSMANN:  That's correct.

20             THE COURT:  So, now we're talking about -- he's not

21   in the campaign anymore, but this case is pending.  And so I'm

22   trying to figure out what the importance is of his ongoing work

23   for a potential candidate in the Ukraine at that time is, and

24   the importance of any lies about that, or lies about Kilimnik's

25   knowledge about that.

1          MR. WEISSMANN:  So the work for Mr. ██████ itself

2     is not of importance.  And if the poll had, in fact, been

3     limited to Mr. ████████, it may be interesting, if they have

4     other aspects, but that is not the focus.

5          What is of interest to us is that the questions in

6     the poll are completely consistent with the ongoing effort, at

7     the very least by Mr. Kilimnik, to promote a ████████████████

8     ███████████████████████████████████████████████.

9     Mr. Kilimnik submits a three-page written document in

10    connection with that polling to Mr. Manafort and others to help

11    frame those questions.

12         It is not true, as Mr. Manafort said in the grand

13    jury, that the poll -- draft poll tests ██████████████████

14    ████████████, which he repeatedly says in the grand jury to help

15    explain away this.  It doesn't do that.  It tests one.  It does

16    test other people who might be able to ███████████, but it

17    doesn't test a whole ████████████████.

18         So, the continuity of Mr. Kilimnik's interest -- and

19    by the way, Mr. Kilimnik points out in that documentation that

20    ██████████████ would be able to facilitate Mr. Manafort being

21    the -- that if he were the spokesperson, and denominated as

22    such within the United States, that he would also have access

23    to senior people in Russia to help promote this -- that's as

24    far as I can go on this record.

25         THE COURT:  Okay.  All right.  That's helpful.

1          MR. WEISSMANN:  I think in the past Your Honor has

2     made reference to potentially, there might be information that

3     would -- could be presented ex parte.  We're trying to avoid

4     that.

5          THE COURT:  I appreciate that.  And I don't know that

6     I need it for this.  I mean, if you think we do at the end of

7     the hearing, then you can consider whether you want to submit

8     it when Mr. Westling gets me his metadata.

9          MR. WEISSMANN:  Okay.

10          THE COURT:  I guess one question I have, certainly

11     did seem to want to keep it under wraps initially.  But, when

12     you provided him with the December 16th email, he does seem to

13     agree that Kilimnik discussed it with him then.  And he seemed

14     to agree pretty readily that if Mr. Kilimnik was in Madrid,

15     well, yeah, then he met with me there.

16          That's in Exhibit 206, I guess the 302 from

17     September 12th.  And he seems to concede:  Well, if I talked to

18     him, then we talked about the plan.

19          So, again, I want to know if we're really talking

20     about a 1001 kind of lie here or something that he corrected as

21     would be reasonable in a proffer situation.

22          MR. WEISSMANN:  So, we went through the same

23     analysis.  And as I mentioned, just to start with the Madrid

24     meeting, if that happened in isolation, you can imagine, even

25     though certainly, to us, there aren't that many in-person

1    meetings with Mr. Kilimnik and they're happening right after

2    the inauguration and they're on something that is of

3    substantial interest to -- well, let me just say, at the time

4    there was an enormous amount of attention to Russian contacts

5    in the United States.

6         And so the idea that this wouldn't be on your mind,

7    especially since we know Mr. Manafort took the precaution in

8    August of 2016 of leaving separately -- Mr. Gates and

9    Mr. Manafort leaving separately from Mr. Kilimnik, by

10   February of 2017 there had been substantial focus on General

11   Flynn and others in terms of their contact.  So this is

12   something that one would imagine that you would remember.

13        But, again, even leaving that aside, to me, it's the

14   fact that it's coming up in a context where not knowing and

15   anticipating what our evidence was, the first time this came

16   up, Mr. Manafort's plan was to say:  He raised it, never came

17   up again, and I was dead set against it.  So it's in that

18   context where it keeps oncoming up.

19        I think that the -- turning to the December email

20   from Mr. Kilimnik, it is true that he then conceded it, but I

21   think he had to.  That email didn't in any way say:  I would

22   like you to revisit this.  I know we ended where you weren't

23   interested.

24        And there's a reason it read that way, which was that

25   there's not a single piece of evidence in this record to

1    support the idea that Mr. Manafort was against this plan.

2    Every single piece of evidence in the record is that he was in

3    favor of it.

4              THE COURT:  All right.  Let me -- before I ask you

5    questions on the defense side of the room, we got a later start

6    than we anticipated.  It's 12:30.  I had originally hoped to

7    just go through this -- all the questions before we broke.

8    But, I'm not sure what the court reporter's point of view is

9    about that.

10             You're fine?  Okay.

11             Why don't we -- if we're still not done by about

12   1:00, maybe we'll break.  But would anybody starve to death if

13   we keep going for another 30 minutes or so?

14             All right.  Then let's try to keep going.  I can tell

15   you now that my initial goal -- which was to take a break, and

16   then come back and make my findings -- is not going to happen.

17   I want to review things more closely.  There may be additional

18   things people give me.

19             And so I think what we will do after this is the --

20   while I'm working on my findings, is the exercise of the review

21   of the transcript, and the determination what can be released

22   or not.  And then we'll probably handle the findings in the

23   same way, a sealed recitation within a public minute order, and

24   ultimately, a public revelation not long after this.

25             I had really wanted to do it all today.  My schedule

1    for the rest of the week is a mess.  But we'll figure out an

2    opportunity when I think how long it's going to take me to be

3    done.  So let's just keep going for now.

4          So, Mr. Westling, or whoever is going to handle this

5    one, is there, you know, a pattern here of minimizing and

6    understatement and belated acknowledgment after he finds out

7    the government already has the proof when Kilimnik and Ukraine

8    are concerned?

9          MR. WESTLING:  Well, Your Honor, I think that the

10   Havana Club meeting is one where the Government raises it.

11   Mr. Manafort, in our view, is forthcoming, provides the

12   information on what happened there.  And then there is the

13   question about:  Well, did you then talk about the peace plan

14   in the future?

15         And, you know, all indications were when the email

16   was provided, there was not a lot of resistance.  It was a

17   sense of:  Oh, this reminds me, rather than:  Oh, I've been

18   caught.  I think the reality here is that there were -- these

19   events are happening --

20         THE COURT:  Well, I don't think they're saying he

21   wasn't honest when he said:  Oh, yes.  I met with him on

22   August 2nd.

23         MR. WESTLING:  Right.

24         THE COURT:  They're saying he wasn't honest when he

25   said:  And that was the end of it.

1           MR. WESTLING:  Well, and I think our, sort of, view

2     of what happened was there that he said he was not willing to

3     work on the plan, but that that was not the end of his

4     communication with Kilimnik or anyone else forever.  And

5     clearly, there is an effort to revisit that in December, which

6     by then, I guess, is after the election and Mr. Manafort is no

7     longer with the campaign at that point.  And there's an email,

8     which is again being floated.

9           But, I think Mr. Manafort was candid all along that

10    his desire to work with ███████████ at that point was

11    minimal, given a lot of bad feelings regarding the way that

12    things had gone in the Ukraine before.  He continued to have a

13    relation with Mr. Kilimnik.  He told the Government all along

14    he remained open to opportunities over there.

15          But, I don't think there was anything inconsistent

16    about what he said in saying:  I told them I wasn't interested,

17    compared to that the timing was wrong.  Because there was --

18    and we pointed this out in our pleading, there was a

19    significant amount of his resistance that related to the role

20    ███████████ would play in that plan.

21          And so it's presented in August as a ███████████

22    production -- my words -- and it sort of resurfaces that way

23    again in December, and there is no real followthrough.  But,

24    clearly, that was not the only possible plan, and it's not the

25    only one that Mr. Kilimnik was involved in.

1          I think that, you know, there continued to be

2     discussions.  But, all indications, for example, when you talk

3     about remembering the Madrid meeting, I mean, he is -- I mean,

4     I can still see Paul sitting there trying to remember what

5     happened.  He remembers being in Madrid.  He remembers he was

6     there on other business.  He remembers that at the first part

7     of the meeting, ███████ was with him, but he does not have a

8     present recollection at that point in the debriefing of

9     Kilimnik.

10         They show him the proof that Kilimnik traveled there,

11    and he doesn't resist.  I mean, he sort of says:  Well, that

12    would makes sense, if that's why we were there, but I don't

13    remember.

14         And it's only after he has time to think about it in

15    that context that he then is able to come back and provide the

16    details of what they talked about.  And so I think all along

17    this was an effort to try to, you know, do his best to recall.

18    And obviously, you know, the Government suggests that there is,

19    perhaps, some way of looking at it that way, but for all this

20    other stuff.

21         You know, from our perspective, it is exactly what it

22    appears to be, which is an effort to try to recall, and to be

23    helpful on topics that simply were not, you know, as a

24    practical matter, the focus of what questions were necessarily

25    anticipated to go to at any given time.  We spent a lot of time

```
 1    talking about a lot of other things, and then this would pop
 2    back up.
 3              So I don't know how helpful that is.  But I think for
 4    those of us who lived through it, it really did look like
 5    someone who was endeavoring to remember.
 6              THE COURT:  All right.
 7              MR. DOWNING:  Your Honor, one other issue.  We pass
 8    the mic.
 9              Just some of the reference about Kilimnik that's come
10    up by Mr. Weissmann more than once in these proceedings, it
11    should be noted that the Office of Special Counsel had produced
12    interview 302 for an interview of Mr. Kilimnik -- about
13    Mr. Kilimnik from ████████████████████████████████████████
14    ██████████████████████████████████████████████████████████
15    ████████████████████████████████████████████████████
16    ███████████████████████████████████████████.
17              There are documents that you were given regarding
18    Mr. Kilimnik's communications with former ███████████████████
19    ███████████████████████████████████ -- about this
20    narrative of a █████████████████████ is nonsense because no
21    matter who gets elected, that the sanctions were going to
22    continue against Russia.
23              So I'd just like -- I think you need to consider this
24    rank speculation --
25              THE COURT:  Wait.  When you say I've been given
```

```
1     these, when have I been --

2               MR. DOWNING:  They're in the exhibits.  I can point

3     out --

4               THE COURT:  In these exhibits?

5               MR. DOWNING:  Yes, they are.  They go to Mr. Kilimnik

6     making comments about the polling data.

7               THE COURT:  All right.

8               MR. DOWNING:  So they're in there.  But I just

9     wanted -- and also, we can produce, it was part of the

10    information provided to us by the Office of Special Counsel,

11    the interview that shows this guy is ██████████████████████

12    ████████████████████████████████.  It was produced as Brady

13    material, I believe.

14              THE COURT:  All right.

15              MR. WESTLING:  I didn't know if you wanted to touch

16    on the poll part of this issue before --

17              THE COURT:  The U.S. polling data?

18              MR. WESTLING:  No.  The polling data related to ████

19              THE COURT:  Yes.

20              MR. WESTLING:  So, I think the one thing that we

21    would point out, Your Honor, about the poll itself, is that

22    while Mr. Weissmann suggests this was all about the peace plan,

23    the reality is there are two questions that -- 72 and 72A,

24    which really deal with it.  And they seem to deal with

25    alternatives about what a member of the Ukrainian populous
```

1    would find acceptable in terms of what price may have to be

2    paid for peace.  So, I don't think it's fair to characterize

3    this as being about the peace plan.

4          I think the other thing that's important is this was

5    basically a benchmark survey being done for a possible

6    candidate.  And so it was surveying a variety of issues to try

7    to better understand both that candidate's viability, but also

8    the issues that the electorate would care about so that

9    Mr. Manafort could make a decision about whether to take on

10   ██████████████  as a client.

11          THE COURT:  Okay.  Anything else you want to say

12   before I ask Mr. Weissmann if there's anything he wants to say

13   in response to the *Brady* information?

14          MR. WESTLING:  I don't think so right now, Your

15   Honor.

16          THE COURT:  All right.  Is there anything else I need

17   to know?  I mean, I understand that there's -- I don't think I

18   have to make a factual finding about Mr. Kilimnik right now.  I

19   don't begin to have the full range of information to do it.

20   But, I think your having made the statement about his alleged

21   connection to Russia's intelligence, they've put in the record

22   his connections to the U.S.

23          And so is there anything else you want to tell me in

24   response to what they've pointed to in this record?

25          MR. WEISSMANN:  Yes.  Two points.  One is to answer a

1    question that you had asked previously, and I don't think I

2    really responded to.  And the other is to address this issue

3    with respect to Mr. Kilimnik.

4          I do think you do have in the record what is

5    sufficient in terms of Mr. Kilimnik's December email, and his

6    own recitation, again, in 2018, of the peace plan, where he

7    lays out, again, what it is that would be needed from America

8    and Russia and his role.

9          I do think that ██████████ is a red herring because

10   the issue is Mr. Manafort had said he was against the plan,

11   whoever was leading it.  That is inconsistent with the other

12   evidence that we have and is before you.

13         With respect to the Brady information, the defense,

14   as is their right, asked us early on in the case to produce any

15   and all communications with the American embassy in Ukraine.

16   And so we then went to the State Department to get

17   communications that were either direct or indirect by

18   Mr. Manafort with the State Department.  So Mr. Kilimnik was

19   encompassed in that search.

20         There is no question that Mr. Manafort had

21   communications with people at the State Department.  There's no

22   question that Mr. Kilimnik did.

23   ███████████████████████████████████████████████

24   ██████████████████████████████████████████

25   █████████████████████████████████████████████████

1    ████████████████████████████████████████████████████████

2    █████████████████████████████████████████████  But, there

3    are definitely communications that Mr. Kilimnik has with people

4    in the State Department.  I don't see how that is in any way

5    relevant to this issue before the Court.

6              But the only reason it was produced is because

7    defense said they were going to make some argument based on it.

8    So we produced it.  We didn't see how it was going to be

9    relevant, but that was not -- relevance has a very minimal

10   standard, at least for the Government, in terms of producing

11   discovery.  We'd rather just produce it and litigate the issue

12   whether it should come in at trial, or not, later.

13             And then the Court had asked a question about

14   Mr. Kilimnik and the 2018 polling and whether he understood who

15   the client was.  And I wanted to just stress for the Court, the

16   reason that's relevant to the Government is, from our

17   perspective, the defendant was trying to minimize his

18   connection to the peace plan and his view of the peace plan.

19   And he was conveying to the grand jury that this was a Klymenko

20   poll, plain and simple.

21             And to the extent that they were asking questions

22   about the so-called ██████████ peace plan, that was just one of

23   many peace plans that was being asked about.  And the problem

24   with that is, one, it's -- as I mentioned, it's not true that

25   there are many peace plans.

1          But, also, when we said:  Well, if that's the case,

2     that this was really just a poll for ███████████ and it didn't

3     serve this other purpose, how is it that Mr. Kilimnik didn't

4     know that?  This was -- why is he saying that Mr. █████████

5     name should be taken out of the poll for the person who is the

6     client?

7          And Mr. Manafort, again, now that he's sort of down

8     that road of saying this was just a ██████ poll, he has to

9     now explain away how it is that the person on the ground in the

10    Ukraine doesn't know that.  And he says:  Well, I didn't tell

11    them.

12         And then you have an email -- I mean, it just got

13    worse and worse, where Mr. Kilimnik is saying:  I just spoke to

14    ████, and I'm doing X, Y, and Z with him.

15         And Mr. Manafort then comes back and volunteers,

16    right after lunch:  It must be a different name that he's

17    talking about.  And the initials don't even work.  I mean, to

18    me, he was caught, and his lies got worse and worse.

19         And the relevance is that it was all part of this

20    effort to make this be a sort of sanitized poll just for

21    ██████████, with no other purpose in terms of trying to get

22    data that would help support the idea of the Russian plan to

23    take over the eastern part of Ukraine.

24         THE COURT:  All right.

25         MR. WESTLING:  Briefly.

1          Your Honor, I think that the first thing is that I

2    understand where Mr. Weissmann is coming from.  I just don't

3    hear any proof behind all of the theorizing about why it was

4    happening the way it was happening.  You know, this is clearly

5    an indication where a poll is being conducted for another

6    candidate.  The Government has theories about what it may have

7    meant or what it might have been, but there's no evidence of

8    any of that.  I mean, that is purely conjecture.

9          THE COURT:  Right.  But, I think what gives them

10   cause to be theorizing is the fact that it's described

11   differently on different occasions, and described

12   inconsistently with the communications between Mr. Kilimnik and

13   Mr. Manafort, and that leads them to wonder.

14         But, I think we can go on to the question of the

15   sharing the U.S. polling data.  And I don't have that many

16   questions, mainly because I think it's pretty straightforward

17   what you're saying.

18         So, I would want to ask you whether it's part of your

19   contention that he lied about the reason the data was shared.

20   I know initially he didn't even agree that that internal

21   polling data was shared, and he didn't even really agree in the

22   grand jury.  He said it just was public information.  But, I

23   think there's some suggestion, at least in the 302, as to what

24   the point was of telling Kilimnik how the candidate was doing

25   and where that information was supposed to go.

1          And so, I'm asking you whether that's part of this,

2     if he was lying about that?

3          MR. WEISSMANN:  So, I don't think the Court needs to

4     reach that issue, and I don't know that we've presented

5     evidence on the -- that issue.

6          THE COURT:  You didn't.  So you just don't want me to

7     think about it, that's okay.

8          MR. WEISSMANN:  No.  No.  No.  I'm going to answer

9     your question.

10          THE COURT:  All right.

11          MR. WEISSMANN*:  I'm just trying to, first, deal with

12     what's in the record.

13          And I think that in the grand jury, Mr. Manafort said

14     that from his perspective, ████████████████████, which he

15     admitted at that point was with -- he understood that it was

16     going to be given by Mr. Kilimnik to the ████████████ and

17     to Mr. ████████, both.  That from his perspective, it was --

18     there was no downside -- I'm paraphrasing -- it was sort of a

19     win-win.  That there was nothing -- there was no negatives.

20          And I think the Government agrees with that, that

21     that was -- and, again, you're just asking for our -- if we are

22     theorizing, based on what we presented to you, that we agree

23     that that was a correct assessment.

24          But, again, for purposes of what's before you on this

25     issue, what his ultimate motive was on what he thought was

1    going to be done with the data at the time that he was

2    instructing it to be shared I don't think is before you as one

3    of the lies that we're saying that he told.

4            It's more that what he specifically said was, he

5    denied that he had told Mr. Gates to share the internal Trump

6    campaign polling data.  That he would not, in fact, have shared

7    anything that was so internal.  That this was all about giving

8    sort of external briefings that he would give on television

9    shows and that he left it to Mr. Gates to just update

10   Mr. Kilimnik.

11           And our view is, that is a lie.  That that is really

12   under -- he knew what the Gates 302s were.  It's obviously an

13   extremely sensitive issue.  And the motive, I think, is plain

14   from the redaction malfunction, is we can see -- we actually

15   have -- we can see what it is that he would be worried about,

16   which is that the reaction to the idea that the campaign

17   chairman of a major campaign was authorizing -- not -- with no

18   plausible deniability, it's like why didn't they keep them

19   updated on public things?  It's very, very different than send

20   them internal, sensitive polling data to a foreign country, let

21   alone a foreign country that is very much in the news, would

22   have, I think, negative consequences in terms of the other

23   motive that Mr. Manafort could have, which is to at least

24   augment his chances for a pardon.

25           And the proof with respect to that is not just

1    Mr. Gates.  So that I will say there's no contrary evidence to

2    Mr. Gates, but you don't have just Mr. Gates's information.

3    You have a series of emails where we know that Mr. Kilimnik, in

4    fact, is reporting that he got information.

5            And probably the best piece of evidence is you have

6    Mr. Manafort asking Mr. Gates to print out polling data that

7    is -- it's interesting, because it's polling data from

8    mid-July.  So, it's -- there's -- from three weeks ago, saying:

9    Print that out and bring it to our scheduled meeting.  And it's

10   ███████ data.  It's not, you know, Gallup poll information.

11           THE COURT:  I understand why it's false.  And I'm not

12   sure I understand what you said at the beginning, that you --

13   and I understand why you've posited that he might not want to

14   be open about this, given the public scrutiny that foreign

15   contacts were under at the time.  But, I'm not sure I

16   understand what you're saying where you say you agree with him

17   when he said it had no downside.

18           So, this is an important falsehood because it was

19   false?  Or is there some larger reason why this is important?

20           MR. WEISSMANN:  So -- so, first, in terms of the what

21   it is that the special counsel is tasked with doing, as the

22   Court knows from having that case litigated before you, is that

23   there are different aspects to what we have to look at, and one

24   is Russian efforts to interfere with the election, and the

25   other is contacts, witting or unwitting, by Americans with

1    Russia, and then whether there was -- those contacts were more

2    intentional or not.  And for us, the issue of internal campaign

3    polling data being sent to ███████████, who the defendant

4    conceded is extremely close to the senior leader in Russia, is

5    in the core of what it is that the special counsel is supposed

6    to be investigating.

7         My answer, with respect to the Court's question about

8    what it is -- what the defendant's intent was in terms of what

9    he thought was going to be done with the data, I was just

10   trying to answer that question, even though that's not one of

11   the bases for saying there was a lie here.  And so I was just

12   trying to answer that question.

13        And what I meant by his statement that there's no

14   downside, is that can you imagine multiple reasons for data

15   being sent, that included business reasons, that included

16   political reasons, and included both of those together as

17   benefits that could come.  And I think the only downside --

18        THE COURT:  You meant no downside to him?

19        MR. WEISSMANN:  Yes.

20        THE COURT:  You weren't suggesting that there was

21   nothing -- there's no scenario under which this could be a bad

22   thing?

23        MR. WEISSMANN:  Oh, sorry.  Yes.  I meant there was

24   no downside -- Mr. Manafort had said there was no downside to

25   Mr. Manafort doing it.

1          THE COURT:  That was where I got confused.

2          MR. WEISSMANN:  Sorry.

3          THE COURT:  All right.

4          MR. WEISSMANN:  And meaning all of this is a benefit.

5     The negative, as I said, was it coming out that he did this.

6          THE COURT:  Right.  Okay.  All right.

7          Mr. Westling, why would this not fall within the

8     category of an intentional false statement?

9          MR. WESTLING:  I think the first issue, Your Honor,

10    is what actually happened.  Special counsel says they believe

11    internal polling data was shared because Mr. Gates says so and

12    because it's referred to in Mr. Kilimnik's various emails.

13         THE COURT:  And because Mr. Manafort told Mr. Gates

14    to do it?

15         MR. WESTLING:  That's what Mr. Gates says, yes.

16         THE COURT:  In an e-mail.

17         MR. WESTLING:  But I think that the e-mail says,

18    Please print this.  That's all it says.

19         THE COURT:  Doesn't it say bring it to the meeting?

20         MR. WESTLING:  I'm sorry?

21         THE COURT:  Doesn't it say bring it to the meeting?

22         MR. WESTLING:  It says related to a scheduling

23    meeting.  Doesn't say anything about a meeting with

24    Mr. Kilimnik, it doesn't say anything about -- just on the same

25    date.

1          THE COURT:  All right.

2          MR. WESTLING:  And importantly, the statements that

3     we're aware of now that Mr. Gates makes that suggest that there

4     was sharing of internal information -- again, there's a lot of

5     material here, so I may be wrong about this, but we have a

6     note -- a September 27th, 2018 interview which we did not see

7     until this submission was made, where Mr. Gates makes that

8     statement.

9          Mr. Weissmann has suggested we had all of Mr. Gates's

10    302s where he said this previously.  I don't think he said it

11    before that interview.  And so as far as we know, that's new

12    testimony from Mr. Gates compared to what he said in prior

13    proffer sessions, where I think he said something more like it

14    was more what was publicly available.

15         So there seems, to me, to be at least a meaningful

16    factual question about what actually happened.  And, you know,

17    we're struck by the fact that there's no evidence here of the

18    emails or anything else that would have sent this information

19    to Mr. Kilimnik.  If it in fact happened.  And so, again,

20    special counsel may have that, we just don't have it.

21         THE COURT:  One of the things you seem to suggest is

22    that, really, the internal polling data wasn't particularly

23    significant anyway.  And if that's true, then why was ████████

24    being paid so much to produce it and why is it covered by a

25    NDA?  I don't really understand that argument.

1          MR. WESTLING:  I think the argument, Your Honor, is

2     that it's only really significant if you do what it is that

3     people like Mr. Manafort and others who run political campaigns

4     do.  You have to have the baseline knowledge.  Knowing when a

5     certain county is thinking about a certain thing in a certain

6     way, this is how you use it to further the campaign.  It's not

7     the kind of poll that I'm able to look at on, you know, Nate

8     Silver's site and be able to figure it out on my own.  This is

9     very detailed polling data on a level that is very focused.

10          THE COURT:  That's what makes the showing of it,

11     which you're saying isn't necessarily established by the

12     record --

13          MR. WESTLING:  Right.

14          THE COURT:  But if I determine that it is established

15     by the record and in his statement -- but that's what makes it

16     significant and unusual.  It's not the sort of thing you would

17     give to someone outside the campaign, much less outside the

18     country.

19          MR. WESTLING:  But it's not the kind of thing you

20     would give to an audience that would have no ability to

21     interpret it.  I mean, I look at this data, and there's copies

22     of it in the exhibits, and it doesn't mean anything to me as a

23     person who has a political life in this country for a long

24     time.  So I don't know how -- the story that's being passed on

25     to people who have no ability to speak English to begin with,

1    beyond Mr. Kilimnik, how it's going to be any use to anyone.

2    It would seem to me if the goal were to help Mr. Manafort's

3    fortunes, that some other kind of summary, something more

4    public, more digestible might help.

5         But the data that we're talking about here is -- it,

6    frankly, to me, is gibberish and I can't imagine it was helpful

7    to anyone else.  I don't even know, looking at it, whether it

8    says Mr. Trump was winning or losing or going to win or lose.

9    It's not easily understandable, unless you are a political pro,

10   in my view.  And so it doesn't -- you know, it just doesn't

11   make sense why you would do that.  And more importantly, I

12   suppose, what the benefit of doing it would be, if the other

13   person can't read it.

14        THE COURT:  Doesn't it reflect particular markets and

15   states and areas of focus?

16        MR. WESTLING:  Yeah.  I mean, it does -- it reflects

17   different markets.  But again, I don't know how you would make

18   use of that.  And I think it's not clear to me that, again,

19   that there's any evidence it was actually shared.

20        I think the other thing is that to the point about it

21   being printed, it was the most recent, from what we can tell,

22   the most recent polling information from mid-July for -- I

23   think it was July 17th, but I'm not sure.  That would have been

24   relevant to a meeting they were having within the campaign.

25        THE COURT:  I think Mr. Gates was saying it was

1    shared as evidence.

2              MR. WESTLING:  But he doesn't ever say it was shared

3    at that meeting, Your Honor.  He never sayings we turned over

4    polling data to Mr. Kilimnik on the 2nd of August, which, if it

5    had happened, you would think he would say it, and that would

6    make the connection of the e-mail and printing relevant.  But

7    Mr. Gates doesn't say that.

8              THE COURT:  Didn't he say it happened at the meeting

9    where they had to leave by different doors and all that?

10   Doesn't he connect the polling data to the meeting and the

11   Havana Club and the coming and going --

12             MR. WESTLING:  I don't believe so.  I stand to be

13   corrected, but I don't believe he makes that connection.

14             MR. DOWNING:  Your Honor, one other point.  I know

15   this Court hasn't had the opportunity to review the testimony,

16   probably, of Mr. Gates from Eastern District of Virginia, but

17   he was found so incredible by the jury that a juror said to the

18   press that they completely disregarded his entire testimony.

19   So to the extent that this Court would cite Mr. Gates as any

20   evidence, I think a review of the findings of the jurors in

21   EDVA should be undertaken because if he is not corroborated --

22             THE COURT:  Don't.  Don't.

23             MR. DOWNING:  Your Honor, it's a fact.

24             THE COURT:  I'm not going to base anything on what

25   one juror said to the press.

1          MR. DOWNING:  Completely disregarded.  The entire

2     jury completely disregarded his testimony, Your Honor.  There's

3     a public record of the statement.

4          But to the extent you're relying on something

5     Mr. Gates said uncorroborated, we would really have grave

6     concerns about that.

7          THE COURT:  Well, I find the e-mail from Mr. Manafort

8     to Mr. Gates corroborative.

9          MR. DOWNING:  It does not say to send it to --

10          THE COURT:  I'm going to look at it again.  But I

11     think the timing of it and the substance of it is consistent

12     with what Mr. Gates said was going on.  And I don't believe

13     that even you have made the argument to me that every single

14     thing in the Gates 302 should be thrown out because he is

15     completely unbelievable on every single issue.  I think what

16     you said is he doesn't remember everything either so, you know,

17     if we can forgive a failure of recollection on one side, we

18     should be able to forgive a recollection on the other side.

19          MR. DOWNING:  Actually, Your Honor, Mr. Westling

20     pointed out to the Court that when previously interviewed,

21     Mr. Gates never gave this kind of detail; he never said this.

22     So we find it very suspect, late in the day and sometime in the

23     middle of or after his performance in the Eastern District of

24     Virginia that cased a juror to say what I just said, that

25     they're getting this information from him all of a sudden.  I

1    think the Court has to consider that, too.  And the terms of

2    his agreement with the Court -- and quite frankly, I don't

3    think anyone from the Office of Special Counsel would say that

4    they felt that Mr. Gates did anything but implode on the stand

5    there.

6             So I do think it's something the Court should

7    consider.  But the fact it's recently fabricated, it didn't

8    come up in prior 302s, I think is very important and I think

9    it's something we can address.

10            THE COURT:  I need to ask the Office of Special

11   Counsel about something ex parte because -- and so I apologize

12   for that, but I need to do that.  And it may be after I talk to

13   them, they tell me there's no problem with sharing it with you.

14   But I have received information in this case, in this binder,

15   and in other means, and I just want to make sure I understand

16   something.  And so, I can't -- I need to ask --

17            MR. DOWNING:  We would object.  But we don't know

18   he --

19            THE COURT:  I note your objection.  And I will deem

20   your objection also to be a request that what we're about to

21   discuss be revealed to you.  And that will be the first thing

22   I'm going to ask.  And we can do it at the end, after we're

23   done, or you can just have him come to the bench for a minute.

24            MR. DOWNING:  That's fine.

25            THE COURT:  All right.  Can you just approach the

1   bench?  And so this portion of the record is even sealed from

2   the defense for the moment.

3           (Bench discussion:)

4           THE COURT:  Okay.  I had all those search warrants

5   that had references to this.  And I think they were before the

6   time that he is saying this is a late revelation, is that

7   correct?  Does he not know that because those search warrants

8   were still redacted as to this information when they were given

9   to him?

10          MR. WEISSMANN:  I would have to check on the

11  redactions.  I know that -- I just have to check the

12  redactions.  I know that, obviously, any search warrant that

13  would be relevant to anything he would have potential standing

14  for would be turned over.  I just have to check redactions.

15  But I think I should be able to answer the Court's question

16  about recent fabrication by just referring to the 302 that's in

17  the record because that has a date on it.

18          THE COURT:  Okay.  Because when I want to let the

19  media have the entire thing, one of the reasons certain

20  paragraphs of the warrant were not shared with the media is

21  because they had not even been shared with the defendant.  This

22  one, it seems these allegations have been shared with the

23  defendant.  And so given how old that material is, it's a

24  surprise to me now that he's saying that this is new.  But I

25  don't know the chronology.

```
 1              So, yes, I would appreciate it if you want to say
 2     something about the 302.
 3              MR. WEISSMANN:  And we will check on the redactions
 4     and we can --
 5              THE COURT:  Then we will know whether this whole
 6     thing can be shared with them.
 7              MR. WEISSMANN:  Absolutely.
 8              (Open court:)
 9              THE COURT:  All right.  It looks like Mr. Manafort is
10     taking a brief break.  All right.
11              (Pause.)
12              THE COURT:  All right.  Going back on the record of
13     this proceeding that's still sealed, but not ex parte.
14              Mr. Weissmann, with respect to the specific argument
15     that they just made that this was a new twist by Mr. Gates,
16     only in the 302 that they most recently received, do you have
17     anything you want to add to that, respond to that?
18              MR. WEISSMANN:  Yes, I do.  So, I would direct the
19     Court's attention to Exhibit 236, which is a 302 with respect
20     to Mr. Gates, and the date of that is January 30th, 2018.
21     And --
22              THE COURT:  What exhibit number is it?
23              MR. WEISSMANN:  236.  And on page 3 it discusses the
24     August.
25              2nd meeting.  And I can tell you that Mr. Gates -- I
```

1    think it may have been his first proffer session -- told us

2    about the internal polling data.  As you could imagine with,

3    you know, experienced defense counsel and the nature of the

4    investigation, that that would be a topic that would come up in

5    short order.

6            I can also represent that at the trial in the Eastern

7    District of Virginia there was a side bar where Mr. Andres

8    addressed this with the Court and defense counsel, the issue of

9    the sharing of the polling data.  And so, this is -- this is

10   not new information, either because Mr. Gates has changed his

11   testimony in any way or that the defense wasn't apprised of it.

12           I also, in terms of referencing the August.

13           2nd meeting and the connectivity in terms of what

14   Mr. Gates has said about it and also corroborating information,

15   if you look at footnote 80, eight zero, there is a reference to

16   the series of emails that Mr. Kilimnik sends that reference

17   Trump's internal polling and what internal polling shows.  It's

18   not talking about external polling or general polling.  That,

19   obviously, doesn't go to the direct issue of who directed that

20   it be sent, but it is about the internal polling.

21           It does go to the issue of -- that Mr. Westling

22   raising, which was this doesn't -- it's not really capable of

23   being interpreted, it's meaningless.  If it's meaningless, it's

24   unusual for it to be sent, if it wasn't going to have any

25   purpose.  And I would note that Mr. Kilimnik -- also, the Court

1    can make its own finding, as well, by looking at the July

2    polling data because that is the -- that is an exhibit.

3          I would also note that Mr. Kilimnik worked with

4    Mr. Manafort for many, many years on polls, and in fact is

5    working on polls in 2018.  So he would very much know how to

6    assist people in how to interpret it.  But I also think it

7    would just -- it wouldn't make a lot of sense to send data that

8    is incapable of being interpreted.  And, in fact, even if it

9    was difficult and it required expertise, they had it.

10          And then Mr. Gates, in -- I think I referred you to

11    236, on page 3, Mr. Gates talks about the August.

12          2nd meeting and actually has Mr. Manafort walking

13    Mr. Kilimnik through his strategy to win certain states,

14    including states that were described as battleground states.

15    And those included Michigan, Wisconsin, Pennsylvania, and

16    Minnesota, which had been explicitly described as battleground

17    states on August 2nd of 2016.

18          So, there is connectivity to what Mr. Gates has said

19    and to the various documentation.

20          In terms of the credibility of Mr. Gates --

21          THE COURT:  When you just said, Which had been

22    specifically described, by whom, where?  You say --

23          MR. WEISSMANN:  Mr. Gates had just said that at the

24    meeting, that Mr. Manafort, in describing the data and the

25    states, described those states as battleground states.

1          THE COURT:  Okay.

2          MR. WEISSMANN:  The -- with respect to Mr. Gates's

3     credibility, as I mentioned, there's no contrary evidence in

4     the record.

5          But, one thing I would note, even if the Court were

6     to want to make sure that there was corroboration for what

7     Mr. Gates said, you have that.  Not just in the emails, but you

8     also have that because, if you want to look at the Eastern

9     District of Virginia case, Mr. Manafort has now pleaded here to

10    and admitted the crimes that he was charged with in the Eastern

11    District of Virginia.  In other words, what it is that

12    Mr. Gates said he did in committing bank fraud and FBAR crimes

13    and tax fraud is something -- and as well as all of the crimes

14    before you, Your Honor, has actually been admitted now by the

15    defendant.

16         So it's hard to say that Mr. Gates is an abject liar

17    and is making this all up when the crimes he said that

18    Mr. Manafort did, Mr. Manafort has now said he did as well.

19         THE COURT:  All right.

20         MR. DOWNING:  I think defense counsel would like to

21    think about possible -- think about the implications of this

22    Court considering anything that came from Mr. Gates.  We would

23    like to think about whether or not -- maybe there should be --

24    Mr. Gates' testimony taken and us being able to cross-examine

25    him.  I think it might be very important.

1              If this Court is going to consider at face value

2      anything Mr. Gates has said -- and by the way, throughout his

3      FBI interviews, the FBI continues -- they have it as reminders,

4      when he gets it wrong, if you look for "reminded Mr. Gates," if

5      you did a search, it occurs again and again and again.  And

6      even at trial he couldn't really get a handle on how many times

7      he lied to the Office of Special Counsel.

8              So we have grave concerns that this Court might

9      actually have to take testimony.  And we're entitled to

10     confront Mr. Gates, if this Court is considering his statements

11     to the FBI.

12             THE COURT:  Well, obviously I'm considering

13     everything in the record, as I was -- as I said I would.  He

14     has made statements to the FBI, they've been proffered to me,

15     you've known about them since the minute this issue was listed

16     as one of the issues.  And you said repeatedly you're willing

17     to stand on the record.

18             MR. DOWNING:  And I will admit, on my end I won't

19     take it as a failure on my part because I did not think this

20     Court wouldn't take into consideration the fact how he was

21     found to have no credibility at all by the jury over there.

22             THE COURT:  You cannot keep saying that.

23             MR. DOWNING:  I can keep saying it, Your Honor,

24     because it's true.

25             THE COURT:  First of all, you're asking me to make a

1       determination about what 12 jurors concluded because of what

2       one juror was quoted in the paper as saying, which right now I

3       don't even have in front of me.  But I believe she said we

4       decided to vote on whether or not we could find him beyond a

5       reasonable doubt, putting his testimony aside, which is

6       different than saying we agreed, as 12 people, that nothing he

7       said was true.

8                  MR. DOWNING:  That's -- that's --

9                  THE COURT:  That's totally different.

10                 MR. DOWNING:  I disagree with you.  But I could go

11      and get the press account of that.

12                 THE COURT:  I don't know.  I don't have the press

13      account.  The press account is not evidence.

14                 MR. DOWNING:  I have a bigger concern, though.

15                 THE COURT:  All right.

16                 MR. DOWNING:  I don't know if providing you with a

17      copy of the transcript of the testimony would help you in

18      assessing his credibility.

19                 THE COURT:  I am aware that he was cross-examined

20      fiercely, that his credibility was shaken enormously, that

21      there were a number of issues that you argued successfully that

22      he was not a good source, that there was evidence produced that

23      he benefited from a lot of the financial things that were

24      wrong, and that his credibility was attacked.  I believe that

25      his credibility was also attacked on a number of issues that

1       are -- were potentially quite collateral to the trial in the

2       Eastern District of Virginia and enormously collateral to the

3       issues that I have to decide.

4            But, I don't believe, notwithstanding the jury's

5       verdict and the split verdict and the fact that he was

6       cross-examined the way he was and that it had the effect on the

7       jury he had, that binds me to determine that not one word he

8       said to the Office of Special Counsel was true.  I don't even

9       think your position in the Eastern District was that not one

10      word that comes out of the man's mouth is true.

11           MR. DOWNING:  Well, Your Honor, I'm going to agree

12      with you on that issue.  But, you just said something that I

13      didn't take before as being part of your consideration, is your

14      understanding of what happened to him and what his performance

15      looked like and that his credibility was truly called into

16      question in, you know, in a very serious way.  We're asking

17      that you consider that when considering anything that's been

18      proffered by the government from Mr. Gates's cooperation with

19      the FBI and the Office of Special Counsel.

20           THE COURT:  Well, the more specific question is, are

21      you asking for an opportunity to cross-examine him about the

22      specific allegation, and only the allegation about whether

23      internal polling data was provided to Mr. Kilimnik, or do you

24      want to stand on the record, which is that he told the FBI that

25      it was.  We have the emails that we have that say what they say

1    and don't say what they don't say, we have the circumstances

2    surrounding the meeting.  And the question is:  Does that

3    establish to me by a preponderance of the evidence -- not

4    beyond a reasonable doubt -- that Mr. Manafort's testimony

5    about that was not accurate?

6              MR. DOWNING:  So if we could confer over the break

7    and have an answer for you afterwards, that would be --

8              THE COURT:  Okay.

9              MR. DOWNING:  That would work for us.

10             THE COURT:  Okay.  I think we only have a couple more

11   issues to discuss.  But I think it may make sense to have a

12   break because I think it would be helpful to resolve the matter

13   about whether what we discussed can be discussed with the

14   defense.

15             I'm actually now, as I'm thinking about it more

16   directly, thinking that it can.  But if we can determine when

17   things were said and revealed and when they weren't, that would

18   be helpful.  I think we should all take a break.  And after the

19   break we will discuss the answers to the questions I asked

20   during the ex parte piece of this, what your position is on

21   whether Mr. Gates needs to be in this courtroom or whether -- I

22   mean, the agent can -- I don't think you're disputing anymore

23   that Mr. Gates said it to the agent.  You're disputing whether

24   what Mr. Gates said to the agent is true.  Is that fair?

25             MR. WESTLING:  Yes, Your Honor.

1          THE COURT:  All right.  So, whether we need to have a

2     hearing on that because I am, actually, particularly concerned

3     about this particular alleged false statement.  But I also

4     think we need to think about what the purposes I'm being asked

5     to find whether or not this is, what the burdens are, etcetera.

6     So, you're entitled to think about it, although I don't think

7     this has come as a surprise, that this was the issue, since

8     this was the only evidence they pointed to as the fact that

9     this fact was false, was Mr. Gates's 302s and the e-mail.

10          MR. DOWNING:  Your Honor, I would say didn't

11     completely allude us, but your take on how he was corroborated

12     caused great concern on our part, and that's why I'm raising

13     the issue.

14          THE COURT:  The only thing I said that corroborated

15     his testimony about this matter was the e-mail within --

16     related to this data on this date.  Is that correct?

17          MR. DOWNING:  Yes.

18          THE COURT:  And you're saying read more carefully,

19     Judge, because it doesn't say bring it to the meeting.  So I

20     will do that, but --

21          MR. DOWNING:  I doesn't say that, Your Honor --

22          THE COURT:  -- I do believe that that is

23     corroborative.

24          I am not pointing to anything because I am not

25     relying on anything that happened in the trial in the Eastern

1    District of Virginia.  I was just responding to your suggestion

2    that if I read the newspaper, I would know that the jury

3    discounted every word that came out of his mouth.  And I

4    thought that was something of an overstatement, but I wasn't

5    there.

6              I haven't had an opportunity to consider the

7    evidence.  I think it would be entirely inappropriate for me to

8    rely on my understanding through the media of what took place

9    in that trial.  I know he was convicted of some counts and not

10   others.  I know he has now sworn to me that he was guilty of

11   the others.  I know that you attacked Mr. Gates's credibility

12   at the time.  And I know all that.

13             But the question is:  Is he lying about this?  And

14   I'm not going to base whether he was lying on this about a

15   proceeding that did not take place before me, that is not part

16   of the record in this case.

17             MR. DOWNING:  Understood.

18             THE COURT:  All right.  All right.  Just to make sure

19   that I don't pass out from hunger, we are going to take a

20   break.  Can we resume at 2:15?

21             MR. ANDRES:  (Nods head.)

22             MR. DOWNING:  (Nods head.)

23             THE COURT:  All right.  Thank you, everybody.

24             (Recess.)

25             THE COURTROOM DEPUTY:  Your Honor, recalling criminal

1    action No. 17-201-1, the United States of America v. Paul J.

2    Manafort, Jr.  The defendant is present in the courtroom.

3              THE COURT:  All right.  Let me start with you,

4    Mr. Weissmann.  Is there anything further you can add to what

5    we talked about, that you can add publicly?

6              MR. WEISSMANN:  Yes.  Yes, Your Honor.  So, we

7    haven't finished our review, but we believe that the material

8    that you asked about was redacted.

9              THE COURT:  Okay.

10             MR. WEISSMANN:  However, I would like to direct your

11   attention to two exhibits in the record.  If you recall, I

12   mentioned that I recalled that Mr. Gates had, very early on in

13   his cooperation, given us information about the polling data.

14   And there are two 302s that are dated in, I believe, both in

15   January of 2018.  So before he actually pled guilty, so in

16   connection with his proffers.

17             So, the first one is Exhibit 222.  And if you look at

18   page 17 of that exhibit, there's a long explanation of

19   communications with Mr. Kilimnik during the Trump campaign that

20   refer to the providing of polling data at the direction of

21   Mr. Manafort.  And then if you look -- and that is dated

22   January 31st, 2018.  And that was, of course, provided to

23   counsel in connection with the Eastern District of Virginia

24   trial.  And Exhibit 236, and I believe I referred you

25   previously to page 3, and I would also refer you to page 5.

1    Both of those refer to the polling data and also refer to the

2    discussions of the -- discussions of the polling data and of

3    the battleground states at the August.

4              2nd, 2016 meeting.

5              THE COURT:  All right.  I will look at all of that.

6    So for right now, I'm going to leave the little conversation

7    that we had ex parte, ex parte with your objection noted.

8              MR. WEISSMANN:  Judge, we will continue to look to

9    see if there is any portion that was unredacted to confirm

10   that.

11             THE COURT:  Okay.  I mean, mainly I was interested in

12   the timing that you've just provided.  So, I think that answers

13   the question.  And we'll all look at these to see what was

14   said.

15             With respect to his credibility, I absolutely

16   recognize defendant's right to argue to me that I should take

17   anything he says with a grain of salt for whatever reasons

18   defense believes I should take it with a grain of salt.

19   However, I wanted to refresh my recollection as to what I read

20   publicly at the time.  And so, I went back and read the article

21   that I believe I read at the time and, indeed, there was a

22   juror who spoke publicly.  She spoke publicly because she said

23   she wanted the public to know that while she wanted

24   Mr. Manafort to be not guilty, the evidence was overwhelming.

25             She indicated that the only reason he was not

1    convicted on all counts was because of a lone holdout in the

2    jury.  She did not attribute that to Mr. Gates's credibility.

3    And reportedly, she did say, as I thought I recalled, some of

4    us had a problem accepting his testimony because he took the

5    plea.  So we agreed to throw out his testimony and look at the

6    paperwork.  And then she added, I think he would have done

7    anything to preserve himself, that's just obvious in the fact

8    that he flipped on Manafort.

9            So, I don't believe -- there's certainly not anything

10   in this record for these proceedings, or the public record, for

11   that matter, that supports your argument that I should consider

12   the fact that the jury unanimously concluded he was a liar, as

13   was reported in the press by a juror, and threw out his

14   testimony.  I don't believe that that is what the newspaper

15   articles reported.  Not that I would have relied on the

16   newspaper article or what happened in the Eastern District of

17   Virginia anyway, but I believe your argument was a little

18   hyperbolic.

19           As I said, you are free to argue that his credibility

20   is suspect for whatever reasons you wish to advance, but I

21   don't believe the jury verdict is emblematic of that, and

22   certainly there's nothing in the press that's emblematic of

23   that.  You will have to argue acceptance of responsibility and

24   credibility issues with the judge who had the opportunity to

25   view Mr. Gates's demeanor.  And should Mr. Gates's credibility

1    be important to that, then that can be argued to that judge.

2              But with respect to me, I think you have to point to

3    some facts in the record that should lead me to discount what

4    he said, and the newspaper account of what a juror said is not

5    one of them.  If you believe it will be helpful and you want me

6    to read your cross-examination of Mr. Gates, you're welcome to

7    give it to me.  But that's where that stands.

8              So, have you had further consideration about whether

9    you want to have a hearing on this particular issue that

10   involves an evidentiary presentation?

11             MR. DOWNING:  We have, Your Honor.  And I must tell

12   you that sitting and talking to the Court is very strange.

13             THE COURT:  Next -- I won't do this anymore.  I did

14   it for your convenience, because sometimes --

15             MR. DOWNING:  No, I'm afraid the next time I go to

16   court, if I don't stand up...

17             THE COURT:  I do it usually for pretrial conferences

18   where there's just so much back and forth and so much in front

19   of you, to keep everybody -- to spend an extra hour walking

20   back and forth.

21             MR. DOWNING:  Sure.

22             THE COURT:  I certainly didn't mean to discombobulate

23   everyone.  And I appreciate the fact that you all like to stand

24   up.

25             MR. DOWNING:  We did have a conversation over the

1      lunch break, and what we would like is just an opportunity,

2      with the record that's in front of the Court, to file some

3      supplemental briefing on what happened in Court today.  And

4      some of the references back and forth, even for us to follow

5      from earlier 302s to later ones, it would just be nice if we

6      had an opportunity to go back through that.

7              I understand we can get an expedited transcript

8      tomorrow morning.  And we would be willing to file anything

9      with the Court on Friday, if that would be possible.

10             THE COURT:  I can tell you that I would not be able

11     to be here and rule before Friday anyway.  So, we can do that,

12     you can also attach anything else you want me to consider.  It

13     all needs to be filed -- can we say by noon on Friday?

14             MR. WESTLING:  That's fine, Your Honor.

15             THE COURT:  And anything the government decides it

16     wants to supplement with.  I really do think I understand your

17     arguments very clearly.  And so, I will read all the things

18     everyone has asked me to read with all that in mind.  I don't

19     think I needed to have it all written out for me.  I'm going to

20     see if the 302s back up your characterization or your

21     characterization, and I don't need it all written out again.

22     So, if you want to, in a very abbreviated fashion, point my

23     attention to something, feel free.

24             But, please, I think you all know me well enough to

25     know by now that I have heard what you said, I understand your

1   arguments and I'm going to look at everything in light of

2   everything that both of you have told me.  But I'm not going to

3   stop you from giving me what you think I need to see in

4   addition.  But only in addition.

5          MR. DOWNING:  Understood.

6          THE COURT:  All right.  So is that a long-winded way

7   of telling me that we are not insisting that Mr. Gates testify

8   in this courtroom and be cross-examined again?

9          MR. DOWNING:  I didn't think I was.

10          THE COURT:  I'm sorry?

11          MR. WESTLING:  Yes, it is, Your Honor.

12          MR. DOWNING:  Yes.

13          THE COURT:  All right.  I mean, when I asked you, do

14   you want to hear from him, you said you wanted to file

15   something.  I just want to make sure you're saying we're done;

16   when this record is concluded, we're done with the record.

17          MR. DOWNING:  Correct.

18          THE COURT:  All right.  Unless you want to send me

19   the metadata or whatever other exhibits you want to send.

20          Okay.  I think we can go on to category IV, the other

21   DOJ investigation.  This involved the special -- the ███████

22   ████████████████████  that was looking into ████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████.  The allegation is that the defendant

1   offered a version of events that downplayed �&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

2   role and/or his knowledge.  Specifically, his knowledge of any

3   prior involvement of the ▆▆▆▆▆▆ that was

4   inconsistent with and less incriminating of ▆▆▆ than what

5   he had already said during the proffer stage and now consistent

6   with what Mr. ▆▆▆ himself was telling the FBI.  And that in

7   the session where he watered down what he said before the plea,

8   he had to be redirected by his lawyer more than once.  That

9   ultimately, I believe, he did then repeat what he had said

10   originally, although I can't recall that at the moment.  So

11   I'll give you a chance each to just argue briefly what you want

12   me to make of that.

13         MR. WEISSMANN:  So, Your Honor, this, like the

14   instance where we were talking about Mr. Kilimnik and his

15   liability for Count 2 of the superseding information, this is

16   one where I think it's important to focus on the details of the

17   story that Mr. Manafort tells, because it's quite dramatically

18   different.  This is not I forgot something or I need to augment

19   some details of a basic core set of facts.

20         The story that was told to us before he entered into

21   his plea agreement was of particular note to the government

22   because it suggested sort of a path that we thought was

23   potentially optimistic in terms of providing information.

24         And there was a detailed account of -- from

25   Mr. Manafort of Mr. ▆▆▆ providing information about a ▆▆▆

1    who was ████████████████████████████████████████

2    ████████████████████████████████████████████████

3    ███████    And there also was a discussion of whether Mr. ████████

4    believed ████████████████, and he had said he did.  And then

5    there was a discussion with the ██████████████ who linked that

6    to needing to get ████████████████████████████████ to

7    resolve that issue.

8              That -- so this is one where there are real details

9    being given.  And the next version that happens, what we, of

10   course, then, as we noted, brought ████████████████████████████

11   █████████████ was relevant to that investigation, and had them

12   come here.  And the story omitted everything, basically, about

13   Mr. ███████ saying that and, instead, there was a very watered-

14   down version related to Mr. ███████ and -- who specifically,

15   Mr. Manafort had previously said, I did not want to be involved

16   in this at all.

17             So this was directly contrary to the statement

18   earlier that Mr. -- when Mr. ███████, he had said had previously

19   called, he said, essentially, I'm on it, don't get involved.

20   This was a very, very different story that was being told and

21   then basically had to be sort of walked back, having seen notes

22   that were described as being the notes that had been taken by

23   defense counsel of that prior session.

24             There's one other point I was going to make which

25   just now has alluded me.  If I can have one moment.

1          (Pause.)

2          MR. WEISSMANN:  Ms. Rhee has reminded me of it.  So

3     one thing that we do think is note is the way in which this

4     initially came up.  And it's in Special Agent Weiland's

5     declaration, which is the way this initially came up is that we

6     were asking questions about an e-mail that Mr. ████ had

7     written about a potential way of saving the candidate.  That's

8     sort of paraphrasing it.  And this was a way of explaining, or

9     explaining away that e-mail.

10          And if you want to ask what do we think is going on,

11    we think that the defendant realized that he thought better of

12    this, this -- what he said was actually not going to help and

13    having the ███████████ there and making it really obvious

14    this is now relevant to what is a ████████████████

15    ████████████████████████████

16    ████ walked back this allegation so there was -- there was no

17    information that could be helpful with respect to either

18    Mr. ██████ or the ████████████ in furthering that

19    investigation.

20          It is also useful to know that detailed account was

21    offered by Mr. Manafort without prompting.  That was his --

22    when he was asked about that ████ e-mail, he proceeds to

23    provide all of those details.

24          That's it, unless there are other questions.

25          THE COURT:  Well, I guess I have a question that I

1    started with at the beginning, which is we've all agreed that I

2    don't actually have to find whether you decided in good faith

3    that he violated the terms of the plea agreement by not being

4    totally forthcoming and candid and all the things that he

5    agreed, that they're not contesting that.  And it may not be

6    necessary, but I don't think there is any quibbling about

7    whether I could find that he did in fact violate the plea

8    agreement.

9          I think where the dispute is, whether he

10   intentionally lied, which you equated, at least in your initial

11   pleadings, with committed a crime while in a cooperation state,

12   and that that's highly relevant to sentencing in a number of

13   ways, including but not limited to acceptance of

14   responsibility.

15         And so, we have a couple of instances where even if I

16   agree with you, when he thought about what he would like to

17   say, that what he decided to say was not true, that it was

18   corrected within the same session, perhaps the prompting of

19   counsel, but, indeed, the record was corrected.  And so, I find

20   it -- I'm not sure that is something that a prosecutor would

21   prosecute as a criminal false statement necessarily, although I

22   think it is something that a prosecutor could definitely say

23   I'm done trying to cooperate with this fellow who we have to

24   pull his teeth every time.

25         And so, I guess the question is does it matter, for

1    my purposes -- and I know we started there, but this is a good

2    example of it -- if he fixed it or if he never fixed it,

3    especially if it got fixed in the same session?

4           MR. WEISSMANN:  So, I think that the issue of whether

5    it was the same session or not is a factor that I would submit

6    is a weak factor.  I can't say it's totally irrelevant.  You

7    can imagine situations where somebody remembers something, they

8    see something and it refreshes their recollection, or just in

9    thinking about something remembers more details.

10          So it's not that it's irrelevant, but it shouldn't be

11   the case that whether the government brings something up at

12   that session or waits to talk to defense counsel afterward, at

13   the end of the day, and then says here's some additional

14   information, this isn't making sense, and then the next day

15   there's a different version, that that -- that the fact that

16   it's during one session is -- should be not just dispositive

17   but, frankly, all that relevant.  I think that the --

18          THE COURT:  Well, even if it's the next day, and it

19   shouldn't depend on vagaries of when you look at the lawyer and

20   raise your eyebrows, what does the fact that he changes it -- I

21   mean, I understand the ones where he changes it multiple times

22   different ways and throws in some new details.  But if he

23   says -- this is a close example, where he said X and then he

24   said Y and then he went back to X --

25          MR. WEISSMANN:  So, I would like to address, first,

1    this issue of, like, that the government wouldn't normally

2    prosecute it.  I don't think that's the standard in the sense

3    that we've already told you we have no -- we're not intending

4    to do that.  We are there.  And so that this is not one where

5    we're saying in this, or, frankly, in our view more egregious

6    ones, or that's something that that's our current intent.

7    And -- but I don't think that -- and, of course, we do agree

8    with you that it's relevant to the issue of, you know, should

9    the person still be a cooperator?

10         But it doesn't change the fact that the person is

11    saying something that's not true, that it's intentionally

12    lying.  And there are instances where someone says something is

13    not true, they're confronted, and they realize it doesn't work

14    and they go backwards.  There are others where they go deeper

15    and deeper.  Maybe one is less egregious, but it doesn't change

16    the initial announcement of what they're saying and whether

17    it's intentional or not.

18         Obviously, if it was something so minor in detail

19    that the Court thinks it wasn't intentional at the outset, game

20    is over.  But I don't think that's the issue of whether they go

21    back to the initial version about being confronted and what

22    their decision is or whether they dig deeper should change the

23    initial issue.

24         I do think that all becomes, if you were to find that

25    the initial pronouncement was intentional, I think it's all

1      then a sentencing factor for the Court as to how to consider

2      it.  The fact that it may not be individually prosecuted may be

3      something that the Court considers in terms of how it affects

4      the sentence.  But I don't think that it would change --

5      certainly not the breach issue, but I don't think that it

6      changes the fact that it is pertinent.

7             And then just finally, I do think if the Court was

8      trying to address also the issue of whether it hits all the

9      elements of a false statement in terms of is it material to an

10     investigation, I mean, what we've tried to do with each of

11     these is put in enough context to show the materiality here,

12     the whole --

13            THE COURT:  I understand the materiality in this

14     circumstance.

15            MR. WEISSMANN:  Okay.

16            THE COURT:  All right.  Mr. Westling, this does seem

17     to be a stark departure and then return.  So, what do you think

18     I should make of it?

19            MR. WESTLING:  Your Honor, first, I think to special

20     counsel's point, there was this first discussion during the

21     proffer leading up to the plea where a lot of detail was

22     provided and then clearly what is going on here is that, it

23     seems to me, he's going over the story, it's just at a very

24     high level.  He's not going to the details and then there's,

25     you know, some point where it's, like, no, that's really not

1   where we are, we have to reset, and there is a discussion

2   off the record with counsel and sharing of notes to refresh

3   recollection.

4            I mean, again, keeping in mind this is how ever many

5   number of sessions along the way, and the fact that topics

6   continue to change.  And I think there was just, in this case,

7   when Mr. Manafort was reoriented, he had no trouble repeating

8   what he had said previously.  And I just think, from my

9   experience, this is the kind of thing that happens in these

10   meetings.  I don't think it necessarily in any way supports the

11   idea that there's some intentional effort to mislead.

12   Obviously, you know, whether anybody remembered it at the

13   moment or not, you know, the prior testimony was of record.

14   And he had given it voluntarily.

15            So, you know, there are times when just -- the day

16   gets off to a start that doesn't work very well.  And we found

17   that a lot in these sessions, where the difficulty of being

18   transported, of, you know, his physical and other

19   circumstances, meant it often took a little while to get back

20   into the groove each day that we got together.  And I think

21   this really fits squarely into that.  It's not that once he was

22   reoriented he fought the issue or suggested that he hadn't been

23   truthful the first time, or to the extent there was any

24   discrepancy, he wasn't trying to correct it.

25            This is the sort of thing you want someone to do if

1      they get it wrong at some point.  And the reason they get it

2      wrong isn't always because they're trying to mislead.  And I

3      think, motive-wise, there's really zero reason here.  These are

4      the same prosecutors that heard the story before.  And so to

5      the extent you go back over it and say, wait a minute,

6      remember, he gave them the story.  And I think, you know, it

7      is, of course, natural to have whatever suspicions people have.

8              But I think there is nothing in this record to

9      suggest that there was some intentional effort to sort of

10     provide, you know, an incomplete or inaccurate version of what

11     happened.

12             THE COURT:  I do think, to quibble with maybe the

13     first thing you said, where you said he started at the level of

14     generality and didn't add the same amount of detail he added

15     the first time, but then he was happy to add the details,

16     that's very different than telling a different detail than the

17     detail you provided the first time.  I don't think that's quite

18     a -- it was a very generous characterization.

19             MR. WESTLING:  Again, I'm sort of reading the

20     documents like everyone else.  I think if you compare what's

21     being said, there is a discussion of a conversation with

22     Mr. ███████ over an issue, there is an elaboration of what the

23     issue is and it takes prompting to get into the details.  But

24     it doesn't seem to me that it is a completely different version

25     of anything.

1         THE COURT:  All right.  Is there anything else you

2    want to tell me about this one?

3         MR. WESTLING:  I think, to the point that the Court

4    has made in its questioning, you know, there is a situation

5    that occurs where someone comes into a session, you know, you

6    move through it and corrections get made.  They were made

7    contemporaneously, you know, within really just a few minutes,

8    an hour of break or whatever it was over lunch.  But, I mean,

9    it just isn't a situation where the government, you know, had

10   any adverse impact from this.

11        I mean, you know, it was a misstep.  And it happens,

12   but I don't think this fits in that category of, gee, let's

13   come in today and deceive the government.  I don't think those

14   are the facts and I don't think the factual record supports

15   that.

16        THE COURT:  All right.  Is there anything you feel

17   you need to add?

18        MR. WEISSMANN:  Just two things, briefly.

19        One, I don't think adversely impact is the standard,

20   but when -- assuming that the Court were to find there is a

21   lie, that is the adverse impact in terms of the utility that

22   can be made of the cooperating witness.

23        Second, I would just ask the Court -- I know the

24   Court is incredibly detailed -- to look at the initial story

25   and the details of it and then look at the next version and

1    then the next version.  Because there is another version even

2    after he reads the defense lawyer's notes and then only later

3    comes to saying what is initially said.

4         And I do think this is one where this is not the

5    situation where -- and the way we look at this, where simply a

6    mistake -- the stories are so dramatically different about

7    ██████████████ significance where there was enormous attention

8    to this issue, that we're not talking about -- again, there

9    were many instances which we are not bringing to the Court's

10   attention because our view is they easily could be mistakes

11   about minor details of dates and times and names.  All of that

12   can happen, where there's no concern about is it intentional.

13        This rises to such a level and it goes really to the

14   heart of what was being looked at in that District that -- to

15   have such a different version, we just don't think that's the

16   kind of thing that somebody just makes a mistake and, you know,

17   has a bad day.

18        THE COURT:  All right.  Well, that leads me into No.

19   5, the contacts with the administration.  And of all of them,

20   this is the one where I have the most difficulty figuring out

21   where the real contradiction is of moment to the investigation.

22        You say that what he said was false because he did in

23   fact agree to have messages sent to the administration on his

24   behalf.  And you point to evidence in which he offered to have

25   other people contact the ██████████ on behalf of Mr. ████████,

1    for example, or to press buttons.  But that outreach appears to

2    have been two people outside the administration who themselves

3    would have contacts within.  There is some evidence that

4    Mr. Gates said that Mr. Manafort said he still had connections,

5    and that another individual asked Mr. Manafort if he, that

6    individual, could tell ███████████ he was still close to

7    Manafort.

8              And you have his involvement in lobbing with respect

9    to ERISA, and Exhibit 404 is this memo summarizing the group's

10   plan that say, somewhat ambiguously, P.G.M. will find out if

11   ████████ did her bit and get her to call ██████  And it's not even

12   crystal clear that he was supposed do that by calling her.

13             So, again, I want you to point to the specific

14   statement in a 302 or a grand jury statement that is the

15   precise question and answer you think I should denote as false.

16   And, you know, it does seem to be that there are indications

17   that he may have bragged that he still had sway or offered to

18   assist people or to lobby.  But do we have direct evidence of

19   contacts that contradict a denial of a contact?

20             MR. ANDRES:  Your Honor, I'm going to handle that

21   one.

22             THE COURT:  All right.

23             MR. ANDRES:  Given that you have issues with it, I

24   drew the short straw.

25             So, the specific false statement that Mr. Manafort

1    made was during his October 16th interview, it's at Exhibit No.

2    4.  And the specific is that Mr. Manafort denies having direct

3    or indirect communications with the administration, and it's

4    the indirect part of that that we believe is a false statement.

5    So specifically what Mr. Manafort -- what's recorded in the

6    302, it says Manafort had no communication with anyone in the

7    administration while they were in the administration.  We don't

8    contest that.

9           Manafort then says, Manafort never asked anyone to

10   try to communicate a message to anyone in the administration.

11   Then it goes on to say Manafort spoke with ████ after he

12   left the administration.  And notably, the last sentence,

13   Manafort communicated with █████ before ████ joined

14   the administration.

15          I think that last sentence is particularly

16   significant because the instance in which Mr. Manafort

17   indirectly communicates with the administration is about ████

18   ████, when he specifically reaches out to Mr. ████, asks if

19   Mr. ████ would like Mr. Manafort to reach out to the

20   administration and basically put a good word in for Mr. ████

21   who's later ████████████████████████████████

22   ████.  And then in the grand jury, specifically, on page 214,

23   Mr. Manafort is asked about that and he's asked about -- I'm

24   sorry, on 215 it says:  How about once the President -- that

25   President Trump took office, were you in touch with anyone in

1    the administration that -- after that period.  And Mr. Manafort

2    says:  Not directly.  Which, in effect, in the ensuing

3    testimony, you learn that he has indirectly reached out to the

4    administration specifically about Mr. ████.  And Mr. Manafort

5    testifies, on page 224, that he reached out to ██████████

6    who's a friend of both Mr. Manafort and █████████████, ██████████

7    █████████████, and that through those individuals he

8    sent a message with respect to Mr. ████.  Tellingly,

9    Mr. Manafort then answers a question that as of this time,

10   March of 2018, he still had the ability to send messages to ████

11   █████████.

12            So, the government's contention is that when

13   Mr. Manafort said that he did not have any indirect

14   communications with the White House or with the administration,

15   that in fact he did.  So that's --

16            THE COURT:  Going back to Exhibit 4, you summarized

17   it to me and you said he denied direct or indirect

18   communications, but then I didn't hear you read me a sentence

19   where he said that.  So what page?

20            MR. ANDRES:  Sorry.

21            THE COURT:  What page are you in Exhibit 4?

22            MR. ANDRES:  It's Government's Exhibit 10, which is

23   the 302.  When I said 4, I should have said 10.

24            THE COURT:  Okay.  And what page of the 302 has the

25   statement that is contradicted by the grand jury testimony?

```
 1              MR. ANDRES:  So page 2 of 8 in the one, two, three,
 2     four, fifth paragraph that starts:  Manafort had no
 3     communications.
 4              The first sentence says he had no communications with
 5     anyone in the administration while they were in the
 6     administration.  That's not the sentence we're contesting.
 7     That would be the direct communications.  What we're contesting
 8     is the next sentence where he says:  Manafort never asked
 9     anyone to try to communicate a message in the administration,
10     a/k/a, the indirect communication.
11              With respect to the other issues, with respect to the
12     ERISA lobbing, Mr. Manafort is also asked about that in the
13     grand jury.  And the question is whether he should reached out.
14     He doesn't have a memory of reaching out to anyone in the
15     administration, but he says the question is whether he should
16     have or Mr. ███████ should have.  The indication that one of
17     the two of them were supposed to reach out to the
18     administration.
19              The last one with respect to Mr. ███████, I think
20     it's Exhibit 405, Mr. ███████ writing in a text:  I may see
21     ███████, should I tell him that you say hi, or should I
22     acknowledge our relationship?  That's not one that we're
23     relying on solely, obviously, but I think it provides important
24     context to the Court with respect to Mr. Manafort's state of
25     mind at the time.  That is, he's looking for the opportunity to
```

 1      reach out to ██████████████.  Even if he didn't prompt

 2      Mr. ████████ to say that, he's at saying, look, if you see the

 3      ███████, tell him I said hi, or you should acknowledge our

 4      relationship, whether or not he asks or not.

 5              So, again, that's not an exhibit that we're relying

 6      on solely.  I think the strongest evidence relates to

 7      Mr. ███████ and Mr. Manafort's grand jury testimony which

 8      affirmatively acknowledges that he was reaching out indirectly

 9      to ███████████████ when he said something contrary to that, to

10      the government during the October interview.

11              THE COURT:  All right.  So you're not saying that he

12      lied to the grand jury, you're saying that his grand jury

13      testimony is inconsistent with what he told -- stated during

14      the interviews on October 16 and that's how you know that what

15      he said was false.

16              MR. ANDRES:  Correct.

17              THE COURT:  All right.  And if materiality were

18      important, why is this of moment that I should be concerned

19      about it?

20              MR. ANDRES:  Sure.  Judge, throughout the interviews

21      with Mr. Manafort and some of the issues we've discussed today,

22      you see that he constantly either minimizes the information he

23      has about the administration or any contact with the

24      administration.  So there's an issue whether or not during his

25      cooperation he's communicating with ██████████████ or

1    providing information about the questions or other things that

2    are happening in the special counsel investigation, whether

3    he's sharing that with other people.  And this is another

4    example of Mr. Manafort --

5            THE COURT:  That hasn't been given to me as we're

6    troubled by this or he wasn't truthful about that, so I don't

7    see how to put this in the context of that because I don't know

8    about that.

9            MR. ANDRES:  Well, so for example, in the No. 4, the

10   one that Mr. Manafort -- that Mr. Weissmann just talked about

11   with respect to the ███████████████, you see Mr. Manafort

12   changing his story so as not to implicate either ████████████

13   or someone in █████████████████.  I think, with respect to

14   this issue, again, Mr. Manafort is trying to distance himself

15   from the administration and saying he's not having contact with

16   the administration at a time when he's under at least one

17   indictment.

18           THE COURT:  But you're not suggesting right now that

19   there's more information in here about other efforts to

20   distance himself from the administration or to deny a

21   relationship or to deny reporting back to them?

22           MR. ANDRES:  We're not relying on any other evidence

23   of that issue.

24           THE COURT:  All right.  Mr. Westling?

25           MR. WESTLING:  Well, I think, Your Honor, you know,

1   these are all situations where Mr. Manafort, at best, had

2   contact with someone who was contemplating contact with the

3   administration.  I don't think there's any evidence here that

4   he had direct or indirect contacts.  I think that, you know,

5   that even in the case of Mr. ████, that the government cites,

6   and he's saying I'll reach out to people and see if I can get

7   them to support you, that could be with any number of players.

8        I think the problem here is that Mr. Manafort

9   volunteers Mr. ████'s name earlier on in the 302.  There's no

10  reason to think that he sees any problem with what he was doing

11  there.  And in fact, wouldn't have a reason to raise

12  Mr. ████'s name in the first place, if he did.

13       I think this is a situation where he honestly did not

14  believe that these were the kinds of contacts that the

15  government asked him about.  They were not direct, clearly.  I

16  think we're all in agreement about that.  And there really

17  isn't evidence of him seeking to have indirect contact, you

18  know, in any of this.  It's the issue of Mr. ████ wanting

19  to use his name or some reference to being talking about

20  somebody who's working on a lobbing project.  Or in

21  Mr. ████'s case, the conversation with Mr. ████ where he

22  says:  Can I help you in some way?  The way that anyone might

23  if someone were interested in seeking a job.

24       But clearly, he hewed to the line of not having, you

25  know, those contacts.  And I think to say it's something more

1    than that, and perhaps more importantly, that there was some

2    effort to conceal or to disguise or lie about it, seems to me

3    just not substantiated by the record that's before the Court.

4              MR. ANDRES:  Your Honor, page 225 -- 224 and 225 is

5    the evidence of the grand --

6              THE COURT:  Of?

7              MR. ANDRES:  -- of the grand jury, of Exhibit 4.  It

8    is the specific evidence of the indirect contact.  And starting

9    on line 6, this is recounting the text with Mr. ███████, it

10   says:

11   ████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████████

15   ██████████████

16   ██████████████████████████████████████

17   ████████████████████

18   ████████████████████████████████████████

19   █████████████████████████████████████████████████████

20   █████████████████████████████████████████████████████

21   █████████████████████████████████████

22   ██████████████████████████████████████████████████

23   ████████

24   ████████████████████████████████████

25   ███████████████████████████████



THE COURT:  Well, if he's calling these people,

██████████████████████ when they pick up the phone, they call the

██████████████████ are they supposed to say I want ████████?  Or are

they supposed to say Paul wants ████████?

MR. ANDRES:  Your Honor, I don't know the answer to

that, but I would argue that that's not relevant.  The

relevance is that Mr. Manafort --

THE COURT:  Well, one is conveying a message and the

other is getting people, other people to help this guy who he's

not going to help directly.  So he's indirectly helping the

guy, but that's different than sending a message, isn't it?

MR. ANDRES:  Well, if the message is ████████████ is

a good guy, then it's sending that message, whether it comes

1      from Mr. Manafort or it comes -- the government is not alleging

2      that the message is Paul Manafort says X, the message is we

3      support or there is support for ███████.  And that's the

4      message that is indirectly sent from Mr. Manafort through a

5      third party to the ███████.

6              THE COURT:  All right.  Mr. Westling, anything?

7              MR. WESTLING:  I guess, two things, Your Honor.  One

8      is that, obviously, when these questions -- Your Honor, I

9      think -- the first is that none of us, in terms of working with

10     Mr. Manafort through this process, would have thought that that

11     would have amounted to a direct or indirect contact.  I mean,

12     so in terms of giving advice and working through this matter, I

13     don't think we thought about it as how many layers do you have

14     to get down before you might run afoul of the I didn't have

15     direct or indirect contact.

16              I think the other point with Mr. ███████ that's

17     particularly well made is that obviously, given when this is

18     happening, the idea that Mr. Manafort was going to be helpful

19     to someone was only going to be because he asked others to

20     potentially support them.  And, you know, he was already under

21     indictment at this point and, you know, the idea that he was

22     going to pass a message and it would have some value, frankly,

23     no offense to Mr. Manafort, but I can't see that.  I think

24     that's why we went to other business leaders and said you

25     should consider this and it was up to them to decide what to do

 1    or whether to do.  And there's not even really any direct

 2    evidence here that they ever contacted anyone in the

 3    administration.  So I think the idea it's an indirect contact,

 4    there's just no basis to make that finding.

 5              THE COURT:  All right.  That covers all the subject

 6    matter areas.  The defendant, though, in his pleading asks me

 7    to consider his health issues exacerbated by the conditions of

 8    confinement, and particularly his solitary confinement as one

 9    reason why I should conclude that any inaccuracies are

10    unintentional.  And I want to know, do you want to elaborate on

11    those statements?  What about his confinement bears on his

12    intent?

13              MR. WESTLING:  Well, I think, Your Honor, that the

14    situation, obviously, has been physically and mentally

15    difficult, as it always is.  I'm not suggesting what

16    Mr. Manafort is going through is not shared by anyone who goes

17    through a similar kind of confinement.  I will note that he's

18    probably doing it at an age that most people don't, and it's

19    been over a meaningful period of time.  And with that, I think

20    there is a natural degree to which one sees an impact on health

21    and mental abilities, that people tend to be sharper when

22    they're not under those conditions.

23              And I think the reality here is it's been shown that

24    those kinds of conditions have an affect on memory.  So I

25    think -- I'm not saying that that explains the situation, I

1   think it's just highly relevant in understanding why there were

2   miscues at various points that might not have happened,

3   particularly given a greater opportunity to sit and prepare and

4   to spend time with counsel, to be ready for sessions.  That

5   just wasn't really possible under the circumstances.

6         We've had tremendous access to Mr. Manafort, I'm not

7   suggesting otherwise.  But it just becomes challenging with his

8   scheduling and everything else, to finish a long day of

9   interviews and then to rush over to the jail at night to be

10  ready for the next day, even if you know what the subject

11  matter is, and often we had only, kind of, headlines.

12        So I guess what we want the Court to understand --

13        THE COURT:  Were you able to -- did you have access

14  to him, or were there times when he was not accessible to you?

15        MR. WESTLING:  Generally we had access to him twice a

16  day; in the afternoon, which of course is when we were together

17  with the government, and then in the evening.  And we generally

18  have had good access, but there are times when there are

19  unscheduled lock downs and all kinds of other things that get

20  in the way of that access.  But it is just one of those

21  situations that makes what is always a difficult and stressful

22  undertaking for your client, in terms of those cooperation

23  sessions, that much more difficult.

24        And I think we've noticed -- without, again, looking

25  to hurt Mr. Manafort's feelings in any way -- the cost of him

1       being incarcerated has been one that has made, you know, him

2       less acute in his ability to sort of see and perceive.  And

3       while he spent a lot of time and he's put in a lot of effort,

4       and we've appreciated his help, it still is just a factor that

5       we think is relevant as the Court looks at the whole construct

6       of what's going on here.

7               THE COURT:  Well, I take your point with respect to

8       the emotional toll this would take on anyone and the physically

9       difference aspect of his existence from what it had been

10      before.  But I got the impression you were asking me to

11      consider his physical health in some particular way, and you

12      were arguing that his physical health was exacerbated by his

13      conditions of confinement.  And certainly I'm aware of the

14      court appearance when he appeared in a wheelchair.  But, did

15      that happen -- was he taken to any of these debriefs in a

16      wheelchair?

17              MR. WESTLING:  He was taken to the grand jury in a

18      wheelchair.

19              THE COURT:  Okay.  On the 26th and the 2nd?

20              MR. WESTLING:  I know on the 26th.  The 2nd as well,

21      Your Honor.  And there's actually a reference in the transcript

22      to talking about had he not been in a wheelchair, he would be

23      sitting somewhere different.  So --

24              THE COURT:  What is it about his conditions of

25      confinement that you want me to understand has something to do

1    with that?

2          MR. WESTLING:  Well, he basically has never in his

3    life before had a problem with the swelling in his leg and foot

4    that he has now related to gout.  The general indications are

5    that has to do with diet and a lack of exercise.  And it's

6    something that has only been onset since he's been

7    incarcerated.  Obviously, it's also been, to the point we made,

8    emotionally.  And we've shared this in the pleadings.  You

9    know, there's been some depression and other things that you

10   would expect that have been treated, as is the physical

11   situation.  But it's obviously not ideal and it has had some --

12   created some challenges to him as he tries to stay focused and,

13   you know, live up to his obligations under the plea agreement.

14         THE COURT:  And this isn't to suggest that the

15   situation he finds himself in wouldn't make someone be

16   depressed, but is there any prior history of depression before

17   this case arose?

18         MR. WESTLING:  Let me confer with Mr. --

19         THE COURT:  All right.

20         (Pause.)

21         MR. WESTLING:  Your Honor, I think there has not been

22   significant depression in the past.  I do want to correct one

23   thing I said:  My fellow counsel and client have been helpful.

24   And that is there has been some history with the gout, but it's

25   been very minor, whereas now it's become a significant issue.

1    I didn't want to not clarify that.

2              THE COURT:  All right.  Did anyone from the office of

3    special counsel have concerns during any meetings that his

4    health or his ability to focus or his emotional state were

5    affecting his ability to be responsive or that they were

6    brought to your attention by the defense?

7              MR. WEISSMANN:  They were -- we had no such concerns

8    and they were not brought to our attention.  To the contrary, I

9    would call the Court's attention to Exhibit 4, the grand jury

10   transcript.  And that is, on October 26, 2018, the normal types

11   of questions you would expect were asked about whether the

12   defendant had any medical concern or issue that would affect

13   his ability to answer the questions and understand what was

14   going on, and he denied that.  In fact, after lunch, when we

15   went over that again, he kind of joked about it, and you'll see

16   that in the transcript.

17             The other thing that's referenced there that may be

18   of note to the Court is that with respect to his medical

19   condition, it's noted in the transcript that that arose and the

20   condition was only in the last of the proffer sessions.  So, in

21   other words, the transcript of the grand jury is on October

22   26th and the last of the proffer sessions, debriefings was

23   October 16th.  So the -- obviously, the prison conditions

24   stayed the same, but in terms of the condition with respect to

25   the inflammation in his leg didn't appear until October 16th.

1          THE COURT:  Okay.  All right.  Is there anything else

2     that I need to cover right now?

3          MR. WEISSMANN:  Judge, the only issue, I think I have

4     mentioned before, and so you should cut me off if you feel like

5     this point has been -- or, at least our position has been made

6     clear, is that in terms of the way that the government looks at

7     this, the issue of the -- whether the defendant breached or

8     didn't breach the agreement, from our perspective, there's a

9     legal standard, which is it's a good faith determination and

10    that that is beyond us because that is one it was conceded.

11         And so that the issue that we see here is not whether

12    he in fact breached, that's something that there is no platonic

13    ideal of that, it's something that's in fact happened because

14    the determination has been made and there's been no challenge

15    to that.  The issue now is one of a sentencing issue, of

16    whether there have been misstatements, intentional

17    misstatements that would be relevant to the Court at

18    sentencing.  And we bear the burden of proving that.

19         THE COURT:  And I think we all agreed last time that

20    trying to differentiate that question from whether he in fact

21    breached was a distinction, you know, too impossible to even

22    draw, that they were essentially the same inquiry.  But I

23    understand that that's not what I'm being asked to find.

24         All right.  Anything further from the defense?

25         MR. WESTLING:  No, Your Honor.

1          THE COURT:  All right.  We now have a little bit of a

2     two-step process in terms of producing the transcript, that is

3     going to be longer than I initially anticipated.  And so I

4     guess first question would be from when the court reporter

5     expects that it could be done, so that we can set a schedule

6     for when you could agree to how much of it we can make public.

7          I think a large portion of what we discussed could be

8     public.  I think there are certain issues where you probably

9     only need to redact out names and turn them back into entities.

10    And then there are may be one or two issues where we're really

11    talking about something that was completely redacted at every

12    point prior to this and will continue to be.  And, hopefully,

13    you'll both be on the same page about that with respect to what

14    of the investigation is not yet public.  I think the Office of

15    Special Counsel has the stronger point of view about that.

16         But I'm going to ask you to see if you can agree on

17    what a redacted version would look like before I docket

18    anything, with the understanding that ordinarily this room

19    would be completely full of people reporting on what happened.

20    And they know that we're meeting and they know that we promised

21    them a transcript, so when --

22         All right.  I will order that tomorrow morning when

23    the sealed transcript is ready, that the parties may have it.

24    And then assuming you get it at some point tomorrow morning,

25    how long do you think it would take to confer and let me know

1      if you have an agreed version?

2                  (Off-the-record discussion between counsel.)

3                  MR. WEISSMANN:  So I think end of the day on

4      Wednesday.

5                  THE COURT:  Okay.  If you're in agreement, then I

6      think you can file a notice and attach it with the proposed

7      redactions, but maybe do it in a way where it's highlighted so

8      I can see what's redacted or bracketed and then I can order

9      that it be made public with those redactions.  If you are not

10     in agreement, then you need to bracket it or highlight it in

11     such a way that I know who's proposing one and what's in

12     dispute.

13                 I think we've had to -- the court reporter has the

14     authority to send counsel for both sides a PDF to accelerate

15     this exercise, though -- I mean, we've done this before, I

16     guess not with transcripts.  So either way, you would make one

17     if you didn't get hers, is that correct?  We have enough

18     information now that we can figure out how to do this.

19                 MR. DOWNING:  The Office of Special Counsel can.

20     We'll rely on them.

21                 THE COURT:  Okay.  That's fine I'll ask the Office of

22     Special Counsel to transmit to me -- and it's still under seal

23     at this point -- what you think the redacted version should

24     look like.  And then I will order it to be placed on the public

25     record.  And that process can continue even before we have a

1    hearing for me to rule, at which point we'll do the same thing.

2    I think I would rather rule from the bench than do a lengthy

3    written opinion, which will take much longer.  And then we can

4    do the same thing about issuing an unsealed transcript as soon

5    as possible.

6              So, we should probably put on the record -- determine

7    right now when a hearing for me to rule on this would be.  And

8    I know I've given the parties some extra time to get

9    information to me.  And I appreciate everybody's patience with

10   what we've had to go through today.

11             I believe it was very helpful, very useful and very

12   important for you to have been here, Mr. Manafort.  I know that

13   we've had hearings where counsel sought to minimize the burden

14   on you and not have you be here, but this is about you, it's

15   not about them.  And I think it's very important that they have

16   you available to ask questions to.

17             All right.  What about on the 12th or 13th?  Can we

18   say 9:30 a.m. on the 13th for --

19             MR. ANDRES:  Tuesday?

20             THE COURT:  13th is the Wednesday.  If not, then I

21   think I can do it Tuesday.  I don't want to go as far as the

22   14th and 15th, if I don't have to.

23             MR. WEISSMANN:  Any of those days we will make work.

24             THE COURT:  All right.  Does the defense have a

25   preference?

1          THE COURTROOM DEPUTY:  11 o'clock on the 13th?

2          THE COURT:  I don't think it will take more than an

3     hour and a half, certainly; hopefully less.

4          MR. WESTLING:  So the 13th works.

5          THE COURT:  13th at 9:30 a.m. then we will reconvene

6     in a sealed proceeding to make my findings.  And I think we can

7     do a public minute order that says they can file supplemental

8     submissions by -- that has all these dates; the date that they

9     are supposed to get back to me with the proposed redactions,

10    the supplemental submissions, and let's just say an additional

11    hearing on that date that will also be under seal, so that

12    people at least know that we're working on it.  Okay.

13         THE COURTROOM DEPUTY:  Do you want to have them

14    check?  You're moving the sentencing to March.

15         THE COURT:  We did, I believe, didn't we?

16         THE COURTROOM DEPUTY:  They couldn't see their

17    calendars.

18         THE COURT:  Oh, that's right.  Did you get to do

19    that?

20         MR. WESTLING:  I wanted to ask which dates we're

21    talking about.  We've looked, so I'm prepared to answer.  So I

22    want to make sure I'm oriented.

23         THE COURT:  How about the 12th or 13th of March?

24         MR. WESTLING:  If we could do the 13th of March, that

25    would be good.

1          THE COURT:  March 13th sentencing.  Let's make that

2     also 9:30 in the morning.  All right.  The date of the

3     submission remains the same.  The point of this exercise was to

4     have time between the receipt of the submission and the

5     hearing.  All right.

6          MR. WESTLING:  Your Honor, that's the 22nd?

7          THE COURT:  Yes.  Okay.  I don't think there's

8     anything else we need to do right now.  And that's good that

9     the door will not be locked when our 4 o'clock matter takes

10    place.

11         Anything further from anybody else?

12         All right.  You all can stand up.  And we'll see you

13    next time.  Thank you.

14                              *   *   *

15

16

17    * Speaker identification corrections have been made on page 25,

18    lines 10 and 13, as well as page 83, line 11.

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5              I, JANICE DICKMAN, do hereby certify that the above

6       and foregoing constitutes a true and accurate transcript of my

7       stenograph notes and is a full, true and complete transcript of

8       the proceedings to the best of my ability.

9                            Dated this 5th day of February 2019.

10

11

12                              /s/_____

13                              Janice E. Dickman, CRR, RMR
                                Official Court Reporter
14                              Room 6523
                                333 Constitution Avenue NW
15                              Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25