<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,     ) Criminal Action
                                     ) No. 17-CR-201
 4                    Plaintiff,     )
                                     ) **PUBLIC VERSION**
 5     vs.                           ) **Sealed Hearing**
                                     )
 6     Paul Manafort, Jr.,           ) Washington, DC
                                     ) Date:  February 13, 2019
 7                    Defendant.     ) Time:  1:30 p.m.
                                     )
 8     _____

 9                  TRANSCRIPT OF SEALED HEARING
                          HELD BEFORE
10          THE HONORABLE JUDGE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
11     _____

12                  A P P E A R A N C E S

13     For Plaintiff:    ANDREW WEISSMANN
                         GREG D. ANDRES
14                       JEANNIE SCLAFANI RHEE
                         U.S. Department of Justice
15                       Special Counsel's office
                         950 Pennsylvania Avenue NW
16                       Washington, D.C.  20530
                         202-514-1746
17                       E-mail:  Aaw@usdoj.gov
                         E-mail:  Gda@usdoj.gov
18                       E-mail:  Jsr@usdoj.gov

19     For Defendant:    KEVIN M. DOWNING
                         815 Connecticut Avenue, N.W.
20                       Suite 730
                         Washington, D.C. 20006
21                       (202) 754-1992
                         E-mail:  Kevindowning@kdowninglaw.com
22
                         RICHARD WILLIAM WESTLING
23                       Epstein Becker & Green, P.C.
                         1227 25th Street, NW
24                       Suite 700
                         Washington, DC 20037
25                       (202) 861-1868
                         e-mail:  Rwestling@ebglaw.com
</pre>

```
 1     Also Present:        Michael Ficht
                            Renee Michael
 2                          Jeff Weiland

 3     Court Reporter:      Janice E. Dickman, RMR, CRR
                            Official Court Reporter
 4                          United States Courthouse, Room 6523
                            333 Constitution Avenue, NW
 5                          Washington, DC  20001
                            202-354-3267
 6
                                   *   *   *
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  Good afternoon Your Honor,

2     this afternoon we have case No. 17-201-1, the United States of

3     America v. Paul J. Manafort, Jr.  Mr. Manafort is present in

4     the courtroom, Your Honor.

5          Will counsel for the parties please approach the

6     lectern, identify yourself for the record.

7          MR. WEISSMANN:  For the government, Andrew Weissmann,

8     Jeannie Rhee, Jeff Weiland, Renee Michael, Mike Ficht, and Greg

9     Andres.

10         THE COURT:  Good afternoon.

11         MR. WESTLING:  Good afternoon, Your Honor.  Richard

12    Westling and Kevin Downing on behalf of Mr. Manafort, along

13    with Tim Wang, who's working as our paralegal.

14         THE COURT:  This is a sealed hearing.  It's a

15    continuation of the hearing we began on February 4th.  And at

16    this hearing I'm planning to announce my findings based on the

17    record.  This transcript, once it's complete, will be my

18    ruling.  I'm not going to issue a written opinion, particularly

19    not after I read all of this out loud.

20         There will be -- I think it will be appropriate to do

21    a public minute order shortly after the hearing that

22    encapsulates my findings in a way that's consistent with what's

23    already been made public in this case.  And then we'll set up a

24    procedure to do what we did last time and to release as much as

25    possible of this transcript.

1          I note there's also an ongoing dispute concerning one

2     set of redactions in the transcript of the breach hearing and

3     I'm going to take that up at the end of this proceeding, after

4     I've ruled on the breach allegations.  I really want to commend

5     both sides for how quickly you got through that exercise and

6     how much was agreed.  I don't think there's any -- the current

7     disagreement is bad faith on the part of anyone.  I think it's

8     legitimate disagreement and we'll talk about it.  But I thought

9     the fact that almost all this could be accomplished through

10    agreement of the parties was very commendable.

11          The plea agreement in this case, docket 422, provides

12    in paragraph 8:  Your client shall cooperate fully, truthfully,

13    completely, and forthrightly with the government.  The

14    defendant agreed, in paragraph 8(a), to be debriefed; in

15    paragraph 8(c) to testify at any proceedings, and in 8(f) that

16    he, quote, must at all times give complete, truthful, and

17    accurate information and testimony, and must not commit, or

18    attempt to commit, any further crimes, close quote.

19          Paragraph 8 goes on to say that the defendant, quote,

20    shall testify fully, completely and truthfully before any and

21    all grand juries in D.C. or elsewhere.

22          Paragraph 13, the breach of agreement paragraph

23    provides:  Your client understands and agrees that, if after

24    entering this agreement, he fails specifically to perform or to

25    fulfil completely each and every one of his obligations under

1    this agreement, or engages in any criminal activity prior to

2    sentencing or during his cooperation, he will have breached

3    this agreement.

4          Should it be judged by the government, in its sole

5    discretion, that the defendant has failed to cooperate fully,

6    intentionally, gave false or misleading testimony --

7    intentionally gave false or misleading testimony, has committed

8    or attempted to commit further crimes, or violated any other

9    provision of this agreement, he would not be released from his

10   guilty plea, but the government would be released from its

11   obligation under the agreement, including its promise not to

12   oppose the downward adjustment to the sentencing guidelines

13   calculations for acceptance of responsibility.  The paragraph

14   goes on to say your client understands that the government

15   shall be required to prove a breach of this agreement only by

16   good faith.

17         The defendant accepted the agreement.  His signed

18   acceptance, on the last page, says, quote, I have read every

19   page of this agreement, close quote.  Also, he signed and

20   initialed each page, signifying that to me.  The acceptance

21   also states I've discussed this with my attorneys.  I fully

22   understand the agreement and I agree to it without reservation.

23   I do this voluntarily and of my own free will, intending to be

24   legally bound.  We then deferred the selection of a sentencing

25   date for a period of cooperation and debriefings.

1          The parties informed me, in a joint status report on

2     November 26th, 2018, docket 455, that it was the Office of

3     Special Counsel's position the defendant had breached the plea

4     agreement by making false statements to the FBI and the Office

5     of Special Counsel, and that it was time to set a sentencing

6     date.

7          The defendant disputed the government's

8     characterization of the information he had provided and denied

9     that he had breached the agreement, but had agreed that, given

10    the dispute, it was time to proceed to sentencing.

11         I held a status hearing and ordered the government to

12    provide me with information concerning the alleged breach.  On

13    December 7th, 2018, the government filed its sealed submission

14    in support of its breach determination, docket 461.  On January

15    8th, 2019 the defendant filed his response to the special

16    counsel's submission in support of the breach determination.

17    That was docket 472, the public version, and 473 was the sealed

18    version.

19         The government was then ordered to identify the

20    particular false statements and produce the evidence that

21    supported its determination that they were false.  And on

22    January 15th, 2019 it filed the FBI declaration in support of

23    the government's breach determination.  That was docket 476,

24    was the redacted version; 477, sealed, with a set of

25    accompanying exhibits.  And the defendant responded in docket

1    480 on January 23rd, 2019.

2          As everyone agrees, it is the government's burden to

3    show there's been a breach, but to be relieved of its

4    obligations under the agreement it must simply show that its

5    determination was made in good faith.

6          In its January 8th response to the breach

7    allegations, the defense said that, quote, given the highly

8    deferential standard that applies to the government's

9    determination, it was not challenging the assertion that the

10   determination was made in good faith.  That was in docket 472,

11   page 2.

12         More important, in response to my question at the

13   status hearing we held on January 25th of this year, the

14   defendant conceded that the determination was in fact made in

15   good faith.

16         In light of the defendant's concession, and based

17   upon my independent review of the entire record, including the

18   pleadings I just listed and the supporting exhibits, the facts

19   and arguments placed on the record at the hearing on February

20   4th, 2019 and the post-hearing submissions filed by the

21   defendant, docket 502, and the government, docket 504, I find

22   that the Office of Special Counsel made its determination that

23   the defendant made false statements and thereby breached the

24   plea agreement in good faith.  And, therefore, the Office of

25   Special Counsel is no longer bound by its obligations under the

1  plea agreement, including its promise to support a reduction of

2  the offense level in the guideline calculation for acceptance

3  of responsibility.

4          But that is not the only question before me today.

5  The second issue is whether the statements made to the FBI, the

6  Office of Special Counsel or the grand jury that were

7  identified by the Office of Special Counsel as the basis for

8  its breach determination were in fact intentionally false.

9  Whether this defendant lied to the FBI or the grand jury bears

10  on the applicability of certain guideline adjustments, such as

11  acceptance of responsibility.  And as I noted at the last

12  status hearing, it also bears more generally on my

13  consideration of the statutory sentencing factors, decisions

14  I'm going to have to make about consecutive and concurrent

15  sentences, etcetera.

16          But, in case there's any confusion on this point, no

17  matter what I decide, I cannot sentence him to more than the

18  statutory maximum for these offenses.  I want to underscore

19  that I'm not ruling today on the applicability of the

20  adjustment for acceptance of responsibility or any other

21  guideline provision.

22          At the time of the plea, the defendant swore to me

23  that he was in fact guilty of offenses set forth in the

24  information, as well as those charged in the Eastern District

25  of Virginia.  And whether the defendant should get credit at

1    sentencing for his acceptance of responsibility for the

2    offenses in the indictment that was pending before me, or those

3    in the Eastern District of Virginia, which isn't my decision at

4    all, will involve consideration of other facts, in addition to

5    the narrow question of whether he lied about these five

6    specific topics.

7            I expect that the presentence report and the parties

8    in their sentencing memorandum will address the totality of the

9    circumstances, including the impact of today's findings on that

10   decision.  But as both the parties agreed that it should, the

11   decision that I'm going to announce today will advise you as to

12   whether I find that the Office of Special Counsel has

13   established by a preponderance of the evidence that the

14   defendant made intentional false statements with respect to any

15   of the matters.  And we're going to leave acceptance of

16   responsibility for another day.

17           I want to make a couple general observations at the

18   outset.  It is true that the Office of Special Counsel bears

19   the burden of proof by a preponderance of the evidence, and I

20   will make all of my findings applying that standard.  But I do

21   want to note that if the defense wanted me to reject inferences

22   to be drawn from the facts put forward, I can't do it based on

23   conclusory statements about how hard it is generally for a

24   witness to remember.  I do take the defendant's point that it

25   can be hard to answer questions on a broad range of topics when

1    questioners have the documents in front of them and you don't.

2    But I'm not sure how that bears on anything in particular.

3        I note generally that the allegations that

4    Mr. Manafort lied are not based on times when he said, "I don't

5    remember," which is something a person even under the pressure

6    of a debriefing session could say when they don't remember.

7    And none of the ones I'm concerned about are even based on

8    general denials which later proved to be untrue or they

9    corrected relatively promptly.  My concern isn't with

10   non-answers or simply denials, but times he affirmatively

11   advanced a detailed alternative story that was inconsistent

12   with the facts.

13       I also found the defendant's statements in his

14   submission concerning his health to be particularly conclusory.

15   In his response to the allegations, the defendant specifically

16   asked me to consider the defendant's health issues exacerbated

17   by the conditions of confinement, quote, in particular,

18   solitary confinement, close quote, as a reason why I should

19   find that the inaccuracies were not intentional.  But the

20   submission did not include any chronology, any medical or

21   mental health information, any information about the details of

22   his custodial situation, or any information concerning the

23   state of his health on any of the dates in question.

24       In short, it gave me no basis upon which I could find

25   that it would be a mitigating factor.  So I gave the defense an

1   opportunity to elaborate at the hearing.  And when I asked

2   questions at it that point it all evaporated and counsel had

3   little or nothing to say, other than, It's been shown, One sees

4   an impact, and there really wasn't any specificity there.  And

5   it left the impression that the issue was left in the pleading

6   for public consumption, but not mine.

7           This isn't the first time that the defense made a

8   strong public declaration about his conditions of confinement.

9   I think it may be useful to review how he got to the Alexandria

10  city jail, where he is now.

11          I revoked his bond on June 15th based on a finding

12  that there was probable cause to believe that he had attempted

13  to obstruct justice and interfere with witnesses.  The D.C.

14  Circuit upheld that ruling.  And he has specifically admitted

15  to doing just that under oath when he pled guilty.  So he was,

16  unquestionably, lawfully detained.  And I noticed in a minute

17  order at the time that the defendant must be afforded a

18  reasonable opportunity for private consultation with counsel.

19          It was the U.S. marshal and not the Court who then

20  made the decision regarding his placement.  He was awaiting

21  trial at the Eastern District of Virginia at that time and the

22  marshal there selected Northern Neck Regional jail.  It would

23  have been one of the options for our marshal as well, the other

24  would have been D.C. jail; it wouldn't have been up to the

25  defendant or to me, but I'm not sure the defendant would have

1    found that to be preferable.

2         Northern Neck, though, in my view, presented real

3    concerns about his ability to confer with counsel for the two

4    upcoming trials.  But before anyone presented that issue to me

5    for action, the defendant presented it to the Court in the

6    Eastern District of Virginia in early July.  He complained that

7    given the distance from the District, restrictions on his

8    electronic and phone communications, there was a severe impact

9    on his ability to prepare for trial and review documents,

10   etcetera.  And that was docket 110 in 18 criminal docket 83 in

11   the Eastern District.

12        He also attached a brief from July 5th in which he

13   told the D.C. Circuit that he was in solitary confinement,

14   locked in his cell 23 hours a day.  The Court in the Eastern

15   District of Virginia made the decision to promptly alleviate

16   those concerns by ordering, and not just recommending, that he

17   be housed in the Alexandria jail.  The defendant then

18   immediately turned around and said, Oh, never mind, we

19   respectfully ask the Court to permit him to remain at Northern

20   Neck Regional jail.

21        It became clear why in the government's pleading,

22   docket 117.  There he was housed by himself, it's true, but

23   housed within a private, self-contained living unit, including

24   his own bathroom, shower, phone, laptop, and access to a

25   separate work room for review of trial materials.  And in his

1    reply, docket 125, the defense conceded that the government had

2    not misrepresented the conditions, other than there was a

3    dispute about whether he could or couldn't send emails.

4        I'm not going to split hairs over whether that did or

5    didn't technically qualify as solitary confinement, and I'm not

6    placing any reliance on what the warden tended to call it, but

7    the facts about what it was are not in dispute.  And so that

8    all leaves the distinct impression that some disingenuousness

9    on the part of the defense played a role in how he got to

10   Alexandria.  Indeed, the Court in the Eastern District of

11   Virginia did not reverse the decision it had just made and the

12   transfer was effectuated.  And that made sense to me because I

13   was concerned about his ability to meet with counsel with the

14   two cases coming up, and with his family's ability to visit

15   him.

16        But in any event, he's been there since July 10th.

17   In those six-plus months he has not filed a single motion

18   seeking any sort of relief whatsoever, here or in the Eastern

19   District of Virginia.  There have been no formal complaints

20   lodged concerning his access to or the quality of his medical

21   care.  No information has been provided to me concerning his

22   classification or the conditions of his confinement.

23        Of course, those decisions fall within the purview of

24   the warden.  But to date, as far as I know, no habeas petition

25   has been filed in the appropriate jurisdiction.  So there's

1   nothing in the record about what's happening there now.  And

2   more important, I didn't see any evidence that indicated I

3   should take it into account.

4        I don't mean to be unduly harsh, I don't mean to

5   minimize the burden he is under.  I accept the defendant's

6   representations concerning the considerable emotional strain

7   imposed by all of it.  The combination of incarceration, the

8   realization that he would be sentenced and there would be no

9   trial, the stress and unpleasantness of repeated debriefings

10  and cooperation are difficult to bear up under any

11  circumstances.

12       I also do not question the defendant's representation

13  that he's been diagnosed with gout or that he's experienced

14  flare-ups which have worsened during his incarceration.  But

15  you didn't provide any dates or records associated with the

16  onset of the symptoms or information about the impact of the

17  medical condition on his cognitive or emotional condition.

18       So there's no evidence in the record of the

19  connection between his confinement and the exacerbation of his

20  symptoms.  And when I asked the defense to substantiate it and

21  gave it a chance, they just said, Well, it's likely that

22  there's a connection.  And the other problem is that the

23  chronology that is known doesn't give me anything to work with

24  and isn't entirely consistent with this argument.

25       Mr. Manafort pled guilty here on Friday, September

1    14th.  At that time, fortunately, he had no health complaints,

2    his ability to walk was not impaired.  He stood at the lectern

3    without difficulty, made no request for assistance during the

4    plea colloquy concerning his mental state.  He indicated that

5    he was not taking any medication that could affect his ability

6    to understand.  I'm not saying he wasn't already diagnosed with

7    gout at that time, but as of that date, September 14th, he

8    hadn't demonstrated or, at least, expressed any concerns

9    regarding physical or mental impairment.

10              Well, why is that important?  It's important because

11   three of the debriefings, September 11th, September 12th and

12   September 13th, had already taken place.  The next five were

13   quite soon thereafter, beginning the following week, on the

14   20th, the 21st, and then the 25th, 26th, and 27th, and the

15   following week October 1st and 5th.  He was debriefed again on

16   October 11th and 16th.  So every single debriefing was before

17   his appearance in the Eastern District of Virginia, in the

18   wheelchair, on October 19th when he complained publicly, as far

19   as I know for the first time, that his health was being

20   compromised by the conditions of his confinement.

21              The parties have informed me that he was still having

22   difficulty walking and required the wheelchair for the two

23   sessions before the grand jury, on October 26th and November

24   2nd, so that's a matter of record.  But the transcript, Exhibit

25   4, doesn't reflect any sort of mental impairment.  He was

1    specifically asked if the medication for the inflammation

2    affected his mental state or his ability to understand, and

3    said no.  The Office of Special Counsel did not develop any

4    concerns about his cognitive ability or emotional state during

5    the questioning and, more important, none were brought to its

6    attention.

7          So I've taken all the defense arguments into

8    consideration, but there is little in the record that would

9    explain, excuse or justify the statements of concern,

10   particularly given when they were made.

11         So now I want to turn to each of the five areas of

12   testimony.

13         The first is the payment by ███ Firm A, towards the

14   debt incurred by the defendant with an unrelated law firm.  The

15   defendant says it's not fair to characterize his initial

16   responses as false, given the confusion surrounding the

17   original transaction and confusion in the questioning.  He says

18   it's unremarkable that he wouldn't have immediate recollection

19   of the details.  But the record doesn't seem to reflect the

20   confusion and the defendant didn't profess to be confused.  He

21   does appear, though, to be making a concerted effort to avoid

22   saying what really took place.

23         Exhibit 9 is the FBI 302 of the interview on

24   September 20th.  During that interview the defendant asserted

25   that the money paid to the law firm to which he owed a debt was

1   repayment by ████████ head of Entity B, the ████████

2   ████████████████ of a loan Mr. Manafort had made to ██,

3   and that Manafort simply had ██ pay on his behalf to the law

4   firm.

5          So the initial answer cut ██ and its head, ████████

6   ████████ out of the picture entirely.  But later that same

7   interview he did agree, when confronted with that fact, that it

8   had been ████████ that made the payment to the law firm that it

9   had.  So, on October 1st, Exhibit 3, the FBI 302 of that

10  interview reflects that Mr. Manafort said, Well, ████████ paid

11  it because he had given him a lot of work in the past.

12         On October 16th he's interviewed again.  And Exhibit

13  10, the FBI 302, reports that he said, for the first time,

14  Well, I asked ████████████ to pay the law firm on my behalf as

15  a loan.  And he, thereafter, produced a copy of a promissory

16  note, but it was unsigned.  Page 3 of Exhibit 10 reports that

17  he said originally they planned for the payment to be a loan.

18         Last year, they executed a note, his accountant has

19  it.  He said he dealt with the accountant through the New York

20  lawyer, ████████████ and that ████████, quote, reminded

21  him that he had signed a loan agreement, and that it was just a

22  friend helping a friend.  About a week later, according to

23  paragraph 11 of the FBI declaration, the defense produced an

24  unsigned loan agreement.  It describes the loan as at

25  5 percent, to be repaid in tree installments in 2018; March,

1   June, and September.  In other words, all of them would have

2   been repaid by the time of the October interview.

3          Then he testified in the grand jury on October 26th,

4   Exhibit 4 is the grand jury testimony.  That time he said

5   ███████████, quote, offered to do it and it was income to him

6   because ███████████ did it in recognition of the business

7   Manafort had sent his way.

8          During the same grand jury session he also said they

9   did a loan agreement and he stated that he made a payment on

10  the loan.

11         Finally, in the same grand jury session, he testified

12  that ███ went to ███████ and asked ████████ to do it because

13  ███████ owed ███ money.

14         So those are all the different ways he's

15  characterized this.  What does the paper trail reveal?  Exhibit

16  12 is a series of texts dated June 26, 2017 from Manafort to

17  ███ -- not ███████ -- in which Manafort gives ███ all of the

18  necessary banking information to transfer funds to the law

19  firm.

20         Exhibit 2 is a bank wire transfer showing the payment

21  made by ███████████'s company, ████, to the law firm on June 26th,

22  2017.  Exhibit 14, ███████████ e-mails Manafort on September

23  24th, 2017, remaining him, I paid the firm on your behalf and

24  the tax documents are going to be forthcoming.

25         Manafort then forwards the email directly to his

accountant himself, telling the accountant that the $125,000 is
income and a 1099 is on its way.  He says, I had the vendor pay
it directly to the law firm, which has several misstatements
even in just that one sentence.  He says nothing about a loan
and he makes no reference to repayments.

Exhibit 16, in the FBI 302 of the interview with the
accountant, Mr. ███████, he said he treated it as income in
the 2017 tax return in accordance with Manafort's instructions
and he never received a 1099.  ███████ was interviewed as
well.  Exhibit 8 is the 302 of that interview.  He said it was
never a loan:  I did it because ███ told me to do it.  He said
he was supposed to kick back or share a percent of what his
company earned in its contract with the ████████, the head
of ████.  And then he simply paid it where ███ told him to
pay it at his direction.

███████ also noted he didn't know whether ███ and
Manafort had a similar arrangement and that's why ███ was
sending funds Manafort's way.  So there's no actual evidence on
that point and I can't make any findings about why Manafort
might have wanted to obscure the details of this transaction.

At the hearing the defendant said to me, Yes, but
look at the ███████ 302.  He acknowledged that he saw the
promissory note.  The plain implication of that argument was
that the loan documents were generated at the time of the
transaction.

1      Well, not quite.  ██████████ specifically told the

2  FBI that he did it because ████ told him to.  He said he had

3  dinner with Manafort afterwards, told him then that the firm

4  would need to have to generate a 1099.  He doesn't even say he

5  discussed it with Manafort as a loan then.  What he told the

6  FBI was that he saw a promissory agreement at some point, but

7  he doesn't put it before the transaction was complete; he

8  doesn't know when he saw it.  Indeed, the unsigned promissory

9  note itself is dated September 14th, 2017, three months after

10  the payment was made.

11      Four days after the grand jury testimony in Exhibit

12  17 Manafort's lawyer ██████████ sends the accountant the loan

13  document for the first time.  It's October 30th, 2018.  The

14  defense said, at the hearing, Well, that's not remarkable, the

15  preparation of the 2017 tax return was still underway.  But the

16  accountant said no.

17      Mr. ██████████ said the tax return designating the

18  payment as income had already been prepared and sent to

19  Manafort for his approval and was approved without changes on

20  that point a month before ██████████ sent him the email with the

21  loan document.  And that's consistent with Exhibit 17, which is

22  an email from ██████████ to ██████████ saying, Mr. Manafort wants

23  to know how you handled -- past tense -- the $125,000 note from

24  ██████████.

25      ██████████ responded that he wasn't aware of any note

1    from that name.  ███████ then said, Well, Paul borrowed

2    125,000 from him last year.  I don't have the signed version,

3    but attached is the draft, which I think was signed without

4    change.  And then he goes on to represent that interest

5    payments were in fact made that year and that Manafort was

6    current on them.  But there is zero evidence in the record that

7    Manafort repaid the amounts on the dates due or any other

8    dates.

9              Now, I was concerned before the hearing that the loan

10   document was a complete concoction to support the latest

11   version of the evolving story.  However, the metadata provided

12   by the defendant in docket 502-1, Exhibit A to defendant's

13   post-hearing submission, reflects that ███████ created an

14   emailed draft of the promissory note to Mr. Manafort on

15   September 14th, 2017.  And that's consistent with the date on

16   the unsigned document that was sent to the accountant in 2018.

17   And that's not disputed by the Office of Special Counsel.

18             So I'm not basing any finding today on any

19   determination that the defendant had the lawyer gin up a

20   fraudulent piece of evidence a year later.  But the fact

21   remains, there's no evidence that there was ever a signed

22   version of a promissory agreement, and even in September of

23   2017 it was nothing but a post hoc effort to make the completed

24   payment, described by Manafort as income in June, look like

25   something different than it had been three months before.

1           Indeed, ███████ told the FBI that after he had

2    already made the payment, █████ came to him and asked him if he

3    would treat it as a loan and he refused.  We don't know why ███

4    made that request, but it does appear that in September of 2017

5    Manafort was engaged in an effort to re-characterize the nature

6    of the payment.  But that never went anywhere, so the statement

7    to the Office of Special Counsel and the FBI on October 16, and

8    grand jury testimony to the effect that there was a loan

9    agreement in place, especially with the added gloss that he was

10   making payments under it, is false.

11          In the end, what we have is a series of contradictory

12   and misleading answers to the same questions, that are

13   inconsistent with the contemporaneous records.  In particular,

14   Exhibit 12, the transmission of the banking information to ███,

15   and Exhibit 14, Manafort's own email to his accountant, and

16   with the accounts of other witnesses.  He was asked about the

17   transaction for the first time on September 20, and then it was

18   the third time it was discussed, about a month later, on

19   October 16, when he first advanced the theory that it was a

20   loan, and then the story continued to evolve in the grand jury

21   on October 26th.

22          He had plenty of time to think, so the, I-can't-be-

23   expected-to-remember-everything-off-the-top-of-my-head excuse

24   doesn't work here.  And it wasn't just a denial or an omitted

25   detail, he advanced a series of new false narratives, including

1    trying to get the accountant involved, and that can't be

2    explained by the suggestion that he was confused or

3    misremembering.

4          So I find this was a matter about which he provided

5    intentionally false information to the Office of Special

6    Counsel, the FBI, and the grand jury.  I also note, without

7    deciding whether I have to make this finding or not, that the

8    record supports a finding that the Office of Special Counsel's

9    interest in tracings the flow of funds to Manafort,

10   particularly from ███ and vendors associated with the

11   campaign, was material to its investigation.

12         With regard to that issue, I'm applying the law of

13   this circuit as set forth in *United States versus Moore*, 612

14   F.3d 698, on page 701, in the D.C. Circuit from 2010.  In that

15   case the Court said Section 1001 does not define "materially

16   false."  The Supreme Court has said a statement is materially

17   false if it has, quote, a natural tendency to influence, or is

18   capable of influencing, the decision of the decisionmaking body

19   to which it is addressed, close quote.  *Moore* there was quoting

20   *United States versus Gaudin*, G-A-U-D-I-N, 515 U.S. 506.

21         The Court went on to say:  Many of our sister

22   circuits have adopted a somewhat broader approach to

23   determining materiality, asking not only whether a statement

24   might influence a discrete decision, but also whether a

25   statement might affect in any way the functioning of the

1    government agency to which it was addressed.  It cites a series

2    of other circuit opinions by example.  Two, in particular, are

3    *United States versus Lichenstein*, 610 F.2d 1272, which it

4    encapsulates the holding as, A false statement must simply have

5    the capacity to impair or pervert the functioning of a

6    government agency.

7         The Court also cites *United States versus White*, 270

8    F.3d 356, out of the Sixth Circuit.  And in that parenthetical

9    the D.C. Circuit said:  Materiality is a fairly low bar.  The

10   government must present at least some evidence showing how the

11   false statement in question was capable of influencing federal

12   functioning, close quote.  So that is how the Circuit quoted

13   the Sixth Circuit.

14        And the Court then went on to say:  In determining

15   whether a false statement is material, this Court -- the D.C.

16   Circuit -- has consistently asked whether the statement has a

17   tendency to influence a discrete decision of the body to which

18   it was addressed.  Then there's several cites.  It said:  We

19   have, however, suggested a lie distorting an investigation

20   already in progress also would run afoul of Section 1001.  We

21   now join the other circuits in holding a statement is material

22   if it has a natural tendency to influence, or is capable of

23   influencing, either a discrete decision or any other function

24   of the agency to which it is addressed.

25        So it is this precedent from *Moore* that provides the

1    definition of materiality that underlies my findings.

2          I also note that the D.C. Circuit said, in *United*

3    *States versus Winestock*, 231 F.2d 699, the issue to which the

4    false statement is material need not be the main issue, it may

5    be a collateral issue, and it need not bear directly on the

6    issue, but may merely augment or diminish the evidence upon

7    some point.

8          All right.  So those are my findings with respect to

9    issue No. 1.

10         Issue No. 2 was Kilimnik's role in the obstruction

11   conspiracy.  This issue has to do with Manafort's and

12   Kilimnik's joint attempt to get witnesses to the FARA charges

13   against Manafort to say that the advocacy he called upon them

14   to do on behalf of former Ukrainian President Yanukovych and

15   his party was not supposed to be performed in the United

16   States.

17         Exhibit 10 is the FBI 302 from October 16, 2018.  It

18   includes a detailed description of Mr. Kilimnik's state of mind

19   and denies that he was attempting to influence witnesses to

20   give false testimony at trial.

21         The defendant's first explanation about this in its

22   initial response to the breach allegations was:  Well, he was

23   just saying he couldn't speak to Kilimnik's state of mind.

24   That actually wasn't a very fair characterization because he

25   affirmatively stated what it was.  At the hearing, defendant's

1    second explanation was that I should look at this in the

2    context of the previous paragraph in the 302, where

3    Mr. Manafort had just said that he had talked to Kilimnik after

4    the superseding indictment came down and he reports what

5    Kilimnik thought and felt at that time.  And the defense said

6    that as in that paragraph and the next paragraph, he was just

7    transmitting what Kilimnik had said to him.

8            I think it's also fair to say that advancing that

9    version was not just relaying what Kilimnik had said, it

10   appears to be an attempt to exonerate him.  And it's odd and

11   problematic that after he huddled with counsel and returned, to

12   agree that, yes, Kilimnik had conspired with him, as had been

13   admitted in the plea agreement.  He denied that he had ever

14   said anything else in the same debriefing session.  That's in

15   the declaration in paragraph 17.

16           It's also a bit of a stretch because Mr. Manafort

17   doesn't just say to the agents, Kilimnik doesn't believe he was

18   pressuring the witness, or Kilimnik didn't think he was

19   suborning perjury, he didn't intend to violate U.S. law, he

20   makes the affirmative assertion that Kilimnik believed the

21   project was a European project, when Manafort plainly knew that

22   Kilimnik knew it wasn't and the documents plainly reflect that

23   it wasn't, and that was the basis for the conspiracy count to

24   which he pled guilty in the first place.

25           To me, this is definitely an example of a situation

1   in which the Office of Special Counsel legitimately concluded

2   he's lying to minimize things here, he's not being forthcoming,

3   this isn't what cooperation is supposed to be.  This is a

4   problematic attempt to shield his Russian conspirator from

5   liability and it gives rise to legitimate questions about where

6   his loyalties lie.

7           So it bears upon my finding that the Office of

8   Special Counsel was fully justified in its determination and

9   acted in good faith when it found that he didn't live up to his

10  obligations under the plea agreement.

11          But even with the relatively low standard of proof by

12  a preponderance, making a finding of an intentional false

13  statement is challenging in the absence of a transcript or even

14  notes that memorialize the particular question he had asked ask

15  and what he was answering, as opposed to a 302 with the answers

16  only.

17          While I find the defense theory to be strained and

18  I'm not really sure I buy it, the language of the 302 can be

19  read to support the defendant's alternative explanation.  Given

20  that, and given his correction of the record within the same

21  interview, I'm not comfortable that I can go on to find that

22  this particular example rises to the level of an intentional

23  falsehood, a lie to the FBI that would constitute the

24  commission of an independent crime while awaiting sentencing in

25  two cases.  So I am not finding that he intentionally lied with

1    respect to that matter.

2           The third matter is his interactions with

3    Mr. Kilimnik.  The first one that came up was discussions

4    concerning what's been referred to as the peace plan.  As with

5    the prior incidents, there was much that was re-explained and

6    corrected the number of times this came up.

7           The most problematic to me is described in paragraph

8    29 in the declaration, and Exhibit 101, the FBI 302 from

9    September 21st, on page 4, where he doesn't just say I don't

10   remember discussing the peace plan with Mr. Kilimnik after

11   August 2016 and proved to be wrong about it.  He asserted that

12   he put the kibosh on the idea.  He called it a bad idea.  He

13   said he didn't trust ███████ and he didn't want to work on

14   it, and then he gave the FBI a series of specific reasons that

15   he ended the discussion for good at that time.

16          This is not supported by any evidence, even his

17   argument that he was telling the truth because what he told the

18   FBI he said at the time was:  I was opposed to any peace plan

19   with ███████, as opposed to any peace plan, is contrary to

20   the subsequent emails trying to elicit the reaction to plans

21   with ██████ playing a key role.  Creating an alternative

22   narrative is not the same thing as simply denying or professing

23   not to remember that something happened, and it's not

24   consistent with the defense argument that he just didn't

25   remember.

1          So I find that the September 21st claim that he laid

2     the issue to rest by telling Kilimnik he was opposed and that

3     it didn't come up again was an intentional material false

4     statement.

5          Moreover, there are other misleading, inaccurate

6     statements that reinforce the conclusion that he was lying

7     about his dealings with Kilimnik.

8          He was also asked about a February 2017 meeting in

9     Madrid regarding the peace plan and questions about his role

10    doing research in advance of Ukrainian elections and his

11    polling for a Ukrainian candidate.  The defense says, in its

12    reply to the FBI declaration, basically, Gee, it was just all

13    so confusing.  And it points out that at the end of the day he

14    sort of acknowledged most of this.  And maybe if you took each

15    fact separately and each attempt to dissemble about Kilimnik

16    individually, they might not support a finding of criminality.

17         But there are multiple instances of this and they all

18    follow a pattern.  Concessions comes in dribs and drabs, only

19    after it's clear that the Office of Special Counsel already

20    knew the answer.  Again, it's part of a pattern of requiring

21    the Office of Special Counsel to pull teeth; withholding facts

22    if he can get away with it.  And that's just not consistent

23    with what was contemplated by the plea, and it supports the

24    breach determination.

25         Denying the meeting in Madrid was denying a contact

1    that was a part of what the Office of Special Counsel was

2    investigating.

3            With respect to the questions regarding his efforts

4    to conduct polling in the Ukraine in connection with its

5    upcoming elections and to have the polls test the reaction to

6    the specific plan that Kilimnik and ███████ were still

7    trying to advance, and questions concerning Kilimnik's

8    knowledge and involvement, we again have a series of revised

9    explanations, grudging revelations and admissions.

10           The defense tries to argue, well, it's only a few

11   questions in the poll and those were collateral to the main

12   thrust of the poll, which is the presidential election.  But I

13   don't think that can really be minimized in that way.  These

14   were the questions that were provided by Manafort and they were

15   important to him and to Kilimnik.

16           On page 6 of docket 470, the defendant's response to

17   the breach determination, the defense explains and tries to

18   minimize Manafort's initial inaccurate statements about meeting

19   Kilimnik in Madrid by saying, Well, it's reasonable he wouldn't

20   recall events from that time period because his primary focus

21   was the U.S. presidential campaign, and he's not likely to

22   recall other, less pressing events like conversations about an

23   unlikely return to power by ███████ in some other country.

24           Maybe.  But ███████ seems to have been a recurring

25   figure of importance in communication with Kilimnik and the

1    Ukraine; in particular, the political faction with loyalty and

2    ties to Russia, doesn't seem to have ever been far from

3    Manafort's mind, even when he was working on the campaign.

4         But even if I want to give that argument some weight,

5    running a presidential campaign is, after all, a fairly

6    all-consuming exercise.  That explanation falls apart

7    completely when the defense goes on to say, in the next

8    sentence, quote, The same is true with regard to the

9    government's allegation that Mr. Manafort lied about sharing

10   polling data with Mr. Kilimnik related to the 2016 presidential

11   campaign, period, close quote.

12        That's not the same at all.  You can't say you didn't

13   remember that because your focus at the time was on the

14   campaign.  That relates to the campaign.  And he wasn't too

15   busy to arrange and attend the meeting and to send Gates the

16   email transmitting the data that very day.  It's problematic no

17   matter how you look at it.

18        If he was, as he told me, so single-mindedly focused

19   on the campaign, then the meeting he took time to attend and

20   had the data available for had a purpose related to the

21   campaign.  Or, if it was just part of his effort to use his

22   position in the campaign to feather his own nest, reestablish

23   and reassure his foreign business contacts for the future,

24   well, in that case he's not being straight with me about how

25   single-minded he was.  It's not good either way.

1          Plus, his asserted inability to remember rings hollow

2     when the event we are discussing involving sharing internal

3     confidential polling data covered by a non-disclosure agreement

4     not only outside the campaign, but he's sharing it with a

5     foreign national with a specific understanding and intent that

6     it would be passed on to other foreign nationals, in this case

7     Russians, at a meeting in which the participants made it a

8     point of leaving separate because of the media attention

9     focused at that very time on Manafort' relationships with

10    Ukraine.

11          This is another example of the distinction between a

12    simple denial or failure of recollection and an assertion of

13    fact.  And the concern here is greater because this false

14    statement occurred before the grand jury.

15          He told the grand jury he only told Gates ██████████

16    ███████████████████████████████████████████████████

17    ███████████████████████████████████████████████

18    ████████████████  The grand jury testimony, Exhibit 4, begins, on

19    page 152 on that matter, quote, ████████████████████████████

20    ██████████████████████████████████████████

21    █████████████████████████████████████████████████

22    ████████████████████████████████████████

23    ███████████████████████████

24          When asked, on page 154, what exactly did you ████████

25    █████████████████████████████████████████████████████

1  ████████████████████████████████████████

2        All this a contrary to what Gates had to say.

3  Exhibit 222, the FBI 302 of the January 31st, 2018 proffer

4  session, Gates said he sent Kilimnik, quote, the polling data,

5  close quote, at Manafort's direction.  He sent it by WhatsApp

6  and deleted it that day.  Gates didn't think that Manafort sent

7  Kilimnik anything else about the campaign, other than the

8  polling data.  Now its true that particular 302 doesn't specify

9  internal polling data.  But publicly available press polls are

10  publicly available, so why would one need encrypted

11  communications immediately deleted?

12        Exhibit 223, September 27th, 2018, the FBI 302,

13  Mr. Gates said clearly, on that day, the polling data he was

14  told to send was a mix of public polls and the ████████ polling

15  data.

16        Defense says I shouldn't believe Gates.  But even if

17  I take into account his lack of recollection of certain details

18  and dates, there's no reason to reject at all in its entirety.

19  The defense pointed to articles outside the record regarding

20  the Virginia trial, whether one or more of the jurors there in

21  fact decided to set aside his testimony because they were

22  concerned about the credibility of a witness who had made a

23  deal.  The verdict, based on the documents alone, if it was,

24  turned out to be consistent with his testimony.  More

25  important, the tax evasion, bank fraud, FBAR, and FARA

1    allegations supported by Gates's testimony have all been

2    admitted to under oath by Manafort himself.  And not everything

3    Gates said was inculpatory.  There were some questions he

4    couldn't answer, and there was a lot of what he said that

5    supports Mr. Manafort's theory.  For instance, as the defense

6    points out, he minimizes the significance of sharing the data

7    in the first place.

8              More important to me, there's other corroboration.

9    There's Exhibit 233, an August 2nd email to Gates directing him

10   to bring the internal polling data to a meeting that day.  Now,

11   I was told on February 8th, for the first time, in the third

12   pleading that was filed in response to these allegations and

13   after the hearing was over, that when Mr. Manafort said bring

14   it to the SCh meeting, that that's shorthand for a scheduling

15   meeting, as opposed to possibly a scheduled meeting, and it

16   meant a scheduling meeting with campaign staff.  There's

17   nothing provided to substantiate that, but there's also nothing

18   in the record to indicate one way or the other that the two men

19   had met previously that date at a scheduling meeting.

20             All Gates said to the FBI in Exhibit 236 on January

21   30th was that he was invited to the Kilimnik meeting by a text

22   or email.  Is that text alone definitive?  Am I relying on that

23   solely?  No.  But is it corroborative of Gates's statement that

24   internal polling data was shared at the meeting?  Yes.

25             So the defense said at the hearing, Well, it's a

1    recent fabrication.  He didn't say internal polling data was

2    shared at the August meeting until September.  September of

3    2018.  But it turns out the record doesn't support that.

4          Exhibit 222, as I noted, on January 31st, on page 17,

5    he did say polling data was sent at Manafort's direction.

6          Exhibit 236, the 302 from January 2018, Gates says we

7    discussed battleground states, polling data, and trends

8    regarding the Trump campaign and the battleground states.

9    Those are pretty specific words.

10         Exhibit C to docket 504, the FBI 302 from February 7,

11   2018, which has more recently been provided by the government,

12   on page 15 it notes that Manafort said, back in February --

13   that Gates said, back in February, Manafort instructed Gates to

14   send Kilimnik information from ███████ polls.  Gates sent

15   Kilimnik both publicly available information and internal

16   information from ███████ poles.  This conclusion is

17   reinforced when you see the series of emails from Kilimnik to a

18   number of people, Exhibits 225 to 232, where he says, quote,

19   Trump's internal polling data shows, and he goes on.

20         So, the defense took another tack then and said,

21   Well, it's not important because these pages of data are

22   gibberish.  Who knows what they mean?  I reject that.  It is,

23   perhaps, true that I don't know what they mean and it's perhaps

24   true that Mr. Westling doesn't know what they mean, but

25   Mr. Manafort, Mr. Gates, and Mr. Kilimnik are political

1    consultants, this is their stock in trade.  These are people

2    who hire pollsters, help design the surveys, and consume the

3    results.

4         Indeed, the 302s make mention of the fact that

5    Manafort specifically wanted his own polling people, █████'s

6    company, instead of █████████, helping out.  And the

7    recently provided 302 from Mr. Gates emphasizes that ████████

8    data was the particular sort of traditional survey data

9    Manafort found most helpful.  And here they're at a meeting

10   where they specifically talked about battleground states, the

11   voters they wanted to appeal to there.  And they're talking

12   about trends and the word "trend" is all over the data.  So

13   that's not a very strong argument.

14        Also, the evidence indicates that it was understood

15   that the data would be passed from Kilimnik to prominent

16   Russians, including ██████████████, and █████████.

17   Whether Kilimnik is tied to Russian intelligence or he's not, I

18   think the specific representation by the Office of Special

19   Counsel was that he had been, quote, assessed by the FBI,

20   quote, to have a relationship with Russian intelligence, close

21   quote.  Whether that's true, I have not been provided with the

22   evidence that I would need to decide, nor do I have to decide

23   because it's outside the scope of this hearing.  And whether

24   it's true or not, one cannot quibble about the materiality of

25   this meeting.

1          In other words, I disagree with the defendant's

2     statement in docket 503, filed in connection with the dispute

3     over the redactions, that, quote, the Office of Special

4     Counsel's explanation as to why Mr. Manafort's alleged false

5     statements are important and material turns on the claim that

6     he is understood by the FBI to have a relationship with Russian

7     intelligence.

8          I don't think that's a fair characterization of what

9     was said.  The intelligence reference was just one factor in a

10    series of factors the prosecutor listed.  And the language of

11    the appointment order, "any links," is sufficiently broad to

12    get over the relatively low hurdle of materiality in this

13    instance, and to make the transmission of campaign information

14    to Kilimnik and to other Russian nationals through Kilimnik

15    material to the FBI's inquiry, no matter what his particular

16    relationship was on that date.

17         At the hearing the defendant pointed me to Exhibit

18    230 as support for its claim that actually Kilimnik was ███

19    ████████ information to the United States, ██████████████████

20    ████████████████████████████████████████████ and,

21    therefore, I should consider the Office of Special Counsel's

22    representation that he was connected to Russian intelligence to

23    be rank speculation.

24         First of all, I don't think these two things are

25    mutually exclusive.  An individual could ██████████████████

1  ████████████████████████████████████████████████████

2  ████████████████████.   But as I've said, I'm not making a

3  finding either way and I don't think it's necessary to the

4  decision I have to make.   The fact that Kilimnik's status,

5  loyalties, or activities could be ████████████████████████

6  █████████████████, doesn't make the meeting immaterial or

7  Manafort's testimony about it truthful.

8           I'm also not sure that Exhibit 230 proves the

9  defendant's point.   It is an August 18, 2016 email sent to an

10  individual in the State Department, I believe at the U.S.

11  embassy in Ukraine, in which Kilimnik voices his personal

12  opinion about comments being made publicly about any affinity

13  between ████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ██████████████

16           I note that ████████████████████████████████████████

17  ████████████ on the part of Kilimnik, as opposed to what might

18  jump out as ████████████████████████████████████████████/

19  because ████████████████████████████████████████████████

20  ██████████████████████████████.   And the focus of the

21  ████████████████████████████████████████████.   He advances

22  the view that, as he sees it, ████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████.

 1      It's also notable that in ██████████████

 2  █████████████████████████████████████████████

 3  █████████████████████████████████████████████

 4  ████████████.  And as we know, Manafort was gone the next day.

 5      So the email doesn't really answer the question

 6  defense counsel raised one way or the other.

 7      In a submission related to the dispute over

 8  redactions to the hearing transcript, the defendant provided

 9  more information, that was docket 503, documents that have been

10  provided in response to his discovery request that do confirm

11  that Kilimnik regularly spoke with officials in the embassy,

12  and the Office of Special Counsel confirmed that at the

13  hearing.

14      Again, and without more guidance on the technical

15  meaning the word has in this context, I don't have the record

16  to decide, don't need to decide, and probably shouldn't decide

17  if the defendant's characterization of Kilimnik ████████████

18  accurate or not, and I'm not making any finding one way or the

19  other on that issue.

20      I do note that in the FBI 302 the defendant asked me

21  to review as an attachment to docket 503, the interviewee ██████

22  ████████████ noted that when ████████████████████████

23  ██████████████████████████████████████████

24  ████████████████████████████████████████████

25  ██████████████████████████.  So they have that in common.

1          The important thing is neither Exhibit 230 or any of

2     the other information provided changes the outcome in my

3     finding on this matter.  And I find by a preponderance of the

4     evidence that Mr. Manafort made intentional false statements to

5     the FBI and the grand jury with respect to the material issue

6     of his interactions with Kilimnik, including, in particular,

7     the sharing of internal polling data.

8          On that note, I also want to say we've now spent

9     considerable time talking about multiple clusters of false or

10    misleading or incomplete or needed-to-be-prodded-by-counsel

11    statements, all of which center around the defendant's

12    relationship or communications with Mr. Kilimnik.  This is a

13    topic at the undisputed core of the Office of Special Counsel's

14    investigation into, as paragraph (b) of the appointment order

15    put it, Any links and/or coordination between the Russian

16    government and individuals associated with the campaign.

17         Mr. Kilimnik doesn't have to be in the government or

18    even be an active spy to be a link.  The fact that all of this

19    is the case, that we have now been over Kilimnik, Kilimnik, and

20    Kilimnik makes the defense argument that I should find the

21    inaccurate statements to be unintentional because they're all

22    so random and disconnected, which was an argument that was made

23    in the hearing, is very unpersuasive.

24         But we now get to go on to another topic, which is

25    IV, about another Department of Justice investigation.  There

1    are allegations in connection with the ██████████████

2    ██████ investigation into potential ████████████ involving

3    ████████████████████████████████████████

4    ████████████████████████████████.

5            The allegation is that Mr. Manafort offered a version

6    of events that downplayed ████████████ role and/or

7    knowledge, specifically including his knowledge of any

8    involvement of ████████████ that was inconsistent with

9    and less incriminating of ████████ than what he had already said

10   during a plea proffer, and was inconsistent with what

11   Mr. ██████ himself -- was consistent with what Mr. ██████

12   himself was telling the FBI, and that in this session where he

13   watered down when he'd said before the plea, he had to be

14   redirected by his lawyer multiple times.

15           Defendant suggested it's not really that important

16   because it wasn't about his own wrongdoing and all the

17   statements were corrected in the same interview.  I'm not sure

18   I buy that because the point of seeking cooperation from a

19   person at the highest level of the campaign was to obtain

20   accurate information about the acts of others, in particular,

21   what transpired during the campaign.  So it's very troubling to

22   me.

23           Also, you don't have a situation where he reverted to

24   the original version after consultation with counsel, but he

25   cycled through a series of different inaccurate versions.

1          Exhibit 301, the proffer session with the Office of

2    Special Counsel and the FBI on September 13, counsel was

3    present.  He advised the FBI that Mr. ██████ had contacted him

4    regarding a, quote, ████████████████.  So they had to go meet

5    ████████████ that day.   ██████████ told Manafort that ████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████

9          They had the meeting.  ████████████████, but

10   Manafort didn't recall the name.  And at the meeting ██████

11   said to ██████, in Manafort's presence, that ████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████.  Later, ██████████ told Manafort

15   ████████████████████.  When contacted by ████████████ regarding

16   what Mr. ██████ called a ████████████, Manafort said he didn't

17   discuss it with him, didn't want him involved, and ultimately

18   just told him it had been handled.

19          Okay.  Then he pled guilty and attended a debriefing

20   session where representatives from ██████████████████████████

21   ████████████████████████████████ were present.  October

22   5th, 2018, Exhibit 300, FBI 302, we've not got a different

23   version.  The first go-around is totally whitewashed.  He

24   leaves out any reference to ██████████████████ or the nature

25   of the problem.  He says after the ████████████ he got a call

1   from ████ saying █████████████████████████

2   ████ It wasn't specified.  It was later told it was a false

3   alarm, not an issue.  So counsel refreshed him with the notes

4   of the first meeting.

5          Second time Mr. Manafort says, Oh, Mr. ████ called

6   around the same time about a ████████ and ████ mentioned

7   that ████████████████████████.  And he

8   told ████ it would been handled and that he had no knowledge

9   of ██████████████████████████

10  ██████████████ had come out.

11         There's some more reading of prior notes, he gives a

12  different account.  This time he remembers being at a meeting

13  with ████████, says they were speaking in shorthand.

14  ██████████████████.  Manafort

15  said that ████ told him it was ██████████████

16  ████████████████████████

17  ██████████████████.

18         The fourth time he says ████ called, said ████

19  ████████████████████████

20  ████████████████████████

21  ██████████████████████

22  ████████████████████████

23  ████████████████████

24  ████████████████████

25  ████████████████████████

███████████████████████████████████████████████████

████████████

       I note that at no point has the defense told me in any pleading that the first version was mistaken.  I can't find that these variations can be explained by a failure of recollection.  The versions were not at all consistent with what had been said by the defendant himself only a month before.  The evidence suggests that he decided to obscure what had taken place to shield possibly Mr. ███████████████

███████████████████████████████████████.

       This withholding of facts, this begrudging behavior, advancing a new version that's less inculpatory of ████████████

██████████████████████████ was significant enough to set off alarm bells with his own lawyers, not consistent with the plea offer, and fairly considered by the Office of Special Counsel to be a breach.  And given the stark difference between what he said and what he reported less than a month before and the effort it took to get him even close to what he said the first time, I find if to be intentionally false.

       Finally, the fifth category of information was contacts with the administration.  Here, I'm not persuaded that the Office of Special Counsel has presented evidence of an intentional misrepresentation, or really a breach of any moment with respect to this issue, although it's already been conceded that they acted in good faith in making the allegation.

1       The Office of Special Counsel says its concern is his

2   denial of even indirect communication.  They don't challenge or

3   claim that he lied about not having direct communication.  They

4   point to Exhibit 10, page 2, the FBI 302 from October 16th

5   which reports Manafort never asked anyone to try to communicate

6   a message to anyone in the administration.

7       Again, I don't have the specificity I need about what

8   question was asked to prompt that.  Was he asked was it direct

9   or indirect?  What was he asked?  And so I can't deem the grand

10  jury testimony and the documents with which I've been provided

11  to be evidence that what he said in that interview when he said

12  that was false.

13      While there is evidence he agreed to talk to other

14  people outside of the administration on ███████ behalf

15  with the understanding that they might contact the

16  administration about ██████, and he agreed that another

17  ████████████ of the administration could report that he had

18  Manafort's support, I'm not sure that's inconsistent with he,

19  quote, never asked anyone no try to communicate a message to

20  anyone in the administration.

21      I've seen the record regarding the ERISA matter, and

22  while it does seem as if part of the plan was that somebody was

23  going to contact ████████, I can't find that the government has

24  proved by a preponderance that he intentionally lied during the

25  debriefing with respect to this matter.  If there were other

1    contacts of concern to the Office of Special Counsel, as

2    counsel seem to allude to at the hearing, they haven't been

3    brought to my attention in this proceeding and they don't bear

4    and can't bear on my decision.

5          With that, I believe I've ruled on every issue that's

6    been put to me in connection with the breach proceeding.  I do

7    think it's important to issue a public order and I will try to

8    do one that is consistent with all our previous redactions and

9    doesn't have any sealed material in it.

10         As I said at the outset, I'm going to determine the

11    applicability of any particular guideline provision at the time

12    of sentencing and not today.  What I think we need to do is, as

13    we did before, establish a schedule for the receipt and review

14    of the transcript.

15         Assuming you get the transcript tomorrow by noon, how

16    long would you like to review it to propose redactions before

17    this makes it to the public record?

18         MR. WEISSMANN:  Can I just consult with --

19         THE COURT:  Yes.

20         (Pause).

21         MR. WEISSMANN:  Your Honor, the parties think if we

22    get it by noon tomorrow, we'll make every effort to get

23    something to you by the end of the day, literally, tomorrow.

24    But if for some reason we can't, first thing Friday morning.

25         THE COURT:  Tomorrow is Thursday.  Okay.  Yes.  All

1    right.  Well, as soon as I get it, I'll review it.  Hopefully,

2    I think particularly after we have our next conversation,

3    hopefully there won't be any disputes about what needs to be

4    redacted and what doesn't.  If there are, I'll resolve them

5    promptly and we'll try to get this on the public record as soon

6    as possible.

7            I think there was an understanding back at the

8    beginning that the probation office would need to be informed

9    of my findings so that it could factor them into its

10   recommendation about the various guideline determinations.  So

11   does anybody have a point of view about whether it needs to be

12   informed of the rulings in their entirety, or whether once we

13   post the redacted transcript and we have the minute order, that

14   that is going to be sufficient?

15           And I guess I have the same question because it

16   appears that the Court in the Eastern District of Virginia was

17   waiting to know how I ruled on these issues.  So whether just

18   continuing to complete this docket with the redacted transcript

19   and a minute order is going to be enough for both of those

20   consumers, do you have a thought about that?

21           MR. WEISSMANN:  So, taking those in turn.  First,

22   with respect to probation, we have no objection to probation

23   getting the unredacted transcript.  And we understand that if

24   it's incorporated in some aspect of the presentence report,

25   that's private in any event, since that doesn't become part of

1    the public record.  And to the extent there's some dispute

2    about the presentence report, I don't think the names would be

3    that relevant and we could sort of deal with that issue if

4    there's something in the presentence report that is sensitive.

5          With respect to Eastern District of Virginia, we were

6    planning, after today's appearance, of writing some sort of

7    status report to alert the Eastern District of Virginia to the,

8    sort of, two issues that might be of relevance to it.  Which

9    is, one, the concession with respect to the breach, and then

10   the Court's determination.  We were planning on submitting the

11   redacted version of the transcript, and then if the Court for

12   some reason wants to see the unredacted one, we, of course,

13   would not have an objection to that, but that wasn't initially

14   how we were going to proceed.

15         THE COURT:  Well, I think that makes sense because

16   that's what's public.

17         And do you have any difficulty with their proceeding

18   in that manner?

19         MR. WESTLING:  I can only say that I am a little

20   concerned about sending a judge a redacted version, rather than

21   the whole transcript.  I mean, I think Judge Ellis would have a

22   right to see everything that's there, without having to ask for

23   it.  I mean, I just think that's from a point of view with

24   respect to his position.  I feel uncomfortable that we would be

25   somehow keeping him out of the loop.

49

1          MR. WEISSMANN:  Well, I guess my view is I'm not

2     asking -- I wouldn't ask this Court to make a ruling with

3     respect to a different judge, but we could always alert the

4     Court that if it wanted that material, of course it would be

5     provided.  The reason I think it's okay to proceed in that way,

6     and I might just be reading between the lines --

7          THE COURT:  I think if you're going to docket there a

8     notice that I have ruled and then you docket there here's what

9     happened, I don't have any problem with your putting into the

10    notice that there's the sealed, unredacted transcript, the

11    parties agree that -- and I would agree that he could have it,

12    if he asked for it.

13         MR. WEISSMANN:  That's fine.

14         MR. WESTLING:  I think that's the point, Your Honor.

15         THE COURT:  All right.  So I think we know how we're

16    going to proceed.

17         The only thing I have left to talk about is the

18    dispute over the redactions.  And I guess my first question for

19    you, Mr. Weissmann, is I went back to see if you had redacted

20    your description of Mr. Kilimnik as having a connection to

21    Russian intelligence, and you didn't.  That's in the public

22    record.  So I don't then understand what the circumstance would

23    be that would require us to redact out Mr. Downing's attempt to

24    counter it.  ██████████████████████████████████████████

25    ████████████████████████████████████████████████████████

1   ████████████████████████████████████████

2   And apparently this entire dispute was already been set out in

3   the *Washington Post* today, so there's that.

4          I don't -- there's an article in the *Washington Post*

5   that discusses the Havana meeting and discusses the fact that

6   the government has called Mr. Kilimnik connected to Russian

7   intelligence, and that there's evidence that he has

8   considerable interaction with the State Department,

9   something -- and so that's all in the newspaper.

10         But, putting aside whether it's there for a good

11  reason or a bad reason, I'm not suggesting it, I don't

12  understand what the harm would be for the limited additional

13  disclosures that they want to make, given what you said on the

14  record.

15         MR. WEISSMANN:  Ms. Rhee is going to handle this.

16         THE COURT:  All right.

17         MS. RHEE:  So, Your Honor, the government does

18  acknowledge that Mr. Weissmann, in the sealed proceeding, made

19  an aside about what had already been previously put into the

20  record in numerous public filings that predate the sealed

21  hearing.  And just to give you one example, from December 2018,

22  on docketed document No. 73, there is the same singular

23  reference to an FBI assessment that Mr. Kilimnik has a

24  relationship with Russian intelligence.  So that's already part

25  of the public record and had not heretofore been responded to

1    or objected to from the defense.

2           So that is the reason why that remains part of the

3    transcript in the sealed proceeding.  The government's

4    objections and the very particularized dispute here begin on

5    page 76 of the transcript.  And it isn't a request on the part

6    of the government to redact the entirety of Mr. Downing's

7    counter to the relevance and/or the significance of

8    Mr. Kilimnik, but, rather, to the particular lines that

9    characterize what at that point in time had not even been

10   entered into the record, ███████████████████████████████

11   ████████████████████████████████████

12   ██████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ████████████████████████

15       ████████████████████████████████████████████████████

16   ██████████████████████████████████████████████

17   ████████████████████████████████████████

18   ██████████████████████████████████████████████

19   █████████████████████████████████████████

20   █████████████████████████████████████████

21   ████████████

22           So just to begin with, Your Honor, now that the

23   underlying 302s are a part of the record, as attached by the

24   defense on Friday's filing, you can see that ████████████

25   ██████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████

4          And so just as a first order matter, for purposes of

5 making the document public, there is really no basis to support

6 that characterization.

7 ████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 █████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████

13 ██████████████████████████████████████████

14 ██████████████████████████████████████████████

15 █████████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ██████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 █████████████████████████████████████████

20 ████████████

21          I would also note, just furthermore, what was not

22 redacted and may well be reflected now in a news article, is

23 the record being replete with an acknowledgment on the part of

24 the government that Mr. Kilimnik did have communications with

25 the State Department and that they may have been rather

1    extensive.

2            THE COURT:  Well, and I guess that's -- it seems like

3    there may be a little bit more of what was blocked out that

4    could come in, where what they're saying is he had

5    communications with the State Department and that's not denied.

6            MS. RHEE:  But those, I think, Your Honor, are

7    already part of the now unredacted transcript.

8            My understanding of the dispute, and you can see it,

9    I think, in what had been Attachment D to the original proposed

10   redaction filing by the parties, the lines in dispute are on

11   page 76, lines 13 through 16.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



THE COURT:                              we have in the

record the assertion that he has connections to Russian

intelligence.  I think there is a desire on the part of

defense, that I understand, to have in the record the defense

assertion, to say he was providing information to the United

States government.

Let's put aside the characterization, just the fact

of those ongoing communications which the government is not

seeking to redact out.

MS. RHEE:  Correct.

```
 1              THE COURT:  But, I'm just thinking that there may be
 2     some other words on the first page that would be consistent
 3     with what you're saying, because otherwise the discussion
 4     that -- what Mr. Weissmann says is not responding to anything,
 5     and it's not clear what it is Mr. Downing was saying.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21              So I'm wondering if you would object to:  There are
22     documents that you were given regarding Mr. Kilimnik's
23     communications with former high-level State Department
24     officials?
25              MS. RHEE:  Government has no objection to that, Your
```

 1   Honor.

 2          THE COURT:  All right.  Let me talk to Mr. Downing

 3   for a minute about this.  Or whoever is going to deal with

 4   this.

 5          All right.  He's using words, terms of art.  I don't

 6   know how specific he meant to be when he used them.  But that

 7   is what the government is objecting to, in a not-unreasonable

 8   manner.  ███████████████████████████████████████████████████

 9   ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ██████████████████████  And then you have Mr. Weissmann's

12   acknowledgment on the record.  There were definitely

13   communications that Mr. Kilimnik has with the people in the

14   State Department.  I don't think it's relevant, but he's not

15   denying it.  And so if that's something that you want to say

16   publicly, it's said.  Is that enough?  ███████████████████████

17   ██████████████████████████

18        ████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22        ████████████████████████████████████████████████████

23   ██████████████████████████████████████████████  We're simply

24   having the record establish, the best we can, that there are

25   these communications going on that we've learned of through

1    discovery. 

2

3

4

5            (Off-the-record discussion between defense counsel.)

6            THE COURT:  All right.  Mr. -- Ms. Rhee.

7            Is there more that you want to say, Mr. Westling?

8            MR. WESTLING:  I don't think so at this point, Your

9    Honor.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



what you have is a document that demonstrates, yes,

Mr. Kilimnik provided information to the United States embassy

in the Ukraine, which Mr. Weissmann acknowledges on the record.

        THE COURT:  I don't think the 302 really

characterized it.  It reflected that he talked to them a lot

        there's no question that they spoke to him.

        MS. RHEE:  Right.  And that's very clearly reflected

on the record, that that is something that Mr. Weissmann and

the United States government is able to acknowledge.



THE COURT:

     I mean, I think it's fair that even in the current
public version, it says there is no question that Mr. Manafort
had -- I don't think he meant Manafort, I think he meant
Kilimnik, but he said Manafort had communications with people
at the State Department.  There's no question that Mr. Kilimnik
did.  So to the extent you want the public record to reflect
the fact that he talked to the State Department, it's in there
and I think it needs to be expanded a little bit.



17        THE COURT:  I want to get as full a discussion of

18   this as possible.  I think they're raising real concerns.  I

19   understand your point.  I do think that, as I said more than

20   once in my ruling, that this is just not relevant to what I

21   have to do.  It may be relevant to something, but it wasn't

22   relevant to what I had to decide.

23        MR. DOWNING:  Well, then it seems to be relevant to

24   the Office of Special Counsel, otherwise they never had to say

25   it, they never had to put it in one file.  So if it obviously

1    is relevant to the Office of Special Counsel, it's relevant to

2    Mr. Manafort.

3              THE COURT:  You're still acting like these two

4    things -- that one disproves the other, and I don't find that.

5              MR. DOWNING:  I know you don't, that's clear.  But it

6    is important that there's no reason for this to be redacted.

7    ███████████████████████████████████████████

8    ████████████████████████████████████████████████

9    █████████████████████████████████████████████████

10   ███████████████████████████████████████████████████

11   ███████████████████████████████

12              ███████████████████████████████████████████

13   we think it's very important that that allegation from

14   Mr. Weissmann, on more than one occasion, about his being

15   known, right, known to have connections to Russian

16   intelligence, it needs to be countered on the public record.

17   It's very important.  It's very important to Mr. Manafort and

18   that's why we raised the issue again.  It's for nothing else

19   but to balance that unsubstantiated allegation, which, quite

20   frankly, why wasn't that sensitive enough not to mention in

21   open court, or to put as a footnote in a filing that wasn't

22   sealed?  All of a sudden what we have to say to counter that or

23   what can be said, it doesn't make any sense that all of a

24   sudden it's now sensitive.

25              ███████████████████████████████████████████



So we do think it's very important for that allegation of his known ties to Russian intelligence be countered, and be countered in a balanced manner.



21          MS. RHEE:

24                                                           I think, again, on
25     the transcript phase and, you know, here you have, again, on

 1    page 79, a full acknowledgment by Mr. Weissmann on the record

 2    that there were communications with the American embassy

 3    Ukraine, that there had been a search of State Department

 4    records of either direct or indirect communications and that

 5    there is no question that there were communications with the

 6    United States embassy by Mr. Kilimnik over that period of time.

 7    We think that that is sufficient to get out what is actually

 8    supported by the record.

 9            THE COURT:  All right.  Mr. Westling, anything

10    further you want to say?

11            MR. WESTLING:  ████████████████████████████████████

12    ████████████████████████████████████████████████████████

13    ██████████████████████████████████████████████████████████

14    ██████████████████████████████████████████████████████████

15    ████████████████████████████████████████████████████

16    ███████████    I understand there's a need to be deft in what the

17    Court is trying to do here and we appreciate your patience in

18    working through it.  But I can't, sort of, overstate the

19    importance of trying to balance the record, ████████████████████

20    ██████████████████████████████████████████████████████████

21    ██████████████████████████████████████████████████████████

22    ██████████████████████    So I would just ask the Court to continue to

23    try to find a balance.

24            THE COURT:  I'm going to try to do something to

25    improve the situation from the defendant's point of view.  I

1    don't think it's going to go as far as unredacting everything

2    that you originally asked me to unredact.  And I would like to

3    look again at the 302s before I decide.

4        MR. DOWNING:  Your Honor, just one other general

5    question:  How are we going to handle the process of unredacted

6    down the road?  I mean, there's been a lot of redactions in

7    this case, and the law enforcement basis for it or ongoing

8    grand jury investigations.  What is going to be the process

9    to -- is the Office of Special Counsel going to notify the

10   Court that the reason stated for a particular redaction no

11   longer exists, or still survives?  Is it going to be some sort

12   of process that we can put in place?

13       THE COURT:  Well, in one case, I know with all the

14   search warrants, it was an evolving process.  There were things

15   that were withheld from you and then you got them but they were

16   still withheld from the press and then the press got them.  But

17   usually things have to be triggered by a motion or request by

18   someone.  There may be reasons related to the defense for

19   everything to stay the way it is.

20       I, right now, without knowing with any particularity

21   what it is that you're concerned about, or if -- and not having

22   the press having filed anything today, asking for anything, I

23   don't know how to answer that question.  But I think that is

24   something that comes up in many cases, cases that were sealed

25   get unsealed later.  And if there's something that you think

1   should be a part of the public record that was sealed and

2   there's no longer any utility for it, obviously you could first

3   find out if it's a joint motion and, if not, then you file a

4   motion.

5          All right.  I just have one question for my public

6   minute order.  The U.S. polling data, the fact that polling

7   data was transferred or alleged to have been transferred at the

8   August 2nd meeting, putting aside what was erroneously made

9   public, is still sealed.  So I should not use that in my minute

10  order, is that correct?

11         MR. WEISSMANN:  I believe that's correct, Your Honor.

12         THE COURT:  Okay.

13         MR. WESTLING:  We agree, Your Honor.

14         THE COURT:  Okay.  So, I think then the Roman

15  numerals are a payment from Firm A, interactions with Kilimnik

16  about the obstruction of justice, interactions with Kilimnik,

17  another DOJ investigation, and contacts with the

18  administration.  So I will use that shorthand to refer to them.

19  Is that the best way to proceed?

20         MR. WEISSMANN:  That's fine, Your Honor.

21         MR. WESTLING:  That's fine, Your Honor.

22         THE COURT:  All right.  Appreciate everybody's

23  patience as we move through all this.  And I guess the next

24  time I see everybody is at the sentencing.  I think that's

25  correct.  All right.  Thank you.

1              MR. ANDRES:   Thank you.

2              MR. WEISSMANN:   Thank you.

3                          *   *   *

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5            I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                         Dated this 14th day of February 2019.

10

11

12                        /s/_____

13                        Janice E. Dickman, CRR, RMR, CRC
                          Official Court Reporter
14                        Room 6523
                          333 Constitution Avenue NW
15                        Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25