**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Criminal No. 17-201 (ABJ) |
| | ) |
| PAUL J. MANAFORT, JR., | )   **UNDER SEAL** |
| | ) |
| *Defendant.* | ) |
| | ) |

---

**DEFENDANT PAUL J. MANAFORT JR.'S REPLY TO THE SPECIAL COUNSEL'S DECLARATION AND EXHIBITS IN SUPPORT OF ITS BREACH DETERMINATION**

Defendant Paul J. Manafort, Jr., by and through counsel, respectfully submits his response to the Office of Special Counsel's declaration and exhibits in support of its determination that Mr. Manafort breached the plea agreement in this case.  (Doc. 474).

**Introduction**

In support on its breach determination, the Office of Special Counsel ("OSC") has filed a 31-page declaration of FBI Special Agent Jeffrey Weiland, along with more than 800 pages of exhibits.  The submission purports to provide the evidence supporting the OSC's contention that Mr. Manafort lied to investigators during meetings with the government.  A fair reading of the document, however, does not support the conclusion that Mr. Manafort intentionally provided false information.  Rather, when placed in proper context, much of the evidence presented by the OSC merely demonstrates a lack of consistency in Mr. Manafort's recollection of certain facts and events.  Indeed, many of these events occurred years ago, or during a high-pressure U.S. presidential campaign he managed when his time was extraordinarily limited, or during the difficult time that followed his departure from the 2016 presidential campaign because of the allegations leveled at him and the investigations that followed.

## I.    <u>Payment to a Law Firm Working for Mr. Manafort</u>

The OSC alleges that Mr. Manafort made "seriatim, inconsistent statements" in response to questions about a $125,000 payment made on Mr. Manafort's behalf in 2017.  (Doc. 474 at 3, ¶7).  As noted previously, from the outset the discussion of this topic with Mr. Manafort was the subject of confusion, beginning with the OSC mistakenly claiming that the payment was much larger than $125,000.  Rather than setting out the facts and documents for Mr. Manafort and asking questions about them, the OSC's approach was to test Mr. Manafort's recall by revealing details along the way.[1]  As a result, Mr. Manafort had difficulty recalling the precise history of the payment; nevertheless, he explained it to the best of his recollection.  Mr. Manafort explained that he asked ███ for assistance with ███ to WilmerHale and that ███ in turn, talked to ███, whose company ultimately made the $125,000 payment.  This is consistent with the OSC's facts.  As Mr. Manafort clarified to the OSC, there was no agreement about the terms of the payment of Mr. Manafort's legal fees. This resulted in confusion as to whether the funds amounted to a loan, income, or even a gift. In an abundance of caution, Mr. Manafort ultimately reported the amount as income on his tax returns.

The OSC claims Mr. Manafort's first statement – about the money being a repayment of a loan by ███ – was a lie. (Doc. 474 at 3, ¶7).  This statement was Mr. Manafort's best recollection of how the payment came about.  He approached ███ for help, in part, because ███ owed him money.[2]  It is also true that his contact with ███ led to the eventual payment from ███.

---

[1] The government is, of course, free to proceed in this manner if it so chooses.  It is unusual, however, in a situation where the defendant has agreed to cooperate with the government for prosecutors not to provide documentation in advance in order to refresh the recollection of the witness about past events.

[2] While Gov. Ex. 11 shows a $20,000 debt, Mr. Manafort explained he had provided other financial help to ███.  Mr. Manafort never suggested that the entire amount was a loan repayment.

The OSC next claims that Mr. Manafort's statement about ██████████ was a lie. (Doc. 474 at 3-4, ¶7). Again, Mr. Manafort was trying to reconstruct the reason he ultimately received money from ████████████████, rather than directly from ████████, and remembered that he had spoken to ████████ about the money at some point. He was not attempting to lie or mislead the government; clearly, he had difficulty remembering the details of what occurred.

Finally, the OSC claims that Mr. Manafort lied when he discussed that the payment might have been a loan. (Doc. 474 at 4, ¶7). This discussion was aimed at explaining the loan agreement, which Mr. Manafort had not remembered previously, and his continuing confusion about how the money was being treated by the payor. The uncertainty of the terms of the payment were verified by Mr. Manafort's civil attorney and accountant.

Importantly, it should be noted that Mr. Manafort reported the payment on his own tax return as *income*. *See* Gov. Ex. 15. Further, Mr. Manafort identified that the payment came from ████████████████████████████████████████████ *Id*. At bottom, then, there was no attempt to conceal the payment or the source on the income tax return that he filed with the government, and he ultimately chose to report the payment as income—the most tax *dis*advantageous manner in which it could have been handled.

## II.    Mr. Kilimnik's Role in the Witness Tampering Conspiracy

The OSC claims Mr. Manafort made false statements regarding Mr. Kilimnik's role in the witness tampering conspiracy. (Doc. 464 at 7-8, ¶15). Reviewing the FBI 302 (Gov. Ex. 10), Mr. Manafort was not expressing his own views, but was providing Mr. Kilimnik's stated view regarding the witness tampering charges.[3]    Indeed, after the OSC expressed concern to Mr.

---

[3] Mr. Manafort's statements that Mr. Kilimnik "did not believe he was suborning perjury" and "did not feel that he exerted any pressure" are expressions of Mr. Manafort's understanding based upon what Mr. Kilimnik said, in the same way that Mr. Kilimnik "thought it was crazy that he had been indicted." *See* Gov. Ex. 10, at 6.

Manafort that what he was saying was inconsistent with his prior statements about the offense, Mr. Manafort explained that he was not attempting to back away from his prior statements about conspiring with Mr. Kilimnik and he confirmed his prior statements, as the FBI 302 indicates.[4]

### III.   Interactions with Mr. Kilimnik

### a.  Peace Plan for Ukraine

The OSC claims that Mr. Manafort made false statements regarding his interactions with Mr. Kilimnik and a proposed peace plan for Ukraine.  (Doc. 464 at 12-13, ¶¶29-32).  Mr. Manafort did his best to recall his interactions regarding the proposed Ukrainian peace plan and openly discussed the August 2016 meeting with Mr. Kilimnik that occurred in New York.  (Gov. Ex. 101, at 4-6).  The OSC claims, though, that Mr. Manafort's statements – that he rejected the plan and that he did not recall Mr. Kilimnik asking him to reconsider the plan – were false.

During the interview, there was continual confusion when discussing the peace plan proposal because Mr. Manafort differentiated between the ███████ peace plan discussed at the August 2016 meeting in New York, which Mr. Manafort did not feel would work and did not support, and other proposals for peace in Ukraine that were also being discussed, which Mr. Manafort believed might work.  While Mr. Manafort did not initially recall Mr. Kilimnik's follow up contact about the ██████ peace plan, after his recollection was refreshed by showing him a December 2016 email, he readily acknowledged that he had seen the email at the time.[5]  Mr. Manafort also volunteered that he had communications with Mr. Kilimnik in March or April of 2017 about a peace plan.[6]

---

[4] *See* Gov. Ex. 10, at 6.
[5] *See* Gov. Ex. 206, at 4.
[6] *Id*. at 5.

**b.  January 2017 Meeting**

The OSC contends that Mr. Manafort lied about his meeting with Mr. Kilimnik and ███ ████████ in January 2017.  (Doc. 464 at 14-15, ¶33-35).  In particular, the OSC alleges that in one interview Mr. Manafort stated ████████ did not present a plan for peace at the meeting or ask Mr. Manafort for anything and, subsequently, Mr. Manafort said that he discussed a peace plan during the meeting.  Contrary to the OSC's allegations, these statements are not inconsistent. First, during the interview, Mr. Manafort noted that while ████████ did not present a peace plan or ask for anything, they did discuss Ukraine, in general, and Eastern Ukraine and Crimea, in particular.[7]  Second, the statements Mr. Manafort made to the grand jury were ████████ ██████████████████████████████████████████████████████████ ████████████████████████.[8]

**c.  February 2017 Madrid Meeting**

In connection with the Madrid meeting, the OSC claims that Mr. Manafort was untruthful because he did not remember that he met with Mr. Kilimnik during this trip.  Mr. Manafort's Madrid trip related was to his Telefonica business investment and, initially, on September 11, he said that he did not meet with Mr. Kilimnik.  He simply did not remember the meeting.  However, the next day, the OSC produced Mr. Kilimnik's travel itinerary for Mr. Manafort and he readily acknowledged that if Mr. Kilimnik was in Madrid it was to meet with Mr. Manafort.  On September 13, after having an opportunity to think more about the matter, Mr. Manafort was able to provide the OSC with information about his meeting with Mr. Kilimnik.  Mr. Manafort's failure of memory is not akin to a false statement and he willingly provided information once he recalled the meeting.

---

[7] *See* Gov. Ex. 209, at 3.
[8] *See* Gov. Ex. 4, at 44-45.

### d. Polling Questions

The OSC also argues that, prior to his grand jury testimony, Mr. Manafort failed to mention a 2018 Ukraine poll that he was hired to conduct, which included questions relating to a potential Ukrainian peace plan. This information did not come up during prior questioning, however, because the poll itself was not to test a peace plan, but rather it related to work for a possible political candidate. When questioned in the grand jury, Mr. Manafort ███████████ ████████████████████████████

The OSC takes issue with Mr. Manafort's grand jury testimony ████████████ ████████████████████████████████. While Mr. Manafort's prior interview indicated he had some discussions with Mr. Kilimnik about potential candidates including ██████████, it does not indicate that Manafort ever told Mr. Kilimnik that he was thinking about working for ██████.[9]  The OSC also raises Mr. Manafort's testimony regarding ████████████████████████████ ████████████████████████████████████████ ██████████.[10]

### e. Sharing Polling Data

The OSC challenges Mr. Manafort's statement that he did not share polling information with Mr. Kilimnik that he did not otherwise share publicly. The OSC notes that when asked about whether he told anyone to give Mr. Kilimnik internal polling data, Mr. Manafort acknowledged instructing Mr. Gates to provide Mr. Kilimnik with information and updates about the campaign, but that he would not have told Mr. Gates to share internal polling data. Mr. Manafort noted,

---

[9] *See* Gov. Ex.4, at 112-116 and Gov. Ex. 238, at 3-4.
[10] *See* Gov. Ex. 18, at 7-8; *see also* Gov. Ex. 4, at 121 ████████████████████ ████████████████████████

however, that he did not know exactly what Mr. Gates was providing to Mr. Kilimnik.  The OSC relies on Mr. Gates testimony in an effort to contradict Mr. Manafort.  However, Mr. Gates recollection of the polling data provided to Mr. Kilimnik was also faulty, and he had to be corrected by OSC.  Mr. Gates further noted that he spoke with Mr. Manafort about sending additional polling data on an *ad hoc* basis, but he did not indicate whether this related to public or internal polling data.[11]

### IV.   Another DOJ Investigation

As argued in the defendant's prior response, even if Mr. Manafort's statements relating to the other DOJ investigation are viewed as inconsistent, *they were corrected by Mr. Manafort during the same interview*.  There statements do not support a conclusion that he intentionally lied; indeed, defense attorneys routinely refresh the recollection of their clients during meetings with government prosecutors.  Such sessions are often stressful for witnesses and there is nothing unusual or inappropriate in refreshing a witness' recollection.

### V.   Contact with the Administration

During an October 16, 2018 interview, Mr. Manafort stated that he did not communicate with anyone in the Administration at the time they were in the Administration and he never asked anyone to try to communicate a message to anyone in the Administration.[12]  The OSC claims this was a false for several reasons. (Doc. 464 at 28-30, ¶69-72).

The OSC suggests that in subsequent grand jury testimony ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████[13]  The grand jury

---

[11] *See* Gov. Ex. 223.
[12] *See* Gov. Ex. 10, at 2.
[13] *See* Gov. Ex. 4, at 215.

testimony, however, is consistent with Mr. Manafort's prior statements. 

[14]

The OSC also points to text messages with ███████ in March 2018 as evidence of Mr. Manafort's misstatements. However, in an interview of October 16, 2018, Mr. Manafort specifically told the OSC about having contacts with ███████ prior to his (███████ joining the Administration.[15] These text messages are therefore consistent with Mr. Manafort's prior statements. Additionally, the text messages do not reference Mr. Manafort having communications with the Administration, but rather show an effort to have individuals outside the Administration support ███████ for the open ███████████ position.

The OSC also alleges Mr. Manafort's statements about Administration contacts are false based upon a series of communications that Mr. Manafort had with ███████ during in May and June 2018. However, the OSC misreads the events referenced in these text messages. In the first series of messages, ███████ contacted Mr. Manafort for advice on a lobbying issue.[16] Mr. Manafort did not make any contact with anyone and the messages do not suggest otherwise. The OSC relies on a set of notes to assume that he had such contact.[17] Mr. Manafort

---

[14] ██████████████████████████████████████████████

[15] *See* Gov. Ex. 10, at 226-27.
[16] *See* Gov. Ex. 402.
[17] *See* Gov. Ex. 404.

explained ████████████████████████████████████████████████████████
████████████████████████.[18]

In a second series of messages, ███████████ asked Mr. Manafort for permission to use his (Manafort's) name as an introduction in the event he met the President at a future meeting.[19] Here again, these text messages to do not amount to contact with the Administration, either direct or indirect.

Finally, while Mr. Gates may have stated that Mr. Manafort was working on getting individuals appointed to the new Administration through approximately February 2017, this likely references Mr. Manafort's admitted efforts during the transition and prior to the Administration taking office on January 20, 2017.

*  *  *

Based upon the pleadings and record, Mr. Manafort does not believe the materials supplied by the OSC demonstrate any intentional falsehoods on this part.  This is particularly so given the relatively few issues identified based on more than 12 proffer and interview sessions.  Finally, Mr. Manafort believes that the information the Court has received, including pleadings and various exhibits, provide a sufficient factual record to allow the Court to decide the issues presented without the need for additional evidence.

 Dated: January 23, 2019                    Respectfully submitted,

                                             /s/
                                            Kevin M. Downing
                                            (D.C. Bar No. 1013984)
                                            Law Office of Kevin M. Downing
                                            601 New Jersey Avenue NW, Suite 620
                                            Washington, DC 20001
                                            (202) 754-1992
                                            kevindowning@kdowninglaw.com

---

[18] *See* Gov. Ex. 4, at 226-27.
[19] *See* Gov. Ex. 405.

   /s/                                 

Thomas E. Zehnle
(D.C. Bar No. 415556)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW, Suite 620
Washington, DC 20001
(202) 368-4668
tezehnle@gmail.com

   /s/                                 

Richard W. Westling
(D.C. Bar No. 990496)
Epstein Becker & Green, P.C.
1227 25th Street, N.W.
Washington, DC 20037
Tel: 202-861-1868
Fax: 202-296-2882
Email: rwestling@ebglaw.com

*Counsel for Defendant Paul J. Manafort, Jr.*