UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 17-201 (ABJ) |
| | ) | |
| PAUL J. MANAFORT, JR., | ) | **UNDER SEAL** |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**DEFENDANT PAUL J. MANAFORT JR.'S POST-HEARING MEMORANDUM**

Defendant Paul J. Manafort, Jr., by and through counsel, respectfully submits his post-hearing memorandum in connection with the February 4, 2019 sealed hearing.

**Introduction**

Mr. Manafort did not lie.  Despite the considerable efforts of the Office of Special Counsel ("OSC" or "government"), it cannot prove what did not happen.  The OSC claims that "[Mr.] Manafort committed federal crimes by lying to the Federal Bureau of Investigation and the Special Counsel's Office on a variety of subject matters" during his cooperation sessions (Doc. 455, at 2) based on questions and answers that were immaterial to its investigation and its mandate.  At the outset of the hearing, the Court raised the issue of whether the OSC needed to prove materiality on any of the alleged false statements asking, "Well, does materiality matter?"  Surprisingly, the OSC, despite alleging that  Mr. Manafort committed "federal crimes," which require a showing of materiality, responded by saying we "don't think it does."[1]  To the contrary, because the OSC first raised this issue by informing the Court that Mr. Manafort violated the law by lying, it is now incumbent on the OSC to prove both intentional falsity and materiality with regard to any alleged

---

[1] *See* Transcript of Sealed Hearing dated February 4, 2018, p.8, lines 21-22 ("Transcript").

misstatement.  The evidence does not support the OSC's claims and the issues raised are collateral

and immaterial to the OSC's investigation.  The Court should find in Mr. Manafort's favor.

At the hearing, the Court raised several issues that warrant further discussion. Those issues

as are addressed below.

### I.        Payment to a Law Firm Working for Mr. Manafort

During the hearing, the Court expressed concern in light of the OSC's argument that the

unsigned promissory note was an after-the-fact attempt by Mr. Manafort to treat the payment as a

loan. (Transcript, p. 43, lines 19-21).  The government confirmed that this was its position.  *Id.*,

lines 23-25.  However, the cover email sent with the unsigned note attached, as well as the related

metadata for the note, establish that the note was created in September 2017, not subsequent to

Mr. Manafort's proffers or debriefings.  *See* Defendant's Exhibit A (attached).

As noted at the hearing (Transcript, p.41, lines 11-13), Mr. ▆▆▆▆ acknowledged seeing

the note in the past, but could not remember when.  *See also* Gov. Ex. 8, p.2 ("▆▆▆▆ has seen

the Note but he cannot recall when or how.")  Overall, the information provided by Mr. Manafort

is consistent with Mr. ▆▆▆▆▆ interview, including Mr. Manafort's stated confusion about not

receiving a Form 1099 from Mr. ▆▆▆▆ company.  There is no reasonable basis for the OSC to

argue Mr. Manafort lied when he said he was unclear about whether the payment was income or a

loan and, as noted previously, he reported the payment as income on his 2017 tax return.[2]

---

[2] There is no evidentiary basis to support the government's *theory* that this payment was some kind of
illegal kickback to the defendant, either.  *See* Transcript, p.33, lines 19-22 ("So, the answer to the first
question, about whether we know the answer to whether Mr. Manafort was receiving a portion of the 3
percent that Mr. ▆▆▆▆ was giving back to Mr. ▆▆ the answer is, we don't know.")  The government's
conjecture in this regard does not hold water, especially when the evidence submitted herein shows that the
loan documentation was done long before the debriefings in September and October of 2018.

## II.        Mr. Kilimnik's Role in the Witness Tampering Conspiracy

The government contends that on October 16, 2018, at Mr. Manafort's last debriefing with the OSC, he denied Mr. Kilimnik's knowing involvement in the conspiracy to obstruct justice, and that the defendant's denial was false.  (Declaration in Support of the Government's Breach Determination and Sentencing ("Declaration"), p.7, ¶ 14).   Even based on a preponderance of the evidence standard, the record does not support such a finding especially when considered in light of (a) Mr. Manafort's previous statements about Mr. Kilimnik's involvement to the same prosecutors on September 11, 2018, (b) his testimony before the Court on September 14, 2018, and (c) the fact that *during the same debriefing—*and shortly after the alleged false statement— Mr. Manafort *clarified any confusion* that there might be regarding Mr. Kilimnik's awareness of the key facts and his knowing involvement in the conspiracy.[3]

The basis for the government's allegation is found in the summary of the interview that occurred on October 16, 2018.[4]   A careful reading of this report, however, does not support the view that the OSC propounds.   More specifically, one can readily determine that Mr. Manafort was initially asked about Mr. Kilimnik's background.  (*See* Gov. Ex. 10, p.5, last paragraph).   It was only after this line of questioning ended that the discussion then turned to Mr. Kilimnik's conspiracy indictment and what Mr. Kilimnik *said* to Mr. Manafort after he was indicted.   *Id.* ("After Kilimnik was indicted, **Kilimnik told Manafort** that he was afraid for his family and moving them back to Moscow") (emphasis supplied).   The reasonable reading of the paragraph that immediately follows is that it is a *recitation of what Mr. Manafort understood Mr. Kilimnik to be saying he [i.e., Kilimnik] thought—*not an attempt to soften the blow for Mr. Kilimnik as the

---

[3] *See* Gov. Ex. 100; ECF No. 423; and Gov. Ex. 10.
[4] *See* Gov. Ex. 10.

Case 1:17-cr-00201-ABJ   Document 679   Filed 05/21/21   Page 4 of 17

government posits.[5]   It is axiomatic that Mr. Manafort could not possibly know the litany of internal beliefs recorded in that paragraph (in declarative sentences) without Mr. Kilimnik having stated them to him.  Mr. Manafort is not a mind-reader.

To be clear:  Mr. Manafort was not denying something that he had said earlier.  Contrary to the government's assertion that his previous statements demonstrate the falsity of the October 16 account, they actually support the opposite conclusion when placed in proper context.  First, the government has acknowledged on numerous occasions that the defendant is an intelligent person.  Mr. Kilimnik was implicated in Mr. Manafort's earlier statements to the prosecutors on September 11, 2018; furthermore, he testified on September 14, 2018, that he conspired with Mr. Kilimnik regarding outreach to two potential witnesses.  It strains credulity to contend that Mr. Manafort was attempting to "take-back" something that he had already admitted to the very same prosecutors only one month earlier, and that he had admitted to this Court in a very public Rule 11 hearing.

It is also important to remember that this was *a cooperation session* with the government and the purpose was (hopefully) to secure their recommendation for a downward departure based on such cooperation.  There would be no motivation to intentionally undercut his legal position with the government by "sugarcoating" Mr. Kilimnik's role in the conspiracy—a role that Mr. Manafort had on previous occasions openly acknowledged.

Nevertheless, in an effort to buttress its theory, the government speculates: "I think he clearly forgot that when he pled guilty, it was a conspiracy where he was necessarily conspiring with Mr. Kilimnik."  (Transcript, p.52, lines 2-4).  But this proposition makes no sense, either.

---

[5] In fact, had the paragraph structure of the FBI 302 reflected the change in topics from general background to "what did you talk about" (*i.e.*, moving the last sentence on page five to the first sentence of the paragraph immediately following on page six), the ambiguity in this report would be greatly reduced.

government posits.[5]   It is axiomatic that Mr. Manafort could not possibly know the litany of internal beliefs recorded in that paragraph (in declarative sentences) without Mr. Kilimnik having stated them to him.  Mr. Manafort is not a mind-reader.

To be clear:  Mr. Manafort was not denying something that he had said earlier.  Contrary to the government's assertion that his previous statements demonstrate the falsity of the October 16 account, they actually support the opposite conclusion when placed in proper context.  First, the government has acknowledged on numerous occasions that the defendant is an intelligent person.  Mr. Kilimnik was implicated in Mr. Manafort's earlier statements to the prosecutors on September 11, 2018; furthermore, he testified on September 14, 2018, that he conspired with Mr. Kilimnik regarding outreach to two potential witnesses.  It strains credulity to contend that Mr. Manafort was attempting to "take-back" something that he had already admitted to the very same prosecutors only one month earlier, and that he had admitted to this Court in a very public Rule 11 hearing.

It is also important to remember that this was *a cooperation session* with the government and the purpose was (hopefully) to secure their recommendation for a downward departure based on such cooperation.  There would be no motivation to intentionally undercut his legal position with the government by "sugarcoating" Mr. Kilimnik's role in the conspiracy—a role that Mr. Manafort had on previous occasions openly acknowledged.

Nevertheless, in an effort to buttress its theory, the government speculates: "I think he clearly forgot that when he pled guilty, it was a conspiracy where he was necessarily conspiring with Mr. Kilimnik."  (Transcript, p.52, lines 2-4).  But this proposition makes no sense, either.

---

[5] In fact, had the paragraph structure of the FBI 302 reflected the change in topics from general background to "what did you talk about" (*i.e.*, moving the last sentence on page five to the first sentence of the paragraph immediately following on page six), the ambiguity in this report would be greatly reduced.

Simply put, the OSC asks the Court to believe that the defendant did not remember one of only two charges to which he pled guilty just a month before. This is not plausible, and in any event, the government's speculation is not evidence upon which this Court should base its determination.

Furthermore, any confusion that existed on October 16 was addressed *during the interview session,* and no additional qualms or concerns were expressed by the government at that time, as the interview summary shows that the inquiry moved to an entirely different topic. (*See* Gov. Ex. 10, p.6). This is not to say that things did not get off course. When it became evident that the interrogators and the witness were not on the same page, a brief break was requested.[6] *Id.* The evidence that is before the Court—the FBI 302—then shows that Mr. Manafort clarified any confusion in the discussion that had occurred only minutes before by stating, among other things, he "conspired with Kilimnik," "Kilimnik knew that the Hapsburg Group performed work in the U.S.," and "Kilimnik is guilty of obstruction of justice because he knowingly participated."[7] *Id.*

Finally, even if one has some concern about how the FBI's summary report reads, it does not provide the evidentiary basis for finding that Mr. Manafort intentionally misled the investigators. The Court itself noted this potential issue. *See* Transcript, p.57, lines 6-7 ("And I may not be able to resolve it on the face of the 302.") The government's summary is not a grand jury transcript that identifies specific questions and answers; it remains ambiguous. Placed in proper context, the government's allegation about a misrepresentation regarding Mr. Kilimnik's

---

[6] Such breaks are not unusual in a cooperation session and the Court has already indicated that it is not placing any weight on the length of the break. (Transcript, p.61, lines 1-2).

[7] It should be noted that the Declaration also contains certain *conclusions* by the FBI agent about Mr. Manafort's statements, but this is **not** evidence; *i.e.*, "Manafort changed his account" (Declaration, p.8, ¶ 17) and "Manafort's statement that he had not changed his story was also false" (Declaration, p.9, ¶ 18). The record of the interview upon which the government relies—the FBI 302—does not contain any contemporaneous recitation within it that the defendant "changed his story "or that he "corrected" his statements after speaking with his attorney. *Cf. id.* and Gov. Ex. 10, p.6.

role is questionable, at best.  *See, e.g., id.* at 47, lines 20-24 ("But, given his correction after consultation with counsel, why would this be something that we would characterize as the crime of making an intentionally false statement to the FBI, or even just a [lie] of significance for acceptance of responsibility in sentencing purposes?).  The government has chosen to characterize the defendant's statements in the most negative light it can, but such characterizations and conclusions are not proof that he lied about material matters.

### III.      Interactions with Mr. Kilimnik

#### a.  Ukraine Peace Plan

The crux of the OSC's allegation regarding the Ukraine peace plan is that Mr. Manafort purportedly lied about the number of times he discussed it with Mr. Kilimnik.  *See* Declaration, p.12.  Even if the defendant was initially incorrect about how many times the issue was raised, a fair reading of the record demonstrates that Mr. Manafort was attempting to recall the discussions as best he could and was not intentionally misleading the interrogators about the matter.  Indeed, in addressing this allegation, the Court noted that although there was evidence of some post-August 2016 meetings and conversations with Mr. Kilimnik about the Ukraine peace plan, "he [Manafort] did confirm them in later sessions, and in the grand jury."  *See* Transcript, p.64, lines 2-3.

In order to demonstrate the alleged importance and materiality of this, the OSC overstates what the record shows, and this overstatement impacts its conclusion regarding the events that subsequently transpired.  More specifically, during the hearing the government addressed the August 2016 meeting in New York and the discussion of the Ukraine peace plan and stated the following: "[T]he first time this came up, Mr. Manafort's plan was to say: He [Kilimnik] raised it, never came up again, and I was dead set against it."  *See* Transcript, p.71, lines 15-17.  In fact, when the topic first came up, the evidence (*i.e.,* the FBI 302) shows that "Kilimnik talked for about

6

fifteen minutes.  Manafort told Kilimnik that the idea was crazy and the discussion ended." *See* Gov. Ex. 101, p.4.  The agent's report states that the "discussion ended" not that it "never came up again." There is no evidence to support the OSC's speculation that Mr. Manafort had a secret "plan" from the outset to hide subsequent meetings with Mr. Kilimnik about the Ukraine peace plan from the OSC.

A clear-eyed view of the record demonstrates that Mr. Manafort was not resistant to answering any questions about the Ukraine peace plan or his discussions with Mr. Kilimnik regarding it.  The Court succinctly summarized his statements during the sealed hearing. *See* Transcript, p.64, lines 4-16.  When shown documentation to refresh his recollection, such as the December 2016 email, he responded.  *See, e.g.,* Declaration, pp.13-14.

The entire issue regarding the Ukraine peace plan is confusing, to say the least.  The government's conjecture is that the ▓▓▓▓▓▓▓▓ plan—where ▓▓▓▓▓▓▓▓▓▓ would play some role in the peace process—was a Russian "backdoor" effort to take over the eastern part of Ukraine. *See, e.g.,* Transcript, p.69, lines 5-8.  The government then impermissibly attempts to shift the burden of proof to the defendant by telling the Court "there's not a single piece of evidence in this record to support the idea that Mr. Manafort was *against* this plan."  *Id.* at p.71, line 25; p.72, line 1 (emphasis supplied).  Except that he was, and the record clearly demonstrates this.

The government neglects the fact that, as noted above, Mr. Manafort believed that ▓▓▓▓▓▓▓▓ involvement in any peace plan was "crazy."  *See* Gov. Ex. 101, p.4.  Further, when the prosecutor specifically questioned Mr. Manafort under oath regarding the so-called ▓▓▓▓▓▓▓▓ plan, the following exchange occurred:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

██████████████

████████████████████████████

██████

*See* Gov. Ex. 4, p.142, lines 12-18.  Thus, even though it is not Mr. Manafort's burden, there is evidence in this record that contradicts the government's assertion.  The prosecutors have simply chosen to ignore it.

To buttress this faulty narrative—*i.e.,* that Mr. Manafort was secretly in favor of the supposed "Russia" backed ████████ plan and therefore wanted to hide this fact from the prosecutors—the government then reaches both far afield and into the future (long after the defendant was forced to leave the 2016 presidential campaign) to argue that *a draft Ukrainian benchmark survey (poll) that was never conducted,* involving a potential client that Mr. Manafort ultimately rejected, is the smoking gun.  The Court expressed similar questions about the relevance of this information.[8]

Specifically, the government told the Court the following at the sealed hearing: "It is not true, as Mr. Manafort said in the grand jury, that the poll – draft poll tests ████████████████ ██████ which he repeatedly says in the grand jury to help explain away this.  It doesn't do that.  It tests one.  It does test other people who might be able to lead that plan, but it doesn't test a whole variety of peace plans."  *See* Transcript, p.69, lines 12-17.  Even if there was any relevance or materiality to this issue given that, at this point, Mr. Manafort has no ties to the presidential campaign or the new administration, the government's assertion (and thus its theory) is based on semantics.  It is also clear that this was a benchmark poll for a possible presidential candidate in

---

[8] THE COURT:  So, now we're talking about – he's not in the campaign anymore, but this case is pending. And so I'm trying to figure out what the importance is of his ongoing work for a potential candidate in the Ukraine at that time is, and the importance of any lies about that, or lies about Kilimnik's knowledge of that.  *See* Transcript, p.68, lines 20-25.

Ukraine and not a poll focused on a particular peace plan. Indeed, in the revised draft, the survey asks the prospective Ukrainian poll-takers about five different peace plans and their preferences with regard to those plans.  For example, respondents were asked whether those eastern regions should receive special status with broad autonomy and the ability to choose any leader, provided there is a plan for reintegration with Ukraine; whether those regions should become an independent state; whether those regions should return to Ukraine as they were before; or whether those regions should become part of Russia.  *See* Gov. Ex. 217, pp.10-11.  If one were trying to promote only one plan and outcome, logic dictates that these questions would not have been proposed.

In the end, the government has attempted to persuade the Court that Mr. Manafort's statements about the Ukraine peace plan (including the draft poll) are material, and that Mr. Manafort intentionally lied about this.  The record before the Court does not support the government's theory, however, and it does not provide an evidentiary basis for holding that the defendant made knowing misrepresentations.

**b.  Internal Polling Data**

The OSC claims that Mr. Manafort lied when he said that he did not tell Mr. Gates to share internal polling data with Mr. Kilimnik during the 2016 presidential campaign.  The OSC provides no reliable evidence to support its claim, however.

The OSC relies on emails and statements of Mr. Gates in an effort to shore up its theory, but these fall far short of providing any reliable proof.  For example, the OSC relies on an email sent by Mr. Manafort to Mr. Gates on August 2, 2016 directing Mr. Gates to "print out and bring" the attached document "to our SCh meeting."[9]  The reference to "our SCh meeting" was to a campaign-scheduling meeting, not a meeting with Mr. Kilimnik. The document attached is polling

---

[9] *See* Gov. Ex. 233, p. 2.

9

information as of June 16, 2016 – prior to the Republican Convention and the start of the General Election.[10]   Based upon this email alone, OSC claims that Mr. Manafort had this information printed so he could share it with Mr. Kilimnik at a meeting later that evening.  This is just a theory, however, and it does not hold up.

First, there is nothing surprising about a campaign manager asking for a printout of data to use at a typical campaign related scheduling meeting with staff.  Second, the OSC's key witness, Mr. Gates, never says that Mr. Manafort shared the printed-out data with Mr. Kilimnik at the August 2, 2016 meeting.

A review of the FBI 302 of a proffer session with Mr. Gates on January 1, 2018 shows Mr. Gates' recall of the meeting was far from ideal.  Mr. Gates first told investigators that at the August 2, 2016 meeting, Mr. Manafort talked with Mr. Kilimnik about the Trump Campaign and specifically about Mr. Manafort's plan for the primaries.  The interviewers then *reminded* Mr. Gates that the meeting was in August and his story changed.  Next, Mr. Gates said they must have discussed the delegate issue and Mr. Manafort's plan to get enough delegates to secure the nomination.  Again, interviewers *reminded* Mr. Gates that the meeting was in August and Mr. Trump had already secured the nomination.  Mr. Gates' story changed again. Finally, Mr. Gates claimed that they discussed the strategy for the battleground states and specifically remember them discussing Michigan, Wisconsin, Pennsylvania, and Minnesota.[11] On these details, Mr. Gate's credibility is questionable at best,

---

[10] The attached polling data measures: (1) the percentage of respondents who have decided to vote for a generic GOP presidential candidate, and (2) the percentage of respondents who have decided to vote for Donald Trump.  It also compares Mr. Trump's numbers to the performance of past Republican presidential candidates including Mitt Romney (2012) and President George W. Bush (2004) in the same districts.  It does not measure the comparative performance of any Democratic presidential candidate.  *See* Gov Ex. 233, pp. 4-79.

[11] Gov. Ex. 236, p. 3.

Notably, while willing to change his story at the prompting of the interviewers, when asked about the discussion with Mr. Kilimnik again, Mr. Gates said that Mr. Manafort and Mr. Kilimnik also talked about polling data as well as trends related to the Trump Campaign and the battleground states. Importantly, and contrary to the OSC's claim, Mr. Gates said that the information that Mr. Manafort discussed with Mr. Kilimnik was "not secret."[12]

The OSC's theorizing on this issue misses the mark. There is no way to square Mr. Gates' statements that non-secret polling data was discussed in connection with the battleground state strategy with the OSC's theory, which is also undermined by the lack of any relationship of the printed-out polling data attached to the email to the issues relating to battleground state strategy in the General Election.

The OSC claims that Mr. Gates told the government that internal polling data was shared with Mr. Kilimnik. Notably, the OSC discussed this topic with Mr. Gates on at least three occasions. In a proffer session on January 30, 2018, Mr. Gates discussed polling data but never said it was internal data. *See* Gov. Ex. 236. To the contrary, he said the information was not secret. On January 31, 2018, Mr. Gates explains that he sent polling data – again no mention of it being internal poling data – to Mr. Kilimnik, ███████████, and to a former colleague of Mr. Gates at ███████████████. *See* Gov. Ex. 222. It is only in September 2018, after the OSC has started to interview Mr. Manafort that Mr. Gates, for the first time, claims he shared internal polling data. In a September 27, 2018, interview, Mr. Gates claims that he provided Mr. Kilimnik a mix of public polls and the campaign's ██████ polling data. Given Mr. Gates' striking inconsistency on this issue, and his past prevarications, this latter-day testimony is not credible. *See* Gov. Ex. 223.

---

[12] *Id.* at 5.

Finally, the OSC relies on a series of emails sent by Mr. Kilimnik's to various individuals referencing "internal polling."  These emails do not suggest Mr. Kilimnik ever received internal polling data; rather, they explain what he is hearing that the internal polls show strengthening in the candidate position.[13]  These emails also describe Mr. Kilimnik's views of the election.  He states ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ ██"[14]  Importantly, while the OSC has obtained Mr. Kilimnik's emails, it has not produced a single message showing he ever received any internal polling data.

## IV.     Another DOJ Investigation

As argued in the defendant's prior response and at the hearing, even if Mr. Manafort's statements relating to the other DOJ investigation are viewed by the OSC as inconsistent – a position Mr. Manafort does not accept – *they were corrected by Mr. Manafort during the same interview*.  In fact, a review of the statements shows they were not inconsistent; rather, the first statement lacked the detail of the statement made immediately after.  This does not support a conclusion that Mr. Manafort lied.

## V.      Contact with the Administration

During an October 16, 2018 interview, Mr. Manafort truthfully stated that he did not communicate with anyone in the Administration at the time they were in the Administration and he never asked anyone to try to communicate a message to anyone in the Administration.[15]  A careful review of the basis for the OSC's claims that this was a false statement reveals that the

---

[13] *See, e.g.,* Gov. Exs. 227 – 232.
[14] *See, e.g.,* Gov. Exs. 227, 228 & 230-232.
[15] *See* Gov. Ex. 10, p. 2.

proffered evidence fails to establish any direct or indirect contact with the administration by Mr.

Manafort. Indeed, Mr. Manafort told the truth.

***

Based upon the pleadings, the record, and the proceedings before the Court at the sealed

hearing, the OSC has not sustained its burden of proof to establish that Mr. Manafort lied during

his interviews or grand jury appearances.  Importantly, given the breadth of the interviews and the

very small number of issues raised by the OSC as problematic, all of which relate to immaterial

matters, there is no basis to find Mr. Manafort lied.

 Dated: February 8, 2019                              Respectfully submitted,

                                                      /s/
                                                      Kevin M. Downing
                                                      (D.C. Bar No. 1013984)
                                                      Law Office of Kevin M. Downing
                                                      601 New Jersey Avenue NW, Suite 620
                                                      Washington, DC 20001
                                                      (202) 754-1992
                                                      kevindowning@kdowninglaw.com


                                                      /s/
                                                      Thomas E. Zehnle
                                                      (D.C. Bar No. 415556)
                                                      Law Office of Thomas E. Zehnle
                                                      601 New Jersey Avenue NW, Suite 620
                                                      Washington, DC 20001
                                                      (202) 368-4668
                                                      tezehnle@gmail.com


                                                      /s/
                                                      Richard W. Westling
                                                      (D.C. Bar No. 990496)
                                                      Epstein Becker & Green, P.C.
                                                      1227 25th Street, N.W.
                                                      Washington, DC 20037
                                                      Tel: 202-861-1868
                                                      Fax: 202-296-2882
                                                      Email: rwestling@ebglaw.com
                                                      *Counsel for Defendant Paul J. Manafort, Jr.*

# Exhibit A



1 message

To: Paul Manafort

Paul:

This is about as barebones as I can make it.

Let me know.

■

📄 Note.pdf
   189K

## PROMISSORY NOTE SECURED

$125,000.00                                           Palm Beach Gardens, Florida
                                                       Date:  September 14, 2017


        FOR VALUE RECEIVED, the undersigned promises to pay to the order of ▮▮▮▮▮
▮▮▮▮▮▮▮ (**"Payee"**) in Fort Lauderdale, Florida, or at such other place as the holder of this Note
shall designate by written notice to the undersigned, the sum of ONE HUNDRED AND TWENTY
FIVE THOUSAND DOLLARS  ($125,000.00), in lawful money of the United States, with interest
thereon from and including the date of this Note, but not including the date this Note is paid.  Simple
interest shall accrue at the rate of 5% per annum.  Payments shall be made pursuant to the following
schedule:

        March 15, 2018 -        $65,624.98;

        June 15, 2018 -         $32,812.49;

        September 15, 2018 -  $32,812.49.

         Principal and interest shall be payable to the Payee in lawful money of the United States.

        In the event this Note is not paid when due, the undersigned promises to pay, in addition to
the unpaid principal sum, together with all accrued interest, all costs of collection including
reasonable attorney's fees.

        The undersigned hereby waives presentment and demand for payment, notice of dishonor,
protest and notice of protest of this Note.

        This Note shall be deemed to have been entered in the State of Florida and any dispute
arising hereunder shall be commenced in a court having appropriate jurisdiction within the State of
Florida.




                                        By:  _____
                                                Paul Manafort
                                                Dated:

