**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. No. 17-201-1 (ABJ)** |
| **PAUL J. MANAFORT, JR.,** | **Filed Under Seal** |
| **Defendant.** | |

## GOVERNMENT'S SUPPLEMENTAL MEMORANDUM WITH
## RESPECT TO THE COURT'S FEBRUARY 13, 2019 RULING

The United States of America, by and through Special Counsel Robert S. Mueller, III, submits this memorandum to address two issues arising from the Court's February 13, 2019 oral ruling that Manafort breached his plea agreement and intentionally lied during briefings with the government and testimony before the grand jury.

### A. August 2, 2016 Email & Meeting

The government seeks to bring to the Court's attention additional evidence concerning one prong of the third subject-matter area addressed in the February 13, 2019 ruling, which the Court's written order identifies as the defendant's "multiple false statements to the FBI, the OSC, and the grand jury concerning matters that were material to the investigation: his interactions and communications with Kilimnik." Order, at 3 (Doc. 509). Specifically at issue is the Court's finding that Manafort lied in claiming that he did not direct Gates to give internal campaign polling data to Konstantin Kilimnik.

After the hearing, on February 15, 2019, Rick Gates was interviewed by the Special Counsel's Office and, as discussed below, Gates confirmed that Manafort instructed him to send

internal polling data to Kilimnik during the campaign.[1]   *See* February 15, 2019 Gates 302, at 1 (Exhibit A).  Gates stated that he did not bring the attachment to the August 2, 2016 email from Manafort (Government Exhibit 233) to the evening meeting with Konstantin Kilimnik (Gates had never stated that he brought any documents to that meeting).

Gates stated, however, that he did not understand the August 2 email to be a request to bring the attachment to the Kilimnik meeting, but related to an earlier meeting, as noted below. *See* February 15, 2019 Gates 302, at 3 (Exhibit A).   Gates does not know if Manafort brought documents to the later meeting, but he did not see Manafort provide any documents to Kilimnik while he (Gates) was present.  *Id*.

As a result of learning new information about a possible earlier meeting on August 2, the government again reviewed the available documentary evidence.  The government had been aware of the Manafort "outlook" calendar, which does not reflect any scheduled meeting during the day-time on August 2, 2016 that related to the ██████ polling data (Exhibit B).  The government then identified another calendar that contains a "scheduling" meeting at 10:30 a.m. on August 2, 2016 (Exhibit C).  Both calendars had been provided to the defense as part of discovery on December 8, 2017.  The Court referred to the calendar issue in the February 13, 2019 hearing.[2]  During the February 15, 2019 interview, Gates said he remembered that he used the attachment to the August 2 email from Manafort (Government Exhibit 233) in  preparing for the scheduling meeting at 10:30.

---

[1] As a result of media coverage of the breach litigation, Gates (through counsel) provided information to the SCO about the August 2 email.  The government thereafter met with Gates on February 15 to debrief him.

[2] *See* February 13, 2019 Hr'g Tr. at 34 ("Mr. Manafort said bring it to the SCh meeting, that that's shorthand for a scheduling meeting, as opposed to possibly a scheduled meeting, and it meant a scheduling meeting with campaign staff. There's nothing provided to substantiate that[.]"

As discussed below, the government does not believe that this new evidence should affect the Court's ruling that Manafort lied with respect to the subject matter area in general or its finding that Manafort lied when he denied that he instructed Gates to share internal polling data with Kilimnik.   The January 14, 2019 Declaration In Support of the Government's Breach Determination and Sentencing cited the following multiple strands of evidence in support of the position that Manafort lied when he denied directing Gates to provide internal campaign polling data with Kilimnik: (1) Gates' various statements documented in FD 302s (*see* Declaration ¶ 54); (2) Kilimnik's emails referencing  the content of  internal campaign polls (*id.* ¶ 55); (3) the fact that Manafort and Gates met with Kilimnik on the evening of August 2; and (4) the fact that on the morning of August 2,  Manafort sent Gates an email with the subject "[p]rint out and bring to our SCh [sic] meeting," and attached to the email an Excel document (Government Exhibit 233) (Declaration ¶ 56).  With respect to the Excel document, the Declaration stated, "[t]he document was ▮▮▮▮▮▮ internal polling data for the presidential campaign."  *Id.*  The Court referenced the August 2 email on several occasions during the February 4 and 13 hearings, but did not rely solely on that document in its ruling.[3]

Because the government presented additional and sufficient evidence that Manafort lied about not directing Gates to provide internal campaign polling data to Kilimnik, Gates' most recent information and the second calendar should not alter the Court's ruling.  First, as noted, Gates has provided consistent information that Manafort repeatedly directed him to share internal polling data with Kilimnik,[4] and did so again at the February 15, 2018 debriefing.  Gates' information was summarized in the February 15, 2019 Gates 302 as follows: "MANAFORT directed GATES to

---

[3] *See* February 13, 2019 Hr'g Tr. at 31, 34; *see* February 4, 2019 Hr'g Tr. at 90-92, 103.
[4] *See, e.g.*, January 31, 2018 Gates 302, at 17 (Exhibit 222); September 27, 2018 Gates 302, at 2 (Exhibit 223);  February 7, 2018 Gates 302, at 15 (Docket 504, Attachment C).

send internal polling data from the DONALD J. TRUMP CAMPAIGN to KONSTANTIN KILIMNIK (KILIMNIK), and GATES did so. The internal polling data was provided by ███ ████████████████████ February 15, 2019 Gates 302, at 1 (Exhibit A).

Second, as the Court found, Gates' statements were corroborated by the Kilimnik emails, which specifically referenced the content of internal campaign polls and which were marked as Government Exhibits 225 to 232.[5]

Third, that Manafort and Gates met with Kilimnik on the evening of August 2 and discussed polling and details about the campaign—a fact not in dispute—also corroborates Gates' statements. Of note, Gates again detailed the substance of the August 2 meeting in his February 15, 2019 debriefing. The February 15, 2019 Gates 302 summarized his statements on this issue. February 15, 2019 Gates 302, at 3-4 (Exhibit A). These statements are consistent with the information previously provided by Gates.[6]

Fourth, Gates has again provided evidence that is helpful to Manafort at least with respect to the existence of the earlier scheduling meeting on August 2 and his use of the August 2 email attachment for that meeting. The fact that Gates came forward to the government with this information further bolsters his credibility.

Finally, Manafort's statements to the government that he never would have told Gates to provide internal polling data and only told Gates to keep Kilimnik up to date is itself implausible: it is hard to imagine that Gates, who worked for Manafort on the campaign and at DMI, would have taken it on himself to provide such data without authorization or alerting his boss. In sum, the government continues to submit that this prong of the subject matter area has been established

---

[5] *See* February 13, 2019 Hr'g Tr. at 35.
[6] *See* January 30, 2018 Gates 302, at 2-5 (Exhibit 236); *see also* February 13, 2019 Hr'g Tr. at 35 ("Exhibit 236, the 302 from January 2018, Gates says we discussed battleground states, polling data, and trends regarding the Trump campaign and the battleground states. Those are pretty specific words.").

by a preponderance of the evidence and, in any event, the new information would not undermine the Court's conclusion as to the subject matter area as a whole.

**B.** 

The government also seeks to advise the Court that the reference in the February 13 transcript to and as "Russians" should instead identify each as Ukrainian.[7]



\* \* \* \* \*

For the reasons cited, the government seeks to correct the record with respect to the Court's February 13, 2019, oral ruling based on the information above.

---

[7] *See* February 13, 2019 Hr'g Tr. at 36:14-16 ("Also, the evidence indicates that it was understood that the data would be passed from Kilimnik to prominent Russians, including

5

Respectfully submitted,


ROBERT S. MUELLER III
Special Counsel

Dated: February 26, 2019                    By: */s/ Andrew Weissmann*
                                            Andrew Weissmann
                                            Jeannie S. Rhee (D.D.C. Bar No. 464127)
                                            Greg D. Andres (D.D.C. Bar No. 459221)
                                            U.S. Department of Justice
                                            Special Counsel's Office
                                            950 Pennsylvania Avenue NW
                                            Washington, D.C. 20530
                                            Telephone: (202) 616-0800

                                            *Attorneys for the United States of America*

# Exhibit A

FD-302 (Rev. 5-8-10)

- 1 of 4 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/17/2019

On 02/15/2019 Special Agent Mickey J. Robinson, Intelligence Analyst Michael Ficht, Senior Assistant Special Counsels Greg Andres, Jeannie Rhee, and Andrew Weissman interviewed RICHARD GATES (GATES) at the Special Counsel's Office. Present for the interview was GATES's counsel, Tom Greene. After being advised of the identity of the interviewing Agent and the nature of the interview, GATES provided the following information:

GATES has never seen FD-302s written related to his interviews with the Special Counsel's Office.

**Polling Data Sent to KONSTANTIN KILIMNIK**

MANAFORT directed GATES to send internal polling data from the DONALD J. TRUMP CAMPAIGN to KONSTANTIN KILIMNIK (KILIMNIK), and GATES did so. The internal polling data was provided by ███████████████ GATES utilized WHATSAPP to forward the "top line" internal polling data to KILIMNIK. The forwarded polling data consisted of results from internal polling including the State, Dates, Generic, and Decided GOP, etc., numbers. It was a cut and paste from summary sheets █████ created based on his internal polling data and not the entire data set including cross tabs. By sending the top lines, GATES sent KILIMNIK an "executive summary" of the ██████ data.

GATES understood KILIMNIK would send the internal polling data on to Ukrainian oligarchs at MANAFORT's request to facilitate MANAFORT's payments. MANAFORT wanted to show Ukrainian oligarchs that he was doing "wonders" with the TRUMP Campaign in securing the nomination. ██████ was also in the mix. GATES recalled, however, that the letter to ██ was related to MANAFORT's and ███████████ legal dispute. GATES does not specifically know if MANAFORT sent internal polling data to ████████.

The states ██████ provided data on were based on ██████████ proprietary choice of polling locations. The majority of polling was done in battleground states. ██████████ polling location choices reflected his internal analysis. GATES recalled there would be a list of five or six states per poll.

Investigation on   02/15/2019   at   Washington, District Of Columbia, United States (In Person)

File #   ████████████                                          Date drafted   02/15/2019

by   ROBINSON MICKEY J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

███████████████

As an example, GATES recalled that some in the campaign were concerned if TRUMP could have won Georgia. So, though not a battleground state, Georgia would appear on the list of polled states and drop off periodically. Additionally, the campaign strategy did not rely solely on the polling data. TRUMP felt he would win Virgina without the need for polling.

GATES deleted the WHATSAPP messages as soon as they were sent to KILIMNIK. MANAFORT did not ask GATES to do this. GATES deleted the messages because he was concerned about ███████ finding out GATES had sent the data.

[GATES was shown Document ID 0.7.4249.179465 (Document 1)]

GATES recalled Document 1 and did not believe it was "polling data" as viewed in campaign terms, but a media market document instead. MANAFORT wanted to put ████████████████████ in areas where the media market was borderline on TRUMP. This is different than a "poll." Document 1 did, however, identify polling data to show states that were pro or anti TRUMP to assist the campaign in scheduling ██████████ appearances.

[GATES was shown Document ID 0.7.4730.110442 (Memo)]

GATES did not think the poll referred to in the Memo was the same as the Document 1, because ██████████ polls have a specific format.

GATES explained that a brush fire poll is a scaled back version of a longer 75-100 word poll. The benefit of the brush fire poll is that the results come back much earlier but with reduced accuracy. GATES recalled that ████████████ favored internet polls because of the quick data response. GATES noted that the IVRs, or phone calls, return more slowly, but are more accurate.

GATES had access to both the shown Memo and Document 1. GATES explained that Document 1 was strategically useful because it could assist the campaign in deciding where to send ████████████████ If ██████ was on one side of the country, they would send ██████ to the other side. The data in Document 1 identified "soft" cities that could benefit from a ████████ visit. Prior to 08/02/2016, the campaign only identified states for ███████ to visit. After 08/02/2016, the campaign had cities plugged in for ██████ to visit.

GATES pointed out that the "6-16" date on the data in Document 1 indicated that the data was old by the time of the 08/02/2016 email. Brush fire data returned more frequently and could assist in identifying the battlegrounds.

GATES did not know what informed the data represented in the column labeled "████████████████████████████████████████" on Document 1. GATES

███████████████

(U)  Interview of Richard Gates (02/15
Continuation of FD-302 of /2019)                                                          , On  02/15/2019 , Page  3 of 4



was not sure where ████████ pulled that data from, whether it was his own
or a conglomerate of data. GATES also did not know what informed the data
in the "███████████████████ column on Document 1. GATES did not
know whose underlying data that was. GATES was not aware of the
proprietary algorithm that ██████████ used to populate the columns in the
data; but GATES knew it was informed by polling data. ██████████ could not
just take public information and make the document. The document was
proprietary and circulated to a small handful of people, including
MANAFORT and ████████████.

████████████ was tasked to identify markets in which the campaign could get
the best impact. ██████ was looking for a media plan on where to purchase TV
buys. ████████ data does not only have battlegrounds, it does include
other states as well.

GATES specifically recalled seeing the data based on the cities identified
in Document 1. GATES was asked if he recalled the subject of an email "███
█████████" GATES recalled Document 1 by the cities and because it was the
one time they discussed ██████ travel scheduling. █████████ team came back
to them a couple weeks later and said the devised schedule was not working
for them.

MANAFORT, GATES, ██████████████████had access to the Document 1. GATES
recalled using it to create the master schedule with ████████████ GATES
printed the top copy of the Document 1.

Document 1 contained relevant campaign information because it informed
decision making as to where ██████ was to travel. GATES recalled the
Document 1 had value to the internal strategy of the campaign. MANAFORT's
strategic decision of where to send PENCE was based on that document.

**Meeting with KONSTANTIN KILIMNIK**

GATES did not recall bringing Document 1 to the meeting, or any other
documents. GATES does not know if documents were passed to KILIMNIK at the
08/02/2016 meeting with MANAFORT and KILIMNIK. GATES arrived late and did
not see any documents passed during the portion at which he was present.
When GATES arrived he received a brief recap of topics previously
discussed including the legal issues with ██████████. GATES does not know
if everything discussed prior to his arrival was recapped.

At the 08/02/2016 meeting with GATES, MANAFORT, and KILIMNIK there was a
much more detailed discussion of internal polling data compared to the
data GATES sent to KILIMNIK via WHATSAPP. At the dinner meeting, GATES,
MANAFORT, and KILIMNIK discussed internal polling from ████████ which
included battleground states. GATES recalled Pennsylvania, Wisconsin,

███████████

Continuation of FD-302 of ___(U) Interview of Richard Gates (02/15___ , On _02/15/2019_ , Page _4 of 4_
/2019)

Minnesota, and Michigan as states MANAFORT discussed. GATES also recalled
MANAFORT discussing polling related to blue-collar workers. GATES recalled
MANAFORT discussed internal polling from other sources including CAMBRIDGE
ANALYTICA. The information provided in this meeting by MANAFORT to
KILIMNIK was based on internal information and polls; it was a synthesis
that included internal polling data.

GATES stated they did not discuss the ███████ scheduling information with
KILIMNIK. GATES said that ███████████████████████ did not win
elections, so there was no point in discussing ███████████ scheduling with
KILIMNIK.

Document ID: 0.7.4249.179465

| | |
|---|---|
| From: | paul manafort <pmanafort@donaldtrump.com> |
| To: | rick gates </o=mex05/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=rgates@dmpint.com4bb> |
| Cc: | |
| Bcc: | |
| Subject: | print out and bring to our SCh meeting |
| Date: | Tue Aug 02 2016 09:29:18 EDT |
| Attachments: | 0.7.3801.371492-000001.xlsx |

Document ID: 0.7.4249.179465-000001
Owner:          paul manafort <pmanafort@donaldtrump.com>
Filename:       0.7.3801.371492-000001.xlsx
Last Modified:  Tue Aug 02 09:29:18 EDT 2016

0.7.3801.371492-000001.xlsx for Printed Item: 1 ( Attachment 1 of 1)

| STA | DMA1516 | MNAME1516 | Decided GOP Generic Prez Ballot as of 6-16 | Decided DJT Vote as of 6-16 |
|---|---|---|---|---|
| AZ | 790 | ALBUQUERQUE-SANTA FE | | |
| AZ | 753 | PHOENIX (PRESCOTT) | 48.1% | 48.3% |
| AZ | 789 | TUCSON (SIERRA VISTA) | 54.4% | 51.7% |
| AZ | 771 | YUMA-EL CENTRO | | |
| CO | 790 | ALBUQUERQUE-SANTA FE | | |
| CO | 752 | COLORADO SPRINGS-PUEBLO | 59.3% | 57.8% |
| CO | 751 | DENVER | 43.2% | 43.5% |
| CO | 773 | GRAND JUNCTION-MONTROSE | 72.2% | 71.1% |
| FL | 571 | FT. MYERS-NAPLES | 59.5% | 57.8% |
| FL | 592 | GAINESVILLE | | |
| FL | 561 | JACKSONVILLE | 65.9% | 63.2% |
| FL | 528 | MIAMI-FT. LAUDERDALE | 27.4% | 26.4% |
| FL | 686 | MOBILE-PENSACOLA (FT WALT) | 78.0% | 65.9% |
| FL | 534 | ORLANDO-DAYTONA BCH-MELBRN | 51.2% | 48.9% |
| FL | 656 | PANAMA CITY | | |
| FL | 530 | TALLAHASSEE-THOMASVILLE | | |
| FL | 539 | TAMPA-ST. PETE (SARASOTA) | 53.8% | 53.5% |
| FL | 548 | WEST PALM BEACH-FT. PIERCE | 50.6% | 48.9% |
| GA | 525 | ALBANY, GA | 60.7% | 53.5% |
| GA | 524 | ATLANTA | 48.1% | 47.7% |
| GA | 520 | AUGUSTA-AIKEN | 47.4% | 46.0% |
| GA | 575 | CHATTANOOGA | | |
| GA | 522 | COLUMBUS, GA (OPELIKA, AL) | | |
| GA | 606 | DOTHAN | | |
| GA | 567 | GREENVLL-SPART-ASHEVLL-AND | | |
| GA | 561 | JACKSONVILLE | | |
| GA | 503 | MACON | 63.9% | 62.8% |
| GA | 507 | SAVANNAH | 67.5% | 64.3% |
| GA | 530 | TALLAHASSEE-THOMASVILLE | | |
| IA | 637 | CEDAR RAPIDS-WTRLO-IWC&DUB | 36.4% | 37.6% |
| IA | 682 | DAVENPORT-R.ISLAND-MOLINE | 55.0% | 47.7% |
| IA | 679 | DES MOINES-AMES | 49.4% | 49.4% |
| IA | 652 | OMAHA | 68.7% | 66.7% |
| IA | 631 | OTTUMWA-KIRKSVILLE | | |
| IA | 717 | QUINCY-HANNIBAL-KEOKUK | | |
| IA | 611 | ROCHESTR-MASON CITY-AUSTIN | | |
| IA | 624 | SIOUX CITY | 59.0% | 56.6% |
| IA | 725 | SIOUX FALLS(MITCHELL) | | |
| IN | 648 | CHAMPAIGN&SPRNGFLD-DECATUR | | |

0.7.3801.371492-000001.xlex for Printed Item: 1 ( Attachment 1 of 1)

| | | | | |
|---|---|---|---|---|
| IN | 602 | CHICAGO | 41.5% | 46.6% |
| IN | 515 | CINCINNATI | | |
| IN | 649 | EVANSVILLE | 59.7% | 49.4% |
| IN | 509 | FT. WAYNE | 58.3% | 53.8% |
| IN | 527 | INDIANAPOLIS | 51.9% | 52.3% |
| IN | 582 | LAFAYETTE, IN | | |
| IN | 529 | LOUISVILLE | 66.7% | 64.0% |
| IN | 588 | SOUTH BEND-ELKHART | 43.8% | 47.7% |
| IN | 581 | TERRE HAUTE | 48.1% | 45.5% |
| ME | 537 | BANGOR | 46.7% | 48.2% |
| ME | 500 | PORTLAND-AUBURN | 41.0% | 44.3% |
| ME | 552 | PRESQUE ISLE | | |
| MI | 583 | ALPENA | | |
| MI | 505 | DETROIT | 44.9% | 44.0% |
| MI | 676 | DULUTH-SUPERIOR | | |
| MI | 513 | FLINT-SAGINAW-BAY CITY | 44.3% | 51.8% |
| MI | 563 | GRAND RAPIDS-KALMZOO-B.CRK | 53.8% | 52.9% |
| MI | 658 | GREEN BAY-APPLETON | | |
| MI | 551 | LANSING | 45.6% | 40.0% |
| MI | 553 | MARQUETTE | | |
| MI | 588 | SOUTH BEND-ELKHART | | |
| MI | 547 | TOLEDO | | |
| MI | 540 | TRAVERSE CITY-CADILLAC | 48.8% | 52.8% |
| MN | 676 | DULUTH-SUPERIOR | 45.8% | 44.7% |
| MN | 724 | FARGO-VALLEY CITY | 45.8% | 58.1% |
| MN | 702 | LA CROSSE-EAU CLAIRE | | |
| MN | 737 | MANKATO | | |
| MN | 613 | MINNEAPOLIS-ST. PAUL | 43.6% | 42.9% |
| MN | 611 | ROCHESTR-MASON CITY-AUSTIN | 40.0% | 36.1% |
| MN | 725 | SIOUX FALLS(MITCHELL) | | |
| MO | 604 | COLUMBIA-JEFFERSON CITY | 52.6% | 48.8% |
| MO | 603 | JOPLIN-PITTSBURG | 63.1% | 65.2% |
| MO | 616 | KANSAS CITY | 53.8% | 52.3% |
| MO | 652 | OMAHA | | |
| MO | 631 | OTTUMWA-KIRKSVILLE | | |
| MO | 632 | PADUCAH-CAPE GIRARD-HARSBG | | |
| MO | 717 | QUINCY-HANNIBAL-KEOKUK | | |
| MO | 619 | SPRINGFIELD, MO | 69.2% | 69.9% |
| MO | 638 | ST. JOSEPH | | |
| MO | 609 | ST. LOUIS | 48.1% | 45.3% |
| NC | 524 | ATLANTA | | |
| NC | 517 | CHARLOTTE | 52.4% | 50.6% |
| NC | 575 | CHATTANOOGA | | |
| NC | 518 | GREENSBORO-H.POINT-W.SALEM | 50.6% | 51.1% |
| NC | 545 | GREENVILLE-N.BERN-WASHNGTN | 60.5% | 57.5% |

0.7.3801.371492-000001.xlsx for Printed Item: 1 ( Attachment 1 of 1)

| | | | | |
|---|---|---|---|---|
| NC | 567 | GREENVLL-SPART-ASHEVLL-AND | 53.8% | 51.7% |
| NC | 570 | MYRTLE BEACH-FLORENCE | | |
| NC | 544 | NORFOLK-PORTSMTH-NEWPT NWS | | |
| NC | 560 | RALEIGH-DURHAM (FAYETVLLE) | 42.4% | 40.4% |
| NC | 550 | WILMINGTON | 45.2% | 56.5% |
| NH | 506 | BOSTON (MANCHESTER) | 47.5% | 47.1% |
| NH | 523 | BURLINGTON-PLATTSBURGH | 28.2% | 30.6% |
| NH | 500 | PORTLAND-AUBURN | | |
| NV | 839 | LAS VEGAS | 45.8% | 44.4% |
| NV | 803 | LOS ANGELES | | |
| NV | 811 | RENO | 55.0% | 52.9% |
| NV | 770 | SALT LAKE CITY | | |
| OH | 564 | CHARLESTON-HUNTINGTON | | |
| OH | 515 | CINCINNATI | 46.9% | 46.5% |
| OH | 510 | CLEVELAND-AKRON (CANTON) | 47.4% | 45.9% |
| OH | 535 | COLUMBUS, OH | 45.6% | 42.4% |
| OH | 542 | DAYTON | 58.4% | 54.8% |
| OH | 509 | FT. WAYNE | | |
| OH | 558 | LIMA | | |
| OH | 597 | PARKERSBURG | | |
| OH | 547 | TOLEDO | 51.3% | 49.4% |
| OH | 554 | WHEELING-STEUBENVILLE | | |
| OH | 536 | YOUNGSTOWN | 44.4% | 37.9% |
| OH | 596 | ZANESVILLE | | |
| PA | 514 | BUFFALO | | |
| PA | 565 | ELMIRA (CORNING) | | |
| PA | 516 | ERIE | 47.3% | 54.3% |
| PA | 566 | HARRISBURG-LNCSTR-LEB-YORK | 53.8% | 53.9% |
| PA | 574 | JOHNSTOWN-ALTOONA-ST COLGE | 64.5% | 59.0% |
| PA | 501 | NEW YORK | | |
| PA | 504 | PHILADELPHIA | 38.1% | 38.2% |
| PA | 508 | PITTSBURGH | 48.8% | 51.1% |
| PA | 511 | WASHINGTON, DC (HAGRSTWN) | | |
| PA | 577 | WILKES BARRE-SCRANTON-HZTN | 52.3% | 51.1% |
| PA | 536 | YOUNGSTOWN | | |
| VA | 559 | BLUEFIELD-BECKLEY-OAK HILL | | |
| VA | 584 | CHARLOTTESVILLE | | |
| VA | 518 | GREENSBORO-H.POINT-W.SALEM | | |
| VA | 569 | HARRISONBURG | | |
| VA | 544 | NORFOLK-PORTSMTH-NEWPT NWS | 39.5% | 40.0% |
| VA | 560 | RALEIGH-DURHAM (FAYETVLLE) | | |
| VA | 556 | RICHMOND-PETERSBURG | 45.0% | 41.9% |
| VA | 573 | ROANOKE-LYNCHBURG | 53.1% | 51.8% |
| VA | 531 | TRI-CITIES, TN-VA | | |
| VA | 511 | WASHINGTON, DC (HAGRSTWN) | 36.1% | 35.6% |

0.7.3801.371492-000001.xlsx for Printed Item: 1 ( Attachment 1 of 1)

| | | | | |
|---|---|---|---|---|
| WI | 676 | DULUTH-SUPERIOR | | |
| WI | 658 | GREEN BAY-APPLETON | 53.2% | 51.7% |
| WI | 702 | LA CROSSE-EAU CLAIRE | 40.7% | 40.9% |
| WI | 669 | MADISON | 30.0% | 27.9% |
| WI | 553 | MARQUETTE | | |
| WI | 617 | MILWAUKEE | 46.7% | 45.2% |
| WI | 613 | MINNEAPOLIS-ST. PAUL | 63.3% | 63.4% |
| WI | 705 | WAUSAU-RHINELANDER | 52.3% | 50.0% |

Document ID: 0.7.4730.110442

| | |
|---|---|
| From: | ████████████████ |
| To: | Paul Manafort </o=mex05/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=pmanafort@dmpint.com202>; Rick Gates </o=mex05/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=rgates@dmpint.com4bb>; ████ ████████████████████████████ |
| Cc: | |
| Bcc: | |
| Subject: | Target State Brushfire Surveys Key Take-Aways Memo |
| Date: | Sun Jul 17 2016 22:33:26 EDT |
| Attachments: | 7-15-16 Target States Pre-Convention Brushfires Key Take-Aways.docx |

Gents:


Attached you'll find a memo that outlines the key take-aways from our recently completed surveys in the 17 Target States.


We will be sharing the full top line data in the next day or so.


Let me know if you have any questions.




Document ID: 0.7.4730.110442-000001
Owner:
Filename:          7-15-16 Target States Pre-Convention Brushfires Key Take-Aways.docx
Last Modified:     Sun Jul 17 22:33:26 EDT 2016





# Exhibit D

FD 302 (Rev. 5 8 10)

- 1 of 15 -



OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   03/28/2018

[REDACTED]

[REDACTED]

---

Investigation on  02/12/2018  at  Washington, District Of Columbia, United States (In Person)

File #  [REDACTED]                                                    Date drafted  02/26/2018

by  Omer J Meisel , EBADI SHERINE DOROTHY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD 302a (Rev. 05 08 10)

Continuation of FD 302 of (U) Interview of Rick Gates , On 02/12/2018 , Page 2 of 15



Davis Manafort

SCO-3500-RG-000767

FD 302a (Rev. 05 08 10)

Continuation of FD 302 of  (U) Interview of Rick Gates                  , On  02/12/2018 , Page  3 of 15

FD 302a (Rev. 05 08 10)

Continuation of FD 302 of  (U)  Interview of Rick Gates                    , On  02/12/2018  , Page  4 of 15



FD 302a (Rev. 05 08 10)

Continuation of FD 302 of   (U)  Interview of Rick Gates                    , On   02/12/2018  , Page   5 of 15



FD 302a (Rev. 05 08 10)

Continuation of FD 302 of   (U)  Interview of Rick Gates                    , On   02/12/2018   , Page   6 of 15



FD 302a (Rev. 05 08 10)

Continuation of FD 302 of ___(U)  Interview of Rick Gates_____ , On _02/12/2018_ , Page _7 of 15_



SCO-3500-RG-000772

FD 302a (Rev. 05 08 10)



FD 302a (Rev. 05 08 10)

Continuation of FD 302 of   (U)  Interview of Rick Gates                    , On   02/12/2018 , Page   9 of 15

FD 302a (Rev. 05 08 10)

Continuation of FD 302 of ___(U)  Interview of Rick Gates_____ , On __02/12/2018__ , Page __10 of 15__



FD 302a (Rev. 05 08 10)

Continuation of FD 302 of (U) Interview of Rick Gates _____ , On 02/12/2018 , Page 11 of 15



we was being pushed out by Bannon. Subsequently, Gates gravitated to Brad

SCO-3500-RG-000776

FD 302a (Rev. 05 08 10)

Continuation of FD 302 of (U) Interview of Rick Gates _____ , On 02/12/2018 , Page 12 of 15



FD 302a (Rev. 05 08 10)

Continuation of FD 302 of   (U)  Interview of Rick Gates            , On   02/12/2018   , Page   13 of 15



FD 302a (Rev. 05 08 10)

Continuation of FD 302 of  (U)  Interview of Rick Gates                          , On  02/12/2018  , Page  14 of 15



FD 302a (Rev. 05 08 10)



Continuation of FD 302 of   (U)  Interview of Rick Gates                    , On   02/12/2018   , Page   15 of 15

SCO-3500-RG-000780

# Exhibit B

## 8/1/2016 to 8/7/2016
📅 **Paul Manafort**

| | | August 2016 | | | | | | | | September 2016 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | | S | M | T | W | T | F | S |
| 31 | 1 | 2 | 3 | 4 | 5 | 6 | | | | | | 1 | 2 | 3 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 | | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 | | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 | | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 28 | 29 | 30 | 31 | | | | | 25 | 26 | 27 | 28 | 29 | 30 | 1 |

**Monday, August 01, 2016**

2:00 PM to 2:30 PM Strategy and Messaging Meeting

**Tuesday, August 02, 2016**

10:00 AM to 10:30 AM Call w/ Pastor

12:00 PM to 12:30 PM

**Wednesday, August 03, 2016**

**Thursday, August 04, 2016**

**Friday, August 05, 2016**

**Saturday, August 06, 2016**

**Sunday, August 07, 2016**

# Exhibit C

**Daily Schedule**                     Tuesday, August 2, 2016

| DJT | PM |
|---|---|
| **DJT Schedule** | **PJM Schedule** |

**10:00 am - Call w/ Pastor** ▮

**10:30 am – Scheduling Meeting**
*15th Floor Conference Room*

**PENCE**



**Call List**

2





3



4