UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 17-201 (ABJ) |
| ) | |
| PAUL J. MANAFORT, JR., ) | **UNDER SEAL** |
| ) | |
| *Defendant.* ) | |

### DEFENDANT PAUL J. MANAFORT JR.'S REPLY AND MOTION TO RECONSIDER BASED ON THE SPECIAL COUNSEL'S SUPPLEMENTAL MEMORANDUM WITH RESPECT TO THE COURT'S FEBRUARY 13, 2019 RULING

Defendant Paul J. Manafort, Jr., by and through counsel, respectfully submits this reply and motion to reconsider based on the supplemental memorandum filed by the Special Counsel's Office ("Special Counsel") with respect to the Court's February 13, 2019 ruling.

### 1. Background

On February 26, 2019, the Special Counsel filed a sealed supplemental memorandum containing information that Mr. Manafort contends was subject to production under *Brady v. Maryland,* 373 U.S. 83 (1983), and its progeny. The supplemental memorandum informed the Court that a statement included in the Declaration the Special Counsel submitted on January 14, 2019, which the Court relied on when considering whether Mr. Manafort lied during his cooperation, was not accurate.[1]

---

[1] The Special Counsel explains that Mr. Gates' counsel made contact in response to the media coverage of the breach litigation, which resulted in a meeting with Mr. Gates on February 15, 2019. The open question is, therefore, when did Mr. Gates's counsel make the initial contact? If the contact resulted from news coverage of the breach litigation, it would likely have been the result of the February 7 release of the redacted transcript of the hearing on February 4, 2019 (Doc. 500) and the attendant news coverage, because the redacted transcript of the Court's February 13, 2019 ruling was not released until February 15. (Doc. 514). This question of timing is not trivial. The Court should inquire about the timeline relating to the

The Declaration stated:

> Finally, as noted, on the evening of August 2, 2016, Manafort met with Kilimnik at the Grand Havana Club in New York City. Gates attended, but arrived late. On the morning of the meeting, Manafort sent Gates an e-mail with the subject: "Print out and bring to our SCh [sic] meeting" and the attachment to the e-mail was an Excel document with 18 tabs. The document was ▮▮▮▮▮▮ internal polling data for the presidential campaign. A review of Manafort and Gates's e-mails confirmed that both received this polling data from ▮▮▮▮▮▮ on July 17 and July 15, respectively.

Declaration, pp. 22-23 (Doc. 474).

At the February 4, 2019 hearing, based on this allegation, the Special Counsel represented that "in 2016 there is an in-person meeting with someone who the Government has certainly proffered to the Court in the past, is understood by the FBI, assessed to be – have a relationship with Russian intelligence, that there is American polling data being shared" and that this issue goes "very much to the heart of what the Special Counsel's Office is investigating." Transcript of Hearing on February 4, 2019, at 67-68.

Thus, the importance of the referenced email and the attachment to the Court's ruling is clear and cannot be overstated. Indeed, when discussing Mr. Gates's testimony, given the serious questions about his credibility, the Court stated:

> More important to me, there's other corroboration. There's Exhibit 233, an August 2nd email to Gates directing him to bring the internal polling data to a meeting that day. Now, I was told on February 8th, for the first time, in the third pleading that was filed in response to the allegations and after the hearing was over, that when Mr. Manafort said bring it to the SCh meeting, that that's shorthand for a scheduling meeting, as opposed to possibly a scheduled meeting, and it meant a scheduling meeting with campaign staff. There's nothing provided to substantiate that, but there's also nothing in the record to indicate one way or the other that the two men had met previously that date at a scheduling meeting.
>
> All Gates said to the FBI in Exhibit 236 on January 30th was that he was invited to the Kilimnik meeting by a text or email. Is that text alone definitive?

---

development of this new information, particularly given the Special Counsel's addition to the record as late as *February 12, 2019* (*i.e.,* before the Court's ruling) in an effort to support its theory.

>Am I relying on that solely?  No.  But is it corroborative of Gates's statement that internal polling data was shared at the meeting?  Yes.

Transcript of the Court's February 13, 2018 Ruling, at 34.

As is clear from the statement above, the Court relied on the Special Counsel's argument that the August 2, 2016 email from Mr. Manafort to Mr. Gates, with polling data attached, instructing Mr. Gates to print that data in connection with a "SCh meeting," was related to the meeting with Mr. Kilimnik later that day.  Indeed, the Court focused on the importance of that data in response to the defense argument that that data was not easily understood.  *Id.* at 35.[2]

Based upon the recent filing, we now know that the Special Counsel's argument on this point—that the approximately 79 pages of polling information attached to the August 2nd email (Gov. Ex. 233) was provided to Mr. Kilimnik at the August 2, 2016 meeting—is not supported by the evidence.  In fact, the 79 pages of polling information was printed in preparation for a campaign scheduling meeting and did not relate to the later meeting with Mr. Kilimnik.  *See* Supplemental Memorandum at 1-2.[3]  In light of this new information, Mr. Manafort asks the Court to reconsider its prior ruling that Mr. Manafort lied when stating that he did not tell Mr. Gates to share internal polling data with Mr. Kilimnik during the 2016 Presidential Campaign.

---

[2] The Court also stated "And here they're at a meeting where they specifically talked about battleground states, the voters they wanted to appeal to there.  And they're talking about trends and the word "trend" is all over the data.  So that's not a very strong argument."  Transcript of the Court's February 13, 2019 Ruling, at 36.

[3] The 79-page document has become a focal point of press coverage and it is of central importance to the Special Counsel's claim that Mr. Manafort was untruthful.  *See, e.g.,* Philip Bump, "*Here's the sort of information that could have been in polling data shared by Paul Manafort*," Washington Post, February 26, 2019 available at https://www.washingtonpost.com/politics/2019/02/26/heres-sort-information-that-could-have-been-polling-data-shared-by-paul-manafort/?utm_term=.33fa8d4d2a27 and Kristen Soltis Anderson, *"In the Manafort case's 'Exhibit 233,' a page count has never been so fascinating,"* Washington Examiner, February 26, 2019 available at https://www.washingtonexaminer.com/opinion/columnists/in-the-paul-manafort-cases-exhibit-233-a-page-count-has-never-been-so-fascinating.

2. <u>**Argument**</u>

Contrary to the Special Counsel's contention that there is still sufficient evidence in the record to support the Court's determination that Mr. Manafort lied about sharing internal polling data, the Special Counsel's recent revelation fundamentally changes the state of the evidence. In evaluating the evidence as it now stands, it is important to consider what Mr. Manafort said about internal polling data.

First, in an interview of September 11, 2018, Mr. Manafort discussed the August 2, 2016 meeting with Mr. Kilimnik and said that he told Mr. Kilimnik about the state of the campaign and his plan to win it, including polling data and messaging. Mr. Manafort also said that he did not share information with Mr. Kilimnik that he did not otherwise share publicly.[4]

Second, during his grand jury appearance, Mr. Manafort gave the following testimony in response to Mr. Weissmann's questions:



---

[4] *See* Gov. Ex. 101, p. 5, ¶ 2.





Now, for the first time, the Court and the defense are advised that on February 15, 2019, the Special Counsel re-interviewed Mr. Gates and he clarified his prior testimony. Mr. Gates stated that the material in Gov. Ex. 233 was printed for a campaign scheduling meeting on August 2nd and was **not** related to the meeting with Mr. Kilimnik.[5] This statement is, in fact, consistent with the Mr. Manafort's position at the hearing and fails to support the Special Counsel's argument. Moreover, the Special Counsel has now acknowledged that it was in possession of calendar entries, attached to its pleading, that establish that a scheduling meeting was calendared for August 2, 2016. *See* Supplemental Memorandum, at 2 & Exhibit C. Apparently, the Special Counsel did not review those calendar entries prior to challenging Mr. Manafort's explanation of the August 2, 2016 email. Even more troubling is the fact that Special Counsel did not question Mr. Gates about this issue prior to determining that Mr. Manafort lied, filing the breach motion, or making arguments to this Court.[6]

Mr. Gates also stated that while he sent internal polling data to Mr. Kilimnik, he sent "top line" data that "was a cut and paste from summary sheets ▮▮▮▮ created based on his internal polling data and not the entire data set including cross tabs. By sending the top lines, [he] sent Kilimnik an "executive summary" of the ▮▮▮▮ data."[7]

Importantly, when the additional information provided by Mr. Gates is combined with his prior statements and compared with Mr. Manafort's statements in the grand jury, there is little

---

[5] *See* Gates 302, February 15, 2019, at 1.

[6] This failure is even more striking given that the Special Counsel interviewed Mr. Gates about this topic on September 27, 2018, during the same period when it was conducting a series of interviews of Mr. Manafort. *See* Gates 302, September 27, 2018 (Gov. Ex. 223).

[7] *Id.*

difference between their accounts. First, in recounting the August 2, 2016 meeting, Mr. Gates stated in prior interviews that Mr. Manafort and Mr. Kilimnik also talked about polling data as well as trends related to the campaign and the battleground states and said the information that Mr. Manafort discussed with Mr. Kilimnik was "not secret."[8] Second, Mr. Manafort's grand jury testimony specifically says ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[9] Third, in his earlier interview, Mr. Manafort says that he discussed polls, but that the information provided was similar to what he would talk about publicly.[10]

The Special Counsel's key piece of evidence—the one that provided the linchpin to its otherwise unfounded theory—is the claim that the polling data (Gov. Ex. 233) was provided to Mr. Kilimnik at the August 2 meeting. We now know that did not happen.

Indeed, Mr. Gates's February 15, 2019 interview makes clear, for the first time, that when he used the term internal polling data he was talking about ▮▮▮▮-sourced "top line" information.[11] Topline information is "the result of how the aggregated sample answered a specific question."[12] Thus, topline information would tell someone whether voters preferred one candidate over another based upon the aggregated sample.[13] Importantly, Mr. Gates specifically denies

---

[8] Gov. Ex. 236, at 5.

[9] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[10] *See* Gov. Ex. 101, p. 5 ¶2.

[11] *See* Gates 302, February 15, 2019, at 1.

[12] *See* Definition of Topline information, Glossary of Terms, Cornell University Roper Center for Public Opinion Research, available at: https://ropercenter.cornell.edu/quick-answers/glossary-terms

[13] For example, Question - What candidate do you support? Candidate A: 30%; Candidate B: 50%; Undecided: 20%.

providing more detailed cross tab information,[14] which is "[a] table which shows the influence of an independent variable (located in the column) on a dependent variable (located in the row.)(e.g. a graph showing how income influences the likelihood of voting for a certain candidate)."[15]

While Mr. Gates says more detailed polling data was discussed at the August 2, 2016 meeting, which was a synthesis that included internal polling data, he clearly states that the printed data (Gov. Ex. 233) was not provided at that meeting and, perhaps even more significantly, that the document was not polling data as viewed in campaign terms.[16]

The Special Counsel's Office, in an effort to create a "smoking gun," apparently failed to fully and carefully interview Mr. Gates, choosing instead to develop a theory and run with it, rather than confirming it with their main cooperating witness. This is particularly surprising given the expectation that Mr. Gates would be vigorously challenged as a source of information. Moreover, the Special Counsel did not review (or ignored) calendar entries that were inconsistent with its theory.

Now, the Special Counsel, after convincing the Court to adopt and rely on its theory that Gov. Ex. 233 was provided to Mr. Kilimnik, in essence says that this monumental change in the evidence does not undermine the Court's ruling. In finding Mr. Manafort made intentional false statements about his interaction with Mr. Kilimnik, the Court specifically cited "the sharing of polling data," "in particular." *See* Transcript of the Court's February 13, 2018 Ruling, at 40. Because this new information changes the balance of the evidence on the most significant finding

---

[14] *See* Gates 302, February 15, 2019, at 1.

[15] *See* Definition of Topline information, Glossary of Terms, Cornell University Roper Center for Public Opinion Research, available at: https://ropercenter.cornell.edu/quick-answers/glossary-terms

[16] *See* Gates 302, February 15, 2019, at 2.

9

made by the Court – one which the Court said is "at the undisputed core of the Office of Special Counsel's investigation" – Mr. Manafort asks the Court to reconsider its prior ruling and find that the Special Counsel has failed to carry its burden of proving that the defendant made false statements about sharing internal polling data.

Dated: March 1, 2019                                     Respectfully submitted,

                                                              /s/
Kevin M. Downing
(D.C. Bar No. 1013984)
Law Office of Kevin M. Downing
601 New Jersey Avenue NW, Suite 620
Washington, DC 20001
(202) 754-1992
kevindowning@kdowninglaw.com

                                                              /s/
Thomas E. Zehnle
(D.C. Bar No. 415556)
Law Office of Thomas E. Zehnle
601 New Jersey Avenue NW, Suite 620
Washington, DC 20001
(202) 368-4668
tezehnle@gmail.com

                                                              /s/
Richard W. Westling
(D.C. Bar No. 990496)
Epstein Becker & Green, P.C.
1227 25th Street, N.W.
Washington, DC 20037
Tel: 202-861-1868
Fax: 202-296-2882
Email: rwestling@ebglaw.com

*Counsel for Defendant Paul J. Manafort, Jr.*